# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF
WASHINGTON; STATE OF RHODE ISLAND;
STATE OF ARIZONA; STATE OF CALIFORNIA;
STATE OF COLORADO; STATE OF
CONNECTICUT; DISTRICT OF COLUMBIA;
STATE OF HAWAI'I; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF MARYLAND;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA; STATE OF
NEW JERSEY; STATE OF NEW MEXICO;
STATE OF OREGON; STATE OF VERMONT;
STATE OF WISCONSIN,

      Plaintiffs,

      v.

U.S. DEPARTMENT OF JUSTICE; PAMELA
BONDI, in her official capacity as ATTORNEY
GENERAL OF THE UNITED STATES; U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; ROBERT F. KENNEDY, JR., in his
official capacity as SECRETARY OF THE U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; U.S. DEPARTMENT OF
EDUCATION; LINDA McMAHON, in her official
capacity as SECRETARY OF THE U.S.
DEPARTMENT OF EDUCATION; U.S.
DEPARTMENT OF LABOR; LORI CHAVEZ-
DeREMER, in her official capacity as
SECRETARY OF THE. US. DEPARTMENT OF
LABOR,

      Defendants.

Case No. 1:25-cv-00345_____

**PLAINTIFF STATES' MOTION
FOR A PRELIMINARY
INJUNCTION**

**REQUEST FOR EMERGENCY
RELIEF**

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ........................................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................................... 1

BACKGROUND ............................................................................................................................. 4

   I.    PRWORA ............................................................................................................................ 4

   II.   Longstanding Interpretations of PRWORA ........................................................................ 6

   III.  Defendants' July 2025 PRWORA Notices ........................................................................ 8

   IV.  The Critical Programs Threatened by the Notices .......................................................... 11

     A.    HHS PRWORA Notice ............................................................................................ 14

       1.    Title X Family Planning Program ....................................................................... 14

       2.    Head Start ............................................................................................................. 16

       3.    Community Service Block Grant ........................................................................... 18

       4.    Health Center Program ........................................................................................ 19

       5.    Substance Use, Prevention, Treatment, and Recovery Services Block Grant .......... 21

       6.    Community Mental Health Services Block Grant .................................................. 22

       7.    Projects for Assistance in Transition from Homelessness Grant Program .............. 23

       8.    Certified Community Behavioral Health Clinics ................................................... 24

       9.    Title IV-E Programs ............................................................................................. 25

       10.    Other Programs ................................................................................................. 27

     B.    ED PRWORA Notice ............................................................................................... 30

       1.    WIOA II ............................................................................................................... 30

       2.    Perkins V .............................................................................................................. 32

     C.    DOL PRWORA Notice ............................................................................................ 34

       3.    WIOA Title I ........................................................................................................ 34

       4.    Wagner-Peyser ES (WIOA Title III) .................................................................... 35

       5.    Other DOL Programs ............................................................................................ 36

     D.    DOJ Notice ............................................................................................................... 36

ARGUMENT ................................................................................................................................. 38

   I.    Plaintiffs Are Likely to Succeed on the Merits. ............................................................... 38

     A.    The PRWORA Notices are Final Agency Action. ................................................... 39

     B.    The HHS, ED, and DOL PRWORA Notices Were Unlawfully Promulgated Without Following the APA's Procedural Requirements. ........................................................ 40

i

C.    Plaintiffs Are Likely to Succeed on the Merits of their Claims that the PRWORA Notices Are Arbitrary and Capricious. ....................................................................... 44

D.    Plaintiffs Are Likely to Succeed on the Merits of their Claim that the HHS, ED, and DOL PRWORA Notices Are Contrary to Law. ....................................................................... 51

    1.    The HHS PRWORA Notice Is Contrary to Law. ....................................................... 52

    2.    The ED PRWORA Notice Is Contrary to Law. ......................................................... 65

    3.    The DOL PRWORA Notice Is Contrary to Law. ....................................................... 69

E.    Plaintiffs Are Likely To Succeed On Their Claims That The PRWORA Notices Violate The Spending Clause. ............................................................................................ 71

    1.    The PRWORA Notices Impose Impermissibly Retroactive Conditions. ................. 72

    2.    The PRWORA Notices Are Impermissibly Coercive. .............................................. 74

II.    Plaintiffs Face Irreparable Harm Absent Temporary Relief. ............................................ 77

III.    The Balance of the Equities and the Public Interest Favor a Preliminary Injunction. ....... 80

CONCLUSION ........................................................................................................................ 82

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*,
　522 U.S. 359 (1998)...........................................................................................49

*Amerijet Int'l, Inc. v. Pistole*,
　753 F.3d 1343 (D.C. Cir. 2014)........................................................................44

*Animal Welfare Inst. v. Martin*,
　588 F. Supp. 2d 70 (D. Me. 2008).....................................................................77

*Appalachian Power Co. v. EPA*,
　208 F.3d 1015 (D.C. Cir. 2000).........................................................................43

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
　548 U.S. 291 (2006)..........................................2, 51-52, 56, 59, 67, 71, 74

*Bennett v. Spear*,
　520 U.S. 154 (1997)...........................................................................................39

*Bond v. United States*,
　572 U.S. 844 (2014)...........................................................................................56

*California v. McMahon*,
　No. 25 Civ. 329 (D.R.I.) ...................................................................................31

*California v. Trump*,
　No. 25-cv-10810, 2025 WL 1667949 (D. Mass. June 13, 2025).................78, 80

*Chrysler Corp. v. Brown*,
　441 U.S. 281 (1979).......................................................................................40-41

*Circuit City Stores, Inc. v. Adams*,
　532 U.S. 105 (2001)...........................................................................................57

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
　408 F. Supp. 3d 1057 (N.D. Cal. 2019) ............................................................47

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)................................................................48

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  591 U.S. 1 (2020)..................................................... 44-45, 49

*Dorse v. United States*,
  567 U.S. 260 (2012)..............................................................63

*Esteras v. United States*,
  145 S. Ct. 2031 (2025)..........................................................57

*Facebook, Inc. v. Duguid*,
  592 U.S. 395 (2021)..............................................................54

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
  592 U.S. 414 (2021)........................................................44, 49

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. 204 (2024)..............................................................70

*Humane Soc'y of the United States v. United States Dep't of Agric.*,
  41 F.4th 564 (D.C. Cir. 2022)...............................................40

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*,
  925 F.2d 6 (1st Cir. 1991)......................................................82

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005)..............................................................73

*K-Mart Corp. v. Oriental Plaza, Inc.*,
  875 F.2d 907 (1st Cir. 1989)..................................................77

*Kholi v. Wall*,
  582 F.3d 147 (1st Cir. 2009)..................................................54

*Kloeckner v. Solis*,
  568 U.S. 41 (2012)................................................................67

*La Casa Del Convaleciente v. Sullivan*,
  965 F.2d 1175 (1st Cir. 1992)...........................................40, 43

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)...................................................81

*Liteky v. United States*,
  510 U.S. 540 (1994)..................................................................................58

*Lockhart v. United States*,
  546 U.S. 142 (2005) (Scalia, J., concurring) ........................................63

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024)..............................................42, 45, 51, 55, 66

*Maine v. United States Dep't of Agriculture*,
  No. 25-cv-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025)............................82

*Marcello v. Bonds*,
  349 U.S. 302 (1955)..................................................................................63

*Massachusetts v. Nat'l Institutes of Health*,
  770 F. Supp. 3d 277 (D. Mass. 2025) ....................................41, 48, 50

*Michigan v. E.P.A.*,
  576 U.S. 743 (2015)..........................................................................44, 49

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)............................................................................44, 47

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  763 F. Supp. 3d 36 (D.D.C. Feb. 3, 2025) ........................................46, 82

*Nat'l Educ. Ass'n v. United States Dep't of Educ.*,
  25-CV-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ..............................42

*Nat'l Family Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*,
  979 F.2d 227 (D.C. Cir. 1992) ................................................................41

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) (plurality opinion) .............................. 72, 74-77

*New Hampshire Hosp. Ass'n v. Azar*,
  887 F.3d 62 (1st Cir. 2018)....................................40-41, 43-44

*New York v. Trump*,
  769 F. Supp (D.R.I. 2025)........................................................................49

*New York v. U.S. Dep't of Health & Human Servs.*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019)................................................72, 75

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................38, 81

*Noerand v DeVos*,
474 F. Supp. 3d 394 (D. Mass. 2020) ........................................ 63-64

*Oakley v. DeVos*,
No. 20-cv-03215-YG, 202 WL 3268661 (N.D. Cal. June 17, 2020)......................63

*P.J.E.S. v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020) ..............................................82

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)................................................................ 3, 72-74

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015)..............................................................40

*Plyler v. Doe*
(457 U.S. 202) (1982) .........................................................5, 67

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)............................................................63

*Rhode Island v. Trump*,
No. 1:25-cv-128, 2025 WL 1303868 (D.R.I. May 6, 2025).................. 39, 44, 81-82

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996).....................................................77

*Shalala v. Guernsey Mem'l Hosp.*,
514 U.S. 87 (1995)..............................................................42

*South Dakota v. Dole*,
483 U.S. 203 (1987).............................................................71

*State v. Becerra*,
544 F. Supp. 3d 1241 (M.D. Fla. 2021).........................................43

*Texas v. Becerra*,
577 F. Supp. 3d 527 (N.D. Tex. 2021) .........................................43

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
121 F.4th 339 (1st Cir. 2024)..................................................38

*United States v. Jicarilla Apache Nation,*
564 U.S. 162 (2011)..............................................................58

*United States v. Morrison,*
529 U.S. 598 (2000)..............................................................76

*Warder v. Shalala,*
149 F.3d 73 (1st Cir. 1998)............................................41-42

*Washington v. Trump,*
No. 25-cv-00244, 2025 WL 659057 (W.D. Wash. Feb. 28, 2025)........................82

*Water Quality Ins. Syndicate v. United States,*
225 F. Supp. 3d 41 (D.D.C. 2016)................................................48

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008)..............................................................77

**Constitutions**

U.S. Const.
art. I, § 8, cl. 1 ..............................................................71

**Federal Statutes**

5 U.S.C.
§ 553..............................................................40
§ 704..............................................................39
§ 705..............................................................4
§ 706..............................................................44
§ 804..............................................................43

8 U.S.C.
§ 1601..............................................................54
§ 1611..............................................................*passim*
§ 1615..............................................................8, 59
§ 1621..............................................................67
§ 1642..............................................................*passim*
§ 1643..............................................................5, 57, 66-67

10 U.S.C.
§ 1070e..............................................................64

20 U.S.C.

    § 1070e ............................................................................................................63

    § 2301 ....................................................................................................32, 68

    § 2302 ............................................................................................................68

    § 2342 ............................................................................................................68

29 U.S.C.

    § 3271 ....................................................................................................30, 67

42 U.S.C.

    § 254b ................................................................................19, 53, 61, 64

    § 290cc-22 ...................................................................................................23

    § 300 ............................................................................................................14

    § 300x ..........................................................................................................22

    § 300x-1 ................................................................................................ 61-62

    § 300x-21 .....................................................................................................21

    § 673 ............................................................................................................56

    § 677 ............................................................................................................56

    § 9831 ....................................................................................................16, 59

    § 9840 .................................................................................................... 64-65

    § 9901 ..........................................................................................................62

    § 9906 ..........................................................................................................18

**Federal Regulations**

Dep't of Justice, Specification of Community Programs Necessary for Protection of Life
    or Safety Under Welfare Reform Legislation, 61 Fed. Reg. 45,985 (Aug. 30, 1996) ..... *passim*

Dep't of Justice, Interim Guidance on Verification of Citizenship, Qualified Alien Status
    and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity
    Reconciliation Act of 1996, 62 Fed. Reg. at 61,346 (Nov. 17, 1997) .................. 55, 60-61, 71

Dep't of Health and Human Servs., Personal Responsibility and Work Opportunity
    Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit,"
    63 Fed. Reg. at 41,658 (Aug. 4, 1998) ............................................................. 7, 60-62, 66, 72

Dep't of Justice, Establishing an Immigration and Naturalization Service Data
    Management Improvement Act Task Force, 66 Fed. Reg. 3,616 (Jan. 16, 2001) ........... 6-7, 52

Dep't of Education, Eligibility to Receive Emergency Financial Aid Grants to Students
    Under the Higher Education Emergency Relief Programs, 86 Fed. Reg. 26,608 (May
    14, 2021) .........................................................................................................................63

Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (Feb. 19, 2025) .....................................................8

Dep't of Agriculture, Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit," 90 Fed. Reg. 30,621 (July 10, 2025) ....................................................................................................................8

Dep't of Education, Clarification of Federal Public Benefits Under the Personal Responsibility and Work Opportunity Reconciliation Act, 90 Fed. Reg. 30,896 (July 11, 2025) ............................................................................................................... *passim*

Dep't of Health and Human Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit," 90 Fed. Reg. 31,232 (July 14, 2025)............................................................................. *passim*

Dep't of Justice, Revised Specification Pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 90 Fed. Reg. 32,023 (July 16, 2025)............ 9, 76-78

DOJ Joint Letter Regarding Immigrant Access to Housing and Services, August 5, 2016, available at https://www.fairhousingnc.org/wp-content/uploads/2016/08/HUD-HHS-DOJ-Letter-Regarding-Immigrant-Access-to-Housing-and-Services.pdf................................8

## State Regulations

Executive Order 14218 ................................................................................................................8

## Rules

Fed. R. Civ. P. 65 ....................................................................................................................82

## PRELIMINARY STATEMENT

For nearly three decades, and across five Presidential Administrations, the federal government followed a clear and consistent understanding of what the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) required. States[1] needed to verify a person's lawful status before allowing them to access certain federal programs—Medicaid and Temporary Assistance for Needy Families, for example. But federal agencies consistently informed States that PRWORA did not require them to check papers before allowing individuals to access other, vital community programs, many of which have always been open to all. The hungry have never needed to produce government identification to enter a soup kitchen or food bank; parents have never needed to produce their children's citizenship or immigration records before enrolling them in Head Start; those suffering from substance abuse disorders have never needed to bring their passports to a rehabilitation clinic; people facing homelessness or domestic violence have never needed proof of immigration status to walk into a shelter. These rules—set forth in clear, authoritative agency pronouncements unchanged for decades—shaped the way social services programs in every State operated. And they set the terms of the bargain under which States accepted billions of dollars of federal funding each year.

Less than two weeks ago, the Administration upended this stable equilibrium. In swift succession, four agencies explicitly repudiated the understanding of PRWORA that had governed since its inception. The Department of Justice (DOJ) revoked exemptions that had been in place since the very day after PRWORA was enacted, suddenly demanding that States screen individuals for lawful status before allowing them to access domestic violence shelters, senior nutrition

_____

[1] The term States includes the States and their subdivisions and instrumentalities.

programs, crisis counseling centers, soup kitchens, and myriad other services. The Department of Health and Human Services (HHS) overturned its settled views since 1998 and identified 13 new programs, from Title X to Head Start to the Health Center Program, that it newly deemed subject to PRWORA's requirements. And the Department of Education (ED) and the Department of Labor (DOL) reversed their prior understandings of PRWORA to place a bevy of education and workforce training programs within the statute's ambit. HHS, ED, and DOL made their new positions effectively immediately, while DOJ gave States just thirty days—until August 15—to bring their programs into alignment.

Chaos has predictably followed. Almost overnight, States and their subgrantees face the threat of enforcement if they do not dramatically restructure crucial components of their social safety nets to comply with Defendants' new dictates. The new rules put States to the impossible choice between shutting their doors or risking an immediate cutoff in federal funding. Many programs cannot realistically conduct verification at the door, such as 24/7 crisis hotlines, emergency services for individuals suffering an overdose, and homeless shelters. Even if some programs could implement such verification with time and resources, vulnerable people lack government identification when accessing these services for myriad reasons, even where they are lawfully present in the country. For the first time, millions of U.S. citizens and lawful residents are facing a new demand before they can access the Nation's most vital programs: "show me your papers."

This is not America, and it is not the law. Congress enacted PRWORA pursuant to the Constitution's Spending Clause. To impose conditions using that power, Congress must speak "unambiguously" and place officials on "fair notice" of what the law requires. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296, 304 (2006). It is farcical to suggest that, for 29

years, PRWORA has "unambiguously" meant the opposite of what every federal agency has said it does. And on issue after issue, the Administration's new interpretation of the statute is indefensible. PRWORA extends to "postsecondary education" benefits; Defendants now say it covers early childhood and secondary education benefits, too. PRWORA applies to programs with "eligibility units"; Defendants now say it extends to programs with no eligibility requirements at all. PRWORA governs access to "benefits"; Defendants now claim it applies to "programs" in their entirety, even where many of their benefits fall outside the statute. These new interpretations are not "unambiguously" correct; they are quite simply wrong.

The Constitution itself also forbids Defendants' effort to reimagine PRWORA. Plaintiff States accepted federal funding for dozens of programs against the backdrop of Defendants' settled interpretation of this statute. The Spending Clause does not permit Defendants to dramatically change that bargain and "surpris[e]" the States with "postacceptance," "retroactive" conditions in the middle of their grant terms. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). Nor may Defendants coerce states to transform their social safety nets—including in areas of traditional state power—or else face the loss of billions of dollars in vital federal funding.

Three of the notices are also inconsistent with the requirements of the Administrative Procedure Act. HHS, ED, and DOL failed to follow the requisite notice-and-comment procedures before announcing major, substantive changes to the way they implement PRWORA. Their explanations also lack the basic elements of reasoned decisionmaking: Defendants did not consider the massive reliance that had built up around their settled interpretations, nor even explain why they deemed many programs newly within PRWORA's scope. Finally, they are contrary to law in numerous respects.

In short, Plaintiff States' likelihood of success is clear. And the other requirements for preliminary injunctive relief are easily satisfied as well. The States will suffer continued, irreparable harm if forced to dramatically restructure their social safety nets and render them inaccessible to countless eligible individuals. And the public's interest lies in restoring the understanding of PRWORA that has prevailed since its enactment—not in allowing the Administration to transform the statute, and our country, into something unrecognizable. The States are thus entitled to a preliminary injunction and a stay under 5 U.S.C. § 705.

## BACKGROUND

### I.   PRWORA

Congress enacted PRWORA in 1996 as part of an overhaul of the federal welfare system. *See* Pub. L. No. 104-193 (Aug. 22, 1996). Title IV of PRWORA—the title relevant here—governs the eligibility of noncitizens for Federal, State, and local public benefits. *See* 8 U.S.C. §§ 1601-1646. Section 1611 provides that "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit," subject to certain exceptions. *Id.* § 1611(a)-(b). Section 1621 similarly provides that a noncitizen is generally not "eligible for any State or local public benefit," subject to parallel exceptions or unless a State affirmatively provides otherwise. *Id.* § 1621(a), (d). A "qualified alien" is defined to include noncitizens with certain forms of lawful status, such as individuals who are lawfully admitted for permanent residence or have been granted asylum. *Id.* § 1642(d). Many noncitizens who are lawfully present in the United States do not fall within the definition of "qualified alien," including foreign students, temporary agricultural workers, and exchange visitors. *See id.*

The definition of "Federal public benefit" is critical to the scope of this statute. Section 1611(c)(1) defines this term to include two categories of benefits. First, section 1611(c)(1)(A) defines the term to include "any grant, contract, loan, professional license, or commercial license

provided by an agency of the United States or by appropriated funds of the United States." Second, section 1611(c)(1)(B) further provides that "Federal public benefit[s]" include "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States."

Not every form of payment or assistance the Federal government provides constitutes a "Federal public benefit." Section 1611(c)(1)(B) itself makes clear that this term reaches only the enumerated benefits and those "similar" to them. And since the very day after the statute's enactment, the Department of Justice has consistently taken the position that this definition does not reach "regular, widely available services," such as "police, fire, ambulance, transportation (including paratransit), [and] sanitation." 61 Fed. Reg. 45,985, 45,986 (Aug. 30, 1996). The statute also includes a rule of construction: "Nothing in this chapter may be construed as addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under *Plyler v. Doe* (457 U.S. 202) (1982)." 8 U.S.C. § 1643(a)(2).

