# Exhibit 3

the quality, utility, and clarity of the information to be collected; and (5) how might the Department minimize the burden of this collection on the respondents, including through the use of information technology. Please note that written comments received in response to this notice will be considered public records.

*Title of Collection:* Streamlined Clearance Process for Discretionary Grants.

*OMB Control Number:* 1894–0001.

*Type of Review:* Extension without change of a currently approved ICR.

*Respondents/Affected Public:* State, Local, and Tribal Governments.

*Total Estimated Number of Annual Responses:* 1.

*Total Estimated Number of Annual Burden Hours:* 3.

*Abstract:* Section 3505(a)(2) of the PRA of 1995 provides the OMB Director authority to approve the streamlined clearance process proposed in this information collection request. This information collection request was originally approved by OMB in January of 1997. This information collection streamlines the clearance process for all discretionary grant information collections which do not fit the generic application process. The streamlined clearance process continues to reduce the clearance time for the U.S. Department of Education's (ED's) discretionary grant information collections by two months or 60 days. This is desirable for two major reasons: it would allow ED to provide better customer service to grant applicants and help meet ED's goal for timely awards of discretionary grants. § 3474.20(d) adds the requirement for grantees to develop a dissemination plan for copyrighted work under open licensing. Information contained in the narrative of an application will be captured in the Evidence of Effectiveness Form.

**Ross Santy,**

*Chief Data Officer, Office of Planning, Evaluation and Policy Development.*

[FR Doc. 2025–13011 Filed 7–10–25; 8:45 am]

**BILLING CODE 4000–01–P**

---

## DEPARTMENT OF EDUCATION

## Clarification of Federal Public Benefits Under the Personal Responsibility and Work Opportunity Reconciliation Act

**AGENCY:** Office of the Secretary, Department of Education.

**ACTION:** Interpretive rule.

**SUMMARY:** The U.S. Department of Education (Department) issues this interpretation to revise and clarify its position on the classification of certain Department programs providing "Federal public benefits," as defined in Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Public Law 104–193. The Department concludes that the postsecondary education programs and "other similar benefit" programs described within this interpretive rule, including adult education programs authorized under Title II of the Workforce Innovation and Opportunity Act of 2014, postsecondary career and technical education programs under the Carl D. Perkins Career and Technical Education Act of 2006, and other programs when used to fund postsecondary learning opportunities, provide federally funded forms of assistance that constitute "Federal public benefits" subject to PRWORA's citizenship verification requirements. The interpretation also revokes and supersedes certain aspects of the Department's previously issued Dear Colleague Letter (DCL) of November 19, 1997, which mischaracterized these programs as not affected by PRWORA, for the reasons described further within this notice.

**DATES:** July 11, 2025.

**FOR FURTHER INFORMATION CONTACT:** Office of Career, Technical, and Adult Education, U.S. Department of Education, 400 Maryland Avenue SW, Washington, DC 20202. Adam Flynn-Tabloff. Email: *adam.flynn-tabloff@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### Full Text of Announcement

On February 19, 2025, President Trump issued Executive Order 14218 (Ending Taxpayer Subsidization of Open Borders), directing agencies, among other actions, to ensure that federally funded programs are operating in compliance with PRWORA. For the reasons described herein, the Department has concluded that Federal programs administered by the Department that provide postsecondary education and other similar benefits, including adult education and career and technical education programs, are "Federal public benefits" subject to the citizenship and immigration verification requirements of PRWORA, so long as such benefits are not protected under *Plyler* v. *Doe,* 457 U.S. 202 (1982) *Plyler* as part of a basic public education.

### I. Background

Title IV of PRWORA, as enacted into law as Public Law 104–193 on August 22, 1996, and amended by the Balanced Budget Act of 1997 (Pub. L. 105–33), generally limits eligibility for "Federal public benefits" to U.S. citizens, U.S. non-citizen nationals, and certain categories of "qualified aliens." For programs that provide "Federal public benefit[s]," providers are required to verify eligibility in order to comply with PRWORA. PRWORA defines "qualified alien" to mean "an alien who, at the time the alien applies for, receives, or attempts to receive a Federal public benefit, is—

(1) an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C. 1101 *et seq.*];

(2) an alien who is granted asylum under section 208 of such Act [8 U.S.C. 1158];

(3) a refugee who is admitted to the United States under section 207 of such Act [8 U.S.C. 1157];

(4) an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C. 1182(d)(5)] for a period of at least 1 year;

(5) an alien whose deportation is being withheld under section 243(h) of such Act [8 U.S.C. 1253];

(6) an alien who is granted conditional entry pursuant to section 203(a)(7) of such Act [8 U.S.C. 1153(a)(7)] as in effect prior to April 1, 1980;

(7) an alien who is a Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980); or

(8) an individual who lawfully resides in the United States in accordance with a Compact of Free Association." 8 U.S.C. 1641(b).

