# Exhibit 5

DEPARTMENT OF HEALTH AND HUMAN SERVICES

# Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit"

Docket No. AHRQ-2025-0002

## Final Regulatory Impact Analysis
## Final Regulatory Flexibility Analysis
## Unfunded Mandates Reform Act Analysis

Analysis Prepared by
The Executive Secretariat
Immediate Office of the Secretary
Department of Health and Human Services

## **Table of Contents**

I.   Introduction and Summary ............................................................................................ 3

    A.   Introduction .......................................................................................................... 3

    B.   Overview of Economic Impacts ........................................................................... 4

II.   Final Economic Analysis of Impacts ......................................................................... 5

    A.   Background ........................................................................................................... 5

    B.   Analytic Approach ............................................................................................... 5

    C.   Baseline Scenario ................................................................................................ 6

    D.   Impacts of the Notice .......................................................................................... 8

    E.   Expenditure Shifts (Transfers or Benefits) ...................................................... 10

    F.   Costs .................................................................................................................. 11

# I.    Introduction and Summary

## A.  Introduction

We have examined the impacts of the notice under Executive Order 12866, Executive Order 13563, Executive Order 14192, the Regulatory Flexibility Act (5 U.S.C. 601-612), the Congressional Review Act/Small Business Regulatory Enforcement Fairness Act of 1996 (5 U.S.C. 801, Pub. L. 104-121), and the Unfunded Mandates Reform Act of 1995 (Pub. L. 104-4).

Executive Orders 12866 and 13563 direct us to assess all benefits and costs of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits. Regulatory actions are "economically significant" under section 3(f)(1) Executive Order 12866 if they "have an annual effect on the economy of $100 million or more; or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities." Executive Order 14192 requires that any new incremental costs associated with significant new regulations "shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least ten prior regulations." This notice addresses alien eligibility for public benefits, and thus is expressly exempt from the requirements of Executive Order 14192 as a regulatory action related to an immigration-related function of the United States. The analysis indicates, and the Office of Information and Regulatory Affairs (OIRA) has determined, that this notice is an economically significant regulatory action under section 3(f)(1) Executive Order 12866.

Because this notice may result in an annual effect on the economy of $100 million or more or meet other criteria specified in the Congressional Review Act/Small Business Regulatory Enforcement Fairness Act of 1996, OIRA has determined that this notice falls within the scope of 5 U.S.C. 804(2).

The Regulatory Flexibility Act requires Agencies to analyze regulatory options that would minimize any significant impact of a rule on small entities. Because the incremental costs of verification are about 0.1% of the average annual expenditures per enrollee, we certify that the notice will not have a significant economic impact on a substantial number of small entities. This analysis, as well as other sections in this document and the notice, serves as the Final Regulatory Flexibility Analysis, as required under the Regulatory Flexibility Act.

The Unfunded Mandates Reform Act of 1995 (UMRA) generally requires that each agency conduct a cost-benefit analysis; identify and consider a reasonable number of regulatory alternatives; and select the least costly, most cost-effective, or least burdensome alternative that achieves the objectives of the rule before promulgating any proposed or final rule that includes a Federal mandate that may result in expenditures of more than $100 million (adjusted for inflation) in at least one year by State, local, and tribal governments, in the aggregate, or by the private sector. Each agency issuing a rule with relevant effects over that threshold must also seek input from State, local, and tribal governments. The current threshold after adjustment for inflation using the Implicit Price Deflator for the Gross Domestic Product is $187 million, reported in 2024 dollars. UMRA only applies in situations where an agency engages in notice-and-comment rulemaking. It does not apply to this notice.

3

B. Overview of Economic Impacts

This notice updates and corrects our interpretation of the term "Federal public benefit." We anticipate that the notice will lead to a reduction in improper expenditures of taxpayer resources on Federal public benefits for unqualified aliens and a corresponding increase in benefits for U.S. citizens and qualified aliens. We present a partial benefit-cost analysis of the notice—for some effects, focusing on the impacts of one program as an illustrative case of the full potential economic impacts. For the Head Start program, we report a primary estimate of $374 million in annual effects representing incremental expenditures on U.S. citizens and qualified aliens. We report a full range of estimated expenditure effects between $184 million and $1,881 million, capturing uncertainty in the baseline share of program beneficiaries who are U.S. citizens and qualified aliens. We anticipate that these expenditure effects will result in improved services and access for U.S. citizens and qualified aliens. For these effects to occur, we estimate corresponding annual costs of $21 million in the opportunity cost of time spent by individuals seeking benefits to document eligibility and time spent by individuals reviewing program eligibility, and additional transition costs for the Head Start program associated with revising standard operating procedures.  A broader scope of analysis would report additional expenditure effects and costs associated with other programs covered by the notice. In a supplementary analysis, we estimate a range of potential upfront transition costs associated with revising standard operating procedures (not limited to Head Start) between $115 million to $175 million.

