# Exhibit 16

## **DECLARATION OF TONY THURMOND**

I, Tony Thurmond, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Superintendent of Public Instruction for the State of California. I have served in this role since January 2019. As the Superintendent of Public Instruction, I am the state official who oversees the California Department of Education (CDE), which provides leadership, assistance, oversight, and resources.

3. I hold dual master's degrees in Law and Social Policy and Social Work from Bryn Mawr College. Prior to becoming Superintendent of Public Instruction, I was an educator, social worker, and elected official. From 2008-2012, I served on the West Contra Costa School Board, where, among other things, I helped build new schools, increase funding for counseling, after-school, music, and athletic programs, reduce school suspensions by 27%, and bring nutrition and wellness programs to our schools. In the State Assembly, I championed legislation to, among other things, expand free school lunch programs, improve access for families for early education and childcare, and shift millions of dollars directly from prisons to schools.

4. As the Superintendent of Public Instruction, I am familiar with the information in the statements set forth below through personal knowledge, consultation with my staff, or from my review of relevant documents and information.

5. I submit this declaration in connection with the Department of Education's (USED) issuance of the USED PRWORA Notice, "Clarification of Federal Public Benefits under the

Personal Responsibility and Work Opportunity Reconciliation Act," 90 Fed. Reg. 30,896 (July 11, 2025) and the Department of Health and Human Services' (HHS) issuance of the HHS PRWORA Notice, "Personal Responsibility and Work Opportunity Reconciliation Act pf 1996 (PRWORA); Interpretation of 'Federal Public Benefit'" 90 Fed. Reg. 31,232 (July 14, 2025).

6. CDE staff notified me of the issuance of the USED PRWORA notice on July 11, 2025, and the HHS PRWORA Notice on July 14, 2025.

7. I understand that the Notices change a longstanding interpretation of PRWORA. Since 1998, USED and HHS have permitted States to offer certain federally funded social safety net services regardless of immigration status. USED and HHS are now requiring that CDE identify and exclude people who are undocumented and certain other noncitizens from our programs including Career and Technical Education, Adult Education and Family Literacy, and Early Head Start.

### The USED PRWORA Notice

8. The USED PRWORA Notice "interprets and finds that 'Federal public benefits' under 8 U.S.C. 1611(c)(1) includes all educational benefits that are provided to individuals, households, or family eligibility units, regardless of age, and including when benefits are provided as in-kind services at the community level, such as through public or private nonprofit agencies, except those benefits that are basic public education benefits under [*Plyler v. Doe*, 457 U.S. 202 (1982)]."

9. The USED PRWORA Notice states that "Congress made clear the term 'Federal public benefits' does not cover basic public education benefits that are received by children."

10. The USED PRWORA Notice then states, "non-qualified alien adults are not permitted to receive education benefits (postsecondary education benefits or otherwise) and non-

qualified alien children are not eligible to receive postsecondary education benefits and certain other education benefits, so long as such benefits are not basic public education benefits."

11. The USED PRWORA Notice goes on to interpret PRWORA to apply to "benefits provided to individuals under programs authorized under Title II of the Workforce Innovation and Opportunity Act of 2014 (WIOA) and career and technical education (CTE) programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006, as amended (Perkins V), as well as benefits provided through postsecondary education programs."

12. Both WIOA and Perkins V authorize grants provided to CDE.

13. In addition to naming certain programs, the USED PRWORA Notice states that "in this interpretive rule, the Department announces how it interprets PRWORA with respect to certain Department programs; however, just because a program is not specifically mentioned herein does not mean the program does not have obligations under PRWORA."

14. The USED PRWORA Notice further states that "grantees have no affirmative obligation to report on verification to the Department" and the "Department may, but is not required to, exercise its enforcement discretion to refrain from taking actions against grantees in certain circumstances, such as for programs not mentioned in this interpretive rule."

