# Exhibit 51

## **DECLARATION OF BENJAMIN ROSEN**

I, Benjamin Rosen, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Acting Executive Deputy Commissioner at the New York Office of Mental Health (NYOMH). I have more than 20 years of public service in the both the Executive and Legislative branches of government, including previously serving as Chief of Staff and as Planning Director at NYOMH.

2. The mission of NYOMH is to promote the mental health of all New Yorkers, with a particular focus on providing hope and recovery for adults with serious mental illness and children with serious emotional disturbances. Each year, New York's public mental health system, which NYOMH oversees, serves over 800,000 individuals across more than 6,500 primarily community-based mental health programs and 23 state operated psychiatric centers.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with NYOMH staff, or from my review of relevant documents and information. I submit this Declaration in support of the States' Motion for a Preliminary Injunction to block the HHS PRWORA Notice.

4. NYOMH administers on behalf of New York State some of the programs listed in a Notice issued by HHS on July 10, 2025, entitled "Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of 'Federal Public Benefit'" (the "HHS PRWORA Notice") including the Community Mental Health Services Block Grant (MHBG); Projects for Assistance in Transition from Homelessness Grant Program (PATH); Certified Community Behavioral Health Clinics (CCBHCs), and Mental Health and Substance Use Disorder Treatment, Prevention, and Recovery Support Services Programs administered by the Substance

Abuse and Mental Health Services Administration not otherwise covered under the grants and programs enumerated (37)-(40) in the HHS PRWORA Notice. I understand that the HHS PRWORA Notice took effect on Monday, July 14, 2025, and since then, NYOMH has no mechanism to demonstrate and verify compliance with the new policy. Even though nonprofit entities are exempt from having to verify citizenship status, the State is not. NYOMH is not aware of any way in which it could implement such verification without requiring the people seeking services under the programs described below to prove their qualified alien status, when they are trying to seek services at a very vulnerable time.

5. If we do not implement some kind of requirement that the subgrantees ask for identification and examine the immigration status of each individual in order to determine and confirm their eligibility with the new requirements, and we do not receive some judicial relief, we face the loss of federal funds due to our inability to verify and demonstrate compliance, not to mention any other enforcement the agency wishes to impose on NYOMH. The HHS PRWORA Notice is not clear as to whether grantees could face clawbacks for funding utilized since July 14.

**Community Mental Health Services Block Grant (MHBG)**

6. Since 1981, NYOMH has administered New York State's Community Mental Health Services Block Grant (MHBG). The objective of the MHBG is "support the grantees in carrying out plans for providing comprehensive community mental health services" with a focus on children with emotional disturbances.[1] The MHBG program is authorized by sections 1911-1920 of Title XIX, Part B, Subpart I and III of the Public Health Service (PHS) Act. SAMHSA's Center for Mental Health Services' (CMHS) Division of State and Community Systems

---

[1] SAMHSA, Community Mental Health Services Block Grant, https://www.samhsa.gov/grants/block-grants/subg (last updated April 24, 2024).

Development (DSCSD) administers MHBG funds. Grantees can be flexible in the use of funds for both new and unique programs or to supplement their current activities.[2]

7.  The MHBG funding to New York for fiscal year 2024 was approximately $65 million. A substantial portion of the funding New York receives goes directly to providers. NYOMH also provides about half of the funding to local county departments of community services within the state to be used for allowable purposes, including funding local services providers. For counties and other recipients, MHBG grants represent a portion of other state funding to support community based mental health services, such as crisis response/services, call centers, and various programs related to outreach and advocacy support, all of which varies by county. In particular, MHBG funding helps support a program called "OnTrackNY," which is a clinical program for teens and young adults across New York State to address first episode psychosis. OnTrackNY Services are offered regardless of insurance status or ability to pay, and the program served 1340 individuals last year. OnTrackNY programs also bill Medicaid and other creditable coverage for services for eligible enrollees. MHBG funds enable the programs to provide comprehensive, evidence-based services and serve even those without ability to pay. Some MHBG funding is also allocated to counties for jail diversion programs. Jail diversion programs reduce arrest and incarceration of persons with serious mental illness (SMI) and better connect criminal justice-involved individuals to treatment. These programs are designed to mirror the model developed by SAMHSA. The model identifies key points for "intercepting" individuals with behavioral health issues and then links them to services which prevents further involvement with the criminal justice system.

---

[2] *Id.*

8. NYOMH currently subgrants to 10 counties around New York State. Supported programs include Mental Health Outpatient Treatment and Rehabilitative Services, Home-Based and General Crisis Intervention services, Advocacy and Support services, School Mental Health Programs, Single Point of Access (SPOA) programs, Vocational Services for Children and Families, Outreach programs, Psychosocial Clubs, Recreation and/or Fitness programs, Monitoring and Evaluation for Community Support Services, Respite Services, Transportation Services, On-Site Rehabilitation programs, Family Peer Support Services for Children and Families, Drop-in Centers, and Non-Medicaid Care Coordination Programs. MHBG funds enable counties to operate single points of access, which offer support to accessing community services and streamline eligibility determinations for services, including congregate and other supportive housing placements for individuals with mental health conditions to ensure services are made available to those with the greatest needs.

