# Exhibit 53

# DECLARATION OF ELANA MARTON

1.      I, Elana Marton, declare I am the Deputy Director and Counsel for the New York State Council on Children and Families (CCF). I have knowledge of the information in the statements set forth below through personal knowledge or from documents provided to and reviewed by me.

2.      I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

**Professional Background**

3.      CCF is a small executive state agency responsible for supporting cross-system coordination and collaboration among New York State's health, education, and human service systems to improve outcomes for all of New York's children and families.

4.      I have worked at CCF for nearly 18 years, providing legal counsel and programmatic support and oversight to support agency operations, including federal grant administration.

5.      Since 1991, CCF has administered the Head Start Collaboration Project, a grant staffed by the New York State Head Start Collaboration Director housed at CCF, and funded by the Office of Head Start (OHS) under the Administration for Children and Families (ACF) within the U.S. Department of Health and Human Services (HHS). The Head Start Collaboration Project provides a structure and a process for OHS to work with state agencies and local entities to leverage common efforts and resolve challenges to formulate, implement, and improve state and local policies and practices to best support the most vulnerable young children and their families in New York State.

6.      The New York State Head Start Collaboration Project conducts community needs assessments to assess and pinpoint the current needs of children and families in their particular

area, including their education, health, nutrition, and social service requirements. Such assessments help Head Start programs in New York State evaluate how major shifts may affect operations, services, and families. Additionally, the Head Start Collaboration Project Director monitors and responds to common questions about the federal Head Start Act and Head Start Program Performance Standards. More recently, the Head Start Collaboration Director has been responding to questions and challenges resulting from the rapid changes in HHS directives and operations affecting the administration of Head Start grants since January 2025. Also, the Head Start Collaboration Project partners with two government agencies that license "child day care" sites where Head Start services are delivered in New York communities: the New York City Department of Health and Mental Hygiene for Head Start programs in New York City and the New York Office of Children and Family Services (OCFS) for programs in the rest of New York State.

**The Head Start Program**

7. The Head Start Program was implemented in 1965 to "promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development" and to help break the cycle of poverty by providing low-income children and families with comprehensive services to meet their social, health, nutritional, educational, and other needs.

8. In 1969, the Migrant and Seasonal Head Start (MSHS) Program was created to provide services expressly for children of low-income families engaged in migrant and seasonal agricultural work.

9. Head Start offers early childhood education and holistic support to promote family stability and well-being. In addition to providing children with early childhood education and diapers, meals, and snacks during the school day, Head Start provides other services not typically provided by child care and prekindergarten programs. Head Start families are connected with

needed resources including housing support, health and mental health services, and adult education and career assistance. This support is provided at no cost to families with incomes below the Federal Poverty Guidelines.

10. In New York State, there are 147 Head Start Programs, including a MSHS Program, annually serving an estimated total of 43,300 children from birth to school entry and 900 pregnant women. Of the total number of children served by Head Start in New York, approximately 230 children are served by the MSHS Program. Across the state, New York's Head Start children and families are served in 927 licensed child care sites by 14,400 staff.

**The Challenged HHS Action**

11. I am providing this declaration to explain the impact of a Notice issued by HHS on July 10, 2025, entitled "Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of 'Federal Public Benefit'" (the "HHS PRWORA Notice"). In the HHS PRWORA Notice, HHS classified Head Start programs as providing "Federal public benefit[s]," under U.S.C. § 1611(c), and rejected its prior interpretation of PRWORA that had been in place since 1998, which permitted Head Start programs to be accessible to families regardless of immigration status. The Rule was published in the Federal Register on July 14, 2025, and became immediately effective, without allowing for a public comment period on the exclusion of "unqualified aliens" from Head Start before implementation, causing tremendous confusion, uncertainty, and fear among Head Start families and providers.

12. HHS provided "a partial benefit-cost analysis," focusing on Head Start "as an illustrative case." HHS states, "a primary estimate of $374 million in annual effects representing incremental expenditures on U.S. citizens and qualified aliens" and "a full range of estimated

3

expenditure effects between $184 million and $1,881 million, capturing uncertainty in the baseline share of program beneficiaries who are U.S. citizens and qualified aliens."

13. I write here to document the impacts of this Notice on New York's Head Start programs and their licensure as "child day care" sites by New York State and New York City.

