# Exhibit 54

## DECLARATION OF EUGENE P. HESLIN, M.D., FAAFP

I, Eugene P. Heslin, M.D., FAAFP, declare under the penalty of perjury pursuant to 28 U.S.C. Section 1746 that the following is true and correct:

1. I am the First Deputy Commissioner and Chief Medical Officer at New York Department of Health (NYDOH). I have served in this capacity since July 13, 2017. My duties and responsibilities in this position involve supporting the Commissioner of Health. Prior to assuming this position, I was a primary care clinician in clinical practice for 30 years. I am a Medical Doctor and received my M.D. from University of Texas Health Science Center in Houston.

2. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with NYDOH staff, or from my review of relevant documents and information.

3. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

4. NYDOH's mission is to protect and promote health and well-being for all, building on a foundation of health equity. To support that goal, NYDOH partners with health centers that provide primary and preventive care to low-income individuals, including health centers that receive funding through the Federal Health Center Program.

## Health Center Program

**Health Centers Are the Public Health Safety Net**

5. Section 330 of the Public Health Service Act created the Federal Health Centers Program, which provides grants to Health Centers on the condition that they provide care to "all residents," regardless of their ability to pay, and be located in geographic areas with few health care providers. 42 U.S.C. § 254b. This program is administered by the Health Resources and Services Administration (HRSA) within the Department of Health and Human Services (HHS), and awards

funding, called "Section 330 Grants," to support outpatient primary care facilities that care for primarily low-income individuals or individuals located in underserved areas.

6. Some Health Centers are eligible for designation as a Federally Qualified Health Centers (FQHCs), which means they are allowed to participate in specific reimbursement systems under Medicare and Medicaid. As such, they can receive cost-based reimbursement rates for services. This higher reimbursement rate is an important source of revenue as more than one-third of the patients seen at some Health Centers, particularly those in urban regions of the state, are enrolled in Medicaid.

7. Health Centers including FQHCs act as safety net providers that must serve underserved communities, which include people who are uninsured, homeless, or low-income. FQHCs include community health centers, migrant health centers, health care for the homeless health centers, public housing primary care centers, and health center program "look-alikes" (addressed further below).

8. FQHCs are required to provide basic health services including enabling services to help patients access care such as outreach, transportation, and language interpretation services. Some centers also provide physician-administered drugs and outpatient prescription drugs. FQHCs must also provide referrals to off-site specialists including mental health and substance use disorder providers. In New York and across the country, many FQHCs also provide a wide range of primary and preventive health care services, diagnostic laboratory and radiology services, pharmaceutical services, patient case management services, preventive health services, public health education services, behavioral health services, oral health services, and some urgent care services.

9. FQHCs can also provide additional services that patients might not generally find in a routine primary care office. Many of the FQHCs provide obstetrical care or dental care. In New York, many FQHCs also serve as residency training program sites for family medicine physicians.

10. A Health Center can establish itself as an FQHC by satisfying a combination of eligibility criteria, including enrolling in a Section 330 Program, providing comprehensive services, having an ongoing quality assurance program, meeting other health and safety requirements, and not concurrently approved as a Rural Health Clinic.

11. Separately, an entity that does not receive Section 330 funds can be considered an "FQHC look-alike" if it is deemed by the Secretary of HHS to meet the requirements of the Health Center Program, serves a designated medically-underserved area or medically-underserved population, offers a sliding fee scale to persons with incomes below 200 percent of the Federal Poverty Level, and is governed by a board of directors, the majority of whom receive care at the institutions. FQHC look-alikes can enroll as a Medicaid and/or Medicare provider. Similar to an FQHC, a look-alike is eligible for enhanced Medicaid/Medicare reimbursement.

12. Health Centers, which include all FQHCs, may be private, non-profit entities, or public agencies. 42 C.F.R. §§ 51c.103; 56.103. Within New York, many operate as charities and are subject to New York regulations governing charitable institutions.

**New York Depends on FQHCs to Provide Healthcare**

13. FQHCs are a critical partner in the effort to provide basic health care services in the state of New York, in both rural and urban areas, including to uninsured individuals.

14. In rural communities, FQHCs often operate as the only healthcare provider in the community. As a result, they care not only for the Medicaid, underinsured, and uninsured populations, but also for Medicare and commercial populations, as well. In urban communities,

FQHCs are often the only centers that care for at-risk populations. Many times, these populations are marginalized from the rest of the health ecosystem.

