# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, *et al.*,

                Plaintiffs,

      v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

           Defendants.

No. 25-cv-00345

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iv

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

    I.    Statutory Background .......................................................................................... 2

        A. PRWORA's Application ................................................................................. 3

        B. The Attorney General's Role Under PRWORA ........................................... 4

    II.   Factual Background ............................................................................................. 6

        A. Executive Order 14,218 ................................................................................ 6

        B. The July 2025 PRWORA Interpretations ..................................................... 6

            1. The DOJ Order .......................................................................................... 7

            2. The ED Notice ........................................................................................... 8

            3. The HHS Notice ........................................................................................ 9

            4. The DOL Notice ...................................................................................... 10

        C. Procedural History ....................................................................................... 11

LEGAL STANDARD ...................................................................................................... 11

ARGUMENT ................................................................................................................... 12

    I.    Plaintiffs Cannot Establish Likelihood of Success on the Merits ..................... 12

        A. Plaintiffs are Not Likely to Prevail on their APA Claims ........................... 12

            1. The ED, HHS, and DOL Notices Are Not Final Agency Action. ........... 12

            2. ED, HHS, and DOL Were Not Required to Engage in Notice and Comment Rulemaking Prior to Issuance of the PRWORA Notices ............................. 15

            3. The PRWORA Notices are Not Contrary to Law ................................... 16

                i.   The ED Notice ...................................................................................... 16

                ii.  The HHS Notice .................................................................................... 19

                iii. The DOL Notice ................................................................................... 23

            4. The PRWORA Notices are Not Arbitrary or Capricious ........................ 25

        B. Plaintiffs' Spending Clause Challenge Fails ............................................... 28

            1. The PRWORA Notices Do Not Impermissibly Impose Retroactive Conditions. .. 28

            2. The PRWORA Notices are Not Impermissibly Coercive ...................... 31

II.   Plaintiffs Have Not Demonstrated that They Will Suffer Irreparable Harm Absent
Preliminary Relief. .................................................................................................... 33

III.    The Balance of the Equities and the Public Interest Disfavor a Preliminary
Injunction. ..................................................................................................................... 37

IV.    Any Injunctive Relief Should Be Narrowly Tailored, and a Stay of the PRWORA
Notices is Not Permitted under the APA. .................................................................... 38

V.   To the Extent the Counts Enters an Injunction, Plaintiffs Should be Ordered to Post
Security in Connection with Any Preliminary Injunctive Relief and Any Preliminary Relief
Should be Stayed to Allow Consideration of Whether to Appeal. ............................................. 39

CONCLUSION ........................................................................................................... 40

# TABLE OF AUTHORITIES

**CASES**

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*,
738 F.3d 387 (D.C. Cir. 2013) .................................................................................. 13

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ................................................................................................... 30

*Bennett v. Kentucky Dep't of Educ.*,
470 U.S. 656 (1985) ................................................................................................... 29

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................... 13

*Borg-Warner Protective Servs. Corp. v. EEOC*,
245 F.3d 831 (D.C. Cir. 2001) .................................................................................. 13

*Bostock v. Clayton Cnt.*,
590 U.S. 644 (2020) ................................................................................................... 28

*Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*,
996 F.3d 37 (1st Cir. 2021) ....................................................................................... 35

*Califano v. Sanders*,
430 U.S. 99 (1977) ..................................................................................................... 25

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................................... 38

*California v. United States Dep't of Transportation*,
No. 25-cv-208, 2025 WL 1711531 (D.R.I. June 19, 2025) ...................................... 37

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ........................................................................... 12, 34, 38

*Christensen v. Harris County*, 529 U.S. 576 (2000) ................................................... 16

*Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Com'n*,
59 F.3d 284 (1st Cir. 1995) ....................................................................................... 26

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................................................................... 25

*Com. of Mass., by Dep't of Pub. Welfare v. Sec'y of Health & Hum. Servs.*,
749 F.2d 89 (1st Cir. 1984) ....................................................................................... 29

iv

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006) ......................................................... 13, 14

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ............................................................................... 25

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ......................................................................... 28

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
140 S. Ct. 1891 (2020) ......................................................................... 27

*DHS v. New York*,
140 S. Ct. 599 (2020) ........................................................................... 38

*DHS v. Regents of the University of California*,
591 U.S. 1 (2020) ................................................................................. 27

*Env't Def. Ctr. v. U.S. EPA*,
344 F.3d 832 (9th Cir. 2003) .............................................................. 31

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*,
445 F.3d 13 (1st Cir. 2006) ................................................................. 12

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ......................................................................... 25, 26

*Fort Stewart Sch. v. Fed. Labor Relations Auth.*,
495 U.S. 641 (1990) ............................................................................. 20

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ............................................................................. 13

*Georator Corp. v. EEOC*,
592 F.2d 765 (4th Cir. 1979) .............................................................. 13

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ............................................................................. 27

*Matos v. Clinton Sch. Dist.*,
367 F.3d 68 (1st Cir. 2004) ............................................................ 12, 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................... 25, 26

*Munaf v. Geren*,
553 U.S. 674 (2008) ............................................................................. 11

*Narragansett Indian Tribe v. Guilbert,*
934 F.2d 4 (1st Cir. 1991) ................................................................. 33

*Nat'l Ass'n of Home Builders v. Norton,*
415 F.3d 8 (D.C. Cir. 2005) ............................................................. 14

*Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB),*
567 U.S. 519 (2012) .................................................................... 31, 32

*New York v. United States,*
505 U.S. 144 (1992) ......................................................................... 31

*Nken v. Holder,*
556 U.S. 418 (2009) .................................................................... 12, 37

*Noerand v. DeVos,*
474 F. Supp. 3d 394 (D. Mass. 2020) ............................................. 23

*Orengo Caraballo v. Reich,*
11 F.3d 186 (D.C. Cir. 1993) ........................................................... 16

*Oxford Immunotec Ltd. v. Qiagen, Inc.,*
271 F. Supp. 3d 358 (D. Mass. 2017) ............................................. 34

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) ....................................................................... 29, 30

*Pennsylvania v. New Jersey,*
426 U.S. 660 (1976) ......................................................................... 36

*Perez v. Mortgage Bankers Ass'n,*
575 U.S. 92 (2015) ........................................................................... 15

*Plyler v. Doe,* 457 U.S. 202 (1982) ..................................... 8, 17, 21

*Pub. Serv. Co. of N.H. v. Town of W. Newbury,*
835 F.2d 380 (1st Cir. 1987) ...................................................... 33, 35

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Com'n,*
324 F.3d 726 (D.C. Cir. 2003) ......................................................... 14

*Rolland v. Romney,*
318 F.3d 42 (1st Cir. 2003) .............................................................. 30

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
217 F.3d 8 (1st Cir. 2000) .......................................................... 12, 33

*Rust v. Sullivan,*
500 U.S. 173 (1991).................................................................................. 27

*Sampson v. Murray,*
415 U.S. 61 (1974)................................................................................... 39

*Shalala v. Guernsey Mem'l Hosp.,*
514 U.S. 87 (1995)............................................................................. 13, 15

*Sierra Club v. Larson,*
769 F. Supp. 420 (D. Mass. 1991) ...................................................... 35

*South Dakota v. Dole,*
483 U.S. 203 (1987)........................................................................... 28, 31

*Strickland v. Comm'r, Maine Dept. of Human Services,*
48 F.3d 12 (1st Cir. 1995).......................................................................... 26

*Trump v. CASA, Inc.,*
145 S. Ct. 2540 (2025).............................................................................. 38

*Trump v. New York,*
592 U.S. 125 (2020).................................................................................. 34

*Warder v. Shalala,*
149 F.3d 73 (1st Cir. 1998)....................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008).......................................................................... 11, 34, 35

**STATUTES**

29 U.S.C. § 3248 ....................................................................................... 24

42 U.S.C. § 602 ......................................................................................... 22

42 U.S.C. § 9831 .................................................................................. 20, 21

42 U.S.C. § 9833 .................................................................................. 20, 21

5 U.S.C. § 553 ........................................................................................... 15

5 U.S.C. § 704 ..................................................................................... 12, 13

5 U.S.C. § 705 ........................................................................................... 38

5 U.S.C. § 706 ..................................................................................... 12, 25

8 U.S.C. § 1601 ..................................................................................... 3, 20

8 U.S.C. § 1611 ................................................................................. *passim*

8 U.S.C. § 1612 ..................................................................................................................... 4

8 U.S.C. § 1621 ..................................................................................................................... 3

8 U.S.C. § 1631 ................................................................................................................... 19

8 U.S.C. § 1641 ........................................................................................................... 2, 3, 29

8 U.S.C. § 1642 ............................................................................................................... 5, 9

8 U.S.C. § 1643 ....................................................................................................... 17, 18, 23

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
Pub. L. No. 104-193, 110 Stat. 2105 (1996) .................................................................... 2

Welfare Indicators Act of 1994, Pub. L. 103–432,
108 Stat. 4398 (1994) ..................................................................................................... 20

**OTHER AUTHORITIES**

20 C.F.R. § 677.150 ........................................................................................................ 24, 25

45 C.F.R. § 260.31 ................................................................................................................ 22

Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. (1946) .......................... 39

Department of Education, Clarification of Federal Public Benefits under the Personal
Responsibility and Work Opportunity Reconciliation Act,
90 Fed. Reg. 30,896 (July 11, 2025) ................................................................................ *passim*

Department of Education, PROWRA DCL, (Nov. 19, 1997) ................................................. 8, 15

Department of Health and Human Services, Personal Responsibility and Work Opportunity
Reconciliation Act of 1996 (PRWORA); Interpretation of 'Federal Public Benefit,
90 Fed. Reg. 31,232 (July 14, 2025) ................................................................................ *passim*

Department of Health and Human Services, Personal Responsibility and Work Opportunity
Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit,"
63 Fed. Reg. 41,658 (Aug. 4, 1998) .................................................................................. 9, 15

Department of Justice, Revised Specification Pursuant to the Personal Responsibility and Work
Opportunity Reconciliation Act of 1996,
90 Fed. Reg. 32,023 (July 16, 2025) .................................................................................. 6, 7

Department of Labor, Training and Employment Guidance Letter No. 10-23
(Feb. 21, 2024) ............................................................................................................... 10, 15

Department of Labor, Training and Employment Guidance Letter No. 10-23, Change 2
(July 10, 2025) ................................................................................................................ *passim*

Executive Order No. 14,218, 90 Fed. Reg. 10,581 (Feb. 19, 2025) ................................................ 6

Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation,
66 Fed. Rep. 3,613 (January 16, 2001) ................................................ 6

Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
62 Fed. Reg. 61,344 (Nov. 17, 1997) ................................................ 5

Request for Comments on the Attorney General's Specification of Community Programs Necessary for the Protection of Life or Safety Under the Welfare Reform Act,
62 Fed. Reg. 48,308 (Sept. 15, 1997) ................................................ 6

Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation,
61 Fed. Rep. 45,985 (August 30, 1996) ................................................ 5

Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41,662 (Aug. 4, 1998) ................... 5

## CONSTITUTIONAL PROVISIONS

U.S. CONST. art. I, § 8 ................................................ 28

## <u>INTRODUCTION</u>

For decades, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) has stated that only United States citizens and qualified aliens are entitled to Federal public benefits. The U.S. Department of Justice (DOJ), U.S. Department of Health and Human Services (HHS), U.S. Department of Education (ED), and U.S. Department of Labor (DOL) recently promulgated notices interpreting provisions of PRWORA. These notices restore compliance with federal law and ensure that taxpayer-funded programs intended for the American people are not diverted to subsidize unqualified aliens.

