## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF
WASHINGTON; STATE OF RHODE ISLAND;
STATE OF ARIZONA; STATE OF CALIFORNIA;
STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE;
DISTRICT OF COLUMBIA; STATE OF
HAWAI'I; STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA; STATE OF
NEW JERSEY; STATE OF NEW MEXICO;
STATE OF OREGON; STATE OF VERMONT;
STATE OF WISCONSIN,

       Plaintiffs,

       v.

U.S. DEPARTMENT OF JUSTICE; PAMELA
BONDI, in her official capacity as ATTORNEY
GENERAL OF THE UNITED STATES; U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; ROBERT F. KENNEDY, JR., in his
official capacity as SECRETARY OF THE U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; U.S. DEPARTMENT OF
EDUCATION; LINDA McMAHON, in her official
capacity as SECRETARY OF THE U.S.
DEPARTMENT OF EDUCATION; U.S.
DEPARTMENT OF LABOR; LORI CHAVEZ-
DeREMER, in her official capacity as
SECRETARY OF THE. US. DEPARTMENT OF
LABOR,

       Defendants.

Case No. 1:25-cv-00345

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      For nearly three decades, and across five Presidential Administrations, the federal government followed a clear and consistent understanding of what the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) required. States needed to verify a person's lawful status before allowing them to access certain federal programs—Medicaid and Temporary Assistance for Needy Families, for example. But federal agencies consistently informed States that PRWORA did not require them to check papers before allowing individuals to access other, vital community programs—many of which have always been open to all. The hungry have never needed to produce government identification to enter a soup kitchen or food bank; parents have never needed to produce their children's citizenship or immigration records before enrolling them in Head Start; those suffering from substance abuse disorders have never needed to bring their passports to a rehabilitation clinic; people facing homelessness or domestic violence have never needed proof of immigration status to walk into a shelter.

2.      These rules—set forth in clear, authoritative agency pronouncements unchanged for decades—shaped the way social services programs in every State operated. And they set the terms of the bargain under which States accepted billions of dollars of federal funding each year.

3.      Less than two weeks ago, the Administration upended this stable equilibrium. In swift succession, four agencies explicitly repudiated the understanding of PRWORA that had governed since its inception.

4.      The Department of Justice (DOJ) revoked exemptions that had been in place since the very day after PRWORA was enacted, suddenly demanding that States screen individuals for lawful status before allowing them to access domestic violence shelters, senior nutrition programs, crisis counseling centers, soup kitchens, and myriad other services.

2

5.      The Department of Health and Human Services (HHS) overturned its settled views since 1998 and identified 13 new programs, from Title X to Head Start to the Health Center Program, that it newly deemed subject to PRWORA's requirements.

6.      And the Department of Education (ED) and the Department of Labor (DOL) reversed their prior understandings of PRWORA to place a bevy of education and workforce training programs within the statute's ambit.

7.      Chaos has predictably followed. Almost overnight, States and their subgrantees faced the threat of enforcement if they could not dramatically restructure crucial components of their social safety nets to comply with Defendants' new dictates. The new rules put the States' community programs to the impossible choice between shutting their doors or risking an immediate cutoff in federal funding. Many programs cannot realistically conduct verification at the door, such as 24/7 crisis hotlines, emergency services for individuals suffering an overdose, and homeless shelters. Even if some programs could implement such verification with time and resources, vulnerable people lack government identification when accessing these services for myriad reasons—some may be undocumented immigrants, but many others are U.S. Citizens or permanent residents. For the first time, millions of people are facing a new demand before they can access the Nation's most essential programs: "show me your papers."

8.      This is not America, and it is not the law. Congress enacted PRWORA pursuant to the Constitution's Spending Clause. To impose conditions using that power, Congress must speak "unambiguously" and place officials on "fair notice" of what the law requires. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296, 304 (2006). It is farcical to suggest that, for 29 years, PRWORA has "unambiguously" meant the opposite of what every federal agency has said it does.

3

9.     On issue after issue, the Administration's new interpretation of the statute is indefensible. PRWORA extends to "postsecondary education" benefits; Defendants now say it covers early childhood and secondary education benefits, too. PRWORA is limited to programs with "eligibility units"; Defendants now say it applies to programs Congress wanted to be open to all. PRWORA governs access to "benefits"; Defendants now claim it applies to "programs" in their entirety, even where many of their benefits fall outside the statute. These new interpretations are not "unambiguously" correct; they are quite simply wrong.

10.    The Constitution itself also forbids Defendants' effort to reimagine PRWORA. Plaintiff States accepted federal funding for dozens of programs against the backdrop of Defendants' settled interpretation of this statute. The Spending Clause does not permit Defendants to dramatically change that bargain and "surpris[e]" the States with "post acceptance," "retroactive" conditions in the middle of their grant terms. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). Nor may Defendants coerce states into restricting critical community programs—particularly in areas of traditional state power like public health and safety—or else face the loss of billions of dollars in federal funding.

11.    Three of the notices are also inconsistent with the requirements of the Administrative Procedure Act. HHS, ED, and DOL failed to follow the requisite notice-and-comment procedures before announcing major, substantive changes to the way they implement PRWORA that would take effect immediately. Their explanations also lack the basic elements of reasoned decision-making: Defendants did not consider the massive reliance that had built up around their settled interpretations, nor even explain why they deemed many programs newly within PRWORA's scope. Finally, the notices are contrary to law in numerous respects.

12.     In short, Defendants' newfound interpretations of PRWORA are unlawful. The Plaintiff States will suffer continued, irreparable harm if forced to dramatically restructure their social safety nets and render them inaccessible to countless of the States' most vulnerable residents. And the public's interest lies in restoring the understanding of PRWORA that has prevailed since its enactment—not in allowing the Administration to transform the statute, and our country, into something unrecognizable.

13.     The Court should declare Defendants' notices to be unlawful, set them aside, and enjoin Defendants from enforcing or implementing them in the Plaintiff States.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act (APA). 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706.

15.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff State of Rhode Island is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Rhode Island.

## PARTIES

### A.    Plaintiffs

16.     Plaintiff State of New York is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian,

and representative of all residents and political subdivisions of New York. Attorney General Letitia James is the chief law enforcement officer for New York.

17.     Plaintiff State of Washington, represented by and through the Attorney General, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

18.     Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

19.     Plaintiff the State of Arizona is a sovereign state of the United States of America. Arizona is represented by and through its chief legal officer, Attorney General Kristin K. Mayes. See Ariz. Rev. Stat. § 41-192(A). Attorney General Mayes is authorized to pursue this action on behalf of the State of Arizona. *Id.*

20.     Plaintiff State of California is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of California. Attorney General Rob Bonta is the chief law enforcement officer for California.

21.     Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

22.     Plaintiff State of Connecticut is a sovereign state of the United States of America. It is represented by Attorney General William Tong, the chief law officer of Connecticut.

23.     Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.[1]

24.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

25.     Plaintiff State of Hawaiʻi, represented by and through its Attorney General Anne Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

26.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. *See* 15 Ill. Comp. Stat. 205/4.

---

[1] This paragraph is the sole addition to this First Amended Complaint.

27.     Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to Me. Rev. Stat. Ann. tit. 5, § 191.

28.     Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

29.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

30.     Plaintiff State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

31.     Plaintiff State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

32.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

33.    Plaintiff State of New Jersey, represented by and through its Attorney General, Matthew J. Platkin, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. Attorney General Matthew J. Platkin is the chief law enforcement officer for New Jersey.

34.    Plaintiff State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

35.    Plaintiff State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

36.    Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159.

37.    The State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

**B.    Defendants**

38.    Defendant United States Department of Justice is a cabinet agency within the executive branch of the United States government. 28 U.S.C. § 501.

39.    Defendant Pamela Bondi is the Secretary of the United States Department of Justice and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity. 28 U.S.C. § 503.

40.    Defendant United States Department of Health and Human Services is a cabinet agency within the executive branch of the United States government. 42 U.S.C. §§ 3501, 3501a.

