## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK; STATE OF WASHINGTON; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as ATTORNEY GENERAL OF THE UNITED STATES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity of THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF EDUCATION; LINDA McMAHON, in her official capacity as SECRETARY OF THE U.S. DEPARTMENT OF EDUCATION; U.S. DEPARTMENT OF LABOR; LORI CHAVEZ-DeREMER, in her official capacity as SECRETARY OF THE. US. DEPARTMENT OF LABOR, <br><br> Defendants. | Case No. 1:25-cv-345 <br><br><br> **PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................ii

PRELIMINARY STATEMENT.......................................................................................... 1

ARGUMENT ...................................................................................................................... 2

   I.    The HHS, ED, and DOL PRWORA Notices Are Final Agency Actions............................ 2

   II.   The HHS, ED, and DOL PRWORA Notices Violated the APA's Procedural Requirements. ...................................................................................................................... 6

   III.  The HHS, ED, and DOL PRWORA Notices Are Arbitrary and Capricious...................... 7

   IV.  The HHS, ED, and DOL PRWORA Notices Are Contrary to Law. ................................ 10

      A.   The HHS PRWORA Notice Is Contrary to Law...........................................................11

      B.   The ED PRWORA Notice Is Contrary to Law.............................................................. 15

      C.   The DOL PRWORA Notice Is Contrary to Law............................................................ 15

   V.    The PRWORA Notices Violate the Spending Clause. ...................................................... 16

      A.   The PRWORA Notices Impose Unforeseeable Post-Acceptance Conditions. ............. 17

      B.   The PRWORA Notices Are Impermissibly Coercive. ................................................... 18

   VI.  Plaintiffs Have Demonstrated Irreparable Harm. ............................................................ 21

   VII. The Balance of the Equities Favor Plaintiffs. ................................................................. 25

   VIII.Plaintiffs' Requested Injunction Should Not Be Narrowed. ............................................ 25

CONCLUSION................................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Min. Cong. v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993) .................................................................................6

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*,
    738 F.3d 387 (D.C. Cir. 2013) ..................................................................................4

*Appalachian Power Co. v. E.P.A.*,
    208 F.3d 1015 (D.C. Cir. 2000) ................................................................................5

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ....................................................................................11, 15, 18

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..................................................................................................2

*Borg-Warner Protective Servs. Corp. v. E.E.O.C.*,
    245 F.3d 831 (D.C. Cir. 2001) ..................................................................................5

*Bostock v. Clayton County*,
    590 U.S. 644 (2020) ................................................................................................10

*California Cmtys. Against Toxics v. E.P.A.*,
    934 F.3d 627 (D.C. Cir. 2019) ...............................................................................2-3

*California v. E.P.A.*,
    940 F.3d 1342 (D.C. Cir. 2019) ................................................................................5

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ..................................................................................................4

*City & Cnty. of San Francisco v. Trump*,
    No. 25-CV-01350-WHO, 2025 WL 1282637 (N.D. Cal. May 3, 2025) ............22, 24

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    452 F.3d 798 (D.C. Cir. 2006) ..................................................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    591 U.S. 1 (2020) ................................................................................................9-10

ii

*Env't Def. Ctr. Inc. v. E.P.A.*,
344 F.3d 832 (9th Cir. 2003) ................................................................20

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ..............................................................................7

*Food & Drug Admin. v. Wages & White Lion Invs, L.L.C.*,
145 S. Ct. 898 (2025) ............................................................................8

*Frozen Food Express v. United States*,
351 U.S. 40 (1956) .................................................................................3

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................................................................27

*Levesque v. Block*,
723 F.2d 175 (1st Cir. 1983) .................................................................9

*Loper Bright Enters. v. Raimonda*,
603 U.S. 369 (2024) .............................................................................11

*Marcello v. Bonds*,
349 U.S. 302 (1955) .............................................................................14

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ...............................................................................6

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................8

*Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*,
763 F. Supp. 3d 36 (D.D.C. 2025) ........................................................5

*Nat'l Fed. of Indep. Bus. v. Sebelius (NFIB)*,
567 U.S. 519 (2012) ..................................................................... 16, 18-19

*New Hampshire Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021) .................................................................23

*New York v. United States Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) ............................................................. 23-24

*Noerand v. DeVos*,
474 F. Supp. 3d 394 (D. Mass. 2020) .................................................14

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ............................................................................ 16-17

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) .............................................................................. 3, 8

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) ................................................................................. 4

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ............................................................................. 19

*State of New York v. United States Department of Education*,
    No. 25-1424, ECF No. 40 (2d Cir. June 20, 2025) ............................. 27

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................... 6

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ............................................................ 5, 7

*U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ............................................................................... 3

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) ............................................................................. 23

*Warder v. Shalala*,
    149 F.3d 73 (1st Cir. 1998) .................................................................... 7

*Weaver v. Henderson*,
    984 F.2d 11 (1st Cir. 1993) .................................................................. 26

**Federal Statutes**

5 U.S.C.
    § 705 ................................................................................................... 27
    § 706 ................................................................................................... 27

8 U.S.C.
    § 1611 ........................................................................................... *passim*
    § 1642 ....................................................................................... 11, 13, 22

20 U.S.C.
    § 2301 ................................................................................................. 15

§ 2302 ................................................................................................................15

29 U.S.C.
§ 3271 ................................................................................................................15

42 U.S.C.
§ 254b ...............................................................................................................14
§ 9831 ...............................................................................................................13

**Federal Regulations**

61 Fed. Reg. 45,985 (Aug. 23, 1996) ................................................................12

63 Fed. Reg. 41,658 (August 4, 1998) ..............................................................13

66 Fed. Reg. 3613 (Jan. 16, 2001) ....................................................................12

90 Fed. Reg. 10,581 (Feb. 25, 2025) .................................................................23

90 Fed. Reg. 30,896 (July 11, 2025) ............................................................2, 22

90 Fed. Reg. 31,232 (July 14, 2025) ..........................................................*passim*

90 Fed. Reg. 32,023 (July 16, 2025) ......................................................2, 20, 22

90 Fed. Reg. 34,877 (July 24, 2025) .................................................................19

**Miscellaneous Authorities**

149 Cong. Rec. S12986 (Sept. 8, 1995) ...........................................................12

Congressional Research Service, Labor, Health and Human Services, and Education:
FY2024 Appropriations (Nov. 4, 2024) ...........................................................19

U.S. Department of Education Ends Taxpayer Subsidization of Postsecondary Education
for Illegal Aliens (July 10, 2025) .......................................................................2

## <u>PRELIMINARY STATEMENT</u>

Defendants' decisions to overturn the decades-old understanding of PRWORA overnight without any public input has wreaked havoc, affecting dozens of vital community programs, millions of people, and billions of dollars in funding to Plaintiff States. Defendants now seek to disclaim the consequences of their actions by characterizing as "speculative" the severe and imminent harms stemming from their Notices, which are documented in dozens of sworn declarations, and going so far as to suggest that the Notices do not have "legal force" and that any enforcement is "hypothetical." But Defendants never disclaim an intent to enforce the Notices against Plaintiffs. So Defendants must now reap what they have sown: their Notices have thrown Plaintiffs' safety nets into chaos. Because those Notices are unlawful and will irreparably harm Plaintiffs and the public interest, they should be enjoined.

Defendants offer little to defend their actions other than suggesting that the Notices' day of reckoning has yet to come (Defendants have also agreed to maintain the status quo through September 10, 2025, *see* ECF No. 46 (Stipulation)). As to the key statutory question, the meaning of "Federal public benefit" in PRWORA, Defendants simply regurgitate the Notices' flawed and limited reasoning. And Defendants continue to ignore the devastation the Notices will cause to lifesaving programs for *everyone*—not just newly-excluded noncitizens—when soup kitchens, mental health crisis services, domestic violence shelters, and many other programs must turn away everyone who fails to produce proof of citizenship.

