## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| State of New York, *et al.*,<br><br>      Plaintiffs,<br>v.<br><br>United States Department of Justice, *et al.*,<br><br>      Defendants. | Case No. 1:25-cv-00345-WES-PAS<br>Judge Mary Susan McElroy |

### FEDERATION FOR AMERICAN IMMIGRATION REFORM'S PROPOSED *AMICUS* BRIEF IN SUPPORT OF DEFENDANTS

Joseph S. Larisa, Jr.
Larisa Law
50 South Main Street
Suite 311
Providence, RI 02903
401-743-4700
Fax: 401-633-6296
Email: joe@larisalaw.com

Jonathon P. Hauenschild*
**FEDERATION FOR AMERICAN IMMIGRATION REFORM**
25 Massachusetts Ave., NW,
Suite 330
Washington, DC 20001
(202) 328-7004
jhauenschild@irli.org

*Counsel for Amicus Curiae*
* Not admitted in this jurisdiction

**STATEMENT OF INTEREST**[1]

*Amicus curiae* Federation for American Immigration Reform ("FAIR"), is America's largest and oldest public interest group advocating for the control of illegal immigration and the reduction in legal migration to levels more consistent with the national interest and sound public policy. FAIR has members in all fifty states, and nearly one million members in total.

FAIR's mission is to inform the public about the effects of both unlawful and lawful immigration, and to defend American citizens, American workers, and the nation's environment by limiting overall immigration, enhancing border security, and ending illegal immigration. In short, FAIR seeks to protect all Americans against the substantial harms of mass migration by attaining strongly-enforced, patriotic immigration reform. To that end, FAIR has been involved in more 100 legal cases since 1980, either as a party or as amicus curiae, in which it has consistently defended American interests against illegal immigration into the United States.

FAIR has a strong interest in this case because Plaintiffs' efforts to secure federal taxpayer funds free of the strings Congress placed on the receipt of those funds aids their efforts to obstruct federal immigration enforcement, violating the Supremacy Clause and federal statutes like 8 U.S.C. §§ 1373 and 1644. FAIR's brief explains Congress's intent in enacting the Personal Responsibility and Work Opportunity Reconciliation Act and demonstrates that in providing sole and exclusive discretion to the Attorney General, Congress precludes judicial review of the exercise of that discretion under the Administrative Procedures Act—all of which aid the Court's resolution of the preliminary injunction motion.

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than amicus curiae, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

Through their Complaint and Motion for Preliminary Injunction, Plaintiffs argue that they are entitled to federal funds free of any strings Congress may have attached and have the right to provide federally-taxpayer funded benefits to illegal aliens. Complaint, ECF 1, at ¶¶ 137-138, 145, 151-156, Motion for Preliminary Injunction, ECF 2 at 11-13 50, 77-80. These arguments run contrary to federal precedent and contradict the Personal Responsibility and Work Opportunity Reconciliation Act's (PRWORA) text and Congress's intent when enacting the law.[2]

In enacting PRWORA, Congress sought both to encourage aliens to be self-sufficient and to ensure that federal, state, and local public benefits were not incentivizing illegal immigration by restricting the expenditure of public benefits to only lawfully present qualified aliens. Between the Supreme Court's 1982 decision in *Plyler v. Doe*, 457 U.S. 202 (1982), and 1995, taxpayer funds spent on welfare benefits for noncitizens grew to a figure of roughly $8 billion per year. STAFF OF H. COMM ON WAYS AND MEANS, 104TH CONG., SUMMARY OF WELFARE REFORMS MADE BY PUBLIC LAW 104-193 THE PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT AND ASSOCIATED LEGISLATION, 6 (Comm. Print 1996) (hereafter "1996 PRWORA Report").

