# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| STATE OF NEW YORK, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 1:25-cv-00345-MSM-PAS |
| U.S. DEPARTMENT OF JUSTICE, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

At its face, this is primarily an administrative law case. It turns on mundane, technical questions far afield from the day-to-day concerns of ordinary people. Those questions circle around four new Notices that four federal agencies—the Department of Justice ("DOJ"), the Department of Labor ("DOL"), the Department of Education ("ED"), and the Department of Health and Human Services ("HHS")—issued about the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). The Plaintiff States argue that these Notices violate several provisions of the Administrative Procedure Act ("APA") and the Spending Clause of the United States Constitution.[1]

Here are some examples of the abstruse (but important) questions that the

---

[1] The "Plaintiff States" refers to the collection of twenty states and the District of Columbia that filed suit. For ease of reading, the Court refers to them simply as "the States."

Court must answer. Are the Notices best understood as "legislative," such that they needed to go through a notice-and-comment period, or "interpretive," such that they did not? Are the Notices "arbitrary" and "capricious," meaning that the Agencies did not properly explain their decisions and should take another look at them, or are they reasonable and reasonably explained? And as a pure matter of statutory interpretation, did the Agencies do a better job interpreting the term "federal public benefit" the first time they took a stab at it—back when PRWORA was passed in the 1990s—or the second time two months ago?

The Government's new policy, across the board, seems to be this: "Show me your papers."[2] If the Government's plan goes into effect, immigration verification will be necessary for individuals to access emergency services for domestic violence victims and veterans, homeless shelters, soup kitchens, mental health crisis programs, and plenty more. *See, e.g.*, ECF No. 4-46 ¶ 38 ("Worse still, the population served primarily by PATH funding, which includes a significant portion of unhoused individuals (including veterans, victims of domestic violence, and individuals with chronic health disorders), are highly unlikely to have access to documentation now necessary to prove their eligibility as of July 14, 2025."); No. 4-55 ¶ 14 ("People going to access a soup kitchen or a food bank would have to produce I.D. to get inside, regardless of immigration status. The result is that fewer people will get critical anti-poverty resources due to immigrant communities avoiding services but also because, generally, people living in poverty at times lack government identification."); No. 4-

---

[2] The Court uses the term "the Government" to refer to the Defendants collectively.

71 ¶¶ 26–30 (explaining similar problems for emergency mental health crisis programs).

While reasonable policymakers can debate the merits of restricting access to programs to lawful citizens—and it is surely not this Court's job to wade into that debate—the Agencies offer at best incomplete answers to serious questions. Under the APA, that is a serious problem. *See* 5 U.S.C. § 706(2)(A). And they did so in a rushed way, without seeking comment from the public or interested parties. Under the APA, that is also a serious problem. *See* 5 U.S.C. § 553(b)(A).

One last problem (at least to start). The Government argues that it has somehow interpreted this statute incorrectly for the nearly thirty years that it has been the law. In its view, everyone (from every past administration) has misunderstood it from the start—at least until last month, when the right way to read it became clear to the Government. The Court is skeptical of that. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024) (overturning *Chevron* deference but explaining that, since the Founding, "very great respect" for an agency's interpretation of an ambiguous statute has been "especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time") (cleaned up). And that makes the Government's case even less tenable.

The bottom line is this: the States' Motion for a Preliminary Injunction—a temporary court order that maintains the status quo, at least while the case works its way through the judicial system—is GRANTED.

# I.    BACKGROUND

## A.    Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA")

As part of a broad overhaul of the federal welfare system in the 1990s, Congress enacted PRWORA.  Relevant here is Title IV of PRWORA, governing noncitizens' eligibility for federal, state, and local public benefits.  8 U.S.C. §§ 1601–1646.  Sections 1611 and 1621 generally make "qualified aliens" eligible for certain federal and state public benefits, while noncitizens who do not meet that definition—such as foreign students and temporary workers—are ineligible absent a statutory or state-law exception.  *See* 8 U.S.C. §§ 1611(a), 1621(a).

The statute defines "federal public benefit" to include grants, contracts, loans, licenses, and a broad range of welfare, health, housing, education, and similar programs funded by the federal government.  8 U.S.C. § 1611(c)(1).  DOJ has long interpreted this definition to not include "regular, widely available services" such as police, fire, and sanitation.  61 Fed. Reg. 45,985, 45,986 (Aug. 30, 1996).  PRWORA also contains specific exemptions, including emergency medical care, disaster relief, and certain community-based life-or-safety services designated by the Attorney General. 8 U.S.C. § 1611(b)(1).

Section 1642 requires states that administer federal public benefits to operate systems for verifying the immigration status of applicants.  *Id.* § 1642(a)–(b).  At the same time, nonprofit charitable organizations providing federal public benefits are not required to verify eligibility.  *Id.* § 1642(d).

### B.    Interpretations of PRWORA

Since shortly after PRWORA's enactment, multiple federal agencies have issued guidance interpreting the statute's scope and exemptions.  The DOJ was the first, publishing interim guidance in August 1996 that interpreted PRWORA not to apply to "widely available services" such as police and sanitation, and invoking the Life/Safety Exemption to exclude a range of services, including domestic violence programs, emergency shelters, soup kitchens, and youth safety initiatives.  61 Fed. Reg. 45,985 (Aug. 30, 1996).  These categories were reaffirmed in a 2001 Final Order. 66 Fed. Reg. 3,613 (Jan. 16, 2001).

ED and HHS also issued guidance in 1997 and 1998, respectively.  ED's interpretation was that federally funded K–12 education programs were not covered by PRWORA, as the statute applies only to "postsecondary education" benefits.  (ECF No. 4-6.)  HHS explained that programs lacking eligibility criteria or that distribute block grants to states generally fall outside the definition of "federal public benefit." 63 Fed. Reg. 41,658, 41,659 (Aug 4. 1998).  It listed thirty-one covered programs but noted that not all benefits within those programs necessarily require immigration status verification.  *Id.* at 41,660.

Over the following decades, agencies continued to rely on DOJ's 1996 guidance and the 2001 Final Order to determine which programs qualify for exemption under PRWORA.  Examples include HHS and HUD programs addressing homelessness,

substance abuse, and mental health. (ECF No. 2 at 17, 18 n.3.)[3]

Most recently, in 2024, DOL issued updated guidance explaining that while some workforce development services may be covered by PRWORA—such as those providing direct financial aid or postsecondary education—others, like informational services or assistance with paperwork, do not meet the statutory definition of a federal public benefit. (ECF No. 4-4 at 3–4.)

### C.    The July 2025 PRWORA Notices

Between July 10 and 16, 2025, the four agency defendants issued new notices, altering the interpretation and implementation of PRWORA. These notices were prompted by Executive Order 14218, which directed agencies to "align" their programs with PRWORA's requirements. 90 Fed. Reg. 10,581.

Specifically, the DOJ revoked all Life/Safety Exemptions it had maintained since PRWORA's enactment, asserting that earlier exemptions were either unnecessary or inconsistent with efforts to deter unlawful immigration. *Id.* at 32,023, 32,025.

HHS withdrew its 1998 interpretations and newly designated thirteen programs as subject to PRWORA. *Id.* at 31,232, 31,238. The HHS notice reinterprets PRWORA to cover programs without eligibility criteria, to include non-postsecondary education programs like Head Start, and to treat block grants as federal public benefits. *Id.* at 31,234-35, 31,235-37. The notice also states that HHS may add

---

[3] Throughout the opinion, the Court's citations to the parties' filings refer to the blue ECF pagination at the top of each page, rather than the pagination that the parties put at the bottom of the page.

additional programs in the future. *Id.* at 31,237.

ED reversed its longstanding view that PRWORA covers only postsecondary education benefits. *Id.* at 30,899. The ED notice now applies PRWORA to nearly all adult and youth education benefits except basic public education. *Id.* Further, ED identified Title II of the Workforce Innovation and Opportunity Act ("WIOA") and career and technical education programs under the Carl D. Perkins Career and Technical Education Act ("Perkins V") as newly covered federal public benefits. *Id.* 30,899–900. The notice also narrowed the nonprofit verification exemption and provided that states remain responsible for ensuring compliance, even when services are provided by charitable nonprofits. *Id.* at 30,900.

DOL similarly reversed its 2024 guidance and now considers all participant-level workforce services to be federal public benefits under PRWORA. (ECF No. 4-4.) DOL instructed recipients to update policies and procedures accordingly. *Id.*

### D.    The Notices' Impact

The July 2025 PRWORA Notices reflect a sweeping policy shift toward requiring immigration status verification for access to a broad array of federally funded social, educational, workforce, and emergency services. For decades, states have administered these programs—such as Title X clinics, Head Start, WIOA-funded education and job training, emergency shelters, mental health services, and victim assistance—under the understanding that they were open to all eligible individuals regardless of immigration status. *See, e.g.*, ECF Nos. 4-18 ¶¶ 13–15; 4-25 ¶ 38; 4-63 ¶ 6; 4-69 ¶ 36. The new requirements, the States argue, upend these assumptions and demand immediate and costly implementation of screening systems

that many programs are neither legally mandated nor practically equipped to carry out. (ECF No. 2 at 13.)

