the quality, utility, and clarity of the information to be collected; and (5) how might the Department minimize the burden of this collection on the respondents, including through the use of information technology. Please note that written comments received in response to this notice will be considered public records.

*Title of Collection:* Streamlined Clearance Process for Discretionary Grants.

*OMB Control Number:* 1894–0001.

*Type of Review:* Extension without change of a currently approved ICR.

*Respondents/Affected Public:* State, Local, and Tribal Governments.

*Total Estimated Number of Annual Responses:* 1.

*Total Estimated Number of Annual Burden Hours:* 3.

*Abstract:* Section 3505(a)(2) of the PRA of 1995 provides the OMB Director authority to approve the streamlined clearance process proposed in this information collection request. This information collection request was originally approved by OMB in January of 1997. This information collection streamlines the clearance process for all discretionary grant information collections which do not fit the generic application process. The streamlined clearance process continues to reduce the clearance time for the U.S. Department of Education's (ED's) discretionary grant information collections by two months or 60 days. This is desirable for two major reasons: it would allow ED to provide better customer service to grant applicants and help meet ED's goal for timely awards of discretionary grants. § 3474.20(d) adds the requirement for grantees to develop a dissemination plan for copyrighted work under open licensing. Information contained in the narrative of an application will be captured in the Evidence of Effectiveness Form.

**Ross Santy,**

*Chief Data Officer, Office of Planning, Evaluation and Policy Development.*

[FR Doc. 2025–13011 Filed 7–10–25; 8:45 am]

**BILLING CODE 4000–01–P**

---

## DEPARTMENT OF EDUCATION

### Clarification of Federal Public Benefits Under the Personal Responsibility and Work Opportunity Reconciliation Act

**AGENCY:** Office of the Secretary, Department of Education.

**ACTION:** Interpretive rule.

**SUMMARY:** The U.S. Department of Education (Department) issues this interpretation to revise and clarify its position on the classification of certain Department programs providing ''Federal public benefits,'' as defined in Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Public Law 104–193. The Department concludes that the postsecondary education programs and ''other similar benefit'' programs described within this interpretive rule, including adult education programs authorized under Title II of the Workforce Innovation and Opportunity Act of 2014, postsecondary career and technical education programs under the Carl D. Perkins Career and Technical Education Act of 2006, and other programs when used to fund postsecondary learning opportunities, provide federally funded forms of assistance that constitute ''Federal public benefits'' subject to PRWORA's citizenship verification requirements. The interpretation also revokes and supersedes certain aspects of the Department's previously issued Dear Colleague Letter (DCL) of November 19, 1997, which mischaracterized these programs as not affected by PRWORA, for the reasons described further within this notice.

**DATES:** July 11, 2025.

**FOR FURTHER INFORMATION CONTACT:** Office of Career, Technical, and Adult Education, U.S. Department of Education, 400 Maryland Avenue SW, Washington, DC 20202. Adam Flynn-Tabloff. Email: *adam.flynn-tabloff@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### Full Text of Announcement

On February 19, 2025, President Trump issued Executive Order 14218 (Ending Taxpayer Subsidization of Open Borders), directing agencies, among other actions, to ensure that federally funded programs are operating in compliance with PRWORA. For the reasons described herein, the Department has concluded that Federal programs administered by the Department that provide postsecondary education and other similar benefits, including adult education and career and technical education programs, are ''Federal public benefits'' subject to the citizenship and immigration verification requirements of PRWORA, so long as such benefits are not protected under *Plyler* v. *Doe,* 457 U.S. 202 (1982) *Plyler* as part of a basic public education.

### I. Background

Title IV of PRWORA, as enacted into law as Public Law 104–193 on August 22, 1996, and amended by the Balanced Budget Act of 1997 (Pub. L. 105–33), generally limits eligibility for ''Federal public benefits'' to U.S. citizens, U.S. non-citizen nationals, and certain categories of ''qualified aliens.'' For programs that provide ''Federal public benefit[s],'' providers are required to verify eligibility in order to comply with PRWORA. PRWORA defines ''qualified alien'' to mean ''an alien who, at the time the alien applies for, receives, or attempts to receive a Federal public benefit, is—

(1) an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C. 1101 *et seq.*];

(2) an alien who is granted asylum under section 208 of such Act [8 U.S.C. 1158];

(3) a refugee who is admitted to the United States under section 207 of such Act [8 U.S.C. 1157];

(4) an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C. 1182(d)(5)] for a period of at least 1 year;

(5) an alien whose deportation is being withheld under section 243(h) of such Act [8 U.S.C. 1253];

(6) an alien who is granted conditional entry pursuant to section 203(a)(7) of such Act [8 U.S.C. 1153(a)(7)] as in effect prior to April 1, 1980;

(7) an alien who is a Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980); or

(8) an individual who lawfully resides in the United States in accordance with a Compact of Free Association.'' 8 U.S.C. 1641(b).

In other words, ''qualified alien'' status generally refers to those non-citizens that have a lawful immigration status allowing them to reside in the U.S. indefinitely, as well as immigrants holding specific humanitarian statuses identified by Congress. Under PRWORA, an alien who is not a ''qualified alien'' is ineligible for payment or assistance of any ''Federal public benefit.'' 8 U.S.C. 1611. Federal public benefits, as defined in 8 U.S.C. 1611(c)(1)(A), include ''any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States.'' PRWORA further defines Federal public benefits to include ''any retirement, welfare, health, disability, public or assisted housing,

ED_PRWORA_000001

*postsecondary education,* food assistance, unemployment benefit, *or any other similar benefit* for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States'' (emphasis added). 8 U.S.C. 1611(c)(1)(B).

## II. Applicability of PRWORA to Department Programs That Provide ''Postsecondary Education'' and ''Other Similar Benefit[s]''

The Department's programs are funded by appropriated funds of the United States and are subject to the restrictions of PRWORA, where such program provides ''Federal public benefits'' based on the applicable criteria of PRWORA. Specifically, PRWORA applies to ''postsecondary education'' benefits or ''any other similar benefit'' under Department programs ''for which payments or assistance are provided to an individual, household, or family eligibility unit.'' Such benefits are ''Federal public benefits'' within the meaning of PRWORA, unless an exception applies.

On November 19, 1997, the Department issued a DCL interpreting PRWORA to, among other things, not cover benefits under Departmental programs provided at the preschool, elementary, and secondary education level. U.S. Dept. of Edu., PRWORA DCL, (Nov. 19, 1997). In general, the Department's interpretation in the DCL enabled all aliens, regardless of immigration status and including adults, to be eligible to receive educational benefits and assistance provided by the Department so long as such benefits were not provided at the ''postsecondary education'' level. The Department's 1997 DCL also reasoned that educational programs provided at the preschool, elementary, and secondary level are not ''similar'' to the programs that Congress enumerated in PRWORA, including ''any retirement, welfare, health, disability, public or assisted housing, *postsecondary education,* food assistance, unemployment benefit[.]'' (emphasis added). The Department specifically claimed that these programs are dissimilar from ''postsecondary education'' because those programs ''are at a completely different level of education.'' The Department also asserted that these programs provide ''a different form of assistance'' than postsecondary education.

The Department finds that the reasoning in the 1997 DCL is flawed because it failed to fully analyze the context and full statutory text of PRWORA, and therefore ultimately misconstrued its meaning. In crafting PRWORA, Congress created an operative definition for ''Federal public benefit'' under 8 U.S.C. 1611(c), five substantive exceptions under 8 U.S.C. 1611(b)(1)(A)–(E), three rules of non-applicability under 8 U.S.C. 1611(c)(2)(A)–(C), and three rules of statutory construction under 8 U.S.C. 1643 (a)–(c). Each part of this statutory enactment contains interrelated parts, which may provide context when construing one of its parts that may otherwise appear to be ambiguous. *See* A. Scalia & B. Garner, Reading Law, 167 (2012)(''Context is the primary determinant of meaning. A legal instrument typically contains interrelated parts that make up the whole. The entirety of the document thus provides the context for each of its parts.''); *see also United Savings Ass'n* v. *Timbers of Inwood Forest Associates,* 484 U.S. 365, 371 (1988) (a statutory ''provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme— because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.'')

In the first instance, the Department looks at the operative definition for ''Federal public benefit'' under 8 U.S.C. 1611(c). In defining the phrase, Congress included enumerated categories of benefits, including ''any retirement, welfare, health, disability, public or assisted housing, *postsecondary education,* food assistance, [or] unemployment benefit,'' (emphasis added) followed by a broader unenumerated category of benefits that encompasses any ''similar benefit[s] for which payments or assistance are provided to an individual, household, or family eligibility unit.'' To ascertain the meaning of the phrase: ''similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit,'' and whether an unenumerated benefit would fall under that definition, we must analyze the similarity of other benefits to the enumerated list of benefits already included within the definition of a ''Federal public benefit.''

Here, Congress included a broad and disparate group of benefits within the enumerated list of ''Federal public benefits.'' For example, ''food assistance'' is a near-term benefit for human subsistence, while retirement benefits are quite different in that they provide for long-term financial stability in old age. The disparate nature of these benefits suggest that Congress intended to capture an expansive array of Federal benefits, within the statutory limit that such benefits be provided through Federal funds, and to ''an individual, household, or family eligibility unit.''

In contrast, the Department's analysis in the 1997 DCL did not mention any of the enumerated examples in the statute, except ''postsecondary education'' when construing whether the benefits discussed in that DCL were ''similar.'' In doing so, the Department ignored important statutory clues regarding the proper reading of the statute. Instead, the Department's previous analysis inappropriately manipulated the level of generality of the inquiry to focus on the narrow question of whether ''postsecondary education'' is similar to education at the ''preschool, elementary, and secondary level.'' This flawed framing led to a flawed result. The conclusion of the 1997 DCL that preschool, elementary, and secondary education are dissimilar from postsecondary education because those programs ''are at a completely different level of education'' ignores the context of the statute that makes it clear that Congress intended to cover a broader array of other Federal benefits. Indeed, preschool, elementary, and secondary education are similar to postsecondary education in that these benefits provide educational assistance to individuals.

The 1997 DCL also discusses the form in which the benefits are distributed. Specifically, the DCL states that ''elementary and secondary 'benefits' are typically made available to public educational agencies through grants that help them supplement their educational programs . . . [while] [p]ostsecondary benefits typically involve financial assistance to individual students.'' Even if assumed to be true, it would be irrelevant.

The statute discusses the method of delivery required in order to be a ''Federal public benefit'' and provides that only those benefits ''for which payments or assistance are provided to an individual, household, or family eligibility unit'' may be construed as a ''Federal public benefit.'' The statute provides for distinct methods of delivery of benefits to include a ''payment'' *or* ''assistance.'' The word ''payment'' is derivative of the word ''pay,'' which means ''the act of paying or state of being paid.'' *See Payment,* Webster's II: New Riverside University Dictionary (1994); *Pay,* Webster's II: New Riverside University Dictionary (1994). In other words, for something to be a ''payment,'' money must be exchanged.

ED_PRWORA_000002

The term "assistance" is defined as "the act of assisting", which is derivative of the word "assist" which means "to aid" or "to give aid or support" to someone or something. *See Assistance,* Webster's II: New Riverside University Dictionary (1994) and *Assist,* Webster's II: New Riverside University Dictionary (1994). The word "assistance" is indeed broader than "payment" and includes at least some actions that do not involve the direct exchange of money.

To further understand the meaning of the word "assistance" within the context of the statute, it is appropriate to consult other parts of the statutory framework. *K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). In the list of five substantive exceptions under 8 U.S.C. 1611(b)(1)(A)–(E), we find clues in deciphering any ambiguities in the term "assistance" as applied in this context. In 8 U.S.C. 1611(b)(1)(B) & (D), Congress provided that the prohibition against providing non-qualified aliens with any federal public benefit "shall not apply with respect to the following Federal public benefits:"

"(B)*Short-term, non-cash, in-kind emergency disaster relief* [. . .]

"(D) Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (i) *deliver in-kind services at the community level, including through public or private nonprofit agencies;* (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety."

As the excepted benefits that are enumerated within sub-clause (A) though (E) are specified as otherwise being "Federal public benefits", it is clear that Congress believed these benefits all would have otherwise met that definition. Therefore, in interpreting whether a program provides "other similar benefit(s)", it is instructive to look not just to the enumerated benefits within 8 U.S.C. 1611(c)(1), but also to the exempted Federal public benefits under 8 U.S.C. 1611(b)(1). Here, Congress specified under sub-clause (B) and (D) that there are exemptions from the general alien restrictions of 8 U.S.C. 1611 on certain

types of non-cash or in-kind benefits.[1] The exception under sub-clause (D) applies more specifically to in-kind benefits that are delivered "at the community level, including through public or private nonprofit agencies." It would not make sense for Congress to exclude these limited non-cash or in-kind benefits explicitly in 8 U.S.C. 1611(b)(1)(B) & (D) if at least some of those benefits were not *already captured* under the operative definition of "Federal public benefit" under 8 U.S.C. 1611(c). Congress would have no need to carve something out that would not otherwise be covered in the first instance under the "Federal public benefit" definition. As such, the general definition of "Federal public benefit" is best understood to include "assistance" similar to the "deliver[y] [of] in-kind services at the community level, including through public or private nonprofit agencies" where such benefits have not been specifically excluded by 8 U.S.C. 1611(b)(1).

The DCL essentially ignored Congress's decision to include Federal public benefits delivered through "assistance," narrowing its analysis not only to Federal public benefits as "payment," but even further still to whether that assistance was similar to "postsecondary [. . .] financial assistance to individual students." The rule against surplusage requires us "to avoid rendering superfluous any statutory language." *Hibbs* v. *Winn,* 542 U.S. 88, 101 (2004). Here, the DCL did not give independent meaning to the word "assistance," improperly rendering it superfluous. Instead, as demonstrated above, Congress clearly contemplated that Federal public benefits could cover assistance provided from entities to "individual[s], household, or family eligibility unit," even when that assistance is provided through an "in-kind" non-money benefit "at the community level, including through public or private nonprofit agencies."

Next, we consider one of the three rules of statutory construction that Congress included under 8 U.S.C. 1643(a)(2) which provides that nothing within [Title IV of the Act] may be construed as "addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under *Plyler* v. *Doe* (457 U.S. 202) (1982)." In effect, this

provision codifies the holding of that case into the statute. Therefore, when construing PRWORA, the Department's interpretation may not otherwise contravene *Plyler.*

*Plyler*'s holding was expressly grounded in the Fourteenth Amendment, as applied to States, and the ability of States to impose unique restrictions on alien eligibility absent "some articulable federal policy[.]" There is nothing in *Plyler*'s holding that addresses the ability of the Federal government to deny benefits (be they educational or other) based on alienage, and expressly noted that "[i]n light of our disposition of the Fourteenth Amendment issue, we have no occasion to reach this claim [of pre-emption by federal law and policy]." The inclusion of 8 U.S.C. 1643(a)(2)'s limitation that PRWORA was not intended to "addres[s] alien eligibility for a basic public education" is thus best understood as instructive toward the other provisions of PRWORA that speak to "State authority to make determinations concerning the eligibility of qualified aliens for public benefits", 8 U.S.C. 1601(7), and the provision of "State or local public benefits" 8 U.S.C. 1621–1625.

A harmonious reading of *Plyler,* 8 U.S.C. 1643(a)(2), and the ability of Congress to regulate the provision of "Federal public benefits" is thus readily apparent. Scalia & Garner, *supra,* at 180 ("The imperative of harmony among provisions is more categorical than most other canons of construction because it is invariably true that intelligent drafters do not contradict themselves.") Indeed, such a harmonious reading is necessary as the text itself of *Plyler,* incorporating its antecedents, specifically noted that "it is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens." *Mathews* v. *Diaz,* 426 U.S. 67, 84 (1976).

Furthermore, *Plyler* focused on the unique position of children who have "little control" over their immigration status. In *Plyler,* the Court noted that "it is thus difficult to conceive of a rational justification for penalizing these children for their presence within the United States." The Court's rationale for protecting the ability of minors to attend school stands in contrast to adults who do have the ability to control their actions and movement. Indeed, the Court noted that the "undocumented status" of adults is not "an absolutely immutable characteristic since it is the product of conscious, indeed unlawful, action." As such, the Department does

---

[1] In-kind is defined as "in the same manner or with something equivalent" Webster's II: New Riverside University Dictionary (1994). In the context of the statute, "in-kind" means some sort of non-cash benefit that provides goods or services directly, rather than providing cash to procure those goods or services.

not interpret the holding in *Plyler* as conferring any rights to adults. Nor does the holding in *Plyler* reach the question as to whether a minor has the right to postsecondary education (such as a 17-year-old individual who may wish to enroll in postsecondary programs, like dual enrollment) or adult training programs that are not included within a ''basic public education''.

Therefore, the Department interprets and finds that ''Federal public benefits'' under 8 U.S.C. 1611(c)(1) includes all educational benefits that are provided to individuals, households, or family eligibility units, regardless of age, and including when benefits are provided as in-kind services at the community level, such as through public or private nonprofit agencies, except those benefits that are basic public education benefits under *Plyler.* In codifying the exceptions under *Plyler,* Congress made clear the term ''Federal public benefits'' does not cover basic public education benefits that are received by children. At the same time, ''Federal education benefits'' does include postsecondary education benefits provided regardless of age, as *Plyler* did not address postsecondary benefits and PRWORA explicitly calls for such benefits to be included. 8 U.S.C. 1611(c)(1)(B).

In other words, non-qualified alien adults are not permitted to receive education benefits (postsecondary education benefits or otherwise) and non-qualified alien children are not eligible to receive postsecondary education benefits and certain other education benefits, so long as such benefits are not basic public education benefits. Postsecondary education benefits include dual enrollment and other similar early college programs that provide opportunities to earn college level credits while participating in a secondary education program, because those programs provide individualized payments or assistance beyond that of a basic public education. This interpretation does not apply to specific later in time statutory exceptions, including under 20 U.S.C. 1070e. In sum, this reading of the statute respects the statutory command to adhere to the holding in *Plyler,* while appropriately capturing the statutory directive to include ''other similar benefits'' within the meaning of a ''Federal public benefit'' under PRWORA.

Of note, the 1997 DCL cited the Congressional conference report to PRWORA. The DCL claimed that with respect to section 401 of PRWORA, the conference report said that ''the intent of the conferees is that Title I, part A of the Elementary and Secondary Education Act would not be affected by section 401 because the benefit is not provided to an individual household or family eligibility unit.'' [2] Use of legislative committee reports like this is disfavored because these reports do not go undergo the ordinary legislative process of bicameralism and presentment. In other words, Congress did not vote on the conference report, nor should we assume Members of Congress actually read the report. *See, e.g., Blanchard* v. *Bergeron,* 489 U.S. 87, 98–99 (1989) (Scalia, J., concurring) (''As anyone familiar with modern-day drafting of congressional committee reports is well aware, the references to the cases [in the committee report] were inserted, at best by a committee staff member on his or her own initiative, and at worst by a committee staff member at the suggestion of a lawyer-lobbyist . . . What a heady feeling it must be for a young staffer, to know that his or her citation of obscure district court cases can transform them into the law of the land . . .''). As such, the Department declines to consider the non-authoritative conference report from PRWORA when interpreting the statute, as it is unreliable in ascertaining the meaning of the text.

### III. Applicability of PRWORA to Specific Department Programs

As it relates to additional programs under the Department's administration, we interpret PRWORA to apply to benefits provided to individuals under programs authorized under Title II of the Workforce Innovation and Opportunity Act of 2014 (WIOA) and career and technical education (CTE) programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006, as amended (Perkins V), as well as benefits provided through postsecondary education programs.

First, it is clear that these programs are all provided through ''appropriated funds of the United States'' because the Department receives these funds under appropriations laws passed by Congress. *See e.g.,* FY 2025 Full-Year Continuing Appropriations and Extensions Act, Public Law 119–4, § 1101(a)(8) 139 Stat. 9, 11. Second, whether as an enumerated benefit or ''other similar benefit,'' these programs provide ''payments or assistance'' to ''an

individual, household, or family eligibility unit[.]''

Under WIOA, the Department administers Title II Adult Education and Literacy Activities, which provides grants to States to support adult education and literacy activities. 29 U.S.C. 3291, 3303. State agencies, in turn, may award grants or enter into contracts with eligible providers who provide adult education and literacy services to eligible individuals. An ''eligible individual'' is an individual who

(A) who has attained 16 years of age;

(B) who is not enrolled or required to be enrolled in secondary school under State law; and

(C) who—

(i) is basic skills deficient;

(ii) does not have a secondary school diploma or its recognized equivalent, and has not achieved an equivalent level of education; or

(iii) is an English language learner.

The Department interprets Title II WIOA programs to provide ''Federal public benefits'' because these educational programs: (1) are ''similar benefits,'' within the meaning of 8 U.S.C. 1611(c)(1)(B), because the programs provide educational services to adults and children who lack certain skills or abilities (as discussed in further detail above); (2) are provided on a non-cash and in-kind basis to individuals, and therefore are a form of ''assistance [. . .] to an individual'' eligibility unit as defined under 8 U.S.C. 1611(c)(1)(B); and (3) are not specifically exempted under PRWORA. As discussed above, the Department interprets PRWORA to apply to adults receiving any form of educational benefits and children receiving educational benefits other than a ''basic public education.''

The Department interprets Title II WIOA benefits to be distinct from the provision of a ''basic public education'' by State and local governments under *Plyler* because, among other distinctions, these benefits are provided to individuals in addition to the basic public education already provided by States to minors of compulsory attendance age. Under Title II of WIOA, any minor who had aged out of compulsory secondary school attendance would further have to drop out of the basic public education offered by their State in order to be eligible for Title II WIOA benefits. *Plyler,* in addition to highlighting the compulsory nature of basic public education, did not confer illegal immigrant children aging out of basic public education with the right to drop out of secondary school in favor of alternative educational programs, such as those designed for

---

[2] The Department does not have specific concerns about how the Congressional conference report is referencing Title I of the Elementary and Secondary Education Act, as such programs generally provide support for states in delivering a basic public education, as protected under *Plyler.* Rather, the Department declines to consider the conference report because it is unreliable in general, and specifically here in how it interprets PRWORA as it relates to the phrase ''payments or assistance'' under 8 U.S.C. 1611(c)(1)(B).

adults under WIOA. As such, the Title II WIOA programs provide ''Federal public benefits'' that are distinct from and are not included within a basic public education under *Plyler.*

Under Perkins V, the Department administers the Basic Grants to States program which is a formula grant for career and technical education to States to support the development and implementation of programs for individuals who are in need of such career and technical education. Congress provided that the purpose of Perkins V, among other things, is to ''to develop more fully the academic knowledge and technical and employability skills of secondary education students and postsecondary education students who elect to enroll in career and technical education programs and programs of study.'' 20 U.S.C. 2301. Although Perkins V does not explicitly create a test for eligibility, it is clear the educational benefits that flow from these programs are designed to benefit students who are *individuals.* Indeed, the very definition of ''career and technical education'' under Perkins V highlights that CTE is always an *individual* good as it is provided through ''a sequence of courses,'' ''competency-based, work-based, or other applied learning'' or ''career exploration'' that can only be received or experienced by an individual for their personal development. 20 U.S.C. 2302(5). Perkins V benefits flow from the Federal government to states, and then to local recipients, who provide educational assistance to individual students in a non-cash in-kind manner.

Perkins V funds programs for individuals both at the secondary and postsecondary levels. 20 U.S.C. 2301. Students may receive Perkins V benefits while enrolled in secondary school. In contrast to Title II WIOA benefits, Perkins V benefits do not require students to drop out or have aged out of secondary school compulsory attendance in order to receive such benefits and are thus provided as part of a ''basic public education'' in those limited circumstances. As such, these benefits, when provided to minors in the secondary school setting, are basic public education benefits that are protected under *Plyler.*

Therefore, the Department interprets Perkins V programs to provide ''Federal public benefits'' because these educational programs: (1) are ''similar benefits,'' within the meaning of 8 U.S.C. 1611(c)(1)(B), because the programs provide career and technical educational services to adults and children who lack certain skills or abilities; (2) are provided on a non-cash

and in-kind basis to individuals, and therefore are a form of ''assistance'' as defined under 8 U.S.C. 1611(c)(1)(B); and (3) are not specifically exempted under PRWORA, except that Perkins V programs that support minors in the secondary school setting are basic public education benefits and are not ''Federal public benefits.'' 8 U.S.C. 1643.[3]

## IV. Verification

Grantees that may have existing legal obligations under PRWORA may seek to verify eligibility using, among other things: (1) the Department of Homeland Security (DHS) Systematic Alien Verification for Entitlements (SAVE) program;[4] (2) review of U.S. birth certificates; (3) review of REAL ID compliant identification cards (ineligible aliens are not able to obtain such IDs); (4) DHS issued documentation verifying immigration status; or (5) other methods to verify eligibility.

In addition, the Department notes that there are existing legal exemptions from verification requirements for nonprofit charitable organizations administering ''Federal public benefits''. Nonprofit charitable organizations that administer ''Federal public benefits'' are not required to conduct eligibility verification under 8 U.S.C. 1642(d). The exemption in 8 U.S.C. 1642(d) is narrowly crafted and does not include other entities administering ''Federal public benefits''. Accordingly, the Department does not interpret 8 U.S.C. 1642(d) to relieve states or other governmental entities involved in the administration of ''Federal public benefits'' from the requirements to ensure that all relevant programs are in compliance with PRWORA (even when some or all educational services are ultimately provided by a nonprofit charitable organization). Grantees may, consistent with 2 CFR 200.413(b)–(c) and 2 CFR 200.405(d), charge direct administrative costs associated with verification as an allocable benefit that

---

[3] In this interpretive rule, the Department announces how it interprets PRWORA with respect to certain Department programs; however, just because a program is not specifically mentioned herein does not mean the program does not have obligations under PRWORA. The Department may, but is not required to, exercise its enforcement discretion to refrain from taking actions against grantees in certain circumstances, such as for programs not mentioned in this interpretive rule.

[4] Effective April 1, 2025, the Department of Homeland Security has eliminated the transaction charge for using SAVE for all state, local, tribal, and territorial government agencies. See U.S. Dep't of Homeland Sec., Save Transaction Charges (last accessed June 25, 2025), *https://www.uscis.gov/save/about-save/transaction-charges.*

can be reasonably documented toward each grant award.

Unless required by Departmental regulations, grantees have no affirmative obligation to report on verification to the Department. Because this interpretative rule is not legislative, the Department lacks the ability to require affirmative reporting.

Interpretive rules cannot have effective dates. Rather, this interpretive rule informs the public of the Department's interpretation of the law. See *Guedes* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives,* 920 F.3d 1, 20 (D.C. Cir. 2019) (holding that an interpretive rule cannot have an effective date and is instead an interpretation of how the law should be interpreted, past and present). The Department may, but is not required to, exercise its enforcement discretion to refrain from taking actions against grantees in certain circumstances.

## V. Conclusion

This interpretive rule finds that Federal programs administered by the Department that provide postsecondary education and other similar benefits, including adult education and CTE programs, are ''Federal public benefits'' subject to the citizenship and immigration verification requirements of PRWORA, so long as such benefits are not protected under *Plyler* as part of a basic public education. This interpretation of adult education and covered CTE programs as providing ''Federal public benefits'' also includes programs that provide dual enrollment and other similar early college programs that go beyond providing a basic public education to prepare students for credit accumulation, degree attainment, or to enter the workforce. Therefore, entities administrating these programs may consider this interpretation when taking action to comply with PRWORA. This interpretation represents the Department's current position on the issue and may be referenced when enforcing or monitoring grantee and subgrantee compliance with PRWORA.

*Accessible Format:* On request to the program contact listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

Electronic Access to This Document: The official version of this document is the document published in the **Federal Register**. You may access the official

ED_PRWORA_000005

edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

### Signing Authority

This document of the U.S. Department of Education was signed on July 8, 2025, by Linda E. McMahon, Secretary of Education. That document with the original signature and date is maintained by the U.S. Department of Education. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned has been authorized to sign the document in electronic format for publication, as an official document of the U.S. Department of Education. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Sharon Cooke,**
*Associate Director, Office of the Executive Secretariat, Office of the Secretary, U.S. Department of Education.*
[FR Doc. 2025–12925 Filed 7–10–25; 8:45 am]
**BILLING CODE 4000–01–P**

---

### DEPARTMENT OF ENERGY

[GDO Docket No. EA–524]

### Application for Authorization To Export Electric Energy; DRW Energy Trading LLC

**AGENCY:** Grid Deployment Office, U.S. Department of Energy.

**ACTION:** Notice of application.

**SUMMARY:** DRW Energy Trading LLC (the Applicant or DRW Energy) has applied for authorization to transmit electric energy from the United States to Canada pursuant to the Federal Power Act.

**DATES:** Comments, protests, or motions to intervene must be submitted on or before August 11, 2025.

**ADDRESSES:** Comments, protests, motions to intervene, or requests for more information should be addressed by electronic mail to *Electricity.Exports@hq.doe.gov*.

**FOR FURTHER INFORMATION CONTACT:** Janessa Zucchetto, (240) 474–8226, *Electricity.Exports@hq.doe.gov*.

**SUPPLEMENTARY INFORMATION:** The United States Department of Energy (DOE) regulates electricity exports from the United States to foreign countries in accordance with section 202(e) of the Federal Power Act (FPA) (16 U.S.C. 824a(e)) and regulations thereunder (10 CFR 205.300 *et seq.*). Sections 301(b) and 402(f) of the DOE Organization Act (42 U.S.C. 7151(b) and 7172(f)) transferred this regulatory authority, previously exercised by the now-defunct Federal Power Commission, to DOE.

Section 202(e) of the FPA provides that an entity which seeks to export electricity must obtain an order from DOE authorizing that export (16 U.S.C. 824a(e)). On April 10, 2023, the authority to issue such orders was delegated to the DOE's Grid Deployment Office (GDO) under Redelegation Order No. S3–DEL–GD1–2023.

On May 6, 2025, DRW Energy filed an application (Application or App.) for authorization to transmit electric energy from the United States to Canada for a term of ten years. App. at 1.

According to the Application, DRW Energy is a power marketer with its principal place of business in Houston, Texas. *Id.* at 1. The Applicant states that it is "the wholly owned subsidiary of DRW Holdings, LLC." *Id.* DRW Energy represents that "The Federal Energy Regulatory Commission (FERC) has granted [it] authority to sell wholesale power at market-based rates under a market-based rate tariff." *Id.* at 1–2 & Exhibit G.

DRW Energy represents that it will purchase "power to be exported from a variety of sources, including but not limited to, power marketers, independent power producers, or U.S. electric utilities and federal power marketing entities." App. at 2. The Applicant thus asserts that because this power is surplus to the system of the generator, its proposed exports "will not impair the sufficiency of the electric power supply within the United States." *Id.*

DRW Energy further asserts that its proposed exports will not impair or tend to impede the sufficiency of electric supplies in the U.S. or the regional coordination of electric utility planning or operations. App. at 3. The Applicant states that it "will make all necessary commercial arrangements and will obtain any other required regulatory approvals to schedule and deliver its power exports." *Id.* The Applicant states that the electricity it plans to export "will be transmitted under arrangements with utilities that own and operate existing transmission facilities, consistent with the export limitations and other terms and conditions contained in existing Presidential Permits and electricity export authorizations associated with these transmission facilities." *Id.* The Applicant further states it will schedule transactions in compliance with reliability standards and guidelines established by the North American Reliability Corporation. *Id.*

The existing international transmission facilities to be utilized by the Applicant have been previously authorized by Presidential permits issued pursuant to Executive Order 10485, as amended, and are appropriate for open access transmission by third parties. *See* App. at Exhibit C.

*Procedural Matters:* Any person desiring to be heard in this proceeding should file a comment or protest to the Application at *Electricity.Exports@hq.doe.gov*. Protests should be filed in accordance with Rule 211 of FERC's Rules of Practice and Procedure (18 CFR 385.211). Any person desiring to become a party to this proceeding should file a motion to intervene at *Electricity.Exports@hq.doe.gov* in accordance with FERC Rule 214 (18 CFR 385.214).

Comments and other filings concerning DRW Energy's Application should be clearly marked with GDO Docket No. EA–524. Additional copies are to be provided directly to Michael J. Lowell, Esq., Reed Smith LLP, 1301 K Street, NW, Suite 1000—East Tower, Washington, DC 20005, *mlowell@ reedsmith.com;* Jon Hoff, DRW Energy Trading LLC, 1500 Post Oak Blvd., Suite 1625, Houston, TX 77056, *jhoff@ drwholdings.com*.

A final decision will be made on the requested authorization after the environmental impacts have been evaluated pursuant to DOE's National Environmental Policy Act Implementing Procedures (10 CFR part 1021) and after DOE evaluates whether the proposed action will have an adverse impact on the sufficiency of supply or reliability of the United States electric power supply system.

Copies of this Application will be made available, upon request, by accessing the program website at *https://www.energy.gov/gdo/pending-applications-0* or by emailing *Electricity.Exports@hq.doe.gov*.

ED_PRWORA_000006

🇺🇸 An official website of the United States government   Here's how you know

## U.S. Department of Education

**PRESS RELEASE**

# U.S. Department of Education Ends Taxpayer Subsidization of Postsecondary Education for Illegal Aliens

JULY 10, 2025

The U.S. Department of Education today announced it will end taxpayer subsidization of illegal aliens in career, technical, and adult education programs. In an interpretive rule issued today, the Department rescinded a Dear Colleague letter from the Clinton Administration that enabled non-qualified illegal aliens to access federal public benefits in contravention of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA). The interpretive rule also ensures that postsecondary education programs authorized under the Higher Education Act (HEA), such as Pell Grants and student loans, continue to be inaccessible to illegal immigrants.

"Postsecondary education programs funded by the federal government should benefit American citizens, not illegal aliens," **said U.S. Secretary of Education Linda McMahon.** "Under President Trump's leadership, hardworking American taxpayers will no longer foot the bill for illegal aliens to participate in our career, technical, or adult education programs or activities. The Department will ensure that taxpayer funds are reserved for citizens and individuals who have entered our country through legal means who meet federal eligibility criteria."

The Notice of Interpretation published in the Federal Register today states that federal programs that provide postsecondary education and other similar benefits, including career and technical education (CTE) programs under the Carl D. Perkins Career and Technical Education Act (Perkins V), ar

**Help improve ED.gov**

ED_PRWORA_000007

programs under Title II of the Adult Education and Family Literacy Act (AEFLA) of the Workforce Innovation and Opportunity Act (WIOA), are federal public benefits subject to the requirements of PRWORA.

The Notice reminds grantees and subgrantees of their obligations to verify the eligibility of participants to ensure that limited federal funding is not being improperly distributed to noneligible individuals or used to support programs and services that serve illegal aliens. The Department drafted the Notice of Interpretation in response to the President's Executive Order 14218 titled, *Ending Taxpayer Subsidization of Open Borders*.

The Notice also rescinds a portion of a previous Dear Colleague Letter issued in November 1997 that mischaracterized federal public benefits. A copy of rescinded the 1997 DCL can be viewed here.

**Background:**

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act generally limits eligibility for "federal public benefits" to U.S. citizens, permanent residents, and certain categories of "qualified aliens." PRWORA defines federal public benefits to include any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefits, or any similar benefits for which payments or assistance are provided to an individual, household, or family eligibility unit.

In 1997, the Clinton Administration issued a Dear Colleague Letter that erroneously exempted career, technical, and adult education programs from being subject to PRWORA. In doing so, the Department's interpretation mischaracterized the law by creating artificial distinctions between federal benefit programs based upon the method of assistance. Congress made no such distinction in PRWORA.

In conjunction with the Notice of Interpretation, the Department will send letters to all Perkins V, AEFLA, and HEA grantees discussing eligibility verification. Interpretive rules cannot have effective dates and are not binding on the public or the Department. The interpretive rule represents the Department's current

ED_PRWORA_000008

position on the issue and may be referenced when enforcing or monitoring grantee and subgrantee compliance with PRWORA. In general, the Department does not have any plans to take enforcement actions against any grantee or subgrantee under PRWORA prior to August 9, 2025.

--

As part of a lawsuit, the U.S. Department of Education (ED) has agreed to stay potential enforcement through September 10, 2025 of the Personal Responsibility and Work Opportunity Act, as amended, (PRWORA), to the degree that such enforcement actions are consistent with ED's interpretive rule regarding PRWORA as announced in the "Clarification of Federal Public Benefits Under the Personal Responsibility and Work Opportunity Reconciliation Act" 90 Fed. Reg. 30,896 (July 11, 2025).

**CONTACT**

Press Office  |  (202) 401-1576  |  press@ed.gov

**Office of Communications and Outreach (OCO)**

Page Last Reviewed: July 30, 2025

**Pay for College**

Fill out the FAFSA

529 Plans

Repay Your Loans

ED_PRWORA_000009

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

## Research

Data

ED_PRWORA_000010

Education Research

What Works Clearinghouse

**Site Notices and Privacy Policies**

**ED Archive**

# U.S. Department of Education



www.ed.gov

**An official website of the Department of Education**

About Dept of Education          Accessibility Support          No FEAR Act data

Office of the Inspector General          Performance reports          FOIA          Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

ED_PRWORA_000011

**July 10, 2025**

**Notification to Grantees and Subgrantees of Assistance Under the
Higher Education Act of 1965 of Updated
PRWORA Interpretation of Federal Public Benefits**

Dear HEA Grantees and Subgrantees:

The U.S. Department of Education (Department) values the important role that its grantees and subgrantees play in promoting postsecondary education so that students receive the skills necessary to get a well-paying career aligned with workforce needs. On February 19, 2025, the President issued Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders," which is designed to promote the rule of law, ensure that Federal public benefit programs are only provided to U.S. citizens, residents, and certain eligible nonresidents, and prevent spending of American taxpayer dollars on Federal assistance for illegal aliens. The President's Executive Order reinforces the importance of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA, P.L. 104-193), which prohibits illegal aliens and other non-qualified aliens from receiving certain Federal public benefits, including "any… *postsecondary education*… or *any similar benefit* for which payments or assistance are provided to an individual, household, or family eligibility unit…" (emphasis added).

Tomorrow, the Department will publish a Notice of Interpretation regarding PRWORA. The interpretive rule discusses how the Department interprets PRWORA with respect to career and technical education (CTE) programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006 (Perkins V), as amended, and adult education programs authorized under Title II / Adult Education and Family Literacy Act (AEFLA) of the Workforce Innovation and Opportunity Act of 2014 (WIOA). The interpretation also restates and reinforces that programs authorized under the Higher Education Act of 1965 (HEA), as amended, are subject to the requirements of PRWORA. While the interpretive rule is not binding on grantees, subgrantees, or the Department, it represents the Department's current interpretation of the law and may be used when taking enforcement actions.

**The Department's Clarification of Postsecondary Education and Other Similar Benefits as Subject to PRWORA**

The Department has taken several recent actions to ensure that its interpretation of Federal postsecondary education programs, or those that provide a similar benefit to the enumerated Federal public benefits under 8 U.S.C. § 1611(c)(1), are compliant and aligned with the purpose of PRWORA. On July 11, 2025, the Department will issue a Notice of Interpretation rescinding portions of a 1997 Dear Colleague Letter that incorrectly classified certain programs as outside the scope of PRWORA. The Notice of Interpretation clarifies that Federal programs administered by the Department that provide postsecondary education and other similar benefits to an "individual, household, or family eligibility unit," including the vast majority of postsecondary education programs authorized under the Higher Education Act of 1965, as amended; CTE

ED_PRWORA_000012

programs under Perkins V; and adult education programs authorized under AEFLA are Federal public benefits subject to the citizenship verification requirements of PRWORA.

**HEA Grantee/Subgrantee Responsibilities under PRWORA, Including Citizenship Verification**

As grantees and subgrantees of assistance authorized under the HEA who are engaged in the administration of Federal public benefits, your organization is responsible for ensuring that your programs are operating in compliance with the citizenship verification requirements of PRWORA. These verification requirements require that your agency or organization ensure that non-qualified aliens do not receive payment under your program, are not provided or receiving services funded by the program, and that non-qualified aliens are not able to access any Federal public benefit that may be imparted via these programs.

The Department recognizes that numerous postsecondary education programs authorized under the HEA are subject to additional statutory and regulatory restrictions regarding participant eligibility, including many programs that contain their own unique restrictions on noncitizen eligibility to participate in the benefits of that particular program. For example, noncitizen eligibility to participate in the federal student aid programs under Title IV, in addition to being a restricted Federal public benefit, requires eligible noncitizens to provide documentation that they are "in the United States for other than a temporary purpose with the intention of becoming a citizen or permanent resident" in order to establish their eligibility for federal student aid. *See* 20 U.S.C. § 1091(a)(5). Where a program authorized under the HEA (such as Title IV aid) requires citizenship verification measures that are more specific or restrictive than those addressed under PRWORA, grantees and subgrantees of assistance under that program should continue to comply with the more specific, programmatic restrictions on noncitizen participation. The Department also recognizes that other programs authorized under the HEA, such as the College Assistance Migrant Program (CAMP), contain no direct statutory or regulatory restrictions on noncitizen participation, though grantees have been properly advised of the applicability of PRWORA through previous guidance.[1] Grantees and subgrantees of HEA-authorized programs that have previously been advised of the applicability of PRWORA should continue to follow that guidance, and any additional guidance that the Department may make available.

As described within the Department's Notice of Interpretation, PRWORA's explicit prohibition includes funding to any postsecondary education or other similar benefits funded wholly or in-part, or directly or indirectly conferred by your program(s), including coursework or postsecondary or workforce credentials. If your organization is a grantee, your organization has an obligation to effectively monitor the activities of subgrantees to ensure that funds distributed to said subgrantees are in compliance with current law and that such services and programs are

---

[1] U.S. Dep't of Ed, Recruitment and Eligibility Guidance, (2012), available at https://www.ed.gov/sites/ed/files/2021/09/hep-camp-eligibility-non-regulatory-guidance-2012.pdf

ED_PRWORA_000013

only provided to U.S. citizens and eligible nonresidents, as defined under PRWORA. 8 U.S.C. § 1641(b).

The Department notes that there are existing legal exemptions from verification requirements for nonprofit charitable organizations administering Federal public benefits. Nonprofit charitable organizations that administer Federal public benefits are not required to conduct eligibility verification under 8 U.S.C. § 1642(d). The exemption is narrowly crafted to nonprofit charitable organizations and does not include other entities administering federal public benefits, including the compliance requirements of states and other grantees that may provide disbursements or subgrants to nonprofit charitable organization.

The interpretive rule represents the Department's current position on the issue and may be referenced when enforcing or monitoring grantee and subgrantee compliance with PRWORA. The Department may exercise its enforcement discretion to seek to ensure that this citizenship verification is in use across all postsecondary education and other similar benefit programs covered under PRWORA. In general, the Department does not have any plans to take enforcement actions against any grantee or subgrantee under PRWORA prior to August 9, 2025.

**Next Steps**

Moving forward, the Department will work with state and local grantees, as well as subgrantees, to ensure that Federal public benefit usage is limited to U.S. citizens, residents, and certain eligible nonresidents.

While the Department is not requiring grantees  to engage in specific verification processes or procedures under this non-binding interpretive rule, grantees that may have existing legal obligations under PRWORA may seek to verify citizenship eligibility using, among other things: (1) the Department of Homeland Security (DHS) Systematic Alien Verification for Entitlements (SAVE) program; (2) review of U.S. birth certificates; (3) review of REAL ID compliant identification cards (ineligible aliens are not able to obtain such IDs); (4) DHS issued documentation verifying immigration status; or (5) other methods to verify eligibility.

In the future, the Department may conduct a review of grant opportunities, grantees and subgrantees, and other relevant parties to ensure compliance with the citizenship and eligibility verifications of PRWORA and that limited Federal funding is not being improperly distributed to noneligible individuals or used to support programs and services that serve illegal aliens.

The Department notes that, unless it is required by Departmental regulations, grantees have no affirmative obligation to report on verification to the Department. As an interpretive rule, this guidance is not binding nor does it have an effective date; rather, it informs the public, in addition to relevant stakeholders, of the Department's interpretation of the law. The Department may, but is not required to, exercise its enforcement discretion to refrain from taking actions against grantees in certain circumstances. The Department also asks that each HEA grantee distribute and share the contents of this letter with its corresponding subgrantees.

ED_PRWORA_000014

The Department looks forward to working with all grantees, subgrantees, and stakeholders in implementing and ensuring compliance with PRWORA, the corresponding provisions of the Notice of Interpretation, and this letter. This effort is necessary to ensure that taxpayer funds are reserved for individuals who have entered our country through legal means and uphold the rule of law. HEA grantees and subgrantees may submit questions related to the Notice of Interpretation to PRWORA@ed.gov. Thank you for your cooperation in this important matter.

Sincerely,

Christopher McCaghren

Acting Assistant Secretary for
Postsecondary Education

ED_PRWORA_000015



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF CAREER, TECHNICAL, AND ADULT EDUCATION

**July 10, 2025**

**Notification to Perkins and AEFLA Grantees and Subgrantees of Updated PRWORA Interpretation of Federal Public Benefits**

Dear Perkins V and Adult Education and Family Literacy Act (AEFLA) Grantees and Subgrantees:

The U.S. Department of Education (Department) values the important role that its grantees and subgrantees play in promoting career, technical, and adult education so that students receive the skills necessary to succeed in postsecondary education. On February 19, 2025, the President issued Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders," which is designed to promote the rule of law, ensure that Federal public benefit programs are only provided to U.S. citizens, residents, and certain eligible nonresidents, and prevent spending of American taxpayer dollars on Federal assistance for illegal aliens. The President's Executive Order reinforces the importance of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA, P.L. 104-193), which prohibits illegal aliens and other non-qualified aliens from receiving certain Federal public benefits, including "any… *postsecondary education*… or *any similar benefit* for which payments or assistance are provided to an individual, household, or family eligibility unit…" (emphasis added).

Tomorrow, the Department will publish a Notice of Interpretation regarding PRWORA. The interpretive rule discusses how the Department interprets PRWORA with respect to career and technical education (CTE) programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006 (Perkins V), as amended, and adult education programs authorized under Title II (AEFLA) of the Workforce Innovation and Opportunity Act (WIOA) of 2014. While the interpretive rule is not binding on grantees, subgrantees, or the Department, it represents the Department's current interpretation of the law and may be used when taking enforcement actions.

**The Department of Education's Interpretation of Postsecondary Education and Other Similar Benefits as Subject to PRWORA**

The Department has taken several recent actions to ensure that its interpretation of Federal postsecondary education programs, or those that provide a similar benefit to the

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

ED_PRWORA_000016

enumerated Federal public benefits under 8 U.S.C. § 1611(c)(1), are compliant and aligned with the purpose of PRWORA. On July 11, 2025, the Department will issue a Notice of Interpretation rescinding portions of a 1997 Dear Colleague Letter that incorrectly classified certain programs as outside the scope of PRWORA. The Notice of Interpretation clarifies that Federal programs administered by the Department that provide postsecondary education and other similar benefits to an "individual, household, or family eligibility unit," including the vast majority of postsecondary education programs authorized under the Higher Education Act of 1965, as amended; CTE programs under Perkins V; and adult education programs authorized under AEFLA are Federal public benefits subject to the citizenship verification requirements of PRWORA.

**Adult Education and CTE Grantee and Subgrantee Responsibilities under PRWORA, Including Citizenship Verification**

As grantees and subgrantees engaged in administering Federal public benefits through CTE programs authorized under Perkins V or the adult education programs authorized under AEFLA, your organization may be responsible for ensuring that such programs are in compliance with the citizenship verification requirements of PRWORA. Under PRWORA, states and local government agencies are required to ensure that noneligible illegal aliens do not receive assistance or payments from federally funded programs.

As described within the Department's Notice of Interpretation, this explicit prohibition includes funding to any postsecondary education or other similar benefits funded wholly or in-part, or directly or indirectly conferred by your program(s), including coursework or postsecondary or workforce credentials. If your organization is a grantee, your organization has an obligation to effectively monitor the activities of subgrantees to ensure that funds distributed to said subgrantees are in compliance with current law and that such services and programs are only provided to U.S. citizens and eligible nonresidents, as defined under PRWORA. 8 U.S.C. § 1641(b).

The Department notes that there are existing legal exemptions from verification requirements for nonprofit charitable organizations administering Federal public benefits. Nonprofit charitable organizations that administer Federal public benefits are not required to conduct eligibility verification under 8 U.S.C. § 1642(d). The exemption is narrowly crafted to nonprofit charitable organizations and does not include other entities administering Federal public benefits, including the compliance requirements of states and other grantees that may provide disbursements or subgrants to nonprofit charitable organizations.

The interpretive rule represents the Department's current position on the issue and may be referenced when enforcing or monitoring grantee and subgrantee compliance with PRWORA. The Department may exercise its enforcement discretion to seek to ensure that this citizenship verification is in use across all postsecondary education and other similar

ED_PRWORA_000017

benefit programs covered under PRWORA, including programs funded under Perkins V and AEFLA. In general, the Department does not have any plans to take enforcement actions against any grantee or subgrantee under PRWORA prior to August 9, 2025.

**Next Steps**

Moving forward, the Department will work with state and local grantees, as well as subgrantees, to ensure that Federal public benefit usage is limited to U.S. citizens, residents, and certain eligible nonresidents.

While the Department is not requiring grantees to engage in specific verification processes or procedures under this non-binding interpretive rule, grantees that may have existing legal obligations under PRWORA may seek to verify citizenship eligibility using, among other things: (1) the Department of Homeland Security (DHS) Systematic Alien Verification for Entitlements (SAVE) program; (2) review of U.S. birth certificates; (3) review of REAL ID compliant identification cards (ineligible aliens are not able to obtain such IDs); (4) DHS-issued documentation verifying immigration status; or (5) other methods to verify eligibility. Grantees are reminded to inform subgrantees of existing legal obligations under PRWORA.

In the future, the Department may conduct a review of grant opportunities, grantees and subgrantees, and other relevant parties to ensure compliance with the citizenship and eligibility verifications of PRWORA and that limited Federal funding is not being improperly distributed to noneligible individuals or used to support programs and services that serve illegal aliens.

The Department notes that, unless it is required by Departmental regulations, grantees have no affirmative obligation to report on verification to the Department. As an interpretive rule, this guidance is not binding nor does it have an effective date; rather, it informs the public, in addition to relevant stakeholders, of the Department's interpretation of the law. The Department may, but is not required to, exercise its enforcement discretion to refrain from taking actions against grantees in certain circumstances.

The Department looks forward to working with all grantees, subgrantees, and stakeholders in implementing and ensuring compliance with PRWORA, the corresponding provisions of the Notice of Interpretation, and this letter. This effort is necessary to ensure that taxpayer funds are reserved for individuals who have entered our country through legal means and

ED_PRWORA_000018

uphold the rule of law. Perkins V and AEFLA grantees and subgrantees may submit questions related to the Notice of Interpretation to PRWORA@ed.gov. Thank you for your cooperation in this important matter.

Sincerely,

**NICHOLAS MOORE**

Digitally signed by
NICHOLAS MOORE
Date: 2025.07.10
09:39:33 -04'00'

Nicholas J. Moore
Acting Assistant Secretary for Career,
Technical, and Adult Education

4

# Presidential Documents

Executive Order 14218 of February 19, 2025

## Ending Taxpayer Subsidization of Open Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* The plain text of Federal law, including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) (PRWORA), generally prohibits illegal aliens from obtaining most taxpayer-funded benefits. Title IV of the PRWORA states that it is national policy that "aliens within the Nation's borders not depend on public resources to meet their needs," and that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." But in the decades since the passage of the PRWORA, numerous administrations have acted to undermine the principles and limitations directed by the Congress through that law. Over the last 4 years, in particular, the prior administration repeatedly undercut the goals of that law, resulting in the improper expenditure of significant taxpayer resources. My Administration will uphold the rule of law, defend against the waste of hard-earned taxpayer resources, and protect benefits for American citizens in need, including individuals with disabilities and veterans.

**Sec. 2**. *Preserving Federal Public Benefits.* (a) To prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens, the head of each executive department or agency (agency) shall:

(i) identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including the PRWORA;

(ii) ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called "sanctuary" policies that seek to shield illegal aliens from deportation; and

(iii) enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(b) Within 30 days of the date of this order, the Director of the Office of Management and Budget and the Administrator of the United States DOGE Service, in coordination with the Assistant to the President for Domestic Policy, shall further:

(i) identify all other sources of Federal funding for illegal aliens; and

(ii) recommend additional agency actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems.

(c) Agencies shall refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action.

**10582**    **Federal Register** / Vol. 90, No. 36 / Tuesday, February 25, 2025 / Presidential Documents

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 19, 2025.*

[FR Doc. 2025–03137
Filed 2–24–25; 8:45 am]
Billing code 3395–F4–P

ED_PRWORA_000021

When completed, the interim operations plan will supersede the annual operations plans/advisories and will guide Project operations until completion of the adjudication. At that time, the interim plan will be revised as necessary and additional NEPA documentation may be required.

Dated: November 5, 1997.

**John F. Davis,**

*Acting Regional Director.*

[FR Doc. 97–30096 Filed 11–14–97; 8:45 am]

**BILLING CODE 4310–94–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Reclamation

### Westland Irrigation District Boundary Adjustment, Hermiston, OR

**AGENCY:** Bureau of Reclamation, Interior.

**ACTION:** Notice of intent to prepare an environmental impact statement.

**SUMMARY:** Pursuant to the National Environmental Policy Act (NEPA) of 1969, as amended, the Bureau of Reclamation (Reclamation) intends to prepare an environmental impact statement (EIS) for a proposed boundary adjustment to include additional lands into the Westland Irrigation District. Westland Irrigation District (WID) proposes the addition of 21,100 acres, of which 9,912 acres are currently irrigated, into their boundaries.

The NEPA process was initiated in late 1993 and, as a result of comments received then, has been on hold until additional information was obtained. This notice is to inform the public of the resumption of the NEPA process and the preparation of an EIS.

**FOR FURTHER INFORMATION CONTACT:** Mr. John Tiedeman, UCA–1607, Upper Columbia Area Office, Bureau of Reclamation, PO Box 1749, Yakima WA 98907–1749; Telephone (509) 575–5848 extension 238.

**SUPPLEMENTARY INFORMATION:** WID is one of several districts in the Umatilla basin either served by federally owned facilities or receiving federally controlled water. A Federal repayment contract with WID requires that changes to district boundaries must be approved by the Secretary of the Interior. During studies undertaken to implement the Umatilla Basin Project Act, it became apparent that WID was providing federally supplied water to lands outside of the district boundaries. In 1993, to address this problem, WID requested that Reclamation allow a change in their boundaries so that they may provide irrigation water to lands

outside the current boundaries. In the interim Reclamation entered into a series of annual water service contracts with WID so irrigation of lands outside of the district boundaries with federally supplied water could continue while issues surrounding the boundary expansion were resolved.

Reclamation and the Natural Resources Department of the Confederated Tribes of the Umatilla Indian Reservation (CTUIR) held public meetings on November 4 and December 17, 1993, to gather comments from the public concerning the ''Proposed Boundary Changes for Irrigation Districts in the Umatilla Project, Oregon.'' Key issues identified in the scoping effort included Umatilla River hydrology and passage conditions for anadromous fish, Native American trust resources, and continued viability of irrigated agriculture. Based on the complex and often controversial nature of the issues involved, the high level of public and agency interest, and Reclamation's Native American trust responsibilities, Reclamation concluded that an EIS should be prepared. Since then, a hydrologic model of the Umatilla basin, necessary to complete the assessment of the proposed boundary adjustment, has been developed. Completion of the hydrologic model is anticipated for February 1998.

Four alternatives are proposed, including the no action alternative. Under the no action alternative all deliveries of federally supplied water by WID to lands outside of the current district boundaries would cease. Under the action alternatives some, or all, of these deliveries could continue. The draft EIS is expected to be completed in March of 1999.

At this time, no additional scoping meetings are planned. A summary of scoping issues identified through previous meetings is available upon request. Anyone interested in more information concerning the proposed action or who has information concerning significant environmental issues, should contact Mr. Tiedeman as provided under the **FOR FURTHER INFORMATION CONTACT** section.

Dated: October 17, 1997.

**John W. Keys, III,**

*Regional Director, Pacific Northwest Region.*

[FR Doc. 97–30062 Filed 11–14–97; 8:45 am]

**BILLING CODE 4310–94–M**

## DEPARTMENT OF JUSTICE

[AG Order No. 2129–97]

### Interim Guidance on Verficiation of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996

**AGENCY:** Department of Justice.

**ACTION:** Notice of interim guidance with request for comments.

**SUMMARY:** Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (''PRWORA'') requires the Attorney General, by February 1998, to promulgate regulations requiring verification that an applicant for federal public benefits is a qualified alien eligible to receive federal public benefits under the Act. Amendments to the PRWORA by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 also require the Attorney General, within the same time period, to establish fair and nondiscriminatory procedures for applicants to provide proof of citizenship. Amendments to the PRWORA by the Balanced Budget Act of 1997 require the Attorney General, by November 3, 1997, to issue interim verification guidance that sets forth procedures that benefit providers can use to verify citizenship, qualified alien status, and eligibility under Title IV of the PRWORA prior to issuance of the final regulations. In accordance with this last statutory requirement, the Attorney General, in consultation with federal benefit-granting agencies, has developed this interim guidance.

**DATES:** This Interim Guidance is effective October 29, 1997.

**ADDRESSES:** Comments should be submitted to: John E. Nahan, Immigration and Naturalization Service, 425 I St., N.W., ULLICO Building, 4th Floor, Washington, D.C. 20536, (202) 514–2317.

**FOR FURTHER INFORMATION CONTACT:** John E. Nahan, Immigration and Naturalization Service, 425 I St., N.W., ULLICO Building, 4th Floor, Washington, D.C. 20536, (202) 514–2317.

**SUPPLEMENTARY INFORMATION:** By the authority vested in me as Attorney General by law, including section 432(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (as amended), I hereby issue the following Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and

ED_PRWORA_000022

Work Opportunity Reconciliation Act of 1996.

Dated: October 29, 1997.

**Janet Reno,**
*Attorney General.*

**Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996**

**Introduction**

*A. Summary*

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act'') provides that, with certain exceptions, only United States citizens, United States non-citizen nationals and ''qualified aliens'' (and sometimes only particular categories of qualified aliens) are eligible for federal, state and local public benefits. The Act, as amended by the Balanced Budget Act of 1997, requires the Attorney General, by November 3, 1997, to issue interim guidance on the verification of eligibility of aliens for federal public benefits. The Act also requires the Attorney General, by February 1998, to promulgate final regulations requiring verification that an applicant is a qualified alien eligible to receive federal public benefits under the Act. States have an additional twenty-four months to put into effect a verification system that complies with those regulations. Amendments to the Act by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 further require the Attorney General to establish fair and nondiscriminatory procedures for applicants to provide proof of citizenship. Benefit providers, however, are required to implement the Act, and hence to make determinations regarding citizenship, qualified alien status, and eligibility under Title IV of the Act, before the Attorney General's issuance of new regulations and the States' development of conforming verification systems.

This memorandum provides guidance on how to verify citizenship, immigration status and eligibility under Title IV of the Act during this interim period. This guidance adopts a four-step procedure: (1) Determine if your program provides a ''federal public benefit'' subject to the Act's verification requirements; (2) Determine whether the applicant is otherwise eligible for benefits under general program requirements; (3) Verify the applicant's status as a U.S. citizen, U.S. non-citizen national or qualified alien; and (4) Verify the applicant's eligibility for

benefits under the Act. If at any step you determine that you are not required to verify (or further verify) immigration status, you should not go on to the following step(s). If you have any questions regarding verification of immigration status pursuant to this Guidance, contact the local office of the Immigration and Naturalization Service (''INS'') serving your geographic area. A list of local INS offices is set forth in Attachment 1. Attachment 1 also includes a copy of INS Form G–845 and the Supplement thereto to be used to verify immigration status pursuant to this Guidance.

This Guidance applies only to federal public benefits, and does not directly address the citizenship and immigration requirements that Title IV of the Act imposes on the provision of state and local public benefits. To the extent that you are required to verify that an applicant is a U.S. citizen, U.S. non-citizen national or qualified alien when determining eligibility for a state or local program, however, the Attorney General will be promulgating regulations that set forth procedures by which state and local providers can verify alien eligibility for such benefits. During the interim, we advise that you use this Guidance in consultation with state and local authorities.

*B. Programs With Governmental Verification*

Some federal programs (*e.g.,* Medicaid) require federal, state and local governmental agencies, but not private providers, to verify citizenship and immigration status as part of program eligibility determinations. The private entities actually providing the benefits must abide by the verification determination made by the governmental agency; they engage in no independent verification. Nothing in this Guidance modifies such program requirements: providers of benefits under programs where verification is performed by a governmental agency are not required by this Guidance to verify that an applicant is a U.S. citizen, non-citizen national or qualified alien, and they should not engage in such verification. They should continue to provide benefits pursuant to program requirements based on the verification determinations made by the appropriate governmental agency.

*C. Programs Currently Required To Use the SAVE System*

Some federal programs (*e.g.,* Medicaid, unemployment compensation, educational assistance under Title IV of the Higher Education Act of 1965, assisted housing programs

administered by the Department of Housing and Urban Development) already require, absent a waiver, verification of the immigration status of noncitizens applying for benefits through the Systematic Alien Verification for Entitlements (''SAVE'') system. SAVE is an intergovernmental information-sharing program that is available to benefit-granting agencies that need to determine an alien's immigration status. With one exception, nothing in the Act changes preexisting legal requirements regarding use of the SAVE system or relieves the administrators of statutorily mandated programs of their obligations to comply with the SAVE program (including the terms of any waiver of SAVE program requirements received from the appropriate federal agency); section 840 of the Act, however, did remove the requirement that a state agency use the SAVE system to verify eligibility for Food Stamps. You should note that SAVE does not provide all of the information that may now be necessary to determine an individual's eligibility under Title IV of the Act. You should use this Guidance to obtain or verify that new information.

*D. Exemption for Nonprofit Charitable Organizations*

Subject to such verification regulations as the Attorney General may subsequently adopt and the limitations set forth immediately below, a ''nonprofit charitable organization'' providing a federal, state or local public benefit covered by the Act is *not* required under Title IV of the Act to determine, verify, or otherwise require proof of an applicant's eligibility for such benefits based on the applicant's status as a U.S. citizen, U.S. non-citizen national or qualified alien. Thus, a nonprofit charitable organization is not required by the Act to seek an applicant's confirmation that he or she is a qualified alien, or to have a separate entity verify the applicant's status before providing benefits. To be eligible for this exemption, an organization must be both ''nonprofit'' and ''charitable.'' For purposes of this Guidance, an organization is ''nonprofit'' if it is organized and operated for purposes other than making gains or profits for the organization, its members or its shareholders, and is precluded from distributing any gains or profits to its members or shareholders. An organization is ''charitable'' if it is organized and operated for charitable purposes. The term ''charitable'' should be interpreted in its generally accepted legal sense as developed by judicial decisions. It includes organizations

ED_PRWORA_000023

dedicated to relief of the poor and distressed or the underprivileged, as well as religiously-affiliated organizations and educational organizations. If you have any questions as to whether your organization is a nonprofit charitable organization exempt from the Act's verification requirements, you should contact the federal, state or local agency overseeing the program you administer to obtain guidance.

The exemption for nonprofit charitable organizations is limited to verification requirements imposed by Title IV of the Act and to those instances in which the nonprofit charitable organization itself would be required by Title IV to engage in verification. Certain programs, however, require federal, state and local agencies to verify citizenship and immigration status as part of program eligibility determinations, while benefits are provided, at least in part, by charitable organizations. Other programs currently require verification by the charitable organization itself. These independent requirements are not altered by the provision exempting nonprofit charitable organizations from the Act's verification requirements. If a non-exempt entity (*e.g.,* a state agency) performs verification for benefits provided through a nonprofit charitable organization, you must abide by those determinations. Similarly, if your program has procedures unrelated to Title IV of the Act that require verification by your charitable organization, or adopts such procedures in the future, you must comply with such procedures.

A nonprofit charitable organization that chooses not to verify cannot be penalized (*e.g.,* through cancellation of its grant or denial of reimbursement for benefit expenditures) for providing federal public benefits to an individual who is not a U.S. citizen, U.S. non-citizen national or qualified alien, except when it does so either in violation of independent program verification requirements or in the face of a verification determination made by a non-exempt entity. However, if your organization chooses to verify, even though it is a nonprofit charitable organization that is not required to do so under the Act, you should comply with the procedures set forth in this Guidance and provide benefits only to those whom you verify to be U.S. citizens, U.S. non-citizen nationals or qualified aliens. Any verification request to INS by a nonprofit charitable organization must be accompanied by the written consent of the individual whose status is to be verified to the

release of information about the individual to a nongovernmental entity. The consent must be notarized or executed under penalty of perjury. (INS Form G–639 may be used for this purpose.)

*E. Nondiscrimination and Privacy Requirements*

Various federal civil rights laws and regulations prohibit discrimination by governmental and private entities on the basis of race, color, national origin, gender, religion, age and disability. They include Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.* (''Title VI''), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.*, the Age Discrimination Act of 1975, 42 U.S.C. 6101 *et seq.*, and the Fair Housing Act, 42 U.S.C. 3601 *et seq.* These laws apply to entities' provision of any public benefits, including their implementation of the Act. In particular, Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity, whether operated by a public or private entity, that receives federal funds or other federal financial assistance. Thus, in operating or participating in a federally assisted program and implementing the requirements of the Act, including those set forth in this Guidance, a provider should not, on the basis of race, color or national origin, directly or indirectly differentiate among persons in the types of program services, aids or benefits it provides or the manner in which it provides them. For example, benefit providers should treat all similarly situated individuals in the same manner, and should not single out individuals who look or sound foreign for closer scrutiny or require them to provide additional documentation of citizenship or immigration status. The nondiscrimination requirements of Title VI and other applicable civil rights laws are discussed more fully in Attachment 2.

If you have questions regarding issues of discrimination that may arise with respect to benefit-granting procedures or the implementation of this Guidance, you should contact the civil rights office of the pertinent benefit-granting agency or the applicable office in the Civil Rights Division of the U.S. Department of Justice. Contact numbers in the U.S. Department of Justice, Civil rights Division are set forth in Attachment 2.

When implementing the Act's verification requirements, you should be sensitive to privacy interests, and should use the citizenship and immigration status information received

only for purposes of verifying the applicant's eligibility for benefits under the Act and, if you are a governmental entity, for sharing such information with the INS and other governmental entities as provided by the Act. You should also review the Privacy Act (5 U.S.C. 552a), state and local privacy laws, and your program's requirements to ensure that you comply with all applicable privacy requirements.

**Verification Procedures**

*Step 1: Determine if Your Program Provides a ''Federal Public Benefit'' Subject to the Act's Verification Requirements*

The Act's requirement that benefit recipients be U.S. citizens, U.S. non-citizen nationals or qualified aliens does not apply to all federally funded activity or programs; it applies only to non-exempted ''federal public benefits''. Therefore, benefit providers should first determine whether the particular program they are administering provides a ''federal public benefit'' for which the Act requires them to verify citizenship, nationality or immigration status. Preliminary guidance on which programs provide ''federal public benefits'' subject to the Act's verification requirements is set forth in Attachment 3. *If the federal program does not provide a ''federal public benefit'' covered by the Act* (*e.g.,* the program is exempted by Attorney General Order No. 2049, 61 FR. 45,985 (1996), regarding government-funded community programs, services or assistance that are necessary for the protection of life or safety), *the benefit provider is not required to, and should not attempt to, verify an applicant's status, unless otherwise required or authorized to do so by law,* because all aliens, regardless of their immigration status, are eligible for such benefits.

If one program provides several public benefits, the Act's requirements apply only to those benefits that are non-exempted federal public benefits under the Act. A provider is not required to, and should not, verify the citizenship, nationality and immigration status of applicants for other benefits provided by the program that do not constitute federal public benefits.

*Step 2: Determine Whether Applicant is Eligible for Benefits Under General Program Requirements*

Given the potential intrusiveness and possibly time-consuming nature of the citizenship and alien status verification inquiry, a provider should determine whether an applicant otherwise meets specific program requirements for

ED_PRWORA_000024

benefit eligibility before initiating the verification process, unless determining program eligibility would be considerably more complex and time-consuming than verifying immigration status. This will reduce verification inquiries that prove unnecessary because the applicant is not otherwise eligible for the benefits requested. This Guidance does not address these other program eligibility requirements; a provider should refer to the statute, regulations and agency guidance (if any) governing its program for such requirements. (Note, however, that Title IV contains provisions requiring that, upon the effective date of the new affidavit of support, required under section 213A of the Act, when determining eligibility for federal means-tested public benefits and the amount of such benefits to which an alien is entitled, the income and resources of the alien be deemed to include those of any person executing an affidavit of support on behalf of the alien and that person's spouse, if applicable, with certain exceptions for indigent qualified aliens and aliens who (or whose children or parents) have been battered or subjected to extreme cruelty in the U.S. by a spouse, parent or member of the spouse or parent's family. See Exhibit B of Attachment 5.)

Determining program eligibility will normally include verifying that the applicant is who he or she claims to be. Although many of the documents and procedures relevant to determining citizenship or immigration status may also be relevant to identity verification, this Guidance is designed to provide assistance in determining the status of applicants whose identity has already been verified, and does not address appropriate identity verification procedures. It is your responsibility to assure yourself, pursuant to non-discriminatory procedures, of the identity of the applicant.

*Step 3: Verify Applicant's Status as A U.S. Citizen, U.S. Non-Citizen National or Qualified Alien*

Because the process of verifying an individual's status as a U.S. citizen, U.S. non-citizen national or qualified alien raises significant issues involving privacy and anti-discrimination protections, no verification of an applicant's status as a U.S. citizen, U.S. non-citizen national or qualified alien should be undertaken where benefits are not contingent on such status. In addition, if an alien is applying for benefits on behalf of another person, you may, under federal law, only verify the status of the person who will actually be receiving the benefits.

Except as set forth in this paragraph, if your program provides a non-exempted ''federal public benefit,'' and thus is available only to U.S. citizens, U.S. non-citizen nationals and qualified aliens, you should verify an applicant's status as set forth below. If you are a private provider of a ''federal public benefit'' and your program requires verification by a federal, state or local governmental agency, but not by a private provider, you should not engage in any independent verification and should continue to comply with the verification determinations made by the appropriate governmental entity. If you are on the SAVE system, you should continue following the SAVE procedures and should use this Guidance only for matters not addressed under the SAVE program.

A. U.S. Citizen or Non-Citizen National

1. *Ask for Declaration of Status.* If you are required to verify an applicant's status as a U.S. citizen, U.S. non-citizen national or qualified alien, you should begin by asking the applicant to submit a written declaration, under penalty of perjury, that he or she is a citizen or non-citizen national of the U.S. (or that he or she is a qualified alien—see Paragraph B.1. below).

Subject to certain exceptions and qualifications (particularly with respect to derivative citizenship), a United States citizen is:

• A person (other than the child of a foreign diplomat) born in one of the several States or in the District of Columbia, Puerto Rico, Guam, the U.S. Virgin Islands, or the Northern Mariana Islands who has not renounced or otherwise lost his or her citizenship;

• A person born outside of the United States to at least one U.S. citizen parent (sometimes referred to as a ''derivative citizen''); or

• A naturalized U.S. citizen.

As a general matter, a United States non-citizen national is a person born in an outlying possession of the United States (American Samoa or Swain's Island) on or after the date the U.S. acquired the possession, or a person whose parents are U.S. non-citizen nationals (subject to certain residency requirements).

The law regarding U.S. citizenship and nationality is complex. These broad definitions are provided for general guidance only, and do not address all of the complexities involved in attaining or losing status as a U.S. citizen or non-citizen national. See 8 U.S.C. 1401 *et seq.*

If you have any questions regarding whether an applicant is a U.S. citizen or non-citizen national, you should consult with the INS (in the case of a naturalized citizen) or the federal agency or department that oversees your program.

2. *Verify Status.* A number of programs have existing procedures for verifying that an applicant is a U.S. citizen or non-citizen national for purposes of program eligibility. You should continue to comply with any existing or future legal requirements for verifying citizenship and nationality that are imposed on your program, as well as with any applicable existing or future guidance provided by the agency or department overseeing your program. If a program has no requirements or guidance regarding verification, a benefit provider should refer to this Guidance.

The appropriate method of verifying an applicant's citizenship will depend upon the requirements and needs of the particular program, including, but not limited to , the nature of the benefits to be provided, the need for benefits to be provided on an expedited basis, the length of time during which benefits will be provided, the cost of providing the benefits, the length of time it will take to verify based on a particular method, and the cost of a particular method of verification. For example, a benefit provider could adopt a quick and simple verification procedure if it provides short-term benefits and the cost of extensive verification will outweigh the cost of the benefits or if verification will be time-consuming and the benefits are needed in the short term. On the other hand, if the benefit provider provides substantial, long-term benefits, it may be reasonable to require more extensive verification of citizenship.

Regardless, a benefit provider's decision as to the appropriate method must be made in a non-discriminatory fashion; for example, it cannot turn on the fact that the applicant looks or sounds foreign or has an ethnic surname. A benefit provider should adopt neutral procedures that apply equally to all applicants regardless of their appearance, ethnicity or accent. A benefit provider should not implement its procedures in a manner that discriminates against applicants whom it assumes to be foreign; nor should a benefit provider treat any applicant in a more beneficial manner based on assumptions as to the applicant's citizenship. (See Nondiscrimination Advisory in Attachment 2.)

To verify that an applicant is a U.S. citizen or non-citizen national, a benefit provider could do any one of the following:

(a) Ask the applicant to present a document demonstrating that he or she is a U.S. citizen or non-citizen national. Documents that can be used to make this demonstration are described in Attachment 4. (A benefit provider may also consult records of verified citizenship, if any, maintained by the agency overseeing its program.)

(i) If the document reasonably appears on its face to be genuine and to relate to the individual presenting it (or, if your program already has existing guidance or procedures mandating a higher standard of proof for acceptance of documentary evidence of status, the document satisfied that higher standard), the provider should accept the document as conclusive evidence that the applicant *is* a U.S. citizen or non-citizen national, and should not verify status any further.

(ii) If the document presented does not on its face reasonably appear to be genuine (or to satisfy a higher applicable standard) or to relate to the individual presenting it, the benefit provider should contact the governmental entity that originally issued the document presented or that can confirm the applicant's status as a U.S. citizen or non-citizen national. (With regard to naturalized citizens and derivative citizens presenting certificates of citizenship, the INS is the appropriate governmental entity to contact for verification of such status. If the applicant presents a document relating to such status and that document does not on its face reasonably appear to be genuine or to relate to the applicant (or to satisfy a higher applicable standard), the provider may request verification of status by filing INS Form G–845 along with copies of the pertinent documents provided by the applicant with the local INS office. If an applicant has lost his or her original documents or never had an original document demonstrating naturalized or derivative citizenship, refer the applicant to the local INS office to obtain documentation of status.)

(b) Accept a written declaration, made under penalty of perjury and possibly subject to later verification of status, from one or more third parties indicating a reasonable basis for personal knowledge that the applicant is a U.S. citizen or non-citizen national.

(c) Accept the applicant's written declaration, made under penalty of perjury and possibly subject to later verification of status, that he or she is a U.S. citizen or non-citizen national.

The options described in subparagraphs (b) and (c) above present a greater potential for undetected false claims of being a United States citizen or non-citizen national, and therefore should be used with caution in appropriate circumstances. For example, before using these options, a provider might require the applicant to demonstrate why a document evidencing that he or she is a U.S. citizen or non-citizen national does not exist or cannot be readily obtained. Such a requirement must be imposed equally on all applicants, and cannot be applied in a discriminatory manner.

3. *Action Pending Verification.* In an applicant has satisfied the above requirements regarding submission of a sworn declaration and presentation of any other required evidence of status, you should refer to the legal requirements of your program and to any applicable guidance provided by the federal agency or department overseeing your program to determine if you should grant or withheld benefits during the period of time in which you are verifying the applicant's status. If your program has no such requirements or guidance and the applicant has submitted a written declaration, under penalty of perjury, that he or she is a U.S. citizen or non-citizen national, you should not delay, deny, reduce or terminate the applicant's eligibility for benefits under the program on the basis of an applicant's citizenship or nationality during the period of time it takes to verify his or her status.

4. *Take Action Based on Results of Verification.* If you verify that the applicant is a U.S. citizen or non-citizen nation, you are subject to no further verification requirements under Title IV of the Act and should grant the benefits requested if the applicant is otherwise eligible for them under the specific program's requirements. If you cannot verify that the applicant is a U.S. citizen or non-citizen national after exhausting the above-described methods (and the applicant is not a qualified alien—see below), you should deny the benefits requested, and notify the applicant pursuant to your regular procedures of his or her rights under the applicable program to appeal the denial of benefits. If the INS was involved in the provider's attempt to verify naturalized or derivative citizenship, the INS will, upon request of the agency or department handling the appeal, conduct a thorough review of its initial verification response and will provide the agency or department with information in its possession necessary to resolve the appeal.

B. Qualified Alien

1. *Ask for Declaration of Status.* If an applicant is not a U.S. citizen or U.S. non-citizen national, you may grant the applicant non-exempt federal public benefits only if the applicant submits a written declaration, under penalty of perjury, that he or she has an immigration status that makes him or her a ''qualified alien'' and you verify that status as set forth below.

A ''qualified alien'' is:

• An alien lawfully admitted for permanent residence under the Immigration and Nationality Act (''INA'');

• An alien granted asylum under section 208 of the INA;

• A refugee admitted to the U.S. under section 207 of the INA;

• An alien paroled into the U.S. under section 212(d)(5) of the INA for at least one year;

• An alien whose deportation is being withheld under section 243(h) of the INA as in effect prior to April 1, 1997, or whose removal is being withheld under section 241(b)(3) of the INA;

• An alien granted conditional entry pursuant to section 203(a)(7) of the INA as in effect prior to April 1, 1980;

• An alien who is a Cuban or Haitian entrant as defined in section 501(e) of the Refugee Education Assistance Act of 1980; or

• An alien who (or whose child or parent) has been battered or subjected to extreme cruelty in the U.S. and otherwise satisfies the requirements of § 431(c) of the Act (see Exhibit B of Attachment 5).

2. *Request Documentation of Immigration Status.* Ask the applicant to provide documentation evidencing his or her status as a qualified alien. The documents that will demonstrate that an applicant is a ''qualified alien'' are described in Attachment 5. *Note that*, if the applicant is applying for federal means-tested public benefits covered by the Act, or possibly a program funded by a Social Services Block Grant, the applicant may well have to present additional documentation demonstrating eligibility under the Act—see Step 4 below—and you will also want to ask the applicant to provide any such additional documentation demonstrating eligibility.

3. *If Supported by Documents, Conclude that the Applicant is a Qualified Alien.* If the documentation reasonably appears on its face to be genuine (or, if your program already has existing guidance or procedures mandating a higher standard of proof for acceptance of documentary evidence of immigration status, the document satisfies that higher standard) and to relate to the individual presenting it, you should accept the documentation as conclusive evidence that the applicant *is* a qualified alien, you should *not* further verify immigration status with

ED_PRWORA_000026

the INS (unless you are a SAVE user, in which case you should proceed to verify status according to SAVE procedures), and you should proceed to determine if the applicant satisfies the Act's other eligibility requirements for the particular benefits discussed in Step 4 below (addressing SSI, Food Stamps, TANF, Medicaid, programs funded by a Social Services Block Grant, and federal means-tested public benefits).

4. *If, Based on the Documents Presented, You Are Considering Concluding that the Applicant Is Not a Qualified Alien, Take the Following Steps.*

(a) *Verify Status.* If, based on your review of the documents presented, you are considering determining that an applicant is *not* a qualified alien and thus is *not* eligible for the benefits requested based on his or her immigration status—*e.g.,* because the document does not on its face reasonably appear to be genuine (or to satisfy a higher applicable standard) or to relate to the person presenting it— you should check with the INS to verify the information presented as set forth below. (You do not need to check with the INS if the applicant presents a document that is valid and demonstrates lawful immigration status but that simply does not qualify him or her for status as a qualified alien: *e.g.,* INS Form I–94 showing admission as a nonimmigrant visitor.) **Do not determine that an applicant is not a qualified alien, and do not conclusively deny benefits on that basis, without first verifying the applicant's status with the INS as follows.**

If you are connected to the INS SAVE system, check the applicant's immigration status using the standard procedures for use of the SAVE system, including both the electronic mechanism and, if necessary (*e.g.,* if information regarding the pertinent immigration status cannot be confirmed through the electronic SAVE database), the procedures for secondary verification. If you are not connected to the SAVE system and the applicant presents documents relating to such status, request verification of immigration status by filing INS Form G–845 and Supplement along with copies of the pertinent immigration documents provided by the applicant with the local INS office. In either instance, the INS will conduct a thorough review of its records to determine if the applicant is a qualified alien. If the applicant presents expired documents or is unable to present any documentation evidencing his or her immigration status, refer the applicant to the local INS office to obtain

documentation of status. In unusual cases involving applicants who are hospitalized or medically disabled, or who can otherwise show good cause for their inability to present documentation, and for whom securing such documentation would constitute an undue hardship, if the applicant can provide an alien registration number, you may file INS Form G–845 and Supplement, along with the alien registration number a copy of any expired INS document presented, with the local INS office to verify status. As with any documentation of immigration status, you should confirm that the status information you receive back from INS pertains to the applicant whose identity you have verified.

(b) *Action Pending Verification.* You should refer to the legal requirements of your program and to any applicable guidance provided by the federal agency or department overseeing your program, if any, to determine whether you should grant or withhold benefits during the period of time in which you are verifying the applicant's immigration status. If your program has not such requirements or guidance and the applicant has submitted a written declaration, under penalty of perjury, that he or she is a qualified alien, you should not delay, deny, reduce or terminate the applicant's eligibility for benefits under the program on the basis of an applicant's immigration status during the period of time it takes to verify his or her immigration status. If you are to grant benefits pending verification, you should first determine if the applicant satisfies the Act's other eligibility requirements (if any) for the benefits requested as set forth in Step 4 below.

(c) *Take Action Based on Response to Verification Inquiry.* If the INS notifies you that the applicant has an immigration status that makes him or her a qualified alien within the meaning of the Act, you should accept the INS verification of and proceed to determine whether the applicant satisfies the Act's other eligibility requirements (if any) for the benefits requested as set forth in Step 4 below.

If the INS modifies you that it cannot verify that the applicant has an immigration status that makes him or her a qualified alien within the meaning of the Act, you should deny benefits and notify the applicant pursuant to your program's regular procedures of his or her rights under the applicable program to appeal the denial of benefits. Upon request of the agency or department handling the appeal, the INS will conduct a thorough review of its initial verification response and will provide

the agency or department with information in its possession necessary to resolve the appeal.

*Step 4: Verify Eligibility Under the Act*

Title IV of the Act provides that all qualified aliens are eligible for some federal public benefits, while it imposes additional eligibility requirements for receipt of other benefits. If the qualified alien is applying for a benefit for which all qualified aliens are eligible, you should not engage in any further verification of immigration status. If he or she is applying for a program for which the Act imposes additional eligibility requirements, however, you should determine whether the applicant satisfies those requirements.

A. Federal Public Benefits With No Further Immigration Eligibility Requirements for Qualified Aliens

Except as set forth below, all qualified aliens are eligible for all federal public benefits. If the qualified alien is applying for a federal public benefit for which all qualified aliens are eligible, you should not engage in any further verification of immigration status.

Wtih some exceptions, individuals receiving SSI as of August 22, 1996, continue to be eligible for such benefits until the Commissioner of Social Security, prior to September 30, 1998, redetermines their eligibility; if, as a result of that redetermination, an individual is found to be ineligible for SSI, the individual can nevertheless continue receiving benefits until September 30, 1998.

In the absence of a State's decision to restrict eligibility for programs funded by a Social Services Block Grant, all qualified aliens are eligible for Social Services Block Grant programs. In the absence of a State's decision to restrict eligibility for TANF and Medicaid, the Act does not restrict the availability of these benefits to qualified aliens who entered the United States prior to August 22, 1996, and who were continuously present in the United States until attaining qualified alien status; however, because the Department of Health and Human Services has determined that TANF and Medicaid are federal means-tested public benefits, *see* 62 FR 45,256 (August 26, 1997), aliens who entered the United States on or after August 22, 1996, are ineligible for those programs for five years from the date that they attain qualified alien status (see discussion of federal means-tested public benefits in Paragraph B below and Attachment 7). You should determine whether your State is continuing to provide TANF, Medicaid,

ED_PRWORA_000027

and programs funded by a Social Services Block Grant to all qualified aliens:

′ If the State is continuing to provide programs funded by a Social Services Block Grant to all qualified aliens, you should not engage in any further verification of immigration status;

′ If the State is continuing to provide TANF and Medicaid to all qualified aliens, you should refer to Paragraph B below and Attachment 7 for further guidance on additional eligibility requirements; and

′ If the State has restricted qualified aliens' eligibility for TANF and Medicaid, you should determine whether the applicant is eligible for such benefits as set forth in Paragraph B below.

B. Federal Benefits With Additional Eligibility Requirements for Qualified Aliens SSI, Food Stamps, TANF, Medicaid, and Programs Funded by a Social Services Block Grant

The Act provides that only certain excepted categories of aliens are eligible for SSI and Food Stamps. A State may, however, choose to issue Food Stamp benefits to individuals that are otherwise ineligible for such benefits under sections 402 or 403 of the Act, provided that the State reimburses the federal government for the costs of such benefits and complies with certain administrative requirements. In addition, if a State has exercised its right to limit qualified aliens' eligibility for TANF, Medicaid, and programs funded by a Social Services Block Grant, certain excepted categories of aliens remain eligible for such programs. The excepted categories of aliens that remain eligible for SSI are somewhat broader than the excepted categories for Food Stamps, Medicaid, TANF and programs funded by a Social Services Block Grant. Consult Attachment 6 for a more specific description of these excepted categories and the documentation that will demonstrate that an alien falls within such an exception and thus remains eligible for these programs.

*Federal Means-Tested Public Benefits.* With certain exceptions discussed in greater detail in Attachment 7, qualified aliens are ineligible to receive federal means-tested public benefits for five years from the date that they attain qualified alien status. However, aliens who entered the United States prior to August 22, 1996, and who were continuously present in the United States until attaining qualified alien status are not subject to this restriction. In addition, exceptions are made for refugees, asylees, aliens whose deportation or removal has been withheld, Cuban/Haitian entrants, certain Amerasian immigrants, and aliens who are veterans honorably discharged or on non-training active duty and their families. This restriction, moreover, does not apply after the expiration of the five-year period. If a qualified alien is applying for such a benefit, you should determine, in accordance with Attachment 7, whether he or she arrived in the United States prior to August 22, 1996, whether he or she falls within one of the enumerated exceptions, or whether he or she has been a qualified alien for at least five years.

**Attachment 1**

LOCAL INS OFFICE ADDRESSES

| State or territory | County | File control office | Address |
|---|---|---|---|
| Alabama | | Atlanta, GA | 77 Forsyth Street, S.W., Atlanta, GA 30303–3427. |
| Alaska | | Anchorage, AK | 620 East 10th Avenue, Suite 102, Anchorage, AK 99501. |
| Arizona | | Phoenix, AZ | 2035 North Central Avenue, Phoenix, AZ 85004–1548. |
| Arkansas | | Memphis, TN | 1341 Sycamore View, Suite 100, Memphis, TN 38134. |
| California | Inyo, Kern, Los Angeles, Orange, Riverside, San Bernardino, San Luis Obispo, Santa Barbara, and Ventura. | Los Angeles, CA | 300 North Los Angeles Street, Los Angeles, CA 90012. |
| | Imperial and San Diego | San Diego, CA | 880 Front Street, Suite 1234, San Diego, CA 92101–8834. |
| | Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kings, Lake, Lassen Madera, Marin, Mariposa, Mendocino, Merced, Modoc, Mono, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Benito, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solono, Sonoma, Stainislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo, and Yuba. | San Francisco, CA | 630 Sansome Street, Room 300, San Francisco, CA 94111–2280. |
| Colorado | | Denver, CO | 4730 Paris Street, Albrook Center, Denver, CO 80239–2804. |
| Connecticut | | Hartford, CT | Ribicoff Federal Building, 450 Main Street, Hartford, CT 06103–3060. |
| Delaware | | Philadelphia, PA | 1600 Callowhill Street, Philadelphia, PA 19130–4112. |
| District of Columbia | | Arlington, VA | 4420 North Fairfax Drive, Arlington, VA 22203. |

ED_PRWORA_000028

## LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
| Florida ........................ | ............................................................... | Miami, FL ................................... | 7880 Biscayne Blvd. Miami, FL 33138–4797. |
| Georgia ..................... | ............................................................... | Atlanta, GA ............................... | 77 Forsyth Street, S.W., Atlanta, GA 30303–3427. |
| Guam ........................ | ............................................................... | Agana, GU ............................... | Pacific News Bldg., Room 801, 238 Archbishop Flores Street, Agana, GU 96910. |
| Hawaii ....................... | ............................................................... | Honolulu, HI ............................. | 595 Ala Moana Blvd., Honolulu, HI 96813. |
| Idaho ........................ | ............................................................... | Helena, MT ............................... | 2800 Skyway Drive, Helena, MT 59601. |
| Illinois ...................... | ............................................................... | Chicago, IL ............................... | 10 West Jackson Blvd., Chicago, IL 60604. |
| Indiana ...................... | ............................................................... | Indianapolis, IN ........................ | Gateway Plaza, 950 North Meridian Street, Room 400, Indianapolis, IN 46204. |
| Iowa .......................... | ............................................................... | Omaha, NE .............................. | 3736 132nd Street, Omaha, NE 68144. |
| Kansas ...................... | ............................................................... | Kansas City, MO ...................... | 9747 North Conant Avenue, Kansas City, MO 64153. |
| Kentucky ................... | ............................................................... | Memphis, TN ............................ | 1341 Sycamore View, Suite 100, Memphis,TN 38134. |
| Louisiana ................. | ............................................................... | New Orleans,LA ....................... | Postal Services Building, 701 Loyola Avenue, Room T–8011, New Orleans, LA 70113–1912. |
| Maine ........................ | ............................................................... | Portland, ME ............................ | 739 Warren Avenue, Portland, ME 04103–1187. |
| Maryland ................... | ............................................................... | Baltimore, MD .......................... | Nations Bank Center, Tower One, 100 South Charles/ 12th Floor, Baltimore, MD 21201–2725. |
| Massachusetts .......... | ............................................................... | Boston, MA ............................... | John F. Kennedy Federal Bldg., Government Center, Room E–160, Boston, MA 02203–0701. |
| Michigan ................... | ............................................................... | Detroit, MI ................................. | Federal Building, 333 Mt. Elliott Street, Detroit, MI 48207–4381. |
| Minnesota ................. | ............................................................... | St. Paul, MN ............................. | 2901 Metro Drive, Suite 100, Bloomington, MN 55425. |
| Mississippi ................ | Alcron, Attala, Benton, Bolivar, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, DeSoto, Grenada, Humphreys, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Sunflower, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Washington, Webster, Winston, and Yalobusha. | Memphis, TN ............................ | 1341 Sycamore View, Suite 100, Memphis, TN 38134. |
| | Adams, Amite, Claiborne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Holmes, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Kemper, Lamar, Lauderdale, Lawrence, Leake, Lincoln, Madison, Marion, Neshoba, Newton, Noxubee, Pearl River, Perry, Pike, Rankin, Scott, Sharkey, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson, and Yazoo. | New Orleans, LA ....................... | Postal Services Building, 701 Loyola Avenue, Room T–8011, New Orleans, LA 70113–1912. |
| Missouri .................... | Andrew, Atchison, Barry, Barton, Bates, Benton, Boone, Buchanan, Caldwell, Callaway, Camden, Carroll, Cass, Cedar, Christian, Clay, Clinton, Cole, Cooper, Dade, Dallas, Daviess, De Kalb, Douglas, Gentry, Greene, Grundy, Harrison, Henry, Hickory, Holt, Howard, Howell, Jackson, Jasper, Johnson, Laclede, Lafayette, Lawrence, Livingston, McDonald, Mercer, Miller, Moniteau, Morgan, Newton, Nodaway, Oregon, Osage, Ozark, Pettis, Platte, Polk, Pulaski, Putnam, Ray, St. Clair, Saline, Stone, Sullivan, Taney, Texas, Vernon, Webster, Worth, and Wright. | Kansas City, MO ...................... | 9747 North Conant Avenue, Kansas City, MO 64153. |

ED_PRWORA_000029

LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
| | Adair, Audrain, Bollinger, Butler, Cape Girardeau, Carter, Chariton, Clark, Crawford, Dent, Dunklin, Franklin, Gasconade, Iron, Jefferson, Knox, Lewis, Lincoln, Linn, Macon, Madison, Maries, Marion, Mississippi, Monroe, Montgomery, New Madrid, Pemiscot, Perry, Phelps, Pike, Ralls, Randolph, Reynolds, Ripley, St. Charles, St. Francois, St. Louis, Ste. Genevieve, Schuyler, Scotland, Scott, Shannon, Shelby, Stoddard, Warren, Washington, and Wayne. | St. Louis, MO | Robert A. Young Federal Bldg., 1222 Spruce Street, Room 1100, St. Louis, MO 63103–2815. |
| Montana | | Helena, MT | 2800 Skyway Drive, Helena, MT 59601. |
| Nebraska | | Omaha, NE | 3736 132nd Street, Omaha, NE 68144. |
| Nevada | Clark, Esmeralda, Lincoln, and Nye | Las Vegas, NV | 3373 Pepper Lane, Las Vegas, NV 89120. |
| | Churchill, Douglas, Elko, Eureka, Humboldt, Lander, Lyon, Mineral, Pershing, Storey, Washoe, and White Pine. | Reno, NV | 1351 Corporate Boulevard, Reno, NV 89502. |
| New Hampshire | | Boston, MA | John F. Kennedy Federal Bldg., Government Center, Room E–160, Boston, MA 02203–0701. |
| New Jersey | | Newark, NJ | Peter Rodino Federal Building, 970 Broad Street, Newark, NJ 07102–2506. |
| New Mexico | | El Paso, TX | 1545 Hawkins, Suite 167, El Paso, TX 79925. |
| New York | Albany, Broome, Chenango, Columbia, Delaware, Fulton, Greene, Hamilton, Herkimer, Madison, Montgomery, Onoeida, Otsego, Rensselaer, Saratoga, Schenectady, Schoharie, Tioga, Warren, and Washington. | Albany, NY | James T. Foley Federal Courthouse, 445 Broadway, Room 227, Albany, NY 12207–2999. |
| | Allegany, Cattaraugus, Cayuga, Chautauqua, Chemung, Clinton, Cortland, Erie, Essex, Franklin, Genesee, Jefferson, Lewis, Livingston, Monroe, Niagara, Onandaga, Ontario, Orleans, Oswego, St. Lawrence, Schuyler, Seneca, Steuben, Tompkins, Wayne, Wyoming, and Yates. | Buffalo, NY | 130 Delaware Avenue, Buffalo, NY 14202–2404. |
| | Bronx, Dutchess, Kings, Nassau, New York, Orange, Putnam, Queens, Richmond, Rockland, Suffolk, Sullivan, Ulster, and Westchester. | New York, NY | 26 Federal Plaza, New York, NY 10278–0127. |
| North Carolina | | Charlotte, NC | 6 Woodlawn Green, Bldg. 6, Suite 138, Charlotte, NC 28217–2216. |
| North Dakota | | St. Paul, MN | 2901 Metro Drive, Suite 100, Bloomington, MN 55425. |
| Ohio | Adams, Athens, Brown, Butler, Champaign, Clark, Clermont, Clinton, Darke, Delaware, Fairfield, Fayette, Franklin, Gallia, Greene, Hamilton, Highland, Hocking, Jackson, Licking, Lawrence, Logan, Madison, Meigs, Miami, Montgomery, Perry, Pickaway, Pike, Preble, Ross, Scioto, Shelby, Union, Vinton, and Warren. | Cincinnati, OH | J.W. Peck Federal Building, 550 Main Street, Room 8525, Cincinnati, OH 45202. |
| | Allen, Ashland, Ashtabula, Auglaize, Belmont, Carroll, Columbiana, Coshocton, Crawford, Cuyahoga, Defiance, Erie, Fulton, Geauga, Guernsey, Hancock, Hardin, Harrison, Henry, Holmes, Huron, Jefferson, Knox, Lake, Lorain, Lucas, Mahoning, Marion, Medina, Mercer, Monroe, Morgan, Morrow, Muskingum, Noble, Ottawa, Paulding, Portage, Putman, Richland, Sandusky, Seneca, Stark, Summit, Trumbull, Tuscarawas, Van Weft, Washington, Wayne, Williams, Wood, and Wyandot. | Cleveland, OH | Anthony J. Celebreeze Federal Bldg., 1240 E. 9th Street, Room 1917, Cleveland, OH 44199. |

ED_PRWORA_000030

LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
| Oklahoma | | Dallas, TX | 8101 North Stemmons Freeway, Dallas, TX 75247. |
| Oregon | | Portland, OR | 511 N.W. Broadway, Portland, OR 97209. |
| Pennsylvania | Adams, Berks, Bradford, Bucks, Cameron, Carbon, Centre, Chester, Clinton, Columbia, Cumberland, Dauphin, Delaware, Franklin, Fulton, Huntingdon, Juniata, Lackawanna, Lancaster, Lebanon, Lehigh, Luzerne, Lycoming, Mifflin, Monore, Montgomery, Montour, Northampton, Northumberland, Perry, Philadelphia, Pike, Potter, Schuylkill, Snyder, Sullivan, Susquehanna, Tioga, Union Wayne, Wyoming, and York. | Philadelphia, PA | 1600 Callowhill Street, Philadelphia, PA 19130–4112. |
| | Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Indiana, Jefferson, Lawrence, McKean, Mercer, Somerset, Venango, Warren, Washington, and Westmoreland. | Pittsburgh, PA | Federal Building, Room 314, 1000 Liberty Avenue, Pittsburgh, PA 15222–4181. |
| Puerto Rico | | San Juan, PR | P.O. Box 365068, San Juan, PR 00936–5068. |
| Rhode Island | | Providence, RI | 200 Dyer Street, Providence, RI 02903–3993. |
| South Carolina | | Charlotte, NC | 6 Woodlawn Green, Bldg. 6, Suite 138, Charlotte, NC 28217–2216. |
| South Dakota | | St. Paul, MN | 2901 Metro Drive, Suite 100, Bloomington, MN 55425. |
| Tennessee | | Memphis, TN | 1341 Sycamore View, Suite 100, Memphis, TN 38134. |
| Texas | Anderson, Andrews, Archer, Armstrong, Bailey, Baylor, Borden, Bosque, Bowie, Briscoe, Callahan, Camp, Carson, Cass, Castro, Cherokee, Childress, Clay, Cochran, Collin, Collingsworth, Comanche, Cooke, Cottie, Crosby, Dallam, Dallas, Dawson, Deaf Smith, Delta, Denton, Dickens, Donley, Eastland, Ellis, Erath, Fannin, Fisher, Floyd, Foard, Franklin, Freestone, Gaines, Garza, Gray, Grayson, Gregg, Hale, Hall, Hamilton, Hansford, Hardeman, Harrison, Hartley, Haskell, Hemphill, Henderson, Hill, Hockley, Hood, Hopkins, Houston, Howard, Hunt, Hutchinson, Jack, Johnson, Jones, Kaufman, Kent, King, Knox, Lamar, Lamb, Leon, Limestone, Lipscomb, Lubbock, Lynn, Marion, Martin, Mitchell, Montague, Moore, Morris, Motley, Navarro, Nolan, Ochiltree, Oldham, Palo Pinto, Panola, Parker, Parmer, Potter, Rains, Randall, Red River, Roberts, Rockwall, Rusk, Scurry, Shackelford, Sherman, Smith, Somervell, Stephens, Stonewall, Swishers, Tarrant, Taylor, Terry, Throckmorton, Titus, Upshur, Van Zandt, Wheeler, Wichita, Wilbarger, Wise, Wood, Yoakum, and Young. | Dallas, TX | 8101 North Stemmons Freeway, Dallas, TX 75247. |
| | Brewster, Crane, Culberson, Ector, El Paso, Hudspeth, Jeff Davis, Loving, Midland, Pecos, Presidio, Reeves, Terrell, Upton, Ward, and Winkler. | El Paso, TX | 1545 Hawkins Suite 167, El Paso, TX 79925. |
| | Brooks, Cameron, Hidalgo, Kenedy, Kleberg, Starr, and Willacy. | Harlingen, TX | 2102 Teege Road, Harlingen, TX 78550. |

ED_PRWORA_000031

LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
| | Angelina, Austin, Brazoria, Chambers, Colorado, Fort Bend, Galveston, Grimes, Hardin, Harris, Jasper, Jefferson, Liberty, Madison, Matagorda, Montgomery, Nacogdoches, Newton, Orange, Polk, Sabine, San Augustine, San Jacinto, Shelby, Trinity, Tyler, Walker, Waller, Washingoton, and Wharton. | Houston, TX ............................ | 509 N. Sam Houston Parkway East, Houston, TX 77060. |
| | Aransas, Aascosa, Bandera, Bastrop, Bee, Bell, Bexar, Blanco, Brozos, Brown, Burleson, Burner, Caldwell, Calhoun, Coke, Coleman, Comal, Concho, Coryell, Crockett, De Witt, Dimmit, Duval, Edwards, Falls, Fayette, Frio, Gillespie, Glasscock, Goliad, Gonzales, Guadalupe, Harp, Haynes, Irion, Jackson, Jim Hogg, Jim Wells, Karnes, Kendall, Kerr, Kimble, Kinney, Lampasas, La Salle, Lavaca, Lee, Live Oak, Llano, McCulloch, McLennan, McMullen, Mason, Maverick, Medina, Menard, Milam, Mills, Nueces, Reagan, Real, Refugio, Robertson, Runnels, San Patricio, San Saba, Schleicher, Sterling, Sutton, Tom Green, Travis, Uvalde, Val Verde, Victoria, Webb, Williamson, Wilson, Zapata, and Zavala. | San Antonia, TX ........................ | 8940 Four Winds Drive, Suite 2020, San Antonia, TX 78239. |
| Utah .......................... | ...................................................... | Salt Lake City, UT .................... | 5272 South College Drive, Suite 100, Salt Lake, UT 84123. |
| Vermont .................... | ...................................................... | St. Albans, VT .......................... | Federal Building, P.O. Box 328, 50 South Maine Street, St. Albans, VT 05478–0238. |
| Virginia ...................... | Accomack, Amelia, Brunswick, Caroline, Charles City, Chesterfield, Colonial Heights, Dinwiddie, Essex, Fredericksburg, Gloucester, Goochland, Greensville, Hanover, Henrico, Isle of Wight, James City, King and Queen, King William, Lancaster, Louisa, Lunenburg, Mathews, Mecklenburg, Middlesex, New Kent, Northampton, Northumberland, Nottoway, Powhatan, Prince Edward, Prince George, Richmond, Southhampton, Spotsylvania, Surry, Sussex, Westmoreland, and York. | Norfolk, VA ............................... | Norfolk Commerce Park, 5280 Hennenman Drive, Norfolk, VA 23513. |
| | Albemarle, Alleghany, Amherst, Appomattox, Arlington, Augusta, Bath, Bedford, Bland, Botetourt, Buchanan, Buckingham, Campbell, Carroll, Charlotte, Clarke, Craig, Culpepper, Cumberland, Dickenson, Fairfax, Fauquier, Floyd, Fluvanna, Franklin, Frederick, Giles, Grayson, Greene, Halifax, Henry, Highland, King George, Lee, Loudoun, Madison, Montgomery, Nelson, Orange, Page, Patrick, Pittsylvania, Prince William, Pulaski, Rappahannock, Roanoke, Rockbridge, Rockingham, Russell, Scott, Shenandoah, Smyth, Stafford, Tazewell, Warren, Warwick, Washington, Wise, and Wythe. | Arlington, VA ............................. | 4420 North Fairfax Drive, Arlington, VA 22203. |
| Virgin Islands ............ | ...................................................... | St. Thomas, VI ......................... | P.C. Box 610, Federal Building, Suite 117, Veterans Drive, Charlotte Amalie, St. Thomas, U.S. Virgin Islands, 00801. |
| Washington ............... | ...................................................... | Seattle, WA .............................. | 815 Airport Way South, Seattle, WA 98134. |
| West Virginia ............ | ...................................................... | Pittsburgh, PA ......................... | Federal Building, Room 314, 1000 Liberty Avenue, Pittsburgh, PA 15222–4181. |

ED_PRWORA_000032

LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
| Wisconsin .................. | ...................................................... | Milwaukee, WI ......................... | Federal Building, 517 East Wisconsin Avenue, Room 186, Milwaukee, WI 53202. |
| Wyoming ................... | ...................................................... | Denver, CO .............................. | 4730 Paris Street, Albrook Center, Denver, CO 80239–2804. |

**Submitting Verification Requests to INS**

A copy of INS Form G–845 is attached, along with a supplemental form that should be used to obtain more detailed information on immigration status, citizenship, and sponsorship. (The supplemental form may only be used in conjunction with Form G–845, not separately.) Requests for verification on Form G–845 may be mailed to the Immigration and Naturalization Service at the addresses listed on the following pages. To speed processing, please indicate ''Attention: Immigration Status Verifier'' on the envelope.

The attached form G–845 may be copied for submission to the INS; it should be reproduced as a two-sided document. Additional copies may be obtained in three ways:

1. Request Form G–845 from the INS Forms Distribution Center serving your region:

Eastern Forms Center, P.O. Box 567, Williston, VT 05497 (east of the Mississippi River)

Forms Center West, 5600 Rickenbacker Road, Building 701A, Bell, CA 90201 (west of the Mississippi River)

2. Download Form G–845 from the Internet: www.usdoj.gov/ins/forms.

3. Call the INS Forms Request Line: 1–800–870–3676. (Due to the high volume of calls to this line, the best time to call is early on weekday mornings.)

INS formerly required that Form G–845 be printed on blue paper stock to distinguish it from Form G–845S, which is printed on white paper. Form G–845 may now be submitted on white stock, and existing copies on blue stock may also be submitted during this transition period. As a result of this change, *it is particularly important that copies of the forms include the form number at the bottom of the page to allow INS to distinguish between them.*

When submitting copies of documents with Form G–845, please send copies made from the originals, if possible, in order to enhance the quality of the reproduction.

**BILLING CODE 4410–10–M**

ED_PRWORA_000033

**61356**  **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

---

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB #1115-0122
**Document Verification Request**

### Section A - to be completed by the submitting agency

**To:** Immigration and Naturalization Service

**From:** Typed or Stamped Name and Address of Submitting Agency

**Attn:  Status Verifier**

(INS may use above address with a #20 window envelope.)

1. Alien Registration or I-94 Number

2. Applicant's Name *(Last, First, Middle)*

3. Nationality

4. Date of Birth *(Month/Day/Year)*

5. Social Security Number

6. Verification Number

7. ☐ Photocopy of Document Attached.
   *(If printed on both sides, attach a copy of the front __and__ of the back.)*
   ☐ Other Information Attached *(Specify documents).*

8. Organization (specify)

9. Name of Submitting Official

10. Title of Submitting Official

11. Date

12. Telephone Number

### Section B - to be completed by INS

**INS RESPONSE: From the documents or information submitted and/or a review of our records we find that:**

1. ☐ This document appears valid and relates to a **Lawful Permanent Resident alien** of the United States.
2. ☐ This document appears valid and relates to a **Conditional Resident alien** of the United States.
3. ☐ This document appears valid and relates to an alien **authorized employment** as indicated below:
   a. ☐ Full-Time
   b. ☐ Part-Time
   c. ☐ No Expiration (Indefinite)
   d. ☐ Expires on _____
      *(specify Month/Day/Year, below)*
      _____
4. ☐ This document appears valid and relates to an alien who has an application pending for *(specify INS benefit below)*
   _____
5. ☐ This document relates to an alien having been **granted asylum/refugee** status in the United States.
6. ☐ This document appears valid and relates to an alien **paroled** into the United States pursuant to Section 212 of the I&N Act.
7. ☐ This document appears valid and relates to an alien who is a **Cuban/Haitian entrant**.

8. ☐ This document appears valid and relates to an alien who is a **conditional entrant**.
9. ☐ This document appears valid and relates to an alien who is a **nonimmigrant** *(specify type or class below)*
   _____
10. ☐ This document appears valid and relates to an alien **not authorized employment** in the United States.
11. ☐ Continue to process as legal alien. INS is searching indices for further information.
12. ☐ This document is **not valid** because it appears to be *(check all that apply)*
   a. ☐ Expired
   b. ☐ Altered
   c. ☐ Counterfeit

INS Stamp

Form G-845 (Rev. 06/02/90) Y

☐ **Please see reverse for additional comments.**

## Comments

13. ☐ No determination can be made from the information submitted. Please obtain a copy of the **original** alien registration documentation and resubmit.

14. ☐ No determination can be made without seeing **both** sides of the document submitted *(please resubmit request)*.

15. ☐ Copy of document is not readable *(please resubmit request)*.

### "PRUCOL"

For Purposes Of Determining If Alien Is Permanently Residing Under Color Of Law <u>Only</u>!

16. ☐ INS actively pursues the expulsion of an alien in this class/category.

17. ☐ INS **is not** actively pursuing the expulsion of an alien in this class/category, at this time.

18. ☐ Other

### Instructions

- **Submit copies of both** *front and back* **of alien's original documentation.**

- **Make certain a** *complete return address* **has been entered in the "From" portion of the form**.

- The Alien Registration Number ("A" Number) is the letter "A" followed by a series of (7) or (8) digits. Also in this block may be recorded the number found on Form I-94. (Check the front and back of the I-94 document and if the "A" Number appears, record that number when requesting information instead of the longer admission number as the "A" Number refers to the most integral record available.)

- If Form G-845 is submitted without copies of applicant's original documentation, it will be returned to the submitting agency without any action taken.

- Address this verification request to the local office of the Immigration and Naturalization Service.

ED_PRWORA_000035

**61358**   **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

**U.S. Department of Justice**
Immigration and Naturalization Service

**Document Verification Request Supplement**

| TO BE COMPLETED BY THE SUBMITTING AGENCY |
|---|

**To:**   Immigration and Naturalization Service

Date _____

Applicant's Name *(Last, First, Middle)*

Social Security Number

Alien Registration Number or I-94 Number

**From:** Typed or Stamped Name and Address of Submitting Agency

Telephone (____) _____

Complete the following items:  ☐ #1   ☐ #2   ☐ #3   ☐ #4   ☐ #5   ☐ #6   ☐ #7

| TO BE COMPLETED BY INS |
|---|

**1. IMMIGRATION STATUS (check all that apply):**
From the document or information submitted and/or a review of our records we find that the person identified is a/an:

☐ a.  Lawful Permanent Resident alien of the United States.
**(Complete b,c,d,g,h,or i if alien adjusted to LPR status from one of those statuses in the past 7 years.)**

☐ b.  Refugee admitted to the United States under Section 207 of the INA. **(Complete Item 2 below.)**

☐ c.  Asylee under Section 208 of the INA. **(Complete Item 3 below.)**

☐ d.  Alien whose deportation has been withheld under section 243(h) of the INA (as in effect prior to April 1, 1997) or whose removal has been withheld under section 241(b)(3).
Date deportation or removal ordered withheld: _____

☐ e.  Alien paroled into the United States under Section 212(d)(5) of the INA for a period of at least 1 year. **(Complete Items 3 and 4 below.)**

☐ f.  Conditional Entrant pursuant to Section 203(a)(7) of the INA in effect prior to April 1, 1980.

☐ g.  American Indian born in Canada to whom the provisions of Section 289 of the INA apply.

☐ h.  Cuban/Haitian Entrant, as defined in Section 501(e) of the Refugee Education Assistance Act of 1980. **(Complete Item 3 below.)**

☐ i.  Amerasian immigrant, pursuant to Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988. **(Complete Item 2 below.)**

☐ j.  Other (indicate status): _____

2.   Date alien entered the United States: _____

3.   Date status was granted: _____

4.   Date status expires: _____

**5. CITIZEN STATUS:**
☐ This document appears valid and relates to a United States citizen.

**6. SPECIAL BENEFIT PROVISIONS FOR CERTAIN VICTIMS OF ABUSE:**
☐ a.  This alien obtained Lawful Permanent (or Conditional) Resident Status as the spouse, child, or widow(er) of a U.S. citizen.

☐ b.  This alien obtained Lawful Permanent (or Conditional) Resident Status as the spouse, child, or unmarried son or daughter of a lawful permanent resident alien.

☐ c.  This alien did not obtain status as described in (a) or (b).

Form G-845 Supplement (9/5/97)

ED_PRWORA_000036

**TO BE COMPLETED BY INS**

7. **AFFIDAVIT OF SUPPORT:**
   - ☐ a. This alien was sponsored on Form I-864, Affidavit of Support under Section 213A of the INA. Service receipt date _____. **(Complete Item 3 on page 1.)**
   - ☐ b. This alien was not sponsored on Form I-864.

**Name of Sponsor**

_____

**Sponsor's Social Security Number**

__ __ __ - __ __ - __ __ __ __

**Sponsor's Address**

_____

_____

_____

_____

**Name of Joint Sponsor(s)** *(if any)*

_____

**Joint Sponsor's Social Security Number**

__ __ __ - __ __ - __ __ __ __

**Joint Sponsor's Address**

_____

_____

_____

_____

☐    **See reverse for information on additional joint sponsor(s).**

INS Stamp

\*    *This supplement may be used in conjunction with Form G-845 to request verification; it cannot be used alone. It reflects information that may be relevant to eligibility for Federal, State, and local public benefits under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, P.L. 104-193.*

Form G-845 Supplement (9/5/97) **Page 2**

**BILLING CODE 4410–10–C**

ED_PRWORA_000037

**Attachment 2—Nondiscrimination Advisory**

Various federal civil rights laws, regulations and executive orders prohibit discrimination by governmental and private entities on the basis of race, national origin, gender, religion, age and disability. These laws, of course, apply to entities' implementation of Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act''). Because of the particular potential for national origin and race discrimination under the Act and its verification requirements, and because persons with disabilities are more likely to need benefits under various public benefit programs, this Advisory focuses on the laws relating to discrimination based on national origin, race and/or disability. Emphasizing these particular laws, however, is in no way meant to minimize the importance of guarding against all forms of illegal discrimination, and you should comply with all nondiscrimination requirements applicable to your program.

*A. Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. (''Title VI'')*

Because Title IV of the Act imposes new and significant restrictions on the ability of noncitizens to receive federal, state or local public benefits, there is particular potential for discrimination on the basis of national origin. It is important to remember that, although the Act limits the benefits available to some aliens, many aliens will continue to be entitled to receive public benefits. If improperly applied, the Act's restrictions may result in national origin discrimination against applicants who are eligible to receive benefits. It is therefore important to understand which aliens are eligible for which benefits.

Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity, whether operated by a state, local or private entity, that receives federal funds or other federal financial assistance. When operating or participating in a federally assisted program, a benefit provider cannot, on the basis of race, color or national origin, either directly or indirectly, including through contractual means, distinguish among individuals in the types, quantity, quality or timeliness of program services, aids or benefits that it provides or the manner in which it provides them. This prohibition applies to disparate treatment, as well as to the utilization of facility neutral procedures, criteria or methods of administration that have the effect of discriminating against individuals because of their race, color, or national origin. Policies and practices that are neutral in design and operation but have a disparate impact based on race, color or national origin must be eliminated unless they are necessary to the program's operation and there is no less discriminatory alternative.

Violations of Title VI may be obvious or subtle. A benefit provider that denies benefits or delays determinations of eligibility on the basis of an individual's race, color or national origin may violate Title VI. A benefit provider may violate Title VI if it concludes that applicants are ineligible for benefits because they have ethnic surnames or origins outside the United States, or because they look or sound foreign. It also may violate Title VI if it acts upon the assumption that applicants with these characteristics are illegal aliens, or if it imposes additional eligibility requirements on ethnic or racial minorities because of their ethnicity or race.

When confirming immigration status for purposes of determining eligibility for public benefits, benefit providers should be aware that there is no single immigration document that will establish all aliens' qualifications to receive benefits under the Act. The types of documents that an alien will be able to present to establish immigration status will vary depending upon the status in which the alien entered the U.S. and his or her individual circumstances. Demanding that an alien present one specific type of document to the exclusion of all other legally valid documents establishing immigration status, or demanding more or different documentation based on assumptions about the applicant's citizenship or national origin rather than knowledge of such status obtained in a non-discriminatory fashion, may constitute a violation of Title VI. For example, it may be discriminatory to demand that a specific applicant present three documents to establish her identity merely because she speaks Spanish or looks Asian, while allowing English-speaking persons and non-Asians to present only one identity document. It may also violate Title VI to assume, based on an applicant's national origin, that his or her documents are fraudulent.

*B. Civil Rights Laws Applicable to Persons With Disabilities*

Sections 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 (''Section 504''), and the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.,* prohibit discrimination on the basis of disability by public entities and recipients of federal funds. Public service providers are required to offer their services in locations that are accessible to applicants with disabilities, including people who use wheelchairs. In addition, service providers must ensure effective communication with applicants who have impaired hearing, vision, or speech, and service providers must make reasonable modifications to their policies and practices to ensure that eligible people with disabilities are not excluded from participation in a program as a result of their disability. Appropriate auxiliary aids may include sign language interpreters for applicants who have hearing impairments or readers or audiotaped materials for applicants who have vision impairments. Applicants who have impaired manual skills may require assistance in completing forms. Citizens, non-citizen nationals and qualified aliens with disabilities may find it difficult to provide the information needed to establish their citizenship, nationality or immigration status. Therefore, if an applicant has a disability that limits the applicant's ability to provide the required evidence of status (*e.g.,* mental retardation, amnesia, or other cognitive, mental or physical impairment), you should make every effort to assist the individual to obtain the required evidence.

You should work with the applicant or his or her representative to obtain leads for possible sources of evidence. In many cases, a current or prior employer will have employment records for the individual that will identify his or her immigration status and provide other relevant information. You should also seek cooperation from local agencies, the INS and other organizations (*e.g.,* rehabilitation programs, advocacy groups and homeless shelters) to assist the individual in obtaining evidence from existing records. If the applicant has been granted another benefit that is contingent upon being a U.S. citizen, U.S. non-citizen national or qualified alien, contact that benefit-granting agency to determine what evidence it relied upon to establish eligibility. When conducting a search for documentation, use all possible spelling variations of the applicant's name.

*C. Other Applicable Federal Civil Rights Laws*

There are a number of other federal civil rights laws that prohibit

ED_PRWORA_000038

discrimination based on other characteristics. They include the following:

• The Age Discrimination Act of 1975, 42 U.S.C. 6101 *et seq.*

The Age Discrimination Act prohibits discrimination on the basis of age in programs or activities receiving federal financial assistance. There are specific exceptions to the general prohibition against age discrimination, however, and you should consult the statute, 42 U.S.C. 6101 *et seq.,* as well as the regulations published by the Department of Health and Human Services, 45 CFR part 90, for further information

• The Fair Housing Act, 42 U.S.C. 3601 *et seq.*

The Fair Housing Act prohibits discrimination in the provision of housing based on race, color, religion, sex, familial status, national origin or handicap.

*D. Contact Numbers*

Benefit providers with questions may call the following numbers for information on the various federal civil rights laws:

Title VI—U.S. Department of Justice, Civil Rights Division, Coordination and Review Section, 1–888–TITLE–06 (1–888–848–5306).

ADA—U.S. Department of Justice, Civil Rights Division, Disability Rights Section, 1–800–514–0301 (voice) or 1–800–514–0383 (TDD).

Age Discrimination Act—U.S. Department of Health and Human Services, 1–800–368–1019.

Fair Housing Act—U.S. Department of Housing and Urban Development, 1–800–669–9777 (voice) or 1–800–927–9275 (TDD).

Questions regarding discrimination in immigration status verification procedures or other benefit-granting procedures can be referred to the civil rights office of the pertinent benefit-granting agency. Such questions can also be referred to the Office of Special Counsel for Immigration Related Unfair Employment Practices in the Civil Rights Division of the U.S. Department of Justice, 1–800–255–8155 (voice) or 1–800–237–2515 (TDD).

**Attachment 3—Federal Public Benefits**

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act'') applies only to non-exempted ''federal public benefits'' as defined by the Act, rather than to all federally funded programs. (It also applies to certain state and local public benefits, which are not the subject of this Attachment.) Under the Act, benefit providers are only required to verify the immigration status of applicants for benefits that fall within the Act's definition of ''federal public benefits'' and are not specifically exempted from the Act's requirements. (If the program independently requires benefit providers to verify the citizenship, nationality and/or immigration status of an applicant, however, you should continue to comply with such requirements even if the program does not provide a ''federal public benefit'' covered by the Act.) Set forth below is preliminary guidance on the meaning of ''federal public benefit,'' as well as a summary of the benefits specifically exempted from the Act's verification requirements. If you have any questions as to whether a particular program provides a federal public benefit covered by the Act or a benefit that is exempted from the Act's requirements, you should consult with the federal agency or department that oversees the program.

*Federal Public Benefit:* A ''federal public benefit'' is:

(a) Any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; or

(b) Any retirement, welfare, health, disability, public or assisted housing, post-secondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

Subject to the list of exceptions set forth below, Title IV of the Act precludes all aliens who are not ''qualified aliens'' from receiving any ''federal public benefit.'' In determining whether a program provides a ''federal public benefit,'' you should first consider whether the program provides one of the benefits expressly enumerated in either (a) or (b) above. Under (a), if your program provides a ''grant,'' ''contract,'' ''loan,'' ''professional license,'' or ''commercial license'' to an individual, either through a U.S. agency or with U.S. appropriated funds, then you provide a ''federal public benefit.'' If you do not provide a benefit of the type enumerated in (a), you should then go on to consider whether your program provides a benefit covered by (b).

To fall within (b), the benefit provided by your program must be one of the types of benefits described (''retirement,'' ''welfare,'' ''health,'' ''disability,'' ''public or assisted housing,'' ''post-secondary education,'' ''food assistance,'' ''unemployment benefit,'' or ''any other similar benefit''), it must be ''provided by an agency of the United States or by appropriated funds of the United States,'' and it must be provided to one of the enumerated categories of recipients (an ''individual household, or family eligibility unit''). Thus, for example, if you provide an ''unemployment benefit'' to an ''individual, household, or family eligibility unit'' using ''appropriated funds of the United States,'' the definition is satisfied. In contrast, if you provide generally available services such as fire or ambulance services, or do not provide benefits to an ''individual, household, or family eligibility unit,'' or do not provide benefits through an ''agency of the United States'' or with ''appropriated funds of the United States,'' the definition does not apply.

If your program provides payments or assistance to an individual, household or family eligibility unit through a U.S. agency or by U.S. appropriated funds, but the benefits are not expressly enumerated above, you should consider whether the benefits are ''similiar'' to one of the benefits enumerated in (b). If you believe that the benefit is arguably similar to an enumerated benefit, you should consult with the federal agency or department that oversees your program to confirm that the benefit constitutes a federal public benefit covered by the Act.

Finally, you should consider who is actually receiving the benefits that you provide. Although the Act prohibits certain aliens from receiving non-exempted ''federal public benefits,'' it does not prohibit governmental or private entities from receiving federal public benefits that they might then use to provide assistance to aliens, *so long as the benefit ultimately provided to the non-qualified aliens does not itself constitute a ''federal public benefit.''* Thus, if a local agency were to receive a ''grant'' (which is expressly identified as a federal public benefit), but the agency uses it to provide police services, fire protection or crime victim counseling (which are not federal public benefits under the Act's definition because they are not similar to an enumerated benefit), the prohibition would not apply. Similarly, if you provide a ''grant'' to a community organization (which is not an ''individual, household or family eligibility unit'') that uses the funds to build a library or renovate a park (which are not federal public benefits under the Act's definition), the prohibition would not apply. In contrast, if the agency uses the ''grant'' to provide a ''federal public benefit''—*e.g.,* a ''loan'' or ''welfare''

ED_PRWORA_000039

payment to a poor ''individual, household or family eligibility unit''—then the prohibition would apply and non-qualified aliens would be ineligible for such benefits.

*Exceptions:* The Act's verification requirements do not apply to all ''federal public benefits,'' as the Act specifically exempts certain types of benefits. If a program provides ''federal public benefits'' that fall within one of the following exceptions, the program provider is not required by this Act to, and should not attempt to, verify an applicant's immigration status, unless otherwise required or authorized to do so by federal law, except to the extent necessary to determine whether the exemption applies:

• Benefits covered by Attorney General Order No. 2049, 61 FR 45985 (1996), or any subsequent order, re: government-funded community programs, services or assistance that are necessary for protection of life or safety;

• Any wages, pensions, annuities, or other earned payments to which an alien is entitled as a result of federal, state, or local government employment, provided that the alien is not residing or present in the United States and provided that the employment was not prohibited under the immigration laws;

• Any veterans benefits to which an alien is entitled, provided that the alien is not residing or present in the United States;

• Any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the U.S.;

• Any contract, professional license, or commercial license for a citizen of a freely associated state (Palau, the Federated States of Micronesia, and the Marshall Islands), if section 141 of the applicable compact of free association is in effect;

• Any benefits that the U.S. is required to pay under the reciprocal treaty agreements listed in the forthcoming Attorney General Order to a work authorized nonimmigrant or alien lawfully admitted for permanent residence qualified for such benefits;

• Medical assistance under Title XIX of the Social Security Act (or any successor program to such Title) for care and services that are necessary for the treatment of an emergency medical condition (as defined in section 1903(v)(3) of such Act) of the alien involved and that are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the state plan approved under such Title (other than the requirement of the receipt of aid or assistance under

Title IV of such Act, SSI benefits under Title XVI of such Act, or a state supplementary payment);

• Short-term, non-cash, in-kind emergency disaster relief;

• Public health assistance (not including any assistance under Title XIX of the Social Security Act) for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease;

• Programs for housing or community development assistance or financial assistance administered by the Secretary of Housing and Urban Development (''HUD''), any program under Title V of the Housing Act of 1949, or any assistance under section 306C of the Consolidated Farm and Rural Development Act, to the extent that the alien is receiving such a benefit on August 22, 1996;

• Any benefit payable under Title II of the Social Security Act to which entitlement is based on an application filed on or before August 31, 1996, and any benefit covered by Attorney General Order No. 2054, 61 FR 47039 (1996), re: benefits payable under Title II of the Social Security Act to an alien who is lawfully present in the U.S.;

• Any benefit the nonpayment of which would contravene an international agreement described in section 233 of the Social Security Act (an agreement establishing totalization arrangements between the social security system of the U.S. and that of any foreign country which establishes entitlement to and the amount of old-age, survivors, disability, or derivative benefits based on an individual's coverage under both systems);

• Any benefit the nonpayment of which would be contrary to section 202(t) of the Social Security Act;

• Any benefit under the school lunch program under the National School Lunch Act, 42 U.S.C. 1751 *et seq.*, or the school breakfast program under section 4 of the Child Nutrition Act of 1966, 42 U.S.C. 1773, provided to an individual who is eligible to receive free public education benefits under state or local law;

• Any benefit payable under Title XVIII of the Social Security Act (relating to the Medicare program) to an alien who is lawfully present in the U.S., as determined by the Attorney General, provided that, with respect to the attribution of the alien's wages for purposes of eligibility for benefits payable under Part A of such program, the alien was authorized to be employed; *and*

• Any benefit payable under the Railroad Retirement Act of 1974 or the Railroad Unemployment Insurance Act to an alien who is lawfully present in the U.S., as determined by the Attorney General, or to an alien residing outside the U.S.

*State Option:* Each State may, but is not required to, provide benefits under programs established under the laws listed below to individuals who are not U.S. citizens, U.S. non-citizen nationals or qualified aliens. You should determine whether your State is providing such benefits to all persons, regardless of citizenship, alienage or immigration status, or whether it is providing them only to U.S. citizens, U.S. non-citizen nationals and qualified aliens. If your State is providing such benefits to all persons, you should *not* verify citizenship or immigration status; if it is limiting such benefits to citizens, non-citizen nationals and qualified aliens, you may want to use the Interim Guidance, in consultation with state and local authorities, to verify citizenship and immigration status.

• Programs (other than the school lunch program and the school breakfast program) under the National School Lunch Act, 42 U.S.C. 1751 *et seq.*, and the Child Nutrition Act of 1966, 42 U.S.C. 1771 *et seq.*;

• Section 4 of the Agriculture and Consumer Protection Act of 1973, 7 U.S.C. 612c note;

• The Emergency Food Assistance Act of 1983, 7 U.S.C. 7501 *et seq.; and*

• The food distribution program on Indian reservations established under section 4(b) of the Food Stamp Act of 1977, 7 U.S.C. 2013(b).

**Attachment 4—Interim Guidance Documentary Evidence of Status as a U.S. Non-Citizen National**

Copies of the following documents will, when combined with satisfactory proof of identity (which will come from the document itself if it bears a photograph of the person to whom it relates), demonstrate that a person is a U.S. citizen or non-citizen national for purposes of Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. (To the extent citizenship or nationality of a child is relevant to a benefit eligibility determination, the documents should demonstrate the child's status rather than that of the parent.) The lists set forth in Paragraphs A and B below are drawn from existing guidance published by the Social Security Administration (''SSA'') and regulations issued by the Immigration and

ED_PRWORA_000040

Naturalization Service ("INS") regarding determination of U.S. citizenship and nationality; the lists in Paragraphs C through F are drawn solely from the SSA guidance. These lists are not exhaustive; you should refer to guidance issued by the agency or department overseeing your program to determine if it accepts documents or other evidence of citizenship not listed below.

### A. Primary Evidence

• A birth certificate showing birth in one of the 50 States, the District of Columbia, Puerto Rico (on or after January 13, 1941), Guam, the U.S. Virgin Islands (on or after January 17, 1917), American Samoa, Swain's Island or the Northern Mariana Islands, unless the person was born to foreign diplomats residing in the U.S.

**Note:** If the document shows that the individual was born in Puerto Rico, the U.S. Virgin Islands or the Northern Mariana Islands before these areas became part of the U.S., the individual may be a collectively naturalized citizen—see Paragraph C below.

• United States passport (except limited passports, which are issued for periods of less than five years);
• Report of birth abroad of a U.S. citizen (FS–240) (issued by the Department of State to U.S. citizens);
• Certificate of birth (FS–545) (issued by a foreign service post) or Certification of Report of Birth (DS–1350) (issued by the Department of State), copies of which are available from the Department of State;
• Certificate of Naturalization (N–550 or N–570) (issued by the INS through a Federal or State court, or through administrative naturalization after December 1990 to individuals who are individually naturalized; the N–570 is a replacement certificate issued when the N–550 has been lost or mutilated or the individual's name has been changed);
• Certificate of Citizenship (N–560 or N–561) (issued by the INS to individuals who derive U.S. citizenship through a parent; the N–561 is a replacement certificate issued when the N–560 has been lost or mutilated or the individual's name has been changed);
• United States Citizen Identification Card (I–197) (issued by the INS until April 7, 1983 to U.S. citizens living near the Canadian or Mexican border who needed it for frequent border crossings) (formerly Form I–179, last issued in February 1974);
• Northern Mariana Identification Card (issued by the INS to a collectively naturalized citizen of the U.S. who was born in the Northern Mariana Islands before November 3, 1986);
• Statement provided by a U.S. consular officer certifying that the individual is a U.S. citizen (this is given to an individual born outside the U.S. who derives citizenship through a parent but does not have an FS–240, FS–545 or DS–1350); or
• American Indian Card with a classification code "KIC" and a statement on the back (identifying U.S. citizen members of the Texas Band of Kickapoos living near the U.S./Mexican border).

### B. Secondary Evidence

If the applicant cannot present one of the documents listed in A above, the following may be relied upon to establish U.S. citizenship or nationality:
• Religious record recorded in one of the 50 States, the District of Columbia, Puerto Rico (on or after January 13, 1941), Guam, the U.S. Virgin Islands (on or after January 17, 1917)), American Samoa, Swain's Island or the Northern Mariana Islands (unless the person was born to foreign diplomats residing in such a jurisdication) within three months after birth showing that the birth occurred in such jurisdiction and the date of birth or the individual's age at the time the record was made;
• Evidence of civil service employment by the U.S. government before June 1, 1976;
• Early school records (preferably from the first school) showing the date of admission to the school, the child's date and place of birth, and the name(s) and place(s) of birth of the parent(s);
• Census record showing name, U.S. citizenship or a U.S. place of birth, and date of birth or age of applicant;
• Adoption Finalization Papers showing the child's name and place of birth in one of the 50 States, the District of Columbia, Puerto Rico (on or after January 13, 1941), Guam, the U.S. Virgin Islands (on or after January 17, 1917), American Samoa, Swain's Island or the Northern Mariana Islands (unless the person was born to foreign diplomats residing in such a jurisdiction) *or,* where or adoption is not finalized and the State or other jurisdiction listed above in which the child was born will not release a birth certificate prior to final adoption, a statement from a state-approved adoption agency showing the child's name and place of birth in one of such jurisdictions (NOTE: the source of the information must be an original birth certificate and must be indicated in the statement); or
• Any other document that establishes a U.S. place of birth or in some way indicates U.S. citizenship (e.g., a contemporaneous hospital record of birth in that hospital in one of the 50 States, the District of Columbia, Puerto Rico (on or after January 13, 1941), Guam, the U.S. Virgin Islands (on or after January 17, 1917), American Samoa, Swain's Island or the Northern Mariana Islands (unless the person was born to foreign diplomats residing in such a jurisdiction).

### C. Collective Naturalization

If the applicant cannot present one of the documents listed in A or B above, the following will establish U.S. citizenship for collectively naturalized individuals:
Puerto Rico:
• Evidence of birth in Puerto Rico on or after April 11, 1899 and the applicant's statement that he or she was residing in the U.S., a U.S. possession or Puerto Rico on January 13, 1941; or
• Evidence that the applicant was a Puerto Rican citizen and the applicant's statement that he or she was residing in Puerto Rico on March 1, 1917 and that he or she did not take an oath of allegiance to Spain.
U.S. Virgin Islands:
• Evidence of birth in the U.S. Virgin Islands, and the applicant's statement of residence in the U.S., a U.S. possession or the U.S. Virgin Islands on February 25, 1927;
• The applicant's statement indicating resident in the U.S. Virgin Islands as a Danish citizen on January 17, 1917 and residence in the U.S., a U.S. possession or the U.S. Virgin Islands on February 25, 1927, and that he or she did not make a declaration to maintain Danish citizenship; or
• Evidence of birth in the U.S. Virgin Islands and the applicant's statement indicating residence in the U.S., a U.S. possession or territory or the Canal Zone on June 28, 1932.
Northern Mariana Islands (NMI) (formerly part of the Trust Territory of the Pacific Islands (TTPI)):
• Evidence of birth in the NMI, TTPI citizenship and residence in the NMI, the U.S., or a U.S. territory or possession on November 3, 1986 (NMI local time) and the applicant's statement that he or she did not owe allegiance to a foreign state on November 4, 1986 (NMI local time);
• Evidence of TTPI citizenship, continuous residence in the NMI since before November 3, 1981 (NMI local time), voter registration prior to January 1, 1975 and the applicant's statement that he or she did not owe allegiance to a foreign state on November 4, 1986 (NMI local time); or
• Evidence of continuous domicile in the NMI since before January 1, 1974 and the applicant's statement that he or she did not owe allegiance to a foreign state on November 4, 1986 (NMI local time).

ED_PRWORA_000041

**Note:** If a person entered the NMI as a nonimmigrant and lived in the NMI since January 1, 1974, this does not constitute continuous domicile and the individual is not a U.S. citizen.

### D. Derivative Citizenship

If the applicant cannot present one of the documents listed in A or B above, you should make a determination of derivative U.S. citizenship in the following situations:

Applicant born abroad to two U.S. citizen parents:

• Evidence of the U.S. citizenship of the parents and the relationship of the applicant to the parents, and evidence that at least one parent resided in the U.S. or an outlying possession prior to the applicant's birth.

Applicant born abroad to a U.S. citizen parent and a U.S. non-citizen national parent:

• Evidence that one parent is a U.S. citizen and that the other is a U.S. non-citizen national, evidence of the relationship of the applicant to the U.S. citizen parent, and evidence that the U.S. citizen parent resided in the U.S., a U.S. possession, American Samoa or Swain's Island for a period of at least one year prior to the applicant's birth.

Applicant born out of wedlock abroad to a U.S. citizen mother:

• Evidence of the U.S. citizenship of the mother, evidence of the relationship to the applicant and, for births on or before December 24, 1952, evidence that the mother resided in the U.S. prior to the applicant's birth or, for births after December 24, 1952, evidence that the mother had resided, prior to the child's birth, in the U.S. or a U.S. possession for a period of one year.

Applicant born in the Canal Zone or the Republic of Panama:

• A birth certificate showing birth in the Canal Zone on or after February 26, 1904 and before October 1, 1979 and evidence that one parent was a U.S. citizen at the time of the applicant's birth; or

• A birth certificate showing birth in the Republic of Panama on or after February 26, 1904 and before October 1, 1979 and evidence that at least one parent was a U.S. citizen and employed by the U.S. government or the Panama Railroad Company or its successor in title.

All other situations where an applicant claims to have a U.S. citizen parent and an alien parent, or claims to fall within one of the above categories but is unable to present the listed documentation:

• If the applicant is in the U.S., refer him or her to the local INS office for determination of U.S. citizenship;

• If the applicant is outside the U.S., refer him or her to the State Department for a U.S. citizenship determination.

### E. Adoption of Foreign-Born Child by U.S. Citizen

• If the birth certificate shows a foreign place of birth and the applicant cannot be determined to be a naturalized citizen under any of the above criteria, obtain other evidence of U.S. citizenship;

• Since foreign-born adopted children do not automatically acquire U.S. citizenship by virtue of adoption by U.S. citizens, refer the applicant to the local INS district office for a determination of U.S. citizenship if the applicant provides no evidence of U.S. citizenship.

### F. U.S. Citizenship By Marriage

A woman acquired U.S. citizenship through marriage to a U.S. citizen before September 22, 1922. Ask for: Evidence of U.S. citizenship of the husband, and evidence showing the marriage occurred before September 22, 1922.

**Note:** If the husband was an alien at the time of the marriage, and became naturalized before September 22, 1922, the wife also acquired naturalized citizenship. If the marriage terminated, the wife maintained her U.S. citizenship if she was residing in the U.S. at that time and continued to reside in the U.S.

### G. Applicants With Disabilities and Nondiscrimination

If an applicant has a disability that limits the applicant's ability to provide the required evidence of citizenship or nationality (*e.g.,* mental retardation, amnesia, or other cognitive, mental or physical impairment), you should make every effort to assist the individual to obtain the required evidence. In addition, you should not discriminate against applicants on the basis of race, national origin, gender, religion, age or disability. See Nondiscrimination Advisory, Attachment 2 to Interim Guidance.

### Attachment 5—Interim Guidance—Documentary Evidence of Status as A "Qualified Alien" Eligible for Federal Public Benefits

The documents listed below (descriptions of which are provided in Exhibit A) will, when combined with satisfactory proof of identity (which will come from the document itself if it bears a photograph of the person to whom it relates), establish that an applicant falls within one of the categories of "qualified alien" for purposes of title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

Under the Immigration and Nationality Act (the "INA"), all aliens over the age of 14 who remain in the United States for longer than 30 days are required to register with the Immigration and Naturalization Service (the "INS") and obtain an alien registration document. All aliens over the age of 18 who receive a registration document are required to carry it with them at all times. With certain exceptions (*e.g.,* Canadian visitors), aliens entering the U.S. are normally issued a registration document (*e.g.,* an INS Form I–94) at the time of entry. The documents listed below that are registration documents are indicated with an asterisk ("*").

Each of the documents listed below will demonstrate lawful status, and you should not require presentation of a registration document if the applicant presents one of the other legally acceptable documents that reasonably appears on its face to be genuine and to relate to the person presenting it. However, if the document presented is not a registration document and does not on its face reasonably appear to be genuine or to relate to the person presenting it, it is appropriate to ask the applicant to produce his or her registration document as additional evidence of immigration status, so long as the request is not made for a discriminatory reason (see Nondiscrimination Advisory, Attachment 2 to Interim Guidance). Presentation of a registration document listed below that reasonably appears on its face to be genuine and to relate to the person presenting it (or to satisfy a higher applicable standard) will often obviate the need to verify the applicant's immigration status with the INS; if the applicant presents a registration document that does not meet this standard, sending the INS a copy of the document will assist it in verifying the applicant's status quickly and accurately.

### Alien Lawfully Admitted for Permanent Residence

• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a "green card"); or

• Unexpired Temporary I–551 stamp in foreign passport or on *INS Form I–94.

### Asylee

• *INS Form I–94 annotated with stamp showing grant of asylum under section 208 of the INA;

- *INS Form I–688B (Employment Authorization Card) annotated ''274a.12(a)(5)'';
- *INS Form I–766 (Employment Authorization Document) annotated ''A5'';
- Grant letter from the Asylum Office of INS;or
- Order of an immigration judge granting asylum.

*Refugee*

- *INS Form I–94 annotated with stamp showing admission under § 207 of the INA;
- *INS Form I–688B (Employment Authorization Card) annotated ''274a.12(a)(3)'';
- *INS Form I–766 (Employment Authorization Document) annotated ''A3''; or
- INS Form I–571 (Refugee Travel Document).

*Alien Paroled Into the U.S. for a Least One Year*

- *INS Form I–94 with stamp showing admission for at least one year under section 212(d)(5) of the INA. (Applicant cannot aggregate periods of admission for less than one year to meet the one-year requirement.)

*Alien Whose Deportation or Removal Was Withheld*

- *INS Form I–688B (Employment Authorization Card) annotated ''274a.12(a)(10)'';
- *INS Form I–766 (Employment Authorization Document) annotated ''A10''; or
- Order from an immigration judge showing deportation withheld under § 243(h) of the INA as in effect prior to April 1, 1997, or removal withheld under § 241(b)(3) of the INA.

*Alien Granted Conditional Entry*

- *INS Form I–94 with stamp showing admission under § 203(a)(7) of the INA;
- *INS Form I–688B (Employment Authorization Card) annotated ''274a.12(a)(3)''; or
- *INS Form I–766 (Employment Authorization Document) annotated ''A3.''

*Cuban/Haitian Entrant*

- *INS Form I–551 (Alien Registration Receipt Card, commonly known as a ''green card'') with the code CU6, CU7, or CH6;
- Unexpired temporary I–551 stamp in foreign passport or on *INS Form I–94 with the code CU6 or CU7; or
- INS Form I–94 with stamp showing parole as ''Cuba/Haitian Entrant'' under Section 212(d)(5) of the INA.

*Alien Who Has Been Battered or Subjected to Extreme Cruelty*

Guidance as to the requirements that must be met for an alien to fall within this category of qualified alien is set forth in Exhibit B. Note that Title IV, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, contains provisions requiring that, upon the effective date of the new affidavit of support (required under section 213A of the Act), when determining eligibility for federal means-tested public benefits and the amount of such benefits to which an alien is entitled, the income and resources of the alien be deemed to include those of any person executing an affidavit of support on behalf of the alien and that person's spouse. Certain exceptions are made for indigent qualified aliens and for qualified aliens who (or whose children) have been battered or subjected to extreme cruelty in the U.S. by a spouse, parent or member of the spouse or parent's family and for qualified alien children whose parents have been subjected to such abuse. *See* Attachment 5, Exhibit B, Section II.

*Expired or Absent Documentation*

If an applicant presents expired documents or is unable to present any documentation evidencing his or her immigration status, refer the applicant to the local INS office to obtain documentation of status. In unusual cases involving applicants who are hospitalized or medically disabled, or who can otherwise show good cause for their inability to present documentation, and for whom securing such documentation would constitute an undue hardship, if the applicant can provide an alien registration number, you may file INS Form G–845 and Supplement, along with the alien registration number and a copy of any expired INS document presented, with the local INS office to verify status. As with any documentation of immigration status, you should confirm that the status information you receive back from INS pertains to the applicant whose identity you have verified.

*Receipt for Replacement Document*

If an applicant presents a receipt indicating that he or she has applied to the INS for a replacement document for one of the documents identified above, file INS Form G–845 and Supplement along with a copy of the receipt with the local INS office to verify status. Upon return receipt of information from INS, confirm that it pertains to the applicant whose identity you have verified. You

should ask to see the replacement document at a later date.

*Applicants with Disabilities and Nondiscrimination*

If an applicant has a disability that limits the applicant's ability to provide the required evidence of immigration status (.*e.g.,* mental retardation, amnesia, or other cognitive, mental or physical impairment), you should make every effort to assist the individual to obtain the required evidence. In addition, you should not discriminate against applicants on the basis of race, national origin, gender, religion, age or disability. See Nondiscrimination Advisory, Attachment 2 to Interim Guidance.

*Local INS Offices*

A list of local INS offices and their addresses is set forth in Attachment 1 to the Interim Guidance. Attachment 1 also includes a copy of INS Form G–845 and the Supplement thereto to be used to verify immigration status pursuant to the Interim Guidance.

**EXHIBIT A TO ATTACHMENT 5**

**''PINK'' I–551 ''RESIDENT ALIEN'' CARD**

*FRONT:* Pink background (blue header bar); blue INS seal overlaps photo area. Repeating ''I–551'' becomes visible when card is tilted under normal light. Expiration date on front of card: Moth, day, and year.

*BACK:* Color gradually changes from pink to blue, with map of U.S. in white. Three lines of machine readable printing at bottom on white background. Immigrant classification and admission/adjustment date on back of card. First set of code is immigrant classification, beginning with letter(s) followed by numbers(s). Third set of code is admission/adjustment date, beginning with year, month, and day.

**''WHITE'' I–551 ''RESIDENT ALIEN'' CARD**

*FRONT:* White background (blue header bar); salmon lines cover the photo in an unbroken pattern. Printing ''detail'' in eagle is excellent. Immigrant classification is on front of card in lower right corner, beginning with letter(s) followed by number(s).

*BACK:* Pale greenish background, map of U.S. in white. Three lines of machine readable codes. Admission/adjustment date is at bottom, left corner on back of card, beginning with year, month, and day.

**UNEXPIRED FOREIGN PASSPORT WITH I–551 STAMP**

An I–551 stamp may be present in a foreign passport, with a handwritten ''Valid Until'' date. A proof of entry and inspection stamp will also present in the passport, similar to the stamp for an I–94. Date of entry is stamped. Immigrant visa classification (letter and number) is printed or stamped on ''Admitted'' line. Valid status expires on date enumerated at ''Until'' section of I–551 stamp. The alien number may be printed beginning with letter A.

ED_PRWORA_000043

## I–94 ARRIVAL/DEPARTURE RECORD

Proof of entry is signified by U.S. immigration stamp. Date of entry is stamped. *Non-immigrant visa classification* (letter or letter and number) is printed or stamped on ''Admitted'' line. Valid status expires on date enumerated at ''Until'' section of stamp.

*Refugees and asylees* each receive a separate INS stamp. Asylum seekers have ''valid to'' date, while refugees have a date of admission.

## ''RED'' I–688B ''EMPLOYMENT AUTHORIZATION''

*FRONT:* White background, read header bar and yellow interlocking wavy lines, gold INS seal becomes visible when tilted under normal light. Expiration date is on front, month, day, and year.

*BACK:* Red outline of U.S., Alaska, and Hawaii. The word ''Void'' is capitalized and underlined.

## ''RED'' I–766 ''EMPLOYMENT AUTHORIZATION''

*FRONT:* White background, red header bar. Statue of Liberty, USA, and Immigration and Naturalization Service symbols become visible when tilted under normal light. Expiration date is at bottom, right corner. Non-immigrant category listed over justice seal by a letter and number abbreviation of the 274A.12 immigration law citation.

*BACK:* White background, black magnetic strip and bar code.

## DECISION GRANTING ASYLUM

Documents issued to aliens, granted asylum vary.

## REFUGEE TRAVEL DOCUMENT FORM I–571

Form I–571 is issued by the INS to aliens who have been granted refugee status.

## ORDER GRANTING WITHHOLDING OF DEPORTATION

The documents used by immigration judges to grant withholding of deportation vary.

## EXHIBIT B TO ATTACHMENT 5—ALIENS WHO HAVE BEEN BATTERED OR SUBJECTED TO EXTREME CRUELTY WITHIN THE MEANING OF SECTION 431 OF THE ACT

INTRODUCTION

Section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act''), as amended by section 501 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (the ''Immigration Act'') and sections 5571–72 and 5581 of the Balanced Budget Act of 1997 (''the Budget Act''), provides that certain categories of aliens who have been subjected to battery or extreme cruelty in the United States by a family member with whom they resided are ''qualified aliens'' eligible for public benefits under the Act. An alien whose child or an alien child whose parent has been abused is also a ''qualified alien.'' Additionally, section 421 of the Act, as amended by section 552 of the Immigration Act and section 5571 of the Budget Act, exempts this group of battered aliens from

the Act's new deeming requirements for a period of one year, and for longer if the battery or cruelty has been recognized in an order of a judicial officer or an administrative law judge or in an Immigration and Naturalization Service (''INS'') determination.

CONSIDERATIONS AFFECTING ALL APPLICANTS

Benfit providers should observe the following protocol with regard to all applicants who seek qualified alien status under section 431(c) of the Act:

(1) This Exhibit should be interpreted consistently with the principles set forth in the Interim Guidance, including, but not limited to, its standards for acceptance of documents demonstrating status, its nondiscrimination advisory and its provisions regarding whether to grant or withhold benefits pending verification of qualified alien status. In addition, as specified in the Interim Guidance, a provider should determine whether an applicant otherwise meets specific program requirements for benefit eligibility before initiating the verification process described below, unless determining program eligibility would be considerably more complex and time-consuming than verifying immigration status. (In the case of providers who are considering referring individual applicants to the Social Security Administration for issuance of a Social Security number, the provider should first determine that the applicant is otherwise eligible for program benefits.)

(2) Many of the applicants seeking assistance pursuant to this provision will need assistance on various matters relating to both their immigration status and their domestic violence-related concerns. You should therefore direct applicants to the INS forms request line (1–800–870–3676) so that applicants who are eligible to self-petition under the Violence Against Women Act, 8 U.S.C. 1154(a)(1), but have yet to do so, may request an INS Form I–360 and filing instructions. You should also refer them to the National Domestic Violence Hotline (1–800–799–7233) so that applicants may obtain assistance from a local domestic violence service provider and referrals to immigration attorneys. (A copy of INS Form I–360 is attached to this Exhibit.)

(3) Except where this attachment directs otherwise, when asking the INS or the Executive Office for Immigration Review (''EOIR'') to verify an applicant's immigration status, a benefit provider should submit a verification request form. Sample INS and EOIR verification forms (hereinafter ''the INS Request Form'' and ''the EOIR Request Form'' respectively) are attached hereto. These samples must be replicated and submitted on your agency's letterhead in order for INS or EOIR to provide verification information. The INS Request Form should be faxed to the INS Vermont Service Center (fax: (802) 527–3159; tel: (802) 527–3160); the EOIR Request Form should be faxed to the office of the appropriate immigration court (a list of the immigration courts and their addresses, fax numbers and telephone numbers is also attached to this Exhibit). In certain limited circumstances described below, the benefit

provider should submit its verification request by filing INS Form G–845 and the G–845 Supplement with the local INS office. Attachment 1 to the Interim Guidance includes a copy of INS Form G–845 and the G–845 Supplement to be used as indicated below, as well as a list of local INS offices.

(4) You should not share any information that you receive from or regarding the applicant with any member of his or her family or any other third party, without the express written permission of the applicant.

I. PROCEDURES FOR DETERMINING QUALIFIED ALIEN STATUS

An alien is a ''qualified alien'' eligible for public benefits under section 431(c) of the Act if he or she meets the following four requirements:

(1) the INS or the EOIR has granted a petition or application filed by or on behalf of the alien, the alien's child, or the alien child's parent under one of several subsections of the Immigration and Nationality Act (''INA'') described below or has found that a pending petition sets forth a prima facie case;

(2) the alien, the alien's child, or the alien child's parent has been abused in the United States [1] as detailed below:

(a) in the case of the abused alien: the alien has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien, if the spouse or parent consents to or acquiesces in such battery or cruelty;

(b) in the case of an alien whose child is abused: the alien's child has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty, and the alien did not actively participate in the batter or cruelty;

(c) in the case of an alien child whose parent is abused: the alien child's parent has been battered or subjected to extreme cruelty in the United States by the parent's spouse, or by a member of the spouse's family residing in the same household as the parent, if the spouse consents to or acquiesces in such battery or cruelty;

(3) there is a substantial connection between the battery or extreme cruelty and the need for the public benefit sought; and

(4) the battered alien, child, or parent no longer resides in the same household as the abuser.

Each of these four requirements, and processes for assuring that an applicant meets these requirements, are discussed in detail below. (In addition to these four requirements, the alien must of course meet the eligibility criteria of the particular

---

[1] Some applicants may possess documents demonstrating that they have been admitted to the United States because of battery or extreme cruelty that occurred *outside* of the United States, but this is insufficient by itself to make them eligible for benefits under section 431(c). Section 431(c) does not apply unless some battery or extreme cruelty occurred in the United States.

program from which benefits are sought.) A benefit provider must determine that an applicant satisfies all four requirements. If an applicant presents documentation indicating that an INS I–130 petition has been filed on the applicant's behalf under the INA provisions listed in subparagraph (a) of requirement one below, or that the applicant has filed an INS I–360 petition under the INA provisions listed in subparagraph (b) of requirement one below, the benefit provider should determine whether the applicant meets the other three requirements for qualified alien status (including battery or extreme cruelty) before verifying his or her immigration status with the INS. If an applicant presents documentation indicating that he or she has filed an INS I–360 petition based on one of the INA provisions listed in subparagraph (c) or (d) of requirement one below, or has sought suspension of deportation or cancellation of removal from the EOIR under one of the INA provisions listed in subparagraph (e) of requirement one below, INS or EOIR will make the determination as to battery or extreme cruelty. In such cases, the benefit provider may contact the INS or the EOIR as applicable to initiate the verification process prior to determining if the applicant meets the other two requirements for qualified alien status. After contacting the INS or the EOIR, the benefit provider should continue reviewing the applicant's eligibility for qualified alien status under requirements three and four below, and should not delay this evaluation while awaiting a response from the INS or the EOIR.

Requirement 1: *Appropriate INS Status.* You must determine that the INS or the EOIR, as applicable, has approved an applicant's petition or application or has found that the applicant's pending petition or application sets forth a prima facie case, under one of the following provisions of the INA:

(a) Section 204(a)(1)(A)(i) and 204(a)(1)(B)(i) of the INA (governing eligibility to receive law permanent resident (''LPR'') status as a spouse or child of a U.S. citizen, or as a spouse, child or unmarried son or daughter of an LPR, based on the petition of a spouse or parent);

(b) Section 204(a)(1)(A)(ii) of the INA (governing eligibility to apply for LPR status as an alien who is the widow or widower of a U.S. citizen to whom the alien had been married for at least two years at the time of such citizen's death);

(c) Sections 204(a)(1)(A)(iii) and 204(a)(1)(B)(ii) of the INA (governing eligibility to apply for LPR status as an alien who is the spouse of a U.S. citizen or LPR, who has resided with the spouse in the United States, and who (or whose child) has been subjected to battery or cruelty in the United States by his or her spouse);

(d) Sections 204(a)(1)(A)(iv) and 204(a)(1)(B)(iii) of the INA (governing eligibility to apply LPR status as an alien who is the child of a U.S. citizen or LPR, and who has resided with that parent in the United States and been subjected to battery or cruelty in the United States by his or her citizen or LPR parent); or

Section 244(a)(3) of the INA as in effect prior to April 1, 1997, or section 204A(b)(2) of the INA (governing the Attorney General's authority to suspend deportation or cancel the removal and adjust the status of an alien if the alien or the alien's child has been subjected to battery or extreme cruelty in the United States by a spouse or parent who is a U.S. citizen or LPR).[2] Note: Only this provision of the INA allows the alien parent of a battered child to obtain relief from deportation or removal even if he or she is not married to the U.S. citizen or LPR parent. This includes aliens who were never married to the U.S. citizen or LPR parent, aliens who are divorced from the U.S. citizen or LPR. Under the provisions described in (a)–(d) above, the alien must have been married to the U.S. citizen or LPR spouse at the time the petition was filed. Unmarried children of U.S. citizen or LPRs less than 21 years of age may petition for admission as a battered child under the provision described in (a) or (d) at any time, regardless of their parents' marital status.

*Documentation*

As set forth in Step 3 of the Interim Guidance regarding verification of qualified alien status, you should ask the alien to present documentation demonstrating his or her immigration status. As described in the Interim Guidance, if the documentation indicates that the applicant fall into one of the categories listed in (a)–(e) above and reasonably appears on its face to be genuine (or, if your program already has existing guidance or procedures mandating a higher standard of proof for acceptance of documentary evidence of immigration status, the document satisfies that higher standard) and to relate to the individual presenting it, you should accept the documentation as conclusive evidence that the applicant satisfies requirement one and should not verify immigration status with the INS or the EOIR. If, based on your review of the documents presented, you are considering determining that an applicant does not have the requisite immigration status and thus is not eligible for the benefits requested based on his or her immigration status—*e.g.,* because the documents does not on its face reasonably appear to be genuine (or to satisfy a higher applicable standard), to demonstrate that the applicant falls into any of the categories listed in (a)–(e) above, or to relate to the person presenting it—you should check with the INS or the EOIR as applicable to verify the information presented by the applicant. To verify status with the INS, in most cases, your should fax the INS Request Form, on your agency letterhead, as well as a copy of the document(s) provided by the applicant, to the INS Vermont Service Center. In some cases, as detailed in footnote three below, request for INS verification should be submitted to the local INS office using from G–845 and its supplement. To verify status with the EOIR, you should fax the EOIR Request Form on your agency letterhead, as well as a copy of the document(s) provided by the applicant, to the court administrator of the appropriate immigration court.

Applicants who have filed a petition or application or had a petition or application filed on their behalf, as applicable, under any of the above-described provisions of the INA will apply to a benefit provider in one of seven possible situations described below.

(1) With documentation evidencing an approved petition or application under one of the provisions listed in (a)–(e) above:

(a) INS Form I–551 (''Resident Alien Card'' or ''Alien Registration Receipt Card'', commonly known as a ''green card'') with one of the following INS class of admission (''COA'') codes printed on the front of a white card or the back of a pink card demonstrates approval of a petition under paragraphs (a)–(b) above:[3] AR1, AR6, C20 through C29, CF1, CF2, CR1, CR2, CR6, CR7, CX1 through CX3, CX6 through CX8, F20 through F29, FX1 through FX3, FX6 through FX8, IF1, IF2, IR1 through IR4, IR6 through IR9, IW1, IW2, IW6, IW7, MR6, MR7, P21 through P23, or P26 through P28;

(b) INS Form I–551 with one of the following COA codes stamped on the lower left side of the back of a pink card demonstrates approval of a petition under paragraphs (c)–(d) above: IB1 through IB3, IB6 through IB8, B11, B12, B16, B17, B20 through B29, B31 through B33, B36 through B38, BX1 through BX3, or BX6 through BX8;

(c) INS Form I–551 with COA code Z13 *may* demonstrate approval of a petition under paragraph (e) above; if an alien claiming approved status presents a card bearing the code Z13, determine where the card was issued by asking the alien where he or she received the grant of suspension of deportation, and then fax the EOIR Request Form on your agency letterhead, as well as a copy of the card and any other document(s) presented by the alien, to the EOIR court that granted the alien's suspension. If the alien does not recall where the grant of suspension of deportation was received, compare the city code on the card to the list of city codes attached to this Exhibit, and fax the EOIR Request Form on your agency letterhead, as well as a copy of the card and any other document(s) presented by the alien, to the Court Administrator of the EOIR court closest to the city where the green card was issued;

(d) Unexpired Temporary I–551 stamp in foreign passport or on INS Form I–94 with one of the COA codes specified in the preceding three paragraphs (if the temporary stamp or the INS Form I–94 bears the code

---

[2] While this provision includes unabused alien parents of battered children, it does not include unabused alien children of battered parents. This rule stands in contrast to the self-petitioning provisions described in (c) above, which battered spouses of U.S. citizen or LPRs can include their alien children in their petitions for status.

[3] The green card codes, green card types, and stamps in foreign passports or on INS Form I–94 that demonstrate an approved petition or application under one of the provisions listed in (a)–(b) above are too numerous to describe here. If an alien claiming approved status presents a code different than those enumerated, or if you cannot determine the class of admission from the I–551 stamp, you should file INS Form G–845, and the G–845 Supplement (mark item six on the Supplement) along with a copy of the document(s) presented, with the local INS office in order to determine whether the applicant gained his or her status because he or she was the spouse, widow, or child of a U.S. citizen or the spouse, child, or unmarried son or daughter of an LPR. (See Attachment 1 to Interim Guidance.)

ED_PRWORA_000045

Z13, follow the process described immediately above); if it bears another code or you cannot determine what the COA code is, follow the process outlined in footnote three; [4]

(e) INS Form I–797 indicating approval of an INS I–130 petition (only I–130 petitions describing the following relationships may be accepted: husbands or wives of U.S. citizens or LPRs, unmarried children under 21 years old of U.S. citizens or LPRs, or unmarried children 21 or older of LPRs), or approval of an I–360 petition (only I–360 approvals based on status as a widow/widower of a U.S. citizen or as a self-petitioning spouse or child of an abusive U.S. citizen or LPR may be accepted); [5] or

(f) A final order of an Immigration Judge or the Board of Immigration Appeals granting suspension of deportation under section 244(a)(3) of the INA as in effect prior to April 1, 1997, or cancellation of removal under section 240A(b)(2) of the INA. If the court or Board order does not indicate that suspension of deportation or cancellation of removal was granted under section 244(a)(3) or 240A(b)(2), you should fax the EOIR Request Form on your agency letterhead, as well as a copy of the order, to the court administrator of the EOIR court issuing the order, and ask the court to notify you of the INA provision under which the applicant was granted relief.

(2) With documentation demonstrating that the applicant has established a prima facie case [6] under one of the provisions described in (c), (d) or (e) above:

(a) INS Form I–797 indicating that the applicant has established a prima facie case; or

(b) An immigration court or Board of Immigration Appeals order indicating that

---

[4] If an applicant possesses the documents listed in items (a) through (d), the applicant has established that he or she is a lawful permanent resident and therefore is a qualified alien. You should nonetheless proceed with the analysis of requirements 2 through 4 to determine if the applicant qualifies for the battered exception to the deeming provisions (see Part IIA below).

[5] INS Form I–797 is used for numerous categories of petitions, and is used to indicate both receipt of a petition *and* approval or denial of a petition. It will also be used to indicate that an applicant has set forth a prima facie case. Thus, it is important to read the language on the Form I–797 presented by an applicant to ensure that it is more than a receipt, and specifically that it (a) denotes filing under one of the provisions specified above, and (b) denotes approval of the petition or a finding that a prima facie case has been demonstrated. Sample copies of Form I–797 are attached to this Exhibit.

[6] Because the INS has not previously been required to conduct prima facie assessments, it is implementing procedures (which will become effective upon publication of an interim rule) to expedite the review of I–360 petitions under the provisions described in (c) and (d) above and to notify the applicant within three weeks of INS' receipt of the petition if he or she has set forth a prima facie case. Similarly, the EOIR has not previously been required to conduct the prima facie assessment which is required under the provisions described in (e) above. The EOIR is currently working to implement a process for determining whether an applicant has set forth a prima facie case. Applicants in deportation or removal proceedings who are in need of a prima facie determination should contact the appropriate immigration court.

---

the applicant has established a prima facie case for suspension of deportation under INA section 244(a)(3) as in effect prior to April 1, 1997, or cancellation of removal under section 240A(b)(2) of the INA.

(3) With documentation indicating that the applicant has filed a petition or that a petition has been filed on the applicant's behalf, as applicable, under one of the provisions listed in (c) or (d) above, but with no evidence of approval of the petition or establishment of a prima facie case, in which case the benefit provider should determine from the documentation when the petition was filed and take the actions set forth below:

(a) Applicants with petitions filed before June 7, 1997 should have an INS Form I–797 indicating filing of the I–360 petition by ''self-petitioning spouse [or child] of abusive U.S.C. or LPR,'' a file-stamped copy of the petition, or another document demonstrating filing (including a cash register or computer-generated receipt indicating filing of Form I–360), but the INS will not have determined whether the applicant's petition sets forth a prima facie case. (If the applicant has no proof of filing, you should follow the instructions in paragraph 6.) You should request that the INS expedite adjudication of the petition or that a prima facie determination be made by faxing the INS Request Form on your agency letterhead, to the INS Vermont Service Center. Inquires about these cases may also be submitted in the same manner to the INS Vermont Service Center.

(b) Applicants with petitions filed after June 7, 1997 should have an INS Form I–797 indicating filing of the I–360 petition, but may have only a copy of the petition and proof of mailing. Within three weeks of filing, INS will send to the applicant either an approval notice, a notice of prima facie case, or a request for additional documentation. In some cases, the applicant will receive both a notice of prima facie case and a request for additional documentation. Upon publication of an interim prima facie rule, INS will begin the process of determining whether an applicant's petition sets forth a prima facie case. If three weeks have elapsed since the filing of the petition, you may determine the status of the case by faxing the INS Request Form, on your letterhead, to the Vermont Service Center.

Please not that the prima facie determination is an interim determination. An INS notice of prima facie case will expire upon issuance of a final decision by the INS or 150 days after issuance, whichever is earlier. An EOIR prima facie determination will expire upon the date of the applicant's hearing on the merits of his or her case, or if made by the Board of Immigration Appeals, upon issuance of the Board's decision on the appeal. In order to remain eligible for benefits after the expiration of a notice of prima facie case an applicant must either request and obtain a renewal of the prima facie determination from the INS or the EOIR, as applicable, or must present the benefit provider with a copy of one of the documents listed in paragraph one above indicating that his or her petition or application has been approved.

(4) With documentation indicating that the applicant has filed a petition or that a

petition was filed on his or her behalf, as applicable, under one of the provisions listed in (a) or (b) above (the documentation must indicate that the applicant is the widow/ widower of a U.S. citizen, the husband or wife of a U.S. Citizen or LPR, the unmarried child under age 21 of a U.S. citizen or LPR, or the unmarried child age 21 or older of an LPR):

• For aliens on whose behalf a petition has been filed: INS Form I–797 indicating filing of an INS I–130 petition, a file-stamped copy of the petition, or another document demonstrating filing (including a cash register or computer-generated receipt indicating filing of Form I–130) (a sample copy of Form I–130 is attached to this Exhibit).

• For self-petitioning widows or widowers: a file-stamped copy of the INS I–360 petition, or another document demonstrating filing (including a cash register or computer-generated receipt indicating filing of Form I–360).

A prima facie determination will not have been made with regard to these petitions. You should request that the INS expedite adjudication of the petition or that a prima facie determination be made by faxing the INS Request Form on your agency letterhead, to the INS Vermont Service Center. Inquires about these cases may also be submitted in the same manner to the INS Vermont Service Center.

Applicants who are beneficiaries of I–130 petitions will have had a petition filed on their behalf. The petition process gives the spouse or parent of the applicant ultimate control over the disposition of the petition. If the spouse or parent is the abuser, he or she can nullify the petition either by withdrawing it or by divorcing the alien before the alien is able to obtain a green card. Because the most current information regarding the status of a pending I–130 petition will reside with the batterer until an applicant has received his or her green card, you should query INS regarding the applicant's continued eligibility each time you recertify the applicant for eleigiblity under general program guidelines. For these reasons, and because a self-petitioning applicant may be able to obtain employment authorization, an alien who is eligible to self-petition under the Violence Against Women Act should be strongly encouraged to do so. (Note: The alien must be the spouse or child of the abuser and, in the case of a spousal petition, still be married to the abuser when the petition is filed.) The applicant should also be directed to the INS forms request line and the National Domestic Violence Hotline as set forth on page one.

(5) Documentation indicating that the INS has initiated deportation or removal proceedings in which relief under the provision(s) listed in section (e) above may be available (copies of the documents listed below are attached to this Exhibit):

• an ''Order to Show Cause'';
• a ''Notice to Appear''; or
• a ''Notice of Hearing in Deportation Proceedings.''

You should inform the applicant that, if the applicant or the applicant's child has been battered or subjected to extreme cruelty

ED_PRWORA_000046

in the United States by a spouse or parent who is a U.S. citizen or LPR, and the applicant has been present in the United States for at least three years, he or she may file an application with the EOIR requesting suspension of deportation or cancellation of removal as applicable. You should also notify the applicant that, upon filing the application, he or she may ask the court to make a prima facie evaluation of the application and that, if the court indicates that the applicant has set forth a prima facie case for relief, he or she should return to your agency to complete the benefit eligibility evaluation process (see also footnote six). You should also refer the applicant to the National Domestic Violence Hotline as set forth on page one so that he or she may obtain assistance from a local domestic violence service provider and referrals to immigration attorneys. (Some of these applicants will also have sought the relief described in (a)–(d) above. Thus the applicant may have an I–797 indicating that his or her petition has been granted or that the petition sets forth a prima facie case, or an I–797 receipt indicating that a petition has recently been filed. You should only follow the procedures described in this paragraph if the applicant does not have such a petition pending with the INS.)

(6) With minimal or no documentation regarding the claimed filing: Because of the nature of abusive relationships, applicants may not have copies of the documents that have been filed by them or on their behalf. If the applicant has some documentation, but it is insufficient to demonstrate filing, establishment of prima facie case or approval of a petition, you should fax the INS Request Form on your agency letterhead, as well as a copy of any document(s) provided by the applicant, to the INS Vermont Service Center in order to determine the applicant's status. If the applicant has no documentation, but is certain that a petition has been filed by his or her spouse or parent, you should fax the INS Request Form to the INS Vermont Service Center. If the applicant has no documentation and is uncertain whether a petition has been filed on his or her behalf, you should refer the applicant to the National Domestic Violence Hotline as set forth on page one.

(7) Without having filed one of the above petitions, but with facts indicating a basis to file such a petition: You should refer such applicants to the INS forms request line and to the National Domestic Violence Hotline as set forth on page one.

Requirement 2: *Battered or Subjected to Extreme Cruelty.* You must also determine whether an applicant, his or her child, or, in the case of an alien child, his or her parent, has been battered or subjected to extreme cruelty (as defined below) as follows:

• in the case of an abused alien: the alien has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty;

• in the case of an alien whose child is abused: the alien's child has been battered or

subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty, and the alien did not actively participate in the battery or cruelty;

• in the case of an alien child whose parent is abused: the alien child's parent has been battered or subjected to extreme cruelty in the United States by the parent's spouse, or by a member of the spouse's family residing in the same household as the parent if the spouse consents to or acquiesces in such battery or cruelty.

(a) *Definitions of Battery, Extreme Cruelty and Family Member*

For purposes of this Guidance, the phrase ''battered or subjected to extreme cruelty'' has the meaning set forth below. This definition is drawn, with slight modification, from the INS interim rule, ''Petition to Classify Alien as Immediate Relative of a United States Citizen or as Preference Immigrant; Self-Petitioning for Certain Battered or Abused Spouses and Children,'' 61 Fed. Reg. 13,061, 13074 (1996) (8 C.F.R. 204.2(c)(vi)).

The phrase ''battered or subjected to extreme cruelty'' includes, but is not limited to, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury. Psychological or sexual abuse or exploitation, including rape, molestation, incest (if the victim is a minor), or forced prostitution shall be considered acts of violence. Other abusive actions may also be acts of violence under this rule. Acts or threatened acts that, in and of themselves, may not initially appear violent may be part of an overall pattern of violence.

This is a broad, flexible definition that encompasses all types of battery and extreme cruelty. The acts mentioned in the above definition should be regarded by benefit providers as acts of violence whenever they occur, so long as one or more of the acts takes place in the United States and while the family relationship between the abuser and the victim exists. It is not possible, however, to identify all behaviors that could be acts of violence under certain circumstances, and this definition does not contain an exhaustive list of the acts of violence that will constitute battery or extreme cruelty. Many other nonenumerated abusive actions will also constitute an act or threatened act of violence under this definition.

For purposes of this Guidance, the phrase ''member of the spouse or parent's family'' means any person related by blood, marriage, or adoption to the spouse or parent of the alien, or any person having a relationship to the spouse or parent that is covered by the civil or criminal domestic violence statutes of the state or Indian country where the alien resides, or the state or Indian country in which the alien, the alien's child, or the alien child's parent received a protection order.

(b) *Applicant With EOIR Order or Approved INS Petition or Other Court Order Based on Battery*

Applicants with approved petitions or orders granted under one of the provisions

enumerated in paragraphs (c), (d) or (e) of requirement one above have already met the requirement of demonstrating battery or extreme cruelty pursuant to the INS rule. Thus, the benefit provider should not make a new determination of battery or cruelty, and should instead proceed directly to the determination of substantial connection under requirement three. Similarly, a protection order or record of criminal conviction satisfies the battery or extreme cruelty requirement for applicants in the following situations:

• any applicant who has or has had a protection order issued against his or her spouse, parent, or family member of the spouse or parent with whom the applicant was living;

• any applicant whose child has or has had a protection order issued against the applicant's spouse, parent, or family member of the spouse or parent with whom the applicant was living (including protection orders issued to the applicant on behalf of the applicant's abused minor child);

• any applicant who is an alien child and whose parent has or has had a protection order issued against the parent's spouse, or family member of the spouse with whom his or her parent was living;

• any applicant who has a record of criminal conviction of his or her spouse, parent, or family member of the spouse or parent with whom the applicant was living, for committing an act of violence against the applicant or his or her child; or

• any applicant who is an alien child and who has a record of criminal conviction of his or her parent's spouse, or family member of the spouse with whom the parent was living , for committing an act of violence against the applicant's parent.

In the above situations, the applicant has established battery or extreme cruelty for purposes of this Guidance, and you should immediately proceed to requirement three.[7]

(c) *All Other Applicants*

Except for applicants addressed in (b) immediately above, an applicant must provide evidence of abuse. The benefit provider should consider *any credible evidence proffered by the applicant.* Evidence of battery or extreme cruelty (and in the case of a petition on behalf of a child, evidence that the applicant did not actively participate in the abuse) includes, but is not limited to, reports or affidavits from police, judges and other court officials, medical personnel, school officials, clergy, social workers, counseling or mental health personnel, and other social service agency personnel; legal documentation, such as an order of protection against the abuser or an order convicting the abuser of committing an act of domestic violence that chronicles the existence of abuse; evidence that indicates

---

[7] In cases where INS is making the determination regarding battery and extreme cruelty, INS will follow its regulations as set forth in 8 C.F.R. 204.2(c)(2). Under these regulations, INS will consider protection orders and criminal convictions along with any credible evidence relevant to the petition. The determination of what evidence is credible and the weight to be given that evidence rests within the sole discretion of INS. See 8 C.F.R. 204(c)(2)(I).

ED_PRWORA_000047

that the applicant sought safe-haven in a battered women's shelter or similar refuge because of the battery against the applicant or his or her child; or photographs of the visibly injured applicant, child, or (in the case of an alien child) parent supported by affidavits. An applicant may also submit sworn affidavits from family members, friends or other third parties who have personal knowledge of the battery or cruelty. Additionally, an applicant may submit his or her own affidavit, under penalty of perjury (it does not have to be notarized), describing the circumstances of the abuse, and the benefit provider has the discretion to conclude that the affidavit is credible, and, by itself or in conjunction with other evidence, provides relevant evidence of sufficient weight to demonstrate battery or extreme cruelty. The benefit provider should keep a copy of all evidence presented by the applicant.

The benefit provider should bear in mind that, due to the nature of the control and fear dynamics inherent in domestic violence, some applicants will lack the best evidence to support their allegations (*e.g.*, a civil protection order or a police report). Thus, the benefit provider will need to be flexible in working with the applicant as he or she attempts to assemble adequate documentation. In determining the existence of battery or cruelty, it is important that the benefit provider understand both the experience of intimate violence and the applicant's cultural context. The dynamics of domestic violence may have inhibited the applicant from seeking public or professional responses to the abuse prior to applying for benefits needed to enable the applicant to leave the abuser. For many cultural groups, going to outsiders for help is viewed as disloyalty to the community and an embarrassment to the family. In some cultures, for example, women have been conditioned to accept the authority and control of their husbands. Thus, there may be little independent documentary evidence of the abuse; the benefit provider should be sensitive to the needs and situation of the abused applicant when reviewing allegations and evidence of abuse.

Many applicants will have had an I–130 petition filed on their behalf by their spouse or parent, in which case the spouse or parent will have ultimate control over the disposition of the petition. If the spouse or parent is the abuser, he or she can nullify the petition either by withdrawing it or by divorcing the alien before the alien is able to obtain a green card. For these reasons, and because a self-petitioning applicant may be able to obtain employment authorization, an alien who is eligible to self-petition (the alien must be married to the abuser when the petition is filed) should be strongly encouraged to do so. The applicant should also be directed to the INS forms request line and the National Domestic Violence Hotline as set forth on page one.

Requirement 3: *Substantial Connection Between Battery and the Need for Benefits.* You must determine whether there is a substantial connection between the battery or extreme cruelty to which the applicant, his or her child, or (in the case of an alien child) his or her parent has been subjected and the

need for the benefits sought. This requirement will not be satisfied simply by a determination that an applicant has been subjected to battery or extreme cruelty. To assist benefit providers in making substantial connection determinations, and as required by the Budget Act, the Attorney General has developed a list of circumstances, set forth below, that demonstrate a substantial connection between the battery or extreme cruelty suffered by an applicant, the applicant's child, or (in the case of an alien child) the applicant's parent, and the need for the benefit sought. You may refer to this list as a guide in making substantial connection determinations.

**Note:** The Attorney General's Order No. 2097–97, Determination of Situations that Demonstrate a Substantial Connection Between Battery or Extreme Cruelty and Need for Specific Public Benefits, 62 FR 39874 (July 24, 1997), has been superseded by amendments in the Budget Act. Revised substantial connection guidance will be issued shortly. In the meantime, benefit providers should look to the information contained in this document for guidance in making substantial connection determinations.

• Where the benefits are needed to enable the applicant, the applicant's child, and/or (in the case of an alien child), the applicant's parent to become self-sufficient following separation from the abuser;

• Where the benefits are needed to enable the applicant, the applicant's child, and/or (in the case of an alien child) the applicant's parent to escape the abuser and/or the community in which the abuser lives, or to ensure the safety of the applicant, the applicant's child, or (in the case of an alien child) the applicant's parent from the abuser;

• Where the benefits are needed due to a loss of financial support resulting from the applicant's, his or her child's, and/or (in the case of an alien child) his or her parent's separation from the abuser;

• Where the benefits are needed because the battery or cruelty, separation from the abuser, or work absences or lower job performance resulting from the battery or extreme cruelty or from legal proceedings relating thereto (including resulting child support, child custody, and divorce actions) cause the applicant, the applicant's child, and/or (in the case of an alien child) the applicant's parent to lose his or her job or to earn less or to require the applicant, the applicant's child, and/or (in the case of an alien child) the applicant's parent to leave his or her job for safety reasons;

• Where the benefits are needed because the applicant, the applicant's child, or (in the case of an alien child) the applicant's parent requires medical attention or mental health counseling, or has become disabled, as a result of the battery or extreme cruelty;

• Where the benefits are needed because the loss of a dwelling or source of income or fear of the abuser following separation from the abuser jeopardizes the applicant's or (in the case of an alien child) the parent's ability to care for his or her children (*e.g.,* inability to house, feed, or clothe children or to put children into a day care for fear of being found by the abuser);

• Where the benefits are needed to alleviate nutritional risk or need resulting from the abuse or following separation from the abuser;

• Where the benefits are needed to provide medical care during a pregnancy resulting from the abuser's sexual assault or abuse of, or relationship with, the applicant, the applicant's child, and/or (in the case of an alien child) the applicant's parent and/or to care for any resulting children; or

• Where medical coverage and/or health care services are needed to replace medical coverage or health care services the applicant, the applicant's child, or (in the case of an alien child) the applicant's parent had when living with the abuser.

Requirement 4: *Battered Applicant No Longer Resides in the Same Household with Batterer.* Before providing benefits, you must determine that the battered applicant, child or parent no longer resides in the same household or family eligibility unit as the batterer. Although an applicant is not a qualified alien eligible for benefits until the battered applicant or child, or parent ceases residing with the batterer, applicants will generally need the assurance of the availability of benefits in order to be able to leave their batterer and survive independently. Wherever possible in this situation, the benefit provider should complete the eligibility determination process and approve the applicant for receipt of benefits pending the applicant's demonstration that the applicant, his or her child, and/or (in the case of an alien child) his or her parent have separated from the batterer. The applicant can then make arrangements to leave the batterer's residence secure in the knowledge that benefits will be provided as soon as he or she leaves.

You should consider any relevant credible evidence supporting the claim of non-residency with the batterer, including, but not limited to, any of the following: A civil protection order requiring the batterer to stay away from the applicant or the applicant's children or parent, or evicting the batterer from the applicant's residence; employment records; utility receipts; school records; hospital or medical records; rental records or records from a building or property manager; an affidavit from a staff member at a shelter for battered women or homeless persons, family members, friends or other third parties with personal knowledge, or from the battered applicant himself or herself; or any other records establishing that the applicant or his or her child or parent no longer resides with the abusive spouse, parent, or family member.

**Note:** While qualified alien status will make the battered applicant, the battered applicant's children, or the parent of a battered child eligible for certain federal public benefits, it will not make them eligible for all federal public benefits. See Interim Guidance and Attachments 6 and 7 thereto for the factors that determine a qualified alien's eligibility for particular benefits.

II. EXEMPTION FROM DEEMING REQUIREMENTS

A. *Battered Aliens*

Section 421 of the Act (as amended by the Immigration Act and the Budget Act) requires

ED_PRWORA_000048

that, upon the effective date of the newly required affidavit of support and subject to the exceptions described below, when determining eligibility for federal means-tested public benefits and the amount of such benefits to which an alien applicant is entitled, agencies must include as income and resources of the alien, the income and resources of the spouse of the alien and any other person executing an affidavit of support on behalf of the alien. An alien is exempt from these ''deeming'' requirements for a period of one year, however, if

(1) in the case of an abused alien,

(a) the alien has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty; (b) there is, in the opinion of the agency providing such benefits, a substantial connection between the battery or extreme cruelty and the need for the benefit sought; and (c) the battered alien no longer resides in the same household as the abuser;

(2) in the case of an alien whose child is abused:

(a) the alien's child has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty, and the alien did not actively participate in the battery or cruelty; (b) there is, in the opinion of the agency providing such benefits, a substantial connection between the battery or extreme cruelty and the need for the benefit sought; and (c) the battered child no longer resides in the same household as the abuser;

(3) in the case of an alien child whose parent is abused:

(a) the alien child's parent has been battered or subjected to extreme cruelty in the United States by the parent's spouse, or by a member of the spouse's family residing in the same household as the parent if the spouse consents to or acquiesces in such battery or cruelty; (b) there is, in the opinion of the agency providing such benefits, a substantial connection between the battery or extreme cruelty and the need for the benefit sought; and (c) the battered parent no longer resides in the same household as the abuser.

See Part I, requirements two and four, above, for the definition and proof of battery/extreme cruelty and non-residency with the abuser; the agency may also want to consult the Attorney General's guidance regarding substantial connection (see part I, requirement three above) when making its own substantial connection determination.

After expiration of the one year period, alien applicants continue to be exempt from the deeming requirements with regard to the resources and income of the *batterer only*, if (a) the applicant demonstrates that the battery or cruelty has been recognized in an order of a judge or administrative law judge or a prior determination of the INS, and (b) in the opinion of the agency, there is a substantial connection between the abuse or battery suffered by the applicant, the applicant's child, or (in the case of an alien child) the applicant's parent and the need for the benefit sought.

B. *Indigent Aliens*

In addition to the exemption for battered aliens, the Act's deeming provision contains a separate exemption for indigent aliens. If, after taking into account the alien's own income plus any cash, food, housing or other assistance provided by other individuals (including the sponsor), an agency determines that a sponsored alien would, in the absence of the assistance provided by the agency, be unable to obtain food and shelter, the amount of income and resources of the sponsor or the sponsor's spouse that shall be attributed to the sponsored alien shall not exceed the amount actually provided for a period of one year after the date such agency determination is made.

**BILLING CODE 4410–10–M**

ED_PRWORA_000049

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB #1115-0117
Petition for Amerasian, Widow or Special Immigrant

**START HERE - Please Type or Print**

**Part 1. Information about person or organization filing this petition.** (Individuals should use the top name line; organizations should use the second line.) If you are a self-petitioning spouse or child and do not want INS to send notices about this petition to your home, you may show an alternate mailing address here. If you are filing for yourself and do not want to use an alternate mailing address, skip to part 2.

| Family Name | Given Name | Middle Initial |
|---|---|---|
| | | |

Company or Organization Name

**Address** - C/O

| Street Number and Name | | Apt. # |
|---|---|---|
| City | State or Province | |
| Country | | ZIP/Postal Code |

| U.S. Social Security # | A # | IRS Tax # (if any) |
|---|---|---|

**Part 2. Classification Requested (check one):**

a. ☐ Amerasian
b. ☐ Widow(er) of a U.S. citizen who died within the past 2 years
c. ☐ Special Immigrant Juvenile
d. ☐ Special Immigrant Religious Worker
e. ☐ Special Immigrant based on employment with the Panama Canal Company, Canal Zone Government or U.S. Government in the Canal Zone
f. ☐ Special Immigrant Physician
g. ☐ Special Immigrant International Organization Employee or family member
h. ☐ Special Immigrant Armed Forces Member
i. ☐ Self-Petitioning Spouse of Abusive U.S. Citizen or Lawful Permanent Resident
j. ☐ Self-Petitioning Child of Abusive U.S. Citizen or Lawful Permanent Resident
k. ☐ Other, explain: _____

**Part 3. Information about the person this petition is for.**

| Family Name | Given Name | Middle Initial |
|---|---|---|
| | | |

**Address** - C/O

| Street Number and Name | | Apt. # |
|---|---|---|
| City | State or Province | |
| Country | | ZIP/Postal Code |

| Date of Birth (Month/Day/Year) | Country of Birth |
|---|---|
| U.S. Social Security # (if any) | A # (if any) |

Marital Status:   ☐ Single   ☐ Married   ☐ Divorced   ☐ Widowed

Complete the items below if this person is in the United States:

| Date of Arrival (Month/Day/Year) | I-94# |
|---|---|
| Current Nonimmigrant Status | Expires on (Month/Day/Year) |

Form I-360 (Rev. 03/07/96) N                    ***Continued on back.***

**FOR INS USE ONLY**

| Returned | Receipt |
|---|---|
| | |
| Resubmitted | |
| | |
| Reloc Sent | |
| | |
| Reloc Rec'd | |
| | |

☐ Petitioner/ Applicant Interviewed

☐ Beneficiary Interviewed

☐ I-485 Filed Concurrently
☐ Bene "A" File Reviewed

Classification

Consulate

Priority Date

Remarks:

**Action Block**

**To Be Completed by Attorney or Representative, if any**

☐ Fill in box if G-28 is attached to represent the applicant

VOLAG#

ATTY State License #

ED_PRWORA_000050

## Part 4. Processing Information.

Below give the United States Consulate you want notified if this petition is approved and if any requested adjustment of status cannot be granted.

| *American Consulate:* City | Country |
|---|---|

If you gave a United States address in Part 3, print the person's foreign address below. If his/her native alphabet does not use Roman letters, print his/her name and foreign address in the native alphabet.

| Name | Address |
|---|---|

| | | |
|---|---|---|
| Sex of the person this petition is for. | ☐ Male | ☐ Female |
| Are you filing any other petitions or applications with this one? | ☐ No | ☐ Yes (How many? _____ ) |
| Is the person this petition is for in exclusion or deportation proceedings? | ☐ No | ☐ Yes (Explain on a separate sheet of paper) |
| Has the person this petition is for ever worked in the U.S. without permission? | ☐ No | ☐ Yes (Explain on a separate sheet of paper) |
| Is an application for adjustment of status attached to this petition? | ☐ No | ☐ Yes |

## Part 5. Complete only if filing for an Amerasian.

### Section A. Information about the mother of the Amerasian

| Family Name | Given Name | Middle Initial |
|---|---|---|

Living? ☐ No (Give date of death _____ )    ☐ Yes (complete address line below)    ☐ Unknown (attach a full explanation)

Address

### Section B. Information about the father of the Amerasian: If possible, attach a notarized statement from the father regarding parentage. Explain on separate paper any question you cannot fully answer in the space provided on this form.

| Family Name | Given Name | Middle Initial |
|---|---|---|
| Date of Birth (Month/Day/Year) | Country of Birth | |

Living? ☐ No (give date of death _____ )    ☐ Yes (complete address line below)    ☐ Unknown (attach a full explanation)

Home Address

| Home Phone # | Work Phone # |
|---|---|

At the time the Amerasian was conceived:

☐ The father was in the military (indicate branch of service below - and give service number here): _____

    ☐ Army    ☐ Air Force    ☐ Navy    ☐ Marine Corps    ☐ Coast Guard

☐ The father was a civilian employed abroad. Attach a list of names and addresses of organizations which employed him at that time.

☐ The father was not in the military, and was not a civilian employed abroad. *(Attach a full explanation of the circumstances.)*

## Part 6. Complete only if filing for a Special Immigrant Juvenile Court Dependent.

### Section A. Information about the Juvenile

List any other names used.

Answer the following questions regarding the person this petition is for. If you answer "no" explain on a separate sheet of paper.

| | | |
|---|---|---|
| Is he or she still dependent upon the juvenile court or still legally committed to or under the custody of an agency or department of a state? | ☐ No | ☐ Yes |
| Does he/she continue to be eligible for long term foster care? | ☐ No | ☐ Yes |

*Continued on next page.*

ED_PRWORA_000051

**Part 7. Complete only if filing as a Widow/Widower, a Self-petitioning Spouse of an Abuser, or as a Self-petitioning Child of an Abuser.**

**Section A. Information about the U.S. citizen husband or wife who died or about the U.S. citizen or lawful permanent resident abuser.**

| Family Name | Given Name | Middle Initial |
|---|---|---|
| | | |

| Date of Birth (Month/Day/Year) | Country of Birth | Date of Death (Month/Day/Year) |
|---|---|---|
| | | |

He or she is now, or was at time of death a *(check one)*:

- ☐ U.S. Citizen born in the United States.
- ☐ U.S. Citizen born abroad to U.S. citizen parents.
- ☐ U.S. Citizen through Naturalization *(Show A #)* _____
- ☐ U.S. lawful permanent resident *(Show A #)* _____
- ☐ Other, explain _____

**Section B. Additional Information about you.**

| How many times have you been married? | How many times was the person in Section A married? | Give the date and place you and the person in Seciton A were married. *(If you are a self-petitioning child, write: "N/A")* |
|---|---|---|
| | | |

When did you live with the person named in Section A?   From *(Month/Year)*_____until *(Month/Year)*_____.

If you are filing as a widow/widower, were you legally separated at the time of the U.S citizens's death?      ☐ No      ☐ Yes, *(attach explanation)*.

Give the last address at which you lived together with the person named in Section A, and show the last date that you lived together with that person at that address:

_____

If you are filing as a self-petitioning spouse, have any of your children filed separate self-petitions?      ☐ No   ☐ Yes *(show child(ren)'s full names)*:

**Part 8. Information about the spouse and children of the person this petition is for.** A widow/widower or a self-petitioning spouse of an abusive citizen or lawful permanent resident should also list the children of the deceased spouse or of the abuser.

| A. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship  ☐ Spouse  ☐ Child | | A # |
| B. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
| | Country of Birth | Relationship  ☐ Child | | A # |
| C. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
| | Country of Birth | Relationship  ☐ Child | | A # |
| D. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
| | Country of Birth | Relationship  ☐ Child | | A # |
| E. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
| | Country of Birth | Relationship  ☐ Child | | A # |
| F. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
| | Country of Birth | Relationship  ☐ Child | | A # |

Form I-360 (Rev 03/07/96) N

ED_PRWORA_000052

**Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices **61375**

| G. | Family<br>Name | Given<br>Name | Middle<br>Initial | Date of Birth<br>(Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship<br>☐ Child | | A # |
| H. | Family<br>Name | Given<br>Name | Middle<br>Initial | Date of Birth<br>(Month/Day/Year) |
| | Country of Birth | Relationship<br>☐ Child | | A # |

**Part 9. Signature.**

*Read the information on penalties in the instructions before completing this part. If you are going to file this petition at an INS office in the United States, sign below. If you are going to file it at a U.S. consulate or INS office overseas, sign in front of a U.S. INS or consular official.*

I certify, or, if outside the United States, I swear or affirm, under penalty of perjury under the laws of the United States of America, that this petition, and the evidence submitted with it, is all true and correct. If filing this on behalf of an organization, I certify that I am empowered to do so by that organization. I authorize the release of any information from my records, or from the petitioning organization's records, which the Immigration and Naturalization Service needs to determine eligibility for the benefit being sought.

| **Signature** | Date |
|---|---|

| **Signature of INS or<br>Consular Official** | Print Name | Date |
|---|---|---|

*Please Note:* *If you do not completely fill out this form, or fail to submit required documents listed in the instructions, then the person(s) filed for may not be found eligible for a requested benefit, and it may have to be denied.*

## Part 10. Signature of person preparing form if other than above. (sign below)

I declare that I prepared this application at the request of the above person and it is based on all information of which I have knowledge.

| **Signature** | Print Your Name | Date |
|---|---|---|

| Firm Name<br>and Address |
|---|

ED_PRWORA_000053

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB# 1115-0117
Petition for Amerasian, Widow(er), or Special Immigrant

## INSTRUCTIONS

**Purpose of This Form.**
This petition is used to classify an alien as:
- an Amerasian;
- a Widow or Widower;
- a Battered or Abused Spouse or Child of a U.S. Citizen or Lawful Permanent Resident;
- a Special Immigrant (Religious Worker; Panama Canal Company Employee, Canal Zone Government Employee, U.S. Government in the Canal Zone Employee; Physician; International Organization Employee or Family Member; Juvenile Court Dependent; or Armed Forces Member).

**Initial Evidence Requirements.**
If these instructions state that a copy of a document may be filed with this petition, and you choose to send us the original, we may keep that original for our records. Any foreign language document must be accompanied by an English translation certified by the translator that he/she is competent to translate from the foreign language into English and that the translation is accurate.

**Amerasian.** Any person who is 18 or older, an emancipated minor, or a U.S. corporation may file this petition for an alien who was born in Korea, Vietnam, Laos, Kampuchea, or Thailand after December 31, 1950, and before October 22, 1982, and was fathered by a U.S. citizen.

The petition must be filed with:
- copies of evidence the person this petition is for was born in one of the above countries between those dates. If he/she was born in Vietnam, you must also submit a copy of his/her Vietnamese I.D. card, or an affidavit explaining why it is not available;
- copies of evidence establishing the parentage of the person, and of evidence establishing that the biological father was a U.S. citizen. Examples of documents that may be submitted are birth or baptismal records or other religious documents; local civil records; an affidavit, correspondence or evidence of financial support from the father; photographs of the father (especially with the child); or, absent other documents, affidavits from knowledgeable witnesses which detail the parentage of the child and how they know such facts;
- a photograph of the person;
- if the person is married, submit a copy of the marriage certificate, and proof of the termination of any prior marriages; and
- if the person is under 18 years old, submit a written statement from his/her mother or legal guardian which:
  - irrevocably releases him/her for emigration and authorizes the placing agencies to make necessary decisions for his/her immediate care until a sponsor receives custody;
  - shows an understanding of the effects of the release, and states whether any money was paid or coercion used prior to obtaining the release; and
  - includes the full name, date and place of birth, and present or permanent address of the mother or guardian, and with the signature of the mother or guardian on the release authenticated by a local registrar, court of minors, or a U.S. immigration or consular officer.

The following sponsorship documents are also required. You may file these documents with the petition, or wait until we review the petition and request them. However, not filing them with the petition will add to the overall processing time.
- An Affidavit of Financial Support, executed by the sponsor, with the evidence of financial ability required by that form. Please note that the original sponsor remains financially responsible for the Amerasian if any subsequent sponsor fails in this area;
- Copies of evidence showing that the sponsor is at least 21 years old and is a U.S. citizen or permanent resident;
- Fingerprints of the sponsor on Form FD-258; and
- If this petition is for a person under 18 years old, the following documents issued by a placement agency must be submitted:
  - a copy of the private, public or state agency's license to place children in the U.S., proof of the agency's recent experience in the intercountry placement of children and of the agency's financial ability to arrange the placement;
  - a favorable home study of the sponsor conducted by a legally authorized agency;

- a pre-placement report from the agency, including information regarding any family separation or dislocation abroad that would result from the placement;
- a written description of the orientation given to the sponsor and to the parent or guardian on the legal and cultural aspects of the placement;
- a statement from the agency showing that the sponsor has been given a report on the pre-placement screening and evaluation of the child; and
- a written plan from the agency to provide follow-up services, including mediation and counseling, and describing the contingency plans to place the person this petition is for in another suitable home if the initial placement fails.

**Widow/Widower of a United States Citizen.** You may file this petition for yourself if:
- you were married for at least two years to a U.S. citizen who is now deceased and who was a U.S. citizen at the time of death;
- your citizen spouse's death was less than two years ago;
- you were not legally separated from your citizen spouse at the time of death; and
- you have not remarried.

The petition must be filed with:
- a copy of your marriage certificate to the U.S. citizen and proof of termination of any prior marriages of either of you;
- copies of evidence that your spouse was a U.S. citizen, such as a birth certificate if born in the U.S.; Naturalization Certificate or Certificate of Citizenship issued by this Service; Form FS-240, Report of Birth Abroad of a Citizen of the United States; or a U.S. passport which was valid at the time of the citizen's death; and
- a copy of the death certificate of your U.S. citizen spouse.

**Self-Petitioning Battered or Abused Spouse or Child of a U.S. Citizen or Lawful Permanent Resident.** You may self-petition for immediate relative or family-sponsored immigrant classification if you:
- are now the spouse or child of an abusive U.S. citizen or lawful permanent resident;
- are eligible for immigrant classification based on that relationship;
- are now residing in the United States;
- have resided in the United States with the U.S. citizen or lawful permanent resident abuser in the past;
- have been battered by, or have been the subject of extreme cruelty perpetrated by:
  - your U.S. citizen or lawful permanent resident spouse during the marriage; or are the parent of a child who has been battered by or has been the subject of extreme cruelty perpetrated by, your abusive citizen or lawful permanent resident spouse during your marriage; or
  - your citizen or lawful permanent resident parent while residing with that parent;
- are a person of good moral character;
- are a person whose deportation would result in extreme hardship to yourself, or to your child if you are a spouse; and
- if you are a spouse, entered into the marriage to the citizen or lawful permanent resident abuser in good faith.

**NOTE:** Divorce or other legal termination of the marriage to the abuser AFTER the self-petition is properly filed with INS will not be the sole basis for denial or revocation of an approved self-petition. If you remarry before you become a lawful permanent resident, however, your self-petition will be denied or the approval revoked.

Your self-petition may be filed with any credible relevant evidence of eligibility. The determination of what evidence is credible and the weight to be given that evidence is within the sole discretion of the INS; therefore, you are encouraged to provide the following evidence:
- evidence of the abuser's U.S. citizenship or lawful permanent resident status;
- marriage and divorce decrees, birth certificates, or other evidence of your legal relationship to the abuser;

Form I-360 (Rev. 03/07/96) N

- one or more documents showing that you and the abuser have resided together in the United States in the past, such as employment records, utility receipts, school records, hospital or medical records, birth certificates of children, deeds, mortgages, rental records, insurance policies, or affidavits;
- one or more documents showing that you are now residing in the United States, such as the documents listed above;
- evidence of the abuse, such as reports and affidavits from police, judges and other court officials, medical personnel, school officials, clergy, social workers, and other social service agency personnel. If you have an order of protection or have taken other legal steps to end the abuse, you should submit copies of those court documents;
- if you are more than 14 years of age, your affidavit of good moral character accompanied by a local police clearance, state-issued criminal background check, or similar report from each locality or state in the United States or abroad in which you have resided for six or more months during the 3-year period immediately preceding the filing of your self-petition;
- affidavits, birth certificates of children, medical reports and other relevant credible evidence of the extreme hardship that would result if you were to be deported; and
- if you are a spouse, proof that one spouse has been listed as the other's spouse on insurance policies, property leases, income tax forms, or bank accounts; and testimony or other evidence regarding your courtship, wedding ceremony, shared residence and experiences showing that your marriage was entered into in good faith.

*Special Immigrant Juvenile.* Any person, including the alien, may file this petition for an alien who:
- is unmarried and less than 21 years old;
- has been declared dependent upon a juvenile court in the United States or who such a court has legally committed to, or placed under the custody of, an agency or department of a state and who has been found eligible for long-term foster care; and
- has been the subject of administrative or judicial proceedings in which it was determined that it would not be in the juvenile's best interests to be returned to the juvenile's or his/her parent's country of nationality or last habitual residence.

NOTE: After a special immigrant juvenile becomes a permanent resident, his or her parent(s) may not receive any immigration benefit based on the relationship to the juvenile.

The petition must be filed with:
- a copy of the juvenile's birth certificate or other evidence of his or her age;
- copies of the court or administrative document(s) upon which the claim to eligibility is based.

*Special Immigrant Religious Worker.* Any person, including the alien, may file this petition for an alien who for the past 2 years has been a member of a religious denomination which has a bona fide nonprofit, religious organization in the U.S.; and who has been carrying on the vocation, professional work, or other work described below, continuously for the past 2 years; and seeks to enter the U.S. to work solely:
- as a minister of that denomination; or
- in a professional capacity in a religious vocation or occupation for that organization; or
- in a religious vocation or occupation for the organization or its nonprofit affiliate.

NOTE: A petition for a special immigrant for a person who is not a minister may only be filed until October 1, 1997.

The petition must be filed with:
- a letter from the authorized official of the religious organization establishing that the proposed services and alien qualify as above;
- a letter from the authorized official of the religious organization attesting to the alien's membership in the religious denomination and explaining, in detail, the person's religious work and all employment during the past 2 years and the proposed employment; and
- evidence establishing that the religious organization, and any affiliate which will employ the person, is a bona fide nonprofit religious organization in the U.S. and is exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986.

*Special Immigrant based on employment with the Panama Canal Company, Canal Zone Government or U.S. government in the Canal Zone.* Any person may file this petition for an alien who, at the time the Panama Canal Treaty of 1977 entered into force, either:
- was resident in the Canal Zone and had been employed by the Panama Canal Company or Canal Zone Government for at least 1 year; or
- was a Panamanian national and either honorably retired from U.S. Government employment in the Canal Zone with a total of 15 or more years of faithful service or so employed for 15 years and since honorably retired; or
- was an employee of the Panama Canal Company or Canal Zone government, had performed faithful service for 5 years or more as an employee, and whose personal safety, or the personal safety of his/her spouse or child, is in danger as a direct result of the special nature of his/her employment and as a direct result of the Treaty.

The petition must be filed with:
- a letter from the Panama Canal Company, Canal Zone government or U.S. government agency employing the person in the Canal Zone, indicating the length and circumstances of employment and any retirement or termination; and
- copies of evidence to establish any claim of danger to personal safety.

*Special Immigrant Physician.* Any person may file this petition for an alien who:
- graduated from a medical school or qualified to practice medicine in a foreign state;
- was fully and permanently licensed to practice medicine in a State of the U.S. on January 9, 1978, and was practicing medicine in a State on that date;
- entered the U.S. as an "H" or "J" nonimmigrant before January 9, 1978; and
- has been continuously present in the U.S. and continuously engaged in the practice or study of medicine since the date of such entry.

The petition must be filed with:
- letters from the person's employers, detailing his/her employment since January 8, 1978, including the current employment; and
- copies of relevant documents that demonstrate that the person filed for meets all the above criteria.

*Special Immigrant International Organization Employee or family member.* Certain long-term "G" and "N" nonimmigrant employees of a qualifying international organization entitled to enjoy privileges, exemptions and immunities under the International Organizations Immunities Act, and certain relatives of such an employee, may be eligible to apply for classification as a Special Immigrant. To determine eligibility, contact the qualifying international organization or your local INS office. The petition must be filed with:
- a letter from the international organization demonstrating that it is a qualifying organization and explaining the circumstances of qualifying employment and the immigration status held by the person the petition is for; and
- copies of evidence documenting the relationship between the person this petition is for and the employee.

*Armed Forces Member.* You may file this petition for yourself, if:
- you have served honorably on active duty in the Armed Forces of the United States after October 15, 1978;
- you originally lawfully enlisted outside the United States under a treaty or agreement in effect on October 1, 1991, for a period or periods aggregating:
  - twelve years, and were never separated from such service except under honorable conditions; or
  - six years, are now on active duty, and have reenlisted to incur a total active duty service obligation of at least 12 years;
- you are a national of an independent state which maintains a treaty or agreement allowing nationals of that state to enlist in the United States Armed Forces each year; and
- the executive department under which you have served or are serving has recommended you for this special immigrant status.

The petition must be filed with:
- certified proof issued by the authorizing official of the executive department in which you are serving or have served which certifies that you have the required honorable active duty service and/or commitment; and
- your birth certificate.

ED_PRWORA_000055

**General Filing Instructions.**

Please answer all questions by typing or clearly printing in black ink only. Indicate that an item is not applicable with "N/A". If an answer is "none," please so state. If you need extra space to answer any item, attach a sheet of paper with your name and your alien registration number (A#), if any, and indicate the number of the item the answer refers to. Every petition must be properly signed, and accompanied by the proper fee. If you are under 14 years of age, your parent or guardian may sign the petition.

**Where to File.**

If you are filing for a Special Immigrant Juvenile, file the petition at the local INS office having jurisdiction over the place he/she lives.

If you are filing for Amerasian classification and the person you are filing for is outside the United States, you may file this petition at the INS office that has jurisdiction over the place he/she lives or the office that has jurisdiction over the place he/she will live.

If you are in the United States and filing as a Widow/Widower or as the Self-petitioning Spouse or Child of an Abusive U.S. Citizen, you may file this petition together with your application for adjustment of status. If you are in the United States, filing as the self-petitioning spouse or child of abusive lawful permanent resident, and have an immediately available immigrant visa number, you may also file this petition together with your application for adjustment of status. See the adjustment of status instructions for information about where to file.

If this petition is for an Amerasian, a Widow/Widower, or a Special Immigrant Armed Forces Member, and that person lives outside the United States, you may file this petition at the INS office overseas or the U.S. consulate or Embassy abroad having jurisdiction over the area in which he or she lives.

In all other instances file this petition at an INS Service Center, as follows:

If you live in Connecticut, Delaware, District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Vermont, Virgin Islands, Virginia, or West Virginia, mail this petition to USINS, Vermont Service Center, 75 Lower Weldon Street, St. Albans, VT 05479-0001.

If you live in Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, or Texas, mail this petition to USINS, Texas Service Center, P.O. Box 152122, Dept. A, Irving, TX 75015-2122.

If you live in Arizona, California, Guam, Hawaii, or Nevada, mail this petition to USINS, California Service Center, P.O. Box 10360, Laguna Niguel, CA 92607-0360

If you live elsewhere in the U.S., mail this petition to USINS, Nebraska Service Center, 850 S Street, Lincoln, NE 68501-2521

**Fee.**

The fee for this petition is $80.00, except that there is no fee if you are filing for an Amerasian. The fee must be submitted in the exact amount. It cannot be refunded. DO NOT MAIL CASH. All checks and money orders must be drawn on a bank or other institution located in the United States and must be payable in United States currency. The check or money order should be made payable to the Immigration and Naturalization Service, except that:

- If you live in Guam, and are filing this application in Guam, make your check or money order payable to the "Treasurer, Guam."
- If you live in the Virgin Islands, and are filing this application in the Virgin Islands, make your check or money order payable to the "Commissioner of Finance of the Virgin Islands."

Checks are accepted subject to collection. An uncollected check will render the application and any document issued invalid. A charge of $5.00 will be imposed if a check in payment of a fee is not honored by the bank on which it is drawn.

**Processing Information.**

*Rejection.* Any petition that is not signed or is not accompanied by the correct fee will be rejected with a notice that the petition is deficient. You may correct the deficiency and resubmit the petition. However, a petition is not considered properly filed until accepted by the Service.

*Initial processing.* Once the petition has been accepted, it will be checked for completeness, including submission of the required initial evidence. If you do not completely fill out the form, or file it without required initial evidence, you will not establish a basis for eligibility and we may deny your petition.

**NOTE:** A Self-Petitioning Battered or Abused Spouse or Child of a U.S. Citizen or Lawful Permanent Resident may submit any relevant credible evidence in place of the suggested evidence.

*Requests for additional information or interview.* We may request additional information or evidence or we may request that you appear at an INS office for an interview. We may also request that you submit the originals of any copy. We will return these originals when they are no longer required.

*Decision.* If you establish that the person this petition is for is eligible for the requested classification, we will approve the petition. We will send it to the U.S. Embassy/Consulate for visa issuance unless he or she is in the U.S. and appears eligible and intends to apply for adjustment to permanent resident status while here. If you do not establish eligibility, we will deny the petition. We will notify you in writing of our decision.

**Penalties.**

If you knowingly and willfully falsify or conceal a material fact or submit a false document with this request, we will deny the benefit you are filing for, and may deny any other immigration benefit. In addition, you will face severe penalties provided by law, and may be subject to criminal prosecution.

**Privacy Act Notice.**

We ask for the information on this form, and associated evidence, to determine if you have established eligibility for the immigration benefit you are filing for. Our legal right to ask for this information is in 8 USC 1154. We may provide this information to other government agencies. Failure to provide this information, and any requested evidence, may delay a final decision or result in denial of your request.

**Paperwork Reduction Act Notice.**

A person is not required to respond to a collection of information unless it displays a currently valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: (1) learning about the law and form, 15 minutes; (2) completing the form, 20 minutes; and (3) assembling and filing the application, 85 minutes for an estimated average of 2 hours per response. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Immigration and Naturalization Service, (1115-0117) 425 I Street, N.W., Room 5307, Washington, D.C. 20536.

BILLING CODE 4410–10–C

**Paperwork Reduction Act Notice**

The information collection requirements contained in the following two forms have been approved for use by the Office of Management and Budget under the Paperwork Reduction Act. The OMB control number for these collections is 1115–0219, with the expiration date 5/31/98. Persons are not required to provide this information unless the form contains a currently valid OMB control number. We estimate that it will take an average of 20 minutes per response to collect this information, including time for reviewing, instruction, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. If you have any comments regarding these estimates or any other aspects of this collection, send them to the Immigration and Naturalization Service, 425 I Street, N.W., Room 5304, Washington, D.C. 20536.

**BILLING CODE 4410–10–M**

ED_PRWORA_000057

**[sample only -- request to be submitted on letterhead of requesting agency]**
**Fax Request Form -- from Benefit Agency to EOIR**

To:  Executive Office for Immigration Review          This fax consists of ___ pages.
     Immigration Court, _____ (insert name of city/state)
     Attn:  Court Administrator          Fax number: _____

This request is being submitted by:

Name (printed):  _____  Title: _____

 Agency name and address:  _____

 _____

 Fax number: _____    Phone number: _____

 Agency case tracking number (optional): _____

**Item 1:** That above-referenced agency requests that EOIR: (please check only one)

____    Verify that the individual referred to on the attached green card (a copy is attached) was
        granted relief under section 244(a)(3) (as in effect prior to April 1, 1997) or 240A(b)(2)
        of the Immigration and Nationality Act.

____    Verify that the attached order grants relief under section 244(a)(3) or 240A(b)(2) of the
        Immigration and Nationality Act.

____    Verify that EOIR has determined that the alien has demonstrated a prima facie case for
        suspension of deportation or cancellation of removal under section 244(a)(3) or
        240A(b)(2) of the Immigration and Nationality Act.

**Item 2**: **If you checked the last item above, please fill out the following information**.  If the
applicant has a copy of a receipt notice or other documentation indicating that he or she filed an
application for suspension of deportation or cancellation of removal, please attach a copy.

     Benefit Applicant's full name: _____

     Benefit Applicant's date of birth:    _____

     Benefit Applicant's best guess as to when application was filed:    _____ (mo/yr)

     Benefit Applicant's best guess as to with
          which immigration court petition was filed: _____

     Benefit Applicant's address at time of filing petition: _____

          (street address, city, state, zip code)  _____

     Date: _____    Agency Signature: _____

ED_PRWORA_000058

**[sample only -- request to be submitted on letterhead of requesting agency]**

**Fax Request Form -- from Benefit Agency to INS**

To: INS Vermont Service Center, fax 802/527-3159
    Attn: Battered Alien Review Unit          This fax consists of _____ pages.

This request is being submitted by:

 Name (printed): _____ Title: _____

 Agency name and address: _____

                          _____

 Fax number: _____     Phone number: _____

 Agency case tracking number: _____ (optional)

**Item 1:** An alien applicant is seeking public benefits from the agency identified above, pursuant to recent welfare reform legislation. This applicant falls into one of two categories:

____ a) believes an INS Form I-130, Petition for Immigrant Status, was filed on the applicant's behalf by his/her spouse or parent; or has self-petitioned as a widow(er) using INS Form I-360, Petition for Amerasian, Widow or Special Immigrant (complete Part A, below);
                     OR
____ b) has self-petitioned as a battered spouse or child using INS Form I-360, Petition for Amerasian, Widow, or Special Immigrant (complete Part B, below).

**Item 2:** The above-referenced agency requests that INS: (please check only one)
☐ Verify that the attached document is valid. A copy of the I-797 approval notice, prima facie determination or receipt notice is attached.
☐ Make a prima facie determination or expedite adjudication of the petition and notify the requesting agency of the outcome.
☐ Update the status of the requesting agency's _____ (insert date) request for a prima facie determination or expedited adjudication. (Requesting agency should allow three weeks from the request for a prima facie determination or filing of a petition before making this request.)
☐ Determine whether the applicant has filed a petition or whether a petition has been filed on his or her behalf under (a) or (b), as indicated above. If so, please make a prima facie determination or expedited adjudication of the applicant's petition and notify the requesting agency of the outcome.

 Date: _____     Agency Signature: _____

ED_PRWORA_000059

**PART A:  For an Applicant Who Is the Beneficiary of a Petition Filed by Spouse or Parent, or Who Has Self-Petitioned as a Widow(er)**

**Step 1**: Does the alien applicant have a copy of an INS Form I-797 indicating that an I-130 was filed on his/her behalf?    [If applicant has self-petitioned as a widow(er), check "No" and proceed to Step 2.]

    Yes _____  ➜ Attach a copy of the I-797 to this fax (you need not complete Step 2)

    No _____  ➜ If the applicant has no documentation, or has documentation other than a Form I-797, proceed to Step 2.

**Step 2**:  If the applicant does not have a Form I-797, please fill out the following information. All blanks, except that noted "if available", must be completed.

Benefit Applicant's full name: _____

Benefit Applicant's date of birth: _____

Benefit Applicant's best guess as to when petition was filed: _____ (mo/yr)

Benefit Applicant's best guess as to with which INS office petition was filed: _____

Petitioner's full name: _____

Petitioner is Applicant's ___ spouse, or ___ parent, or ___ self [widow(er)]   (check one)

Petitioner is a ___ U.S. citizen, or ___ lawful permanent resident ("green card holder")

Petitioner's date of birth: _____

Petitioner's Alien Registration Number, if available:    A_____

Petitioner's address at time of filing petition:    _____

    (street address, city, state, zip code)  _____

INS Request Form -- page 2

ED_PRWORA_000060

**PART B:   For an Applicant Who Has Self-Petitioned as a Battered Spouse or Child**

**Step 1:** Attach a copy of the receipt notice or other documentation evidencing that a Form I-360 has been filed with the INS.   If that documentation does not include the following information, please complete the blanks:

Applicant/self-petitioner's full name: _____

Applicant/self-petitioner's date of birth: _____

Date I-360 was filed: _____

Location (city) of INS office where filed: _____

INS Request Form -- page 3

**BILLING CODE 4410–10–C**

ED_PRWORA_000061

**61384**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW—IMMIGRATION COURTS

| State/City/App. Code | Judges | Court administrator | Phone Nos. |
|---|---|---|---|
| **ARIZONA** | | | |
| Eloy—85231, 1705 E. Hanna Rd., Suite 366, App. Code—7D05030234. | William Lee Abbott, Isabel A. Bronzina, Dean A. Levay, Sean Keenan. | John A. Meehan ..................... | (520) 466–3671, (520) 466–7795 (fax). |
| Florence—85232, 3260 N. Pinal Parkway Ave., App. Code—7D05030229. | Lamonte S. Freerks, Scott Jefferies ....... | Jack B. Odom ......................... | (520) 868–3341, (520) 868–4962 (fax). |
| Phoenix—85025, Federal Building, Room 3114, 230 N. First Avenue, App. Code—7D05030226. | John W. Richardson, John T. Zastrow ... | Jack B. Odom ......................... | (602) 514–7356, (602) 514–7387 (fax). |
| **CALIFORNIA** | | | |
| Imperial—92251, 2409 La Brucherie Road, App. Code—7D05030222. | Michael H. Bennett, Dennis R. James, Richard N. Knuck, Jack W. Staton, Jack H. Weil. | M. Graciela Sosa .................... | (619) 355–0070, (619) 355–8692 (fax). |
| Los Angeles—90012, 300 N. Los Angeles St., Room 2001, App. Code—7A05030223, Mailing Address: P.O. Box 53711, Los Angeles, CA 90053–0711. | Roy J. Daniel, Bruce J. Einhorn, Thomas Y.K. Fong, Harry L. Gastley, Gilbert T. Gembacz, Nathan W. Gordon, Ingrid K. Hrycenko, Henry P. Ipema, Jr., Jan D. Latimore, William J. Martin, Jr., Ronald N. Ohata, Margaret Reichenberg, Jay Segal, Darlene R. Seligman, Stephen L. Sholomson, Eleazar Tovar, Richard D. Walton. | Evelyn Diaz Brown ................ | (213) 894–2811, (213) 894–5196 (fax). |
| Los Angeles—90012, Roybal Federal Office Building and Courthouse, 255 E. Temple Street, Rm. 577, App. Code—7D05030223. | ................................................. | ................................................. | (213) 894–5159, (213) 894–2632 (fax). |
| San Diego—92101–7904, 401 West A Street, Suite 800, App. Code—7D05030225. | Anthony Atenaide, Kenneth A. Bagley, Robert J. Barrett, Richard J. Bartolomei, Jr., Gaylyn Boone, C. Zsa Zsa De Paolo, Ignacio Fernandez Valdes, Joseph Ragusa, John C. Williams. | Brent L. Perkins ..................... | (619) 557–6052, (619) 557–6405 (fax). |
| San Diego—92188, 880 Front Street, Room 800, App. Code—7D05030225. | ................................................. | ................................................. | (619) 557–7647, (619) 557–7655 (fax). |
| San Francisco—94108, 550 Kearny Street, Suite 800, App. Code—7D05030224, Mailing Address: P.O. Box 2326, San Francisco, CA 94126–2326. | Lawrence N. DiCostanzo, Alberto E. Gonzalez, Bernard J. Hornbach, Dana Marks Keener, Carol A. King, Tue Phan Quang, Beverly M. Phillips, Mimi Y. Schooley, Brian H. Simpson, Bette K. Stockton, Polly A. Webber. | Stephen P. Perkins ............... | (415) 705–4415, (415) 705–4418 (fax). |
| San Pedro-90731, INS San Pedro Service Proc. Center, 2001 Seaside Avenue, Room 136, App. Code—7D05030233. | Rose Collantes Peters, D.D. Sitgraves .. | Evelyn Diaz Brown ................ | (310) 732–0753, (310) 732–0757 (fax). |
| **COLORADO** | | | |
| Denver—80294, Byron G. Rogers Fed. Building, 1961 Stout Street, Room 1403, App. Code—7D05030220. | David J. Cordova, James P. Vandello ... | Alec Revelle ........................... | (303) 844–5815, (303) 844–4578 (fax). |
| Aurora—80010, Wackenhut Security, Inc., 11901 E. 30th Avenue, App. Code—7D05030220. | David J. Cordova, James P. Vandello ... | Alec Revelle ........................... | (303) 361–0488, (303) 361–0688 (fax). |
| **CONNECTICUT** | | | |
| Hartford–06103, AA Ribicoff Building and Courthouse, 459 Main Street, Room 509, App. Code—7D05030277. | Harriet B. Marple ..................................... | Sandra V. Majia (acting) ........ | (860) 240–3919, (860) 240–3921 (fax). |
| **FLORIDA** | | | |
| Bradenton—4205, 515 11th Street, West, Building A, Room 300, App. Code—7D05030244. | R. Kevin McHugh ..................................... | George A. Spreyne ................ | (941) 749–1044, (941) 749–0992 (fax). |
| Miami—33130, 155 S. Miami Ave., Room 800, App. Code—7D05030217. | Teofilo Chapa, J. Daniel Dowell, Rex J. Ford, Mahlon F. Hanson, Michael C. Horn, Denise Marks Lane, Stephen E. Mander, Nancy R. McCormack, Pedro A. Miranda, Philip J. Montante, Jr., Anthony J. Randall, Charles J. Sanders, Ira Sandron, Denise N. Slavin, Bruce W. Solow, Ronald G. Sonom, Elisa M. Sukkar, Lilliana Torreh-Bayouth, Ketih C. Williams. | Michael T. Ringstad ............... | (305) 530–6455, (305) 530–7001 (fax). |
| Miami Federal Building, 51 S.W. First Ave., Room 224, Miami, FL 33130. | Suzan C. Brauwerman Seymour R. Kleinfeld, Roberto Moreno, William K. Zimmer,. | ................................................. | (305), 530–6451, No fax. |

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW—IMMIGRATION COURTS—Continued

| State/City/App. Code | Judges | Court administrator | Phone Nos. |
|---|---|---|---|
| Miami—33194, Krome North Processing Center, 18201 S.W. 12th Street, App. Code—7D05030231. | Neal S. Foster, Kenneth S. Hurewitz ..... | George A. Spreyne ................ | (305) 530–7196, (305) 530–7040 (fax). |
| GEORGIA | | | |
| Atlanta—30303, 101 Marietta Street, Suite 2702, App. Code—7D05030228. | William A. Cassidy, G. Mackenzie Rast | John J. Topp ......................... | (404) 331–7647, (404) 331–4555 (fax). |
| ILLINOIS | | | |
| Chicago—60605–1521, Federal Building, Room 646, 536 S. Clark Street, App. Code—7D05030218. | O. John Brahos, Carlos Cuevas, James R. Fujimoto, Anthony D. Petrone, Jr., Renetta Smith, Robert D. Vinikoor, Craig M. Zerbe. | Peter P. Pauli, IV .................... | (312) 353–7313, (312) 353–9894 (fax). |
| LOUISIANA | | | |
| New Orleans—70130, One Canal Place, 365 Canal Street, Suite 2450. | Jeffrey Zlatow ....................................... | Lizbeth L. Wilson .................... | (504) 589–3992, (504) 589–3990 (fax). |
| Oakdale—71463, 1900 E. Whatley Road, App. Code—7D05030230. Mailing Address: P.O. Box 750, Oakdale, LA 71463. | John A. Duck, Jr., Charles A. Wiegand, III. | Lizbeth L. Wilson .................... | (318) 335–0365, (318) 335–3187 (fax). |
| MARYLAND | | | |
| Baltimore—21202, U.S. Appraisers Building, 103 S. Gay Street, Room 702, App. Code—7D05030201. | Bruce M. Barrett, Lisa Dornell, John F. Gossart, Jr., William P. Greene, Jr.. | Brenda L. Cook ...................... | (410) 962–3092, (410) 962–9021 (fax). |
| MASSACHUSETTS | | | |
| Boston—02203, JFK Federal Building, 15 New Sudbury St., Room 320, App. Code—7D05030202. | Billino W. D'Ambrosio, Eliza C. Klein, Thomas M. Ragno, Leonard I. Shapiro, Patricia M.B. Sheppard. | Sandra V. Mejia (acting) ........ | (617) 565–3080, (617) 565–4495 (fax). |
| MICHIGAN | | | |
| Detroit—48207, Brewery Park II, 1155 Brewery Park Blvd., Suite 450, App. Code—7D05030219. | Elizabeth Hacker ..................................... | Sandra Roberts ...................... | (313) 226–2603, (313) 226–3053 (fax). |
| NEVADA | | | |
| Las Vegas—79101, Alan Bible Federal Building, 600 Las Vegas Blvd. South, Room 410, App. Code—7A05030240. | Irene Weiss ............................................ | Jack B. Odom ........................ | (702) 388–5837, (702) 388–5844 (fax). |
| NEW JERSEY | | | |
| Elizabeth—625 Evans St., Rm. 148A, App. Code—7D05030236. | Esmeralda Cabrera ................................ | Fletcher Graves ...................... | (201) 693–4113, (201) 645–4121 (fax). |
| Newark—07102, 970 Broad Street, Room 1135, App. Code—7D05030204. | Henry S. Dogin, Annie Sue Garcy, Nicole Yae Kyoung Kim, Daniel A. Meisner, Eugene Pugliese, Alberto Riefkohl, William Strasser. | Star B. Pacitto ....................... | (201) 645–3524, (201) 645–3432 (fax). |
| NEW YORK | | | |
| Buffalo—14202, 130 Delaware Ave., Suite 410 App. Code—7D05030203. | Walter A. Durling, Jr., Mchaelangelo Rocco. | Gary M. Somerville ................ | (716) 551–3442, (716) 551–3452 (fax). |
| Fishkill—12524, c/o Downstate Correctional Facility, Red Schoolhouse Road, App. Code—7D05030206. | Mitchell Levinksky ................................... | Thomas J. Bonita, III .............. | (914) 831–3657, (914) 831–5452 (fax). |
| Napanoch—12458, Ulster Correctional Facility, Berne Road, App. Code—7D05030235. | Joe D. Miller .......................................... | Thomas J. Bonita, III .............. | (914) 647—5506, (914) 647–5641 (fax). |
| New York—10278, 26 Federal Plaza, Room 10–1000, App. Code—7D5030205. | Matthew T. Adrian, Terry A. Bain, Joanna M. Bukszpan, Sarah M. Burr, Jeffrey Chase, George T. Chew, Annette S. Elstein, Noel Anne Ferris, Victoria Ghartey, Sandy K. Hom, Charles M. Honeyman, William F. Jankun, Elizabeth A. Lamb, Margaret McManus, Philip L. Morace, Barabara A. Nelson, Patricia A. Rohan, John K. Speer, Jr., Mirlande Tadal, Gabriel C. Videla, Robert D. Weisel, Phillip T. Williams, Jeffrey Chase. | John D. Hannah, Jr. .............. | (212) 264,5958, (202) 264–1070 (fax). |
| New York—10014, 201 Varick Street, Room 1140, App. Code—7D05030232.. | Donn L. Livingston, Alan L. Page, Alan A. Vomacka. | Thomas J. Bonita, III .............. | (212) 620–6279, (212) 620–6357 (fax). |
| PENNSYLVANIA | | | |
| Philadelphia—19103, 1600 Callowhill Street, Suite 400, App. Code—7D05030207. | Donald V. Ferlise, Craig DeBernardis .... | R. Elliott Edwards ................... | (215) 656–7000, (215) 656–7013 (fax). |
| York—17402, 3434 Concord Road, App. Code—7D05030209. | William Van Wyke ................................... | Brenda L. Cook ...................... | (717) 755–7555, (717) 757–0132 (fax). |

ED_PRWORA_000063

**61386**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW—IMMIGRATION COURTS—Continued

| State/City/App. Code | Judges | Court administrator | Phone Nos. |
|---|---|---|---|
| *PUERTO RICO* | | | |
| *Guaynabo* (San Juan)—00965, GSA Center, 651 Federal Drive, Suite 111–14, App. Code—7D05030208. | Rafael B. Ortiz-Segura | George A. Spreyne | (787) 749–4386, (787) 749–4393 (fax). |
| *TEXAS* | | | |
| *Dallas*—75202, 1200 Main Street, Suite 700, App. Code—7D05030211. | Edwin R. Hughes, D. Anthony Rogers, Cary Copeland. | Barbara T. Baker | (214) 767–1814, (214) 767–6410 (fax). |
| *El Paso*—79925, 1545 Hawkins Boulevard, Suite 205, App. Code—7D05030212. | Gary D. Burkholder, Penny M. Smith, Bertha A. Zuniga. | Theresa N. Baeza | (915) 540–1910, (915) 540–1922 (fax). |
| *El Paso*—79925, El Paso Service Processing Center, 8915 Montana Avenue, App. Code—7D05030212. | Visiting IJ | Theresa N. Baeza | (915) 540–7854, No fax. |
| *Harlingen*—78550, 201 E. Jackson Street, App. Code—7D05030213. | Howard E. Achtsam, David Ayala, Margaret D. Burkhart, M. Edwin Prudhomme. | Celeste Garza | (210)427–8580, (210) 427–8905 (fax). |
| *Los Fresnos*—78566, Port Isabel Processing Center, Route 3, Box 341, Building 37, App. Code—7D05030213. Mailing Address: 201 E. Jackson St., Harlingen, TX 78550. | Visiting IJ | Celeste Garza | (210) 233–4467, (210) 233–5318 (fax). |
| *Houston*—77004, 2320 La Branch Street, Room 2235, App. Code—7D05030214. | Robert Brown, Clarease M. Rankin, Michael K. Suarez, Joseph Vail. | Dina P. Sherman | (713) 718–3870, (713) 718–3879 (fax). |
| *Houston*—77032, Houston Service Processing Center, 15850 Export Plaza Drive, App. Code—7D05030214. | Susan L. Yarbrough | Dina P. Sherman | (713) 987–0290, (713) 987–3142 (fax). |
| *Huntsville*—77340, Goree INS Facility, 30000A Highway 75 South, App. Code—7D05030232. Mailing Address: P.O. Box 1538, Huntsville, TX 77342–1538. | Jimmie L. Benton | Dina P. Sherman | (409) 295–1353, (409) 295–6510 (fax). |
| *Laredo*—78041, 4702 E. Saunders, App. Code—7D05030215. Mailing Address: Laredo Service Processing Center, P.O. Box 440110, Laredo, TX 78044–0110. | Visiting IJ | J. Thomas Davis | (210) 727–4772, (210) 726–2320 (fax). |
| *San Antonio*-78205-2040, 615 E. Houston Street, Room 598, App. Code-7D05030215. | Richard F. Brodsky, Susan E. Conley-Castro, Glenn P. McPhaul. | J. Thomas Davis | (210) 472–6637, (210) 472–4282 (fax). |
| *VIRGINIA* | | | |
| *Arlington*-22203, 901 N. Stuart St., Suite 1300, App. Code-7D05030210. | John M. Bryant, Joan V. Churchill, Christopher M. Grant, Wayne R. Iskra, Paul A. Nejelski. | Beverly Swihart Holmes | (703) 235–2307, (703) 235–2372 (fax). |
| *WASHINGTON* | | | |
| *Seattle*-98104, Key Tower Building, 1000 Second Avenue, Suite 2500, App. Code-7D05030221. | Anna Ho, Kenneth Josephson, Kendall B. Warrem. | Joseph Neifert | (206) 553–5953, (206) 553–0622 (fax). |
| *Seattle*-98134, Seattle Det. Center, c/o U.S. INS, 815 Airport Way, App. Code-7D05030221. | Anna Ho, Kenneth Josephson, Kendall B. Warren. | Joseph Neifert | call Seattle office: (206) 553–5953, (206) 553–0622 (fax). |

BILLING CODE 4310–GG–M

ED_PRWORA_000064

U.S. Department of Justice
Immigration and Naturalization Service

## Notice of Action

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE I-360 PETITION FOR AMERASIAN, |
| --- | --- | --- |
| EAC-97-OOO-OOOOO | | WIDOW(ER) OR SPECIAL IMMIGRANT |

| RECEIPT DATE | PRIORITY DATE | PETITIONER |
| --- | --- | --- |
| June 1, 1997 | June 1, 1997 | DOE, Jane |

| NOTICE DATE | PAGE | BENEFICIARY |
| --- | --- | --- |
| July 9, 1997 | 1 | DOE, Jane |

Susan SMITH, Esq.
100 Main St.
Anywhere VT 05400

Notice Type:  Approval Notice
Section:  Self-Petitioning Spouse of
Abusive U.S.C. or LPR
Class:  B21

Note:  Includes Notice of Deferred Action

The above petition has been approved.

The petition indicates you, the self-petitioner, are in the United States and will apply for adjustment of status.  The information submitted with the petition shows you are not eligible to file an adjustment of status application at this time.

Additional information about eligibility for adjustment of status may be obtained from the local INS office serving the area where you live.

Until you file an adjustment application, or apply for an immigrant visa, this approved petition will be stored in this office.  If you become eligible to adjust status based on this petition, you should submit a copy of this notice with Form I-485, Application for Permanent Residence to the local office.

If you decide to apply for an immigrant visa outside the United States based on this petition, you should file Form I-824, Application for Action on an Approved Application or Petition, with this office to request that we send the petition to the Department of State National Visa Center (NVC).

The NVC processes all approved immigrant visa petitions that required consular action.  The NVC also determines which consular post is the appropriate consulate to complete visa processing.  It will then forward the approved petition to that consulate.

Please read the back of this form carefully for more information.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

DEFERRED ACTION

Deferred Action has been approved for this case.  Deferred Action is an administrative choice used to give some cases lower priority for removal.  The Service does not anticipate instituting action for removal, in this case, at this time.  Pursuant to 8 CFR § 274a.12(c)(14), an alien, who has been granted deferred action, is eligible to submit an application for employment authorization, if the alien establishes an economic necessity for employment.  This application, on Form I-765, should be filed with this office.  The alien must provide information regarding his or her assets, income, and expenses in accordance with the instructions on the Form I-765.

The approval of Deferred Action will expire one (1) year from the date of this notice.  Request for the continuation of deferred action should be submitted, in writing, to this office, sixty (60) days before the expiration of the current approval.  The request for continuation may be accompanied by an application, on Form I-765, for continuation of employment authorization.

THIS FORM IS NOT AN EMPLOYMENT AUTHORIZATION NOR MAY IT BE USED IN PLACE OF AN EMPLOYMENT AUTHORIZATION

Please see the additional information on the back.  You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
Customer Service Telephone: (802) 527-3160

Form I-797C (Rev. 09/07/93)N

BILLING CODE 4410-10-M

ED_PRWORA_000065

• Please save this notice for your records. Please enclose a copy if you have to write us or a U.S. Consulate about this case, or if you file another application based on this decision.

• You will be notified separately about any other applications or petitions you have filed.

**Additional Information**

General

The filing of an application or petition does not in itself allow a person to enter the United States and does not confer any other right or benefit.

Inquiries

You should contact the office listed on the reverse of this notice if you have questions about the notice, or questions about the status of your application or petition. We recommend you call.

However, if you write us, please enclose a copy of this notice with your letter.

Approval of Nonimmigrant Petition

Approval of a nonimmigrant petition means that the person for whom it was filed has been found eligible for the requested classification. If this notice indicated we are notifying a U.S. Consulate about the approval for the purpose of visa issuance, and you or the person you filed for have questions about visa issuance, please contact the appropriate U.S. Consulate directly.

Approval of an Immigrant Petition

Approval of an immigrant petition does not convey any right or status. The approved petition simply establishes a basis upon which the person you filed for can apply for an immigrant or fiance(e) visa or for adjustment of status.

A person is not guaranteed issuance of a visa or a grant of adjustment simply because this petition is approved. Those processes look at additional criteria.

If this notice indicates we have approved the immigrant petition you filed, and have forwarded it to the Department of State Immigrant Visa Processing Center, that office will contact the person you filed the petition for directly with information about visa issuance.

In addition to the information on the reverse of this notice, the instructions for the petition you filed provide additional information about processing after approval of the petition.

For more information about whether a person who is already in the U.S. can apply for adjustment of status, please see Form I–485, Application to Register Permanent Residence or Adjust Status.

**BILLING CODE 4410–10–M**

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE I-360 PETITION FOR AMERASIAN, |
| --- | --- | --- |
| EAC-97-OOO-OOOOO | | WIDOW(ER) OR SPECIAL IMMIGRANT |

| RECEIPT DATE | PRIORITY DATE | PETITIONER |
| --- | --- | --- |
| June 1, 1997 | June 1, 1997 | DOE, Jane |

| NOTICE DATE | PAGE | BENEFICIARY |
| --- | --- | --- |
| July 9, 1997 | 1 | DOE, Jane |

Susan SMITH, Esq.
100 Main St.
Anywhere VT 05400

Notice Type: Approval Notice
Section: Self-Petitioning Spouse of
Abusive U.S.C. or LPR
Class: B21

The above petition has been approved.

The petition indicates you, the self-petitioner, are in the United States and will apply for adjustment of status. The information submitted with the petition shows you are not eligible to file an adjustment of status application at this time.

Additional information about eligibility for adjustment of status may be obtained from the local INS office serving the area where you live.

Until you file an adjustment application, or apply for an immigrant visa, this approved petition will be stored in this office. If you become eligible to adjust status based on this petition, you should submit a copy of this notice with Form I-485, Application for Permanent Residence to the local office.

If you decide to apply for an immigrant visa outside the United States based on this petition, you should file Form I-824, Application for Action on an Approved Application of Petition, with this office to request that we send the petition to the Department of State National Visa Center (NVC).

The NVC processes all approved immigrant visa petitions that required consular action. The NVC also determines which consular post is the appropriate consulate to complete visa processing. It will then forward the approved petition to that consulate.

Please read the back of this form carefully for more information.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
Customer Service Telephone: (802) 527-3160

Form I-797C (Rev. 09/07/93)N

BILLING CODE 4410–10–M

ED_PRWORA_000067

• Please save this notice for your records. Please enclose a copy if you have to write us or a U.S. Consulate about this case, or if you file another application based on this decision.

• You will be notified separately about any other applications or petitions you have filed.

**Additional Information**

General

The filing of an application or petition does not in itself allow a person to enter the United States and does not confer any other right or benefit.

Inquiries

You should contact the office listed on the reverse of this notice if you have questions about the notice, or questions about the status of your application or petition. We recommend you call.

However, if you write us, please enclose a copy of this notice with your letter.

Approval of Nonimmigrant Petition

Approval of a nonimmigrant petition means that the person for whom it was filed has been found eligible for the requested classification. If this notice indicated we are notifying a U.S. Consulate about the approval for the purpose of visa issuance, and you or the person you filed for have questions about visa issuance, please contact the appropriate U.S. Consulate directly.

Approval of an Immigrant Petition

Approval of an immigrant petition does not convey any right or status. The approved petition simply establishes a basis upon which the person you filed for can apply for an immigrant or fiance(e) visa or for adjustment of status.

A person is not guaranteed issuance of a visa or a grant of adjustment simply because this petition is approved. Those processes look at additional criteria.

If this notice indicates we have approved the immigrant petition you filed, and have forwarded it to the Department of State Immigrant Visa Processing Center, that office will contact the person you filed the petition for directly with information about visa issuance.

In addition to the information on the reverse of this notice, the instructions for the petition you filed provide additional information about processing after approval of the petition.

For more information about whether a person who is already in the U.S. can apply for adjustment of status, please see Form I–485, Application to Register Permanent Residence or Adjust Status.

BILLING CODE 4410–10–M

ED_PRWORA_000068

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE 1-360 PETITION FOR AMERASIAN, |
|---|---|---|
| EAC-97-000-00000 | | WIDOW(ER) OR SPECIAL IMMIGRANT |

| RECEIPT DATE | PRIORITY DATE | PETITIONER |
|---|---|---|
| June 1, 1997 | June 1, 1997 | DOE, Jane |

| NOTICE DATE | PAGE | BENEFICIARY |
|---|---|---|
| June 27, 1997 | 1 | DOE, Jane |

Jane DOE
Susan SMITH, Esq.
100 Main St.
Anywhere VT 05400

Section: Self-Petitioning Spouse of Abusive U.S.C. or LPR

**NOTICE OF PRIMA FACIE CASE**

The above petition has been reviewed and found to establish a prima facie case for classification under the self-petitioning provisions of the Violence Against Women Act.

**THIS PRIMA FACIE DETERMINATION IS VALID FOR A PERIOD OF 150 DAYS FROM THE NOTICE DATE SHOWN ABOVE, AND EXPIRES ON THE DATE INDICATED AT THE BOTTOM OF THE PAGE.**

We will send you a written notice as soon as we make a decision on this case. It is expected that a final decision will be made on this case before the end of 150 days. In a few cases, the adjudication may not be completed in this time frame. If this period is coming to a close and you need an extension of this prima facie determination in order to continue receiving public benefits, please submit a written request for extension at least 15 days prior to expiration.

**PLEASE NOTE: ESTABLISHING A PRIMA FACIE CASE FOR CLASSIFICATION UNDER THE SELF-PETITIONING PROVISIONS OF THE VIOLENCE AGAINST WOMEN ACT DOES <u>NOT</u> NECESSARILY MEAN THAT YOUR PETITION WILL BE APPROVED.**

```
*************************************************
EXPIRATION DATE: November 27, 1997
*************************************************
```

Please see the additional information on the back. You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
Customer Service Telephone: (802) 527-3160

Form I-797C (Rev. 09/07/93)N

BILLING CODE 4410–10–M

ED_PRWORA_000069

• Please save this notice for your records. Please enclose a copy if you have to write us or a U.S. Consulate about this case, or if you file another application based on this decision.

• You will be notified separately about any other applications or petitions you have filed.

**Additional Information**

General

The filing of an application or petition does not in itself allow a person to enter the United States and does not confer any other right or benefit.

Inquiries

You should contact the office listed on the reverse of this notice if you have questions about the notice, or questions about the status of your application or petition. We recommend you call.

However, if you write us, please enclose a copy of this notice with your letter.

Approval of Nonimmigrant Petition

Approval of a nonimmigrant petition means that the person for whom it was filed has been found eligible for the requested classification. If this notice indicated we are notifying a U.S. Consulate about the approval for the purpose of visa issuance, and you or the person you filed for have questions about visa issuance, please contact the appropriate U.S. Consulate directly.

Approval of an Immigrant Petition

Approval of an immigrant petition does not convey any right or status. The approved petition simply establishes a basis upon which the person you filed for can apply for an immigrant or fiance(e) visa or for adjustment of status.

A person is not guaranteed issuance of a visa or a grant of adjustment simply because this petition is approved. Those processes look at additional criteria.

If this notice indicates we have approved the immigrant petition you filed, and have forwarded it to the Department of State Immigrant Visa Processing Center, that office will contact the person you filed the petition for directly with information about visa issuance.

In addition to the information on the reverse of this notice, the instructions for the petition you filed provide additional information about processing after approval of the petition.

For more information about whether a person who is already in the U.S. can apply for adjustment of status, please see Form I–485, Application to Register Permanent Residence or Adjust Status.

**BILLING CODE 4410–10–M**

ED_PRWORA_000070

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER<br>EAC-97-094-50417 | | CASE TYPE   I360    PETITION FOR AMERASIAN, WIDOWER, OR SPECIAL IMMIGRANT |
|---|---|---|
| RECEIVED DATE<br>February 24, 1997 | PRIORITY DATE<br>February 24, 1997 | PETITIONER<br>CARSWELL, GRACE E. |
| NOTICE DATE<br>February 24, 1997 | PAGE<br>1 of 1 | BENEFICIARY<br>CARSWELL, GRACE E. |

GRACE E. CARSWELL
75 LOWER WELDEN ST
SAINT ALBANS VT 05479

**Notice Type:** Receipt Notice

Fee Waived

Section: Self-Petitioning Spouse of
Abusive U.S.C. or LPR

The above application or petition has been received. It usually takes 60 to 120 days from the date of this receipt for us to process this type of case. Please notify us immediately if any of the above information is incorrect. Our customer service phone number is listed below.

We will send you a written notice as soon as we make a decision on this case. You can also use the phone number below to obtain case status information direct from our automated system 24 hours a day with a touch-tone phone and the receipt number for this case (at the top of this notice).

Please see the additional information on the back. You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
**Customer Service Telephone: (802) 527-3160**



Form I-797C (Rev. 09/07/93)N

BILLING CODE 4410–10–M

ED_PRWORA_000071

**61394**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

- Please save this notice for your records. Please enclose a copy if you have to write us or a U.S. Consulate about this case, or if you file another application based on this decision.

- You will be notified separately about any other applications or petitions you have filed.

**Additional Information**

General

The filing of an application or petition does not in itself allow a person to enter the United States and does not confer any other right or benefit.

Inquiries

You should contact the office listed on the reverse of this notice if you have questions about the notice, or questions about the status of your application or petition. We recommend you call.

However, if you write us, please enclose a copy of this notice with your letter.

Approval of Nonimmigrant Petition

Approval of a nonimmigrant petition means that the person for whom it was filed has been found eligible for the requested classification. If this notice indicated we are notifying a U.S. Consulate about the approval for the purpose of visa issuance, and you or the person you filed for have questions about visa issuance, please contact the appropriate U.S. Consulate directly.

Approval of an Immigrant Petition

Approval of an immigrant petition does not convey any right or status. The approved petition simply establishes a basis upon which the person you filed for can apply for an immigrant or fiance(e) visa or for adjustment of status.

A person is not guaranteed issuance of a visa or a grant of adjustment simply because this petition is approved. Those processes look at additional criteria.

If this notice indicates we have approved the immigrant petition you filed, and have forwarded it to the Department of State Immigrant Visa Processing Center, that office will contact the person you filed the petition for directly with information about visa issuance.

In addition to the information on the reverse of this notice, the instructions for the petition you filed provide additional information about processing after approval of the petition.

For more information about whether a person who is already in the U.S. can apply for adjustment of status, please see Form I–485, Application to Register Permanent Residence or Adjust Status.

**BILLING CODE 441–10–M**

ED_PRWORA_000072

| RECEIPT NUMBER<br>LIN-96-170-50006 | | CASE TYPE   I130   IMMIGRANT PETITION FOR RELATIVE,<br>FIANCE(E), OR ORPHAN | |
|---|---|---|---|
| RECEIVED DATE<br>March 25, 19 | PRIORITY DATE | PETITIONER   A12 123 431<br>AAA, VV | |
| NOTICE DATE<br>March 25, 1997 | PAGE<br>1 of 1 | BENEFICIARY<br>SFDF, DD | |
| VV AAA<br>343 I ST NW<br>WASHINGTON DC 20536 | | Notice Type:  Receipt Notice<br><br>Amount received: $   80.00<br><br>Section: Sister or brother of U.S.<br>Citizen, 203(a)(4) INA | |

The above application or petition has been received.  It usually takes 30 to 90 days from the date of this receipt for us to process this type of case.  Please notify us immediately if any of the above information is incorrect.  Our customer service phone number is listed below.

We will send you a written notice as soon as we make a decision on this case.  You can also use the phone number below to obtain case status information direct from our automated system 24 hours a day with a touch-tone phone and the receipt number for this case (at the top of this notice).

---

Please see the additional information on the back.  You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
LIN TEST PLATFORM
4313 INS HQ
LINCOLN NA 55479
**Customer Service Telephone: (802)527-3112**



BILLING CODE 4410–10–M

ED_PRWORA_000073

**61396** **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

### DISTRICT CODES

| Districts–36 | Org type |
|---|---|
| 2—Boston, MA | DAF BOS |
| 3—New York, NY | DAF NYC |
| 4—Philadelphia, PA | DAF PHI |
| 5—Baltimore, MD | DAF BAL |
| 6—Miami, FL | DAF MIA |
| 7—Buffalo, NY | DAF BUF |
| 8—Detroit, MI | DAF DET |
| 9—Chicago, IL | DAF CHI |
| 10—St. Paul, MN | DAF SPM |
| 11—Kansas City, MO | DF KAN |
| 12—Seattle, WA | DAF SEA |
| 13—San Francisco, CA | DAF SFR |
| 14—San Antonio, TX | DAF SNA |
| 15—El Paso, TX | DAF ELP |
| 16—Los Angeles, CA | DAF LOS |
| 17—Honolulu, HI | DAF HHW |
| 18—Phoenix, AZ | DAF PHO |
| 19—Denver, CO | DAF DEN |
| 20—Dallas, TX | DAF DAL |
| 21—Newark, NJ | DAF NEW |
| 22—Portland, ME | DAF POM |
| 24—Cleveland, OH | DAF CLE |
| 25—Washington, DC | DAF WAS |
| 26—Atlanta, GA | DAF ATL |
| 27—San Juan, PR | DAF SAJ |
| 28—New Orleans, LA | DAF NOL |
| 29—Omaha, NE | DF OMA |
| 30—Helena, MT | DF HEL |
| 31—Portland, OR | DAF POO |
| 32—Anchorage, AK | DAF ANC |
| 33—Bangkok, Thailand | OD BKK |
| 35—Mexico City, MX | OD MEX |
| 37—Rome, Italy | OD RIT |
| 38—Houston, TX | DAF HOU |
| 39—San Diego, CA | DAF SND |
| 40—Harlingen, TX | DAF HLG |
| *EASTERN REGION:* | |
| *DISTRICT 2—BOSTON, MA* | |
| Providence, RI | SAF PRO |
| *Hartford, CT | SAF HAR |
| *Lebanon, MA | A LEB |
| Boston Proc. Ctr | P BPC |
| *DISTRICT 3—New York, NY* | |
| *NY Seaport combined w/ quarantine unit, NY. | U NYS |
| JFK Airport, NY | A ZJK |
| Hamilton, Bermuda | I HAM |
| Varick Proc. Ctr | P VRK |
| *Brookland Proc. Ctr | P BKN |
| *DISTRICT 4—Philadelphia, PA* | |
| *Altoona, PA | U ALT |
| Pittsburgh, PA | SF PIT |
| *Dover AFB, DL | A DVD |
| *DISTRICT 5—Baltimore, MD* | |
| *DISTRICT 6—Miami, FL* | |
| Jacksonville, FL | SA JAC |
| Key West, FL | SA KEY |
| Port Everglades, FL | SA PEV |
| *Port Canaveral, FL | A PCF |
| Tampa, FL | SA TAM |
| West Palm Beach, FL | SA WPB |
| Orlando Airport, FL | A ORL |
| Krome Proc. Ctr | P KRO |
| Fort Pierce, FL | A FTP |
| Jacksonville Seaport, FL | U JAS |
| Miami Seaport, FL | U MSE |
| *Panama City, FL | A PAN |
| *Sanford, FL | A SFB |
| *DISTRICT 7—Buffalo, NY* | |
| Thousand Island Bridge, NY | SA THO |
| Trout River, NY | SA TRO |

### DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| *Rooseveltown, NY | A RSV |
| Albany, NY | SAF ALB |
| Champlain, NY | SA CHM |
| Chateauguay, NY | SA CHT |
| Fort Covington, NY | SA FTC |
| *Lewiston, NY | A LEW |
| Massena, NY | SA MAS |
| Mooers, NY | SA MOO |
| Niagara Falls, NY | SA NIA |
| Ogdensburg, NY | SA OGD |
| Peace Bridge, NY | SA PBB |
| Rouses Point, NY | SA ROU |
| *DISTRICT 8—Detroit, MI* | |
| Algonac, MI | SA AGN |
| Marine City, MI | SA MRC |
| Port Huron, MI | SA PHU |
| Roberts Landing, MI | SA RBT |
| Sault Ste. Marie, MI | SA SSM |
| *Detroit Michigan Bridge, MI | A DCB |
| *Detroit Michigan Tunnel, MI | A DCT |
| *DISTRICT 21—Newark, NJ* | |
| *Camden, NJ | A CNJ |
| McGuire AFB, NJ | A MAG |
| Alburg, VT | SA ABG |
| Alburg Springs, VT | SA ABS |
| Bangor, ME | SA BGM |
| Beebe Plains, VT | SA BEB |
| Beecher Falls, VT | SA BEE |
| Bridgewater, ME | SA BWM |
| *Burlington, VT | A BRG |
| Calais, ME | SA CLS |
| *Eastport, ME | A EPM |
| Canann, VT | SA CNA |
| Coburn Gore, ME | SA COB |
| Derby Line, VT | SA DER |
| *Derby Line RT5 POE | P DVL |
| East Richford, VT | SA ERC |
| Fort Fairfield, ME | SA FTF |
| Fort Kent, ME | SA FTK |
| *Eastcourt, ME | A EST |
| *St. Pampile, ME | A SPA |
| Hamlin, ME | SA HML |
| Highgate Springs, VT | SA HIG |
| Houlton, ME | A HTM |
| *Easton, ME | A EAS |
| *Forest City, ME | A FOR |
| *Monticello, ME | A MTC |
| *Orient, ME | A ORI |
| Jackman, ME | SA JKM |
| *St. Aurelie | SA SRL |
| Limestone, ME | SA LIM |
| Lubec, ME | SA LUB |
| Madawaska, ME | SA MAD |
| *Morses Line, VT | A MOR |
| North Troy, VT | SA NRT |
| Norton, VT | SA NRN |
| Pinnacle Rd., VT | A PIV |
| *Pittsburgh, NH | A PNH |
| Richford, VT | SA RIF |
| *St. Albans, VT | SA STA |
| Van Buren, ME | SA VNB |
| Vancboro, ME | SA VCB |
| West Berkshire, VT | SA WBE |
| *DISTRICT 24—Cleveland, OH* | |
| Cincinnati, OH | SAF CIN |
| Sandusky, OH | SA SDY |
| Toledo, OH | SA TOL |
| Columbus, OH | A CLM |
| *DISTRICT 25—Washington, D.C.* | |
| Norfolk, VA | |
| Norfolk Seaport, VA | U NOS |

### DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| *DISTRICT 26—Atlanta, GA* | |
| Charleston, SC | SA CHL |
| Charlotte, NC | SF CLT |
| *Greer, SC | SA GRR |
| Mobile, AL | SA MOB |
| *Raleigh-Durham, NC | SA RDU |
| Savannah, GA | SA SAV |
| Wilmington, NC | SA WIL |
| *DISTRICT 27—San Juan, PR* | |
| Aguadilla Proc. Ctr. | P AGC |
| Charlotte Amalie, St. Thomas, VI. | SA CHA |
| Christiansted, St. Croix, VI | SA CHR |
| Cruz, Bay, St. John, VI | SA CRU |
| Mayaguez, PR | A MAY |
| Ponce, PR | SA PON |
| *DISTRICT 28—New Orleans, LA* | |
| *Baton Rouge, LA | A BTN |
| *Gulfport, MS | A GUL |
| *Lake Charles, LA | A LKC |
| Louisville, KY | S LOU |
| Memphis, TN | SF MEM |
| *Nashville, TN | A NSV |
| *Oakdale, LA | P OAK |
| *CENTRAL REGION:* | |
| *DISTRICT 9—Chicago, IL* | |
| Milwaukee, WI | SAF MIL |
| *Indianapolis, IN | S INP |
| *DISTRICT 10—St. Paul, MN* | |
| Baudette, MN | SA BAU |
| Duluth, MN | SA DUL |
| Grand Portage, MN | SA GPM |
| International Falls, MN | SA INT |
| Lancaster, MN | SA LAN |
| Noyes, MN | SA NOY |
| *Pembina, ND | A PEM |
| Pine Creek, MN | SA PIN |
| Roseau, MN | SA ROS |
| Warroad, MN | SA WAR |
| Ambrose, ND | SA AMB |
| Antler, ND | SA ANT |
| Carbury, ND | SA CRY |
| Dunseith, ND | SA DNS |
| Fargo, ND | SA FAR |
| Fortuna, ND | SA FRT |
| Minot, ND | A MND |
| Hannah, ND | SA HNN |
| Hansboro, ND | SA HNS |
| Maida, ND | SA MAI |
| Neche, ND | SA NEC |
| Noonan, ND | SA NOO |
| Northgate, ND | SA NRG |
| Portal, ND | SA POR |
| St. John, ND | SA SJO |
| Sarles, ND | SA SAR |
| Sherwood, ND | SA SHR |
| Walhalla, ND | SA WAL |
| Westhope, ND | SA WHO |
| Wilton, ND | A WND |
| *DISTRICT 11—Kansas CITY, MO* | |
| St. Louis, MO | SF STL |
| *DISTRICT 14—San Antonio, TX* | |
| Austin, TX | SA AUS |
| Amistad Dam, TX | A ADT |
| *Corpus Christi, TX | SA CRP |
| Del Rio, TX | SA DLR |
| Eagle Pass, TX | SA EGP |
| Laredo, TX | SA LAR |
| Juarez-Lincoln Bridge, TX | A LLB |

ED_PRWORA_000074

### DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| Laredo Proc. Ctr. .................... | P LRD |
| Laredo Columbia Bridge, TX | A LCB |
| *DISTRICT 15—El Paso, TX* | |
| Columbus, NM ....................... | SA COL |
| Fabens, TX ............................ | SA FAB |
| Presidio, TX ........................... | SA PRE |
| *Port of El Paso .................... | A POE |
| *Paso del Norte Bridge, TX ... | A PDN |
| *Bridge of the Americas, TX .. | A BOA |
| *Ysleta, TX ............................ | SA YSL |
| Santa Teresa, NM .................. | A STR |
| Albuquerque, NM ................... | S ABQ |
| El Paso Processing Center, TX. | P EPC |
| *Fort Hanock, TX .................. | P FTH |
| *DISTRICT 19—Denver, CO* | |
| Salt Lake City, UT ................. | SAF SLC |
| *DISTRICT 20—Dallas, TX* | |
| Oklahoma City, OK ............... | SF OKC |
| *DISTRICT 29—Omaha, NE ...* | OMA |
| *DISTRICT 30—Helena, MT ...* | HEL |
| Boise, ID ............................... | S BOI |
| Chief Mountain, MT ............... | A CHF |
| Del Bonita, MT ...................... | A DLB |
| Great Falls, MT ..................... | A GRE |
| Morgan, MT ........................... | SA MGM |
| Opheim, MT ........................... | SA OPH |
| Piegan, MT ............................ | SA PIE |
| Raymond, MT ........................ | SA RAY |
| Roosville, MT ........................ | SA ROO |

### DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| Scobey, MT ........................... | SA SCO |
| Sweetgrass, MT ..................... | SA SWE |
| Turner, MT ............................ | SA TUR |
| Whitetail, MT ......................... | SA WHI |
| Wild Horse, MT ..................... | SA WHM |
| Willow Creek, MT .................. | SA WCM |
| Missoula, MT ......................... | SA MIS |
| *DISTRICT 38—Houston, TX* | |
| Galveston, TX ....................... | SA GAL |
| Port Arthur, TX ..................... | SA PAR |
| *DISTRICT 40—Harlington, TX* | |
| *Brownsville, TX .................... | A BRO |
| *Brownsville/Gateway, Bridge, TX. | A BRO |
| *Brownsville Matamoros Bridge, TX. | A BBM |
| Falcon Heights, TX ............... | SA FAL |
| Hidalgo, TX ........................... | SA HID |
| Los Ebanos, TX .................... | SA LSE |
| *Los Indios, TX ...................... | A LOI |
| Port Isabel Proc. Ctr. ............ | P PIC |
| Progresso, TX ....................... | SA PGR |
| Rio Grande, TX ..................... | SA RIO |
| Roma, TX .............................. | SA ROM |
| Pharr, TX .............................. | SA PHR |
| Nogales, AZ .......................... | SA NOG |
| Sasabe, AZ ........................... | SA SAS |
| San Luis, AZ ......................... | SA SLU |
| Tucson, AZ ............................ | S TUC |
| *Las Vegas, NV ..................... | SF LVG |

### DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| *Reno, NV .............................. | SF REN |
| *Mariposa, AZ ....................... | A MAP |
| *Eloy Proc. Cr., AZ ................ | P EAZ |
| *DISTRICT 31—Portland, OR* | |
| Astoria, AK ............................ | SA AST |
| Coos Bay, OR ........................ | A COO |
| New Port, OR ........................ | P NPT |
| *DISTRICT 32—Anchorage, AK* | |
| Alcan, AK ............................... | SA ALC |
| Dalton Cache, AK .................. | SA DAC |
| Ketchikan, AK ........................ | SA KET |
| Skagway, AK .......................... | A SKA |
| *Dutch Harbor, AK ................. | A DTH |
| Poker Creek, AK .................... | A PKC |
| Nome, AK ............................... | A NOM |
| Fairbanks, AK ........................ | A FRB |
| *DISTRICT 39—San Diego* | |
| Andrade, CA .......................... | SA AND |
| Calexico, CA .......................... | SA CAL |
| Calexico East Port ................ | P IVP |
| El Centro Proc. Ctr., CA ........ | P ECC |
| *San Diego Port-of-Entry, CA | A SDP |
| *Otay Mesa, CA ..................... | A OTM |
| *San Ysidro, CA .................... | SA SYS |
| *Tecata, CA ............................ | SA TEC |

**BILLING CODE 4410–10–M**

**U.S. Department of Justice**
Immigration and Naturalization Service (INS)

OMB #1115-0054
**Petition for Alien Relative**

### DO NOT WRITE IN THIS BLOCK - FOR EXAMINING OFFICE ONLY

| Case ID# | Action Stamp | Fee Stamp |
|---|---|---|

A#

G-28 or Volag #

Section of Law:
- ☐ 201 (b) spouse   ☐ 203 (a)(1)
- ☐ 201 (b) child    ☐ 203 (a)(2)
- ☐ 201 (b) parent   ☐ 203 (a)(4)
- ☐ 203 (a)(5)

AM CON: _____

Petition was filed on: _____ (priority date)
- ☐ Personal Interview          ☐ Previously Forwarded
- ☐ Pet. ☐ Ben. "A" File Reviewed    ☐ Stateside Criteria
- ☐ Field Investigations        ☐ I-485 Simultaneously
- ☐ 204 (a)(2)(A) Resolved      ☐ 204 (h) Resolved

Remarks:

## A. Relationship

1. **The alien relative is my**
   ☐ Husband/Wife   ☐ Parent   ☐ Brother/Sister   ☐ Child
2. Are you related by adoption?   ☐ Yes   ☐ No
3. Did you gain permanent residence through adoption?   ☐ Yes   ☐ No

## B. Information about you

1. **Name** (Family name in CAPS)   (First)   (Middle)

2. **Address** (Number and Street)   (Apartment Number)

   (Town or City)   (State/Country)   (ZIP/Postal Code)

3. **Place of Birth** (Town or City)   (State/Country)

4. **Date of Birth** (Mo/Day/Yr)
5. **Sex**   ☐ Male   ☐ Female
6. **Marital Status**   ☐ Married   ☐ Single   ☐ Widowed   ☐ Divorced

7. **Other Names Used** (including maiden name)

8. **Date and Place of Present Marriage** (if married)

9. **Social Security Number**
10. **Alien Registration Number** (if any)

11. **Names of Prior Husbands/Wives**
12. **Date(s) Marriages(s) Ended**

13. **If you are a U.S. citizen, complete the following:**
    My citizenship was acquired through (check one)
    - ☐ Birth in the U.S.
    - ☐ Naturalization (Give number of certificate, date and place it was issued)
    - ☐ Parents
      Have you obtained a certificate of citizenship in your own name?
      ☐ Yes   ☐ No
      If "Yes", give number of certificate, date and place it was issued

14a. **If you are a lawful permanent resident alien, complete the following:**
    Date and place of admission for, or adjustment to, lawful permanent residence, and class of admission:

14b. **Did you gain permanent resident status through marriage to a United States citizen or lawful permanent resident?** ☐ Yes   ☐ No

## C. Information about your alien relative

1. **Name** (Family name in CAPS)   (First)   (Middle)

2. **Address** (Number and Street)   (Apartment Number)

   (Town or City)   (State/Country)   (ZIP/Postal Code)

3. **Place of Birth** (Town or City)   (State/Country)

4. **Date of Birth** (Mo/Day/Yr)
5. **Sex**   ☐ Male   ☐ Female
6. **Marital Status**   ☐ Married   ☐ Single   ☐ Widowed   ☐ Divorced

7. **Other Names Used** (including maiden name)

8. **Date and Place of Present Marriage** (if married)

9. **Social Security Number**
10. **Alien Registration Number** (if any)

11. **Names of Prior Husbands/Wives**
12. **Date(s) Marriages(s) Ended**

13. **Has your relative ever been in the U.S.?**   ☐ Yes   ☐ No

14. **If your relative is currently in the U.S., complete the following:** He or she last arrived as a (visitor, student, stowaway, without inspection, etc.)

Arrival/Departure Record (I-94) Number   Date arrived (Month/Day/Year)

Date authorized stay expired, or will expire, as shown on Form I-94 or I-95

15. **Name and address of present employer** (if any)

    Date this employment began (Month/Day/Year)

16. **Has you relative ever been under immigration proceedings?**
    ☐ Yes   ☐ No   Where _____   When _____
    ☐ Exclusion   ☐ Deportation   ☐ Recission   ☐ Judicial Proceedings

| INITIAL RECEIPT | RESUBMITTED | RELOCATED | | COMPLETED | | |
|---|---|---|---|---|---|---|
| | | Rec'd | Sent | Approved | Denied | Returned |
| | | | | | | |

Form I-130 (Rev. 4/11/91) N

ED_PRWORA_000076

## C. (continued) Information about your alien relative

**16. List husband/wife and all children of your relative** (if your relative is your husband/wife, list only his or her children).

| (Name) | (Relationship) | (Date of Birth) | (Country of Birth) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**17. Address in the United States where your relative intends to live**

(Number and Street)                                (Town or City)                                (State)

**18. Your relative's address abroad**

(Number and Street)        (Town or City)        (Province)        (Country)        (Phone Number)

**19. If your relative's native alphabet is other than Roman letters, write his or her name and address abroad in the native alphabet:**

(Name)        (Number and Street)        (Town or City)        (Province)        (Country)

**20. If filing for your husband/wife, give last address at which you both lived together:**        **From**        **To**

(Name)        (Number and Street)        (Town or City)        (Province)        (Country)        (Month)    (Year)        (Month)    (Year)

**21. Check the appropriate box below and give the information required for the box you checked:**

☐ Your relative will apply for a visa abroad at the American Consulate in _____

(City)                            (Country)

☐ Your relative is in the United States and will apply for adjustment of status to that of a lawful permanent resident in the office of the Immigration and Naturalization Service at _____. If your relative is not eligible for adjustment of status, he or she will

(City)                    (State)

apply for a visa abroad at the American Consulate in _____ ,

(City)                    (Country)

(Designation of a consulate outside the country of your relative's last residence does not guarantee acceptance for processing by that consulate. Acceptance is at the discretion of the designated consulate.)

## D.  Other Information

**1. If separate petitions are also being submitted for other relatives, give names of each and relationship.**

**2. Have you ever filed a petition for this or any other alien before?**        ☐ Yes        ☐ No

If "Yes," give name, place and date of filing, and result.

**Warning:** The INS investigates claimed relationships and verifies the validity of documents.  The INS seeks criminal prosecutions when family relationships are falsified to obtain visas.

**Penalties:** You may, by law be imprisoned for not more than five years, or fined $250,000, or both, for entering into a marriage contract for the purpose of evading any provision of the immigration laws and you may be fined up to $10,000 or imprisoned up to five years or both, for knowingly and willfully falsifying or concealing a material fact or using any false document in submitting this petition.

**Your Certification:** I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.  Furthermore, I authorize the release of any information from my records which the Immigration and Naturalization Service needs to determine eligibility for the benefit that I am seeking.

Signature _____  Date _____  Phone Number _____

## Signature of Person Preparing Form if Other than Above

I declare that I prepared this document at the request of the person above and that it is based on all information of which I have any knowledge.

Print Name _____  (Address) _____  (Signature) _____  (Date) _____

**G-28 ID Number** _____

**Volag Number** _____

ED_PRWORA_000077

## NOTICE TO PERSONS FILING FOR SPOUSES IF MARRIED LESS THAN TWO YEARS

Pursuant to section 216 of the Immigration and Nationality Act, your alien spouse may be granted conditional permanent resident status in the United States as of the date he or she is admitted or adjusted to conditional status by an officer of the Immigration and Naturalization Service. Both you and your conditional permanent resident spouse are required to file a petition, Form I-751, Joint Petition to Remove Conditional Basis of Alien's Permanent Resident Status, during the ninety day period immediately before the second anniversary of the date your alien spouse was granted conditional permanent residence.

Otherwise, the rights, privileges, responsibilities and duties which apply to all other permanent residents apply equally to a conditional permanent resident. A conditional permanent resident is not limited to the right to apply for naturalization, to file petitions in behalf of qualifying relatives, or to reside permanently in the United States as an immigrant in accordance with the immigration laws.

> **Failure to file Form I-751, Joint Petition to Remove the Conditional Basis of Alien's Permanent Resident Status, will result in termination of permanent residence status and initiation of deportation proceedings.**

**NOTE: You must complete Items 1 through 6 to assure that petition approval is recorded. Do not write in the section below item 6.**

---

1. **Name of relative** (Family name in CAPS)        (First)        (Middle)

2. **Other names used by relative** (Including maiden name)

3. **Country of relative's birth**        4.    **Date of relative's birth** (Month/Day/Year)

5. **Your name** (Last name in CAPS)  (First)        (Middle)        6.    **Your phone number**

**Action Stamp**

| SECTION | DATE PETITION FILED |
|---|---|
| ☐ 201 (b)(spouse) | |
| ☐ 201 (b)(child) | |
| ☐ 201 (b)(parent) | |
| ☐ 203 (a)(1) | ☐ STATESIDE |
| ☐ 203 (a)(2) | CRITERIA GRANTED |
| ☐ 203 (a)(4) | |
| ☐ 203 (a)(5) | SENT TO CONSUL AT; |

Relative Petition Card
Form I-130A (Rev. 4/11/91) N

### CHECKLIST

**Have you answered each question?**
**Have you signed the petition?**
**Have you enclosed:**

☐ The filing fee for each petition?
☐ Proof of your citizenship or lawful permanent residence?
☐ All required supporting documents for each petition?

**If you are filing for your husband or wife have you included:**

☐ Your picture?
☐ His or her picture?
☐ Your G-325A?
☐ His or her G-325A?

**Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices    **61401**

**U.S. Department of Justice**
Immigration and Naturalization Service (INS)

**Petition for Alien Relative**

## Instructions

**Read the instructions carefully. If you do not follow the instructions, we may have to return your petition, which may delay final action. If more space is needed to complete an answer continue on separate sheet of paper.**

**1. Who can file?**
A citizen or lawful permanent resident of the United States can file this form to establish the relationship of certain alien relatives who may wish to immigrate to the United States. You must file a separate form for each eligible relative.

**2. For whom can you file?**
A. If you are a citizen, you may file this form for:
1) your husband, wife, or unmarried child under 21 years old
2) your unmarried child over 21, or married child of any age
3) your brother or sister if you are at least 21 years old
4) your parent if you are at least 21 years old.
B. If you are a lawful permanent resident you may file this form for:
1) your husband or wife
2) your unmarried child
**Note:** If your relative qualifies under instruction A(2) or A(3) above, separate petitions are not required for his or her husband or wife or unmarried children under 21 years old. If your relative qualifies under instruction B(2) above, separate petitions are not required for his or her unmarried children under 21 years old. These persons will be able to apply for the same type of immigrant visa as your relative.

**3. For whom can you not file?**
Your cannot file for people in the following categories:
A. An adoptive parent or adopted child, if the adoption took place after the child became 16 years old, or if the child has not been in the legal custody and living with the parent(s) for at least two years.
B. A natural parent if the United States citizen son or daughter gained permanent residence through adoption.
C. A stepparent or stepchild, if the marriage that created this relationship took place after the child became 18 years old.
D. A husband or wife, if your were not both physically present at the marriage ceremony, and the marriage was not consummated.
E. A husband or wife if you gained lawful permanent resident status by virtue of a prior marriage to a United States citizen or lawful permanent resident unless:
1) a period of five years has elapsed since you became a lawful permanent resident; OR
2) you can establish by clear and convincing evidence that the prior marriage (through which you gained your immigrant status) was not entered into for the purpose of evading any provision of the immigration laws; OR
3) your prior marriage (through which you gained your immigrant status) was terminated by the death of your former spouse.
F. A husband or wife if he or she was in exclusion, deportation, rescission, or judicial proceedings regarding his or her right to remain in the United States when the marriage took place, unless such spouse has resided outside the United States for a two-year period after the date of the marriage.
G. A husband or wife if the Attorney General has determined that such alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.
H. A grandparent, grandchild, nephew, niece, uncle, aunt, cousin, or in-law.

**4. What documents do your need?**
You must give INS certain documents with this form to prove you are eligible to file. You must also give the INS certain documents to prove the family relationship between you and your relative.
A. For each document needed, give INS the original and one copy. However, because it is against the law to copy a Certificate of Naturalization, a Certificate of Citizenship or an Alien Registration Receipt Card (Form I-151 or I-551) give INS the original only. **Originals will be returned to you.**
B. If you do not wish to give INS the original document, you may give INS a copy. The copy must be certified by:
1) an INS or U.S. consular officer, or
2) an attorney admitted to practice law in the United States, or
3) an INS accredited representative (INS may still require originals).
C. Documents in a foreign language must be accompanied by a complete English translation. The translator must certify that the translation is accurate and that he or she is competent to translate.

**5. What documents do you need to show you are a United States citizen?**
A. If you were born in the United States, give INS your birth certificate.
B. If you were naturalized, give INS your original Certificate of Naturalization.
C. If you were born outside the United States, and you are a U.S. citizen through your parents, give INS:
1) your original Certificate of Citizenship, or
2) your Form FS-240 (Report of Birth Abroad of a United States Citizen).
D. In place of any of the above, you may give INS your valid unexpired U.S. passport that was initially issued for at least 5 years.
E. If you do not have any of the above and were born in the United States, see instruction under 8 below. *"What if a document is not available?"*

**6. What documents do you need to show you are a permanent resident?**
You must give INS your alien registration receipt card (Form I-151 or Form I-551). Do not give INS a photocopy of the card.

**7. What documents do you need to prove family relationship?**
You have to prove that there is a family relationship between your relative and yourself.

In any case where a marriage certificate is required, if either the husband or wife was married before, you must give INS documents to show that all previous marriages were legally ended. In cases where the names shown on the supporting documents have changed, give INS legal documents to show how the name change occurred (for example a marriage certificate, adoption decree, court order, etc.)

Find the paragraph in the following list that applies to the relative for whom you are filing.

Form I-130 (Rev. 4/11/91) N

ED_PRWORA_000079

If you are filing for your:

A. **husband or wife,** give INS
   1) your marriage certificate
   2) a color photo of you and one of your husband or wife, taken within 30 days of the date of this petition. These photos must have a white background. They must be glossy, unretouched, and not mounted. The dimension of the facial image should be about 1 inch from chin to top of hair in 3/4 frontal view, showing the right side of the face with the right ear visible. Using pencil or felt pen, lightly print name (and Alien Registration Number, if known) on the back of each photograph.
   3) a completed and signed G-325A (Biographic Information) for you and one for your husband or wife. Except for name and signature, you do not have to repeat on the G-325A the information given on your I-130 petition.

B. **child** and you are the **mother,** give the child's birth certificate showing your name and the name of your child.

C. **child** and you are the **father or stepparent,** give the child's birth certificate showing both parents' names and your marriage certificate. **Child** born out of wedlock and you are the **father,** give proof that a parent/child relationship exists or existed. For example, the child's birth certificate showing your name and evidence that you have financially supported the child. (A blood test may be necessary).

D. **brother or sister,** your birth certificate and the birth certificate of your brother or sister showing both parents' names. If you do not have the same mother, you must also give the marriage certificates of your father to both mothers.

E. **mother,** give your birth certificate showing your name and the name of your mother.

F. **father,** give your birth certificate showing the names of both parents and your parents' marriage certificate.

G. **stepparent,** give your birth certificate showing the names of both natural parents and the marriage certificate of your parent to your stepparent.

H. **adoptive parent or adopted child,** give a certified copy of the adoption decree, the legal custody decree if you obtained custody of the child before adoption, and a statement showing the dates and places you have lived together with the child.

8. **What if a document is not available?**
If the documents needed above are not available, you can give INS the following instead. (INS may require a statement from the appropriate civil authority certifying that the needed document is not available.)

A. Church record: A certificate under the seal of the church where the baptism, dedication, or comparable rite occurred within two months after birth, showing the date and place of child's birth, date of the religious ceremony, and the names of the child's parents.

B. School record: A letter from the authorities of the school attended (preferably the first school), showing the date of admission to the school, child's date and place of birth, and the names and places of birth parents, if shown in the school records.

C. Census record: State or federal census record showing the names, place of birth, and date of birth or the age of the person listed.

D. Affidavits: Written statements sworn to or affirmed by two persons who were living at the time and who have personal knowledge of the event you are trying to prove; for example, the date and place of birth, marriage, or death. The persons making the affidavits need not be citizens of the United States. Each affidavit should contain the following information regarding the person making the affidavit: his or her full name, address, date and place of birth, and his or her relationship to you, if any; full information concerning the event; and complete details concerning how the person acquired knowledge of the event.

9. **How should you prepare this form?**
A. Type or print legibly in ink.
B. If you need extra space to complete any item, attach a continuation sheet, indicate the item number, and date and sign each sheet.
C. Answer all questions fully and accurately. If any item does not apply, please write "N/A".

10. **Where should you file this form?**
A. If you live in the United States, send or take the form to the INS office that has jurisdiction over where you live.
B. If you live outside the United States, contact the nearest American Consulate to find out where to send or take the completed form.

11. **What is the fee?**
You must pay seventy five dollars ($75.00) to file this form. **The fee will not be refunded, whether the petition is approved or not.** DO NOT MAIL CASH. All checks or money orders, whether U.S. or foreign, must be payable in U.S. currency at a financial institution in the United States. When a check is drawn on the account of a person other than yourself, write your name on the face of the check. If the check is not honored, INS will charge you $5.00.

Pay by check or money order in the exact amount. Make the check or money order payable to "Immigration and Naturalization Service". However,
A. if you live in Guam: Make the check or money order payable to "Treasurer, Guam", or
B. if you live in the U.S. Virgin Islands: Make the check or money order payable to "Commissioner of Finance of the Virgin Islands".

12. **When will a visa become available?**
When a petition is approved for the husband, wife, parent, or unmarried minor child of a United States citizen, these relatives do not have to wait for a visa number, as they are not subject to the immigrant visa limit. However, for a child to qualify for this category, all processing must be completed and the child must enter the United States before his or her 21st birthday.

For all other alien relatives there are only a limited number of immigrant visas each year. The visas are given out in the order in which INS receives properly filed petitions. To be considered properly filed, a petition must be completed accurately and signed, the required documents must be attached, and the fee must be paid.

For a monthly update on the dates for which immigrant visas are available, you may call (202) 647-0508.

13. **What are the penalties for committing marriage fraud or submitting false information or both?**
Title 8, United States Code, Section 1325 states that any individual who knowingly enters into a marriage contract for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than five years, or fined not more than $250,000.00 or both.

Title 18, United States Code, Section 1001 states that whoever willfully and knowingly falsifies a material fact, makes a false statement, or makes use of a false document will be fined up to $10,000 or imprisoned up to five years, or both.

14. **What is our authority for collecting this information?**
We request the information on the form to carry out the immigration laws contained in Title 8, United States Code, Section 1154(a). We need this information to determine whether a person is eligible for immigration benefits. The information you provide may also be disclosed to other federal, state, local, and foreign law enforcement and regulatory agencies during the course of the investigation required by this Service. You do not have to give this information. However, if you refuse to give some or all of it, your petition may be denied.

15. **Reporting Burden.**
Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Department of Justice, Immigration and Naturalization Service (Room 5304), Washington, D.C. 20536; and to the Office of Management and Budget, Paperwork Reduction Project, OMB No. 1115-0054, Washington, D.C. 20503.

**It is not possible to cover all the conditions for eligibility or to give instructions for every situation. If you have carefully read all the instructions and still have questions, please contact your nearest INS office.**

ED_PRWORA_000080

Federal Register / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

**61403**

---

**U.S. Department of Justice**
Immigration and Naturalization Service

Order to Show Cause and Notice of Hearing

---

## ORDER TO SHOW CAUSE AND NOTICE OF HEARING
## *(ORDEN DE PRESENTAR MOTIVOS JUSTIFICANTES Y AVISO DE AUDIENCIA)*

*In Deportation Proceedings under section 242 of the Immigration and Nationality Act.*
*(En los trámites de deportación a tenor de la sección 242 de la Ley de Inmigración y Nacionalidad.)*

**United States of America:**
**(Estados Unidos de América:)**

File No. _____
*(No. de registro)*

Dated _____
**(Fechada)**

In the matter of _____ (Respondent)
*(En el asunto de)* *(Demandado)*
Address _____
*(Dirección)*

_____

Telephone No. (Area Code) _____
*(No. de teléfono y código de área)*

Upon inquiry conducted by the Immigration and Naturalization Service, it is alleged that:
*(Según las indagaciones realizadas por el Servicio de Inmigración y Naturalización, se alega que:)*

1) You are not a citizen or national of the United States;
*(Ud. no es ciudadano o nacional de los Estados Unidos)*

2) You are a native of _____ and a citizen of _____ ;
*(Ud. es nativo de)* *(y ciudadano de)*

3) You entered the United States at or near _____ on or about _____ ;
*(Ud. entró a los Estados Unidos en o cerca de)* *(el día o hacia esa fecha)*

Form I-221 (Rev. 6/12/92) N

Page 1

ED_PRWORA_000081

Page 2

## U.S. Department of Justice
Immigration and Naturalization Service

Order to Show Cause and Notice of Hearing

### NOTICE OF RIGHTS AND CONSEQUENCES

The Immigration and Naturalization Service believes that you are an alien not lawfully entitled to be in or to remain in the United States. Read this notice carefully and ask questions about anything in this notice you do not understand. This notice identifies your rights as an alien in deportation proceedings, and your obligations and the conditions with which you must comply in order to protect your eligibility to be considered for certain benefits.

Any statement you make before an Immigration Officer may be used against you in any immigration or administrative proceeding.

You may be represented, at no expense to the United States government, by an attorney or other individual who is authorized and qualified to represent persons in these proceedings. You will be given a list of organizations, attorneys and other persons who have indicated their availability to represent aliens in these proceedings. Some of these persons may represent you free of charge or for a nominal fee. You may also be represented by a friend, relative, or other person having a pre-existing relationship with you, provided his or her appearance is permitted by the immigration judge.

You will have a hearing before an immigration judge, scheduled **no sooner than 14 days from the date you are served with this Order to Show Cause (unless you request in writing an earlier hearing date).** The fourteen-day period is to allow you to seek an attorney or representative, if you desire to be represented. At your hearing, you will be given the opportunity to admit or deny any or all of the allegations in this Order to Show Cause, and whether you are deportable on the charges set forth herein. You will have an opportunity to present evidence and/or witnesses on your own behalf, to examine evidence presented by the government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the government. Any document that you present that is in a foreign language must be accompanied by a certified English translation. It is your responsibility to ensure that any witnesses you wish to present on your own behalf be present at the hearing.

The immigration judge will advise you regarding relief from deportation for which you may be eligible. You will be given a reasonable opportunity to make an application for any such relief. If you are not satisfied with the decision of the immigration judge, you have the right to appeal. The immigration judge will provide you with your appeal rights.

### AVISO DE DERECHOS Y CONSECUENCIAS

El Servicio de Inmigración y Naturalización opina que Ud. es un extranjero sin derecho legal a estar o permanecer en los Estados Unidos. Lea este aviso cuidadosamente y pregunte acerca de cualquier parte del mismo que no entienda. Este aviso le explica los derechos que tiene como extranjero en los trámites de deportación, y las obligaciones y condiciones que debe cumplir con el fin de proteger su derecho a que se le considere para recibir ciertos beneficios.

Las declaraciones que haga ante un funcionario del Servicio de Inmigración podrán usarse en su contra en cualquier trámite administrativo o de inmigración.

Ud. puede ser representado, sin costo alguno para el gobierno de los Estados Unidos, por un abogado o otra persona autorizada y calificada para representar personas en estos trámites. Ud. recibirá una lista de las entidades, abogados y demás personas dispuestas a representar a extranjeros en estos trámites. Algunas de esas personas pueden representarle gratuitamente o por honorarios nominales. También puede representarle un amigo, familiar o otra persona con la que tenga una relación establecida, siempre que el juez de inmigración permita su comparecencia.

Ud. tendrá una audiencia ante un juez de inmigración, fijada **con un mínimo de 14 días a partir de la fecha que se le expidio esta Orden (a menos que Ud. solicite por escrito una audiencia en plazo aún menor).** El plazo de catorce días le permitirá conseguir los servicios de un abogado o representante, si lo desea. En la audiencia se le dará la oportunidad de admitir o negar cualquiera de los alegatos de esta Orden o todos ellos, y se le informará si está sujeto a deportación por los cargos expresados en la misma. Ud. tendrá la oportunidad de presentar pruebas y testigos a favor suyo, de examinar las pruebas presentadas por el gobierno, de oponerse, con base en los razonamientos legales pertinentes, a la admisión de pruebas y de interrogar a cualquier testigo del gobierno. Todo documento que presente en un idioma extranjero debe ir acompañado de una traducción certificada al inglés. Será responsabilidad suya asegurarse de que cualquier testigo suyo comparesca a la audiencia.

El juez de inmigración le informará sobre los recursos de deportación a los que tenga derecho y se le dará una oportunidad adecuada para solicitarlos. Si no está de acuerdo con la decisión del juez, puede apelarla. El juez de inmigración le informará acerca de sus derechos de apelación.

Form I-221 (Rev. 6/12/92) N

ED_PRWORA_000082

**Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

**61405**

## U.S. Department of Justice
Immigration and Naturalization Service

Order to Show Cause and Notice of Hearing

Respondent _____
(Demandado)

Dated _____
(Fechada)
File No. _____
(No. de registro)

**AND** on the basis of the foregoing allegations, it is charged that you are subject to deportation pursuant to the following provision(s) of law:

*(Y según los alegatos anteriores, se le acusa de estar sujeto a deportación de acuerdo con la(s) siguiente(s) disposicion(es) de la ley:)*

**WHEREFORE, YOU ARE ORDERED** to appear for a hearing before an Immigration Judge of the Executive Office for Immigration Review of the United States Department of Justice at:

*(POR LO CUAL, SE LE ORDENA comparecer ante un juez de inmigración de la Oficina Ejecutiva de Revisión de Inmigración del Departamento de Justicia de los Estados Unidos en:)*

Address _____
(Dirección)
On _____  At _____ .m.
(Fecha)                        (Hora)

and show cause why you should not be deported from the United States on the charge(s) set forth above.
*(y mostrar motivos justificantes por cual no debería ser deportado de los Estados Unidos por los cargos expresados anteriormente.)*

Dated _____
(Fechada)

Signature of Issuing Officer _____
(Firma del funcionario que la expide)

City and State of Issuance _____
(Ciudad y Estado donde se expide)

Title of Issuing Officer _____
(Título del funcionario que la expide)

Form I-221 (Rev. 6/12/92) N

Page 3

ED_PRWORA_000083

**61406**   **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

Page 4

**You are required to be present at your deportation hearing prepared to proceed.** If you fail to appear at any hearing after having been given written notice of the date, time and location of your hearing, you will be ordered deported *in your absence*, if it is established that you are deportable and you have been provided the appropriate notice of the hearing.

You are required by law to provide immediately in writing an address (and telephone number, if any) where you can be contacted. You are required to provide written notice, within five (5) days, of any change in your address or telephone number to the office of the Immigration Judge listed in this notice. Any notices will be mailed only to the last address provided by you. If you are represented, notice will be sent to your representative. If you fail to appear at the scheduled deportation hearing, you will be ordered deported *in your absence* if it is established that you are deportable and you have been provided the appropriate notice of the hearing.

If you are ordered deported *in your absence*, you cannot seek to have that order rescinded except that: (a) you may file a motion to reopen the hearing within 180 days after the date of the order if you are able to show that your failure to appear was because of exceptional circumstances, or (b) you may file a motion to reopen at any time after the date of the order if you can show that you did not receive written notice of your hearing and you had provided your address and telephone number (or any changes of your address or telephone number) as required, or that you were incarcerated and did not appear at your hearing through no fault of your own. If you choose to seek judicial review of a deportation order entered *in your absence*, you must file the petition for review within 60 days (30 days if you are convicted of an aggravated felony) after the date of the final order, and the review shall be confined to the issues of validity of the notice provided to you, the reasons for your failure to appear at your hearing, and whether the government established that you are deportable.

In addition to the above, if you are ordered deported *in your absence*, you are ineligible for five (5) years from the date of the final order for the following relief from deportation: voluntary departure under section 242 (b) of the Immigration and Nationality Act (INA); suspension of deportation or voluntary departure under section 244 of the INA; and adjustment of status under sections 245, 248, and 249 of the INA.

**The copy of this Order to Show Cause served upon you is evidence of your alien registration while you are under deportation proceedings. The law requires that you carry it with you at all times.**

**Está obligado a asistir a la audiencia de deportación y de estar preparado para ella.** Si no asiste a cualquiera de las audiencias después de haber sido notificado por escrito de la fecha, hora y lugar de la audiencia, se ordenará su deportación **en su ausencia,** si se establece que puede ser deportado y que recibió los avisos correspondientes.

La ley le obliga a informar inmediatamente por escrito de su domicilio (y número de teléfono, de haberlo) donde pueda ser localizado. Tiene la obligación de notificar por escrito, en el plazo de cinco (5) diás, cualquier cambio de domicilio o de teléfono a la oficina del juez de inmigración que aparece en este aviso. Los avisos se enviarán solamente a la última dirección facilitada por Ud. Si ha decidido tener un representante, se enviarán los avisos a dicha persona. Si no asiste a cualquiera de las audiencias después de haber sido notificado por escrito de la fecha, hora y lugar de las mismas, se ordenará su deportación **en su ausencia,** si se establece que puede ser deportado y que recibió el aviso de la audiencia.

Si se ordena su deportación **en su ausencia,** no podrá solicitar la anulación de esa orden salvo que: a) pueda presentar un pedimento para tener otra audiencia en el plazo de 180 días después de la fecha de la orden si puede demostrar que no compareció debido a circunstancias excepcionales, o b) puede presentar un pedimento para tener otra audiencia en cualquier momento después de la fecha de la orden si puede demostrar que no recibió el aviso de la audiencia por escrito y que había facilitado su dirección y número de teléfono (o notificado los cambios de dirección o número de teléfono) según lo previsto, o que estaba encarcelado y no compareció a la audiencia por motivos ajenos a su voluntad. Si decide solicitar una revisión judicial de la orden de deportación **en su ausencia,** debe presentar la solicitud de revisión en el plazo de 60 días (30 días si ha sido condenado por un delito grave con agravantes) a partir de la fecha de la orden definitiva, y la revisión se limitará a decidir si el aviso que recibió es válido, las razones por las cuales no compareció a la audiencia y si el gobierno demostró que puede ser deportado.

Además de lo anterior, si se ordena su deportación **en su ausencia,** no podrá, en el plazo de cinco años después de la fecha de la orden definitiva, tener derecho a los siguientes recursos: salida voluntaria según la sección 242 (b) de la ley de Inmigración y Nacionalidad (INA); suspensión de la deportación o de la salida voluntaria según la sección 244 de la INA, y ajuste de condición según las secciones 245, 248, y 249 de la INA.

**Esta copia de la Orden de Presentar Motivos Justificantes que le ha sido notificada constituye la prueba de su registro de extranjero mientras se llevan a cabo los trámites para su deportación. La ley le exige que la lleve consigo en todo momento.**

Form I-221 (Rev. 6/12/92) N

| | |
|---|---|
| This Order to Show Cause shall be filed with the Immigration Judge of the Executive Office for Immigration Review at the address provided below. You must report any changes of your address or telephone number in writing to this office: | Esta Orden de Presentar Motivos Justificantes será registrada con la Oficina Ejecutiva de Revisión de Inmigración en la siguiente dirección. Debe notificar cualquier cambio de su domicilio o número de teléfono por escrito a: |

**The Office of the Immigration Judge**

_____

_____

_____

---

### Certificate of Translation and Oral Notice

This Order to Show Cause ☐ **was**   ☐ **was not**   read to the named alien in the _____ language, which is his/her native language or a language which he/she understands.

| Date | Signature | Printed Name and Title of Translator |
|---|---|---|

Address of Translator (If other than INS employee) or office location and division (if INS employee)

(If oral notice was not provided please explain)

| **Manner of Service** | Alien's Right Thumb Print |
|---|---|
| ☐ Personal Service to Alien<br><br>☐ Certified Mail - Return Receipt Requested<br><br>    ☐ Alien<br><br>    ☐ Counsel of Record | |

### Certificate of Service

This Order to Show Cause was served by me at _____ on _____ 19 ___
at _____ m.

| Officer's Signature | Printed Name | Title | Office |
|---|---|---|---|

Alien's Signature (acknowledgment/receipt of this form)
(_Firma de extranjero/acuse de recibo_)

---

### Request for Prompt Hearing and Waiver of 14-Day Minimum Period
(_Solicitud de audiencia inmediata y renuncia al plazo mínimo de 14 días_)

To expedite determination of my case, I request an immediate hearing, and waive my right to the 14 day notice.
(_Para agilizar la decisión sobre mi caso, solicito una audiencia inmediata y renuncio a mi derecho a un plazo mínimo de 14 días._)

| | |
|---|---|
| Signature of Respondent<br>(_Firma de demandado_) | Date<br>(_Fecha_) |

Form I-221 (Rev. 6/12/92) N

Page 5

## Notice to Respondent

**Warning: Any statement you make may be used against you in removal proceedings.**

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 3.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this Notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents which you desire to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certified English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or deportable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge.

You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

### Request for Prompt Hearing

To expedite a determination in my case, I request an immediate hearing. I waive my right to have a 10-day period prior to appearing before an immigration judge.

_____
(Signature of Respondent)

Before:

_____
(Signature and Title of INS Officer)

Date: _____

### Certificate of Service

This Notice to Appear was served on the respondent by me on _____, in the following manner and in
(Date)

compliance with section 239(a)(1)(F) of the Act:

☐ in person          ☐ by certified mail, return receipt requested          ☐ by regular mail

☐ Attached is a list of organizations and attorneys which provide free legal services.

☐ The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____
(Signature of Respondent if Personally Served)

_____
(Signature and Title of Officer)

Form I-862 (Rev. 4-1-97)

ED_PRWORA_000087

**Attachment 6—Interim Guidance— Documentary Evidence for Excepted Categories of Aliens Eligible for SSI, Food Stamps, TANF, Medicaid, and Programs Funded by a Social Services Block Grant**

Under Section 402 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act''), only certain excepted categories of aliens remain eligible for SSI and Food Stamps. States may also limit eligibility for TANF, Medicaid and programs funded by a Social Services Block Grant to certain excepted categories of aliens. Some of the excepted categories enjoy unqualified exemptions from the restrictions in section 402, while others are exempted for limited time periods. The exceptions for each program, and the documents that may be used to determine eligibility under these exceptions, are set forth below.

*Exceptions*

A. *SSI*

Certain categories of aliens are excepted from the restrictions on SSI eligibility imposed by Section 402. If an alien falls within one of the categories listed below, he or she remains eligible for SSI:

• Lawfully admitted permanent resident aliens who have worked or can be credited with 40 qualifying quarters (any quarter after December 31, 1996 cannot be counted if the alien received any federal means-tested public benefit during that quarter);

• Qualified aliens lawfully residing in any State who are honorably discharged veterans and who fulfill minimum active-duty service requirements, or who are on non-training active duty in the U.S. Armed Forces, or who are the spouse, unmarried dependent child, or unremarried surviving spouse of such a veteran or active-duty personnel, provided that, in the latter case, the marriage satisfies the requirements of 38 U.S.C. 1304 (see DOD/VA Guidance attached as Exhibit B hereto);

• Qualified aliens lawfully residing in the United States who were receiving SSI on August 22, 1996;

• Qualified aliens who were lawfully residing in the United States on August 22, 1996, and who are blind or disabled;

• American Indians born in Canada and to whom the provisions of section 289 of the INA apply;

• Members of an Indian tribe (as defined in section 4(e) of the Indian Self-Determination and Education Assistance Act); or

• Qualified aliens receiving SSI benefits after July 1996 on the basis of an application filed before January 1,

1979, if the Commissioner of Social Security lacks clear and convincing evidence that such individuals are otherwise ineligible under section 402.

Other categories of aliens remain eligible for SSI for only a limited time period:

• Asylees, for a period of seven years after obtaining such status;

• Aliens whose deportation or removal has been withheld, for a period of seven years after obtaining such status;

• Refugees, for a period of seven years after the date they entered the U.S. as refugees;

• Cuban/Haitian entrants, as defined in section 501(c) of the Refugee Education Assistance Act of 1980, for a period of seven years after they obtain such status; and

• Amerasian immigrants admitted to the U.S. pursuant to section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, for a period of seven years after their admission.

B. *Medicaid*

Regardless of whether a State chooses to impose additional restrictions on the eligibility of aliens to receive Medicaid, the following categories of aliens are eligible:

• Lawfully admitted permanent resident aliens who have worked or can be credited with 40 qualifying quarters (any quarter after December 31, 1996 cannot be counted if the alien received any federal means-tested public benefit during that quarter);

• Qualified aliens lawfully residing in any State who are honorably discharged veterans and who fulfill minimum active-duty service requirements, or who are on non-training active duty in the U.S. Armed Forces, or who are the spouse, unmarried dependent child, or unremarried surviving spouse of such a veteran or active-duty personnel, provided that, in the latter case, the marriage satisfies the requirements of 38 U.S.C. 1304 (see DOD/VA Guidance attached as Exhibit B hereto);

• American Indians born in Canada and to whom the provisions of section 289 of the INA apply; and

• Members of an Indian tribe (as defined in section 4(e) of the Indian Self-Determination and Education Act).

Time-limited exceptions apply to the following categories:

• Asylees, for a period of seven years after obtaining such status;

• Aliens whose deportation or removal has been withheld, for a period of seven years after obtaining such status;

• Refugees, for a period of seven years after the date they entered the U.S. as refugees;

• Cuban/Haitian entrants, as defined in section 501(e) of the Refugee Education Assistance Act of 1980, for a period of seven years after they obtain such status; and

• Amerasian immigrants admitted to the U.S. pursuant to section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, for a period of seven years after their admission.

Also, any alien receiving SSI benefits retains derivative eligibility for Medicaid, regardless of whether he or she is otherwise ineligible for Medicaid under the Act.

C. Food Stamps, TANF, and Social Services Block Grant Programs

With respect to TANF and programs funded by a Social Services Block Grant, states have the option of limiting aliens' eligibility for such programs. As an initial matter, then, you should determine whether your State has imposed additional eligibility requirements. Even if your State has chosen to impose such restrictions, the following categories of aliens would remain eligible for Food Stamps, TANF, and programs funded by a Social Services Block Grant, without any time limitation:

• Lawfully admitted permanent resident aliens who have worked or can be credited with 40 qualifying quarters (any quarter after December 31, 1996 cannot be counted if the alien received any federal means-tested public benefit during that quarter); and

• Qualified aliens lawfully residing in any State who are honorably discharged veterans and who fulfill minimum active-duty service requirements, or who are on non-training active duty in the U.S. Armed Forces, or who are the spouse, unmarried dependent child, or unremarried surviving spouse of such a veteran or active-duty personnel, provided that, in the latter case, the marriage satisfies the requirements of 38 U.S.C. § 1304 (see DOD/VA Guidance attached as Exhibit B hereto).

Time-limited exceptions apply to the following categories:

• Asylees, for a period of five years after obtaining such status;

• Aliens whose deportation of removal has been withheld, for a period of five years after obtaining such status;

• Refugees, for a period of five years after the date they entered the U.S. as refugees;

• Cuban/Haitian entrants, as defined in section 501(e) of the Refugee Education Assistant Act of 1980, for a

ED_PRWORA_000088

period of five years after they obtain such status; and

• Amerasian immigrants admitted to the U.S. pursuant to section 84 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, for a period of five years after their admission.

Unlike the derivative eligibility provision for Medicaid, aliens receiving SSI benefits for *not* entitled to derivative eligibility for Food Stamps if they are otherwise ineligible for Food Stamp benefits under the Act.

*Documentation of Exceptions*

The documents listed below (examples of which are attached to Attachment 5 of the Interim Guidance) establish that an applicant falls within one of the excepted categories of aliens.

Under the INA, all aliens over the age of 14 who remain in the United States for longer than 30 days are required to register with the Immigration and Naturalization Service (the ''INS'') and obtain an alien registration document; all aliens over the age of 18 who receive a registration document are required to carry it with them at all times. With certain exceptions (*e.g.,* Canadian visitors), aliens entering the U.S. are normally issued a registration document (*e.g.,* an INS Form I–94) at the time of entry. The documents listed below that are registration documents are indicated with an asterisk (''*'').

Each of the documents listed below will demonstrate lawful status, and you should not require presentation of a registration document if the applicant presents one for the other legally acceptable documents that reasonably appears on its face to be genuine and to relate to the person presenting it. However, if the document presented is not a registration document and does not on its face reasonably appear to be genuine or to relate to the person presenting it, it is appropriate to ask the applicant to produce his or her registration document as additional evidence of immigration status, so long as the request is not made for a discriminatory reason (see Nondiscrimination Advisory, Attachment 2 to Interim Guidance). Presentation of a registration document listed below that reasonably appears on its face to be genuine and to relate to the person presenting it (or to satisfy a higher applicable standard) will often obviate the need to verify the applicant's immigration status with the INS; if the applicant presents a registration document that does not meet this standard, sending the INS a copy of the document will assist it in

verifying the applicant's status quickly and accurately.

Alien Lawfully Admitted for Permanent Resident (''LPR'') under the INA Who Has Worked or Can Be Credited With 40 Qualifying Quarters or Who is Otherwise Eligible

LPR:
• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a ''green card''); or
• Unexpired temporary I–551 stamp in foreign passport or on *INS Form I–94.

*40 Qualifying Quarters:* Until you have access to SSA's automated system for verifying qualifying quarters, refer to the SSA Guidance attached as Exhibit A for guidance on how to verify 40 qualifying quarters. NOTE: Any quarter after December 31, 1996, cannot be counted if the alien received any federal means-tested public benefit during that quarter.

*LPR Who is Otherwise Eligible:* An LPR who does not have 40 qualifying quarters will still be eligible if he or she:
• entered the U.S. as a refugee within the previous five years, was granted asylum during the previous five years, or had his or her deportation or removal withheld within the previous five years:

If an applicant attests to having been admitted as a refugee within the previous five years, review the applicant's INS Form I–551 (green card) for code RE–6, RE–7, RE–8 or RE–9, and derive the date of admission from the date on the card.

If an applicant attests to having been granted asylum or having had deportation or removal withheld within the previous five years, file INS Form G–845 and Supplement along with a copy of the I–551 with the local INS office to verify status.
or
• is an honorably discharged veteran who fulfilled minimum active-duty service requirements, or is a person on none-training active duty or is the spouse, dependent child, or unremarried surviving spouse of such a person:

Referer to DOD Guidance attached as Exhibit B for guidance on how to verify such status.

Qualified Alien Lawfully Residing in State Who Is an Honorably Discharged Veteran, On Non-Training Active Duty in the U.S. Armed Forces, or the Spouse, Unmarried Dependent Child, or Unremarried Surviving Spouse of Such a Veteran or Active-Duty Personnel

• Refer to Attachment 5 to the Interim Guidance for documentation of qualified alien status; and

• Refer to DOD/VA Guidance attached as Exhibit B for guidance on how to verify veteran and active duty status.

Qualified Alien Lawfully Residing in the U.S. Who Was Receiving SSI on August 22, 1996.

• Contact SSA for guidance on appropriate documentation.

Qualified Alien Lawfully Residing the U.S. on August 22, 1996 Who Is Blind or Disabled

• Contact SSA for guidance on appropriate documentation.

Qualified Alien Receiving SSI Benefits After July 1996 on the Basis of An Application Filed Before January 1, 1979:

• Contact SSA for guidance on appropriate documentation.

American Indians Born in Canada and Covered By Section 289 of the INA

• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a ''green card'') with the code S13;

Unexpired temporary I–551 stamp in Canadian passport or on *INS Form I–94 with the code S13; or
• A letter or other tribal document certifying at least 50 per centum American Indian blood, as required by INA Section 289, combined with a birth certificate or other satisfactory evidence of birth in Canada.

Members of an Indian Tribe

• Membership card or other tribal document demonstrating membership in a federally-recognized Indian tribe under section 4(e) of the Indian Self-Determination and Education Assistance Act. Contact Soo Song, Deputy Director, Office of Tribal Justice, United States Department of Justice, (202) 415–8812, for a list of federally-recognized tribes under section 4(e).
• If the individual has no document evidencing tribal membership, contact the tribal government for confirmation of the individual's membership. Tribal government contact lists are available from Soo Song, Deputy Director, Office of Tribal Justice, Department of Justice, (202) 514–8812.

Asylee

• *INS Form I–94 annotated with stamp showing grant of asylum under § 208 of the INA;
• *INS Form I–688B (Employment Authorization Card) annotated ''274a12(a)(5)'';
• INS Form I–766 (Employment Authorization Document) annotated ''A5'';

ED_PRWORA_000089

• Grant letter from the Asylum Office of INS; or

• Order of an immigration judge granting asylum.

*Seven or Five-Year Limit:* Where eligibility is limited to asylees who obtained asylee status within the previous seven or five years, INS Form I–94, the INS grant letter and the court order will each include the date asylee status was granted; if the applicant cannot provide any of these documents, file INS Form G–845 and Supplement along with a copy of the documents indicating asylee status with the local INS office to verify the date the status was granted.

Refugee

• *INS Form I–94 annotated with stamp showing admission under section 207 of the INA;

• INS Form I–688B (Employment Authorization Card) annotated "274a12(a)(3)";

• *INS Form I–766 (Employment Authorization Document) annotated "A3"; or

• INS Form I–571 (Refugee Travel Document).

*Seven or Five-Year Limit:* Where eligibility is limited to aliens who were admitted as refugees within the previous seven or five years, the date of inspection on the refugee stamp on INS Form I–94 will indicate the date of admission as a refugee; if the date is missing or if the applicant cannot present an I–94, file INS Form G–845 and Supplement along with a copy of the pertinent documents with the local INS office to verify the date of admission as a refugee.

Alien Whose Deportation or Removal Was Withheld

• *INS Form I–688B (Employment Authorization Card) annotated "274a12(a)(10)";

• INS Form I–766 (Employment Authorization Document) annotated "A10"; or

• Order from an immigration judge showing deportation withheld under § 243(h) of the INA as in effect prior to April 1, 1997, or removal withheld under § 241(b)(3) of the INA.

*Seven or Five-Year Limited:* Where eligibility is limited to aliens whose deportation was withheld within the previous seven or five years, the court order will include the date deportation was withheld; if the applicant does not present a court order, file INS Form G–845 and Supplement along with a copy of the pertinent documents with the local INS office to verify the date deportation was withheld.

Cuban/Haitian Entrants

• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a "green card") with the code CU6, CU7, and CH6;

• Unexpired temporary I–551 stamp in foreign passport or on *INS Form I–94 with the code CU6 or CU7; or

• INS Form *I–94 with stamp showing parole as "Cuban/Haitian Entrant" under Section 212(d)(5) of the INA.

*Seven or Five–Year Limit:* Where eligibility is limited to aliens who were granted status as a Cuban/Haitian entrant within the previous seven or five years, the date on the INS Form I–551 or the date of inspection on the stamp on INS Form I–94 will indicate the date status was granted; if the date is missing on Form I–94, file INS Form G–845 and Supplement along with a copy of the pertinent documents with the local INS office to verify the date status was granted.

Amerasian Immigrants

• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a "green card") with the code AM6, AM7, or AM8; or

• Unexpired temporary I–551 stamp in foreign passport or on *INS Form I–94 with the code AM1, AM2, or AM3.

*Seven or Five-Year Limit:* Where eligibility is limited to aliens who were admitted as Amerasian immigrants within the previous seven or five years, the date on the INS Form I–551 or the date of inspection on the stamp on INS Form I–94 will indicate the date of admission; if the date is missing on Form I–94, file INS Form G–845 and Supplement along with a copy of the pertinent documents with the local INS office to verify the date of admission.

*Expired or Absent Documentation:* If an applicant presents expired documents or is unable to present any documentation evidencing his or her immigration status, refer the applicant to the local INS office to obtain documentation of status. In unusual cases involving applicants who are hospitalized or medically disabled, or who can otherwise show good cause for their inability to present documentation, and for whom securing such documentation would constitute an undue hardship, if the applicant can provide an alien registration number, you may file INS Form G–845 and Supplement, along with the alien registration number and a copy of any expired INS document presented, with the local INS office to verify status. As with any documentation of immigration status, you should confirm that the

status information you receive back from INS pertains to the applicant whose identity you have verified.

*Receipt for Replacement Document:* If an applicant presents a receipt indicating that he or she has applied to the INS for a replacement document for one of the documents identified above, file INS Form G–845 and Supplement, along with a copy of the receipt and a copy of any expired INS document presented, with the local INS office to verify status. Upon return receipt of information from INS, confirm that it pertains to the applicant whose identify you have verified. You should ask to see the replacement document at a later date.

*Applicants with Disabilities and Nondiscrimination:* If an applicant has a disability that limits the applicant's ability to provide the required evidence of immigration status (*e.g.,* mental retardation, amnesia, or other cognitive or mental impairment), you should make every effort to assist the individual to obtain the required evidence. In addition, you should not discriminate against applicants on the basis of race, national origin, gender, religion, age or disability. See Nondiscrimination Advisory, Attachment 2 to Interim Guidance.

*Local INS Offices:* A list of local INS offices and their addresses is set forth in Attachment 1 to the Interim Guidance. Attachment 1 also includes a copy of INS Form G–845 and the Supplement thereto to be used to verify immigration status pursuant to the Guidance.

**EXHIBIT A TO ATTACHMENT 6—SSA GUIDANCE ON CERTIFICATION OF 40 QUALIFYING QUARTERS**

Section 402 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("the Act") generally limits the eligibility of legal immigrants for certain federal public benefits, but sections 402(a)(2)(B) and (b)(2)(B) provide an exception for aliens lawfully admitted for permanent residence who have worked or can be credited with 40 quarters of qualified work. The law provides that the worker's own quarters and quarters worked by a parent while the alien was under age 18 or by a spouse during the marriage if the alien remains married to the spouse or the marriage ended by the death of the spouse may also be credited to the individual in determining the number of qualifying quarters.

Implementing this requirement will be challenging for the individual immigrants, program administrators, and the Social Security Administration ("SSA"), which is the primary source of qualifying quarters information. SSA has developed an automated system to provide, on an overnight basis, information on qualifying quarters for work covered under the Social Security Act and certain, but not all, work

not covered under the Social Security Act. Verification of quarters of coverage for most applicants and current recipients will be accomplished primarily through this automated system.

SSA's automated system is being revised to include additional available information on qualifying quarters from noncovered work. The following interim procedures for determining whether the 40 quarters of qualified work exception is met should be followed until you have access to the SSA automated system. This interim process authorizes certification of eligibility pending verification through the automated system. (This guidance does not supersede program requirements; programs should refer to statutes, regulations, and agency guidance governing certification of eligibility.)

Under these interim procedures, the individual's attestation to 40 quarters is sufficient provided the immigrant, alone or in combination with his parents and/or spouse, has spent sufficient time in this country to have acquired 40 quarters of qualified work. The individual need only state that he or she, alone or in combination with his or her parents and/or spouse, has met the work requirement. No further documentation of earnings is required at application. These interim procedures should be used when the legal immigrant does not qualify under other exemptions of the Act (*e.g.,* refugees, asylees, or deportees with five years of limited eligibility, or applicants with a claim to eligibility based on military service).

Although the automated system is now available, each state must approve an addendum to the current Computer Matching and Privacy Protection Act agreement they maintain with SSA before access to the system can be approved. When you sign the agreement, SSA will provide further guidance defining covered/noncovered qualifying quarters, how to use the system when making determinations, and how to resolve problems arising from discrepancies.

After the agreement addendum is signed and access to the system approved, you should contact SSA to schedule a quarters of coverage verification for each individual you conclude has met the 40 quarters exemption using these interim instructions. SSA will report back a qualifying quarters of coverage history for each individual and applicable family member requested. SSA will provide additional guidance and the name of the contact for scheduling verification.

*Interim Procedures*

To determine eligibility based on 40 qualifying quarters, the State agency/benefit provider should ascertain the applicant's understanding as to the following:

1. How many years has the applicant, the applicant's spouse (during their marriage if they are still married or the marriage ended by the death of the spouse), or the applicant's parents (before the applicant turned 18) lived and/or worked in this country.

(If the answer to 1 is a total of less than 10 years, the applicant cannot meet the 40 qualifying quarter requirement. Stop at this point.)

(If the total equals 10 years or the applicant alleges they commuted to work in the U.S., then proceed to question 2.)

2. In how many of the years reported in answer to question 1, did the applicant, the applicant's spouse, or the applicant's parent earn money through work.

(If the state agency/benefit provider or the applicant needs further information about what constitutes a "quarter of coverage" in those years, they may wish to refer to the attached chart.)

Verify, from INS documents, the date of entry into the country of the applicant, spouse and/or parent. If the dates are consistent with having 10 or more years of work, no further documentation is required at this time; the state agency/benefit provider should conclude that the immigrant meets the 40 qualifying quarters of work exception pending verification from SSA. Inform the applicant (subject to each program's requirements and due process considerations) that he/she may have to repay any benefits to which he/she is not found to be entitled after verification. Keep a record of each individual certified pending verification from SSA.

If the dates of entry are inconsistent with having 10 or more years of work, deny benefits and notify the applicant of his/her right to appeal the denial of benefits.

The applicant shall also provide, for purposes of future verification, the full name, social security number, date of birth, and sex of each individual (self, parent or spouse) whose work history is relevant to the determination of eligibility. In addition, obtain a release form signed by each such individual (copy attached) giving SSA permission to release information concerning that individual's entire quarters of coverage history to the state agency/benefit provider and/or the applicant. This form shall be retained in the case file to document the individual's consent.

As noted earlier, these are temporary instructions and you should schedule verification of all cases processed under these guidelines with SSA. In its response, SSA will provide available information about qualifying quarters of work. Consult the SSA guidelines for using the system if the immigrant believes the information from SSA is inaccurate or incomplete. If SSA action is required, SSA will give the individual a document indicating that the number of quarters is under review. Refer to the requirements of your program to determine whether an immigrant may receive benefits during the period of SSA's review.

*Establishing Qualifying Quarters*

The term "quarter" means the three calendar month period ending on March 31, June 30, September 30, or December 31 of any year.

Social Security credits called "quarters of coverage" ("QCs") are earned by working at a job or as a self-employed individual. Each earner can be credited with a maximum of four quarters each year.

For 1978 and later, credits are based solely on the total yearly amount of earnings. All types of earnings follow this rule. The number of creditable QCs are obtained by dividing the individual's total yearly earned income by the increment amount for the year up to a yearly maximum of four. The amount of earnings needed to earn a credit increases and is different for each year. For 1978 through 1997, the amount of earnings needed for each credit is:

| Year | Amount |
|------|--------|
| 1978 | $250 |
| 1979 | $260 |
| 1980 | $290 |
| 1981 | $310 |
| 1982 | $340 |
| 1983 | $370 |
| 1984 | $390 |
| 1985 | $410 |
| 1986 | $440 |
| 1987 | $460 |
| 1988 | $470 |
| 1989 | $500 |
| 1990 | $520 |
| 1991 | $540 |
| 1992 | $570 |
| 1993 | $590 |
| 1994 | $620 |
| 1995 | $630 |
| 1996 | $640 |
| 1997 | $670 |

A current year quarter may be included in the 40 quarter computation. Use the yearly amount shown in the chart as the divisor to determine the number of quarters available up to a yearly maximum of four. FOLLOW YOUR AGENCY GUIDELINES REGARDING COUNTING A QUARTER THAT HAS NOT ENDED.

If you need to use quarters before 1978:

• A credit was earned for each calendar quarter in which an individual was paid $50 or more in wages (including agricultural wages for 1951–1954);

• Four credits were earned for each taxable year in which an individual's net earnings from self-employment were $400 or more; and/or

• A credit was earned for each $100 (limit to a total of four) of agricultural wages paid during the year for years 1955 through 1977.

QUALIFYING QUARTER FROM NONCOVERED EARNINGS WILL ALSO BE DETERMINED USING THE ABOVE GUIDELINES.

**EXHIBIT B TO ATTACHMENT 6—DOD GUIDANCE ON IMPLEMENTATION OF VETERAN AND ACTIVE DUTY EXCEPTION**

This fact sheet provides guidance for implementing certain sections of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("the Act") concerning exemptions for active duty service members and veterans and their family members. The Act limits the eligibility of certain aliens to receive public benefits. Under various provisions of the Act, a qualified alien who is lawfully residing in a state and is (1) a veteran (per 38 U.S.C. 101(2), 107, 1101, or 1301) with an Honorable Discharge (not on account of alienage) and who fulfills the minimum active-duty service requirements of 38 U.S.C. 5303A(d); (2) on active duty (other than active duty for training) in the United States Armed Forces; or (3) a spouse, unmarried dependent child, or unremarried surviving spouse of such an individual, is eligible for particular programs.

ED_PRWORA_000091

*Honorably Discharged Veterans*

• A discharge certificate, DD Form 214 or equivalent, that shows active duty in the Army, Navy, Air Force, Marine Corps, or Coast Guard and character of discharge ''Honorable'' is acceptable to qualify for the veteran exemption without further inquiry, unless the certificate appears to have been altered or is otherwise irregular. A discharge certificate that shows character of discharge as anything but ''Honorable'' is not acceptable for purposes of this exemption and need not be referred to the VA. (**Note:** A character of discharge ''Under Honorable Conditions'' is NOT an ''Honorable'' discharge for these purposes.) A discharge certificate that shows ''Honorable'' and any other branch of service or any other type of duty (*e.g.,* ''Active Duty for Training,'' ''Inactive Duty for Training,'' etc.) should be referred to the local VA regional office for determination as to veteran status.

• If veteran status is claimed but the individual has no papers showing service or discharge, refer the inquiry to the local VA regional office to determine veteran status.

• If a discharge certificate, DD Form 214 or equivalent, shows an original enlistment in the Army, Navy, Air Force, Coast Guard, or Maine Corps before September 7, 1980, there is no minimum active-duty service requirement. If a discharge certificate, DD Form 214 or equivalent, shows two or more years of continuous active duty in the Army, Navy, Air Force, Coast Guard, or Marine Corps, the individual meets the minimum active-duty service requirement. If such a discharge certificate is not available, or if it shows active-duty service of less than two years with an original enlistment after September 7, 1980, refer the inquiry to the local VA regional office to determine satisfaction of the minimum active-duty service requirement.

• Applications for exemption based on status as a spouse, unmarried dependent child, or unremarried surviving spouse of an honorably discharged veteran require a determination of the veteran's status and a determination that the applicant is a spouse or child. Status of the veteran may be established by possession of a discharge certificate showing an ''Honorable'' discharge. If the applicant is not in possession of a discharge certificate, refer the question of veteran status to the VA for a determination. The determination as to whether the individual is a spouse or an unmarried dependent child should be made based on your agency guidance for marital and dependency status. VA will not make spousal or dependency findings in these cases.

• Applications for exception based on status as an unremarried surviving spouse of a veteran or active-duty personnel further require the following findings (set forth in 38 U.S.C. 1304), in addition to a determination that the surviving spouse has not remarried:

—that the surviving spouse was married to the veteran or active-duty personnel within fifteen years after the termination of the period of service in which the injury or disease causing the death of the veteran was incurred or aggravated;

—that the surviving spouse was married to the veteran or active-duty personnel for one year or more; or

—that a child was born of the relationship between the surviving spouse and the veteran or active-duty personnel, either during or before the marriage.

*Members on Active Duty*

• Active duty as a member of the Armed Forces means the individual is on full time duty in the U.S. Army, Navy, Air Force, Marine Corps, or Coast Guard. It does not include full-time National Guard duty.

• Service members on active duty shall establish their status by presenting a current Military Identification Card (DD Form 2 (Active)) that lists an expiration date of more than one year from the date of determination.

• If the Military Identification Card is due to expire within one year from the date of the determination, the service member shall verify active duty by showing a copy of his or her current military orders. If the service member is unable to furnish a copy of his or her military orders, active duty may be verified through the nearest RAPIDS (Real Time Automated Personnel Identification System) (located at many military installations) or by notifying the following office in writing (which can be transmitted by facsimile): DEERS Support Office, ATTN: Research and Analysis, 400 Gigling Road, Seaside, California 93955–6771, Fax Number: (408) 655–8317.

*Reserve Members (not on active duty for training)*

• Active duty for training is temporary full-time duty in the Armed Forces performed by members of the Reserves, Army National Guard, or Air National Guard for training purposes. Active duty for training does not establish eligible status. However, a discharge from active duty for training may establish veteran status and should be referred to VA for a determination.

• A Member of a Reserve Component shall establish status by showing a current DD Form 2 (Reserve) [red] and military active duty orders showing such person is on active duty, but not on active duty for training. No other method for verifying this status is currently available.

*Spouse, Children, or Unremarried Surviving Spouse of Active Duty Members or Veterans*

Step 1. Establish that the individual is a spouse, dependent child, or unremarried surviving spouse of an active duty member or veteran.

• The determination as to whether an individual is a spouse of an active duty member or veteran should be made based on your agency guidance. Possession of a current Military Identification Card showing that the individual is married to a veteran or active duty member may be considered as evidence of marriage to the member.

• The determination as to whether an individual is an unremarried surviving spouse of an active-duty member or veteran should be made based on agency guidance, in accordance with the following requirements (set forth in 38 U.S.C. § 1304), in addition to a determination that the surviving spouse has not remarried:

—the surviving spouse was married to the veteran or active-duty personnel within fifteen years after the termination of the period of service in which the injury or disease causing the death of the veteran was incurred or aggravated;

—the surviving spouse was married to the veteran or active-duty personnel for one year or more; or

—that a child was born of the relationship between the surviving spouse and the veteran or active-duty personnel, either during or before the marriage.

• The determination as to whether an individual is an unmarried legally adopted or biological dependent child of an honorably discharged veteran or active duty member of the Armed Forces should be made based on your agency guidance. Possession of a Military Identification Card may be considered as evidence that a child is dependent on the veteran or on the active duty member of the Armed Forces for his or her support and is under the age of 18 or if a full time student, under age 22.

Step 2. Determine that the member is on active duty or is a veteran.

• A spouse or child in possession of a Military Identification Card with an expiration date of more than one year from the date of its presentation presumptively meets the active duty requirement for his or her spouse or parent respectively.

• If the Identification Card is due to expire within one year, the spouse or child must provide a copy of the military orders for his or her spouse or parent as applicable to establish the active duty status of the service member. If married to a reserve member or if an unmarried child of a reserve member, the orders must show that the service member is on active duty and not on active duty for training.

• For dependents not possessing military orders but possessing an Identification Card with an expiration date less than one year from the date of presentation, active duty status can be verified by contacting RAPIDS or the DEERS Support Office.

• If a dependent child does not possess a Dependent Military Identification Card, status may be ascertained through the nearest RAPIDS station or by contacting the DEERS Office at the address provided above.

• A spouse or child showing a discharge certificate, DD Form 214 or equivalent, that shows active duty in the Army, Navy, Air Force, Marine Corps or Coast Guard and character of discharge ''Honorable'' is acceptable to establish the veteran status of his or her spouse or parent respectively without further inquiry, unless the certificate appears to be altered or irregular. If veteran status is claimed, but the spouse or child does not have papers showing service or discharge, refer the inquiring to the local VA regional office for determination.

### Attachment 7—Interim Guidance; Federal Means-Tested Public Benefits

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act'') provides that qualified aliens entering the United States on or after August 22, 1996, are ineligible for

ED_PRWORA_000092

federal means-tested public benefits during the first five years they are qualified aliens, unless they fall within a specific exception. (With limited exceptions, non-qualified aliens are ineligible for such benefits regardless of when they entered the United States.) All qualified aliens are eligible for federal means-tested public benefits after the expiration of such five-year period, unless the State in which the alien seeks benefits has imposed additional restrictions on eligibility.

The Department of Health and Human Services and the Social Security Administration have interpreted the limitations on eligibility for federal means-tested public benefits to apply only to mandatory spending programs of the federal government in which eligibility for benefits, or the amount of such benefits, or both, are determined on the basis of income, resources, or financial need of the individual, household, or family. See 62 FR 45,256 (August 26, 1997); 62 FR 45,284 (August 26, 1997). Under the HHS and SSA interpretations, TANF, Medicaid, and SSI are federal means-tested public benefits that are not otherwise exempted under the Act. You should consult with the appropriate federal agency overseeing the benefit program you administer to determine whether the program is a federal means-tested public benefit program.

The eligibility of qualified aliens for federal means-tested public benefits turns on whether they entered the U.S. before August 22, 1996, the number of years since they obtained qualified alien status, their particular immigration status, and the specific benefits they are seeking.

1. Determine whether the qualified alien entered the United States before August 22, 1996, by reviewing the documents evidencing his or her immigration status or, if the documents do not indicate whether the alien entered before August 22, 1996, by reviewing additional documentation pursuant to guidance provided by the agency or department overseeing your program. Further determine whether the qualified alien obtained qualified alien status prior to August 22, 1996. See Attachment 6 for a list of documents evidencing qualified alien status and guidance on how to derive relevant dates from those documents. In addition to the documents listed in Attachment 6, an alien who was in the United States before August 22, 1996, in a nonimmigrant or other lawful status, but who subsequently obtained qualified alien status, may present INS Form I–94, which is stamped with the date of entry,

to demonstrate entry prior to August 22, 1996.

• If the applicant entered the United States before August 22, 1996, and obtained qualified alien status before that date, he or she is eligible for all federal means-tested public benefits for which he or she satisfies all programmatic eligibility requirements. You should not engage in any further verification of immigration status for these persons.

• If the applicant entered the United States before August 22, 1996, but obtained qualified alien status after that date, you must verify that the alien was continuously present in the United States from the latest date of entry prior to August 22, 1996, until the date he or she obtained qualified alien status. In general, any single absence from the United States of more than 30 days, or a total of aggregated absences of more than 90 days, should be considered to interrupt ''continuous presence.'' To verify continuous presence, you should follow guidance provided by the agency or department overseeing your program, which may call for an applicant to present additional documentation such as tax returns, bills, rent receipts, or a letter from an employer. If the applicant can demonstrate continuous presence, he or she is eligible for all federal means-tested public benefits for which he or she satisfies all programmatic eligibility requirements.

• If the applicant entered the United States before August 22, 1996, and obtained qualified alien status after that date but was not continuously present in the United States from the latest date of entry prior to August 22, 1996, until obtaining such status, determine if he or she is eligible under Paragraphs 2 and 3 below.

• If the applicant entered the United States on or after August 22, 1996, and is a qualified alien, determine if he or she is eligible under Paragraphs 2 and 3 below.

2. With certain exceptions listed below, an applicant who entered the United States on or after August 22, 1996, and has attained qualified alien status, or who entered the United States before August 22, 1996, and obtained qualified alien status after that date but did not remain continuously present in the United States from the latest date of entry prior to August 22, 1996, until obtaining such status, is ineligible for all federal means-tested public benefits during the first five years after he or she obtained qualified alien status. Thus, unless the applicant falls within one of the excepted categories listed below, such an applicant is only eligible for federal means-tested public benefits for

which he or she satisfies all programmatic eligibility requirements if five years have passed from the date the applicant attained qualified alien status. Determine the date on which the applicant attained qualified alien status by reviewing the documents evidencing his or her status or, if the documents do not indicate the date he or she obtained such status, by filing INS Form G–845 and Supplement along with a copy of the document with the local INS office.

As noted above, the following categories of aliens are exempt from this five-year ban:

a. Refugees, asylees and aliens whose deportation or removal has been withheld—*see* Attachment 5 to Interim Guidance for definition and documentation;

b. Qualified aliens lawfully residing in any state who are honorably discharged veterans and who fulfill minimum active-duty service requirements, or who are on non-training active duty in the U.S. Armed Forces, or who are the spouse, unmarried dependent child, or unmarried surviving spouse of such a veteran or active service member, provided that, in the latter case, the marriage satisfies the requirements of 38 U.S.C. 1304—*see* Attachment 6 and Exhibit B thereto to Interim Guidance for definition and documentation;

c. Cuban/Haitian entrants, as defined in section 501(e) of the Refugee Education Assistance Act of 1980;

d. Amerasian immigrants admitted to the U.S. pursuant to section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988; and

e. With respect to SSI and Medicaid benefits, American Indians born in Canada and to whom the provisions of section 289 of the INA apply or members of an Indian tribe (as defined in section 4(e) of the Indian Self-Determination and Education Assistance Act).

3. Under the terms of the Act, the five-year ban does not apply to the following benefits or assistance:

• Medical assistance under Title XIX of the Social Security Act (or any successor program to such Title) for care and services that are necessary for the treatment of an emergency medical condition (as defined in § 1903(v)(3) of such Act) of the alien involved and are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the state plan approved under such Title (other than the requirement of the receipt of aid or assistance under Title IV of such Act, SSI benefits under

ED_PRWORA_000093

**61416** **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

Title XVI of such Act, or a state supplementary payment);

• Short-term, non-cash, in-kind emergency disaster relief;

• Assistance or benefits under the National School Lunch Act;

• Assistance or benefits under the Child Nutrition Act of 1966;

• Public health assistance (not including any assistance under Title XIX of the Social Security Act) for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease;

• Payments for foster care and adoption assistance under parts B and E of Title IV of the Social Security Act for a parent or child who would, in the absence of the Act's prohibition on payment of federal means-tested public benefits to qualified aliens during the first five years after entry into the U.S. with qualified alien status, be eligible to have such payments made on the child's behalf under such part, but only if the foster or adoptive parent(s) of such child is a qualified alien;

• Benefits covered by Attorney General Order No. 2049, 61 F.R. 45985 (Aug. 30, 1996), re: government-funded community programs, services or assistance that are necessary for protection of life or safety;

• Programs of student assistance under Titles IV, V, IX, and X of the Higher Education Act of 1965, and Titles III, VII, and VIII of the Public Health Service Act;

• Means-tested programs under the Elementary and Secondary Education Act of 1965;

• Benefits under the Head Start Act; and

• Benefits under the Job Training Partnership Act.

[FR Doc. 97–29851 Filed 11–14–97; 8:45 am]
**BILLING CODE 4410–10–M**

## DEPARTMENT OF JUSTICE

### Immigration and Naturalization Service

### Agency Information Collection Activities: Proposed Collection; Comment Request

**ACTION:** Revision of existing collection; generic clearance of customer service surveys.

Office of Management and Budget approval is being sought for the information collection listed below. This proposed collection was previously published in the **Federal Register** on

September 2, 1997, at 62 FR 46375, allowing for a 60-day public comment period. No comments were received by the Immigration and Naturalization Service.

The purpose of this notice is to allow an additional 30 days for public comments. Comments are encouraged and will be accepted until December 17, 1997. This process is conducted in accordance with 5 CFR 1320.10.

Written comments and/or suggestions regarding the item contained in this notice, especially regarding the estimated public burden and associated response time, should be directed to the Office of Management and Budget, Office of Regulatory Affairs, Attention: Department of Justice Desk Officer, Washington, DC 20530.

Written comments and suggestions from the public and affected agencies concerning the proposed collection of information should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agencies estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

*Overview of this information collection:* (1) *Type of Information Collection:* Revision of currently approved information collection.

(2) *Title of the Form/Collection:* Generic Clearance of Customer Service Surveys.

(3) *Agency form number, if any, and the applicable component of the Department of Justice sponsoring the collection:* No agency form number. Office of Policy and Planning, Immigration and Naturalization Service.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals and Households. This information will be used to access individual and agency needs, identify problems, and plan for programmatic improvements in the delivery of immigration services.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 150,000 responses at 30 minutes (.5) hours per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* 75,000 annual burden hours.

If you have additional comments, suggestions, or need a copy of the proposed information collection instrument with instructions, or additional information, please contact Richard A. Sloan 202–514–3291, Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, U.S. Department of Justice, Room 5307, 425 I Street, NW., Washington, DC 20536. Additionally, comments may be submitted to INS via facsimile to (202) 305–0143.

If additional information is required contact: Mr. Robert B. Briggs, Clearance Officer, United States Department of Justice, Information Management and Security Staff, Justice Management Division, Suite 850, Washington Center 1001 G Street, NW, Washington, DC 20530.

Dated: November 11, 1997.

**Robert B. Briggs,**
*Department Clearance Officer, United States Department of Justice.*
[FR Doc. 97–30091 Filed 11–14–97; 8:45 am]
**BILLING CODE 4410–18–M**

## MEDICARE PAYMENT ADVISORY COMMISSION

### Commission Meeting

**AGENCY:** Medicare Payment Advisory Commission.

**ACTION:** Notice of meeting.

**SUMMARY:** The Commission will hold its next public meeting on Monday, November 24, 1997 and Tuesday, November 25, 1997, at the Sheraton City Centre, 1143 New Hampshire Avenue, NW, Washington, D.C., in the New Hampshire I and II room. The meetings are tentatively scheduled to begin at 9:00 a.m. on November 24 and at 9:00 a.m. on November 25.

Among the topics the Commission will discuss are: patient classification systems for post acute care payment, urban critical access hospitals, disproportionate share payment policy, risk adjustment, adjusted community rate, quality of care, impact of the Balanced Budget Act on acute care hospitals, payment policy options affecting Medicare+Choice, other policy issues concerning Medicare+Choice, outpatient hospital payment policy, and

ED_PRWORA_000094



**UNITED STATES DEPARTMENT OF EDUCATION**

WASHINGTON, D.C. 20202

NOV 19 1997

Dear Colleague:

The welfare legislation enacted in 1996, the Personal Responsibility and Work Opportunity Reconciliation Act(PRWORA), as amended, contains a number of provisions that restrict the availability of Federal public benefits to aliens. We are aware that there has been considerable discussion regarding the effects of these provisions on programs of Federal aid to education administered by the United States Department of Education. The purpose of this letter and the attached memorandum is to clarify that, except in the limited situations described in the memorandum, the PRWORA does not affect eligibility for assistance under Federal programs administered by the Department at the preschool, elementary or secondary school levels, including special education, and will not require State and local educational agencies to take additional steps, such as verification of citizenship or alien status, with regard to student participation in those programs.

The enclosed memorandum describes in greater detail our conclusions regarding this matter and the reasons that we reached them. We hope that this clarification will be of use to you in the administration of these important programs and that you will share it as appropriate.

Sincerely,

Judith E. Heumann, Assistant Secretary for Special Education and Rehabilitative Services

Patricia McNeil, Assistant Secretary for Vocational and Adult Education

Gerald Tirozzi, Assistant Secretary for Elementary and Secondary Education

Delia Pompa, Director, Office of Bilingual Education and Minority Languages Affairs

Enclosure

ED_PRWORA_000095

## MEMORANDUM

### I. SUMMARY

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("Act"; "PRWORA") was enacted into law as Pub. L. No. 104-193 on August 22, 1996 and was recently amended by the Balanced Budget Act of 1997. Title IV contains a number of provisions restricting the availability of Federal public benefits to aliens. The Department of Justice has issued interim guidance, which has been published in the Federal Register, on several of those provisions, including how to verify that an alien applying for federal public benefits is eligible to receive them. 62 Fed. Reg. 61344 (Nov.17,1997). In light of this issuance by the Department of Justice, the Department of Education considers it desirable to clarify the applicability of Title IV of the Act to programs administered by the Department of Education at the preschool, elementary and secondary levels. This will enable State educational agencies, local educational agencies or other recipients to determine the extent, if any, to which verification is needed.

In summary, subject to the exceptions discussed in IV below, assistance provided under federally funded preschool, elementary and secondary education programs administered by the U.S. Department of Education does not involve "federal public benefits," as defined in section 401 of the PRWORA. Other sections of title IV relating to federal benefits are not applicable to these programs. Therefore, all aliens, regardless of their citizenship or immigration status, are eligible for assistance under these programs, in accordance with their authorizing statutes. As stated in the Department of Justice verification guidance, "If the federal program does not provide a `federal public benefit' covered by the Act..., the benefit provider is not required to, and should not attempt to, verify an applicant's status unless otherwise required or authorized to do so by law..." (62 Fed. Reg. at 61346) Except as noted below, the provisions of title IV of the PRWORA, relating to eligibility for federal benefits, do not require, or authorize, SEAs, LEAs and other providers under the Department's preschool, elementary, or secondary school programs to verify students' citizenship or immigration status, and neither do their authorizing statutes.

### II. BACKGROUND

Title IV of the Act generally limits eligibility for "federal public benefits" to U.S. citizens, U.S. non-citizen nationals and "qualified aliens," thus requiring benefit providers to verify the citizenship or immigration status of applicants for nonexempted federal public benefits. The term "qualified alien"

ED_PRWORA_000096

is defined in section 431(b) of the Act. (The text of section 431(b) is in the appendix to this memorandum.) In order to understand how title IV relates to the programs discussed in this memorandum, it may help to consider each of title IV's three major sections relating to eligibility for _federal_ benefits.

(1) Section 401 generally makes aliens who are not qualified aliens ineligible for federal public benefits. However, it does not affect the eligibility of aliens, regardless of their immigration status, for federal benefits that do not fall within section 401's definition of "federal public benefits" or that are specifically exempted under section 401(b).

(2) Section 402 provides for the limited eligibility of qualified aliens for certain federal programs. While all "qualified aliens" are eligible for most federal public benefits, only certain categories of qualified aliens are eligible for the programs specified in section 402. However, those provisions are not relevant here as none of these programs are administered by the Department of Education.

(3) Finally, section 403 generally provides that qualified aliens entering the United States after August 22, 1996 are ineligible for "federal means-tested public benefits" for a period of five years unless they fall within a specific exception. However, section 403(c)(2)(I) specifically excepts from that term "means-tested programs under the Elementary and Secondary Education Act of 1965." Moreover, eligibility for benefits, or the amount of these benefits, under other pre-school, elementary, and secondary level programs administered by the Department is not determined on the basis of the income or resources of the individual students or other persons who participate in these programs. Accordingly, these programs are not means-tested in that sense. Moreover, the Department concurs in the interpretation, adopted by the Department of Health and Human Services and other agencies, that section 403 applies only to mandatory spending programs administered by the Federal Government. See 62 Fed. Reg. 45256 (August 26, 1997). The Department does not administer mandatory spending programs at the preschool, elementary or secondary school level. Accordingly, the Federal preschool, elementary and secondary level programs administered by the Department of Education do not constitute federal means-tested public benefit programs for the purposes of section 403.

Because sections 402 and 403 do not apply to the Department's programs, at the preschool, elementary or secondary level, the rest of this memorandum focuses on section 401's definition of "federal public benefit," and, as set forth below, concludes that, with limited exceptions, the definition does not encompass assistance under the Department's federally administered and federally funded preschool, elementary and secondary education programs. Therefore, subject to these exceptions, title IV of the PRWORA does not affect the eligibility of aliens regardless of their citizenship or immigration status, for these programs, and

ED_PRWORA_000097

State and local educational agencies need not verify their status.

## III. APPLICABILITY OF SECTION 401

Section 401(a) of the Act, as indicated above, makes an alien who is not a "qualified alien" ineligible for any nonexempted "Federal public benefit." Federal public benefits, as defined in section 401(c)(1)(A), include "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States." Section 401(c)(1)(B) further defines the term to include "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any similar benefit for which payments or assistance are provided to an individual, household or family eligibility unit by an agency of the United States or by appropriated funds of the United States." (emphasis added).

Except in the limited situations identified below, the Department of Education does not consider its federally administered or federally funded programs, at the preschool, elementary and secondary levels,  or the activities that these programs support, to constitute federal public benefits because, for the reasons stated below, the programs are not specifically enumerated in section 401(c)(1)(A) or (B) and are not similar to those identified in section 401(c)(1)(B).

Section 401(c)(1)(A). The programs in question are not specifically identified in section 401(c)(1)(A). In that section, the PRWORA specifically makes receipt of a grant, loan, or a contract by an individual alien subject to the prohibitions of section 401. However, assistance under the Department programs discussed in this memorandum is not, to our knowledge, made available in the form of a grant, loan, or a contract to an individual student. On the contrary, funds under these programs are awarded to, and must remain under the control of, an agency, institution, or organization. See sections 14303 and 14306 of the Elementary and Secondary Education Act. When, for example, a local educational agency reimimburses a service provider or another local educational agency or private school for costs incurred to provide educational services to a student for whom the paying local educational agency is responsible, the transaction takes the form of an agency to agency payment, rather than a grant, loan, or contract to the individual student.

In sum, to our knowledge, no State or local educational agency, nor any other entity receiving funds under these programs, uses any of its federal funds to provide a loan or grant to an individual student. If it did so, however, such a grant or a loan would literally be a federal public benefit subject to the Act's eligibility restrictions.

Section 401(c)(1)(B). The programs discussed in this memorandum

are not specifically identified in section 401(c)(1)(B). Nor are
they "similar" to the programs identified in that section. This
is because the Department programs discussed here are at a
completely different level of education than "postsecondary
education," which is specifically identified in section
401(c)(1)(B), and they provide a different form of assistance.

Under programs administered by the Department, elementary and
secondary "benefits" are typically made available to public
educational agencies through grants that help them supplement
their educational programs. Postsecondary "benefits" typically
involve financial assistance to individual students. Congress
recognized this distinction when, in the conference report on the
PWRORA, it observed with respect to section 401: "The intent of
the conferees is that title I, part A of the Elementary and
Secondary Education Act would not be affected by section 401
because the benefit is not provided to an individual, household
or family eligibility unit." H.R. Rept. No. 104-725, 104th Cong.
2d Sess. 380 (1996) The same reasoning applies to the other
programs discussed in this memorandum.

Our interpretation also comports with section 433(a)(2) of the
Act, which states that nothing in title IV of the Act should be
construed as addressing alien eligibility for a basic public
education as determined by the Supreme Court of the United States
under Plyler v. Doe, 457 U.S. 202 (1982), as benefits provided by
federal elementary and secondary education programs are commonly
and properly integrated into public school programs.

Hence, we conclude that, except as set forth in this memorandum,
assistance under programs administered by the Department
provided, in an LEA or other setting, to students, including
special education students, at the preschool, elementary and
secondary school levels, is not affected by section 401. The
statutory authorities under which these programs are carried out
include the following: the Goals 2000: Educate America Act; the
Elementary and Secondary Education Act of 1965, as amended; the
Individuals with Disabilities Education Act; the Stewart B.
McKinney Homeless Assistance Act; and K-12 level programs under
the Carl D. Perkins Vocational Education and Applied Technology
Education Act, the Adult Education Act, the School-to-Work
Opportunities Act of 1994, and the Educational Research,
Development, Dissemination and Improvement Act of 1994.
Therefore, except as set forth in this memorandum, in
implementing the restrictions on eligibility contained in section
401 of the Act, State and local agencies administering these
Department of Education programs are not required to engage in
title IV verification procedures with respect to assistance under
those programs for students at the preschool, elementary and
secondary school levels.

IV. POSTSECONDARY BENEFITS

A number of the programs identified above permit State or local

agencies to use program funds to pay costs that help teachers and other individuals to enroll in, and attend classes at, institutions of higher education (IHEs) so that they can take courses that will help them obtain a postsecondary degree or credit, or participate in long-term postsecondary fellowship programs. This use of program funds may significantly benefit preschool, elementary and secondary school students by providing high quality professional development for participating teachers and other staff. However, payment of these costs also constitutes a discrete "postsecondary education benefit," within the meaning of section 401(c)(1)(B) of the PRWORA, for those individuals who attend the IHE, and so is subject to both the limitations on eligibility contained in section 401 and to the required verification procedures.

However, a variety of other professional development activities are carried out with funds under the programs described above. These activities generally take the form of in-service training of a short duration, typically delivered in the school or school district, where the purpose is to enhance the ability of professional staff to deliver the services to students under projects assisted by these programs. The Department does not believe that any incidental benefit for the teacher or other professional staff member constitutes a disecrete postsecondary benefit under section 401 similar to the provision of financial aid for study for credit at an institution of higher education. Therefore, the Department does not regard section 401(c)(1)(B) as encompassing teacher training under these programs, whether or not provided by an institution of higher education, if the training does not involve credit toward a postsecondary degree or certificate.

## V. CONCLUSIONS

Subject to these exceptions, the provisions of title IV of the PRWORA do not require SEAs, LEAs and other providers to verify applicants' citizenship or immigration status under the Department's preschool, elementary, or secondary school programs.

We will endevor to keep you informed regarding further pertinent developments under title IV. If you have questions regarding this guidance, please share them with the members of the Department's program staff or call Ted Sky, Senior Counsel, at 202-401-6000.

Appendix

Section 431(b) of the PRWORA defines the term "qualified alien" to mean "an alien who, at the time the alien applies for, receives or attempts to receive a Federal public benefit is--

"(1) an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act,
"(2) an alien who is granted asylum under section 208 of such Act,
"(3) a refugee who is admitted to the United States under section 207 of such Act,
"(4) an alien who is paroled into the United States under section 212(d)(5) of such Act for a period of at least 1 year;
"(5) an alien whose deportation is being withheld under section 243(h) of such Act, or
"(6) an alien who is granted conditional entry pursuant to section 203(a)(7) of such Act as in effect prior to April 1, 1980."

ED_PRWORA_000101



**U.S. Citizenship
and Immigration
Services**

MENU

Home > SAVE > About SAVE > Transaction Charges

# Transaction Charges

> ⓘ **ALERT:** Effective April 1, 2025, SAVE has revised its transaction charges for all state, local, tribal, and territorial government agencies using SAVE to eliminate those charges.

## Federal Agencies

On Oct. 1, 2024, USCIS implemented the second phase of a transaction charge increase for SAVE verification cases, which also streamlines billing to a single charge per verification case. SAVE also charges a minimum monthly service charge of $25.00 for each month in which a user agency submits at least one SAVE case. This increase is necessary as part of a phased approach through 2028 to more fully recover program costs as required by law and Federal agency guidance.

The federal agency charge is $2.25 per case in Fiscal Year (FY) 2025 (Oct. 1, 2024 – Sept. 30, 2025) and incrementally increases until reaching $3.10 per case in FY 2026.

| Fiscal Year | Federal Agency Charge<br>**Per Verification Case** |
|---|---|
| FY 2024 | $1.50 |
| FY 2025 | $2.25 |
| FY 2026 | $3.10 |

## Non-federal Agencies:

Effective April 1, 2025, SAVE has revised its transaction charges for all state, local, tribal, and territorial government agencies using SAVE to eliminate those charges.



Need Help?
Chat with Emma™

ED_PRWORA_000102

Transaction Charges | USCIS

| Fiscal Year | Non-Federal Agency Charge **Per Verification Case** |
|---|---|
| FY 2024 | $1.00 |
| FY 2025 | $1.50 for cases run through March 31, 2025; no charge for cases run on or after April 1, 2025. |

Last Reviewed/Updated: 04/29/2025

ED_PRWORA_000103

# GUIDANCE

## Recruitment and Eligibility under section 418A of the Higher Education Act of 1965, as amended



U.S. Department of Education
Office of Elementary and Secondary Education

ED_PRWORA_000104

**Purpose of the Guidance**

The purpose of this guidance is to provide information about participant recruitment and eligibility for the High School Equivalency Program (HEP) and the College Assistance Migrant Program (CAMP), authorized under section 418A of the Higher Education Act of 1965, as amended (HEA).  This guidance represents the Department's current thinking on this topic.  It does not create or confer any rights for or on any person.  This guidance does not impose any requirements beyond those required under applicable law and regulations.

If you are interested in commenting on this guidance document, please send your comment to OESEGuidanceDocument@ed.gov.

ED_PRWORA_000105

# Table of Contents

**I.  RECRUITMENT AND ELIGIBILITY** ................................................................................1

**A.  Recruitment** ..................................................................................................................2

A1.  Must each recipient of HEP and CAMP funds develop and implement a plan for recruiting eligible participants?.......................................................................................2

A2.  What is meant by the terms "identifying," "informing," and "recruiting," as they are used in 34 CFR 206.20(d)(1)? ....................................................................................2

A3.  In developing and implementing an effective recruiting plan, what are the qualities that a HEP or CAMP project should consider for its recruiter(s)?.....................................3

A4.  In developing and implementing an effective recruiting plan, what responsibilities should a HEP or CAMP project assign to its recruiter? ...............................................4

A5.  What should the project's recruiting plan include? .....................................................4

A6.  How should grantees determine the geographical area of recruitment for a HEP or CAMP project? ............................................................................................................5

A7.  What should the grantee do if it becomes necessary to change the recruitment area after the project has been funded?........................................................................................5

**B.  Eligibility** ........................................................................................................................5

B1.  Who is eligible to participate in a HEP project?..........................................................5

B2.  Who is eligible to participate in a CAMP project?.......................................................6

B3.  What family members are eligible to participate in HEP and CAMP?.........................6

B4.  Who can be an individual's "immediate family member" for purposes of eligibility for HEP and CAMP?..........................................................................................................6

B5.  Who is a "spouse" for the purposes of eligibility for HEP and CAMP? ....................7

B6.  What is an example of an immediate family member who would qualify under 34 CFR 206.5(c)(5)(iii)(B)?.......................................................................................................7

B7.  According to 34 CFR 206.3(b)(1), a potential HEP participant must not have earned a secondary school diploma or its equivalent.  If a student has graduated from the equivalent of secondary school in his or her native country, would that student still be eligible to participate in a HEP project? .........................................................................7

B8.  If a student meets all of CAMP's eligibility criteria, but does not meet the participating IHE's admissions policies, is the student eligible to participate in the CAMP project at that IHE? .....................................................................................................................7

B9.  As stated above, 34 CFR 206.3(c)(1) requires students to be enrolled, or admitted for enrollment, as full-time students at the participating IHE in order to be eligible to participate in a CAMP project.  How is "full-time" defined?....................................8

B10.  According to 34 CFR 206.3(c)(2), in order to be eligible for CAMP, a potential student must not be beyond the first academic year of a program of study at the IHE, as determined under the standards of the IHE.  How is the "first academic year of a program of study" defined? .............................................................................................9

B11.  If a student has completed a year of study at a foreign post-secondary institution, could that student still be eligible for CAMP services? ....................................................9

**C.  Determining Need** ..........................................................................................................9

ED_PRWORA_000106

C1.    Must a grantee consider academic, supporting-services, and financial need when recruiting project participants?.................................................................................9
C2.    How might a CAMP grantee determine that a potential participant has the academic, supporting-service, and financial-assistance needs that the project is designed to serve?.......9
C3.    How might a HEP grantee determine that a potential participant has the academic and supporting-service and financial-assistance needs that the project is designed to serve?......10

**D.    Farmwork under 34 CFR 206.3(a)(1)........................................................................10**
D1.    What does 34 CFR 206.3(a)(1) require relating to qualifying work? ...................................10
D2.    What is a seasonal farmworker for the purpose of 34 CFR 206.3(a)(1)? .............................10
D3.    Must the period of at least 75 days be continuous?...............................................................11
D4.    What is a migrant farmworker for purposes of determining eligibility under 34 CFR 206.3(a)(1)?...........................................................................................................................11
D5.    How is farmwork defined for purposes of determining eligibility under 34 CFR 206.3(a)(1)?...........................................................................................................................11
D6.    The definition of farmwork in 34 CFR 206.5(c)(3) refers to an agricultural activity being performed on a farm, ranch, or similar establishment.  What are some examples of a "similar establishment"? ......................................................................................................11
D7.    Could a packing or sorting facility be considered a "similar establishment"?......................11
D8.    What is the definition of agricultural activity for purposes of determining whether one's farmwork qualifies for HEP and CAMP eligibility (34 CFR 206.3(a)(1))? ..........................11
D9.    In the definition of agricultural activity, what is a "crop"? .................................................12
D10.   In the definition of agricultural activity, what is the "production of a dairy product"?........12
D11.   In the definition of agricultural activity, what is "poultry"? ................................................12
D12.   In the definition of agricultural activity, what is "livestock"?..............................................12
D13.   What are some examples of activities that would be considered agricultural activities because they are directly related to the production of crops?...............................................12
D14.   What are some examples of activities that would be considered agricultural activities because they are directly related to the production of dairy products?.................................12
D15.   What are some examples of activities that would be considered agricultural activities because they are directly related to the production of livestock?..........................................13
D16.   What are some examples of activities that would be considered agricultural activities because they are directly related to the production of poultry?............................................13
D17.   What are some examples of activities that are not directly related to the production of crops, dairy products, poultry, or livestock, and so not an agricultural activity for purposes of 34 CFR 206.5(c)(2)(i)?.....................................................................................13
D18.   Could employment in agricultural processing be an agricultural activity that would qualify an individual to be eligible for a HEP or CAMP project under 34 CFR 206.3(a)?...13
D19.    Is sorting and packing considered to be an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)?...........................................................................................................................14
D20.   Is slaughtering considered to be an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)? ..................14
D21.   Is transportation of agricultural products considered to be an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)? ..................................................................................................................15

ED_PRWORA_000107

D22. What are some examples of activities that would be considered agricultural activities because they are directly related to the cultivation or harvesting of trees?............................15

D23. Is transporting trees from a harvesting site to a processor an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)? ..........................................................................................15

D24. Does work in a tree nursery normally constitute an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)?..........................................................................................15

D25. Does commercial landscaping qualify as farmwork for purposes of determining eligibility under 34 CFR 206.3(a)(1)? ................................................................15

D26. In the definition of "agricultural activity" in 34 CFR 206.5(c)(2), what is a "fish farm"?....16

D27. What are some examples of activities that are considered agricultural activities because they are directly related to fish farms?..................................................................16

**E.    Temporary and Seasonal Employment ..............................................................................16**
E1. What is seasonal employment?...........................................................................................16
E2. What is temporary employment?.........................................................................................16
E3. How does one determine whether employment was temporary?..........................................16
E4. If a worker is employed year round by the same employer performing a series of different activities, may the worker, or his or her immediate family members, be eligible for HEP or CAMP?........................................................................................16

**F.    Primary Employment .........................................................................................................17**
F1. The definitions of both "migrant farmworker" and "seasonal farmworker" in 34 CFR 206.5((c)(7) and (c)(8), respectively, require the worker's "primary employment" to be in temporary or seasonal farmwork.  What is meant by the term "primary employment"? ...........................................................................................17

F2. Must the period of "primary employment" in temporary or seasonal farmwork for at least 75 days in the past 24 months be continuous? .............................................17

F3. If a person holds a job as an instructional aide, bus driver, or other temporary or seasonal non-agricultural worker during the regular school year, and works in seasonal farmwork for 75 days during the summer months, would he or she qualify as a migrant or seasonal farmworker? ...............................................................17

**G.    Qualifying work under 34 CFR 206.3(a)(2) ......................................................................18**
G1. What does 34 CFR 206.3(a)(2) state?..................................................................................18
G2. Who is eligible to receive MEP services? ...........................................................................18
G3. What types of information and resources regarding MEP eligibility requirements are available to HEP and CAMP grantees?..................................................................19
G4. Should HEP or CAMP project staff make MEP eligibility determinations?........................19
G5. May a HEP/CAMP project rely upon a MEP Certificate of Eligibility (COE) that a State educational agency (SEA) has already accepted to establish and document eligibility for a HEP or CAMP project under 34 CFR 206.3(a)(2)?....................................19
G6. If a HEP/CAMP project cannot obtain an SEA-accepted COE that confirms the eligibility of a prospective HEP/CAMP student for the MEP, how else may the project document MEP participation or eligibility under 34 CFR 206.3(a)(2)?................................19

ED_PRWORA_000108

G7.     Who is eligible to participate in the NFJP? ...............................................................19
G8.     How does the NFJP define "eligible farmworker"?...................................................20
G9.     Should HEP or CAMP project staff make a determination regarding NFJP eligibility?.......20
G10.    If an individual participated in, or is eligible to participate in, the MEP or NFJP, must
        he or she also meet the "special HEP qualifications" specified in 34 CFR 206.3(b) or
        the "special CAMP qualifications" cited in 34 CFR 206.3(c) in order to be eligible for a
        HEP or CAMP?..........................................................................................................20
G11.    Is there a timeframe within which a potential HEP participant must have participated in
        the MEP or NFJP in order to be eligible for the HEP?...............................................21
G12.    Is there a timeframe within which a potential CAMP participant must have participated
        in the MEP or NFJP in order to be eligible for the CAMP?.......................................21

H.      Other Eligibility and Recruitment Issues...........................................................22
H1.     Once an individual is enrolled in a HEP project, how long is he or she eligible for HEP
        services? ....................................................................................................................22
H2.     Once an individual is enrolled in a CAMP project how long is he or she eligible for
        CAMP services?.........................................................................................................22
H3.     Under what circumstances must a HEP or CAMP project re-establish eligibility of a
        student who has already been enrolled in the project and begun receiving services but
        has not yet finished the program? ..............................................................................22
H4.     Must a HEP or CAMP project re-establish eligibility for individuals who, during the
        budget period, are unable to attain the equivalent of a high school diploma (in the case
        of HEP), or complete the first academic year of a program of study at an IHE (in the
        case of CAMP), but who wish to resume HEP or CAMP activities? ........................23
H5.     If an individual is identified toward the end of the individual's period of HEP / CAMP
        eligibility, is there a limit on how long he or she may receive HEP or CAMP services? .....24
H6.     Are individuals who do not meet the civil status requirements for student financial
        assistance eligible to participate in the CAMP program? ........................................24
H7.     May a grantee use program funds for recruitment services?....................................24
H8.     May a grantee use program funds to recruit participants through radio, TV or
        newspaper advertising?.............................................................................................24

I.      Documenting Eligibility.......................................................................................25
I1.     Is there a federally developed form for documenting eligibility for HEP or CAMP?...........25
I2.     What constitutes adequate documentation of eligibility as a migrant or seasonal
        farmworker? ..............................................................................................................25
I3.     Is maintaining a MEP COE or NFJP enrollment form sufficient for documenting an
        individual's participation in the MEP or NFJP according to 34 CFR 206.3(a)(2)?..............26
I4.     Are HEP and CAMP projects permitted to determine independently whether an
        individual meets the eligibility requirements for the MEP or NFJP in order to qualify
        the individual for a HEP or CAMP project?..............................................................26
I5.     If MEP or NFJP staff determine that an individual is not eligible for the MEP or NFJP,
        may a HEP or CAMP project find the individual eligible under 34 CFR 206.3(a)(2)
        based on its own independent determination of the MEP and NFJP eligibility
        requirements? ............................................................................................................26
I6.     Who is responsible for establishing the eligibility of participants?.........................27

ED_PRWORA_000109

I7.     34 CFR 206.3(a)(1) extends eligibility to participate in HEP and CAMP to individuals who have spent a minimum of 75 days during the past 24 months as a migrant or seasonal farmworker.  From what date should a recruiter count back to determine the 24-month period? ..................................................................................................................27

ED_PRWORA_000110

# I.    RECRUITMENT AND ELIGIBILITY

Both the High School Equivalency Program (HEP) and College Assistance Migrant Program (CAMP) are authorized under section 418A of title IV of the Higher Education Act of 1965, as amended by section 408 of the Higher Education Opportunity Act, P.L. 110-315 (HEA).  The purposes of HEP are to help migrant and seasonal farmworkers and members of their immediate family: (1) obtain the equivalent of a secondary school diploma, and (2) subsequently to gain employment or be placed in an institution of higher education (IHE) or other postsecondary education or training.  The purpose of CAMP is to provide the academic and financial support necessary to help migrant and seasonal farmworkers and members of their immediate families successfully complete their first year of college.

In order to successfully achieve these purposes, grantees funded under HEP or CAMP are responsible for: (1) identifying and recruiting potential project participants in the recruitment areas described in their approved grant application; (2) determining and documenting participant eligibility; (3) enrolling participants in their projects; and (4) maintaining appropriate records documenting the eligibility of project participants.  Furthermore, grantees must select and train recruiters, control the quality of eligibility documentation, and maintain other appropriate project records.

Providing recruitment services and determining participant eligibility is required of both HEP and CAMP grantees.  Section 418(A)(b)(1) and (A)(c)(1) of the HEA and 34 CFR 206.3 identify the eligibility requirements for participants served by HEP and CAMP projects.

Locating and enrolling eligible HEP and CAMP participants is critical to the success of a project.  However, determining whether an individual is eligible to participate in a HEP or CAMP project can be difficult at times, and it requires gathering specific information about the individual and his or her family.  This document, which will be part of a larger set of non-regulatory guidance for HEP and CAMP, addresses--

1. Recruitment of potential participants;
2. Establishment of their eligibility for HEP and CAMP in each of the four ways the HEA permits– (a)  as a migrant or seasonal farmworker; (b)  as an immediate family member of a migrant or seasonal farmworker; (c)  as one whose eligibility for HEP or CAMP is based on eligibility under the Migrant Education Program (MEP);  or, (d)  as one whose eligibility for HEP or CAMP is based on eligibility under the National Farmworker Jobs Program (NFJP) (administered by the U.S. Department of Labor); and
3. Documentation of participant eligibility.

   The MEP provides formula grants to State educational agencies (SEAs) to establish and improve education programs for migratory children.  Many HEP and CAMP projects coordinate closely with projects funded under the MEP for recruitment and other purposes.

ED_PRWORA_000111

**Statutory Requirements:**

Section 418A(b) and (c) of HEA
Section 1309(2) of Title I, Part C of Elementary and Secondary Education Act (ESEA)
Section 167(h) of Workforce Investment Act (WIA)

**Regulatory Requirements:**

34 CFR part 206
34 CFR 200.81 (Program Definitions for Migrant Education Program)
20 CFR 669.110 (Definitions Applicable to the National Farmworker Jobs Program (NFJP) and the other services and activities established under WIA section 167)[1]

## A.     Recruitment

### A1.     Must each recipient of HEP and CAMP funds develop and implement a plan for recruiting eligible participants?

Yes.  34 CFR 206.20(d)(1) requires each applicant for a HEP or CAMP project to provide an assurance with its application that, if awarded a grant, it will develop and implement a plan for identifying, informing, and recruiting eligible participants who are most in need of the academic and supporting services and financial assistance provided by the project.  The project's geographical recruitment area should be described in the approved application.

### A2.     What is meant by the terms "identifying," "informing," and "recruiting," as they are used in 34 CFR 206.20(d)(1)?

We intend these terms to mean the following with respect to HEP and CAMP:

- *identifying* means determining the presence and location of eligible migrant or seasonal farmworkers and their immediate family members;

- *informing* means providing potential participants with information about the purpose of the program, participant eligibility, and the services provided by the project;

- *recruiting* means locating potential applicants, determining and documenting their eligibility for participating in the grantee's project, including determining which eligible applicants are

---

[1] Section 418(A)(b)(1) and (A)(c)(1) of the HEA refer to programs under section 167 of the Workforce Investment Act of 1998 (WIA), which authorizes the National Farmworker Jobs Program (NFJP) administered by the U.S. Department of Labor (DOL).  The regulations for the NFJP are found in 20 CFR part 669.  However, the HEP/CAMP regulations in 34 CFR 206.3(a)(2) refer incorrectly to 20 CFR part 633 as the regulations for the relevant DOL program.  The regulations in 20 CFR part 633 are, in fact, obsolete and apply to the former Migrant and Seasonal Farmworker Programs authorized under the Job Training Partnership Act, which was replaced by WIA in 1998.  For the purposes of this guidance, the regulations in 20 CFR part 669 will be cited; the Department will be working to correct this discrepancy in the HEP/CAMP regulations.

ED_PRWORA_000112

most in need of the project's services in accordance with 34 CFR 206.20(d)(1), and enrolling these new participants in the grantee's project.

**A3.    In developing and implementing an effective recruiting plan, what are the qualities that a HEP or CAMP project should consider for its recruiter(s)?**

In general, a recruiter should (1) have access to the population in the project's recruitment area that is potentially able to participate in and benefit from the HEP or CAMP project,  and (2) be able to communicate with this population about the services offered through and eligibility requirements for participating in HEP and CAMP projects.  In many cases, grantees will need to conduct training and professional development for their recruiters to ensure they possess these competencies.  We therefore would expect recruiters for HEP and CAMP grantees to have the following qualities and qualifications:

- knowledge of the HEP and CAMP eligibility requirements;

- knowledge of the locations within the project's geographical recruitment area where migrant and seasonal farmworkers reside, work and frequently visit, including roads, labor camps, and other housing areas where migrant and seasonal farmworker families typically live;

- knowledge of local organizations that may assist migrant and seasonal farmworkers and their families in the project's recruitment area, including community agencies that may provide services to them; churches that they and their families attend; events that might attract them; and other local areas where they might gather;

- knowledge of the agricultural community in the recruitment area, including the local growers, and agricultural production activities outlined in the project's recruitment plan;

- willingness and skills to collaborate with local and State MEPs and NFJP grantees;

- knowledge of the language(s) spoken by migrant and seasonal farmworkers in the project's recruitment area;

- knowledge of the migrant lifestyle, cultures, values, and beliefs, and the ability to develop a strong rapport with migrant and seasonal farmworker families;

- knowledge of the type of student who would most likely benefit from the HEP or CAMP project;

-  knowledge of the services provided by the individual HEP or CAMP project;

- knowledge of the secondary schools that potential participants have attended, and good communication with teachers and counselors at those schools; and

- willingness to work flexible hours and to visit places migrant and seasonal farmworkers are likely to be found.

3

**A4.     In developing and implementing an effective recruiting plan, what responsibilities should a HEP or CAMP project assign to its recruiter?**

A recruiter's primary responsibilities should be to:

- identify prospective participants based on the program's eligibility criteria;

- work closely with NFJP and MEP staff to locate eligible participants for HEP or CAMP who potentially qualify by being currently eligible for, or having participated in, the NFJP or MEP. (For more information on requirements for documenting eligibility of participants served by these programs, see the response to question I2 in this document.);

- gather eligibility information from prospective participants, their parents, guardians, immediate family and others;

- work with his or her project to make and document eligibility determinations for potential participants; and

- maintain, in conjunction with other relevant project staff, a record of the eligibility documentation of individuals who are recruited and enrolled.

- <u>Note</u>:  While an individual might self-identify herself or himself as eligible for HEP or CAMP, it is the responsibility of the recruiter and project staff, not the prospective participant, to make the eligibility determination.  Determinations should be based on credible documentation of the individual's status.

**A5.     What should the project's recruiting plan include?**

A HEP or CAMP grantee should develop and implement a recruitment plan that includes:

- a defined geographical recruitment area (targeted recruitment area) that reflects a known population of individuals who are likely to be eligible to participate in a HEP or CAMP project and that corresponds to the recruitment area defined in the grantee's approved application;

- the steps the grantee will take for identifying and recruiting prospective participants, particularly those individuals who are most in need of the academic and supporting services and financial assistance provided by the project, and for informing them about potential HEP or CAMP services;

- a list and contact information of local growers, MEP staff, and other helpful contacts; and

- the steps the grantee will take to collaborate with local schools and agencies, MEP and NFJP grantees, and other projects that serve migrant and seasonal farmworkers in the targeted recruitment area.

ED_PRWORA_000114

**A6.    How should grantees determine the geographical area of recruitment for a HEP or CAMP project?**

The geographic recruitment area that is identified in the plan should be consistent with the grantee's approved application.  Grantees should determine the geographical areas where the project will recruit based on their knowledge of where migratory and seasonal farmworkers are employed and reside.  Typically, for projects in which students are expected to commute to receive services (as opposed to projects in which students reside in the location where services are provided), the recruitment area should extend far enough to ensure an adequate number of participants while not creating unreasonable travel distances for commuters.  For residential projects, the recruitment area could extend farther and could even cross State lines.  That said, residential projects are still encouraged to not unduly scatter their efforts by attempting to recruit in an area that is unreasonably large.  For projects that establish satellite instructional sites, the project should apply similar standards to determine the size of the recruitment area for each site.

**A7.    What should the grantee do if it becomes necessary to change the recruitment area after the project has been funded?**

Grantees should notify their ED program officer whenever there is a proposed change to the recruitment area.  ED staff would then determine whether such a proposed change is consistent with the project's scope and objectives as described in the grantee's application.

## B.    Eligibility

**B1.    Who is eligible to participate in a HEP project?**

Under section 418A(b)(1) of the HEA[2] and 34 CFR 206.3(a) and (b), an individual is eligible to participate in a HEP project if he or she:

1.  Has, or has at least one immediate family member who has, spent a minimum of 75 days during the past 24 months as a migrant or seasonal farmworker (34 CFR 206.3(a)(1)); or

2.  Is eligible to participate, or has participated within the past 24 months, in the MEP or the NFJP (see questions G1-G12 regarding participant eligibility under 34 CFR 206.3(a)(2)); and

3.  Has not have earned a secondary school diploma or its equivalent (34 CFR 206.3(b)(1)); and

4.  Is not be currently enrolled in an elementary or secondary school (34 CFR 206.3(b)(2)); and

---

[2]  The Higher Education Opportunity Act of 2008 (HEOA) amended the HEA to extend eligibility from an individual's parent who meets the program's eligibility requirements to the individual's immediate family member who does so.

5

5. Is 16 years of age or over, or beyond the age of compulsory school attendance in the State in which he or she resides (34 CFR 206.3(b)(3)); and

6. Is determined by the grantee to need the academic and supporting services and financial assistance provided by the project in order to attain the equivalent of a secondary school diploma and to gain employment or be placed in an institution of higher education (IHE) or other postsecondary education or training (34 CFR 206.3(b)(4)).

**B2.   Who is eligible to participate in a CAMP project?**

Under section 418A(c)(1) of the HEA and 34 CFR 206.3(a) and (c), an individual is eligible to participate in the CAMP if he or she:

1. Has, or has at least one immediate family member who has, spent a minimum of 75 days during the past 24 months as a migrant or seasonal farmworker (34 CFR 206.3(a)(1)); or

2. Is eligible to participate, or has participated, in the MEP or the NFJP (see questions G1-G12 regarding participant eligibility under 34 CFR 206.3(a)(2)); and

3. Is enrolled or admitted for enrollment as a full-time student at the participating IHE (34 CFR 206.3(c)(1)); and

4. Is not beyond the first academic year of a program of study at the IHE, as determined under the standards of the IHE (34 CFR 206.3(c)(2)); and

5. Is determined by the grantee to need the academic and supporting services and financial assistance provided by the project in order to complete an academic program of study at the IHE (34 CFR 206.3(c)(3)).

**B3.   What family members are eligible to participate in HEP and CAMP?**

An individual who, or whose immediate family member, has spent a minimum of 75 days during the past 24 months as a migrant or seasonal farmworker is eligible to participate in a HEP or CAMP project.

**B4.   Who can be an individual's "immediate family member" for purposes of eligibility for HEP and CAMP?**

Under 34 CFR 206.5(c)(5), the term "immediate family member"  means:
   (i) A spouse.
   (ii) A parent, step-parent, adoptive parent, foster parent, or anyone with guardianship.
   (iii) Any person who --
   (A)  Claims the prospective HEP or CAMP participant as a dependent on a Federal income tax return for either of the previous two years, or
   (B)  Resides in the same household as the prospective HEP or CAMP participant, supports

6

that individual financially, and is a relative of that individual.

**B5.    Who is a "spouse" for the purposes of eligibility for HEP and CAMP?**

The term "spouse" is not defined in section 418A(b) and (c) of HEA or 34 CFR part 206. Therefore, for purposes of HEP and CAMP, the definition of spouse is governed by the laws of the State in which the project delivers services to the participants.

**B6.    What is an example of an immediate family member who would qualify under 34 CFR 206.5(c)(5)(iii)(B)?**

If a potential HEP or CAMP student lives with his or her uncle and that uncle supports the potential student financially, that uncle would be considered an "immediate family member" for the purposes of the eligibility of the potential HEP or CAMP student.  However, in this example, as an "immediate family member" the uncle can only help to confer HEP or CAMP eligibility if he also "spent a minimum of 75 days during the past 24 months as a migrant or seasonal farmworker" (see 34 CFR 206.3(a)(1)).  And to be an eligible student in the HEP or CAMP project, the prospective student must meet the special HEP or CAMP qualifications in 34 CFR 206.3(b) and 206.3(c), respectively.

**B7.    According to 34 CFR 206.3(b)(1), a potential HEP participant must not have earned a secondary school diploma or its equivalent.  If a student has graduated from the equivalent of secondary school in his or her native country, would that student still be eligible to participate in a HEP project?**

It depends on whether the IHE identified as the HEP grantee, or in the case of a private nonprofit organization, the IHE with which the organization collaborates, accepts the credential from the foreign school as the equivalent of a high school diploma for purposes of a student's eligibility for admission to the IHE.  If the IHE accepts the foreign credential, the student would not be eligible to participate in the HEP project (because the student would have an equivalent to a high school diploma as determined by the IHE).  On the other hand, if the IHE does not accept the credential from the foreign secondary school for these purposes, then the student would be eligible to participate in the HEP project provided, however, that the student meets the other program eligibility requirements.

**B8.    If a student meets all of CAMP's eligibility criteria, but does not meet the participating IHE's admissions policies, is the student eligible to participate in the CAMP project at that IHE?**

No.  One of the eligibility requirements for CAMP is that the individual be enrolled, or be admitted for enrollment, as a full-time student at the participating IHE (34 CFR 206.3(c)(1)).  Therefore, an individual who does not meet the university's admissions standards and requirements (or is otherwise unable to secure the university's provisional admission) would not meet the eligibility requirement that he or she be enrolled or admitted for enrollment as a full-time student at the participating IHE.

7

**B9.** **As stated above, 34 CFR 206.3(c)(1) requires students to be enrolled, or admitted for enrollment, as full-time students at the participating IHE in order to be eligible to participate in a CAMP project.  How is "full-time" defined?**

Section 206.5(c)(4) of the HEP and CAMP regulations define "full-time" as, "with respect to an individual, a student who is carrying a full-time academic workload, as defined in 34 CFR part 690." Part 690, through a cross-reference to 34 CFR 668.2(b), defines the term "full-time student" as:

> An enrolled student who is carrying a full-time academic workload, as determined by the institution, under a standard applicable to all students enrolled in a particular educational program.  The student's workload may include any combination of courses, work, research, or special studies that the institution considers sufficient to classify the student as a full-time student, including for a term-based program, repeating any coursework previously taken in the program but not including either more than one repetition of a previously passed course, or any repetition of a previously passed course due to the student failing other coursework.  However, for an undergraduate student, an institution's minimum standard must equal or exceed one of the following minimum requirements:
>
> (1) For a program that measures progress in credit hours and uses standard terms (semesters, trimesters, or quarters), 12 semester hours or 12 quarter hours per academic term.
>
> (2) For a program that measures progress in credit hours and does not use terms, 24 semester hours or 36 quarter hours over the weeks of instructional time in the academic year, or the prorated equivalent if the program is less than one academic year.
>
> (3) For a program that measures progress in credit hours and uses non-standard terms (terms other than semesters, trimesters or quarters) the number of credits determined by—
>
>> (i) Dividing the number of weeks of instructional time in the term by the number of weeks of instructional time in the program's academic year; and
>>
>> (ii) Multiplying the fraction determined under paragraph (3)(i) of this definition by the number of credit hours in the program's academic year.
>
> (4) For a program that measures progress in clock hours, 24 clock hours per week.
>
> (5) A series of courses or seminars that equals 12 semester hours or 12 quarter hours in a maximum of 18 weeks.
>
> (6) The work portion of a cooperative education program in which the amount of work performed is equivalent to the academic workload of a full-time student.
>
> (7) For correspondence coursework, a full-time course load must be—

8

ED_PRWORA_000118

(i) Commensurate with the full-time definitions listed in paragraphs (1) through (6) of this definition; and

(ii) At least one-half of the coursework must be made up of non-correspondence coursework that meets one-half of the institution's requirement for full-time students.

**B10.  According to 34 CFR 206.3(c)(2), in order to be eligible for CAMP, a potential student must not be beyond the first academic year of a program of study at the IHE, as determined under the standards of the IHE.  How is the "first academic year of a program of study" defined?**

Each IHE determines for itself what constitutes the "first academic year of a program of study." Grantees should review their participating IHE's policies to determine what constitutes a first academic year of a program of study at that IHE.

**B11.  If a student has completed a year of study at a foreign post-secondary institution, could that student still be eligible for CAMP services?**

Possibly.  If the participating IHE does not accept the full year of credits obtained from the foreign institution, the student could still be considered to be in his or her first year of the program of study and, therefore, could still be eligible for CAMP services.  Note, however, that regardless of the length of the CAMP project at the IHE, this student would cease to be eligible to participate in a CAMP project once he or she is considered to be beyond the first academic year of a program of study, according to the guidelines of the IHE.

## C.    Determining Need

**C1.  Must a grantee consider academic, supporting-services, and financial need when recruiting project participants?**

Yes.  In selecting applicants for funding, the Secretary looks at the overall quality of the recruitment plan, and looks specifically for "...information that shows that the applicant has adequate plans for...recruiting eligible participants who are most in need of the academic and supporting services and financial assistance provided by the project."  34 CFR 206.20(d)(1)

As such, the grantee should establish a written policy for choosing students according to their level of need for the academic and supporting services and financial assistance provided by the project. Documentation of the student's need for assistance should be maintained in the student's official project file.

**C2.  How might a CAMP grantee determine that a potential participant has the academic, supporting-service, and financial-assistance needs that the project is designed to serve?**

In order to determine a prospective participant's need for academic and supporting services, grantees may use information from a variety of sources, including correspondence with teachers and

ED_PRWORA_000119

counselors, student records and transcripts, and interviews with prospective students and their families.

How one documents financial assistance need is left to the grantee. Most CAMP projects rely on the Free Application for Federal Student Aid (FAFSA) to determine financial assistance needs as this is a commonly used tool to determine financial need throughout post-secondary education. Relying on a FAFSA to make this determination has the added benefit of making CAMP students more prepared to apply for additional Federal financial aid when they are no longer eligible for financial assistance through the CAMP project.

**C3.    How might a HEP grantee determine that a potential participant has the academic and supporting-service and financial-assistance needs that the project is designed to serve?**

With regard to determining academic and supporting-services needs, as with CAMP grantees, HEP grantees may consider information from a variety of sources, including correspondence with teachers and counselors, student records and transcripts, and interviews with prospective students and their families. While not required, most HEP projects tend to use a standard placement test to determine the academic skill level and potential academic needs of their incoming students.

In order to determine a prospective participant's financial assistance needs, a HEP grantee may consider information from a variety of sources, such as a worker's pay stubs or W-2 forms. In contrast to the CAMP, there is no common form, such as the FAFSA, that is generally used by HEP grantees to make this determination. New HEP grantees are encouraged to seek advice and assistance from successful established grantees on best practices for making this determination.

## D.    <u>Farmwork under 34 CFR 206.3(a)(1)</u>

**D1.    What does 34 CFR 206.3(a)(1) require relating to qualifying work?**

To be eligible to participate in a HEP or CAMP project, an individual must demonstrate his or her connection to migrant or seasonal farmwork based on criteria in either 34 CFR 206.3(a)(1) or (a)(2). Section 206.3(a)(1) provides for eligibility to participate in a HEP or CAMP project if a person or his or her immediate family member has spent a minimum of 75 days during the past 24 months as a migrant or seasonal farmworker. This eligibility requirement is often referred to as the "75-days/24 months rule" or the "HEP/CAMP rule."

Please note that the MEP definition of "qualifying work" is not used as part of the definition of a migrant farmworker in section 206.3(a)(1). The MEP definition of "qualifying work" is used in section 206.3(a)(2). This second method of establishing HEP or CAMP eligibility is discussed in more detail in section G of this document.

**D2.    What is a seasonal farmworker for the purpose of 34 CFR 206.3(a)(1)?**

The term "seasonal farmworker" means a person whose primary employment was in farmwork on a temporary or seasonal basis (that is, not a constant year-round activity) for a period of at least 75 days within the past 24 months. (34 CFR 206.5(c)(8))

ED_PRWORA_000120

**D3.    Must the period of at least 75 days be continuous?**

No.

**D4.    What is a migrant farmworker for purposes of determining eligibility under 34 CFR 206.3(a)(1)?**

A migrant farmworker is a seasonal farmworker, as defined in the response to D2, above, whose employment required travel that precluded the farmworker from returning to his or her domicile (permanent place of residence) within the same day.  (34 CFR 206.5(c)(7))

**D5.    How is farmwork defined for purposes of determining eligibility under 34 CFR 206.3(a)(1)?**

Farmwork means any agricultural activity, performed for either wages or personal subsistence, on a farm, ranch, or similar establishment.  (34 CFR 206.5(c)(3))

**D6.    The definition of farmwork in 34 CFR 206.5(c)(3) refers to an agricultural activity being performed on a farm, ranch, or similar establishment.  What are some examples of a "similar establishment"?**

Similar establishments include, for example, mushroom-growing facilities, tree farms, nurseries, forest nurseries, and cranberry bogs.  They also include some establishments that are primarily engaged in performing one or more activities typically associated with agricultural production (*e.g.*, packing or sorting), but not all of them.  Facilities that perform only processing activities (*e.g.*, poultry or meat processing facilities) would <u>not</u> be considered "similar establishments" because processing and manufacturing are not among the activities that are considered to be directly related to the production of crops, dairy products, poultry, or livestock; the cultivation or harvesting of trees; or fish farms.

**D7.    Could a packing or sorting facility be considered a "similar establishment"?**

A packing or sorting facility may be considered a similar establishment to a ranch or farm if it is either (a)  part of a larger establishment that performs agricultural production (*e.g.,* a farm where harvesting, sorting, and packing all occur) or (b) an establishment that is primarily engaged in packing or sorting that would otherwise take place on a farm.  Packing or sorting areas of a food processing facility would not be considered similar establishments.  See also question D19 in this document.

**D8.    What is the definition of agricultural activity for purposes of determining whether one's farmwork qualifies for HEP and CAMP eligibility (34 CFR 206.3(a)(1))?**

An agricultural activity is:

1.  Any activity directly related to the production of crops, dairy products, poultry, or livestock;

ED_PRWORA_000121

2. Any activity directly related to the cultivation or harvesting of trees; or

3. Any activity directly related to fish farms.  (34 CFR 206.5(c)(2))

**D9.     In the definition of agricultural activity, what is a "crop"?**

The Department considers a crop to be a plant that is harvested for use by people or by livestock.

**D10.    In the definition of agricultural activity, what is the "production of a dairy product"?**

For the purposes of HEP and CAMP participant eligibility, the "production of a dairy product" is restricted to the production of milk.  Other items commonly referred to as "dairy products," such as cheese or yogurt, are processed -- not produced.  Because processing is different from producing, we do not consider processing cheese or yogurt as constituting the production of a dairy product.

**D11.    In the definition of agricultural activity, what is "poultry"?**

In general, we consider the term "poultry" to refer to any bird produced and used primarily for meat or egg production. The most common examples of poultry are chickens and turkeys, but this term also includes other birds used for the same purposes, such as ducks, geese, pheasant, and quail.

**D12.    In the definition of agricultural activity, what is "livestock"?**

We consider the term "livestock" to refer to any animal produced or kept primarily for breeding or slaughter, including, but not limited to, beef and dairy cattle, hogs, sheep, goats, and horses.  For the purposes of HEP and CAMP, livestock does not include animals that are raised for sport, recreation, research, service, or pets.  The Department does not consider the term "livestock" to include animals hunted or captured in the wild.

**D13.    What are some examples of activities that would be considered agricultural activities because they are directly related to the production of crops?**

Some examples of activities directly related to the production of crops include, but are not limited to: preparing land or greenhouse beds, planting, seeding, watering, fertilizing, staking, pruning, thinning, weeding, transplanting, applying pesticides, harvesting, picking, and gathering.

**D14.    What are some examples of activities that would be considered agricultural activities because they are directly related to the production of dairy products?**

Some examples of activities that are directly related to the production of dairy products include, but are not limited to: milking or operating milking machines, cleaning and maintaining animal housing areas for livestock that produce milk, and administering vaccinations or medicines for livestock that produce milk.

12

ED_PRWORA_000122

**D15.   What are some examples of activities that would be considered agricultural activities because they are directly related to the production of livestock?**

The Department considers the production of livestock to involve raising and taking care of animals that are produced or kept primarily for breeding or slaughter.  Such work includes, but is not limited to: herding, handling, feeding, watering, milking, caring for, branding, tagging, and assisting in the raising of livestock.

**D16.   What are some examples of activities that would be considered agricultural activities because they are directly related to the production of poultry?**

Examples of activities directly related to the production of poultry might include, but are not limited to, breeding, hatching, and raising poultry for meat or egg production.

**D17.   What are some examples of activities that are not directly related to the production of crops, dairy products, poultry, or livestock, and so not an agricultural activity for purposes of 34 CFR 206.5(c)(2)(i)?**

Some activities that are not directly related to production of crops, dairy products, poultry or livestock include:  transporting a product outside of the farm, ranch or similar establishment; selling an agricultural or fishing product; landscaping; managing a farm; providing accounting, bookkeeping, or clerical services for farmworkers; providing babysitting or childcare services for farmworkers; and working at a restaurant.  With regard to work such as repairing or maintaining equipment used for agricultural production or cleaning or sterilizing farm machinery or equipment, the Department does not consider individuals who were hired solely to do this work to be performing work directly related to the production of crops, dairy products, poultry, or livestock.  Therefore, these activities and work are not considered agricultural activities or farmwork and thus could not be used as a basis for establishing HEP or CAMP eligibility under 34 CFR 206.3(a)(1).

**D18.   Could employment in agricultural processing be an agricultural activity that would qualify an individual to be eligible for a HEP or CAMP project under 34 CFR 206.3(a)?**

No. To qualify under 34 CFR 206.3(a)(1) an individual's (or the individual's immediate family member's) primary employment must have been in farmwork (*i.e.*, an agricultural activity being performed for wages or personal subsistence on a farm, ranch, or similar establishment) on a temporary or seasonal basis (that is not constant year-round activity) for a minimum of 75 days during the past 24 months.  As noted above, 34 CFR 206.5(c)(2) defines an agricultural activity as "(a)ny activity directly related to the *production* of crops, dairy products, poultry, or livestock..." (emphasis added).  The term "agricultural activity" does not include agricultural processing.  Therefore, employment in agricultural processing does not constitute farmwork for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1).

However, 34 CFR 206.3(a)(2) extends HEP and CAMP eligibility to individuals who have participated, or are eligible to participate, in programs under 34 CFR part 200, subpart C (MEP) or 20 CFR part 669 (for HEP, the individual must have participated in one of these programs within the last 24 months; for CAMP, there is no corresponding time limitation).

13

ED_PRWORA_000123

The MEP program regulations in 34 CFR 200.81(a) define "agricultural work" as the production or initial processing of crops, dairy products, poultry, or livestock, as well as the cultivation or harvesting of trees.  In addition, the definition makes clear that this work must be performed for wages or personal subsistence.  Therefore, individuals who perform agricultural processing activities may qualify for HEP or CAMP under 34 CFR 206.3(a)(2) if they have participated in the MEP or are eligible to participate in the MEP and meet all other HEP or CAMP eligibility criteria.

The regulations for NFJP make no such provision for individuals whose work was in processing.  In 20 CFR 669.110, "farmwork" is defined as those occupations and industries within agricultural production and agricultural services that are identified for the National Farmworker Jobs Program.  The U.S. Department of Labor clarifies this definition further in eligibility guidance for the NFJP (www.doleta.gov/MSFW/pdf/TEGL-25-04attach.pdf).  Page two states that "farmwork" for the purposes of NFJP means agricultural labor performed for wages in agricultural production and agricultural services as provided under three subsections of the North American Industry Classification System (NAICS): 111 -- Crop Production; subsection 112 -- Animal Production; and subsection 115 -- Support Activities for Agriculture and Forestry.  None of these subsections include activities in processing.

### D19.    Is sorting and packing considered to be an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)?

It depends on where this activity occurs.  Sorting and packing that takes place on a farm or in a facility off the farm that is primarily engaged in sorting and packing would likely be classified as agricultural activities (*i.e.*, activities directly related to the production of crops, dairy products, poultry, or livestock under the definition of "agricultural activity" in 34 CFR 206.5(c)(2)).  This is because these activities are an integral part of harvesting the crop.  In contrast, sorting and packing that takes place at a processing facility would likely be classified as the beginning of processing, rather than the end of agricultural production, and would therefore not be considered an agricultural activity under this part.  As such, such an activity would not meet the definition of "farmwork" and an individual performing such an activity would not be considered a migrant or seasonal farmworker under 34 CFR 206.3(a)(1).

### D20.    Is slaughtering considered to be an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)?

No.  Slaughtering is considered to be the beginning of processing of livestock or poultry, and generally takes place in a processing facility.  Because slaughtering is not an agricultural activity under the program's regulatory definitions, it does not constitute farmwork and, thus, could not serve as the basis of HEP or CAMP eligibility under 34 CFR 206.3(a)(1).

ED_PRWORA_000124

**D21.** **Is transportation of agricultural products considered to be an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)?**

It depends. Transporting activities such as "trucking," whereby agricultural products are shipped from the farm or similar establishment to a processing plant or other location, would not meet the definition of "agricultural activity" in 34 CFR 206.5(c)(2), because this type of transporting (*i.e.*, shipping) is not directly related to agricultural production.  However, if transporting the agricultural products takes place on the farm or similar establishment or is otherwise part of the harvest (such as transporting the crop to a packing shed with a truck or tractor), a HEP or CAMP grantee may determine this activity to be an "agricultural activity," and, therefore, farmwork for purposes of establishing participant eligibility under 34 CFR 206.3(a)(1).

**D22.** **What are some examples of activities that would be considered agricultural activities because they are directly related to the cultivation or harvesting of trees?**

Examples of activities that are directly related to the cultivation or harvesting of trees include, but are not limited to: soil preparation; plowing or fertilizing land; sorting seedlings; planting seedlings; transplanting; staking; watering; removing diseased or undesirable trees; applying insecticides; shearing tops and limbs; pruning or trimming trees; and felling or cutting.

**D23.** **Is transporting trees from a harvesting site to a processor an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)?**

No.  Transporting trees is agricultural *processing* if it occurs after the cultivation and harvesting of the trees; at this point in the process, transporting trees it is not a qualifying activity.  If, however, similar to the discussion in question D21 in this document, transportation takes place at the tree-producing establishment, such as transporting saplings with the truck or tractor, this could be considered to be directly related to agricultural production and, therefore, a qualifying activity under 34 CFR 206.3(a)(1).

**D24.** **Does work in a tree nursery normally constitute an agricultural activity, and, therefore, farmwork, for purposes of determining HEP or CAMP eligibility under 34 CFR 206.3(a)(1)?**

Work that is directly related to the cultivation or harvesting of the trees, such as soil preparation, planting, watering, spraying, tending, pruning, and weeding would be considered agricultural activities, and, therefore, farmwork for the HEP and CAMP programs under 34 CFR 206.3(a)(1).

**D25.** **Does commercial landscaping qualify as farmwork for purposes of determining eligibility under 34 CFR 206.3(a)(1)?**

No.  Commercial landscaping activities such as contouring land and planting grounds are not directly related to the cultivation and harvesting of trees or the actual *production* of a crop and, therefore, are not considered agricultural activities or farmwork for purposes of determining eligibility under 34 CFR 206.3(a)(1).

ED_PRWORA_000125

**D26.    In the definition of "agricultural activity" in 34 CFR 206.5(c)(2), what is a "fish farm"?**

For purposes of HEP and CAMP, the Department considers a fish farm to be a tract of water, such as a pond, a floating net pen, a tank, or a raceway reserved for the raising or harvesting of fish or shellfish.  Large fish farms sometimes cultivate fish in the sea, relatively close to shore.  In these farms, the fish are artificially cultivated, rather than caught, as they would be in "fishing."  Fish species raised on fish farms include, but are not limited to, catfish, salmon, cod, carp, eels, oysters, and clams.

**D27.    What are some examples of activities that are considered agricultural activities because they are directly related to fish farms?**

Examples of activities directly related to fish farms include, but are not limited to, breeding, stocking, feeding, collecting, and harvesting fish or shellfish.

## E.    Temporary and Seasonal Employment

**E1.    What is seasonal employment?**

Seasonal employment generally is employment that occurs only during a certain period of the year because of the cycles of nature and that is not constant year-round employment.

**E2.    What is temporary employment?**

Temporary employment generally is employment that lasts for a limited period of time, usually a few months, but is not constant year-round employment.

**E3.    How does one determine whether employment was temporary?**

For a worker to meet the definition of a migrant or seasonal farmworker for purposes of establishing eligibility for HEP or CAMP, the recruiter must determine that the worker's employment was not constant year-round employment (*i.e.*, that it was temporary or seasonal).  To do so, the Department recommends that recruiters rely on a statement from the worker's employer, the worker, or another credible source that establishes the temporary or seasonal nature of the employment.  The recruiter should document the basis for his or her determination.

**E4.    If a worker is employed year round by the same employer performing a series of different activities, may the worker, or his or her immediate family members, be eligible for HEP or CAMP?**

No.  Workers who are hired to work year round by the same employer, regardless of how many different jobs they perform, are not employed on a temporary or seasonal basis and are, therefore, not eligible for a HEP or CAMP project.  Eligibility intake forms should include a means for capturing information that establishes that the worker's employment was temporary or seasonal.

16

ED_PRWORA_000126

## F.  **Primary Employment**

**F1.  The definitions of both "migrant farmworker" and "seasonal farmworker" in 34 CFR 206.5((c)(7) and (c)(8), respectively, require the worker's "primary employment" to be in temporary or seasonal farmwork.  What is meant by the term "primary employment"?**

"Primary employment" means that for a period of at least 75 days in the past 24 months, temporary or seasonal employment in migrant or seasonal farmwork is the principal, but not necessarily the sole, means of support for the worker or his or her immediate family.

**F2.  Must the period of "primary employment" in temporary or seasonal farmwork for at least 75 days in the past 24 months be continuous?**

No.  If, for example --
1. An individual did 30 days of work that constitutes farmwork under 34 CFR 206.5(c)(3);
2. The farmwork was his or her primary employment during that time;
3. After that time, he or she worked in construction for 12 months (*i.e.*, work that does not meet the definition of farmwork);
4. After the 12 months of construction, but still in the same 24-month period during which the individual did the 30 days of farmwork, he or she returned to the farmwork for at least another 45 days; and
5. During this  period of farmwork, the work was again the individual's primary employment, he or she may qualify to be eligible for a HEP or CAMP project under 34 CFR206.3(a)(1), assuming all other eligibility requirements are met.

**F3.  If a person holds a job as an instructional aide, bus driver, or other temporary or seasonal non-agricultural worker during the regular school year, and works in seasonal farmwork for 75 days during the summer months, would he or she qualify as a migrant or seasonal farmworker?**

It depends.  If during the 75 days of seasonal farmwork, the qualifying farmwork was the worker's primary employment, the worker would qualify as a migrant or seasonal farmworker.  However, the recruiter should keep in mind that in order for the worker or his or her immediate family members to be eligible to participate in a HEP or CAMP project, the potential participant must also meet all other eligibility criteria, including being in need of the academic and supporting services and financial assistance provided by a project.  It may be the case that an individual who has worked only 75 days in seasonal farmwork and had steady employment during the school year would not need these services and assistance.  HEP and CAMP grantees should follow the policies they have in place for determining which individuals need services and assistance.

ED_PRWORA_000127

### G.  Qualifying work under 34 CFR 206.3(a)(2)

**G1.  What does 34 CFR 206.3(a)(2) state?**

Section 206.3(a)(2) of the regulations establishes the second of the two possible means of participant eligibility (along with 34 CFR 206.3(a)(1), referred to as the "75 days/24 months rule"). To be eligible to participate in a HEP or a CAMP project under 34 CFR 206.3(a)(2), an individual must have participated (with respect to HEP within the last 24 months), or be eligible to participate in programs under  34 CFR part 200, subpart C (MEP) or 20 CFR part 669 (NFJP).

**G2.  Who is eligible to receive MEP services?**

Consistent with sections 1115(b)(1)(A), 1304(c)(2)), and 1309(2) of the of the Elementary and Secondary Education Act, as amended (ESEA) and 34 CFR 200.81(e) and 200.103(a) of the MEP regulations, a child is a "migratory child" and is eligible for MEP services if all of the following conditions are met:

- The child is not older than 21 years of age;

- The child is entitled to a free public education (through grade 12);

- The child is a migratory agricultural worker or a migratory fisher, or the child has a parent, spouse, or guardian who is a migratory agricultural worker or a migratory fisher;

- The child moved within the preceding 36 months in order to seek or obtain qualifying work, or to accompany or join the child's parent, spouse, or guardian who is a migratory agricultural worker or a migratory fisher, in order to seek or obtain qualifying work; and

- With regard to the move identified in the preceding paragraph, the child:

  - Has moved from one school district to another;
  - In a State that is comprised of a single school district, has moved from one administrative area to another within such district; or
  - Resides in a school district of more than 15,000 square miles and migrates a distance of 20 miles or more to a temporary residence to engage in or to accompany or join a parent, spouse, or guardian who engages in a fishing activity.  (This provision currently applies only to Alaska.)

Note:  The terms "migratory agricultural worker," "migratory fisher," "move or moved," "in order to obtain," and "qualifying work" are defined in 34 CFR 200.81.

ED_PRWORA_000128

**G3.    What types of information and resources regarding MEP eligibility requirements are available to HEP and CAMP grantees?**

Grantees should refer to sections 1115(b)(1)(A) and 1309 of the of the ESEA; 34 CFR 200.81 (of the MEP regulations); and 34 CFR 200.103(a) (definitions in the general ESEA Title I regulations) for the statutory and regulatory requirements governing eligibility under the MEP, as well as to non-regulatory guidance that the Department has issued on MEP eligibility. See http://www2.ed.gov/programs/mep/legislation.html.

**G4.    Should HEP or CAMP project staff make MEP eligibility determinations?**

No.  The Department strongly discourages HEP and CAMP grantees from making MEP eligibility determinations independent of a State MEP's determination.  Eligibility for the MEP is complex, and these determinations should be left to State or local MEP staff with the training and experience to make these determinations.  Questions on MEP eligibility should be addressed to State MEP staff.

**G5.    May a HEP/CAMP project rely upon an MEP Certificate of Eligibility (COE) that a State educational agency (SEA) has already accepted to establish and document eligibility for a HEP or CAMP project under 34 CFR 206.3(a)(2)?**

Yes.  The Department considers a valid State MEP COE to adequately establish eligibility for the MEP, and a HEP and CAMP project may rely on that COE.

**G6.    If a HEP/CAMP project cannot obtain an SEA-accepted COE that confirms the eligibility of a prospective HEP/CAMP student for the MEP, how else may the project document MEP participation or eligibility under 34 CFR 206.3(a)(2)?**

To document MEP participation or eligibility under 34 CFR 206.3(a)(2), a HEP or CAMP project may rely on an official signed letter or other official documentation from the State MEP program verifying that the potential student is currently eligible for the MEP program, or formerly participated in the MEP program (in the case of HEP, within the past 24 months).

**G7.    Who is eligible to participate in the NFJP?**

The NFJP program regulations in 20 CFR 669.320[3] state that eligible participants are disadvantaged migrant and seasonal farmworkers, as defined in 669.110, or their dependents.  In addition, the eligibility guidance for the NFJP (www.doleta.gov/MSFW/pdf/TEGL-25-04attach.pdf) states that to qualify as eligible for participation in the NFJP under section 167 of the WIA and 20 CFR 669, an individual on the date of application for enrollment must--

　　1)  be an "eligible farmworker" or a "dependent" of an eligible farmworker;

---

[3] See footnote 1 on page 2.

ED_PRWORA_000129

2) be a citizen, a national of the United States, a lawfully admitted permanent resident alien, a refugee, an asylee, a parolee, or other immigrant authorized by the Attorney General to work in the United States *[WIA section 188(a)(5)]*; and

3) if a male applicant, not have violated section 3 of the Military Selective Service Act by failing to present and submit to selective service registration as required *[WIA section 189(h)]*.

**G8.     How does the NFJP define "eligible farmworker"?**

Consistent with 20 CFR 669.320, an "eligible farmworker" is a person who, during the 12-month eligibility determination period, is a disadvantaged migrant farmworker or seasonal farmworker. The term "disadvantaged" is defined in 20 CFR 669.10 as a farmworker whose income, for any 12 consecutive months out of the 24 months immediately before the farmworker applies for the program, does not exceed the higher of either the poverty line or 70 percent of the lower living standard income level, adjusted for the farmworker's family size and including the income of all wage earners, except when its inclusion would be unjust due to unstable conditions of the family unit (20 CFR 669.110).  Additionally, 20 CFR 669.110 defines "farmwork" as those occupations and industries within agricultural production and agricultural services that are identified for the NFJP.  The eligibility guidance for that program further states, on page two, that for the purposes of NFJP "farmwork" means agricultural labor performed for wages in agricultural production and agricultural services as provided under three subsections of the North American Industry Classification System (NAICS): 111 -- Crop Production; subsection 112 -- Animal Production; and subsection 115 -- Support Activities for Agriculture and Forestry (www.doleta.gov/MSFW/pdf/TEGL-25-04attach.pdf).

**G9.     Should HEP or CAMP project staff make a determination regarding NFJP eligibility?**

No. The Department strongly discourages HEP and CAMP grantees from making NFJP eligibility determinations.  Rather, HEP and CAMP staff should rely on NFJP staff to make NFJP eligibility determinations, and staff should rely on documentation provided by NFJP projects to establish HEP and CAMP eligibility.

**G10.    If an individual participated in, or is eligible to participate in, the MEP or NFJP, must he or she also meet the "special HEP qualifications" specified in 34 CFR 206.3(b) or the "special CAMP qualifications" cited in 34 CFR 206.3(c) in order to be eligible for a HEP or CAMP?**

Yes.  While an individual may have participated in or be eligible to participate in the MEP or NFJP, he or she must also meet the requirements in 34 CFR 206.3(b) or 206.3(c) in order to qualify for HEP or CAMP, respectively.  Under the additional HEP qualifications in 34 CFR 206.3(b), to be eligible to participate in a HEP project, a person also must --

(1)  Not have earned a secondary school diploma or its equivalent;

(2)  Not be currently enrolled in an elementary or secondary school;

20

(3)  Be 16 years of age or over, or beyond the age of compulsory school attendance in the State in which he or she resides; and

(4)  Be determined by the grantee to need the academic and supporting services and financial assistance provided by the project in order to attain the equivalent of a secondary school diploma and to gain employment or be placed in an IHE or other postsecondary education or training.

Similarly, under the additional CAMP qualifications in 34 CFR 206.3(c), to be eligible to participate in a CAMP project, a person also must --

(1)  Be enrolled or be admitted for enrollment as a full-time student at the participating IHE;

(2)  Not be beyond the first academic year of a program of study at the IHE, as determined under the standards of the IHE; and

(3)  Be determined by the grantee to need the academic and supporting services and financial assistance provided by the project in order to complete an academic program of study at the IHE.

**G11.   Is there a timeframe within which a potential HEP participant must have participated in the MEP or NFJP in order to be eligible for the HEP?**

Yes.  Under 34 CFR 206.3(a)(2), in order to be eligible to participate in a HEP project,  an individual must either --

1.  Have participated in the MEP or NFJP within the preceding 24 months, or

2.  Be currently eligible to participate in either of these programs.

With regard to the first option, if, for example, a project were to begin delivering services other than recruitment (e.g. instruction, tutoring, transportation assistance, or stipends) to a HEP student on August 1, 2013, then that student must have participated in either the MEP or NFJP on or after August 1, 2011.  With the second option, the HEP student must be currently eligible for the MEP or NFJP program.

**G12.   Is there a timeframe within which a potential CAMP participant must have participated in the MEP or NFJP in order to be eligible for the CAMP?**

No.  Neither the statute nor regulations set a timeframe for when a potential CAMP participant must have participated in the MEP or NFJP.  Therefore, to be eligible for CAMP under 34 CFR 206.3(a)(2), individuals must simply have participated in the MEP or NFJP at some point in their lifetime, or be currently eligible for either of those programs.

ED_PRWORA_000131

### H.    Other Eligibility and Recruitment Issues

**H1.    Once an individual is enrolled in a HEP project, how long is he or she eligible for HEP services?**

An individual who is enrolled in a HEP project may continue to receive services until he or she receives the equivalent of a high school diploma.

**H2.    Once an individual is enrolled in a CAMP project how long is he or she eligible for CAMP services?**

An individual who is enrolled in a CAMP project may continue to receive services until he or she completes the first academic year of a program of study, as determined under the standards of the participating IHE.

**H3.    Under what circumstances must a HEP or CAMP project re-establish eligibility of a student who has already been enrolled in the project and begun receiving services but has not yet finished the program?**

As noted in questions H1 and H2 above, once a student is enrolled in a HEP or CAMP project and begins receiving services, that student is eligible to continue receiving services until he or she has received the equivalent of a high school diploma (in the case of HEP), or completed the first academic year of a program of study at the IHE (in the case of CAMP). As long as a student has no break in services, meaning the student remained a project participant and did not leave (*i.e.*, withdraw from) the project and re-enter, there is no need to re-establish his or her eligibility for HEP or CAMP.

However, if a student does withdraw from the HEP or CAMP project and subsequently wishes to re-enroll or re-enter, eligibility for that student must be re-established before the student may begin receiving project services (other than recruitment). The HEP Annual Performance Report (APR) defines a "withdrawal" in terms of a HEP GED eligible student who was enrolled in and attended HEP GED instruction for at least 12 hours of instructional services in the reported budget period, who then left the HEP GED program without attaining a GED, and who did not return for instruction in the subsequent budget period.

The CAMP APR defines a "withdrawal" in terms of a CAMP student who completed intake and was enrolled and attended college courses past the IHE's last date for adding courses, but who then left the CAMP program without completing the first academic year of college and did not re-enroll for instruction in the project's subsequent budget period.

All HEP or CAMP students reported on the APR for any given budget period as "withdrawals" must have their eligibility re-established if they subsequently re-enroll or re-enter a HEP or CAMP project. In fact, a project that reported a student as a "withdrawal" in an APR for a prior budget year must report the same students on its current year's APR as a "new participant" if the student re-enrolled or re-entered the program during the budget period covered by the new APR. More broadly, projects should establish eligibility for anyone it reports on the APR as a "new participant,"

22

whether that individual is re-entering the project after leaving as a "withdrawal" or is participating in the project for the first time.

**H4.**    **Must a HEP or CAMP project re-establish eligibility for individuals who, during the budget period, are unable to attain the equivalent of a high school diploma (in the case of HEP), or complete the first academic year of a program of study at an IHE (in the case of CAMP), but who wish to resume HEP or CAMP activities?**

Not necessarily. The Department recognizes that due to the many challenges facing students with backgrounds in migrant and seasonal farmwork, it may take project participants more than one year (*i.e.*, budget period) to achieve the primary objective of the program. Because each budget period of the five-year HEP or CAMP grant cycle is a distinct grant award for which enrollment and performance must be reported, the HEP and CAMP APRs create a special category called "persisters" to account for those students whose participation stretches across budget periods.

For the purposes of the HEP program, the term "persisters" is defined in the program's APR as HEP students who completed intake and were enrolled and attending HEP GED instruction for at least 12 hours of instructional services in the reported budget period and did not attain a GED, but either:

(1) re-enrolled for continuing instructional services in support of a GED in the subsequent budget period prior to the mid-November APR submission date, or

(2) re-enrolled for the sole purpose of taking the GED assessment in the subsequent budget period prior to the mid-November APR submission due date.

For the purposes of the CAMP program, the term "persisters" is defined in the program's APR as CAMP students enrolled in their first academic year of college who:

(1) completed intake and were enrolled and attending college courses past the Add/Drop deadline assigned by the project's IHE, but

(2) did not complete their first academic year of college, and then re-enrolled -- for continuing instructional services in support of completing their first academic year of postsecondary education -- in the subsequent budget period prior to the mid-November APR submission due date.

Students reported as "persisters" on a given budget period's APR are reported as "returning participants," rather than "new participants," on the subsequent budget period's APR; they do not need to have their eligibility re-established as they are not considered to have left and re-entered the project. If, however, as noted in H3 above, the student had left the project and been reported as a "withdrawal" on a previous APR and comes back in the future to resume HEP or CAMP activities, that student must be reported as a "new participant" after the student's eligibility has been re-established.

23

ED_PRWORA_000133

**H5.    If an individual is identified toward the end of the individual's period of HEP / CAMP eligibility, is there a limit on how long he or she may receive HEP or CAMP services?**

So long as the individual begins receiving services other than recruitment (*e.g.*, instruction, tutoring, transportation assistance, or stipends) during a period in which he or she is eligible and is not reported as a "withdrawal," that individual may continue to receive services -- even across multiple budget periods -- until he or she receives a secondary school diploma or its equivalent (in the case of HEP) or completes the first academic year of a program of study at the IHE (in the case of CAMP).

**H6.    Are individuals who do not meet the civil status requirements for student financial assistance eligible to participate in the CAMP program?**

No.  While this issue is not addressed in the CAMP regulations in 34 CFR Part 206, section 401(a) and (b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (also known as the Welfare Reform Act), which became law on August 22, 1996, states that an alien who is not a "qualified alien" may not receive what the law refers to as "Federal public benefits."  The term "Federal public benefits," under section 401(c) of the Welfare Reform Act, includes "postsecondary education or any similar benefit for which payments or assistance are provided to an individual by an agency of the United States or appropriated funds of the United States."  Since CAMP is a federally-funded program under which participants receive direct services in order to help them to succeed in their first year of college or university, participants who are not "qualified aliens" would be recipients of postsecondary education services, and so they are not eligible to participate in CAMP.

Section 431 of the Welfare Reform Act defines a "qualified alien" as one who has been lawfully admitted for permanent residency, as well as one who falls into one of several other narrowly defined groups, such as those formally granted asylum, refugees, and Cuban and Haitian entrants, aliens paroled into the United States for a period of at least one year, aliens granted withholding of deportation by the United States Citizenship and Immigration Services (USCIS), aliens granted conditional entry into the United States, and certain battered alien spouses and children.  Thus, the Department believes that all other aliens are prohibited from receiving services under CAMP.

**H7.    May a grantee use program funds for recruitment services?**

Yes.  34 CFR 206.10(b)(1)(i) and (b)(2)(i) authorize the use of both HEP and CAMP funds for recruitment services to reach persons who are eligible for these programs.

**H8.    May a grantee use program funds to recruit participants through radio, TV or newspaper advertising?**

Yes.  Although advertising to recruit project participants is an allowable use of program funds, grantees may be able to minimize advertising costs, for example, by asking local radio and television stations to provide free air time as a public service announcement.  More information on guidelines for the use of federal funds can be found in the OMB Cost Circulars, which have been incorporated into part 2 of the CFR and can be found online at www.gpoaccess.gov.

ED_PRWORA_000134

## I.    <u>Documenting Eligibility</u>

**I1.    Is there a federally developed form for documenting eligibility for HEP or CAMP?**

No.  However, projects must maintain adequate documentation (see question I2 of this document) for each person whom they enroll in their project so that they can confirm that the person met all program eligibility requirements.  Projects are encouraged to develop their own form and procedures for maintaining this information.  Project-specific documentation should be used in conjunction with MEP or NFJP eligibility forms, where possible, for those participants who qualify for services under either of these programs.  See questions G4, G5, G6, and G9 in this document for more information on how eligibility forms used by the MEP or NFJP may be used to determine eligibility for HEP or CAMP.

**I2.    What constitutes adequate documentation of eligibility as a migrant or seasonal farmworker?**

Each project must maintain documentation for each HEP and CAMP participant to confirm that the individual has met all eligibility criteria under 34 CFR 206.3(a)(1) or 34 CFR 206.3(a)(2), as well as the additional eligibility requirements for either the HEP or CAMP programs.  See questions B1 and B2, respectively.

- **MEP**:  If eligibility is determined in conjunction with the MEP under 34 CFR 206.3(a)(2), a copy of a completed COE should be made part of the participant's official record to confirm that the individual either has participated in (within the preceding 24 months in the case of HEP), or is eligible to participate in, the MEP.  If the SEA is not willing or able to provide a COE, a grantee may also obtain other forms of verification, such as a formal, signed letter from the SEA verifying that the student was a MEP participant (in the case of HEP, within the preceding 24 months) or is currently MEP eligible, or an official participant list for that MEP project.  This documentation should be kept in the student's file.

- **NFJP**:  If eligibility is determined in conjunction with the NFJP, the HEP or CAMP project should contact the NFJP project in which the potential student participated and obtain a copy of his or her NFJP eligibility record to demonstrate eligibility for, or participation in, this program.  This documentation should be kept in the student's file.

- **75 Days in 24 Months**:  If an individual qualifies under 34 CFR 206.3(a)(1), *i.e.*, the prospective student or an immediate family member spent 75 days during the past 24 months as a migrant or seasonal farmworker, the grantee is encouraged to develop and maintain a standard enrollment form that reflects the applicable eligibility factors.  In general, this form should clearly identify when and where the migrant or seasonal farmwork occurred, what the qualifying activity was, and on what basis that work was deemed to be migrant or seasonal, as defined by 34 CFR 206.5(c).

  Where it may be available, the Department encourages grantees to try to secure documentation verifying the migrant or seasonal farmwork, such as a signed statement by the employer or a pay stub.  However, the Department does not require any  particular item of documentation (*e.g.*, the employee's Social Security Card, W-2, W-4, I-9 form or pay

ED_PRWORA_000135

stub) to verify eligibility; nor are multiple forms of documentation required.  Additionally, if these sources of information are not available, a HEP or CAMP recruiter may rely on what the recruiter believes is the worker's reasonable statement of work history to determine whether the worker has met the qualifying work requirements.  Please note that while worker attestation is an acceptable form of documentation in this case, excessive reliance on worker attestations could be a cause for concern to Department staff or others conducting monitoring or audits.  In general, projects should seek to document participant eligibility clearly, while not creating an undue barrier to participation by the documentation that they require.

If recruiters or other project staff has reasonable doubts about the reliability of information provided, they should try to obtain corroborating documentation.  If corroborating documentation cannot be obtained, the Department would not recommend that the project enroll the individual in the HEP or CAMP project.

**I3.   Is maintaining a MEP COE or NFJP enrollment form sufficient for documenting an individual's participation in the MEP or NFJP according to 34 CFR 206.3(a)(2)?**

Yes.

**I4.   Are HEP and CAMP projects permitted to determine independently whether an individual meets the eligibility requirements for the MEP or NFJP in order to qualify the individual for a HEP or CAMP project?**

As stated in questions G4 and G9 in this document, HEP and CAMP project staff are strongly discouraged from determining whether individuals meet the MEP or NFJP eligibility requirements.  The eligibility requirements under these programs are complex and require familiarity with specific criteria for each program.  Instead, HEP and CAMP recruiters are encouraged to work closely with MEP and NFJP staff to learn of potential participants and to obtain the proper documentation for those individuals who qualify for HEP and CAMP under these programs.   If a HEP or CAMP recruiter believes that an individual he or she has identified might be *currently* eligible for the MEP or NFJP, the recruiter should refer the individual to a local MEP or NFJP project in order for staff of those programs to make the eligibility determination.  The HEP or CAMP recruiter can then work closely with staff of the MEP or NFJP to obtain the necessary documentation for eligibility in the HEP or CAMP program.

**I5.   If MEP or NFJP staff determine that an individual is not eligible for the MEP or NFJP, may a HEP or CAMP project find the individual eligible under 34 CFR 206.3(a)(2) based on its own independent determination of the MEP and NFJP eligibility requirements?**

The Department strongly discourages grantees from doing so.  If a HEP or CAMP grantee disagrees with the eligibility determination of the MEP or NFJP staff with whom they are working, the Department instead encourages the grantee to confer with other State-level MEP or local NFJP staff members to try to resolve the matter.

ED_PRWORA_000136

**I6.    Who is responsible for establishing the eligibility of participants?**

The grantee is ultimately responsible for confirming and documenting that correct eligibility determinations were made for all project participants.  In the case of eligibility determinations made under 34 CFR 206.3(a)(1), the grantee is responsible for both making the eligibility determination and adequately documenting that decision.  In eligibility determinations made under 34 CFR 206.3(a)(2) (*i.e.*, eligibility decisions with regard to MEP and NFJP), the grantee is responsible for documenting that the student has a valid MEP or NFJP eligibility determination or record of participation, but is not responsible for making the eligibility determination itself.

To strengthen internal controls on eligibility determinations made by HEP and CAMP project recruiters, the Department strongly suggests that a person other than the recruiter, preferably the project director, review all eligibility determinations (and the supporting documentation) made by HEP or CAMP recruiters to verify that participants are eligible for project services based on the statutory and regulatory requirements discussed in this document, and that their eligibility is fully documented.

**I7.    34 CFR 206.3(a)(1) extends eligibility to participate in HEP and CAMP to individuals who have spent a minimum of 75 days during the past 24 months as a migrant or seasonal farmworker.  From what date should a recruiter count back to determine the 24-month period?**

During the recruitment process it may be unclear if a student is actually eligible, if, in fact, he or she will become a participant, and if so, when.  A potential project participant cannot be considered a "participant" until after the project has determined the student to be eligible and has begun delivering services other than recruitment (*e.g.*, instruction, tutoring, transportation assistance, or stipends) to him or her; therefore, a recruiter should count back the 24 months from the date the student has begun, or will begin, receiving services other than recruitment.

ED_PRWORA_000137