PRWORA also includes provisions exempting certain "Federal public benefits" from its scope. *Id.* § 1611(b)(1). These exemptions include specific items, such as emergency medical care and short-term, in-kind emergency disaster relief. *Id.* § 1611(b)(1)(A-B). And they include a general authorization for the Attorney General, in her "sole and unreviewable discretion," to add exemptions for programs, services, and assistance that (i) "deliver in-kind services at the community level, (ii) do not condition the provision of assistance on the individual recipient's income or resources, and (iii) are necessary for the protection of life or safety." *Id.* § 1611(b)(1)(D) (the "Life/Safety Exemption").

PRWORA requires States to adopt systems for verifying the eligibility of applicants for Federal public benefits. In particular, section 1642 provides that the Attorney General must "promulgate regulations requiring verification that a person applying for a Federal public benefit . . . is a qualified alien and is eligible to receive such benefit." *Id.* § 1642(a)(1). Any State that "administers a program that provides a Federal public benefit" must "have in effect a verification system that complies with the regulations." *Id.* § 1642(b). But any "nonprofit charitable organization, in providing any Federal public benefit . . . is *not* required . . . to determine, verify, or otherwise require proof of eligibility of any applicant for such benefits." *Id.* § 1642(d) (emphasis added).

## II.     Longstanding Interpretations of PRWORA

Federal agencies have issued notices interpreting PRWORA since almost immediately after its enactment. DOJ was the first agency to do so. As noted, it issued a regulation just one day after the statute's enactment that construed the statute not to apply to "widely available services." 61 Fed. Reg. at 45,985. In addition, this notice exercised the Attorney General's discretionary authority under the Life/Safety Exemption, 8 U.S.C. §§ 1611(b)(1)(D), 1621(b)(4), to exempt a broad swath of services from the scope of PRWORA, including services for domestic violence or crime victims, short-term homeless shelters, soup kitchens, medical and public health services, and activities designed to protect the life and safety of children and youths. 61 Fed. Reg. 45,985 (Aug. 30, 1996). These categories remained unchanged for the following 29 years, including after a 2001 order reaffirmed the same categories. 66 Fed. Reg. 3,613 (Jan. 16, 2001) ("2001 Final Order").

ED and HHS issued notices interpreting PRWORA in 1997 and 1998, respectively. In 1997, ED issued a Dear Colleague Letter interpreting the statute not to cover "assistance provided under federally funded preschool, elementary and secondary education programs" because the statutory

definition of Federal public benefits is limited to "postsecondary education" benefits. Dep't of Educ., Dear Colleague Letter 2, 4-5 (Nov. 19, 1997), Ex. 6 ("ED DCL").[2] In 1998, HHS issued a notice that contained several clarifications about PRWORA's scope. Among other things, it explained that the statute did not reach non-postsecondary education programs, like Head Start, because the definition of Federal public benefits is limited to "postsecondary education." 63 Fed. Reg. 41,658, 41,659 (Aug. 4, 1998). It found that the statute does not cover programs that lack eligibility criteria, because—among other reasons—the definition of Federal public benefits in section 1611(c)(1)(B) requires the existence of an "eligibility unit." *Id.* at 41,660. And it said that block grants to States are not automatically included in the definition of Federal public benefits because they do not provide benefits to individuals. *Id.* at 41,659. On the basis of these and other interpretive principles, the notice listed 31 programs that HHS deemed to provide Federal public benefits, but it noted that not all benefits and services provided by these programs fell within the statutory definition and required verification. *Id.* at 41,660.

These interpretations of the statute remained in place for almost three decades. During this time, many federal agencies have relied on the 2001 Final Order or the 1996 interim guidance to designate their own programs as exempt from PRWORA under the Life/Safety Exemption. *See infra* 36-38. These include, for example, domestic violence shelters under HHS's Family Violence Prevention and Services Act (FVPSA); HUD's Emergency Solutions Grants and Continuum of Care programs for rapid rehousing, transitional housing, and homeless outreach; and HHS's Substance Abuse Prevention and Treatment Block Grant and Community Mental Health Services

---

[2] All cited exhibits are attached to the Declaration of Jessica Ranucci.

Block Grant that fund crisis stabilization services, medication-assisted treatment for opioid addiction, and mental health support in schools.[3]

The Department of Labor (DOL) issued its last interpretation of PRWORA in February 2024. *See* "Training and Employment Guidance Letter No. 10-23" (the "2024 DOL Guidance"), Ex. 7. That guidance explained that "[m]any, but not all, services authorized" by workforce training programs fell outside of the scope of PRWORA. *Id.* at 5. In particular, the guidance explained that services that entail a "direct financial benefit" or "post-secondary education and training" constitute Federal public benefits, but that services that provide non-postsecondary education, information and referrals, or assistance in completing paperwork do not. *Id.* at 5-7.

### III. Defendants' July 2025 PRWORA Notices

In the past two weeks, the landscape governing PRWORA changed dramatically. Between July 10 and 16, several federal agencies—including all four federal Agency Defendants—issued notices setting forth brand new positions on the scope of PRWORA (together, the "PRWORA Notices").[4] These notices implemented Executive Order 14218, which directed agencies to take action to "align" their programs with the purpose and requirements of PRWORA. 90 Fed. Reg.

---

[3] *See* HUD, HHS, and DOJ Joint Letter Regarding Immigrant Access to Housing and Services, August 5, 2016, available at https://www.fairhousingnc.org/wp-content/uploads/2016/08/HUD-HHS-DOJ-Letter-Regarding-Immigrant-Access-to-Housing-and-Services.pdf; HHS, "Domestic Violence Factsheet," last revised August 22, 2012, available at https://www.hhs.gov/civil-rights/for-individuals/special-topics/national-origin/domestic-violence/index.html; Office of Special Needs Assistance Programs, "The Personal Responsibility and Work Opportunity Act of 1996 and HUD's Homeless Assistance Programs," August 16, 2016, available at https://files.hudexchange.info/resources/documents/PRWORA-Fact-Sheet.pdf?.

[4] In addition to the Agency Defendants named in this action, the United States Department of Agriculture (USDA) issued a PRWORA Notice on July 10, 2025. 90 Fed. Reg. 30,621 (July 10, 2025). Many USDA programs are subject to an independent statutory requirement to provide certain benefits programs to everyone regardless of citizenship, *see* 8 U.S.C. § 1615, which the Notice affirmed will "continue to apply where relevant." 90 Fed. Reg. at 30,622.

10,581. These notices were released with no warning or opportunity to comment. And they represent a sea change in the way PRWORA operates.

The Department of Justice's PRWORA Notice ("DOJ PRWORA Notice") revokes every one of the Life/Safety Exemptions that DOJ had in place since the statute was enacted 29 years earlier. 90 Fed. Reg. 32,023, 32,025 (July 16, 2025), Ex. 1. The Notice claims that agencies had "misunderstandings" about the scope of some of these exemptions, and some exemptions were not "necessary" to protect "aliens' immediate welfare." *Id.* at 32,025. The Notice further reasons that, even if noncitizens did rely on these programs, their reliance was outweighed by the interest in "reduc[ing] the incentive for aliens to illegally migrate to the United States." *Id.* The Notice is effective on August 15, 2025. *Id.* at 32,023.

The PRWORA Notice from the Department of Health and Human Services ("HHS PRWORA Notice") overturns all of the interpretations the agency had adopted in 1998 and deems 13 new programs subject to PRWORA "effective immediately." 90 Fed. Reg. 31,232, 31,238 (July 14, 2025), Ex. 2. First, the Notice claims that HHS's 1998 notice erred by reading PRWORA as limited to programs that contain eligibility criteria, reasoning that PRWORA's reference to "eligibility unit[s]" was meant only to limit the statute to programs with "discrete end-recipients." *Id.* at 31,234-35. Second, it argues that non-postsecondary education benefits—including Head Start—actually fall within the definition of "Federal public benefit"—even though section 1611(c)(1)(B) specifically lists only "*postsecondary* education . . . benefit[s]"—because all education benefits are "similar" to "welfare." *Id.* at 31,235-37 (emphasis added). Third, the Notice asserts that block grants to States automatically qualify as Federal public benefits because they are "grants." *Id.* at 31,233-34.

Having set forth these interpretations, the HHS PRWORA Notice identifies 13 new sets of programs as subject to PRWORA in their entirety (the "Newly Restricted HHS Programs"). With the exception of Head Start and (arguably) the Title X Family Planning Program, the Notice offers no explanation as to why it added any of these programs to the list and expressly refuses to consider any reliance interests in its longstanding interpretation or negative impacts of its novel interpretation on public health. *Id.* at 31,238. Further, the Notice states that its list is "not exhaustive" and that HHS may find "additional programs . . . to be Federal public benefits" in a future guidance. *Id.* at 31,237.

The Department of Education's PRWORA Notice ("ED PRWORA Notice") reverses the interpretation set forth in the Department's 1997 DCL and identifies two new programs as subject to PRWORA. 90 Fed. Reg. 30,896, 30,896 (July 11, 2025). Rather than reading the statute as covering only "postsecondary" education benefits as the agency always had before, the Notice pieces together multiple provisions of the statute to read it to cover: (1) all education benefits provided to adults ("postsecondary education benefits or otherwise"), and (2) all education benefits provided to children except "basic public education benefits." *Id.* at 30,899. Relying on this new interpretation, the Notice deems two programs that expressly include secondary education benefits—Title II of the Workforce Innovation and Opportunity Act of 2014 (WIOA II) and career and technical education programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006 ("Perkins V," and together, the "Newly Restricted ED Programs")—as Federal public benefits subject to PRWORA. *Id.* at 30,899-900.

The ED PRWORA Notice also adopts a broad understanding of the verification obligations of charitable nonprofit organizations. It acknowledges that, under 8 U.S.C. § 1642(d), non-profit organizations are not required to verify eligibility. *See* 90 Fed. Reg. at 30,900, Ex. 3. However, the

ED PRWORA Notice states that this "exemption . . . is narrowly crafted" and that "the Department does not interpret 8 U.S.C. § 1642(d) to relieve states or other governmental entities involved in the administration of 'Federal public benefits' from the requirements to ensure that all relevant programs are in compliance with PRWORA (even when some or all educational services are ultimately provided by a nonprofit charitable organization)." *Id*. ED has announced that "[i]n general, the Department does not have any plans to take enforcement actions against any grantee or subgrantee under PRWORA prior to August 9, 2025."[5]

Finally, the Department of Labor's PRWORA Notice ("DOL PRWORA Notice") reverses the interpretation set forth in the 2024 DOL Notice and identifies seven sets of programs as now subject to PRWORA. "Training and Employment Guidance Letter No. 10-23, Change 2" (the "DOL PRWORA Notice"), Ex. 4. Rather than distinguishing which services are covered based on the nature of the benefits provided, the Notice asserts without elaboration that "all participant-level services are considered 'federal public benefits' under PRWORA" because "their overall goal is to move participants into gainful employment." *Id.* at 2-3. The Notice states that recipient entities "must review and revise policies, documentation requirements, and procedures to align with this guidance." *Id.* at 1.

## IV.    The Critical Programs Threatened by the Notices

The PRWORA Notices inflict immediate and irreparable harm on the Plaintiff States. These Notices have deemed dozens of critically important State-operated programs newly subject to PRWORA. The programs listed in the HHS PRWORA Notice fund a wide range of services vital

---

[5] "Department of Education Ends Taxpayer Subsidization of Postsecondary Education for Illegal Aliens." July 10, 2025, available at https://www.ed.gov/about/news/press-release/us-department-of-education-ends-taxpayer-subsidization-of-postsecondary-education-illegal-aliens.

to protecting health and safety—they support health clinics (Title X, the Health Center Program, and the Certified Community Behavioral Health Clinics program), aid substance abuse prevention and treatment (Substance Use Prevention, Treatment and Recovery Support Block Grants and Community Mental Health Services Block Grants), educate and protect at-risk children (Head Start and Title IV-E), and help alleviate the causes and conditions of poverty (Community Service Block Grant and Projects for Transitions in Homelessness). The programs in the ED PRWORA Notice fund education and literacy for people 16 and older (WIOA II) and community and technical training for individuals at both the secondary and postsecondary level (Perkins V). The DOL PRWORA Notice newly designates a range of workforce-training programs subject to PRWORA. And the DOJ PRWORA Notice affects a sweeping set of programs long considered exempt from PRWORA's requirements, including emergency homeless shelters and services for victims of domestic violence.

Until two weeks ago, Plaintiff States did not screen participants in these programs for their immigration status. And as the States' declarations reveal, the effects of doing so in order to comply with the PRWORA Notices are and will continue to be devastating.[6] States will need to restructure their own programs and assume additional administrative costs to comply with Defendants' new verification regime. *See, e.g.*, WA-Kirschbaum Decl. ¶¶ 29-30 (Substance Use Block Grants); MD-Roth Decl. ¶ 29 (WIOA II); CO-Folks Decl. ¶¶ 9, 18-24 (DOL programs).[7] Many States expect

---

[6] All cited declarations are exhibits to the Declaration of Jessica Ranucci. Exhibit 9 to the Ranucci declaration contains a chart showing all exhibits with exhibit numbers.

[7] Even though the operators of many States' programs are nonprofits exempt from verifying citizenship, States are not, and it is unclear how Defendants intend to apply the verification requirement to States and how States could fulfill any verification obligation without requiring nonprofits to engage in verification. *See., e,g.*, NY-Heslin Decl. ¶ 47 (Title X); MI-Haywood Decl. ¶¶ 16-17 (CSBG); MD-Roth ¶ 31 (WIOA II).

the numbers of individuals enrolled in the programs to decline substantially, because the vulnerable individuals that they serve will often be unable to produce the requisite identification documents, even when they are citizens or have lawful status. *See, e.g.*, NY-Heslin Decl. ¶ 46 (Title X); CA-Jaime-Mileham Decl. ¶ 25 (Head Start); WA-Kirschbaum Decl. ¶ 28 (PATH). And the States may need to shutter some of their programs entirely because they lack the resources to screen for immigration or citizenship status, or because doing so is impossible or incompatible with the services being provided—such as serving the homeless or providing aid to people suffering overdoses. *See, e.g.*, IL-Wortmon Decl. ¶ 24 (Head Start); OR-Shore Decl. ¶¶ 13-16 (Title X); WA-Kirschbaum Decl. ¶ 29 (Substance Use Block Grants); CA-Kunins Decl. ¶¶ 9, 14 (Mental Health Services Block Grant); MD-Meister Decl. ¶ 8 (homeless shelters).

These Notices are thus causing the Plaintiff States a range of immediate and irreparable harms. They are causing here-and-now financial injury by requiring States to immediately incur the substantial expense of implementing and administering verification systems or else risk a cutoff in federal funding. They are eroding the States' own programs by requiring the States, as a condition of receiving federal funding, to implement a verification requirement that will drive away many beneficiaries and render some state programs fully inoperable. And they are inflicting sovereign injury by undermining community programs that the States have designed on the premise that they will be broadly accessible.

The paragraphs that follow describe each program in greater detail and explain how the PRWORA Notices will transform and undermine the way Plaintiff States administer them. This description is lengthy because the PRWORA Notices are so sweeping. But the key point is this: All of these programs are vitally important, and none can verify immigration status without

immediately causing severe harms to the States and the people the programs are designed to protect.

### A. HHS PRWORA Notice

#### 1. Title X Family Planning Program

The Title X Family Planning Program provides grants to fund family planning and primary care services. 42 U.S.C. § 300. These services are accessible to everyone, but they are particularly important for low-income people, young people, and individuals who lack insurance, reside in areas with provider shortages, or otherwise do not have access to care. *see* WA-Roberts Decl. ¶ 27; NY-Heslin Decl. ¶¶ 38, 44; IL-Masinter Decl. ¶ 5; MI-Lyon-Callo Decl. ¶ 6; WI-Standridge Decl. ¶ 18; MA-Boyle Decl. ¶ 22. Title X funds are awarded by States in lump sums to healthcare facilities to use in a variety of ways, including to support salaries, facilities, and medical supplies. WA-Roberts Decl. ¶ 28; NY-Heslin Decl. ¶¶ 39-41, 49; IL-Masinter Decl. ¶ 8; MA-Boyle Decl. ¶ 22. State health departments that receive Title X funds typically subgrant them to organizations and local and county health departments who provide services. WA-Roberts Decl. ¶ 31; NY-Heslin Decl. ¶ 42; IL-Masinter Decl. ¶ 7.

Title X serves as an essential family planning and primary care lifeline. In New York, for example, Title X funds ensure family clinics are available in 53 out of the State's 62 counties, bringing services to rural counties and an estimated 12% of people who reported having no other source of healthcare. NY-Heslin Decl. ¶¶ 43-44. In Washington, 28% of the 2024 budget for the State's Sexual and Reproductive Health Program came from Title X funds, which allowed the Program to serve over 84,700 clients. WA-Roberts Decl. ¶¶ 30, 32. That number includes contraceptive care provided to over 59,000 clients, which prevented about 16,140 unintended pregnancies, 7,600 unplanned births, 5,460 abortions, and 3,080 miscarriages following unintended pregnancies. WA-Roberts Decl. ¶ 32. Also in 2024, the Program provided over 122,000

STI tests and over 17,000 Pap and HPV tests, preventing infections, infertility, and cervical cancer. WA-Roberts Decl. ¶ 32.

Plaintiff States do not currently require Title X-funded programs to verify immigration status. WA-Roberts Decl. ¶ 36; NY-Heslin Decl. ¶ 46; IL-Masinter Decl. ¶ 12. But the HHS PRWORA Notice would change that, by requiring Title X clinics to check the citizenship or immigration status of every individual before providing them care. This process would demand significant time and resources, including on the part of the States themselves, and subject grantees to the risk of enforcement for noncompliance. NY-Heslin Decl. ¶ 51; WA-Roberts Decl. ¶ 37; MI-Lyon-Callo Decl. ¶ 7; NM-Gonzales Decl. ¶ 6; MA-Boyle Decl. ¶¶ 23-24. Oregon is considering withdrawing from the Title X program entirely rather than being charged with implementing the Notice, in part because state policies require that Oregon's reproductive health program offer services regardless of immigration status. OR-Shore Decl. ¶¶ 13-16.

Further, this new verification requirement will likely drive down participation in Title X programs. Title X clinics are used predominantly by low-income individuals, who disproportionately lack government identification; as a result, requiring verification is likely to prevent some people who are citizens or qualified noncitizens from accessing Title X services. NY-Heslin Decl. ¶ 46; IL-Masinter Decl. ¶ 15; MI-Lyon-Callo Decl. ¶ 9; WI-Standridge Decl. ¶ 21. This will mean that substantially fewer vulnerable people get essential care, NY-Heslin Decl. ¶ 46; IL-Masinter Decl. ¶ 14; WA-Roberts Decl. ¶ 39; MI-Lyon-Callo Decl. ¶ 10, and that fewer providers will be willing to join the program due to fear of legal exposure, IL-Masinter Decl. ¶ 16. Because Title X funding to States depends in part on the amount allocated to sub-grantee service providers, a reduction in Title X program participation will reduce the funding the States themselves receive. *Id.* ¶ 18. And it will have dire consequences for public health in Plaintiff States,

as people who would have gotten preventive health care like prenatal care, contraception, and STI testing will become sicker, and will be more likely to enter the healthcare system through emergency rooms. IL-Masinter Decl. ¶ 17; NY-Heslin Decl. ¶ 48; WA-Roberts Decl. ¶¶ 38-39; OR-Shore Decl. ¶ 17; WI-Standridge Decl. ¶ 22; MA-Boyle Decl. ¶ 23.

## 2. Head Start

Head Start provides billions of dollars in funding each year to support early childhood education for needy children. 42 U.S.C. § 9831; *see* CA-Jaime-Mileham Decl. ¶ 12; NY-Marton Decl. ¶¶ 9-10. Head Start is so important because it is so accessible. The only thing many families need to do to be eligible for Head Start is demonstrate that their family unit falls below a certain level of income; other families can establish eligibility by attesting to homelessness. NY-Marton Decl. ¶ 37. States receive Head Start funds both to administer the Head Start networks within their States and, in some cases, to subgrant to or operate Head Start centers; additional funds flow directly to Head Start providers. CA-Thurmond Decl. ¶ 60; IL-Wortmon Decl. ¶¶ 7, 10.