In other words, "qualified alien" status generally refers to those non-citizens that have a lawful immigration status allowing them to reside in the U.S. indefinitely, as well as immigrants holding specific humanitarian statuses identified by Congress. Under PRWORA, an alien who is not a "qualified alien" is ineligible for payment or assistance of any "Federal public benefit." 8 U.S.C. 1611. Federal public benefits, as defined in 8 U.S.C. 1611(c)(1)(A), include "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States." PRWORA further defines Federal public benefits to include "any retirement, welfare, health, disability, public or assisted housing,

*postsecondary education,* food assistance, unemployment benefit, *or any other similar benefit* for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States'' (emphasis added). 8 U.S.C. 1611(c)(1)(B).

## II. Applicability of PRWORA to Department Programs That Provide ''Postsecondary Education'' and ''Other Similar Benefit[s]''

The Department's programs are funded by appropriated funds of the United States and are subject to the restrictions of PRWORA, where such program provides ''Federal public benefits'' based on the applicable criteria of PRWORA. Specifically, PRWORA applies to ''postsecondary education'' benefits or ''any other similar benefit'' under Department programs ''for which payments or assistance are provided to an individual, household, or family eligibility unit.'' Such benefits are ''Federal public benefits'' within the meaning of PRWORA, unless an exception applies.

On November 19, 1997, the Department issued a DCL interpreting PRWORA to, among other things, not cover benefits under Departmental programs provided at the preschool, elementary, and secondary education level. U.S. Dept. of Edu., PRWORA DCL, (Nov. 19, 1997). In general, the Department's interpretation in the DCL enabled all aliens, regardless of immigration status and including adults, to be eligible to receive educational benefits and assistance provided by the Department so long as such benefits were not provided at the ''postsecondary education'' level. The Department's 1997 DCL also reasoned that educational programs provided at the preschool, elementary, and secondary level are not ''similar'' to the programs that Congress enumerated in PRWORA, including ''any retirement, welfare, health, disability, public or assisted housing, *postsecondary education,* food assistance, unemployment benefit[.]'' (emphasis added). The Department specifically claimed that these programs are dissimilar from ''postsecondary education'' because those programs ''are at a completely different level of education.'' The Department also asserted that these programs provide ''a different form of assistance'' than postsecondary education.

The Department finds that the reasoning in the 1997 DCL is flawed because it failed to fully analyze the context and full statutory text of

PRWORA, and therefore ultimately misconstrued its meaning. In crafting PRWORA, Congress created an operative definition for ''Federal public benefit'' under 8 U.S.C. 1611(c), five substantive exceptions under 8 U.S.C. 1611(b)(1)(A)–(E), three rules of non-applicability under 8 U.S.C. 1611(c)(2)(A)–(C), and three rules of statutory construction under 8 U.S.C. 1643 (a)–(c). Each part of this statutory enactment contains interrelated parts, which may provide context when construing one of its parts that may otherwise appear to be ambiguous. *See* A. Scalia & B. Garner, Reading Law, 167 (2012)(''Context is the primary determinant of meaning. A legal instrument typically contains interrelated parts that make up the whole. The entirety of the document thus provides the context for each of its parts.''); *see also United Savings Ass'n* v. *Timbers of Inwood Forest Associates,* 484 U.S. 365, 371 (1988) (a statutory ''provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme— because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.'')

In the first instance, the Department looks at the operative definition for ''Federal public benefit'' under 8 U.S.C. 1611(c). In defining the phrase, Congress included enumerated categories of benefits, including ''any retirement, welfare, health, disability, public or assisted housing, *postsecondary education,* food assistance, [or] unemployment benefit,'' (emphasis added) followed by a broader unenumerated category of benefits that encompasses any ''similar benefit[s] for which payments or assistance are provided to an individual, household, or family eligibility unit.'' To ascertain the meaning of the phrase: ''similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit,'' and whether an unenumerated benefit would fall under that definition, we must analyze the similarity of other benefits to the enumerated list of benefits already included within the definition of a ''Federal public benefit.''