Table 1. Summary of Economic Impacts of the Notice, Head Start (2024 dollars)

| Category | | Primary Estimate | Low Estimate | High Estimate | Units | | | Notes |
|---|---|---|---|---|---|---|---|---|
| | | | | | Year Dollars | Discount Rate | Period Covered | |
| Expenditure Shifts | Annualized Monetized (millions) | $374 | $184 | $1,881 | 2024 | 7% | FY2026 | Incremental Head Start expenditures on U.S. citizens and qualified aliens, offsetting decrease for unqualified aliens |
| | | $374 | $184 | $1,881 | 2024 | 3% | FY2026 | |
| Costs | Annualized Monetized (millions) | $21 | $21 | $21 | 2024 | 7% | FY2026 | Time spent documenting and verifying eligibility and transition costs at Head Start programs |
| | | $21 | $21 | $21 | 2024 | 3% | FY2026 | |

## II.  Final Economic Analysis of Impacts

### A.  Background

On August 4, 1998, the Department of Health and Human Services (HHS) published a notice to interpret the term "Federal public benefit" and identify the HHS programs that provide such benefits under this interpretation ("1998 Notice").[1] President Trump's Executive Order 14218 of February 19, 2025 directs the head of each executive department to "prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens."[2] Through this notice, HHS updates its interpretation of the term "Federal public benefit" and preliminarily identifies the HHS programs that provide such benefits, including HHS programs that were not listed in the 1998 Notice.

### B.  Analytic Approach

In conducting this analysis, we began by identifying the most consequential impacts that will likely occur under this notice. For this regulatory action, these impacts relate to reducing improper expenditures of taxpayer resources on Federal public benefits for unqualified aliens. In our main analysis, we report the corresponding increases in expenditures on U.S. citizens and qualified aliens and offsetting reductions in expenditures for unqualified aliens. We also consider and report costs associated with time spent, on an ongoing basis, verifying eligibility for Federal public benefits, as well as upfront transition costs.

The interpretation under this notice corresponds to a number of programs that have been improperly administered by HHS. We present a partial benefit-cost analysis of the notice, for some effects, focusing on the impacts of one program as an illustrative case of the full potential economic impacts. Specifically, in assessing expenditure changes and ongoing costs of checking eligibility, we adopt a scope of analysis that covers the Head Start program, administered by the Office of Head Start within the Administration for Children and Families.  A broader scope of analysis would report additional expenditure effects and costs associated with other programs covered by the notice. In a supplementary analysis, we estimate a range of potential upfront transition costs associated with revising standard operating procedures (not limited to Head Start).

We consider and quantitatively assess several important sources of uncertainty. First, we present a range of estimates for the share of Head Start beneficiaries under the baseline scenario who are U.S. citizens or qualified aliens. Second, we assess a policy scenario of full compliance and an alternative policy scenario of partial compliance. In general, we report rounded total estimates but have not rounded several of the underlying inputs and intermediate calculations for transparency and reproducibility of the estimation process. The unrounded inputs and intermediate calculations should not be interpreted as representing a particular degree of

---

[1] Department of Health and Human Services. August 4, 1998. "Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of 'Federal Public Benefit'" notice with comment period. 63 FR 41658. https://www.federalregister.gov/documents/1998/08/04/98-20491/personal-responsibility-and-work-opportunity-reconciliation-act-of-1996-prwora-interpretation-of.
[2] https://www.federalregister.gov/documents/2025/02/25/2025-03137/ending-taxpayer-subsidization-of-open-borders

precision. Unless otherwise noted, all monetary estimates are reported in constant 2024 dollars: when necessary, we adjust estimates from other years using annual averages of the Consumer Price Index for all Urban Consumers (CPI-U).[3]

## C. Baseline Scenario

We adopt as our analytic baseline a continuation of the interpretation under the 1998 Notice. We model the potential economic impacts of this 2025 Notice by assuming that, absent this regulatory action, access to public benefits for the previously enumerated programs would continue to depend on immigration status, but access to the additionally identified programs would not. This choice of analytic baseline allows us to focus on any changes in the composition of beneficiaries for the additionally identified programs. This notice does not impact overall spending levels for any discretionary-funded HHS program. For the purposes of this analysis, we adopt a simplifying modeling assumption that Federal appropriations under the baseline scenario will grow at the same rate as the price level.