15. The USED PRWORA Notice outlines "existing legal exemptions from verification requirements" and takes the position that those exemptions do not "relieve states or other governmental entities involved in the administration of 'Federal public benefits' the requirements to ensure that all relevant programs are in compliance with PRWORA (even when some or all educational services are ultimately provided by a nonprofit charitable organization)." 90 Fed. Reg. at 30900.

## The HHS PRWORA Notice

16. The HHS PRWORA Notice clarifies "the Department hereby explicitly display[s] awareness that it is changing position" on the meaning of "federal public benefit" as previously established in the 1998 HHS PRWORA Notice (internal quotations omitted).

17. The HHS PRWORA Notices states, "the Department believes the proper interpretation of subparagraph (c)(1)(B) [of 8 U.S. Code § 1641] is as follows: the listed benefits, including 'other similar benefit[s],' are 'Federal public benefit[s]' as long as they are provided on either a per-individual, per-household, or per-'family eligibility unit' basis."

18. The Notice further states that this interpretation of the definition of "federal public benefits" is "true whether the 'eligibility' of the relevant 'unit' turns on being part of a specific 'communit[y],' part of a 'specified sector of the population,' having a 'specified income level,' being a 'specified age,' etc." (internal citation omitted.)

19. The HHS PRWORA Notice announces the Department's new interpretation of the term "similar benefit" in PRWORA, and that the Department "believes that Head Start is a 'similar benefit' to a welfare benefit."

20. The HHS PRWORA Notice goes on to state that "HHS has determined that the list of HHS programs set forth in the 1998 HHS PRWORA Notice is incomplete and needs to be updated."

21. In the HHS PRWORA Notice, "HHS now identifies [] additional HHS programs as providing 'Federal public benefit[s],'" including Head Start.

22. Head Start programs include the Early Head Start-Child Care Partnership (EHS-CCP) program, and CDE is awarded funds under EHS-CHP.

23. The HHS PRWORA notice states that "the Department is not formally revising the aspects of the 1998 Notice that touch on PROWRA's verification requirements at this time."

24. Building on this, the HHS PRWORA notice explains, "Even if PRWORA and related regulatory activity do not mandate an entity to conduct verification of the immigration status of a person applying for benefits, nothing in the statute prohibits such an entity from conducting verification…Pending further regulation and/or guidance on the situations in which verification is required, all entities that are part of HHS's administration of public benefits should pay heed to the clear expressions of national policy described above [in the HHS PRWORA Notice]." (internal citation omitted.)

### California Department of Education Programs Affected by PRWORA Notices

25. The Notices from USED and HHS will harm CDE's administration of Career and Technical Education under Perkins V, Adult Education and Family Literacy, and Early Head Start programs by reducing or terminating funding, requiring additional funding and staff time to develop systems required for implementation, and causing a chilling effect on populations served and State and local staff.

<u>Career and Technical Education under Perkins V</u>

26. CDE receives federal financial assistance under Perkins V, the Carl D. Perkins Career and Technical Education Act of 2006, as amended by the Strengthening Career and Technical Education for the 21st Century Act. 20 U.S.C. § 2301.

27. In California, Perkins V CTE grants support a program of study that involves a multiyear sequence of courses that integrates core academic knowledge with technical and occupational knowledge to provide students with a pathway to a career. These programs are

offered by community colleges and public school districts, to secondary and postsecondary students.

28. Each state educational agency, including CDE, submits a Perkins V State Plan covering a four-year period. 20 U.S.C. § 2342(a)(1). CDE's most recent Perkins V State Plan, covers fiscal years 2024-2027.