9. During the 2024 fiscal year, OMH had two active grants in the amount of approximately $8 million awarded to New York State from the Bipartisan Safer Communities Act (BSCA) which is funded by SAMHSA MHBG dollars. The primary purpose is to improve Disaster Mental Health Services, the creation of a statewide Disaster Mental Health Response Team, as well as improve rural access to mental health services. This funding is also used to support the expansion of the OnTrackNY program into rural areas of NY. The BSCA grant requires that ten percent of the funds received be used for first episode psychosis programs, like OnTrackNY. Additionally, the BSCA grant also requires five percent of the funding be used for crisis services. We utilized the five percent of the funding for public education and outreach as part of the suicide prevention hotline, 988.

10. MHBG subrecipients do not ask for or screen based on immigration status. They serve individuals with mental health conditions regardless of ability to pay and support some of the most vulnerable communities in the State, including people experiencing mental health crises, where it would be clinically detrimental to delay intervention in order to determine immigration or insurance status. NYOMH has relied on the longstanding HHS position that States can provide funds regardless of immigration status of the people served with the funds.

11. Some of those who receive services may be undocumented immigrants, but many people also just lack insurance or means to pay for services. While this action may be targeting undocumented immigrants, a far broader array of vulnerable people will suffer if the State cannot disburse funds to the organizations and counties that help make up the crisis response network in the state.

12. One of the most significant ongoing challenges in working with individuals with Serious Mental Illness is engaging them in essential care needed to keep them safe and stable in the community. The added burden of needing to demonstrate qualifying immigration status will impact individuals' ability to obtain care in a timely manner and will have further downstream impacts driven by concern and fear about engaging in care. Ultimately this will keep people from seeking care, including people who may qualify. Ongoing, consistent care is needed to keep people in their homes, and out of hospitals and carceral settings. This change will impact not only individuals without documentation, but will also have a chilling effect on the community of individuals with Serious Mental Illness in general. OMH is devoted to supporting people with Serious Mental Illness in improving their lives, not only by treatment, but by providing housing, skill building rehabilitation services, peer support services and care management in multiple settings. Without this care, people will lose the functional and clinical gains they have made.

13. The specific impact on children cannot be overstated. Children with mental health challenges are at the mercy of adults in their lives to identify their challenges and seek access to services that can ameliorate them. When parents avoid seeking mental healthcare due to their fears that they will be asked about immigration status, including fears that they will be separated from their children, children and families suffer. This is particularly tragic in the case that the child's immigration status is not in question, but a parent or family member's is. Children, especially young children, will be unable to access life-saving supports. The children and youth of the United States are currently in the throes of a youth mental health crisis that will be exacerbated by the lack of early supports.

**Projects for Assistance in Transition from Homelessness Grant Program (PATH)**

14. Projects for Assistance in Transition from Homelessness Grant Program (PATH) "funds services for people with serious mental illness (SMI) experiencing homelessness"[3] It is a formula grant authorized by the Stewart B. McKinney Homeless Assistance Amendments Act of 1990 and was reauthorized by Section 1218 of the Consolidated Appropriations Act, 2023 (P.L. 117-328). "PATH, part of the first major federal legislative response to homelessness, is administered by the SAMHSA Center for Mental Health Services (CMHS)."[4]

15. New York receives about $4 million annually from this program, which has a state matching component to provide funds for efforts to help transition people out of homelessness. We have 15 providers statewide that receive PATH funding to provide or assist with transitional housing, temporary support, and access to permanent housing. These funds are administered through direct contracting with service providers; a small amount goes to counties in the state to

---

[3] SAMHSA, Projects for Assistance in Transition from Homelessness (PATH), https://www.samhsa.gov/communities/homelessness-programs-resources/grants/path (last updated December 12, 2023).
[4] *Id.*

support single point of access programs that are utilized to determine eligibility for and placement in permanent housing.

16. PATH primarily serves individuals that are homeless or at-risk of homelessness. A recent success story from a PATH provider in New York City was its ability to reach out to and assist an individual in escaping a harmful domestic relationship and avoiding homelessness by supporting them in accessing the benefits and residential housing for which they were eligible. The individual is now in permanent housing and has established access to services and benefits that they have been qualified to receive. Absent the availability of PATH funding for these services, the individual would likely have been subjected to domestic violence and homelessness.

17. PATH subrecipients do not ask for or screen based on immigration status. They serve individuals who are homeless or at risk of homelessness without regard for their status. In this program, too, NYOMH has relied on the longstanding HHS position that States can provide funds regardless of immigration status of the people served with the funds. People served by this program are, almost by definition, unlikely to have documentation handy to prove their eligibility, but are in urgent need of services. If there were a verification requirement, many people would be deterred from accepting assistance and would end up on the streets.