14. While the number of children who will be impacted in New York is not known because Head Start programs, including the separate MSHS Program (Head Start Act, 42 U.S.C. § 9801 et. seq.), have never inquired about the immigration status of those who apply to participate, the Notice has already created a "chilling effect" and effectively upended the welcoming and inclusive approach of Head Start's 60-year history of effectively serving children and families facing poverty and other challenges.

15. The lack of clear guidance on how to implement the new immigration policy is creating many questions, including who is considered a "qualified alien," what documentation is needed to prove immigration status, and whether the new requirement applies only to children enrolled in the program and/or to their parents, too. Some families have expressed that they may withdraw their children from the program because they are missing documentation to verify their child's or their own immigration status, while some mixed-status families where the children are U.S. citizens and the parents are undocumented (e.g., living in the U.S. without being a lawful permanent resident, asylee, refugee, or other immigrants admitted into the country for humanitarian reasons) are concerned about risking exposure of their immigration status. Still further, certain lawful visa-holders are now also excluded, such as people present on student visas.

16. Furthermore, the sudden implementation of a new eligibility requirement based on immigration status will place enormous burdens on already strained Head Start programs in New York, along with the State of New York and New York City, which partner with those programs.

Head Start programs have never required proof of immigration status, and implementing new verification processes will be challenging and consume enormous amounts of time and financial resources. To put it simply, programs do not have the staff resources or knowledge to implement this sudden and new eligibility requirement.

17. For the reasons stated above, the new Rule also will lead to decreased attendance and enrollment in Head Start that will negatively impact children, families, and communities. In turn, reduced access to early childhood education will hinder school readiness, the ability of parents to work, as well as the viability of the Head Start program. It is expected that under-enrollment will also lead to reductions in funding, impacting a program's capacity to maintain staff and remain operational for the children and families that the Rule prioritizes to participate in this vital program.

18. Head Start children and families, in addition to many Head Start staff, live in or near poverty levels, and they experience financial and mental health stressors when funding is jeopardized. Because Head Start is a critical safety net for entire communities, with Head Start being the largest employer in some rural communities, the ripple effects into the community at large will also be significant. Head Start historically has helped families move out of poverty and break the cycle of generational poverty. In particular, the MSHS program is critical to farms that employ migrant farmworkers who play a crucial role in New York's agricultural sector, contributing to the production of fresh and healthy food. When children cannot access Head Start or MHSH programming, their parents miss work or lose their jobs, resulting in significant economic, social, and health costs to children, families, and communities.

19. The disruption of Head Start by this abrupt new rule marks a significant policy shift. In expressing alarm over the new rule, the executive director of the National Head Start Association stated: "This decision undermines the fundamental commitment that the country has

5

made to children and disregards decades of evidence that Head Start is essential to our collective future." (Statement from NHSA Executive Director Yasmina Vinci on "HHS Decision to Change Head Start Enrollment Criteria," July 10, 2025).

20. In short, HHS has made a decision in a matter of days that unwinds nearly 30 years of precedent of allowing people to access Head Start regardless of immigration status as the program was not considered a "federal public benefit," and 60 years of practice of welcoming all low-income children and their families to participate in Head Start programs. Such a dramatic and abrupt shift in long-standing and foundational Head Start principles will throw whole communities into chaos.

**Head Start Programs Have Faced Regulatory Whiplash since January 20, 2025**

21. It is hard to summarize the dramatic harms New York's Head Start programs have suffered since January 2025. This new action to mandate citizenship or immigration status checks is only the latest in a series of federal threats to these critical programs.

22. On January 27, 2025, the Office of Management and Budget froze all funds for federal funding recipients in the HHS Payment Management System (PMS), including Head Start grant recipients. Although the freeze was reportedly lifted, Head Start programs in New York continued to face challenges drawing down approved grant funds. Approximately 20 Head Start programs reported being unable to draw down funds as scheduled, receiving messages of 'pending' or 'in process' when they requested funds in PMS and/or waiting to receive a new Notice of Award (NOA).[1] Because Head Start programs rely on steady, predictable access to maintain program

---

[1] Beford-Stuyvesant Early Childhood Development Center, Inc. CEO Empowers, Inc., Columbia Opportunities, Inc., Committee for Early Childhood Development Day Care Center, Inc., Community Action Planning Council of Jefferson County, Inc., East Side House, Family Enrichment Network, Inc., Head Start Of Eastern Orange County, Opportunities for Otsego, Inc., The Community Program Centers of Long Island, LEAP (formerly Washington County Economic Opportunity Council), Lifeworks Community Action Agency, Inc., Long Island Child and Family

6

operations (pay staff, rent, food vendors, and other expenses), these 20 programs had to make difficult choices about whether to remain open, with all these programs being in jeopardy of closing.