15. In New York, there are approximately 850 FQHCs and 47 look-alike Health Center organizations. FQHCs in New York serve approximately 2.4 million patents annually. Among those served, about 12% (or 290,000) are uninsured – significantly higher than the statewide average.

16. FQHCs in the state of New York do not verify citizenship status of their patients as there has been no requirement to do so; care is provided regardless of immigration or insurance status, or ability to pay. In fact, 88.2% of FQHC patients had household incomes at or below 200% of the Federal Poverty Limit, and 71% of FQHC patients had household incomes at or below 100% of the Federal Poverty Limit.

**Health Centers and FQHCs Are Dependent on Intertwined State and Federal Funding**

17. Health Centers and FQHCs rely on funding from several different state and federal sources to maintain their operations. Because FQHCs are so critical to the safety net in New York, and in many states, there is a complex funding and reimbursement scheme that relies on both the state and federal government and that provides financial protections and stability for these critical centers. Health Centers represent a federal-state public health partnership to maintain basic primary and preventive services for rural and underserved populations.

18. First, all Health Centers can receive Section 330 grants, which in New York cover an estimated 11% of the health centers' operating costs. Without the federal grants from the HRSA, many Health Centers would not be able to sustain their operations.

19. FQHCs are also eligible for Medicare and Medicaid funds related to costs based on the Prospective Payment System (PPS) for medically necessary primary health services and qualified

4

preventive health services furnished by a FQHC practitioner. That PPS rate is set by Section 1902(bb) of the Social Security Act. 42 U.S.C. 1396a.

20. Under PPS, a provider is reimbursed at a threshold rate, including all facility and professional fees associated with the services rendered to the NYS Medicaid member during the threshold visit. An eligible threshold visit is billable each time a NYS Medicaid member crosses the threshold of the FQHC and receives services from a certified practitioner regardless of the number of services provided or time spent during the visit.

21. In New York, FQHCs may alternatively select to participate in the Ambulatory Patient Group (APG), which is available to hospital outpatient departments, ambulatory surgery services, hospital emergency departments, and diagnostic treatment centers. New York's Public Health Law Section 2807(8)(f), and its subsequent regulations, govern APG rates and practices. A provider is reimbursed at specific rates for specific costs as put forth in state regulation. 10 NYCRR 86-8.9.

22. As a "hold harmless" provision, FQHCs that choose APG reimbursement will be eligible to receive a supplemental payment reflecting the difference between total APG reimbursement and the aggregate amount that would have otherwise been paid under the PPS rate.

23. Aside from Medicaid funding, FQHCs also receive supplemental payments from the states for the amount, if any, that the FQHC's blended Medicaid rate exceeds the amount of payments provided under the managed care contract for the services rendered by the FQHC. 42 U.S.C. § 1396a(bb)(5)(A). When total managed care organization payments to an FQHC are less than what the center would have been paid under the PPS or APG amount, the state Medicaid agency must pay the difference. These supplemental payments are sometimes called "wrap" payments. The amount will vary by FQHC depending on its blended Medicaid rate and average managed care per visit rate with contracted Managed Care Organization. In effect, the wrap makes up the difference

between what the managed-care company pays the FQHC and what that centers cost rate would be. This additional fee is 50% state money and 50% federal money.

24. Though FQHCs have a prospective payment system that helps with cashflow, most operate on an extremely narrow margin because the reimbursement system does not take into account current state or future state changes such as inflation rate, cost of goods and services, or cost of labor. These payment structures ensure that FQHC services are accessible to Medicaid members.

**The Challenged HHS Action**

25. I am providing this declaration to explain the impact of a Notice issued by HHS on July 10, 2025, entitled "Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of 'Federal Public Benefit'" (the "HHS PRWORA Notice"). In the HHS PRWORA Notice, HHS has classified the Health Center Program as providing "Federal public benefit[s]," under U.S.C. § 1611(c). The Notice was published in the Federal Register on July 14, 2025, and became immediately effective.

26. For the twenty-seven years leading up to July 10, 2025, FQHCs have provided healthcare services regardless of the patient's immigration status and cared for a disproportionate amount of Medicaid and undocumented patients in urban areas of New York State.

27. In 1996, Congress passed the Personal Responsibility and Work Opportunity Act (PRWORA), under which "aliens," who were not "qualified aliens," were ineligible for "federal public benefit." 8 U.S.C. § 1611. Shortly thereafter, in 1998, agency guidance allowed patients to receive care at Health Centers and FQHCs regardless of immigration status. Specifically, the guidance exempted public health assistance for immunizations and testing of communicable diseases, 63 Fed. Reg. 41660 (Section 401(b)(1)(C) exempts public health assistance for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of

6

communicable diseases whether or not such symptoms are caused by a communicable disease). This exemption, designed to safeguard public health, excludes some HHS programs from the definition of "Federal public benefits."