Plaintiffs—twenty States and the District of Columbia—request that Defendants be preliminarily enjoined and stayed from implementing and enforcing Congress's clear directives. As an initial matter, Plaintiffs' Administrative Procedure Act (APA) claims are unlikely to succeed on the merits. Defendants have issued interpretive notices to advise the public of their construction of certain of PRWORA's terms. These notices do not constitute final agency action because they merely state the agencies' interpretations of what sorts of benefits constitute "Federal public benefits" as that term is used in PRWORA. Notably, they do not require any particular immigration verification methods, do not announce any consequences for the States' failure to verify immigration status in accordance with the agencies' statutory interpretations, and do not impose any penalties for deficient verification. In any case, the notices comply with the APA. And because the notices merely set forth Defendants' statutory interpretation, notice and comment was not required. Moreover, each agency supported its interpretation of PRWORA's text and purpose with extensive justifications. Those justifications were neither contrary to law, nor arbitrary or capricious.

Further, Plaintiffs are unlikely to succeed on the merits of their Spending Clause claim because Defendants' statutory interpretation, closely aligned with PRWORA's plain text, does not impose any retroactive conditions but instead, constitutes the correct reading of the statutory text. In giving effect to those statutory provisions, Defendants' notices are not coercive, but merely recognize that the breadth of benefits available to unqualified aliens is narrower than the

1

agencies previously interpreted.

In addition, Plaintiffs fail to establish irreparable harm. Plaintiffs' asserted injuries are largely speculative, and Plaintiffs fail to demonstrate how the asserted harms, if they materialize, would be irreparable. Plaintiffs' harm theories rest on a mischaracterization of the contents and effects of the PRWORA Notices. Specifically, the PRWORA Notices do not speak to which verification methods are required for each program, making any discussion of dramatic change and administrative compliance costs purely speculative. And Plaintiffs do not, and cannot, point to a single sentence in the PRWORA Notices detailing enforcement procedures or outlining consequences for non-compliance, rendering baseless their concerns about immediate enforcement actions resulting in a complete loss of federal funding. Additionally, the States' allegations of injuries to third parties and their potential choice to restructure State programs to provide benefits to residents do not establish an entitlement to preliminary relief.

Finally, the public interest and balance of equities do not favor an injunction because such relief would impede the government's ability to enforce PRWORA, as enacted by Congress.

For all the reasons discussed herein, the Court should deny Plaintiffs' Motion. If the Court nonetheless grants Plaintiffs' Motion, any injunctive relief should be narrowly tailored to only the parties in this case that have offered evidence of irreparable harm and should be secured by an appropriate bond—and regardless, should be stayed pending a determination by the Solicitor General whether to appeal and, if appeal is authorized, pending any appeal.

## **<u>BACKGROUND</u>**

### I.    **Statutory Background**

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, 110 Stat. 2105, 2260 (1996), *codified at* 8 U.S.C. §§ 1601–1646, largely deems aliens who are not "qualified aliens" ineligible for "Federal public benefits." 8 U.S.C. § 1611(a); *see also id.* § 1611(c) (defining "Federal public benefit"); *id.* § 1641 (defining "qualified alien"). These restrictions apply to a wide range of federal benefits,

including health care, housing, welfare, unemployment, and retirement benefits, among others, that fall within the definition of "Federal public benefit." *Id*. §§ 1611, 1621. Before PRWORA, the authorizing statute for each federal benefit program generally established its immigration-related eligibility criteria or lack thereof. *See generally id.* § 1601. PRWORA seeks to establish a set of uniform and restrictive eligibility criteria for a broad array of federal benefits. *Id*.

Under PRWORA's baseline rule, aliens who are not "qualified aliens" are ineligible for "Federal public benefit[s]." *Id*. § 1611(a). Qualified aliens include lawful permanent residents, asylees, refugees, aliens paroled into the United States for a period of at least one year, and some other groups. *Id*. § 1641(b) and (c).

### A. PRWORA's Application

Whether the PRWORA eligibility restrictions apply to a particular federal program typically depends on two questions: (1) whether the program delivers benefits that fit PRWORA's definition of "Federal public benefits"; and (2) whether divergent language about alien eligibility in other statutes limits or overrides the PRWORA eligibility restrictions. *See* 8 U.S.C. § 1611(a).

PRWORA defines "Federal public benefit" broadly to include:

(A) Any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

(B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

*Id*. § 1611(c)(1)

The language of the Federal public benefit definition encompasses benefits provided with federal funds even if they are not provided by a federal agency. *See id*. § 1611(c)(1). Therefore, PRWORA's restrictions carry through to state, local, and private benefit providers that deliver federally funded benefits. *See id*.

3

On top of the definition of "Federal public benefit," PRWORA makes clear that its eligibility framework applies to a set of specified federal programs, including Temporary Assistance for Needy Families (TANF), Supplemental Security Income (SSI), Medicaid, and the Supplemental Nutrition Assistance Program (SNAP). Specifically, PRWORA cites the authorizing statutes for these programs and establishes additional eligibility criteria that go beyond the "qualified alien" requirement. *See* 8 U.S.C. §§ 1612(a) (framework of rules for the "specified federal programs" of SSI and SNAP), (b) (framework of rules for the "designated federal programs" of TANF, SSBG, and Medicaid). Conversely, PRWORA also makes clear that its eligibility rules for Federal public benefits do *not* apply to some other federal programs that it cites by authorizing statute. *Id*. § 1615(a). And PRWORA exempts other federal programs from its general eligibility rules and subjects them instead to less stringent eligibility criteria. *Id*. § 1611(b)(2)–(4).

Apart from these major federal programs that receive special treatment under PRWORA, "Federal public benefit[s]" are subject to PRWORA verification requirements. *See id*. § 1611(c)(1). To constitute a "Federal public benefit," an enumerated benefit must also be delivered by a federal agency or with federally "appropriated funds." *Id*. § 1611(c)(1). Further, benefits enumerated under § 1611(c)(1)(B), such as unemployment and housing benefits, qualify as Federal public benefits only if they are provided "to an individual, household, or family eligibility unit." *Id*. § 1611(c)(1)(B).

A third category of federal programs subject to PRWORA's verification requirements deliver benefits of a type that are "similar" to the enumerated benefit types listed in § 1611(c)(1)(B). *Id*.

**B. The Attorney General's Role Under PRWORA**

Section 1642(a) requires that the Attorney General, who at the time of PRWORA's enactment oversaw the Immigration and Naturalization Service within DOJ, "promulgate regulations requiring verification that a person applying for a Federal public benefit . . . is a

4

qualified alien and is eligible to receive such benefit." 8 U.S.C. § 1642(a)(1). Section 1642(b) provides that "[n]ot later than 24 months after the date the regulations described in subsection (a) are adopted, a State that administers a program that provides a Federal public benefit shall have in effect a verification system that complies with the regulations." *Id*. § 1642(b).

On October 29, 1997, the Attorney General issued interim guidance regarding the implementation of PRWORA verification requirements. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61,344 (Nov. 17, 1997) (DOJ Interim Verification Guidance).  On August 4, 1998, the Attorney General proposed a rule outlining verification requirements for benefit-issuing entities, Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41,662 (Aug. 4, 1998) (Proposed Verification Regulation), but this regulation was not finalized. As a result, a regulation under § 1642(a) has never been promulgated.

Under section 1611(b)(1)(D) the Attorney General may, in her "sole and unreviewable discretion after consultation with appropriate Federal agencies and departments," except from PRWORA's prohibition on receipt of Federal public benefits by unqualified aliens certain types of programs, services, and assistance that meet all of the following criteria: "(i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety." 8 U.S.C. § 1611(b)(1)(D); *see also id*. § 1621(b)(4) (affording the Attorney General the same "sole and unreviewable discretion" with respect to "State or local public benefits").

On August 23, 1996, while the inter-agency consultation process was "still ongoing," the Attorney General issued a "provisional specification" of benefits excepted from PRWORA. *See* Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation, 61 Fed. Rep. 45,985 (August 30, 1996). Shortly thereafter, on September 9,

1997, the Attorney General issued a notice to solicit input from "federal, state, and local agencies operating programs or providing services or assistance that may be covered by the final Order." *See* Request for Comments on the Attorney General's Specification of Community Programs Necessary for the Protection of Life or Safety Under the Welfare Reform Act, 62 Fed. Reg. 48,308 (Sept. 15, 1997). Subsequently, on January 16, 2001, the Attorney General issued a final order specifying the "types of community programs, services, or assistance for which all aliens remain eligible." Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation, 66 Fed. Rep. 3,613 (January 16, 2001) (Life or Safety Final Order).