41.    Defendant Robert F. Kennedy, Jr., is the Secretary of the Department of Health and Human Services and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 42 U.S.C. §§ 3501a, 3502.

42.    Defendant United States Department of Education is a cabinet agency within the executive branch of the United States government. 20 U.S.C. § 3411.

43.    Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 20 U.S.C. § 3412.

44.    Defendant United States Department of Labor is a cabinet agency within the executive branch of the United States government. 29 U.S.C. § 551.

45.    Defendant Lori Chavez-DeRemer is the Secretary of the United States Department of Labor and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity. 29 U.S.C. § 551.

## FACTUAL ALLEGATIONS

**A.    The Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA)**

46.    Congress enacted PRWORA in 1996 as part of a larger overhaul of the federal welfare system. *See* Pub. L. No. 104-193 (Aug. 22, 1996).

47.     Title IV of PRWORA, which is codified at 8 U.S.C. §§ 1601–1646, governs the eligibility of noncitizens for Federal, State, and local public benefits. Section 1611 provides that "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit," subject to certain exceptions. 8 U.S.C. § 1611(a)–(b). Section 1621 similarly provides that a noncitizen is generally not "eligible for any State or local public benefit," subject to parallel exceptions or unless a State affirmatively provides otherwise. *Id.* § 1621(a), (d).

48.     A "qualified alien" is defined in 8 U.S.C. § 1641(b) to include noncitizens with certain forms of lawful status such as those who are lawfully admitted for permanent residence under the Immigration and Nationality Act (INA); those who have been granted asylum under INA § 208, 8 U.S.C. § 1158; refugees under INA § 207, 8 U.S.C. § 1157; and noncitizens who are paroled into the United States for at least a year under INA § 212(d)(5), 8 U.S.C. § 1182(d)(5).

49.     Many noncitizens who have other forms of lawful status are excluded from the definition of "qualified alien" in 8 U.S.C. § 1641(b), and therefore ineligible to receive "Federal public benefit[s]." These noncitizens include foreign students on F-1 visas, temporary agricultural workers on H-2A visas, temporary non-agricultural workers under H-2B in jobs facing a shortage of U.S. workers, and exchange visitors on J-1 visas. These visa programs allow visa holders' spouses and children to accompany them to the U.S. while they work and study.

50.     The definition of "Federal public benefit" is critical to the scope of this statute. Section 1611(c)(1) defines the term to include two categories of benefits. Section 1611(c)(1)(A) defines the term to include "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States." And section 1611(c)(1)(B) further provides that "Federal public benefits" include "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance,

unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States."

51.     Not every form of payment or assistance the Federal government provides constitutes a "Federal public benefit." Section 1611(c)(1)(B) itself makes clear that it reaches only the enumerated benefits and those "similar" to them. And since the very day after the statute's enactment, the Department of Justice has consistently taken the position that this definition does not reach "regularly, widely available services," such as "police, fire, ambulance, transportation (including paratransit), [and] sanitation." Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation, 61 Fed. Reg. 45,985 (Aug. 23, 1996). In addition, the statute includes a rule of construction: "[n]othing in this chapter may be construed as addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under *Plyler v. Doe* (457 U.S. 202) 1982." 8 U.S.C. § 1643(a)(2).

52.     PRWORA also includes provisions exempting certain "Federal public benefits" from its scope. *Id.* § 1611(b)(1). These exemptions include specific items, such as emergency medical care and short-term, in-kind emergency disaster relief. *Id.* § 1611(b)(1)(A–B). And they include a general authorization for the Attorney General, in her "sole and unreviewable discretion," to add exemptions for programs, services, and assistance that: "(i) deliver in-kind services at the community level, (ii) do not condition the provision of assistance on the individual recipient's income or resources, and (iii) are necessary for the protection of life or safety." *Id.* § 1611(b)(1)(D) (the "Life/Safety Exemption").

53.     Section 1642 requires States to adopt systems for verifying the eligibility of applicants for Federal public benefits.

54.    In particular, section 1642(a) provides the Attorney General must, not later than 18 months after August 22, 1996, "promulgate regulations requiring verification that a person applying for a Federal public benefit . . . is a qualified alien and is eligible to receive such benefit." *Id.* § 1642(a)(1). It also requires the Attorney General to "issue interim verification guidance" not later than 90 days after August 5, 1997. *Id.*

55.    Section 1642(b) provides that, "[n]ot later than 24 months after the date the regulations described in subsection (a) are adopted, a State that administers a program that provides a Federal public benefit shall have in effect a verification system that complies with the regulations."

56.    Section 1642(d) exempts nonprofit charitable organizations from the statute's verification requirements. It provides that "a nonprofit charitable organization, in providing any Federal public benefit . . . or any State or local public benefit . . . is not required under this chapter to determine, verify, or otherwise require proof of eligibility of any applicant for such benefits." *Id.* § 1642(d).

57.    In 1997, the U.S. Department of Justice promulgated interim guidance on PRWORA's verification requirements. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61,344 (Nov. 17, 1997) (the "1997 Verification Guidance"). The Attorney General has proposed, but not finalized, regulations on verification. *See* 63 Fed. Reg. 41,662 (Aug. 4, 1998).

58.    The 1997 Verification Guidance states that "a nonprofit charitable organization is not required by the Act to seek an applicant's confirmation that he or she is a qualified alien, or to

have a separate entity verify the applicant's status before providing benefits." 62 Fed. Reg. at 61,346.

59.    The 1997 Verification Guidance further states:

> The exemption for nonprofit charitable organizations is limited to verification requirements imposed by Title IV of the [PRWORA] and to those instances in which the nonprofit charitable organization itself would be required by Title IV to engage in verification. Certain programs, however, require federal, state and local agencies to verify citizenship and immigration status as part of program eligibility determinations, while benefits are provided, at least in part, by charitable organizations. Other programs currently require verification by the charitable organization itself. These independent requirements are not altered by the provision exempting nonprofit charitable organizations from the Act's verification requirements. If a non-exempt entity (e.g., a state agency) performs verification for benefits provided through a nonprofit charitable organization, you must abide by those determinations.

*Id.*

## B.    Longstanding Interpretations of PRWORA

60.    Federal agencies have issued notices interpreting PRWORA since almost immediately after its enactment.

61.    On August 23, 1996, one day after PRWORA was enacted, the DOJ issued a notice specifying programs and services that are exempt from PRWORA under the Life/Safety Exemption under 8 U.S.C. §§ 1611(b)(1)(D) and 1621(b)(4). *See* 61 Fed. Reg. 45,985.

62.    This notice identified seven categories of programs that fell within the Life/Safety Exemption:

a)    Crisis counseling and intervention programs; services and assistance relating to child protection, adult protective services, violence and abuse prevention, victims of domestic violence or other criminal activity; or treatment of mental illness or substance abuse;

b)    Short-term shelter or housing assistance for the homeless, for victims of domestic violence, or for runaway, abused, or abandoned children;

c)    Programs, services, or assistance to help individuals during periods of heat, cold, or other adverse weather conditions;

d)     Soup kitchens, community food banks, senior nutrition programs such as meals on wheels, and other such community nutritional services for persons requiring special assistance;

e)     Medical and public health services (including treatment and prevention of diseases and injuries) and mental health, disability, or substance abuse assistance necessary to protect life or safety;

f)     Activities designed to protect the life or safety of workers, children and youths, or community residents; and

g)     Any other programs, services, or assistance necessary for the protection of life or safety.

*Id.*

63.     The Notice also clarified that the Attorney General "d[id] not construe the Act to preclude aliens from receiving police, fire, ambulance, transportation (including paratransit), sanitation, and other regular, widely available services." *Id.* The Attorney General also did "not mak[e] specifications of such programs, services, or assistance." *Id.*

64.     DOJ issued a request for comment in 1997. Request for Comments on the Attorney General's Specification of Community Programs Necessary for the Protection of Life or Safety Under the Welfare Reform Act, 62 Fed. Reg. 48,308 (Sept. 15, 1997).