Plaintiffs are thus entitled to an injunction requiring Defendants to maintain the twenty-nine year status quo of PRWORA through the pendency of this litigation.

## ARGUMENT

### I.    The HHS, ED, and DOL PRWORA Notices Are Final Agency Actions.

The PRWORA Notices are final agency actions. Pls.' Mot. For Prelim. Inj. ("Mot."), ECF No. 2 at 39. They plainly "mark the consummation" of agency decision-making and determine "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). By their terms, the Notices reversed nearly three decades of Defendants' own precedent to dramatically constrict eligibility requirements for critical federal programs like Head Start, Title X, community health clinics, job counseling, and other services. Millions of people who were eligible for these services one day were suddenly not the following day, based entirely on Defendants' Notices. *See* 90 Fed. Reg. 31,232, 31,238 (July 14, 2025). And Defendants expect States that accept and disburse federal funds to immediately abide by the new requirements. *See id.* (HHS Notice "effective immediately."); 90 Fed. Reg. 30,896, 30,900 (July 11, 2025) (ED's Notice "may be referenced when enforcing . . . compliance").[1] By any measure, these Notices are final, subject to review under the APA.

Defendants do not dispute that the PRWORA Notices reflect the completion of the agencies' decisionmaking process. Instead, they contend the Notices are merely "interpretive rules" that set out the agencies' thinking. Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Opp'n"), ECF No. 48 at 13-16. But even if the rules were properly classified as interpretive, the Supreme Court has recently "affirm[ed] that interpretive rules can be final." *California Cmtys. Against*

---

[1] Two Notices indicated a thirty-day delay—one in effectiveness (DOJ) and one in enforcement (ED)—but that thirty-day period has already elapsed. 90 Fed. Reg. 32,023, 32,025 (July 16, 2025) (DOJ Notice effective in 30 days, August 15, 2025); U.S. Department of Education Ends Taxpayer Subsidization of Postsecondary Education for Illegal Aliens (July 10, 2025), *available at* https://www.ed.gov/about/news/press-release/us-department-of-education-ends-taxpayer-subsidization-of-postsecondary-education-illegal-aliens ("In general, the Department does not have any plans to take enforcement actions against any grantee or subgrantee under PRWORA prior to August 9, 2025.").

*Toxics v. E.P.A.*, 934 F.3d 627, 635 (D.C. Cir. 2019) (citing *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)). Thus, "the test for finality is independent of the analysis for whether an agency action is a legislative rule rather than an interpretive rule." *Id.* In *Perez v. Mortgage Bankers Association*, the Court specifically stated that an "interpretive rule" is subject to "a variety of constraints on agency decisionmaking—the arbitrary and capricious standard being the most notable." 575 U.S. at 105-06. And the Court reaffirmed this principle again in *U.S. Army Corps. of Engineers v. Hawkes Co., Inc.*, explaining that, in a prior case, an order that gave "notice of how [an agency] interpreted the relevant statute, and would have effect only if and when a particular action was brought against a particular [regulated entity]" was final agency action because it warned entities that they violated the notice "at the risk of incurring criminal penalties." 578 U.S. 590, 599-600 (2016) (cleaned up) (citing *Frozen Food Express v. United States*, 351 U.S. 40, 44-45 (1956)). Defendants suggest otherwise only by citing a line of D.C. Circuit cases that preceded *Perez*, *Hawkes*, and the D.C. Circuit's subsequent clarification of the law on this precise point. *Compare* Opp'n 13-14, *with California Cmtys.*, 934 F.3d at 634 ("clarify[ing] the proper text for finality," which had "become blurred amidst the 'considerable smog'"). And as Plaintiffs have shown, the Notices meet the ordinary, "pragmatic" standard for finality not only by rendering millions of people ineligible for government programs, but also by setting forth positions that Plaintiffs must "heed" or else suffer "the risk of significant . . . penalties" —namely, the loss of billions of dollars in federal funding. *California Cmtys.*, 934 F.3d at 637 (cleaned up) (quoting *Hawkes*, 578 U.S. at 599).

In any event, as Plaintiffs already explained in detail, Defendants are wrong that these rules are merely interpretive. Defendants did not *merely* change their interpretation of a statute—they also reversed decades-long precedent to provide that millions of people are no longer eligible for

3

dozens of government-funded programs and specifically identified the individual programs for which those people would no longer be eligible immediately upon the Notices taking effect. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) ("[A] substantive rule" is "one affecting individual rights and obligations" such that it "may be binding or have the force of law." (internal quotation marks omitted)).

None of Defendants' cited cases help them. As noted, nearly all of them have been superseded by intervening law, but even if they did apply, they would not support Defendants' position. *American Tort Reform Association* concerned a paragraph in an OSHA manual setting forth OSHA's views regarding "the preemptive effect of the OSH Act"—an issue "[t]he parties agree[d] . . . OSHA lack[ed] legal authority to determine." *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 390 (D.C. Cir. 2013). Here, Defendants' PRWORA Notices set new eligibility requirements for programs that the Defendants themselves administer. *Guernsey Memorial Hospital* involved internal Medicaid accounting guidance and principally stands for the (here irrelevant) proposition that in making reimbursement decisions, Medicaid is entitled "to resolve certain reimbursement issues by adjudication and interpretive rules, rather than by regulations that address all accounting questions in precise detail." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 89–90 (1995). It is a far cry from this case, which concerns eligibility guidelines for federal programs. Moreover, the Court there noted that "APA rulemaking would . . . be required if" the guidance in question "adopted a new position inconsistent with any of the Secretary's existing regulations." *Id.* at 100. Which is what happened here. Mot. 41–43. *Center for Auto Safety* is similarly inapt. That case concerned "*guidelines*, not binding regulations," reflecting the agency's view on an issue in "general," "conditional," and "flexible" terms that did "not command[ ], require[ ], order[ ], or dictate[ ]" anything and left the agency "free to exercise

4

discretion . . . in enforcing the" law. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 809 (D.C. Cir. 2006) (emphasis in original); *see also Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, 763 F. Supp. 3d 36, 54 (D.D.C. 2025). Here, by contrast, the PRWORA Notices are clear and directive; neither Plaintiffs nor the agencies are free to apply or disregard them as circumstances dictate.

Lastly, Defendants do find a reasonably close analogue in *Syncor*: that case involved FDA changing its mind about whether a particular class of drug fell within the scope of the Food, Drug, and Cosmetic Act so that, like here, things that "clearly fell within the scope" of a statutory category "are thought no longer to fall within that scope." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997). But the outcome there is *exactly the opposite* of what Defendants urge here. There, the D.C. Circuit concluded that FDA's about-face was substantive, not interpretive. *Id.*[2]

Defendants also miss the mark in trying to downplay the very real legal consequences of their new rules by deriding the Plaintiff States' so-called "voluntary compliance." Opp'n 14. With their new PRWORA Notices, Defendants have set new eligibility requirements for their programs, which they clearly expect States to abide by in administering the programs—creating "enforceable rules for regulated parties" that would not exist absent the Notices. *Compare Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (finding action final where agency had "given the States their 'marching orders' and . . . expect[ed] the States to fall in line") *with California v. E.P.A.*, 940 F.3d 1342, 1352-53 (D.C. Cir. 2019) (characterizing compliance as "voluntary" when

---

[2] *Borg-Warner*, which Defendants cite, is not about interpretive rules at all. *Borg-Warner Protective Servs. Corp. v. E.E.O.C.*, 245 F.3d 831, 836 (D.C. Cir. 2001) ("[A]n EEOC determination of reasonable cause is not final agency action because standing alone, it is lifeless and can fix no obligation nor impose any liability on the plaintiff.") (quotation omitted).