In addition to restricting public benefit expenditures to citizens and qualified aliens, Congress provided the Attorney General latitude to interpret and apply PRWORA, while removing that latitude from the realm of what courts could review. *E.g.* 8 U.S.C. §§ 1611(b)(1)(D) and 1621(b)(4) (giving the Attorney General "sole and unreviewable discretion" as to which types of public benefits may be excepted from PRWORA's requirements). Attorney General Janet Reno exercised her authority to grant temporary waivers

---

[2] Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. 104-193, 110 Stat. 2105.

2

after the law's 1996 enactment. 90 Fed. Reg. 32023, 32024 (reciting orders issued by the Attorney General Sept. 15, 1997 and Jan. 16, 2001) and Defendants' Opposition to Preliminary Injunction, ECF 48, at 5-6 ("Opposition"). Plaintiffs now complain that the Attorney General cannot, using the provisions of the law, reconsider or reverse those temporary waivers.

If this Court were to accept the Plaintiffs' arguments, no future President, cabinet secretary, agency, or department would be able to reevaluate, reverse, or even revise any grant program regardless of the language Congress employed when enacting the relevant statute. Relatedly, Plaintiffs argue for an interpretation that would supersede, if not replace, the text of the legislation as, among other things, the statute provides the Attorney General "sole and unreviewable discretion" to evaluate and reevaluate exceptions. When Congress drafts a statute committing certain decisions to the discretion of an agency or head of agency such as the Attorney General, judicial review of those decisions is not available under the Administrative Procedures Act (APA).

Understandably, the Government Defendants' Opposition spends significant time addressing whether the Department of Education's, Department of Health and Human Services', and Department of Labor's PRWORA interpretations qualify as "final rules" for purposes of the APA. Opposition at 12-25. *Amicus* FAIR agrees with the Government's arguments, but submits this brief to point out to the Court both that the statute empowers the Attorney General to promulgate exceptions in consultation with the relevant Departments and uses language removing the Attorney General's decisions from what may be reviewed under the APA.

3

# ARGUMENT

## I. Congress Wanted to Prevent Federal, State, and Local Taxpayer Funds from Incentivizing Illegal Immigration

In passing the PRWORA, Congress took the unusual step of expressly codifying its objective: "It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6). Congress made clear its belief that the breakdown of the rule of law in immigration had been exacerbated by the availability of public benefits for illegal aliens. The statutory text makes clear that Congress intended to cut off such benefits to increase compliance with federal immigration laws.

To achieve this purpose, the PRWORA included a provision intended to stop the flow of state and local public benefits to illegal aliens. Now codified at 8 U.S.C. § 1621, that provision prohibits the offering of "State or local public benefit[s]" to aliens unlawfully present in the United States. 8 U.S.C. § 1621(a). However, Congress did create a savings clause: if a state nevertheless wanted to give a public benefit to illegal aliens, Congress would not stop the state from doing so, if the state enacted a new law that "affirmatively provided" the public benefit to illegal aliens, to assure accountability to state taxpayers. 8 U.S.C. § 1621(d). A parallel PRWORA provision, codified at 8 U.S.C. § 1611, prohibits the federal government from providing public benefits to illegal aliens.

Congress thought PRWORA necessary after the Supreme Court's *Plyler* decision as it potentially required State and Local governments to provide welfare benefits to illegal aliens.[3] *See* H.R. Rep. No. 104-725 (1996) (Conf. Rep.) at 382. Because of the *Plyler* decision and an exponential increase in federal benefits flowing to aliens between 1986 and 1995, Congress

---

[3] In *Plyler*, the Supreme Court held that Texas could not withhold educational benefits for the minor children of illegal aliens, but in so doing called into question whether a State could deny welfare benefits to individuals residing within its borders based on immigration status. 457 U.S. at 250-252 (Burger, C.J., dissenting).

wanted to broadly limit State and Municipal public benefit programs, especially where those government programs were underwritten by federal funds. H.R. Rep. No. 104-725 (Conf. Rep.) at 383. In the Staff Report on PRWORA, the Ways and Means Committee cited the dramatic increase in benefits flowing broadly to aliens, including the explosion of aliens receiving Supplemental Security Income (SSI):

> [T]he number of noncitizens receiving benefits increased from over 244,000 in 1986 to almost 800,000 in 1996, an increase of about 230 percent. By 1995, slightly more than one-half the SSI benefits provided to the elderly were collected by noncitizens. GAO has estimated that if current policies had remained in place, by the year 2000, nearly 2 million noncitizens would have been receiving SSI benefits.