More specifically, the States warn that the new verification mandates are incompatible with the nature and purpose of these programs. Many affected services—like crisis counseling, domestic violence shelters, emergency housing, or substance use treatment—are designed for individuals in immediate need, who are often unable to produce legal documentation. *See, e.g.*, ECF Nos. 4-39 ¶¶ 24–29; 4-42 ¶¶ 7–9; 4-51 ¶ 17; 4-57 ¶ 14. Others, such as WIOA-funded adult education and Perkins career training, rely on continuity of instruction and inclusive access to enable economic mobility. *See, e.g.*, ECF Nos. 4-16 ¶ 39; 4-18 ¶ 8; 4-33 ¶ 16; 4-60 ¶ 51. Verification requirements are expected to exclude current participants midstream, chill participation among even eligible individuals who lack paperwork or fear enforcement, and lead to program closures where compliance is logistically or financially infeasible. *See, e.g.*, ECF Nos. 4-16 ¶ 53; 4-36 ¶ 23; 4-43 ¶ 13.

The States also present evidence about the heavy administrative burdens of implementing these Notices. Developing verification systems, retraining staff, modifying intake procedures, and addressing legal compliance risks will require extensive time and resources. *See, e.g.*, ECF Nos. 4-24 ¶ 55; 4-50 ¶ 11; 4-52 ¶ 16; 4-68 ¶ 20. Yet the Notices provide no additional funding or transition period.[4] In some cases—such as Perkins V—attempting to backfill lost federal funds with state dollars

---

[4] This is in contrast to 8 U.S.C. § 1642(b), which allowed states two years to develop a program to comply with verification regulations.

could violate statutory prohibitions on supplanting, jeopardizing future eligibility. *See, e.g.*, ECF Nos. 4-16 ¶¶ 43, 51; 4-24 ¶ 52; 4-25 ¶ 40. The result will be reduced program enrollment, lower federal allocations, and increased reliance on emergency departments, shelters, or law enforcement. *See, e.g.*, ECF Nos. 4-27 ¶ 18; 4-54 ¶ 46; 4-69 ¶¶ 38–39. Programs meant to prevent high-cost interventions—like Title IV-E family stabilization, 988 crisis hotlines, and Certified Community Behavioral Health Clinics—will be severely undermined. *See, e.g.*, ECF Nos. 4-21 ¶ 14; 4-51 ¶ 26; 4-70 ¶ 31.

Ultimately, the States present evidence that they may be forced to scale back or abandon federally funded services altogether to avoid violating their own inclusive policies or exposing providers to liability. *See, e.g.*, ECF Nos. 4-15 ¶ 24; 4-20 ¶ 17; 4-23 ¶ 21; 4-36 ¶ 33; 4-59 ¶¶ 13–16. To the States, these actions will reverse years of coordinated public investment in equitable service delivery, exacerbate economic and health disparities, and inflict lasting harm on the populations these programs were designed to serve.

### E.    This Case

The States assert that the July 2025 PRWORA Notices violate the APA, 5 U.S.C. § 551 *et seq.*, and the Spending Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 1. They seek injunctive relief to restrain and enjoin the Government from implementing the July 2025 PRWORA Notices in the States party to this suit. (ECF No. 2.)

## II.    STANDARD OF REVIEW

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). "To secure a preliminary injunction, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (cleaned up). Here, the last two factors merge because the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"The first two factors" here "are the most critical." *Id.* at 434. "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success—rather, they must establish a strong likelihood that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Loc. 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (citation modified). In evaluating whether the States have shown a likelihood of success on the merits, the Court must keep in mind that the merits need not be "conclusively determine[d]"; instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (citation modified).

## III.    DISCUSSION

The Court begins with an extended discussion of the States' likelihood of success on the merits. Finding that the States are likely to succeed on its claims, it proceeds to analyze irreparable harm, the balance of the equities, and the public

interest.  It concludes by addressing the scope of the remedy, the issuance of a bond, and the Government's request for a seven-day stay.

### A.    Likelihood of Success on the Merits

The Court now turns to the States' likelihood of success on the merits of their three APA claims and one constitutional claim.

As to the three APA claims, the States first argue that the HHS, ED, and DOL Notices failed to comply with APA procedural requirements—particularly, the necessary notice-and-comment period.  Second, the States submit that the Notices are arbitrary and capricious and thus in violation of the APA, because the Notices are neither "reasonable" nor "reasonably explained," each independently being fatal to their viability.  *See Ohio v. EPA*, 603 U.S. 279, 292 (2024).  Third, the States contend that the Notices are contrary to law, mostly in that the Agencies have misinterpreted the term "federal public benefit" as a basic matter of statutory interpretation.

As to the constitutional claim, the States argue that all four Notices impose new conditions on spending that violate the U.S. Constitution's Spending Clause.

At this stage, the States need only show a substantial likelihood of success on one of their claims against each defendant to merit a preliminary injunction.  *See, e.g.*, *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 461 (D.R.I. 2025); *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 215 (D. Mass. 2023) (collecting cases).

### 1.    "Final Agency Action" Analysis

Before reaching the merits of the APA claims, though, the Court must

determine whether the States are likely to show that the Notices constitute "final agency action." 5 U.S.C. § 704. If the Notices do not, then they cannot be subject to judicial review under the APA. *Id.*

A final agency action has two essential qualities. First, it "marks the consummation of the agency's decisionmaking process." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (cleaned up). And second, it either is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (cleaned up).

The States argue that the HHS, ED, and DOL Notices "mark the consummation of agency decisionmaking from which legal consequences will flow" because the Notices "identify new programs as providing "federal public benefit[s] requiring immigration status verification under PRWORA. (ECF No. 2 at 49.) In HHS's case, for instance, this is "effective immediately." *Id.* (citing 90 Fed. Reg. at 31,238). So no further action is necessary to issue a decision and the decision affects the Agencies' commitments to funding programs. *Id.*

The Government responds that the Notices are not "final agency action" because they are interpretive rules. In its view, the "critical feature" of the interpretive rule is "that it does not have independent legal force," and that is the case here. (ECF No. 48 at 22 (quoting *Ctr. For Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805–06 (D.C. Cir. 2006))). These Notices only set "forth the agency's understanding of PRWORA's purpose and plain text," and although there may be practical consequences, those practical consequences do not create final

agency action.  For instance, the Government notes that the Notices "do not require adoption of specific verification methods and do not identify any consequences that will follow failure to verify."  (ECF No. 48 at 23.)

The States have the better of the argument.  The Supreme Court has held that even internal memoranda that bind staff constitute "final agency action."  *Biden v. Texas*, 597 U.S. 785, 808–09 (2022).  These Notices go beyond that, insofar as two of the three Notices are issued in the Federal Register with immediate effect.  The HHS Notice explains that "it is necessary to apply this interpretation to HHS programs immediately."  90 Fed. Reg. at 31,238.  The ED Notice is not as clear, stating only that "entities administering [the covered programs] may consider this interpretation when taking action to comply with PRWORA," but that still implies that it is effective immediately.  90 Fed. Reg. 30,900.  And either way, these bind staff and notify the public of changing obligations for specific programs.

Meanwhile, the DOL Notice, though not issued in the Federal Register, specifically "directs the public workforce development system to update all policies and procedures to ensure that all participants served by the programs identified in the guidance are legally authorized to work in the United States." (ECF No. 4-4 at 3.) That is akin to the memoranda found to be a "final agency action" in *Biden v. Texas*. 597 U.S. at 808–09.

Read in that context, both facets of the final agency action test are satisfied as to all three Notices.  These Notices clearly "mark the consummation" of the Agencies' decisionmaking about the scope of PRWORA, and, specifically, how it applies to

programs that each Agency administers. 603 U.S. at 808. And by extending PRWORA to cover new programs, "legal consequences will flow" and both rights and obligations "have been determined." *Id.* The legal consequences include the new verification regimes; from that, individuals' rights to access newly covered PRWORA programs are narrowed, and obligations to states and localities who administer covered programs are expanded, because as they need to establish these verification regimes.

While the Court understands the Government's argument that the Notices are best understood as "interpretive," that analysis is better suited for the Court's consideration of Count I than it is the "final agency action" analysis. *See Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019) ("Because only final agency action is reviewable under the APA . . . , *Perez* [*v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)] thus affirms that interpretive rules can be final, and, by implication, that the test for finality is independent of the analysis for whether an agency action is a legislative rule rather than an interpretive rule.")

### 2. Count I: APA Procedural Violations

The Court now turns to the APA claims' merits. Under Count I, the States argue that the Notices were "unlawfully promulgated" because the agencies failed to go through the requisite notice-and-comment period. (ECF No. 2 at 50–54.) The central issue here is whether these Notices were "legislative" or "interpretive." If the Notices are "legislative," then notice-and-comment rules apply; if interpretive, they do not. *See* 5 U.S.C. § 553(b)(A). Despite this binary choice, the analysis is

14

complicated.

Background from the First Circuit is the natural starting place. "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.* Still, "exempted from this requirement are '*interpretive rules*, general statements of policy, or rules of agency organization, procedure, or practice.'" *Id.* (quoting 5 U.S.C. § 553(b) (emphasis added)). The first exception is central, because this claim turns on whether the HHS, ED, and DOL Notices are "interpretive" or "substantive/legislative."

The First Circuit has explained that an interpretive rule is issued "merely to advise the public of the agency's construction of the statutes and rules which it administers." *Azar*, 887 F.3d at 70 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)). These rules "do not have the force and effect of law" but "nevertheless may have a substantial impact on regulated entities." 887 F.3d at 70.

In contrast, a legislative rule "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *Id.* The D.C. Circuit, the leading Court of Appeals on issues of administrative law, has also said that a rule is legislative "if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in

existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).