Head Start centers in Plaintiff States generally do not inquire about immigration status and immigration status has never been a criterion for Head Start eligibility. *See, e.g.*, CA-Thurmond Decl. ¶ 69; IL-Wortmon Decl. ¶ 15; NY-Marton Decl. ¶ 14. Because immigration status is far more complex to verify than income or homelessness, Head Start programs are not equipped to verify eligibility based on immigration status. CA-Jaime-Mileham Decl. ¶ 30; IL-Wortmon Decl. ¶ 24; NM-Lafferty Decl. ¶¶ 25, 31; NY-Marton Decl. ¶ 43; OR-Chatterjee Decl. ¶ 17. Doing so would require funding and staff training and would require Head Start centers to create entirely new procedures for documentation, staff training, and data management. CA-Jaime-Mileham Decl. ¶ 28; IL-Wortmon Decl. ¶ 23; OR-Chatterjee Decl. ¶ 36. But Head Start programs are small entities that operate on razor-thin margins. CA-Jaime-Mileham Decl. ¶ 31; IL-Wortmon Decl. ¶ 24; NM-Lafferty Decl. ¶ 31. There is no funding or practical capacity for these programs to create the

structures that would enable them to identify and exclude children based on citizenship and immigration status. CA-Jaime-Mileham Decl. ¶ 27; NY-Marton Decl. ¶ 43; ME-McCoy Decl. ¶ 5(a); OR-Chatterjee Decl. ¶ 17. Some likely cannot absorb the cost of this training and additional administrative burden; if Head Start programs cannot access funds unless they identify and exclude families based on immigration status, Head Start programs will risk closure. CA-Jaime-Mileham Decl. ¶ 24; DC-Matthews Decl. ¶ 21. "It is not an exaggeration to say the July 2025 HHS notice presents an existential program for some [Head Start] centers." IL-Wortmon Decl. ¶ 24; *see* NM-Lafferty Decl. ¶¶ 23, 32; NY-Marton Decl. ¶¶ 22-24.

Further, the HHS PRWORA Notice is contributing to a "chilling effect," where many families are likely to withdraw from or decline to enroll in Head Start centers, even though their children are citizens or have lawful status, because they are missing the requisite documentation or fear that providing documents will cause other family members to be targeted for immigration enforcement. CA-Jaime-Mileham Decl. ¶ 25; DC-Matthews Decl. ¶ 20; IL-Wortmon Decl. ¶ 20. NM-Lafferty Decl. ¶¶ 22, 25; ME-McCoy Decl. ¶ 5(d); OR-Chatterjee Decl. ¶ 14. For instance, it will be particularly difficult for persons experiencing homelessness—one of the program's key constituencies—to produce documentation. NM-Lafferty Decl. ¶ 27; ME-McCoy Decl. ¶ 5(b).

These decreases in enrollment will threaten the States' Head Start funding, since the program requires more than 97% of spots to be filled and require States to expend more resources on outreach. *See* CA-Thurmond Decl. ¶ 62; NM-Lafferty Decl. ¶ 29. It will also have ripple effects for Plaintiff States' educational systems, which are often interwoven with Head Start. *See* CA-Jaime-Mileham Decl. ¶ 31; DC-Matthews Decl. ¶¶ 21-22; ME-McCoy Decl. ¶ 5(c); NM-Lafferty Decl. ¶¶ 24, 30; OR-Chatterjee Decl. ¶ 33.

Communities at large will also suffer, as Head Start is a critical safety net for entire impoverished communities, and a significant employer. CA-Jaime-Mileham Decl. ¶ 24; DC-Matthews Decl. ¶ 21; IL-Wortman Decl. ¶ 26; NM-Lafferty Decl. ¶ 23; NY-Marton Decl. ¶ 18. In many communities, such as rural communities, there are few other options for early education, particularly for children with disabilities. CA-Thurmond Decl. ¶¶ 63-64; IL-Wortman Decl. ¶¶ 26-27. Parents will be unable to participate in or rejoin the workforce; children will be more likely to exhibit challenging behaviors in kindergarten and will likely struggle to read at grade level by third grade. CA-Jaime-Mileham Decl. ¶ 26; OR-Chatterjee Decl. ¶¶ 32, 34. These effects will be "profound and lasting," CA-Thurmond Decl. ¶ 64, as evidence on early learning demonstrates that there is no way to effectively replace early interventions later. OR-Chatterjee Decl. ¶ 35.

### 3. Community Service Block Grant

The Community Service Block Grant (CSBG) is a federally funded block grant that provides formula funding to States to support services that alleviate the causes and conditions of poverty in under-resourced communities. 42 U.S.C. §§ 9906(a)-(b); *see* NJ-Winter Decl. ¶ 7. States use CSBG grants to fund a broad variety of services that low-income individuals need, such as shelter, food, clothing, medical assistance, homelessness intervention, and domestic violence crisis support. NJ-Winter Decl. ¶ 9; NY-Orr Decl. ¶ 11; MI-Haywood Decl. ¶ 9; MD-Meister Decl. ¶ 5(c); OR-Weber Decl. ¶ 7. In New York, grantees used CSBG funds to serve over half a million people in 2024—distributing nearly 1.5 million boxes of food, providing safe before- and after-school programing to close to 200,000 children, addressing the physical health needs of over 150,000 individuals, and tackling the mental health needs of around 130,000 people. NY-Orr Decl. ¶ 12.

CSBG programs are successful at tackling poverty in part because they do not generally impose eligibility requirements—people do not need to show papers or fill out applications to enter

food banks or get shelter. And CSBG-funded programs in Plaintiff States do not verify immigration status. CA-Brown Decl. ¶ 13; NJ-Winter Decl. ¶ 11; NY-Orr Decl. ¶¶ 10-11; MI-Haywood Decl. ¶ 11; MD-Meister Decl. ¶¶ 5(c), 8(a), (c); OR-Weber Decl. ¶ 10; CT-Hadler Decl. ¶ 14. Implementing immigration status verification at CSBG programs would require those programs to ask for identification and examine the immigration or citizenship status of all individuals served with CSBG funds. NY-Orr Decl. ¶ 14; NJ-Winter Decl. ¶ 6. As a result, no one will be able to access a CSBG-funded soup kitchen or food bank without producing identification or a passport. NY-Orr Decl. ¶ 14; NJ-Winter Decl. ¶ 13; WA-Guertin-Anderson ¶ 14. Implementing this type of verification process will present severe administrative, financial, and staffing challenges for the States. MI-Haywood Decl. ¶¶ 11-13; CA-Brown Decl. ¶¶ 20-24. And in many circumstances— such as emergency situations involving domestic violence or homelessness—demanding verification may be impossible. NJ-Winter Decl. ¶ 13. The Notice will thus put States to the impossible choice of discontinuing some CSBG programs or facing the loss of federal funds due to potential noncompliance. NJ-Winter Decl. ¶ 15; NY-Orr Decl. ¶ 15.

Further, the HHS PRWORA Notice will likely make CSBG programs inaccessible for many individuals. The public health and safety consequences of eliminating critical resources for so many will also be devastating—families will go hungry, more people will become unhoused, physically or mentally unwell people will become sicker, and those facing domestic violence will go without intervention. NY-Orr Decl. ¶ 11; NJ-Winter Decl. ¶¶ 13, 16; MD-Meister Decl. ¶ 5(c); MI-Haywood Decl. ¶ 14; CA-Brown Decl. ¶¶ 27-28; OR-Weber Decl. ¶¶ 11-12; CT-Hadler Decl. ¶ 18.

### 4. Health Center Program

The Health Center Program is a pillar of the Nation's and the States' healthcare systems. Health Centers are clinics that are required by law to serve "all residents" in medically underserved

areas, and to provide critical primary and preventive care regardless of a patient's ability to pay. 42 U.S.C. § 254b; *see* NY-Heslin Decl. ¶¶ 5, 7-9; WA-Khan Decl. ¶¶ 10-11; CA-Hansen Decl. ¶ 14, 34; MA- Boyle Decl. ¶¶ 10-13. The federal Health Resources & Services Administration (HRSA) provides grants to health centers that cover key operational expenses. NY-Heslin Decl. ¶ 5. Some Plaintiff States' subdivisions receive Health Center Program grants directly, which they use both to operate Health Centers and to contract with third parties. *See*, *e.g.*, WA-Khan Decl. ¶¶ 13-14; CA-Chawla Decl. ¶¶ 6, 12. For example, San Mateo, California, receives a Health Center grant that supports medical, dental, mental health, and care coordination services to persons experiencing homelessness and farmworkers, serving approximately 4,800 clients. CA-Chawla Decl. ¶ 6. In New York, Health Centers serve approximately 2.4 million patients annually, of which 12% are uninsured. NY-Heslin Decl. ¶ 15.

Requiring Health Centers to verify immigration status for the vulnerable populations they are designed to serve would jeopardize their ability to provide care. CA-Chawla Decl. ¶ 10; NY-Heslin Decl. ¶¶ 30-34. The populations most in need of services, whether they have lawful status or not, will struggle to produce the necessary documentation. CA-Chawla Decl. ¶¶ 11-12; CA-Neary Decl. ¶ 6; WA-Khan Decl. ¶¶ 18-19. These clinics have built trust with communities to encourage people to get care; if patients lack documentation or fear of enforcement risks, they will stop coming to clinics, which will lead to worsened health outcomes, and ultimately tax hospitals and emergency services. CA-Chawla Decl. ¶ 10; NY-Heslin Decl. ¶ 35; WA-Khan Decl. ¶ 12, 20. Status verification also imposes significant administrative burdens and costs on clinics, including those run or supervised by the States themselves. CA-Chawla Decl. ¶ 13; CA- Neary Decl. ¶ 7; WA-Khan Decl. ¶ 17; MA-Boyle Decl. ¶ 11. If Health Center Program support slows or stops,

many centers will be forced to close their doors, with rippling effects for patients, families, communities, and states. CA-Chawla Decl. ¶¶ 14-16; WA-Khan Decl. ¶ 22; NY-Heslin Decl. ¶ 33.

### 5. Substance Use, Prevention, Treatment, and Recovery Services Block Grant

The Substance Use, Prevention, Treatment, and Recovery Services Block Grant (SUBG) is a formula funding program for states to plan, implement, and evaluate activities that prevent and treat substance use and promote public health. 42 U.S.C. § 300x-21; *see* NY-Morris-Groves Decl. ¶ 8. The funding supports States in providing critical substance abuse services that Medicaid or other federal and state funds do not cover, such as community prevention, outpatient treatment, overdose prevention, crisis services, recovery support services, education, training, workforce development, and support for individuals seeking services and their families. NY-Morris-Groves Decl. ¶¶ 8-11, 13. WA-Kirschbaum Decl. ¶ 18; ME-Gagne-Holmes Decl. ¶ 11; CO-Becker Decl. ¶¶ 9-10; RI-Martin Decl. ¶ 6; NJ-Adelman Decl. ¶¶ 20-23. The SUBG program focuses on prevention and targets pregnant women and women with dependent children, injection drug users, tuberculosis services, and primary prevention services. NY-Morris-Groves Decl. ¶ 10; NJ-Adelman Decl. ¶¶ 20-23.

Because many people requiring these services lack the means to verify their immigration status, many of those entitled to services even under HHS's new interpretation will be turned away. WA-Kirschbaum Decl. ¶¶ 29-30; CO-Becker Decl. ¶¶ 9-10; Adelman Decl. ¶¶ 25-26; NY-Morris-Groves Decl. ¶ 14. In addition to directly harming those turned away, this will result in over-utilization of more intensive services such as emergency departments, inpatient hospitalizations and law enforcement interventions. WA-Kirschbaum Decl. ¶¶ 29-30; CO-Becker Decl. ¶¶ 9-10. And limiting access to these programs based on immigration status will create massive administrative burdens for state-funded clinics and for the States themselves. CA-Hansen Decl. ¶

29; Kirschbaum Decl. ¶¶ 29-30; CO-Becker Decl. ¶¶ 9-10. These services are set up to be low-barrier or no-barrier and so lack infrastructure currently in place to suddenly start restricting services based on immigration status; in some circumstances, doing so may be impossible. WA-Kirschbaum Decl. ¶ 29; ME-Gagne-Holmes Decl. ¶ 19; CA-Hansen Decl. ¶ 30. Forcing clinics to now abruptly restrict services will likely force some clinics to leave the program, meaning that "the new status restrictions in the HHS PRWORA Notice are likely to reduce service availability for immigrants and non-immigrants alike and undermin[e] [States'] goal of promoting the health and well-being of all [residents]." WA-Kirschbaum Decl. ¶ 29; Adelman Decl. ¶¶ 27-30.

### 6. Community Mental Health Services Block Grant

The Community Mental Health Services Block Grant (MHBG) supports efforts by states and their grantees to plan and provide comprehensive community mental health services, with a focus on children with emotional disturbances. 42 U.S.C. § 300x; *see* CA-Chawla Decl. ¶ 6; CA-Kunins Decl. ¶ 5-12; CO-Becker Decl. ¶¶ 11-12; NY-Rosen Decl. ¶ 6; WA-Kirschbaum Decl. ¶ 14. States use the grants to fund organizations or counties engaged in community-based mental health programs, including homeless services, housing assistance, and crisis response or outreach. CA-Hansen Decl. ¶ 31; NY-Rosen Decl. ¶ 7; WA-Kirschbaum Decl. ¶¶ 14-15.

MHBG subrecipients are not required to, and do not, screen based on immigration status, but rather serve individuals with mental health conditions regardless of status or ability to pay. CA-Kunins Decl. ¶¶ 7, 12; NY-Rosen Decl. ¶ 10. States and affected programs lack the infrastructure and funds to engage in verification for those served by these programs. CO-Becker Decl. ¶¶ 11. Indeed, engaging in such verification is often nonsensical or impossible; recipients cannot realistically ask individuals suffering an overdose or callers to a 24/7 crisis hotline to produce their papers. CA-Kunins Decl. ¶¶ 9, 14. As a result, the HHS PRWORA Notice will require States to expend additional time and resources to implement a verification system, and cause them

22

to close some MBHG-funded programs entirely. CA-Kunins Decl. ¶ 15; CO-Becker Decl. ¶¶ 11-12.

In addition, many people in crisis simply do not have access to documents to verify identity and status. CA-Kunins Decl. ¶ 8; CO-Becker Decl. ¶¶ 11-12. For those with serious mental illness, staying engaged in services and care is a challenge, and the added burdens and fears associated with demonstrating qualifying immigration status to service providers will impact access to care and ultimately prevent people from receiving services. CA-Hansen Decl. ¶ 33; NY-Rosen Decl. ¶¶ 10-12. Disruption to these critical crisis services and their accessibility would have devastating impacts, including increased risk of suicide, and increased pressure on hospital emergency departments and psychiatric facilities. CO-Becker Decl. ¶¶ 11-12.

### 7. Projects for Assistance in Transition from Homelessness Grant Program

The Projects for Assistance in Transition from Homelessness (PATH) Grant Program is designed to assist individuals experiencing homelessness or at imminent risk of becoming homeless in accessing supportive services, basic needs resources and connection to care. 42 U.S.C. § 290cc-22; *see* CO-Becker Decl. ¶ 15; ME-Gagne-Holmes Decl. ¶ 13; MI-Haywood Decl. ¶ 19; RI-Martin Decl. ¶ 11; WA-Kirschbaum Decl. ¶ 23. PATH serves some of the most vulnerable individuals, including veterans and victims of domestic violence. MI-Haywood Decl. ¶ 19; NJ-Adelman Decl. ¶ 38; NY-Rosen Decl. ¶ 16. PATH services include housing resources, systems and benefits advocacy, mental health care, substance use treatment, disability support, and other services to enable individuals to move toward their self-determined goals. NJ-Adelman Decl. ¶¶ 33-34. WA-Kirschbaum Decl. ¶ 23. PATH services can be provided at locations like train stations, hospital emergency rooms, shelters, and soup kitchens. NJ-Adelman Decl. ¶ 34. PATH funds are provided to States, which typically contract with service providers. MI-Haywood Decl. ¶¶ 18-19;

NY-Rosen Decl. ¶ 15. PATH programs do not screen based on immigration status, in reliance on HHS's longstanding position. CA-Chawla Decl. ¶ 8; CA-Hansen Decl. ¶ 29; NJ-Adelman Decl. ¶¶ 35; NY-Rosen Decl. ¶ 17.

Verifying status and restricting services to PATH participants "pose[s] a huge—in many cases, impossible—burden to providing services." WA-Kirschbaum Decl. ¶ 28. This is because "individuals experiencing homelessness who are served by the PATH program may well lack documentation to demonstrate their legal status, even if they are citizens." *Id.* "[A]lmost by definition," the PATH program serves people who are unlikely to have documentation available but in urgent need of services. NY-Rosen Decl. ¶ 17; *see* CA-Chawla Decl. ¶ 12; CO-Becker Decl. ¶ 16; ME-Gagne-Holmes Decl. ¶ 18. Implementing a verification requirement would thus "undermine the purpose" of PATH. CO-Becker Decl. ¶ 17; *see* MI-Haywood Decl. ¶¶ 23. It would also undermine hard-earned trust between outreach workers and this at-risk community. CA-Chawla Decl. ¶ 13; CA-Hansen Decl. ¶ 33; ME-Gagne-Holmes Decl. ¶ 20. Nor do States have the staff, training, or resources to implement a verification requirement in their PATH programs. CA-Hansen Decl. ¶ 29; CO-Becker Decl. ¶¶ 16-17. According to one estimate, implementing a verification process in Michigan alone would cost the State hundreds of thousands of dollars and hundreds of staff hours. MI-Haywood Decl. ¶ 22. It is likely that some state programs will have to close, at least temporarily, as a result. CO-Becker Decl. ¶ 17; ME-Gagne-Holmes Decl. ¶ 17. The HHS PRWORA Notice will thus result in denial of PATH services to many people of all backgrounds who could end up on the streets. NJ-Adelman Decl. ¶ 38; NY-Rosen Decl. ¶ 17.

### 8. Certified Community Behavioral Health Clinics

Certified Community Behavioral Health Clinics (CCBHCs) provide access to coordinate behavioral health care for anyone who requests care for mental health or substance use, "regardless of their ability to pay, place of residence, age, or until now apparently, immigration status." WA-

Kirschbaum Decl. ¶ 7; *see* ME-Gagne-Holmes Decl. ¶ 14. Among other things, CCBHCs provide 24/7 crisis services; screening, assessment, and diagnosis; outpatient mental health and substance use treatment; and armed forces and veteran's services. ME-Gagne-Holmes Decl. ¶ 13; NY-Rosen Decl. ¶¶ 18-19; WA-Kirschbaum Decl. ¶ 9. One of the key roles of CCBHCs is to divert people in crisis from emergency departments, involuntary detentions, hospital admissions, and jails. WA-Kirschbaum Decl. ¶ 10. In New York, this has proven to reduce costs for in-patient and emergency room visits by over 25%. NY-Rosen Decl. ¶ 24. SAMHSA provides funding for CCBHCs and States can receive CCBHC funding for planning and certifying. CT-Navarretta Decl. ¶ 10-11; NY-Rosen Decl. ¶ 21; WA-Kirschbaum Decl. ¶ 12. States can also purchase CCBHC services and regulate CCBHCs. NY-Rosen Decl. ¶ 21; WA-Kirschbaum ¶ 12.

SAMHSA itself requires, in certifying CCBHCs, that "no individual is denied behavioral health care services." CT-Navarretta Decl. ¶ 8; NY-Rosen Decl. ¶ 23. A verification requirement would "fundamentally alter" the program. NY-Rosen ¶ 23. Many patients would be ineligible and many more would be deterred from seeking services. CT-Navarretta Decl. ¶ 15; NY-Rosen Decl. ¶ 23. And many people seeking care at CCBHCs who would remain eligible are unhoused and lack documentation, so would be denied care. CT-Navarretta Decl. ¶ 14. These individuals may seek emergency room care, with States footing the bill. *See* NY-Rosen Decl. ¶ 24. A verification requirement would also create new administrative burdens for the States and pull critical resources away from the core services. CT-Navarretta Decl. ¶ 16.

### 9. Title IV-E Programs

Title IV-E of the Social Security Act authorizes several programs that benefit at risk children, including the Title IV-E Prevention Services Program, the Title IV-E Kinship Guardianship Assistance Program, and the Title IV-E Education and Training Voucher Program. 42 U.S.C. §§ 671, 673, 677; *see* WA-Mathis Decl. ¶ 5. The Title IV-E Prevention Services Program

filled a critical gap in services for vulnerable children, by helping provide resources to strengthen families and address issues *before* children end up in foster care. CA-Miller Decl. ¶ 4; WA-Mathis Decl. ¶ 14. It does so by reimbursing state child welfare agencies for providing mental health and substance abuse prevention and treatment, training and education to increase positive parenting skills, and individual and family counseling. WA-Mathis Decl. ¶ 15. HHS has previously told States *not* to exclude individuals from this program based on immigration status, and States do not currently screen individuals for citizenship or immigration status. CA-Miller Decl. ¶ 5; WA-Mathis Decl. ¶ 23.