Here, Congress included a broad and disparate group of benefits within the enumerated list of ''Federal public benefits.'' For example, ''food assistance'' is a near-term benefit for human subsistence, while retirement benefits are quite different in that they provide for long-term financial stability in old age. The disparate nature of these

benefits suggest that Congress intended to capture an expansive array of Federal benefits, within the statutory limit that such benefits be provided through Federal funds, and to ''an individual, household, or family eligibility unit.''

In contrast, the Department's analysis in the 1997 DCL did not mention any of the enumerated examples in the statute, except ''postsecondary education'' when construing whether the benefits discussed in that DCL were ''similar.'' In doing so, the Department ignored important statutory clues regarding the proper reading of the statute. Instead, the Department's previous analysis inappropriately manipulated the level of generality of the inquiry to focus on the narrow question of whether ''postsecondary education'' is similar to education at the ''preschool, elementary, and secondary level.'' This flawed framing led to a flawed result. The conclusion of the 1997 DCL that preschool, elementary, and secondary education are dissimilar from postsecondary education because those programs ''are at a completely different level of education'' ignores the context of the statute that makes it clear that Congress intended to cover a broader array of other Federal benefits. Indeed, preschool, elementary, and secondary education are similar to postsecondary education in that these benefits provide educational assistance to individuals.

The 1997 DCL also discusses the form in which the benefits are distributed. Specifically, the DCL states that ''elementary and secondary 'benefits' are typically made available to public educational agencies through grants that help them supplement their educational programs . . . [while] [p]ostsecondary benefits typically involve financial assistance to individual students.'' Even if assumed to be true, it would be irrelevant.

The statute discusses the method of delivery required in order to be a ''Federal public benefit'' and provides that only those benefits ''for which payments or assistance are provided to an individual, household, or family eligibility unit'' may be construed as a ''Federal public benefit.'' The statute provides for distinct methods of delivery of benefits to include a ''payment'' *or* ''assistance.'' The word ''payment'' is derivative of the word ''pay,'' which means ''the act of paying or state of being paid.'' *See Payment,* Webster's II: New Riverside University Dictionary (1994); *Pay,* Webster's II: New Riverside University Dictionary (1994). In other words, for something to be a ''payment,'' money must be exchanged.

The term "assistance" is defined as "the act of assisting", which is derivative of the word "assist" which means "to aid" or "to give aid or support" to someone or something. *See Assistance,* Webster's II: New Riverside University Dictionary (1994) and *Assist,* Webster's II: New Riverside University Dictionary (1994). The word "assistance" is indeed broader than "payment" and includes at least some actions that do not involve the direct exchange of money.

To further understand the meaning of the word "assistance" within the context of the statute, it is appropriate to consult other parts of the statutory framework. *K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). In the list of five substantive exceptions under 8 U.S.C. 1611(b)(1)(A)–(E), we find clues in deciphering any ambiguities in the term "assistance" as applied in this context. In 8 U.S.C. 1611(b)(1)(B) & (D), Congress provided that the prohibition against providing non-qualified aliens with any federal public benefit "shall not apply with respect to the following Federal public benefits:"

"(B) *Short-term, non-cash, in-kind emergency disaster relief* [. . .]

"(D) Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (i) *deliver in-kind services at the community level, including through public or private nonprofit agencies;* (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety."

As the excepted benefits that are enumerated within sub-clause (A) though (E) are specified as otherwise being "Federal public benefits", it is clear that Congress believed these benefits all would have otherwise met that definition. Therefore, in interpreting whether a program provides "other similar benefit(s)", it is instructive to look not just to the enumerated benefits within 8 U.S.C. 1611(c)(1), but also to the exempted Federal public benefits under 8 U.S.C. 1611(b)(1). Here, Congress specified under sub-clause (B) and (D) that there are exemptions from the general alien restrictions of 8 U.S.C. 1611 on certain

types of non-cash or in-kind benefits.[1] The exception under sub-clause (D) applies more specifically to in-kind benefits that are delivered "at the community level, including through public or private nonprofit agencies." It would not make sense for Congress to exclude these limited non-cash or in-kind benefits explicitly in 8 U.S.C. 1611(b)(1)(B) & (D) if at least some of those benefits were not *already captured* under the operative definition of "Federal public benefit" under 8 U.S.C. 1611(c). Congress would have no need to carve something out that would not otherwise be covered in the first instance under the "Federal public benefit" definition. As such, the general definition of "Federal public benefit" is best understood to include "assistance" similar to the "deliver[y] [of] in-kind services at the community level, including through public or private nonprofit agencies" where such benefits have not been specifically excluded by 8 U.S.C. 1611(b)(1).