Our quantitative baseline is informed by the most recent full-year estimates for Head Start:

> "In FY 2024, Congress provided $12.27 billion for the Head Start Preschool and Early Head Start programs (hereafter, collectively referred to as 'Head Start,' unless otherwise noted), with funding to serve 718,947 children and pregnant women in centers, family homes, and family child care settings in urban, suburban, and rural communities throughout the country. This includes funding provided directly to tribes to operate American Indian and Alaska Native (AIAN) programs in tribal communities. It also includes funding for Migrant and Seasonal Head Start (MSHS) programs to provide Head Start services designed to meet the needs of migrant or seasonal farmworker families."[4]

In FY 2024, funding supported 1,562 Head Start grant recipients, with awards averaging $4 million and ranging from $322,000 to $202.6 million.[5] For our analysis, we focus on a share of the annual appropriations that are awarded to grant recipients for base program operations. In fiscal year 2024, spending on base program operations amounted to $11.9 billion, or about 97% of the total appropriations.[6] We divide $11.9 billion by 718,947 enrollees and report an average expenditure per enrollee of $16,503 and assume this average expenditure on will remain constant under our baseline scenario.

---

[3] Bureau of Labor Statistics. CPI for all Urban Consumers (CPI-U), Not Seasonally Adjusted, https://data.bls.gov/timeseries/CUUR0000SA0.

[4] Department of Health and Human Services. Fiscal Year 2026. Administration for Children, Families, and Communities. Justification of Estimates for Appropriations Committees. Page 47. https://www.hhs.gov/sites/default/files/fy-2026-acfc-cj.pdf.

[5] Department of Health and Human Services. Fiscal Year 2026. Administration for Children, Families, and Communities. Justification of Estimates for Appropriations Committees. Page 47. https://www.hhs.gov/sites/default/files/fy-2026-acfc-cj.pdf.

[6] Department of Health and Human Services, Administration for Children and Families, Office of Head Start. August 21, 2024. "Supporting the Head Start Workforce and Consistent Quality Programming" final rule. https://www.federalregister.gov/documents/2024/08/21/2024-18279/supporting-the-head-start-workforce-and-consistent-quality-programming. See Table B1. Baseline Head Start Budget Scenario. Nominal Dollars (in thousands).

We supplement these data with a range of estimates for the share of beneficiaries that are 'authorized' (term used in the context of this analysis to refer to persons who are U.S. citizens and qualified aliens) or 'unauthorized' (term used in the context of this analysis to refer to persons who are not U.S. citizens are also not qualified aliens) under the baseline scenario. This parameter is inherently uncertain since this demographic information is not currently collected under the 1998 Notice. As an additional source of uncertainly, this analysis considers a range of possible implementation approaches in advance of potential future guidance discussed in this Notice. For the 'unauthorized' share of beneficiaries, we adopt a primary estimate of 3.3%, based on a ratio of the unauthorized immigration population living in the U.S. in 2022, 10,990,000,[7] and of the total U.S. population for the same year, 333,288,000.[8] We produce a lower-bound estimate of 1.7% using a similar comparison of the unauthorized immigrant population under 18 years old, 1,230,000,[9] and the U.S. population under age 18 years, 72,451,000.[10] We adopt 16% as our upper-bound estimate by combining several data sources, discussed below.

For this calculation, we note that estimates suggest that there are approximately 4.4 million U.S.-born children live in households with at least one unauthorized parent[11] and another 675,000 are themselves unauthorized children,[12] for a total of 5.1 million children. We pair this estimate with Census data that approximately 28% of all children are under the age of 5,[13] for an estimated total of 1.5 million children under age 5 who have at least one unauthorized parent. Studies indicate that 30–40% of families who are unauthorized immigrants live in poverty,[14] compared to the national poverty rate of 11.1%.[15] Together, these figures point to approximately 500,000 children under the age of 5 in poverty who have an unauthorized parent or are unauthorized themselves. Combining this estimate with an estimate that Head Start programs serve

---

[7] Department of Homeland Security, Office of Homeland Security Statistics. 2024. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022." https://ohss.dhs.gov/topics/immigration/unauthorized/population-estimates. This report offers insight into the potential geographic distribution of the Notice's effects; per report Table 3, the top ten states by population of unauthorized immigrants are California, Texas, Florida, New Jersey, Illinois, New York, North Carolina, Georgia, Washington and Arizona.