29. Each State's plan must describe "how the eligible agency will ensure equal access to approved CTE programs of study and activities assisted under this chapter for special populations." 20 U.S.C. § 2342(d)(4)(C)(iv). The plan must also include "levels of performance," including requiring the State to "continually make meaningful progress toward improving the performance of all career and technical education students, including" particular "subgroups of students" and "special populations." *Id.* § 2323(b)(3)(A)(i)(III)(bb). The statute further defines "subgroups of students" as including "each major racial and ethnic group; economically disadvantaged students . . . ; children with disabilities . . . ; English proficiency status; gender; and migrant status." 20 U.S.C. § 6311(b)(2)(B)(xi). "Special populations" include English learners. 20 U.S.C. § 2302(48).

30. In California, the CDE monitors secondary recipients through its Federal Program Monitoring (FPM) process, which is conducted in collaboration with other federally monitored programs. The CTE Perkins V funded staff work with the FPM office to conduct Perkins V monitoring visits. All Local Education Agencies (LEAs) are divided into four cohorts (A, B, C, and D), with one cohort selected each year for on-site reviews and another for online reviews. LEAs are selected based on various risk factors including program size, performance on state assessments, rates of poverty and high-needs students, unspent funds, late spending, findings in past monitoring visits, and time elapsed since their last review. Beyond compliance monitoring,

the state requires local recipients to review their performance levels within their annual Perkins V applications. Recipients that fail to meet state-required performance levels must submit improvement plans describing why they haven't met requirements and their planned actions for improvement. State staff also provide technical assistance as needed and when requested by LEAs.

31. The secondary Perkins V CTE funds are used by the State to support course offerings, via equipment purchases, teacher salaries, curriculum development, supplies, and professional development and other administrative or oversight functions.

32. A small portion of Perkins V funds are used for the benefit of the "special populations" enumerated below.

33. I understand the USED PRWORA Notice seeks to disqualify postsecondary students from enrolling in courses supported by Perkins V funding, absent verification of their citizenship status.

34. California has been apportioned approximately $141 million for vocational education for the 2024-2025 fiscal year.

35. CDE allocated roughly 50% of those funds to California Community College Chancellor's Office to administer the postsecondary awards under Perkins V.

36. CDE distributed the remaining funds through grants to eligible LEAs to administer the secondary awards under Perkins V. For the 2024-2025 fiscal year, we awarded approximately $54 million to 325 Secondary LEAs (K-12); approximately $3.8 million to twelve Postsecondary (Adult) LEAs; and $475,000 to three State Special Schools (California School for the Deaf in Fremont, School of the Deaf Riverside, School for the Blind).

37. Approximately 675,000 students are currently enrolled in at least one CTE course in California K-12 public schools funded with Perkins V.

38. CDE does not collect citizenship or other qualified alien status information from individuals who participate in Perkins V-funded programs of study because it has never been required to do so.

39. CDE monitors grantees. Under the USED PRWORA Notice, CDE would have to train our monitors on how to collect the newly required information and to develop a policy and build a system to collect and verify information, and guide LEAs on how to implement this new requirement. This would create a substantial administrative burden on CDE and the LEAs.

40. It would divert time and funding from secondary CTE program oversight, requiring additional funding for state operations to train staff and modify monitoring instruments. It would require expansion to monitor all grantees, 300 LEAs, annually.

41. USED has not released any guidance on how to implement the PRWORA Notice. LEAs are unsure if they are required to track, monitor, and retain records verifying the immigration status of students enrolled in secondary CTE programs. Without guidance on how states should implement these new guidelines CDE staff would be expected to build out a system and guidance not being fully confident if it is what the US Department of Education is expecting.

42. Research and policy analysis indicate that a significant proportion of migrant and English language learner populations specifically named in the Perkins V statute may become ineligible for enrollment in secondary and postsecondary courses under USED's new interpretation. Educational access research demonstrates that eligible parents and students often experience reduced enrollment when required to provide documentation regarding immigration status. Current immigration enforcement patterns suggest this documentation requirement may create barriers to enrollment, as families with valid temporary status but non-citizen members may

avoid programs requiring status verification, based on documented trends in similar educational contexts.