**Certified Community Behavioral Health Clinics (CCBHCs)**

18. Certified Community Behavioral Health Clinics "are designed to ensure access to coordinated comprehensive behavioral health care" and "are required to serve anyone who requests care for mental health or substance use, regardless of their ability to pay, place of residence, or age."[5] The CCBHC model has several requirements, including that crisis services are

---

[5] SAMHSA, Certified Community Behavioral Health Clinics (CCBHCs), https://www.samhsa.gov/communities/certified-community-behavioral-health-clinics (last updated April 24, 2023).

available 24 hours a day, 7 days a week and comprehensive behavioral health services and care coordination are available.

19. CCBHCs provide nine types of required services:

   a. Crisis mental health services including 24-hour mobile crisis teams, emergency crisis intervention, and crisis stabilization;

   b. Screening, assessment, and diagnosis including risk assessment;

   c. Patient-centered treatment planning or similar processes, including risk assessment and crisis planning;

   d. Outpatient mental health and substance use services;

   e. Outpatient clinic primary care screening and monitoring of key health indicators and health risk;

   f. Targeted case management;

   g. Psychiatric rehabilitation services;

   h. Peer support, counselor services, and family support services;

   i. Intensive community-based mental health care for members of the armed forces & veterans.

20. "CCBHCs can be supported through the Section 223 CCBHC Medicaid Demonstration, through SAMHSA administered CCBHC Expansion (CCBHC-E) Grants, or through independent state programs separate from the Section 223 CCBHC Medicaid Demonstration."[6]

21. SAMHSA selected New York State as one of the original eight Certified Community Behavioral Health Clinics (CCBHCs) demonstration (i.e. pilot) states pursuant to

---

[6] *Id.*

Section 223 of the Protecting Access to Medicare Act, P.L. 113-93, as amended. NYOMH administered this demonstration program with the New York State Office of Addiction Services and Supports. The 39 CCBHCs in the demonstration program are state-certified, integrated mental health and substance use disorder programs that have received preferential Medicaid funding in the form of an increased Federal Match Percentage since their inception in 2017. CCBHCs are required to comply with SAMHSA certification criteria, which includes the requirement that programs establish a sliding fee scale and agree not to refuse medically necessary behavioral health services to anyone due to inability to pay. While SAMHSA sets criteria for state-certification of CCBHCs, NYOMH administers New York's demonstration program without additional funding from SAMHSA.

22. Separate from the congressionally authorized CCBHC demonstration program in New York State, SAMHSA has also issued multiple notices of awards for CCBHC expansion grants since 2018. According to SAMHSA, the expansion grants "support providers to meet the CCBHC criteria and establish CCBHC programs, improve and enhance existing CCBHC programs, and to provide support for uncompensated care." While NYOMH does not administer the expansion grants, multiple behavioral health providers in NYS received and use these grants to expand mental health and substance use disorder services and to cover uncompensated care costs for serving individuals without creditable coverage or the ability to pay on a sliding fee scale.

23. While it is unclear whether New York's CCBHC demonstration program, which will end on October 1, 2025 without Congressional reauthorization, or just CCBHC expansion grant recipients will be impacted by the HHS PRWORA Notice, in either case, requiring CCBHC providers to verify immigration status would not be consistent with SAMHSA's own CCBHC certification criterion which requires them to provide access to behavioral health services to

anyone regardless of their ability to pay. Changing this criterion would fundamentally alter a service delivery model that SAMHSA and NYS have invested significant resources to demonstrate is effective at increasing engagement in these critical services. Further, imposing this requirement will harm individuals with mental health or addiction disorders, regardless of legal status, who may be reluctant to receive services due to fear of negative immigration repercussions.

24. New York State CCBHCs have shown success in reducing avoidable hospital use and complications with the initial phase showing a 26% reduction in costs of inpatient and emergency room visits among CCBHC enrollees. A reduction in reimbursement for these integrated behavioral health services, or the addition of eligibility determinations, will place more cost on the state and could result in cuts in services.

**Other Affected Programs**

25. The Notice refers to "Mental Health and Substance Use Disorder Treatment, Prevention, and Recovery Support Services Programs administered by the Substance Abuse and Mental Health Services Administration not otherwise covered under (37)-(40)" of the Notice.

26. While it is unclear what will be encompassed by this catchall category, we are concerned about the suicide prevention hotline, 988. New York receives approximately $20 million in funding to support this critical suicide prevention resource, and 988 does not screen or inquire about immigration status when people call for help with their mental health, including suicidal thoughts. We believe that requiring 988 call center employees to inquire about immigration status will delay life-saving care or lead to individuals who need assistance not calling for help due to fear of negative immigration consequence. NYOMH is also unaware of any way for a 988 call center employee to verify an individuals immigration status over the phone.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of July, 2025, in Albany, NY.

_____
Benjamin Rosen
Acting Executive Deputy Commissioner
New York Office of Mental Health

11