23. In early February 2025, the Cattaraugus-Wyoming County Head Start program was forced to temporarily close when approved funds could not be accessed. Approximately 200 children had no care such that their parents were not able to work or go to school, and 87 program staff were furloughed.

24. In early February 2025, the Great Neck-Manhasset Head Start, one of the smallest Head Start programs in the state, receiving a Head Start grant of $577,859 annually to serve 46 families and employ 11 staff, was on the brink of closure. The program notified families that it would have to close if they could not access their funding. While funding was received at the last minute, so the program avoided closing, families and staff experienced tremendous fear and uncertainty.

25. On March 14, 2025, ACF within HHS issued a letter implementing the President's ban on "DEI." The letter threatened funding consequences for agencies that "promote" or "take part" in any "diversity, equity, and inclusion (DEI) initiatives." No guidance was provided on what constitutes DEI and how programs could remove these elements from their services while also targeting the "diverse needs of the population served," as mandated by the Head Start Act. In the absence of any direction in the face of conflicting requirements, providers expressed fear of losing their funding, having funds clawed back, or being subject to investigation.

26. Adding to funding uncertainty and delays, on April 1, 2025, half of the OHS regional offices were closed, including Region 2 serving New York. Head Start grantees in New York were

---

Development Centers, Inc., Promesa Head Start, Tompkins Community Action, Ulster County Community Action Committee, Inc.,. United Talmudical Academy of Borough Park Head Start, Warren County Head Start, Inc., and West Harlem Community Organization, Inc.

7

left without necessary grant funding and programmatic support. Many reported experiencing problems accessing their federal grant funds already allocated to them and delays in receipt of federal funding awards.

27. Following the closure of the Region 2 OHS, Head Start grantees who attempted to contact OHS about their anticipated Notice of Awards were directed to use the Correspondence feature within the Head Start Enterprise System (HSES) or to direct questions to a centralized OHS email mailbox. Accustomed to having direct contact and needing support from a Regional Office Program Specialist, and after writing to HSES and the central mailbox and receiving no response, many Head Start grantees contacted the New York State Head Start Collaboration Director to ask if she had a new federal contact. Some grantees also shared that they had written directly to Heather Wanderski at OHS, Program Operations Director responsible for supporting grant recipient operations, and received no response. With "reductions in force" eliminating more than half of the OHS staff in Washington D.C. (out of 230 staff, only 95 staff remained), and no new regional OHS contact identified, no OHS staff were available to provide federal support critical to successful program operations.

28. On April 3, 2025, the chief financial officer from one Head Start program (Community Action Planning Council of Jefferson County) awaiting its NOA expressed how critical Head Start is to their community, and that it was their intention to operate as long as they could avoid an interruption in services. But without the drawdown of the remainder of their funds, their resources would be stretched too thin at the end of the month. As a result, some staff started to seek new

employment in case their Head Start job ended abruptly. CCF received similar messages from other Head Start grantees while they waited for their grant awards.

29. On April 7, 2025, the Department of Government Efficiency began intercepting Head Start grantees' requests to draw down their grant funds for routine requests (such as payroll) through PMS by directing them to justify "what the award is for, what the funds will be used for, and why it is necessary." Programs were directed to send an email to defendthespend@hhs.gov, adding another step in the payment request process, largely duplicative of the grantee's Notice of Award. Programs were surprised by this new requirement and unclear about what was expected and whether they needed to answer the questions. Concerns continued about whether payments would be further delayed, all while there were no federal office staff to advise them due to the abrupt closure of five of OHS's ten regional offices in April 2025, including the regional office in New York.