28. In the Notice, HHS rejects an interpretation of PRWORA that has been in place since 1998, which made FQHC programs accessible regardless of immigration status. 63 Fed. Reg. 41658.

29. Further, Congress has encouraged nonprofit health centers, including Section 330 Health Centers and FQHCs, to provide services to patients regardless of their immigration status. Existing statutes protect nonprofit 501(c)(3) health centers against requirements to conduct immigration eligibility verification. 8 U.S.C. §1642(d) ("(d) No verification requirement for nonprofit charitable organizations[:] Subject to subsection (a), a nonprofit charitable organization, in providing any Federal public benefit (as defined in section 1611(c) of this title) or any State or local public benefit (as defined in section 1621(c) of this title), is not required under this chapter to determine, verify, or otherwise require proof of eligibility of any applicant for such benefits.").

**Anticipated Impacts to New York Under the Challenged Action**

30. The Challenged Action, if allowed to take effect, would have a material impact on finances of FQHCs assuming they would no longer be reimbursed for the services they provide to their many undocumented patients. FQHCs may put their ability to obtain operational grants from HRSA at risk by treating "unqualified aliens." They may also lose revenue if immigrants as well as their family members and others are deterred from seeking care under this new scheme.

31. In rural communities, these changes to the PRWORA could put the only health care center in the area at risk of closing. As just one example, an FQHC on the eastern side of the Adirondacks cares for more than half of the population in its community. Prior to the establishment of that FQHC, the impacted community had limited preventive health care and often had to use hospitals

and emergency rooms once medical needs became more urgent. Over the last decade, FQHCs' mission has been to go into communities that have few or no physicians to provide needed healthcare. If they were not a federally qualified institution under the Health Center Program, this would not have been possible.

32. In urban communities, FQHCs are often the only center that cares for many at-risk populations. Under the HHS Notice, most of these people would lose an essential source of health care.

33. In either case, whether rural or urban, the harms of having these centers suffer financially and possibly fail would be catastrophic for the communities they serve, resulting in: loss of preventive services leading to increased costs to the system for urgent or emergent care due to preventable issues (e.g., managing diabetes, hypertension, high cholesterol); loss of evaluation, management, and treatment services for children leading to delays in needed support and, ultimately, a lifetime of increased costs to the system; and loss of community access to preventive treatment, as well as pre- and post- prophylactic treatments leading to increased risk of multiple infectious disease. Examples include communicable diseases such as Measles, Hepatitis or HIV, and severe dangers could arise from many other common situations. A child with strep throat, if untreated, can result in poststreptococcal, rheumatic heart disease, or poststreptococcal kidney failure and a lifetime of serious health consequences.

34. For many uninsured and undocumented people, FQHCs are the only option to receive basic care including preventative care, screenings, and vaccines.

35. Further, the populations served by FQHCs are impacted by threats of immigration enforcement. We have already seen a drop in enrollment since the new administration began. The chilling effect in terms of seeking care at health centers will extend beyond undocumented

immigrants to include mixed-status families and lawfully present immigrants. This change threatens to disrupt the trust health centers have cultivated in the communities they serve around New York State.

36. Uninsured and undocumented people who do not receive preventative care at FQHCs will predictably wait until their medical needs are more severe and then go to an emergency department. This increases costs on the state.

**Title X Funds**

37. DOH has successfully competed for Title X grant funds for over forty years. DOH receives more than 80% of the Title X funds awarded in the State.

38. The NYS Comprehensive Family Planning & Reproductive Health Program (FPP), which receives and administers Title X funds along with state funds, has ensured that low-income families, women, and communities of color across New York State have access to affordable, high-quality and comprehensive family planning care, improving health outcomes and the quality of life of millions of New Yorkers.

39. Title X funds are allocated through a competitive grant process administered and overseen by the Office of Population Affairs ("OPA") within the U.S. Department of Health and Human Services ("HHS"). Through this grant process, OPA selects grantees across the United States to receive a portion of the set amount of congressionally-appropriated funds for family planning projects.