## II.    Factual Background

### A.  Executive Order 14,218

On February 19, 2025, the President issued Executive Order No. 14,218, 90 Fed. Reg. 10,581, "Ending Taxpayer Subsidization of Open Borders" (PRWORA EO). The PRWORA EO seeks "[t]o prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens." *Id*. § 2(a). To that end, it directs federal agencies to identify "all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or noncash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purpose of the Executive Order and applicable law, including . . . PRWORA." *Id*. § 2(a)(i).

### B. The July 2025 PRWORA Interpretations

In July 2025, pursuant to the PRWORA EO, Defendants issued interpretations of certain PRWORA provisions. *See* Department of Justice, Revised Specification Pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 90 Fed. Reg. 32,023 (July 16, 2025) (DOJ Order); Department of Health and Human Services, Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of 'Federal Public Benefit, 90 Fed. Reg. 31,232 (July 14, 2025) (HHS Notice); Department of Education,

6

Clarification of Federal Public Benefits under the Personal Responsibility and Work Opportunity Reconciliation Act, 90 Fed. Reg. 30,896 (July 11, 2025) (ED Notice); Department of Labor, Training and Employment Guidance Letter No. 10-23, Change 2 (July 10, 2025) (DOL Notice).

### 1. The DOJ Order

In discharging her responsibilities under PRWORA and the PRWORA EO, the Attorney General reviewed the 2001 Life or Safety Final Order and, based on her consultations with the appropriate Federal agencies and departments, "determined that the Final Order has created confusion about what sorts of programs are subject to PRWORA's requirements and is being applied more broadly than the statute permits." DOJ Order at 32,025. The Attorney General found that, as a result of this confusion, unqualified aliens have "receive[d] public benefits for which they are not lawfully eligible" and, to correct this, she chose "not to except any benefits from PRWORA beyond those excepted by the statute itself." *Id*.

As explained in the DOJ Order, the Attorney General acknowledges that aliens may have relied on the receipt of excepted Federal benefits, but the changes are nonetheless warranted for four reasons. First, "some agencies have been excepting certain benefits from PRWORA verification requirements based on a misunderstanding of the Attorney General's exception authority and [] have been providing benefits to aliens who were not lawfully eligible to receive them. Bringing the Federal Government into compliance with the law is a powerful reason to withdraw the Final Order regardless of any reliance interests." *Id*. Second, "some of the benefits [] provided under the Final Order were not, in fact, necessary for life or safety. The lack of any connection to aliens' immediate welfare necessarily reduces the extent of any reliance interests in these benefits." Third, "reliance interests are significantly outweighed by the need to reduce the incentive for aliens to illegally migrate to the United States. *See* 8 U.S.C. § 1601(2) ('It continues to be the immigration policy of the United States that . . . the availability of public benefits not constitute an incentive for immigration to the United States.')." *Id*. And, finally, Congress "delegated to the Attorney General the authority to determine the appropriate scope of this specification under her 'sole and unreviewable discretion.' *E.g.*, 8 U.S.C. § 1611(b)(1)(D).

This delegation indicates Congress's intent that the scope of this specification not be subject to the sort of arbitrary-and-capricious review that would typically require consideration of reliance interests." *Id*. at 32,025–26.

### 2. The ED Notice

In November 1997, ED issued a Dear Colleague Letter interpreting PRWORA. Department of Education, PROWRA DCL, (Nov. 19, 1997) (1997 DCL). The July 11, 2025, ED Notice clarifies that " Federal programs administered by the agency that provide postsecondary education and other similar benefits, including adult education and career and technical education programs, are 'Federal public benefits' subject to the citizenship and immigration verification requirements of PRWORA, so long as such benefits are not protected under *Plyler v. Doe*, 457 U.S. 202 (1982) as part of a basic public education." ED Notice at 30,896.  The 2025 ED Notice explains that the 1997 DCL misunderstood Congress' intent and misconstrued PRWORA's meaning by deeming programs dissimilar from "postsecondary education" and, therefore, outside of PRWORA's citizenship verification requirements, simply because they support a different level of education or provide a different form of assistance. *Id*. at 30,897. The Notice explains that "Congress included a broad and disparate group of benefits within the enumerated list of 'Federal public benefits' [in 8 U.S.C. § 1611(c)(1)(B)] suggesting its intent 'to capture an expansive array of Federal benefits, within the statutory limit that such benefits be provided through Federal funds, and to "an individual, household, or family eligibility unit."'" *Id*. The Notice further explains that "preschool, elementary, and secondary education benefits are similar to postsecondary" benefits because they all provide "financial assistance" and "educational assistance to individuals." *Id*. 30,897–98. And Congress clearly contemplated that Federal public benefits includes assistance provided "through an 'in-kind' non-money benefit 'at the community level, including through public or private non-profit agencies." *Id*. at 30,898. The ED Notice explains that the *Plyler* holding was expressly limited to States' imposition of restrictions on alien eligibility for benefits and did not address the Federal government's ability to deny benefits—including education benefits—based on alienage. *Id*. Further, *Plyler* focused

on the unique position of children who have little control over their immigration status, but this does not confer rights to adults, who are differently situated. *Id*. at 30,898–99. In summary, "non-qualified alien adults are not permitted to receive education benefits (postsecondary education benefits or otherwise) and non-qualified alien children are not eligible to receive postsecondary education benefits and certain other education benefits [that] are not basic public education benefits." *Id*. at 30,899.

Accordingly, the ED Notice extends PRWORA's application to benefits provided under "Title II of the Workforce Innovation and Opportunity Act of 2014 (WIOA) and career and technical education (CTE) programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006, as amended (Perkins V), as well as benefits provided through postsecondary education programs." *Id*. at 30,899.

The ED Notice outlines that grantees who administer Federal public benefit programs subject to PRWORA's verification requirements may verify recipient eligibility using: (1) the Department of Homeland Security's (DHS) Systematic Alien Verification for Entitlements (SAVE) program; (2) review of U.S. birth certificates; (3) review of Real ID compliant identification cards; (4) DHS issued documentation verifying immigration status; or (5) other methods to verify eligibility. *Id*. at 30,900. The ED Notice makes clear that, while nonprofit charitable organizations that administer Federal public benefits "are not required to conduct eligibility verification[,]" this "narrowly crafted" exception outlined in 8 U.S.C. § 1642(d) does not relieve states or other governmental entities involved in the administration of Federal public benefits from the requirements "even when some or all educational services are ultimately provided by a nonprofit charitable organization[]." *Id*.

### 3. The HHS Notice

In August 1998, HHS issued a notice listing 31 programs the agency deemed as providing Federal public benefits. 63 Fed. Reg. 41,658 (Aug. 4, 1998) (1998 HHS Notice). The July 14, 2025 HHS Notice revises the agency's interpretation of the term "Federal public benefit" and identifies additional HHS programs that provide those benefits. HHS Notice at

31,232. The HHS Notice explains that the 1998 HHS Notice "artificially and impermissibly constrains" the statutory definitions found in 8 U.S.C. § 1611 in four ways. *Id*. at 31,233. First, the 1998 Notice "reads a limitation into § 1611(c)(1)(A) that 'grant' refers to financial awards to individuals and thus does not include block grants to States and localities." *Id*. Second, it incorrectly interprets "eligibility unit" to preclude subparagraph (c)(1)(B) from applying to benefits provided to individuals, households, or families unless the individual, household, or family, as a condition of receipt of the benefit, is also required to meet additional specified criteria (e.g., a specified income level or residency). *Id*. at 31,233–34. Third, the 1998 HHS Notice does not give due regard to the catchall phrase "any other similar benefit" language in § 1611(c)(1)(B). *Id*. at 31,233–36. For instance, the 1998 HHS Notice, while recognizing that Head Start provides non-postsecondary education and therefore does not fall within the enumerated "postsecondary education" phrase in § 1611(c)(1)(B), fails to recognize that the benefit provided under the Head Start program is "similar to" a welfare benefit and, therefore, falls within the scope of subparagraph (c)(1)(B). *Id*. at 31,236.  And, finally, the 1998 HHS Notice "incorrectly asserts that the 'exemption[s]' in § 1611(b)(1) 'excludes some HHS programs from the definition of 'Federal public benefits.'" *Id*. at 31,233. The HHS Notice identifies 44 HHS programs that provide Federal public benefits and that are not excepted from § 1611(a). *Id*. at 31,237.

### 4. The DOL Notice

DOL's Employment and Training Administration (ETA) issued an interpretation of PRWORA in February 2024, explaining that some ETA-administered program services did not constitute "Federal public benefits" under PRWORA. *See* Department of Labor, Training and Employment Guidance Letter No. 10-23 (Feb. 21, 2024). The February 2024 interpretation was rescinded on March 27, 2025, and the July 10, 2025 DOL Notice clarifies "that all participant-level services are considered '[F]ederal public benefits' under PRWORA "because they are the same or similar as benefits listed in PRWORA at 8 U.S.C. § 1611(c)." Notice at 2–3. Therefore, "grantees must verify work authorization for all participants served by WIOA and related

10

programs prior to delivering participant-level services." *Id*. at 2. The DOL Notice explains that "[w]ork authorization must be verified by submission of documentation with a unique identifier." *Id*. at 4. Form I-9, Employment Eligibility Verification Documents that can demonstrate work authorization include: a Social Security card; a Form I-551, Permanent Resident Card; a Form I-765, Employment Authorization Document; a U.S. birth certificate; or a U.S. passport. *Id*. Additionally, in most instances, valid work authorization and immigration status can be verified through SAVE. *Id*. "[A]ll participants must provide, and grantees must keep copies in case files, proof of authorization to work in the United States" and, for individuals whose work authorization is temporary, grantees must verify their continued work authorization and exit any participant whose authorization has expired or been revoked. *Id*. at 5.

### C. Procedural History

On July 21, 2025, Plaintiffs filed a Complaint for declaratory and injunctive relief. *See* Compl., ECF No. 1. The Complaint alleges violations of the Administrative Procedure Act ("APA") and the Spending Clause. *Id*. at 45. On the same day, Plaintiffs filed a Motion for Preliminary Injunction, "request[ing] that Defendants be preliminarily enjoined and stayed from implementing and enforcing the PRWORA Notices in the Plaintiff States." Mot., ECF No. 25, at 82. Plaintiffs submitted various declarations in conjunction with their Motion. *See* ECF No. 4. The declarations generally allege that implementation of the ED, HHS, and DOL PRWORA Notices and the DOJ Order will cause irreparable harm, but not all States submitted evidence of irreparable harm stemming from each agency document, or from each agency-funded program. *See infra* part IV. And Plaintiffs Nevada and Hawaii did not submit any declarations. *See id*.

## LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy[.]" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer

an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Finally, when "the Government is the opposing party[,]" the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). Plaintiffs' irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (citing *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004)); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("Irreparable harm is an essential prerequisite for a grant of injunctive relief.") (citation omitted).

## ARGUMENT

I. **Plaintiffs Cannot Establish Likelihood of Success on the Merits.**

    **A.  Plaintiffs are Not Likely to Prevail on their APA Claims.**

Under the APA, only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.  The Court may set aside agency action if the Court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). Plaintiffs' APA claims with respect to the ED, HHS, and DOL PRWORA Notices are not likely to succeed because (1) Plaintiffs have not identified final agency action, (2) Defendants have not violated any procedure required by law, (3) Defendants have not acted contrary to law, and (4) Defendants have not acted arbitrarily and capriciously. Plaintiffs do not assert any APA claims with respect to the DOJ Order.

    **1.  The ED, HHS, and DOL Notices Are Not Final Agency Action.**

Plaintiffs raise APA claims with respect to the ED, HHS, and DOL Notices, but these

PRWORA notices do not constitute final agency action. *See* 5 U.S.C. § 704. Final agency action has two characteristics. "First, the action must mark the 'consummation' of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177 (1997) (internal citations and quotation marks omitted). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

Agencies' "interpretative rules or statements of policy generally do not qualify" as final agency action "because they are not finally determinative of the issues or rights to which they are addressed." *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (cleaned up). Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (internal quotation marks omitted). A non-binding interpretive rule is not a "final agency action" suitable for review because "'standing alone, it is lifeless and can fix no obligation nor impose any liability on the plaintiff.'" *Borg-Warner Protective Servs. Corp. v. EEOC*, 245 F.3d 831, 836 (D.C. Cir. 2001) (quoting *Georator Corp. v. EEOC*, 592 F.2d 765, 767 (4th Cir. 1979)). The critical feature of this interpretive rule is that it does not have independent legal force. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805–06 (D.C. Cir. 2006). In other words, interpretative rules "generally do not qualify" as final agency actions "because they are not 'finally determinative of the issues or rights to which [they are] addressed.'" *Am. Tort Reform*, 738 F.3d at 395 (citing *Ctr. for Auto Safety*, 452 F.3d at 800).

Here, the PRWORA Notices are interpretive rules that simply "reflect" Defendants' interpretation of PRWORA and do not "modif[y] or add[] to a legal norm based on the agency's own authority." *Syncor Intern. Corp. v. Shalala*, 127 F.3d 90, 94–95 (D.C. Cir. 1997). Each PRWORA Notice sets forth the agency's understanding of PRWORA's purpose and plain text,

13

and explains why the agency's statutory interpretation closely aligns with PRWORA's provisions. *See, e.g.*, HHS Notice at 31,232 ("This notice sets forth the interpretation that [HHS] uses for the term 'Federal public benefit' as used in" PRWORA.); ED Notice at 30,900 ("This interpretive rule finds that Federal programs administered by the Department that provide postsecondary education and other similar benefits, including adult education and CTE programs, are 'Federal public benefits' subject to the citizenship and immigration verification requirements of PRWORA, so long as such benefits are not protected under *Plyler* as part of a basic public education."); DOL Notice at 2 (DOL "is changing its prior [PRWORA] guidance" to "align" with the statute).

That practical consequences—such as decisions by States to restructure State programs and incur additional administrative costs for verification, Mot. at 12— may stem from the Notices does not create final agency action. *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Com'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) ("To be sure, there may be practical consequences, namely the choice . . . between voluntary compliance . . . and the prospect of having to defend itself in an administrative hearing should the agency actually decide to pursue enforcement. But the request for voluntary compliance clearly has no legally binding effect."); *Ctr. For Auto Safety*, 452 F.3d at 811 ("[D]e facto compliance is not enough to establish that the guidelines have had legal consequences."). Ultimately, "if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005). Although the PRWORA Notices indicate how each agency interprets the statute and provide that each agency will employ that interpretation in its administration of applicable programs, the PRWORA Notably, although the Notices indicate how each agency interprets the statute and indicate that the agency will employ that interpretation in administration of applicable programs, the Notices do not require adoption of specific verification methods and do not identify any consequences that will follow failure to verify. *See* HHS Notice at 31,237 (HHS "is not formally revising the aspects of the 1998 Notice that touch on PRWORA's verification

requirements at this time. However, the Department notes important considerations for stakeholders to keep in mind."); ED Notice at 30,900 ("Because this interpretative rule is not legislative, the Department lacks the ability to require affirmative reporting."); DOL Notice at 4–5 (providing "examples of acceptable" verification methods and recommending, but not requiring, that grantees use SAVE). Because the PRWORA Notices do not have legal consequences, Plaintiffs do not challenge "final agency action" reviewable under the APA.

## 2. ED, HHS, and DOL Were Not Required to Engage in Notice and Comment Rulemaking Prior to Issuance of the PRWORA Notices.

The procedural requirements for rulemaking under the APA, which include advance notice and an opportunity for public comment, do not apply to "interpretative rules." 5 U.S.C. § 553(b). Interpretive rules "do not have the force and effect of law," and "do not require notice and comment." *Shalala*, 514 U.S. at 99; *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015).

All three PRWORA Notices that Plaintiffs challenge under the APA are plainly interpretive. *See supra* part (I)(A)(1). Under the APA, notice and comment is not required for interpretative rules. 5 U.S.C.A. § 553(b)(A). The fact that the PRWORA guidance documents previously issued by Defendants were longstanding does not alter the procedural requirements, as no additional requirements are necessary to amend an interpretive rule. *See Perez*, 575 U.S. at 103 (rejecting the argument that the rule having been a definitive prior interpretation requires additional procedures.). And in any event, the guidance documents that the PRWORA Notices supersede were likewise issued without notice and comment. *See* 1998 HHS Notice; 1997 ED DCL; 2024 DOL TEGL. Notably, Plaintiffs do not suggest that those original notices were procedurally invalid.

A change in Defendants' interpretation of PRWORA does not transform these interpretive rules into legislative rules requiring notice and comment rulemaking. A rule is not legislative merely because the agency has changed its interpretation of a statute. *Orengo Caraballo v. Reich*, 11 F.3d 186, 196 (D.C. Cir. 1993). Rather, "[i]f a rule creates rights, assigns

duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive." *Warder v. Shalala*, 149 F.3d 73, 80 (1st Cir. 1998) (cleaned up).

Here, the PRWORA Notices merely set forth each agency's construction of the statute and, therefore, lack the force of law. *See, e.g., Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (explaining that interpretations contained "in opinion letters," "policy statements, agency manuals, and enforcement guidelines . . . lack the force of law"). Defendants were free to change or withdraw their prior interpretations without engaging in notice and comment rulemaking. Accordingly, Plaintiffs' procedural violation claim fails.

### 3. The PRWORA Notices are Not Contrary to Law.

Under PRWORA, only U.S. citizens and qualified aliens are entitled to receive Federal public benefits. *See* 8 U.S.C § 1611(a). Each of the PRWORA Notices properly interprets the term "Federal public benefit" and guides grantees of Federal public benefit programs to verify that benefit recipients are of a qualifying immigration status, and thus is not contrary to law.

### i.    The ED Notice

In construing the context and full statutory text of PRWORA, the ED Notice first recognizes that the definition of "Federal public benefit" includes "a broad and disparate group of benefits," ranging from food assistance to retirement benefits. ED Notice at 30,897. ED notes that a broad range of educational benefits are "similar" to the benefits specifically enumerated in Subsection (B) because, for instance, "[t]he word 'assistance' is . . .  broader than 'payment' and includes at least some actions that do not involve the direct exchange of money." *Id*. at 30,898. As a result "Congress clearly contemplated that Federal public benefits could cover assistance provided from entities to 'individuals, household, or family eligibility unit,' even when that assistance is provided through an 'in-kind' non-money benefit 'at the community level, including through public or private nonprofit agencies.'" *Id*. (alteration adopted); *see also id*. ("Congress would have no need to carve something out that would not otherwise be covered in the first instance under the 'Federal public benefit' definition. As such, the general definition of 'Federal public benefit' is best understood to include 'assistance' similar to the 'delivery of in-kind

services at the community level, including through public or private nonprofit agencies' where such benefits have not been specifically excluded by 8 U.S.C. 1611(b)(1)." (alterations adopted)).

Furthermore, the ED Notice recognizes that its interpretation of PRWORA cannot contravene *Plyler*, which "was expressly grounded in the Fourteenth Amendment, as applied to States, and the ability of States to impose unique restrictions on alien eligibility absent 'some articulable federal policy." ED Notice at 30,898. However, the *Plyler* Court did not address pre-emption by federal law or policy, *see Plyler*, 457 U.S. at 210 n.8, and PRWORA's statutory construction provision expressly states that PRWORA cannot "be construed as addressing alien eligibility for a basic public education," 8 U.S.C. § 1643(a)(2). As a result, the term "Federal public benefit" includes "all educational benefits that are provided to individuals, households, or family eligibility units, regardless of age, and including when benefits are provided as in-kind services at the community level, such as through public or private nonprofit agencies, except those benefits that are basic public education benefits under *Plyler*." ED Notice at 30,899. The term "does not cover basic public education benefits that are received by children," but does include "postsecondary education benefits provided regardless of age, as *Plyler* did not address postsecondary benefits and PRWORA explicitly calls for such benefits to be included." *Id.* ("In other words, non-qualified alien adults are not permitted to receive education benefits (postsecondary education benefits or otherwise) and non-qualified alien children are not eligible to receive postsecondary education benefits and certain other education benefits, so long as such benefits are not basic public education benefits.").