65.     DOJ issued a final notice in 2001. Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation, 66 Fed. Reg. 3613 (Jan. 16, 2001) ("2001 Final Order"). As DOJ acknowledges, the 2001 Final Order was "in substance, unchanged" from the 1996 guidance. *See* Revised Specification Pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 90 Fed. Reg. 32,023, 32,024 (July 16, 2025). It simply repeated verbatim each of the exemptions in the 1996 Interim Notice. *See* 66 Fed. Reg. at 3616.

66.     These Life/Safety Exemptions remained in effect, unchanged, until the DOJ PRWORA Notice was published on July 16, 2025.

67.    During this time, many federal agencies relied on the 2001 Final Order or the 1996 Interim Guidance to designate their own programs as exempt from PRWORA under the Life/Safety Exemption. These include, for example, the domestic violence shelters under HHS's Family Violence Prevention and Services Act; the Department of Housing and Urban Development's Emergency Solutions Grants and Continuum of Care programs for rapid rehousing, transitional housing, and homeless outreach; and HHS's Substance Abuse Prevention and Treatment Block Grant and the Community Mental Health Services Block Grant that fund crisis stabilization services, medication-assisted treatment for opioid addiction, and mental health support in schools.

68.    The Department of Education (ED) issued a Dear Colleague Letter interpreting PRWORA in 1997. This letter interpreted the statute not to cover "assistance provided under federally funded preschool, elementary and secondary education programs" because the statutory definition of Federal public benefits is limited to "postsecondary education" benefits.

69.    ED's interpretation of PRWORA was unchanged from November 1997 until July 11, 2025.

70.    In August 1998, the Department of Health and Human Services (HHS) issued a notice that contained several clarifications about PRWORA's scope. Among other things, it explained that the statute did not reach non-postsecondary education programs like Head Start because the definition of Federal public benefits is limited to "postsecondary education." 63 Fed. Reg. 41,658, 41,569 (Aug. 4, 1998). It found that the statute does not cover programs that lack eligibility criteria, because—among other reasons—the definition of Federal public benefits in section 1611(c)(1)(B) requires the existence of an "eligibility unit." *Id.* at 41,660. And it said that block grants to States are not automatically included in the definition of Federal public benefits because they do not provide benefits to individuals. *Id.* at 41,659.

71.    On the basis of these and other interpretive principles, the HHS notice listed 31 programs that HHS deemed to provide Federal public benefits, including Medicare, Medicaid, and Temporary Assistance for Needy Families. 63 Fed. Reg. at 41,660.

72.    HHS noted, however, that not "all benefits or services provided by these programs are 'Federal public benefits' and require verification." *Id.* To illustrate this point, HHS observed that although "some states may provide [Low-Income Home Energy Assistance Program] funds for weatherization of multi-unit buildings," those "funds would not be considered a 'Federal public benefit' since the eligibility of individuals, households, or family units is not considered in determining whether such funds will be used to improve the building." *Id.*

73.    HHS's interpretation of PRWORA was unchanged from August 1998 until July 14, 2025.

74.    The Department of Labor (DOL) issued its last interpretation of PRWORA in February 2024. *See* Training and Employment Guidance Letter No. 10-23 (the "2024 DOL Guidance"). That guidance explained that "[m]any, but not all, services authorized" by workforce training programs fell outside of the scope of PRWORA. *Id.* at 5. In particular, the guidance explained that services that entail a "direct financial benefit" or "post-secondary education and training" constitute Federal public benefits, but that services that provide non-postsecondary education, information and referrals, or assistance in completing paperwork do not. *Id.* at 5–7.

## C.    July 2025 Coordinated PRWORA Agency Action

75.    On February 19, 2025, President Trump signed Executive Order 14218, titled "Ending Taxpayer Subsidization of Open Borders." 90 Fed. Reg. 10,581 (Feb. 25, 2025). Among other things, the Order directs federal agencies to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash

public benefit," and to take action to "align such programs" with the purpose and requirements of PRWORA. *Id.*

76.    The Executive Order further directs federal agencies to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Id.*

77.    The Executive Order further directs federal agencies to "refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action." *Id.*

78.    In the span of a week, beginning July 10, 2025, multiple federal agencies announced that, effective immediately, they were interpreting "Federal public benefit" under PRWORA to cover programs that had existed outside of PRWORA's reach for the entirety of PRWORA's existence, thereby upending more than a quarter century of settled understanding.

79.    These "similar measures being taken across the federal government" were expressly part of an "effort to carry out President Trump's Executive Order 14218."[2]

80.    In addition to the PRWORA Notices published by Defendants, the U.S. Department of Agriculture published a PRWORA notice, which Plaintiffs do not challenge here.[3]

_____

[2] U.S. Department of Labor, *Press Release: US Department of Labor Moves to Prevent Illegal Immigrants From Utilizing Taxpayer-Funded Workforce Programs* (July 10, 2025), https://www.dol.gov/newsroom/releases/osec/osec20250710.

[3] USDA published this notice on July 10, 2025. 90 Fed. Reg. 30,621 (July 10, 2025). The Notice concerns Food and Nutrition Service Programs, including, for example, the National School Lunch Program, the Special Supplemental Nutrition Program for Women, Infants, and Children, and the Emergency Food Assistance Program. However, many USDA programs are subject to an independent statutory requirement to provide certain benefits programs to everyone regardless of citizenship, *see* 8 U.S.C. § 1615, which the Notice affirmed will "continue to apply where relevant." 90 Fed. Reg. at 30,622.

### D.    Department of Justice PRWORA Notice

81.    On July 16, 2025, DOJ published a Notice titled "Revised Specification Pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996" (the "DOJ PRWORA Notice"). 90 Fed. Reg. 32,023 (July 16, 2025).

82.    The DOJ PRWORA Notice formally revokes the 2001 Final Order. *Id.* at 32,024. In that Final Order, DOJ had "specified" certain types of "programs, services or assistance" that were exempted from PRWORA's eligibility bar for Federal public benefits pursuant to 8 U.S.C. §§ 1611(b)(1)(D), 1621(b)(4).

83.    The DOJ PRWORA Notice concludes that no benefits are excepted from PRWORA under the 8 U.S.C. §§ 1611(b)(1)(D), 1621(b)(4) exemption for community programs that are necessary for protection of life or safety "beyond those set forth in the statute itself." 90 Fed. Reg. at 32,026.

84.    The DOJ PRWORA Notice claims that agencies had "misunderstandings" about the scope of some of these exemptions, and some exemptions were not "necessary" to protect "aliens' immediate welfare." *Id.* at 32,025.

85.    The Notice further states that, even if noncitizens did rely on these programs, their reliance was outweighed by the interest in "reduc[ing] the incentive for aliens to illegally migrate to the United States," although the Notice provides no evidence of that purported incentive. *Id.*

86.    The DOJ PRWORA Notice states that it "does not require notice-and-comment rulemaking[] [b]ecause PRWORA commits a decision about exceptions to the Attorney General's 'sole and unreviewable discretion' after consultation with Federal officials." *Id.* at 32,024.

87.    The DOJ PRWORA Notice also states that it is exempt from notice-and-comment procedures because the designation of certain benefits as excepted is a "matter relating to . . . public property, loans, grants, benefits, or contracts" under 5 U.S.C. § 553(a)(2). *Id.*

88.    By revoking the 2001 Final Order without providing an updated specification of which programs DOJ considers exempt under the statute, DOJ has cast doubt on its view of the legality of providing a wide range of services that have been considered outside the scope of PRWORA for decades.

89.    For example, under the 2001 Final Order, the Department of Housing and Urban Development's Emergency Solutions Grants and Continuum of Care programs for transitional housing were presumed exempt as providing for life/safety needs, and providers were able to deliver services such as rapid rehousing, transitional housing, and homeless outreach without consideration of the recipient's citizenship.

90.    Substance Abuse and Mental Health Services Administration programs funded through the Substance Abuse Prevention and Treatment Block Grant and the Community Mental Health Services Block Grant were exempt under the 2001 Final Order, which funded crisis stabilization services, medication-assisted treatment for opioid addiction, and mental health support in schools.