States acted "based on their prediction" of what would be contained in "forthcoming final rule"). This is the "clearest case" when a rule is substantive, not interpretative: "where, in the absence of [the] . . . rule by the agency, the legislative basis for agency enforcement would be inadequate." *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993). Plaintiffs cannot be required to disobey the rules, and risk clawbacks, sanctions, or other consequences, in order to challenge them. *See, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat[.]") (emphasis in original); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

Nor may Defendants avoid judicial review by claiming their Notices do not have legal consequences insofar as "the Notices do not require adoption of specific verification methods and do not identify any consequences that will follow failure to verify." Opp'n 14. It is true that the Notices fail to provide Plaintiffs guidance about *how* they are supposed to implement Defendants' sudden policy change. But that does not mean Plaintiffs are not obligated to comply—indeed, it just means they have to comply with a problematically vague directive. If Defendants could evade review in circumstances like this one, regulated parties would be left unable to challenge rules until it was far too late—possibly not until they were already facing costly enforcement proceedings—and paradoxically where an agency has chosen not to provide clear guidance. As long as Defendants have set new eligibility criteria with which they expect Plaintiffs to comply, they cannot seriously contend that the rules lack legal consequences.

## II.  The HHS, ED, and DOL PRWORA Notices Violated the APA's Procedural Requirements.

For the same reason, Defendants are wrong that the PRWORA Notices were immune from notice-and-comment rulemaking. Here again, Defendants' only defense is that their rules are

interpretive. And here again, because the new rules dramatically change eligibility requirements for foundational federal programs, stripping benefits from millions of people, and affecting the economy to the tune of over $100 million, they are substantive. *See* 90 Fed. Reg. at 31,238.

Defendants make two responses. Neither is persuasive.

First, they contend that "[a] rule is not [substantive] merely because the agency has changed its interpretation of a statute." Opp'n 15. That is true enough, but it does not describe what happened here. Defendants substantively reversed the eligibility requirements for millions of people. *See Syncor*, 127 F.3d at 95; *cf. Warder v. Shalala*, 149 F.3d 73, 80 (1st Cir. 1998) ("[A] rule is exempt from notice and comment as an interpretative rule if it does not 'effect a substantive change in the regulations.'" (quoting *Guernsey Mem'l Hosp.*, 514 U.S. at 100)).

*Second*, Defendants note that "the guidance documents that the PRWORA Notices supersede were likewise issued without notice and comment" and quip that "Plaintiffs do not suggest that those original notices were procedurally invalid." Opp'n 15. Whatever Defendants did or did not do with respect to their original PRWORA notices nearly three decades ago, they have maintained consistent eligibility requirements for their programs basically since PRWORA was enacted—until last month, when they suddenly deemed millions of people newly ineligible for federal programs. Their new rule curtailing eligibility for federal programs was plainly substantive. As such, their failure to go through the notice and comment process requires vacatur of the PRWORA Notices.

### III.    The HHS, ED, and DOL PRWORA Notices Are Arbitrary and Capricious.

The PRWORA Notices are arbitrary and capricious because the new interpretations of PRWORA are neither "reasonable [nor] reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021). Defendants' insistence that the "Notices all include extensive

discussions and explanations of the agencies' revisions" and "amply describe the basis for those interpretations," Opp'n 26, does not bear scrutiny. Defendants' broad-brush revision of decades-old guidance is not tied to any factual developments in the interim, and Defendants do not explain why most of the newly listed programs are now subject to PRWORA—nor address glaring inconsistencies in their treatment of similar programs. S*ee* Mot. 48–50; *see infra* 11-12 (noting that DOJ includes generally available programs but HHS does not); Opp'n 24-25 (stating, without explanation, that DOL includes some workforce-training programs but excludes those with "light-touch services"). The authority Defendants call on in support of this unreasoned approach actually cuts against their position. *See Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 34 (1983) (cited at Opp'n 26) (agency's "fail[ure] to present an adequate basis and explanation for rescinding" automobile regulation was arbitrary and capricious).

Furthermore, the Notices are arbitrary and capricious because they refuse to take into account reliance interests or consider any of the severe drawbacks of the agencies' changes in position. *See Food & Drug Admin. v. Wages & White Lion Invs, L.L.C.*, 145 S. Ct. 898, 917-18 (2025) (when an agency changes position, including by "disavow[ing] prior inconsistent agency action as no longer good law," it must "provide a reasoned explanation for the change" and "consider serious reliance interests" (cleaned up)); *cf. Perez*, 575 U.S. at 105-06 (an agency cannot evade review by "issu[ing] an interpretive rule" rather than a substantive one because an interpretive rule is subject to "the arbitrary and capricious standard" and the agency must "provide more substantial justification . . . when its prior policy has engendered serious reliance interests that must be taken into account"). Defendants do not address Plaintiffs' arguments that the Notices are arbitrary because they fail to take into account the significant costs they impose, including the

costs of compliance, Mot. 46; because the Notices' verification requirements will exclude many eligible people who simply lack documentation, undermining the core purpose of the Notices to direct benefits to American citizens, *id.* at 46-47; and because the verification requirements' severe burdens will likely force many programs to close, *id.* at 47–48.[3]

Defendants instead contend that they were free to ignore any and all reliance interests or other practical costs because they concluded the prior interpretations were unlawful. Opp'n 27. But that argument is incompatible with the Supreme Court's holding in *Regents* that the agency's conclusion that DACA was "illegal" and "must cease immediately" did *not* excuse it from the obligation to consider "reliance interests" or weigh alternative means of accommodating those interests. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). Defendants' attempt to distinguish *Regents* on the basis that "DACA recipients had no statute to rely on," Opp'n 27, makes no sense: the agency's theory in *Regents* was that DACA was illegal and could be revoked without explanation. As Defendants' reliance on the views of the dissenters indicates, *see* Opp'n 27 (quoting *Regents*, 591 U.S. at 60 (Thomas, J., concurring in the judgment in part and dissenting in part), that position did not prevail. And much as in *Regents*, Defendants have stated that their new positions will be effective immediately, without considering alternatives such as periods of forbearance, wind-downs, exceptions, or other ways of accommodating the massive reliance interests Defendants have upended. *See Regents*, 591 U.S. at 32-33 (majority

---

[3] How HHS's post-promulgation comment period has played out underscores the stakes of the error Defendants made here. There are over *half a million* comments submitted to HHS. *See* Regulations.gov, Docket AHRQ-2025-0002-0001. These comments show not only that there is tremendous public interest in the PRWORA Notices, but also the broad range of harms Defendants should have considered, but did not, when issuing the Notices. (The law is clear that these post-promulgation comments are not an adequate substitute for standard notice and comment, as now, there is no way for those comments to "feasibly influence" the HHS PRWORA Notice and no reason that HHS will "pay attention" to them at all. *Levesque v. Block*, 723 F.2d 175, 187-88 (1st Cir. 1983).).

opinion). Defendants' suggestion that the agencies "may" consider some of those possibilities in post-hoc program guidance, *see* Opp'n 27, only confirms that they acted arbitrarily by failing to consider them before taking final agency action. *See Regents*, 591 U.S. at 20-22 (noting the "foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action" and refusing to consider "impermissible *post hoc* rationalizations" (quotations omitted)).

The other cases cited by Defendants (Opp'n 27–28) are easily distinguishable. In *Rust v. Sullivan*, HHS justified its revision of guidance based on extensive factual findings, including reports from the General Accounting Office and Office of Inspector General and examination of "client experience under the prior policy." 500 U.S. 173, 187 (1991). No such factual basis was relied upon here. Likewise, in *Department of Commerce v. New York*, as "required," the decisionmaker reviewed agency analysis and data, "consider[ing] the evidence and giv[ing] reasons for [its] chosen course of action." 588 U.S. 752, 777 (2019). Here, the agencies did not make a "value-laden decision," *id.*, as to how to weigh reliance against their views of the law, Opp'n 28; they simply refused to consider any of the interests on one side of the balance.[4] Defendants' Opposition therefore fails to show that the Notices are not arbitrary and capricious.