1996 PRWORA REPORT at 6.

The dramatic increase in welfare funding and benefits enjoyed by aliens led Congress to make "significant changes in the eligibility of noncitizens… for Federal, State, and local benefits," while providing States "broad authority to decide which noncitizens may participate in State and local programs" that were wholly funded by the State or municipalities within the broader Welfare Reform Act of 1996. *Id* at 34. Though Congress wanted to provide States some discretion, it intended to deny "most Federal benefits… to aliens who are not qualified aliens— illegal aliens, aliens admitted temporarily for a limited purpose (nonimmigrants)" and other, similar categories from receiving welfare benefits funded, even in part, by the federal government. *Id*.

It is possible, thus, broadly to categorize the goals Congress sought to achieve through PRWORA as "encouraging aliens' self-sufficiency;" ensuring that "the availability of public benefits not constitute an incentive for immigration to the United States;" and "reducing the rising costs of operating federal benefits programs." *City of Chicago (Alvarez) v. Shalala*, 189 F.3d 598, 606-607 (7th Cir. 1999). *See also* H.R. REP. NO. 104-725 (1996) (Conf. Rep.) at 378. To achieve these purposes, PRWORA "greatly restricted non-citizen access to public benefits in

5

response to concerns that non-citizens were applying for and receiving public benefits . . . at increasing rates." *New York v. United States Department of Homeland Security*, 969 F.3d 42, 52 (2nd Cir. 2020); *see also*, *Tennessee v. United States Department of State*, 931 F.3d 499, 504 (6th Cir., 2019) (Noting noncitizens causing increased Medicaid costs to Federal and State governments), and *Bruns v. Mayhew*, 750 F.3d 61 (1st Cir. 2014) (same).

PRWORA did not bar all aliens from receiving federal, state, and local public benefits. Instead, Congress classified aliens "into two general categories: qualified aliens and non-qualified aliens." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1099 (9th Cir. 2012) (citation modified). Qualified aliens could still receive public welfare benefits as long as they met certain other conditions. Non-qualified aliens could not receive public welfare benefits, though Congress later amended the statute to provide States discretion to extend state SNAP benefits to non-qualified aliens "so long as the state then reimburses the U.S. Secretary of Agriculture for the value of the benefit and for all administrative costs associated with its issuance." 670 F.3d at 1100. *See also New York*, 969 F.3d at 52-53 (Listing some criteria for qualified and non-qualified aliens).

Similarly, Congress broadly defined the type of public benefits subject to the law. A "federal public benefit" is

> any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

8 U.S.C. § 1611(c). The definition of "State or local public benefit" is nearly identical, except for the final phrase, which limits the term to benefits provided "by an agency of a State or local government or by appropriated funds of a State or local government." 8 U.S.C. § 1621(c). These definitions mean that a state or local program receiving federal funds is "still considered a

'federal public benefit'" under the law "even if administered by a state or local agency." *Pimentel*, 670 F.3d at 1099, n. 4.

The Plaintiffs have few grounds upon which to complain that they are unable to comply with PRWORA's verification requirements. When Congress enacted PRWORA, it expected States to verify whether an alien was qualified or not qualified to receive welfare prior to enrolling him or her in any public benefit program. At the time, most state agencies used the federal Systematic Alien Verification for Entitlements (SAVE) system, and Congress directed the Attorney General to "adopt regulations to verify the lawful presence of applicants for Federal benefits." H.R. REP. NO. 104-725 (1996) (Conf. Rep.) at 390 and 8 U.S.C. § 1642(a). The law further required States to establish and implement a verification system complying with the regulations within 24 months of their adoption. *Id*. and 8 U.S.C. § 1642(b).