The distinction between the two is not very clear. "Somewhere along a spectrum, a rule transitions from being interpretive to being legislative," but "the point at which a rule crosses that line is a question enshrouded in considerable smog." *Azar*, 887 F.3d at 70 (cleaned up). Still, *Azar* says "five considerations" are relevant: statutory text; the explanation (or lack thereof) given by an agency in adopting a policy; whether the rule is "inconsistent with another rule having the force of law" or otherwise "alters or enlarges obligations imposed by a preexisting regulation"; the "manner in which the Secretary's actions fit within the statutory and regulatory scheme;" and, finally, "pragmatic considerations." 887 F.3d at 73 (cleaned up).

The States argue that the Notices are legislative for three reasons. First, the Notices "substantially change eligibility for several foundational programs." (ECF No. 2 at 51.) Second, they have "massive effects," requiring notice and comment. (ECF No. 2 at 53.) Third, the Agencies' characterization of the Notices as "interpretive" should be afforded little deference. (ECF No. 2 at 53–54.)

The Government responds that the Notices are interpretive because they only reflect the Government's new interpretation of the statutes, and do not modify legal consequences or add obligations. Likewise, the Government posits that a change in position alone is not enough to transform an interpretive rule into a legislative one. Finally, the Government observes that the Agencies "were free to change or withdraw their prior interpretations without engaging in notice-and-comment rulemaking," so

the same is true here.  (ECF No. 48 at 25.)

The Court structures its analysis around the considerations that the First Circuit identified in *Azar*.

### a.    Text

This factor favors the Government.  This case turns on what a "federal public benefit" is.  Recall the statutory text: an "alien who is not a qualified alien" is "not eligible for any Federal public benefit (as defined in subsection (c))."  8 U.S.C. § 1611(a).  Congress expressly notes here that the definition of "federal public benefit" is defined in subsection (c) of the statute, seeming to downsize the Agencies' role in the deliberative process.  *Cf. Mendoza*, 764 F.3d at 1022 ("Where Congress has specifically declined to create a standard, the Department cannot claim its implementing rule is an interpretation of the statute.")  Subsection (c) then provides a robust (though not necessarily clear) definition of "federal public benefit."  *See* 8 U.S.C. § 1611(c).  So the Agency Notices serve a somewhat narrow function: to decide whether specific programs they administer provide a "federal public benefit."

That is unlike *Azar*.  There, the "textual silence on whether to offset other sources of payment" led the First Circuit to conclude that "any authority that the Secretary may have to adopt the rule at issue would most likely flow from Congress's delegation of a power to make a decision that Congress chose not to make itself."  887 F.3d at 71.

*Azar* also drew on a Supreme Court case called *Guernsey Memorial Hospital*, describing it as a case where "the Secretary argued, and the Court appeared to agree,

that the only plausible interpretation of the statutory and regulatory scheme was the one advanced by the Secretary" and that the Secretary was "thus simply following the statutory command, and was not making a discretionary policy judgment." 887 F.3d at 70–71 (citing *Shalala v. Guernsey Mem. Hosp.* 514 U.S. 87, 89–90 (1995)). The First Circuit then offered a hypothetical: "We would have a similar situation in this case if, for example, Congress had expressly specified that all sources of third-party reimbursements be offset from costs incurred, and the Secretary then implemented that directive by identifying Medicare payments as just such a reimbursement." 887 F.3d at 71.

That hypothetical seems close to the Notices in this case. Congress states that the term "federal public benefit" means "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States" or "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit." 8 U.S.C. § 1611(c)(1)(A)-(B). So Congress here "expressly specified" PRWORA's scope, and the Notices, like the *Azar* hypothetical, "implemented that directive by identifying" the Agency programs that fall under its umbrella. 887 F.3d at 71. So this factor favors the Government insofar as it supports the conclusion that the Notices are interpretive.

### b.    Explanation

This factor also favors the Government as to the HHS and ED Notices, but not

the DOL Notice.

Both the HHS and ED Notices rely heavily on canons of statutory interpretation in their analysis. The HHS Notice relies on the "plain meaning" canon, the statutory term "any" as compelling an expansive reading, the *noscitur a sociis* canon, the *expressio unius* canon (albeit by a different name), the presumption against superfluity, the role of the residual clause in discerning meaning, and the *ejusdem generis* canon. The ED Notice relies on arguments about context and statutory structure, dictionary definitions, the presumption against superfluity, the statute's built-in *Plyler* construction rule, and the 1997 Notice's improper use of legislative history. These are all bread-and-butter statutory interpretation arguments and observations.

The fact that these are the building blocks of the HHS and ED Notices cuts against the States' position that these notices are "legislative." In *Azar*, the First Circuit explained that had "the Secretary merely been interpreting the governing statute and regulation, then one would expect that the agency's justification for the rule would rely on an interpretive methodology." *Id.* at 71–72. And *Azar* collects cases to illustrate the point. *See Warder v. Shalala*, 149 F.3d 73, 78 (1st Cir. 1998) (noting that the agency discussed "relevant statutes, regulations, legislative history, and administrative materials before reaching its conclusion"); *Metro. Sch. Dist. of Wayne Twp. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992) (stating that the Secretary's reliance on "the language of both the statute and an implementing regulation, and the legislative history of the Act" in a letter announcing the rule was an "important"

19

factor weighing "in favor of a determination that the rule is interpretive" (cleaned up)); *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (noting that the agency's "entire justification for the rule" in the Federal Register was "comprised of reasoned statutory interpretation, with reference to the language, purpose and legislative history of" the statute, so it was interpretive).

But the DOL Notice reads differently than the other two.  It includes none of the same arguments and instead focuses mostly on the impact of the change.  *See generally* ECF No. 4-4.  That is similar to the FAQ in *Azar*, where the Secretary "offered no meaningful hint that the Secretary derived the policy announced in the FAQs from an interpretation of the statute or the regulation."  887 F.3d at 72.  That favors its classification as legislative.

The Court digresses here to consider the States' argument about how the Agencies' characterizations of the Notices should be afforded little deference.  On this point, the States are right.  HHS and ED characterize their rules as interpretive.  *See, e.g.*, 90 Fed. Reg. at 31,238 (HHS describing the notice as an "interpretation"); 90 Fed. Reg. at 30,900 (ED describing the Notice as an "interpretive rule").  But the First Circuit has stated that "the probative value of the Secretary's own characterization of a pronouncement as interpretive is limited, and we do not place on it more weight than its merits can bear."  *Azar*, 887 F.3d at 70.  If the Agency's characterization were decisive, it "would create an easy end run around the APA's procedural protections."  *Id.*  The substance of the claim, rather than just the classification, matters most.

In short, this factor favors the ED and HHS Notices being interpretive but the

DOL Notice being legislative.

### c.   Inconsistency

"Inconsistency with past regulations" heavily favors the States.  These Notices substantially change eligibility for a host of federal programs, strongly indicating that the Notices are legislative, not interpretive.

First, HHS.  In 1998, HHS made three decisions that it reversed in 2025, adding thirteen new programs to PRWORA's sweep.  First, in 1998, it found that the term "grant" only "refers to financial awards to individuals" and "does not include so-called 'block grants' which are provided to states or localities, since that would give the word an entirely different meaning than the other terms in that Part."  63 Fed Reg. 41,658, 41,659 (Aug. 4, 1998).  In 2025, HHS walked this back, because the division it made in 1998 "reads a limitation into" the statutory term "any grant" that "Congress intentionally left out."  90 Fed. Reg. at 31,233.  Instead, block grants to states and localities are covered and thus subject to PRWORA.

Second, in 1998, HHS found that "by explicitly identifying 'postsecondary education' the statute excludes non-postsecondary education programs, such as Head Start and elementary and secondary education."  63 Fed. Reg. at 41,659.  In 2025, HHS reversed this decision because it "rests on a misapplication of canons of statutory interpretation," particularly *ejusdem generis*.  90 Fed. Reg. at 31,233.

Third, in 1998, HHS said that PRWORA does not cover programs that do not include an "eligibility unit" in determining who gets benefits.  63 Fed. Reg. at 41,659.  For example, "in order for a program to be determined to provide benefits to 'eligibility

units' the authorizing statute must be interpreted to mandate ineligibility for individuals, households, or families that do not meet certain criteria, such as a specified income level or a specified age." *Id.* In 2025, HHS reversed that decision, explaining that the 1998 Notice "gave greater significance to 'eligibility unit' than that text can bear." 90 Fed. Reg. at 31,235.

The result of those three changes is that the 2025 HHS Notice interpreted PRWORA to cover thirteen additional programs. *See* 90 Fed. Reg. at 31,237 (listing the programs). That is a textbook inconsistency with its past position not covering those programs, and HHS does acknowledge that it is changing position. *Id.* at 31,237–38.

Next, ED. In 1997, ED issued a Dear Colleague Letter stating that the statute did not cover "assistance provided under federally funded preschool, elementary, and secondary education programs," because the definition of "federal public benefits" is limited to postsecondary education benefits. (ECF No. 4-6 at 2.) Reversing that decision in 2025, it added several more programs. 90 Fed. Reg. at 30,899–900 (explaining that ED now interprets "PRWORA to apply to benefits provided to individuals under programs authorized under Title II of the Workforce Innovation and Opportunity Act of 2014 (WIOA) and career and technical education (CTE) programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006, as amended (Perkins V), as well as benefits provided through postsecondary education programs"). This expansion of regulation constitutes an inconsistency.

Finally, DOL. Just last year, it explained that "many, but not all, services

authorized" by workforce training did not fall under PRWORA's scope. (ECF No. 4-7 at 6.) After all, those services "are not included in the definition of 'federal public benefits,'" as it later defined it. *Id.* Not so anymore. The 2024 Notice was "rescinded on March 27, 2025" and replaced with the current one, which states that DOL is "changing its prior guidance to clarify and establish that all participant-level services are considered 'federal public benefits' under PRWORA." (ECF No. 4-4 at 3.)