Requiring immigration status verification will impose administrative costs on State agencies. WA-Mathis Decl. ¶ 34. It will also deter families from participating in the Title IV-E program and erode the trust with vulnerable families that is key to the success of this program in addressing the needs of children. WA-Mathis Decl. ¶¶ 24-28. Reduced participation in the program will not only hurt vulnerable families, but also reduce the reimbursements that States receive under Title IV-E and require them to support more complex and expensive out-of-home placements. WA-Mathis Decl. ¶¶ 31-33; CA-Miller Decl. ¶ 5. Once a child enters out-of-home care, they can be in it for years. WA-Mathis Decl. ¶ 32.

The Title IV-E Kinship Guardianship Assistance Program funds are similarly intended to enhance family preservation and stability by providing funds to support the relative guardians of children in long-term placement with relatives. CA-Miller Decl. ¶¶ 7-8. If these benefits become subject to immigration verifications, more children will enter into, and stay, in foster care, harming the child and imposing increased costs on State and local foster care programs. *Id.*; WA-Mathis Decl. ¶¶ 6.

States also receive critical funds through the Title IV-E Education and Training Voucher Program, which helps youth aging out of foster care make the transition to self-sufficiency and receive the education, training, and services necessary to obtain employment. *See, e.g.*, New York Office of Children & Family Services, *Education and Training Vouchers (ETV)*, https://ocfs.ny.gov/programs/youth/etv.php.

### 10. Other Programs

The HHS Notice designates as "Federal public benefits" the catch-all categories of "Mental Health and Substance Use Disorder Treatment, Prevention, and Recovery Support Services Programs administered by the Substance Abuse and Mental Health Services Administration not otherwise covered," and "Health Workforce Programs not otherwise covered under" the previous PRWORA guidance, "including grants, loans, scholarships, payments, and loan repayments." 90 Fed. Reg. at 31,237. Plaintiff States operate a number of programs that appear to fall into these catch-alls and will face significant and irreparable harm if these programs are made subject to immigration verification requirements.

For example, the 988 Lifeline is supported with SAMHSA funding and therefore appears to come within the catch-alls. The 988 Lifeline is a free mental health resource that offers one-on-one support for mental health, suicide, and substance-use-related problems for anyone. NY-Rosen Decl. ¶ 26; RI-Martin Decl. ¶ 17; WA-Roberts Decl. ¶ 10. States receive SAMHSA funding through a cooperative agreement that is designed to improve local 988 capacity by expanding resources to enhance recruitment, hiring, and training of the 988 workforce. WA-Roberts Decl. ¶¶ 11-12.

Requiring 988 call center employees to inquire about immigration status is likely to delay life-saving care or lead to individuals who need assistance not calling. NY-Rosen ¶ 26. Hotline callers should have the expectation that what they share will remain confidential and private, and

they do not have to provide their name, demographic information, citizenship status, or other identifying information to receive crisis intervention services. WA-Roberts Decl. ¶¶ 17, 20. Requiring verification of immigration status of people who call in crisis is at odds with the 988 Lifeline's purpose of providing immediate support to people experiencing mental health crisis. WA-Roberts Decl. ¶¶ 23-25. Interposing obstacles to accessing crisis services could put the broader community at risk from a mental health or substance use crisis. *Id*. ¶ 21. This would then overburden the States' first responders, including police and emergency medical services, who may need to respond if 988 could not be used. *Id*. ¶¶ 21, 25. And the ultimate toll on families and communities is incalculable.

Because Plaintiff States are not aware of any way for 988 employees to perform the required verification over the phone, it is uncertain how the 988 hotline could implement PRWORA's verification requirement at all. NY-Rosen ¶ 26. If Plaintiff States do not implement the verification requirement, they face a loss of federal funding; if they do, it is unclear how this life-saving program could continue to operate.

State Opioid Response Grants, similarly, are administered by SAMHSA and subject to the catch-all categories in the HHS PRWORA Notice. These grants provide hundreds of millions of dollars to support states in combatting the opioid crisis. NY-Morris-Groves ¶¶ 20-26. State Opioid Response Grants 3 and 4 (SOR) are intended to help states expand access to the Food and Drug Administration's approved medications for opioid use disorder, and strengthen the continuum of prevention, harm reduction, treatment, and recovery support services for individuals with opioid use disorder (OUD) and other substance use disorders, including those involving other substances. *Id.*; CO Becker Decl. ¶ 7. For example, in Maine, SOR is a critical component of the community response to the opioid crisis, supporting over 150,000 people in the last year, or 10% of Maine's

population. ME-Gagne-Holmes Decl. ¶ 12. SOR is the largest funder of Maine's Naloxone community response which has allowed OBH to distribute (via the Maine Naloxone Distribution Initiative) almost 650,000 doses since July 2019. *Id.* The grant funding supports a wide range of services in the states, and providers are required to serve individuals regardless of their insurance coverage, ability to pay, or immigration status. CO-Becker Decl. ¶¶ 7-8; NY-Morris-Groves ¶¶ 23, 26; RI-Martin Decl. ¶¶ 12-14.

If people seeking treatment for addiction had to verify their immigration status, the resulting delay or end in services, including treatment for withdrawal, could lead to overdose and even death. CO-Becker Decl. ¶ 7-8; NY-Morris-Groves ¶ 6. The requirement to verify status would undermine these critical programs to treat OUD: due to the nature of the disease and addiction, those suffering would be unable to access services at all with such a barrier in place. CO-Becker Decl. ¶ 7-8.

Other SAMHSA-funded programs operated by the Plaintiff States that likely fall within the catch-all categories include:

- Community Overdose Prevention Education, which reduces fatal overdoses in high-risk populations, including those who are pregnant and post-partum;
- HIV/STI Prevention and Treatment Program, which provides funding to states for both HIV prevention and STI prevention;
- Partnership for Early Diversion of Youth, which seeks to divert youth ages 13 to 21 from the juvenile justice system to community based support services;
- Strategic Prevention Framework-Partnership for Success, which supports state programs to reduce substance misuse;
- Screening, Brief Intervention, and Referral to Treatment, which implements evidence-based early intervention to identify youth engaging in underage drinking and opioid use; and
- Youth and Family Treatment Recovery Enhancement and Expansion, which provides treatment, intervention, and recovery for young people ages 12 to 25 with substance use.

*See* MI-Lyon-Callo Decl. ¶¶ 11-15; NY-Chisholm Decl. ¶¶ 4-15; NY-Morris-Groves Decl. ¶¶ 16-19.

### B. ED PRWORA Notice

#### 1. WIOA II

WIOA II (often referred to as the Adult Education and Family Literacy Act program) provides funds to states for adult education, serving hundreds of thousands of Plaintiff States' residents. 29 U.S.C. § 3271; *see* IL-Durham Decl. ¶¶ 15-18, 22; MD-Roth Decl. ¶¶ 8-9. Many WIOA II programs focus on providing education for adult students who lack a secondary-school education. IL-Durham Decl. ¶ 15; MD-Roth Decl. ¶¶ 11, 21. Programs under WIOA II include, for example, adult instruction in basic reading and math skills in the pursuit of a High School Equivalent diploma; instruction to improve the English skills of English language learners and provide civics education; and academic opportunities for individuals involved in the criminal justice system. CO-Ongart Decl. ¶ 8; MD-Roth Decl. ¶¶ 7-8, 11; NY-Meyers-Ruff Decl. ¶¶ 11-12. WIOA II also funds family literacy programs that aim to improve the literacy skills of adults and their children. MD-Roth Decl. ¶¶ 7-11; NY-Meyers-Ruff Decl. ¶ 11. States directly receive millions of dollars of funds and primarily subgrant to providers. CO-Ongart Decl. ¶ 9; IL-Durham Decl. ¶¶ 18-19; MA-Mackinnon Decl. ¶ 8; MD-Roth Decl. ¶ 9; NY-Meyers-Ruff Decl. ¶ 10. States' WIOA II programs are approved for four-year terms pursuant to state-specific plans. *See* CO-Ongart Decl. ¶ 7; DC-Boardman Decl. ¶¶ 20-21.

WIOA II programs do not inquire about immigration status, and immigration status has never been a criterion for eligibility, as States and their programs have relied on the 1997 ED DCL. CO-Ongart Decl. ¶¶ 13-15; MD-Roth Decl. ¶ 16; OR-Cannon Decl. ¶ 26; NY-Meyers-Ruff Decl. ¶ 16. WIOA II programs are not equipped to verify eligibility based on immigration status. Under the ED PRWORA Notice, programs would be required to immediately exclude many individuals,

including current participants mid-instruction. MA-Mackinnon Decl. ¶ 16; MD-Roth Decl. ¶ 23. Further, the ED PRWORA Notice creates a chilling effect where even eligible noncitizens or citizens may be deterred from participating or may not have the documentation to show their eligibility. CA-Thurmond Decl. ¶ 53; CO-Ongart Decl. ¶ 13; DC-Boardman Decl. ¶ 28; IL-Durham Decl. ¶ 25; MA-Mackinnon Decl. ¶ 14; MD-Roth Decl. ¶ 25; OR-Cannon Decl. ¶ 27.

Implementing verification requirements would require significant time and effort. MD-Roth Decl. ¶ 29; OR-Cannon Decl. ¶¶ 32-33; NY-Meyers-Ruff Decl. ¶ 22. This financial burden would be significant—for example, over $1 million in Colorado—which Plaintiff States do not have funding to cover. CO-Ongart Decl. ¶ 17. And this administrative burden would be immediate, as programs would need to identify immigration and citizenship status of current participants immediately. MD-Roth Decl. ¶ 29. But implementing an immediate (or even swift) verification process is impossible for States given the burdens and complexities involved. CO-Ongart Decl. ¶ 22. The programs would need to respond to widespread confusion by explaining to participants (in many languages) the requirements for verification. MD-Roth Decl. ¶ 30.

If States were to have their WIOA II funds stopped or reduced, some programs may immediately stop operating. *Id.* ¶ 33 (describing shutdown of WIOA II-funded program after federal funding freeze).[8] States would be unable to replace these federal funds or would do so only with significant harms to other state programs. CO-Ongart Decl. ¶ 17; IL- Durham Decl. ¶ 26.

The ED PRWORA Notice will have a significant negative impact on Plaintiff States' adult education programs under WIOA II. WIOA II programs are a gateway to employment: they significantly increase the earnings of program participants and lead to employment for many

---

[8] ED has recently frozen WIOA II funds to States. That freeze is the subject of litigation in *California v. McMahon*, No. 25 Civ. 329 (D.R.I.).

individuals who were previously unemployed due to, for example, homelessness—but following the Notice, Plaintiff States will have fewer adults and families achieving literacy and the increased economic stability that comes with it. CO-Ongart Decl. ¶¶ 10, 18; IL-Durham Decl. ¶¶ 24, 29; *see* CA-Thurmond Decl. ¶ 53; DC-Boardman Decl. ¶ 33; MA-Mackinnon Decl. ¶¶ 15, 17; MD-Roth Decl. ¶ 21; OR-Cannon Decl. ¶ 32.

## 2. Perkins V

Perkins V appropriates nearly $1.4 billion annually for career and technical education programs for youth and adults. *See* 20 U.S.C. §§ 2301. Perkins V programs provide career and technical education that is specifically designed to prepare Plaintiff States' residents for high-skill, high-wage, in-demand jobs, focused on key industries in each state. IL-Durham Decl. ¶ 37; NJ-Schiff Decl. ¶ 8; OR-Cannon Decl. ¶¶ 40, 45. States directly receive hundreds of millions of dollars of funds and primarily subgrant to providers and provide services pursuant to approved plans. NJ-Schiff Decl. ¶ 11; OR-Cannon Decl. ¶¶ 36, 43; NY-Meyers-Ruff Decl. ¶ 25. The vast majority of Perkins V funds are not distributed on a per-individual-student basis; rather, they are used to support education via general expenses like funding equipment purchases, teacher salaries, curriculum development, and other administrative or oversight functions. CA-Thurmond Decl. ¶ 31; IL-Durham Decl. ¶ 33; IL-Sanders Decl. ¶¶ 22-23; OR-Cannon Decl. ¶ 39; NY-Meyers-Ruff Decl. ¶ 27.

Like WIOA II, Perkins V programs do not inquire about immigration status, and States and their programs have relied on the 1997 ED DCL in doing so. CA-Thurmond Decl. ¶ 38; DC-Boardman Decl. ¶ 50; IL-Durham Decl. ¶ 38; IL-Sanders Decl. ¶ 28; NJ-Schiff Decl. ¶ 13; OR-Cannon Decl. ¶ 47. And as with WIOA II, requiring Perkins V programs to verify eligibility based on immigration status would exclude many current participants, wreaking havoc on programs and students who may have, for example, taken out student loans to complete their Perkins V programs.

IL-Durham Decl. ¶ 41; NJ-Schiff Decl. ¶ 15; OR-Cannon Decl. ¶¶ 48, 53; NY-Meyers-Ruff Decl. ¶ 28. This would also create a chilling effect for eligible noncitizens and American citizens and would exclude those who lack documentation to show their eligibility, such as those impacted by natural disasters or floods. CA-Thurmond Decl. ¶ 39; DC-Boardman Decl. ¶ 51; IL-Durham Decl. ¶ 41; IL-Sanders Decl. ¶ 29; NJ-Schiff Decl. ¶ 22; OR-Cannon Decl. ¶ 48.

Implementing verification requirements at Perkins V programs would require significant time, training, and administrative effort. CA-Thurmond Decl. ¶¶ 39-40; DC-Boardman Decl. ¶ 55; IL-Durham Decl. ¶ 43; OR-Cannon Decl. ¶ 54. It is not possible for Perkins V programs to comply with the ED PRWORA Notice overnight. It would be "[a] truly massive undertaking"—taking months or even a year or more—to plan and develop guidance on the verification process and to communicate and train grantees. NJ-Schiff Decl. ¶¶ 14, 19-21. There are many practical considerations that would have to be worked out: for example, if Perkins V funds are used to pay for a laboratory or a teacher's salary, schools would have to figure out how to ensure that ineligible students do not use that laboratory or take classes with that teacher, leading to classrooms segregated by immigration status. NJ-Schiff Decl. ¶ 20; CA-Thurmond Decl. ¶ 50; MA-Mackinnon Decl. ¶¶ 15, 17.

If a Plaintiff State was required to use their own funding to fill the gap in a loss of federal funding, doing so may prohibit that State from ever receiving Perkins V funding the future, due to a strict rule against supplanting state funding. CA-Thurmond Decl. ¶¶ 43, 51; DC-Boardman Decl. ¶ 52; IL-Durham Decl. ¶ 40.

Perkins V programs provide crucial members of Plaintiff States' workforce who are trained in specific fields needed within the States. OR-Cannon Decl. ¶ 51; CA-Thurmond Decl. ¶ 44. Many Perkins V program students obtain an associate's degree or workforce certification that

virtually guarantees them a job; without those credentials, they are unlikely to be employed. IL-Durham Decl. ¶¶ 32-33. In Oregon, for example, where there are only two-thirds as many skilled workers as jobs for them to fill, Perkins V programs train in-demand construction managers and computer and information technologists. OR-Cannon Decl. ¶ 51. Illinois will not have enough electricians, pharmacy technicians, and welders. IL-Durham Decl. ¶ 42. The effects of the ED PRWORA Notice on Perkins V will therefore be felt not only by Plaintiff States' schools and their students, but in their broader communities.

### C. DOL PRWORA Notice

### 3. WIOA Title I

The Department of Labor's reclassification of WIOA Title I programs as "federal public benefits" will significantly disrupt the delivery of employment and training services to adults, dislocated workers, and youth. *See* WA-Adams Decl. ¶¶ 6-7, 14, 17; MI-Johnson Decl. ¶ 12; NJ-Asaro-Angelo Decl. ¶¶ 11-21; RI-Weldon Decl. ¶¶ 14-18. These WIOA Title I programs are designed to serve individuals facing barriers to employment and depend on low barriers to access and community trust. WA-Adams Decl. ¶¶ 17-18; MD-Roth Decl. ¶ 22; NJ-Asaro-Angelo Decl. ¶ 17. The Department of Labor's reclassification of these programs as "Federal public benefits" will significantly disrupt the delivery of employment and training services to adults, dislocated workers, and youth. *See* WA-Adams Decl. ¶¶ 6-7, 14, 17; MI-Johnson Decl. ¶ 12; NJ-Asaro-Angelo Decl. ¶¶ 11-21; RI-Weldon Decl. ¶¶ 14-18. Imposing documentary proof or work authorization requirements on these services will deter eligible individuals from participation, strain already limited administrative capacity, and fundamentally alter the way States deliver services. *See* NM-Nair (First) Decl. ¶ 9; WA-Adams Decl. ¶ 17; MI-Johnson Decl. ¶ 13; NJ-Asaro-Angelo Decl. ¶¶ 10-11. New verification rules are expected to chill participation among U.S. citizens in mixed-status households and lawfully present immigrants, in particular for youth

experiencing homelessness, reentry populations, and low-income individuals who often lack documentation or are wary of disclosing sensitive personal information. *See* CO-Folks Decl. ¶ 9; MD-Roth Decl. ¶ 14; NM-Nair (First) Decl. ¶ 9; WA-Adams Decl. ¶¶ 17-19; RI-Weldon Decl. ¶¶ 10, 18. Agencies anticipate needing to reprogram intake systems, retrain staff, and modify contracts and service workflows, all without new federal funding or technical assistance. *See* WA-Adams Decl. ¶ 20; MI-Johnson Decl. ¶ 17; NJ-Asaro-Angelo Decl. ¶¶ 16-21; NM-Nair (Second) Decl. ¶ 11.

### 4. Wagner-Peyser ES (WIOA Title III)

Wagner-Peyser Employment Services provide core labor exchange functions, including resume support, job matching, interview preparation, and referrals to training or apprenticeships. *See* WA-Adams Decl. ¶ 14; CO-Folks Decl. ¶¶ 12-16. These services are typically delivered universally at American Job Centers through both staff-assisted and online self-service options. *See* CO-Folks Decl. ¶ 12; MI-Johnson Decl. ¶¶ 5-8; NM-Nair (Second) Decl. ¶¶ 7-8. For decades, states have operated these services without requiring immigration verification. MI-Johnson Decl. ¶ 9; RI-Weldon Decl. ¶¶ 12-14. Reclassifying these services as federal public benefits will require States to redesign intake processes, restrict access to online tools, and verify status even for those seeking the most basic forms of job search assistance. *See* CO-Folks Decl. ¶¶ 9, 18-24; WA-Adams Decl. ¶¶ 14, 17-18. This will reduce foot traffic at job centers, increase wait times, and divert limited staff time from service delivery to compliance. *See* MI-Johnson Decl. ¶ 13; WA-Adams Decl. ¶¶ 17, 21. Populations that rely most heavily on these services—including homeless jobseekers, youth, and individuals reentering the workforce—are among those least likely to be able to provide immediate documentation. RI-Weldon Decl. ¶ 18; WA-Adams Decl. ¶ 18. The chilling effect on participation is expected to be severe and will undermine labor market inclusion

goals. *See* CO-Folks Decl. ¶ 19-20; WA-Adams Decl. ¶¶ 17-19; NJ-Asaro-Angelo Decl. ¶¶ 16-21; MI-Johnson Decl. ¶¶ 13-16.

### 5. Other DOL Programs

DOL's reclassification of REO, YouthBuild and SCSEP programs as "Federal public benefits" will significantly disrupt the delivery of employment and training services to other vulnerable populations, including justice-involved individuals, the elderly, and young people. CO-Folks Decl. ¶ 12; WA-Adams Decl. ¶ 4, 18; NJ-Asaro-Angelo Decl. ¶¶ 7, 17-18; RI-Weldon Decl. ¶¶ 7-10. Requiring immigration verification at the point of intake will deter youth from engaging with YouthBuild, even where they are eligible. NJ-Asaro-Angelo Decl. ¶¶ 9, 18; RI-Weldon Decl. ¶¶ 17-18. Verification requirements will slow enrollment, discourage participation by imposing complex eligibility protocols and strain limited program resources. RI-Weldon Decl. ¶¶ 7, 15-17. WA-Adams Decl. ¶¶ 18-20; CO-Folks Decl. ¶ 20.