The DCL essentially ignored Congress's decision to include Federal public benefits delivered through "assistance," narrowing its analysis not only to Federal public benefits as "payment," but even further still to whether that assistance was similar to "postsecondary [. . .] financial assistance to individual students." The rule against surplusage requires us "to avoid rendering superfluous any statutory language." *Hibbs* v. *Winn,* 542 U.S. 88, 101 (2004). Here, the DCL did not give independent meaning to the word "assistance," improperly rendering it superfluous. Instead, as demonstrated above, Congress clearly contemplated that Federal public benefits could cover assistance provided from entities to "individual[s], household, or family eligibility unit," even when that assistance is provided through an "in-kind" non-money benefit "at the community level, including through public or private nonprofit agencies."

Next, we consider one of the three rules of statutory construction that Congress included under 8 U.S.C. 1643(a)(2) which provides that nothing within [Title IV of the Act] may be construed as "addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under *Plyler* v. *Doe* (457 U.S. 202) (1982)." In effect, this

provision codifies the holding of that case into the statute. Therefore, when construing PRWORA, the Department's interpretation may not otherwise contravene *Plyler.*

*Plyler*'s holding was expressly grounded in the Fourteenth Amendment, as applied to States, and the ability of States to impose unique restrictions on alien eligibility absent "some articulable federal policy[.]" There is nothing in *Plyler*'s holding that addresses the ability of the Federal government to deny benefits (be they educational or other) based on alienage, and expressly noted that "[i]n light of our disposition of the Fourteenth Amendment issue, we have no occasion to reach this claim [of pre-emption by federal law and policy]." The inclusion of 8 U.S.C. 1643(a)(2)'s limitation that PRWORA was not intended to "addres[s] alien eligibility for a basic public education" is thus best understood as instructive toward the other provisions of PRWORA that speak to "State authority to make determinations concerning the eligibility of qualified aliens for public benefits", 8 U.S.C. 1601(7), and the provision of "State or local public benefits" 8 U.S.C. 1621–1625.

A harmonious reading of *Plyler,* 8 U.S.C. 1643(a)(2), and the ability of Congress to regulate the provision of "Federal public benefits" is thus readily apparent. Scalia & Garner, *supra,* at 180 ("The imperative of harmony among provisions is more categorical than most other canons of construction because it is invariably true that intelligent drafters do not contradict themselves.") Indeed, such a harmonious reading is necessary as the text itself of *Plyler,* incorporating its antecedents, specifically noted that "it is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens." *Mathews* v. *Diaz,* 426 U.S. 67, 84 (1976).

Furthermore, *Plyler* focused on the unique position of children who have "little control" over their immigration status. In *Plyler,* the Court noted that "it is thus difficult to conceive of a rational justification for penalizing these children for their presence within the United States." The Court's rationale for protecting the ability of minors to attend school stands in contrast to adults who do have the ability to control their actions and movement. Indeed, the Court noted that the "undocumented status" of adults is not "an absolutely immutable characteristic since it is the product of conscious, indeed unlawful, action." As such, the Department does

---

[1] In-kind is defined as "in the same manner or with something equivalent" Webster's II: New Riverside University Dictionary (1994). In the context of the statute, "in-kind" means some sort of non-cash benefit that provides goods or services directly, rather than providing cash to procure those goods or services.

not interpret the holding in *Plyler* as conferring any rights to adults. Nor does the holding in *Plyler* reach the question as to whether a minor has the right to postsecondary education (such as a 17-year-old individual who may wish to enroll in postsecondary programs, like dual enrollment) or adult training programs that are not included within a ''basic public education''.