[8] Census Bureau. "2023 National Populations Projections Tables: Main Series." Table 1. Projected Population and Components of Change, 2022. https://www.census.gov/data/tables/2023/demo/popproj/2023-summary-tables.html.

[9] Department of Homeland Security, Office of Homeland Security Statistics. 2024. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022." Table 4: Unauthorized Immigrant Population Estimates by Age and Sex: 2018–2020 and 2022. https://ohss.dhs.gov/topics/immigration/unauthorized/population-estimates.

[10] Census Bureau. "2023 National Populations Projections Tables: Main Series." Table 2. Projected Population by Age Group and Sex, 2022. https://www.census.gov/data/tables/2023/demo/popproj/2023-summary-tables.html.

[11] Passel, J.S., & Krogstad, J.M, (2024). "What we Know about Unauthorized Immigrants Living in the U.S." Washington, D.C.: Pew Research Center.

[12] Passel, J.S., & Cohn, D. (2018). "U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade." Washington, D.C: Pew Research Center. https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2019/03/Pew-Research-Center_2018-11-27_U-S-Unauthorized-Immigrants-Total-Dips_Updated-2019-06-25.pdf.

[13] Census Bureau. September 2024. "Poverty in the United States: 2023." https://www.census.gov/data/tables/2024/demo/income-poverty/p60-283.html.

[14] Batalova, J., & Fix, M. (2023). "Understanding Poverty Declines among Immigrants and Their Children in the United States." Washington, D.C.: Migration Policy Institute. https://www.migrationpolicy.org/sites/default/files/publications/mpi-poverty-declines-immigrants-2023_final.pdf.

[15] Census Bureau. September 2024. "Poverty in the United States: 2023." https://www.census.gov/data/tables/2024/demo/income-poverty/p60-283.html

approximately 26% of the potentially eligible population,[16] we anticipate that approximately 115,000 Head Start children and families could be impacted, or about 16% of total cumulative enrollment in Head Start programs in FY 2024.

Table 2 summarizes the range of estimates for the share of beneficiaries that are authorized and unauthorized, and corresponding enrollment and expenditure estimates corresponding to these population groups.

Table 2. Baseline Scenario, Head Start (millions of 2024 dollars)

| Estimate | Low | Primary | High |
|---|---|---|---|
| Share of Beneficiaries | | | |
|    Authorized | 98.3% | 96.7% | 84.0% |
|    Unauthorized | 1.7% | 3.3% | 16.0% |
| Enrollment | | | |
|    Total | 718,947 | 718,947 | 718,947 |
|    Authorized | 706,741 | 695,240 | 603,915 |
|    Unauthorized | 12,206 | 23,707 | 115,032 |
| Expenditures | | | |
|    Total | $11,865 | $11,865 | $11,865 |
|    Authorized | $11,663 | $11,473 | $9,966 |
|    Unauthorized | $201 | $391 | $1,898 |

The range of estimates above are intended to describe the population of the entire Head Start program and are not based on a disaggregated analysis of any single program or group of programs. For example, the share of beneficiaries that are 'authorized' or 'unauthorized' might be higher for Migrant and Seasonal Head Start (MSHS) programs, which are designed to provide program services to farmworker families. We are aware of other estimates that might be relevant for this analysis and request public comment on our estimates and, more generally, any alternative credible estimates of the likely impacts of the notice.