43. The statute mandates that Perkins V funds are used to supplement, not supplant non-Federal funds that States expend to promote career and technical education. 20 U.S.C. § 2391(a). Even if the CDE uses its own funds to continue these programs without Perkins V grants in a given year, the non-supplanting provision creates potential restrictions on future federal funding for those same activities. Under typical non-supplanting requirements, agencies must demonstrate that federal funds supplement rather than replace existing funding sources. However, districts may be able to access federal funding in future years if other funding streams are reduced or eliminated, or if they can document through legal review that the use of federal funds would not constitute supplanting under the specific circumstances.

44. Based on my knowledge and experience, Perkins V-funded programs boost California's economy and improve job-readiness and quality of life for participating students. CTE training programs prepare students to become critical workforce members who are needed in the State. Without these training programs, California would suffer from having an insufficient number of technical workers.

45. If CDE experiences reductions in Perkins V CTE funding or program participation due to these requirements, the state's workforce development capacity could be affected. The extent of impact would depend on the magnitude of participation reduction and the availability of alternative funding sources. Students currently enrolled in dual credit coursework through these programs may face disruption if program access changes, though the specific outcomes would vary by individual circumstances and institutional responses.

## Adult Education and Family Literacy under WIOA

46.    CDE receives funds under Title II of the Workforce Innovation and Opportunity Act: Adult Education and Family Literacy Act (AEFLA) for adult education to (1) assist adults to become literate and obtain the knowledge and skills necessary for employment and economic self-sufficiency; (2) assist adults who are parents or family members to obtain education and skills; (3) assist adults in attaining a secondary school diploma and postsecondary education and training, including through career pathways; and (4) assist immigrants and other individuals who are English language learners. This is year three of the four year grant cycle.

47.    CDE allocates AEFLA funds through a competitive grant process. In fiscal year 2024-2025, CDE allocated $100 million to 211 LEAs agencies to assist adult students to become literate and obtain the knowledge and skills necessary for employment and self-sufficiency; who are parents or family members to obtain the education and skills that are necessary to becoming full partners in the educational development of their children and lead to sustainable improvements in the economic opportunities for their family; in attaining a secondary diploma or equivalent and in the transition to postsecondary education and training; immigrants and other individuals who are English language learners to improve their reading, writing, speaking and comprehension skills in English, mathematics skills, and acquiring an understanding of the American system of Government, individual freedom, and the responsibilities of citizenship. So far, we have served nearly 350,000 students with funds in fiscal year 2024-2025.

48.    Many of the agencies have contacted CDE to express major concerns about the USED PRWORA notice. The agencies do not check currently check immigration status because it has never been required. The agencies are concerned because they do not have staff qualified to verify the numerous types of qualified immigration status. Agencies have inquired if they could

use adult education funding to create repositories to collect required information and train staff as well.

49. Collection and verification would require CDE and agencies to build systems, develop policies, and train staff. This all would require additional funding, as current funding has already been allocated. This would require additional monitoring of the 211 agencies supported with AEFLA funds.

50. Additionally, agencies are concerned about a potential conflict with California state law that prohibits them from collecting information regarding citizenship or immigration status of students and their family members, except where required by state or federal law. Cal. Ed. Code 234.7(a). AEFLA funds are required to be supplemental to state and local funding. Agencies are concerned that they will have to segregate classes in order to follow this interpretation. For example, if a student does not have or elects to not share their status, they can be in a class funded with only state dollars while there is a duplicate class next door for students with qualified status.

51. The statute mandates that AEFLA funds are used to supplement, not supplant non-Federal funds that States expend to promote adult education. 20 U.S.C. § 2391(a). Even if CDE was able to use its own funds to continue these programs without AEFLA grants in a given year, those agencies would be prohibited from accepting federal funds to support those same programs for all future years under the 'non-supplanting' provision. As a result, CDE would be barred in the future from securing federal funding to support these activities even if the terms and conditions of these grants were to change.