30. On April 16, 2025, HHS amended its Grants Policy Statement[2] to add a certification requirement stating that agencies that accept grant awards "are certifying that…they do not and will not during the term of this financial assistance operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." In the event that a funding recipient engages in impermissible "DEIA," consequences might include a claw back of grant funds and civil and criminal liability for misrepresentation under the False Claims Act. As stated above, no guidance was provided about what was considered a "diversity, equity, and inclusion (DEI) initiative," an activity "advancing" or "promoting" "DEIA," or "discriminatory equity ideology." In addition to these terms being ambiguous and undefined, no guidance was provided on how to reconcile these limitations on the content of Head Start

---

[2] https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-april-2025.pdf

9

programming with the conflicting obligations under the Head Start Act to serve the "diverse needs" of their communities. Head Start grantees expressed confusion about this new Certification requirement. For example, some asked whether food that meets cultural or religious dietary needs or interpretation services violate the new requirements, even though all of these are currently required by the Head Start Program Performance Standards. Grantees also reported their fear of the extreme consequences of non-compliance, such as losing their funding, having funds clawed back, or being subject to investigation. Some shared that they felt stuck in a "doomed if you do – doomed if you don't" dilemma, adding tremendous stress to their already demanding job of running a complex and critical program upon which children, families, staff, employers, and communities depend.

31. Due to funding delays, the New York State Head Start Collaboration Director regularly received messages of distress from Head Start programs in fear of closing, grappling with the difficult choice of whether to remain open while waiting for funds to become available, facing the possibility of being unable to cover payroll, pay food vendors, make rent, and see to other program expenses. The New York State Head Start Collaboration Project Director surveyed programs about how long they could operate if there was a disruption in funding. As many programs operate with tight cash flow, one week was a common response, and the maximum period before having to suspend programming was two months.

32. Programs also reported being unable to fill open staff positions due to funding uncertainty, threatening their ability to maintain sufficient staffing and continue operating.

33. Head Start grantees in New York continued to report funding issues. On April 14, 2025, the Warren County Head Start executive director wrote that programming would be suspended for 183 children and families and 78 staff laid off. While funding was received at the last possible

moment to avoid closure, Head Start families experienced significant fear of the possible temporary and/or permanent disruption in services, as did program staff, some of whom reported looking for another job in anticipation of the program closing.

34. Even for programs that did not have to close, the possible delays and disruption in accessing funding threatened the viability of their programs and caused significant distress and harm. Head Start program directors repeatedly shared that the chaos and uncertainty were impacting their Head Start parents and staff. Parents asked if the program would stay open so their children would have care and they could keep working, concerned that they would lose their jobs. Similarly, Head Start staff expressed concerns about the stability of their jobs and the safety of and support for the children in their care. Program directors also were heavily burdened by the additional work and troubled by the lack of certainty around whether programs will be able remain open and provide critical services to Head Start children and families in their communities.

35. As described above, HHS abruptly closed the OHS Region 2 office in the course of a massive reduction in force, leaving Head Start programs in New York without needed guidance and administrative support. While this restructuring and termination of OHS employees was halted by a Court on July 1, 2025, *see New York v. Kennedy*, No. 25 Civ. 196 (D.R.I.), the detrimental consequences of these reductions continue to negatively impact Head Start programming.

**The HHS PRWORA Notice**

36. The Head Start Act (42 U.S.C. § 9801 et. seq.) outlines eligibility criteria for children and pregnant women. It is primarily based on income, but also includes children in foster care, those experiencing homelessness, and those from families receiving public assistance. Specific program types like Migrant or Seasonal Head Start, and those serving American Indian/Alaska

11

Native populations may have additional criteria. Since the Head Start program began 60 years ago, immigration status has never been a criterion for program eligibility.

37. Program eligibility based on income is verified by Head Start program staff using tax forms, pay stubs, or other proof of income to determine the family income during the relevant time period. The program calculates total gross income using applicable sources of income. To verify whether a family is homeless, a program may accept a written statement from a homeless services provider, school personnel, or other service agency attesting that the child is homeless or any other documentation that indicates homelessness, including documentation from a public or private agency, a declaration, information gathered on enrollment or application forms, or notes from an interview with staff to establish the child is homeless; or any other document that establishes homelessness. To verify whether a child is in foster care, program staff must accept either a court order or other legal or government-issued document, a written statement from a government child welfare official that demonstrates the child is in foster care, or proof of a foster care payment (Eligibility verification is detailed in Head Start Performance Standards § 1302.12).