40. This competitive process starts when OPA releases a "Funding Opportunity Announcement" ("FOA") that publicly announces the opportunity to apply for the grant, along with the program requirements and application process. The application incudes: (a) a project narrative describing the administrative, management and clinical experience and capability of the

9

applicant, services to be provided with Title X grant funds, the need for the proposed services, geographic area to be served, evidence of a system for ensuring quality family planning services, and a plan for ensuring all family planning services are provided in compliance with Title X statute and regulations; (b) a budget narrative justifying the overall cost of the project and completing required budget forms; (c) a work plan outlining the overall goals, objectives, action steps and anticipated outcomes; and (d) a list of subrecipient agencies and other required appendices. OPA then issues to successful grantees their Notices of Award, which set forth the amount of the award and the terms of accepting the funds. At no point in our last application process was DOH informed that it would ever need to inquire about immigration status.

41. DOH's annual Title X award for April 2022 to March 2027 is $11,808,930 (totaling $59,044,650 for all five years). For the current grant year, however, DOH received only a partial Notice of Award for $5,397,525.00. It is unclear if NYSDOH will receive full funding for the current grant year.

42. As a direct Title X grantee, DOH does not itself provide family planning services, but instead sub-grants the Title X funding to reproductive health providers throughout New York State who agree to comply with all of the Title X regulations and requirements in their DOH-funded projects. DOH currently has 36 sub-contracts supporting Title X services at over 160 facilities, including local health departments, FQHCs, nonprofits, and hospitals. The NYS FPP is competitively procured through a Request for Applications process in accordance with New York State Finance Law. Eligible entities are governmental and not-for-profit health care facilities licensed through Article 28 of the NYS Public Health Law certified to provide Medical Services – Primary Care Services.

43. The NYS FPP has been successful in creating and maintaining access to services through a network of subrecipient agencies spanning the state, with at least one family planning clinic site in 53 of the 62 counties in NYS, and multiple sites located in urban and suburban counties. The vast majority of subrecipient agencies have been providing comprehensive family planning services in their communities for decades and are integral parts of their communities' health care delivery systems.

44. Those seeking care at publicly funded family planning clinics rarely receive health care from any other source. According to the Guttmacher Institute, more than six in ten women who obtain care at a Title X clinic consider it their usual source of medical care.[1] In 2024, 12% of clients served by the NYS FPP were reported to have had no other source of health care, not even Medicaid. Most are low-income and some may be undocumented.

45. Some of New York's Title X subgrantees operate several mobile health clinics specifically designed to serve immigrant and other hard-to-reach communities.

46. New York's Title X subgrantees do not typically check immigration status; to do so now would represent a significant shift for clinics that are committed to providing care to all individuals in need, regardless of circumstance. Staff at Title X clinics are not trained in the complex body of federal law that governs lawful and unlawful immigration status. At most, they verify income, which does not necessarily involve the production of government ID. Many low-income people may not have government identification even if they are not undocumented.

47. While some of our subgrantees are nonprofits that may be exempt from verifying immigration status, the State is not exempt, nor are the many subgrantees that are also government entities, such as local and county health departments.

---

[1] U.S. Women's Use of Sexual and Reproductive Health Services: Trends, Sources of Care and Factors Associated with Use, 1995–2010 | Guttmacher Institute.

11

48. Since the administration has started targeting services for undocumented people, we have seen a chilling effect in immigrant communities seeking care at Title X clinics. Patients are fearful. The result is fewer persons are getting critical healthcare. Those who do not get preventive care are more likely to reenter the health system at a far less optimal point, such as an emergency room. To prevent such worsening health outcomes, the State seeks to expand access to critical basic healthcare to all residents regardless of immigration status.

49. Title X grants are awarded yearly, they are not fee-for-service. Subgrantees can use Title X funds for rent, salaries, facilities, and many other expenses. In other words, there is no way to separate out funds for particular patients.

50. Notably, many Title X subrecipients are also FQHCs that are separately targeted by the HHS PRWORA Notice.

51. Implementing the requirements of the HHS PRWORA Notice will demand significant time and resources from DOH. Because services cannot be separated by patient immigration status, our entire Title X grant could be jeopardized. We face potential enforcement in the form of refusals to disburse funds or clawbacks. Since 64 of our Title X clinics are also FQHCs, those facilities could be hit particularly hard. Many of the community providers we support with our Title X grant are already operating with minimal resources and are struggling to stay afloat. The loss of even a portion of their funding could shutter providers entirely.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of July, 2025, in Albany, New York.

_____
Eugene P. Heslin, MD
First Deputy Commissioner and
Chief Medical Officer
New York State Department of Health