For example, as to adult education programs authorized under Title II of the Workforce Innovation and Opportunity Act of 2014, ED appropriately determined that these programs provide "Federal public benefits" because these educational programs: (1) are "similar benefits," within the meaning of 8 U.S.C. § 1611(c)(1)(B), because the programs provide educational services to adults and children who lack certain skills or abilities; (2) are provided on a non-cash and in-kind basis to individuals, and therefore are a form of "assistance [. . .] to an individual" as

defined under 8 U.S.C. § 1611(c)(1)(B); and (3) are not specifically exempted under PRWORA. ED Notice at 30,899–90. Moreover, as to postsecondary career and technical education programs under the Carl D. Perkins Career and Technical Education Act of 2006, ED correctly determined these programs to provide "Federal public benefits" because these educational programs: (1) are "similar benefits," within the meaning of 8 U.S.C. § 1611(c)(1)(B), because the programs support the development and implementation of programs for individuals who are in need of CTE; and (2) are provided on a non-cash and in-kind basis to individuals who enroll in CTE and therefore are a form of "assistance [. . .] to an individual" eligibility unit as defined under 8 U.S.C. 1611(c)(1)(B). *Id.* at 30,900. Although Perkins V programs for individuals at the postsecondary level are not specifically exempted under PRWORA, ED acknowledged that Perkins V programs that support minors in the secondary school setting are basic public education benefits under *Plyler* and are not "Federal public benefits." *Id.*

Plaintiff's objection to ED's interpretation of § 1611(c)(1)(B) amounts to a semantic distinction without a difference. Mot. at 67. ED interprets § 1611(c)(1)(B) to include "postsecondary education" and "any other similar benefit" while excluding basic public education as directed by § 1643(a)(2). Whether § 1643(a)(2) is deemed a rule of construction or an exception to the statutory scheme and the definition of "federal public benefit," the result is the same: § 1611(c)(1)(B) should not classify basic public education addressed by *Plyler* as a federal public benefit to which citizenship eligibility requirements apply. ED's approach respects the statutory text and intent behind Congress' acknowledgement of *Plyler* while giving full force and effect to the definitional clauses expressly set forth in 1611(c)(1)(B). Far from being "too complicated" an interpretation, Mot. at 67, ED's approach corresponds to the statutory definition in 1643(a)(2). This section specifies certain types of benefits included within "federal public benefits," alongside a "catchall clause" ("any other similar benefit,") against a backdrop of construing the definition pursuant to 1643(a)(2). And that section could be viewed as an "exception" to the otherwise broad catchall phrase, or simply as application of the statutory

18

construction dictated by § 1643(a)(2). Either way, Plaintiffs' argument fails to show that ED's interpretation is "wrong" or erroneous.

### ii.    The HHS Notice

The HHS Notice starts with PRWORA's "plain language" definition of the term "Federal public benefit." HHS Notice at 31,233 (citing 8 U.S.C. § 1611(c)(1)(A)–(B)). Under subsection (A), "Federal public benefit" means "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(A). The HHS Notice interprets this subsection as applying to all HHS "grants," including financial awards to individuals and block grants to States and localities. HHS Notice at 31,233. Although benefits may flow through a middleman such as a State, PRWORA applies if, ultimately, a beneficiary receives a "Federal public benefit" provided "by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(A).

Under subsection (B), "Federal public benefit" means "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(B). In construing "individual, household, or family eligibility unit," the HHS Notice properly applies the rule of the last antecedent to conclude that "'eligibility unit' does not modify all items of the list." HHS Notice at 31,234. Indeed, "the term 'family eligibility unit' is used in parallel to "household" elsewhere in the statute," 8 U.S.C. § 1631(f)(1), (2), and "in the benefits context, 'family eligibility unit' just means the 'unit' by which 'eligibility' is assessed." HHS Notice at 31,234. And, absent a statutory definition, HHS takes a plain-meaning approach in construing the term "family eligibility unit." *Id.* ("Under a plain-meaning approach, eligibility simply means the quality or state of being eligible" (citation omitted)). As a result, "if an HHS program provides a benefit that falls within the categories set forth in the first half of subparagraph (c)(1)(B), and it does so on a per-individual, per-household, or per-family basis, it will be a 'Federal public benefit.'" *Id.*

at 31,235. Moreover, the HHS Notice properly reads subsection (B)'s catch-all "any other similar benefit" phrase "in line with its plain meaning: any other benefit that is 'alike in substance or essentials' to or that 'has characteristics in common' with 'retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, or unemployment benefits.'" *Id*. (citing 8 U.S.C. 1611(c)(1)(B)) (alterations adopted).

Additionally, HHS applies the canon of *ejusdem generis* to interpret subsection (B)'s "any other similar benefit" catch-all provision "in line with plain meaning: any other benefit that is 'alike in substance or essentials' to or that 'has characteristics in common' with 'retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, or unemployment benefits.'" *Id*. at 31,236 (quoting 8 U.S.C. 1611(c)(1)(B)) (alterations adopted). Because PRWORA applies to "welfare" broadly, *id*., the listing in subsection (B) can also be understood pursuant to the *ex abundanti cautela* canon to have been "inserted out of an abundance of caution," *Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 646 (1990), to underscore that "any other similar benefit" means those benefits similar to the types of benefits expressly listed in subsection (B)—that is similar to "retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit[s]," 8 U.S.C. 1611(c)(1)(B).

For example, Head Start is an anti-poverty program that provides for school readiness, provides low-income children and their families with "health, educational, nutritional, and social and other services, that are determined based on family needs assessment, to be necessary," and "may serve as child care for parents of young children." 42 U.S.C. §§ 9831, 9833. For the reasons previously explained, the HHS Notice interprets that Head Start is a "Federal public benefit" because these benefits are "'similar' to 'welfare' benefits." HHS Notice at 31,236. While the term "welfare" is not defined in PRWORA, it can be given a fair reading in its plain meaning and agency usage. The broad sweep of "welfare" described in PRWORA's preamble, 8 U.S.C. § 1601, supports a broad reading of "welfare" and any "similar benefit," as do other laws enacted around the same time such as the Welfare Indicators Act of 1994 (Pub. L. 103–432). *Id*.

20

The Administration for Children and Families also defines "welfare" specifically in the context of services that help children: "Child welfare is a continuum of services designed to ensure that children are safe and that families have the necessary support to care for their children successfully."[1] The Head Start Program is, at minimum, a program that provides means-tested assistance to families and individuals similar to programs under part A of title IV of the Social Security Act, the food stamp program under the Food Stamp Act of 1977, and the Supplemental Security Income program under title XVI of the Social Security Act. *See* HHS Notice at 31,236.

Plaintiffs rely on *Plyler v. Doe* and the language in PRWORA excluding basic public education to support their argument that Head Start should, similarly, be excluded. *See* Mot. at 56–59. But Head Start is an anti-poverty program that also provides "health, educational, nutritional, and social and other services," 42 U.S.C. §§ 9831, 9833—it does not provide basic public education, *Plyler*, 457 U.S. at 226. And *Plyler* did not conclude that aliens have a right to federally-funded pre-school programs such as Head Start, nor do Plaintiffs argue aliens have such a constitutional right under the 14th Amendment.

Nor does PRWORA only apply to programs offering direct financial assistance to individuals. Plaintiffs' apparent word search of PRWORA assuredly returned hits on "welfare," but fails to consider the broader context of that term within the applicable sections. *See* Mot. at 58. Assistance provided through block grants to States is addressed in the statute. For example, § 103(a) of PRWORA reformed "welfare" by changing the previous Aid to Families with Dependent Children (AFDC) program to the Temporary Assistance for Needy Families (TANF), which provides block grants to States. Pub. L. No. 104-193, § 103(a) (codified at 42 U.S.C. §§ 601–19). TANF aims to, among other thing, "provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives" and "end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage." 42 U.S.C. § 601. States must certify TANF administration, including through

---

[1] *See* Administration for Children and Families, *Child Welfare*, available at https://acf.gov/acf_issues/child_welfare.

assurances that State and local organizations have been consulted regarding the "plan and design of welfare services in the State so that services are provided in a manner appropriate to local populations." 42 U.S.C. § 602(a)(4). Thus, "welfare" under the new TANF program was intended to include far more than just cash assistance. *See* 45 C.F.R. § 260.31(a) (assistance "includes cash payments, vouchers, and other forms of benefits designed to meet a family's ongoing basic needs (i.e., for food, clothing, shelter, utilities, household goods, personal care items, and general incidental expenses)"). A close review of PRWORA's text thus makes clear that the statute does not restrict "welfare" "to cash payments to low-income families," as Plaintiffs suggest. Mot. at 58.

Additionally, Plaintiffs contend that the HHS Notice unlawfully applies PRWORA to benefits that are generally available to the public—"programs that do not require applications or impose some eligibility restriction on recipients." Mot. at 52–56. To support this notion, Plaintiffs rely on the Attorney General's previous exercise of her discretionary authority under 8 U.SC. § 1611(b)(1)(D) to exempt certain "widely-available" services from PRWORA's reach. Mot. at 55.  However, the very existence of this exemption authority and its historic application to services generally available to the public demonstrates that PRWORA reaches "generally [publicly] available" benefits.

Plaintiffs also claim that the HHS Notice improperly deems programs subject to PRWORA in their entirety, rather than identifying "Federal public benefits" on a benefit-by-benefit basis, Mot. at 59–61, and that it improperly includes all benefits funded by block grants, *id*. at 61–62. But this misunderstands the nature of the HHS Notice, which states that "[p]ending further regulation and/or guidance on the situations in which verification is required, all entities that are part of HHS's administration of public benefits should pay heed to the clear expressions of national policy described." HHS Notice at 31232, 31237. The HHS Notice merely sets forth the agency's interpretation of PRWORA's text and purpose. As indicated in the supporting declarations—Engels, Gradison, Margolis, Crocker Decls.—and as is clear on the face of the Notice, the various HHS programs are deliberating regarding the need for program-specific

guidance and will issue any necessary program specific guidance to address the benefit-by-benefit applications of the agency's PRWORA interpretation. At this juncture, Plaintiffs' claims are premature.