91.    And, under the 2001 Final Order, FEMA Disaster Relief programs like the Crisis Counseling Program, temporary disaster housing, and non-cash evacuation support were treated as exempt under the Life/Safety Exemption.

92.    The DOJ PRWORA Notice takes effect on August 15, 2025, thirty days after July 16, 2025, when it was published in the Federal Register. 90 Fed. Reg. at 32,023.

E.    **Department of Health and Human Services PRWORA Notice**

93.    On July 14, 2025, HHS published its Notice (the "HHS PRWORA Notice"). Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit." 90 Fed. Reg. 31,232 (July 14, 2025).

94.    The HHS PRWORA Notice overturns all of the interpretations the agency had adopted in 1998 and deems 13 programs newly subject to PRWORA, "effective immediately." *Id.* at 31,238.

95.    The Notice claims that HHS's 1998 notice erred by reading PRWORA as limited to programs that contain eligibility criteria, asserting that PRWORA's reference to "eligibility unit[s]" was meant only to limit the statute to programs with "discrete end-recipients." *Id.* at 31,234–35.

96.    The Notice argues that non-postsecondary education benefits—including Head Start—actually fall within the definition of "Federal public benefit," even though section 1611(c)(1)(B) specifically lists only "*postsecondary* education . . . benefit[s]," because all education benefits are "similar" to "welfare." *Id.* at 31,235–37 (emphasis added).

97.    The Notice also asserts that block grants to States automatically qualify as Federal public benefits because they are "grants." *Id.* at 31,233–34.

98.    Having set forth these interpretations, the HHS PRWORA Notice designates thirteen additional HHS programs as providing "Federal public benefit[s]," under 8 U.S.C. § 1611(c), specifically:

- Title X Family Planning Program;

- Head Start;

- Title IV-E Educational and Training Voucher Program;

- Community Services Block Grant (CSBG);

- Health Center Program;

- Substance Use Prevention, Treatment, and Recovery Services Block Grant;

- Community Mental Health Services Block Grant;

- Projects for Assistance in Transition from Homelessness Grant Program;

- Certified Community Behavioral Health Clinics;

- Mental Health and Substance Use Disorder Treatment, Prevention, and Recovery Support Services Programs administered by the Substance Abuse and Mental Health Services Administration not otherwise covered by prior designated programs;

- Title IV-E Prevention Services Program;

- Title IV-E Kinship Guardianship Assistance Program; and

- Health Workforce Programs not otherwise covered by prior designated programs (including grants, loans, scholarships, payments, and loan repayments).

*Id.* at 31,237.

99.    With the exception of Head Start and (arguably) one other program, the Notice offers no explanation as to why it added any of these programs to the list, and it expressly refuses to consider any reliance interests in its longstanding interpretation or the negative impacts of its novel interpretation on public health. *See id.* at 31,238.

100.    The HHS PRWORA Notice states that the list "is not exhaustive"; that "[a]ny programs not listed in this notice or established after the date of this notice may still fall under the definition of Federal public benefit"; and that "additional programs determined to be Federal public benefits will be announced in program specific guidance." *Id*. at 31,237.

101.    The changes announced through the HHS PRWORA Notice became "effective immediately." 90 Fed. Reg. at 31,238. HHS "anticipates that numerous" noncitizens "will no longer receive benefits under Federally funded programs due to this notice." *Id.*

102.    Although HHS is soliciting public comment on the HHS PRWORA Notice, HHS states that "it is necessary to apply this [Notice] to HHS programs immediately, prior to receipt and consideration of any comments." *Id*. This has precluded HHS from considering key issues prior to implementation, despite explicitly acknowledging that it would benefit from such comments. *See id.* at 31,234–35 (seeking comment on "the application of 'eligibility unit' in other federal programs at HHS or similar contexts," while admitting such application "bears significant weight" as to whether the 1998 interpretation it now rejects was incorrect); *id.* at 31,329 (seeking "comment on [HHS's] estimates of benefits, costs, and transfers of" the HHS PRWORA Notice).

103.    HHS states that "[p]ost-promulgation notice-and-comment and immediate effectiveness are consistent with" 5 U.S.C. § 553(b)(A) (which excludes "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from notice and comment requirements) and 5 U.S.C. § 553 (d)(2) (which excludes "interpretative rules and statements of policy" from the requirement that rules must be published 30 days before they are effective). *Id*.

104.    The Notice offers as additional justifications that "[a]ny delay would be contrary to the public interest and fail to address the ongoing emergency at the Southern Border of the United States"; "would fail to remove incentives to illegal immigration that are exacerbating the invasion at the Southern Border"; and "will also cause unnecessary or incorrect administrative actions by agencies or entities that administer our programs, resulting ultimately in the denial of critical benefits and services to U.S. citizens and qualified aliens. . . ." *Id*.

105.    HHS "anticipates that the notice will lead to a reduction" in benefits paid to noncitizens and "a corresponding increase in benefits for U.S. citizens and qualified aliens." *Id*.

106.     HHS did not weigh the costs and benefits of the Notice as a whole. Instead, HHS provided "a partial benefit-cost analysis," focusing on Head Start "as an illustrative case." *Id.* at 31,238–39; *see also* Final Regulatory Impact Analysis, Docket No. AHRQ-2025-0002 at 4.

107.     For Head Start, HHS estimated that increased expenditures to U.S. citizens and qualified aliens would "offset[]" a "decrease for unqualified aliens." Final Regulatory Impact Analysis at 4. HHS estimated that the magnitude of this effect ranges between $184 million and $1.881 billion. *Id.* at 4–9.

108.     Aside from Head Start, HHS performed only a minimal Regulatory Impact Analysis. HHS estimated that the Notice would affect approximately 226,000 to 344,000 programs nationwide and that upfront transition costs for the Notice as a whole fell between approximately $115 million to $175 million. 90 Fed. Reg. at 31,238; Final Regulatory Impact Analysis at 14–15.

109.     HHS also noted that one of the "consequences for numerous other programs, many of which relate to the provision of health care," would be that "the Notice shifts these types of funding" so that "effects could partially flow to and from providers of charity care, jurisdictions that reimburse providers for uncompensated care, and other such entities." Final Regulatory Impact Analysis at 11 n.19.

110.     The Office of Information and Regulatory Affairs (OIRA) designated the HHS PRWORA Notice as an economically significant regulatory action under section 3(f)(1) Executive Order 12866, meaning that it "ha[s] an annual effect on the economy of $100 million or more; or adversely affect[s] in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities." 90 Fed. Reg. at 31,238.

111.    OIRA also designated the HHS PRWORA Notice as a major rule under 5 U.S.C. § 804(2), meaning that it is likely to result in an annual effect on the economy of $100 million or more; cause a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions; or cause significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. *See id.* at 31,238; 5 U.S.C. § 804(2).

112.    The HHS PRWORA Notice based its designation of the thirteen additional programs as "Federal public benefit[s]" on two things: first, "the interpretation of PRWORA set forth" in the Notice and, second "intervening developments since" 1998. 90 Fed. Reg. at 21,237.

113.    The HHS PRWORA Notice does not explain any connection between its change in interpretation of PRWORA and 11 of the 13 programs it identifies as being subject to the Notice. For the remaining two programs—the Title X Family Planning Program and Head Start—the Notice provides little more. It notes only that Title X service grants are an example of "grants [that] go to States," and "HHS believes Head Start is similar to a welfare benefit." *Id.* at 21,236.

114.    The HHS PRWORA Notice does not identify any intervening developments since 1998 relevant to the Notice.

115.    HHS explicitly declined to consider reliance interests or negative effects on public health, stating instead:

> Some may argue that there are reliance interests that are affected by the Department's change in position. Some may argue that the Department's new position will negatively impact public health. However strong these hypothetical policy arguments may be, the Department has no power to override Congress's will, expressed in the clear statutory text of PRWORA. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("In the business of statutory interpretation, if [an agency's interpretation of a statute] is not the best, it is not permissible."). The Department anticipates that numerous unqualified aliens will no longer receive

benefits under Federally funded programs due to this notice. This is a necessary result of the Department's obligation to comply with the law.