## IV.    The HHS, ED, and DOL PRWORA Notices Are Contrary to Law.

Plaintiffs are also likely to succeed on the merits of their claims that the HHS, ED, and DOL PRWORA Notices are contrary to law. Defendants do not dispute that these notices adopt interpretations of PRWORA that contradict the understandings of the statute that have prevailed since its enactment. *See* Mot. 6–11. Nor do they contest that those contemporaneous, longstanding

---

[4] The Defendants' final citation, to *Bostock v. Clayton County*, 590 U.S. 644, 666 (2020), is particularly inapposite: that employment discrimination case bears no relation to the APA.

constructions of PRWORA are "entitled very great respect," *Loper Bright Enters. v. Raimonda*, 603 U.S. 369, 386 (2024), and that—as the parties proffering the more burdensome interpretation of a Spending Clause enactment—Defendants must show that their newfound interpretations are "unambiguously" correct, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (citation omitted); *see* Opp'n 28–29 (acknowledging this principle).

Defendants fail to surmount these high interpretive hurdles. Instead, they largely repeat without elaboration the explanations contained in the Notices themselves, without acknowledging or engaging with the bulk of Plaintiffs' explanations as to why those interpretations are incorrect. And what few responses Defendants do offer are without merit.

**A.  The HHS PRWORA Notice Is Contrary to Law.**

*i. Benefits generally available to the public*. As Plaintiffs' Motion explained, the HHS PRWORA Notice contradicts the text of PRWORA, its legislative history, and decades of administrative practice by extending the statute to generally available benefits that members of the public can receive without "applying" or falling within a statutory "eligibility unit." 8 U.S.C. §§ 1611(c)(1)(B), 1642(a)(1); *see* Mot. 52–56. Defendants engage with none of Plaintiffs' textual, structural, or historical arguments. Indeed, Defendants themselves describe one ED program as provided to an "'individual' eligibility unit as defined under 8 U.S.C. 1611(c)(1)(B), Opp'n 18, undercutting HHS's core textual theory that this term only modifies the term "family," 90 Fed. Reg. at 31,234.

Rather than engaging with text or structure, Defendants merely claim that, from 1996 until last month, the Attorney General exempted generally available benefits in the "exercise of her discretionary authority," suggesting that the statute would apply to such benefits absent an exemption. Opp'n 22. In fact, the Attorney General said precisely the opposite. The 1997 DOJ notice says, "I do not construe the Act to preclude aliens from receiving . . . regular, widely

11

available services and, for that reason, I am not making specifications of such programs" under the statute's exemption authority. 61 Fed. Reg. 45,985, 45,985 (Aug. 23, 1996). The Attorney General repeated that language verbatim in the 2001 notice. 66 Fed. Reg. 3613, 3616 (Jan. 16, 2001). And in the very notice at issue in this case, she maintains that PRWORA does not reach police, fire, ambulance, transportation and sanitation services—all generally available services. *See* 90 Fed. Reg. 32,2023, 32,026 (July 16, 2025). Defendants either ignored or were unaware of this longstanding interpretation. And they offer no reasoning as to why HHS now believes PRWORA reaches generally available benefits, in direct contradiction of DOJ's decades-old view.

*ii. Non-postsecondary education benefits*. The HHS PRWORA Notice is also unlawful because it extends PRWORA to non-postsecondary education benefits, like Head Start, despite statutory text and history limiting the definition of Federal public benefits to "postsecondary education . . . benefits," 8 U.S.C. § 1611(c)(1)(B); *see* Mot. 56–59. Indeed, an early version of the bill that became PRWORA would have defined "Federal benefit[s]" to include all "education" benefits. *See* 149 Cong. Rec. S12986 (Sept. 8, 1995) (amendment no. 2525). But after Senators expressed concerns that this language would have terminated all "educational assistance to . . . children," including "elementary and secondary education," *see id.* at S13568 (Sept. 14, 1995) (statement of Sen. Graham), the bill's sponsor introduced an amended version that added the word "postsecondary." *id.* at S13567 (amendment no. 2525, as modified). The Senate then adopted this amendment with the assurance that it "takes care of the education issue." *Id.* at S13569 (statement of Sen. Simpson).

Defendants seek to unwind that clear congressional choice by construing the words "similar benefits" in Section 1611(c)(1)(B) to include any education benefits that are not "basic public education benefits" constitutionally protected under *Plyler v. Doe*. *See* Opp'n 21. But no

12

amount of squinting at the language of section 1611(c)(1)(B) can produce that wholly atextual reading. And it is simply untenable to read a catchall term like "similar" to negate the limit Congress plainly sought to impose through the use of the term "postsecondary." Further, Defendants cannot identify a single provision of PRWORA that uses "welfare" to refer to benefits "similar" to early-childhood education; their sole example is drawn from a regulation, promulgated in 1999, that defines the distinct term "assistance" that, in any event, specifically *excludes* "child care." *See* Opp'n 22 (citing 45 C.F.R. § 260.31). Defendants' contention that Head Start is a generic "anti-poverty program" rather than not an educational benefit, Opp'n 21, is belied by the plain text of its authorizing statute, which states that Head Start is designed to promote "school readiness" by enhancing children's "cognitive, social, and emotional development," 42 U.S.C. § 9831.

*iii. Application of PRWORA on a benefit-by-benefit basis and to benefits funded by block grants.* Defendants appear to concede that PRWORA applies on a benefit-by-benefit basis, rather than program-wide, and that it does not include all benefits funded by block grants to States. Opp'n 22–23; *see* Mot. 59–62. While those concessions are welcome, that is not what the HHS PRWORA Notice actually says. The Notice unequivocally states that the programs listed in the Notice— which include several block grants—are "*programs* determined to *be* Federal public benefits." 90 Fed. Reg. at 31,238 (emphases added). The Notice offers no suggestion, as HHS did in its 1998 notice, that any benefits under these programs were exempt from PRWORA. *Cf.* 63 Fed. Reg. 41,658 (August 4, 1998).[5] On the contrary, the Notice argues at some length that "any grant[s]," including "'block grants . . . provided to states and localities,'" are necessarily Federal public

---

[5] HHS did not address this issue when it stated that it was not revisiting aspects of its 1998 notice that touched on verification, such as the exemption for charitable nonprofit organizations in 8 U.S.C. § 1642. *See* 90 Fed. Reg. at 31,237. HHS expressly noted that verification questions are "conceptually distinct from a proper definition of 'Federal public benefit.'" *Id.*

benefits. 90 Fed. Reg. at 31,233–34. By acknowledging that, in fact, HHS is required to consider the application of PRWORA on a "benefit-by-benefit" basis, Opp'n 23, Defendants effectively concede that the entire list of programs in its Notice is premised on legal error.

*iv. Statutes that supersede PRWORA.* Finally, Defendants offer no convincing response to the argument that PRWORA does not apply to the Health Center Program or the Head Start Program because those programs were exempted under other statutes. Mot. 62–65. Defendants appear to accept that statutes exempt programs from PRWORA if they are sufficiently "specific" and "unambiguously direct[] certain aid to a plainly defined group of people." Opp'n 23 (quoting *Noerand v. DeVos*, 474 F. Supp. 3d 394, 403 (D. Mass. 2020)); *see also id. 3*. And they do not dispute that the courts and ultimately ED correctly concluded that the CARES Act was such a statute. *Id.* 23; *see* Mot. 63.