## II. When Congress Vests Sole Discretionary Authority in the Attorney General, that Decision is Not Subject to Review under the APA

Where Congress vests an agency or other cabinet-level official with discretion to take a particular action, that language strips the judiciary of the ability to review any decision made pursuant to that authority. *Roland v. United States Citizenship & Immigration Services*, 850 F.3d 625, 629 (4th Cir. 2017). The inability to review such a decision includes efforts to review it under the APA. *Bremer v. Johnson*, 834 F.3d 925, 930-931 (8th Cir. 2016).

In PRWORA, Congress vests the Attorney General with the sole discretion to make certain policy decisions multiple times. *See*, *e.g.*, 8 U.S.C. §§ 1611(b)(1)(D), 1613(c)(2)(G), 1621(b)(4), (employing the phrase "in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments" several times). The Attorney General exercised the authority Congress granted her on July 11, 2025, and which the President directed her to do through the Executive Order, when she published in the Federal

7

Register, her reevaluation and rescission of prior guidance that largely waived PRWORA. *See* 90 Fed. Reg. 32023, *Revised Specification Pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*.

If the Attorney General has statutory authority to except certain categories of public benefit programs from PRWORA, she certainly has the authority to revisit, revise, or even reverse the decision. And the statute commends such decisions to her "sole and unreviewable discretion." Multiple Circuits have had the opportunity to review language similar, if not identical to, the discretionary language in PRWORA. All have concluded that such language strips courts of jurisdiction to review the Attorney General's decision broadly and, more specifically, under the Administrative Procedures Act. *E.g. Department of Commerce v. New York*, 588 U.S. 752, 771 (2019) ("Review is not available to the extent that… the agency action is 'committed to agency discretion by law.'"), *Make the Road New York v. Wolf*, 962 F.3d 612, 631-632 (D.C. Cir. 2020) (Congress's use of the phrase "sole and unreviewable discretion" with respect to expedited removals ensures that such discretion is not subject to the APA)., *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018) (Courts lack jurisdiction to review any standard for adjudicating certain immigration petitions because the statute entrusts those standards to the Secretary's "sole and unreviewable discretion"), *Bremer*, 834 F.3d at 929 (The language "sole and unreviewable discretion" excepts certain immigration-related decisions from APA review), *Roland*, 850 F.3d at 629-630 (Statute giving USCIS "'sole and unreviewable discretion' to determine whether a petitioner poses no risk" deprives the court of jurisdiction to review such determinations), *Lee v. United States Citizenship & Immigration Services*, 592 F.3d 612 (4th Cir. 2010) (granting the Attorney General discretionary power to adjust immigration status deprives

8

the courts of jurisdiction to review any decision make pursuant to the authority and excepts it from review under the APA).

In this case, PRWORA provides the Attorney General the "sole and unreviewable discretion" to revisit, revise, and reverse prior guidance and waivers. Her decision to rescind the 2001 guidance and replace it with guidance consistent with the law is not subject to APA review and her exercise of discretion cannot be reviewed by this Court.

## CONCLUSION

For the reasons stated above, this Court should deny the Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted this 15th day of August, 2025.

s/ Joseph S. Larisa, Jr.
Joseph S. Larisa, Jr.
LARISA LAW
50 South Main Street
Suite 311
Providence, RI, 02903
401-743-4700
Fax: 401-633-6296
Emai: joe@larisalaw.com


Jonathon P. Hauenschild*
FEDERATION FOR AMERICAN IMMIGRATION REFORM
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
(202) 328-7004
jhauenschild@irli.org

*Counsel for Amicus Curiae*
* Not admitted in this jurisdiction