The Court does not know how to interpret this as anything other than being "inconsistent" with past rules and altering (really enlarging) "obligations imposed by a preexisting regulation." *Azar*, 887 F.3d at 73. With more programs subject to PRWORA verification, more subgrantees and actors will need to verify individuals' immigration statuses to receive federal funds for the program. That is a major change from past practice, favoring the States.

### d.    Fit within the Statutory Scheme

For the reasons just described, the Notices significantly expand the reach of the statute while also being just that: interpretations of an existing statute. On the available caselaw, it seems that the Notices' expansive practical effects and inconsistency with past interpretations outweigh its interpretive reasoning for purposes of this factor.

Admittedly, the Notices do not easily map on to past cases favoring either position. They are not quite like *Azar*, where, because the FAQ document addressed a "gap rather than an overlap," it was more legislative than interpretive. 887 F.3d at 773. Here there is no gap, but rather a vigorous debate about what "federal public

benefit" means.

But the Notices also are not like *Warder*, where an agency action that the court held was interpretive only addressed "a small overlap" in the scheme and provided an answer that was clearly "consistent with the existing definitions." 149 F.3d at 81. This is far from a small or narrow decision, and it conflicts with—specifically rejecting—past regulations.

That seems dispositive for this factor, as the Supreme Court in *Guernsey Memorial Hospital* observed. *See* 514 U.S. at 100 ("We can agree that APA rulemaking would still be required if PRM § 233 adopted a new position inconsistent with any of the Secretary's existing regulations."). This factor thus favors the States.

### e.    Practical Considerations

Finally, this factor favors finding that the Notices are legislative. Here is where the FAQ Document from *Azar* is on all-fours with the Notices.

Like in *Azar*, the Notices call "for a categorical resolution that affects a broad range of payments and scenarios and likely involves large sums of money." 887 F.3d at 73. HHS, for instance, estimates that its Notice could "result in an annual effect on the economy of $100 million or more." (ECF No. 4-5 at 4.)

Like in *Azar*, the Government cannot point to "evidence that the [agencies] consistently implemented the statute" between the 1990s and 2025 "in accord with the Secretary's present policy." 887 F.3d at 73. Quite the opposite: as discussed, all three Notices recognize that the Notices depart from past practices.

Like in *Azar*, the Notices "announced a new policy on a matter of some

24

considerable import." 887 F.3d at 74. That is true economically, politically, and socially. The new Notices, in the States' estimate, will curtail access to federally funded programs for millions. (ECF No. 2 at 12.)

And like in *Azar*, "the burdens that might weigh against requiring notice and comment for interstitial, minor, or confirmatory pronouncements guiding agency operation are much more easily justified in order to ensure the benefits of notice and comment." 887 F.3d at 74. As explained thus far, and highlighted more fully in the irreparable harm section, these Notices are far from "interstitial, minor, or confirmatory." *Id.*

### f.    Weighing the Factors

Though text (as to all three Notices) and explanation (as to HHS and ED but not DOL) favor the Government's position, the other three factors weigh against the Government and counsel a holding that the Notices are legislative.

The First Circuit did not state how the factors should be weighed in *Azar*, aside from noting that the Government's characterization of the rule should not be afforded all that much weight. 887 F.3d at 70. But the caselaw's emphasis on practicality, consistency with past regulations, and the significance of the regulation—or perhaps, its "import," as stated in *Azar*, or put more colloquially, how "big of a deal" the regulation is—suggests that the last three factors should be given more weight than the first two. *Azar*, 887 F.3d at 74; *Guernsey Mem. Hosp.*, 514 U.S. at 100; *see also Appalachian Power Co v. EPA*, 208 F.3d 1015, 1024 ("It is well-established that an agency may not escape the notice and comment requirements . . . by labeling a major

substantive legal addition to a rule a mere interpretation."); *id.* at 1028 (explaining that EPA could not "in effect amend" a statute "without complying with the rulemaking procedures required").

The Court thus holds that the rules are legislative and subject to notice-and-comment.

### B.    Count II: Arbitrary and Capricious

Next, the States argue that the Notices were arbitrary and capricious. (ECF No. 2 at 54–61.) In their view, all three fail to consider reliance interests and costs, and all three fail to adequately explain why the newly restricted programs are considered "federal public benefits" under the statute.

The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious "if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The Court cannot "substitute its judgment for that of the agency," but it must take care to "ensure" that the agency has "offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up). And "an agency cannot simply ignore an important aspect of the problem." *Id.* (cleaned up).

"In arbitrary and capricious cases, we distinguish substantive unreasonableness claims from lack-of-reasoned-explanation claims." *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936

(D.C. Cir. 2017) (Kavanaugh, J.).  "A substantive unreasonableness claim ordinarily is an argument that, given the facts, the agency exercised its discretion unreasonably," and a "decision that the agency's action was substantively unreasonable generally means that, on remand, the agency must exercise its discretion differently and reach a different bottom-line decision." *Id.* Meanwhile, "a lack-of-reasoned-explanation claim in this context ordinarily consists of a more modest claim that the agency has failed to adequately address all of the relevant factors or to adequately explain its exercise of discretion in light of the information before it." *Id.*

A decision is not reasonably explained if, among other things, "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024).

The starting place is the reasoning that the agencies employed in the Notices. After all, "it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983).  The Court considers the three Notices individually.

### a.    HHS Notice

In the States' view, three problems are apparent with the HHS Notice.  The

27

States first say that the HHS Notice "all but explicitly declines to obey the binding precedent requiring it to consider reliance interests." (ECF No. 2 at 55.) And those reliance interests are, in the States' view, "extensive." *Id.* For instance, Title X and Head Start have "served people regardless of immigration status" for "nearly thirty years," and States have developed networks and devoted resources to this interpretation of the statute. *Id.* at 55–56. Bolstering that are the reliance interests of the "millions of people who have relied on these services for early childhood education, substance abuse treatment, and other necessities." *Id.* at 56.

The States also highlight HHS's failure to consider important aspects of the problem: the "significant time and resources to implement new processes to verify immigration status" for the services, the fact that "any other vulnerable still-eligible people who rely on safety net benefits but lack ready proof of citizenship or immigration status," and the potential for "covered programs to close because they do not have the resources to implement a complex system." (ECF No. 2 at 56–58.)

Finally, the States emphasize how the HHS Notice "fails to explain why eleven of the thirteen" newly covered programs are "federal public benefits," despite the "immediate practical effect." (ECF No. 2 at 58.) For example, the "Health Center Program" funds over 1,400 community health centers nationwide and serves over 30 million people a year, but the Notice "provides no explanation as to why services at those centers are now designated as federal public benefits." *Id.* at 58. The result, in the States' view, is confusion: providers "and patients are left to wonder: is it due to a broader definition of 'grant'? The change in 'eligibility unit'? An 'other similar

benefit'?" *Id.*

The Government responds by suggesting that HHS need not "minutely explain why every individual program listed in the HHS Notice provides Federal public benefits." (ECF No. 48 at 35.) Nor does it need to provide "an exhaustive explanation that addresses all possible alternatives." *Id.* Instead, the Notice's "extensive discussions and explanations" suffice to justify revision of their prior interpretations of PRWORA. As for reliance interests, the Government says that they deserve little weight given HHS's decision to correct course on what it sees as an incorrect reading of a statute. *Id.* at 35–37.

Starting with the first argument, the States have the better of it. Because HHS was "not writing on a blank slate," it "was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (cleaned up).

Here, HHS failed to do any of that—and even seemed to spurn the thought of it. All HHS had to say about reliance interests was this:

> Some may argue that there are reliance interests that are affected by the Department's change in position. Some may argue that the Department's new position will negatively impact public health. However strong these hypothetical policy arguments may be, the Department has no power to override Congress's will, expressed in the clear statutory text of PROWRA.

90 Fed. Reg. at 31,238. It then cited *Loper Bright Enterprises, Inc. v. Raimondo*, 603 U.S. 369, 400 (2024), for the proposition that, "in the business of statutory interpretation, if [an agency's interpretation of the statute] is not the best, it is not

permissible." *Id.* But *Loper Bright*—a case about statutory interpretation—is not a get-out-of-considering-reliance-interests free card. (And, as explained later, the 2025 HHS Notice's interpretation of the statutes is likely not the "best," either.)

To try to save this claim, the Government cites to Justice Thomas's separate opinion in *Regents*, a partial concurrence and partial dissent, to support HHS's punting on reliance interests. (ECF No. 48 at 36 (citing 591 U.S. at 60)). That authority is unconvincing. Writing for the *Regents* majority, Chief Justice Roberts explained that "nothing about" the agency's determination that the program was unlawful "foreclosed or even addressed the options of retaining forbearance or accommodating particular reliance interests." 591 U.S. at 33. The Government, here as there, "should have considered those matters but did not," and "that failure was arbitrary and capricious in violation of the APA," even if the Government considered the program unlawful. 591 U.S. at 33; *see also FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917–18 ("Under [the change-in-position doctrine], agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests.") (cleaned up). To that extent, the Government's efforts to distinguish *Regents* are unconvincing; in fact, concerns about reliance interests here are likely weightier than in *Regents*, given that some of the programs here have operated for nearly 30 years, while DACA had operated for only eight at the time of the *Regents* decision.

The failure to consider reliance interests is sufficient to settle Count II against

HHS, so the Court declines to delve into the States' other arguments.