### D. DOJ PRWORA Notice

The Department of Justice's revocation of all of its Life/Safety Exemptions will newly subject numerous essential services to PRWORA's verification requirements. States have operated many such services without screening for immigration status, based on the settled understanding that those services fell within the now-revoked Life/Safety Exemptions. IL-Stevens Decl. ¶ 14; MD-Meister Decl. ¶¶ 7-8; MN-Grumdahl Decl. ¶ 7; RI-Giron Decl. ¶ 6; WA-Roberts Decl. ¶¶ 7-8, 22. For instance, Maryland has long operated two Department of Housing and Urban Development programs for rapid rehousing, transitional housing, and homeless outreach—the Emergency Solutions Grant Program (ESG) and the Continuum of Care (CoC) Program—that it understood to fall within the DOJ exemption for short-term shelter or housing assistance for the homeless. MD-Meister Decl. ¶ 5; *see* MN-Grumdahl ¶¶ 5-9 (explaining that Minnesota also operates the ESG program). Washington similarly operates crisis counseling and intervention

programs (including its 988 Lifeline), medical and public health services, and mental health, disease or substance abuse programs—all categories of benefits previously carved out by the DOJ exemptions (and in some instances excluded by HHS's now-revoked interpretation, as well). WA-Roberts Decl. ¶¶ 7, 22.

By newly subjecting these and other programs to PRWORA, the DOJ PRWORA Notice will impose substantial administrative costs on the States, which are not equipped to develop and implement immigration status verification systems for these programs. MD-Meister Decl. ¶ 8; WA-Roberts Decl. ¶ 21. And some of these programs will likely not be able to operate at all if they are required to verify status, as programs that serve individuals facing emergency threats to their life and safety—like individuals experiencing homelessness or those facing a mental health crisis—cannot realistically verify immigration status, and the individuals who use these programs often cannot produce the necessary documentation at the time they are in crisis. MD-Meister Decl. ¶ 8; WA-Roberts Decl. ¶ 23; MN-Grumdahl Decl. ¶¶ 7-9. Indeed, the States expect the DOJ PRWORA Notice to chill many individuals from participating in these essential programs in the first place. WA-Roberts Decl. ¶ 24. Rhode Island, for example, provides federally funded, legally required services to crime victims, a category previously carved out by the Life/Safety Exemption. RI-Giron Decl. ¶¶ 5-7. Screening for immigration status when individuals report crimes would not only be burdensome, but would also undermine trust, impeding prosecution and deterring reporting of crimes. *Id.* ¶¶ 9-11; *see* IL-Stevens Decl. ¶ 18 (describing similar harms in Illinois). As another example, Michigan provides federally funded benefits to families who have had to flee their homes due to a natural disaster. MI-Haywood ¶¶ 24-26. These individuals may not have their documents due to the disaster, and verification would delay critical emergency assistance. *Id.* ¶¶ 28-29. And Massachusetts relies on the DOJ Life/Safety Exemptions to administer meals on wheels programs

for elderly individuals, who are often unable to produce the necessary documentation to prove immigration status because of age, lack of family support, and other factors. MA-Boyle Decl. ¶ 16. The application of PRWORA to these programs will thus "defeat the[ir] purpose" and cause a broad array of individuals—homeless individuals, veterans, battered women, and people of limited means—to suffer. MD-Meister Decl. ¶ 8; *see* WA-Roberts Decl. ¶ 23; MN-Grumdahl Decl. ¶¶ 8-9; RI-Giron Decl. ¶ 11; MA-Boyle Decl. ¶ 16.

## ARGUMENT

Plaintiff States have satisfied each of the elements for issuance of a preliminary injunction. Under that standard, "[t]he district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (cleaned up). The final two factors—the balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, each of these factors tips decisively in Plaintiffs' favor.

### I.     Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits for several independent reasons. *First*, the HHS, ED, and DOL PRWORA Notices are substantive rules unlawfully issued without going through notice and comment procedures required by the Administrative Procedure Act.[9] *Second*, these PRWORA Notices are arbitrary and capricious. *Third*, these PRWORA Notices are contrary

---

[9] Plaintiffs bring only a Spending Clause claim, and not APA claims, with respect to the DOJ PRWORA Notice.

to law because they offer a definition of "Federal public benefit" that is contrary to the statutory definition or otherwise unlawful. *Finally*, each PRWORA Notice violates the Spending Clause by imposing conditions on federal funds that are impermissibly retroactive and coercive.

### A. The PRWORA Notices are Final Agency Action.

The PRWORA Notices are "final agency actions" subject to review under the APA, 5 U.S.C. § 704, because they: (1) "mark the consummation" of agency decision-making and (2) determine "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). It is clear that the Notices mark the consummation of agency decision-making from which legal consequences will flow because the Notices identify new programs as providing "Federal public benefit[s]" requiring immigration status verification under PRWORA, in the case of HHS, "effective immediately." 90 Fed. Reg. at 31,238; *see also, e.g.,* 90 Fed. Reg. at 30,900 (ED's "current position" that "may be referenced when enforcing"); DOL PRWORA Notice 2 ("grantees must verify work authorization. . . ."). Nothing about these determinations is "tentative or interlocutory." *Rhode Island v. Trump*, No. 1:25-cv-128, 2025 WL 1303868, at *9 (D.R.I. May 6, 2025) (quotation omitted). Even if Defendants may take additional final agency actions, that does not render the Notices non-final. For example, ED states that it can reference its Notice "when enforcing . . . compliance." 90 Fed. Reg. at 30,900. And there is no suggestion that HHS will take additional steps with respect to the Newly Restricted Programs: the HHS PRWORA Notice states that additional "program specific guidance" will be issued only as to programs that are "*not* listed in this notice." 90 Fed. Reg. at 31,237 (emphasis added). The Notices are, by their own terms, documents from which legal consequences will flow.

## B. The HHS, ED, and DOL PRWORA Notices Were Unlawfully Promulgated Without Following the APA's Procedural Requirements.

Under the APA, before a federal agency can adopt or repeal a rule, it must generally go through the notice-and-comment process. 5 U.S.C. § 553; *see also Humane Soc'y of the United States v. United States Dep't of Agric.*, 41 F.4th 564, 569 (D.C. Cir. 2022). Where notice and comment are required, "[f]ailure to abide by these requirements renders a rule procedurally invalid." *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018). Defendants suggest that notice-and-comment rulemaking was not required for the HHS and ED PRWORA Notices because they are merely interpretive rules under 5 U.S.C. § 553(b)(A). This is wrong. By their terms, these Notices reverse the agencies' longstanding position and modify applicability for the affected programs going forward. They are thus substantive rules for which notice-and-comment rulemaking was required.

"Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). By contrast, "[i]f a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive." *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) ("[A] substantive rule" is "one affecting individual rights and obligations" such that it "may be binding or have the force of law.") (internal quotation omitted); *Perez*, 575 U.S. at 109 (Scalia, J., concurring) ("An agency may use interpretive rules to *advise* the public by explaining its interpretation of the law. But an agency may not use interpretive rules to *bind* the public by making law, because it remains the responsibility of the court to decide whether the law means what the agency says it means.") (emphasis in original).

Most importantly, "[w]here a rule falls along the interpretative/legislative spectrum will turn in many cases on the novelty of a rule's substantive content." *Warder v. Shalala*, 149 F.3d 73, 80 (1st Cir. 1998). "Put more succinctly, a rule is exempt from notice and comment as an interpretative rule if it does not 'effect a substantive change in the regulations.'" *Id.* (quoting *Guernsey Mem'l Hosp.,* 514 U.S. at 100); *see also Nat'l Family Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C. Cir. 1992) ("[A] rule which 'effect[s] a change in existing law or policy' is legislative." (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983))). Here, the HHS, ED, and DOL PRWORA Notices substantially change eligibility for several foundational programs, exactly the sort of thing for which notice and comment is required.

Take HHS. Shortly after PRWORA was passed, HHS promulgated guidance outlining the scope of its programs that are covered by PRWORA. And for at least 27 years—essentially the entirety of PRWORA's lifespan—HHS has maintained that Title X, Head Start, and the other eleven Newly Restricted Programs are available to all, regardless of immigration status. *Supra* 7. The HHS PRWORA Notice abruptly changes all of that. It is flatly, and concededly, inconsistent with the way HHS has always interpreted and applied PRWORA. And HHS readily admits that the Notice is meant to "affect[] individual rights and obligations," *Chrysler Corp.*, 441 U.S. at 302, by blocking millions of Americans who were previously eligible for certain programs from accessing those services. *See* 90 Fed. Reg. at 31,238 ("The Department anticipates that numerous unqualified aliens will no longer receive benefits under Federally funded programs due to this notice."). Changing programs to deny people benefits is plainly substantive. *See New Hampshire Hosp. Ass'n*, 887 F.3d at 73-74 (finding a rule substantive where there was "no evidence that the agency consistently implemented the statute between 1993 and 2010 in accord with the Secretary's present policy"); *Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 315 (D. Mass.

2025) (finding a notice was substantive where it "is both inconsistent with an existing rule and alters existing obligations"); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 25-CV-091-LM, 2025 WL 1188160, at *29 (D.N.H. Apr. 24, 2025) ("The obligations imposed by the 2025 Letter are new. Indeed, as recently as 2023, the Department advised schools and regulated entities that DEI programs were not only lawful, but to be encouraged."); *compare Guernsey Mem'l Hosp.,* 514 U.S. at 99-100 (holding a policy was "a prototypical example of an interpretive rule" because it merely applied existing law and was not "inconsistent with any of the Secretary's existing regulations"); *Warder*, 149 F.3d at 81 (holding a rule was interpretive where it was "consistent with the existing definitions").[10]

The same goes for ED. Since 1997, ED has applied a consistent interpretation of PRWORA. *See supra* 6-7. But now, ED drastically alters that interpretation, and its Notice specifically concludes that WIOA Title II and Perkins V programs—and possibly other, unidentified programs—are no longer available for millions of Americans.

DOL, too. Less than eighteen months ago, DOL maintained that PRWORA did not restrict eligibility for individualized services that did not provide a financial benefit, such as labor exchange services, informational services, referrals to community resources for transportation or childcare, career planning services, and assistance in completing paperwork to finalize work authorization. 2024 DOL Guidance, Ex. 7. But the DOL PRWORA Notice now restricts these services and imposes the requirement that grantees verify immigration status. DOL PRWORA

_____

[10] Nothing in *Loper Bright* changes the analysis here. *Contra* 90 Fed. Reg. at 31,238. Quite the opposite: the *Loper Bright* Court emphasized that prior agency interpretations of a statute are entitled to "very great respect," "especially . . . . when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385-86 (2024) (citation omitted). Here, due respect of HHS' unbroken application of PRWORA weighs in favor of notice-and-comment rulemaking.

Notice at 2-4. And the Notice directs recipient entities under various grants to change their "policies" and "procedures to align with" the DOL PRWORA Notice. *Id.* at 1. These Notices change the rules of the game for programs and their participants. That makes them substantive.

Making matters worse, the effect of these administrative reversals is massive. Indeed, HHS admits that the Notice is a "major rule" within the meaning of the APA because it "may result in an annual effect on the economy of *$100 million or more*." 90 Fed. Reg. at 31,238 (emphasis added); *see also* 5 U.S.C. § 804(2). Agency actions with such massive effects are exactly the sort for which notice-and-comment rulemaking are most critical. *See Texas v. Becerra*, 577 F. Supp. 3d 527, 545-46, 547-50 (N.D. Tex. 2021) (holding that HHS could not impose funding condition affecting grants to Head Start without going through notice-and-comment); *State v. Becerra*, 544 F. Supp. 3d 1241, 1269, 1288-90, 1298 (M.D. Fla. 2021) (considering economically significant agency action to be a rule requiring notice-and-comment). And "[i]t is well-established that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1025 (D.C. Cir. 2000). As described above, these Notices implemented massive regulatory changes with no notice at all—and the result has been than the States' programs have likely been noncompliant with new federal regulations for days without them having a chance to even explore how to comply. "In short, the [PRWORA Notices] announced a new policy on a matter of some considerable import," and are thus substantive rules. *New Hampshire Hosp. Ass'n*, 887 F.3d at 74.

Although courts can look at "the agency's own characterization of the rule," that characterization is "not conclusive[] in determining the true nature of a rule." *La Casa Del Convaleciente*, 965 F.2d at 1178. Here, HHS and ED characterize their rule as interpretive, but DOL does not. The "probative value" of HHS's and ED's "own characterization . . . is limited,"

especially so here where HHS concedes that its supposed "interpretation" meets the definition of a "major rule" under the APA that would ordinarily need to be subject to notice-and-comment rulemaking. *New Hampshire Hosp. Ass'n*, 887 F.3d at 72; *Levesque*, 723 F.2d at 182 ("[W]hether a rule has a substantial impact may be relevant in construing the intent of the agency in issuing the rule.").

In sum, the Notices bear the hallmarks of classic rulemaking—they announce new, changed, rules of law that the agencies intend to be binding going forward. They strip resources away from millions of vulnerable people with an enormous impact on the economic and social fabric of the States. Defendants' failure to go through the notice-and-comment process in promulgating the new Notices renders the agencies' actions void.

### C. Plaintiffs Are Likely to Succeed on the Merits of their Claims that the HHS, ED, and DOL PRWORA Notices Are Arbitrary and Capricious.

Under the APA a court must "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n of U.S.*, *Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Among other things, a federal agency must take into account both any reliance interests affected by its decision and also any costs of its decision. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020); *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015); *State Farm*, 463 U.S. at 43. And it is a "fundamental requirement of administrative law" that an agency "set forth its reasons for decision," *Amerijet Int'l*, *Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014), so that its decision is "reasonable and reasonably explained," *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agencies must explain their reasoning not only to be "accountable to the public," but also so that their actions are "subject to review by the courts." *Regents*, 591 U.S. at 16 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)); *see also Rhode Island*, 2025 WL 1303868, at *11.

The HHS, ED, and DOL PRWORA Notices are arbitrary and capricious because they fail to consider reliance interests and costs and fail to adequately explain why the specific Newly Restricted Programs have been redesignated as "Federal public benefits."

In support of its Notice, HHS all but explicitly declines to obey the binding precedent requiring it to consider reliance interests under the APA. The Notice states that "[s]ome may argue that there are reliance interests that are affected by the Department's change in position. Some may argue that the Department's new position will negatively impact public health. However strong these hypothetical policy arguments may be, the Department has no power to override Congress's will, expressed in the clear statutory text of PRWORA. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)." 90 Fed. Reg. at 31,238. But *Loper Bright* is about the *courts'* ability to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. 369 at 412.

HHS's argument that it need not consider reliance interests or the disadvantages of its decision because, in the view of the Agency, the current interpretation is unlawful, has also been specifically rejected by the Supreme Court in *Regents. See*. There, the Supreme Court held that *even though* the Attorney General made a determination that the DACA program was illegal and issued a rescission of that program on the basis of that finding of illegality, the government was still required to consider reliance interests and the failure to do so was arbitrary and capricious. *Regents*, 591 U.S. at 33. Nothing in *Loper Bright sub silentio* overturns this rule; rather, *Loper Bright* repeatedly reaffirms that agencies must comply with the APA.

The reliance interests that the HHS PRWORA Notice refuses to take into account are extensive. For nearly thirty years, the Newly Restricted HHS Programs like Title X and Head Start have served people regardless of immigration status. States have relied on HHS's longstanding

view of the law in developing networks of providers, tailoring programs to hard-to-reach client populations. *See supra* 11-30. Not to mention the millions of people who have relied on these services for early childhood education, substance abuse treatment, and other necessities, many of whom will now be unable to access them due to burdensome documentation requirements. *See id.*

There are likewise significant costs (including, as referenced in the Notice itself, negative impacts to public health), that HHS refused or failed to consider. For one thing, the Notice does not grapple at all with the fact that it would take time significant time and resources for States to implement new processes to verify immigration status for services that have always been considered to *not* provide Federal public benefits, if such changes are possible at all. *See id.* Indeed, when Congress enacted PRWORA, it recognized that requiring States to verify benefit recipients' immigration status imposed substantial burdens on States and addressed those burdens by providing States *two years* to develop and implement verification systems. 8 U.S.C § 1642(b). Defendants, by contrast, utterly failed to consider the enormous burdens imposed on States from the Notices' requirement that dozens of new programs develop and implement verification systems. essentially overnight. Indeed, the Notice completely ignores that it would have been impossible for programs to immediately implement the requisite verification systems. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. Feb. 3, 2025) ("Rather than taking a measured approach . . . Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision.").

Nor did the Notice consider other critical disadvantages. For instance, to the extent that programs are able to implement immigration status verification at some point, the result will be to exclude not only undocumented people but also any other vulnerable *still-eligible* people—

including citizens and qualified noncitizens under PRWORA—who rely on safety net benefits but lack ready of proof of citizenship or immigration status or are deterred by the requirement to provide it. The programs being targeted by these notices involve some of the most vulnerable members of society, including those who are transient and do not maintain significant personal records or are unable to overcome administrative hurdles, such as children of seasonal agriculture workers, those in mental health or substance abuse treatment programs, victims of violence, and those who have experienced natural disasters. *Supra* 11-30; *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1108 (N.D. Cal. 2019) (granting motion for preliminary injunction where agency refused to account for predictable disenrollment by those who "erroneously believe themselves to be affected" or who for other reasons were eligible but would not be able to prove eligibility), *aff'd*, 981 F.3d 742 (9th Cir. 2020). This predictable effect undermines a fundamental purpose of the Notice, "to protect benefits for American citizens in need, including individuals with disabilities and veterans." 90 Fed. Reg. at 31,237. But the Notice entirely fails to consider this effect.

Likewise, the Notice fails to consider the potential for covered programs to close because they do not have the resources to implement a complex system for immigration status verification, thus again undermining the Notice's own purported purpose to protect benefits for needy citizens and qualified noncitizens. *State Farm*, 463 U.S. at 43. Ignoring all of this, the HHS PRWORA Notice asserts, without explanation, that there will be an increase in benefits to U.S. citizens and qualified noncitizens from the "corresponding" decrease to unqualified noncitizens. 90 Fed. Reg. at 31,238; *see also* HHS Final Regulatory Impact Analysis, Ex. 5 at 4. But failure to justify such an assertion, while ignoring important and predictable reasons it is unlikely to be true, is a

quintessential "unsupported assumption on which an agency is not entitled to rely." *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41 (D.D.C. 2016) (quotations omitted).

The HHS PRWORA Notice is additionally flawed because it fails to explain why eleven of the thirteen Newly Restricted HHS Programs are "Federal public benefits." Specifically, HHS asserts that it based its re-designation of the Newly Restricted Programs as "Federal public benefits" on "the interpretation of PRWORA set forth" in the Notice. 90 Fed. Reg. at 31,237. But, for eleven of those Programs, the Notice fails to provide any explanation at all *why* they qualify as "Federal public benefits" under the revised interpretation, leaving Plaintiff States and their programs left to guess. Yet, the Notice has "immediate" practical effect as to those programs. *Id.* at 31,238. (The Notice also says that it based its redesignation of the Newly Restricted Programs on "intervening developments since" 1998, *id.* at 31,237, but does not identify any of those intervening developments). As an example, the Health Center Program, one of the eleven Newly Restricted Programs, funds over 1,400 community health centers, which are located in all states and territories, and serves over 30 million people per year. The Notice provides no explanation as to why services at these centers are now designated as Federal public benefits, and providers and patients are left to wonder: is it due to a broader definition of "grant"? The change in "eligibility unit"? An "other similar benefit"? Without understanding that, the Plaintiff States, program administrators, and the general public have no way to determine why the newly designated programs are subject to PRWORA, or what other programs might similarly be deemed subject under HHS's interpretation.

In sum, because HHS did not "'set forth its reasons for decision,'" its directive is arbitrary and capricious. *Nat'l Insts. of Health*, 770 F. Supp. 3d at 304 (quoting *Amerijet Int'l, Inc.*, 753 F.3d at 1350); *see also Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (an agency is required

to "articulate[] a satisfactory explanation for [its] decision" (cleaned up)); *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.").