Therefore, the Department interprets and finds that ''Federal public benefits'' under 8 U.S.C. 1611(c)(1) includes all educational benefits that are provided to individuals, households, or family eligibility units, regardless of age, and including when benefits are provided as in-kind services at the community level, such as through public or private nonprofit agencies, except those benefits that are basic public education benefits under *Plyler.* In codifying the exceptions under *Plyler,* Congress made clear the term ''Federal public benefits'' does not cover basic public education benefits that are received by children. At the same time, ''Federal education benefits'' does include postsecondary education benefits provided regardless of age, as *Plyler* did not address postsecondary benefits and PRWORA explicitly calls for such benefits to be included. 8 U.S.C. 1611(c)(1)(B).

In other words, non-qualified alien adults are not permitted to receive education benefits (postsecondary education benefits or otherwise) and non-qualified alien children are not eligible to receive postsecondary education benefits and certain other education benefits, so long as such benefits are not basic public education benefits. Postsecondary education benefits include dual enrollment and other similar early college programs that provide opportunities to earn college level credits while participating in a secondary education program, because those programs provide individualized payments or assistance beyond that of a basic public education. This interpretation does not apply to specific later in time statutory exceptions, including under 20 U.S.C. 1070e. In sum, this reading of the statute respects the statutory command to adhere to the holding in *Plyler,* while appropriately capturing the statutory directive to include ''other similar benefits'' within the meaning of a ''Federal public benefit'' under PRWORA.

Of note, the 1997 DCL cited the Congressional conference report to PRWORA. The DCL claimed that with respect to section 401 of PRWORA, the conference report said that ''the intent of the conferees is that Title I, part A of the Elementary and Secondary Education Act would not be affected by

section 401 because the benefit is not provided to an individual household or family eligibility unit.'' [2] Use of legislative committee reports like this is disfavored because these reports do not go undergo the ordinary legislative process of bicameralism and presentment. In other words, Congress did not vote on the conference report, nor should we assume Members of Congress actually read the report. *See, e.g., Blanchard* v. *Bergeron,* 489 U.S. 87, 98–99 (1989) (Scalia, J., concurring) (''As anyone familiar with modern-day drafting of congressional committee reports is well aware, the references to the cases [in the committee report] were inserted, at best by a committee staff member on his or her own initiative, and at worst by a committee staff member at the suggestion of a lawyer-lobbyist . . . What a heady feeling it must be for a young staffer, to know that his or her citation of obscure district court cases can transform them into the law of the land . . .''). As such, the Department declines to consider the non-authoritative conference report from PRWORA when interpreting the statute, as it is unreliable in ascertaining the meaning of the text.

### III. Applicability of PRWORA to Specific Department Programs

As it relates to additional programs under the Department's administration, we interpret PRWORA to apply to benefits provided to individuals under programs authorized under Title II of the Workforce Innovation and Opportunity Act of 2014 (WIOA) and career and technical education (CTE) programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006, as amended (Perkins V), as well as benefits provided through postsecondary education programs.

First, it is clear that these programs are all provided through ''appropriated funds of the United States'' because the Department receives these funds under appropriations laws passed by Congress. *See e.g.,* FY 2025 Full-Year Continuing Appropriations and Extensions Act, Public Law 119–4, § 1101(a)(8) 139 Stat. 9, 11. Second, whether as an enumerated benefit or ''other similar benefit,'' these programs provide ''payments or assistance'' to ''an

---

[2] The Department does not have specific concerns about how the Congressional conference report is referencing Title I of the Elementary and Secondary Education Act, as such programs generally provide support for states in delivering a basic public education, as protected under *Plyler.* Rather, the Department declines to consider the conference report because it is unreliable in general, and specifically here in how it interprets PRWORA as it relates to the phrase ''payments or assistance'' under 8 U.S.C. 1611(c)(1)(B).

individual, household, or family eligibility unit[.]''

Under WIOA, the Department administers Title II Adult Education and Literacy Activities, which provides grants to States to support adult education and literacy activities. 29 U.S.C. 3291, 3303. State agencies, in turn, may award grants or enter into contracts with eligible providers who provide adult education and literacy services to eligible individuals. An ''eligible individual'' is an individual who
(A) who has attained 16 years of age;
(B) who is not enrolled or required to be enrolled in secondary school under State law; and
(C) who—
(i) is basic skills deficient;
(ii) does not have a secondary school diploma or its recognized equivalent, and has not achieved an equivalent level of education; or
(iii) is an English language learner.
The Department interprets Title II WIOA programs to provide ''Federal public benefits'' because these educational programs: (1) are ''similar benefits,'' within the meaning of 8 U.S.C. 1611(c)(1)(B), because the programs provide educational services to adults and children who lack certain skills or abilities (as discussed in further detail above); (2) are provided on a non-cash and in-kind basis to individuals, and therefore are a form of ''assistance [. . .] to an individual'' eligibility unit as defined under 8 U.S.C. 1611(c)(1)(B); and (3) are not specifically exempted under PRWORA. As discussed above, the Department interprets PRWORA to apply to adults receiving any form of educational benefits and children receiving educational benefits other than a ''basic public education.''