## D. Impacts of the Notice

In our main analysis, we consider a policy scenario that assumes full compliance with the notice such that the share of beneficiaries unauthorized to receive Federal assistance will fall to zero. We also report a sensitivity analysis that assumes a lower rate of compliance, resulting in one-third of the effects of the full-compliance scenario.[17] The partial-compliance scenario corresponds to alternative assumptions of the types of program grant recipients that would incur

---

[16] Calculated as the ratio of Head Start slots to the estimated 3.1 million children in poverty below the age of 5.
[17] Department of Health and Human Services. 2016. "Guidelines for Regulatory Impact Analysis." https://aspe.hhs.gov/reports/guidelines-regulatory-impact-analysis. See, e.g., page 24 "In most cases, the analysis focuses on estimating the incremental compliance costs incurred by the regulated entities, assuming full compliance with the regulation, and government costs," and corresponding footnote 53, "Analysts should consider the uncertainty associated with an assumption of full compliance and provide analysis of alternative assumptions, as appropriate."

costs associated with verification that we discuss in greater detail in the cost section. Also, as documented in the cost section, we anticipate a slightly lower total enrollment level consistent with some resources spent on verification rather than other program activities. Table 3 summarizes these estimates for the full-compliance policy scenario, while Table 4 presents our estimates of the incremental effects of the notice. Table 5 summarizes the estimates for the partial-compliance policy scenario, discussed in greater detail later, and Table 6 presents estimates of the corresponding incremental effects under that scenario.

Table 3. Full-Compliance Policy Scenario, Head Start (millions of 2024 dollars)

| Estimate | Low | Primary | High |
|---|---|---|---|
| Share of Beneficiaries | | | |
|   Authorized | 100.0% | 100.0% | 100.0% |
|   Unauthorized | 0.0% | 0.0% | 0.0% |
| Enrollment | | | |
|   Total | 717,829 | 717,829 | 717,829 |
|   Authorized | 717,829 | 717,829 | 717,829 |
|   Unauthorized | 0 | 0 | 0 |
| Expenditures (Excluding New Costs) | | | |
|   Total | $11,847 | $11,847 | $11,847 |
|   Authorized | $11,847 | $11,847 | $11,847 |
|   Unauthorized | $0 | $0 | $0 |

Table 4. Impact of the Policy, Full-Compliance Scenario, Head Start (millions of 2024 dollars)

| Estimate | Low | Primary | High |
|---|---|---|---|
| Share of Beneficiaries | | | |
|   Authorized | 1.7% | 3.3% | 16.0% |
|   Unauthorized | -1.7% | -3.3% | -16.0% |
| Enrollment | | | |
|   Total | -1,118 | -1,118 | -1,118 |
|   Authorized | 11,088 | 22,589 | 113,914 |
|   Unauthorized | -12,206 | -23,707 | -115,032 |
| Expenditures (Excluding New Costs) | | | |
|   Total | -$18 | -$18 | -$18 |
|   Authorized | $184 | $374 | $1,881 |
|   Unauthorized | -$201 | -$391 | -$1,898 |

Table 5. Partial-Compliance Policy Scenario, Head Start (millions of 2024 dollars)

| Estimate | Low | Primary | High |
|---|---|---|---|
| Share of Beneficiaries | | | |
|    Authorized | 99.4% | 98.9% | 94.7% |
|    Unauthorized | 0.6% | 1.1% | 5.3% |
| Enrollment | | | |
|    Total | 718,542 | 718,542 | 718,542 |
|    Authorized | 714,476 | 710,644 | 680,220 |
|    Unauthorized | 4,066 | 7,898 | 38,322 |
| Expenditures (Excluding New Costs) | | | |
|    Total | $11,859 | $11,859 | $11,859 |
|    Authorized | $11,792 | $11,728 | $11,226 |
|    Unauthorized | $67 | $130 | $632 |

Table 6. Impact of the Policy, Partial-Compliance Scenario, Head Start (millions of 2024 dollars)

| Estimate | Low | Primary | High |
|---|---|---|---|
| Share of Beneficiaries | | | |
|    Authorized | 1.1% | 2.2% | 10.7% |
|    Unauthorized | -1.1% | -2.2% | -10.7% |
| Enrollment | | | |
|    Total | -405 | 718,542 | 718,542 |
|    Authorized | 7,734 | 710,644 | 680,220 |
|    Unauthorized | -8,139 | 7,898 | 38,322 |
| Expenditures (Excluding New Costs) | | | |
|    Total | -$6 | $11,859 | $11,859 |
|    Authorized | $128 | $11,728 | $11,226 |
|    Unauthorized | -$134 | $130 | $632 |