52. There is confusion due to lack of guidance in the USED PRWORA Notice. As described above, the Notice does not impose an affirmative obligation to report on verification, but also highlights USED's discretion in enforcement. The lack of guidance and the suggestion of

enforcement leaves CDE and local agencies to try and read the mind of USED to determine a course of action that would withstand scrutiny and investigation.

53. LEAs have expressed that enforcement of the USED PROWRA Notice would drastically reduce program enrollment. Sixty-eight percent of adult students are English learners who have barriers to employment due to low levels of literacy and are low-income individuals. The LEAs fear the new policy will have a chilling effect on the populations they serve, and adult students will choose not to enroll if immigration status verification is required. This would reduce funding to communities that experience this chilling effect. With sixty-eight percent of adult students in programs for English language acquisition, a significant loss of students would require agencies to lay off teaching and support staff. This will greatly impact the already rising unemployment numbers due to federal cuts in other programs. Additionally, students who are qualified aliens will fear attending classes which will stifle their ability to achieve economic freedom thus reducing their ability to contribute to society through federal taxes.

### Early HeadStart

54. The federal Head Start program, founded in 1965, promotes school readiness for children of low-income families from birth to five years old. Head Start services support early learning and development, health, and family wellbeing.

55. Head Start is administered by the Office of Head Start (OHS) within the Administration for Children and Families (ACF) of the U.S. Department of Health and Human Services (HHS).

56. Head Start programs include the Early Head Start-Child Care Partnership (EHS-CCP) program for infants, toddlers, and expectant families and Head Start preschool programs for primarily three-and four-year-old children. In addition, Head Start includes American Indian and

Alaska Native (AIAN) Head Start programs and Migrant and Seasonal Head Start (MSHS) programs serving farmworker families.

57. In 2014, EHS-CCP was launched to expand access to high-quality early childhood education for infants and toddlers from low-income families. CDE was first awarded an EHS-CCP grant in January 2015.

58. As its primary goal, the EHS-CCP grant builds on the current level of early childhood education services offered to children and families in the community and increases the quality of services offered through center-based and family childcare home education network programs. Early Head Start programs provide similar services as preschool Head Start programs, but they are tailored for the unique needs of infants and toddlers. Early Head Start programs promote the physical, cognitive, social, and emotional development of infants and toddlers through safe and developmentally enriching caregiving. The EHS-CCP program is designed to expand the availability of EHS services and applicability of EHS standards to existing childcare centers and family childcare homes.

59. The Head Start programs are largely administered at the federal level by HHS employees working out of HHS Regional Offices.

60. During the 2024-2025 program year, which spanned from July 1, 2024, to June 30, 2025, CDE was awarded $5.6 million in EHS-CCP funds, which were used to provide services across five rural counties of California: Butte, Del Norte, Fresno, Humboldt, and Trinity. As a grant recipient, CDE is required to provide a 20 percent match as non-federal match each budget period. During the 2024-2025 program year, CDE cumulatively served 373 children with this grant, including 24 children in foster care, 12 experiencing homelessness, and 179 from families

receiving public assistance such a Temporary Assistance for Needy Families (TANF), Supplemental Security Income (SSI), or the Supplemental Nutrition Assistance Program (SNAP).

61. CDE draws down funds monthly as expenses are incurred and Partner Agencies (PAs) require reimbursement. CDE's monthly draw-down is typically between $200 and $900 thousand and is effectuated through the HHS Payment Management System (PMS).

62. Based on my knowledge and experience, and the chilling effect described below, implementation of the Notice will likely decrease enrollment, leading to reduction or termination of funding. CDE is required to maintain at least 97% enrollment in its Early Head Start programs to maintain funding. If enrollment falls below that threshold for three consecutive months, we must develop a six-month enrollment plan. At the end of that period, if we do not hit enrollment targets, HHS may reduce or terminate our funding.