38. The Head Start Act (42 U.S.C. § 9801 et. seq.) states that a child who has been determined to meet the eligibility criteria and is participating in a program year is considered to meet the eligibility criteria through the end of the succeeding program year. This means that no child should be disenrolled until they age of out of the Head Start program.

39. When a parent wants to enroll their child in a Head Start program, the parent completes the enrollment application (either in person at the Head Start center by interview, online, or on paper). Each application is scored based on need and then when it is time to conduct the selection to fill a vacancy at the program the highest scored application is selected, based on the age group where the opening is available.

40. Selection criteria are annually established by programs pursuant to Head Start Program Performance Standards § 1302.14. Such criteria weigh the prioritization of selection of participants based on community needs, including prevalent social or economic factors, challenges, and barriers experienced by families and children, identified in the community needs assessment as described in § 1302.11(b) of the Head Start Program Performance Standards. If a program serves migrant and seasonal families, it must annually establish selection criteria that weigh the prioritization of selection of participants based on community needs identified in the community needs assessment and give priority to children whose families can demonstrate they have relocated frequently within the past two years to pursue agricultural work. Further, a program must ensure that at least 10 percent of its total actual enrollment is filled by children eligible for services under the Individuals with Disabilities Education Act.

41. The New York State Federation of Growers & Processors Associations Inc. DBA, Agri-Business Child Development (ABCD) runs a Migrant and Seasonal Head Start Program and operates in 13 sites across New York in areas of highest farm worker concentration. ABCD was created in 1946 by New York State farm owners who realized that children needed to be in a safe and healthy environment while their parents worked in the fields. ABCD has graduated thousands of children who today thrive as successful members of society.

42. Head Start programs do not have sufficient staff or resources to verify immigration status. Head Start programs are already experiencing a workforce crisis. Furthermore, Head Start programs receive funding for the staffing pattern in their approved application. In addition to teaching staff, programs employ home visitors, family service support staff (usually they have a caseload of 40 families each), coordinators for the comprehensive delivery of services (in the areas

of: special needs services, health, nutrition, mental health, family services, and education), and fiscal and program management and leadership staff.

43. HHS estimated "annual costs of $21 million in the opportunity cost of time spent by individuals seeking benefits to document eligibility and time spent by individuals reviewing program eligibility" in 90 Fed. Reg. at 31239. With current Head Start program staffing and long-standing eligibility policies and procedures, it is not possible for any Head Start program to abruptly change course in program implementation and divert limited resources from core operational responsibilities to immediately begin verifying the immigration status of program applicants. Moreover, screening based on immigration status is complex and will require training, and the Rule is ambiguous as to whether the status of the child, parent, and/or household members will be used to determine eligibility. Right now, staff simply need to receive one of the forms of information (described above) showing income. For those who are experiencing homelessness, there are an array of options for demonstrating eligibility (described above) that do not require government identification.

44. Head Start programs operate with very limited and tightly planned budgets, and as we have repeatedly learned since January, some programs cannot even withstand a week without funding. The implementation of the HHS PRWORA Rule will further destabilize programs and negatively impact the well-being of children, families, and entire communities.

45. While the majority of Head Start grantees in New York are nonprofit charitable organizations, and the July 14, 2025 HHS Notice purports to exempt nonprofit charitable organizations from being required to determine, verify, or otherwise require proof of eligibility of any applicant, the Notice also states that all entities that are part of HHS's administration of public benefits must "pay heed to the clear expressions of national policy," with no explanation of the

nature of this obligation, how entities are expected to follow or implement the policy, or the consequences of not following it.

46. Further, in issuing the July 14, 2025 Rule and applying the reinterpretation immediately, HHS bypassed the 30-day notice and comment period required by the Administrative Procedure Act and the Head Start Act (42 U.S.C. § 9839(d)).

47. For all the reasons described above, the July 14 Rule compounds the chaos and confusion Head Starts have faced since January, undermining and imperiling decades of Head Start providing young children with a safe place to learn and grow while helping families achieve economic stability. The broad and chilling effect of this latest HHS action to exclude "unqualified aliens" is that some of the most vulnerable children in our communities and their families will not be served, including those who continue to be legally entitled to participate in Head Start, at significant cost to the economic and social fabric of our state and country.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of July 2025, in Rensselaer, New York.

*Elana Marton*
Elana Marton
Deputy Director and Counsel
New York State Council on Children and Families