Finally, Plaintiffs argue that the HHS notice improperly includes exempted programs. Mot. 62–65. Plaintiffs improperly rely on cases interpreting language in the Coronavirus Aid, Relief, and Economic Security (CARES) Act to import meaning into PRWORA. *Id*. at 63. In *Noerand v. DeVos*, the Court rejected an interim final rule issued by ED, which attempted to restrict eligibility for Higher Education Economic Relief Fund (HEERF) funds to only "students" eligible for federal financial aid. 474 F. Supp. 3d 394, 398–99 (D. Mass. 2020). The court rejected ED's rule, reasoning that if ED's interpretation was correct, "then these textual restrictions imposed by Congress are surplusage." *Id*. And "to the extent that the CARES Act directs a federal public benefit [i.e., the HEERF grants], it constitutes a statutory exception to Section 1611's general denial of federal public benefits." *Id*.; *id*. at 403 (The CARES Act "is a specific statutory enactment in which Congress unambiguously directed certain aid to a plainly defined group of people.").

Here, Plaintiffs do not point to any similar language in the Health Center Program or the Head Start Program that specifically includes or excludes non-citizens from benefits. *See* Mot. at 64 (conceding that the Health Center Program "contains several carefully drawn exceptions, none of which includes PRWORA" (citations omitted)); *id*. (recognizing that Head Start provides that "children from low-income families *shall* be eligible for participation." (citation omitted and emphasis supplied)). Neither the Health Center Program nor the Head Start Program supplant or supersede PRWORA's requirements.

### iii.    The DOL Notice

The DOL Notice is slightly different in form and structure from the HHS and ED Notices. The DOL Notice is a "Training and Employment Guidance Letter" addressed to the grantees that administer the WIOA Title I formula and discretionary programs, the Wagner-

Peyser Act Employment Service formula grant program, and the Title V of the Older Americans Act (Senior Community Service Employment Program (SCSEP)). DOL Notice at 1. The DOL Notice provides the agency's interpretation of PRWORA and the later-enacted, nondiscrimination provisions of WIOA, 29 U.S.C. § 3248. *Id*. at 2. The DOL Notice clarifies that all participant-level services that are part of the WIOA, Wagner-Peyser, and SCSEP programs are considered "Federal public benefits" under PRWORA. *Id*.

Plaintiffs claim that DOL errs in determining that participant-level services constitute "Federal public benefits" under PRWORA because their "overall goal is to move participants into gainful employment." Mot. at 69 (quoting DOL Notice at 3). Per Plaintiffs, the goal of a benefit is irrelevant to whether the benefit is "similar" to the items listed in subsection (B), and PRWORA limits eligibility on a benefit-by-benefit, not a program-by-program basis. Mot. at 70. These arguments miss the crux of DOL's reasoning and misunderstand the significance of the DOL interpretation of PRWORA as it applies to "participant-level services."

Plaintiffs ignore that participant-level services include comprehensive and specialized assessments, development of individual employment plans, group counseling, individual counseling, career planning, short-term prevocational services, internships and work experiences, workforce preparation activities, financial literacy services, out-of-area job search and relocation assistance, English-language acquisition and integrated education and training programs, and certain incumbent worker training. Vitelli Decl. ¶ 6; *see also* 20 C.F.R. § 677.150 (defining "participant" based on the services an individual receives). WIOA programs aim to "prepare job seekers and workers to succeed in the labor market while helping employers hire the skilled workers they need to compete in the global economy." DOL Notice at 2. "The same is true for programs under the Wagner-Peyser Act and title V of the Older Americans Act." *Id*. at 3. Therefore, the goal and the benefit stemming from these programs is "gainful employment." *Id*.

The participant-level services provided under WIOA, Wagner-Peyser, and SCSEP programs are "Federal public benefits" "because they are the same as or similar to benefits listed in PRWORA at 8 U.S.C. § 1611(c)." DOL Notice at 2. For example, participant-level services

include training and individualized career services, discussed above, that are "similar" to "postsecondary education" under subsection (B). "Because at least some services provided to youth participants are [F]ederal public benefits, recipients must verify participants' work authorization." *Id*.

Finally, Plaintiffs argue that "the DOL Notice errs by including services that only provide information, referrals, or assistance in completing paperwork." Mot. at 71. However, the DOL Notice does not extend to light-touch services, which are not included within the definition of participant level services. Specifically, participant-level services do not include some basic career services, such as provision of information on job vacancies, skills requirements, available programs and services, as well as referral to supportive services. *See* Vitelli Decl. ¶ 6. Instead of being considered "participants," people who receive these light-touch and self-services are considered "reportable individuals." 20 C.F.R § 677.150(a)–(b); *see also* Vitelli Decl. ¶ 6. Plaintiffs' argument thus misses the mark.

### 4. The PRWORA Notices are Not Arbitrary or Capricious.

The APA permits courts to set aside agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). Under the arbitrary or capricious standard, an agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Review is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and simply examines whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Moreover, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id*. at 43. Because the Defendants' interpretations of PRWORA were both reasonable and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), they satisfy the deferential "arbitrary and capricious" standard. *See Strickland v. Comm'r, Maine*

*Dept. of Human Services*, 48 F.3d 12, 18 (1st Cir. 1995) (noting that "an explained modification, even one that represents a sharp departure from a longstanding prior interpretation, ordinarily retains whatever deference is due" (citations omitted)); *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Com'n*, 59 F.3d 284, 291 (1st Cir. 1995) ("[A]ny such alteration or reversal must be accompanied by some reasoning-some indication that the shift is rational, and therefore not arbitrary and capricious."(cleaned up)). Plaintiffs argue the notices are arbitrary and capricious because they lack adequate explanation for their revised interpretations of PRWORA and fail to consider reliance interests. Mot. at 44–50. Neither objection is persuasive.

First, the Notices all include extensive discussions and explanations of the agencies' revisions of their prior interpretations of PRWORA. *See* HHS Notice at 31,233–36; ED Notice at 30,897–99; DOL Notice at 2. Plaintiffs fault HHS for failing to minutely explain why every individual program listed in the HHS Notice provides Federal public benefits, Mot. 48, but the APA merely requires that an agency action be reasonable and reasonably explained. *FCC*, 592 U.S. at 417. It does not require an exhaustive explanation that addresses all possible alternatives. *See Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (quotation omitted)). Plaintiffs' similar criticism of the DOL Notice, Mot. 50, is likewise meritless. The DOL Notice clearly explains that it interprets "Federal public benefits" under PRWORA to include "participant-level services," which is a well-established category that is extensively described in preexisting DOL guidance and other documents. *See* Vitelli Decl. ¶ 6. The analysis contained in each PRWORA Notices was reasonable and reasonably explained for purposes of the APA's deferential arbitrary and capricious standard. The PRWORA Notices set forth each agency's interpretation of PRWORA and they amply describe the basis for those interpretations, as well as how those interpretations broadly apply to the programs each agency administers. The APA requires no more

Second, Plaintiffs fail to show that the Notices are arbitrary and capricious because of a failure to adequately consider reliance interests. Mot. at 45-46, 49-50. As an initial matter,

reliance interests are less relevant in matters of statutory interpretation. Under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), PRWORA means what it means; its best reading cannot have changed simply because the government previously interpreted it wrongly, even if people relied on its error. *See DHS v. Regents of the University of California*, 591 U.S. 1, 60 (2020) (Thomas, J., concurring in the judgment) (opinion joined by Alito and Gorsuch, JJ.) ("But reliance interests are irrelevant when assessing whether to rescind an action that the agency lacked statutory authority to take. No amount of reliance could ever justify continuing a program that allows DHS to wield power that neither Congress nor the Constitution gave it.").

While Plaintiffs cite *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020), arguing it is per se error not to heavily weigh reliance interests in a case involving a change in positions, *Regents* is distinguishable: *Regents* involved an exercise of enforcement discretion for those receiving Deferred Action for Early Childhood Arrivals (DACA). DACA recipients had no statute to rely on, as the Executive's discretion was the only source of their status. Here, Congress enacted PRWORA to limit who could receive federal public benefits, and the agencies' Notices are consistent with the statutory language. Moreover, the *Regents* Court faulted DHS for failing to consider reliance interests after it had received DOJ's determination of DACA's illegality because "nothing about that determination foreclosed or even addressed the options of retaining forbearance or accommodating particular reliance interests." *Regents*, 140 S. Ct. at 1915. The agencies may in fact consider such interests when they issue program-specific guidance, which can address the specific ways in which status will be verified, as well as any applicable enforcement guidelines.

Ultimately, it is not arbitrary or capricious for an agency to decline to adopt an incorrect reading of a statute merely because the correct reading of the text comes with practical costs; rather, if the agency reasonably concludes that Congress already made that judgment by using the words that it did, it is entitled to follow Congress's lead. *See Rust v. Sullivan*, 500 U.S. 173, 187 (1991) (holding that agency action was not arbitrary or capricious because the agency "determined that the new regulations are more in keeping with the original intent of the statute,

27

are justified by client experience under the prior policy, and are supported by a shift in attitude"); *Bostock v. Clayton Cnt.*, 590 U.S. 644, 666 (2020) (employers "warn, too, about consequences that might follow a ruling for the employees. But none of these contentions about what the employers think the law was meant to do, or should do, allow us to ignore the law as it is."). At the very least, the choice between fidelity to the best interpretation of statutory text and practical consequences involves the sort of "value-laden decisionmaking and the weighing of incommensurables" entrusted to federal agencies. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019).

Accordingly, Plaintiffs are unlikely to succeed on their arbitrary-and-capricious claim.

**B.  Plaintiffs' Spending Clause Challenge Fails.**

Plaintiffs are also unlikely to succeed on their claim that the PRWORA Notices violate the Spending Clause, U.S. CONST. art. I, § 8, cl. 1. ECF No. 1 ¶ 42–45. First, the conditions the Plaintiff States describe as newly-announced in the PRWORA Notices were unambiguously outlined by Congress in PRWORA at the time of the statute's enactment and ascertainable at the time the States accepted federal funds.[2]  Second, these conditions are not impermissibly coercive.

**1.  The PRWORA Notices Do Not Impermissibly Impose Retroactive Conditions.**

"Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quotation marks omitted). The *Dole* Court outlined that "the exercise of the spending power must be in pursuit of 'the general welfare'" and conditions on the receipt of federal funds must be stated "unambiguously" so that recipients can

---

[2] While Plaintiffs do not explicitly identify the "conditions" discussed in their Spending Clause claim, Defendants understand the challenged conditions to be the requirement that, consistent with PRWORA, the States use identity verification mechanisms to limit the distribution of Federal public benefits to qualified aliens.

"exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207. If a state is "unaware of" or "unable to ascertain what is expected of it," there can be no knowing acceptance. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). However, grant agreements "cannot be viewed . . . as a bilateral contract," requiring "any ambiguities with respect to the State's obligations invariably be resolved against the Federal Government." *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 657 (1985); *see also Com. of Mass., by Dep't of Pub. Welfare v. Sec'y of Health & Hum. Servs.*, 749 F.2d 89, 95 (1st Cir. 1984) (holding that *Pennhurst* does not require "every arguably ambiguous provision conditioning the receipt of federal funds by a state be construed in the state's favor").

Here, Plaintiffs assert that when they "accepted funding from HHS, DOL, and ED, each agency had publicly adopted an interpretation of PRWORA that excluded all of the newly covered programs from its scope," and "HHS, ED, and DOL[, through their notices,] have explicitly repudiated their longstanding positions on the statute's scope and adopted an entirely novel view as to what PRWORA means." Mot. at 72–73. This argument is merely a reprise of Plaintiffs' claim that the agencies' interpretations are contrary to law, and fails for the same reasons. As set forth above, the PRWORA Notices communicate PRWORA interpretations that closely and correctly track the text of the statute and appropriately effectuate Congressional intent. *See supra* part (I)(A)(3)–(4). PRWORA unambiguously states that only "qualified alien[s]" are eligible for benefits that fall within the statute's definition of "Federal public benefit." *See* 8 U.S.C. § 1611(c) (defining "Federal public benefit"), § 1641 (defining "qualified alien"). Because, as outlined above, each of the programs and categories of programs identified in the PRWORA Notices provides a Federal public benefit as defined in § 1611(c), the text of the statute itself provides Plaintiffs "fair notice" that the listed programs are limited to American citizens and qualified aliens, and subject to identity verification requirements. Regardless, Plaintiffs' concerns about the practical implications of the agencies' PRWORA interpretations does not transform their statutory claim into a constitutional one.

29

As to the DOJ Order articulating the Attorney General's decision regarding life and safety exemptions, Plaintiffs cannot plausibly claim that the text of 8 U.S.C. § 1611(b)(1)(D) fails to put grantees on notice that exemptions are designated by the Attorney General pursuant to her discretion and can be eliminated pursuant to that discretion. Given this provision of PRWORA, that exemptions were designated historically does not create room for Plaintiffs to argue that a decision by the Attorney General to forgo exempting benefits is unforeseeable. *See* Mot. at 73–74.

Plaintiffs attempt to draw support from *Pennhurst* and *Arlington* to bolster their insufficient notice argument, but these cases focused on whether federal statutes imposed conditions on the receipt, by States, of Federal funds at all. Whereas, here, it is the agencies' interpretation of the scope of an obligation under PRWORA, not the condition's existence, that is at issue.  In *Pennhurst*, the Supreme Court ultimately found that "the statute did not intend to unambiguously bind the states" because Congress "legislat[ed] by innuendo." *Rolland v. Romney*, 318 F.3d 42, 55 (1st Cir. 2003) (quoting *Pennhurst*, 451 U.S. at 19). And in *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006), the Court found that the Individuals with Disabilities Education Act (IDEA) "certainly fails to provide the clear notice [to states] that is required under the Spending Clause" because the provision at issue did "not even hint that acceptance of IDEA funds makes a State responsible for reimbursing prevailing parents for services rendered by experts." *Arlington*, 548 U.S. at 297. These cases simply serve to underscore that the relevant Spending Clause inquiry is whether Congress, in exercising its spending power to attach conditions to grants for States, did so with explicit and unambiguous language.

Here, Plaintiffs' Spending Clause claim boils down to an argument about the correctness of the Defendant agencies' interpretation of PRWORA. Congress unambiguously outlined in the plain text of PRWORA that "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit," 8 U.S.C. § 1611(a). And the agencies' interpretations as outlined in the PRWORA Notices are drawn from and supported by this text. *See supra* part (I)(A)(3). The

States do not and cannot dispute that they knew PRWORA imposes conditions on the receipt of federal funds—the law unambiguously limits the administration of Federal public benefits to Americans and qualified aliens. Thus, Plaintiffs fail to show that any agency's interpretation rests on a reading of PRWORA that would be incompatible with the Spending Clause.

### 2.  The PRWORA Notices are Not Impermissibly Coercive.

The Supreme Court has made clear that although the Federal Government may not be able to *compel* States to do a particular activity, it may *encourage* States and municipalities to implement Federal regulatory programs. *See New York v. United States*, 505 U.S. 144, 149 (1992). Thus, the Federal Government can, constitutionally, use conditions on federal funds to "induce the States to adopt policies that the Federal Government itself could not impose." *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 537 (2012). It may, for example, make certain federal funds available only to localities that enact a given regulatory regime. *Dole*, 483 U.S. at 205–08 (upholding Federal statute conditioning State receipt of federal highway funds on state adoption of minimum drinking age of twenty-one). "[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation." *Env't Def. Ctr. v. U.S. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) (citation omitted). The key is whether the financial inducement is "so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211 (citation omitted).

Here, Plaintiffs assert that the PRWORA Notices are unconstitutionally coercive in that they demand that States "dramatically" "transform" those programs that administer Federal public benefits or lose "billions in funding annually." ECF No. 1 ¶ 214, Mot. at 75. Plaintiffs' "coercion" argument amounts to another objection to the agencies' interpretation of the statute, which fails for reasons already explained.

Regardless, Plaintiffs fail to show that the Notices and DOJ Order are impermissibly coercive. Plaintiffs claim they are being forced to choose between dramatically altering their

31

federal benefits programs—by developing costly new systems for screening eligibility, and fundamentally altering program operations, Mot. at 75–76—or "forgo[ing] all [] federal funding." ECF No. 1 ¶ 213. However, as outlined above, the Notices do not outline specific verification methods that must be utilized for each federal benefit program and at least one of the suggested verification programs comes at no cost to the States, rendering Plaintiffs' suggestions of extreme costs and administrative burden unfounded. *See supra* part (I)(A).

Plaintiffs attempt to draw support from the Supreme Court's finding in *NFIB* that a federal condition becomes impermissibly coercive "when it threatens a substantial portion of a state's federal funding unless the state accepts a program that is different in kind" than the one the state previously agreed to join, ECF No. 1 ¶ 208 (citing *NFIB* at 580). In *NFIB*, the Supreme Court found that the threatened loss of all Medicaid funds that made up approximately 20 percent of the average state's total budget, to induce the states to further expand their Medicaid program was so coercive as to violate the Spending Clause. 567 U.S. at 581. The present instance is, however, distinct from that of *NFIB* because Plaintiff States are not being asked to accept a program that is "different in kind." Specifically, the Plaintiff States are not required to "broadly expand"—or expand in any way—their Federal public benefits programs; nor are they required to alter the Federal public benefits they provide. Instead, as Plaintiffs recognize, they are to narrow the scope of who may access the programs at issue—consistent with Congress' expressed intent in PRWORA. Narrowing their recipient pools does not, as Plaintiffs claim, transform the programs themselves, Mot. at 75.

Additionally, because the monetary value of the "coercion" in *NFIB* was such an outsized percentage of the states' total budgets, *NFIB* should be viewed as the exception rather than the general rule. The federal funding at issue in this case is nowhere near as large a portion of federal grants to state budgets as Medicaid—or, at a minimum, Plaintiff have made no such showing at this stage. Thus, the facts of this case fall in the range of the inducements considered acceptable in *Dole*, which constituted less than half of one percent of South Dakota's budget, rather than the

threat of a loss of all Medicaid funds considered in *NFIB*. Plaintiffs fail to show any Spending Clause violation on the basis of "coercion."

Accordingly, Plaintiffs' constitutional claim is unlikely to succeed.

* * * * * * *

In sum, for all the reasons discussed above, Plaintiffs cannot show a likelihood of success on their claims.

## II. Plaintiffs Have Not Demonstrated that They Will Suffer Irreparable Harm Absent Preliminary Relief.

Plaintiffs' Motion should also be denied because Plaintiffs have not made a clear showing of irreparable harm absent a preliminary injunction. Plaintiffs claim speculative injuries that may never materialize. And Plaintiffs fail to show how these hypothetical injuries, even if realized, are irreparable or substantial.

"Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos*, 367 F.3d at 73.  "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank*, 370 F.3d at 162 (quoting *Baccarat*, 217 F.3d at 18). To meet this burden, Plaintiffs must demonstrate a "likelihood of substantial and immediate irreparable injury, as opposed to speculative claims of future injury." *Nunez-Soto*, 956 F.2d at 3 (citing *Lyons*, 461 U.S. at 111); *see also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–7 (1st Cir. 1991) ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987)).

Plaintiffs allege four theories of harm: (1) proprietary injury because Plaintiff States face the threat of enforcement that would jeopardize their receipt of federal funding; (2) proprietary injury in the form of potential monetary costs and resources expelled to comply with the PRWORA Notices and implement and administer immigration status verification systems; (3) the erosion of State community programs, that is harm to residents and States having to foot the bill to compensate for lost access; and (4) interference with their sovereign prerogative of

shielding public health and community safety. Mot. at 77–80. Under none of these conjectural theories do Plaintiffs demonstrate a threat of immediate irreparable harm.

First, Plaintiffs' claim that "almost overnight" they will face a threat of enforcement that would immediately "jeopardize[e] billions of dollars in federal funding," Mot at 2, 13, 77–78, is entirely speculative. Plaintiffs offer no concrete evidence that this hypothetical harm will occur, let alone that it would be irreparable. Plaintiffs speak of immediate enforcement actions and loss of funding as inevitable, yet the PRWORA Notices do not speak to enforcement procedures or non-compliance consequences, and no action has been taken by any agency to enforce or withhold funding, "making any prediction about future injury [and its imminence] just that—a prediction." *Trump v. New York*, 592 U.S. 125, 133 (2020) (citing *Lyons*, 461 U.S. at 108). Nowhere do the Notices suggest an immediate loss of federal funding, and, if the agencies' longstanding compliance monitoring and enforcement processes are any indication, there is no imminent threat of funding loss because agency enforcement processes have historically involved notice and the opportunity for a non-compliant entity to come into compliance. *See* Engels Decl.; Gradison Decl.; Margolis Decl.; Crocker Decl.; Burke Decl.; Vitelli Decl. At this juncture, Plaintiffs merely speculate about the specific harms the PRWORA Notices might ultimately cause. *See, e.g.*, *Blinds To Go, Inc.*, 370 F.3d at 162 ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."); *Oxford Immunotec Ltd. v. Qiagen, Inc.*, 271 F. Supp. 3d 358, 367 (D. Mass. 2017) ("Plaintiffs seeking injunctive relief must make a 'clear showing' that substantial and immediate irreparable harm is 'likely' in the absence of an injunction" (quoting *Winter*, 555 U.S. at 22)).  Neither the Court nor Defendants can evaluate the parameters of any so-called injury.