90 Fed. Reg. at 21,238.

116.    HHS set forth the following additional justification for the Notice:

It is also necessary to remedy the corresponding harm of the denial of limited benefits to those U.S. citizens and qualified aliens who otherwise would receive benefits to which they are entitled, but for them being provided to unqualified aliens. In addition, HHS is concerned that the provision of Federal public benefits to unqualified aliens incentivizes increased illegal immigration, compounding the problem over time, of unqualified aliens increasingly unlawfully drawing down and crowding out benefits reserved for U.S. citizens and qualified aliens.

*Id.*

117.    The HHS PRWORA notice does not "formally revis[e] the aspects of the 1998 Notice that touch on PRWORA's verification requirements" but directs "all entities that are part of HHS's administration of public benefits" to "pay heed to the clear expressions of national policy" as expressed in PRWORA and the President's Executive Orders 14218 and 14159. *Id.* at 21,237.

## F.    Department of Education PRWORA Notice

118.    On July 11, 2025, ED issued its Notice (the "ED PRWORA Notice"). Clarification of Federal Public Benefits under the Personal Responsibility and Work Opportunity Reconciliation Act, 90 Fed. Reg. 30,896 (July 11, 2025).

119.    The ED PRWORA Notice reverses the interpretation set forth in the department's 1997 Dear Colleague Letter and identifies two new programs as subject to PRWORA. 90 Fed. Reg. at 30,896.

120.    Rather than reading the statute as covering only "postsecondary" education benefits as the agency always had before, the Notice asserts for the first time that the statute covers: (1) all education benefits provided to adults ("postsecondary education benefits or otherwise"), and (2) all education benefits provided to children except "basic public education benefits." *Id.* at 30,899.

121.    The ED PRWORA Notice then interprets PRWORA to apply to two programs that expressly include secondary education benefits: (1) "benefits provided to individuals under programs authorized under Title II of the Workforce Innovation and Opportunity Act of 2014 (WIOA)"; and (2) "career and technical education (CTE) programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006, as amended (Perkins V)." *Id.*

122.    Both WIOA Title II and Perkins V are grants provided to States, including Plaintiff States. *See id.* at 30,899–900.

123.    The ED PRWORA Notice states that "in this interpretive rule, the Department announces how it interprets PRWORA with respect to certain Department programs; however, just because a program is not specifically mentioned herein does not mean the program does not have obligations under PRWORA." *Id.* at 30,900 n.3.

124.    The ED PRWORA Notice states that "[t]he Department may, but *is not required to*, exercise its enforcement discretion to refrain from taking actions against grantees in certain circumstances, such as for programs not mentioned in this interpretive rule." *Id.* (emphasis added).

125.    The ED PRWORA Notice acknowledges that, under 8 U.S.C. § 1642(d), non-profit organizations are not required to verify eligibility. *See id.* at 30,900. However, the ED PRWORA Notice states that this "exemption . . . is narrowly crafted," and "the Department does not interpret 8 U.S.C. § 1642(d) to relieve states or other governmental entities involved in the administration of 'Federal public benefits' from the requirements to ensure that all relevant programs are in compliance with PRWORA (even when some or all educational services are ultimately provided by a nonprofit charitable organization)." *Id*.

126.    The ED PRWORA Notice states: "Interpretive rules cannot have effective dates. Rather, this interpretive rule informs the public of the Department's interpretation of the law. . . .

The Department may, *but is not required to*, exercise its enforcement discretion to refrain from taking actions against grantees in certain circumstances." *Id.* (emphasis added).

127.    The ED PRWORA Notice states: "This interpretation represents the Department's current position on the issue and may be referenced when enforcing or monitoring grantee and subgrantee compliance with PRWORA." *Id.*

128.    The Department of Education's press release states that "In general, the Department does not have any plans to take enforcement actions against any grantee or subgrantee under PRWORA prior to August 9, 2025." Press Release, U.S. Department of Education Ends Taxpayer Subsidization of Postsecondary Education for Illegal Aliens," July 10, 2025, available at https://www.ed.gov/about/news/press-release/us-department-of-education-ends-taxpayer-subsidization-of-postsecondary-education-illegal-aliens.

## G.    Department of Labor PRWORA Notice

129.    On July 10, 2025, the DOL issued its notice—"Training and Employment Guidance Letter No. 10-23, Change 2" (the "DOL PRWORA Notice"), *available at* https://www.dol.gov/sites/dolgov/files/ETA/advisories/TEGL/2023/TEGL%2010-23%20Change%202/TEGL%2010-23%20Change%202.pdf.

130.    The DOL PRWORA Notice reverses the interpretation set forth in the 2024 DOL Notice, identifying seven sets of programs as now subject to PRWORA.

131.    Rather than distinguishing which services are covered based on the nature of the benefits provided, the Notice asserts simply—and without elaboration—that "all participant-level services are considered 'federal public benefits' under PRWORA" because "their overall goal is to move participants into gainful employment." *Id.* at 3.

132.    The DOL PRWORA Notice does not define "participant-level services."

133.    Instead, the DOL PRWORA Notice cites to Attachment II of TEGL 19-16, "Guidance on Services through the Adult and Dislocated Worker Programs under the Workforce Innovation and Opportunity Act (WIOA) and the Wagner-Peyser Employment Service (ES), as amended by title III of WIOA, and for Implementation of the WIOA Final Rules," ("TEGL 19-16 Attachment II") *available at*

https://www.dol.gov/sites/dolgov/files/ETA/advisories/TEGL/2017/TEGL_19-16_Attachment_II.pdf.

134.    TEGL 19-16 Attachment II also does not define "participant-level services." The table in Attachment II, however, suggests that services that "trigger inclusion in participation" (indicated by a Yes or No in column two) comprise "participant-level services," distinct from self-service or information-only services and activities.

135.    The DOL PRWORA Notice applies to "[e]ntities receiving grants under the following programs":

- Workforce Innovation and Opportunity Act (WIOA) Title I Adult, Dislocated Worker, and Youth programs (including statewide employment and training services funded by the Governor reserve);

- WIOA National Dislocated Grants (DWGs);

- Wagner-Peyser Act (W-P) Employment Service;

- Reentry Employment Opportunities (REO) and other programs authorized under Section 169 of WIOA;

- YouthBuild;

- Section 167 Migrant and Seasonal Farmworker Program, also commonly referred to as the National Farmworker Jobs Program (NFJP); and

- the Senior Community Service Employment Program (SCSEP).

DOL PRWORA Notice at 1.

136.    The DOL PRWORA Notice states that recipient entities "must review and revise policies, documentation requirements, and procedures to align with this guidance." *Id.*

137.    While the February 2024 guidance aimed to "provide grant recipients direction in developing policies, procedures, and practices that reduce unnecessary administrative barriers," the barebones purpose statement of the DOL PRWORA Notice reads: "This guidance provides direction regarding work authorization verification for grant programs administered by the Employment and Training Administration (ETA)." *Id.*

## H.    Harm to Plaintiff States

138.    In service of its campaign to target undocumented people at virtually any cost, Defendants have upended the delivery of critical services to citizens and noncitizens alike in the Plaintiff States. The harms to the States include both proprietary injuries due to the costs imposed by the upheaval and sovereign injuries to the States' ability to maintain their social safety nets—regimes Plaintiff States carefully designed in reliance on a longstanding federal-state balance that was radically transformed with nearly no notice.

139.    *First*, Plaintiff States face imminent risk of enforcement for noncompliance with the PRWORA Notices, which each implicitly or explicitly threaten enforcement for noncompliance.

140.    The HHS, ED, and DOL PRWORA Notices went into immediate effect when they were issued between July 10 and July 14 of 2025. States had no notice that they were going to have to comply immediately with the Notices and no time to establish the processes necessary for compliance, even if they believed the new obligations were lawful. As a result, Plaintiffs' programs faced the risk of enforcement action from Defendants as soon as those Notices were issued.

141.    ED has said that, "in general," it "does not have any plans to take enforcement actions" before August 9, 2025, although it does not disclaim the ability to do so.