Defendants nonetheless attempt to distinguish the Health Center Program and the Head Start Program from the CARES Act on the ground that neither program "specifically includes or excludes *non-citizens* from benefits." Opp'n 23 (emphasis added). That is no distinction. The CARES Act also did not mention non-citizens; it simply directed aid to all "students." *See Noerand*, 474 F. Supp. 3d at 397 (quoting CARES Act § 18004). In any event, Congress does not need to use "magical passwords" to exempt one statute from an earlier one. *Marcello v. Bonds*, 349 U.S. 302, 310 (1955). It is enough that Congress mandated that health centers serve "*all* residents" of a given area, 42 U.S.C. § 254b(a)(1)(2), and that "children from low-income families *shall* be eligible for participation" in Head Start, *id.* § 9840(a)(1)(B)(i)—directives that are irreconcilable with a requirement to screen and exclude individuals unless they furnish proof of immigration status.

14

### B.  The ED PRWORA Notice Is Contrary to Law.

The ED PRWORA Notice is unlawful for two reasons. First, it interprets PRWORA to apply to two sets of non-postsecondary education benefits: the WIOA II program, which provides training and education "below the postsecondary level," 29 U.S.C. § 3271, and the Perkins V program, which provides benefits at the "secondary" level, 20 U.S.C. §§ 2301, 2302(5). *See* Mot. 65–68. Second, it errs by applying PRWORA to Perkins V because, as ED acknowledges, this program contains no "test for eligibility," and thus is a generally available benefit exempt from PRWORA. Mot. 68 (quoting 90 Fed. Reg. at 30,900).

Defendants offer no response to the second of these legal errors. As to the first, they present the curious theory that the parties' disagreement is "semantic" because, under either interpretation, "the result is the same." Opp'n 18. But this is incorrect. ED interprets PRWORA to extend to *all* education benefits, including secondary education benefits, unless they are part of a "basic public education" constitutionally protected under *Plyler v. Doe*. *Id.* Plaintiffs read the statute to mean what it says: it applies only to "postsecondary education . . . benefit[s]." 8 U.S.C. § 1611(c)(1)(B). Defendants proffer no theory as to why a Congress that intended Defendants' roundabout reading would have drafted the statute the way it did. And the legislative history confirms that Congress specifically meant to exclude primary and secondary education benefits from the statute's scope. *See supra* 12. Defendants surely cannot claim that the statute "unambiguously" sets forth their novel interpretation. *Arlington*, 548 U.S. at 296.

### C.  The DOL PRWORA Notice Is Contrary to Law.

The DOL Notice unlawfully interprets PRWORA to extend to all services provided to "participants" in several workforce-training programs. As the Motion explains, the characteristic supposedly rendering these disparate services "similar" to the benefits listed in the statute—that their "overall goal is to move participants into gainful employment"—is not one that the statute

15

deems relevant or that links the benefits listed in section 1611(c)(1)(B). *See* Mot. 69–70. And DOL's interpretation sweeps in non-postsecondary education benefits that fall outside of PRWORA's scope. *Id.* at 70–71.

Defendants' response to these arguments is difficult to parse. Defendants principally respond by providing a laundry list of services provided by their workforce-training programs and summing up by stating that the "goal and the benefit stemming from these programs is 'gainful employment.'" Opp'n 24. But Defendants do not say anything new to illuminate why promoting "gainful employment" is a relevant statutory criterion. And the services Defendants list, like helping people with "career planning" or an "out-of-area job search," look nothing like the benefits enumerated in the statutory definition of "Federal public benefit," all of which entail some form of monetary "payment" or tangible "assistance," such as housing or food. 8 U.S.C. § 1611(c)(1)(B). Nor do Defendants explain why programs that DOL acknowledges include non-postsecondary education benefits are included in their entirety—a particularly indefensible choice in light of Defendants' concession that PRWORA must be applied on a "benefit-by-benefit" basis. Opp'n 22.

## V.    The PRWORA Notices Violate the Spending Clause.

The Spending Clause prohibits the federal government from "surprising participating States with post acceptance or 'retroactive' conditions" on grant funding, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981), or leveraging the spending power to "coerce" States to adopt the federal government's preferred policies, *Nat'l Fed. of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 577 (2012). The PRWORA Notices violate both limits, and Defendants fail to offer any persuasive argument to the contrary.

16

### A.  The PRWORA Notices Impose Unforeseeable Post-Acceptance Conditions.

Defendants do not dispute that they have dramatically reversed their prior positions on the scope of PRWORA, both by abrogating their long-settled understandings of the statute (HHS, ED, and DOL), and by repealing their longstanding regulatory exemptions (DOJ). Nor do Defendants dispute that, as a result of these changed positions, States will need to substantially alter their administration of dozens of previously-accepted grants in order to continue receiving federal funds. It follows that Defendants have "surprise[d] participating States" with an impermissible "post-acceptance . . . condition[]: no federal official accepting grant funding prior to the PRWORA Notices could reasonably have foreseen that HHS, ED, and DOL would suddenly say the statute means the opposite of what they have said for decades, or that DOJ would retract exemptions in place since the day after the statute's enactment. *See Pennhurst*, 451 U.S. at 25; *see* Mot. 72–74.

Defendants nonetheless contend that "the text of the statute itself" provided Plaintiffs with "fair notice" of the interpretations in the HHS, ED, and DOL PRWORA Notices. Opp'n 29. As an initial matter, this argument depends on the proposition that Defendants' statutory arguments are not just correct, but "unambiguously" so, *id.*—a hurdle that Defendants cannot clear. *See supra* 10. But even if Defendants somehow had the better of the statutory arguments, it does not follow that States had fair notice that the agencies would do a 180 on their consistent, settled, published interpretations of PRWORA. As the Supreme Court has noted in similar circumstances, "[it] strains credulity to argue that participating States should have known of their 'obligations' under [a statute] when . . . the governmental agency responsible for the administration of the Act . . . has never understood [it] to impose [the] conditions" it now claims. *Pennhurst*, 451 U.S. at 25. So too

17

here, it blinks reality to imagine that the States "knew" the agencies were publicly misinterpreting PRWORA for nearly 30 years.[6]

Defendants' "fair notice" argument makes even less sense as to DOJ. They claim that Plaintiffs were on clear notice that DOJ could revoke its exemptions because PRWORA gave it the legal authority to do so. Opp'n 30. This argument proves far too much: If the existence of legal authority to change grant terms were sufficient to eliminate retroactivity objections under the Spending Clause, then the constitutional constraint would never come into play. Furthermore, the Supreme Court rejected a similar argument in *NFIB*. There, much like here, the federal government argued that States were on notice of any changes to Medicaid because the statute includes a provision "expressly reserving '[t]he right to alter, amend, or repeal any provision' of that statute." *NFIB*, 567 U.S. at 583 (quoting 42 U.S.C. § 1304). The Court disagreed, explaining that "[a] State could hardly anticipate" that Congress would use this power to "dramatically" "transform" the Medicaid program. *Id.* at 584. The same holds here: no State could reasonably be charged with anticipating that the Attorney General would use reserved discretionary authority under PRWORA to revoke exemptions that had been in place since the very day after the statute's enactment, and to dramatically enlarge the States' obligations.

### B. The PRWORA Notices Are Impermissibly Coercive.

The PRWORA Notices are unconstitutionally coercive. The financial threat attached to compliance with these Notices is overwhelming: States must conform their practices to the

---

[6] Defendants are incorrect that the constitutional prohibition on retroactive conditions only applies to the existence of conditions and not their "scope." Opp'n 30. In *Arlington*, the Court applied this principle in assessing whether the scope of the statutory term "costs" extended to "expert costs." 548 U.S. at 297. The Court concluded that because the term did not unambiguously encompass such costs, it failed to "provide the clear notice that would be needed to attach such a condition to a State's receipt of IDEA funds." *Id.* at 300.

PRWORA Notices in order to continue receiving funding for dozens of programs, which together amount to billions of dollars in funding.[7] But Plaintiffs have introduced a mountain of unrebutted evidence showing that compliance with the Notice would compel States to dramatically restructure or shutter many of their social services programs—including by effectively compelling States and their subgrantees to stop operating programs that cannot feasibly implement a verification system, and by requiring many other programs to transform their operations in ways that would slash enrollment of or render them inaccessible to large numbers of eligible individuals.