### b.    ED Notice

Next, ED.  In the States' view, ED "simply ignores reliance entirely."  (ECF No. 2 at 59.)  Its failure to do so is significant, given the newly covered programs are expansive and PRWORA coverage will "immediately exclude thousands of participants in the middle of programs without any regard to the impact on them, their families, their employers, and their communities."  *Id.*  Likewise, the States contend that ED failed "to consider the disadvantages of its decision, as it was required to do."  *Id.*

For its part, the Government's arguments here largely track those that it made for the HHS Notice.  (ECF No. 48 at 34–37.)

The Court agrees that the ED Notice did not grapple with reliance interests at all.  Again, like in *Regents*, the Government "should have considered those matters but did not," and "that failure was arbitrary and capricious in violation of the APA," even if the Government considered the program unlawful.  591 U.S. at 33.  Nothing more is needed on the question.

### c.    DOL Notice

Finally, DOL.  The Court need not repeat the arguments from either party because they largely track the arguments from above.

And for the same reason—the lack of consideration of reliance interests—the Court holds that the DOL Notice is arbitrary and capricious.  The Court notes also that, while the HHS and ED Notices at least attempted to justify their interpretations

based on legal principles, the DOL Notice barely attempts to do that, beyond a single vague paragraph. (ECF No. 4-6 at 3–7.) That makes the case that it is "arbitrary" and "capricious" even clearer.

### C.    Count III: Contrary to Law

The States' third claim is that the Notices are contrary to law. At bottom, this claim boils down to who offers the best interpretation of PRWORA, because it largely concerns whether the Notices' extension of PRWORA to new programs violates the definition of "federal public benefit" in § 1611(c). Again, it is best to take each Notice on its own.

### a.    HHS Notice

The States argue that the HHS Notice is contrary to law for five reasons. First, it "unlawfully applies PRWORA to benefits that are generally available to the public," extending the statute's coverage largely based on a misreading of the term "eligibility unit." (ECF No. 2 at 62.) Second, it "unlawfully extends PRWORA to non-postsecondary educational benefits, including Head Start." (ECF No. 2 at 66.) Third, it "improperly deems programs subject to PRWORA in their entirety, rather than identifying 'federal public benefits' on a benefit-by-benefit basis." (ECF No. 2 at 69.) Fourth, it "incorrectly includes all benefits funded by block grants to State or local governments." (ECF No. 2 at 71.) Fifth, it "includes several programs that Congress exempted from PRWORA in subsequent statutes." (ECF No. 2 at 72.)

The Government responds that the HHS Notice is grounded in the "plain meaning" of the term "federal public benefit." (ECF No. 48 at 28–29.) Though it does

not take each of the States' arguments in turn, the Court sees the matching counterarguments as follows. First, the statute does sweep as broadly as HHS says, and the Attorney General's previous exercise of discretion to exclude a host of programs—the exercise of discretion that has now been revoked—shows as much. *Id.* at 31. Second, Head Start and other non-postsecondary educational benefits are covered under the catch-all term, "any other similar benefit," based on *ejusdem generis*. *Id.* at 29–31. Third, not identifying benefits on an individualized basis demonstrates how the States' claims are "premature." *Id.* at 32. As to the States' fourth argument, the same is true. *Id.* at 31. Fifth, the excepting statutes that the States identify do not really exempt programs from PRWORA's requirements. *Id.* at 32.

As to the first argument, the Court agrees with the States that PRWORA is limited to programs that have eligibility requirements. The statute first defines a "federal public benefit" as "any grant, contract, loan, professional license, or commercial license." 8 U.S.C. § 1611(c)(1)(A). By their nature, contracts, loans, professional licenses, and commercial licenses all require an application or a similar transaction in order to take effect. Those transactions necessarily require eligibility.

The statute's second definition of "federal public benefit" is admittedly more expansive, but eligibility is still a prerequisite. A federal public benefit is also "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family

eligibility unit."  8 U.S.C. § 1611(c)(1)(B).  The crux here is that last phrase, "eligibility unit."

The States, relying on the series-qualifier canon, argue that a program "that imposes no limits on eligibility is not provided to 'eligibility units,' and so cannot constitute a 'federal public benefit'" under this provision.  (ECF No. 2 at 63.)  More simply, their position is that the phrase "eligibility unit" modifies all three preceding items in the list, not just the last one.  To paraphrase, their position is that the statute should be read like this: a "federal public benefit" is one that is "provided to an individual [eligibility unit], household [eligibility unit], or family eligibility unit."

In contrast, the Government, relying on the last-antecedent rule, argues that the term "eligibility unit" only modifies "family," so programs that serve individuals or households, even without eligibility criteria, are covered under PRWORA.  (ECF No. 48 at 28.)  In its view, "eligibility unit" only modifies "family."  To paraphrase, its position is that PRWORA requirements extend to cases involving conferral of a benefit to an "individual," a "household, or a "family eligibility unit."  So "eligibility unit" only modifies "family."

The States have the better read of the statute here, because the last-antecedent rule does not control.  The Supreme Court's decision in *Lockhart v. United States*, 577 U.S. 347 (2016), illustrates why.  In considering the phrase, "relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward," the Court held that the phrase "involving a minor or ward" only applies to "abusive sexual conduct" based on the last antecedent rule.  *Id.* at 349 (quoting 18

U.S.C. § 2552(b)(2)).  But it explained that the rule "is not an absolute and can assuredly be overcome by other indicia of meaning."  *Id.* at 352 (cleaned up).

For instance, the *Lockhart* majority explained that the last antecedent rule did not apply to the phrase "the laws, the treaties, and the Constitution of the United States," such that "of the United States" only modified "the Constitution," because (1) laws, treaties, and the Constitution are cited together, (2) readers are used to seeing them together, and (3) the "listed items are simple and parallel without unexpected internal modifiers or structure."  *Id.* at 352; *see also id.* at 367 n.2 (Kagan, J., dissenting) (collecting similar examples).  The Court sees the phrase "individual, household, or family eligibility unit" as more like that example than the phrase from § 2252(b), because the items in § 1611(c)(1)(B) are "simple and parallel without unexpected internal modifiers or structure."  *Id.* at 352; *id.* at 362 (Kagan, J., dissenting) (noting that the last antecedent rule would not apply to the phrase "an actor, director, or producer involved with the new Star Wars movie").

Context bolsters the Court's conclusion here.  *See* 577 U.S. at 352 ("More importantly, here the interpretation urged by the rule of the last antecedent is not overcome by other indicia of meaning.")  For instance, another part of the statute, its verification provisions, direct the Attorney General to promulgate regulations "requiring verification that a person applying for a federal public benefit" is "a qualified alien and is eligible to receive such benefit."  8 U.S.C. § 1642(a)(1).  That indicates an application is necessary for something to qualify as a federal public benefit.  So too later on.  *See* 8 U.S.C. § 1642(d) (requiring "proof of eligibility of any

applicant for such benefits"). While the Government points to the phrase "the same household or family eligibility unit" in another part of the statute, § 1631(f)(2), as evidence that "eligibility unit" should not be carried over to individual or household in § 1611(c)(1)(B), the Court believes that the phrase in § 1631(f)(2) just replicates the same ambiguity, rather than providing evidence that clearly resolves it.

The Government's interpretation also makes the term "eligibility unit" meaningless. The HHS Notice practically gives as much away: "Now, if an HHS program provides a benefit that falls within the categories set forth in the first half of subparagraph (c)(1)(B), and it does so on a per-individual, per-household, or per-family basis, it will be a 'Federal public benefit.'" 90 Fed. Reg. at 31,235. Note that, in this paraphrase, the term "eligibility unit" has fallen away.

If Congress had wanted the statute not to include the term, it could have easily drafted as much. But the presumption against superfluidity, the "rule that instructs a court, in undertaking the interpretation of a statute, to give meaning whenever possible to every word and phrase in a statute's text," counsels that "eligibility unit" should probably have a meaning. *Kholi v. Wall*, 582 F.3d 147, 153 (1st Cir. 2009) (cleaned up). Reading "eligibility unit" to limit PRWORA's reach to programs that include eligibility criteria is a natural way to give it meaning. To boot, the Court agrees with the States that inclusion of the term would make little sense if "federal public benefit" included programs that did not have "eligibility" to determine. *See N.H. Lottery Comm. v. Rosen*, 986 F.3d 38, 55 (1st Cir. 2018) (explaining that courts should not apply the last antecedent rule "in a mechanical way where it would require

accepting unlikely premises") (quoting *Paroline v. United States*, 572 U.S. 434, 447 (2014)).   Other parts of the statute make that clear.   *See* 8 U.S.C. §§ 1641(d), 1642(a)(1).

One last point: the Court takes special note of DOJ's original interpretation of the statute, that it excluded generally available public benefits that lacked eligibility criteria.   62 Fed. Reg. at 61,361 (explaining that, "if you provide generally available services such as fire or ambulance services," the "definition does not apply").   As the States observe, DOJ issued this interpretation one day after PRWORA was enacted, and—before this case—the Government has read the statute this way consistently since that moment.