The ED PRWORA Notice suffers from these same flaws. Unlike HHS, ED does not even attempt to excuse any failure to consider reliance interests: it simply ignores reliance entirely. The Notice provides a statutory analysis, which is incorrect for the reasons identified *infra* 65-68. But, even if that analysis were correct, ED is still required to consider reliance interests. *See Regents*, 591 U.S. at 33 (2020). ED, like HHS, also failed to consider the disadvantages of its decision, as it was required to do. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015).

The Newly Restricted ED programs have operated for decades in reliance on ED's determination that they are not Federal public benefits, including for all of the students currently enrolled. Requiring these programs to undertake immigration status verification and forcing these programs to immediately exclude thousands of participants in the middle of programs without any regard to the impact on them, their families, their employers, and their communities is arbitrary and capricious, as is the failure to consider the spillover effects on American citizens and qualified immigrants under PRWORA. *See supra* 30-34. *New York v. Trump*, 769 F. Supp, 3d. 119, 142 (D.R.I. 2025) (considering "the catastrophic consequences that flowed" as evidence that the agency failed to meaningfully consider the important aspects of the problem, in violation of the APA). The ED PRWORA Notice also fails to "reasonably explain[]" its scope, *Prometheus Radio Project*, 592 U.S. at 423, because it suggests that it may apply to some unspecified programs beyond the two Newly Restricted ED programs. 90 Fed. Reg. at 30,900 n.3. ("[J]ust because a

program is not specifically mentioned herein does not mean the program does not have obligations under PRWORA.").

Similarly, the DOL PRWORA Notice outright ignores any reliance interests.  Nor does it address costs. Many of the programs offered by the States under these statutes do not verify immigration status and cannot immediately do so. *See supra* 34-36. The Notice gives no consideration whatsoever as to the effects on the people who will lose access to these services, their families, employers, and communities.

The DOL PRWORA Notice is also arbitrary and capricious because, like HHS, DOL fails to explain *why* it determined that the Newly Restricted DOL Programs are "Federal public benefits" under PRWORA. The DOL PRWORA Notice identifies these new programs as "Federal public benefits" by classifying them as "participant-level services." DOL PRWORA Notice at 2. This term is undefined in the Notice, and although the Notice asserts that the term is defined in another document, it is not. *Id.* (stating term is defined in TEGL 19-16 Attachment II); TEGL 19-16 Attachment II, Ex. 8. The DOL Notice asserts that "participant-level services," however defined, are necessarily "Federal public benefits" under PRWORA because "their overall goal is to move participants into gainful employment." DOL PRWORA Notice at 3. But the agency gives no explanation of why this goal is a relevant criterion under PRWORA, or how "participant-level services" share this characteristic. The lack of definition and explanation violates the "'fundamental requirement of administrative law'" that "'an agency set forth its reasons for decision.'" *Nat'l Insts. of Health*, 770 F. Supp. 3d at 304 (quoting *Amerijet Int'l, Inc.*, 753 F.3d at1350).

**D. Plaintiffs Are Likely to Succeed on the Merits of their Claim that the HHS, ED, and DOL PRWORA Notices Are Contrary to Law.**

The HHS, ED, and DOL PRWORA Notices are also contrary to law. By their own admissions, these agencies have rejected the interpretations of PRWORA they adhered to for decades, and have dramatically reinterpreted the statute to cover more than two dozen programs they long considered exempt from the statute's requirements. *See* 90 Fed. Reg. at 31,238 (rejecting interpretation in 1998 HHS PRWORA Notice); 90 Fed. Reg. at 30,896 (reversing interpretation in 1997 ED DCL); *see infra* 70-71 (explaining that the DOL notice is inconsistent with longstanding interpretation). Critically, although the agency does not acknowledge it, the HHS PRWORA Notice also rejects a foundational understanding of the statute—that it excludes programs "widely available" to the public—that the federal government has consistently adhered to since one day after PRWORA was enacted. 61 Fed. Reg. at 45,986; *see infra* 52-56.

It would be surprising, to say the least, if five Presidential Administrations, spanning both parties, had so fundamentally misread the statute since the day after its enactment. *See Loper Bright*, 603 U.S. at 386 (explaining that an Executive Branch interpretation that "was issued roughly contemporaneously with enactment of the statute and remained consistent over time" is "entitled to very great respect" (citation omitted)). And Defendants' burden in making this showing is a high one: because PRWORA was enacted pursuant to the Spending Clause as a condition on the States' acceptance of federal funds, any requirements must be set forth "unambiguously" in the statutory text. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). As the parties proffering the more burdensome reading of the statute, Defendants must therefore show not simply that their interpretation is the "best" one, *cf.* 90 Fed. Reg. at 31,238, but that their interpretation is

"unambiguously" correct—and, correspondingly, that every State has been on "clear notice" for thirty years that the federal government was misreading the statute. *Arlington*, 548 U.S. at 296.

Defendants cannot meet that high burden. To the contrary, the HHS, ED, and DOL PRWORA Notices are riddled with a series of legal errors. Together, these errors render the addition of every new program to the agencies' lists of PRWORA-covered programs unlawful.

### 1. The HHS PRWORA Notice Is Contrary to Law.

#### a. The HHS PRWORA Notice unlawfully applies PRWORA to benefits that are generally available to the public.

The HHS PRWORA Notice unlawfully expands the scope of PRWORA by reading it to apply to programs that are generally available to members of the public. PRWORA would have been a statute of breathtaking scope and severity if it barred noncitizens from receiving services that members of the public can receive without applying or meeting eligibility requirements. Under that reading, PRWORA would have barred noncitizens from being picked up by ambulances, having their calls answered by emergency dispatchers, or receiving crime victim counseling whenever those services were supported—as most are—by federal funds. What is more, the statute would have required States and localities to require that every person furnish proof of citizenship or lawful presence before receiving any of those forms of assistance. That absurd reading has never been the law. Since one day after the statute's enactment, DOJ has interpreted the law not to apply to "regular, widely available services." 61 Fed. Reg. at 45,985; *see* 66 Fed. Reg. at 3,616 (same). And it has made clear that this interpretation holds even where those benefits are provided on an individualized basis, such as "ambulance" or "paratransit" services. 61 Fed. Reg. at 45,985.

The HHS PRWORA Notice overthrows this settled understanding. It rejects the longstanding reading of the statute as limited to programs that require applications or impose some eligibility restriction on recipients. *See* 90 Fed. Reg. at 31,234. Instead, it claims that PRWORA

extends to *any* benefits that are "provided on either a per-individual, per-household, or per-'family eligibility unit' basis,'" regardless of whether those programs require applications or otherwise impose eligibility limits. *Id.* And the Notice follows this reading all the way down the slippery slope, including programs on its banned list that fund public health clinics, *see* 42 U.S.C. §§ 254b *et seq.* (Health Center Program); outreach to the homeless, *id.* §§ 290cc-35 *et seq.* (Projects for Assistance in Transition from Homelessness); and substance abuse counseling, *id.* §§ 300x-21 *et seq.* (Block Grants for Prevention and Treatment of Substance Abuse). The astonishing result, it seems, is that none of these federally funded programs can remain open to all comers, as they have been for decades. Going forward, by HHS's lights, States and localities may not let anyone walk into a health clinic or a homeless shelter unless they first demand: "show us your papers."

Statutory text, history, and common sense all refute this interpretation. First, the text: at every turn, PRWORA makes clear that Congress did not intend its requirements to apply to programs that are generally available to the public. The statutory definition of "Federal public benefits" is limited to (A) "grant[s], contract[s], loan[s], professional license[s], or commercial license[s]," and (B) "benefit[s] for which payments or assistance are provided to an individual, household, or family *eligibility unit*." 8 U.S.C. § 1611(c)(1) (emphasis added). Subsection (A) necessarily excludes generally applicable benefits because grants, contracts, loans, and licenses all require an individualized application. And subsection (B) presupposes that a program already limits eligibility; otherwise, there would be no "eligibility unit" for PRWORA to apply to. By definition, a program that imposes no limits on eligibility is not provided to "eligibility units," and so cannot constitute a "Federal public benefit" under section 1611(c)(1)(B).

HHS disputes this reading on the ground that the phrase "eligibility unit" only modifies the term "family." *See* 90 Fed. Reg. at 31,234-35. But that interpretation strains the ordinary rules of

grammar. Where, as here, there is "'a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402-03 (2021) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012)). And it would have made little sense for Congress to refer to the "eligibility unit" when identifying a "family," but not when identifying the similarly context-dependent term "household."

Further, HHS has no plausible theory of why the words "eligibility unit" are in the statute at all. Under its interpretation, section 1611(c)(1)(B) simply refers to benefits provided on a "per-individual, per-household, or per-family basis." 90 Fed. Reg. at 31,235. But Congress could easily have conveyed that meaning by omitting the words "eligibility unit" and just drafting section 1611(c)(1)(B) to refer to "benefits for which payments or assistance are provided to an individual, household, or family." HHS's interpretation thus runs headlong into the "rule against superfluities." *Kholi v. Wall*, 582 F.3d 147, 153 (1st Cir. 2009). Yet it is particularly unlikely that Congress inserted a meaningless reference to "eligibility" in a statute whose principal focus was refining preexisting eligibility criteria. *See, e.g.*, 8 U.S.C. § 1601(4)-(5) (finding that "[c]urrent eligibility rules" are inadequate and that "[i]t is a compelling government interest to enact new rules for eligibility").

Additional textual clues refute HHS's reading. The statute's verification provisions direct the Attorney General to promulgate regulations "requiring verification that a person *applying for* a Federal public benefit . . . is a qualified alien and is eligible to receive such benefit." *Id.* § 1642(a)(1) (emphasis added). Similarly, the statute's exemption for nonprofit charitable organizations excepts those organizations from the requirement to "require proof of eligibility of any *applicant* for such benefits." *Id.* § 1642(d) (emphasis added). These provisions assume that a

person must "apply[] for" a Federal public benefit. They would make no sense if the definition of "Federal public benefits" included programs that did not require applications in the first place.

The statutory history also undermines HHS's reading. The Conference Report for PRWORA explains that "[t]he intent of the conferees is that title I, part A of the Elementary and Secondary Education Act would not be affected by section [1611] because the benefit is not provided to an individual, household, or family eligibility unit." H.R. Conf. Rep. 104-725, at 380 (July 30, 1996). This contemporaneous interpretation by the statute's drafters is consistent with the view that section 1611(c)(1)(B) does not reach generally available benefits, because Title I-A funds public schools that are open to all children. *See generally* Cong. Research Serv., "ESEA Title I-A Formulas: A Primer," R47702 (Sept. 19, 2023). By contrast, it is difficult to square with HHS's view, under which educational benefits that flow to individual children are covered by the statute regardless of whether they are subject to separate eligibility restrictions. *See* 90 Fed. Reg. at 31,235-36.

It is also significant that DOJ first adopted its view that the statute excluded generally available benefits one day after the statute was enacted, *see* 62 Fed. Reg. at 61,361, and that it has not wavered from that interpretation over the intervening 29 years. The Supreme Court recently reaffirmed that "when an Executive Branch interpretation was issued roughly contemporaneously with enactment the statute at issue and remained consistent over time," it is "entitled to very great respect." *Loper Bright*, 603 U.S. at 386; *see id.* at 394 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). It is difficult to imagine a case in which an agency's interpretation was more contemporaneous or consistent than this one.

Finally, the extreme results of HHS's interpretation give ample reason to reject it. Were HHS correct, then PRWORA would have silently superimposed an extraordinary new term on

every grant agreement with State or local governments: as a condition of receiving federal funds, each recipient would have needed to erect a new system for screening individuals before granting them access to federally funded services that were previously open to all. Congress, however, must speak "unambiguously" before imposing new spending conditions on the States. *Arlington Cent*, 548 U.S. at 296 (quotation marks omitted). And that is especially true where the grant terms would intrude on areas of core state power, like the manner in which States conduct law enforcement, protect public health, or provide education. *See*, *e.g.*, *Bond v. United States*, 572 U.S. 844, 858 (2014) (legislation affecting the federal-state balance requires a "clear statement" of intent (internal quotation marks omitted)). The absence of any explicit indication that Congress intended the dramatic mandate HHS now imposes further confirms it is wrong.

HHS's error in this regard renders nearly its entire Notice unlawful. Of the programs that HHS added to the Notice, at most three of them impose limits on the eligibility of individuals, households, or families to receive their benefits. *See*, *e.g.*, 42 U.S.C. §§ 673(d)(3), 677(i)(1) (Title IV-E programs); *id.* § 9840(a)(1)(A) (Head Start). The rest do not. Although some of these programs are *targeted* at certain populations, such as low-income individuals or the homeless, they do not limit benefits to those populations, require that individuals meet any particular eligibility requirements, or demand that people submit an application to access these programs. *See, e,g.*, NY-Orr Decl. ¶ 11 (Community Service Block Grant); CT-Navarretta ¶ 8 (Behavioral Health Clinics). Under a proper construction of the statute, all of these programs should therefore be excluded from PRWORA's requirements.

> b. *The HHS PRWORA Notice unlawfully extends PRWORA to non-postsecondary educational benefits, including Head Start.*

The HHS PRWORA Notice is also contrary to law because it misreads PRWORA to extend to benefits for non-postsecondary education, including the Head Start program. The statute could

hardly be clearer on this point: It provides that the term "Federal public benefits" includes "any retirement, welfare, health, disability, public or assisted housing, *postsecondary education*, food assistance, unemployment benefit, or any other similar benefit." 8 U.S.C. § 1611(c)(1)(B) (emphasis added). By expressly including "*postsecondary* education . . . benefit[s]" in the statute, Congress made clear it did not intend to include *non*-postsecondary education benefits, like Head Start. *See Esteras v. United States*, 145 S. Ct. 2031, 2040 (2025) ("expressing one item of an associated group or series excludes another left unmentioned" (citation and alteration omitted)).

To remove any doubt, the drafters underscored twice over that the statute should not be read to reach non-postsecondary education benefits. They inserted a rule of construction stating that "[n]othing in this chapter may be construed as addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under *Plyler v. Doe*." 8 U.S.C. § 1643(a)(2). And, as already noted, they included language in the Conference Report confirming that "[t]he intent of the conferees" is that title I, part A of the Elementary and Secondary Education Act"—a statute providing support for disadvantaged public schools—"would not be affected by section [1611]." H.R. Conf. Rep. 104-725, at 380. All of these interpretive principles point in the same direction: when Congress limited section 1611(c)(1)(B) to "postsecondary education . . . benefit[s]," it meant it.

HHS's attempts to avoid the plain meaning of the statute are unpersuasive. First, HHS argues that benefits for non-postsecondary education fall within the catchall for "other similar benefit[s]" in section 1611(c)(1)(B) because they are "similar" to welfare benefits. 90 Fed. Reg. at 31,236. But it is hornbook law that courts should not read a "residual phrase" in a way that "fails to give independent effect to the statute's enumeration of the specific categories . . . which precedes it." *Circuit City Stores*, *Inc. v. Adams*, 532 U.S. 105, 114 (2001). Nor should courts read catchall

provisions to "implicitly eliminat[e] a limitation explicitly set forth" elsewhere in the statute. *Liteky v. United States*, 510 U.S. 540, 548, 553 (1994); *see United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011). If "other similar benefits" covered all education benefits because they are similar to "welfare," then the enumeration of "postsecondary education benefits" earlier in the same list would be superfluous. And this reading would effectively override Congress's considered insertion of the word "postsecondary" before "education."

In any event, the premise of HHS's argument is wrong. Congress used the word "welfare" some six dozen times in PRWORA—a statute famously designed to reform the welfare system— and its consistent meaning throughout the statute is to refer to cash payments to low-income families. *See, e.g.*, PRWORA, Pub. L. No. 104-193, § 101(8)(F) (finding that "[c]hildren born out-of-wedlock are 3 times more likely to be on welfare when they grow up"); *id.* § 103(a) (qualifying states for block grants based on "the level of welfare spending per poor person"); *id.* § 302(a) (directing a study into program's success in "moving people off of welfare and keeping them off of welfare"). In-kind services to support a child's education are not "similar" to such payments. HHS attempts to support a broader definition of "welfare" by invoking two unrelated, cherry-picked sources, but neither supports its interpretation. One source (a statute enacted two years before PRWORA) uses the term in much the same way as PRWORA: it directs the agency to consider three programs authorizing cash payments to low-income individuals in a report on "welfare receipt in the United States." *See* Social Security Amendments of 1994, Pub. L. No. 103-432, § 232 (1994). The other is a government website, posted by HHS decades after PRWORA's enactment, that defines the distinct term "child welfare." 90 Fed. Reg. at 31,236 & n.4. Needless to say, this post-enactment website is considerably less probative in defining PRWORA's terms than the Act itself.

Second, HHS suggests that Head Start is not just an education program because it provides "health," "nutritional," "social and other services," and "child care." 90 Fed. Reg. at 31,236 (quoting 42 U.S.C. § 9831(2)). But these features are expressly designated by the statute as means "through" which it achieves its educational goals of "promot[ing] the school readiness of low-income children" and "enhancing their cognitive, social, and emotional development." 42 U.S.C. § 9831. Further, these features of Head Start do not distinguish it from any other form of education for young children, which typically includes healthy meals, support for physical and mental health, social and emotional support, and full-day child care. *See* 8 U.S.C. § 1615 (explicitly carving school-lunch programs out of PRWORA).

In sum, the best reading of the statute is that it means what it says: it applies to "postsecondary education . . . benefit[s]," not early childhood benefits like Head Start. 8 U.S.C. § 1611(c)(1)(B). At minimum, "a state official" reading the Act would not "clearly understand" it to mean the opposite. *Arlington*, 548 U.S. at 296. Accordingly, HHS erred by including Head Start in its list of banned programs.

        *c.  The HHS PRWORA Notice improperly deems programs subject to PRWORA in their entirety, rather than identifying "Federal public benefits" on a benefit-by-benefit basis.*

The HHS PRWORA Notice is also contrary to law because it defines programs as "Federal public benefits" in their entirety, rather than identifying Federal public benefits on an individual basis. PRWORA provides that non-qualifying aliens are ineligible for certain "Federal public benefit[s]." 8 U.S.C. § 1611(a), (c)(1)(A)-(B). A given program, however, may provide a range of benefits, some of which qualify as "Federal public benefits" and some of which do not. Accordingly, since the enactment of PRWORA, DOJ has recognized that "[i]f one program

provides several public benefits, [PRWORA]'s requirements apply only to those benefits that are non-exempted federal public benefits under the Act." 62 Fed. Reg. at 61,346.

The 1998 HHS PRWORA Notice reflected this understanding. Although that notice identified 31 programs that "provide 'Federal public benefits,'" it explained that "this does not mean that all benefits or services provided under these programs are 'Federal public benefits.'" 63 Fed. Reg. at 41,658. Rather, the agency cautioned that some services provided by these programs "would not be considered a 'Federal public benefit'" if they fell outside the statutory definition. 63 Fed. Reg. at 41,660. And, within the listed programs, the agency identified specific services that were included or excluded from coverage. *See*, *e.g., id.* ("ADD—Special Projects (direct services only)"; "Medicaid (except assistance for an emergency medical condition)").

The new HHS PRWORA Notice abandons this approach. It "update[s]" the 1998-era list by identifying 13 "additional HHS programs" in their entirety. 90 Fed. Reg. at 31,237. It does not contain any qualification stating that noncitizens may access individual services in these programs that fall outside of PRWORA. Nor does it attempt to identify specific services that are included or excluded. To the contrary, HHS states that this list consists of "programs determined to be Federal public benefits." *Id.* And it has said that the order "Bans Illegal Aliens from Accessing its Taxpayer-Funded Programs."[11]

Many benefits within the listed programs, however, fall outside of PRWORA under any understanding of the statute. For instance, some of the listed programs offer benefits that are not provided—to borrow HHS's terminology—on a "per-individual, per-household, or per-family

---

[11] "HHS Bans Illegal Aliens from Accessing its Taxpayer Funded Programs (July 10, 2025) ("HHS Release"), https://www.hhs.gov/press-room/prwora-hhs-bans-illegal-aliens-accessing-taxpayer-funded-programs.html .

basis." 90 Fed. Reg. at 31,235 (acknowledging that such benefits fall outside the statute); *see*, *e.g.*, 42 U.S.C. § 300x-1(b)(1)(A)(iii) (Community Mental Health Services Block Grant may be used to coordinate "law enforcement services"). Other programs fund "assistance . . . for immunizations" and "treatment of symptoms of communicable diseases." 8 U.S.C. § 1611(b)(1)(C) (exempting these benefits from the statute); *see*, *e.g.*, 42 U.S.C. § 254b(b)(1)(A) (Health Center Program funds "immunizations," "emergency medical services," and other "primary health services"). HHS made no effort, however, to identify which benefits within these programs are actually covered by the statute. As a result, the entire list is overbroad.