The Department interprets Title II WIOA benefits to be distinct from the provision of a ''basic public education'' by State and local governments under *Plyler* because, among other distinctions, these benefits are provided to individuals in addition to the basic public education already provided by States to minors of compulsory attendance age. Under Title II of WIOA, any minor who had aged out of compulsory secondary school attendance would further have to drop out of the basic public education offered by their State in order to be eligible for Title II WIOA benefits. *Plyler,* in addition to highlighting the compulsory nature of basic public education, did not confer illegal immigrant children aging out of basic public education with the right to drop out of secondary school in favor of alternative educational programs, such as those designed for

adults under WIOA. As such, the Title
II WIOA programs provide ''Federal
public benefits'' that are distinct from
and are not included within a basic
public education under *Plyler.*

Under Perkins V, the Department
administers the Basic Grants to States
program which is a formula grant for
career and technical education to States
to support the development and
implementation of programs for
individuals who are in need of such
career and technical education.
Congress provided that the purpose of
Perkins V, among other things, is to ''to
develop more fully the academic
knowledge and technical and
employability skills of secondary
education students and postsecondary
education students who elect to enroll
in career and technical education
programs and programs of study.'' 20
U.S.C. 2301. Although Perkins V does
not explicitly create a test for eligibility,
it is clear the educational benefits that
flow from these programs are designed
to benefit students who are *individuals.*
Indeed, the very definition of ''career
and technical education'' under Perkins
V highlights that CTE is always an
*individual* good as it is provided
through ''a sequence of courses,''
''competency-based, work-based, or
other applied learning'' or ''career
exploration'' that can only be received
or experienced by an individual for
their personal development. 20 U.S.C.
2302(5). Perkins V benefits flow from
the Federal government to states, and
then to local recipients, who provide
educational assistance to individual
students in a non-cash in-kind manner.

Perkins V funds programs for
individuals both at the secondary and
postsecondary levels. 20 U.S.C. 2301.
Students may receive Perkins V benefits
while enrolled in secondary school. In
contrast to Title II WIOA benefits,
Perkins V benefits do not require
students to drop out or have aged out of
secondary school compulsory
attendance in order to receive such
benefits and are thus provided as part of
a ''basic public education'' in those
limited circumstances. As such, these
benefits, when provided to minors in
the secondary school setting, are basic
public education benefits that are
protected under *Plyler.*

Therefore, the Department interprets
Perkins V programs to provide ''Federal
public benefits'' because these
educational programs: (1) are ''similar
benefits,'' within the meaning of 8
U.S.C. 1611(c)(1)(B), because the
programs provide career and technical
educational services to adults and
children who lack certain skills or
abilities; (2) are provided on a non-cash

and in-kind basis to individuals, and
therefore are a form of ''assistance'' as
defined under 8 U.S.C. 1611(c)(1)(B);
and (3) are not specifically exempted
under PRWORA, except that Perkins V
programs that support minors in the
secondary school setting are basic
public education benefits and are not
''Federal public benefits.'' 8 U.S.C.
1643.[3]

## IV. Verification

Grantees that may have existing legal
obligations under PRWORA may seek to
verify eligibility using, among other
things: (1) the Department of Homeland
Security (DHS) Systematic Alien
Verification for Entitlements (SAVE)
program;[4] (2) review of U.S. birth
certificates; (3) review of REAL ID
compliant identification cards
(ineligible aliens are not able to obtain
such IDs); (4) DHS issued
documentation verifying immigration
status; or (5) other methods to verify
eligibility.