### E.  Expenditure Shifts (Transfers or Benefits)

The quantified effects of this regulatory action include increases in expenditures on U.S. citizens and qualified aliens and offsetting reductions in expenditures for unqualified aliens. Current guidance to Federal agencies on the development of regulatory analysis states that "transfers from the United States to other nations should be included as costs, and transfers from other nations to the United States as benefits, as long as the analysis is conducted from the United States perspective."[18]  The quantified effects are categorized as transfers to the extent that they

---

[18] U.S. Office of Management and Budget. 2003. "Circular A-4: Regulatory Analysis."

ultimately flow to and from U.S. citizens and residents.[19]  The transfers category would also be used if a U.S. perspective is defined as within the borders of the United States or if a global perspective is used (as is encouraged for a supplemental analysis[20]).  Expenditure changes being categorized as benefits is contingent upon unqualified aliens being considered as part of another nation (in U.S.-focused analysis) and, even with such an analytic perspective, would only apply to the portion of effects not ultimately flowing from U.S. citizens and residents.

As a rough measure of the value of the program per enrollee, we adopt the average expenditure per enrollee under our baseline scenario of around $16,503. For our primary scenario, we estimate that the notice could generate $374 million in expenditure effects per year, with a full range of estimates between $184 million to $1,881 million. For these effects to fully materialize, programs would need to maintain current enrollment levels while serving only U.S. citizens and qualified aliens. We acknowledge some uncertainty about whether all programs could maintain current enrollment levels. For example, MSHS programs, which are designed to provide program services to farmworker families, collectively enroll about 3.3% of total annual funded enrollment. [21] These programs might experience under enrollment rather than a full transfer of enrollment to U.S. citizens and qualified aliens, which would translate to reductions in total Head Start enrollment rather than a shift in enrollment to other programs.[22]

### F.  Costs

This notice does not contain a new regulatory requirement related to verification of the immigration status of a person applying for benefits, and states "the Department is not formally revising the aspects of the 1998 Notice that touch on PROWRA's verification requirements at this time." However, the notice also points out that "nothing in the statute prohibits such entity from conducting verification," and discusses the possibility of "further regulation and/or guidance on the situations in which verification is required." Additional activities to verify program eligibility, inclusive of immigration status of a person applying for benefits, represent one plausible method to effectuate the interpretation under the notice. In this section, we estimate the opportunity costs of the time spent on eligibility verification. For our main analysis, we model the costs associated with universal verification for all program enrollees, but also consider an alternative scope of verification in a sensitivity analysis.

---

https://trumpwhitehouse.archives.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf. Pg. 38. Emphasis in original text.

[19] One potential for such flows in within households, a setting in which resources are especially fungible; as noted elsewhere in this analysis, many unqualified aliens live in households that also include U.S. citizens, residents or qualified aliens.  Although the quantification in this analysis focuses on Head Start, the Notice will have consequences for numerous other programs, many of which relate to the provision of health care; to the extent that the Notice shifts these types of funding, effects could partially flow to and from providers of charity care, jurisdictions that reimburse providers for uncompensated care, and other such entities, rather than entirely being experienced by unqualified aliens paying increased amounts out of pocket.

[20] "[E]ffects beyond… the United States… should be reported separately." U.S. Office of Management and Budget. 2003. "Circular A-4: Regulatory Analysis." https://www.reginfo.gov/public/jsp/Utilities/a-4.pdf. P. 15.

[21] Administration for Children and Families, Office of Head Start. "Head Start Program Facts: Fiscal Year 2023." https://headstart.gov/program-data/article/head-start-program-facts-fiscal-year-2023. 26,056 / 778,420 ≈ 0.033.

[22] P.L. 110-334 121 STAT 1368.

To quantify the time spent on verification of immigration status under this notice, we adopt estimates of the time burden associated with employment eligibility verification.[23] Specifically, we assume that individuals seeking benefits would spend approximately 9 minutes to demonstrate citizenship or qualified alien status, including time gathering supporting documentation, time completing any paperwork, and time consulting instructions as needed. Individuals reviewing program eligibility will spend approximately 31 minutes per verification on a variety of activities, including time collecting and reviewing documentation and creating or updating the eligibility determination record.