63. Reduction or termination of funding will harm California because EHS-CCP funding allows CDE to improve and expand comprehensive health and quality services to 236 infants, toddlers, preschool age children, and their families in rural counties in Northern California. Many children and families in this region share characteristics that have been identified in the community assessment process. These include children who are protective-service recipients; children who are at risk of exploitation; families below federal poverty income levels; English language learners and dual language learners; and pregnant teens, teen parents, and low birth weight babies.

64. Many of the Northern California counties that benefit from EHS-CCP are sparsely populated, with limited access to basic services, including early learning and care options. This area has many needs and few resources. If EHS-CCP funding were to be delayed or discontinued,

it would exacerbate existing disparities and have profound and lasting effects on the children and families who rely on Early Head Start services.

65. Although our EHS-CCP grantees and partners receive some state funding, it does not cover the costs of comprehensive services that the federal funds provide. If CDE were to lose the federal funding, basic services would continue through other state funds; however comprehensive services would end, and families and children would be more at risk of adverse impacts.

66. The loss of EHS-CCP would have dramatic and far-reaching impacts throughout our communities. Children would lose educational, nutritional, and healthcare services. Low-income parents or guardians may be forced to cut spending on other critical needs to fill the gaps, and some may be forced out of work so they can care for their children. The long-term impacts to the health, academic, and professional success of EHS-CCP children would also be significant.

67. Reduction or termination of funding would risk significant harm to young children and their families in California because children and families currently receiving services will lose access to comprehensive services and risk being served in lower quality settings. Educators in these settings will have less access to professional development and essential training as well.

68. CDE does not collect information regarding immigration status for Early Head Start students and their families because it has never been required to do so.

69. CDE would require additional funds and time to build systems, develop a policy, and train staff on how to collect and verify information regarding immigration status. It could take at least two months to develop policies and procedures for implementation and longer to ensure the infrastructure was in place. It would create a dual burden on CDE to train both State and local staff. CDE has budgeted for routine mandated expenses including monitoring, training, and other

operating expenses in adherence to grant requirements. The grant the CDE has received from US HHS for these services is insufficient to implement a collection and verification protocol. Deviating from planned activities to implement a collection and verification protocol would prevent the CDE from meeting the mandates currently provided by its award from the US HHS.

70. Implementing a collection and verification system would divert educator and/or administrator time to meet with families and collect information and documents, taking time away from core responsibilities such as ongoing monitoring, coaching and instructional support, family engagement, ensuring a culture of safety, and academic planning. This process would also require significant coordination of outreach and follow-up, with families, secure document storage, and compliance tracking at both the partnering agency and grantee level. Within partnering agencies with limited administrative capacity, these additional duties could delay or reduce attention to student support services, family engagement events, and essential operational functions such as attendance monitoring, special education compliance, and behavioral interventions.

71. The HHS PRWORA Notice did not provide guidance on how to implement the new requirements or what documentation would be sufficient for verification.

72. On July 15, 2025, Start Early hosted a webinar titled, "Unpacking the New HHS Notice on Public Benefits: What Programs Need to Know." On July 14, 2025, the National Head Start Association provided a brief summary of the immigration verification notice. HHS has not provided any policy or guidance on the change in policy.

73. Based on my knowledge and experience, there would also be a chilling effect among parents, students, and staff. We are concerned that families will choose not to enroll to receive services provided through the Early Head Start if new information collection and verification requirements are implemented. CDE has witnessed parents being fearful of bringing

children to school at California schools as federal immigration enforcement has ramped up in recent months.

74. This can also create a chilling effect among teachers and other staff as they may fear coming to work if immigration status verification is implemented. Teachers and other staff who disagree with verification of immigration status may seek other employment that does not discriminate against children and families.

75. I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on July 17, 2025 at Philadelphia, Pennsylvania.

_____
Tony Thurmond