Similarly conjectural is Plaintiffs' assertion that compliance with the PRWORA Notices' directives to verify the immigration status of benefit recipients will lead to significant administrative costs. ECF No. 1 ¶ 146–150, Mot. at 78. Plaintiffs assert, as future irreparable injury, monetary costs and resource expenditure they assume will accompany the "develop[ment]

and implement[ation]" of "eligibility verification systems." *Id*. at 46. Yet, the PRWORA Notices nowhere mandate program-specific verification methods, deflating Plaintiffs' claims of substantial compliance costs and infeasibility. At most, the Notices suggest verification methods. *See* DOL Notice at 4. Notably, DOL suggests SAVE, a verification method that states can use at no cost. *See id*. The HHS and ED Notices generally set forth their interpretation of the PRWORA verification requirements, but they do not impose any program-specific verification methods. *See* HHS Notice at 31,237 ("Pending further regulation and/or guidance on the situations in which verification is required, all entities that are part of HHS's administration of public benefits should pay heed to the clear expressions of national policy described above."); ED Notice at 30,900 ("Unless required by Departmental regulations, grantees have no affirmative obligation to report on verification to the Department. Because this interpretative rule is not legislative, the Department lacks the ability to require affirmative reporting.").

Even assuming *arguendo* that financial harms could be irreparable if they were unable to be recouped, Plaintiffs fail to show that their feared loss of federal funding and reimbursements are imminent, and Plaintiffs' threadbare assertion that some programs may fail due to increased compliance costs, Mot. at 79, is not enough to warrant the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 22; *see Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, 996 F.3d 37, 44 (1st Cir. 2021) ("simply showing some possibility of irreparable injury" is insufficient) (citation omitted). Even if compliance costs are incurred, it is unlikely the costs would pose an existential threat to state programs when, for example, Head Start receives over $12 billion in federal funds annually, ECF No. 4–5 at 6, and HHS has estimated compliance costs for *all* program entities receiving federal HHS funds to be between $115 and $175 million, *Id*. at 15–16—a tiny portion of that funding. Without this predicate, the States' claim of irreparable harm fails. *See Pub. Serv. Co.*, 835 F.2d at 382; *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991) ("To establish irreparable harm there must be an actual, viable, presently existing threat of *serious* harm") (emphasis added). Continuing with this example, a myriad of States, through declarations, predict administrative difficulties for their

HHS-funded programs but nowhere detail estimated costs, let alone assert that these costs could prove fatal to their programs or Head Start specifically. *See, e.g.*, ECF No. 4–35, MD–Meister Decl. ¶ 8 (asserting Maryland Dept. of Housing and Community Development does not have the resources to conduct identity verification for its programs, but failing to predict monetary costs of compliance and never asserting that verification would threaten the existence of their programs).

Next, Plaintiffs assert as irreparable harm that the Notices will negatively impact State residents' health and welfare, ultimately leaving Plaintiff States to compensate for loss of access by residents to federal benefit programs. ECF No. 1 ¶ 151–160, Mot. at 12, 79. This argument fails on two fronts. First, irreparable harms pled must be harms *to the Plaintiffs*; Plaintiffs may not rely on alleged harms to third parties in requesting a preliminary injunction. *CMM Cable*, 48 F.3d at 622 ("the issuance of a preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties") (emphasis in original). Second, any compensatory spending the States might choose to undertake would be spending of their own choosing—unattributable to the PRWORA Notices, which do not require States to restructure their own programs.

Indeed, Plaintiffs have not identified any source of federal law that compels them to provide additional benefits to state residents who lose access to federal benefit programs under the clarified PRWORA interpretations.  Because the States may *voluntarily* choose to provide such benefits, the costs they incur to do so are the result of an independent choice made by the States' legislatures and not attributable to the Government. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("The injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures. . . . No State can be heard to complain about damage inflicted by its own hand.").

Finally, Plaintiffs argue that the PRWORA Notices will cause irreparable harm by preventing them from effectively exercising their sovereign prerogative of shielding public health and community safety. Mot. at 80. In claiming this abstract harm, however, Plaintiffs fail

to demonstrate how they are being asked to "relinquish[] their sovereign right[s]" Mot. at 80 (quoting *California v. United States Dep't of Transportation*, No. 25-cv-208, 2025 WL 1711531, at *3 (D.R.I. June 19, 2025)). As recognized by Plaintiffs, States are free to make changes to their own benefit programs as desired.

Plaintiffs cite a single case, *California*, in which irreparable harm warranting an injunction was found in part because the federal government's action "put [States] in a position of relinquishing their sovereign right to decide how to use *their own police officers*." *California*, 2025 WL 1711531, at *3 (emphasis added). But here Plaintiffs point to nothing in any of the challenged Notices that restricts how States may protect public health and community safety; the Notices merely address the scope of PRWORA's requirement that states verify the identity of individuals applying to receive Federal public benefits. And Plaintiffs do not, for instance, identify any state law concerning public health or community safety with which the interpretations set forth in the PRWORA Notices conflict, or show that the Notices would require a State to cede control over any element of its regulation of those domains.

## III.    The Balance of the Equities and the Public Interest Disfavor a Preliminary Injunction.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). In this setting, granting the preliminary injunction that Plaintiffs seek would disrupt the agencies' efforts to comply with the PRWORA EO and to correctly interpret PRWORA's plain text consistent with the statutory purpose. A preliminary injunction order would effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with legal authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted); *see also Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological*

*Diversity*, 18 F.4th 38, 47 (1st Cir. 2021).

**IV.    Any Injunctive Relief Should Be Narrowly Tailored, and a Stay of the PRWORA Notices is Not Permitted under the APA.**

To the extent the Court is inclined to grant any relief, it should be narrowly tailored to the Plaintiff States who have met their burden of establishing irreparable harm. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025). And for each of these States, relief should be limited to relief from the agency notices for which they have met this burden. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (explaining that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").  For instance, the Court should not grant Arizona relief from the ED, HHS, or DOL Notices, as Arizona did not submit declarations to demonstrate irreparable harm resulting from any of these notices. *See* ECF No. 4–74, AZ–Flores Decl. (describing DOJ Order and asserting detrimental impact on the Arizona Office of Victim Services, but nowhere speaking to the remaining PRWORA Notices). Similarly, the Court should not grant relief to Connecticut, Minnesota, or Wisconsin from the ED or DOL Notices, as these States only submitted declarations alleging irreparable harm caused by the HHS Notice. *See* ECF Nos. 4–21, CT–Navarretta Decl.; 4–22, CT–Hadler Decl.; 4–42, MN–Grumdahl Decl.; 4–72, WI–Standridge Decl. At a minimum, the Court should not grant any relief as to Nevada or Hawaii because these States submitted no evidence regarding their asserted harms from the challenged Notices and, as a result, cannot meet their threshold burden of establishing irreparable harm. *See Blinds To Go*, 370 F.3d at 162 ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

Plaintiffs also request a "stay" under 5 U.S.C. § 705. Mot. at 4. Plaintiffs appear to be invoking § 705's provision that a court may "postpone the effective date of an agency action" in some circumstances. But an order to "postpone the effective date" of the notices at issue would pose all the same problems as a universal injunction. *See DHS v. New York*, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring in the grant of stay). *Cf. CASA*, 145 S. Ct. at 2557 (Under

the complete-relief principle, "the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to the plaintiffs before the court." (cleaned up)). Moreover, § 705 (like other APA provisions) "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Plaintiffs do not identify, and Defendants have not found, any pre-APA practice of district courts granting universal stays of agency regulations, let alone interpretive notices like the ones at issue here. Indeed, Congress contemplated that any relief under § 705 "would normally, if not always, be limited to the parties," Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. at 277 (1946).

## V.    To the Extent the Counts Enters an Injunction, Plaintiffs Should be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief and Any Preliminary Relief Should be Stayed to Allow Consideration of Whether to Appeal.

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' Motion in its entirety.  However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post security.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c).  In the event the Court issues a preliminary injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such order.  Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c); *cf. Department of Education v. California*, No. 24A910, 2025 WL 1008354, at *2 (Apr. 4, 2025) ("[R]espondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee promised to return withdrawn funds should its grant termination be reinstated, and the District Court declined to impose bond.") (quotation omitted).

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that

relief be stayed for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## **CONCLUSION**

For the reasons explained above, Plaintiffs are not entitled to any preliminary relief. But, in the event the Court concludes otherwise, injunctive relief should be limited in two ways: (1) any injunction issued should be limited to Plaintiff States who have demonstrated irreparable harm, and (2) for each State that has demonstrated irreparable harm, the injunction should be limited to relief from the specific PRWORA Notices for which the State has shown irreparable harm.


Dated: August 11, 2025                     Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           ERIC J. HAMILTON
                                           Deputy Assistant Attorney General
                                           Federal Programs Branch

                                           DIANE KELLEHER
                                           Branch Director
                                           Federal Programs Branch

                                           ELIZABETH TULIS
                                           Assistant Branch Director
                                           Federal Programs Branch

                                           */s/ Alexandra L. Yeatts*
                                           ALEXANDRA L. YEATTS (CA Bar No. 358762)
                                           HEIDY L. GONZALEZ (FL Bar No. 1025003)
                                           *Trial Attorneys*
                                           U.S. Department of Justice,
                                           Civil Division, Federal Programs
                                           1100 L Street, N.W.
                                           Washington, DC  20005
                                           Tel: (202) 353-5677
                                           Email: Alexandra.Yeatts@usdoj.gov