142.    Plaintiffs risk enforcement due to the DOJ PRWORA Notice after it becomes effective on August 15, 2025.

143.    The PRWORA Notices specifically reference enforcement. For example, the ED PRWORA Notice states that the guidance "may be referenced when enforcing . . . grantee and subgrantee compliance with PRWORA" and that the Department of Education may take enforcement action even for programs that are *not* designated in the Notice and suggests that the agency may do so retroactively. 90 Fed. Reg. at 30,900 & n.3.

144.    The Executive Order specifically directs agencies to take enforcement action. Specifically, it directs agencies to "refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action."

145.    None of the PRWORA Notices clarify what obligation, if any, States have to verify for programs operated by nonprofits, except the ED PRWORA Notice, which provides that States must do so for "all relevant programs." 90 Fed. Reg. at 30,900. States are thus at risk of enforcement not only for their own programs, but also for an undefined set of nonprofit-run programs which themselves have no verification requirement.

146.    Plaintiff States receive billions of dollars in federal funding under the Notices' newly designated programs. The Notices threaten enforcement that would jeopardize that critical funding.

147.    *Second*, Plaintiff States are harmed by the costs of compliance with the verification requirements imposed by the PRWORA Notices.

148.    Plaintiff States' programs cannot immediately implement verification processes that comply with the PRWORA Notices. Creating those processes will take significant state agency staff time and money. The HHS PRWORA Notice's Regulatory Impact Statement acknowledges this, estimating costs of compliance of over $100 million.

149.    Implementing verification processes will also require training. Whether a person is a "qualified alien" under the statute is a complex determination that cannot be made by an untrained individual and would require the person making the determination to distinguish between various immigration statuses such as asylum applicants with work authorization and individuals who have student visas.

150.    For example, workforce development programs funded by the Department of Labor, such as WorkSource centers in Washington State, are not trained or equipped to conduct immigration status verification.

151.    It is likely that for some programs, the costs of compliance will be so high as to lead to the programs' closure. Many Head Start programs are small entities that operate on razor-thin margins and are likely to close if facing a significant administrative burden.

152.    *Third*, the PRWORA Notices will reduce or eliminate the ability of Plaintiff States' social services programs to meet their core missions, which will cause negative impacts on public health, safety, and welfare that ultimately harm not only Plaintiff States' neediest residents but also Plaintiff States themselves.

153.    Many of the programs affected by these Notices serve the most vulnerable residents of Plaintiff States, who rely on those programs to meet their basic daily needs.

154.    The Notices are likely to chill many who are lawfully present and eligible to receive benefits, including U.S. citizens, from accessing services from which they would benefit.

155.    These programs are relied on by many low-income U.S. citizens and lawful residents who lack government identification and, thus, would be unable to provide documentation of their citizenship. Even if immigration status and documentation do not provide insuperable barriers, the additional disclosure of personal information is likely to turn some off from accessing services. Many of these programs are set up to serve underserved populations, precisely the populations who will be deterred due to documentation requirements.

156.    As a result of the Notices' deterrent effect, Plaintiff States' programs will have reduced efficacy and ability to meet their core missions.

157.    Further, some of Plaintiff States' programs that are affected by the Notice are fundamentally incompatible with immigration status verification. For those programs, the Notices will not just reduce, but fully eliminate, their ability to meet their core purpose.

158.    For example, the HHS PRWORA Notice will affect soup kitchens run through the Community Services Block Grant program, meaning that—according to the Notice—soup kitchens must undergo the complex process of verifying immigration status before allowing someone to enter and eat.

159.    As a result, the Notices will dramatically affect Plaintiff States' key community programs by reducing and eliminating their ability to provide services to fulfil their core missions in the ways described above.

160.    Plaintiff States' residents' health and welfare will be harmed when they are unable to access key programs affected by the Notices such as health clinics, family planning services, mental health services, soup kitchens, literacy programs, and job training programs.

161.    Harm to Plaintiff States' residents' health and welfare will also cause harm to Plaintiff States, who will be left footing the bill for their residents' unmet needs.

162.    HHS appears to admit this will be the case, noting that the Notice will "shift[]" funding, requiring payments by "providers of charity care" or "jurisdictions that reimburse providers for uncompensated care." Final Regulatory Impact Analysis at 11 n.19.

163.    As an example, the Title X program provides funding for State entities that provide comprehensive and confidential family planning services and preventive care, focused on providing essential services who otherwise would lack access to healthcare, such as contraceptive services, cancer screenings, STI testing, mammograms, and wellness exams. Because of the HHS notice, the States could lose funding for their Title X programs, face financial uncertainty, and ultimately the burden of covering Title X services will shift to the States. If the program has to verify immigration status, fewer residents of Plaintiff States will get important healthcare. People who are unable to access basic preventive healthcare inevitably enter the healthcare system at far less optimal and more complex and expensive points—usually when they are sicker and often at emergency rooms.

164.    Further, the DOJ Notice poses additional harms by removing the safe harbor for state agencies and service providers to legally provide services necessary for the protection of life or safety without consideration of the recipient's immigration status, creating ambiguity in the law that will deter both providers and recipients of services from participating in life-saving programs.[4] This uncertainty has triggered a chilling effect on both state agencies and frontline providers

---

[4] Despite the fact that the DOJ Notice threatens enforcement after 30 days, the Attorney General may lack the authority to take enforcement action against states for failing to verify. By statute, a "a State that administers a program that provides a Federal public benefit shall have in effect a verification system that complies with the regulations" "not later than 24 months after the date" those regulations are adopted. 8 U.S.C. § 1642(b). The Attorney General proposed, but has not finalized, regulations on verification. 63 Fed. Reg. 41,662 (Aug. 4, 1998).

administering programs previously understood to be exempt from PRWORA under the Life/Safety Exemption.

165.    As an example, emergency homeless shelters, such as those provided via the Department of Housing and Urban Development's Emergency Solutions Grant Program, would now have to verify immigration status.

166.    *Fourth*, Plaintiff States face sovereign harms because their social safety nets, designed around a longstanding federal-state balance, have been thrown into chaos, preventing the States from seeing to their sovereign prerogative of shielding the public health and community safety.

167.    Since 1997, across the Federal government, agencies have hewed to a single interpretation of "Federal public benefit" under PRWORA. In reliance on that interpretation, States have designed some of their benefits programs to provide services regardless of immigration status. As described above, these programs provide essential services to the most vulnerable, including preventive healthcare, basic nutrition, and early childhood education.

168.    The States have made the policy decision that they benefit from providing these services to all because doing so results in better public health and better economies.

169.    The States accepted federal funds from the government across all of the programs mentioned in this Complaint in reliance on the longstanding interpretation of PRWORA. The States would have weighed the benefits and costs of accepting federal funding differently and would have structured their programs differently if they had known that they would be required to inquire about immigration status in programs that have long offered services regardless of immigration status.

170.    With effectively no notice, Defendants have upset this balance, imposing onerous new immigration status verification requirements that will bring States' social safety nets to the brink of disaster and with which the Plaintiff States could not possibly have complied before they took effect. These Notices threaten the States' programs with immediate enforcement and thus interfere with their ability to advance their sovereign prerogatives with respect to public health and community safety.

**CAUSES OF ACTION**

**Count I**
**Violation of the Administrative Procedure Act – Procedural Violation**
**(Against All Defendants Except U.S. Department of Justice and Attorney General Bondi)**

171.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

172.    HHS, ED, and DOL are "agenc[ies]" under the Administrative Procedure Act (APA). 5 U.S.C. § 551(1).

173.    The APA requires agency rules to undergo notice and comment. *Id.* § 553. Failure to abide by notice-and-comment requirements renders a rule procedurally invalid.

174.    The notice-and-comment requirement "does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(A).

175.    But this exception does not apply here because HHS's, ED's, and DOL's PRWORA Notices are substantive rules or "legislative" rules, not interpretive ones.

176.    "[T]he critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers. The absence of a notice-and-comment obligation makes the process of issuing interpretive rules

comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96–97 (2015).