Defendants argue that this financial threat is too mild to cross the line from pressure to coercion, analogizing this case to *South Dakota v. Dole*, 483 U.S. 203 (1987). Opp'n 32–33. But unlike in *Dole*, where the challenged condition was tied to receipt of only 5% of a state's funding under one federal program, a State that disregards PRWORA stands to lose "*all* of" the funding for *dozens* of federal programs. *NFIB*, 567 U.S. at 581. Federal agencies have already begun the project of requiring compliance with the PRWORA Notices challenged here as a condition of a broad range of federal funding. *See, e.g.*, 90 Fed. Reg. 34,877 (July 24, 2025) (HUD proposing to require public housing grant recipients to certify that they will "administer [their] grant in accordance with . . . the eligibility and verification requirements that apply under. . . PRWORA[] and any applicable requirements that HUD, the Attorney General, or [USCIS] may establish from time to time to comply with PRWORA."). It is fantasy to suggest that the States could opt out of dozens of vital federal programs.

---

[7] *See, e.g.*, Congressional Research Service, Labor, Health and Human Services, and Education: FY2024 Appropriations (Nov. 4, 2024), *available at* https://www.congress.gov/crs_external_products/R/PDF/R47936/R47936.7.pdf, at 36-38 ($12 billion for Head Start, $286 million for Title X, $1.9 billion for SUBG).

Defendants also suggest, in passing, that the massive changes required by the PRWORA Notices are not significant enough to satisfy the coercion test. Opp'n 32. But their sole support for that claim is a vague assertion that the Notices "do not outline specific verification methods," and that some costless verification method may exist. *Id.* It is not clear on what basis Defendants believe that States could implement massive verification programs with no cost. *Cf. Env't Def. Ctr. Inc. v. E.P.A.*, 344 F.3d 832, 847 (9th Cir. 2003) (no coercion where condition merely required States to "implement the regulatory program" or "pursue [an] Alternative Permit option" that came at little cost). But, regardless, the transformations required by the PRWORA Notices come from the requirement to verify eligibility for the newly covered programs *at all*. Requiring beneficiaries of soup kitchens, suicide hotlines, homeless shelters, domestic violence services, and mental health crisis clinics to produce proof of immigration status will render those programs inoperable. The Notices therefore will not merely "narrow the scope of who may access the programs at issue," Opp'n 32; they will pose an existential threat to the programs themselves.

Finally, it is again no answer for Defendants to argue that their PRWORA Notices correctly interpret the statute. Opp'n 31. DOJ's Notice is not an interpretation of the statute at all; it is an "exercise of [the Attorney General's] discretion" that is plainly subject to Spending Clause scrutiny. 90 Fed. Reg. 32,023, 32,026 (July 16, 2025). And even if the interpretations in the HHS, ED, and DOL PRWORA Notices were correct (which they are not), Congress, no less than the agencies, is barred from coercing States under the Spending Clause. The PRWORA Notices would transform PRWORA into an unconstitutionally coercive command; that is yet another reason not to read the statute in the tortured way Defendants propose, and it is an independent reason the Notices themselves are unlawful.

**VI.     Plaintiffs Have Demonstrated Irreparable Harm.**

Defendants grossly mischaracterize the severe harm Plaintiffs face as a result of their PRWORA Notices as "speculative injuries that may never materialize." Opp'n 33. In doing so, Defendants fail to grapple with many of the catastrophic consequences of their actions. Defendants have thus failed to meaningfully counter Plaintiffs' irreparable harm showing.

First, Defendants ignore that many of the State's programs affected by the Notices are fundamentally incompatible with verification, meaning that these programs will need to cease performing their functions or close entirely. Plaintiffs' evidence is rife with examples: the 988 hotline and Certified Community Behavioral Health Clinics will no longer be able to provide immediate, 24/7 life-saving support to individuals experiencing mental health crises, Mot. 24–25, 27–28; emergency homeless shelters will not be able to serve individuals fleeing domestic violence who lack documentation, *id*. 18–19, 23–24; key components of States' responses to the opioid epidemic will no longer function as many people seeking help with addiction will be unable to access it, *id*. 28–29; and soup kitchens and food banks cannot function as intended if they are required to verify immigration status at the door, *id*. 18–19 (CSBG program). Critically, many American citizens who have low incomes, are experiencing homelessness, or have survived natural disasters are unlikely to possess the documents necessary to prove their citizenship and will be excluded from programs specifically intended to serve them. *See, e.g.*, Mot. 15 (Title X clinics are used predominantly by low-income individuals, who disproportionately lack government identification); NY-Rosen Decl., ECF No. 4-51 ¶ 17 ("[A]lmost by definition," the PATH program serves people who are unlikely to have documentation available but in urgent need of services).

Second, Defendants do not acknowledge the havoc they have wreaked by issuing the Notices with immediate or near-immediate effective dates. The Notices require Plaintiff States to

completely overhaul their programs almost overnight, an impossible feat. To have any hope of timely compliance, Plaintiff States must take immediate, costly steps. *See, e.g.*, NJ-Schiff Decl., ECF No. 4-44 ¶¶ 14, 19–21 ("many months of preparation, potentially a year or more"); MI-Lyon-Callo Decl., ECF No. 4-41 ¶ 7 ("minimum nine months and cost an untold amount of funding and staff hours"); *cf.* 8 U.S.C § 1642(b) (Congress providing States two years to develop and implement verification systems). That injury is both imminent and irreparable.

The arguments that Defendants *do* make regarding harm lack merit.

Defendants first claim that Plaintiffs' harm based on enforcement threat is "entirely speculative." Opp'n 34. But, as Defendants' own declarations make clear, they will have the authority to enforce against Plaintiffs based on the interpretation of PRWORA espoused in their Notices starting on September 11, 2025, absent an injunction.[8] And because many of the affected programs operate on a reimbursement basis, starting on that date, Plaintiffs risk spending funds that Defendants could later refuse to pay even without an immediate enforcement action. *See, e.g.*, MI-Lyon-Callo Decl., ECF No. 4-41 ¶ 7 (reimbursement at risk); NY-Heslin Decl., ECF 4-54 ¶ 30 (same); *see also City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1282637, at *24 (N.D. Cal. May 3, 2025) (finding harm where "governing bodies face looming budget deadlines without knowing whether they will receive reimbursements for funds already expended"). Defendants carefully avoid saying that they will not enforce against Plaintiffs soon. *See, e.g.*, Opp'n 34 ("[T]he PRWORA Notices do not speak to enforcement procedures."). And

---

[8] *See* 90 Fed. Reg. at 31,238 (HHS Notice "effective immediately."); 90 Fed. Reg. at 30,900 (ED's Notice "may be referenced when enforcing . . . compliance"); *see* Gradison Decl., ECF No. 48-1 ¶ 5 (describing process for HHS "tak[ing] a disallowance" and "tak[ing] a penalty" against states); Engels Decl., ECF No. 48-2 ¶ 7 ("termination"); Margolis Decl., ECF No. 48-3 ¶ 6 ("enforcement actions, up to and including termination"); Crocker Decl., ECF No. 48-4 ¶ 11 ("disallow costs, suspend or terminate the award"); Burke Decl., ECF No. 48-5 ¶ 8 (similar); Vitelli Decl., ECF No. 48-6 ¶¶ 9–10.

any such claim would be implausible, as the President himself has directed enforcement in his Executive Order, which directs agencies to refer violations of PRWORA to DOJ and DHS. 90 Fed. Reg. 10,581 (Feb. 25, 2025); *cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 53 (1st Cir. 2021) ("[T]he plaintiffs should be forced to sit like Damocles.").