True, after *Loper Bright*, most deference to agencies' interpretation of statutes is unwarranted.   *Loper Bright*, 603 U.S. at 412 ("*Chevron* is overruled.")   But the Supreme Court specifically carved out one type of agency interpretation that still merited respect: those cases when "an Executive Branch interpretation" of an ambiguous law "was issued roughly contemporaneously with enactment of the statute and remained consistent over time," that interpretation is "entitled to very great respect."   *Id.* at 386 (cleaned up).[5]   The original interpretations offered by DOJ (and soon after HHS) seem to fit neatly within this paradigm, further favoring the States'

---

[5] Whether a statute is "ambiguous" is, in and of itself, another issue.   *See, e.g.*, Brett Kavanaugh, Fixing Statutory Interpretation, 129 Harv. L. Rev. 2118, 2118 (2016) (explaining that judges cannot decide whether a statute is clear or ambiguous "in a settled, principled, or evenhanded way").   But here, given the two detailed, competing visions of the statute espoused by the parties, read against the backdrop of thirty years of interpretation favoring one, the Court feels comfortable stating that the statute is ambiguous.

position.

With all that in mind, the best reading of the statute is likely that PRWORA does not extend to programs that do not have eligibility requirements. Of the thirteen programs added, the States say that "at most" three of them impose limits on eligibility. (ECF No. 2 at 66.) Any program without eligibility requirements is not covered.

Second, the Court agrees with the States that Head Start, a program providing early childhood education for needy children, is not covered under the best reading of the statute. The Government argues that Head Start is covered because the statute extends to "any other similar benefit," a catch-all related to the preceding enumerated items of "retirement, welfare, health, disability public or assisted housing, postsecondary education, food assistance," and "employment benefit." (ECF No. 48 at 29.) Recognizing that the inclusion of "postsecondary education" implies the exclusion of secondary and presecondary education, the Government tries to hang its hat on Head Start being like a "welfare" benefit via the *ejusdem generis* canon. *Id.* at 29–30. But its appeals are unconvincing.

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) is instructive. There, the Supreme Court considered whether the FAA provision exempting arbitration in cases involving "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," and specifically, the catch-all at the end, applied to a regular retail worker in a national company. 532 U.S. at 109 (quoting 9 U.S.C. § 1). The Court held that it did

not, and that it only extended to other "transportation workers." *Id.* That was because "construing the residual phrase to exclude all employment contracts fails to give independent effect to the statute's enumeration of the specific categories of workers which precedes it; there would be no need for Congress to use the phrases 'seamen' and 'railroad employees' if those same classes of workers were subsumed within the meaning of the 'engaged in . . . commerce' residual clause." *Id.* at 114.

So too here: if the Court construed the residual phrase to cover all education programs (including Head Start) because they were "a similar benefit" to "welfare," "there would be no need for Congress to use" the phrase "postsecondary education." *Id.* Or more simply, if "welfare" covered education programs writ-large, that would render another item in the list, "postsecondary education," meaningless. That cannot be.

The Court thus holds that Head Start is likely not covered by PRWORA, based on the best reading of the statute.

Third, the Court agrees with the Government that, under the statute, the PRWORA Notices likely need not list the covered programs on a benefit-by-benefit basis. HHS's approach here seems consistent with its original approach. The original 1997 DOJ Notice stated that, "If one program provides several public benefits, the Act's requirements apply only to those benefits that are non-exempted federal public benefits under the Act." 62 Fed. Reg. at 61,346. And the original 1998 HHS Notice listed more than thirty programs, and in that list, made occasional exceptions. *See* 63 Fed. Reg. at 41,659 (noting coverage for "Medicaid (except assistance for an

emergency medical condition)"). But, right after the list, HHS explained that the list itself "does not mean, however, that all benefits or services provided by these programs are 'federal public benefits' and require verification." *Id.* It then carved out an example exception for benefit funds under LIHEAP, even though LIHEAP was not qualified in the list above. *Id.* But it did not, beyond that, explain that all benefits in each program are covered. With that in mind, the Court does not see why more is required at this point—especially given the Agencies' statements that further guidance about specific programs may be coming. The Notice itself informs the stakeholders that their programs are subject to PRWORA unless otherwise instructed. (ECF No. 48-2 at 3.)

As to the fourth argument, the Court agrees that block grants to the states are not covered. 8 U.S.C. § 1611(a) states that "an alien who is not a qualified alien" is "not eligible for any Federal public benefit." A grant issued to a state is not provided to an alien, so PRWORA only applies if the State or local government itself funds payments or assistance that are "federal public benefits" under the statute. DOJ's contemporaneous interpretation of the statute confirmed as much. "Although the Act prohibits certain aliens from receiving non-exempted 'federal public benefits,' it does not prohibit governmental or private entities from receiving federal public benefits that they might then use to provide assistance to aliens, so long as the benefit ultimately provided to the non-qualified aliens does not itself constitute a 'federal public benefit.'" 62 Fed. Reg. at 61,361. To illustrate the point, "if a local agency were to receive a "grant" (which is expressly identified as a federal public benefit), but the

agency uses it to provide police services, fire protection or crime victim counseling (which are not federal public benefits under the Act's definition because they are not similar to an enumerated benefit), the prohibition would not apply." *Id.* The States make a good point that the fact that a State receives a block grant does not mean that the grant itself provides a federal public benefit, or that noncitizens are necessarily barred from it.

Finally, the Court agrees that the Health Center Program is exempted from PRWORA.[6] The statute governing the Health Center Program specifically requires that health centers receiving funding must "provide services for all residents within a catchment area" to receive funding. 42 U.S.C. § 254(b)(2). That is in direct tension with PRWORA's general requirement (cutting across federal law) that any alien who is not a "qualified alien" cannot receive "federal public benefits." 8 U.S.C. § 1611(a).

Navigating the tension among statutes like these is hard, but two points favor the States' approach. The Health Center Program statute only extends to one program, while PRWORA covers all federal public benefits; this situation fits neatly into the rule that "the specific controls the general." *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) (explaining that "a specific statute will not be controlled or nullified by a general one, regardless of the priority of the enactment."); *see also Noerand v. Devos*, 474 F. Supp. 3d 394, 403 (D. Mass. 2020) ("Section 18004 of the CARES Act is a specific statutory enactment in which Congress unambiguously

---

[6] Finding that Head Start was not covered by PRWORA under a previous argument, the Court need not address it again here.

directed certain aid to a plainly defined group of people.  In these circumstances, to the extent that the CARES Act directs a federal public benefit, it constitutes a statutory exception to Section 1611's general denial of federal public benefits.")  Likewise, the Health Center Program statute was enacted after PRWORA (though by the same Congress), further favoring reading it as an exception to the general PRWORA rule.  *See, e.g.*, *Dorsey v. United States*, 567 U.S. 260, 273–75 (2012) (discussing how earlier statutes do not bind Congress from excepting them later on).  So because the Health Center Program statute is specific and later-in-time, it is best read as an exception and thus not covered.

The Court thus holds that the States have shown that the HHS Notice is likely contrary to law in at least four ways.

### b.    ED Notice

The States next argue that the ED Notice is contrary to law in its extension of PRWORA's coverage to all educational benefits, regardless of whether they are "postsecondary."  The arguments largely track the same arguments about HHS's (likely unlawful) decision to cover Headstart—that using the catch-all to extend "federal public benefit" beyond postsecondary education, the Government renders that term superfluous.  From that (and other more minor points), the States argues that neither WIOA II nor Perkins V should be covered by PRWORA.

The Government responds that its interpretation of PRWORA complies with the statutory text and the *Plyler* provision of construction, too.  More specifically, it argues that WOIA II is covered as a "similar benefit" to those enumerated under 8

U.S.C. § 1611(c)(1)(B), because it provides educational services to adults and children who lack certain skills or abilities. (ECF No. 48 at 26–27.) Secondary-level Perkins V programs, in turn, are not covered under PRWORA when they are "provided to minors in the secondary school setting," but otherwise are. 90 Fed. Reg. at 30,900; ECF No. 48 at 27.

Again, the States have the better of the argument. To start, the Court struggles to see how WIOA II/AEFLA, which focuses on providing education for adults who lack a secondary school education, could be construed as akin to a "postsecondary education" benefit or "any other similar kind" of benefit. *See* 29 U.S.C. § 3271; 90 Fed. Reg. at 30,899 (describing the program as an "alternative" to "secondary school"). For the same reasons that Head Start did not qualify, neither does WIOA II/AEFLA. *See, e.g.*, C*ircuit City Stores,* 532 U.S. at 114–15. And in fact, the case is clearer here, where rather than trying to hook the program to "any other similar benefit" as "welfare" (as with Head Start), the Government here tries to hook WIOA II/AEFLA as another "similar benefit" as "postsecondary education." (ECF No. 48 at 26–27.) As Congress explained, it is not similar to postsecondary education, but instead preservative of the possibility of attaining any postsecondary education. *See, e.g.*, 29 U.S.C. § 3271(3) (explaining that AEFLA aims to "assist adults in attaining a secondary school diploma and in the transition to postsecondary education and training"); 4-25 ¶ 16 ("AEFLA funds education benefits below the postsecondary level for students who lack a secondary-school education."). And again, such an expansive reading of the residual phrase would render the term "postsecondary" useless. *Cf.*

532 U.S. at 114.

Perkins V is a closer call.  Congress expressly designated it to cover both "secondary" and "postsecondary" programs.  20 U.S.C. § 2301.  "Postsecondary" programs are covered by PRWORA under § 1611(c)(1)(B).  That leaves "secondary" programs.  ED seems to recognize that when Perkins V programs are "provided to minors in the secondary school setting," they are exempt from PRWORA under the *Plyler* rule.  The harder question, then, is when they are secondary-level programs but do not otherwise satisfy that test.  But the test itself is not in the statute, so it should get little weight.

And either way, as ED acknowledged in its Notice, Perkins V did not "create a test for eligibility," 90 Fed. Reg. at 30,900, so it is hard to say that it confers a federal public benefit upon an "individual" "eligibility unit" as the Court interpreted the statute above.