> d. *The HHS PRWORA Notice incorrectly includes all benefits funded by block grants to State or local governments.*

The HHS PRWORA Notice incorrectly includes any benefits provided by block grant programs within its definition of "Federal public benefits." Section 1611 only restricts the eligibility of "an alien" for Federal public benefits. 8 U.S.C. § 1611(a). A grant issued to a State or local government therefore does not itself trigger any of the Act's prohibitions, because it is not provided to "an alien." Such a grant only triggers PRWORA if it is in turn used by the State or local government to fund payments or assistance to noncitizens that constitute "Federal public benefits" within the meaning of the statute—for instance, if they pay for "welfare" to an "individual, household, or family eligibility unit," but not if they fund police services or a library. 8 U.S.C. § 1611(c)(1)(B); *see* 62 Fed. Reg. at 61,361 (giving additional examples).

Again, this reading of the statute has long been uncontroversial. DOJ explained shortly after the statute's passage that the Act "does not prohibit governmental or private entities from receiving federal public benefits that they might then use to provide assistance to aliens, so long as the benefit ultimately provided to the non-qualified aliens does not itself constitute a 'federal public benefit.'" 62 Fed. Reg. at 61,361. HHS reached a similar conclusion in its 1998 notice. 63

Fed. Reg. at 41,659. This reading did not exclude block grant programs from the statute entirely. *Cf.* 90 Fed. Reg. 31,234. It simply meant that HHS deemed block grant programs included only where they provided qualifying Federal public benefits to noncitizens, such as the Social Services Block Grant program. 63 Fed. Reg. at 41,660.

The new HHS PRWORA Notice departs from this straightforward understanding. It claims that block grants necessarily qualify as Federal public benefits because they are "grants" within the meaning of section 1611(c)(1)(A). 90 Fed. Reg. at 31,233-34 (quoting 63 Fed. Reg. at 41,659). And, relying on this reasoning, it adds a large number of block grants to its list of "programs [that] provid[e] 'Federal public benefits,'" 90 Fed. Reg. at 31,237, which it now claims noncitizens are "Ban[ned]" from "Accessing," *see* HHS Release. But one conclusion simply doesn't follow from the other: the fact that a State receives a block grant does not mean that the State uses that program to "provid[e] 'Federal public benefit[s],'" let alone that noncitizens are barred from accessing those benefits. And, in fact, the block grant programs that HHS has listed fund a large number of services that do not qualify as "Federal public benefits." *See*, *e.g.*, 42 U.S.C. § 9901 (authorizing the use of Community Services Block Grants to strengthen "community capabilities" and increase the role of "business, labor, and professional groups" in combatting poverty); *id.* § 300x-1(b)(1)(A)(iii) (authorizing use of Community Mental Health Block Grants to "coordinate . . . law enforcement services" and the "services to be provided by local school systems"). The inclusion of these block grants on the list of covered programs is unlawful.

> e. *The HHS PRWORA Notice includes several programs that Congress exempted from PRWORA in subsequent statutes.*

Finally, the HHS PRWORA Notice is unlawful because it includes several programs that Congress exempted from PRWORA in subsequent statutes. In PRWORA, Congress set a background eligibility restriction that applies "notwithstanding any other provision of law." 8

U.S.C. § 1611(a)(1). But because "statutes enacted by one Congress cannot bind a later Congress," *Dorse v. United States*, 567 U.S. 260, 273 (2012), Congress always remains free to exempt programs from PRWORA's scope. It need not use "magical passwords" to do so. *Marcello v. Bonds*, 349 U.S. 302, 310 (1955). Even where the Supreme Court has encountered statutes that mark their terrain far more emphatically than PRWORA—providing, for instance, that a statute controls unless Congress "expressly provides" otherwise—the Court has held that later statutes are exempt from their requirements if the "plain import" or "fair implication" of the later statute is that it is not subject to the earlier. *Dorsey*, 349 U.S. at 274-275 (citing cases); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("the specific governs the general"); *Lockhart v. United States*, 546 U.S. 142, 149 (2005) (Scalia, J., concurring).

Applying this rule, both courts and Defendants themselves have found statutes exempt from PRWORA where they were enacted later-in-time than PRWORA and contain mandatory obligations inconsistent with its restrictions. In 2020, for instance, multiple courts held that a provision of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was exempt from PRWORA because Congress enacted it decades later and "unambiguously directed certain aid to a plainly defined group of people": "all students." *Noerand v DeVos*, 474 F. Supp. 3d 394, 398, 403 (D. Mass. 2020); *see Oakley v. DeVos*, No. 20-cv-03215-YG, 202 WL 3268661, at *15-16 (N.D. Cal. June 17, 2020) (same). ED itself agreed with that interpretation in a final rule. *See* 86 Fed. Reg. 26,608, 26,618-20 (May 14, 2021). And the ED PRWORA Notice maintains a similar approach, stating that its interpretation does not apply to "specific later in time statutory exceptions." 90 Fed. Reg. at 30,899. As an example, it gives 20 U.S.C. § 1070e, a statute stating that child-care grants "shall be used . . . to support or establish a campus-based child care program

primarily serving the needs of low-income students," including students on temporary visas. 10 U.S.C. § 1070e(b)(5), 7(B)(ii).

At least two programs on the HHS list are similarly exempt from PRWORA. First, the statute governing the Health Center Program provides that health centers that receive funding under the program are subject to a "requirement . . . to provide services for *all* residents within a catchment area." 42 U.S.C. § 254b(a)(1)-(2) (emphasis added). This statute unambiguously directs aid to "all" residents, without regard to immigration status. *Cf. Noerand*, 474 F. Supp. 3d at 398 (finding exemption from PRWORA for statute that directed benefits to "all students"). It contains several carefully drawn exceptions, none of which includes PRWORA. *See* 42 U.S.C. § 254b(b), (g), (h), (i). And it was enacted after PRWORA. *See* Health Centers Consolidation Act of 1996, Pub. L. No. 104-299, § 2 (Oct. 11, 1996). Because it is impossible both to provide services to "all residents" of an area and to exclude a large class of noncitizens, the "plain import" of this provision is that it is not subject to PRWORA. *Dorsey*, 349 U.S. at 275.

Second, Head Start is similarly exempt from PRWORA by a later enactment. The statute governing the Head Start program provides that, "[e]xcept as provided in paragraph (2)"—a provision governing Head Start agencies in small communities—"children from low income families *shall* be eligible for participation" if they meet the relevant income thresholds, 42 U.S.C. § 9840(a)(1)(B)(i) (emphasis added), and that "homeless children *shall* be deemed eligible for such participation." *id.* § 9840(a)(1)(B)(ii) (emphasis added). As with the Health Center statute, these directives are specific, mandatory, and qualified by only a single exception. And the statute repeatedly reaffirms that Congress intended to enable universal coverage among these groups of children. It directs Head Start agencies to "ensure" that they are "meeting the needs of children eligible under" these clauses before enrolling other children, *id.* § 9840(a)(1)(B)(iii)(II); it requires

agencies to attempt to "be fully enrolled with children eligible under" these clauses, *id.* § 9840(a)(1)(B)(iv)(III); it instructs the Secretary to "remove barriers to the enrollment and participation of homeless children," including burdensome documentation requirements, *id.* § 9835(m); and it authorizes funding specifically to "address the challenges of children from immigrant, refugee, and asylee families," *id.* § 9835(a)(5)(B)(i). Congress enacted all of these provisions more than a decade after PRWORA, at a time when it was settled law that PRWORA did not apply to Head Start. *See* Improving Head Start for School Readiness Act of 2007, Pub. L. No. 110-134 (Dec. 12, 2007). It is a "fair implication" of these provisions that Congress did not intend Head Start to be subject to PRWORA.[12]

## 2. The ED PRWORA Notice Is Contrary to Law.

The ED PRWORA Notice, too, is contrary to law. From 1997 onward, ED (like HHS) interpreted PRWORA to cover only those educational benefits provided at the "postsecondary" level. *See* ED DCL at 4-5. In its new PRWORA Notice, ED rejects this reading and adopts a jerry-rigged new test: it contends that the statute covers (1) all educational benefits provided to adults, "postsecondary education benefits or otherwise"; and (2) all educational benefits provided to children that are not "basic public education benefits." 90 Fed. Reg. at 30,899. And it relies on this test to cover two programs that expressly provide secondary education benefits. *See id.* at 30,899-900.

---

[12] It is especially clear that PRWORA does not apply to children already enrolled in Head Start programs. Section 9840(a)(1)(B) provides that "a child who is determined to meet the eligibility criteria described in this subparagraph and who is participating in a Head Start program in a program year shall be considered to continue to meet the eligibility criteria through the end of the succeeding program year." 42 U.S.C. § 9840(a)(1)(B)(v).

This test is flawed on its face. The statutory text expressly defines "Federal public benefit[s]" to include "postsecondary education . . . benefits." 8 U.S.C. § 1611(c)(1)(B). Congress would not have included the qualifier "postsecondary" in this phrase if it actually intended to cover "all" educational benefits except "basic public education." *Cf.* 90 Fed. Reg. at 30,899. And both the contemporaneous construction of the statute's drafters, *see* H.R. Conf. Rep. No. 104-725, at 380, and the contemporaneous and consistent construction of the federal agencies responsible for administering this statute, *see* 90 Fed. Reg. at 30,897 (discussing 1997 ED DCL); 63 Fed. Reg. at 41,659 (HHS PRWORA Notice), confirm that it is limited, as it says, to postsecondary education benefits. *See Loper Bright*, 603 U.S. at 394.

Much like HHS, ED attempts to cram non-postsecondary education benefits into the catchall clause in section 1611(b)(1)(C), on the theory that "the disparate nature" of the benefits listed in section 1611(c)(1)(B) "suggest[s] that Congress intended to capture an expansive array of Federal benefits." 90 Fed. Reg. at 30,897. But this reading ignores the principle that a catchall clause should not be used to contradict specific limits elsewhere in the statute. *See supra* 57-58. And it lacks any apparent limiting principle; if the only rule in interpreting section 1611(c)(1)(B) is that Congress intended the covered benefits to be "expansive," then the word "similar" has no work to do, and the statute effectively means "any other benefit."

ED's reading is also irreconcilable with the statute's rule of construction that "[n]othing in this chapter may be construed as addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under *Plyler v. Doe*." 8 U.S.C. § 1643(a)(2). If the catchall clause in section 1611(c)(1)(B) encompassed all educational benefits, then section 1611 would bar noncitizens from attending any public schools that receive federal money (as the vast majority do). And section 1621—which mirrors the definition of "Federal public benefit" in

defining "state or local public benefit"—would render noncitizens ineligible to attend public schools. 8 U.S.C. § 1621(a), (c). These interpretations would flatly contradict the holding of *Plyler*. *See* 457 U.S. at 230.

In an effort to avoid this untenable result, ED proposes to read the catchall clause in section 1611(c)(1)(B) to contain an unstated exception for "basic public education benefits." 90 Fed. Reg. at 30,899. But section 1643(a)(2) is a rule of construction, not a statutory exception. If ED's interpretation of the catchall clause in section 1611(c)(1)(B) leads to a result that contradicts the rule of construction, that is proof that it is wrong—not a license to graft an extratextual exception onto section 1611(c)(1)(B).

In the end, ED's theory of how the statute works is simply too complicated to be plausible. If Congress had wished to cover all educational benefits except basic public education benefits, it could easily have said so. It would not have achieved this result by (1) expressly listing "postsecondary education . . . benefit[s]," (2) implicitly including all other education benefits through the phrase "any other similar benefit," and (3) implicitly excluding "basic public education benefits" through a rule of construction placed at the other end of the statute. ED offers "no reason for Congress to have constructed such an obscure path to such a simple result." *Kloeckner v. Solis*, 568 U.S. 41, 52 (2012). And the very obscureness of ED's reading is a further reason, under the Spending Clause's clear-statement rule, that it cannot prevail. *See Arlington*, 548 U.S. at 296.

Because ED's interpretation is wrong, it follows that ED erred by relying on that interpretation to deem two new programs covered by PRWORA. *See* 90 Fed. Reg. at 30,899-900. WIOA II authorizes grants to States to provide basic literacy training and education "below the postsecondary level" to adults who are "basic skills deficient," lack a secondary-level education, or are "English language learner[s]." *See* 29 U.S.C. § 3271 (providing that the programs funds

"adult education and literacy activities"); *id.* § 3272(1), (4), (13) (defining "adult education," "literacy," and "eligible individuals"). As the text makes plain, this program funds education benefits "below the postsecondary level" for students who lack a secondary-school education. *Cf.* 90 Fed. Reg. at 30,899 (describing the program as an "alternative" to "secondary school"). It therefore does not constitute a "postsecondary education . . . benefit" subject to PRWORA.

Perkins V authorizes grants to states to fund "career and technical education" at both the "secondary and postsecondary" level. *See* 20 U.S.C. §§ 2301, 2302(5); *see* 90 Fed. Reg. at 30,900 ("Perkins V funds programs for individuals both at the secondary and postsecondary levels"). ED suggests that the program's secondary-level benefits are only exempt from PRWORA if they are provided "in the secondary school setting." 90 Fed. Reg. at 30,900. But this artificial distinction is derived entirely from ED's attempt to define what counts as a "basic public education" under its invented statutory test. *See id.* That description of "basic public education" is dubious on its own terms. But once ED's test is rejected, it does not matter where secondary-level benefits are provided. They are not "postsecondary education . . . benefit[s]," and fall outside of PRWORA for that reason.

The remainder of Perkins V falls outside of PRWORA for a separate reason. As ED acknowledges, Perkins V contains no "test for eligibility." *Id.* Rather, it gives States broad discretion to make career and technical training programs available throughout the state, without imposing any requirements that individuals must satisfy to benefit from them or demanding that individuals apply. *See, e.g.*, 20 U.S.C. § 2342(d). Accordingly, for the reasons noted with respect to the HHS PRWORA Notice, Perkins V cannot constitute a "Federal public benefit" subject to PRWORA and its eligibility verification requirements. *See supra* pp. 52-56.

### 3. The DOL PRWORA Notice Is Contrary to Law.

The DOL PRWORA notice is also unlawful. In 2024, DOL adopted a measured, nuanced policy for identifying which portions of its employment and training programs were subject to PRWORA. *See* DOL, Training & Employment Guidance Letter No. 10-23 (Feb. 21, 2024) ("2024 DOL Notice"). DOL acknowledged that these programs funded some services that constituted Federal public benefits, such as "direct financial benefit[s]" and "post-secondary education and training." *Id.* at 5. But it observed that they funded other services that did not fall within PRWORA's scope, including non-postsecondary education like "high school equivalency"; "[i]nformation on worker rights and where to find legal assistance"; and "assistance" with completing various types of paperwork. *Id.* at 6. DOL therefore identified those services that did not constitute Federal public benefits, and explained that individuals could access those services— and only those services—without providing proof of eligibility under PRWORA. *Id.* at 5-7.

The new DOL guidance replaces this targeted approach with a blunderbuss. It now asserts that "*all* participant-level services are 'federal public benefits' under PRWORA." DOL PRWORA Notice at 2 (emphasis added). The reason? The agency's explanation is, in full, the following:

> [A]ll participant-level services are "federal public benefits" under PRWORA, because they are the same or similar as benefits listed in PRWORA at 8 USC 1611(c). While [these] programs provide a range of services to jobseekers, the overall goal is to move participants into gainful employment.

DOL PRWORA Notice at 2-3.

This spare justification is entirely without merit. The fact that a program's "overall goal" is to "move participants into gainful employment" plainly does not make it a "Federal public benefit."

For one thing, the definition of "Federal public benefits" does not turn on a program's "overall goal" at all. All of the items in section 1611(c)(1)(B) are identified by the nature of the

assistance they provide, not the reason it is provided: *e.g.*, "postsecondary education," "food assistance," or "housing." 8 U.S.C. § 1611(c)(1)(B). It follows that the goal of a benefit is not a relevant consideration in determining whether a benefit is "similar" to the listed items. *Id.*; *see, e.g.*, *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024) (defining scope of a catchall by identifying "what a statute's specific listed items share in common").

For another, even if a program's "overall goal" mattered, nothing in PRWORA suggests that Congress sought to include all programs whose goal is to "move participants into gainful employment." If anything, the common thread among the items listed in section 1611(c)(1)(B) is that they cover individuals who face a long-term *barrier* to gainful employment. *See* 8 U.S.C. § 1611(c)(1)(B) (listing "retirement, welfare, health, [and] disability" benefits). And PRWORA's central aim was to promote "[s]elf-sufficiency" among noncitizens in order to ensure that they are "not depend[ent] on public resources to meet their needs, but rather rely on their own capabilities." *Id.* § 1601(1)-(2). Providing forms of assistance that would "move [them] into gainful employment" would advance, not subvert, this aim.

DOL's justification has still other problems. As DOL acknowledges in a footnote, some of the programs swept into its notice "provide . . . secondary-level education services." DOL PRWORA Notice at 2 n.1. As already noted, PRWORA's definition of "Federal public benefits" is explicitly limited to "*post*secondary education" services, and Congress made clear several times over that it did not intend to limit access to primary or secondary education. 8 U.S.C. § 1611(c)(1)(B) (emphasis added); *see supra* pp. 65-68. DOL suggests that these programs are subject to PRWORA anyway because they provide other benefits *in addition* to secondary education. But PRWORA limits eligibility on a benefit-by-benefit, not program-by-program basis. *See supra* pp. 59-61. And DOL does not explain why it could not limit access to benefits out

individually, as the 2024 DOL Notice did. *Compare* DOL PRWORA Notice *with* 2024 DOL Notice at 5-6.

Finally, the DOL Notice errs by including services that only provide information, referrals, or assistance in completing paperwork. *See* 2024 DOL Notice at 6-7 (listing many such services). All of the benefits listed in section 1611(c)(1)(B) entail the provision of some tangible or monetary assistance—retirement payments, housing, food, and the like. Merely sharing information with a noncitizen is dissimilar to all of those benefits. *Cf.* 62 Fed. Reg. at 61361 (explaining that "crime victim counseling" is "not similar to an enumerated benefit"). And it is unlikely in the extreme that Congress sought to require recipients of federal funding to screen individuals for their immigration status before speaking with them.

To the extent there is any doubt, the Spending Clause resolves it. Would a state official reading section 1611(c)(1)(B) "clearly understand," *Arlington*, 548 U.S. at 296, that a service is covered by PRWORA simply because its "overall goal" (something the statute never mentions) is to promote "gainful employment" (an aim PRWORA affirmatively seeks to promote), even where those benefits involve the provision of secondary education (a subject the statute purposefully excludes) or information (enough said)? Surely not. DOL therefore cannot reinterpret the statute to say that it does.

### E. Plaintiffs Are Likely to Succeed on their Claims that the PRWORA Notices Violate the Spending Clause.

The Spending Clause provides that "[t]he Congress shall have Power To . . . provide for the general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Under this Clause, Congress may "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But "[t]he spending power is of course not unlimited." *Id.* at 207. Conditions attached to federal spending are "much in the nature of a contract," and States must be able to "voluntarily

and knowingly accept[] the terms" without undue "coercion" from the federal government. *Nat'l Fed. of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 577 (2012) (plurality opinion) (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)).

The Spending Clause therefore imposes two limits relevant here. First, the federal government must provide States "clear notice" of the terms of their grants and may not "surprise[e] participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp.*, 451 U.S. 1, 25 (1981). Second, the "financial inducement" must not be "impermissibly coercive." *NFIB*, 567 U.S. at 580. These limits constrain Congress when it enacts spending legislation, *id.*, and they apply as well to federal agencies when adopting or enforcing spending conditions, *see, e.g.*, *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019) (holding that an HHS rule violated the Spending Clause).