In addition, the Department notes that
there are existing legal exemptions from
verification requirements for nonprofit
charitable organizations administering
''Federal public benefits''. Nonprofit
charitable organizations that administer
''Federal public benefits'' are not
required to conduct eligibility
verification under 8 U.S.C. 1642(d). The
exemption in 8 U.S.C. 1642(d) is
narrowly crafted and does not include
other entities administering ''Federal
public benefits''. Accordingly, the
Department does not interpret 8 U.S.C.
1642(d) to relieve states or other
governmental entities involved in the
administration of ''Federal public
benefits'' from the requirements to
ensure that all relevant programs are in
compliance with PRWORA (even when
some or all educational services are
ultimately provided by a nonprofit
charitable organization). Grantees may,
consistent with 2 CFR 200.413(b)–(c)
and 2 CFR 200.405(d), charge direct
administrative costs associated with
verification as an allocable benefit that

---

[3] In this interpretive rule, the Department
announces how it interprets PRWORA with respect
to certain Department programs; however, just
because a program is not specifically mentioned
herein does not mean the program does not have
obligations under PRWORA. The Department may,
but is not required to, exercise its enforcement
discretion to refrain from taking actions against
grantees in certain circumstances, such as for
programs not mentioned in this interpretive rule.

[4] Effective April 1, 2025, the Department of
Homeland Security has eliminated the transaction
charge for using SAVE for all state, local, tribal, and
territorial government agencies. See U.S. Dep't of
Homeland Sec., Save Transaction Charges (last
accessed June 25, 2025), *https://www.uscis.gov/
save/about-save/transaction-charges.*

can be reasonably documented toward
each grant award.

Unless required by Departmental
regulations, grantees have no affirmative
obligation to report on verification to
the Department. Because this
interpretative rule is not legislative, the
Department lacks the ability to require
affirmative reporting.

Interpretive rules cannot have
effective dates. Rather, this interpretive
rule informs the public of the
Department's interpretation of the law.
See *Guedes* v. *Bureau of Alcohol,
Tobacco, Firearms & Explosives,* 920
F.3d 1, 20 (D.C. Cir. 2019) (holding that
an interpretive rule cannot have an
effective date and is instead an
interpretation of how the law should be
interpreted, past and present). The
Department may, but is not required to,
exercise its enforcement discretion to
refrain from taking actions against
grantees in certain circumstances.

## V. Conclusion

This interpretive rule finds that
Federal programs administered by the
Department that provide postsecondary
education and other similar benefits,
including adult education and CTE
programs, are ''Federal public benefits''
subject to the citizenship and
immigration verification requirements
of PRWORA, so long as such benefits
are not protected under *Plyler* as part of
a basic public education. This
interpretation of adult education and
covered CTE programs as providing
''Federal public benefits'' also includes
programs that provide dual enrollment
and other similar early college programs
that go beyond providing a basic public
education to prepare students for credit
accumulation, degree attainment, or to
enter the workforce. Therefore, entities
administrating these programs may
consider this interpretation when taking
action to comply with PRWORA. This
interpretation represents the
Department's current position on the
issue and may be referenced when
enforcing or monitoring grantee and
subgrantee compliance with PRWORA.

*Accessible Format:* On request to the
program contact listed under **FOR
FURTHER INFORMATION CONTACT**,
individuals with disabilities can obtain
this document in an accessible format.
The Department will provide the
requestor with an accessible format that
may include Rich Text Format (RTF) or
text format (txt), a thumb drive, an MP3
file, braille, large print, audiotape, or
compact disc, or other accessible format.

Electronic Access to This Document:
The official version of this document is
the document published in the **Federal
Register**. You may access the official

edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**Signing Authority**

This document of the U.S. Department of Education was signed on July 8, 2025, by Linda E. McMahon, Secretary of Education. That document with the original signature and date is maintained by the U.S. Department of Education. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned has been authorized to sign the document in electronic format for publication, as an official document of the U.S. Department of Education. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Sharon Cooke,**

*Associate Director, Office of the Executive Secretariat, Office of the Secretary, U.S. Department of Education.*

[FR Doc. 2025–12925 Filed 7–10–25; 8:45 am]

**BILLING CODE 4000–01–P**

**DEPARTMENT OF ENERGY**

**[GDO Docket No. EA–524]**

**Application for Authorization To Export Electric Energy; DRW Energy Trading LLC**

**AGENCY:** Grid Deployment Office, U.S. Department of Energy.

**ACTION:** Notice of application.

**SUMMARY:** DRW Energy Trading LLC (the Applicant or DRW Energy) has applied for authorization to transmit electric energy from the United States to Canada pursuant to the Federal Power Act.