To estimate the costs associated with the verification, we monetize the opportunity costs of the time spent by individuals seeking benefits and time spent by individuals reviewing program eligibility. For time spent by individuals seeking benefits, we apply an estimate of an hourly value of time of $19.75,[24] following HHS's default approach to monetizing changes in time use for unpaid activities.[25] This approach indicates a cost-per-verification for individuals seeking benefits of $2.96.[26] For time spent by individuals reviewing program eligibility, we adopt a value of time that accounts for taxes and fringe benefits, as well as indirect costs not associated with production of a particular good or provision of a specific service. These indirect costs include overhead costs such as space rental and utilities, and other costs such as office supplies and administrative oversight. Specifically, we begin with data from the U.S. Bureau of Labor Statistics for the median pre-tax hourly wage for all occupations of $23.80.[27] We assume that fringe benefits plus indirect costs equal approximately 100 percent of pre-tax wages and adjust this hourly rate by multiplying by two for a fully loaded hourly wage rate of $47.60. This approach indicates a cost-per-verification for individuals reviewing program eligibility of $24.59. Combining the costs-per-verification for individuals seeking benefits and individuals reviewing program eligibility, we estimate total social costs of $27.56 per verification.

Verifying program eligibility for all 718,947 program participants would cost about $19.8 million. For the purposes of this analysis, we assume that the subset of costs associated with reviewing program eligibility would be funded through Federal expenditures and, absent

---

[23] Department of Homeland Security, U.S. Citizenship and Immigration Services. February 7, 2024. Supporting Statement for Employment Eligibility Verification. OMB Control No.: 1615-0047. Collection Instrument(s): Form I-9. https://www.reginfo.gov/public/do/DownloadDocument?objectID=139141501. See discussion on pages 6-7 on the time burden for employers and employees.

[24] Kearsley, A. "HHS Standard Values for Regulatory Analysis, 2025." Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation. February 2025. https://aspe.hhs.gov/reports/standard-ria-values.

[25] Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation. 2017. "Valuing Time in U.S. Department of Health and Human Services Regulatory Impact Analyses: Conceptual Framework and Best Practices." https://aspe.hhs.gov/reports/valuing-time-us-department-health-human-services-regulatory-impact-analyses-conceptual-framework.

[26] This approach to valuing the time spent on non-work activities might be an underestimate, as it does not explicitly consider other intangible costs associated with providing program eligibility. As a sensitivity analysis, we considered accounting for this and other factors by applying our estimate of the value of time for on-the-job activities. All else equal, this would result in a cost-per-verification for individuals seeking benefits of $7.14 and a total social cost of $31.73 per verification and a total cost of verification that is about 15% higher for both compliance types.

[27] Bureau of Labor Statistics. May 2024 Occupational Employment and Wage Statistics. All Occupations (00-0000). https://data.bls.gov/oes/#/industry/000000.

any new source of funding consistent with our baseline scenario, would result in reduction in total enrollment of 1,118 children and pregnant women, representing a reduction of about 0.16% compared to the baseline scenario.[28] For this enrollment calculation, we first added the new costs associated with reviewing eligibility of $24.79 to the baseline average expenditure per enrollee of $16,503 for a new total cost per enrollee of $16,527; and then divided the appropriation of $11.9 billion[29] by the new total cost per enrollee. With this adjustment, we estimate verification costs of about $19.8 million, including costs to individuals seeking benefits of about $2.1 million and costs to reviewing eligibility of about $17.7 million.

We also consider a sensitivity analysis of the benefits and costs under a different assumption about overall compliance. The Office of Head Start awards grants to a mix of public agencies, private nonprofit and for-profit organizations, tribal governments, and school systems for operating Head Start programs in local communities. Based on the Office of Head Start's Program Information Report (PIR),[30] an annual survey of Head Start grant recipients, approximately two-thirds of programs are either non-profits or Community Action Agencies. Although the PIR does not capture the category of "charitable non-profit" specifically, it is highly likely that these grant recipients are charitable non-profits due to the nature of their work. For this "partial-compliance" sensitivity analysis, we assume that verification would occur for the one-third of grant recipients that are not charitable non-profits. Under this scenario, we estimate verification costs of about $6.6 million, including costs to individuals seeking benefits of about $0.7 million and costs to reviewing eligibility of about $5.9 million. For this sensitivity analysis, we calculate enrollment using a weighted average of the cost of enrollment with and without verification.