177.    By contrast, "a substantive rule" is "one affecting individual rights and obligations" such that it "may be binding or have the force of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (internal quotation omitted). And "a rule which 'effect[s] a change in existing law or policy' is legislative." *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C. Cir. 1992) (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983)).

178.    These PRWORA Notices fundamentally change eligibility requirements for federally funded programs providing services to millions of residents of Plaintiff States. Indeed, Defendant HHS admits not only that it is reversing its prior eligibility guidelines, but that the effect of the Notice will be "that numerous unqualified aliens will no longer receive benefits under Federally funded programs." And HHS concedes that the Notice "may result in an annual effect on the economy of $100 million or more," making it a "major rule" under 5 U.S.C. § 804(2).

179.    Because these PRWORA Notices are substantive rules for which Defendants failed to undergo the notice-and-comment procedure, they are invalid.

180.    The PRWORA Notices also failed to undergo notice-and-comment even where required by program-specific statutes or regulations. *See, e.g.*, 42 U.S.C. § 9839(d).

181.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the HHS, ED, and DOL PRWORA Notices violate the APA because they are procedurally invalid.

182.    Plaintiff States are also entitled to vacatur of these PRWORA Notices pursuant to 5 U.S.C. § 706, a stay of Defendants' PRWORA Notices pursuant to 5 U.S.C. § 705, and preliminary and permanent injunctions preventing the Notices' implementation.

**Count II**
**Violation of the Administrative Procedure Act –**
**Arbitrary & Capricious**
**(Against All Defendants Except U.S. Department of Justice and Attorney General Bondi)**

183.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

184.    HHS, ED, and DOL are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

185.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

186.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

187.    That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decision making process." *Id.*

188.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before" it. *Dep't of Homeland Sec. v. Regents of the Univ. of*

*Calif.*, 591 U.S. 1, 25 (2020) (citation omitted); *see also id.* at 30. An agency must "pay[] attention to the advantages *and* the disadvantages" of its decision. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015)

189.    In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33.

190.    The HHS, ED, and DOL PRWORA Notices are arbitrary and capricious because these Defendants failed to provide a reasoned basis or explanation, and their stated reasoning is conclusory.

191.    These PRWORA Notices are arbitrary and capricious because the Defendants failed to consider the consequences of their actions, including the disadvantages of their decisions.

192.    These PRWORA Notices are arbitrary and capricious because they fail to take into account important reliance interests.

193.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that these PRWORA Notices violate the APA because they are arbitrary and capricious.

194.    Plaintiff States are also entitled to vacatur of the HHS, ED, and DOL PRWORA Notices pursuant to 5 U.S.C. § 706, a stay of these PRWORA Notices pursuant to 5 U.S.C. § 705, and preliminary and permanent injunctions preventing the Notices' implementation.

**Count III**
**Violation of the Administrative Procedure Act – Contrary to Law**
**(Against All Defendants Except U.S. Department of Justice and Attorney General Bondi)**

195.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

196.   HHS, ED, and DOL are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

197.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

198.   The HHS, ED, and DOL PRWORA Notices adopt interpretations of PRWORA that are directly contrary to decades of settled agency interpretation. It cannot be that PRWORA now "unambiguously" dictates (as it must to be constitutional) precisely the opposite of what the entire federal government has understood it to mean for decades. *See Arlington*, 548 U.S. at 296. These novel interpretations are riddled with legal errors. The Notices are thus contrary to law, including, but not limited to, in the following ways.

199.   *First*, these PRWORA Notices unlawfully expand the scope of PRWORA by reading it to apply to programs that Congress intended to be generally available to members of the public, regardless of immigration status. Since one day after PRWORA's enactment, DOJ has interpreted the law not to apply to "regular, widely available services," such as paratransit and ambulance services. 61 Fed. Reg. at 45,985–86. And the statute's text makes clear that "Federal public benefits" are limited to benefits that themselves require an application or impose eligibility requirements. *See* 8 U.S.C. §§ 1611(c)(1)(A)–(B), 1642(a), (d). Defendants' contrary interpretation would have breathtaking results. It would justify barring noncitizens from being picked up by ambulances, having their calls answered by emergency dispatchers, or receiving crime victim counseling where those services are supported—as most are—by federal funds. And it would require states and localities to require that every person furnish proof of citizenship or lawful presence before receiving any of those forms of assistance. As decades of unbroken administrative practice confirms, that reading is not correct.

200.    *Second*, these PRWORA notices unlawfully extend PRWORA to services that fall outside the definition of "Federal public benefits." For instance, they construe the Act to include non-postsecondary education benefits such as Head Start, even though the statute's list of Federal public benefits only includes "*postsecondary* education . . . benefits." 8 U.S.C. § 1611(c)(1)(B) (emphasis added). And they construe the Act to cover various forms of counseling and information-providing, even though these benefits are not listed in § 1611(c)(1)(B) and are not "similar" to any of the listed benefits.

201.    *Third,* these PRWORA Notices unlawfully interpret PRWORA to bar noncitizens from accessing programs in their entirety. PRWORA, however, only restricts the eligibility of noncitizens for particular "benefits." *See* 8 U.S.C. § 1611(a), (c)(1)(A)–(B). And DOJ has recognized for decades that "[i]f one program provides several public benefits, [PRWORA]'s requirements apply only to those benefits that are non-exempted federal public benefits under the Act." 62 Fed. Reg. at 61,346. The notices violate PRWORA by failing to distinguish between benefits within a particular program and instead banning noncitizens from programs in gross.

202.    *Fourth*, these PRWORA Notices unlawfully interpret PRWORA to apply automatically to benefits funded by block grants to states and localities. PRWORA only restricts the eligibility of "an alien" for Federal public benefits. 8 U.S.C. § 1611(a). A grant issued to a state or local government therefore does not *itself* trigger any of the Act's prohibitions, because it is not provided to "an alien." Such a grant only triggers PRWORA if it is in turn used by the state or local government to fund payments or assistance to aliens that *themselves* constitute "Federal public benefits" within the meaning of the statute. Because the notices include in the scope of "Federal public benefits" block grants that do not ultimately provide Federal public benefits to "an alien," the notices contradict the plain text of PRWORA.

203.    *Fifth*, these PRWORA notices unlawfully include programs that contain superseding eligibility requirements. PRWORA does not apply where a statute imposes eligibility requirements that are inconsistent with or supersede PRWORA. *See, e.g.*, *Oakley v. DeVos*, No. 20-CV-03215-YGR, 2020 WL 3268661, at *15 (N.D. Cal. June 17, 2020); *Noerand v. Devos*, 474 F. Supp. 3d 394, 403 (D. Mass. 2020). The Notices are unlawful because they include some of those programs. *See, e.g.*, 42 U.S.C. § 254b(a)(1) (providing that public health centers must serve "a population that is medically underserved" by providing "health services . . . for *all* residents of the area served by the center" (emphasis added)).

204.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the HHS, ED, and DOL PRWORA Notices violate the APA because they are contrary to law.

205.    Plaintiff States are also entitled to vacatur of the HHS, ED, and DOL PRWORA Notices pursuant to 5 U.S.C. § 706, a stay of these PRWORA Notices pursuant to 5 U.S.C. § 705, and preliminary and permanent injunctions preventing the Notices' implementation.

**Count IV**
**Constitutional Violation- Spending Clause**
**(Against All Defendants)**

206.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

207.    The Spending Clause of the U.S. Constitution provides that "[t]he Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

208.    Among other requirements, the Spending Clause requires that states must receive "fair notice" of any conditions on the receipt of federal funds. *Arlington*, 548 U.S. at 304. Any

conditions on federal funding must be accepted by States "knowingly and voluntarily." *Id.* (citation omitted). And "States cannot knowingly accept conditions of which they are 'unaware.'" *Id.* at 296. Any condition on the states' acceptance of federal funds must thus be set forth "unambiguously." *Id.* Because PRWORA constitutes a condition on the acceptance of federal funds, any new requirements that Defendants identify in the statute must be set forth "clearly." *Id.*

209.    In addition, any "financial inducement" must not be "impermissibly coercive." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) (plurality opinion). A federal condition "pass[es] the point at which 'pressure turns into compulsion,'" when it threatens a substantial portion of a state's federal funding unless the state accepts a program that is "different in kind, not merely degree" than the one the state previously agreed to join. *Id.* at 581–83.