Defendants next erroneously assert that because the Notices do not "mandate" any particular verification method and at least one method (the SAVE system) is free to access, Plaintiff States would have no compliance costs. Opp'n 35. But this is belied both by the record and by common sense. Even implementing a free verification system has significant costs. The programs must train staff, develop and implement new procedures, and divert resources that would otherwise go toward other program functions. *See, e.g.*, NJ-Schiff Decl., ECF No. 4-44 ¶ 20 (detailing at least five practical steps for compliance). Those are real, irreparable harms—as HHS itself acknowledges, estimating compliance costs for its programs alone of over $100 million. HHS Final Regulatory Impact Analysis, ECF No. 4-5, at 15; *see also New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (finding irreparable harm where States would "be required to undertake costly revisions to their eligibility systems to ensure that non-citizens are not automatically made eligible for or enrolled in benefits" and the Defendant federal agency had itself "predicted that the Rule would have economic harms").

Defendants claim that Plaintiffs have not shown their programs are likely to fail and that there is no "existential threat to state programs." Opp'n 35–36. But the record clearly shows otherwise. *See, e.g.*, CA-Chawla Decl., ECF No. 4-11 ¶ 14 (may have to "stop offering" SAMHSA-funded programs); CA-Jaime-Mileham Decl., ECF No. 4-15 ¶ 24 (Head Start programs "risk

23

closure"); *see supra* 20-21 (describing programs incompatible with verification). As this unrebutted evidence shows, for many programs, requiring clients to show their papers before they can receive services will render the programs non-viable. Defendants' hand-waving disagreement is no substitute for evidence. In any event, beyond program closures, the record shows with specificity many irreparable injuries facing Plaintiffs as a result of the Notices, including the risk of enforcement, compliance costs, costs stemming from their residents no longer being served by these programs relying on other, costly state programs, and harm to their sovereign interests. Mot. 77–80. The record also shows that the injuries to Plaintiff States from the collapse of their safety net programs is not a result of "voluntar[y]" actions by Plaintiffs, Opp'n 36, but a consequence of the Notices themselves harming States' residents in a way that will overwhelm and drain state resources. *See, e.g.*, NY-Heslin Decl., ECF No. 4-54 ¶ 48 (individuals "who do not get preventative care are more likely to reenter the health system at a far less optimal point, such as an emergency room."); NY-Rosen Decl., ECF No. 4-51 ¶ 24 (similar as to mental health care); *see City & Cnty. of San Francisco*, 2025 WL 1282637, at *24 (finding irreparable harm based on "significant cuts" to "healthcare, disease control, emergency management, public benefits, and law enforcement programs"); *New York*, 969 F.3d at 86 (finding irreparable harm for States where "the Rule has already had a chilling effect on non-citizen use of public benefits" and would cause "a greater number of uninsured patients seeking care" at public hospitals).

As to sovereign harm, the PRWORA Notices' extraordinary and unprecedented reach extends deep into Plaintiff States' social safety nets. By defining Federal public benefits so broadly as to sweep in state programs that have never before been considered subject to PRWORA, including block grants that fund numerous social services programs, the Notices tremendously

"restrict[] how States may protect public health and community safety," *see* Opp'n 37. States' soup kitchens, homeless shelters, victims' support services, and emergency health care are all at risk.

## VII.    The Balance of the Equities Favor Plaintiffs.

Because of the severity and immediacy of the harm caused by Defendants' unlawful actions, the balance of the equities and public interest weigh heavily in favor of Plaintiffs. Defendants' sole response is that an injunction would "disable" Defendant agencies "from implementing the President's priorities," unlawful and harmful though they may be. Opp'n 37–38. Not only have courts routinely rejected the assertion that the government is harmed by being unable to implement President Trump's priorities when they are likely unlawful, *see* Mot. 81–82, but this claim belies Defendants' primary argument opposing relief—that the Notices merely set forth "the correct reading of the statutory text," *see, e.g.*, Opp'n 1. The Government cannot fairly assert both that the Notices mean nothing and also that being unable to enforce them will "disable" the President's priorities. In any event, a preliminary injunction would not, as Defendants' claim, stop the government "from effectuating" the PRWORA statute. Opp'n 37 (quotation omitted). To the contrary, an injunction preserving the status quo while this litigation is pending would allow the government to effectuate the PRWORA statute in precisely the same manner as it has in the twenty-nine-year history of PRWORA, upon which States and millions of their residents have relied.

## VIII.    Plaintiffs' Requested Injunction Should Not Be Narrowed.

Seeking to capitalize on the Supreme Court's recent *Trump v. CASA* decision, Defendants suggest an unwarranted and impractical narrowing of Plaintiffs' proposed injunction that has nothing to do with *CASA*. Plaintiffs are not seeking a "universal injunction" as in *CASA*, Opp'n 38; they seek relief only for "the plaintiffs before the court," Opp'n 38–39 (quoting *CASA*, 145 S.

Ct. 2540, 2557 (2025)); *see also* Mot. 82. Defendants' proposed restrictions on an injunction here, *see* Opp'n 38, are gerrymandered around the exemplar state programs that Plaintiffs' declarations feature. But this proposal would prevent Plaintiffs from obtaining complete relief to which they are entitled. In crafting injunctive relief, the court plainly can and should make reasonable inferences from the record, such as the clear reality that the PRWORA Notices will have largely similar effects for each Plaintiff State. As the robust record demonstrates, each state offers critical community services impacted by the PRWORA Notices and the same causal mechanisms will cause harm in the same ways across States.[9] The record is already voluminous, with sixty-plus declarations, and replete with harms. The Court does not need to receive hundreds of additional, duplicative declarations at this stage of the case to determine that these effects are well-documented, reasonably apply across the Plaintiffs, and warrant preliminary relief applicable to them all. *Weaver v. Henderson*, 984 F.2d 11, 14 (1st Cir. 1993) ("At the preliminary injunction stage, it is . . . the district court's duty" to "assess the facts" and draw "reasonable inferences."

---

[9] See, for example, common harm to States that would arise from implementing verification in Head Start programs. CA-Jaime-Mileham Decl., ECF No. 4-15 ¶ 30 ("It is not clear how California *or any Head Start program* could verify the immigration status of applicants to Head Start, whatever the cost, given how stretched current Head Start staff are and the limited resources and guidance to support such implementation.") (emphasis added); NY-Marton Decl., ECF No. 4-53 ¶ 43 ("[I]t is not possible for *any Head Start program* to abruptly change course in program implementation and divert limited resources from core operational responsibilities to immediately begin verifying the immigration status of program applicants. Moreover, screening based on immigration status is complex and will require training.") (emphasis added); OR-Chatterjee Decl., ECF No. 4-58 ¶ 17 (Head Start centers "will not have the staff resources or knowledge to implement this sudden and new eligibility requirement."); IL-Wortmon Decl., ECF No. 4-28 ¶ 24 ("None of our . . . [Head Start] centers have sufficient staff or resources to implement an immigration status verification system, and they are not trained or equipped to verify immigration documents."). In Title X the harms are equally similar across States. NY-Heslin Decl., ECF No. 4-54 ¶ 48; ("The result is fewer persons are getting critical healthcare."); IL-Masinter Decl., ECF No. 4-27 ¶ 16 ("[A]nyone who relies on the Illinois Family Planning Program, faces diminished access to care due to the HHS notice."); MI-Lyon-Callo Decl., ECF No. 4-41 ¶ 8 (Notices "will likely result in decreased clients being served by the clinics."); WI-Standridge Decl., ECF No. 4-72 ¶ 22 (Individuals' "health may deteriorate, resulting in poorer health outcomes."). Defendants do not (and could not) point to any reasonable basis upon which these causal mechanisms would differ across States.