The Court thus holds that including WIOA II and Perkins V's non-postsecondary programs under PRWORA is contrary to law, because it finds no support in the statute.

### c.    DOL Notice

Finally, the States argue that the DOL's decision to designate "all participant-level services" as subject to PRWORA is contrary to law.  The States attack what they see as the DOL's "spare" justification in favor of PRWORA covering all participant-level services, largely appealing to the "overall goal" of the program being "to move participants into gainful employment."  (ECF No. 2 at 79–80 (quoting ECF No. 4-4

at 2–3)).  The States highlight other minor issues, too, like DOL's inclusion of secondary-level education services and programs about information, referral, and assistance in completing paperwork.  (ECF No. 2 at 80–81.)

The Government responds that the States misapprehend what "participant-level" services actually are.  These services include "comprehensive and specialized assessments, development of individual employment plans, group counseling, individual counseling, career planning, short-term prevocational services, internships and work experiences, workforce preparation activities, financial literacy services, out-of-area job search and relocation assistance, English-language acquisition and integrated education and training programs, and certain incumbent worker training."  ECF No. 48 at 33; *see also* ECF No. 48-6 ¶ 5.  The Government argues that these are benefits listed in 8 U.S.C. § 1611(c)(1)(B) because they are similar to "postsecondary education."  (ECF No. 48 at 33–34.)  And the Government argues that the States' argument about informational paperwork is incorrect, because these "light-touch and self-services" are for "reportable individuals," rather than "participants."  *Id.* at 34.

The DOL Notice presents a much closer call than either the HHS or ED Notices.  It may be that the Government has the better argument with respect to "light-touch services" based on a fair reading of the 2024 Guidance Letter.  (ECF No. 4-7.)  However, the States may well have the better argument that the language "all participant-level services are 'federal public benefits' under PRWORA, because they are the same or similar as benefits listed in PRWORA" sweeps too broadly and

includes programs specifically exempted by the statute such as those provided in a secondary school setting. That reading of the statute is contradicted by the clear text. The Court, reviewing the Notice as a whole may well find that in its broad language it is contrary to law. At this stage the States have made a sufficient showing that the DOL Notice is likely contrary to law. And, because the States need only show a likelihood of success on the merits on one of their claims to prevail at this stage, the Court need not address the specifics of the impacts of the DOL notice at this stage.

### D.    Count IV: Spending Clause

By now, the States have more than made the requisite showing under this prong of the preliminary injunction analysis, because they have shown that three of their claims will likely be successful. *See Woonasquatucket*, 778 F. Supp. 3d at 461; *Worthley*, 652 F. Supp. 3d at 215 (collecting cases). But because their only claim against the DOJ is Count IV, a constitutional claim grounded in the Spending Clause, the Court proceeds to consider that claim.

The Spending Clause provides that "[t]he Congress shall have Power to . . . provide for the general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Under the Spending Clause, Congress may "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But "[t]he spending power is of course not unlimited." *Id.* at 207. Conditions attached to federal spending are "much in the nature of a contract," and States must be able to "voluntarily and knowingly accept[] the terms" without undue "coercion" from the federal government. *Nat'l Fed. of Indep. Bus. v. Sebelius ("NFIB")*, 567 U.S. 519, 577 (2012) (plurality

46

opinion) (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)).

More specifically, the government must provide states "clear notice" of the terms of their grants and may not "surprise[e] participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp.*, 451 U.S. 1, 25 (1981). Second, the "financial inducement" must not be "impermissibly coercive." *NFIB*, 567 U.S. at 580. These limits constrain Congress when it enacts spending legislation, *id.*, and they apply as well to federal agencies when adopting or enforcing spending conditions, *see, e.g.*, *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019).

The States challenge the PRWORA Notices under the Spending Clause, arguing that they (1) impermissibly impose retroactive conditions that were unforeseeable at the time the States accepted federal funding, and (2) are unconstitutionally coercive because of the severe financial pressure to comply. The Government responds that the statute's conditions were ascertainable from its text when enacted and that the Notices merely implement those terms without coercion.

### a. Retroactive Conditions

The Spending Clause allows Congress to attach conditions to federal funds but requires that states receive clear notice at the time they accept funding. *See Pennhurst*, 451 U.S. at 25. Here, when the States accepted funding, the governing agencies had publicly adopted interpretations exempting many programs from PRWORA. By abruptly revoking these exemptions—including for programs such as emergency shelters, the 988 crisis line, and domestic violence services—and directing

compliance within thirty days, the Notices upset decades of reliance. The States were not afforded a genuine choice to accept or reject the new conditions. This constitutes the type of post-acceptance change that *Pennhurst* forbids.

### a. Coercion

The Notices implicate programs central to state social-service systems—Head Start, health centers, WIOA training, foster care, and others. For many of these, compliance would require significant restructuring, new verification regimes, and operational overhauls. The scale of threatened loss leaves States with no real option but to comply. Unlike the "mild encouragement" upheld in *Dole*, 483 U.S. at 212, the Notices effectively compel States to accept conditions under threat of dismantling essential programs.

In all, because the PRWORA Notices failed to provide clear notice and imposed conditions that function as coercive ultimatums, the States have demonstrated a likelihood of success on the merits of their Spending Clause claim.

### E. Irreparable Harm

Still, likelihood of success on the merits is necessary but not sufficient for a preliminary injunction. Proof of irreparable harm "constitutes a necessary threshold showing," too. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Id.* "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Id.* It "most

often exists where a party has no adequate remedy at law." *Id.* Put differently, "the necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies. The two are flip sides of the same coin: if money damages will fully alleviate harm, then the harm cannot be said to be irreparable." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989). And the Court has "broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Id.*

The States argue that absent judicial action, they stand to suffer immediate, irreparable harm through both proprietary injuries and harm to their sovereign interests. (ECF No. 2 at 87.) The Government responds that the States' injuries are not irreparable and instead are merely "speculative injuries that may never materialize." (ECF No. 48 at 42.)

The Court sees four main types of irreparable harm: (1) harm arising from the incompatibility between verification requirements and emergency services; (2) harm arising to the individuals whose access to programs are cut-off based on an unlawful expansion of PRWORA; (3) harm arising from the immediate nature of the Notices; (4) harm arising from the costs of compliance. Each is sufficient.

First, the States make a compelling argument that the PRWORA verification program is not fundamentally compatible with the emergency services offered by many of the now-covered programs, constituting a form of irreparable harm. Recall, for instance, the declarations cited at the start of the opinion. *See* ECF No. 4-46 ¶ 38 ("Worse still, the population served primarily by PATH funding, which includes a

significant portion of unhoused individuals (including veterans, victims of domestic violence, and individuals with chronic health disorders), are highly unlikely to have access to documentation now necessary to prove their eligibility as of July 14, 2025."); No. 4-55 ¶ 14 ("People going to access a soup kitchen or a food bank would have to produce I.D. to get inside, regardless of immigration status. The result is that fewer people will get critical anti-poverty resources due to immigrant communities avoiding services but also because, generally, people living in poverty may at times lack government identification."); No. 4-71 ¶¶ 26–30 (explaining similar problems for emergency mental health crisis programs). These are only some of the many declarations provided showing how verification regimes do not comport well with the emergency services that the States provide.

The "new obstacles" that PRWORA verification puts between the States' programs and their constituents are a well-established irreparable harm. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("Because, as a result of the Newby Decisions, those new obstacles unquestionably make it more difficult for the Leagues to accomplish their primary mission of registering voters, they provide injury for purposes . . . [of] irreparable harm."); *Woonasquatucket*, 778 F. Supp. 3d at 475 (finding illegal funding freeze caused irreparable harm when it caused work stoppages and indefinitely delayed progress for grantees); *see also California v. Dep't of Transp.*, No. 25-cv-208-JJM-PAS, 2025 WL 1711531, at *3 (finding irreparable harm when states "face losing billions of dollars in federal funding, are being put in a position of relinquishing their sovereign right to decide

how to use their own police officers, are at risk of losing the trust built between local law enforcement and immigrant communities, and will have to scale back, reconsider, or cancel ongoing transportation projects").

Second, the nature of the constituents' crises is worth highlighting. In life-or-death scenarios—times of crisis, when someone faces domestic violence, homelessness, or a mental health crisis—it practically goes without saying that "there can be no do over and no redress" if services are unlawfully denied and someone suffers for it. *Newby*, 838 F.3d at 9. That of course constitutes irreparable harm.

*Woonasquatucket* offers a helpful comparison here. This Court previously held, for instance, that damage to "irreparable giant sequoia trees" based on funding delays for a project to mitigate bark-beetle attacks was a form of irreparable harm for a similar reason: that "there can be no do over and no redress" if a valuable tree were lost because of the downstream effects of an illegal funding freeze. 778 F. Supp. 3d at 475. The case for irreparable harm is all the clearer here. Rather than trees, human lives that the States have deemed worthy of protection are at stake. The State's interest here is important. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256 (2022) (reversing *Roe v. Wade* in part because "the people of the various States" are best positioned to make decisions about what defines life and how to protect it).