The PRWORA Notices violate both of these limits. When accepting federal funds, the States could not have foreseen that the agencies would make a dramatic about-face on the scope of PRWORA in the middle of their grant terms. And the States cannot be coerced into transforming or eliminating their social service programs under threat of losing billions of dollars in federal funding.

### 1. The PRWORA Notices Impose Impermissibly Retroactive Conditions.

The PRWORA Notices impose conditions on the States that they could not possibly have foreseen when accepting federal funding. At the time the Plaintiff States accepted funding from HHS, DOL, and ED, each agency had publicly adopted an interpretation of PRWORA that excluded all of the newly covered programs from its scope. *See* 63 Fed. Reg. at 41658; 2024 DOL Notice at 5-7; 90 Fed. Reg. at 30,896 (describing 1997 ED DCL). What is more, DOJ had in place a binding, notice-and-comment regulation formally exempting a vast swathe of federal spending

programs from PRWORA. 61 Fed. Reg. at 45,985, 45,985-86. These interpretations and exemptions were not new, and they were not contested: the HHS, ED, and DOJ notices had been in place almost from the statute's inception and had remained untouched across five Presidential Administrations. And the DOL notice merely implemented the well-settled understanding of the statute's scope.

The new PRWORA Notices changed all of that on a dime. HHS, ED, and DOL have explicitly repudiated their longstanding positions on the statute's scope and adopted an entirely novel view as to what PRWORA means. Those interpretations have dramatically expanded the reach of the statute; HHS has added more than a dozen new programs to its banned list, DOL has added seven, and ED has added at least two, collectively worth billions of dollars in federal funding. Those interpretations are anything but obvious: whatever one thinks of the merits of Defendants' newfound views—and we do not think much, *see supra* 51-71—it "strains credulity to argue that participating states should have known of" these interpretations when "the government agenc[ies] responsible for the administration of the Act . . . h[ad] never understood" the statute in this way. *Pennhurst*, 451 U.S. at 25; *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (state agency "could not have realistically supposed" that spending statute meant something different than regulations that "ha[d] been on the books for nearly thirty years"). Yet the agencies have informed the States that they must obey their new interpretations immediately—in the middle of their grant terms—or risk enforcement and a cutoff in federal funding. 90 Fed. Reg. at 31,238; 90 Fed. Reg. at 30,900; DOL PRWORA Notice at 1.

The DOJ notice effects an even more egregious bait-and-switch. Since the day after PRWORA's enactment, DOJ has exempted a broad number of programs from PRWORA's scope. *See* 61 Fed. Reg. 45,986. Plaintiff States accepted numerous federal grants in reliance on that

interpretation—to a first approximation, there were literally dozens of programs previously covered by the DOJ exemptions, from emergency homeless shelters under the Emergency Solutions Grants to the 988 hotline to crime victim services under the Violence Against Women Act. Without warning, DOJ has revoked all of those exemptions, demanding that agencies begin applying PRWORA to all of these programs in a matter of 30 days. 90 Fed. at 32,024-25. And, as DOJ acknowledges, it has imposed this new regulatory mandate in a purported exercise of the Attorney General's regulatory authority—that is, it has not claimed (however dubiously) that the statute *always* included these programs. *See id.* at 32,024. In an exercise of raw will, the Attorney General has just decided she no longer wishes to exempt them. *See id.* at 32,025-26 (explaining that the order "does not purport to define what benefit programs are, and are not, 'public benefits' subject to PRWORA," but is solely an "exercise of . . . discretion").

This is the epitome of unfair notice. The federal government may not "surprise[e] participating States with post acceptance or 'retroactive' conditions" on Federal grants. *Pennhurst*, 451 U.S. at 25. Yet the federal government has imposed conditions on the States that they were wholly "unable to ascertain" at the time they accepted the relevant grants. *Arlington*, 548 U.S. at 296. Indeed, the federal government had clearly, consistently told them precisely the opposite of what it now says. The Spending Clause therefore bars Defendants from demanding compliance with these conditions.

### 2. The PRWORA Notices Are Impermissibly Coercive.

The PRWORA Notices also unconstitutionally coerce the Plaintiff States. The Supreme Court has held that a federal condition "pass[es] the point at which 'pressure turns into compulsion,'" when it threatens a substantial portion of a state's federal funding unless the state accepts a program that is "different in kind, not merely degree" than the one the state previously agreed to join. *NFIB*, 567 U.S. at 580-83. In *NFIB*, for instance, the Court held that the Affordable

Care Act's Medicaid expansion was unconstitutionally coercive because it threatened to withhold the entirety of each State's Medicaid funding—equaling over 10 percent of a State's budget—unless the State accepted a dramatic transformation of the Medicaid program. *Id.* And in *New York*, a court found that an HHS "conscience rule" was unconstitutionally coercive because it conditioned access to all of the States' federal health care funding on new terms for responding to conscience-based objections in the health care area. 414 F. Supp. 3d at 570-71.

The PRWORA Notices place a similar "gun to the head[s]" of the Plaintiff States. *NFIB*, 567 U.S. at 581. The financial pressure on the Plaintiff States to accept these conditions is enormous. As noted, Defendants have imposed new conditions on the receipt of funds for dozens of federal programs. These programs comprise the very core of the social safety net in many States: they include resources for early childhood education (Head Start), health centers (the Health Center Program), workforce training (WIOA), and programs for domestic violence prevention, foster care, mental health, temporary shelter, child welfare, and much more. Collectively, these programs provide billions of dollars in funding annually and are often critical to the survival of state programs. The States could not realistically forgo all of this federal funding—especially in the middle of the grant terms, when States have devised their budgets and designed their programs in reliance on federal funding.

Yet Defendants have demanded that the States "transform" their own social services programs "dramatically" in order to continue receiving federal funding. *NFIB*, 567 U.S. at 584. The PRWORA Notices "change[] the 'who,' 'what,' 'when,' 'where,' 'why,' and 'how'" with respect to how States must restrict eligibility for these programs. *New York*, 414 F. Supp. 3d at 571. They substantially alter which individuals may access these state programs, throwing numerous citizens and non-citizens alike out of the states' social safety net. They will require the development

of costly new systems for screening for eligibility. *See supra* 11-38. And in so doing, they will dramatically transform the nature of many of these programs. Programs that were previously open to all comers will now need to bar individuals at the door unless they can produce their papers. And many programs that cannot realistically provide such screening will likely need to close entirely. *See id*.

Two additional features of this coercion make it especially problematic. First, Defendants have not simply identified or enlarged conditions in the threatened programs *themselves*. Rather, they have taken a freestanding statute, PRWORA, and leveraged it as a basis to "threat[en] to terminate other significant independent grants." *NFIB*, 567 U.S. at 580. Furthermore, they have done so in order to achieve policy objectives entirely distinct from those that animate those grant programs themselves—in the Attorney General's words, to "reduce the incentive for aliens to illegally migrate to the United States." 90 Fed. Reg. at 32,025. In this context, "the conditions are properly viewed as a means of pressuring the States to accept policy changes." *NFIB*, 567 U.S. at 580.

Second, these grants cut deep into areas of traditional state authority. Many of the affected federal programs supplement or support the states' *own* efforts to carry out activities at the core of state authority in our federal system, such as foster care, combating domestic violence, and healthcare. *See United States v. Morrison*, 529 U.S. 598, 615-16 (2000). Because federal funds are used pervasively in many of these programs, States will need to alter how they themselves carry out their responsibilities in order to accept the terms. But the central concern underlying Spending Clause doctrine is that the federal government not be able to use its spending power to "require the States to govern according to Congress' instructions." *NFIB*, 567 U.S. at 577 (quoting *New York v. United States,* 505 U.S. 144, 162 (1992)). Those concerns are at their apex here.

In short, Defendants have given Plaintiffs an ultimatum—dramatically restructure your social safety net, immediately, or lose billions of dollars in federal funding. The Spending Clause does not give Congress, and still less four federal agencies, the authority to dictate such coercive terms. The PRWORA Notices are therefore unconstitutional.

## II.        Plaintiffs Face Irreparable Harm Absent Temporary Relief.

The Court should enter a preliminary injunction because Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). A movant need not "demonstrate definitive harm." *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 101 (D. Me. 2008). Rather, a showing that "irreparable injury is *likely*" will suffice. *Winter*, 555 U.S. at 22 (emphasis in original). Injuries of many types are irreparable, and district courts "have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quotation marks and citation omitted). Plaintiff States face immense irreparable injuries that have already begun, in the form of both proprietary injuries and harm to their sovereign interests.

*First*, Plaintiffs face proprietary injuries because they face the threat of enforcement, jeopardizing up to billions of dollars in federal funding that Plaintiff States receive. The HHS, ED, and DOL PRWORA Notices went into effect immediately. Enforcement of PRWORA's obligations is specifically directed by the President's Executive Order and the PRWORA Notices themselves. *See* 90 Fed. Reg. 105,81 (Feb. 25, 2025) (directing agencies to refer violations to DOJ and DHS); 90 Fed. Reg. at 30,900 (ED Notice describing enforcement); *see also* 90 Fed. Reg. at 31,237. Because of the PRWORA Notices, Programs in Plaintiff States face an imminent risk of

enforcement resulting in loss of federal funds. *See supra* at 11-38. While some of the nonprofits providing direct services will be exempt from verifying immigration status, the States will not be. *See supra* 12 n.7. The threat of a loss of billions of dollars in funding if States do not change their practices is irreparable injury. *See California v. Trump*, No. 25-cv-10810, 2025 WL 1667949, at *17 (D. Mass. June 13, 2025).

*Second*, Plaintiff States face proprietary injuries stemming from the costs of complying with the unlawful Notices to implement immigration status verification systems. *Id.* at *16 (identifying irreparable harm where an executive order "would impose new and complex duties on agencies across the States and would divert and require significant resources to train personnel in these agencies to assess citizenship where public assistance agencies do not have such expertise"). Many affected programs have no eligibility restrictions; a handful verify income, but even that is not a similar process to verifying immigration status, which requires specialized knowledge. *See supra* 11-38. The determination of who is a "qualified alien" under PRWORA is far from straightforward: it excludes many categories of noncitizens who are lawfully present in the United States and permitted to work or study here, such as asylum applicants with work authorization or individuals with student visas. *See supra* 4. Some programs, such as Head Start Centers, are unlikely to be able to implement verification programs at all because the time and expense is too great for their overburdened services to bear, such that they may close entirely. *See supra* 16-18. For other programs, it will take time and training (up to a year or more, in some programs' estimate) to prepare Plaintiff States' program staff to perform verification of immigration status. *See supra* 11-38. This is particularly true for the many affected programs that currently have no eligibility requirements at all. *See*, *e.g.*, *supra* 23-24 (PATH), 24-25 (CCBHC). Recognizing this, HHS estimates that the costs of changing systems to comply with the notice—

for affected HHS programs alone—to be over $100 million. HHS Final Regulatory Impact Analysis, Ex. 5, at 15. It is likely that some programs cannot bear that cost, and implementing the verification process will be so expensive and onerous that they will close. *See supra* 11-38.

*Third*, the Notices will undermine the mission and efficacy of Plaintiff States' own programs, causing negative impacts on public health and other negative effects that will not only harm Plaintiff States' residents but also cause the States to have to pick up the bill as the federally-funded safety net collapses. Many of the programs affected by these notices serve the most vulnerable residents of Plaintiff States, who rely on those programs to meet their basic daily needs. *See, e.g., supra* 16-18 (Head Start), 18-19 (CSBG), 23-24 (PATH). These programs are not only relied on by noncitizens, but also many needy citizens who lack government identification and will no longer be able to access those programs. *See supra* 11-38.

The chilling effect caused by fear among immigrant communities has resulted in fewer people seeking these programs' services already. Plaintiff States will be harmed when the failure of these programs to meet community needs causes their social safety nets to erode, with cascading effects on public health and welfare, leaving Plaintiff States to foot the bill. In the public health context, for example, the chilling effects of Defendants' PRWORA Notices will predictably result in worse health outcomes and more emergency room visits for which the States will also have to pay—as HHS acknowledges. *See* HHS Final Regulatory Impact Analysis, Ex. 5, at 11 n.19 (noting that the Notice will have economic "consequences" for health care programs, including "providers of charity care [and] jurisdictions that reimburse providers for uncompensated care"). These are financial injuries, and they are also irreparable injuries because no amount of financial recompense can make up for the costs to the States and their communities caused by people who need resources such as food and healthcare going without or children losing access to early childhood education.

*See California*, 2025 WL 1667949, at *18 (concluding that irreparable harm can result where a diversion of resources and funding interferes with States' public policies to protect health and safety).

*Fourth*, the States's social safety nets, designed around a longstanding federal-state balance, have been thrown into chaos, preventing the States from seeing to their sovereign prerogative of shielding the public health and community safety. *See supra* 11-38. Plaintiffs have made the policy judgment that they are best served by keeping vulnerable residents healthy, learning, and working. Programs like Title X, Head Start, and community services like food banks work precisely because they are so accessible. They will not work if people are afraid to use them, or if bureaucratic hurdles make them too difficult to access or too expensive to operate. The Notices threaten programs that each Plaintiff State has made, in its reasoned judgment, available to all regardless of citizenship. With effectively no notice, Defendants have upset that balance, immediately bringing the States' social safety nets to the brink because they cannot overhaul their systems overnight.

As the District Court in *California v. United States Dep't of Transportation* recently concluded, States clearly face irreparable harm when they "face losing billions of dollars in federal funding," are forced to "relinquish[] their sovereign right[s]," and are "at risk of losing the trust built between" the State "and immigrant communities." No. 25-cv-208, 2025 WL 1711531, at *3 (D.R.I. June 19, 2025). Plaintiff States confront those same harms here.

III.    **The Balance of the Equities and the Public Interest Favor a Preliminary Injunction.**

The equities and the public interest tip sharply in favor of Plaintiff States. These factors "merge when the government is the opposing party." *Nken*, 556 U.S. at 435. "When weighing these factors, the Court must balance the competing claims of injury and must consider the effect on

each party of the granting or withholding of the requested relief paying particular regard for the public consequences that would result from granting the emergency relief sought." *Rhode Island*, 2025 WL 1303868, at *17 (quoting *Winter*, 555 U.S. at 24) (cleaned up).

While this litigation is pending, Plaintiff States seek to preserve the status quo as it existed for nearly three decades before the PRWORA Notices upended longstanding practice, immediately and with no opportunity for public input. Plaintiff States and the general public have relied on the longstanding interpretation of Federal public benefits in administering and participating in affected programs. The harms that will occur in the absence of an injunction, *supra* 11-38, shows that granting emergency relief here is equitable and in the public interest. Unless enjoined, the Notices will have a tremendous impact on States' social services programs and safety net, jeopardize billions of dollars States rely on, and cause immense harm to the individuals and communities that rely on these programs. *See id.*

Defendants may argue they will be injured by an injunction because it will limit their ability to implement the Trump Administration's priorities. But "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). While Defendants may act within their delegated authority, they must do so in ways that are legally compliant. *See*, *e.g.*, *Rhode Island*, 2025 WL 1303868, at *17 (rejecting argument "that granting the injunctive relief the States request would effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities" (quoting record) (internal quotation marks omitted)); *Washington v. Trump*, No. 25-cv-00244, 2025 WL 659057, at *27 (W.D. Wash. Feb. 28, 2025) (rejecting argument that "an injunction should not issue because the relief Plaintiffs request would effectively disable the President and federal agencies from effectuating the President's

agenda" (quoting record) (internal quotation marks omitted)). Here, there is no public interest in Defendants' immediate and unlawful about-face as to the settled meaning of statutes upon which millions of people and hundreds of thousands of programs have relied for decades. The balance of the equities and the public interest tip decisively in favor of an injunction.[13]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs States and their subdivisions and instrumentalities respectfully request that Defendants be preliminarily enjoined and stayed from implementing and enforcing the PRWORA Notices in the Plaintiff States.

---

[13] The Court should not require a bond under Fed. R. Civ. P. 65. "[T]here is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991); *see also P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (no bond); *Rhode Island*, 2025 WL 1303868, at *17–18 (same). To the extent a bond is required, Plaintiffs request that the bond be nominal, consistent with the practice in this Circuit. *See Maine v. United States Dep't of Agriculture*, No. 25-cv-00131, 2025 WL 1088946, at *29–30 (D. Me. Apr. 11, 2025) (collecting cases).

Dated: July 21, 2025

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*

Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
Jessica Ranucci*
*Special Counsel*
Zoe Levine*
*Special Counsel for Immigrant Justice*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
zoe.levine@ag.ny.gov
jessica.ranucci@ag.ny.gov

*Attorneys for the State of New York*


**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Sarah W. Rice*
Sarah W. Rice (RI No. 10588)
Stephen N. Provazza (RI No. 10435)
*Unit Chief, Consumer & Economic Justice Unit*
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
SRice@riag.ri.gov
SProvazza@riag.ri.gov

*Attorneys for the State of Rhode Island*


**NICHOLAS W. BROWN**
Attorney General of Washington

By: /s/ Andrew Hughes

Andrew Hughes*
Benjamin Seel*
Zane Muller*
*Assistant Attorneys General*
Cristina Sepe*
*Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Andrew.Hughes@atg.wa.gov
Benjamin.Seel@atg.wa.gov
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for the State of Washington*


**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Hayleigh S. Crawford*
Hayleigh S. Crawford*
Mary M. Curtin*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
Mary.Curtin@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Heidi Lehrman*
Heidi Lehrman*
Neli Palma*
Michael L. Newman
*Senior Assistant Attorneys General*
Kathleen Boergers*
Srividya Panchalam*
*Supervising Deputy Attorneys General*
Heidi Lehrman*
Jeanelly Orozco Alcalá*
Natasha A. Reyes*
*Deputy Attorneys General*
1300 I Street
Sacramento CA 95814
Heidi.Lehrman@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov
Natasha.Reyes@doj.ca.gov

*Attorneys for the State of California*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
Jennifer L. Sullivan*
*Deputy Attorney General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
jen.sullivan@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Patricia McCooey*
Patricia McCooey*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov

*Attorney for the State of Connecticut*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

Attorney for the District of Columbia

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Sarah J. North*
Sarah J. North*
*Deputy Division Chief, Public Interest Division*
Holly Berlin*
*Assistant Attorney General, Special Litigation Bureau*
Alexandra Reed*
*Assistant Attorney General, Civil Rights Bureau*
R. Henry Weaver*
*Assistant Attorney General, Special Litigation Bureau*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
Sarah.North@ilag.gov
Holly.Berlin@ilag.gov
Alexandra.Reed@ilag.gov
Robert.Weaver@ilag.gov

*Attorneys for the State of Illinois*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: /s Kalikoʻonālani D. Fernandes

David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for Plaintiff State of Hawaiʻi*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6584
VWilliamson@oag.state.md.us

*Attorney for the State of Maryland*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Brendan Kreckel*
Brendan Kreckel*
By: */s/ Kristin Trabucchi*
Kristin Trabucchi*
*Assistant Attorneys General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
Brendan.kreckel@maine.gov
kristin.k.trabucchi@maine.gov

*Attorneys for the State of Maine*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Bryan Beach*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
BeachB@michigan.gov

*Attorneys for the State of Michigan*


**AARON D. FORD**
Attorney General for the State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorney for the State of Nevada*


**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Mark Noferi*
Mark Noferi*
*Senior Litigation Counsel*
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ David Ureña*
Katherine Dirks
*Chief State Trial Counsel*
Ethan W. Marks*
David Ureña*
Brett M. Gannon*
*Assistant Attorneys General*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2675
david.urena@mass.gov

*Attorneys for the Commonwealth of Massachusetts*


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Joseph R. Richie*
Joseph R. Richie*
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Attorney for the State of Minnesota*


**MATTHEW J. PLATKIN**
Attorney General of New Jersey

By: */s/ Meghan Musso*
Meghan Musso*
Patrick Clancey*
Kathleen Riley*
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5289
meghan.musso@law.njoag.gov

*Attorney for the State of New Mexico*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Attorney for the State of Vermont*

*Attorneys for the State of New Jersey*

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Coby Howell*
Coby Howell*
*Senior Assistant Attorney General*
Tel (971) 673-1880
Fax (971) 673-5000
coby.howell@doj.oregon.gov

*Attorney for the State of Oregon*

**JOSHUA L. KAUL**
Attorney General for the State of
Wisconsin

By: */s/ Faye B. Hipsman*
Faye B. Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov

*Attorney for the State of Wisconsin*