**DATES:** Comments, protests, or motions to intervene must be submitted on or before August 11, 2025.

**ADDRESSES:** Comments, protests, motions to intervene, or requests for more information should be addressed by electronic mail to *Electricity.Exports@hq.doe.gov.*

**FOR FURTHER INFORMATION CONTACT:** Janessa Zucchetto, (240) 474–8226, *Electricity.Exports@hq.doe.gov.*

**SUPPLEMENTARY INFORMATION:** The United States Department of Energy (DOE) regulates electricity exports from the United States to foreign countries in accordance with section 202(e) of the Federal Power Act (FPA) (16 U.S.C. 824a(e)) and regulations thereunder (10 CFR 205.300 *et seq.*). Sections 301(b) and 402(f) of the DOE Organization Act (42 U.S.C. 7151(b) and 7172(f)) transferred this regulatory authority, previously exercised by the now-defunct Federal Power Commission, to DOE.

Section 202(e) of the FPA provides that an entity which seeks to export electricity must obtain an order from DOE authorizing that export (16 U.S.C. 824a(e)). On April 10, 2023, the authority to issue such orders was delegated to the DOE's Grid Deployment Office (GDO) under Redelegation Order No. S3–DEL–GD1–2023.

On May 6, 2025, DRW Energy filed an application (Application or App.) for authorization to transmit electric energy from the United States to Canada for a term of ten years. App. at 1.

According to the Application, DRW Energy is a power marketer with its principal place of business in Houston, Texas. *Id.* at 1. The Applicant states that it is "the wholly owned subsidiary of DRW Holdings, LLC." *Id.* DRW Energy represents that "The Federal Energy Regulatory Commission (FERC) has granted [it] authority to sell wholesale power at market-based rates under a market-based rate tariff." *Id.* at 1–2 & Exhibit G.

DRW Energy represents that it will purchase "power to be exported from a variety of sources, including but not limited to, power marketers, independent power producers, or U.S. electric utilities and federal power marketing entities." App. at 2. The Applicant thus asserts that because this power is surplus to the system of the generator, its proposed exports "will not impair the sufficiency of the electric power supply within the United States." *Id.*

DRW Energy further asserts that its proposed exports will not impair or tend to impede the sufficiency of electric supplies in the U.S. or the regional coordination of electric utility planning or operations. App. at 3. The Applicant states that it "will make all necessary commercial arrangements and will obtain any other required regulatory approvals to schedule and deliver its power exports." *Id.* The Applicant states that the electricity it plans to export "will be transmitted under arrangements with utilities that own and operate existing transmission facilities, consistent with the export limitations and other terms and conditions contained in existing Presidential Permits and electricity export authorizations associated with these transmission facilities." *Id.* The Applicant further states it will schedule transactions in compliance with reliability standards and guidelines established by the North American Reliability Corporation. *Id.*

The existing international transmission facilities to be utilized by the Applicant have been previously authorized by Presidential permits issued pursuant to Executive Order 10485, as amended, and are appropriate for open access transmission by third parties. *See* App. at Exhibit C.

*Procedural Matters:* Any person desiring to be heard in this proceeding should file a comment or protest to the Application at *Electricity.Exports@ hq.doe.gov.* Protests should be filed in accordance with Rule 211 of FERC's Rules of Practice and Procedure (18 CFR 385.211). Any person desiring to become a party to this proceeding should file a motion to intervene at *Electricity.Exports@hq.doe.gov* in accordance with FERC Rule 214 (18 CFR 385.214).

Comments and other filings concerning DRW Energy's Application should be clearly marked with GDO Docket No. EA–524. Additional copies are to be provided directly to Michael J. Lowell, Esq., Reed Smith LLP, 1301 K Street, NW, Suite 1000—East Tower, Washington, DC 20005, *mlowell@ reedsmith.com;* Jon Hoff, DRW Energy Trading LLC, 1500 Post Oak Blvd., Suite 1625, Houston, TX 77056, *jhoff@ drwholdings.com.*

A final decision will be made on the requested authorization after the environmental impacts have been evaluated pursuant to DOE's National Environmental Policy Act Implementing Procedures (10 CFR part 1021) and after DOE evaluates whether the proposed action will have an adverse impact on the sufficiency of supply or reliability of the United States electric power supply system.

Copies of this Application will be made available, upon request, by accessing the program website at *https://www.energy.gov/gdo/pending-applications-0* or by emailing *Electricity.Exports@hq.doe.gov.*