In addition to the ongoing cost of checking participant eligibility, we anticipate upfront transition costs associated with revising standard operating procedures to reflect changes in response to the Notice. To quantify this impact, we assume that each of the 1,562 Head Start grant recipients would spend an average of 8 hours of work activity (for example, one business day for one worker). We assume these activities would be performed by a supervisor and monetize the opportunity costs using a fully loaded hourly wage of $63.60.[31] This approach indicates a typical cost per grant recipient of about $509 and a total cost across all grant recipients of about $0.8 million. Combined, we report total costs for Head Start of $20.6 million for the full-compliance scenario and $7.4 million for the partial-compliance scenario. We report these costs in Table 7.

---

[28] This reduction in enrollment could result in additional impacts that we do not quantify in this analysis, such as any potential impacts on the workforce.

[29] Excludes estimated transition costs for Head Start grant recipients discussed below.

[30] Department of Health and Human Services, Administration for Children and Families, Office of Head Start. "Program Information Report (PIR)." https://headstart.gov/program-data/article/program-information-report-pir.

[31] Bureau of Labor Statistics. May 2024 Occupational Employment and Wage Statistics. First-Line Supervisors of Office and Administrative Support Workers (43-1011). https://data.bls.gov/oes/#/industry/000000. Hourly median wage estimate doubled to produce a fully loaded estimate.

Table 7. Costs, Head Start (2024 dollars)

| Estimate | Baseline Scenario | Full-Compliance Scenario | Partial-Compliance Scenario |
|---|---|---|---|
| Enrollment | 718,947 | 717,829 | 718,542 |
| Verifications | 0 | 717,829 | 239,514 |
| Individuals Seeking Benefits | | | |
|     Minutes per Verification | 9 | 9 | 9 |
|     Hourly Value of Time | $19.75 | $19.75 | $19.75 |
|     Opportunity Cost per Verification | $2.96 | $2.96 | $2.96 |
|     Costs, Subtotal | $0 | $2,126,999 | $709,704 |
| Individuals Confirming Eligibility | | | |
|     Minutes per Verification | 31 | 31 | 31 |
|     Hourly Value of Time | $47.60 | $47.60 | $47.60 |
|     Opportunity Cost per Verification | $24.59 | $24.59 | $24.59 |
|     Costs, Subtotal | $0 | $17,653,810 | $5,890,447 |
| Verification Costs | $0 | $19,780,810 | $6,600,151 |
| Transition Costs | 0 | $794,746 | $794,746 |
| **Total Costs** | **$0** | **$20,575,555** | **$7,394,896** |

All else equal, these costs may be overestimated if, for example, verification of citizenship or qualified-alien status is incorporated into existing processes for determining overall program eligibility. Similarly, while this analysis adopts a single year time horizon for analysis, the annualized costs for a longer time horizon would be lower if programs verified eligibility once per individual served by the program for multiple years, as is currently the practice for many programs. These costs may be underestimated if, for example, many individuals who are not eligible for the program as an U.S. citizen or qualified alien attempt verification or for certain grantees, such as public schools, to implement the verification.

As an additional metric, we also considered the total costs as a share of the average expenditure per enrollee. For our full-compliance scenario, these costs represent about 0.16% of total expenditures; and for our partial-compliance scenario, about 0.06%.

The cost estimates in Table 6 correspond to the Head Start program, matching the scope of analysis adopted for the other estimates in this analysis. As an additional analysis, we also considered the potential transition costs that may be experienced across all programs (not limited to Head Start). For this analysis, we adopt a range of estimates of the number of total entities receiving HHS funds.[32] Since some of these entities were covered by the 1998 Notice, we reduce these counts by 50%. For each entity receiving HHS funds, we adopt the per-entity estimate of $509 described above. Across all entities, we estimate transition costs ranging from about $115

---

[32] See Tables 6 and 12 of Regulatory Impact Analysis, 0945-AA15, https://www.hhs.gov/sites/default/files/sec-504-ria-final-rule-2024.pdf. This range of entities matches 74.9 percent of 604,844, 665,331 or 918,433 entities.

million to $175 million. Table 8 presents these estimates. We welcome comments that would allow for refinement of this analysis.

Table 8. Upfront Transition Costs, All Programs (2024 dollars)

| Estimate | Lower | Medium | Higher |
|---|---|---|---|
| Entities Receiving HHS Funds | 453,028 | 498,333 | 687,906 |
| Entities with Transition Costs | 226,514 | 249,167 | 343,953 |
| Transition Cost per Entity | $509 | $509 | $509 |
| **Transition Costs** | **$115,250,323** | **$126,775,915** | **$175,003,286** |