210.    The PRWORA Notices violate both of these limits on the Spending Clause.

211.    *First*, Defendants did not provide "fair notice" of these changes. "[I]t strains credulity to argue that participating States would have known of their 'obligations' under [a statute] when . . . the governmental agency responsible for the administration of the [statite] and the agency with which the participating States have the most contact, has never understood [it] to impose conditions on participating States." *Pennhurst State Sch. & Hosp.*, 451 U.S. at 25.

212.    The PRWORA Notices impose conditions on the states that they could not possibly have foreseen when accepting federal funding. Plaintiff States have, continuously since the statute was enacted, accepted funds from Defendants pursuant to the understanding of PRWORA and the DOJ-promulgated exemptions that Defendants had adhered to for decades. Those interpretations and exemptions were set forth in formal, authoritative notices. Prior to distributing federal funds, Defendants never hinted that they might revisit those interpretations, much less in such dramatic and immediate ways. These novel interpretations are riddled with legal errors and are plainly not

unambiguously correct interpretations of the statute. Because the Spending Clause does not permit the federal government to "surpris[e] participating States with post acceptance or 'retroactive' conditions," *id.* at 25, the application of Defendants' new conditions to the Plaintiff States is unconstitutional.

213.    Each of the PRWORA notices has suddenly and dramatically upended Defendants' bargains with the Plaintiff States. Defendants now read PRWORA to impose substantially more burdens on the states than they could possibly have foreseen when they accepted funds and committed their own resources to establishing safety net programs in reliance on that settled understanding. And DOJ has rescinded exemptions that have been in place since one day after the statute's enactment. These changes will impose immediate, massive, and unforeseeable compliance costs on states, and require them to either dramatically restructure their programs or forgo federal funding.

214.    *Second*, the PRWORA Notices unconstitutionally coerce the Plaintiff States. Defendants have imposed new conditions on the receipt of funds for dozens of federal programs that comprise core components of the social safety net in many states. Collectively, these funds provide Plaintiff States billions in funding annually. The states could not realistically forgo all of this federal funding—especially in the middle of the grant terms—when states have devised their budgets and designed their programs in reliance on this federal funding.

215.    Yet Defendants have demanded that the states "transform" these programs "dramatically" in order to continue receiving federal funding. *NFIB*, 567 U.S. at 548. They substantially alter which individuals may access these programs; require the development of costly new systems for screening for eligibility; and fundamentally alter the way in which many of these programs will operate. Further, the PRWORA Notices pressure states to alter the way in which

states regulate in traditional areas of states authority—such as foster care, combatting domestic violence, and health care—for the purpose of achieving policy objectives unrelated to the goals of the grants themselves.

216.    The Spending Clause does not give Congress, let alone Defendants, the authority to dictate such coercive terms. The PRWORA Notices are therefore unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

i.    Issue a judicial declaration that the HHS, ED, and DOL PRWORA Notices are unlawful because they violate the Administrative Procedure Act;

ii.    Pursuant to 5 U.S.C. § 706, vacate the HHS, ED, and DOL PRWORA Notices;

iii.    Pursuant to 5 U.S.C. § 705, stay the HHS, ED, and DOL PRWORA Notices in Plaintiff States;

iv.    Issue a judicial declaration that all of the PRWORA Notices violate the Constitution.

v.    Temporarily restrain, and preliminarily and permanently enjoin, Defendants from implementing all of the PRWORA Notices in Plaintiff States[5];

vi.    Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

vii.    Grant other such relief as this Court may deem proper.

---

[5] Plaintiff States include their subdivisions and instrumentalities.

45

Dated: July 21, 2025

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*

Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
Jessica Ranucci*
*Special Counsel*
Zoe Levine*
*Special Counsel for Immigrant Justice*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
zoe.levine@ag.ny.gov
jessica.ranucci@ag.ny.gov

*Attorneys for the State of New York*

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Sarah W. Rice*
Sarah W. Rice (RI No. 10588)
Stephen N. Provazza (RI No. 10435)
*Unit Chief, Consumer & Economic Justice Unit*
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
SRice@riag.ri.gov
SProvazza@riag.ri.gov

*Attorneys for the State of Rhode Island*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: /s/ Andrew Hughes

Andrew Hughes*
Benjamin Seel*
Zane Muller*
*Assistant Attorneys General*
Cristina Sepe*
*Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Andrew.Hughes@atg.wa.gov
Benjamin.Seel@atg.wa.gov
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for the State of Washington*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Hayleigh S. Crawford*
Hayleigh S. Crawford*
Mary M. Curtin*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
Mary.Curtin@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Heidi Lehrman*
Heidi Lehrman*
Neli Palma*

Jennifer L. Sullivan*
*Deputy Attorney General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
jen.sullivan@coag.gov

*Attorneys for the State of Colorado*

Michael L. Newman
*Senior Assistant Attorneys General*
Kathleen Boergers*
Srividya Panchalam*
*Supervising Deputy Attorneys General*
Heidi Lehrman*
Jeanelly Orozco Alcalá*
Natasha A. Reyes*
*Deputy Attorneys General*
1300 I Street
Sacramento CA 95814
Heidi.Lehrman@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov
Natasha.Reyes@doj.ca.gov

*Attorneys for the State of California*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Patricia McCooey*
Patricia McCooey*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov

*Attorney for the State of Connecticut*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia
By: */s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Sarah J. North*
Sarah J. North*
*Deputy Division Chief, Public Interest Division*

Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorney for the District of Columbia*

Holly Berlin*
*Assistant Attorney General, Special Litigation Bureau*
Alexandra Reed*
*Assistant Attorney General, Civil Rights Bureau*
R. Henry Weaver*
*Assistant Attorney General, Special Litigation Bureau*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
Sarah.North@ilag.gov
Holly.Berlin@ilag.gov
Alexandra.Reed@ilag.gov
Robert.Weaver@ilag.gov

*Attorneys for the State of Illinois*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6584
VWilliamson@oag.state.md.us

*Attorney for the State of Maryland*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: /s Kalikoʻonālani D. Fernandes

David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for Plaintiff State of Hawaiʻi*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Bryan Beach*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Brendan Kreckel*
Brendan Kreckel*
By: */s/ Kristin Trabucchi*
Kristin Trabucchi*
*Assistant Attorneys General*
Office of the Attorney General

48

Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
BeachB@michigan.gov

*Attorneys for the State of Michigan*


**AARON D. FORD**
Attorney General for the State of Nevada

By: /s/ Heidi Parry Stern
Heidi Parry Stern*
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorney for the State of Nevada*


**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: /s/ Mark Noferi
Mark Noferi*
*Senior Litigation Counsel*
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov

*Attorney for the State of New Mexico*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
Brendan.kreckel@maine.gov
kristin.k.trabucchi@maine.gov

*Attorneys for the State of Maine*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: /s/ David Ureña
Katherine Dirks
*Chief State Trial Counsel*
Ethan W. Marks*
David Ureña*
Brett M. Gannon*
*Assistant Attorneys General*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2675
david.urena@mass.gov

*Attorneys for the Commonwealth of Massachusetts*


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: /s/ Joseph R. Richie
Joseph R. Richie*
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Attorney for the State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

49

By: /s/ Ryan P. Kane
Ryan P. Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Attorney for the State of Vermont*

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: /s/ Faye B. Hipsman
Faye B. Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov

*Attorney for the State of Wisconsin*

By: /s/ Meghan Musso
Meghan Musso*
Patrick Clancey*
Kathleen Riley*
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5289
meghan.musso@law.njoag.gov

*Attorneys for the State of New Jersey*

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: /s/ Coby Howell
Coby Howell*
*Senior Assistant Attorney General*
Tel (971) 673-1880
Fax (971) 673-5000
coby.howell@doj.oregon.gov

*Attorney for the State of Oregon*

50