(quotations omitted)); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (reversing district court's denial of preliminary injunction; drawing inference that, "based on" evidence of irreparable harm in Kansas, "it seems almost certain that similar" harms would occur in Alabama and Georgia; and stating that "Damocles's sword does not have to actually fall on all [plaintiffs] before the court will issue an injunction"). Defendants offer no legal support at all for their contrary argument, or for their position that two States that did not submit declarations at the outset of the case should receive no relief. *See* Opp'n 38.[10]

Defendants go even further afield from *CASA* in their novel assertion that a stay of the PRWORA Notices is "[n]ot [p]ermitted under the APA." Opp'n 38. The *CASA* Court expressly declined to consider relief under the APA. 145 S. Ct. 2540, 2554 n.10. Here, the APA provides the Court authority to "issue all necessary and appropriate process to postpone the effective date of an agency action" during the pendency of litigation. 5 U.S.C. § 705. Defendants again miss the point: Plaintiffs seek APA relief that *is* "limited to the parties," *compare* Opp'n 39 *with* Mot. 82, which is not only unquestionably permissible under the APA, but also substantially narrower than Plaintiffs could obtain upon a final judgment, when the APA would permit the Court to set aside the Notices in their entirety. 5 U.S.C. § 706(2).[11]

_____

[10] To the extent that the Court is inclined to limit the injunction as Defendants have requested, Plaintiffs respectfully request the opportunity to supplement the record. Additionally, Plaintiffs are submitting along with this motion four new declarations, including from Hawaiʻi and Delaware (states that did not previously submit them, *see* Opp'n 38).

[11] Defendants identify no harm that warrants a bond, *see* Opp'n 39, and a bond should be denied here in any event as this case seeks to vindicate the public interest (or, at most, any bond should be nominal). *See* Mot. 82 n.13; *State of New York v. United States Department of Education*, No. 25-1424, ECF No. 40 (2d Cir. June 20, 2025). And Defendants' request for a seven day stay, Opp'n 39–40, makes no sense in light of their agreement not to enforce through September 10, as there is no reason to alter the status quo for a seven-day period. Regardless, this request should be denied for the same reasons that the preliminary injunction should be granted: Plaintiffs face irreparable harm and the public interest and balance of the equities tip in their favor.

27

## **CONCLUSION**

For the foregoing reasons, Plaintiffs States and their subdivisions and instrumentalities respectfully request that Defendants be preliminarily enjoined and stayed from implementing and enforcing the PRWORA Notices in the Plaintiff States.

Dated: August 18, 2025                                    Respectfully submitted,

**LETITIA JAMES**                                          **NICHOLAS W. BROWN**
Attorney General for the State of New York                 Attorney General of Washington

By: */s/ Rabia Muqaddam*                                   By: /s/ Andrew Hughes

Rabia Muqaddam*                                            Andrew Hughes*
*Chief Counsel for Federal Initiatives*                    Benjamin Seel*
Jessica Ranucci*                                           Zane Muller*
*Special Counsel*                                          *Assistant Attorneys General*
Zoe Levine*                                                Cristina Sepe*
*Special Counsel for Immigrant Justice*                    *Deputy Solicitor General*
28 Liberty St.                                             800 Fifth Avenue, Suite 2000
New York, NY 10005                                         Seattle, WA 98104-3188
(929) 638-0447                                             (206) 464-7744
rabia.muqaddam@ag.ny.gov                                   Andrew.Hughes@atg.wa.gov
zoe.levine@ag.ny.gov                                       Benjamin.Seel@atg.wa.gov
jessica.ranucci@ag.ny.gov                                  Zane.Muller@atg.wa.gov
                                                           Cristina.Sepe@atg.wa.gov
*Attorneys for the State of New York*
                                                           *Attorneys for the State of Washington*

**PETER F. NERONHA**                                       **KRISTIN K. MAYES**
Attorney General for the State of Rhode                    Attorney General for the State of Arizona
Island
                                                           By: */s/ Hayleigh S. Crawford*
By: */s/ Sarah W. Rice*                                    Hayleigh S. Crawford*
Sarah W. Rice (RI No. 10588)                               Mary M. Curtin*
Stephen N. Provazza (RI No. 10435)                         2005 North Central Avenue
*Unit Chief, Consumer & Economic Justice*                  Phoenix, Arizona 85004
*Unit*                                                     Phone: (602) 542-3333
150 South Main St.                                         Hayleigh.Crawford@azag.gov
Providence, RI 02903                                       Mary.Curtin@azag.gov
Phone: 401-274-4400                                        ACL@azag.gov
SRice@riag.ri.gov
SProvazza@riag.ri.gov                                      *Attorneys for the State of Arizona*

*Attorneys for the State of Rhode Island*

**PHILIP J. WEISER**                                       **ROB BONTA**
Attorney General for the State of Colorado                 Attorney General for the State of California

By: */s/ David Moskowitz*                                  By: */s/ Heidi Lehrman*
David Moskowitz*                                           Heidi Lehrman*
*Deputy Solicitor General*                                 Neli Palma*

29

Jennifer L. Sullivan*
*Deputy Attorney General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
jen.sullivan@coag.gov

*Attorneys for the State of Colorado*

Michael L. Newman
*Senior Assistant Attorneys General*
Kathleen Boergers*
Srividya Panchalam*
*Supervising Deputy Attorneys General*
Heidi Lehrman*
Jeanelly Orozco Alcalá*
Natasha A. Reyes*
*Deputy Attorneys General*
1300 I Street
Sacramento CA 95814
Heidi.Lehrman@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov
Natasha.Reyes@doj.ca.gov

*Attorneys for the State of California*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Patricia McCooey*
Patricia McCooey*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov

*Attorney for the State of Connecticut*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia
By: */s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Sarah J. North*
Sarah J. North*
*Deputy Division Chief, Public Interest Division*

30

Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorney for the District of Columbia*

Holly Berlin*
*Assistant Attorney General, Special
Litigation Bureau*
Alexandra Reed*
*Assistant Attorney General, Civil Rights
Bureau*
R. Henry Weaver*
*Assistant Attorney General, Special
Litigation Bureau*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
Sarah.North@ilag.gov
Holly.Berlin@ilag.gov
Alexandra.Reed@ilag.gov
Robert.Weaver@ilag.gov

*Attorneys for the State of Illinois*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6584
VWilliamson@oag.state.md.us

*Attorney for the State of Maryland*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s Kalikoʻonālani D. Fernandes*

David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for Plaintiff State of Hawaiʻi*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Bryan Beach*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Brendan Kreckel*
Brendan Kreckel*
By: */s/ Kristin Trabucchi*
Kristin Trabucchi*
*Assistant Attorneys General*
Office of the Attorney General

31

Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
BeachB@michigan.gov

*Attorneys for the State of Michigan*


**AARON D. FORD**
Attorney General for the State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorney for the State of Nevada*


**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Mark Noferi*
Mark Noferi*
*Senior Litigation Counsel*
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov

*Attorney for the State of New Mexico*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
Brendan.kreckel@maine.gov
kristin.k.trabucchi@maine.gov

*Attorneys for the State of Maine*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ David Ureña*
Katherine Dirks
*Chief State Trial Counsel*
Ethan W. Marks*
David Ureña*
Brett M. Gannon*
*Assistant Attorneys General*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2675
david.urena@mass.gov

*Attorneys for the Commonwealth of Massachusetts*


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Joseph R. Richie*
Joseph R. Richie*
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Attorney for the State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

By: */s/ Ryan P. Kane*
Ryan P. Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Attorney for the State of Vermont*

**JOSHUA L. KAUL**
Attorney General for the State of
Wisconsin

By: */s/ Faye B. Hipsman*
Faye B. Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov

*Attorney for the State of Wisconsin*

By: */s/ Meghan Musso*
Meghan Musso*
Patrick Clancey*
Kathleen Riley*
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5289
meghan.musso@law.njoag.gov

*Attorneys for the State of New Jersey*

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Coby Howell*
Coby Howell*
*Senior Assistant Attorney General*
Tel (971) 673-1880
Fax (971) 673-5000
coby.howell@doj.oregon.gov

*Attorney for the State of Oregon*

33