Third, the confusion and chaos imposed by an overnight change to a thirty-year-old interpretation of a law, as well as the resulting change in plans that comes from it, is a form of irreparable harm. *See, e.g.*, ECF No. 4-44 ¶ 14 (explaining that

immediate compliance "is certainly not feasible" and instead requires "many months of preparation, potentially a year or more, due to the extensive planning, guidance development, communication to Perkins V grantees, and the time required for their responsive actions"); ECF No. 4-41 ¶ 8 (explaining that implementing changes "will take at a minimum nine months and cost an untold amount of funding and staffing hours," and explaining that, while making those changes, the program "runs the risk of being found in noncompliance . . . risking reimbursement for drawdown requests and future federal funding). The Court notes that the rapidity of the change here is in stark contrast to the two years that Congress provided to establish initial verification systems, back in 1997. 8 U.S.C. § 1642(b) ("Not later than 24 months after the date the regulations described in subsection (a) are adopted, a State that administers a program that provides a Federal public benefit shall have in effect a verification system that complies with the regulations.").

And confusion aside, these compliance costs are, indeed, costly—a fourth form of irreparable harm. HHS itself recognizes that compliance costs (dubbed "transition costs") will range "from about $115 million to $175 million. (ECF No. 4-5 at 15–16.) At least one federal circuit court has recognized irreparable harm in similar circumstances. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (finding irreparable harm where states alleged they were "required to undertake costly revisions to their eligibility systems to ensure that non-citizens are not automatically made eligible for or enrolled in benefits they may no longer wish to receive after the Rule's implementation"")). And because "money damages are

52

prohibited in APA actions," these compliance costs really are irreparable. *Id.*

The Government's arguments about non-enforcement are largely unconvincing. The Notices take effect immediately, and the Government has explained that it maintains the authority to enforce them against the States starting on September 11, 2025 (absent injunctive relief). Given the "unequivocal position" of the Government that PRWORA now covers a host of new programs, the Court "cannot see why" the States "should be forced to sit like Damocles while the Government draws out" any subsequent enforcement measures. *Rosen*, 986 F.3d at 53.[7] And either way, even the threat of enforcement and the uncertainty that stems from that threat is likely sufficient here. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1282637, at *24 (N.D. Cal. May 3, 2025) (finding irreparable harm where "governing bodies face looming budget deadlines without knowing whether they will receive reimbursements for funds already expended in the last fiscal year, much less whether they will be able to rely on federal funds in the next").

F.    Balance of the Equities and the Public Interest

Finally, the Court must weigh the equities and the public interest. It "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and it "should pay particular

---

[7] The above language from *Rosen* is related to the First Circuit's discussion of ripeness, rather than irreparable harm. 986 F.3d at 52–53. But because the Government's arguments about the speculative nature of the harm largely sound in ripeness, *Rosen* remains instructive.

regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

The Court digresses briefly to address how important balancing the equities is. Though commentators have observed that "there is usually no balancing" these days, *see* Samuel Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 831 (2025), the equities have indeed proven decisive in important cases recently. *See, e.g.*, *NetChoice, LLC v. Fitch*, 606 U.S. ___, slip op. at 2, (2025) (Kavanaugh, J., concurring in the denial of the application to vacate stay) (explaining that although a law is "likely unconstitutional," a stay should remain in place "because NetChoice has not sufficiently demonstrated that the balance of harms and equities favors" emergency relief"); *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, 777 F. Supp. 3d 87, 112 (D.R.I. 2025) ("Although Plaintiffs can show a substantial likelihood of success on the merits of their (not moot) eligibility-bar claim, the balance of the equities and public interest weigh heavily against preliminary injunctive relief, at this time.").

How, exactly, the equities should be weighed, though, is a different—and open—question. *See, e.g.*, *Labrador v. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring) ("But not infrequently—especially with important new laws—the harms and equities are very weighty on both sides. Courts historically have relied on likelihood of success as a factor because, if the harms and equities are sufficiently weighty on both sides, the best and fairest way to decide whether to temporarily enjoin a law pending the final decision is to evaluate which party is most likely to

prevail in the end.")).

To be sure, there is an occasional "rare case where the balance of the harms and equities plus the public interest caution against" a preliminary injunction, even if the plaintiff has demonstrated a likelihood of success on the merits. 777 F. Supp. 3d at 99. But this is not one of them.

On one side of the ledger, the States argue that they seek "to preserve the status quo as it existed for nearly three decades before the PRWORA Notices upended longstanding practice, immediately and with no opportunity for public input." (ECF No. 2 at 91.) Without an injunction, the Notices will "have a tremendous impact on States' social service programs and safety net, jeopardize billions of dollars States rely on, and cause immense harm to the individuals and communities that rely on these programs." *Id.*

On the other side of the ledger, the Government argues that the injunction would "disrupt the agencies' efforts" to comply with an Executive Order and "to correctly interpret PRWORA's plain text consistent with the statutory purpose." (ECF No. 48 at 46.) The injunction would, in the Government's view, "effectively disable several federal agencies, as well as the President himself, from implementing" his priorities. *Id.*

The States have the better of the argument. The Government's "equities" argument largely binds itself up with the merits, because the thrust of it is that the Government should be entitled to enforce its correct interpretation of the law. (ECF No. 48 at 46.) But that argument begs a question that the Court already answered.

As the Court already held, the Notices likely did not interpret the law correctly. Why, then, should the Government be entitled to enforce that interpretation? The States' "high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest," especially given that there "is generally no public interest in the perpetuation of unlawful agency action" while there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (cleaned up) (collecting cases).

Of course, there are also competing claims of dollars at stake here: either the Government gives money to states without imposing the new PRWORA requirements that it seeks, or the States spend significant amounts of their own money to come into compliance with the new (and flawed) interpretation of PRWORA. As between the two, the Court believes that the balance of the equities and the public interest favors maintaining the status quo before the Notices. Avoiding compliance costs based on a likely unlawful reading of the statute makes more sense.

### G.    Scope of the Remedy

Having decided that the States have made the requisite showing under the four-factor test for a preliminary injunction, the Court must next decide the injunction's scope.

The Government argues that relief should be "narrowly tailored" in two ways: first, "to the Plaintiff States who have met their burden of establishing irreparable harm," and for those states, "to relief from the agency notices for which they have met

56

this burden." (ECF No. 48 at 47.) For example, the Government suggests that Arizona should be exempt because it "did not submit declarations to demonstrate irreparable harm resulting from" the ED, HHS, and DOL Notices. *Id.* Likewise, it says that Connecticut, Minnesota, and Wisconsin should not be exempted from the ED notices, because they "only submitted declarations alleging irreparable harm caused by the HHS notice." *Id.* And, in the Government's view, there should be no relief as to Nevada and Hawaii because these States submitted "no evidence regarding their asserted harms from the challenged notices." *Id.*

What the Government casts as narrow tailoring should better be understand as gerrymandering. The Court declines to complicate things further, especially given that the States have demonstrated that they deserve a preliminary injunction based on the four factors. For one, it is this Court's "duty—and its prerogative—to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." *Weaver v. Henderson*, 984 F.2d 11, 14 (1st Cir. 1993). The extensive record that the States have already produced—more than sixty declarations and hundreds of pages—shows the obvious effects of the unlawful Notices. It is reasonable to infer that similar harms will flow from each Notice across each state, based on the extensive record already provided. With the addition of Nevada and Hawaii's declarations, each state has indeed shown irreparable harm. (ECF No. 55-1, No. 55-2.) To instead write a complicated injunction that prohibits (just by way of hypothetical) the DOL and HHS Notices in Connecticut, but the ED, DOL, and HHS Notice in Rhode Island, but just the HHS Notice in New York (and on and on for

seventeen more states), would be unnecessary.

The Government's references to *Trump v. CASA Inc.* are likewise irrelevant. (ECF No. 48 at 47.)  For one, CASA expressly declined to evaluate relief under the APA.  145 S. Ct. 2540, 2554 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action. *See* 5 U.S.C. § 706(2) (authorizing courts to 'hold unlawful and set aside agency action').")  Anyway, the relief here is limited to the Plaintiff States, well-within the more general principles undergirding *CASA Inc.*, 145 S. Ct. at 2548 ("Traditionally, courts issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit.")

### H.    Bond

Federal Rule of Civil Procedure 65(c) states that the court may issue a TRO or preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Government asks the Court to require the States to post "an appropriate bond commensurate with the scope of any such order." (ECF No. 48 at 48.)  The Court declines.

Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (internal quotation omitted).  A bond "is not necessary where requiring [one] would

have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); *Woonasquatucket*, 778 F. Supp. 3d 440, 477 (D.R.I. 2025) (declining to impose bond); *cf. Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review").

## I.    Stay

The Government also requests a seven-day stay.  (ECF No. 48 at 48–49.)  The Court declines.

## IV.    ORDER

Upon consideration of the Plaintiff States' Motion for a Preliminary Injunction (ECF No. 2), it is hereby:

1.  ORDERED that the Plaintiff States' Motion for a Preliminary Injunction (ECF No. 2) is GRANTED; it is further

2.  ORDERED that Defendants, their employees, and anyone acting in concert with them, are and until further order of this Court shall remain ENJOINED from enforcing or implementing in the Plaintiff States:

    a.  90 Fed. Reg. 32,025 (July 16, 2025) ("DOJ PRWORA Notice");

    b.  90 Fed. Reg. 31,232 (July 14, 2025) ("HHS PRWORA Notice");

    c.  90 Fed. Reg. 30,896 (July 11, 2025) ("ED PRWORA Notice"); and

    d.  Training and Employment Guidance Letter No. 10-23, Change 2

("DOL PRWORA Notice"); it is further

3.   ORDERED that this Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706; it is further

4.   ORDERED that Defendants shall provide notice of this Order within 72 hours of entry to all Defendants, their employees, and anyone acting in concert with them.  Defendants shall file a copy of the notice on the docket within 72 hours of its dissemination; it is further

5.   ORDERED that this Order shall become effective immediately upon entry by this Court.

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

September 10, 2025