| | |
|---|---|
| **EMPLOYMENT AND TRAINING ADMINISTRATION ADVISORY SYSTEM** <br> **U.S. DEPARTMENT OF LABOR** <br> Washington, D.C. 20210 | **CLASSIFICATION** <br> WIOA |
| | **CORRESPONDENCE SYMBOL** <br> OWI |
| | **DATE** <br> July 10, 2025 |

**ADVISORY:**   **TRAINING AND EMPLOYMENT GUIDANCE LETTER NO. 10-23, Change 2**

**TO:**   STATE WORKFORCE AGENCIES
STATE WORKFORCE ADMINISTRATORS
STATE WORKFORCE LIAISONS
STATE AND LOCAL WORKFORCE BOARD CHAIRS AND DIRECTORS
AMERICAN JOB CENTER DIRECTOR
STATE LABOR COMMISSIONERS
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 167
MIGRANT AND SEASONAL FARMWORKER PROGRAM GRANTEES
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 169
REENTRY EMPLOYMENT OPPORTUNITIES GRANTEES AND OTHER
DEMONSTRATION PROGRAMS
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 171
YOUTHBUILD GRANTEES
WORKFORCE INNOVATION AND OPPORTUNITY ACT NATIONAL
DISLOCATED WORKER GRANT PROGRAM GRANTEES
SENIOR COMMUNITY SERVICE EMPLOYMENT PROGRAM
GRANTEES

**FROM:**   LORI FRAZIER BEARDEN
Acting Assistant Secretary

**SUBJECT:**   Work Authorization Verification in Grant Programs Administered by the Employment and Training Administration

1. **Purpose.** This guidance provides direction regarding work authorization verification for grant programs administered by the Employment and Training Administration (ETA).

2. **Action Requested.** Entities receiving grants under the following programs must review and revise policies, documentation requirements, and procedures to align with this guidance: Workforce Innovation and Opportunity Act (WIOA) Title I Adult, Dislocated Worker, Youth programs (including statewide employment and training services funded by the Governor reserve); WIOA National Dislocated Worker Grants (DWGs); Wagner-Peyser Act (W-P) Employment Service; Reentry Employment Opportunities (REO) and other programs authorized under Section 169 of WIOA; YouthBuild; Section 167 Migrant and Seasonal Farmworker Program, also commonly referred to as the National Farmworker Jobs Program (NFJP); and the Senior Community Service Employment Program (SCSEP).

| **RESCISSIONS** <br> None | **EXPIRATION DATE** <br> Continuing |
|---|---|

3. **Summary and Background.**

a. Summary – This Training and Employment Guidance Letter (TEGL) directs the public workforce development system to update all policies and procedures to ensure that all participants served by the programs identified in the guidance are legally authorized to work in the United States. The overall goal of WIOA is to prepare job seekers and workers to succeed in the labor market while helping employers hire the skilled workers they need to compete in the global economy. Accordingly, participants served through WIOA and the related programs above must have valid work authorization. This will focus ETA-administered federal resources on the workers who can ultimately accomplish the congressionally directed goal of employment. Additionally, it will ensure employers have confidence that partnering with the workforce system will help them identify and hire workers who are both equipped with the skills to succeed on the job and legally authorized to work in the United States.

b. Background – In February 2024, ETA issued TEGL 10-23, which explained that some ETA-administered program services did not constitute "federal public benefits" under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) and therefore could be provided to job seekers and workers without verifying work authorization. This guidance attempted to differentiate among services that all help participants attain employment, which created confusion among grantees about which services were and were not allowable before verifying work authorization. Additionally, the guidance had acknowledged that individuals' work authorization could change, but made no provisions for continued validation of work authorization. The guidance also did not require maintaining the kind of documentation that is routinely required for other participant characteristics. That TEGL was rescinded on March 27, 2025.

With this new TEGL, ETA is changing its prior guidance to clarify and establish that all participant-level services are considered "federal public benefits" under PRWORA. Therefore, grantees must verify work authorization for all participants served by WIOA and related programs named above prior to delivering participant-level services.[1]

This change aligns with PRWORA and WIOA. This guidance uses the more commonly understood and better-defined category of participant-level services[2], and clearly states that all participant-level services are "federal public benefits" under PRWORA, because

---

[1] Programs such as YouthBuild, REO Youth, and NFJP youth services generally include assisting young people in obtaining their high school equivalency or other secondary-level education services. These youth programs provide these secondary-level education services along with other participant-level services that constitute federal public benefits. Because at least some services provided to youth participants are federal public benefits, recipients must verify participants' work authorization. This policy is consistent with the overall goal of these youth programs to prepare participants for employment, as discussed in this guidance.

[2] Participant level services are defined in Attachment II in TEGL 19-16, *Guidance on Services through the Adult and Dislocated Worker Programs under the Workforce Innovation and Opportunity Act (WIOA) and the Wagner-Peyser Employment Service (ES), as amended by title III of WIOA, and for Implementation of the WIOA Final Rules*.

2

DOL_PRWORA_000002

they are the same or similar as benefits listed in PRWORA at 8 USC 1611(c).[3] While WIOA programs provide a range of services to jobseekers, the overall goal is to move participants into gainful employment. The same is true for programs under the Wagner-Peyser Act and title V of the Older Americans Act. Therefore, grantees are directed to provide participant-level services only to individuals with work authorization. This will focus ETA-administered federal resources on the main purpose of these programs.

4. **Verification of Work Authorization Status.** For the grant programs covered by this guidance, grantees may only deliver participant-level services to individuals authorized to work in the United States. The legal considerations for limiting services to these individuals include the following:

- **WIOA -** Section 188(a)(5) of WIOA states, "Participation in programs and activities or receiving funds under [Title I of WIOA] shall be available to citizens and nationals[4] of the United States, lawfully admitted permanent resident aliens, refugees, asylees, and parolees, and other immigrants authorized by the Attorney General[5] to work in the United States."

- **PRWORA** - Title IV of the PRWORA restricts the eligibility of aliens (non-U.S. citizens and non-U.S. nationals) to receive what the law defines as "federal public benefits," 8 U.S.C. § 1611, limiting eligibility for such benefits to certain "qualified aliens," defined at 8 U.S.C. § 1641.
  - **Qualified Alien** - At 8 U.S.C. 1611(a), PRWORA states, "an alien who is not a qualified alien (as defined in section 1641 of this title) is not eligible for any Federal public benefit." The law then defines "qualified aliens" to include, among others, lawful permanent residents and individuals who have been granted asylum or refugee status.[6]
  - **Federal Public Benefit** - PRWORA defines "federal public benefit" to include "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual,

---

[3] The term "federal public benefit" includes "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States."

[4] A U.S. national is defined as a citizen of the United States or a person who, though not a citizen of the United States, owes permanent allegiance to the United States. 8 U.S.C. 1101(a)(22). For more information on non-citizen nationals, see https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/us-citizenship/Certificates-Non-Citizen-Nationality.html.

[5] As explained in the preamble to the WIOA Final Rule, after the Homeland Security Act of 2002, Pub. L. 107–296, transferred this work authorization authority to the Department of Homeland Security, reference in Federal law to any transferred function shall refer to the official to whom that function is transferred. Therefore, instead of the Attorney General, 20 CFR 683.285(a)(5) clarifies that this provision is referring to the Secretary of Homeland Security or their designee.

[6] Note that the list above includes those "qualified aliens" that are most likely to interact with ETA grant programs. For the complete list of "qualified aliens" under PRWORA, see 8 U.S.C. 1641. For questions regarding whether an individual is a "qualified alien" under 8 U.S.C. 1641, contact ETA as noted in the Inquiries section.

DOL_PRWORA _000003

household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States."

- *Note on Certain Nonimmigrants -* Aliens in certain employment-based nonimmigrant categories, such as H-2A, H-2B, and CW-1 workers, are ineligible to receive participant-level services in WIOA and related programs as they are not included in WIOA Section 188's category of "other immigrants authorized to work in the United States" or in PRWORA's definition of "qualified alien." *See* 29 U.S.C. § 3248; 8 U.S.C. § 1641.

All grantees must verify work authorization for individuals who otherwise meet participant eligibility requirements prior to delivering participant-level services.[7] (If an individual does not meet participant eligibility requirements, the grantee will not deliver services and does not need to verify work authorization for that individual.) Work authorization must be verified by submission of documentation with a unique identifier (also called a "verifiable enumerator"). Some examples of acceptable documents for Form I-9, Employment Eligibility Verification, purposes include an unrestricted Social Security card; a Form I-551, Permanent Resident Card, (informally called green card); Form I-765, Employment Authorization Document (EAD); a U.S. birth certificate; and a U.S. passport. Several other documents might be specifically held by refugees, asylees, parolees, and other immigrants with work authorization.[8] Grantees should give individuals the Lists of Acceptable Documents included on the Form I-9, so that individuals know which documents they can use to establish their work authorization.[9] Individuals can choose from the acceptable types of documents which documentation they will show to establish their work authorization. This does not require individuals or grantees to complete an I-9 form; these requirements refer to the documents described in the I-9 that can demonstrate work authorization.

If an individual certifies that they are a non-citizen or if an individual's documentation indicates they are a non-citizen, valid work authorization and immigration status can be verified through the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE). SAVE is an online service for registered federal, state, territorial, tribal, and local government agencies to verify U.S. citizenship and immigration status of applicants seeking benefits. In most instances, SAVE can also verify work authorization.[10] ETA strongly recommends that grantees who are registered for SAVE (state, territorial, tribal, and local government agencies) use SAVE to verify immigration status in

---

[7] In the rare instance that an individual does not have work authorization but is in one of the categories of "qualified alien" in PRWORA, 8 U.S.C. § 1641, contact ETA for further guidance.

[8] For guidelines on which documents on Form I-9 are issued to which categories of individuals, see USCIS I-9 Central at https://www.uscis.gov/i-9-central/form-i-9-acceptable-documents/who-is-issued-this-document. For specific guidance on evidence of employment authorization for refugees and asylees, see the USCIS Handbook for Employers at https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/70-evidence-of-employment-authorization-for-certain-categories/73-refugees-and-asylees.

[9] Page 2 of the Form I-9 includes the Lists of Acceptable Documents. The Form I-9 is available at: https://www.uscis.gov/sites/default/files/document/forms/i-9.pdf.

[10] In some situations, the initial automated SAVE response may not reflect an individual's employment authorization incident to status or may otherwise provide an unexpected response. In these situations, or when the benefit applicant requests it, the agency that initiated the automated request to SAVE may need to request manual SAVE verification and provide an electronic copy of the individual's immigration document.

DOL_PRWORA_000004

relation to work authorization. State workforce agencies that are not registered for SAVE can apply with USCIS for SAVE access in order to use SAVE. As announced in April 2025, SAVE is now free to use for state, local, tribal, and territorial government agencies.[11]

As grantees conduct verification of work authorization, they must ensure they comply with the nondiscrimination provisions at Section 188 of WIOA and its implementing regulations at 29 C.F.R. part 38. To ensure equal treatment, all participants must provide, and grantees must keep copies in case files, proof of authorization to work in the United States. Grantees must update all policies and procedures to conform to these requirements. For individuals whose work authorization is temporary, grantees must verify their continued work authorization at a reasonable interval determined by when their temporary authorization is expected to expire, but no less than once every three months. If, at any time, a grantee becomes aware that a participant's employment authorization has expired or been revoked outside that 3-month check, then the grantee should exit the participant. Grantees who are registered to use SAVE can use the SAVE system for this continuous verification procedure. Grantees that cannot access SAVE should review documents listed as acceptable on the I-9 as described above.

The above requirements reference verifying work authorization prior to delivering participant-level services. In the WIOA title I Adult and Dislocated Worker programs, to become a participant, an individual must meet all applicable program requirements to receive services aside from self-service or information-only services or activities. A chart that details which services go beyond self-service or information-only service and therefore trigger participation is included as Attachment II in TEGL 19-16. For other WIOA programs, refer to program-specific guidance regarding what services trigger determination of "participant" status. For the W-P Employment Service program, which provides access to all job seekers, an individual must receive a service other than self-service and information-only services or activities to be considered a participant. Additionally, filing complaints via the W-P Employment Service and Employment-Related Law Complaint System is not a participant-level service, see 20 C.F.R. part 658, subpart E. For SCSEP, a participant is defined as an individual who is determined to be eligible, is given a community service assignment, and is receiving any service funded by the program as described in 20 C.F.R. part 641, subpart E.

WIOA Section 166 Indian and Native American Program (INAP) grantees are not subject to the requirements of this TEGL.

5. **Inquiries.**  Please direct inquiries to the appropriate Regional Office or your ETA Federal Project Officer.

6. **References.**
   - Workforce Innovation and Opportunity Act (WIOA), Pub. L. 113-128, 29 U.S.C. 3101 et seq.;
   - Wagner-Peyser Act (W-P Act), 29 U.S.C. 49 et seq.;
   - Older Americans Act, Title V, 42 U.S.C. 3056 et seq.;

---

[11] See USCIS, About SAVE, Transaction Charges, https://www.uscis.gov/save/about-save/transaction-charges

DOL_PRWORA _000005

- Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), Title IV, Pub. L. 104-193, 8 U.S.C. 1601 et seq.;
- The Nondiscrimination and Equal Opportunity Provisions (Section 188) of WIOA available at: https://www.ecfr.gov/current/title-29/subtitle-A/part-38;
- Training and Employment Guidance Letter (TEGL) No. 02-14, *Eligibility of Deferred Action for Childhood Arrivals Participants for Workforce Investment Act and Wagner-Peyser Act Programs* available at: https://www.dol.gov/agencies/eta/advisories/training-and-employment-guidance-letter-no-02-14;
- TEGL No. 19-16, *Guidance on Services through the Adult and Dislocated Worker Programs under the Workforce Innovation and Opportunity Act (WIOA) and the Wagner-Peyser Employment Service (ES), as amended by title III of WIOA, and for Implementation of the WIOA Final* Rules available at: https://www.dol.gov/agencies/eta/advisories/training-and-employment-guidance-letter-no-19-16;
- TEGL 10-23 change 1, *Rescission of TEGL No. 10-23: Reducing Admin Barriers to Improve Customer Experience in Grant Programs Administered by ETA*; and
- Executive Order 14218, *Ending Taxpayer Subsidization of Open Borders*.

7. **Attachment.** Not Applicable.

DOL_PRWORA _000006

**U.S. DEPARTMENT OF LABOR**

**News Release**

## US DEPARTMENT OF LABOR MOVES TO PREVENT ILLEGAL IMMIGRANTS FROM UTILIZING TAXPAYER–FUNDED WORKFORCE PROGRAMS

**WASHINGTON**    The U.S. Department of Labor's Employment and Training Administration today announced new guidance to ensure illegal immigrants are not allowed access to federal workforce development resources and related grants. Coinciding with similar measures being taken across the federal government, this announcement is the department's latest effort to carry out President Trump's executive order 14218, Ending Taxpayer Subsidization of Open Borders.

Under this guidance, all grantees funded through the Workforce Innovation and Opportunity Act and related programs must verify valid work authorization before providing participant-level services. This action replaces the Biden Administration's guidance that incentivized illegal immigration and reinforces the department's commitment to ensuring taxpayer-funded workforce resources remain focused on strengthening the American workforce.

"America's workforce is stronger than ever under President Trump's leadership because he is committed to upholding the rule of law and putting American workers first," said U.S. Secretary of Labor Lori Chavez DeRemer. "Our updated guidance makes clear that taxpayer funded workforce services are reserved for individuals who are authorized to work in the United States, as required by federal law. By ensuring these programs serve their intended purpose, we're protecting good paying jobs for American workers and reaffirming this Administration's commitment to securing our borders and ending illegal immigration."

This guidance directs the public workforce development system to update all policies and procedures to verify work authorization and maintain proper documentation in participant case files. This ensures employers can have confidence that partnering with the workforce system will help them hire workers who are both equipped with the skills to succeed and have the necessary approval to work in the United States.

The guidance applies to programs including WIOA Title I Adult, Dislocated Worker, Youth programs (including statewide employment and training services funded by the Governor reserve), WIOA National Dislocated Worker Grants, Wagner Peyser Act Employment Service, Reentry Employment Opportunities and other programs authorized under Section 169 of WIOA, YouthBuild, the National Farmworker Jobs Program, and the Senior Community Service Employment Program.

**Agency:** Office of the Secretary
**Date:** July 10, 2025
**Release Number:** 25-1153-NAT

**Media Contact:** Courtney Parella
**Phone Number:** (202) 693-4676
**Email:** parella.courtney.e@dol.gov
Share This

   

### More News Releases

**Previous**
Unemployment Insurance Weekly Claims Report

**Next Up**
US Department of Labor cites Georgia-based Keystone Foods for exposing workers to fire, explosion hazards

**Agencies**    **Forms**    **Guidance Search**    **FAQ**    **About DOL**    **News**



**FEDERAL GOVERNMENT** ⊞   **LABOR DEPARTMENT** ⊞   **ABOUT THE SITE** ⊞

**U.S. DEPARTMENT OF LABOR**

200 Constitution Ave NW
Washington, DC 20210
1-866-4-USA-DOL
1 866 487 2365
www.dol.gov

| White House | About DOL | Freedom of Information Act |
| Disaster Recovery Assistance | Guidance Search | Privacy & Security Statement |
| DisasterAssistance.gov | Español | Disclaimers |
| USA.gov | Office of Inspector General | Important Website Notices |
| No Fear Act Data | A to Z Index | Plug-Ins Used on DOL.gov |
| U.S. Office of Special Counsel | | Accessibility Statement |

Connect With DOL

     

Important Website Notices    |    Privacy & Security Statement

DOL_PRWORA _000008

## Presidential Documents

Executive Order 14218 of February 19, 2025

### Ending Taxpayer Subsidization of Open Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* The plain text of Federal law, including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) (PRWORA), generally prohibits illegal aliens from obtaining most taxpayer-funded benefits. Title IV of the PRWORA states that it is national policy that "aliens within the Nation's borders not depend on public resources to meet their needs," and that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." But in the decades since the passage of the PRWORA, numerous administrations have acted to undermine the principles and limitations directed by the Congress through that law. Over the last 4 years, in particular, the prior administration repeatedly undercut the goals of that law, resulting in the improper expenditure of significant taxpayer resources. My Administration will uphold the rule of law, defend against the waste of hard-earned taxpayer resources, and protect benefits for American citizens in need, including individuals with disabilities and veterans.

**Sec. 2.** *Preserving Federal Public Benefits.* (a) To prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens, the head of each executive department or agency (agency) shall:

(i) identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including the PRWORA;

(ii) ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called "sanctuary" policies that seek to shield illegal aliens from deportation; and

(iii) enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(b) Within 30 days of the date of this order, the Director of the Office of Management and Budget and the Administrator of the United States DOGE Service, in coordination with the Assistant to the President for Domestic Policy, shall further:

(i) identify all other sources of Federal funding for illegal aliens; and

(ii) recommend additional agency actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems.

(c) Agencies shall refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action.

**Sec. 3**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 19, 2025.*

[FR Doc. 2025–03137
Filed 2–24–25; 8:45 am]
Billing code 3395–F4–P

DOL_PRWORA _000010

**61344** **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

When completed, the interim operations plan will supersede the annual operations plans/advisories and will guide Project operations until completion of the adjudication. At that time, the interim plan will be revised as necessary and additional NEPA documentation may be required.

Dated: November 5, 1997.

**John F. Davis,**
*Acting Regional Director.*
[FR Doc. 97–30096 Filed 11–14–97; 8:45 am]
BILLING CODE 4310–94–P

## DEPARTMENT OF THE INTERIOR

### Bureau of Reclamation

### Westland Irrigation District Boundary Adjustment, Hermiston, OR

**AGENCY:** Bureau of Reclamation, Interior.

**ACTION:** Notice of intent to prepare an environmental impact statement.

**SUMMARY:** Pursuant to the National Environmental Policy Act (NEPA) of 1969, as amended, the Bureau of Reclamation (Reclamation) intends to prepare an environmental impact statement (EIS) for a proposed boundary adjustment to include additional lands into the Westland Irrigation District. Westland Irrigation District (WID) proposes the addition of 21,100 acres, of which 9,912 acres are currently irrigated, into their boundaries.

The NEPA process was initiated in late 1993 and, as a result of comments received then, has been on hold until additional information was obtained. This notice is to inform the public of the resumption of the NEPA process and the preparation of an EIS.

**FOR FURTHER INFORMATION CONTACT:** Mr. John Tiedeman, UCA–1607, Upper Columbia Area Office, Bureau of Reclamation, PO Box 1749, Yakima WA 98907–1749; Telephone (509) 575–5848 extension 238.

**SUPPLEMENTARY INFORMATION:** WID is one of several districts in the Umatilla basin either served by federally owned facilities or receiving federally controlled water. A Federal repayment contract with WID requires that changes to district boundaries must be approved by the Secretary of the Interior. During studies undertaken to implement the Umatilla Basin Project Act, it became apparent that WID was providing federally supplied water to lands outside of the district boundaries. In 1993, to address this problem, WID requested that Reclamation allow a change in their boundaries so that they may provide irrigation water to lands outside the current boundaries. In the interim Reclamation entered into a series of annual water service contracts with WID so irrigation of lands outside of the district boundaries with federally supplied water could continue while issues surrounding the boundary expansion were resolved.

Reclamation and the Natural Resources Department of the Confederated Tribes of the Umatilla Indian Reservation (CTUIR) held public meetings on November 4 and December 17, 1993, to gather comments from the public concerning the "Proposed Boundary Changes for Irrigation Districts in the Umatilla Project, Oregon." Key issues identified in the scoping effort included Umatilla River hydrology and passage conditions for anadromous fish, Native American trust resources, and continued viability of irrigated agriculture. Based on the complex and often controversial nature of the issues involved, the high level of public and agency interest, and Reclamation's Native American trust responsibilities, Reclamation concluded that an EIS should be prepared. Since then, a hydrologic model of the Umatilla basin, necessary to complete the assessment of the proposed boundary adjustment, has been developed. Completion of the hydrologic model is anticipated for February 1998.

Four alternatives are proposed, including the no action alternative. Under the no action alternative all deliveries of federally supplied water by WID to lands outside of the current district boundaries would cease. Under the action alternatives some, or all, of these deliveries could continue. The draft EIS is expected to be completed in March of 1999.

At this time, no additional scoping meetings are planned. A summary of scoping issues identified through previous meetings is available upon request. Anyone interested in more information concerning the proposed action or who has information concerning significant environmental issues, should contact Mr. Tiedeman as provided under the **FOR FURTHER INFORMATION CONTACT** section.

Dated: October 17, 1997.

**John W. Keys, III,**
*Regional Director, Pacific Northwest Region.*
[FR Doc. 97–30062 Filed 11–14–97; 8:45 am]
BILLING CODE 4310–94–M

## DEPARTMENT OF JUSTICE

[AG Order No. 2129–97]

### Interim Guidance on Verficiation of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996

**AGENCY:** Department of Justice.

**ACTION:** Notice of interim guidance with request for comments.

**SUMMARY:** Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") requires the Attorney General, by February 1998, to promulgate regulations requiring verification that an applicant for federal public benefits is a qualified alien eligible to receive federal public benefits under the Act. Amendments to the PRWORA by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 also require the Attorney General, within the same time period, to establish fair and nondiscriminatory procedures for applicants to provide proof of citizenship. Amendments to the PRWORA by the Balanced Budget Act of 1997 require the Attorney General, by November 3, 1997, to issue interim verification guidance that sets forth procedures that benefit providers can use to verify citizenship, qualified alien status, and eligibility under Title IV of the PRWORA prior to issuance of the final regulations. In accordance with this last statutory requirement, the Attorney General, in consultation with federal benefit-granting agencies, has developed this interim guidance.

**DATES:** This Interim Guidance is effective October 29, 1997.

**ADDRESSES:** Comments should be submitted to: John E. Nahan, Immigration and Naturalization Service, 425 I St., N.W., ULLICO Building, 4th Floor, Washington, D.C. 20536, (202) 514–2317.

**FOR FURTHER INFORMATION CONTACT:** John E. Nahan, Immigration and Naturalization Service, 425 I St., N.W., ULLICO Building, 4th Floor, Washington, D.C. 20536, (202) 514–2317.

**SUPPLEMENTARY INFORMATION:** By the authority vested in me as Attorney General by law, including section 432(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (as amended), I hereby issue the following Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and

DOL_PRWORA_000011

Work Opportunity Reconciliation Act of 1996.

Dated: October 29, 1997.

**Janet Reno,**

*Attorney General.*

**Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996**

**Introduction**

*A. Summary*

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act'') provides that, with certain exceptions, only United States citizens, United States non-citizen nationals and ''qualified aliens'' (and sometimes only particular categories of qualified aliens) are eligible for federal, state and local public benefits. The Act, as amended by the Balanced Budget Act of 1997, requires the Attorney General, by November 3, 1997, to issue interim guidance on the verification of eligibility of aliens for federal public benefits. The Act also requires the Attorney General, by February 1998, to promulgate final regulations requiring verification that an applicant is a qualified alien eligible to receive federal public benefits under the Act. States have an additional twenty-four months to put into effect a verification system that complies with those regulations. Amendments to the Act by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 further require the Attorney General to establish fair and nondiscriminatory procedures for applicants to provide proof of citizenship. Benefit providers, however, are required to implement the Act, and hence to make determinations regarding citizenship, qualified alien status, and eligibility under Title IV of the Act, before the Attorney General's issuance of new regulations and the States' development of conforming verification systems.

This memorandum provides guidance on how to verify citizenship, immigration status and eligibility under Title IV of the Act during this interim period. This guidance adopts a four-step procedure: (1) Determine if your program provides a ''federal public benefit'' subject to the Act's verification requirements; (2) Determine whether the applicant is otherwise eligible for benefits under general program requirements; (3) Verify the applicant's status as a U.S. citizen, U.S. non-citizen national or qualified alien; and (4) Verify the applicant's eligibility for benefits under the Act. If at any step you determine that you are not required to verify (or further verify) immigration status, you should not go on to the following step(s). If you have any questions regarding verification of immigration status pursuant to this Guidance, contact the local office of the Immigration and Naturalization Service (''INS'') serving your geographic area. A list of local INS offices is set forth in Attachment 1. Attachment 1 also includes a copy of INS Form G–845 and the Supplement thereto to be used to verify immigration status pursuant to this Guidance.

This Guidance applies only to federal public benefits, and does not directly address the citizenship and immigration requirements that Title IV of the Act imposes on the provision of state and local public benefits. To the extent that you are required to verify that an applicant is a U.S. citizen, U.S. non-citizen national or qualified alien when determining eligibility for a state or local program, however, the Attorney General will be promulgating regulations that set forth procedures by which state and local providers can verify alien eligibility for such benefits. During the interim, we advise that you use this Guidance in consultation with state and local authorities.

*B. Programs With Governmental Verification*

Some federal programs (*e.g.,* Medicaid) require federal, state and local governmental agencies, but not private providers, to verify citizenship and immigration status as part of program eligibility determinations. The private entities actually providing the benefits must abide by the verification determination made by the governmental agency; they engage in no independent verification. Nothing in this Guidance modifies such program requirements: providers of benefits under programs where verification is performed by a governmental agency are not required by this Guidance to verify that an applicant is a U.S. citizen, non-citizen national or qualified alien, and they should not engage in such verification. They should continue to provide benefits pursuant to program requirements based on the verification determinations made by the appropriate governmental agency.

*C. Programs Currently Required To Use the SAVE System*

Some federal programs (*e.g.,* Medicaid, unemployment compensation, educational assistance under Title IV of the Higher Education Act of 1965, assisted housing programs administered by the Department of Housing and Urban Development) already require, absent a waiver, verification of the immigration status of noncitizens applying for benefits through the Systematic Alien Verification for Entitlements (''SAVE'') system. SAVE is an intergovernmental information-sharing program that is available to benefit-granting agencies that need to determine an alien's immigration status. With one exception, nothing in the Act changes preexisting legal requirements regarding use of the SAVE system or relieves the administrators of statutorily mandated programs of their obligations to comply with the SAVE program (including the terms of any waiver of SAVE program requirements received from the appropriate federal agency); section 840 of the Act, however, did remove the requirement that a state agency use the SAVE system to verify eligibility for Food Stamps. You should note that SAVE does not provide all of the information that may now be necessary to determine an individual's eligibility under Title IV of the Act. You should use this Guidance to obtain or verify that new information.

*D. Exemption for Nonprofit Charitable Organizations*

Subject to such verification regulations as the Attorney General may subsequently adopt and the limitations set forth immediately below, a ''nonprofit charitable organization'' providing a federal, state or local public benefit covered by the Act is *not* required under Title IV of the Act to determine, verify, or otherwise require proof of an applicant's eligibility for such benefits based on the applicant's status as a U.S. citizen, U.S. non-citizen national or qualified alien. Thus, a nonprofit charitable organization is not required by the Act to seek an applicant's confirmation that he or she is a qualified alien, or to have a separate entity verify the applicant's status before providing benefits. To be eligible for this exemption, an organization must be both ''nonprofit'' and ''charitable.'' For purposes of this Guidance, an organization is ''nonprofit'' if it is organized and operated for purposes other than making gains or profits for the organization, its members or its shareholders, and is precluded from distributing any gains or profits to its members or shareholders. An organization is ''charitable'' if it is organized and operated for charitable purposes. The term ''charitable'' should be interpreted in its generally accepted legal sense as developed by judicial decisions. It includes organizations

DOL_PRWORA _000012

dedicated to relief of the poor and distressed or the underprivileged, as well as religiously-affiliated organizations and educational organizations. If you have any questions as to whether your organization is a nonprofit charitable organization exempt from the Act's verification requirements, you should contact the federal, state or local agency overseeing the program you administer to obtain guidance.

The exemption for nonprofit charitable organizations is limited to verification requirements imposed by Title IV of the Act and to those instances in which the nonprofit charitable organization itself would be required by Title IV to engage in verification. Certain programs, however, require federal, state and local agencies to verify citizenship and immigration status as part of program eligibility determinations, while benefits are provided, at least in part, by charitable organizations. Other programs currently require verification by the charitable organization itself. These independent requirements are not altered by the provision exempting nonprofit charitable organizations from the Act's verification requirements. If a non-exempt entity (*e.g.,* a state agency) performs verification for benefits provided through a nonprofit charitable organization, you must abide by those determinations. Similarly, if your program has procedures unrelated to Title IV of the Act that require verification by your charitable organization, or adopts such procedures in the future, you must comply with such procedures.

A nonprofit charitable organization that chooses not to verify cannot be penalized (*e.g.,* through cancellation of its grant or denial of reimbursement for benefit expenditures) for providing federal public benefits to an individual who is not a U.S. citizen, U.S. non-citizen national or qualified alien, except when it does so either in violation of independent program verification requirements or in the face of a verification determination made by a non-exempt entity. However, if your organization chooses to verify, even though it is a nonprofit charitable organization that is not required to do so under the Act, you should comply with the procedures set forth in this Guidance and provide benefits only to those whom you verify to be U.S. citizens, U.S. non-citizen nationals or qualified aliens. Any verification request to INS by a nonprofit charitable organization must be accompanied by the written consent of the individual whose status is to be verified to the

release of information about the individual to a nongovernmental entity. The consent must be notarized or executed under penalty of perjury. (INS Form G–639 may be used for this purpose.)

### E. Nondiscrimination and Privacy Requirements

Various federal civil rights laws and regulations prohibit discrimination by governmental and private entities on the basis of race, color, national origin, gender, religion, age and disability. They include Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.* (''Title VI''), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.*, the Age Discrimination Act of 1975, 42 U.S.C. 6101 *et seq.*, and the Fair Housing Act, 42 U.S.C. 3601 *et seq.* These laws apply to entities' provision of any public benefits, including their implementation of the Act. In particular, Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity, whether operated by a public or private entity, that receives federal funds or other federal financial assistance. Thus, in operating or participating in a federally assisted program and implementing the requirements of the Act, including those set forth in this Guidance, a provider should not, on the basis of race, color or national origin, directly or indirectly differentiate among persons in the types of program services, aids or benefits it provides or the manner in which it provides them. For example, benefit providers should treat all similarly situated individuals in the same manner, and should not single out individuals who look or sound foreign for closer scrutiny or require them to provide additional documentation of citizenship or immigration status. The nondiscrimination requirements of Title VI and other applicable civil rights laws are discussed more fully in Attachment 2.

If you have questions regarding issues of discrimination that may arise with respect to benefit-granting procedures or the implementation of this Guidance, you should contact the civil rights office of the pertinent benefit-granting agency or the applicable office in the Civil Rights Division of the U.S. Department of Justice. Contact numbers in the U.S. Department of Justice, Civil rights Division are set forth in Attachment 2.

When implementing the Act's verification requirements, you should be sensitive to privacy interests, and should use the citizenship and immigration status information received

only for purposes of verifying the applicant's eligibility for benefits under the Act and, if you are a governmental entity, for sharing such information with the INS and other governmental entities as provided by the Act. You should also review the Privacy Act (5 U.S.C. 552a), state and local privacy laws, and your program's requirements to ensure that you comply with all applicable privacy requirements.

### Verification Procedures

*Step 1: Determine if Your Program Provides a ''Federal Public Benefit'' Subject to the Act's Verification Requirements*

The Act's requirement that benefit recipients be U.S. citizens, U.S. non-citizen nationals or qualified aliens does not apply to all federally funded activity or programs; it applies only to non-exempted ''federal public benefits''. Therefore, benefit providers should first determine whether the particular program they are administering provides a ''federal public benefit'' for which the Act requires them to verify citizenship, nationality or immigration status. Preliminary guidance on which programs provide ''federal public benefits'' subject to the Act's verification requirements is set forth in Attachment 3. *If the federal program does not provide a ''federal public benefit'' covered by the Act* (*e.g.,* the program is exempted by Attorney General Order No. 2049, 61 FR. 45,985 (1996), regarding government-funded community programs, services or assistance that are necessary for the protection of life or safety), *the benefit provider is not required to, and should not attempt to, verify an applicant's status, unless otherwise required or authorized to do so by law,* because all aliens, regardless of their immigration status, are eligible for such benefits.

If one program provides several public benefits, the Act's requirements apply only to those benefits that are non-exempted federal public benefits under the Act. A provider is not required to, and should not, verify the citizenship, nationality and immigration status of applicants for other benefits provided by the program that do not constitute federal public benefits.

*Step 2: Determine Whether Applicant is Eligible for Benefits Under General Program Requirements*

Given the potential intrusiveness and possibly time-consuming nature of the citizenship and alien status verification inquiry, a provider should determine whether an applicant otherwise meets specific program requirements for

DOL_PRWORA _000013

benefit eligibility before initiating the verification process, unless determining program eligibility would be considerably more complex and time-consuming than verifying immigration status. This will reduce verification inquiries that prove unnecessary because the applicant is not otherwise eligible for the benefits requested. This Guidance does not address these other program eligibility requirements; a provider should refer to the statute, regulations and agency guidance (if any) governing its program for such requirements. (Note, however, that Title IV contains provisions requiring that, upon the effective date of the new affidavit of support, required under section 213A of the Act, when determining eligibility for federal means-tested public benefits and the amount of such benefits to which an alien is entitled, the income and resources of the alien be deemed to include those of any person executing an affidavit of support on behalf of the alien and that person's spouse, if applicable, with certain exceptions for indigent qualified aliens and aliens who (or whose children or parents) have been battered or subjected to extreme cruelty in the U.S. by a spouse, parent or member of the spouse or parent's family. See Exhibit B of Attachment 5.)

Determining program eligibility will normally include verifying that the applicant is who he or she claims to be. Although many of the documents and procedures relevant to determining citizenship or immigration status may also be relevant to identity verification, this Guidance is designed to provide assistance in determining the status of applicants whose identity has already been verified, and does not address appropriate identity verification procedures. It is your responsibility to assure yourself, pursuant to non-discriminatory procedures, of the identity of the applicant.

*Step 3: Verify Applicant's Status as A U.S. Citizen, U.S. Non-Citizen National or Qualified Alien*

Because the process of verifying an individual's status as a U.S. citizen, U.S. non-citizen national or qualified alien raises significant issues involving privacy and anti-discrimination protections, no verification of an applicant's status as a U.S. citizen, U.S. non-citizen national or qualified alien should be undertaken where benefits are not contingent on such status. In addition, if an alien is applying for benefits on behalf of another person, you may, under federal law, only verify the status of the person who will actually be receiving the benefits.

Except as set forth in this paragraph, if your program provides a non-exempted ''federal public benefit,'' and thus is available only to U.S. citizens, U.S. non-citizen nationals and qualified aliens, you should verify an applicant's status as set forth below. If you are a private provider of a ''federal public benefit'' and your program requires verification by a federal, state or local governmental agency, but not by a private provider, you should not engage in any independent verification and should continue to comply with the verification determinations made by the appropriate governmental entity. If you are on the SAVE system, you should continue following the SAVE procedures and should use this Guidance only for matters not addressed under the SAVE program.

A. U.S. Citizen or Non-Citizen National

1. *Ask for Declaration of Status.* If you are required to verify an applicant's status as a U.S. citizen, U.S. non-citizen national or qualified alien, you should begin by asking the applicant to submit a written declaration, under penalty of perjury, that he or she is a citizen or non-citizen national of the U.S. (or that he or she is a qualified alien—see Paragraph B.1. below).

Subject to certain exceptions and qualifications (particularly with respect to derivative citizenship), a United States citizen is:

• A person (other than the child of a foreign diplomat) born in one of the several States or in the District of Columbia, Puerto Rico, Guam, the U.S. Virgin Islands, or the Northern Mariana Islands who has not renounced or otherwise lost his or her citizenship;

• A person born outside of the United States to at least one U.S. citizen parent (sometimes referred to as a ''derivative citizen''); or

• A naturalized U.S. citizen.

As a general matter, a United States non-citizen national is a person born in an outlying possession of the United States (American Samoa or Swain's Island) on or after the date the U.S. acquired the possession, or a person whose parents are U.S. non-citizen nationals (subject to certain residency requirements).

The law regarding U.S. citizenship and nationality is complex. These broad definitions are provided for general guidance only, and do not address all of the complexities involved in attaining or losing status as a U.S. citizen or non-citizen national. See 8 U.S.C. 1401 *et seq.*

If you have any questions regarding whether an applicant is a U.S. citizen or non-citizen national, you should consult with the INS (in the case of a naturalized citizen) or the federal agency or department that oversees your program.

2. *Verify Status.* A number of programs have existing procedures for verifying that an applicant is a U.S. citizen or non-citizen national for purposes of program eligibility. You should continue to comply with any existing or future legal requirements for verifying citizenship and nationality that are imposed on your program, as well as with any applicable existing or future guidance provided by the agency or department overseeing your program. If a program has no requirements or guidance regarding verification, a benefit provider should refer to this Guidance.

The appropriate method of verifying an applicant's citizenship will depend upon the requirements and needs of the particular program, including, but not limited to , the nature of the benefits to be provided, the need for benefits to be provided on an expedited basis, the length of time during which benefits will be provided, the cost of providing the benefits, the length of time it will take to verify based on a particular method, and the cost of a particular method of verification. For example, a benefit provider could adopt a quick and simple verification procedure if it provides short-term benefits and the cost of extensive verification will outweigh the cost of the benefits or if verification will be time-consuming and the benefits are needed in the short term. On the other hand, if the benefit provider provides substantial, long-term benefits, it may be reasonable to require more extensive verification of citizenship.

Regardless, a benefit provider's decision as to the appropriate method must be made in a non-discriminatory fashion; for example, it cannot turn on the fact that the applicant looks or sounds foreign or has an ethnic surname. A benefit provider should adopt neutral procedures that apply equally to all applicants regardless of their appearance, ethnicity or accent. A benefit provider should not implement its procedures in a manner that discriminates against applicants whom it assumes to be foreign; nor should a benefit provider treat any applicant in a more beneficial manner based on assumptions as to the applicant's citizenship. (See Nondiscrimination Advisory in Attachment 2.)

To verify that an applicant is a U.S. citizen or non-citizen national, a benefit provider could do any one of the following:

DOL_PRWORA _000014

(a) Ask the applicant to present a document demonstrating that he or she is a U.S. citizen or non-citizen national. Documents that can be used to make this demonstration are described in Attachment 4. (A benefit provider may also consult records of verified citizenship, if any, maintained by the agency overseeing its program.)

(i) If the document reasonably appears on its face to be genuine and to relate to the individual presenting it (or, if your program already has existing guidance or procedures mandating a higher standard of proof for acceptance of documentary evidence of status, the document satisfied that higher standard), the provider should accept the document as conclusive evidence that the applicant *is* a U.S. citizen or non-citizen national, and should not verify status any further.

(ii) If the document presented does not on its face reasonably appear to be genuine (or to satisfy a higher applicable standard) or to relate to the individual presenting it, the benefit provider should contact the governmental entity that originally issued the document presented or that can confirm the applicant's status as a U.S. citizen or non-citizen national. (With regard to naturalized citizens and derivative citizens presenting certificates of citizenship, the INS is the appropriate governmental entity to contact for verification of such status. If the applicant presents a document relating to such status and that document does not on its face reasonably appear to be genuine or to relate to the applicant (or to satisfy a higher applicable standard), the provider may request verification of status by filing INS Form G–845 along with copies of the pertinent documents provided by the applicant with the local INS office. If an applicant has lost his or her original documents or never had an original document demonstrating naturalized or derivative citizenship, refer the applicant to the local INS office to obtain documentation of status.)

(b) Accept a written declaration, made under penalty of perjury and possibly subject to later verification of status, from one or more third parties indicating a reasonable basis for personal knowledge that the applicant is a U.S. citizen or non-citizen national.

(c) Accept the applicant's written declaration, made under penalty of perjury and possibly subject to later verification of status, that he or she is a U.S. citizen or non-citizen national.

The options described in subparagraphs (b) and (c) above present a greater potential for undetected false claims of being a United States citizen or non-citizen national, and therefore should be used with caution in appropriate circumstances. For example, before using these options, a provider might require the applicant to demonstrate why a document evidencing that he or she is a U.S. citizen or non-citizen national does not exist or cannot be readily obtained. Such a requirement must be imposed equally on all applicants, and cannot be applied in a discriminatory manner.

3. *Action Pending Verification.* In an applicant has satisfied the above requirements regarding submission of a sworn declaration and presentation of any other required evidence of status, you should refer to the legal requirements of your program and to any applicable guidance provided by the federal agency or department overseeing your program to determine if you should grant or withheld benefits during the period of time in which you are verifying the applicant's status. If your program has no such requirements or guidance and the applicant has submitted a written declaration, under penalty of perjury, that he or she is a U.S. citizen or non-citizen national, you should not delay, deny, reduce or terminate the applicant's eligibility for benefits under the program on the basis of an applicant's citizenship or nationality during the period of time it takes to verify his or her status.

4. *Take Action Based on Results of Verification.* If you verify that the applicant is a U.S. citizen or non-citizen nation, you are subject to no further verification requirements under Title IV of the Act and should grant the benefits requested if the applicant is otherwise eligible for them under the specific program's requirements. If you cannot verify that the applicant is a U.S. citizen or non-citizen national after exhausting the above-described methods (and the applicant is not a qualified alien—see below), you should deny the benefits requested, and notify the applicant pursuant to your regular procedures of his or her rights under the applicable program to appeal the denial of benefits. If the INS was involved in the provider's attempt to verify naturalized or derivative citizenship, the INS will, upon request of the agency or department handling the appeal, conduct a thorough review of its initial verification response and will provide the agency or department with information in its possession necessary to resolve the appeal.

B. Qualified Alien

1. *Ask for Declaration of Status.* If an applicant is not a U.S. citizen or U.S. non-citizen national, you may grant the applicant non-exempt federal public benefits only if the applicant submits a written declaration, under penalty of perjury, that he or she has an immigration status that makes him or her a ''qualified alien'' and you verify that status as set forth below.

A ''qualified alien'' is:

• An alien lawfully admitted for permanent residence under the Immigration and Nationality Act (''INA'');

• An alien granted asylum under section 208 of the INA;

• A refugee admitted to the U.S. under section 207 of the INA;

• An alien paroled into the U.S. under section 212(d)(5) of the INA for at least one year;

• An alien whose deportation is being withheld under section 243(h) of the INA as in effect prior to April 1, 1997, or whose removal is being withheld under section 241(b)(3) of the INA;

• An alien granted conditional entry pursuant to section 203(a)(7) of the INA as in effect prior to April 1, 1980;

• An alien who is a Cuban or Haitian entrant as defined in section 501(e) of the Refugee Education Assistance Act of 1980; or

• An alien who (or whose child or parent) has been battered or subjected to extreme cruelty in the U.S. and otherwise satisfies the requirements of § 431(c) of the Act (see Exhibit B of Attachment 5).

2. *Request Documentation of Immigration Status.* Ask the applicant to provide documentation evidencing his or her status as a qualified alien. The documents that will demonstrate that an applicant is a ''qualified alien'' are described in Attachment 5. *Note that*, if the applicant is applying for federal means-tested public benefits covered by the Act, or possibly a program funded by a Social Services Block Grant, the applicant may well have to present additional documentation demonstrating eligibility under the Act—see Step 4 below—and you will also want to ask the applicant to provide any such additional documentation demonstrating eligibility.

3. *If Supported by Documents, Conclude that the Applicant is a Qualified Alien.* If the documentation reasonably appears on its face to be genuine (or, if your program already has existing guidance or procedures mandating a higher standard of proof for acceptance of documentary evidence of immigration status, the document satisfies that higher standard) and to relate to the individual presenting it, you should accept the documentation as conclusive evidence that the applicant *is* a qualified alien, you should *not* further verify immigration status with

the INS (unless you are a SAVE user, in which case you should proceed to verify status according to SAVE procedures), and you should proceed to determine if the applicant satisfies the Act's other eligibility requirements for the particular benefits discussed in Step 4 below (addressing SSI, Food Stamps, TANF, Medicaid, programs funded by a Social Services Block Grant, and federal means-tested public benefits).

4. *If, Based on the Documents Presented, You Are Considering Concluding that the Applicant Is Not a Qualified Alien, Take the Following Steps.*

(a) *Verify Status.* If, based on your review of the documents presented, you are considering determining that an applicant is *not* a qualified alien and thus is *not* eligible for the benefits requested based on his or her immigration status—*e.g.,* because the document does not on its face reasonably appear to be genuine (or to satisfy a higher applicable standard) or to relate to the person presenting it— you should check with the INS to verify the information presented as set forth below. (You do not need to check with the INS if the applicant presents a document that is valid and demonstrates lawful immigration status but that simply does not qualify him or her for status as a qualified alien: *e.g.,* INS Form I–94 showing admission as a nonimmigrant visitor.) **Do not determine that an applicant is not a qualified alien, and do not conclusively deny benefits on that basis, without first verifying the applicant's status with the INS as follows.**

If you are connected to the INS SAVE system, check the applicant's immigration status using the standard procedures for use of the SAVE system, including both the electronic mechanism and, if necessary (*e.g.,* if information regarding the pertinent immigration status cannot be confirmed through the electronic SAVE database), the procedures for secondary verification. If you are not connected to the SAVE system and the applicant presents documents relating to such status, request verification of immigration status by filing INS Form G–845 and Supplement along with copies of the pertinent immigration documents provided by the applicant with the local INS office. In either instance, the INS will conduct a thorough review of its records to determine if the applicant is a qualified alien. If the applicant presents expired documents or is unable to present any documentation evidencing his or her immigration status, refer the applicant to the local INS office to obtain

documentation of status. In unusual cases involving applicants who are hospitalized or medically disabled, or who can otherwise show good cause for their inability to present documentation, and for whom securing such documentation would constitute an undue hardship, if the applicant can provide an alien registration number, you may file INS Form G–845 and Supplement, along with the alien registration number a copy of any expired INS document presented, with the local INS office to verify status. As with any documentation of immigration status, you should confirm that the status information you receive back from INS pertains to the applicant whose identity you have verified.

(b) *Action Pending Verification.* You should refer to the legal requirements of your program and to any applicable guidance provided by the federal agency or department overseeing your program, if any, to determine whether you should grant or withhold benefits during the period of time in which you are verifying the applicant's immigration status. If your program has not such requirements or guidance and the applicant has submitted a written declaration, under penalty of perjury, that he or she is a qualified alien, you should not delay, deny, reduce or terminate the applicant's eligibility for benefits under the program on the basis of an applicant's immigration status during the period of time it takes to verify his or her immigration status. If you are to grant benefits pending verification, you should first determine if the applicant satisfies the Act's other eligibility requirements (if any) for the benefits requested as set forth in Step 4 below.

(c) *Take Action Based on Response to Verification Inquiry.* If the INS notifies you that the applicant has an immigration status that makes him or her a qualified alien within the meaning of the Act, you should accept the INS verification of and proceed to determine whether the applicant satisfies the Act's other eligibility requirements (if any) for the benefits requested as set forth in Step 4 below.

If the INS modifies you that it cannot verify that the applicant has an immigration status that makes him or her a qualified alien within the meaning of the Act, you should deny benefits and notify the applicant pursuant to your program's regular procedures of his or her rights under the applicable program to appeal the denial of benefits. Upon request of the agency or department handling the appeal, the INS will conduct a thorough review of its initial verification response and will provide

the agency or department with information in its possession necessary to resolve the appeal.

*Step 4: Verify Eligibility Under the Act*

Title IV of the Act provides that all qualified aliens are eligible for some federal public benefits, while it imposes additional eligibility requirements for receipt of other benefits. If the qualified alien is applying for a benefit for which all qualified aliens are eligible, you should not engage in any further verification of immigration status. If he or she is applying for a program for which the Act imposes additional eligibility requirements, however, you should determine whether the applicant satisfies those requirements.

A. Federal Public Benefits With No Further Immigration Eligibility Requirements for Qualified Aliens

Except as set forth below, all qualified aliens are eligible for all federal public benefits. If the qualified alien is applying for a federal public benefit for which all qualified aliens are eligible, you should not engage in any further verification of immigration status.

Wtih some exceptions, individuals receiving SSI as of August 22, 1996, continue to be eligible for such benefits until the Commissioner of Social Security, prior to September 30, 1998, redetermines their eligibility; if, as a result of that redetermination, an individual is found to be ineligible for SSI, the individual can nevertheless continue receiving benefits until September 30, 1998.

In the absence of a State's decision to restrict eligibility for programs funded by a Social Services Block Grant, all qualified aliens are eligible for Social Services Block Grant programs. In the absence of a State's decision to restrict eligibility for TANF and Medicaid, the Act does not restrict the availability of these benefits to qualified aliens who entered the United States prior to August 22, 1996, and who were continuously present in the United States until attaining qualified alien status; however, because the Department of Health and Human Services has determined that TANF and Medicaid are federal means-tested public benefits, *see* 62 FR 45,256 (August 26, 1997), aliens who entered the United States on or after August 22, 1996, are ineligible for those programs for five years from the date that they attain qualified alien status (see discussion of federal means-tested public benefits in Paragraph B below and Attachment 7). You should determine whether your State is continuing to provide TANF, Medicaid,

DOL_PRWORA _000016

**61350**　　**Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

and programs funded by a Social Services Block Grant to all qualified aliens:

′ If the State is continuing to provide programs funded by a Social Services Block Grant to all qualified aliens, you should not engage in any further verification of immigration status;

′ If the State is continuing to provide TANF and Medicaid to all qualified aliens, you should refer to Paragraph B below and Attachment 7 for further guidance on additional eligibility requirements; and

′ If the State has restricted qualified aliens' eligibility for TANF and Medicaid, you should determine whether the applicant is eligible for such benefits as set forth in Paragraph B below.

B. Federal Benefits With Additional Eligibility Requirements for Qualified Aliens SSI, Food Stamps, TANF, Medicaid, and Programs Funded by a Social Services Block Grant

The Act provides that only certain excepted categories of aliens are eligible for SSI and Food Stamps. A State may,

however, choose to issue Food Stamp benefits to individuals that are otherwise ineligible for such benefits under sections 402 or 403 of the Act, provided that the State reimburses the federal government for the costs of such benefits and complies with certain administrative requirements. In addition, if a State has exercised its right to limit qualified aliens' eligibility for TANF, Medicaid, and programs funded by a Social Services Block Grant, certain excepted categories of aliens remain eligible for such programs. The excepted categories of aliens that remain eligible for SSI are somewhat broader than the excepted categories for Food Stamps, Medicaid, TANF and programs funded by a Social Services Block Grant. Consult Attachment 6 for a more specific description of these excepted categories and the documentation that will demonstrate that an alien falls within such an exception and thus remains eligible for these programs.

*Federal Means-Tested Public Benefits.* With certain exceptions discussed in greater detail in Attachment 7, qualified

aliens are ineligible to receive federal means-tested public benefits for five years from the date that they attain qualified alien status. However, aliens who entered the United States prior to August 22, 1996, and who were continuously present in the United States until attaining qualified alien status are not subject to this restriction. In addition, exceptions are made for refugees, asylees, aliens whose deportation or removal has been withheld, Cuban/Haitian entrants, certain Amerasian immigrants, and aliens who are veterans honorably discharged or on non-training active duty and their families. This restriction, moreover, does not apply after the expiration of the five-year period. If a qualified alien is applying for such a benefit, you should determine, in accordance with Attachment 7, whether he or she arrived in the United States prior to August 22, 1996, whether he or she falls within one of the enumerated exceptions, or whether he or she has been a qualified alien for at least five years.

**Attachment 1**

LOCAL INS OFFICE ADDRESSES

| State or territory | County | File control office | Address |
| --- | --- | --- | --- |
| Alabama | | Atlanta, GA | 77 Forsyth Street, S.W., Atlanta, GA 30303–3427. |
| Alaska | | Anchorage, AK | 620 East 10th Avenue, Suite 102, Anchorage, AK 99501. |
| Arizona | | Phoenix, AZ | 2035 North Central Avenue, Phoenix, AZ 85004–1548. |
| Arkansas | | Memphis, TN | 1341 Sycamore View, Suite 100, Memphis, TN 38134. |
| California | Inyo, Kern, Los Angeles, Orange, Riverside, San Bernardino, San Luis Obispo, Santa Barbara, and Ventura. | Los Angeles, CA | 300 North Los Angeles Street, Los Angeles, CA 90012. |
| | Imperial and San Diego | San Diego, CA | 880 Front Street, Suite 1234, San Diego, CA 92101–8834. |
| | Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kings, Lake, Lassen Madera, Marin, Mariposa, Mendocino, Merced, Modoc, Mono, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Benito, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solono, Sonoma, Stainislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo, and Yuba. | San Francisco, CA | 630 Sansome Street, Room 300, San Francisco, CA 94111–2280. |
| Colorado | | Denver, CO | 4730 Paris Street, Albrook Center, Denver, CO 80239–2804. |
| Connecticut | | Hartford, CT | Ribicoff Federal Building, 450 Main Street, Hartford, CT 06103–3060. |
| Delaware | | Philadelphia, PA | 1600 Callowhill Street, Philadelphia, PA 19130–4112. |
| District of Columbia | | Arlington, VA | 4420 North Fairfax Drive, Arlington, VA 22203. |

DOL_PRWORA _000017

LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
| Florida | | Miami, FL | 7880 Biscayne Blvd. Miami, FL 33138–4797. |
| Georgia | | Atlanta, GA | 77 Forsyth Street, S.W., Atlanta, GA 30303–3427. |
| Guam | | Agana, GU | Pacific News Bldg., Room 801, 238 Archbishop Flores Street, Agana, GU 96910. |
| Hawaii | | Honolulu, HI | 595 Ala Moana Blvd., Honolulu, HI 96813. |
| Idaho | | Helena, MT | 2800 Skyway Drive, Helena, MT 59601. |
| Illinois | | Chicago, IL | 10 West Jackson Blvd., Chicago, IL 60604. |
| Indiana | | Indianapolis, IN | Gateway Plaza, 950 North Meridian Street, Room 400, Indianapolis, IN 46204. |
| Iowa | | Omaha, NE | 3736 132nd Street, Omaha, NE 68144. |
| Kansas | | Kansas City, MO | 9747 North Conant Avenue, Kansas City, MO 64153. |
| Kentucky | | Memphis, TN | 1341 Sycamore View, Suite 100, Memphis,TN 38134. |
| Louisiana | | New Orleans,LA | Postal Services Building, 701 Loyola Avenue, Room T–8011, New Orleans, LA 70113–1912. |
| Maine | | Portland, ME | 739 Warren Avenue, Portland, ME 04103–1187. |
| Maryland | | Baltimore, MD | Nations Bank Center, Tower One, 100 South Charles/ 12th Floor, Baltimore, MD 21201–2725. |
| Massachusetts | | Boston, MA | John F. Kennedy Federal Bldg., Government Center, Room E–160, Boston, MA 02203–0701. |
| Michigan | | Detroit, MI | Federal Building, 333 Mt. Elliott Street, Detroit, MI 48207–4381. |
| Minnesota | | St. Paul, MN | 2901 Metro Drive, Suite 100, Bloomington, MN 55425. |
| Mississippi | Alcron, Attala, Benton, Bolivar, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, DeSoto, Grenada, Humphreys, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Sunflower, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Washington, Webster, Winston, and Yalobusha. | Memphis, TN | 1341 Sycamore View, Suite 100, Memphis, TN 38134. |
| | Adams, Amite, Claiborne, Clarke, Copiah, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Hinds, Holmes, Issaquena, Jackson, Jasper, Jefferson, Jefferson Davis, Jones, Kemper, Lamar, Lauderdale, Lawrence, Leake, Lincoln, Madison, Marion, Neshoba, Newton, Noxubee, Pearl River, Perry, Pike, Rankin, Scott, Sharkey, Simpson, Smith, Stone, Walthall, Warren, Wayne, Wilkinson, and Yazoo. | New Orleans, LA | Postal Services Building, 701 Loyola Avenue, Room T–8011, New Orleans, LA 70113–1912. |
| Missouri | Andrew, Atchison, Barry, Barton, Bates, Benton, Boone, Buchanan, Caldwell, Callaway, Camden, Carroll, Cass, Cedar, Christian, Clay, Clinton, Cole, Cooper, Dade, Dallas, Daviess, De Kalb, Douglas, Gentry, Greene, Grundy, Harrison, Henry, Hickory, Holt, Howard, Howell, Jackson, Jasper, Johnson, Laclede, Lafayette, Lawrence, Livingston, McDonald, Mercer, Miller, Moniteau, Morgan, Newton, Nodaway, Oregon, Osage, Ozark, Pettis, Platte, Polk, Pulaski, Putnam, Ray, St. Clair, Saline, Stone, Sullivan, Taney, Texas, Vernon, Webster, Worth, and Wright. | Kansas City, MO | 9747 North Conant Avenue, Kansas City, MO 64153. |

DOL_PRWORA _000018

**61352**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
|  | Adair, Audrain, Bollinger, Butler, Cape Girardeau, Carter, Chariton, Clark, Crawford, Dent, Dunklin, Franklin, Gasconade, Iron, Jefferson, Knox, Lewis, Lincoln, Linn, Macon, Madison, Maries, Marion, Mississippi, Monroe, Montgomery, New Madrid, Pemiscot, Perry, Phelps, Pike, Ralls, Randolph, Reynolds, Ripley, St. Charles, St. Francois, St. Louis, Ste. Genevieve, Schuyler, Scotland, Scott, Shannon, Shelby, Stoddard, Warren, Washington, and Wayne. | St. Louis, MO | Robert A. Young Federal Bldg., 1222 Spruce Street, Room 1100, St. Louis, MO 63103–2815. |
| Montana | | Helena, MT | 2800 Skyway Drive, Helena, MT 59601. |
| Nebraska | | Omaha, NE | 3736 132nd Street, Omaha, NE 68144. |
| Nevada | Clark, Esmeralda, Lincoln, and Nye | Las Vegas, NV | 3373 Pepper Lane, Las Vegas, NV 89120. |
| | Churchill, Douglas, Elko, Eureka, Humboldt, Lander, Lyon, Mineral, Pershing, Storey, Washoe, and White Pine. | Reno, NV | 1351 Corporate Boulevard, Reno, NV 89502. |
| New Hampshire | | Boston, MA | John F. Kennedy Federal Bldg., Government Center, Room E–160, Boston, MA 02203–0701. |
| New Jersey | | Newark, NJ | Peter Rodino Federal Building, 970 Broad Street, Newark, NJ 07102–2506. |
| New Mexico | | El Paso, TX | 1545 Hawkins, Suite 167, El Paso, TX 79925. |
| New York | Albany, Broome, Chenango, Columbia, Delaware, Fulton, Greene, Hamilton, Herkimer, Madison, Montgomery, Onoeida, Otsego, Rensselaer, Saratoga, Schenectady, Schoharie, Tioga, Warren, and Washington. | Albany, NY | James T. Foley Federal Courthouse, 445 Broadway, Room 227, Albany, NY 12207–2999. |
| | Allegany, Cattaraugus, Cayuga, Chautauqua, Chemung, Clinton, Cortland, Erie, Essex, Franklin, Genesee, Jefferson, Lewis, Livingston, Monroe, Niagara, Onandaga, Ontario, Orleans, Oswego, St. Lawrence, Schuyler, Seneca, Steuben, Tompkins, Wayne, Wyoming, and Yates. | Buffalo, NY | 130 Delaware Avenue, Buffalo, NY 14202–2404. |
| | Bronx, Dutchess, Kings, Nassau, New York, Orange, Putnam, Queens, Richmond, Rockland, Suffolk, Sullivan, Ulster, and Westchester. | New York, NY | 26 Federal Plaza, New York, NY 10278–0127. |
| North Carolina | | Charlotte, NC | 6 Woodlawn Green, Bldg. 6, Suite 138, Charlotte, NC 28217–2216. |
| North Dakota | | St. Paul, MN | 2901 Metro Drive, Suite 100, Bloomington, MN 55425. |
| Ohio | Adams, Athens, Brown, Butler, Champaign, Clark, Clermont, Clinton, Darke, Delaware, Fairfield, Fayette, Franklin, Gallia, Greene, Hamilton, Highland, Hocking, Jackson, Licking, Lawrence, Logan, Madison, Meigs, Miami, Montgomery, Perry, Pickaway, Pike, Preble, Ross, Scioto, Shelby, Union, Vinton, and Warren. | Cincinnati, OH | J.W. Peck Federal Building, 550 Main Street, Room 8525, Cincinnati, OH 45202. |
| | Allen, Ashland, Ashtabula, Auglaize, Belmont, Carroll, Columbiana, Coshocton, Crawford, Cuyahoga, Defiance, Erie, Fulton, Geauga, Guernsey, Hancock, Hardin, Harrison, Henry, Holmes, Huron, Jefferson, Knox, Lake, Lorain, Lucas, Mahoning, Marion, Medina, Mercer, Monroe, Morgan, Morrow, Muskingum, Noble, Ottawa, Paulding, Portage, Putman, Richland, Sandusky, Seneca, Stark, Summit, Trumbull, Tuscarawas, Van Weft, Washington, Wayne, Williams, Wood, and Wyandot. | Cleveland, OH | Anthony J. Celebreeze Federal Bldg., 1240 E. 9th Street, Room 1917, Cleveland, OH 44199. |

DOL_PRWORA _000019

LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
| Oklahoma | | Dallas, TX | 8101 North Stemmons Freeway, Dallas, TX 75247. |
| Oregon | | Portland, OR | 511 N.W. Broadway, Portland, OR 97209. |
| Pennsylvania | Adams, Berks, Bradford, Bucks, Cameron, Carbon, Centre, Chester, Clinton, Columbia, Cumberland, Dauphin, Delaware, Franklin, Fulton, Huntingdon, Juniata, Lackawanna, Lancaster, Lebanon, Lehigh, Luzerne, Lycoming, Mifflin, Monore, Montgomery, Montour, Northampton, Northumberland, Perry, Philadelphia, Pike, Potter, Schuylkill, Snyder, Sullivan, Susquehanna, Tioga, Union Wayne, Wyoming, and York. | Philadelphia, PA | 1600 Callowhill Street, Philadelphia, PA 19130–4112. |
| | Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Indiana, Jefferson, Lawrence, McKean, Mercer, Somerset, Venango, Warren, Washington, and Westmoreland. | Pittsburgh, PA | Federal Building, Room 314, 1000 Liberty Avenue, Pittsburgh, PA 15222–4181. |
| Puerto Rico | | San Juan, PR | P.O. Box 365068, San Juan, PR 00936–5068. |
| Rhode Island | | Providence, RI | 200 Dyer Street, Providence, RI 02903–3993. |
| South Carolina | | Charlotte, NC | 6 Woodlawn Green, Bldg. 6, Suite 138, Charlotte, NC 28217–2216. |
| South Dakota | | St. Paul, MN | 2901 Metro Drive, Suite 100, Bloomington, MN 55425. |
| Tennessee | | Memphis, TN | 1341 Sycamore View, Suite 100, Memphis, TN 38134. |
| Texas | Anderson, Andrews, Archer, Armstrong, Bailey, Baylor, Borden, Bosque, Bowie, Briscoe, Callahan, Camp, Carson, Cass, Castro, Cherokee, Childress, Clay, Cochran, Collin, Collingsworth, Comanche, Cooke, Cottie, Crosby, Dallam, Dallas, Dawson, Deaf Smith, Delta, Denton, Dickens, Donley, Eastland, Ellis, Erath, Fannin, Fisher, Floyd, Foard, Franklin, Freestone, Gaines, Garza, Gray, Grayson, Gregg, Hale, Hall, Hamilton, Hansford, Hardeman, Harrison, Hartley, Haskell, Hemphill, Henderson, Hill, Hockley, Hood, Hopkins, Houston, Howard, Hunt, Hutchinson, Jack, Johnson, Jones, Kaufman, Kent, King, Knox, Lamar, Lamb, Leon, Limestone, Lipscomb, Lubbock, Lynn, Marion, Martin, Mitchell, Montague, Moore, Morris, Motley, Navarro, Nolan, Ochiltree, Oldham, Palo Pinto, Panola, Parker, Parmer, Potter, Rains, Randall, Red River, Roberts, Rockwall, Rusk, Scurry, Shackelford, Sherman, Smith, Somervell, Stephens, Stonewall, Swishers, Tarrant, Taylor, Terry, Throckmorton, Titus, Upshur, Van Zandt, Wheeler, Wichita, Wilbarger, Wise, Wood, Yoakum, and Young. | Dallas, TX | 8101 North Stemmons Freeway, Dallas, TX 75247. |
| | Brewster, Crane, Culberson, Ector, El Paso, Hudspeth, Jeff Davis, Loving, Midland, Pecos, Presidio, Reeves, Terrell, Upton, Ward, and Winkler. | El Paso, TX | 1545 Hawkins Suite 167, El Paso, TX 79925. |
| | Brooks, Cameron, Hidalgo, Kenedy, Kleberg, Starr, and Willacy. | Harlingen, TX | 2102 Teege Road, Harlingen, TX 78550. |

DOL_PRWORA_000020

**61354**   Federal Register / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
| | Angelina, Austin, Brazoria, Chambers, Colorado, Fort Bend, Galveston, Grimes, Hardin, Harris, Jasper, Jefferson, Liberty, Madison, Matagorda, Montgomery, Nacogdoches, Newton, Orange, Polk, Sabine, San Augustine, San Jacinto, Shelby, Trinity, Tyler, Walker, Waller, Washingoton, and Wharton. | Houston, TX ............................ | 509 N. Sam Houston Parkway East, Houston, TX 77060. |
| | Aransas, Aascosa, Bandera, Bastrop, Bee, Bell, Bexar, Blanco, Brozos, Brown, Burleson, Burner, Caldwell, Calhoun, Coke, Coleman, Comal, Concho, Coryell, Crockett, De Witt, Dimmit, Duval, Edwards, Falls, Fayette, Frio, Gillespie, Glasscock, Goliad, Gonzales, Guadalupe, Harp, Haynes, Irion, Jackson, Jim Hogg, Jim Wells, Karnes, Kendall, Kerr, Kimble, Kinney, Lampasas, La Salle, Lavaca, Lee, Live Oak, Llano, McCulloch, McLennan, McMullen, Mason, Maverick, Medina, Menard, Milam, Mills, Nueces, Reagan, Real, Refugio, Robertson, Runnels, San Patricio, San Saba, Schleicher, Sterling, Sutton, Tom Green, Travis, Uvalde, Val Verde, Victoria, Webb, Williamson, Wilson, Zapata, and Zavala. | San Antonia, TX ........................ | 8940 Four Winds Drive, Suite 2020, San Antonia, TX 78239. |
| Utah .......................... | ...................................................... | Salt Lake City, UT .................... | 5272 South College Drive, Suite 100, Salt Lake, UT 84123. |
| Vermont .................... | ...................................................... | St. Albans, VT .......................... | Federal Building, P.O. Box 328, 50 South Maine Street, St. Albans, VT 05478–0238. |
| Virginia ...................... | Accomack, Amelia, Brunswick, Caroline, Charles City, Chesterfield, Colonial Heights, Dinwiddie, Essex, Fredericksburg, Gloucester, Goochland, Greensville, Hanover, Henrico, Isle of Wight, James City, King and Queen, King William, Lancaster, Louisa, Lunenburg, Mathews, Mecklenburg, Middlesex, New Kent, Northampton, Northumberland, Nottoway, Powhatan, Prince Edward, Prince George, Richmond, Southhampton, Spotsylvania, Surry, Sussex, Westmoreland, and York. | Norfolk, VA ............................... | Norfolk Commerce Park, 5280 Hennenman Drive, Norfolk, VA 23513. |
| | Albemarle, Alleghany, Amherst, Appomattox, Arlington, Augusta, Bath, Bedford, Bland, Botetourt, Buchanan, Buckingham, Campbell, Carroll, Charlotte, Clarke, Craig, Culpepper, Cumberland, Dickenson, Fairfax, Fauquier, Floyd, Fluvanna, Franklin, Frederick, Giles, Grayson, Greene, Halifax, Henry, Highland, King George, Lee, Loudoun, Madison, Montgomery, Nelson, Orange, Page, Patrick, Pittsylvania, Prince William, Pulaski, Rappahannock, Roanoke, Rockbridge, Rockingham, Russell, Scott, Shenandoah, Smyth, Stafford, Tazewell, Warren, Warwick, Washington, Wise, and Wythe. | Arlington, VA ............................ | 4420 North Fairfax Drive, Arlington, VA 22203. |
| Virgin Islands ............ | ...................................................... | St. Thomas, VI ......................... | P.C. Box 610, Federal Building, Suite 117, Veterans Drive, Charlotte Amalie, St. Thomas, U.S. Virgin Islands, 00801. |
| Washington ............... | ...................................................... | Seattle, WA ............................. | 815 Airport Way South, Seattle, WA 98134. |
| West Virginia ............ | ...................................................... | Pittsburgh, PA ......................... | Federal Building, Room 314, 1000 Liberty Avenue, Pittsburgh, PA 15222–4181. |

DOL_PRWORA _000021

LOCAL INS OFFICE ADDRESSES—Continued

| State or territory | County | File control office | Address |
|---|---|---|---|
| Wisconsin ................ | ................................................................ | Milwaukee, WI ......................... | Federal Building, 517 East Wisconsin Avenue, Room 186, Milwaukee, WI 53202. |
| Wyoming ................... | ................................................................ | Denver, CO .............................. | 4730 Paris Street, Albrook Center, Denver, CO 80239–2804. |

**Submitting Verification Requests to INS**

A copy of INS Form G–845 is attached, along with a supplemental form that should be used to obtain more detailed information on immigration status, citizenship, and sponsorship. (The supplemental form may only be used in conjunction with Form G–845, not separately.) Requests for verification on Form G–845 may be mailed to the Immigration and Naturalization Service at the addresses listed on the following pages. To speed processing, please indicate ''Attention: Immigration Status Verifier'' on the envelope.

The attached form G–845 may be copied for submission to the INS; it should be reproduced as a two-sided document. Additional copies may be obtained in three ways:

1. Request Form G–845 from the INS Forms Distribution Center serving your region:

Eastern Forms Center, P.O. Box 567, Williston, VT 05497 (east of the Mississippi River)

Forms Center West, 5600 Rickenbacker Road, Building 701A, Bell, CA 90201 (west of the Mississippi River)

2. Download Form G–845 from the Internet: www.usdoj.gov/ins/forms.

3. Call the INS Forms Request Line: 1–800–870–3676. (Due to the high volume of calls to this line, the best time to call is early on weekday mornings.)

INS formerly required that Form G–845 be printed on blue paper stock to distinguish it from Form G–845S, which is printed on white paper. Form G–845 may now be submitted on white stock, and existing copies on blue stock may also be submitted during this transition period. As a result of this change, *it is particularly important that copies of the forms include the form number at the bottom of the page to allow INS to distinguish between them.*

When submitting copies of documents with Form G–845, please send copies made from the originals, if possible, in order to enhance the quality of the reproduction.

**BILLING CODE 4410–10–M**

DOL_PRWORA _000022

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB #1115-0122
**Document Verification Request**

### Section A - *to be completed by the submitting agency*

**To:** Immigration and Naturalization Service

6. Verification Number

7. ☐ Photocopy of Document Attached.
   *(If printed on both sides, attach a copy of the front __and__ of the back.)*
   ☐ Other Information Attached *(Specify documents).*

**From:** Typed or Stamped Name and Address of Submitting Agency

8. Organization (specify)

**Attn:   Status Verifier**

(INS may use above address with a #20 window envelope.)

1. Alien Registration or I-94 Number

2. Applicant's Name *(Last, First, Middle)*

3. Nationality

4. Date of Birth *(Month/Day/Year)*

5. Social Security Number

9. Name of Submitting Official

10. Title of Submitting Official

11. Date

12. Telephone Number

### Section B - *to be completed by INS*

**INS RESPONSE: From the documents or information submitted and/or a review of our records we find that:**

1. ☐ This document appears valid and relates to a **Lawful Permanent Resident alien** of the United States.
2. ☐ This document appears valid and relates to a **Conditional Resident alien** of the United States.
3. ☐ This document appears valid and relates to an alien **authorized employment** as indicated below:
   a. ☐ Full-Time
   b. ☐ Part-Time
   c. ☐ No Expiration (Indefinite)
   d. ☐ Expires on
      *(specify Month/Day/Year, below)*

4. ☐ This document appears valid and relates to an alien who has an application pending for *(specify INS benefit below)*

5. ☐ This document relates to an alien having been **granted asylum/refugee** status in the United States.
6. ☐ This document appears valid and relates to an alien **paroled** into the United States pursuant to Section 212 of the I&N Act.
7. ☐ This document appears valid and relates to an alien who is a **Cuban/Haitian entrant**.

8. ☐ This document appears valid and relates to an alien who is a **conditional entrant**.
9. ☐ This document appears valid and relates to an alien who is a **nonimmigrant** *(specify type or class below)*

10. ☐ This document appears valid and relates to an alien **not authorized employment** in the United States.
11. ☐ Continue to process as legal alien. INS is searching indices for further information.
12. ☐ This document is **not valid** because it appears to be *(check all that apply)*
   a. ☐ Expired
   b. ☐ Altered
   c. ☐ Counterfeit

INS Stamp

Form G-845 (Rev. 06/02/90) Y

☐ **Please see reverse for additional comments.**

DOL_PRWORA_000023

## Comments

13. ☐ No determination can be made from the information submitted. Please obtain a copy of the **original** alien registration documentation and resubmit.

14. ☐ No determination can be made without seeing **both** sides of the document submitted *(please resubmit request)*.

15. ☐ Copy of document is not readable *(please resubmit request)*.

### "PRUCOL"

For Purposes Of Determining If Alien Is Permanently Residing Under Color Of Law <u>Only</u>!

16. ☐ INS actively pursues the expulsion of an alien in this class/category.

17. ☐ INS **is not** actively pursuing the expulsion of an alien in this class/category, at this time.

18. ☐ Other

### Instructions

- **Submit copies of both** *front and back* **of alien's original documentation.**

- **Make certain a** *complete return address* **has been entered in the "From" portion of the form**.

- The Alien Registration Number ("A" Number) is the letter "A" followed by a series of (7) or (8) digits. Also in this block may be recorded the number found on Form I-94. (Check the front and back of the I-94 document and if the "A" Number appears, record that number when requesting information instead of the longer admission number as the "A" Number refers to the most integral record available.)

- If Form G-845 is submitted without copies of applicant's original documentation, it will be returned to the submitting agency without any action taken.

- Address this verification request to the local office of the Immigration and Naturalization Service.

DOL_PRWORA _000024

**61358**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

---

**U.S. Department of Justice**
Immigration and Naturalization Service

**Document Verification Request Supplement**

---

### TO BE COMPLETED BY THE SUBMITTING AGENCY

**To:**    Immigration and Naturalization Service        Date _____

Applicant's Name *(Last, First, Middle)*

Social Security Number

Alien Registration Number or I-94 Number

**From:** Typed or Stamped Name and Address of Submitting Agency     Telephone (   ) _____

Complete the following items:   □ #1   □ #2   □ #3   □ #4   □ #5   □ #6   □ #7

### TO BE COMPLETED BY INS

**1. IMMIGRATION STATUS (check all that apply):**
From the document or information submitted and/or a review of our records we find that the person identified is a/an:

□ a.   Lawful Permanent Resident alien of the United States.
     **(Complete b,c,d,g,h,or i if alien adjusted to LPR status from one of those statuses in the past 7 years.)**

□ b.   Refugee admitted to the United States under Section 207 of the INA. **(Complete Item 2 below.)**

□ c.   Asylee under Section 208 of the INA. **(Complete Item 3 below.)**

□ d.   Alien whose deportation has been withheld under section 243(h) of the INA (as in effect prior to April 1, 1997) or whose removal has been withheld under section 241(b)(3).
     Date deportation or removal ordered withheld: _____

□ e.   Alien paroled into the United States under Section 212(d) (5) of the INA for a period of at least 1 year. **(Complete Items 3 and 4 below.)**

□ f.   Conditional Entrant pursuant to Section 203(a)(7) of the INA in effect prior to April 1, 1980.

□ g.   American Indian born in Canada to whom the provisions of Section 289 of the INA apply.

□ h.   Cuban/Haitian Entrant, as defined in Section 501(e) of the Refugee Education Assistance Act of 1980. **(Complete Item 3 below.)**

□ i.   Amerasian immigrant, pursuant to Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988. **(Complete Item 2 below.)**

□ j.   Other (indicate status): _____

2.   Date alien entered the United States: _____

3.   Date status was granted: _____

4.   Date status expires: _____

**5. CITIZEN STATUS:**
□ This document appears valid and relates to a United States citizen.

**6. SPECIAL BENEFIT PROVISIONS FOR CERTAIN VICTIMS OF ABUSE:**
□ a.   This alien obtained Lawful Permanent (or Conditional) Resident Status as the spouse, child, or widow(er) of a U.S. citizen.

□ b.   This alien obtained Lawful Permanent (or Conditional) Resident Status as the spouse, child, or unmarried son or daughter of a lawful permanent resident alien.

□ c.   This alien did not obtain status as described in (a) or (b).

---

Form G-845 Supplement (9/5/97)

DOL_PRWORA_000025

## TO BE COMPLETED BY INS

7. **AFFIDAVIT OF SUPPORT:**
   - ☐ a.  This alien was sponsored on Form I-864, Affidavit of Support under Section 213A of the INA. Service receipt date _____. **(Complete Item 3 on page 1.)**
   - ☐ b.  This alien was not sponsored on Form I-864.

| **Name of Sponsor** | **Name of Joint Sponsor(s)** *(if any)* |
| --- | --- |
| **Sponsor's Social Security Number** | **Joint Sponsor's Social Security Number** |
| __ __ __ - __ __ - __ __ __ __ | __ __ __ - __ __ - __ __ __ __ |
| **Sponsor's Address** | **Joint Sponsor's Address** |

☐  See reverse for information on additional joint sponsor(s).

INS Stamp

\*  *This supplement may be used in conjunction with Form G-845 to request verification; it cannot be used alone. It reflects information that may be relevant to eligibility for Federal, State, and local public benefits under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, P.L. 104-193.*

Form G-845 Supplement (9/5/97) **Page 2**

BILLING CODE 4410–10–C

DOL_PRWORA _000026

**Attachment 2—Nondiscrimination Advisory**

Various federal civil rights laws, regulations and executive orders prohibit discrimination by governmental and private entities on the basis of race, national origin, gender, religion, age and disability. These laws, of course, apply to entities' implementation of Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act''). Because of the particular potential for national origin and race discrimination under the Act and its verification requirements, and because persons with disabilities are more likely to need benefits under various public benefit programs, this Advisory focuses on the laws relating to discrimination based on national origin, race and/or disability. Emphasizing these particular laws, however, is in no way meant to minimize the importance of guarding against all forms of illegal discrimination, and you should comply with all nondiscrimination requirements applicable to your program.

*A. Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. (''Title VI'')*

Because Title IV of the Act imposes new and significant restrictions on the ability of noncitizens to receive federal, state or local public benefits, there is particular potential for discrimination on the basis of national origin. It is important to remember that, although the Act limits the benefits available to some aliens, many aliens will continue to be entitled to receive public benefits. If improperly applied, the Act's restrictions may result in national origin discrimination against applicants who are eligible to receive benefits. It is therefore important to understand which aliens are eligible for which benefits.

Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity, whether operated by a state, local or private entity, that receives federal funds or other federal financial assistance. When operating or participating in a federally assisted program, a benefit provider cannot, on the basis of race, color or national origin, either directly or indirectly, including through contractual means, distinguish among individuals in the types, quantity, quality or timeliness of program services, aids or benefits that it provides or the manner in which it provides them. This prohibition applies to disparate treatment, as well as to the utilization of facility neutral procedures, criteria or methods of administration that have the effect of discriminating against individuals because of their race, color, or national origin. Policies and practices that are neutral in design and operation but have a disparate impact based on race, color or national origin must be eliminated unless they are necessary to the program's operation and there is no less discriminatory alternative.

Violations of Title VI may be obvious or subtle. A benefit provider that denies benefits or delays determinations of eligibility on the basis of an individual's race, color or national origin may violate Title VI. A benefit provider may violate Title VI if it concludes that applicants are ineligible for benefits because they have ethnic surnames or origins outside the United States, or because they look or sound foreign. It also may violate Title VI if it acts upon the assumption that applicants with these characteristics are illegal aliens, or if it imposes additional eligibility requirements on ethnic or racial minorities because of their ethnicity or race.

When confirming immigration status for purposes of determining eligibility for public benefits, benefit providers should be aware that there is no single immigration document that will establish all aliens' qualifications to receive benefits under the Act. The types of documents that an alien will be able to present to establish immigration status will vary depending upon the status in which the alien entered the U.S. and his or her individual circumstances. Demanding that an alien present one specific type of document to the exclusion of all other legally valid documents establishing immigration status, or demanding more or different documentation based on assumptions about the applicant's citizenship or national origin rather than knowledge of such status obtained in a non-discriminatory fashion, may constitute a violation of Title VI. For example, it may be discriminatory to demand that a specific applicant present three documents to establish her identity merely because she speaks Spanish or looks Asian, while allowing English-speaking persons and non-Asians to present only one identity document. It may also violate Title VI to assume, based on an applicant's national origin, that his or her documents are fraudulent.

*B. Civil Rights Laws Applicable to Persons With Disabilities*

Sections 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 (''Section 504''), and the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.,* prohibit discrimination on the basis of disability by public entities and recipients of federal funds. Public service providers are required to offer their services in locations that are accessible to applicants with disabilities, including people who use wheelchairs. In addition, service providers must ensure effective communication with applicants who have impaired hearing, vision, or speech, and service providers must make reasonable modifications to their policies and practices to ensure that eligible people with disabilities are not excluded from participation in a program as a result of their disability. Appropriate auxiliary aids may include sign language interpreters for applicants who have hearing impairments or readers or audiotaped materials for applicants who have vision impairments. Applicants who have impaired manual skills may require assistance in completing forms. Citizens, non-citizen nationals and qualified aliens with disabilities may find it difficult to provide the information needed to establish their citizenship, nationality or immigration status. Therefore, if an applicant has a disability that limits the applicant's ability to provide the required evidence of status (*e.g.,* mental retardation, amnesia, or other cognitive, mental or physical impairment), you should make every effort to assist the individual to obtain the required evidence.

You should work with the applicant or his or her representative to obtain leads for possible sources of evidence. In many cases, a current or prior employer will have employment records for the individual that will identify his or her immigration status and provide other relevant information. You should also seek cooperation from local agencies, the INS and other organizations (*e.g.,* rehabilitation programs, advocacy groups and homeless shelters) to assist the individual in obtaining evidence from existing records. If the applicant has been granted another benefit that is contingent upon being a U.S. citizen, U.S. non-citizen national or qualified alien, contact that benefit-granting agency to determine what evidence it relied upon to establish eligibility. When conducting a search for documentation, use all possible spelling variations of the applicant's name.

*C. Other Applicable Federal Civil Rights Laws*

There are a number of other federal civil rights laws that prohibit

DOL_PRWORA _000027

discrimination based on other characteristics. They include the following:

• The Age Discrimination Act of 1975, 42 U.S.C. 6101 *et seq.*

The Age Discrimination Act prohibits discrimination on the basis of age in programs or activities receiving federal financial assistance. There are specific exceptions to the general prohibition against age discrimination, however, and you should consult the statute, 42 U.S.C. 6101 *et seq.,* as well as the regulations published by the Department of Health and Human Services, 45 CFR part 90, for further information

• The Fair Housing Act, 42 U.S.C. 3601 *et seq.*

The Fair Housing Act prohibits discrimination in the provision of housing based on race, color, religion, sex, familial status, national origin or handicap.

### D. Contact Numbers

Benefit providers with questions may call the following numbers for information on the various federal civil rights laws:

Title VI—U.S. Department of Justice, Civil Rights Division, Coordination and Review Section, 1–888–TITLE–06 (1–888–848–5306).

ADA—U.S. Department of Justice, Civil Rights Division, Disability Rights Section, 1–800–514–0301 (voice) or 1–800–514–0383 (TDD).

Age Discrimination Act—U.S. Department of Health and Human Services, 1–800–368–1019.

Fair Housing Act—U.S. Department of Housing and Urban Development, 1–800–669–9777 (voice) or 1–800–927–9275 (TDD).

Questions regarding discrimination in immigration status verification procedures or other benefit-granting procedures can be referred to the civil rights office of the pertinent benefit-granting agency. Such questions can also be referred to the Office of Special Counsel for Immigration Related Unfair Employment Practices in the Civil Rights Division of the U.S. Department of Justice, 1–800–255–8155 (voice) or 1–800–237–2515 (TDD).

### Attachment 3—Federal Public Benefits

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "Act") applies only to non-exempted "federal public benefits" as defined by the Act, rather than to all federally funded programs. (It also applies to certain state and local public benefits, which are not the subject of this Attachment.) Under the Act, benefit providers are only required to verify the immigration status of applicants for benefits that fall within the Act's definition of "federal public benefits" and are not specifically exempted from the Act's requirements. (If the program independently requires benefit providers to verify the citizenship, nationality and/or immigration status of an applicant, however, you should continue to comply with such requirements even if the program does not provide a "federal public benefit" covered by the Act.) Set forth below is preliminary guidance on the meaning of "federal public benefit," as well as a summary of the benefits specifically exempted from the Act's verification requirements. If you have any questions as to whether a particular program provides a federal public benefit covered by the Act or a benefit that is exempted from the Act's requirements, you should consult with the federal agency or department that oversees the program.

*Federal Public Benefit:* A "federal public benefit" is:

(a) Any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; or

(b) Any retirement, welfare, health, disability, public or assisted housing, post-secondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

Subject to the list of exceptions set forth below, Title IV of the Act precludes all aliens who are not "qualified aliens" from receiving any "federal public benefit." In determining whether a program provides a "federal public benefit," you should first consider whether the program provides one of the benefits expressly enumerated in either (a) or (b) above. Under (a), if your program provides a "grant," "contract," "loan," "professional license," or "commercial license" to an individual, either through a U.S. agency or with U.S. appropriated funds, then you provide a "federal public benefit." If you do not provide a benefit of the type enumerated in (a), you should then go on to consider whether your program provides a benefit covered by (b).

To fall within (b), the benefit provided by your program must be one of the types of benefits described ("retirement," "welfare," "health," "disability," "public or assisted housing," "post-secondary education,"

"food assistance," "unemployment benefit," or "any other similar benefit"), it must be "provided by an agency of the United States or by appropriated funds of the United States," and it must be provided to one of the enumerated categories of recipients (an "individual household, or family eligibility unit"). Thus, for example, if you provide an "unemployment benefit" to an "individual, household, or family eligibility unit" using "appropriated funds of the United States," the definition is satisfied. In contrast, if you provide generally available services such as fire or ambulance services, or do not provide benefits to an "individual, household, or family eligibility unit," or do not provide benefits through an "agency of the United States" or with "appropriated funds of the United States," the definition does not apply.

If your program provides payments or assistance to an individual, household or family eligibility unit through a U.S. agency or by U.S. appropriated funds, but the benefits are not expressly enumerated above, you should consider whether the benefits are "similiar" to one of the benefits enumerated in (b). If you believe that the benefit is arguably similar to an enumerated benefit, you should consult with the federal agency or department that oversees your program to confirm that the benefit constitutes a federal public benefit covered by the Act.

Finally, you should consider who is actually receiving the benefits that you provide. Although the Act prohibits certain aliens from receiving non-exempted "federal public benefits," it does not prohibit governmental or private entities from receiving federal public benefits that they might then use to provide assistance to aliens, *so long as the benefit ultimately provided to the non-qualified aliens does not itself constitute a "federal public benefit."* Thus, if a local agency were to receive a "grant" (which is expressly identified as a federal public benefit), but the agency uses it to provide police services, fire protection or crime victim counseling (which are not federal public benefits under the Act's definition because they are not similar to an enumerated benefit), the prohibition would not apply. Similarly, if you provide a "grant" to a community organization (which is not an "individual, household or family eligibility unit") that uses the funds to build a library or renovate a park (which are not federal public benefits under the Act's definition), the prohibition would not apply. In contrast, if the agency uses the "grant" to provide a "federal public benefit"—*e.g.,* a "loan" or "welfare"

**61362**   **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

payment to a poor ''individual, household or family eligibility unit''—then the prohibition would apply and non-qualified aliens would be ineligible for such benefits.

*Exceptions:* The Act's verification requirements do not apply to all ''federal public benefits,'' as the Act specifically exempts certain types of benefits. If a program provides ''federal public benefits'' that fall within one of the following exceptions, the program provider is not required by this Act to, and should not attempt to, verify an applicant's immigration status, unless otherwise required or authorized to do so by federal law, except to the extent necessary to determine whether the exemption applies:

• Benefits covered by Attorney General Order No. 2049, 61 FR 45985 (1996), or any subsequent order, re: government-funded community programs, services or assistance that are necessary for protection of life or safety;

• Any wages, pensions, annuities, or other earned payments to which an alien is entitled as a result of federal, state, or local government employment, provided that the alien is not residing or present in the United States and provided that the employment was not prohibited under the immigration laws;

• Any veterans benefits to which an alien is entitled, provided that the alien is not residing or present in the United States;

• Any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the U.S.;

• Any contract, professional license, or commercial license for a citizen of a freely associated state (Palau, the Federated States of Micronesia, and the Marshall Islands), if section 141 of the applicable compact of free association is in effect;

• Any benefits that the U.S. is required to pay under the reciprocal treaty agreements listed in the forthcoming Attorney General Order to a work authorized nonimmigrant or alien lawfully admitted for permanent residence qualified for such benefits;

• Medical assistance under Title XIX of the Social Security Act (or any successor program to such Title) for care and services that are necessary for the treatment of an emergency medical condition (as defined in section 1903(v)(3) of such Act) of the alien involved and that are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the state plan approved under such Title (other than the requirement of the receipt of aid or assistance under

Title IV of such Act, SSI benefits under Title XVI of such Act, or a state supplementary payment);

• Short-term, non-cash, in-kind emergency disaster relief;

• Public health assistance (not including any assistance under Title XIX of the Social Security Act) for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease;

• Programs for housing or community development assistance or financial assistance administered by the Secretary of Housing and Urban Development (''HUD''), any program under Title V of the Housing Act of 1949, or any assistance under section 306C of the Consolidated Farm and Rural Development Act, to the extent that the alien is receiving such a benefit on August 22, 1996;

• Any benefit payable under Title II of the Social Security Act to which entitlement is based on an application filed on or before August 31, 1996, and any benefit covered by Attorney General Order No. 2054, 61 FR 47039 (1996), re: benefits payable under Title II of the Social Security Act to an alien who is lawfully present in the U.S.;

• Any benefit the nonpayment of which would contravene an international agreement described in section 233 of the Social Security Act (an agreement establishing totalization arrangements between the social security system of the U.S. and that of any foreign country which establishes entitlement to and the amount of old-age, survivors, disability, or derivative benefits based on an individual's coverage under both systems);

• Any benefit the nonpayment of which would be contrary to section 202(t) of the Social Security Act;

• Any benefit under the school lunch program under the National School Lunch Act, 42 U.S.C. 1751 *et seq.*, or the school breakfast program under section 4 of the Child Nutrition Act of 1966, 42 U.S.C. 1773, provided to an individual who is eligible to receive free public education benefits under state or local law;

• Any benefit payable under Title XVIII of the Social Security Act (relating to the Medicare program) to an alien who is lawfully present in the U.S., as determined by the Attorney General, provided that, with respect to the attribution of the alien's wages for purposes of eligibility for benefits payable under Part A of such program, the alien was authorized to be employed; *and*

• Any benefit payable under the Railroad Retirement Act of 1974 or the Railroad Unemployment Insurance Act to an alien who is lawfully present in the U.S., as determined by the Attorney General, or to an alien residing outside the U.S.

*State Option:* Each State may, but is not required to, provide benefits under programs established under the laws listed below to individuals who are not U.S. citizens, U.S. non-citizen nationals or qualified aliens. You should determine whether your State is providing such benefits to all persons, regardless of citizenship, alienage or immigration status, or whether it is providing them only to U.S. citizens, U.S. non-citizen nationals and qualified aliens. If your State is providing such benefits to all persons, you should *not* verify citizenship or immigration status; if it is limiting such benefits to citizens, non-citizen nationals and qualified aliens, you may want to use the Interim Guidance, in consultation with state and local authorities, to verify citizenship and immigration status.

• Programs (other than the school lunch program and the school breakfast program) under the National School Lunch Act, 42 U.S.C. 1751 *et seq.*, and the Child Nutrition Act of 1966, 42 U.S.C. 1771 *et seq.*;

• Section 4 of the Agriculture and Consumer Protection Act of 1973, 7 U.S.C. 612c note;

• The Emergency Food Assistance Act of 1983, 7 U.S.C. 7501 *et seq.; and*

• The food distribution program on Indian reservations established under section 4(b) of the Food Stamp Act of 1977, 7 U.S.C. 2013(b).

**Attachment 4—Interim Guidance Documentary Evidence of Status as a U.S. Non-Citizen National**

Copies of the following documents will, when combined with satisfactory proof of identity (which will come from the document itself if it bears a photograph of the person to whom it relates), demonstrate that a person is a U.S. citizen or non-citizen national for purposes of Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. (To the extent citizenship or nationality of a child is relevant to a benefit eligibility determination, the documents should demonstrate the child's status rather than that of the parent.) The lists set forth in Paragraphs A and B below are drawn from existing guidance published by the Social Security Administration (''SSA'') and regulations issued by the Immigration and

DOL_PRWORA _000029

Naturalization Service (''INS'') regarding determination of U.S. citizenship and nationality; the lists in Paragraphs C through F are drawn solely from the SSA guidance. These lists are not exhaustive; you should refer to guidance issued by the agency or department overseeing your program to determine if it accepts documents or other evidence of citizenship not listed below.

*A. Primary Evidence*

• A birth certificate showing birth in one of the 50 States, the District of Columbia, Puerto Rico (on or after January 13, 1941), Guam, the U.S. Virgin Islands (on or after January 17, 1917), American Samoa, Swain's Island or the Northern Mariana Islands, unless the person was born to foreign diplomats residing in the U.S.

**Note:** If the document shows that the individual was born in Puerto Rico, the U.S. Virgin Islands or the Northern Mariana Islands before these areas became part of the U.S., the individual may be a collectively naturalized citizen—see Paragraph C below.

• United States passport (except limited passports, which are issued for periods of less than five years);
• Report of birth abroad of a U.S. citizen (FS–240) (issued by the Department of State to U.S. citizens);
• Certificate of birth (FS–545) (issued by a foreign service post) or Certification of Report of Birth (DS–1350) (issued by the Department of State), copies of which are available from the Department of State;
• Certificate of Naturalization (N–550 or N–570) (issued by the INS through a Federal or State court, or through administrative naturalization after December 1990 to individuals who are individually naturalized; the N–570 is a replacement certificate issued when the N–550 has been lost or mutilated or the individual's name has been changed);
• Certificate of Citizenship (N–560 or N–561) (issued by the INS to individuals who derive U.S. citizenship through a parent; the N–561 is a replacement certificate issued when the N–560 has been lost or mutilated or the individual's name has been changed);
• United States Citizen Identification Card (I–197) (issued by the INS until April 7, 1983 to U.S. citizens living near the Canadian or Mexican border who needed it for frequent border crossings) (formerly Form I–179, last issued in February 1974);
• Northern Mariana Identification Card (issued by the INS to a collectively naturalized citizen of the U.S. who was born in the Northern Mariana Islands before November 3, 1986);
• Statement provided by a U.S. consular officer certifying that the individual is a U.S. citizen (this is given to an individual born outside the U.S. who derives citizenship through a parent but does not have an FS–240, FS–545 or DS–1350); or
• American Indian Card with a classification code ''KIC'' and a statement on the back (identifying U.S. citizen members of the Texas Band of Kickapoos living near the U.S./Mexican border).

*B. Secondary Evidence*

If the applicant cannot present one of the documents listed in A above, the following may be relied upon to establish U.S. citizenship or nationality:
• Religious record recorded in one of the 50 States, the District of Columbia, Puerto Rico (on or after January 13, 1941), Guam, the U.S. Virgin Islands (on or after January 17, 1917)), American Samoa, Swain's Island or the Northern Mariana Islands (unless the person was born to foreign diplomats residing in such a jurisdication) within three months after birth showing that the birth occurred in such jurisdiction and the date of birth or the individual's age at the time the record was made;
• Evidence of civil service employment by the U.S. government before June 1, 1976;
• Early school records (preferably from the first school) showing the date of admission to the school, the child's date and place of birth, and the name(s) and place(s) of birth of the parent(s);
• Census record showing name, U.S. citizenship or a U.S. place of birth, and date of birth or age of applicant;
• Adoption Finalization Papers showing the child's name and place of birth in one of the 50 States, the District of Columbia, Puerto Rico (on or after January 13, 1941), Guam, the U.S. Virgin Islands (on or after January 17, 1917), American Samoa, Swain's Island or the Northern Mariana Islands (unless the person was born to foreign diplomats residing in such a jurisdiction) *or,* where or adoption is not finalized and the State or other jurisdiction listed above in which the child was born will not release a birth certificate prior to final adoption, a statement from a state-approved adoption agency showing the child's name and place of birth in one of such jurisdictions (NOTE: the source of the information must be an original birth certificate and must be indicated in the statement); or
• Any other document that establishes a U.S. place of birth or in some way indicates U.S. citizenship (e.g., a contemporaneous hospital record of birth in that hospital in one of the 50 States, the District of Columbia, Puerto Rico (on or after January 13, 1941), Guam, the U.S. Virgin Islands (on or after January 17, 1917), American Samoa, Swain's Island or the Northern Mariana Islands (unless the person was born to foreign diplomats residing in such a jurisdiction).

*C. Collective Naturalization*

If the applicant cannot present one of the documents listed in A or B above, the following will establish U.S. citizenship for collectively naturalized individuals:

Puerto Rico:
• Evidence of birth in Puerto Rico on or after April 11, 1899 and the applicant's statement that he or she was residing in the U.S., a U.S. possession or Puerto Rico on January 13, 1941; or
• Evidence that the applicant was a Puerto Rican citizen and the applicant's statement that he or she was residing in Puerto Rico on March 1, 1917 and that he or she did not take an oath of allegiance to Spain.

U.S. Virgin Islands:
• Evidence of birth in the U.S. Virgin Islands, and the applicant's statement of residence in the U.S., a U.S. possession or the U.S. Virgin Islands on February 25, 1927;
• The applicant's statement indicating resident in the U.S. Virgin Islands as a Danish citizen on January 17, 1917 and residence in the U.S., a U.S. possession or the U.S. Virgin Islands on February 25, 1927, and that he or she did not make a declaration to maintain Danish citizenship; or
• Evidence of birth in the U.S. Virgin Islands and the applicant's statement indicating residence in the U.S., a U.S. possession or territory or the Canal Zone on June 28, 1932.

Northern Mariana Islands (NMI) (formerly part of the Trust Territory of the Pacific Islands (TTPI)):
• Evidence of birth in the NMI, TTPI citizenship and residence in the NMI, the U.S., or a U.S. territory or possession on November 3, 1986 (NMI local time) and the applicant's statement that he or she did not owe allegiance to a foreign state on November 4, 1986 (NMI local time);
• Evidence of TTPI citizenship, continuous residence in the NMI since before November 3, 1981 (NMI local time), voter registration prior to January 1, 1975 and the applicant's statement that he or she did not owe allegiance to a foreign state on November 4, 1986 (NMI local time); or
• Evidence of continuous domicile in the NMI since before January 1, 1974 and the applicant's statement that he or she did not owe allegiance to a foreign state on November 4, 1986 (NMI local time).

DOL_PRWORA _000030

**Note:** If a person entered the NMI as a nonimmigrant and lived in the NMI since January 1, 1974, this does not constitute continuous domicile and the individual is not a U.S. citizen.

*D. Derivative Citizenship*

If the applicant cannot present one of the documents listed in A or B above, you should make a determination of derivative U.S. citizenship in the following situations:

Applicant born abroad to two U.S. citizen parents:

• Evidence of the U.S. citizenship of the parents and the relationship of the applicant to the parents, and evidence that at least one parent resided in the U.S. or an outlying possession prior to the applicant's birth.

Applicant born abroad to a U.S. citizen parent and a U.S. non-citizen national parent:

• Evidence that one parent is a U.S. citizen and that the other is a U.S. non-citizen national, evidence of the relationship of the applicant to the U.S. citizen parent, and evidence that the U.S. citizen parent resided in the U.S., a U.S. possession, American Samoa or Swain's Island for a period of at least one year prior to the applicant's birth.

Applicant born out of wedlock abroad to a U.S. citizen mother:

• Evidence of the U.S. citizenship of the mother, evidence of the relationship to the applicant and, for births on or before December 24, 1952, evidence that the mother resided in the U.S. prior to the applicant's birth or, for births after December 24, 1952, evidence that the mother had resided, prior to the child's birth, in the U.S. or a U.S. possession for a period of one year.

Applicant born in the Canal Zone or the Republic of Panama:

• A birth certificate showing birth in the Canal Zone on or after February 26, 1904 and before October 1, 1979 and evidence that one parent was a U.S. citizen at the time of the applicant's birth; or

• A birth certificate showing birth in the Republic of Panama on or after February 26, 1904 and before October 1, 1979 and evidence that at least one parent was a U.S. citizen and employed by the U.S. government or the Panama Railroad Company or its successor in title.

All other situations where an applicant claims to have a U.S. citizen parent and an alien parent, or claims to fall within one of the above categories but is unable to present the listed documentation:

• If the applicant is in the U.S., refer him or her to the local INS office for determination of U.S. citizenship;

• If the applicant is outside the U.S., refer him or her to the State Department for a U.S. citizenship determination.

*E. Adoption of Foreign-Born Child by U.S. Citizen*

• If the birth certificate shows a foreign place of birth and the applicant cannot be determined to be a naturalized citizen under any of the above criteria, obtain other evidence of U.S. citizenship;

• Since foreign-born adopted children do not automatically acquire U.S. citizenship by virtue of adoption by U.S. citizens, refer the applicant to the local INS district office for a determination of U.S. citizenship if the applicant provides no evidence of U.S. citizenship.

*F. U.S. Citizenship By Marriage*

A woman acquired U.S. citizenship through marriage to a U.S. citizen before September 22, 1922. Ask for: Evidence of U.S. citizenship of the husband, and evidence showing the marriage occurred before September 22, 1922.

**Note:** If the husband was an alien at the time of the marriage, and became naturalized before September 22, 1922, the wife also acquired naturalized citizenship. If the marriage terminated, the wife maintained her U.S. citizenship if she was residing in the U.S. at that time and continued to reside in the U.S.

*G. Applicants With Disabilities and Nondiscrimination*

If an applicant has a disability that limits the applicant's ability to provide the required evidence of citizenship or nationality (*e.g.,* mental retardation, amnesia, or other cognitive, mental or physical impairment), you should make every effort to assist the individual to obtain the required evidence. In addition, you should not discriminate against applicants on the basis of race, national origin, gender, religion, age or disability. See Nondiscrimination Advisory, Attachment 2 to Interim Guidance.

**Attachment 5—Interim Guidance—Documentary Evidence of Status as A "Qualified Alien" Eligible for Federal Public Benefits**

The documents listed below (descriptions of which are provided in Exhibit A) will, when combined with satisfactory proof of identity (which will come from the document itself if it bears a photograph of the person to whom it relates), establish that an applicant falls within one of the categories of "qualified alien" for purposes of title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996,

as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

Under the Immigration and Nationality Act (the "INA"), all aliens over the age of 14 who remain in the United States for longer than 30 days are required to register with the Immigration and Naturalization Service (the "INS") and obtain an alien registration document. All aliens over the age of 18 who receive a registration document are required to carry it with them at all times. With certain exceptions (*e.g.,* Canadian visitors), aliens entering the U.S. are normally issued a registration document (*e.g.,* an INS Form I–94) at the time of entry. The documents listed below that are registration documents are indicated with an asterisk ("*").

Each of the documents listed below will demonstrate lawful status, and you should not require presentation of a registration document if the applicant presents one of the other legally acceptable documents that reasonably appears on its face to be genuine and to relate to the person presenting it. However, if the document presented is not a registration document and does not on its face reasonably appear to be genuine or to relate to the person presenting it, it is appropriate to ask the applicant to produce his or her registration document as additional evidence of immigration status, so long as the request is not made for a discriminatory reason (see Nondiscrimination Advisory, Attachment 2 to Interim Guidance). Presentation of a registration document listed below that reasonably appears on its face to be genuine and to relate to the person presenting it (or to satisfy a higher applicable standard) will often obviate the need to verify the applicant's immigration status with the INS; if the applicant presents a registration document that does not meet this standard, sending the INS a copy of the document will assist it in verifying the applicant's status quickly and accurately.

*Alien Lawfully Admitted for Permanent Residence*

• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a "green card"); or

• Unexpired Temporary I–551 stamp in foreign passport or on *INS Form I–94.

*Asylee*

• *INS Form I–94 annotated with stamp showing grant of asylum under section 208 of the INA;

DOL_PRWORA _000031

- *INS Form I–688B (Employment Authorization Card) annotated ''274a.12(a)(5)'';
- *INS Form I–766 (Employment Authorization Document) annotated ''A5'';
- Grant letter from the Asylum Office of INS;or
- Order of an immigration judge granting asylum.

*Refugee*

- *INS Form I–94 annotated with stamp showing admission under § 207 of the INA;
- *INS Form I–688B (Employment Authorization Card) annotated ''274a.12(a)(3)'';
- *INS Form I–766 (Employment Authorization Document) annotated ''A3''; or
- INS Form I–571 (Refugee Travel Document).

*Alien Paroled Into the U.S. for a Least One Year*

- *INS Form I–94 with stamp showing admission for at least one year under section 212(d)(5) of the INA. (Applicant cannot aggregate periods of admission for less than one year to meet the one-year requirement.)

*Alien Whose Deportation or Removal Was Withheld*

- *INS Form I–688B (Employment Authorization Card) annotated ''274a.12(a)(10)'';
- *INS Form I–766 (Employment Authorization Document) annotated ''A10''; or
- Order from an immigration judge showing deportation withheld under § 243(h) of the INA as in effect prior to April 1, 1997, or removal withheld under § 241(b)(3) of the INA.

*Alien Granted Conditional Entry*

- *INS Form I–94 with stamp showing admission under § 203(a)(7) of the INA;
- *INS Form I–688B (Employment Authorization Card) annotated ''274a.12(a)(3)''; or
- *INS Form I–766 (Employment Authorization Document) annotated ''A3.''

*Cuban/Haitian Entrant*

- *INS Form I–551 (Alien Registration Receipt Card, commonly known as a ''green card'') with the code CU6, CU7, or CH6;
- Unexpired temporary I–551 stamp in foreign passport or on *INS Form I–94 with the code CU6 or CU7; or
- INS Form I–94 with stamp showing parole as ''Cuba/Haitian Entrant'' under Section 212(d)(5) of the INA.

*Alien Who Has Been Battered or Subjected to Extreme Cruelty*

Guidance as to the requirements that must be met for an alien to fall within this category of qualified alien is set forth in Exhibit B. Note that Title IV, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, contains provisions requiring that, upon the effective date of the new affidavit of support (required under section 213A of the Act), when determining eligibility for federal means-tested public benefits and the amount of such benefits to which an alien is entitled, the income and resources of the alien be deemed to include those of any person executing an affidavit of support on behalf of the alien and that person's spouse. Certain exceptions are made for indigent qualified aliens and for qualified aliens who (or whose children) have been battered or subjected to extreme cruelty in the U.S. by a spouse, parent or member of the spouse or parent's family and for qualified alien children whose parents have been subjected to such abuse. *See* Attachment 5, Exhibit B, Section II.

*Expired or Absent Documentation*

If an applicant presents expired documents or is unable to present any documentation evidencing his or her immigration status, refer the applicant to the local INS office to obtain documentation of status. In unusual cases involving applicants who are hospitalized or medically disabled, or who can otherwise show good cause for their inability to present documentation, and for whom securing such documentation would constitute an undue hardship, if the applicant can provide an alien registration number, you may file INS Form G–845 and Supplement, along with the alien registration number and a copy of any expired INS document presented, with the local INS office to verify status. As with any documentation of immigration status, you should confirm that the status information you receive back from INS pertains to the applicant whose identity you have verified.

*Receipt for Replacement Document*

If an applicant presents a receipt indicating that he or she has applied to the INS for a replacement document for one of the documents identified above, file INS Form G–845 and Supplement along with a copy of the receipt with the local INS office to verify status. Upon return receipt of information from INS, confirm that it pertains to the applicant whose identity you have verified. You

should ask to see the replacement document at a later date.

*Applicants with Disabilities and Nondiscrimination*

If an applicant has a disability that limits the applicant's ability to provide the required evidence of immigration status (.*e.g.,* mental retardation, amnesia, or other cognitive, mental or physical impairment), you should make every effort to assist the individual to obtain the required evidence. In addition, you should not discriminate against applicants on the basis of race, national origin, gender, religion, age or disability. See Nondiscrimination Advisory, Attachment 2 to Interim Guidance.

*Local INS Offices*

A list of local INS offices and their addresses is set forth in Attachment 1 to the Interim Guidance. Attachment 1 also includes a copy of INS Form G–845 and the Supplement thereto to be used to verify immigration status pursuant to the Interim Guidance.

**EXHIBIT A TO ATTACHMENT 5**

**''PINK'' I–551 ''RESIDENT ALIEN'' CARD**

*FRONT:* Pink background (blue header bar); blue INS seal overlaps photo area. Repeating ''I–551'' becomes visible when card is tilted under normal light. Expiration date on front of card: Moth, day, and year.

*BACK:* Color gradually changes from pink to blue, with map of U.S. in white. Three lines of machine readable printing at bottom on white background. Immigrant classification and admission/adjustment date on back of card. First set of code is immigrant classification, beginning with letter(s) followed by numbers(s). Third set of code is admission/adjustment date, beginning with year, month, and day.

**''WHITE'' I–551 ''RESIDENT ALIEN'' CARD**

*FRONT:* White background (blue header bar); salmon lines cover the photo in an unbroken pattern. Printing ''detail'' in eagle is excellent. Immigrant classification is on front of card in lower right corner, beginning with letter(s) followed by number(s).

*BACK:* Pale greenish background, map of U.S. in white. Three lines of machine readable codes. Admission/adjustment date is at bottom, left corner on back of card, beginning with year, month, and day.

**UNEXPIRED FOREIGN PASSPORT WITH I–551 STAMP**

An I–551 stamp may be present in a foreign passport, with a handwritten ''Valid Until'' date. A proof of entry and inspection stamp will also present in the passport, similar to the stamp for an I–94. Date of entry is stamped. Immigrant visa classification (letter and number) is printed or stamped on ''Admitted'' line. Valid status expires on date enumerated at ''Until'' section of I–551 stamp. The alien number may be printed beginning with letter A.

DOL_PRWORA _000032

## I–94 ARRIVAL/DEPARTURE RECORD

Proof of entry is signified by U.S. immigration stamp. Date of entry is stamped. *Non-immigrant visa classification* (letter or letter and number) is printed or stamped on ''Admitted'' line. Valid status expires on date enumerated at ''Until'' section of stamp.

*Refugees and asylees* each receive a separate INS stamp. Asylum seekers have ''valid to'' date, while refugees have a date of admission.

## ''RED'' I–688B ''EMPLOYMENT AUTHORIZATION''

*FRONT:* White background, read header bar and yellow interlocking wavy lines, gold INS seal becomes visible when tilted under normal light. Expiration date is on front, month, day, and year.

*BACK:* Red outline of U.S., Alaska, and Hawaii. The word ''Void'' is capitalized and underlined.

## ''RED'' I–766 ''EMPLOYMENT AUTHORIZATION''

*FRONT:* White background, red header bar. Statue of Liberty, USA, and Immigration and Naturalization Service symbols become visible when tilted under normal light. Expiration date is at bottom, right corner. Non-immigrant category listed over justice seal by a letter and number abbreviation of the 274A.12 immigration law citation.

*BACK:* White background, black magnetic strip and bar code.

## DECISION GRANTING ASYLUM

Documents issued to aliens, granted asylum vary.

## REFUGEE TRAVEL DOCUMENT FORM I–571

Form I–571 is issued by the INS to aliens who have been granted refugee status.

## ORDER GRANTING WITHHOLDING OF DEPORTATION

The documents used by immigration judges to grant withholding of deportation vary.

## EXHIBIT B TO ATTACHMENT 5—ALIENS WHO HAVE BEEN BATTERED OR SUBJECTED TO EXTREME CRUELTY WITHIN THE MEANING OF SECTION 431 OF THE ACT

### INTRODUCTION

Section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act''), as amended by section 501 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (the ''Immigration Act'') and sections 5571–72 and 5581 of the Balanced Budget Act of 1997 (''the Budget Act''), provides that certain categories of aliens who have been subjected to battery or extreme cruelty in the United States by a family member with whom they resided are ''qualified aliens'' eligible for public benefits under the Act. An alien whose child or an alien child whose parent has been abused is also a ''qualified alien.'' Additionally, section 421 of the Act, as amended by section 552 of the Immigration Act and section 5571 of the Budget Act, exempts this group of battered aliens from the Act's new deeming requirements for a period of one year, and for longer if the battery or cruelty has been recognized in an order of a judicial officer or an administrative law judge or in an Immigration and Naturalization Service (''INS'') determination.

### CONSIDERATIONS AFFECTING ALL APPLICANTS

Benfit providers should observe the following protocol with regard to all applicants who seek qualified alien status under section 431(c) of the Act:

(1) This Exhibit should be interpreted consistently with the principles set forth in the Interim Guidance, including, but not limited to, its standards for acceptance of documents demonstrating status, its nondiscrimination advisory and its provisions regarding whether to grant or withhold benefits pending verification of qualified alien status. In addition, as specified in the Interim Guidance, a provider should determine whether an applicant otherwise meets specific program requirements for benefit eligibility before initiating the verification process described below, unless determining program eligibility would be considerably more complex and time-consuming than verifying immigration status. (In the case of providers who are considering referring individual applicants to the Social Security Administration for issuance of a Social Security number, the provider should first determine that the applicant is otherwise eligible for program benefits.)

(2) Many of the applicants seeking assistance pursuant to this provision will need assistance on various matters relating to both their immigration status and their domestic violence-related concerns. You should therefore direct applicants to the INS forms request line (1–800–870–3676) so that applicants who are eligible to self-petition under the Violence Against Women Act, 8 U.S.C. 1154(a)(1), but have yet to do so, may request an INS Form I–360 and filing instructions. You should also refer them to the National Domestic Violence Hotline (1–800–799–7233) so that applicants may obtain assistance from a local domestic violence service provider and referrals to immigration attorneys. (A copy of INS Form I–360 is attached to this Exhibit.)

(3) Except where this attachment directs otherwise, when asking the INS or the Executive Office for Immigration Review (''EOIR'') to verify an applicant's immigration status, a benefit provider should submit a verification request form. Sample INS and EOIR verification forms (hereinafter ''the INS Request Form'' and ''the EOIR Request Form'' respectively) are attached hereto. These samples must be replicated and submitted on your agency's letterhead in order for INS or EOIR to provide verification information. The INS Request Form should be faxed to the INS Vermont Service Center (fax: (802) 527–3159; tel: (802) 527–3160); the EOIR Request Form should be faxed to the office of the appropriate immigration court (a list of the immigration courts and their addresses, fax numbers and telephone numbers is also attached to this Exhibit). In certain limited circumstances described below, the benefit provider should submit its verification request by filing INS Form G–845 and the G–845 Supplement with the local INS office. Attachment 1 to the Interim Guidance includes a copy of INS Form G–845 and the G–845 Supplement to be used as indicated below, as well as a list of local INS offices.

(4) You should not share any information that you receive from or regarding the applicant with any member of his or her family or any other third party, without the express written permission of the applicant.

### I. PROCEDURES FOR DETERMINING QUALIFIED ALIEN STATUS

An alien is a ''qualified alien'' eligible for public benefits under section 431(c) of the Act if he or she meets the following four requirements:

(1) the INS or the EOIR has granted a petition or application filed by or on behalf of the alien, the alien's child, or the alien child's parent under one of several subsections of the Immigration and Nationality Act (''INA'') described below or has found that a pending petition sets forth a prima facie case;

(2) the alien, the alien's child, or the alien child's parent has been abused in the United States [1] as detailed below:

(a) in the case of the abused alien: the alien has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien, if the spouse or parent consents to or acquiesces in such battery or cruelty;

(b) in the case of an alien whose child is abused: the alien's child has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty, and the alien did not actively participate in the batter or cruelty;

(c) in the case of an alien child whose parent is abused: the alien child's parent has been battered or subjected to extreme cruelty in the United States by the parent's spouse, or by a member of the spouse's family residing in the same household as the parent, if the spouse consents to or acquiesces in such battery or cruelty;

(3) there is a substantial connection between the battery or extreme cruelty and the need for the public benefit sought; and

(4) the battered alien, child, or parent no longer resides in the same household as the abuser.

Each of these four requirements, and processes for assuring that an applicant meets these requirements, are discussed in detail below. (In addition to these four requirements, the alien must of course meet the eligibility criteria of the particular

---

[1] Some applicants may possess documents demonstrating that they have been admitted to the United States because of battery or extreme cruelty that occurred *outside* of the United States, but this is insufficient by itself to make them eligible for benefits under section 431(c). Section 431(c) does not apply unless some battery or extreme cruelty occurred in the United States.

DOL_PRWORA _000033

program from which benefits are sought.) A benefit provider must determine that an applicant satisfies all four requirements. If an applicant presents documentation indicating that an INS I–130 petition has been filed on the applicant's behalf under the INA provisions listed in subparagraph (a) of requirement one below, or that the applicant has filed an INS I–360 petition under the INA provisions listed in subparagraph (b) of requirement one below, the benefit provider should determine whether the applicant meets the other three requirements for qualified alien status (including battery or extreme cruelty) before verifying his or her immigration status with the INS. If an applicant presents documentation indicating that he or she has filed an INS I–360 petition based on one of the INA provisions listed in subparagraph (c) or (d) of requirement one below, or has sought suspension of deportation or cancellation of removal from the EOIR under one of the INA provisions listed in subparagraph (e) of requirement one below, INS or EOIR will make the determination as to battery or extreme cruelty. In such cases, the benefit provider may contact the INS or the EOIR as applicable to initiate the verification process prior to determining if the applicant meets the other two requirements for qualified alien status. After contacting the INS or the EOIR, the benefit provider should continue reviewing the applicant's eligibility for qualified alien status under requirements three and four below, and should not delay this evaluation while awaiting a response from the INS or the EOIR.

Requirement 1: *Appropriate INS Status.* You must determine that the INS or the EOIR, as applicable, has approved an applicant's petition or application or has found that the applicant's pending petition or application sets forth a prima facie case, under one of the following provisions of the INA:

(a) Section 204(a)(1)(A)(i) and 204(a)(1)(B)(i) of the INA (governing eligibility to receive law permanent resident ("LPR") status as a spouse or child of a U.S. citizen, or as a spouse, child or unmarried son or daughter of an LPR, based on the petition of a spouse or parent);

(b) Section 204(a)(1)(A)(ii) of the INA (governing eligibility to apply for LPR status as an alien who is the widow or widower of a U.S. citizen to whom the alien had been married for at least two years at the time of such citizen's death);

(c) Sections 204(a)(1)(A)(iii) and 204(a)(1)(B)(ii) of the INA (governing eligibility to apply for LPR status as an alien who is the spouse of a U.S. citizen or LPR, who has resided with the spouse in the United States, and who (or whose child) has been subjected to battery or cruelty in the United States by his or her spouse);

(d) Sections 204(a)(1)(A)(iv) and 204(a)(1)(B)(iii) of the INA (governing eligibility to apply LPR status as an alien who is the child of a U.S. citizen or LPR, and who has resided with that parent in the United States and been subjected to battery or cruelty in the United States by his or her citizen or LPR parent); or

Section 244(a)(3) of the INA as in effect prior to April 1, 1997, or section 204A(b)(2)

of the INA (governing the Attorney General's authority to suspend deportation or cancel the removal and adjust the status of an alien if the alien or the alien's child has been subjected to battery or extreme cruelty in the United States by a spouse or parent who is a U.S. citizen or LPR).[2] Note: Only this provision of the INA allows the alien parent of a battered child to obtain relief from deportation or removal even if he or she is not married to the U.S. citizen or LPR parent. This includes aliens who were never married to the U.S. citizen or LPR parent, aliens who are divorced from the U.S. citizen or LPR. Under the provisions described in (a)–(d) above, the alien must have been married to the U.S. citizen or LPR spouse at the time the petition was filed. Unmarried children of U.S. citizen or LPRs less than 21 years of age may petition for admission as a battered child under the provision described in (a) or (d) at any time, regardless of their parents' marital status.

*Documentation*

As set forth in Step 3 of the Interim Guidance regarding verification of qualified alien status, you should ask the alien to present documentation demonstrating his or her immigration status. As described in the Interim Guidance, if the documentation indicates that the applicant fall into one of the categories listed in (a)–(e) above and reasonably appears on its face to be genuine (or, if your program already has existing guidance or procedures mandating a higher standard of proof for acceptance of documentary evidence of immigration status, the document satisfies that higher standard) and to relate to the individual presenting it, you should accept the documentation as conclusive evidence that the applicant satisfies requirement one and should not verify immigration status with the INS or the EOIR. If, based on your review of the documents presented, you are considering determining that an applicant does not have the requisite immigration status and thus is not eligible for the benefits requested based on his or her immigration status—*e.g.,* because the documents does not on its face reasonably appear to be genuine (or to satisfy a higher applicable standard), to demonstrate that the applicant falls into any of the categories listed in (a)–(e) above, or to relate to the person presenting it—you should check with the INS or the EOIR as applicable to verify the information presented by the applicant. To verify status with the INS, in most cases, your should fax the INS Request Form, on your agency letterhead, as well as a copy of the document(s) provided by the applicant, to the INS Vermont Service Center. In some cases, as detailed in footnote three below, request for INS verification should be submitted to the local INS office using from G–845 and its supplement. To verify status with the EOIR, you should fax the EOIR Request Form on your agency letterhead, as

well as a copy of the document(s) provided by the applicant, to the court administrator of the appropriate immigration court.

Applicants who have filed a petition or application or had a petition or application filed on their behalf, as applicable, under any of the above-described provisions of the INA will apply to a benefit provider in one of seven possible situations described below.

(1) With documentation evidencing an approved petition or application under one of the provisions listed in (a)–(e) above:

(a) INS Form I–551 ("Resident Alien Card" or "Alien Registration Receipt Card", commonly known as a "green card") with one of the following INS class of admission ("COA") codes printed on the front of a white card or the back of a pink card demonstrates approval of a petition under paragraphs (a)–(b) above:[3] AR1, AR6, C20 through C29, CF1, CF2, CR1, CR2, CR6, CR7, CX1 through CX3, CX6 through CX8, F20 through F29, FX1 through FX3, FX6 through FX8, IF1, IF2, IR1 through IR4, IR6 through IR9, IW1, IW2, IW6, IW7, MR6, MR7, P21 through P23, or P26 through P28;

(b) INS Form I–551 with one of the following COA codes stamped on the lower left side of the back of a pink card demonstrates approval of a petition under paragraphs (c)–(d) above: IB1 through IB3, IB6 through IB8, B11, B12, B16, B17, B20 through B29, B31 through B33, B36 through B38, BX1 through BX3, or BX6 through BX8;

(c) INS Form I–551 with COA code Z13 *may* demonstrate approval of a petition under paragraph (e) above; if an alien claiming approved status presents a card bearing the code Z13, determine where the card was issued by asking the alien where he or she received the grant of suspension of deportation, and then fax the EOIR Request Form on your agency letterhead, as well as a copy of the card and any other document(s) presented by the alien, to the EOIR court that granted the alien's suspension. If the alien does not recall where the grant of suspension of deportation was received, compare the city code on the card to the list of city codes attached to this Exhibit, and fax the EOIR Request Form on your agency letterhead, as well as a copy of the card and any other document(s) presented by the alien, to the Court Administrator of the EOIR court closest to the city where the green card was issued;

(d) Unexpired Temporary I–551 stamp in foreign passport or on INS Form I–94 with one of the COA codes specified in the preceding three paragraphs (if the temporary stamp or the INS Form I–94 bears the code

---

[2] While this provision includes unabused alien parents of battered children, it does not include unabused alien children of battered parents. This rule stands in contrast to the self-petitioning provisions described in (c) above, which battered spouses of U.S. citizen or LPRs can include their alien children in their petitions for status.

[3] The green card codes, green card types, and stamps in foreign passports or on INS Form I–94 that demonstrate an approved petition or application under one of the provisions listed in (a)–(b) above are too numerous to describe here. If an alien claiming approved status presents a code different than those enumerated, or if you cannot determine the class of admission from the I–551 stamp, you should file INS Form G–845, and the G–845 Supplement (mark item six on the Supplement) along with a copy of the document(s) presented, with the local INS office in order to determine whether the applicant gained his or her status because he or she was the spouse, widow, or child of a U.S. citizen or the spouse, child, or unmarried son or daughter of an LPR. (See Attachment 1 to Interim Guidance.)

Z13, follow the process described immediately above); if it bears another code or you cannot determine what the COA code is, follow the process outlined in footnote three; [4]

(e) INS Form I–797 indicating approval of an INS I–130 petition (only I–130 petitions describing the following relationships may be accepted: husbands or wives of U.S. citizens or LPRs, unmarried children under 21 years old of U.S. citizens or LPRs, or unmarried children 21 or older of LPRs), or approval of an I–360 petition (only I–360 approvals based on status as a widow/widower of a U.S. citizen or as a self-petitioning spouse or child of an abusive U.S. citizen or LPR may be accepted); [5] or

(f) A final order of an Immigration Judge or the Board of Immigration Appeals granting suspension of deportation under section 244(a)(3) of the INA as in effect prior to April 1, 1997, or cancellation of removal under section 240A(b)(2) of the INA. If the court or Board order does not indicate that suspension of deportation or cancellation of removal was granted under section 244(a)(3) or 240A(b)(2), you should fax the EOIR Request Form on your agency letterhead, as well as a copy of the order, to the court administrator of the EOIR court issuing the order, and ask the court to notify you of the INA provision under which the applicant was granted relief.

(2) With documentation demonstrating that the applicant has established a prima facie case [6] under one of the provisions described in (c), (d) or (e) above:

(a) INS Form I–797 indicating that the applicant has established a prima facie case; or

(b) An immigration court or Board of Immigration Appeals order indicating that

the applicant has established a prima facie case for suspension of deportation under INA section 244(a)(3) as in effect prior to April 1, 1997, or cancellation of removal under section 240A(b)(2) of the INA.

(3) With documentation indicating that the applicant has filed a petition or that a petition has been filed on the applicant's behalf, as applicable, under one of the provisions listed in (c) or (d) above, but with no evidence of approval of the petition or establishment of a prima facie case, in which case the benefit provider should determine from the documentation when the petition was filed and take the actions set forth below:

(a) Applicants with petitions filed before June 7, 1997 should have an INS Form I–797 indicating filing of the I–360 petition by ''self-petitioning spouse [or child] of abusive U.S.C. or LPR,'' a file-stamped copy of the petition, or another document demonstrating filing (including a cash register or computer-generated receipt indicating filing of Form I–360), but the INS will not have determined whether the applicant's petition sets forth a prima facie case. (If the applicant has no proof of filing, you should follow the instructions in paragraph 6.) You should request that the INS expedite adjudication of the petition or that a prima facie determination be made by faxing the INS Request Form on your agency letterhead, to the INS Vermont Service Center. Inquires about these cases may also be submitted in the same manner to the INS Vermont Service Center.

(b) Applicants with petitions filed after June 7, 1997 should have an INS Form I–797 indicating filing of the I–360 petition, but may have only a copy of the petition and proof of mailing. Within three weeks of filing, INS will send to the applicant either an approval notice, a notice of prima facie case, or a request for additional documentation. In some cases, the applicant will receive both a notice of prima facie case and a request for additional documentation. Upon publication of an interim prima facie rule, INS will begin the process of determining whether an applicant's petition sets forth a prima facie case. If three weeks have elapsed since the filing of the petition, you may determine the status of the case by faxing the INS Request Form, on your letterhead, to the Vermont Service Center.

Please not that the prima facie determination is an interim determination. An INS notice of prima facie case will expire upon issuance of a final decision by the INS or 150 days after issuance, whichever is earlier. An EOIR prima facie determination will expire upon the date of the applicant's hearing on the merits of his or her case, or if made by the Board of Immigration Appeals, upon issuance of the Board's decision on the appeal. In order to remain eligible for benefits after the expiration of a notice of prima facie case an applicant must either request and obtain a renewal of the prima facie determination from the INS or the EOIR, as applicable, or must present the benefit provider with a copy of one of the documents listed in paragraph one above indicating that his or her petition or application has been approved.

(4) With documentation indicating that the applicant has filed a petition or that a

petition was filed on his or her behalf, as applicable, under one of the provisions listed in (a) or (b) above (the documentation must indicate that the applicant is the widow/widower of a U.S. citizen, the husband or wife of a U.S. Citizen or LPR, the unmarried child under age 21 of a U.S. citizen or LPR, or the unmarried child age 21 or older of an LPR):

• For aliens on whose behalf a petition has been filed: INS Form I–797 indicating filing of an INS I–130 petition, a file-stamped copy of the petition, or another document demonstrating filing (including a cash register or computer-generated receipt indicating filing of Form I–130) (a sample copy of Form I–130 is attached to this Exhibit).

• For self-petitioning widows or widowers: a file-stamped copy of the INS I–360 petition, or another document demonstrating filing (including a cash register or computer-generated receipt indicating filing of Form I–360).

A prima facie determination will not have been made with regard to these petitions. You should request that the INS expedite adjudication of the petition or that a prima facie determination be made by faxing the INS Request Form on your agency letterhead, to the INS Vermont Service Center. Inquires about these cases may also be submitted in the same manner to the INS Vermont Service Center.

Applicants who are beneficiaries of I–130 petitions will have had a petition filed on their behalf. The petition process gives the spouse or parent of the applicant ultimate control over the disposition of the petition. If the spouse or parent is the abuser, he or she can nullify the petition either by withdrawing it or by divorcing the alien before the alien is able to obtain a green card. Because the most current information regarding the status of a pending I–130 petition will reside with the batterer until an applicant has received his or her green card, you should query INS regarding the applicant's continued eligibility each time you recertify the applicant for eleigiblity under general program guidelines. For these reasons, and because a self-petitioning applicant may be able to obtain employment authorization, an alien who is eligible to self-petition under the Violence Against Women Act should be strongly encouraged to do so. (Note: The alien must be the spouse or child of the abuser and, in the case of a spousal petition, still be married to the abuser when the petition is filed.) The applicant should also be directed to the INS forms request line and the National Domestic Violence Hotline as set forth on page one.

(5) Documentation indicating that the INS has initiated deportation or removal proceedings in which relief under the provision(s) listed in section (e) above may be available (copies of the documents listed below are attached to this Exhibit):

• an ''Order to Show Cause'';
• a ''Notice to Appear''; or
• a ''Notice of Hearing in Deportation Proceedings.''

You should inform the applicant that, if the applicant or the applicant's child has been battered or subjected to extreme cruelty

---

[4] If an applicant possesses the documents listed in items (a) through (d), the applicant has established that he or she is a lawful permanent resident and therefore is a qualified alien. You should nonetheless proceed with the analysis of requirements 2 through 4 to determine if the applicant qualifies for the battered exception to the deeming provisions (see Part IIA below).

[5] INS Form I–797 is used for numerous categories of petitions, and is used to indicate both receipt of a petition *and* approval or denial of a petition. It will also be used to indicate that an applicant has set forth a prima facie case. Thus, it is important to read the language on the Form I–797 presented by an applicant to ensure that it is more than a receipt, and specifically that it (a) denotes filing under one of the provisions specified above, and (b) denotes approval of the petition or a finding that a prima facie case has been demonstrated. Sample copies of Form I–797 are attached to this Exhibit.

[6] Because the INS has not previously been required to conduct prima facie assessments, it is implementing procedures (which will become effective upon publication of an interim rule) to expedite the review of I–360 petitions under the provisions described in (c) and (d) above and to notify the applicant within three weeks of INS' receipt of the petition if he or she has set forth a prima facie case. Similarly, the EOIR has not previously been required to conduct the prima facie assessment which is required under the provisions described in (e) above. The EOIR is currently working to implement a process for determining whether an applicant has set forth a prima facie case. Applicants in deportation or removal proceedings who are in need of a prima facie determination should contact the appropriate immigration court.

in the United States by a spouse or parent who is a U.S. citizen or LPR, and the applicant has been present in the United States for at least three years, he or she may file an application with the EOIR requesting suspension of deportation or cancellation of removal as applicable. You should also notify the applicant that, upon filing the application, he or she may ask the court to make a prima facie evaluation of the application and that, if the court indicates that the applicant has set forth a prima facie case for relief, he or she should return to your agency to complete the benefit eligibility evaluation process (see also footnote six). You should also refer the applicant to the National Domestic Violence Hotline as set forth on page one so that he or she may obtain assistance from a local domestic violence service provider and referrals to immigration attorneys. (Some of these applicants will also have sought the relief described in (a)–(d) above. Thus the applicant may have an I–797 indicating that his or her petition has been granted or that the petition sets forth a prima facie case, or an I–797 receipt indicating that a petition has recently been filed. You should only follow the procedures described in this paragraph if the applicant does not have such a petition pending with the INS.)

(6) With minimal or no documentation regarding the claimed filing: Because of the nature of abusive relationships, applicants may not have copies of the documents that have been filed by them or on their behalf. If the applicant has some documentation, but it is insufficient to demonstrate filing, establishment of prima facie case or approval of a petition, you should fax the INS Request Form on your agency letterhead, as well as a copy of any document(s) provided by the applicant, to the INS Vermont Service Center in order to determine the applicant's status. If the applicant has no documentation, but is certain that a petition has been filed by his or her spouse or parent, you should fax the INS Request Form to the INS Vermont Service Center. If the applicant has no documentation and is uncertain whether a petition has been filed on his or her behalf, you should refer the applicant to the National Domestic Violence Hotline as set forth on page one.

(7) Without having filed one of the above petitions, but with facts indicating a basis to file such a petition: You should refer such applicants to the INS forms request line and to the National Domestic Violence Hotline as set forth on page one.

Requirement 2: *Battered or Subjected to Extreme Cruelty.* You must also determine whether an applicant, his or her child, or, in the case of an alien child, his or her parent, has been battered or subjected to extreme cruelty (as defined below) as follows:

• in the case of an abused alien: the alien has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty;

• in the case of an alien whose child is abused: the alien's child has been battered or

subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty, and the alien did not actively participate in the battery or cruelty;

• in the case of an alien child whose parent is abused: the alien child's parent has been battered or subjected to extreme cruelty in the United States by the parent's spouse, or by a member of the spouse's family residing in the same household as the parent if the spouse consents to or acquiesces in such battery or cruelty.

(a) *Definitions of Battery, Extreme Cruelty and Family Member*

For purposes of this Guidance, the phrase "battered or subjected to extreme cruelty" has the meaning set forth below. This definition is drawn, with slight modification, from the INS interim rule, "Petition to Classify Alien as Immediate Relative of a United States Citizen or as Preference Immigrant; Self-Petitioning for Certain Battered or Abused Spouses and Children," 61 Fed. Reg. 13,061, 13074 (1996) (8 C.F.R. 204.2(c)(vi)).

The phrase "battered or subjected to extreme cruelty" includes, but is not limited to, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury. Psychological or sexual abuse or exploitation, including rape, molestation, incest (if the victim is a minor), or forced prostitution shall be considered acts of violence. Other abusive actions may also be acts of violence under this rule. Acts or threatneded acts that, in and of themselves, may not initially appear violent may be part of an overall pattern of violence.

This is a broad, flexible definition that encompasses all types of battery and extreme cruelty. The acts mentioned in the above definition should be regarded by benefit providers as acts of violence whenever they occur, so long as one or more of the acts takes place in the United States and while the family relationship between the abuser and the victim exists. It is not possible, however, to identify all behaviors that could be acts of violence under certain circumstances, and this definition does not contain an exhaustive list of the acts of violence that will constitute battery or extreme cruelty. Many other nonenumerated abusive actions will also constitute an act or threatened act of violence under this definition.

For purposes of this Guidance, the phrase "member of the spouse or parent's family" means any person related by blood, marriage, or adoption to the spouse or parent of the alien, or any person having a relationship to the spouse or parent that is covered by the civil or criminal domestic violence statutes of the state or Indian country where the alien resides, or the state or Indian country in which the alien, the alien's child, or the alien child's parent received a protection order.

(b) *Applicant With EOIR Order or Approved INS Petition or Other Court Order Based on Battery*

Applicants with approved petitions or orders granted under one of the provisions

enumerated in paragraphs (c), (d) or (e) of requirement one above have already met the requirement of demonstrating battery or extreme cruelty pursuant to the INS rule. Thus, the benefit provider should not make a new determination of battery or cruelty, and should instead proceed directly to the determination of substantial connection under requirement three. Similarly, a protection order or record of criminal conviction satisfies the battery or extreme cruelty requirement for applicants in the following situations:

• any applicant who has or has had a protection order issued against his or her spouse, parent, or family member of the spouse or parent with whom the applicant was living;

• any applicant whose child has or has had a protection order issued against the applicant's spouse, parent, or family member of the spouse or parent with whom the applicant was living (including protection orders issued to the applicant on behalf of the applicant's abused minor child);

• any applicant who is an alien child and whose parent has or has had a protection order issued against the parent's spouse, or family member of the spouse with whom his or her parent was living;

• any applicant who has a record of criminal conviction of his or her spouse, parent, or family member of the spouse or parent with whom the applicant was living, for committing an act of violence against the applicant or his or her child; or

• any applicant who is an alien child and who has a record of criminal conviction of his or her parent's spouse, or family member of the spouse with whom the parent was living, for committing an act of violence against the applicant's parent.

In the above situations, the applicant has established battery or extreme cruelty for purposes of this Guidance, and you should immediately proceed to requirement three.[7]

(c) *All Other Applicants*

Except for applicants addressed in (b) immediately above, an applicant must provide evidence of abuse. The benefit provider should consider *any credible evidence proffered by the applicant.* Evidence of battery or extreme cruelty (and in the case of a petition on behalf of a child, evidence that the applicant did not actively participate in the abuse) includes, but is not limited to, reports or affidavits from police, judges and other court officials, medical personnel, school officials, clergy, social workers, counseling or mental health personnel, and other social service agency personnel; legal documentation, such as an order of protection against the abuser or an order convicting the abuser of committing an act of domestic violence that chronicles the existence of abuse; evidence that indicates

---

[7] In cases where INS is making the determination regarding battery and extreme cruelty, INS will follow its regulations as set forth in 8 C.F.R. 204.2(c)(2). Under these regulations, INS will consider protection orders and criminal convictions along with any credible evidence relevant to the petition. The determination of what evidence is credible and the weight to be given that evidence rests within the sole discretion of INS. See 8 C.F.R. 204(c)(2)(I).

that the applicant sought safe-haven in a battered women's shelter or similar refuge because of the battery against the applicant or his or her child; or photographs of the visibly injured applicant, child, or (in the case of an alien child) parent supported by affidavits. An applicant may also submit sworn affidavits from family members, friends or other third parties who have personal knowledge of the battery or cruelty. Additionally, an applicant may submit his or her own affidavit, under penalty of perjury (it does not have to be notarized), describing the circumstances of the abuse, and the benefit provider has the discretion to conclude that the affidavit is credible, and, by itself or in conjunction with other evidence, provides relevant evidence of sufficient weight to demonstrate battery or extreme cruelty. The benefit provider should keep a copy of all evidence presented by the applicant.

The benefit provider should bear in mind that, due to the nature of the control and fear dynamics inherent in domestic violence, some applicants will lack the best evidence to support their allegations (*e.g.,* a civil protection order or a police report). Thus, the benefit provider will need to be flexible in working with the applicant as he or she attempts to assemble adequate documentation. In determining the existence of battery or cruelty, it is important that the benefit provider understand both the experience of intimate violence and the applicant's cultural context. The dynamics of domestic violence may have inhibited the applicant from seeking public or professional responses to the abuse prior to applying for benefits needed to enable the applicant to leave the abuser. For many cultural groups, going to outsiders for help is viewed as disloyalty to the community and an embarrassment to the family. In some cultures, for example, women have been conditioned to accept the authority and control of their husbands. Thus, there may be little independent documentary evidence of the abuse; the benefit provider should be sensitive to the needs and situation of the abused applicant when reviewing allegations and evidence of abuse.

Many applicants will have had an I–130 petition filed on their behalf by their spouse or parent, in which case the spouse or parent will have ultimate control over the disposition of the petition. If the spouse or parent is the abuser, he or she can nullify the petition either by withdrawing it or by divorcing the alien before the alien is able to obtain a green card. For these reasons, and because a self-petitioning applicant may be able to obtain employment authorization, an alien who is eligible to self-petition (the alien must be married to the abuser when the petition is filed) should be strongly encouraged to do so. The applicant should also be directed to the INS forms request line and the National Domestic Violence Hotline as set forth on page one.

Requirement 3: *Substantial Connection Between Battery and the Need for Benefits.* You must determine whether there is a substantial connection between the battery or extreme cruelty to which the applicant, his or her child, or (in the case of an alien child) his or her parent has been subjected and the need for the benefits sought. This requirement will not be satisfied simply by a determination that an applicant has been subjected to battery or extreme cruelty. To assist benefit providers in making substantial connection determinations, and as required by the Budget Act, the Attorney General has developed a list of circumstances, set forth below, that demonstrate a substantial connection between the battery or extreme cruelty suffered by an applicant, the applicant's child, or (in the case of an alien child) the applicant's parent, and the need for the benefit sought. You may refer to this list as a guide in making substantial connection determinations.

**Note:** The Attorney General's Order No. 2097–97, Determination of Situations that Demonstrate a Substantial Connection Between Battery or Extreme Cruelty and Need for Specific Public Benefits, 62 FR 39874 (July 24, 1997), has been superseded by amendments in the Budget Act. Revised substantial connection guidance will be issued shortly. In the meantime, benefit providers should look to the information contained in this document for guidance in making substantial connection determinations.

• Where the benefits are needed to enable the applicant, the applicant's child, and/or (in the case of an alien child), the applicant's parent to become self-sufficient following separation from the abuser;

• Where the benefits are needed to enable the applicant, the applicant's child, and/or (in the case of an alien child) the applicant's parent to escape the abuser and/or the community in which the abuser lives, or to ensure the safety of the applicant, the applicant's child, or (in the case of an alien child) the applicant's parent from the abuser;

• Where the benefits are needed due to a loss of financial support resulting from the applicant's, his or her child's, and/or (in the case of an alien child) his or her parent's separation from the abuser;

• Where the benefits are needed because the battery or cruelty, separation from the abuser, or work absences or lower job performance resulting from the battery or extreme cruelty or from legal proceedings relating thereto (including resulting child support, child custody, and divorce actions) cause the applicant, the applicant's child, and/or (in the case of an alien child) the applicant's parent to lose his or her job or to earn less or to require the applicant, the applicant's child, and/or (in the case of an alien child) the applicant's parent to leave his or her job for safety reasons;

• Where the benefits are needed because the applicant, the applicant's child, or (in the case of an alien child) the applicant's parent requires medical attention or mental health counseling, or has become disabled, as a result of the battery or extreme cruelty;

• Where the benefits are needed because the loss of a dwelling or source of income or fear of the abuser following separation from the abuser jeopardizes the applicant's or (in the case of an alien child) the parent's ability to care for his or her children (*e.g.,* inability to house, feed, or clothe children or to put children into a day care for fear of being found by the abuser);

• Where the benefits are needed to alleviate nutritional risk or need resulting from the abuse or following separation from the abuser;

• Where the benefits are needed to provide medical care during a pregnancy resulting from the abuser's sexual assault or abuse of, or relationship with, the applicant, the applicant's child, and/or (in the case of an alien child) the applicant's parent and/or to care for any resulting children; or

• Where medical coverage and/or health care services are needed to replace medical coverage or health care services the applicant, the applicant's child, or (in the case of an alien child) the applicant's parent had when living with the abuser.

Requirement 4: *Battered Applicant No Longer Resides in the Same Household with Batterer.* Before providing benefits, you must determine that the battered applicant, child or parent no longer resides in the same household or family eligibility unit as the batterer. Although an applicant is not a qualified alien eligible for benefits until the battered applicant or child, or parent ceases residing with the batterer, applicants will generally need the assurance of the availability of benefits in order to be able to leave their batterer and survive independently. Wherever possible in this situation, the benefit provider should complete the eligibility determination process and approve the applicant for receipt of benefits pending the applicant's demonstration that the applicant, his or her child, and/or (in the case of an alien child) his or her parent have separated from the batterer. The applicant can then make arrangements to leave the batterer's residence secure in the knowledge that benefits will be provided as soon as he or she leaves.

You should consider any relevant credible evidence supporting the claim of non-residency with the batterer, including, but not limited to, any of the following: A civil protection order requiring the batterer to stay away from the applicant or the applicant's children or parent, or evicting the batterer from the applicant's residence; employment records; utility receipts; school records; hospital or medical records; rental records or records from a building or property manager; an affidavit from a staff member at a shelter for battered women or homeless persons, family members, friends or other third parties with personal knowledge, or from the battered applicant himself or herself; or any other records establishing that the applicant or his or her child or parent no longer resides with the abusive spouse, parent, or family member.

**Note:** While qualified alien status will make the battered applicant, the battered applicant's children, or the parent of a battered child eligible for certain federal public benefits, it will not make them eligible for all federal public benefits. See Interim Guidance and Attachments 6 and 7 thereto for the factors that determine a qualified alien's eligibility for particular benefits.

II. EXEMPTION FROM DEEMING REQUIREMENTS

A. *Battered Aliens*

Section 421 of the Act (as amended by the Immigration Act and the Budget Act) requires

that, upon the effective date of the newly required affidavit of support and subject to the exceptions described below, when determining eligibility for federal means-tested public benefits and the amount of such benefits to which an alien applicant is entitled, agencies must include as income and resources of the alien, the income and resources of the spouse of the alien and any other person executing an affidavit of support on behalf of the alien. An alien is exempt from these ''deeming'' requirements for a period of one year, however, if

(1) in the case of an abused alien,

(a) the alien has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty; (b) there is, in the opinion of the agency providing such benefits, a substantial connection between the battery or extreme cruelty and the need for the benefit sought; and (c) the battered alien no longer resides in the same household as the abuser;

(2) in the case of an alien whose child is abused:

(a) the alien's child has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien, or by a member of the spouse or parent's family residing in the same household as the alien if the spouse or parent consents to or acquiesces in such battery or cruelty, and the alien did not actively participate in the battery or cruelty; (b) there is, in the opinion of the agency providing such benefits, a substantial connection between the battery or extreme cruelty and the need for the benefit sought; and (c) the battered child no longer resides in the same household as the abuser;

(3) in the case of an alien child whose parent is abused:

(a) the alien child's parent has been battered or subjected to extreme cruelty in the United States by the parent's spouse, or by a member of the spouse's family residing in the same household as the parent if the spouse consents to or acquiesces in such battery or cruelty; (b) there is, in the opinion of the agency providing such benefits, a substantial connection between the battery or extreme cruelty and the need for the benefit sought; and (c) the battered parent no longer resides in the same household as the abuser.

See Part I, requirements two and four, above, for the definition and proof of battery/extreme cruelty and non-residency with the abuser; the agency may also want to consult the Attorney General's guidance regarding substantial connection (see part I, requirement three above) when making its own substantial connection determination.

After expiration of the one year period, alien applicants continue to be exempt from the deeming requirements with regard to the resources and income of the *batterer only*, if (a) the applicant demonstrates that the battery or cruelty has been recognized in an order of a judge or administrative law judge or a prior determination of the INS, and (b) in the opinion of the agency, there is a substantial connection between the abuse or battery suffered by the applicant, the applicant's child, or (in the case of an alien child) the applicant's parent and the need for the benefit sought.

B. *Indigent Aliens*

In addition to the exemption for battered aliens, the Act's deeming provision contains a separate exemption for indigent aliens. If, after taking into account the alien's own income plus any cash, food, housing or other assistance provided by other individuals (including the sponsor), an agency determines that a sponsored alien would, in the absence of the assistance provided by the agency, be unable to obtain food and shelter, the amount of income and resources of the sponsor or the sponsor's spouse that shall be attributed to the sponsored alien shall not exceed the amount actually provided for a period of one year after the date such agency determination is made.

**BILLING CODE 4410–10–M**

DOL_PRWORA _000038

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB #1115-0117
Petition for Amerasian, Widow or Special Immigrant

**START HERE - Please Type or Print**

**Part 1. Information about person or organization filing this petition.** (Individuals should use the top name line; organizations should use the second line.) If you are a self-petitioning spouse or child and do not want INS to send notices about this petition to your home, you may show an alternate mailing address here. If you are filing for yourself and do not want to use an alternate mailing address, skip to part 2.

| Family Name | Given Name | Middle Initial |
|---|---|---|
| | | |

Company or Organization Name

**Address** - C/O

| Street Number and Name | | Apt. # |
|---|---|---|
| City | State or Province | |
| Country | ZIP/Postal Code | |

| U.S. Social Security # | A # | IRS Tax # (if any) |
|---|---|---|
| | | |

**Part 2. Classification Requested (check one):**

a. ☐ Amerasian
b. ☐ Widow(er) of a U.S. citizen who died within the past 2 years
c. ☐ Special Immigrant Juvenile
d. ☐ Special Immigrant Religious Worker
e. ☐ Special Immigrant based on employment with the Panama Canal Company, Canal Zone Government or U.S. Government in the Canal Zone
f. ☐ Special Immigrant Physician
g. ☐ Special Immigrant International Organization Employee or family member
h. ☐ Special Immigrant Armed Forces Member
i. ☐ Self-Petitioning Spouse of Abusive U.S. Citizen or Lawful Permanent Resident
j. ☐ Self-Petitioning Child of Abusive U.S. Citizen or Lawful Permanent Resident
k. ☐ Other, explain: _____

**Part 3. Information about the person this petition is for.**

| Family Name | Given Name | Middle Initial |
|---|---|---|
| | | |

**Address** - C/O

| Street Number and Name | | Apt. # |
|---|---|---|
| City | State or Province | |
| Country | ZIP/Postal Code | |

| Date of Birth (Month/Day/Year) | Country of Birth |
|---|---|
| U.S. Social Security # (if any) | A # (if any) |

Marital Status: ☐ Single ☐ Married ☐ Divorced ☐ Widowed

Complete the items below if this person is in the United States:

| Date of Arrival (Month/Day/Year) | I-94# |
|---|---|
| Current Nonimmigrant Status | Expires on (Month/Day/Year) |

Form I-360 (Rev. 03/07/96) N    ***Continued on back.***

**FOR INS USE ONLY**

| Returned | Receipt |
|---|---|
| _____ | |
| _____ | |
| Resubmitted | |
| _____ | |
| _____ | |
| Reloc Sent | |
| _____ | |
| _____ | |
| Reloc Rec'd | |
| _____ | |
| _____ | |

☐ Petitioner/Applicant Interviewed

☐ Beneficiary Interviewed

☐ I-485 Filed Concurrently
☐ Bene "A" File Reviewed

Classification

Consulate

Priority Date

Remarks:

**Action Block**

**To Be Completed by**
***Attorney*** or ***Representative***, if any

☐ Fill in box if G-28 is attached to represent the applicant

VOLAG#

ATTY State License #

## Part 4. Processing Information.

Below give the United States Consulate you want notified if this petition is approved and if any requested adjustment of status cannot be granted.

| *American Consulate:* City | Country |
|---|---|
|  |  |

If you gave a United States address in Part 3, print the person's foreign address below. If his/her native alphabet does not use Roman letters, print his/her name and foreign address in the native alphabet.

| Name | Address |
|---|---|
|  |  |

| | | |
|---|---|---|
| Sex of the person this petition is for. | ☐ Male | ☐ Female |
| Are you filing any other petitions or applications with this one? | ☐ No | ☐ Yes (How many? _____ ) |
| Is the person this petition is for in exclusion or deportation proceedings? | ☐ No | ☐ Yes (Explain on a separate sheet of paper) |
| Has the person this petition is for ever worked in the U.S. without permission? | ☐ No | ☐ Yes (Explain on a separate sheet of paper) |
| Is an application for adjustment of status attached to this petition? | ☐ No | ☐ Yes |

## Part 5. Complete only if filing for an Amerasian.

### Section A. Information about the mother of the Amerasian

| Family Name | Given Name | Middle Initial |
|---|---|---|
|  |  |  |

Living?    ☐ No (Give date of death _____ )    ☐ Yes (complete address line below)    ☐ Unknown (attach a full explanation)

Address

### Section B. Information about the father of the Amerasian: If possible, attach a notarized statement from the father regarding parentage. Explain on separate paper any question you cannot fully answer in the space provided on this form.

| Family Name | Given Name | Middle Initial |
|---|---|---|
|  |  |  |
| Date of Birth (Month/Day/Year) | Country of Birth | |

Living?    ☐ No (give date of death _____ )    ☐ Yes (complete address line below)    ☐ Unknown (attach a full explanation)

Home Address

| Home Phone # | Work Phone # |
|---|---|
|  |  |

At the time the Amerasian was conceived:

☐ The father was in the military (indicate branch of service below - and give service number here): _____

  ☐ Army    ☐ Air Force    ☐ Navy    ☐ Marine Corps    ☐ Coast Guard

☐ The father was a civilian employed abroad. Attach a list of names and addresses of organizations which employed him at that time.

☐ The father was not in the military, and was not a civilian employed abroad. *(Attach a full explanation of the circumstances.)*

## Part 6. Complete only if filing for a Special Immigrant Juvenile Court Dependent.

### Section A. Information about the Juvenile

List any other names used.

Answer the following questions regarding the person this petition is for. If you answer "no" explain on a separate sheet of paper.

| | | |
|---|---|---|
| Is he or she still dependent upon the juvenile court or still legally committed to or under the custody of an agency or department of a state? | ☐ No | ☐ Yes |
| Does he/she continue to be eligible for long term foster care? | ☐ No | ☐ Yes |

*Continued on next page.*

DOL_PRWORA_000040

**61374**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

---

**Part 7. Complete only if filing as a Widow/Widower, a Self-petitioning Spouse of an Abuser, or as a Self-petitioning Child of an Abuser.**

**Section A.** Information about the U.S. citizen husband or wife who died or about the U.S. citizen or lawful permanent resident abuser.

| Family Name | Given Name | Middle Initial |
|---|---|---|
| | | |

| Date of Birth (Month/Day/Year) | Country of Birth | Date of Death (Month/Day/Year) |
|---|---|---|
| | | |

He or she is now, or was at time of death a *(check one)*:

☐ U.S. Citizen born in the United States.
☐ U.S. Citizen born abroad to U.S. citizen parents.

☐ U.S. Citizen through Naturalization *(Show A #)* _____
☐ U.S. lawful permanent resident *(Show A #)* _____
☐ Other, explain _____

**Section B. Additional Information about you.**

| How many times have you been married? | How many times was the person in Section A married? | Give the date and place you and the person in Seciton A were married. *(If you are a self-petitioning child, write: "N/A")* |
|---|---|---|
| | | |

When did you live with the person named in Section A? From *(Month/Year)*_____ until *(Month/Year)*_____.

If you are filing as a widow/widower, were you legally separated at the time of the U.S citizens's death?    ☐ No    ☐ Yes, *(attach explanation)*.

Give the last address at which you lived together with the person named in Section A, and show the last date that you lived together with that person at that address:

_____

If you are filing as a self-petitioning spouse, have any of your children filed separate self-petitions?    ☐ No ☐ Yes *(show child(ren)'s full names)*:

---

**Part 8. Information about the spouse and children of the person this petition is for.** A widow/widower or a self-petitioning spouse of an abusive citizen or lawful permanent resident should also list the children of the deceased spouse or of the abuser.

| A. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Spouse ☐ Child | | A # |

| B. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

| C. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

| D. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

| E. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

| F. | Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | Country of Birth | Relationship ☐ Child | | A # |

Form I-360 (Rev 03/07/96) N

DOL_PRWORA_000041

| G. Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
|---|---|---|---|
| Country of Birth | Relationship  ☐ Child | | A # |
| H. Family Name | Given Name | Middle Initial | Date of Birth (Month/Day/Year) |
| Country of Birth | Relationship  ☐ Child | | A # |

**Part 9. Signature.**   *Read the information on penalties in the instructions before completing this part. If you are going to file this petition at an INS office in the United States, sign below. If you are going to file it at a U.S. consulate or INS office overseas, sign in front of a U.S. INS or consular official.*

I certify, or, if outside the United States, I swear or affirm, under penalty of perjury under the laws of the United States of America, that this petition, and the evidence submitted with it, is all true and correct. If filing this on behalf of an organization, I certify that I am empowered to do so by that organization. I authorize the release of any information from my records, or from the petitioning organization's records, which the Immigration and Naturalization Service needs to determine eligibility for the benefit being sought.

| **Signature** | Date |
|---|---|

| **Signature of INS or Consular Official** | Print Name | Date |
|---|---|---|

*Please Note:* If you do not completely fill out this form, or fail to submit required documents listed in the instructions, then the person(s) filed for may not be found eligible for a requested benefit, and it may have to be denied.

## Part 10. Signature of person preparing form if other than above. (sign below)

I declare that I prepared this application at the request of the above person and it is based on all information of which I have knowledge.

| **Signature** | Print Your Name | Date |
|---|---|---|

| Firm Name and Address |
|---|

DOL_PRWORA _000042

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB# 1115-0117
Petition for Amerasian, Widow(er), or Special Immigrant

## INSTRUCTIONS

**Purpose of This Form.**
This petition is used to classify an alien as:
- an Amerasian;
- a Widow or Widower;
- a Battered or Abused Spouse or Child of a U.S. Citizen or Lawful Permanent Resident;
- a Special Immigrant (Religious Worker; Panama Canal Company Employee, Canal Zone Government Employee, U.S. Government in the Canal Zone Employee; Physician; International Organization Employee or Family Member; Juvenile Court Dependent; or Armed Forces Member).

**Initial Evidence Requirements.**
If these instructions state that a copy of a document may be filed with this petition, and you choose to send us the original, we may keep that original for our records. Any foreign language document must be accompanied by an English translation certified by the translator that he/she is competent to translate from the foreign language into English and that the translation is accurate.

**Amerasian.** Any person who is 18 or older, an emancipated minor, or a U.S. corporation may file this petition for an alien who was born in Korea, Vietnam, Laos, Kampuchea, or Thailand after December 31, 1950, and before October 22, 1982, and was fathered by a U.S. citizen.

The petition must be filed with:
- copies of evidence the person this petition is for was born in one of the above countries between those dates. If he/she was born in Vietnam, you must also submit a copy of his/her Vietnamese I.D. card, or an affidavit explaining why it is not available;
- copies of evidence establishing the parentage of the person, and of evidence establishing that the biological father was a U.S. citizen. Examples of documents that may be submitted are birth or baptismal records or other religious documents; local civil records; an affidavit, correspondence or evidence of financial support from the father; photographs of the father (especially with the child); or, absent other documents, affidavits from knowledgeable witnesses which detail the parentage of the child and how they know such facts;
- a photograph of the person;
- if the person is married, submit a copy of the marriage certificate, and proof of the termination of any prior marriages;  and
- if the person is under 18 years old, submit a written statement from his/her mother or legal guardian which:
  - irrevocably releases him/her for emigration and authorizes the placing agencies to make necessary decisions for his/her immediate care until a sponsor receives custody;
  - shows an understanding of the effects of the release, and states whether any money was paid or coercion used prior to obtaining the release; and
  - includes the full name, date and place of birth, and present or permanent address of the mother or guardian, and with the signature of the mother or guardian on the release authenticated by a local registrar, court of minors, or a U.S. immigration or consular officer.

The following sponsorship documents are also required.  You may file these documents with the petition, or wait until we review the petition and request them.  However, not filing them with the petition will add to the overall processing time.
- An Affidavit of Financial Support, executed by the sponsor, with the evidence of financial ability required by that form.  Please note that the original sponsor remains financially responsible for the Amerasian if any subsequent sponsor fails in this area;
- Copies of evidence showing that the sponsor is at least 21 years old and is a U.S. citizen or permanent resident;
- Fingerprints of the sponsor on Form FD-258; and
- If this petition is for a person under 18 years old, the following documents issued by a placement agency must be submitted:
  - a copy of the private, public or state agency's license to place children in the U.S., proof of the agency's recent experience in the intercountry placement of children and of the agency's financial ability to arrange the placement;
  - a favorable home study of the sponsor conducted by a legally authorized agency;

- a pre-placement report from the agency, including information regarding any family separation or dislocation abroad that would result from the placement;
- a written description of  the orientation given to the sponsor and to the parent or guardian on the legal and cultural aspects of the placement;
- a statement from the agency showing that the sponsor has been given a report on the pre-placement screening and evaluation of the child; and
- a written plan from the agency to provide follow-up services, including mediation and counseling, and describing the contingency plans to place the person this petition is for in another suitable home if the initial placement fails.

**Widow/Widower of a United States Citizen.** You may file this petition for yourself if:
- you were married for at least two years to a U.S. citizen who is now deceased and who was a U.S. citizen at the time of death;
- your citizen spouse's death was less than two years ago;
- you were not legally separated from your citizen spouse at the time of death; and
- you have not remarried.

The petition must be filed with:
- a copy of your marriage certificate to the U.S. citizen and proof of termination of any prior marriages of either of you;
- copies of evidence that your spouse was a U.S. citizen, such as a birth certificate if born in the U.S.; Naturalization Certificate or Certificate of Citizenship issued by this Service; Form FS-240, Report of Birth Abroad of a Citizen of the United States; or a U.S. passport which was valid at the time of the citizen's death; and
- a copy of the death certificate of your U.S. citizen spouse.

**Self-Petitioning Battered or Abused Spouse or Child of a U.S. Citizen or Lawful Permanent Resident.**   You may self-petition for immediate relative or family-sponsored immigrant classification if you:
- are now the spouse or child of an abusive U.S. citizen or lawful permanent resident;
- are eligible for immigrant classification based on that relationship;
- are now residing in the United States;
- have resided in the United States with the U.S. citizen or lawful permanent resident abuser in the past;
- have been battered by, or have been the subject of extreme cruelty perpetrated by:
  - your U.S. citizen or lawful permanent resident spouse during the marriage; or are the parent of a child who has been battered by or has been the subject of extreme cruelty perpetrated by, your abusive citizen or lawful permanent resident spouse during your marriage; or
  - your citizen or lawful permanent resident parent while residing with that parent;
- are a person of good moral character;
- are a person whose deportation would result in extreme hardship to yourself, or to your child if you are a spouse; and
- if you are a spouse, entered into the marriage to the citizen or lawful permanent resident abuser in good faith.

**NOTE:** Divorce or other legal termination of the marriage to the abuser AFTER the self-petition is properly filed with INS will not be the sole basis for denial or revocation of an approved self-petition. If you remarry before you become a lawful permanent resident, however, your self-petition will be denied or the approval revoked.

Your self-petition may be filed with any credible relevant evidence of eligibility. The determination of what evidence is credible and the weight to be given that evidence is within the sole discretion of the INS; therefore, you are encouraged to provide the following evidence:
- evidence of the abuser's U.S. citizenship or lawful permanent resident status;
- marriage and divorce decrees, birth certificates, or other evidence of your legal relationship to the abuser;

Form I-360 (Rev. 03/07/96) N

- one or more documents showing that you and the abuser have resided together in the United States in the past, such as employment records, utility receipts, school records, hospital or medical records, birth certificates of children, deeds, mortgages, rental records, insurance policies, or affidavits;
- one or more documents showing that you are now residing in the United States, such as the documents listed above;
- evidence of the abuse, such as reports and affidavits from police, judges and other court officials, medical personnel, school officials, clergy, social workers, and other social service agency personnel. If you have an order of protection or have taken other legal steps to end the abuse, you should submit copies of those court documents;
- if you are more than 14 years of age, your affidavit of good moral character accompanied by a local police clearance, state-issued criminal background check, or similar report from each locality or state in the United States or abroad in which you have resided for six or more months during the 3-year period immediately preceding the filing of your self-petition;
- affidavits, birth certificates of children, medical reports and other relevant credible evidence of the extreme hardship that would result if you were to be deported; and
- if you are a spouse, proof that one spouse has been listed as the other's spouse on insurance policies, property leases, income tax forms, or bank accounts; and testimony or other evidence regarding your courtship, wedding ceremony, shared residence and experiences showing that your marriage was entered into in good faith.

**Special Immigrant Juvenile.**  Any person, including the alien, may file this petition for an alien who:
- is unmarried and less than 21 years old;
- has been declared dependent upon a juvenile court in the United States or who such a court has legally committed to, or placed under the custody of, an agency or department of a state and who has been found eligible for long-term foster care; and
- has been the subject of administrative or judicial proceedings in which it was determined that it would not be in the juvenile's best interests to be returned to the juvenile's or his/her parent's country of nationality or last habitual residence.

**NOTE:** After a special immigrant juvenile becomes a permanent resident, his or her parent(s) may not receive any immigration benefit based on the relationship to the juvenile.

The petition must be filed with:
- a copy of the juvenile's birth certificate or other evidence of his or her age;
- copies of the court or administrative document(s) upon which the claim to eligibility is based.

**Special Immigrant Religious Worker.**  Any person, including the alien, may file this petition for an alien who for the past 2 years has been a member of a religious denomination which has a bona fide nonprofit, religious organization in the U.S.; and who has been carrying on the vocation, professional work, or other work described below, continuously for the past 2 years; and seeks to enter the U.S. to work solely:
- as a minister of that denomination; or
- in a professional capacity in a religious vocation or occupation for that organization; or
- in a religious vocation or occupation for the organization or its nonprofit affiliate.

 **NOTE:**  A petition for a special immigrant for a person who is not a minister may only be filed until October 1, 1997.

The petition must be filed with:
- a letter from the authorized official of the religious organization establishing that the proposed services and alien qualify as above;
- a letter from the authorized official of the religious organization attesting to the alien's membership in the religious denomination and explaining, in detail, the person's religious work and all employment during the past 2 years and the proposed employment; and
- evidence establishing that the religious organization, and any affiliate which will employ the person, is a bona fide nonprofit religious organization in the U.S. and is exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986.

**Special Immigrant based on employment with the Panama Canal Company, Canal Zone Government or U.S. government in the Canal Zone.**  Any person may file this petition for an alien who, at the time the Panama Canal Treaty of 1977 entered into force, either:
- was resident in the Canal Zone and had been employed by the Panama Canal Company or Canal Zone Government for at least 1 year; or
- was a Panamanian national and either honorably retired from U.S. Government employment in the Canal Zone with a total of 15 or more years of faithful service or so employed for 15 years and since honorably retired; or
- was an employee of the Panama Canal Company or Canal Zone government, had performed faithful service for 5 years or more as an employee, and whose personal safety, or the personal safety of his/her spouse or child, is in danger as a direct result of the special nature of his/her employment and as a direct result of the Treaty.

The petition must be filed with:
- a letter from the Panama Canal Company, Canal Zone government or U.S. government agency employing the person in the Canal Zone, indicating the length and circumstances of employment and any retirement or termination; and
- copies of evidence to establish any claim of danger to personal safety.

**Special Immigrant Physician.**  Any person may file this petition for an alien who:
- graduated from a medical school or qualified to practice medicine in a foreign state;
- was fully and permanently licensed to practice medicine in a State of the U.S. on January 9, 1978, and was practicing medicine in a State on that date;
- entered the U.S. as an "H" or "J" nonimmigrant before January 9, 1978; and
- has been continuously present in the U.S. and continuously engaged in the practice or study of medicine since the date of such entry.

The petition must be filed with:
- letters from the person's employers, detailing his/her employment since January 8, 1978, including the current employment; and
- copies of relevant documents that demonstrate that the person filed for meets all the above criteria.

**Special Immigrant International Organization Employee or family member.**  Certain long-term "G" and "N" nonimmigrant employees of a qualifying international organization entitled to enjoy privileges, exemptions and immunities under the International Organizations Immunities Act, and certain relatives of such an employee, may be eligible to apply for classification as a Special Immigrant.  To determine eligibility, contact the qualifying international organization or your local INS office. The petition must be filed with:
- a letter from the international organization demonstrating that it is a qualifying organization and explaining the circumstances of qualifying employment and the immigration status held by the person the petition is for; and
- copies of evidence documenting the relationship between the person this petition is for and the employee.

**Armed Forces Member.**  You may file this petition for yourself, if:
- you have served honorably on active duty in the Armed Forces of the United States after October 15, 1978;
- you originally lawfully enlisted outside the United States under a treaty or agreement in effect on October 1, 1991, for a period or periods aggregating:
  ○ twelve years, and were never separated from such service except under honorable conditions; or
  ○ six years, are now on active duty, and have reenlisted to incur a total active duty service obligation of at least 12 years;
- you are a national of an independent state which maintains a treaty or agreement allowing nationals of that state to enlist in the United States Armed Forces each year; and
- the executive department under which you have served or are serving has recommended you for this special immigrant status.

The petition must be filed with:
- certified proof issued by the authorizing official of the executive department in which you are serving or have served which certifies that you have the required honorable active duty service and/or commitment; and
- your birth certificate.

DOL_PRWORA_000044

**61378**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

**General Filing Instructions.**

Please answer all questions by typing or clearly printing in black ink only. Indicate that an item is not applicable with "N/A". If an answer is "none," please so state. If you need extra space to answer any item, attach a sheet of paper with your name and your alien registration number (A#), if any, and indicate the number of the item the answer refers to. Every petition must be properly signed, and accompanied by the proper fee. If you are under 14 years of age, your parent or guardian may sign the petition.

**Where to File.**

If you are filing for a Special Immigrant Juvenile, file the petition at the local INS office having jurisdiction over the place he/she lives.

If you are filing for Amerasian classification and the person you are filing for is outside the United States, you may file this petition at the INS office that has jurisdiction over the place he/she lives or the office that has jurisdiction over the place he/she will live.

If you are in the United States and filing as a Widow/Widower or as the Self-petitioning Spouse or Child of an Abusive U.S. Citizen, you may file this petition together with your application for adjustment of status. If you are in the United States, filing as the self-petitioning spouse or child of abusive lawful permanent resident, and have an immediately available immigrant visa number, you may also file this petition together with your application for adjustment of status. See the adjustment of status instructions for information about where to file.

If this petition is for an Amerasian, a Widow/Widower, or a Special Immigrant Armed Forces Member, and that person lives outside the United States, you may file this petition at the INS office overseas or the U.S. consulate or Embassy abroad having jurisdiction over the area in which he or she lives.

In all other instances file this petition at an INS Service Center, as follows:

If you live in Connecticut, Delaware, District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Vermont, Virgin Islands, Virginia, or West Virginia, mail this petition to USINS, Vermont Service Center, 75 Lower Weldon Street, St. Albans, VT 05479-0001.

If you live in Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, or Texas, mail this petition to USINS, Texas Service Center, P.O. Box 152122, Dept. A, Irving, TX 75015-2122.

If you live in Arizona, California, Guam, Hawaii, or Nevada, mail this petition to USINS, California Service Center, P.O. Box 10360, Laguna Niguel, CA 92607-0360

If you live elsewhere in the U.S., mail this petition to USINS, Nebraska Service Center, 850 S Street, Lincoln, NE 68501-2521

**Fee.**

The fee for this petition is $80.00, except that there is no fee if you are filing for an Amerasian. The fee must be submitted in the exact amount. It cannot be refunded. DO NOT MAIL CASH. All checks and money orders must be drawn on a bank or other institution located in the United States and must be payable in United States currency. The check or money order should be made payable to the Immigration and Naturalization Service, except that:

- If you live in Guam, and are filing this application in Guam, make your check or money order payable to the "Treasurer, Guam."
- If you live in the Virgin Islands, and are filing this application in the Virgin Islands, make your check or money order payable to the "Commissioner of Finance of the Virgin Islands."

Checks are accepted subject to collection. An uncollected check will render the application and any document issued invalid. A charge of $5.00 will be imposed if a check in payment of a fee is not honored by the bank on which it is drawn.

**Processing Information.**

*Rejection.* Any petition that is not signed or is not accompanied by the correct fee will be rejected with a notice that the petition is deficient. You may correct the deficiency and resubmit the petition. However, a petition is not considered properly filed until accepted by the Service.

*Initial processing.* Once the petition has been accepted, it will be checked for completeness, including submission of the required initial evidence. If you do not completely fill out the form, or file it without required initial evidence, you will not establish a basis for eligibility and we may deny your petition.

**NOTE:** A Self-Petitioning Battered or Abused Spouse or Child of a U.S. Citizen or Lawful Permanent Resident may submit any relevant credible evidence in place of the suggested evidence.

*Requests for additional information or interview.* We may request additional information or evidence or we may request that you appear at an INS office for an interview. We may also request that you submit the originals of any copy. We will return these originals when they are no longer required.

*Decision.* If you establish that the person this petition is for is eligible for the requested classification, we will approve the petition. We will send it to the U.S. Embassy/Consulate for visa issuance unless he or she is in the U.S. and appears eligible and intends to apply for adjustment to permanent resident status while here. If you do not establish eligibility, we will deny the petition. We will notify you in writing of our decision.

**Penalties.**

If you knowingly and willfully falsify or conceal a material fact or submit a false document with this request, we will deny the benefit you are filing for, and may deny any other immigration benefit. In addition, you will face severe penalties provided by law, and may be subject to criminal prosecution.

**Privacy Act Notice.**

We ask for the information on this form, and associated evidence, to determine if you have established eligibility for the immigration benefit you are filing for. Our legal right to ask for this information is in 8 USC 1154. We may provide this information to other government agencies. Failure to provide this information, and any requested evidence, may delay a final decision or result in denial of your request.

**Paperwork Reduction Act Notice.**

A person is not required to respond to a collection of information unless it displays a currently valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: (1) learning about the law and form, 15 minutes; (2) completing the form, 20 minutes; and (3) assembling and filing the application, 85 minutes for an estimated average of 2 hours per response. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Immigration and Naturalization Service, (1115-0117) 425 I Street, N.W., Room 5307, Washington, D.C. 20536.

BILLING CODE 4410–10–C

DOL_PRWORA _000045

**Paperwork Reduction Act Notice**

The information collection requirements contained in the following two forms have been approved for use by the Office of Management and Budget under the Paperwork Reduction Act. The OMB control number for these collections is 1115–0219, with the expiration date 5/31/98. Persons are not required to provide this information unless the form contains a currently valid OMB control number. We estimate that it will take an average of 20 minutes per response to collect this information, including time for reviewing, instruction, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. If you have any comments regarding these estimates or any other aspects of this collection, send them to the Immigration and Naturalization Service, 425 I Street, N.W., Room 5304, Washington, D.C. 20536.

**BILLING CODE 4410–10–M**

DOL_PRWORA _000046

**[sample only -- request to be submitted on letterhead of requesting agency]**
**Fax Request Form -- from Benefit Agency to EOIR**

To:  Executive Office for Immigration Review          This fax consists of ____ pages.
       Immigration Court, _____ (insert name of city/state)
       Attn:  Court Administrator          Fax number: _____

This request is being submitted by:

Name (printed):  _____ Title: _____

Agency name and address:  _____

_____

Fax number: _____          Phone number: _____

Agency case tracking number (optional): _____

**Item 1:** That above-referenced agency requests that EOIR: (please check only one)

____  Verify that the individual referred to on the attached green card (a copy is attached) was granted relief under section 244(a)(3) (as in effect prior to April 1, 1997) or 240A(b)(2) of the Immigration and Nationality Act.

____  Verify that the attached order grants relief under section 244(a)(3) or 240A(b)(2) of the Immigration and Nationality Act.

____  Verify that EOIR has determined that the alien has demonstrated a prima facie case for suspension of deportation or cancellation of removal under section 244(a)(3) or 240A(b)(2) of the Immigration and Nationality Act.

**Item 2**: **If you checked the last item above, please fill out the following information**.  If the applicant has a copy of a receipt notice or other documentation indicating that he or she filed an application for suspension of deportation or cancellation of removal, please attach a copy.

Benefit Applicant's full name: _____

Benefit Applicant's date of birth: _____

Benefit Applicant's best guess as to when application was filed: _____ (mo/yr)

Benefit Applicant's best guess as to with
       which immigration court petition was filed: _____

Benefit Applicant's address at time of filing petition: _____

       (street address, city, state, zip code) _____

Date: _____     Agency Signature: _____

**[sample only -- request to be submitted on letterhead of requesting agency]**

**Fax Request Form -- from Benefit Agency to INS**

To: INS Vermont Service Center, fax 802/527-3159
    Attn: Battered Alien Review Unit          This fax consists of ____ pages.

This request is being submitted by:

Name (printed): _____ Title: _____

Agency name and address: _____

_____

Fax number: _____ Phone number: _____

Agency case tracking number: _____ (optional)

**Item 1:** An alien applicant is seeking public benefits from the agency identified above, pursuant to recent welfare reform legislation. This applicant falls into one of two categories:

___ a) believes an INS Form I-130, Petition for Immigrant Status, was filed on the applicant's behalf by his/her spouse or parent; or has self-petitioned as a widow(er) using INS Form I-360, Petition for Amerasian, Widow or Special Immigrant (complete Part A, below);
OR
___ b) has self-petitioned as a battered spouse or child using INS Form I-360, Petition for Amerasian, Widow, or Special Immigrant (complete Part B, below).

**Item 2:** The above-referenced agency requests that INS: (please check only one)
☐ Verify that the attached document is valid. A copy of the I-797 approval notice, prima facie determination or receipt notice is attached.
☐ Make a prima facie determination or expedite adjudication of the petition and notify the requesting agency of the outcome.
☐ Update the status of the requesting agency's _____ (insert date) request for a prima facie determination or expedited adjudication. (Requesting agency should allow three weeks from the request for a prima facie determination or filing of a petition before making this request.)
☐ Determine whether the applicant has filed a petition or whether a petition has been filed on his or her behalf under (a) or (b), as indicated above. If so, please make a prima facie determination or expedited adjudication of the applicant's petition and notify the requesting agency of the outcome.

Date: _____     Agency Signature: _____

**61382**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

**PART A: For an Applicant Who Is the Beneficiary of a Petition Filed by Spouse or Parent, or Who Has Self-Petitioned as a Widow(er)**

**Step 1**: Does the alien applicant have a copy of an INS Form I-797 indicating that an I-130 was filed on his/her behalf?    [If applicant has self-petitioned as a widow(er), check "No" and proceed to Step 2.]

    Yes _____ ➔ Attach a copy of the I-797 to this fax (you need not complete Step 2)

    No _____ ➔ If the applicant has no documentation, or has documentation other than a Form I-797, proceed to Step 2.

**Step 2**: If the applicant does not have a Form I-797, please fill out the following information. All blanks, except that noted "if available", must be completed.

Benefit Applicant's full name: _____

Benefit Applicant's date of birth: _____

Benefit Applicant's best guess as to when petition was filed: _____ (mo/yr)

Benefit Applicant's best guess as to with which INS office petition was filed: _____

Petitioner's full name: _____

Petitioner is Applicant's ___ spouse, or ___ parent, or ___ self [widow(er)]   (check one)

Petitioner is a ___ U.S. citizen, or ___ lawful permanent resident ("green card holder")

Petitioner's date of birth: _____

Petitioner's Alien Registration Number, if available:    A_____

Petitioner's address at time of filing petition: _____

    (street address, city, state, zip code) _____

INS Request Form -- page 2

DOL_PRWORA _000049

## PART B:   For an Applicant Who Has Self-Petitioned as a Battered Spouse or Child

**Step 1:** Attach a copy of the receipt notice or other documentation evidencing that a Form I-360 has been filed with the INS.   If that documentation does not include the following information, please complete the blanks:

Applicant/self-petitioner's full name: _____

Applicant/self-petitioner's date of birth: _____

Date I-360 was filed:        _____

Location (city) of INS office where filed:   _____

INS Request Form -- page 3

BILLING CODE 4410–10–C

DOL_PRWORA _000050

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW—IMMIGRATION COURTS

| State/City/App. Code | Judges | Court administrator | Phone Nos. |
|---|---|---|---|
| **ARIZONA** | | | |
| Eloy—85231, 1705 E. Hanna Rd., Suite 366, App. Code—7D05030234. | William Lee Abbott, Isabel A. Bronzina, Dean A. Levay, Sean Keenan. | John A. Meehan | (520) 466–3671, (520) 466–7795 (fax). |
| Florence—85232, 3260 N. Pinal Parkway Ave., App. Code—7D05030229. | Lamonte S. Freerks, Scott Jefferies | Jack B. Odom | (520) 868–3341, (520) 868–4962 (fax). |
| Phoenix—85025, Federal Building, Room 3114, 230 N. First Avenue, App. Code—7D05030226. | John W. Richardson, John T. Zastrow | Jack B. Odom | (602) 514–7356, (602) 514–7387 (fax). |
| **CALIFORNIA** | | | |
| Imperial—92251, 2409 La Brucherie Road, App. Code—7D05030222. | Michael H. Bennett, Dennis R. James, Richard N. Knuck, Jack W. Staton, Jack H. Weil. | M. Graciela Sosa | (619) 355–0070, (619) 355–8692 (fax). |
| Los Angeles—90012, 300 N. Los Angeles St., Room 2001, App. Code—7A05030223, Mailing Address: P.O. Box 53711, Los Angeles, CA 90053–0711. | Roy J. Daniel, Bruce J. Einhorn, Thomas Y.K. Fong, Harry L. Gastley, Gilbert T. Gembacz, Nathan W. Gordon, Ingrid K. Hrycenko, Henry P. Ipema, Jr., Jan D. Latimore, William J. Martin, Jr., Ronald N. Ohata, Margaret Reichenberg, Jay Segal, Darlene R. Seligman, Stephen L. Sholomson, Eleazar Tovar, Richard D. Walton. | Evelyn Diaz Brown | (213) 894–2811, (213) 894–5196 (fax). |
| Los Angeles—90012, Roybal Federal Office Building and Courthouse, 255 E. Temple Street, Rm. 577, App. Code—7D05030223. | | | (213) 894–5159, (213) 894–2632 (fax). |
| San Diego—92101–7904, 401 West A Street, Suite 800, App. Code—7D05030225. | Anthony Atenaide, Kenneth A. Bagley, Robert J. Barrett, Richard J. Bartolomei, Jr., Gaylyn Boone, C. Zsa Zsa De Paolo, Ignacio Fernandez Valdes, Joseph Ragusa, John C. Williams. | Brent L. Perkins | (619) 557–6052, (619) 557–6405 (fax). |
| San Diego—92188, 880 Front Street, Room 800, App. Code—7D05030225. | | | (619) 557–7647, (619) 557–7655 (fax). |
| San Francisco—94108, 550 Kearny Street, Suite 800, App. Code—7D05030224, Mailing Address: P.O. Box 2326, San Francisco, CA 94126–2326. | Lawrence N. DiCostanzo, Alberto E. Gonzalez, Bernard J. Hornbach, Dana Marks Keener, Carol A. King, Tue Phan Quang, Beverly M. Phillips, Mimi Y. Schooley, Brian H. Simpson, Bette K. Stockton, Polly A. Webber. | Stephen P. Perkins | (415) 705–4415, (415) 705–4418 (fax). |
| San Pedro-90731, INS San Pedro Service Proc. Center, 2001 Seaside Avenue, Room 136, App. Code—7D05030233. | Rose Collantes Peters, D.D. Sitgraves | Evelyn Diaz Brown | (310) 732–0753, (310) 732–0757 (fax). |
| **COLORADO** | | | |
| Denver—80294, Byron G. Rogers Fed. Building, 1961 Stout Street, Room 1403, App. Code—7D05030220. | David J. Cordova, James P. Vandello | Alec Revelle | (303) 844–5815, (303) 844–4578 (fax). |
| Aurora—80010, Wackenhut Security, Inc., 11901 E. 30th Avenue, App. Code—7D05030220. | David J. Cordova, James P. Vandello | Alec Revelle | (303) 361–0488, (303) 361–0688 (fax). |
| **CONNECTICUT** | | | |
| Hartford–06103, AA Ribicoff Building and Courthouse, 459 Main Street, Room 509, App. Code—7D05030277. | Harriet B. Marple | Sandra V. Majia (acting) | (860) 240–3919, (860) 240–3921 (fax). |
| **FLORIDA** | | | |
| Bradenton—4205, 515 11th Street, West, Building A, Room 300, App. Code—7D05030244. | R. Kevin McHugh | George A. Spreyne | (941) 749–1044, (941) 749–0992 (fax). |
| Miami—33130, 155 S. Miami Ave., Room 800, App. Code—7D05030217. | Teofilo Chapa, J. Daniel Dowell, Rex J. Ford, Mahlon F. Hanson, Michael C. Horn, Denise Marks Lane, Stephen E. Mander, Nancy R. McCormack, Pedro A. Miranda, Philip J. Montante, Jr., Anthony J. Randall, Charles J. Sanders, Ira Sandron, Denise N. Slavin, Bruce W. Solow, Ronald G. Sonom, Elisa M. Sukkar, Lilliana Torreh-Bayouth, Ketih C. Williams. | Michael T. Ringstad | (305) 530–6455, (305) 530–7001 (fax). |
| Miami Federal Building, 51 S.W. First Ave., Room 224, Miami, FL 33130. | Suzan C. Brauwerman Seymour R. Kleinfeld, Roberto Moreno, William K. Zimmer,. | | (305), 530–6451, No fax. |

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW—IMMIGRATION COURTS—Continued

| State/City/App. Code | Judges | Court administrator | Phone Nos. |
|---|---|---|---|
| Miami—33194, Krome North Processing Center, 18201 S.W. 12th Street, App. Code—7D05030231. | Neal S. Foster, Kenneth S. Hurewitz ..... | George A. Spreyne ................ | (305) 530–7196, (305) 530–7040 (fax). |
| *GEORGIA* | | | |
| Atlanta—30303, 101 Marietta Street, Suite 2702, App. Code—7D05030228. | William A. Cassidy, G. Mackenzie Rast | John J. Topp ......................... | (404) 331–7647, (404) 331–4555 (fax). |
| *ILLINOIS* | | | |
| Chicago—60605–1521, Federal Building, Room 646, 536 S. Clark Street, App. Code—7D05030218. | O. John Brahos, Carlos Cuevas, James R. Fujimoto, Anthony D. Petrone, Jr., Renetta Smith, Robert D. Vinikoor, Craig M. Zerbe. | Peter P. Pauli, IV .................... | (312) 353–7313, (312) 353–9894 (fax). |
| *LOUISIANA* | | | |
| New Orleans—70130, One Canal Place, 365 Canal Street, Suite 2450. | Jeffrey Zlatow ....................................... | Lizbeth L. Wilson .................... | (504) 589–3992, (504) 589–3990 (fax). |
| Oakdale—71463, 1900 E. Whatley Road, App. Code—7D05030230. Mailing Address: P.O. Box 750, Oakdale, LA 71463. | John A. Duck, Jr., Charles A. Wiegand, III. | Lizbeth L. Wilson .................... | (318) 335–0365, (318) 335–3187 (fax). |
| *MARYLAND* | | | |
| Baltimore—21202, U.S. Appraisers Building, 103 S. Gay Street, Room 702, App. Code—7D05030201. | Bruce M. Barrett, Lisa Dornell, John F. Gossart, Jr., William P. Greene, Jr.. | Brenda L. Cook ...................... | (410) 962–3092, (410) 962–9021 (fax). |
| *MASSACHUSETTS* | | | |
| Boston—02203, JFK Federal Building, 15 New Sudbury St., Room 320, App. Code—7D05030202. | Billino W. D'Ambrosio, Eliza C. Klein, Thomas M. Ragno, Leonard I. Shapiro, Patricia M.B. Sheppard. | Sandra V. Mejia (acting) ........ | (617) 565–3080, (617) 565–4495 (fax). |
| *MICHIGAN* | | | |
| Detroit—48207, Brewery Park II, 1155 Brewery Park Blvd., Suite 450, App. Code—7D05030219. | Elizabeth Hacker ..................................... | Sandra Roberts ...................... | (313) 226–2603, (313) 226–3053 (fax). |
| *NEVADA* | | | |
| Las Vegas—79101, Alan Bible Federal Building, 600 Las Vegas Blvd. South, Room 410, App. Code—7A05030240. | Irene Weiss .............................................. | Jack B. Odom ........................ | (702) 388–5837, (702) 388–5844 (fax). |
| *NEW JERSEY* | | | |
| Elizabeth—625 Evans St., Rm. 148A, App. Code—7D05030236. | Esmeralda Cabrera ................................. | Fletcher Graves ...................... | (201) 693–4113, (201) 645–4121 (fax). |
| Newark—07102, 970 Broad Street, Room 1135, App. Code—7D05030204. | Henry S. Dogin, Annie Sue Garcy, Nicole Yae Kyoung Kim, Daniel A. Meisner, Eugene Pugliese, Alberto Riefkohl, William Strasser. | Star B. Pacitto ....................... | (201) 645–3524, (201) 645–3432 (fax). |
| *NEW YORK* | | | |
| Buffalo—14202, 130 Delaware Ave., Suite 410 App. Code—7D05030203. | Walter A. Durling, Jr., Mchaelangelo Rocco. | Gary M. Somerville ................ | (716) 551–3442, (716) 551–3452 (fax). |
| Fishkill—12524, c/o Downstate Correctional Facility, Red Schoolhouse Road, App. Code—7D05030206. | Mitchell Levinksy ................................... | Thomas J. Bonita, III ............. | (914) 831–3657, (914) 831–5452 (fax). |
| Napanoch—12458, Ulster Correctional Facility, Berne Road, App. Code—7D05030235. | Joe D. Miller .......................................... | Thomas J. Bonita, III ............. | (914) 647—5506, (914) 647–5641 (fax). |
| New York—10278, 26 Federal Plaza, Room 10–1000, App. Code—7D5030205. | Matthew T. Adrian, Terry A. Bain, Joanna M. Bukszpan, Sarah M. Burr, Jeffrey Chase, George T. Chew, Annette S. Elstein, Noel Anne Ferris, Victoria Ghartey, Sandy K. Hom, Charles M. Honeyman, William F. Jankun, Elizabeth A. Lamb, Margaret McManus, Philip L. Morace, Barabara A. Nelson, Patricia A. Rohan, John K. Speer, Jr., Mirlande Tadal, Gabriel C. Videla, Robert D. Weisel, Phillip T. Williams, Jeffrey Chase. | John D. Hannah, Jr. .............. | (212) 264,5958, (202) 264–1070 (fax). |
| New York—10014, 201 Varick Street, Room 1140, App. Code—7D05030232.. | Donn L. Livingston, Alan L. Page, Alan A. Vomacka. | Thomas J. Bonita, III ............. | (212) 620–6279, (212) 620–6357 (fax). |
| *PENNSYLVANIA* | | | |
| Philadelphia—19103, 1600 Callowhill Street, Suite 400, App. Code—7D05030207. | Donald V. Ferlise, Craig DeBernardis .... | R. Elliott Edwards ................... | (215) 656–7000, (215) 656–7013 (fax). |
| York—17402, 3434 Concord Road, App. Code—7D05030209. | William Van Wyke ................................... | Brenda L. Cook ...................... | (717) 755–7555, (717) 757–0132 (fax). |

DOL_PRWORA _000052

**61386**   **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW—IMMIGRATION COURTS—Continued

| State/City/App. Code | Judges | Court administrator | Phone Nos. |
|---|---|---|---|
| *PUERTO RICO* | | | |
| *Guaynabo* (San Juan)—00965, GSA Center, 651 Federal Drive, Suite 111–14, App. Code—7D05030208. | Rafael B. Ortiz-Segura ........................... | George A. Spreyne ................ | (787) 749–4386, (787) 749–4393 (fax). |
| *TEXAS* | | | |
| *Dallas*—75202, 1200 Main Street, Suite 700, App. Code—7D05030211. | Edwin R. Hughes, D. Anthony Rogers, Cary Copeland. | Barbara T. Baker .................... | (214) 767–1814, (214) 767–6410 (fax). |
| *El Paso*—79925, 1545 Hawkins Boulevard, Suite 205, App. Code—7D05030212. | Gary D. Burkholder, Penny M. Smith, Bertha A. Zuniga. | Theresa N. Baeza .................. | (915) 540–1910, (915) 540–1922 (fax). |
| *El Paso*—79925, El Paso Service Processing Center, 8915 Montana Avenue, App. Code—7D05030212. | Visiting IJ ................................................ | Theresa N. Baeza .................. | (915) 540–7854, No fax. |
| *Harlingen*—78550, 201 E. Jackson Street, App. Code—7D05030213. | Howard E. Achtsam, David Ayala, Margaret D. Burkhart, M. Edwin Prudhomme. | Celeste Garza ........................ | (210)427–8580, (210) 427–8905 (fax). |
| *Los Fresnos*—78566, Port Isabel Processing Center, Route 3, Box 341, Building 37, App. Code—7D05030213. Mailing Address: 201 E. Jackson St., Harlingen, TX 78550. | Visiting IJ ................................................ | Celeste Garza ........................ | (210) 233–4467, (210) 233–5318 (fax). |
| *Houston*—77004, 2320 La Branch Street, Room 2235, App. Code—7D05030214. | Robert Brown, Clarease M. Rankin, Michael K. Suarez, Joseph Vail. | Dina P. Sherman .................... | (713) 718–3870, (713) 718–3879 (fax). |
| *Houston*—77032, Houston Service Processing Center, 15850 Export Plaza Drive, App. Code—7D05030214. | Susan L. Yarbrough ................................ | Dina P. Sherman .................... | (713) 987–0290, (713) 987–3142 (fax). |
| *Huntsville*—77340, Goree INS Facility, 30000A Highway 75 South, App. Code—7D05030232. Mailing Address: P.O. Box 1538, Huntsville, TX 77342–1538. | Jimmie L. Benton ................................... | Dina P. Sherman .................... | (409) 295–1353, (409) 295–6510 (fax). |
| *Laredo*—78041, 4702 E. Saunders, App. Code—7D05030215. Mailing Address: Laredo Service Processing Center, P.O. Box 440110, Laredo, TX 78044–0110. | Visiting IJ ................................................ | J. Thomas Davis .................... | (210) 727–4772, (210) 726–2320 (fax). |
| *San Antonio*-78205-2040, 615 E. Houston Street, Room 598, App. Code-7D05030215. | Richard F. Brodsky, Susan E. Conley-Castro, Glenn P. McPhaul. | J. Thomas Davis .................... | (210) 472–6637, (210) 472–4282 (fax). |
| *VIRGINIA* | | | |
| *Arlington*-22203, 901 N. Stuart St., Suite 1300, App. Code-7D05030210. | John M. Bryant, Joan V. Churchill, Christopher M. Grant, Wayne R. Iskra, Paul A. Nejelski. | Beverly Swihart Holmes ......... | (703) 235–2307, (703) 235–2372 (fax). |
| *WASHINGTON* | | | |
| *Seattle*-98104, Key Tower Building, 1000 Second Avenue, Suite 2500, App. Code-7D05030221. | Anna Ho, Kenneth Josephson, Kendall B. Warrem. | Joseph Neifert ........................ | (206) 553–5953, (206) 553–0622 (fax). |
| *Seattle*-98134, Seattle Det. Center, c/o U.S. INS, 815 Airport Way, App. Code-7D05030221. | Anna Ho, Kenneth Josephson, Kendall B. Warren. | Joseph Neifert ........................ | call Seattle office: (206) 553–5953, (206) 553–0622 (fax). |

**BILLING CODE 4310–GG–M**

DOL_PRWORA_000053

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Action**

# THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE | I-360 PETITION FOR AMERASIAN, |
| --- | --- | --- | --- |
| EAC-97-000-00000 | | | WIDOW(ER) OR SPECIAL IMMIGRANT |

| RECEIPT DATE | PRIORITY DATE | PETITIONER |
| --- | --- | --- |
| June 1, 1997 | June 1, 1997 | DOE, Jane |

| NOTICE DATE | PAGE | BENEFICIARY |
| --- | --- | --- |
| July 9, 1997 | 1 | DOE, Jane |

Susan SMITH, Esq.
100 Main St.
Anywhere VT 05400

Notice Type: Approval Notice
Section: Self-Petitioning Spouse of Abusive U.S.C. or LPR
Class: B21

Note: Includes Notice of Deferred Action

The above petition has been approved.

The petition indicates you, the self-petitioner, are in the United States and will apply for adjustment of status. The information submitted with the petition shows you are not eligible to file an adjustment of status application at this time.

Additional information about eligibility for adjustment of status may be obtained from the local INS office serving the area where you live.

Until you file an adjustment application, or apply for an immigrant visa, this approved petition will be stored in this office. If you become eligible to adjust status based on this petition, you should submit a copy of this notice with Form I-485, Application for Permanent Residence to the local office.

If you decide to apply for an immigrant visa outside the United States based on this petition, you should file Form I-824, Application for Action on an Approved Application or Petition, with this office to request that we send the petition to the Department of State National Visa Center (NVC).

The NVC processes all approved immigrant visa petitions that required consular action. The NVC also determines which consular post is the appropriate consulate to complete visa processing. It will then forward the approved petition to that consulate.

Please read the back of this form carefully for more information.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.


DEFERRED ACTION

Deferred Action has been approved for this case. Deferred Action is an administrative choice used to give some cases lower priority for removal. The Service does not anticipate instituting action for removal, in this case, at this time. Pursuant to 8 CFR § 274a.12(c)(14), an alien, who has been granted deferred action, is eligible to submit an application for employment authorization, if the alien establishes an economic necessity for employment. This application, on Form I-765, should be filed with this office. The alien must provide information regarding his or her assets, income, and expenses in accordance with the instructions on the Form I-765.

The approval of Deferred Action will expire one (1) year from the date of this notice. Request for the continuation of deferred action should be submitted, in writing, to this office, sixty (60) days before the expiration of the current approval. The request for continuation may be accompanied by an application, on Form I-765, for continuation of employment authorization.

THIS FORM IS NOT AN EMPLOYMENT AUTHORIZATION NOR MAY IT BE USED IN PLACE OF AN EMPLOYMENT AUTHORIZATION

Please see the additional information on the back. You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
Customer Service Telephone: (802) 527-3160

Form I-797C (Rev. 09/07/93)N

BILLING CODE 4410–10–M

DOL_PRWORA_000054

**61388**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

• Please save this notice for your records. Please enclose a copy if you have to write us or a U.S. Consulate about this case, or if you file another application based on this decision.

• You will be notified separately about any other applications or petitions you have filed.

**Additional Information**

General

The filing of an application or petition does not in itself allow a person to enter the United States and does not confer any other right or benefit.

Inquiries

You should contact the office listed on the reverse of this notice if you have questions about the notice, or questions about the status of your application or petition. We recommend you call.

However, if you write us, please enclose a copy of this notice with your letter.

Approval of Nonimmigrant Petition

Approval of a nonimmigrant petition means that the person for whom it was filed has been found eligible for the requested classification. If this notice indicated we are notifying a U.S. Consulate about the approval for the purpose of visa issuance, and you or the person you filed for have questions about visa issuance, please contact the appropriate U.S. Consulate directly.

Approval of an Immigrant Petition

Approval of an immigrant petition does not convey any right or status. The approved petition simply establishes a basis upon which the person you filed for can apply for an immigrant or fiance(e) visa or for adjustment of status.

A person is not guaranteed issuance of a visa or a grant of adjustment simply because this petition is approved. Those processes look at additional criteria.

If this notice indicates we have approved the immigrant petition you filed, and have forwarded it to the Department of State Immigrant Visa Processing Center, that office will contact the person you filed the petition for directly with information about visa issuance.

In addition to the information on the reverse of this notice, the instructions for the petition you filed provide additional information about processing after approval of the petition.

For more information about whether a person who is already in the U.S. can apply for adjustment of status, please see Form I–485, Application to Register Permanent Residence or Adjust Status.

**BILLING CODE 4410–10–M**

DOL_PRWORA _000055

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER EAC-97-000-00000 | | CASE TYPE I-360 PETITION FOR AMERASIAN, WIDOW(ER) OR SPECIAL IMMIGRANT | |
| RECEIPT DATE June 1, 1997 | PRIORITY DATE June 1, 1997 | PETITIONER DOE, Jane | |
| NOTICE DATE July 9, 1997 | PAGE 1 | BENEFICIARY DOE, Jane | |

Susan SMITH, Esq.
100 Main St.
Anywhere VT 05400

Notice Type:  Approval Notice
Section:  Self-Petitioning Spouse of
Abusive U.S.C. or LPR
Class:  B21

The above petition has been approved.

The petition indicates you, the self-petitioner, are in the United States and will apply for adjustment of status.  The information submitted with the petition shows you are not eligible to file an adjustment of status application at this time.

Additional information about eligibility for adjustment of status may be obtained from the local INS office serving the area where you live.

Until you file an adjustment application, or apply for an immigrant visa, this approved petition will be stored in this office.  If you become eligible to adjust status based on this petition, you should submit a copy of this notice with Form I-485, Application for Permanent Residence to the local office.

If you decide to apply for an immigrant visa outside the United States based on this petition, you should file Form I-824, Application for Action on an Approved Application or Petition, with this office to request that we send the petition to the Department of State National Visa Center (NVC).

The NVC processes all approved immigrant visa petitions that required consular action.  The NVC also determines which consular post is the appropriate consulate to complete visa processing.  It will then forward the approved petition to that consulate.

Please read the back of this form carefully for more information.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

Please see the additional information on the back.  You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
Customer Service Telephone: (802) 527-3160

Form I-797C (Rev. 09/07/93)N

BILLING CODE 4410–10–M

DOL_PRWORA_000056

**61390**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

- Please save this notice for your records. Please enclose a copy if you have to write us or a U.S. Consulate about this case, or if you file another application based on this decision.

- You will be notified separately about any other applications or petitions you have filed.

**Additional Information**

General

The filing of an application or petition does not in itself allow a person to enter the United States and does not confer any other right or benefit.

Inquiries

You should contact the office listed on the reverse of this notice if you have questions about the notice, or questions about the status of your application or petition. We recommend you call.

However, if you write us, please enclose a copy of this notice with your letter.

Approval of Nonimmigrant Petition

Approval of a nonimmigrant petition means that the person for whom it was filed has been found eligible for the requested classification. If this notice indicated we are notifying a U.S. Consulate about the approval for the purpose of visa issuance, and you or the person you filed for have questions about visa issuance, please contact the appropriate U.S. Consulate directly.

Approval of an Immigrant Petition

Approval of an immigrant petition does not convey any right or status. The approved petition simply establishes a basis upon which the person you filed for can apply for an immigrant or fiance(e) visa or for adjustment of status.

A person is not guaranteed issuance of a visa or a grant of adjustment simply because this petition is approved. Those processes look at additional criteria.

If this notice indicates we have approved the immigrant petition you filed, and have forwarded it to the Department of State Immigrant Visa Processing Center, that office will contact the person you filed the petition for directly with information about visa issuance.

In addition to the information on the reverse of this notice, the instructions for the petition you filed provide additional information about processing after approval of the petition.

For more information about whether a person who is already in the U.S. can apply for adjustment of status, please see Form I–485, Application to Register Permanent Residence or Adjust Status.

**BILLING CODE 4410–10–M**

DOL_PRWORA _000057

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE  I-360 PETITION FOR AMERASIAN, |
|---|---|---|
| EAC-97-000-00000 | | WIDOW(ER) OR SPECIAL IMMIGRANT |

| RECEIPT DATE | PRIORITY DATE | PETITIONER |
|---|---|---|
| June 1, 1997 | June 1, 1997 | DOE, Jane |

| NOTICE DATE | PAGE | BENEFICIARY |
|---|---|---|
| June 27, 1997 | 1 | DOE, Jane |

Jane DOE
Susan SMITH, Esq.
100 Main St.
Anywhere VT 05400

Section:  Self-Petitioning Spouse of
Abusive U.S.C. or LPR

**NOTICE OF PRIMA FACIE CASE**

The above petition has been reviewed and found to establish a prima facie case for classification under the self-petitioning provisions of the Violence Against Women Act.

**THIS PRIMA FACIE DETERMINATION IS VALID FOR A PERIOD OF 150 DAYS FROM THE NOTICE DATE SHOWN ABOVE, AND EXPIRES ON THE DATE INDICATED AT THE BOTTOM OF THE PAGE.**

We will send you a written notice as soon as we make a decision on this case.  It is expected that a final decision will be made on this case before the end of 150 days.  In a few cases, the adjudication may not be completed in this time frame.  If this period is coming to a close and you need an extension of this prima facie determination in order to continue receiving public benefits, please submit a written request for extension at least 15 days prior to expiration.

**PLEASE NOTE:   ESTABLISHING A PRIMA FACIE CASE FOR CLASSIFICATION UNDER THE SELF-PETITIONING PROVISIONS OF THE VIOLENCE AGAINST WOMEN ACT DOES <u>NOT</u> NECESSARILY MEAN THAT YOUR PETITION WILL BE APPROVED.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**EXPIRATION DATE:  November 27, 1997**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please see the additional information on the back.  You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
Customer Service Telephone: (802) 527-3160

Form I-797C (Rev. 09/07/93)N

BILLING CODE 4410–10–M

DOL_PRWORA _000058

**61392**   **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

• Please save this notice for your records. Please enclose a copy if you have to write us or a U.S. Consulate about this case, or if you file another application based on this decision.

• You will be notified separately about any other applications or petitions you have filed.

**Additional Information**

General

The filing of an application or petition does not in itself allow a person to enter the United States and does not confer any other right or benefit.

Inquiries

You should contact the office listed on the reverse of this notice if you have questions about the notice, or questions about the status of your application or petition. We recommend you call.

However, if you write us, please enclose a copy of this notice with your letter.

Approval of Nonimmigrant Petition

Approval of a nonimmigrant petition means that the person for whom it was filed has been found eligible for the requested classification. If this notice indicated we are notifying a U.S. Consulate about the approval for the purpose of visa issuance, and you or the person you filed for have questions about visa issuance, please contact the appropriate U.S. Consulate directly.

Approval of an Immigrant Petition

Approval of an immigrant petition does not convey any right or status. The approved petition simply establishes a basis upon which the person you filed for can apply for an immigrant or fiance(e) visa or for adjustment of status.

A person is not guaranteed issuance of a visa or a grant of adjustment simply because this petition is approved. Those processes look at additional criteria.

If this notice indicates we have approved the immigrant petition you filed, and have forwarded it to the Department of State Immigrant Visa Processing Center, that office will contact the person you filed the petition for directly with information about visa issuance.

In addition to the information on the reverse of this notice, the instructions for the petition you filed provide additional information about processing after approval of the petition.

For more information about whether a person who is already in the U.S. can apply for adjustment of status, please see Form I–485, Application to Register Permanent Residence or Adjust Status.

BILLING CODE 4410–10–M

DOL_PRWORA _000059

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE I360   PETITION FOR AMERASIAN, WIDOWER, OR SPECIAL IMMIGRANT |
|---|---|---|
| EAC-97-094-50417 | | |

| RECEIVED DATE | PRIORITY DATE | PETITIONER |
|---|---|---|
| February 24, 1997 | February 24, 1997 | CARSWELL, GRACE E. |

| NOTICE DATE | PAGE | BENEFICIARY |
|---|---|---|
| February 24, 1997 | 1 of 1 | CARSWELL, GRACE E. |

GRACE E. CARSWELL
75 LOWER WELDEN ST
SAINT ALBANS VT 05479

Notice Type:  Receipt Notice

Fee Waived

Section: Self-Petitioning Spouse of
Abusive U.S.C. or LPR

The above application or petition has been received. It usually takes 60 to 120 days from the date of this receipt for us to process this type of case. Please notify us immediately if any of the above information is incorrect. Our customer service phone number is listed below.

We will send you a written notice as soon as we make a decision on this case. You can also use the phone number below to obtain case status information direct from our automated system 24 hours a day with a touch-tone phone and the receipt number for this case (at the top of this notice).

Please see the additional information on the back. You will be notified separately about any other cases you filed.
    IMMIGRATION & NATURALIZATION SERVICE
    VERMONT SERVICE CENTER
    75 LOWER WELDEN STREET
    SAINT ALBANS VT 05479-0001
    Customer Service Telephone: (802) 527-3160

Form I-797C (Rev. 09/07/93)N

BILLING CODE 4410–10–M

DOL_PRWORA _000060

**61394**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

- Please save this notice for your records. Please enclose a copy if you have to write us or a U.S. Consulate about this case, or if you file another application based on this decision.

- You will be notified separately about any other applications or petitions you have filed.

**Additional Information**

General

The filing of an application or petition does not in itself allow a person to enter the United States and does not confer any other right or benefit.

Inquiries

You should contact the office listed on the reverse of this notice if you have questions about the notice, or questions about the status of your application or petition. We recommend you call.

However, if you write us, please enclose a copy of this notice with your letter.

Approval of Nonimmigrant Petition

Approval of a nonimmigrant petition means that the person for whom it was filed has been found eligible for the requested classification. If this notice indicated we are notifying a U.S. Consulate about the approval for the purpose of visa issuance, and you or the person you filed for have questions about visa issuance, please contact the appropriate U.S. Consulate directly.

Approval of an Immigrant Petition

Approval of an immigrant petition does not convey any right or status. The approved petition simply establishes a basis upon which the person you filed for can apply for an immigrant or fiance(e) visa or for adjustment of status.

A person is not guaranteed issuance of a visa or a grant of adjustment simply because this petition is approved. Those processes look at additional criteria.

If this notice indicates we have approved the immigrant petition you filed, and have forwarded it to the Department of State Immigrant Visa Processing Center, that office will contact the person you filed the petition for directly with information about visa issuance.

In addition to the information on the reverse of this notice, the instructions for the petition you filed provide additional information about processing after approval of the petition.

For more information about whether a person who is already in the U.S. can apply for adjustment of status, please see Form I–485, Application to Register Permanent Residence or Adjust Status.

**BILLING CODE 441–10–M**

DOL_PRWORA _000061

| RECEIPT NUMBER<br>LIN-96-170-50006 | | CASE TYPE  I130    IMMIGRANT PETITION FOR RELATIVE,<br>FIANCE(E), OR ORPHAN | |
|---|---|---|---|
| RECEIVED DATE<br>March 25, 19 | PRIORITY DATE | PETITIONER   A12 123 431<br><br>AAA, VV | |
| NOTICE DATE<br>March 25, 1997 | PAGE<br>1 of 1 | BENEFICIARY<br><br>SFDF, DD | |

| VV AAA<br>343 I ST NW<br>WASHINGTON DC 20536 | Notice Type:  Receipt Notice<br><br>Amount received: $   80.00<br><br>Section: Sister or brother of U.S.<br>          Citizen, 203(a)(4) INA |
|---|---|

The above application or petition has been received.  It usually takes 30 to 90 days from the date of this receipt for us to process this type of case.  Please notify us immediately if any of the above information is incorrect.  Our customer service phone number is listed below.

We will send you a written notice as soon as we make a decision on this case.  You can also use the phone number below to obtain case status information direct from our automated system 24 hours a day with a touch-tone phone and the receipt number for this case (at the top of this notice).

Please see the additional information on the back.  You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
LIN TEST PLATFORM
4313 INS HQ
LINCOLN NA 55479
**Customer Service Telephone: (802)527-3112**



BILLING CODE 4410–10–M

**61396**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

DISTRICT CODES

| Districts–36 | Org type |
|---|---|
| 2—Boston, MA | DAF BOS |
| 3—New York, NY | DAF NYC |
| 4—Philadelphia, PA | DAF PHI |
| 5—Baltimore, MD | DAF BAL |
| 6—Miami, FL | DAF MIA |
| 7—Buffalo, NY | DAF BUF |
| 8—Detroit, MI | DAF DET |
| 9—Chicago, IL | DAF CHI |
| 10—St. Paul, MN | DAF SPM |
| 11—Kansas City, MO | DF KAN |
| 12—Seattle, WA | DAF SEA |
| 13—San Francisco, CA | DAF SFR |
| 14—San Antonio, TX | DAF SNA |
| 15—El Paso, TX | DAF ELP |
| 16—Los Angeles, CA | DAF LOS |
| 17—Honolulu, HI | DAF HHW |
| 18—Phoenix, AZ | DAF PHO |
| 19—Denver, CO | DAF DEN |
| 20—Dallas, TX | DAF DAL |
| 21—Newark, NJ | DAF NEW |
| 22—Portland, ME | DAF POM |
| 24—Cleveland, OH | DAF CLE |
| 25—Washington, DC | DAF WAS |
| 26—Atlanta, GA | DAF ATL |
| 27—San Juan, PR | DAF SAJ |
| 28—New Orleans, LA | DAF NOL |
| 29—Omaha, NE | DF OMA |
| 30—Helena, MT | DF HEL |
| 31—Portland, OR | DAF POO |
| 32—Anchorage, AK | DAF ANC |
| 33—Bangkok, Thailand | OD BKK |
| 35—Mexico City, MX | OD MEX |
| 37—Rome, Italy | OD RIT |
| 38—Houston, TX | DAF HOU |
| 39—San Diego, CA | DAF SND |
| 40—Harlingen, TX | DAF HLG |
| *EASTERN REGION:* | |
| *DISTRICT 2—BOSTON, MA* | |
| Providence, RI | SAF PRO |
| *Hartford, CT | SAF HAR |
| *Lebanon, MA | A LEB |
| Boston Proc. Ctr | P BPC |
| *DISTRICT 3—New York, NY* | |
| *NY Seaport combined w/ quarantine unit, NY. | U NYS |
| JFK Airport, NY | A ZJK |
| Hamilton, Bermuda | I HAM |
| Varick Proc. Ctr | P VRK |
| *Brookland Proc. Ctr | P BKN |
| *DISTRICT 4—Philadelphia, PA* | |
| *Altoona, PA | U ALT |
| Pittsburgh, PA | SF PIT |
| *Dover AFB, DL | A DVD |
| *DISTRICT 5—Baltimore, MD* | |
| *DISTRICT 6—Miami, FL* | |
| Jacksonville, FL | SA JAC |
| Key West, FL | SA KEY |
| Port Everglades, FL | SA PEV |
| *Port Canaveral, FL | A PCF |
| Tampa, FL | SA TAM |
| West Palm Beach, FL | SA WPB |
| Orlando Airport, FL | A ORL |
| Krome Proc. Ctr | P KRO |
| Fort Pierce, FL | A FTP |
| Jacksonville Seaport, FL | U JAS |
| Miami Seaport, FL | U MSE |
| *Panama City, FL | A PAN |
| *Sanford, FL | A SFB |
| *DISTRICT 7—Buffalo, NY* | |
| Thousand Island Bridge, NY | SA THO |
| Trout River, NY | SA TRO |

DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| *Rooseveltown, NY | A RSV |
| Albany, NY | SAF ALB |
| Champlain, NY | SA CHM |
| Chateauguay, NY | SA CHT |
| Fort Covington, NY | SA FTC |
| *Lewiston, NY | A LEW |
| Massena, NY | SA MAS |
| Mooers, NY | SA MOO |
| Niagara Falls, NY | SA NIA |
| Ogdensburg, NY | SA OGD |
| Peace Bridge, NY | SA PBB |
| Rouses Point, NY | SA ROU |
| *DISTRICT 8—Detroit, MI* | |
| Algonac, MI | SA AGN |
| Marine City, MI | SA MRC |
| Port Huron, MI | SA PHU |
| Roberts Landing, MI | SA RBT |
| Sault Ste. Marie, MI | SA SSM |
| *Detroit Michigan Bridge, MI | A DCB |
| *Detroit Michigan Tunnel, MI | A DCT |
| *DISTRICT 21—Newark, NJ* | |
| *Camden, NJ | A CNJ |
| McGuire AFB, NJ | A MAG |
| Alburg, VT | SA ABG |
| Alburg Springs, VT | SA ABS |
| Bangor, ME | SA BGM |
| Beebe Plains, VT | SA BEB |
| Beecher Falls, VT | SA BEE |
| Bridgewater, ME | SA BWM |
| *Burlington, VT | A BRG |
| Calais, ME | SA CLS |
| *Eastport, ME | A EPM |
| Canann, VT | SA CNA |
| Coburn Gore, ME | SA COB |
| Derby Line, VT | SA DER |
| *Derby Line RT5 POE | P DVL |
| East Richford, VT | SA ERC |
| Fort Fairfield, ME | SA FTF |
| Fort Kent, ME | SA FTK |
| *Eastcourt, ME | A EST |
| *St. Pampile, ME | A SPA |
| Hamlin, ME | SA HML |
| Highgate Springs, VT | SA HIG |
| Houlton, ME | A HTM |
| *Easton, ME | A EAS |
| *Forest City, ME | A FOR |
| *Monticello, ME | A MTC |
| *Orient, ME | A ORI |
| Jackman, ME | SA JKM |
| *St. Aurelie | SA SRL |
| Limestone, ME | SA LIM |
| Lubec, ME | SA LUB |
| Madawaska, ME | SA MAD |
| *Morses Line, VT | A MOR |
| North Troy, VT | SA NRT |
| Norton, VT | SA NRN |
| Pinnacle Rd., VT | A PIV |
| *Pittsburgh, NH | A PNH |
| Richford, VT | SA RIF |
| *St. Albans, VT | SA STA |
| Van Buren, ME | SA VNB |
| Vanceboro, ME | SA VCB |
| West Berkshire, VT | SA WBE |
| *DISTRICT 24—Cleveland, OH* | |
| Cincinnati, OH | SAF CIN |
| Sandusky, OH | SA SDY |
| Toledo, OH | SA TOL |
| Columbus, OH | A CLM |
| *DISTRICT 25—Washington, D.C.* | |
| Norfolk, VA | |
| Norfolk Seaport, VA | U NOS |

DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| *DISTRICT 26—Atlanta, GA* | |
| Charleston, SC | SA CHL |
| Charlotte, NC | SF CLT |
| *Greer, SC | SA GRR |
| Mobile, AL | SA MOB |
| *Raleigh-Durham, NC | SA RDU |
| Savannah, GA | SA SAV |
| Wilmington, NC | SA WIL |
| *DISTRICT 27—San Juan, PR* | |
| Aguadilla Proc. Ctr. | P AGC |
| Charlotte Amalie, St. Thomas, VI. | SA CHA |
| Christiansted, St. Croix, VI | SA CHR |
| Cruz, Bay, St. John, VI | SA CRU |
| Mayaguez, PR | A MAY |
| Ponce, PR | SA PON |
| *DISTRICT 28—New Orleans, LA* | |
| *Baton Rouge, LA | A BTN |
| *Gulfport, MS | A GUL |
| *Lake Charles, LA | A LKC |
| Louisville, KY | S LOU |
| Memphis, TN | SF MEM |
| *Nashville, TN | A NSV |
| *Oakdale, LA | P OAK |
| *CENTRAL REGION:* | |
| *DISTRICT 9—Chicago, IL* | |
| Milwaukee, WI | SAF MIL |
| *Indianapolis, IN | S INP |
| *DISTRICT 10—St. Paul, MN* | |
| Baudette, MN | SA BAU |
| Duluth, MN | SA DUL |
| Grand Portage, MN | SA GPM |
| International Falls, MN | SA INT |
| Lancaster, MN | SA LAN |
| Noyes, MN | SA NOY |
| *Pembina, ND | A PEM |
| Pine Creek, MN | SA PIN |
| Roseau, MN | SA ROS |
| Warroad, MN | SA WAR |
| Ambrose, ND | SA AMB |
| Antler, ND | SA ANT |
| Carbury, ND | SA CRY |
| Dunseith, ND | SA DNS |
| Fargo, ND | SA FAR |
| Fortuna, ND | SA FRT |
| Minot, ND | A MND |
| Hannah, ND | SA HNN |
| Hansboro, ND | SA HNS |
| Maida, ND | SA MAI |
| Neche, ND | SA NEC |
| Noonan, ND | SA NOO |
| Northgate, ND | SA NRG |
| Portal, ND | SA POR |
| St. John, ND | SA SJO |
| Sarles, ND | SA SAR |
| Sherwood, ND | SA SHR |
| Walhalla, ND | SA WAL |
| Westhope, ND | SA WHO |
| Wilton, ND | A WND |
| *DISTRICT 11—Kansas CITY, MO* | |
| St. Louis, MO | SF STL |
| *DISTRICT 14—San Antonio, TX* | |
| Austin, TX | SA AUS |
| Amistad Dam, TX | A ADT |
| *Corpus Christi, TX | SA CRP |
| Del Rio, TX | SA DLR |
| Eagle Pass, TX | SA EGP |
| Laredo, TX | SA LAR |
| Juarez-Lincoln Bridge, TX | A LLB |

DOL_PRWORA_000063

## DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| Laredo Proc. Ctr. .................. | P LRD |
| Laredo Columbia Bridge, TX | A LCB |
| *DISTRICT 15—El Paso, TX* | |
| Columbus, NM ....................... | SA COL |
| Fabens, TX ............................ | SA FAB |
| Presidio, TX ........................... | SA PRE |
| *Port of El Paso .................... | A POE |
| *Paso del Norte Bridge, TX ... | A PDN |
| *Bridge of the Americas, TX .. | A BOA |
| *Ysleta, TX ............................ | SA YSL |
| Santa Teresa, NM ................. | A STR |
| Albuquerque, NM .................. | S ABQ |
| El Paso Processing Center, TX. | P EPC |
| *Fort Hanock, TX .................. | P FTH |
| *DISTRICT 19—Denver, CO* | |
| Salt Lake City, UT ................. | SAF SLC |
| *DISTRICT 20—Dallas, TX* | |
| Oklahoma City, OK ............... | SF OKC |
| *DISTRICT 29—Omaha, NE ...* | OMA |
| *DISTRICT 30—Helena, MT ...* | HEL |
| Boise, ID ................................ | S BOI |
| Chief Mountain, MT ............... | A CHF |
| Del Bonita, MT ...................... | A DLB |
| Great Falls, MT ..................... | A GRE |
| Morgan, MT ........................... | SA MGM |
| Opheim, MT ........................... | SA OPH |
| Piegan, MT ............................ | SA PIE |
| Raymond, MT ........................ | SA RAY |
| Roosville, MT ........................ | SA ROO |

## DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| Scobey, MT ........................... | SA SCO |
| Sweetgrass, MT .................... | SA SWE |
| Turner, MT ............................ | SA TUR |
| Whitetail, MT ........................ | SA WHI |
| Wild Horse, MT .................... | SA WHM |
| Willow Creek, MT .................. | SA WCM |
| Missoula, MT ........................ | SA MIS |
| *DISTRICT 38—Houston, TX* | |
| Galveston, TX ....................... | SA GAL |
| Port Arthur, TX ..................... | SA PAR |
| *DISTRICT 40—Harlington, TX* | |
| *Brownsville, TX .................... | A BRO |
| *Brownsville/Gateway, Bridge, TX. | A BRO |
| *Brownsville Matamoros Bridge, TX. | A BBM |
| Falcon Heights, TX ............... | SA FAL |
| Hidalgo, TX .......................... | SA HID |
| Los Ebanos, TX .................... | SA LSE |
| *Los Indios, TX ...................... | A LOI |
| Port Isabel Proc. Ctr. ............ | P PIC |
| Progresso, TX ....................... | SA PGR |
| Rio Grande, TX ..................... | SA RIO |
| Roma, TX .............................. | SA ROM |
| Pharr, TX .............................. | SA PHR |
| Nogales, AZ .......................... | SA NOG |
| Sasabe, AZ ........................... | SA SAS |
| San Luis, AZ ......................... | SA SLU |
| Tucson, AZ ............................ | S TUC |
| *Las Vegas, NV ..................... | SF LVG |

## DISTRICT CODES—Continued

| Districts–36 | Org type |
|---|---|
| *Reno, NV .............................. | SF REN |
| *Mariposa, AZ ....................... | A MAP |
| *Eloy Proc. Cr., AZ ................ | P EAZ |
| *DISTRICT 31—Portland, OR* | |
| Astoria, AK ............................ | SA AST |
| Coos Bay, OR ....................... | A COO |
| New Port, OR ........................ | P NPT |
| *DISTRICT 32—Anchorage, AK* | |
| Alcan, AK ............................... | SA ALC |
| Dalton Cache, AK ................. | SA DAC |
| Ketchikan, AK ....................... | SA KET |
| Skagway, AK ......................... | A SKA |
| *Dutch Harbor, AK ................ | A DTH |
| Poker Creek, AK ................... | A PKC |
| Nome, AK .............................. | A NOM |
| Fairbanks, AK ....................... | A FRB |
| *DISTRICT 39—San Diego* | |
| Andrade, CA .......................... | SA AND |
| Calexico, CA ......................... | SA CAL |
| Calexico East Port ................ | P IVP |
| El Centro Proc. Ctr., CA ........ | P ECC |
| *San Diego Port-of-Entry, CA | A SDP |
| *Otay Mesa, CA .................... | A OTM |
| *San Ysidro, CA .................... | SA SYS |
| *Tecata, CA ........................... | SA TEC |

**BILLING CODE 4410–10–M**

**U.S. Department of Justice**
Immigration and Naturalization Service (INS)

OMB #1115-0054
**Petition for Alien Relative**

| DO NOT WRITE IN THIS BLOCK - FOR EXAMINING OFFICE ONLY |
|---|

| Case ID# | Action Stamp | Fee Stamp |
|---|---|---|
| A# | | |
| G-28 or Volag # | | |

| Section of Law: | | Petition was filed on: _____ (priority date) |
|---|---|---|
| ☐ 201 (b) spouse  ☐ 203 (a)(1) | | ☐ Personal Interview       ☐ Previously Forwarded |
| ☐ 201 (b) child   ☐ 203 (a)(2) | | ☐ Pet. ☐ Ben. "A" File Reviewed    ☐ Stateside Criteria |
| ☐ 201 (b) parent  ☐ 203 (a)(4) | | ☐ Field Investigations      ☐ I-485 Simultaneously |
|                   ☐ 203 (a)(5) | | ☐ 204 (a)(2)(A) Resolved     ☐ 204 (h) Resolved |
| AM CON: _____ | | |

Remarks:

## A. Relationship

1. The alien relative is my
   ☐ Husband/Wife    ☐ Parent    ☐ Brother/Sister    ☐ Child

2. Are you related by adoption?    ☐ Yes    ☐ No

3. Did you gain permanent residence through adoption?    ☐ Yes    ☐ No

## B. Information about you

1. **Name** (Family name in CAPS)    (First)    (Middle)

2. **Address** (Number and Street)    (Apartment Number)

   (Town or City)    (State/Country)    (ZIP/Postal Code)

3. **Place of Birth** (Town or City)    (State/Country)

4. **Date of Birth** (Mo/Day/Yr)

5. **Sex**    ☐ Male    ☐ Female

6. **Marital Status**    ☐ Married    ☐ Single    ☐ Widowed    ☐ Divorced

7. **Other Names Used** (including maiden name)

8. **Date and Place of Present Marriage** (if married)

9. **Social Security Number**

10. **Alien Registration Number** (if any)

11. **Names of Prior Husbands/Wives**

12. **Date(s) Marriages(s) Ended**

13. If you are a U.S. citizen, complete the following:
    My citizenship was acquired through (check one)
    ☐ Birth in the U.S.
    ☐ Naturalization (Give number of certificate, date and place it was issued)

    ☐ Parents
       Have you obtained a certificate of citizenship in your own name?
       ☐ Yes    ☐ No
    If "Yes", give number of certificate, date and place it was issued

14a. If you are a lawful permanent resident alien, complete the following:
     Date and place of admission for, or adjustment to, lawful permanent residence, and class of admission:

14b. Did you gain permanent resident status through marriage to a United States citizen or lawful permanent resident? ☐ Yes    ☐ No

## C. Information about your alien relative

1. **Name** (Family name in CAPS)    (First)    (Middle)

2. **Address** (Number and Street)    (Apartment Number)

   (Town or City)    (State/Country)    (ZIP/Postal Code)

3. **Place of Birth** (Town or City)    (State/Country)

4. **Date of Birth** (Mo/Day/Yr)

5. **Sex**    ☐ Male    ☐ Female

6. **Marital Status**    ☐ Married    ☐ Single    ☐ Widowed    ☐ Divorced

7. **Other Names Used** (including maiden name)

8. **Date and Place of Present Marriage** (if married)

9. **Social Security Number**

10. **Alien Registration Number** (if any)

11. **Names of Prior Husbands/Wives**

12. **Date(s) Marriages(s) Ended**

13. Has your relative ever been in the U.S.?    ☐ Yes    ☐ No

14. If your relative is currently in the U.S., complete the following:  He or she last arrived as a  (visitor, student, stowaway, without inspection, etc.)

    Arrival/Departure Record (I-94) Number    Date arrived (Month/Day/Year)

    Date authorized stay expired, or will expire, as shown on Form I-94 or I-95

15. Name and address of present employer (if any)

    Date this employment began (Month/Day/Year)

16. Has you relative ever been under immigration proceedings?
    ☐ Yes    ☐ No    Where _____    When _____
    ☐ Exclusion    ☐ Deportation    ☐ Recission    ☐ Judicial Proceedings

| INITIAL RECEIPT | RESUBMITTED | RELOCATED | | COMPLETED | | |
|---|---|---|---|---|---|---|
| | | Rec'd | Sent | Approved | Denied | Returned |
| | | | | | | |

Form I-130 (Rev. 4/11/91) N

DOL_PRWORA_000065

## C. (continued) Information about your alien relative

16. **List husband/wife and all children of your relative** (if your relative is your husband/wife, list only his or her children).

| (Name) | (Relationship) | (Date of Birth) | (Country of Birth) |
|--------|----------------|-----------------|--------------------|
|        |                |                 |                    |
|        |                |                 |                    |
|        |                |                 |                    |

17. **Address in the United States where your relative intends to live**

(Number and Street)                    (Town or City)                    (State)

18. **Your relative's address abroad**

(Number and Street)    (Town or City)    (Province)    (Country)    (Phone Number)

19. **If your relative's native alphabet is other than Roman letters, write his or her name and address abroad in the native alphabet:**

(Name)    (Number and Street)    (Town or City)    (Province)    (Country)

20. **If filing for your husband/wife, give last address at which you both lived together:**    From    To

(Name)    (Number and Street)    (Town or City)    (Province)    (Country)    (Month)    (Year)    (Month)    (Year)

21. **Check the appropriate box below and give the information required for the box you checked:**

☐ Your relative will apply for a visa abroad at the American Consulate in _____

(City)    (Country)

☐ Your relative is in the United States and will apply for adjustment of status to that of a lawful permanent resident in the office of the Immigration and Naturalization Service at _____ . If your relative is not eligible for adjustment of status, he or she will

(City)    (State)

apply for a visa abroad at the American Consulate in _____ ,

(City)    (Country)

(Designation of a consulate outside the country of your relative's last residence does not guarantee acceptance for processing by that consulate. Acceptance is at the discretion of the designated consulate.)

## D. Other Information

1. If separate petitions are also being submitted for other relatives, give names of each and relationship.

2. Have you ever filed a petition for this or any other alien before?    ☐ Yes    ☐ No
   If "Yes," give name, place and date of filing, and result.

**Warning: The INS investigates claimed relationships and verifies the validity of documents. The INS seeks criminal prosecutions when family relationships are falsified to obtain visas.**

**Penalties: You may, by law be imprisoned for not more than five years, or fined $250,000, or both, for entering into a marriage contract for the purpose of evading any provision of the immigration laws and you may be fined up to $10,000 or imprisoned up to five years or both, for knowingly and willfully falsifying or concealing a material fact or using any false document in submitting this petition.**

**Your Certification: I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Furthermore, I authorize the release of any information from my records which the Immigration and Naturalization Service needs to determine eligibility for the benefit that I am seeking.**

Signature _____ Date _____ Phone Number _____

### Signature of Person Preparing Form if Other than Above

I declare that I prepared this document at the request of the person above and that it is based on all information of which I have any knowledge.

Print Name _____ (Address) _____ (Signature) _____ (Date) _____

G-28 ID Number _____

Volag Number _____

DOL_PRWORA _000066

### NOTICE TO PERSONS FILING FOR SPOUSES IF MARRIED LESS THAN TWO YEARS

Pursuant to section 216 of the Immigration and Nationality Act, your alien spouse may be granted conditional permanent resident status in the United States as of the date he or she is admitted or adjusted to conditional status by an officer of the Immigration and Naturalization Service. Both you and your conditional permanent resident spouse are required to file a petition, Form I-751, Joint Petition to Remove Conditional Basis of Alien's Permanent Resident Status, during the ninety day period immediately before the second anniversary of the date your alien spouse was granted conditional permanent residence.

Otherwise, the rights, privileges, responsibilities and duties which apply to all other permanent residents apply equally to a conditional permanent resident. A conditional permanent resident is not limited to the right to apply for naturalization, to file petitions in behalf of qualifying relatives, or to reside permanently in the United States as an immigrant in accordance with the immigration laws.

> **Failure to file Form I-751, Joint Petition to Remove the Conditional Basis of Alien's Permanent Resident Status, will result in termination of permanent residence status and initiation of deportation proceedings.**

**NOTE:** You must complete Items 1 through 6 to assure that petition approval is recorded. Do not write in the section below item 6.

1. Name of relative (Family name in CAPS)    (First)    (Middle)

2. Other names used by relative (Including maiden name)

3. Country of relative's birth    4. Date of relative's birth (Month/Day/Year)

5. Your name (Last name in CAPS) (First)    (Middle)    6. Your phone number

**Action Stamp**

| SECTION | DATE PETITION FILED |
|---|---|
| ☐ 201 (b)(spouse) | |
| ☐ 201 (b)(child) | |
| ☐ 201 (b)(parent) | |
| ☐ 203 (a)(1) | ☐ STATESIDE |
| ☐ 203 (a)(2) | CRITERIA GRANTED |
| ☐ 203 (a)(4) | |
| ☐ 203 (a)(5) | SENT TO CONSUL AT; |

### CHECKLIST

Have you answered each question?
Have you signed the petition?
Have you enclosed:

☐ The filing fee for each petition?
☐ Proof of your citizenship or lawful permanent residence?
☐ All required supporting documents for each petition?

**If you are filing for your husband or wife have you included:**

☐ Your picture?
☐ His or her picture?
☐ Your G-325A?
☐ His or her G-325A?

Relative Petition Card
Form I-130A (Rev. 4/11/91) N

DOL_PRWORA _000067

**U.S. Department of Justice**
Immigration and Naturalization Service (INS)

**Petition for Alien Relative**

## Instructions

**Read the instructions carefully. If you do not follow the instructions, we may have to return your petition, which may delay final action. If more space is needed to complete an answer continue on separate sheet of paper.**

**1. Who can file?**
A citizen or lawful permanent resident of the United States can file this form to establish the relationship of certain alien relatives who may wish to immigrate to the United States. You must file a separate form for each eligible relative.

**2. For whom can you file?**
A. If you are a citizen, you may file this form for:
1) your husband, wife, or unmarried child under 21 years old
2) your unmarried child over 21, or married child of any age
3) your brother or sister if you are at least 21 years old
4) your parent if you are at least 21 years old.
B. If you are a lawful permanent resident you may file this form for:
1) your husband or wife
2) your unmarried child
**Note:** If your relative qualifies under instruction A(2) or A(3) above, separate petitions are not required for his or her husband or wife or unmarried children under 21 years old. If your relative qualifies under instruction B(2) above, separate petitions are not required for his or her unmarried children under 21 years old. These persons will be able to apply for the same type of immigrant visa as your relative.

**3. For whom can you not file?**
Your cannot file for people in the following categories:
A. An adoptive parent or adopted child, if the adoption took place after the child became 16 years old, or if the child has not been in the legal custody and living with the parent(s) for at least two years.
B. A natural parent if the United States citizen son or daughter gained permanent residence through adoption.
C. A stepparent or stepchild, if the marriage that created this relationship took place after the child became 18 years old.
D. A husband or wife, if your were not both physically present at the marriage ceremony, and the marriage was not consummated.
E. A husband or wife if you gained lawful permanent resident status by virtue of a prior marriage to a United States citizen or lawful permanent resident unless:
1) a period of five years has elapsed since you became a lawful permanent resident; OR
2) you can establish by clear and convincing evidence that the prior marriage (through which you gained your immigrant status) was not entered into for the purpose of evading any provision of the immigration laws; OR
3) your prior marriage (through which you gained your immigrant status) was terminated by the death of your former spouse.
F. A husband or wife if he or she was in exclusion, deportation, rescission, or judicial proceedings regarding his or her right to remain in the United States when the marriage took place, unless such spouse has resided outside the United States for a two-year period after the date of the marriage.
G. A husband or wife if the Attorney General has determined that such alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.
H. A grandparent, grandchild, nephew, niece, uncle, aunt, cousin, or in-law.

**4. What documents do your need?**
You must give INS certain documents with this form to prove you are eligible to file. You must also give the INS certain documents to prove the family relationship between you and your relative.
A. For each document needed, give INS the original and one copy. However, because it is against the law to copy a Certificate of Naturalization, a Certificate of Citizenship or an Alien Registration Receipt Card (Form I-151 or I-551) give INS the original only. **Originals will be returned to you.**
B. If you do not wish to give INS the original document, you may give INS a copy. The copy must be certified by:
1) an INS or U.S. consular officer, or
2) an attorney admitted to practice law in the United States, or
3) an INS accredited representative (INS may still require originals).
C. Documents in a foreign language must be accompanied by a complete English translation. The translator must certify that the translation is accurate and that he or she is competent to translate.

**5. What documents do you need to show you are a United States citizen?**
A. If you were born in the United States, give INS your birth certificate.
B. If you were naturalized, give INS your original Certificate of Naturalization.
C. If you were born outside the United States, and you are a U.S. citizen through your parents, give INS:
1) your original Certificate of Citizenship, or
2) your Form FS-240 (Report of Birth Abroad of a United States Citizen).
D. In place of any of the above, you may give INS your valid unexpired U.S. passport that was initially issued for at least 5 years.
E. If you do not have any of the above and were born in the United States, see instruction under 8 below. "What if a document is not available?"

**6. What documents do you need to show you are a permanent resident?**
You must give INS your alien registration receipt card (Form I-151 or Form I-551). Do not give INS a photocopy of the card.

**7. What documents do you need to prove family relationship?**
You have to prove that there is a family relationship between your relative and yourself.

In any case where a marriage certificate is required, if either the husband or wife was married before, you must give INS documents to show that all previous marriages were legally ended. In cases where the names shown on the supporting documents have changed, give INS legal documents to show how the name change occurred (for example a marriage certificate, adoption decree, court order, etc.)

Find the paragraph in the following list that applies to the relative for whom you are filing.

Form I-130 (Rev. 4/11/91) N

DOL_PRWORA _000068

If you are filing for your:

A. **husband or wife,** give INS
1) your marriage certificate
2) a color photo of you and one of your husband or wife, taken within 30 days of the date of this petition. These photos must have a white background. They must be glossy, unretouched, and not mounted. The dimension of the facial image should be about 1 inch from chin to top of hair in 3/4 frontal view, showing the right side of the face with the right ear visible. Using pencil or felt pen, lightly print name (and Alien Registration Number, if known) on the back of each photograph.
3) a completed and signed G-325A (Biographic Information) for you and one for your husband or wife. Except for name and signature, you do not have to repeat on the G-325A the information given on your I-130 petition.

B. **child** and you are the **mother,** give the child's birth certificate showing your name and the name of your child.

C. **child** and you are the **father or stepparent,** give the child's birth certificate showing both parents' names and your marriage certificate. **Child** born out of wedlock and you are the **father,** give proof that a parent/child relationship exists or existed. For example, the child's birth certificate showing your name and evidence that you have financially supported the child. (A blood test may be necessary).

D. **brother or sister,** your birth certificate and the birth certificate of your brother or sister showing both parents' names. If you do not have the same mother, you must also give the marriage certificates of your father to both mothers.

E. **mother,** give your birth certificate showing your name and the name of your mother.

F. **father,** give your birth certificate showing the names of both parents and your parents' marriage certificate.

G. **stepparent,** give your birth certificate showing the names of both natural parents and the marriage certificate of your parent to your stepparent.

H. **adoptive parent or adopted child,** give a certified copy of the adoption decree, the legal custody decree if you obtained custody of the child before adoption, and a statement showing the dates and places you have lived together with the child.

8. **What if a document is not available?**
If the documents needed above are not available, you can give INS the following instead. (INS may require a statement from the appropriate civil authority certifying that the needed document is not available.)

A. Church record: A certificate under the seal of the church where the baptism, dedication, or comparable rite occurred within two months after birth, showing the date and place of child's birth, date of the religious ceremony, and the names of the child's parents.

B. School record: A letter from the authorities of the school attended (preferably the first school), showing the date of admission to the school, child's date and place of birth, and the names and places of birth parents, if shown in the school records.

C. Census record: State or federal census record showing the names, place of birth, and date of birth or the age of the person listed.

D. Affidavits: Written statements sworn to or affirmed by two persons who were living at the time and who have personal knowledge of the event you are trying to prove; for example, the date and place of birth, marriage, or death. The persons making the affidavits need not be citizens of the United States. Each affidavit should contain the following information regarding the person making the affidavit: his or her full name, address, date and place of birth, and his or her relationship to you, if any; full information concerning the event; and complete details concerning how the person acquired knowledge of the event.

9. **How should you prepare this form?**
A. Type or print legibly in ink.
B. If you need extra space to complete any item, attach a continuation sheet, indicate the item number, and date and sign each sheet.
C. Answer all questions fully and accurately. If any item does not apply, please write "N/A".

10. **Where should you file this form?**
A. If you live in the United States, send or take the form to the INS office that has jurisdiction over where you live.
B. If you live outside the United States, contact the nearest American Consulate to find out where to send or take the completed form.

11. **What is the fee?**
You must pay seventy five dollars ($75.00) to file this form. **The fee will not be refunded, whether the petition is approved or not.** DO NOT MAIL CASH. All checks or money orders, whether U.S. or foreign, must be payable in U.S. currency at a financial institution in the United States. When a check is drawn on the account of a person other than yourself, write your name on the face of the check. If the check is not honored, INS will charge you $5.00.

Pay by check or money order in the exact amount. Make the check or money order payable to "Immigration and Naturalization Service". However,
A. if you live in Guam: Make the check or money order payable to "Treasurer, Guam", or
B. if you live in the U.S. Virgin Islands: Make the check or money order payable to "Commissioner of Finance of the Virgin Islands".

12. **When will a visa become available?**
When a petition is approved for the husband, wife, parent, or unmarried minor child of a United States citizen, these relatives do not have to wait for a visa number, as they are not subject to the immigrant visa limit. However, for a child to qualify for this category, all processing must be completed and the child must enter the United States before his or her 21st birthday.

For all other alien relatives there are only a limited number of immigrant visas each year. The visas are given out in the order in which INS receives properly filed petitions. To be considered properly filed, a petition must be completed accurately and signed, the required documents must be attached, and the fee must be paid.

For a monthly update on the dates for which immigrant visas are available, you may call (202) 647-0508.

13. **What are the penalties for committing marriage fraud or submitting false information or both?**
Title 8, United States Code, Section 1325 states that any individual who knowingly enters into a marriage contract for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than five years, or fined not more than $250,000.00 or both.

Title 18, United States Code, Section 1001 states that whoever willfully and knowingly falsifies a material fact, makes a false statement, or makes use of a false document will be fined up to $10,000 or imprisoned up to five years, or both.

14. **What is our authority for collecting this information?**
We request the information on the form to carry out the immigration laws contained in Title 8, United States Code, Section 1154(a). We need this information to determine whether a person is eligible for immigration benefits. The information you provide may also be disclosed to other federal, state, local, and foreign law enforcement and regulatory agencies during the course of the investigation required by this Service. You do not have to give this information. However, if you refuse to give some or all of it, your petition may be denied.

15. **Reporting Burden.**
Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Department of Justice, Immigration and Naturalization Service (Room 5304), Washington, D.C. 20536; and to the Office of Management and Budget, Paperwork Reduction Project, OMB No. 1115-0054, Washington, D.C. 20503.

It is not possible to cover all the conditions for eligibility or to give instructions for every situation. If you have carefully read all the instructions and still have questions, please contact your nearest INS office.

**U.S. Department of Justice**
Immigration and Naturalization Service

Order to Show Cause and Notice of Hearing

# ORDER TO SHOW CAUSE AND NOTICE OF HEARING
## (ORDEN DE PRESENTAR MOTIVOS JUSTIFICANTES Y AVISO DE AUDIENCIA)

In Deportation Proceedings under section 242 of the Immigration and Nationality Act.
*(En los trámites de deportación a tenor de la sección 242 de la Ley de Inmigración y Nacionalidad.)*

**United States of America:**
**(Estados Unidos de América:)**

**File No.** _____
*(No. de registro)*

**Dated** _____
**(Fechada)**

In the matter of
*(En el asunto de)* _____ (Respondent)
*(Demandado)*

Address
*(Dirección)* _____

_____

Telephone No. (Area Code) _____
*(No. de teléfono y código de área)*

Upon inquiry conducted by the Immigration and Naturalization Service, it is alleged that:
*(Según las indagaciones realizadas por el Servicio de Inmigración y Naturalización, se alega que:)*

1) You are not a citizen or national of the United States;
   *(Ud. no es ciudadano o nacional de los Estados Unidos)*

2) You are a native of _____ and a citizen of _____ ;
   *(Ud. es nativo de)* *(y ciudadano de)*

3) You entered the United States at or near _____ on or about _____ ;
   *(Ud. entró a los Estados Unidos en o cerca de)* *(el día o hacia esa fecha)*

Form I-221 (Rev. 6/12/92) N

Page 1

DOL_PRWORA_000070

**61404**    **Federal Register** / Vol. 62, No. 221 / Monday, November 17, 1997 / Notices

Page 2

**U.S. Department of Justice**
Immigration and Naturalization Service

Order to Show Cause and Notice of Hearing

## NOTICE OF RIGHTS AND CONSEQUENCES

The Immigration and Naturalization Service believes that you are an alien not lawfully entitled to be in or to remain in the United States. Read this notice carefully and ask questions about anything in this notice you do not understand. This notice identifies your rights as an alien in deportation proceedings, and your obligations and the conditions with which you must comply in order to protect your eligibility to be considered for certain benefits.

Any statement you make before an Immigration Officer may be used against you in any immigration or administrative proceeding.

You may be represented, at no expense to the United States government, by an attorney or other individual who is authorized and qualified to represent persons in these proceedings. You will be given a list of organizations, attorneys and other persons who have indicated their availability to represent aliens in these proceedings. Some of these persons may represent you free of charge or for a nominal fee. You may also be represented by a friend, relative, or other person having a pre-existing relationship with you, provided his or her appearance is permitted by the immigration judge.

You will have a hearing before an immigration judge, scheduled **no sooner than 14 days from the date you are served with this Order to Show Cause (unless you request in writing an earlier hearing date).** The fourteen-day period is to allow you to seek an attorney or representative, if you desire to be represented. At your hearing, you will be given the opportunity to admit or deny any or all of the allegations in this Order to Show Cause, and whether you are deportable on the charges set forth herein. You will have an opportunity to present evidence and/or witnesses on your own behalf, to examine evidence presented by the government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the government. Any document that you present that is in a foreign language must be accompanied by a certified English translation. It is your responsibility to ensure that any witnesses you wish to present on your own behalf be present at the hearing.

The immigration judge will advise you regarding relief from deportation for which you may be eligible. You will be given a reasonable opportunity to make an application for any such relief. If you are not satisfied with the decision of the immigration judge, you have the right to appeal. The immigration judge will provide you with your appeal rights.

## AVISO DE DERECHOS Y CONSECUENCIAS

El Servicio de Inmigración y Naturalización opina que Ud. es un extranjero sin derecho legal a estar o permanecer en los Estados Unidos. Lea este aviso cuidadosamente y pregunte acerca de cualquier parte del mismo que no entienda. Este aviso le explica los derechos que tiene como extranjero en los trámites de deportación, y las obligaciones y condiciones que debe cumplir con el fin de proteger su derecho a que se le considere para recibir ciertos beneficios.

Las declaraciones que haga ante un funcionario del Servicio de Inmigración podrán usarse en su contra en cualquier trámite administrativo o de inmigración.

Ud. puede ser representado, sin costo alguno para el gobierno de los Estados Unidos, por un abogado o otra persona autorizada y calificada para representar personas en estos trámites. Ud. recibirá una lista de las entidades, abogados y demás personas dispuestas a representar a extranjeros en estos trámites. Algunas de esas personas pueden representarle gratuitamente o por honorarios nominales. También puede representarle un amigo, familiar o otra persona con la que tenga una relación establecida, siempre que el juez de inmigración permita su comparecencia.

Ud. tendrá una audiencia ante un juez de inmigración, fijada **con un mínimo de 14 días a partir de la fecha que se le expidio esta Orden (a menos que Ud. solicite por escrito una audiencia en plazo aún menor).** El plazo de catorce días le permitirá conseguir los servicios de un abogado o representante, si lo desea. En la audiencia se le dará la oportunidad de admitir o negar cualquiera de los alegatos de esta Orden o todos ellos, y se le informará si está sujeto a deportación por los cargos expresados en la misma. Ud. tendrá la oportunidad de presentar pruebas y testigos a favor suyo, de examinar las pruebas presentadas por el gobierno, de oponerse, con base en los razonamientos legales pertinentes, a la admisión de pruebas y de interrogar a cualquier testigo del gobierno. Todo documento que presente en un idioma extranjero debe ir acompañado de una traducción certificada al inglés. Será responsabilidad suya asegurarse de que cualquier testigo suyo comparesca a la audiencia.

El juez de inmigración le informará sobre los recursos de deportación a los que tenga derecho y se le dará una oportunidad adecuada para solicitarlos. Si no está de acuerdo con la decisión del juez, puede apelarla. El juez de inmigración le informará acerca de sus derechos de apelación.

Form I-221 (Rev. 6/12/92) N

DOL_PRWORA _000071

**U.S. Department of Justice**
Immigration and Naturalization Service

Order to Show Cause and Notice of Hearing

Dated _____
(Fechada)

Respondent _____

File No. _____

(Demandado)

(No. de registro)

**AND** on the basis of the foregoing allegations, it is charged that you are subject to deportation pursuant to the following provision(s) of law:

*(Y según los alegatos anteriores, se le acusa de estar sujeto a deportación de acuerdo con la(s) siguiente(s) disposicion(es) de la ley:)*

**WHEREFORE, YOU ARE ORDERED** to appear for a hearing before an Immigration Judge of the Executive Office for Immigration Review of the United States Department of Justice at:

*(POR LO CUAL, SE LE ORDENA comparecer ante un juez de inmigración de la Oficina Ejecutiva de Revisión de Inmigración del Departamento de Justicia de los Estados Unidos en:)*

Address _____
(Dirección)

On _____    At _____ .m.
(Fecha)                                        (Hora)

and show cause why you should not be deported from the United States on the charge(s) set forth above.
*(y mostrar motivos justificantes por cual no deberia ser deportado de los Estados Unidos por los cargos expresados anteriormente.)*

Dated _____
(Fechada)

Signature of Issuing Officer _____
(Firma del funcionario que la expide)

City and State of Issuance _____
(Ciudad y Estado donde se expide)

Title of Issuing Officer _____
(Título del funcionario que la expide)

Form I-221 (Rev. 6/12/92) N

Page 3

You are required to be present at your deportation hearing prepared to proceed. If you fail to appear at any hearing after having been given written notice of the date, time and location of your hearing, you will be ordered deported *in your absence*, if it is established that you are deportable and you have been provided the appropriate notice of the hearing.

You are required by law to provide immediately in writing an address (and telephone number, if any) where you can be contacted. You are required to provide written notice, within five (5) days, of any change in your address or telephone number to the office of the Immigration Judge listed in this notice. Any notices will be mailed only to the last address provided by you. If you are represented, notice will be sent to your representative. If you fail to appear at the scheduled deportation hearing, you will be ordered deported *in your absence* if it is established that you are deportable and you have been provided the appropriate notice of the hearing.

If you are ordered deported *in your absence*, you cannot seek to have that order rescinded except that: (a) you may file a motion to reopen the hearing within 180 days after the date of the order if you are able to show that your failure to appear was because of exceptional circumstances, or (b) you may file a motion to reopen at any time after the date of the order if you can show that you did not receive written notice of your hearing and you had provided your address and telephone number (or any changes of your address or telephone number) as required, or that you were incarcerated and did not appear at your hearing through no fault of your own. If you choose to seek judicial review of a deportation order entered *in your absence*, you must file the petition for review within 60 days (30 days if you are convicted of an aggravated felony) after the date of the final order, and the review shall be confined to the issues of validity of the notice provided to you, the reasons for your failure to appear at your hearing, and whether the government established that you are deportable.

In addition to the above, if you are ordered deported *in your absence*, you are ineligible for five (5) years from the date of the final order for the following relief from deportation: voluntary departure under section 242 (b) of the Immigration and Nationality Act (INA); suspension of deportation or voluntary departure under section 244 of the INA; and adjustment of status under sections 245, 248, and 249 of the INA.

**The copy of this Order to Show Cause served upon you is evidence of your alien registration while you are under deportation proceedings. The law requires that you carry it with you at all times.**

Está obligado a asistir a la audiencia de deportación y de estar preparado para ella. Si no asiste a cualquiera de las audiencias después de haber sido notificado por escrito de la fecha, hora y lugar de la audiencia, se ordenará su deportación **en su ausencia,** si se establece que puede ser deportado y que recibió los avisos correspondientes.

La ley le obliga a informar inmediatamente por escrito de su domicilio (y número de teléfono, de haberlo) donde pueda ser localizado. Tiene la obligación de notificar por escrito, en el plazo de cinco (5) diás, cualquier cambio de domicilio o de teléfono a la oficina del juez de inmigración que aparece en este aviso. Los avisos se enviarán solamente a la última dirección facilitada por Ud. Si ha decidido tener un representante, se enviarán los avisos a dicha persona. Si no asiste a cualquiera de las audiencias después de haber sido notificado por escrito de la fecha, hora y lugar de las mismas, se ordenará su deportación **en su ausencia,** si se establece que puede ser deportado y que recibió el aviso de la audiencia.

Si se ordena su deportación **en su ausencia,** no podrá solicitar la anulación de esa orden salvo que: a) pueda presentar un pedimento para tener otra audiencia en el plazo de 180 días después de la fecha de la orden si puede demostrar que no compareció debido a circunstancias excepcionales, o b) puede presentar un pedimento para tener otra audiencia en cualquier momento después de la fecha de la orden si puede demostrar que no recibió el aviso de la audiencia por escrito y que había facilitado su dirección y número de teléfono (o notificado los cambios de dirección o número de teléfono) según lo previsto, o que estaba encarcelado y no compareció a la audiencia por motivos ajenos a su voluntad. Si decide solicitar una revisión judicial de la orden de deportación **en su ausencia,** debe presentar la solicitud de revisión en el plazo de 60 días (30 días si ha sido condenado por un delito grave con agravantes) a partir de la fecha de la orden definitiva, y la revisión se limitará a decidir si el aviso que recibió es válido, las razones por las cuales no compareció a la audiencia y si el gobierno demostró que puede ser deportado.

Además de lo anterior, si se ordena su deportación **en su ausencia,** no podrá, en el plazo de cinco años después de la fecha de la orden definitiva, tener derecho a los siguientes recursos: salida voluntaria según la sección 242 (b) de la ley de Inmigración y Nacionalidad (INA); suspensión de la deportación o de la salida voluntaria según la sección 244 de la INA, y ajuste de condición según las secciones 245, 248, y 249 de la INA.

**Esta copia de la Orden de Presentar Motivos Justificantes que le ha sido notificada constituye la prueba de su registro de extranjero mientras se llevan a cabo los trámites para su deportación. La ley le exige que la lleve consigo en todo momento.**

Form I-221 (Rev. 6/12/92) N

This Order to Show Cause shall be filed with the Immigration Judge of the Executive Office for Immigration Review at the address provided below. You must report any changes of your address or telephone number in writing to this office:

Esta Orden de Presentar Motivos Justificantes será registrada con la Oficina Ejecutiva de Revisión de Inmigración en la siguiente dirección. Debe notificar cualquier cambio de su domicilio o número de teléfono por escrito a:

### The Office of the Immigration Judge

_____

_____

_____

### Certificate of Translation and Oral Notice

This Order to Show Cause ☐ **was**    ☐ **was not**    read to the named alien in the _____ language, which is his/her native language or a language which he/she understands.

_____
Date                          Signature                                    Printed Name and Title of Translator

Address of Translator (If other than INS employee) or office location and division (if INS employee)

(If oral notice was not provided please explain)

| Manner of Service | Alien's Right Thumb Print |
|---|---|
| ☐ Personal Service to Alien | |
| ☐ Certified Mail - Return Receipt Requested | |
| ☐ Alien | |
| ☐ Counsel of Record | |

### Certificate of Service

This Order to Show Cause was served by me at _____ on _____ 19 ___
at _____ m.

_____
Officer's Signature          Printed Name          Title          Office

_____
Alien's Signature (acknowledgment/receipt of this form)
(Firma de extranjero/acuse de recibo)

### Request for Prompt Hearing and Waiver of 14-Day Minimum Period
### (Solicitud de audiencia inmediata y renuncia al plazo mínimo de 14 días)

To expedite determination of my case, I request an immediate hearing, and waive my right to the 14 day notice.
(Para agilizar la decisión sobre mi caso, solicito una audiencia inmediata y renuncio a mi derecho a un plazo mínimo de 14 días.)

_____          _____
Signature of Respondent                        Date
(Firma de demandado)                           (Fecha)

Form I-221 (Rev. 6/12/92) N                                                    Page 5

**U.S. Department of Justice**

Immigration and Naturalization Service

## Notice to Appear

### In removal proceedings under section 240 of the Immigration and Nationality Act

File No: _____

In the Matter of:

Respondent: _____ currently residing at:

_____          _____
               (Number, street, city, state and ZIP code)          (Area code and phone number)

☐ 1. You are an arriving alien.

☐ 2. You are an alien present in the United States who has not been admitted or paroled.

☐ 3. You have been admitted to the United States, but are deportable for the reasons stated below.

The Service alleges that you:

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8 CFR 208.30(f)(2)  ☐ 8 CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at: _____

_____
     (Complete Address of Immigration Court, Including Room Number, if any)

on _____ at _____ to show why you should not be removed from the United States based on the
    (Date)          (Time)

charge(s) set forth above.

_____
      (Signature and Title of Issuing Officer)

Date: _____

_____
      (City and State)

### See reverse for important information

Form I-862 (Rev. 4-1-97)

DOL_PRWORA_000075

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 3.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this Notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents which you desire to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certified English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or deportable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge.

You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

### Request for Prompt Hearing

To expedite a determination in my case, I request an immediate hearing. I waive my right to have a 10-day period prior to appearing before an immigration judge.

_____
(Signature of Respondent)

Before:

Date: _____

_____
(Signature and Title of INS Officer)

### Certificate of Service

This Notice to Appear was served on the respondent by me on _____, in the following manner and in
(Date)
compliance with section 239(a)(1)(F) of the Act:

☐ in person          ☐ by certified mail, return receipt requested          ☐ by regular mail

☐ Attached is a list of organizations and attorneys which provide free legal services.

☐ The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____                    _____
(Signature of Respondent if Personally Served)              (Signature and Title of Officer)

Form I-862 (Rev. 4-1-97)

**BILLING CODE 4410–10–M**

DOL_PRWORA _000076

**Attachment 6—Interim Guidance—Documentary Evidence for Excepted Categories of Aliens Eligible for SSI, Food Stamps, TANF, Medicaid, and Programs Funded by a Social Services Block Grant**

Under Section 402 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act''), only certain excepted categories of aliens remain eligible for SSI and Food Stamps. States may also limit eligibility for TANF, Medicaid and programs funded by a Social Services Block Grant to certain excepted categories of aliens. Some of the excepted categories enjoy unqualified exemptions from the restrictions in section 402, while others are exempted for limited time periods. The exceptions for each program, and the documents that may be used to determine eligibility under these exceptions, are set forth below.

*Exceptions*

A. *SSI*

Certain categories of aliens are excepted from the restrictions on SSI eligibility imposed by Section 402. If an alien falls within one of the categories listed below, he or she remains eligible for SSI:

• Lawfully admitted permanent resident aliens who have worked or can be credited with 40 qualifying quarters (any quarter after December 31, 1996 cannot be counted if the alien received any federal means-tested public benefit during that quarter);

• Qualified aliens lawfully residing in any State who are honorably discharged veterans and who fulfill minimum active-duty service requirements, or who are on non-training active duty in the U.S. Armed Forces, or who are the spouse, unmarried dependent child, or unremarried surviving spouse of such a veteran or active-duty personnel, provided that, in the latter case, the marriage satisfies the requirements of 38 U.S.C. 1304 (see DOD/VA Guidance attached as Exhibit B hereto);

• Qualified aliens lawfully residing in the United States who were receiving SSI on August 22, 1996;

• Qualified aliens who were lawfully residing in the United States on August 22, 1996, and who are blind or disabled;

• American Indians born in Canada and to whom the provisions of section 289 of the INA apply;

• Members of an Indian tribe (as defined in section 4(e) of the Indian Self-Determination and Education Assistance Act); or

• Qualified aliens receiving SSI benefits after July 1996 on the basis of an application filed before January 1,

1979, if the Commissioner of Social Security lacks clear and convincing evidence that such individuals are otherwise ineligible under section 402.

Other categories of aliens remain eligible for SSI for only a limited time period:

• Asylees, for a period of seven years after obtaining such status;

• Aliens whose deportation or removal has been withheld, for a period of seven years after obtaining such status;

• Refugees, for a period of seven years after the date they entered the U.S. as refugees;

• Cuban/Haitian entrants, as defined in section 501(c) of the Refugee Education Assistance Act of 1980, for a period of seven years after they obtain such status; and

• Amerasian immigrants admitted to the U.S. pursuant to section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, for a period of seven years after their admission.

B. *Medicaid*

Regardless of whether a State chooses to impose additional restrictions on the eligibility of aliens to receive Medicaid, the following categories of aliens are eligible:

• Lawfully admitted permanent resident aliens who have worked or can be credited with 40 qualifying quarters (any quarter after December 31, 1996 cannot be counted if the alien received any federal means-tested public benefit during that quarter);

• Qualified aliens lawfully residing in any State who are honorably discharged veterans and who fulfill minimum active-duty service requirements, or who are on non-training active duty in the U.S. Armed Forces, or who are the spouse, unmarried dependent child, or unremarried surviving spouse of such a veteran or active-duty personnel, provided that, in the latter case, the marriage satisfies the requirements of 38 U.S.C. 1304 (see DOD/VA Guidance attached as Exhibit B hereto);

• American Indians born in Canada and to whom the provisions of section 289 of the INA apply; and

• Members of an Indian tribe (as defined in section 4(e) of the Indian Self-Determination and Education Act).

Time-limited exceptions apply to the following categories:

• Asylees, for a period of seven years after obtaining such status;

• Aliens whose deportation or removal has been withheld, for a period of seven years after obtaining such status;

• Refugees, for a period of seven years after the date they entered the U.S. as refugees;

• Cuban/Haitian entrants, as defined in section 501(e) of the Refugee Education Assistance Act of 1980, for a period of seven years after they obtain such status; and

• Amerasian immigrants admitted to the U.S. pursuant to section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, for a period of seven years after their admission.

Also, any alien receiving SSI benefits retains derivative eligibility for Medicaid, regardless of whether he or she is otherwise ineligible for Medicaid under the Act.

C. Food Stamps, TANF, and Social Services Block Grant Programs

With respect to TANF and programs funded by a Social Services Block Grant, states have the option of limiting aliens' eligibility for such programs. As an initial matter, then, you should determine whether your State has imposed additional eligibility requirements. Even if your State has chosen to impose such restrictions, the following categories of aliens would remain eligible for Food Stamps, TANF, and programs funded by a Social Services Block Grant, without any time limitation:

• Lawfully admitted permanent resident aliens who have worked or can be credited with 40 qualifying quarters (any quarter after December 31, 1996 cannot be counted if the alien received any federal means-tested public benefit during that quarter); and

• Qualified aliens lawfully residing in any State who are honorably discharged veterans and who fulfill minimum active-duty service requirements, or who are on non-training active duty in the U.S. Armed Forces, or who are the spouse, unmarried dependent child, or unremarried surviving spouse of such a veteran or active-duty personnel, provided that, in the latter case, the marriage satisfies the requirements of 38 U.S.C. § 1304 (see DOD/VA Guidance attached as Exhibit B hereto).

Time-limited exceptions apply to the following categories:

• Asylees, for a period of five years after obtaining such status;

• Aliens whose deportation of removal has been withheld, for a period of five years after obtaining such status;

• Refugees, for a period of five years after the date they entered the U.S. as refugees;

• Cuban/Haitian entrants, as defined in section 501(e) of the Refugee Education Assistant Act of 1980, for a

DOL_PRWORA _000077

period of five years after they obtain such status; and

• Amerasian immigrants admitted to the U.S. pursuant to section 84 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, for a period of five years after their admission.

Unlike the derivative eligibility provision for Medicaid, aliens receiving SSI benefits for *not* entitled to derivative eligibility for Food Stamps if they are otherwise ineligible for Food Stamp benefits under the Act.

*Documentation of Exceptions*

The documents listed below (examples of which are attached to Attachment 5 of the Interim Guidance) establish that an applicant falls within one of the excepted categories of aliens.

Under the INA, all aliens over the age of 14 who remain in the United States for longer than 30 days are required to register with the Immigration and Naturalization Service (the ''INS'') and obtain an alien registration document; all aliens over the age of 18 who receive a registration document are required to carry it with them at all times. With certain exceptions (*e.g.,* Canadian visitors), aliens entering the U.S. are normally issued a registration document (*e.g.,* an INS Form I–94) at the time of entry. The documents listed below that are registration documents are indicated with an asterisk (''*'').

Each of the documents listed below will demonstrate lawful status, and you should not require presentation of a registration document if the applicant presents one for the other legally acceptable documents that reasonably appears on its face to be genuine and to relate to the person presenting it. However, if the document presented is not a registration document and does not on its face reasonably appear to be genuine or to relate to the person presenting it, it is appropriate to ask the applicant to produce his or her registration document as additional evidence of immigration status, so long as the request is not made for a discriminatory reason (see Nondiscrimination Advisory, Attachment 2 to Interim Guidance). Presentation of a registration document listed below that reasonably appears on its face to be genuine and to relate to the person presenting it (or to satisfy a higher applicable standard) will often obviate the need to verify the applicant's immigration status with the INS; if the applicant presents a registration document that does not meet this standard, sending the INS a copy of the document will assist it in

verifying the applicant's status quickly and accurately.

Alien Lawfully Admitted for Permanent Resident (''LPR'') under the INA Who Has Worked or Can Be Credited With 40 Qualifying Quarters or Who is Otherwise Eligible

LPR:

• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a ''green card''); or

• Unexpired temporary I–551 stamp in foreign passport or on *INS Form I–94.

*40 Qualifying Quarters:* Until you have access to SSA's automated system for verifying qualifying quarters, refer to the SSA Guidance attached as Exhibit A for guidance on how to verify 40 qualifying quarters. NOTE: Any quarter after December 31, 1996, cannot be counted if the alien received any federal means-tested public benefit during that quarter.

*LPR Who is Otherwise Eligible:* An LPR who does not have 40 qualifying quarters will still be eligible if he or she:

• entered the U.S. as a refugee within the previous five years, was granted asylum during the previous five years, or had his or her deportation or removal withheld within the previous five years:

If an applicant attests to having been admitted as a refugee within the previous five years, review the applicant's INS Form I–551 (green card) for code RE–6, RE–7, RE–8 or RE–9, and derive the date of admission from the date on the card.

If an applicant attests to having been granted asylum or having had deportation or removal withheld within the previous five years, file INS Form G–845 and Supplement along with a copy of the I–551 with the local INS office to verify status.

or

• is an honorably discharged veteran who fulfilled minimum active-duty service requirements, or is a person on none-training active duty or is the spouse, dependent child, or unremarried surviving spouse of such a person:

Referer to DOD Guidance attached as Exhibit B for guidance on how to verify such status.

Qualified Alien Lawfully Residing in State Who Is an Honorably Discharged Veteran, On Non-Training Active Duty in the U.S. Armed Forces, or the Spouse, Unmarried Dependent Child, or Unremarried Surviving Spouse of Such a Veteran or Active-Duty Personnel

• Refer to Attachment 5 to the Interim Guidance for documentation of qualified alien status; and

• Refer to DOD/VA Guidance attached as Exhibit B for guidance on how to verify veteran and active duty status.

Qualified Alien Lawfully Residing in the U.S. Who Was Receiving SSI on August 22, 1996.

• Contact SSA for guidance on appropriate documentation.

Qualified Alien Lawfully Residing the U.S. on August 22, 1996 Who Is Blind or Disabled

• Contact SSA for guidance on appropriate documentation.

Qualified Alien Receiving SSI Benefits After July 1996 on the Basis of An Application Filed Before January 1, 1979:

• Contact SSA for guidance on appropriate documentation.

American Indians Born in Canada and Covered By Section 289 of the INA

• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a ''green card'') with the code S13;

Unexpired temporary I–551 stamp in Canadian passport or on *INS Form I–94 with the code S13; or

• A letter or other tribal document certifying at least 50 per centum American Indian blood, as required by INA Section 289, combined with a birth certificate or other satisfactory evidence of birth in Canada.

Members of an Indian Tribe

• Membership card or other tribal document demonstrating membership in a federally-recognized Indian tribe under section 4(e) of the Indian Self-Determination and Education Assistance Act. Contact Soo Song, Deputy Director, Office of Tribal Justice, United States Department of Justice, (202) 415–8812, for a list of federally-recognized tribes under section 4(e).

• If the individual has no document evidencing tribal membership, contact the tribal government for confirmation of the individual's membership. Tribal government contact lists are available from Soo Song, Deputy Director, Office of Tribal Justice, Department of Justice, (202) 514–8812.

Asylee

• *INS Form I–94 annotated with stamp showing grant of asylum under § 208 of the INA;

• *INS Form I–688B (Employment Authorization Card) annotated ''274a12(a)(5)'';

• INS Form I–766 (Employment Authorization Document) annotated ''A5'';

• Grant letter from the Asylum Office of INS; or

• Order of an immigration judge granting asylum.

*Seven or Five-Year Limit:* Where eligibility is limited to asylees who obtained asylee status within the previous seven or five years, INS Form I–94, the INS grant letter and the court order will each include the date asylee status was granted; if the applicant cannot provide any of these documents, file INS Form G–845 and Supplement along with a copy of the documents indicating asylee status with the local INS office to verify the date the status was granted.

Refugee

• *INS Form I–94 annotated with stamp showing admission under section 207 of the INA;

• INS Form I–688B (Employment Authorization Card) annotated ''274a12(a)(3)'';

• *INS Form I–766 (Employment Authorization Document) annotated ''A3''; or

• INS Form I–571 (Refugee Travel Document).

*Seven or Five-Year Limit:* Where eligibility is limited to aliens who were admitted as refugees within the previous seven or five years, the date of inspection on the refugee stamp on INS Form I–94 will indicate the date of admission as a refugee; if the date is missing or if the applicant cannot present an I–94, file INS Form G–845 and Supplement along with a copy of the pertinent documents with the local INS office to verify the date of admission as a refugee.

Alien Whose Deportation or Removal Was Withheld

• *INS Form I–688B (Employment Authorization Card) annotated ''274a12(a)(10)'';

• INS Form I–766 (Employment Authorization Document) annotated ''A10''; or

• Order from an immigration judge showing deportation withheld under § 243(h) of the INA as in effect prior to April 1, 1997, or removal withheld under § 241(b)(3) of the INA.

*Seven or Five-Year Limited:* Where eligibility is limited to aliens whose deportation was withheld within the previous seven or five years, the court order will include the date deportation was withheld; if the applicant does not present a court order, file INS Form G–845 and Supplement along with a copy of the pertinent documents with the local INS office to verify the date deportation was withheld.

Cuban/Haitian Entrants

• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a ''green card'') with the code CU6, CU7, and CH6;

• Unexpired temporary I–551 stamp in foreign passport or on *INS Form I–94 with the code CU6 or CU7; or

• INS Form *I–94 with stamp showing parole as ''Cuban/Haitian Entrant'' under Section 212(d)(5) of the INA.

*Seven or Five–Year Limit:* Where eligibility is limited to aliens who were granted status as a Cuban/Haitian entrant within the previous seven or five years, the date on the INS Form I–551 or the date of inspection on the stamp on INS Form I–94 will indicate the date status was granted; if the date is missing on Form I–94, file INS Form G–845 and Supplement along with a copy of the pertinent documents with the local INS office to verify the date status was granted.

Amerasian Immigrants

• *INS Form I–551 (Alien Registration Receipt Card, commonly known as a ''green card'') with the code AM6, AM7, or AM8; or

• Unexpired temporary I–551 stamp in foreign passport or on *INS Form I–94 with the code AM1, AM2, or AM3.

*Seven or Five-Year Limit:* Where eligibility is limited to aliens who were admitted as Amerasian immigrants within the previous seven or five years, the date on the INS Form I–551 or the date of inspection on the stamp on INS Form I–94 will indicate the date of admission; if the date is missing on Form I–94, file INS Form G–845 and Supplement along with a copy of the pertinent documents with the local INS office to verify the date of admission.

*Expired or Absent Documentation:* If an applicant presents expired documents or is unable to present any documentation evidencing his or her immigration status, refer the applicant to the local INS office to obtain documentation of status. In unusual cases involving applicants who are hospitalized or medically disabled, or who can otherwise show good cause for their inability to present documentation, and for whom securing such documentation would constitute an undue hardship, if the applicant can provide an alien registration number, you may file INS Form G–845 and Supplement, along with the alien registration number and a copy of any expired INS document presented, with the local INS office to verify status. As with any documentation of immigration status, you should confirm that the

status information you receive back from INS pertains to the applicant whose identity you have verified.

*Receipt for Replacement Document:* If an applicant presents a receipt indicating that he or she has applied to the INS for a replacement document for one of the documents identified above, file INS Form G–845 and Supplement, along with a copy of the receipt and a copy of any expired INS document presented, with the local INS office to verify status. Upon return receipt of information from INS, confirm that it pertains to the applicant whose identify you have verified. You should ask to see the replacement document at a later date.

*Applicants with Disabilities and Nondiscrimination:* If an applicant has a disability that limits the applicant's ability to provide the required evidence of immigration status (*e.g.,* mental retardation, amnesia, or other cognitive or mental impairment), you should make every effort to assist the individual to obtain the required evidence. In addition, you should not discriminate against applicants on the basis of race, national origin, gender, religion, age or disability. See Nondiscrimination Advisory, Attachment 2 to Interim Guidance.

*Local INS Offices:* A list of local INS offices and their addresses is set forth in Attachment 1 to the Interim Guidance. Attachment 1 also includes a copy of INS Form G–845 and the Supplement thereto to be used to verify immigration status pursuant to the Guidance.

**EXHIBIT A TO ATTACHMENT 6—SSA GUIDANCE ON CERTIFICATION OF 40 QUALIFYING QUARTERS**

Section 402 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (''the Act'') generally limits the eligibility of legal immigrants for certain federal public benefits, but sections 402(a)(2)(B) and (b)(2)(B) provide an exception for aliens lawfully admitted for permanent residence who have worked or can be credited with 40 quarters of qualified work. The law provides that the worker's own quarters and quarters worked by a parent while the alien was under age 18 or by a spouse during the marriage if the alien remains married to the spouse or the marriage ended by the death of the spouse may also be credited to the individual in determining the number of qualifying quarters.

Implementing this requirement will be challenging for the individual immigrants, program administrators, and the Social Security Administration (''SSA''), which is the primary source of qualifying quarters information. SSA has developed an automated system to provide, on an overnight basis, information on qualifying quarters for work covered under the Social Security Act and certain, but not all, work

DOL_PRWORA _000079

not covered under the Social Security Act. Verification of quarters of coverage for most applicants and current recipients will be accomplished primarily through this automated system.

SSA's automated system is being revised to include additional available information on qualifying quarters from noncovered work. The following interim procedures for determining whether the 40 quarters of qualified work exception is met should be followed until you have access to the SSA automated system. This interim process authorizes certification of eligibility pending verification through the automated system. (This guidance does not supersede program requirements; programs should refer to statutes, regulations, and agency guidance governing certification of eligibility.)

Under these interim procedures, the individual's attestation to 40 quarters is sufficient provided the immigrant, alone or in combination with his parents and/or spouse, has spent sufficient time in this country to have acquired 40 quarters of qualified work. The individual need only state that he or she, alone or in combination with his or her parents and/or spouse, has met the work requirement. No further documentation of earnings is required at application. These interim procedures should be used when the legal immigrant does not qualify under other exemptions of the Act (*e.g.,* refugees, asylees, or deportees with five years of limited eligibility, or applicants with a claim to eligibility based on military service).

Although the automated system is now available, each state must approve an addendum to the current Computer Matching and Privacy Protection Act agreement they maintain with SSA before access to the system can be approved. When you sign the agreement, SSA will provide further guidance defining covered/noncovered qualifying quarters, how to use the system when making determinations, and how to resolve problems arising from discrepancies.

After the agreement addendum is signed and access to the system approved, you should contact SSA to schedule a quarters of coverage verification for each individual you conclude has met the 40 quarters exemption using these interim instructions. SSA will report back a qualifying quarters of coverage history for each individual and applicable family member requested. SSA will provide additional guidance and the name of the contact for scheduling verification.

*Interim Procedures*

To determine eligibility based on 40 qualifying quarters, the State agency/benefit provider should ascertain the applicant's understanding as to the following:

1. How many years has the applicant, the applicant's spouse (during their marriage if they are still married or the marriage ended by the death of the spouse), or the applicant's parents (before the applicant turned 18) lived and/or worked in this country.

(If the answer to 1 is a total of less than 10 years, the applicant cannot meet the 40 qualifying quarter requirement. Stop at this point.)

(If the total equals 10 years or the applicant alleges they commuted to work in the U.S., then proceed to question 2.)

2. In how many of the years reported in answer to question 1, did the applicant, the applicant's spouse, or the applicant's parent earn money through work.

(If the state agency/benefit provider or the applicant needs further information about what constitutes a ''quarter of coverage'' in those years, they may wish to refer to the attached chart.)

Verify, from INS documents, the date of entry into the country of the applicant, spouse and/or parent. If the dates are consistent with having 10 or more years of work, no further documentation is required at this time; the state agency/benefit provider should conclude that the immigrant meets the 40 qualifying quarters of work exception pending verification from SSA. Inform the applicant (subject to each program's requirements and due process considerations) that he/she may have to repay any benefits to which he/she is not found to be entitled after verification. Keep a record of each individual certified pending verification from SSA.

If the dates of entry are inconsistent with having 10 or more years of work, deny benefits and notify the applicant of his/her right to appeal the denial of benefits.

The applicant shall also provide, for purposes of future verification, the full name, social security number, date of birth, and sex of each individual (self, parent or spouse) whose work history is relevant to the determination of eligibility. In addition, obtain a release form signed by each such individual (copy attached) giving SSA permission to release information concerning that individual's entire quarters of coverage history to the state agency/benefit provider and/or the applicant. This form shall be retained in the case file to document the individual's consent.

As noted earlier, these are temporary instructions and you should schedule verification of all cases processed under these guidelines with SSA. In its response, SSA will provide available information about qualifying quarters of work. Consult the SSA guidelines for using the system if the immigrant believes the information from SSA is inaccurate or incomplete. If SSA action is required, SSA will give the individual a document indicating that the number of quarters is under review. Refer to the requirements of your program to determine whether an immigrant may receive benefits during the period of SSA's review.

*Establishing Qualifying Quarters*

The term ''quarter'' means the three calendar month period ending on March 31, June 30, September 30, or December 31 of any year.

Social Security credits called ''quarters of coverage'' (''QCs'') are earned by working at a job or as a self-employed individual. Each earner can be credited with a maximum of four quarters each year.

For 1978 and later, credits are based solely on the total yearly amount of earnings. All types of earnings follow this rule. The number of creditable QCs are obtained by

dividing the individual's total yearly earned income by the increment amount for the year up to a yearly maximum of four. The amount of earnings needed to earn a credit increases and is different for each year. For 1978 through 1997, the amount of earnings needed for each credit is:

| | |
|---|---|
| 1978 | $250 |
| 1979 | $260 |
| 1980 | $290 |
| 1981 | $310 |
| 1982 | $340 |
| 1983 | $370 |
| 1984 | $390 |
| 1985 | $410 |
| 1986 | $440 |
| 1987 | $460 |
| 1988 | $470 |
| 1989 | $500 |
| 1990 | $520 |
| 1991 | $540 |
| 1992 | $570 |
| 1993 | $590 |
| 1994 | $620 |
| 1995 | $630 |
| 1996 | $640 |
| 1997 | $670 |

A current year quarter may be included in the 40 quarter computation. Use the yearly amount shown in the chart as the divisor to determine the number of quarters available up to a yearly maximum of four. FOLLOW YOUR AGENCY GUIDELINES REGARDING COUNTING A QUARTER THAT HAS NOT ENDED.

If you need to use quarters before 1978:

• A credit was earned for each calendar quarter in which an individual was paid $50 or more in wages (including agricultural wages for 1951–1954);

• Four credits were earned for each taxable year in which an individual's net earnings from self-employment were $400 or more; and/or

• A credit was earned for each $100 (limit to a total of four) of agricultural wages paid during the year for years 1955 through 1977.

QUALIFYING QUARTER FROM NONCOVERED EARNINGS WILL ALSO BE DETERMINED USING THE ABOVE GUIDELINES.

**EXHIBIT B TO ATTACHMENT 6—DOD GUIDANCE ON IMPLEMENTATION OF VETERAN AND ACTIVE DUTY EXCEPTION**

This fact sheet provides guidance for implementing certain sections of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (''the Act'') concerning exemptions for active duty service members and veterans and their family members. The Act limits the eligibility of certain aliens to receive public benefits. Under various provisions of the Act, a qualified alien who is lawfully residing in a state and is (1) a veteran (per 38 U.S.C. 101(2), 107, 1101, or 1301) with an Honorable Discharge (not on account of alienage) and who fulfills the minimum active-duty service requirements of 38 U.S.C. 5303A(d); (2) on active duty (other than active duty for training) in the United States Armed Forces; or (3) a spouse, unmarried dependent child, or unremarried surviving spouse of such an individual, is eligible for particular programs.

DOL_PRWORA _000080

*Honorably Discharged Veterans*

• A discharge certificate, DD Form 214 or equivalent, that shows active duty in the Army, Navy, Air Force, Marine Corps, or Coast Guard and character of discharge ''Honorable'' is acceptable to qualify for the veteran exemption without further inquiry, unless the certificate appears to have been altered or is otherwise irregular. A discharge certificate that shows character of discharge as anything but ''Honorable'' is not acceptable for purposes of this exemption and need not be referred to the VA. (**Note:** A character of discharge ''Under Honorable Conditions'' is NOT an ''Honorable'' discharge for these purposes.) A discharge certificate that shows ''Honorable'' and any other branch of service or any other type of duty (*e.g.,* ''Active Duty for Training,'' ''Inactive Duty for Training,'' etc.) should be referred to the local VA regional office for determination as to veteran status.

• If veteran status is claimed but the individual has no papers showing service or discharge, refer the inquiry to the local VA regional office to determine veteran status.

• If a discharge certificate, DD Form 214 or equivalent, shows an original enlistment in the Army, Navy, Air Force, Coast Guard, or Maine Corps before September 7, 1980, there is no minimum active-duty service requirement. If a discharge certificate, DD Form 214 or equivalent, shows two or more years of continuous active duty in the Army, Navy, Air Force, Coast Guard, or Marine Corps, the individual meets the minimum active-duty service requirement. If such a discharge certificate is not available, or if it shows active-duty service of less than two years with an original enlistment after September 7, 1980, refer the inquiry to the local VA regional office to determine satisfaction of the minimum active-duty service requirement.

• Applications for exemption based on status as a spouse, unmarried dependent child, or unremarried surviving spouse of an honorably discharged veteran require a determination of the veteran's status and a determination that the applicant is a spouse or child. Status of the veteran may be established by possession of a discharge certificate showing an ''Honorable'' discharge. If the applicant is not in possession of a discharge certificate, refer the question of veteran status to the VA for a determination. The determination as to whether the individual is a spouse or an unmarried dependent child should be made based on your agency guidance for marital and dependency status. VA will not make spousal or dependency findings in these cases.

• Applications for exception based on status as an unremarried surviving spouse of a veteran or active-duty personnel further require the following findings (set forth in 38 U.S.C. 1304), in addition to a determination that the surviving spouse has not remarried:

—that the surviving spouse was married to the veteran or active-duty personnel within fifteen years after the termination of the period of service in which the injury or disease causing the death of the veteran was incurred or aggravated;

—that the surviving spouse was married to the veteran or active-duty personnel for one year or more; or
—that a child was born of the relationship between the surviving spouse and the veteran or active-duty personnel, either during or before the marriage.

*Members on Active Duty*

• Active duty as a member of the Armed Forces means the individual is on full time duty in the U.S. Army, Navy, Air Force, Marine Corps, or Coast Guard. It does not include full-time National Guard duty.

• Service members on active duty shall establish their status by presenting a current Military Identification Card (DD Form 2 (Active)) that lists an expiration date of more than one year from the date of determination.

• If the Military Identification Card is due to expire within one year from the date of the determination, the service member shall verify active duty by showing a copy of his or her current military orders. If the service member is unable to furnish a copy of his or her military orders, active duty may be verified through the nearest RAPIDS (Real Time Automated Personnel Identification System) (located at many military installations) or by notifying the following office in writing (which can be transmitted by facsimile): DEERS Support Office, ATTN: Research and Analysis, 400 Gigling Road, Seaside, California 93955–6771, Fax Number: (408) 655–8317.

*Reserve Members (not on active duty for training)*

• Active duty for training is temporary full-time duty in the Armed Forces performed by members of the Reserves, Army National Guard, or Air National Guard for training purposes. Active duty for training does not establish eligible status. However, a discharge from active duty for training may establish veteran status and should be referred to VA for a determination.

• A Member of a Reserve Component shall establish status by showing a current DD Form 2 (Reserve) [red] and military active duty orders showing such person is on active duty, but not on active duty for training. No other method for verifying this status is currently available.

*Spouse, Children, or Unremarried Surviving Spouse of Active Duty Members or Veterans*

Step 1. Establish that the individual is a spouse, dependent child, or unremarried surviving spouse of an active duty member or veteran.

• The determination as to whether an individual is a spouse of an active duty member or veteran should be made based on your agency guidance. Possession of a current Military Identification Card showing that the individual is married to a veteran or active duty member may be considered as evidence of marriage to the member.

• The determination as to whether an individual is an unremarried surviving spouse of an active-duty member or veteran should be made based on agency guidance, in accordance with the following requirements (set forth in 38 U.S.C. § 1304), in addition to a determination that the surviving spouse has not remarried:

—the surviving spouse was married to the veteran or active-duty personnel within fifteen years after the termination of the period of service in which the injury or disease causing the death of the veteran was incurred or aggravated;
—the surviving spouse was married to the veteran or active-duty personnel for one year or more; or
—that a child was born of the relationship between the surviving spouse and the veteran or active-duty personnel, either during or before the marriage.

• The determination as to whether an individual is an unmarried legally adopted or biological dependent child of an honorably discharged veteran or active duty member of the Armed Forces should be made based on your agency guidance. Possession of a Military Identification Card may be considered as evidence that a child is dependent on the veteran or on the active duty member of the Armed Forces for his or her support and is under the age of 18 or if a full time student, under age 22.

Step 2. Determine that the member is on active duty or is a veteran.

• A spouse or child in possession of a Military Identification Card with an expiration date of more than one year from the date of its presentation presumptively meets the active duty requirement for his or her spouse or parent respectively.

• If the Identification Card is due to expire within one year, the spouse or child must provide a copy of the military orders for his or her spouse or parent as applicable to establish the active duty status of the service member. If married to a reserve member or if an unmarried child of a reserve member, the orders must show that the service member is on active duty and not on active duty for training.

• For dependents not possessing military orders but possessing an Identification Card with an expiration date less than one year from the date of presentation, active duty status can be verified by contacting RAPIDS or the DEERS Support Office.

• If a dependent child does not possess a Dependent Military Identification Card, status may be ascertained through the nearest RAPIDS station or by contacting the DEERS Office at the address provided above.

• A spouse or child showing a discharge certificate, DD Form 214 or equivalent, that shows active duty in the Army, Navy, Air Force, Marine Corps or Coast Guard and character of discharge ''Honorable'' is acceptable to establish the veteran status of his or her spouse or parent respectively without further inquiry, unless the certificate appears to be altered or irregular. If veteran status is claimed, but the spouse or child does not have papers showing service or discharge, refer the inquiring to the local VA regional office for determination.

## Attachment 7—Interim Guidance; Federal Means-Tested Public Benefits

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the ''Act'') provides that qualified aliens entering the United States on or after August 22, 1996, are ineligible for

DOL_PRWORA_000081

federal means-tested public benefits during the first five years they are qualified aliens, unless they fall within a specific exception. (With limited exceptions, non-qualified aliens are ineligible for such benefits regardless of when they entered the United States.) All qualified aliens are eligible for federal means-tested public benefits after the expiration of such five-year period, unless the State in which the alien seeks benefits has imposed additional restrictions on eligibility.

The Department of Health and Human Services and the Social Security Administration have interpreted the limitations on eligibility for federal means-tested public benefits to apply only to mandatory spending programs of the federal government in which eligibility for benefits, or the amount of such benefits, or both, are determined on the basis of income, resources, or financial need of the individual, household, or family. See 62 FR 45,256 (August 26, 1997); 62 FR 45,284 (August 26, 1997). Under the HHS and SSA interpretations, TANF, Medicaid, and SSI are federal means-tested public benefits that are not otherwise exempted under the Act. You should consult with the appropriate federal agency overseeing the benefit program you administer to determine whether the program is a federal means-tested public benefit program.

The eligibility of qualified aliens for federal means-tested public benefits turns on whether they entered the U.S. before August 22, 1996, the number of years since they obtained qualified alien status, their particular immigration status, and the specific benefits they are seeking.

1. Determine whether the qualified alien entered the United States before August 22, 1996, by reviewing the documents evidencing his or her immigration status or, if the documents do not indicate whether the alien entered before August 22, 1996, by reviewing additional documentation pursuant to guidance provided by the agency or department overseeing your program. Further determine whether the qualified alien obtained qualified alien status prior to August 22, 1996. See Attachment 6 for a list of documents evidencing qualified alien status and guidance on how to derive relevant dates from those documents. In addition to the documents listed in Attachment 6, an alien who was in the United States before August 22, 1996, in a nonimmigrant or other lawful status, but who subsequently obtained qualified alien status, may present INS Form I–94, which is stamped with the date of entry,

to demonstrate entry prior to August 22, 1996.

• If the applicant entered the United States before August 22, 1996, and obtained qualified alien status before that date, he or she is eligible for all federal means-tested public benefits for which he or she satisfies all programmatic eligibility requirements. You should not engage in any further verification of immigration status for these persons.

• If the applicant entered the United States before August 22, 1996, but obtained qualified alien status after that date, you must verify that the alien was continuously present in the United States from the latest date of entry prior to August 22, 1996, until the date he or she obtained qualified alien status. In general, any single absence from the United States of more than 30 days, or a total of aggregated absences of more than 90 days, should be considered to interrupt ''continuous presence.'' To verify continuous presence, you should follow guidance provided by the agency or department overseeing your program, which may call for an applicant to present additional documentation such as tax returns, bills, rent receipts, or a letter from an employer. If the applicant can demonstrate continuous presence, he or she is eligible for all federal means-tested public benefits for which he or she satisfies all programmatic eligibility requirements.

• If the applicant entered the United States before August 22, 1996, and obtained qualified alien status after that date but was not continuously present in the United States from the latest date of entry prior to August 22, 1996, until obtaining such status, determine if he or she is eligible under Paragraphs 2 and 3 below.

• If the applicant entered the United States on or after August 22, 1996, and is a qualified alien, determine if he or she is eligible under Paragraphs 2 and 3 below.

2. With certain exceptions listed below, an applicant who entered the United States on or after August 22, 1996, and has attained qualified alien status, or who entered the United States before August 22, 1996, and obtained qualified alien status after that date but did not remain continuously present in the United States from the latest date of entry prior to August 22, 1996, until obtaining such status, is ineligible for all federal means-tested public benefits during the first five years after he or she obtained qualified alien status. Thus, unless the applicant falls within one of the excepted categories listed below, such an applicant is only eligible for federal means-tested public benefits for

which he or she satisfies all programmatic eligibility requirements if five years have passed from the date the applicant attained qualified alien status. Determine the date on which the applicant attained qualified alien status by reviewing the documents evidencing his or her status or, if the documents do not indicate the date he or she obtained such status, by filing INS Form G–845 and Supplement along with a copy of the document with the local INS office.

As noted above, the following categories of aliens are exempt from this five-year ban:

a. Refugees, asylees and aliens whose deportation or removal has been withheld—*see* Attachment 5 to Interim Guidance for definition and documentation;

b. Qualified aliens lawfully residing in any state who are honorably discharged veterans and who fulfill minimum active-duty service requirements, or who are on non-training active duty in the U.S. Armed Forces, or who are the spouse, unmarried dependent child, or unmarried surviving spouse of such a veteran or active service member, provided that, in the latter case, the marriage satisfies the requirements of 38 U.S.C. 1304—*see* Attachment 6 and Exhibit B thereto to Interim Guidance for definition and documentation;

c. Cuban/Haitian entrants, as defined in section 501(e) of the Refugee Education Assistance Act of 1980;

d. Amerasian immigrants admitted to the U.S. pursuant to section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988; and

e. With respect to SSI and Medicaid benefits, American Indians born in Canada and to whom the provisions of section 289 of the INA apply or members of an Indian tribe (as defined in section 4(e) of the Indian Self-Determination and Education Assistance Act).

3. Under the terms of the Act, the five-year ban does not apply to the following benefits or assistance:

• Medical assistance under Title XIX of the Social Security Act (or any successor program to such Title) for care and services that are necessary for the treatment of an emergency medical condition (as defined in § 1903(v)(3) of such Act) of the alien involved and are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the state plan approved under such Title (other than the requirement of the receipt of aid or assistance under Title IV of such Act, SSI benefits under

DOL_PRWORA _000082

Title XVI of such Act, or a state supplementary payment);

• Short-term, non-cash, in-kind emergency disaster relief;

• Assistance or benefits under the National School Lunch Act;

• Assistance or benefits under the Child Nutrition Act of 1966;

• Public health assistance (not including any assistance under Title XIX of the Social Security Act) for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease;

• Payments for foster care and adoption assistance under parts B and E of Title IV of the Social Security Act for a parent or child who would, in the absence of the Act's prohibition on payment of federal means-tested public benefits to qualified aliens during the first five years after entry into the U.S. with qualified alien status, be eligible to have such payments made on the child's behalf under such part, but only if the foster or adoptive parent(s) of such child is a qualified alien;

• Benefits covered by Attorney General Order No. 2049, 61 F.R. 45985 (Aug. 30, 1996), re: government-funded community programs, services or assistance that are necessary for protection of life or safety;

• Programs of student assistance under Titles IV, V, IX, and X of the Higher Education Act of 1965, and Titles III, VII, and VIII of the Public Health Service Act;

• Means-tested programs under the Elementary and Secondary Education Act of 1965;

• Benefits under the Head Start Act; and

• Benefits under the Job Training Partnership Act.

[FR Doc. 97–29851 Filed 11–14–97; 8:45 am]
**BILLING CODE 4410–10–M**

## DEPARTMENT OF JUSTICE

### Immigration and Naturalization Service

### Agency Information Collection Activities: Proposed Collection; Comment Request

**ACTION:** Revision of existing collection; generic clearance of customer service surveys.

Office of Management and Budget approval is being sought for the information collection listed below. This proposed collection was previously published in the **Federal Register** on September 2, 1997, at 62 FR 46375, allowing for a 60-day public comment period. No comments were received by the Immigration and Naturalization Service.

The purpose of this notice is to allow an additional 30 days for public comments. Comments are encouraged and will be accepted until December 17, 1997. This process is conducted in accordance with 5 CFR 1320.10.

Written comments and/or suggestions regarding the item contained in this notice, especially regarding the estimated public burden and associated response time, should be directed to the Office of Management and Budget, Office of Regulatory Affairs, Attention: Department of Justice Desk Officer, Washington, DC 20530.

Written comments and suggestions from the public and affected agencies concerning the proposed collection of information should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agencies estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

*Overview of this information collection:* (1) *Type of Information Collection:* Revision of currently approved information collection.

(2) *Title of the Form/Collection:* Generic Clearance of Customer Service Surveys.

(3) *Agency form number, if any, and the applicable component of the Department of Justice sponsoring the collection:* No agency form number. Office of Policy and Planning, Immigration and Naturalization Service.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals and Households. This information will be used to access individual and agency needs, identify problems, and plan for programmatic improvements in the delivery of immigration services.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 150,000 responses at 30 minutes (.5) hours per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* 75,000 annual burden hours.

If you have additional comments, suggestions, or need a copy of the proposed information collection instrument with instructions, or additional information, please contact Richard A. Sloan 202–514–3291, Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, U.S. Department of Justice, Room 5307, 425 I Street, NW., Washington, DC 20536. Additionally, comments may be submitted to INS via facsimile to (202) 305–0143.

If additional information is required contact: Mr. Robert B. Briggs, Clearance Officer, United States Department of Justice, Information Management and Security Staff, Justice Management Division, Suite 850, Washington Center 1001 G Street, NW, Washington, DC 20530.

Dated: November 11, 1997.

**Robert B. Briggs,**
*Department Clearance Officer, United States Department of Justice.*
[FR Doc. 97–30091 Filed 11–14–97; 8:45 am]
**BILLING CODE 4410–18–M**

## MEDICARE PAYMENT ADVISORY COMMISSION

### Commission Meeting

**AGENCY:** Medicare Payment Advisory Commission.

**ACTION:** Notice of meeting.

**SUMMARY:** The Commission will hold its next public meeting on Monday, November 24, 1997 and Tuesday, November 25, 1997, at the Sheraton City Centre, 1143 New Hampshire Avenue, NW, Washington, D.C., in the New Hampshire I and II room. The meetings are tentatively scheduled to begin at 9:00 a.m. on November 24 and at 9:00 a.m. on November 25.

Among the topics the Commission will discuss are: patient classification systems for post acute care payment, urban critical access hospitals, disproportionate share payment policy, risk adjustment, adjusted community rate, quality of care, impact of the Balanced Budget Act on acute care hospitals, payment policy options affecting Medicare+Choice, other policy issues concerning Medicare+Choice, outpatient hospital payment policy, and

DOL_PRWORA _000083

| | |
|---|---|
| **EMPLOYMENT AND TRAINING ADMINISTRATION ADVISORY SYSTEM U.S. DEPARTMENT OF LABOR Washington, D.C. 20210** | **CLASSIFICATION** OWI |
| | **CORRESPONDENCE SYMBOL** WIA |
| | **DATE** |

**ADVISORY:    TRAINING AND EMPLOYMENT GUIDANCE LETTER NO.**

**TO:**    AMERICAN JOB CENTERS
STATE WORKFORCE AGENCIES
STATE WORKFORCE ADMINISTRATORS
STATE WORKFORCE LIAISONS
STATE AND LOCAL WORKFORCE BOARD CHAIRS AND DIRECTORS
ALL WIA GRANT RECIPIENTS

**FROM:**    PORTIA WU
Assistant Secretary

**SUBJECT:**    Eligibility of Deferred Action for Childhood Arrivals Participants for Workforce Investment Act and Wagner-Peyser Act Programs

1.  **Purpose.**  The purpose of this Training and Employment Guidance Letter (TEGL) is to provide guidance to states and grantees concerning the eligibility of individuals granted relief under the Deferred Action for Childhood Arrivals (DACA) Initiative (DACA participants) with employment authorization documents (employment authorization) for program eligibility for Workforce Investment Act (WIA) programs and Wagner-Peyser Act programs.

2.  **References.**
    *   Title I, WIA, as amended (29 U.S.C. 2801 *et seq.*);
    *   The Wagner-Peyser Act, as amended (29 U.S.C. 49 *et seq.*);
    *   Chapter 2 of Title II of the Trade Act of 1974, as amended (Pub. L. 93-618) (1974 Act and, as amended, Trade Act); and
    *   Training and Employment Guidance Letter (TEGL) No. 25-04, *Participant Eligibility Guidance* (April 11, 2005).

3.  **Background.**  On June 15, 2012, Department of Homeland Security (DHS) announced its "Deferred Action for Childhood Arrivals" (DACA) process for individuals who came to the United States as children and meet the following key guidelines:
    *   Were under the age of 31 as of June 15, 2012;
    *   Came to the United States before reaching their 16th birthday;
    *   Have continuously resided in the United States since June 15, 2007, up to the present time;
    *   Were physically present in the United States on June 15, 2012, and at the time of making their request for consideration of deferred action with U.S. Citizenship and Immigration Services (USCIS);

| | |
|---|---|
| **RESCISSIONS** None | **EXPIRATION DATE** Continuing |

DOL_PRWORA_000084

- Entered without inspection before June 15, 2012, or their lawful immigration status expired as of June 15, 2012;
- Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or other equivalent State-authorized exam in the United States, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and
- Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

The DACA process may result in a 2-year period of "deferred action," or relief from removal from the country or from entering into removal proceedings, subject to renewal, and issuance of employment authorization for the period of deferred action. Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment."

Section 188 of WIA contains a specific nondiscrimination provision that provides that participation in WIA is available to citizens and nationals of the United States, lawfully admitted permanent resident aliens, refugees, asylees, and parolees, and other immigrants authorized by the Attorney General to work in the United States. Individuals with employment authorization qualify under this provision as "immigrants authorized by the Attorney General to work in the United States." Therefore, DACA participants with employment authorization may access any WIA services for which they otherwise would qualify.

4. **Workforce Investment Act Programs.** This TEGL applies to all programs authorized under WIA, including: Adult, Dislocated Worker, and Youth formula programs; National Emergency Grants; Section 166 Indian and Native American Program; Section 167 National Farmworker Jobs Program; Reintegration of Ex-Offender Program; YouthBuild; and Job Corps.

State Workforce Agencies and WIA grant recipients must have policies and procedures in place to ensure that the intensive or training services provided to DACA participants under WIA programs are limited to those DACA participants who have employment authorization. Appropriate documentation of employment authorization must include self-attestation at a minimum. The appropriate method of verifying an applicant's employment authorization will depend upon the requirements and needs of the particular program, including, but not limited to the:
- nature of the benefits to be provided;
- need for benefits to be provided on an expedited basis;
- length of time during which benefits will be provided;
- cost of providing the benefits;
- length of time it will take to verify based on a particular method; and
- cost of a particular method of verification.

DOL_PRWORA_000085

For example, it would be impractical and administratively burdensome to require individuals seeking self-services to be screened for employment authorization as doing so would require a greater investment of resources than likely cost savings.  In contrast, a higher level of verification may be appropriate for the longer and more costly services such as training.

5. **Job Corps.**  Section 188's nondiscrimination provision applies to the Job Corps program, which is authorized under title I-C of WIA.  As a result, DACA participants who meet program eligibility requirements qualify for Job Corps if they have employment authorization.  ETA will separately issue a Job Corps Policy and Requirements Handbook change notice with further instructions for operators of Job Corps programs.

6. **National Farmworker Jobs Program.**  TEGL No. 25-04 describes eligibility determination requirements for the WIA National Farmworker Jobs Program (NFJP).  As indicated in that TEGL, NFJP grantees are required to have an eligibility determination system that enables the generation of a record supporting eligibility determinations and enrollment decisions. Under that longstanding guidance, the Department expects NFJP grantees to obtain source documentation that verifies the information provided by applicants for eligibility elements, including employment authorization.  That TEGL also provides that, for NFJP, self-certification alone cannot be used for employment authorization, and employment authorization must be verified with documentation.  NFJP grantees must continue to ensure that their eligibility determination procedures for all applicants, including DACA participants, with employment authorization are consistent with the requirements in TEGL No. 25-04.

7. **Wagner-Peyser Act.**  The Wagner-Peyser Act provides employment services to help individuals find meaningful employment and to help employers find the skilled workers that they need. While Wagner-Peyser Act services are not authorized by WIA, they are often delivered alongside WIA services by American Job Centers.  Wagner-Peyser Act services are available to all DACA participants.

8. **Resources.**  DOL is sharing the DACA resources below to provide accurate information to people who may be eligible to apply for DACA.

   - DACA information and resource are available in English www.uscis.gov/childhoodarrivals and Spanish www.uscis.gov/acciondiferida.

   - Information on how to avoid immigration scams are in English www.uscis.gov/avoidscams and Spanish www.uscis.gov/eviteestafas.

   - "How Do I" guides, including How Do I Request Consideration of Deferred Action for Childhood Arrivals (DACA), are located at www.uscis.gov/howdoi.

9. **Action Requested.**  Recipients of this guidance are required to share the TEGL with all appropriate State Workforce Agency, American Job Center, and WIA grantee staff. Recipients are also encouraged to post the resources listed above.

3

**10. <u>Inquiries</u>.** Additional information on DACA is available from DHS and USCIS at www.dhs.gov/deferred-action-childhood-arrivals and www.uscis.gov/childhoodarrivals. Please direct questions regarding this guidance to the appropriate ETA Regional Office.

DOL_PRWORA _000087

| EMPLOYMENT AND TRAINING ADMINISTRATION ADVISORY SYSTEM U.S. DEPARTMENT OF LABOR Washington, D.C. 20210 | CLASSIFICATION WIOA – Adult, Dislocated Worker, ES |
|---|---|
| | CORRESPONDENCE SYMBOL OWI |
| | DATE March 1, 2017 |

ADVISORY:   **TRAINING AND EMPLOYMENT GUIDANCE LETTER WIOA NO.** 19-16
**OPERATING GUIDANCE for the WORKFORCE INNOVATION AND OPPORTUNITY ACT**

TO:        STATE WORKFORCE AGENCIES
           STATE WORKFORCE ADMINISTRATORS
           STATE WORKFORCE LIAISONS
           STATE AND LOCAL WORKFORCE BOARD CHAIRS AND DIRECTORS
           LABOR COMMISSIONERS
           AMERICAN JOB CENTERS

FROM:      BYRON ZUIDEMA /s/
           Deputy Assistant Secretary

SUBJECT:   Guidance on Services provided through the Adult and Dislocated Worker
           Programs under the Workforce Innovation and Opportunity Act (WIOA) and the
           Wagner-Peyser Act Employment Service (ES), as amended by title III of WIOA,
           and for Implementation of the WIOA Final Rules

1. **Purpose.** To provide guidance to the workforce system on delivering services under the Adult and Dislocated Worker programs under WIOA Title I, and individuals served by the ES program, as amended by WIOA Title III, under the WIOA Final Rule.

   WIOA, signed into law on July 22, 2014, supersedes titles I and II of the Workforce Investment Act of 1998 (WIA) and amends the Wagner-Peyser Act of 1933 and the Rehabilitation Act of 1973. In general, WIOA took effect on July 1, 2015, the first full program year after enactment, unless otherwise noted. On August 19, 2016, the Departments of Labor (DOL) and Education published the WIOA Final Rules in the Federal Register. The DOL-only rule became fully effective on October 18, 2016, 60 days after it was published on the Federal Register.

   In order to continue implementation of WIOA prior to publication of the final rule, DOL issued a Training and Employment Guidance Letter (TEGL) 3-15, on July 1, 2015, which provided guidance to the public workforce system on delivering services to adults and dislocated workers under WIOA. This TEGL rescinds TEGL 3-15, and provides updated guidance to the public workforce system on service delivery to adults and dislocated workers, consistent with WIOA and the WIOA Final Rules. The section of the final rule pertaining to services for adults and dislocated workers under WIOA title I can be found at 20 CFR part

| RESCISSIONS TEGL 3-15 | EXPIRATION DATE Continuing |
|---|---|

DOL_PRWORA _000088

680. The sections of the final rule pertaining to individuals served under the Wagner-Peyser Act programs, as revised, can be found at 20 CFR parts 651, 652, 653 and 658.

2.  **References.**  See Attachment I.

3.  **Background.**  WIOA provides for a workforce system that is accessible to all job seekers, customer centered, and training that is job-driven.  The workforce system delivers career and training services at the nation's nearly 2,500 American Job Centers.  The Adult, Dislocated Worker, and ES programs provide training and employment services in the American Job Center network, and are required partners under the law.  Under WIOA, partner programs and entities that are jointly responsible for workforce and economic development, educational, and other human resource programs, collaborate to create a seamless customer-focused American Job Center network that integrates service delivery across all programs to make it easier for workers to access the services they need to obtain skills and employment.

Table of Contents:

| Section | Page |
|---|---|
| Career Services | 2 |
| Transitional Jobs | 4 |
| Career Services provided by ES staff | 4 |
| Training Services | 5 |
| Training Contracts | 7 |
| Priority Populations under WIOA | 8 |
| Dislocated Worker Eligibility | 11 |
| Employment Status Clarification | 12 |
| Work-Based Training | 12 |
| Incumbent Worker Training | 15 |
| Supportive Services and Needs-Related Payments | 18 |
| Transfer of Funds | 19 |
| Performance Accountability: Career and Training Services | 20 |
| Other Permissible Local Activities | 22 |
| Rapid Response | 24 |
| Coordination with WIOA Core Programs | 29 |
| Coordination with Trade Adjustment Assistance | 33 |

4.  **Career Services.**  WIOA authorizes career services for adults and dislocated workers.  There are three types of career services: basic career services, individualized career services, and follow-up services.  The provision of individualized career services must be based on the employment needs of the individual as determined jointly by the individual and the career planner (case manager), and may be identified through an individual employment plan (IEP).  Although WIOA distinguishes levels of service, this distinction is not intended to imply that there is a sequence of services. These services can be provided in any order.  Career services

2

DOL_PRWORA _000089

under this approach provide local areas and service providers with flexibility to target services that meet the needs of the customer, while still allowing for tracking of outcomes for reporting purposes.  Career Services are defined in 20 CFR 678.430, and rules governing their provision to adults and dislocated workers are discussed in 20 CFR 680.100 through 195.

The three categories of career services are as follows, and are further defined in TEGL 16-16 "One-Stop Operations Guidance for the American Job Center Network".

Basic Career Services

Basic career services are universally accessible and must be made available to all individuals seeking employment and training services in at least one comprehensive American Job Center per local area.  Generally, these services involve less staff time and involvement and include services such as: eligibility determinations, initial skill assessments, labor exchange services, provision of information on programs and services, and program referrals.  These services may be provided by both the Adult and Dislocated Worker programs, as well as by the Employment Service.

Individualized Career Services

Individualized career services must be provided to participants after American Job Center staff determine that such services are required to retain or obtain employment, consistent with any applicable statutory priorities.  Generally, these services involve significant staff time and customization to each individual's need.  Individualized career services include services such as: specialized assessments, developing an individual employment plan, counseling, work experiences (including transitional jobs), etc.

Local Workforce Development Boards (WDBs) must identify the assessments to be used to determine eligibility, and ensure eligibility determination procedures are consistent with state policies.  American Job Center staff may use recent previous interviews, evaluations, or assessments by partner programs to determine if individualized career services would be appropriate.  These services generally will be provided by the Adult and Dislocated Worker programs, although it may be appropriate for the Employment Service to provide some of these services.

Follow-up Services

States and local areas must provide follow-up services for adults and dislocated worker participants who are placed in unsubsidized employment, for up to 12 months after the first day of employment.  States and local areas must establish policies that define what are considered to be appropriate follow-up services, as well as policies for identifying when to provide follow-up services to participants.  One type of follow-up service highlighted in WIOA is to provide individuals counseling about the work place.  Follow-up services do not extend the date of exit in performance reporting; for more information on performance reporting see TEGL 10-16.

3

DOL_PRWORA_000090

5. **Transitional Jobs.** Transitional jobs are a type of work-experience Local WDBs may provide under WIOA and are considered an individualized career service. Transitional jobs are time-limited and wage-paid work experiences that are subsidized up to 100 percent. These jobs are in the public, private, or nonprofit sectors and are only available for individuals with barriers to employment who are chronically unemployed or have an inconsistent work history, as determined by the Local WDB. Transitional jobs provide an individual with work experience that takes place within the context of an employee-employer relationship, in which the program provider generally acts as the employer, and with an opportunity to develop important workplace skills. The WIOA Final Rule governs the requirements for transitional jobs at 20 CFR 680.190 and .195.

   This service must be combined with career and supportive services. These jobs must be designed to establish a work history for the individual, demonstrate success in the workplace, and develop the skills that lead to entry into and retention in unsubsidized employment. Unlike on-the-job training (OJT), there is no requirement that the employer retains the individual upon completion of the transitional job; however, retention, where appropriate, is preferred for the benefit of the worker and employer. Under section 134(d)(5) of WIOA and 20 CFR 680.195 of the Final Rule, Local WDBs may use up to 10 percent of their combined total of adult and dislocated worker funds to provide transitional jobs to individuals. For example, if a local area receives $1.5 million in adult funds and $1.0 million in DW funds, the Local WDB may use up to $250,000 (10% of the total) for transitional jobs.

   If the Local WDB uses transitional jobs as part of its service delivery strategy, it must adopt policies and identify appropriate employers (public, private, or nonprofit). Additionally, these policies must include plans on the amount of reimbursements for the jobs (up to 100 percent of the wage), what supportive services must be included, and the limits on the duration of the transitional job. If states and Local WDBs choose to use transitional jobs as a strategy, they must develop policies for defining and identifying individuals who are "chronically unemployed" or "have an inconsistent work history". The Department encourages targeting individuals who are long-term unemployed, ex-offenders, and individuals who are currently receiving or have exhausted TANF benefits when developing these policies. Additionally, the Department encourages utilizing job readiness training in combination with transitional jobs if determined appropriate by the Local WDB.

6. **Career Services provided by ES staff.** Labor exchange services, which are the primary services provided by ES staff, fall under the basic career services discussed in Section 4 of this TEGL. Additionally, all of the basic career services must be made available by ES staff in coordination with other American Job Center partners. ES staff may also make available the individualized career services discussed in Section 4 of this TEGL, and the Department encourages states to make these services available, particularly for those individuals with barriers to employment, such as the long-term unemployed, as defined in WIOA sec. 3(24). The WIOA Final Rules discuss career services provided by the ES program in 20 CFR 652.206 and 208.

   ES staff members also have specific obligations in serving unemployment insurance (UI)

4

claimants and carrying out components of the state's UI program, which include:

- Coordination of basic career services, particularly labor exchange services;
- Targeting UI claimants for job search assistance and referrals to employment;
- Administering state UI work test requirements, including, obtaining/documenting relevant information for eligibility assessments and providing job search assistance and referrals to employment;
- Provision of referrals to and application assistance to UI claimants for training and education resources and programs, including but not limited to Pell Grants, GI Bill, Post 9/11 Veterans Educational Assistance, WIOA, higher education assistance, and Vocational Rehabilitation;
- Outreach, intake (including identification through the state's Worker Profiling and Reemployment Services system of UI claimants likely to exhaust benefits and related programs, such as the Reemployment Services and Eligibility Assessment program), and orientation to information and other services available through the American Job Center network;
- Provision of information and assistance regarding filing claims under UI programs, including meaningful assistance to individuals (including individuals with language or other program access barriers) seeking assistance in filing a claim—
  - Meaningful assistance means providing assistance:
    - In the American Job Center(s), using staff who are well trained in UI claims filing activities and on the rights and responsibilities of claimants, and information necessary to file a claim, or
    - By phone or via other technology, such as live web chat and video conference, as long as the assistance is provided by appropriately-trained and available staff and within a reasonable time;
  - Technology-based approaches to providing meaningful assistance must ensure American Job Center customers have access to appropriately trained staff within a reasonable time. The referral of American Job Center customers to the state UI agency's self-service website or public phone line where the individual is placed into a queue with all other claimants is not meaningful assistance;
  - The cost associated in providing meaningful assistance may be paid for by the State's UI administrative funding, the WIOA Adult or Dislocated Worker programs, the ES program, or some combination of these funding sources.

7. **Training Services.** Training services can be critical to the employment success of many adults and dislocated workers. Training services are governed by sections 20 CFR 680.200 through .230 and 20 CFR 680.300 through .350 of the WIOA Final Rule. American Job Center staff may determine training services are appropriate, regardless of whether the individual has received basic or individualized career services first, and there is no sequence of service requirement.

Under WIOA, training services may be provided if the American Job Center staff, including partner programs' staff, determines after conducting an interview, an evaluation, or assessment, and career planning, that the individual:

5

DOL_PRWORA _000092

- Is unlikely or unable to obtain or retain employment that leads to economic self-sufficiency or wages comparable to or higher than wages from previous employment through career services alone;
- Is in need of training services to obtain or retain employment that leads to economic self-sufficiency or wages comparable to or higher than wages from previous employment;
- Has the skills and qualifications to successfully participate in the selected program of training services;
- Is unable to obtain grant assistance from other sources to pay the costs of such training, including such sources as State-funded training funds or Federal Pell Grants established under title IV of the Higher Education Act of 1965, or requires WIOA assistance in addition to other sources of grant assistance, including Federal Pell Grants (20 CFR 680.230 and WIOA sec. 134(c)(3)(B) contain provisions relating to fund coordination.);
- Is a member of a worker group covered under a petition filed for Trade Adjustment Assistance (TAA) and is awaiting a determination.  If the petition is certified, the worker may then transition to TAA approved training.  If the petition is denied, the worker will continue training under WIOA;
- Is determined eligible in accordance with the State and local priority system in effect for adults under WIOA sec. 134(c)(3)(E) if training services are provided through the adult funding stream; and
- Selected a program of training services that is directly linked to the employment opportunities in the local area or the planning region, or in another area to which the individual is willing to commute or relocate.

Training services, when determined appropriate, must be provided either through an Individual Training Account (ITA) or through a training contract discussed in Section 8 of this TEGL. Except in certain instances listed in WIOA sec. 122(h) and 20 CFR sec. 680.320, training services must be provided by an Eligible Training Provider (ETP) in accordance with WIOA sec. 122(d). Training is available through a State Eligible Training Provider and Program List (ETPL), comprised of entities determined eligible to receive funds through WIOA title I, subtitle B, according to the Governor's eligibility criteria and procedure.  As described in TEGL 41-14 (https://wdr.doleta.gov/directives/corr_doc.cfm?DOCN=5816), the State ETPL ensures the accountability, quality and labor-market relevance of programs, and ensures informed customer choice for individuals eligible for training.  WIOA also provides enhanced access and flexibility for work-based training options, such as Registered Apprenticeship (RA), on-the-job training, customized training, and incumbent worker training.

The list of ETPs must be made available to the Local WDB within the state by the State Workforce Agency (SWA), and to the participant by the Local WDB, in order to maximize consumer choice. The selection of training services should be conducted in a manner that maximizes customer choice, is linked to in-demand occupations, is informed by the performance of relevant training providers, and is coordinated to the extent possible with other sources of assistance, including Pell Grants (see WIOA sec. 134(c)(3)).

DOL_PRWORA _000093

DOL encourages States and Local WDBs, where appropriate, to utilize previous assessments when making training determinations to reduce duplicate assessments and develop enhanced alignment across partner programs.  This could include common intake forms across partner programs to encourage system alignment, reduce individual burden, and ensure customers greater access to programs based on their need.  The provision of training services necessary to assist a participant in achieving his/her employment and/or training goals may be reflected in the IEP.

Types of training services that may be provided include:

(a)     Occupational skills training, including training for nontraditional employment;
(b)     On-the-job training;
(c)     Incumbent worker training (see Section 13 of this TEGL);
(d)     Programs that combine workplace training with related instruction, which may include cooperative education programs;
(e)     Training programs operated by the private sector;
(f)     Skill upgrading and retraining;
(g)     Entrepreneurial training;
(h)     Job readiness training provided in combination with the training services described in any of clauses (a) through (g) or transitional jobs;
(i)     Adult education and literacy activities, including activities of English Language acquisition and integrated education and training programs, provided concurrently or in combination with services provided in any of clauses (a) though (g); and
(j)     Customized training conducted with a commitment by an employer or group of employers to employ an individual upon successful completion of the training.

8.  **Training Contracts.** Individual Training Accounts (ITAs) are the primary method to be used for procuring training services under WIOA, similar to the provision of training services under WIA.  However, in certain circumstances, a training contract may be used to provide training services, instead of an ITA.  These circumstances are referred to as the "training exceptions" or "contract exceptions". Training contracts may only be used if at least one of the five circumstances listed below applies and the process for their use is described in the Local Plan.  Additionally, the Local WDB must have fulfilled the consumer choice requirements of 20 CFR 680.340.  Under section 134(c)(3)(G)(ii) of WIOA and consistent with 20 CFR 680.320, 680.340, and 680.530, states may use the contract exceptions as described below:

- On-the-job training, which may include paying for the on-the-job training portion of an RA program, customized training, incumbent worker training, or transitional jobs;
- If the Local WDB determines that there are an insufficient number of Eligible Training Providers in the local area to accomplish the purpose of a system of ITAs.  This determination process must include a public comment period for interested providers of at least 30 days and must be described in the Local Plan;
- To use a training services program of demonstrated effectiveness offered in a local area by a community-based organization or other private organization to serve individuals with barriers to employment.  The Local WDB must develop criteria to be used in

7

determining demonstrated effectiveness, particularly as it applies to individuals with barriers to employment to be served.  The criteria may include:
- o Financial stability of the organization;
- o Demonstrated performance in the delivery of services to individuals with barriers to employment through such means as program completion rate; attainment of the skills, certificates, or degrees the program is designed to provide; placement after training in unsubsidized employment, and retention in employment; and
- o How the specific program relates to the workforce investment needs identified in the local plan;
- If the Local WDB determines that the most appropriate training could be provided by an institution of higher education or other provider of training services in order to facilitate the training of a cohort of multiple individuals for jobs in-demand sectors or occupations, provided that the contract does not limit consumer choice; and
- If the Local WDB determines, a pay-for-performance contract is suitable consistent with 683.500 (note that no more than 10 percent of the local funds may be spent on pay-for-performance contract strategies as they are defined in section 3(47) of WIOA, and be consistent with 20 CFR 683.510).

Additionally, a Local WDB may determine that providing training through a combination of ITAs and contracts is the most effective approach.  This approach could be used to support placing participants in programs such as Registered Apprenticeships and other similar types of training.

9. **Priority Populations under WIOA.**  Services provided to adults and dislocated workers under title I of WIOA can be a pathway to the middle class and to maintain and build skills to remain in the middle class.  Across all titles, WIOA focuses on serving "individuals with barriers to employment", defined in WIOA section 3(24) and seeks to ensure access to quality services for these populations. The WIOA Final Rules discuss priority and special populations for the Adult and Dislocated Worker programs at 20 CFR 680.600 through .660. These populations are discussed below:

Individuals with Barriers to Employment

The populations included in the "individuals with barriers to employment" in WIOA sec. 3(24) include:
- (a) Displaced homemakers (as defined in WIOA sec. 3(16));
- (b) Low-income individuals (as defined in WIOA sec. 3(36));
- (c) Indians, Alaska Natives, and Native Hawaiians (as defined in WIOA sec. 166(b));
- (d) Individuals with disabilities, including youth who are individuals with disabilities (as defined in WIOA sec. 3(25) (includes individuals who are in receipt of Social Security Disability Insurance);
- (e) Older individuals (age 55 and older) (as defined in WIOA sec. 3(39));
- (f) Ex-offenders ("offender" as defined in WIOA sec. 3(38));
- (g) Homeless individuals or homeless children and youths (see Attachment III);

DOL_PRWORA _000095

(h) Youth who are in or have aged out of the foster care system;

(i) Individuals who are:

(1)    English language learners (WIOA sec. 203(7)),

(2)    Individuals who have low levels of literacy (an individual is unable to compute or solve programs, or read, write, or speak English at a level necessary to function on the job, or in the individual's family, or in society); and

(3)    Individuals facing substantial cultural barriers;

(j) Eligible migrant and seasonal farmworkers (as defined in WIOA sec. 167(i)(1-3);

(k) Individuals within two years of exhausting lifetime TANF eligibility;

(l) Single parents (including single pregnant women);

(m) Long-term unemployed individuals (unemployed for 27 or more consecutive weeks); and

(n) Such other groups as the Governor involved determines to have barriers to employment

Statutory Priority for Adult Funds

Section 134(c)(3)(E) of WIOA establishes a priority requirement with respect to funds allocated to a local area for adult employment and training activities. Under this section, American Job Center staff when using WIOA Adult funds to provide individualized career services, as described in Section 4 of this TEGL, training services, or both, as described in Section 7, must give priority to recipients of public assistance, other low-income individuals, and individuals who are basic skills deficient. WIOA sec. 3(36) defines "low-income individual" and WIOA sec. 3(5) defines "basic skills deficient" (see Appendix IV for full definition). ETA notes that individuals who are English language learners meet the criteria for "basic skills deficient" and must be included in the priority populations for the title I Adult program. Under WIOA, priority must be implemented regardless of the amount of funds available to provide services in the local area. States are required to develop policies and procedures for applying this priority, including monitoring local areas' compliance with this priority.

Under WIOA, there is no exclusion of payments for unemployment compensation, child support payments, and old-age survivors insurance benefits from the income calculations for determining if an individual is low-income. These exclusions that were previously provided under WIA sec. 101(25) no longer apply.

The priority established in the previous paragraph does not necessarily mean that these services may only be provided to recipients of public assistance, other low-income individuals, and individuals who are basic skills deficient. The Local WDB and the Governor may establish a process that also gives priority to other individuals eligible to receive such services, provided that it is consistent with priority of service for veterans (see 20 CFR 680.650) and the priority provisions of WIOA sec. 134(c)(3)(E) and §680.600. Any additional priority populations identified by the State and Local WDB should be reflected in the State's WIOA Unified or Combined Plan, as well as the local area plan(s). Additionally,

9

the priority is to be applied for the provision of individualized career services and training services.  There are no restrictions to providing basic career services; they may be provided to any eligible adult.

<u>Veterans and Adult Priority</u>

Veterans and eligible spouses continue to receive priority of service for all DOL-funded job training programs, which include WIOA programs.  However, as described in TEGL 10-09, when programs are statutorily required to provide priority for a particular group of individuals, such as the WIOA priority for Adult funds described above, priority must be provided in the order described below.  A veteran must meet each program's eligibility criteria to receive services under the respective employment and training program.  For income-based eligibility determinations and for determining priority of service, military pay or allowances paid while on active duty or paid by the Department of Veterans Affairs (VA) for vocational rehabilitation, disability payments, or related VA-funded programs are not to be considered as income, in accordance with 38 U.S.C. 4213 and 20 CFR 683.230.

Priority must be provided in the following order:
  i.    First, to veterans and eligible spouses who are also included in the groups given statutory priority for WIOA Adult formula funding.  This means that veterans and eligible spouses who are also recipients of public assistance, other low-income individuals, or individuals who are basic skills deficient would receive first priority for services with WIOA Adult formula funds for individualized career services and training services.
  ii.   Second, to non-covered persons (that is, individuals who are not veterans or eligible spouses) who are included in the groups given priority for WIOA adult formula funds.
  iii.  Third, to veterans and eligible spouses who are not included in WIOA's priority groups.
  iv.   Fourth, priority populations established by the Governor and/or Local WDB.
  v.    Last, to non-covered persons outside the groups given priority under WIOA.

Note: When past income is an eligibility determinant for Federal employment or training programs, any amounts received as military pay or allowances by any person who served on active duty, and certain other specified benefits must be disregarded for the veteran and for other individuals for whom those amounts would normally be applied in making an eligibility determination.  Military earnings are not to be included when calculating income for veterans or transitioning service members for this priority, in accordance with 38 U.S.C. 4213.

Additionally, the WIOA Final Rule at 20 CFR 680.230, require coordinating WIOA funded training with "other grant assistance", such as Federal Pell Grants.  Some service providers have interpreted these provisions to mean that veterans or spouses who are eligible for the GI Bill or other forms of VA funded education or training are required to coordinate their entitlement to those benefits with their eligibility for WIOA funded training.  Some have further interpreted the coordination requirement to mean that the VA funded training

10

entitlement must be exhausted before the veteran or eligible spouse can be enrolled in WIOA funded training.  However, VA benefits for education and training services do not constitute "other grant assistance" under WIOA's eligibility requirements.  Therefore, eligibility for VA benefits for education or training services do not preclude a veteran or the veteran's eligible spouse from receiving WIOA funded services, including training funds.  Similarly, WIOA program operators may not require veterans or spouses to exhaust their entitlement to VA funded training benefits prior to allowing them to enroll in WIOA funded training.

10. **Dislocated Worker Eligibility**.  WIOA sec. (3)(15) defines the term dislocated worker, see Attachment III for the complete definition.

In order to further clarify the definition of a dislocated worker, the WIOA Final Rule at 20 CFR 680.130(b) allows for Governors and Local WDBs to create policies to define terms such as a "general announcement" of a plant closing consistent with WIOA sec. 3(15)(B)(ii) or (iii), "unemployed as a result of general economic conditions in the community in which the individual resides or because of natural disasters," and "unlikely to return to a previous industry or occupation" under WIOA sec. 3(15)(A)(iii) consistent with 20 CFR 680.660. Governors and Local WDBs may also develop policies for determining the eligibility of self-employed individuals, including family members and farm workers or ranch hands under WIOA sec. 3(15)(C). Additionally, States and Local WDBs should note that the definition of dislocated workers must include separating service members, as further described below.

Serving Separating Service Members and Military Spouses with Dislocated Worker Funds

Under 20 CFR 680.660, service members exiting the military, including, but not limited to, those who receive or are eligible for Unemployment Compensation for Ex-service members (UCX), generally qualify as dislocated workers.  Dislocated Worker funds under title I can help separating service members to enter or reenter the civilian labor force.  Generally a separating service member needs a notice of separation, either a DD-214 from the Department of Defense, or other appropriate documentation that shows a separation or imminent separation from the Armed Forces.  These documents meet the requirement that the individual has received a notice of termination or layoff, to meet the required dislocated worker definition.  In the case of separating service members, because they may be on a terminal leave from the military, it may make sense to begin providing career services while the service member may still be part of the Active Duty military, but has an imminent separation date.  It is appropriate to provide career services to separating service members who will be imminently separating from the military, provided that their discharge will be anything other than dishonorable.  Lastly, ETA policy generally dictates that a separating service member meets the dislocated worker requirement that an individual is unlikely to return to his or her previous industry or occupation in the military.

Regarding military spouses, 20 CFR 680.630 expands the definition of dislocated workers to include military spouses who have experienced a loss of employment as a direct result of relocation to accommodate a permanent change in duty station of the spouse.  Military spouses also can qualify if they are unemployed or underemployed and are experiencing

11

difficulty in obtaining or upgrading employment (see WIOA secs. 3(15)(E) and 3(16)(A) and (B)) and 20 CFR 680.630 of the DOL-only Final Regulations).  Military spouses may also qualify if they are a dependent spouse of a member of the Armed Forces on active duty whose family income is significantly reduced, as determined by the State or local area, because of a deployment, a call or order to active duty, a permanent change of station, or the service-connected death or disability of the service member.  See Attachment III for definitions of these terms.

11. **Employment Status Clarification.**  In addition to providing career and training services to individuals who are unemployed, a significant number of job seekers are underemployed.  State and local policy should be developed for serving individuals that are underemployed.  Examples of underemployed individuals that the policies may include are:
   - Individuals employed less than full-time who are seeking full-time employment;
   - Individuals who are employed in a position that is inadequate with respect to their skills and training;
   - Individuals who are employed who meet the definition of a low-income individual in WIOA sec. 3(36); and
   - Individuals who are employed, but whose current job's earnings are not sufficient compared to their previous job's earnings from their previous employment.

   Individuals who are underemployed and meet the definition of a low-income individual may receive career and training services under the Adult program on a priority basis per Section 10 of this TEGL.  Individuals who meet the definition of an individual with a barrier to employment (see WIOA sec. 3(24)) who are underemployed may also be served in the Adult program; however, unless they are a recipient of public assistance, a low-income individual, or are basic skills deficient, they are not eligible for service on a priority basis.  Individuals who were determined eligible for the Dislocated Worker program who are determined by State and/or local policies to be underemployed, may still be considered eligible to receive services under the Dislocated Worker program depending on State and/or local policies.  For instance, an individual who is dislocated from a full time job who has found part-time employment may still be considered a dislocated worker by State and/or local policies.  We encourage states and local areas to develop policies and procedures for determining underemployment for both the adult and dislocated worker programs.

12. **Work-Based Training.**  Under WIOA, there are additional work-based training options and flexibilities for adults and dislocated workers. Work-based training presents a great opportunity for fostering increased employer engagement, implementing sector strategies, and encouraging industry partnerships, as these types of training allow employers to train their employees while continuing to be productive members of the workforce.  This section covers allowed types of work-based training including: registered apprenticeships, on-the-job training (OJT), and customized training.  Sections 20 CFR 680.700 through .840 govern Work-Based Training.

   Registered Apprenticeship (RA)

DOL_PRWORA _000099

RA is an important component of potential training and employment services that the workforce system can provide to its customers.  We encourage Local WDBs to partner with the RA system and use RA opportunities as a career pathway for job seekers and as a job-driven strategy for employers and industries.  RA can be funded through several mechanisms.  Section 122(a)(3) of WIOA also provides a new opportunity for RA programs to be more directly connected to the public workforce system.  As RA programs, they are automatically eligible for inclusion on the State and local WDB's  ETPL, if they choose to be, allowing ITAs to support participants in RA programs, and more directly connect those programs to the American Job Center network.

Every State has either a federal DOL Office of Apprenticeship (OA) or a State Apprenticeship Agency (SAA).  Local WDBs and American Job Centers should work with the offices in their State to implement registered apprenticeships, (Federal OA and SAA State contact information is available at http://www.doleta.gov/oa/contactlist.cfm).

RA Program sponsors can be Eligible Training Providers (ETPs).  Some examples of typical RA Program sponsors are:

- **Employers who provide related instruction:**  A number of employers with RA programs provide formal in-house instruction as well as on-the-job training (OJT) at the work site.
- **Employers who use an outside educational provider**: Under this model, RA program sponsors do not provide the related instruction or educational portion of the apprenticeship, but rely upon an outside educational entity to deliver instruction. Employers can use two- or four-year post-secondary institutions, technical training schools or on-line courses for related instruction.  Under this formulation, the employer is the ETP and must identify their instructional provider.
- **Joint Apprenticeship Training Programs**:  These programs are made up of employers and unions.  They have an apprenticeship training school where the instructional portion of the apprenticeship program is delivered.  The training schools are usually administered by the union, in which case the union would be the ETP. Multiple employers can be a part of the same Joint Apprenticeship Training Program.
- **Intermediaries:** Intermediaries can serve as program sponsors when they take responsibility for the administration of the apprenticeship program.  They also can provide expertise such as curriculum development, classroom instruction and supportive services, as appropriate.  The intermediary is the ETP and must identify the instructional provider if an outside organization is providing the educational portion of the apprenticeship.  Intermediaries include:
  - Educational institutions including two- and four-year post-secondary institutions or technical schools.  In this model, the educational institution administers the program, works with employers to hire apprentices and provides classroom or on-line instruction for the apprenticeship program;
  - Industry associations that administer the program and work with employer/members and educational entities to implement the apprenticeship program; and

13

- o Community-based organizations that administer the program and work with employers, educational entities and the community to implement the apprenticeship program.

ETA is committed to fully integrating RA programs as an employment and training solution for American Job Center centers.  American Job Center centers may make arrangements with RA programs to initiate applications to RA programs on behalf of participants. ETA wants to ensure that local areas have maximum flexibility to serve participants and support their placement into RA programs.  Given the unique nature of RA, there are several ways in which training services may be used in conjunction with these programs:

- An ITA may be developed for a participant to receive RA training;
- An OJT contract may be developed with a RA program for training participants.  OJT contracts are made with the employer or RA program sponsor, and RAs generally involve both classroom and on-the-job instruction.  The OJT contract may be made to support some or all of the OJT portion of the RA program;
- A combination of an ITA to cover the classroom instruction along with an OJT contract to cover on-the-job portions of the RA is allowed; and
- Incumbent worker training may be used for upskilling apprentices or journey workers who already have an established working/training relationship with the RA program.

Local areas may also include supportive services, in coordination with career and/or training services, to participants in a RA program.  These supportive services must be consistent with WIOA section 134(d)(2), Section 14 of this TEGL, and state and local policies.

*Reporting on Registered Apprenticeship Participation under WIOA*

As states and local areas increasingly adopt RA programs as part of their sector strategies and career pathways approaches, complete and accurate reporting of the workforce system's investments in these programs is vital.  Under WIOA, data on program participants and program outcomes is reported by states through the Participant Individual Record Layout (PIRL).  Participants who are placed into a registered apprenticeship with WIOA funds or individuals in a registered apprenticeship at the time of program entry must be identified in PIRL element 931.  In addition to the other required reporting elements, individuals who receive RA training services funded in whole or in part from WIOA under either an Individual Training Account (ITA) or through a contract (e.g. OJT) must be reported under code value 09 on PIRL element number 1303 (or elements 1310 or 1315 if the participant is in receipt of multiple types of training).  If the RA program is funded using an ITA, PIRL elements 1301, 1304 (code value "2"), and 1305 must also be reported.

On-the-Job Training

OJT continues to be a key method of delivering training services to adults and dislocated workers.  WIOA provides for State and Local WDB to provide up to 50 percent of the wage rate of the participant to employers for the costs of training while the participant is in the

DOL_PRWORA_000101

program. OJT contracts may also be entered into with RA program sponsors or participating employers in registered apprenticeship programs for the OJT portion of the registered apprenticeship program consistent with 20 CFR 680.700. Depending on the length of the registered apprenticeship and State and Local WDB OJT policies, these funds may cover some or all of the duration of the registered apprenticeship. Additionally, the Governor and Local WDBs have the flexibility under WIOA to increase the reimbursement level to up to 75 percent of the total wage taking into account the following factors:

- The characteristics of the participants taking into consideration whether they are "individuals with barriers to employment" as defined in WIOA sec. 3(24);
- The size of the employer, with an emphasis on small businesses;
- The quality of employer-provided training and advancement opportunities, for example if the OJT contract is for an in-demand occupation and will lead to an industry-recognized credential; and
- Other factors the Governor or Local WDB may determine appropriate (e.g. the number of employees participating in the training, wage and benefit levels of the employees (both pre and post participation earnings), and relation of the training to the competitiveness of the participant).

Governors or Local WDBs must document the factors used when deciding to increase the wage reimbursement levels above 50 percent up to 75 percent.

Customized Training

Customized training is designed to meet the specific requirements of an employer or group of employers with the commitment that the employer(s) hire an individual upon successful completion of the training. The Final Rules provide Local WDBs with flexibility to ensure that customized training meets the unique needs of the job seekers and employer(s). The employer must pay for a significant portion of the cost of training, as determined by the Local WDB. Local WDBs must identify policies for determining what constitutes employer's payment of "a significant portion of the cost of training" taking into account: the size of the employer and other factors the Local WDB determines are appropriate, which may include, the number of employees participating in training, wage and benefit levels of those employees (at present and anticipated upon completion of the training), relation of the training to the competitiveness of a participant, and other employer-provided training and advancement opportunities.

*Reporting On-the-Job Training and Customized Training Participation under WIOA*

It is important to note that OJT and customized training are excluded from the credential attainment performance indicator because although they often provide employment benefits to recipients of these services, they rarely result in a credential. However, ETA encourages Local WDBs to consider OJT and customized training programs that do result in a credential.

13. **Incumbent Worker Training (IWT).** IWT provides both workers and employers with the opportunity to build and maintain a quality workforce and is governed by sections 20 CFR

15

680.780 through .820 of the Final Rule.  IWT is designed to meet the needs of an employer or group of employers to retain a skilled workforce or avert layoffs.  IWT is not permitted to be used to provide the occupational training a new hire needs.  IWT can be used to either:

- Help avert potential layoffs of employees, or
- Obtain the skills necessary to retain employment, such as increasing the skill levels of employees so they can be promoted within the company and create backfill opportunities for less-skilled employees.

Under section 134(d)(4) of WIOA and 20 CFR 680.800, a Local WDB can use up to 20 percent of their Adult and Dislocated Worker funds to provide for the federal share of the cost of providing IWT.  For example, if a Local WDB receives $1.5 million in Adult funds and $1.0 million in DW funds; it may use up to $500,000 (20 percent of the total) for IWT.  This 20 percent can be used for IWT activities that are programmatic in nature, as administrative activities must be paid out of the Board's administrative funds.   The Local WDB must determine an employer's eligibility for participating in IWT based on the following factors which help to evaluate whether training would increase the competitiveness of the employees or both the employees and the employer:

- The characteristics of the individuals in the program (e.g. individuals with barriers to employment);
- Whether the training improves the labor market competitiveness of the employees or both the employees and the employer; and
- Other factors the Local WDB may consider appropriate, including:
  - the number of employees participating in the training;
  - wage and benefit levels of those employees (both pre- and post-training earnings);
  - the existence of other training and advancement opportunities provided by the employer;
  - credentials and skills gained as a result of the training;
  - layoffs averted as a result of the training;
  - utilization as part of a larger sector and/or career pathway strategy; or
  - employer size

For an employer to receive IWT funds, the individual(s) receiving training must be:

- Employed;
- Meet the Fair Labor Standards Act requirements for an employer-employee relationship; and
- Employment history requirement - Have an established employment history with the employer for 6 months or more (which may include time spent as a temporary or contract worker performing work for the employer receiving IWT funds).

There is one exception to the six month requirement, which is that in the event that incumbent worker training is being provided to a cohort of employees, not every employee in the cohort must have an established employment history with the employer for six months or more as long as a majority of those employees being trained meet the employment history requirement.

16

An incumbent worker does not have to meet the eligibility requirements for career and training services for adults and dislocated workers under WIOA, unless they are also enrolled as a participant in the WIOA adult or dislocated worker program.

The Governor or the State WDB may make recommendations to the Local WDBs for providing incumbent worker training that has a statewide impact.  ETA encourages States and Local WDBs to cultivate opportunities and develop policies that can appropriately support employers in their efforts to develop a more competitive workforce or avert potential layoffs and that provide incumbent workers with opportunities for advancement and wage gains within their company.

States may also provide IWT with Rapid Response funds for statewide incumbent worker training activities as part of a broader layoff aversion strategy, as described in section 18 of this TEGL.  IWT policies must be consistent with State and Local Plans, as well as with career pathway and sector strategy approaches for in-demand occupations.  Generally, IWT should be provided to private sector employers; however, there may be instances where non-profit and local government entities may be the recipients of IWT funds.  For example, IWT may be used in the health care industry where hospitals are operated by non-profit or local government entities and a nursing upskilling opportunity is available.

IWT can also be used for underemployed workers—e.g. workers who would prefer full-time work but are working part-time for economic reasons.  While these workers are employed, they may have accepted reduced hours to gain or maintain employment or a previous dislocation has led them to accept reduced employment and often lower wages that may have a permanent effect on their careers.  The use of these strategies may focus on increasing skills for underemployed frontline workers in an effort to advance these workers to more skilled positions with the same employer or industry sector leading to an increase in earnings through more work hours or an increase in pay. As part of an incumbent worker upskilling strategy, State and Local WDBs are also encouraged to develop an upskill/backfill strategy which involves filling jobs vacated by workers who are moving into more advanced positions in the company with other WIOA participants.  State and Local WDBs are encouraged to develop contracts such that once incumbent workers advance with the employer; the employer then provides an opportunity to the State or Local WDBs to fill this now vacant position with a local WIOA participant.

State and Local WDBs must develop a process for documenting the six month work-history requirement for IWT recipients with the employer.  The contract between the Local WDB and the employer must include this as a term of the contract.

Employer Payment Requirement
Employers are required to pay the non-Federal share of the cost of providing incumbent worker training. WIOA sec. 134(d)(4)(D) requires Local WDBs to establish policies regarding the non-federal share of the cost of IWT.  Employers are required to pay a portion of the training for those individuals in incumbent worker training and this may be done

17

through both cash payments and fairly evaluated in-kind contributions.  The employer contribution may include the wages the employer pays to the incumbent worker trainee while the worker is attending training. Under section 134(d)(4)(D) of WIOA, in establishing the employer share of the cost, the Local WDB must consider the number of employees participating in the training, the wage and benefit levels of the employees (at the beginning and anticipated upon completion of the training), the relationship of the training to the competitiveness of the employer and employees, and the availability of other employer-provided training and advancement opportunities.  The employer's payment for the non-federal share can be cash payments, fairly evaluated in-kind contributions, or both.  The minimum amount of employer share in the IWT depends on the size of the employer and may not be less than:

- 10 percent of the cost, for employers with 50 or fewer employees;
- 25 percent of the cost, for employers with between 51 to 100 employees; and
- 50 percent of the cost, for employers with more than 100 employees.

Employer share must be reported on the quarterly ETA-9130 financial report. States may also create policies establishing minimum amounts of employer share for IWT conducted using statewide funds, including rapid response funds.

14. **Supportive Services and Needs-Related Payments.**  A key principle in WIOA is to provide local areas with the authority to make policy and administrative decisions, and the flexibility to tailor the workforce system to the needs of the local community.  To ensure maximum flexibility, this guidance provides local areas the discretion to provide the supportive services they deem appropriate, subject to WIOA's limitations.  Supportive services are designed to provide a participant with the resources necessary to enable their participation in career and training services, and are governed by the DOL-only Final Rule at 20 CFR 680.900 through .970.

Local WDBs must develop policies and procedures governed by 20 CFR 680.900 through .970 of the Final Rule. Local WDBs, in consultation with the American Job Center partners and other community service providers, must develop a policy on supportive services that ensures resource and service coordination in the local area. The policy should address procedures for referral to such services, including how such services will be funded when they are not otherwise available from other sources.  These policies may establish limits on the provision of supportive services or provide the one-stop center with the authority to establish such limits, including a maximum amount of funding and maximum length of time for supportive services to be available to a participant.  These policies may also allow American Job Centers to grant exceptions to these limits.  Local WDBs must develop policies and procedures that ensure that supportive services are WIOA-funded only when these services are not available through other agencies and that the services are necessary for the individual to participate in title I activities.  These policies include establishing limits on the provision of supportive services and any exceptions to those limits, as described in 20 CFR 680.920.

18

Supportive services may be made available to any adult or dislocated worker participating in title I career services or training activities that is unable to obtain supportive services through other programs providing such services.  Additionally, the supportive services must be necessary to enable the individual to participate in career services or training activities.  Note that follow-up career services are not a qualifying service for the receipt of supportive services; therefore, an individual who is only receiving "follow-up" services may not receive supportive services.  Individuals identified as needing ongoing supportive services must still be participating in career services (other than follow-up), training activities, or both to continue to receive supportive services.  Supportive services also may not be used to extend the date of exit for performance accountability purposes.  Supportive services, like follow-up services, do not make an individual a participant or extend participation.

Supportive services may include, but are not limited to:
- Assistance with transportation;
- Assistance with child care and dependent care;
- Linkages to community services;
- Assistance with housing;
- Needs-Related Payments (available only to individuals enrolled in training services and must be consistent with 20 CFR 680.930, 680.940, 680.950, 680.960, and 680.970)
- Assistance with educational testing;
- Reasonable accommodations for individuals with disabilities;
- Referrals to health care;
- Assistance with uniforms or other appropriate work attire and work-related tools, including such items as eye glasses and protective eye gear;
- Assistance with books, fees, school supplies, and other necessary items for students enrolled in post-secondary education classes;
- Payments and fees for employment and training-related applications, tests, and certifications; and
- Legal aid services.

Needs-related payments are designed to provide a participant with financial assistance for the purpose of enabling them to participate in training services.  ETA recognizes that many individuals in need of training services may not have the resources available to participate in the training.  Needs-related payments can help individuals meet their non-training expenses and help them to complete training successfully.  The maximum level of needs-related payments must be established by the Local WDB and must follow criteria at 20 CFR 680.970.  According to sec. 134(d)(3)(B) of WIOA, a participant must be enrolled in a training program described in sec. 134(c)(3) of WIOA in order to receive needs-related payments.  Specific criteria for Adult and Dislocated Worker eligibility may be found in 20 CFR 680.940 and 680.950.

15. **Transfer of Funds**.  WIOA sec. 133(b)(4) provides the authority for Local WDBs, with the written approval of the Governor, to expend up to 100 percent of the Adult activities funds on Dislocated Worker activities, and up to 100 percent of Dislocated Worker activities funds on Adult activities.  Governors must have a written policy in place to evaluate transfer requests

19

from local workforce areas which is documented in the State Plan or another written policy. ETA encourages the Governor's policy to take into account the employment and service needs of the local area (both job seekers and employers), current labor market information and demographics, consistency with broader strategies in the local plan, meeting the Local Area's negotiated levels of performance, and any other considerations the Governor considers necessary to determine the appropriateness of a transfer.  Expenditures of monies transferred between the local dislocated workers and adult programs are reported on the ETA-9130 reports.  ETA notes when considering such transfers that career and training services must continue to be made available to both adults and dislocated workers in the American Job Centers (see WIOA sec. 134(c)(1)).

16. **Performance Accountability: Career and Training Services.**  In order to achieve the vision of WIOA, align service delivery across the core WIOA programs, and ensure a comprehensive approach across all partners, the Departments of Labor and Education have developed common performance measures and reporting elements, see TEGL 10-16 (https://wdr.doleta.gov/directives/corr_doc.cfm?DOCN=8226).  This includes common definitions of the terms "reportable individual", "participant", and "exit" for performance accountability purposes.  These terms distinguish which individuals are included in performance accountability calculations, while also ensuring the Department tracks the other important self-service and information-only services or activities provided by the Adult, Dislocated Worker, and ES programs.

In the WIOA title I Adult and Dislocated Worker programs, in order to become a participant, an individual must meet all applicable program requirements to receive services, such as being determined eligible and have received a service other than self-service or accessed information-only services or activities.  For the ES program, which provides access to all job seekers and does not have an eligibility component, to be considered a participant, an individual must receive a service other than self-service and information-only services or activities to be considered a participant.  A chart that details which services go beyond self-service or information-only service and therefore trigger participation is included as Attachment II.  It is important to note that the receipt of one or more services that would trigger participation means that a person is considered a participant and therefore should be included in the performance accountability measures reported through the Annual Statewide Performance Reports. The WIOA Final Rules discuss performance accountability at Part 677 of the Joint Regulations.  20 CFR 677.150 defines "participant", "reportable individual", and "exit" and for the purposes of the WIOA Adult, Dislocated Worker, and ES programs, and the definitions of these terms are included in III of this TEGL.

State and Local WDBs should also note that unlike the WIOA Youth program, in the WIOA Adult, Dislocated Worker, and the ES programs, an assessment (other than an eligibility assessment) is considered to be a type of basic career service that does trigger participation. A referral to employment (when a specific individual or group of individuals is referred to a specific job or jobs) is the only type of referral that would trigger participation. Referrals alone to other programs and services do not trigger participation.  However, referrals that are generated as a result of a service, such as career counseling, trigger participation.  Simple

20

searches of job boards or automated emails are not considered to be referrals to employment, as they are informational in nature and contain publicly available information.

The ES program provides vital self-service and informational services which would result in the ES program having a high percentage of reportable individuals. Even though these individuals are not included in the performance accountability calculations, ETA strongly supports these services and other services which can be provided virtually. ETA also notes that individuals may also receive virtual services and virtual career planning that demonstrate sufficient interaction or engagement with the system to be considered participants.

Performance Accountability for Training Services
Generally, all participants enrolled in training funded by the WIOA title I Adult, Dislocated Worker program, or both are counted for performance accountability purposes. However, participants who receive OJT or customized training *are not* included in the credential attainment indicator at 20 CFR 677.155(a)(1)(iv) for performance accountability purposes, but, must be included in the calculation of the other performance indicators.

Performance Accountability for Incumbent Worker Training
WIOA sec. 134(d)(4) requires the Local WDB to determine if an employer is eligible to have its employees receive IWT and the incumbent worker who receives the training is not required to meet the eligibility requirements for career and training services for adults and dislocated workers under WIOA title I, unless they also are enrolled as a participant, resulting from the receipt of other services in the WIOA title I Adult or Dislocated Worker program. Due to WIOA sec. 134's unique eligibility requirements, the Department does not consider individuals who receive only IWT to be participants required for inclusion in the WIOA performance accountability calculations.

As a result, an individual who _only_ receives incumbent worker training and does not become a core program participant will not be included in the calculation of the State primary indicators of performance for negotiations and accountability purposes. However, states and Local WDBs are required to report the outcomes of individuals in receipt of IWT on the primary indicators of performance (i.e. employed 2nd quarter after exit, employed 4th quarter after exit, median earnings, measurable skills gain, and credential attainment), among other required elements. Although there are fewer required elements for an individual who receives only IWT and is not an Adult or Dislocated Worker, the required elements for these "IWT-only" individuals will mostly be limited to the elements that are used to identify whether the incumbent worker was employed in certain quarters after exit, the wages earned during these quarters, whether a measurable skill gain or gains were achieved, and whether a credential was attained (see TEGL 10-16, Attachment 8 for the specific list of required elements). For the purposes of calculating these metrics, the exit date for a participant who has only received IWT will be the last date of training, as indicated in the training contract. If the individual receiving IWT is also a participant in another program, the State is required to report that program's performance reporting information.

All recipients of IWT must be reported in the PIRL under element number 907, regardless of whether they become a participant in one of the other WIOA programs. For individuals who

21

only receive IWT, and therefore are not participants in the Adult or Dislocated Worker programs, states must still report a "Date of Program Entry" in element 900, and should report a "0" in elements 903 "Adult" and 904 "Dislocated Worker."  The Departments also encourage the collection of participant Social Security Numbers (SSNs) as part of the training contract with the employer so that wage records will be available for these individuals. Otherwise the State or Local WDB must utilize supplemental wage information to verify the wages reported.  The Departments will issue additional guidance on the usage of supplemental data.

For individuals who receive IWT that is funded with Statewide Rapid Response (element 908) funds under WIOA sec. 134(a)(2)(A)(i)(I), states  must also report on these individuals under DOL-only PIRL element 1501, "Most Recent Date Received Rapid Response Services".

17. **Other Permissible Local Activities.**  WIOA provides significant flexibility to local areas when providing services with adult and dislocated worker funds.  In addition to the required career and training services, local areas may use these funds to provide additional job seeker services, business services, as well as to facilitate enhanced coordination between other partner programs and entities at the State and local level.  Local areas can use these funds to develop new types of technical assistance, develop new intake procedures, test new procurement methods which may lead to better outcomes for job seekers, and ensure provision of robust services for businesses throughout the workforce system.  These permissible local activities include:

Other Job Seeker Services
- Customer support to enable individuals with barriers to employment (including individuals with disabilities and veterans) to navigate among multiple services and activities (e.g. dedicated staff specializing in disability services);
- Training programs for displaced homemakers and for individuals training for nontraditional occupations (see WIOA sec. 3(37)), in conjunction with programs operated in the local area; and
- Work support activities for low-wage workers, in coordination with American Job Center partners, which will provide opportunities for these workers to retain or enhance employment.  Work support activities could include providing services during nontraditional hours and provision of onsite childcare while the services are being provided.  Work support activities are a strategy that can be used to ensure quality services to individuals who are underemployed.  This may include any activities available under the WIOA Adult and Dislocated Worker programs in coordination with the appropriate activities and resources available through partner programs.  For example, an apprentice who has not yet reached the full wage-rate could be provided these services to help him/her to continue to advance in the RA.

Other Employer Services
- Customized screening and referral of qualified participants in career and  training services to employers;

DOL_PRWORA _000109

- Customized employment-related services to employers, employer associations, or other such organizations on a fee-for-service basis that are in addition to labor exchange services available to employers under the ES program; and,
- Activities to provide business services and strategies that meet the workforce investment needs of area employers, as determined by the Local WDB, consistent with the local plan.

Other Coordination Activities
- Employment and training activities in coordination with child support enforcement activities, as well as child support services and assistance activities, of State and local agencies carrying out part D of title IV of the Social Security Act;
- Employment and training activities in coordination with cooperative extension programs carried out by the Department of Agriculture;
- Employment and training activities in coordination with activities to facilitate remote access to services provided through the American Job Center network, including facilitating access through the use of technology;
- Improving coordination between workforce investment activities and economic development activities carried out within the local area involved, and to promote entrepreneurial skills training and microenterprise services;
- Improving services and linkages between the local workforce investment system and employers, including small employers, in the local area;
- Strengthening linkages between the American Job Center network and the unemployment insurance programs;
- Improving coordination between employment and training activities and programs carried out in the local area for individual with disabilities, including programs carried out by State agencies relating to intellectual disabilities and developmental disabilities, activities carried out by Statewide Independent Living Councils established under sec. 705 of the Rehabilitation Act of 1973, programs funded under part B of chapter 1 of title VII of the Act, and activities carried out by centers for independent living; and
- Other Federal agency supported workforce development initiatives, under the Departments of Transportation, Energy, Veterans Affairs, Housing and Urban Development, Interior, Health and Human Services, and Defense programs.

Other Activities
- Implementing a pay-for-performance contract strategy for training services utilizing up to 10 percent of the combined total of Adult and Dislocated Worker funds;
- Technical assistance for American Job Center partners, and eligible training providers on the provision of services to individuals with disabilities in local areas, including staff training and development, provision of outreach and intake assessments, service delivery, service coordination across providers and programs, and development of performance accountability measures;
- Activities to adjust the economic self-sufficiency standards referred to in WIOA sec. 134(a)(3)(A)(xii) for local factors or activities to adopt, calculate or commission for approval, economic self-sufficiency standards for the local areas that specify the income needs of families, by family size, the number and ages of children in the family, and sub-State geographical considerations; and

23

- Implementing promising services to workers and businesses, which may include support for education, training, skill upgrading, and statewide networking for employees to become workplace learning advisors and maintain proficiency in carrying out the activities associated with such advising.

18. **Rapid Response.**  Rapid Response activities are described at 20 CFR 682 Subpart C of the WIOA regulations (covering 20 CFR 682.300 through 682.370).  Rapid Response encompasses the strategies and activities necessary to plan for and respond as quickly as possible following an announcement or notification of a permanent closure or mass layoff, a mass job dislocation resulting from a natural or other disaster, or the filing of a Trade Adjustment Assistance (TAA) petition.  Rapid Response delivers services to enable dislocated workers to transition to new employment as quickly as possible.

Purpose

The purpose of Rapid Response is to promote economic recovery and vitality by developing ongoing, comprehensive approaches to identifying, planning for, or responding to layoffs and dislocations, and preventing or minimizing their impacts on workers, businesses, and communities.  A successful Rapid Response system must include:
- Informational and direct reemployment services for workers, including but not limited to: information and support for filing unemployment insurance claims; information about the Trade Adjustment Assistance (TAA) program; information on the impacts of layoff on health coverage or other benefits; information on and referral to career services; reemployment-focused workshops and services; and training;
- Delivery of solutions to address the needs of businesses in transition, provided across the business lifecycle (expansion and contraction), including comprehensive business engagement and layoff aversion strategies and activities designed to prevent or minimize the duration of unemployment;
- Convening, brokering, and facilitating the connections, networks and partners to ensure the ability to provide assistance to dislocated workers and their families such as home heating assistance, legal aid, and financial advice; and
- Strategic planning, data gathering and analysis designed to anticipate, prepare for, and manage economic change.

Responsibility for Carrying out, Overseeing, and Managing Rapid Response Activities

Under the WIOA Final Rule at 20 CFR 682.310, Rapid Response activities must be carried out by the State or an entity designated by the State, in conjunction with the Local WDBs, Chief Elected Officials (CEOs), and other stakeholders consistent with WIOA secs. 133(a)(2) and 134(a)(2)(A).  The regulations also require states to establish and maintain a Rapid Response unit, even if the State chooses to designate an entity to carry out some or all of the Rapid Response program activities in the State.  This State-level unit is responsible for developing policies and practices for Rapid Response, carrying out statewide Rapid Response activities, and, if a state entity was designated to carry out Rapid Response activities, the

24

state-level unit must oversee Rapid Response activities undertaken by a designated State entity.

<u>When is Rapid Response Required?</u>

Rapid Response must be provided when one or more of the following circumstances occur:
a)  Announcement or notification of a permanent closure of a facility, store, enterprise, or plant, regardless of the number of workers affected;
b)  Announcement or notification of a mass layoff (see below for more detail);
c)  A mass job dislocation (see below for how mass dislocation is defined) resulting from a disaster as defined by state or local emergency management policies.  The Department encourages States to consider appropriate roles and responsibilities for Rapid Response activities following a natural or other disaster event and establish these roles and responsibilities as part of any emergency management plans that are developed; or,
d) The filing of a TAA petition, in accordance with sec. 221(a)(2)(A) of the Trade Act, which requires that the Governor ensure that Rapid Response services are delivered to all workers who are covered by the petition for TAA.

Although we describe above the circumstances that require delivery of Rapid Response, we do not intend to suggest or imply that these are the only instances for which States and local workforce areas may provide Rapid Response.  Instead, the Department strongly encourages States or their designated entities to deliver Rapid Response services to as many workers and companies as possible and to adopt policies that maximize the opportunities for Rapid Response services to be provided in a manner that best supports the businesses and workers in their communities.  One good way to achieve this goal is through the State's definition of "mass layoff" for purposes of Rapid Response.

<u>Defining "Mass Layoff" for Purposes of Rapid Response</u>

One specific instance where Rapid Response services must be provided is upon notification of a mass layoff.  As described in the regulations, for the purposes of Rapid Response, a mass layoff will have occurred when at least one of the following conditions have been met:
- A mass layoff, as defined by the State; however, under no circumstances may a State's definition of mass layoff exceed a minimum threshold of 50 affected workers.  For example, in its definition, the State cannot set the minimum threshold of laid off workers at 75, but it can be set to as few as 1.  The definition may be based upon factors such as the size of the company that is impacted, the percentage of workers impacted by a layoff, the income level of the employees, and other relevant factors;
- Where a State has not defined a minimum threshold for mass layoff, any layoff affecting 50 or more workers will be considered a mass layoff by default; or
- When a company files a Worker Adjustment and Retraining Notification (WARN) Act notice, regardless of the number of workers affected by the layoff announced.

25

DOL_PRWORA _000112

As mentioned above, the Department strongly encourages states to consider developing mass layoff policies and definitions that maximize the number of companies and workers who may benefit from Rapid Response services.

Required Rapid Response Activities

Rapid Response practitioners will notice that the regulations for Rapid Response under WIOA have significantly increased the amount and types of required activities from under WIA.  These required elements include activities that were previously discussed in guidance and through technical assistance as well as elements that were previously allowable under WIA but which are now required.  In particular, the regulations now specifically identify layoff aversion activities and the provision of additional assistance to local areas experiencing increased dislocation events as required Rapid Response activities.  Our experience under WIA showed that such activities are critical for a successful Rapid Response program.  To meet the needs of affected workers and businesses, a Rapid Response program must be proactive, data-driven, engaged with businesses, and focused on preventing layoffs or minimizing their negative impacts.  Therefore, we substantially increased the level of required activities under Rapid Response to drive those outcomes.

A.  Layoff Aversion

The most significant change related to Rapid Response from the WIA regulation to the WIOA regulation is the requirement to conduct layoff aversion activities, as appropriate.  More specifically, the regulations require that states and local areas have the capability to conduct layoff aversion; however, it is left to the discretion of the operators of Rapid Response programs to determine which strategies and activities are applicable in a given situation, based upon specific needs, policies, and procedures within the state and operating areas.  In this way the regulations permit state and local rapid response operators the flexibility to meet the requirements of WIOA based on the specific needs of the companies and workers being served and the particular characteristics of each event, while ensuring that valuable and important solutions are delivered whenever possible.  We encourage state and local rapid response teams to develop strategies that maximize the ability to deploy the appropriate layoff aversion solutions for the challenges they face.

Layoff aversion strategies and activities are designed to prevent, or minimize the duration of, unemployment resulting from layoffs.  Layoff aversion is a comprehensive approach requiring the integration of data, relationships, partnerships, and policies and procedures to allow an assessment of the economic situation that exists within a given area.  This approach enables the development of a plan that may be applied, at any time, to intervene and manage transition that occurs within that area.  Layoff aversion strategies and activities are customized to specific needs, quickly deployable, informed by economic data, and designed and coordinated with partners as necessary.

ETA encourages state and local Rapid Response operators to design innovative solutions for both businesses and workers in transition.  Such solutions include, but are not limited to:

DOL_PRWORA_000113

- Ongoing engagement, partnership, and relationship-building activities with businesses in the community, in order to create an environment for successful layoff aversion efforts and to enable the provision of assistance to dislocated workers in obtaining reemployment as soon as possible;
- Providing assistance to employers in managing reductions in force, which may include early identification of firms at risk of layoffs, assessment of the needs of and options for at-risk firms, and the delivery of services to address these needs;
- Funding feasibility studies to determine if a company's operations may be sustained through a buyout or other means to avoid or minimize layoffs;
- Developing, funding, and managing incumbent worker training programs or other worker upskilling approaches as part of a layoff aversion strategy or activity;
- Connecting companies to state Short-Time Compensation or other programs designed to prevent layoffs or to quickly reemploy dislocated workers, employer loan programs for employee skill upgrading; and other Federal, state and local resources as necessary to address other business needs;
- Establishing linkages with economic development activities at the Federal, State and local levels, including Federal Department of Commerce programs and available State and local business retention and expansion activities;
- Partnering or contracting with business-focused organizations to assess risks to companies, propose strategies to address those risks, implement services, and measure impacts of services delivered;
- Conducting analyses of the suppliers of an affected company to assess their risks and vulnerabilities from a potential closing or shift in production of their major customer;
- Engaging in proactive measures to identify opportunities for potential economic transition and training needs in growing industry sectors or expanding businesses; and
- Connecting businesses and workers to short-term, on-the-job, or customized training programs and apprenticeships before or after layoff to help facilitate rapid reemployment.

B. Other Required Activities

In addition to layoff aversion as described above, there are a number of other activities that are required to be carried out by state and local Rapid Response operators. These are:

- Immediate and on-site contact with the employer, affected workers or their representatives, and the local community, which includes an assessment of, and strategy to address: 1) the employer's layoff plans and schedule; 2) the background, probable assistance needs, and reemployment prospects of the affected workers; and 3) resources available to meet the short and long-term assistance needs of the affected workers;
- The provision of information and access to unemployment compensation benefits and programs, such as Short-Time Compensation, comprehensive American Job Center network services, and employment and training activities, including information on the TAA program, Pell Grants, the GI Bill, and other resources;
- The delivery of other necessary services and resources including workshops and classes, use of worker transition centers, and job fairs, to support reemployment efforts for affected workers;

DOL_PRWORA_000114

- Establishing partnerships with Local WDBs and CEO(s) to ensure coordinated responses to dislocation events and, as needed, obtain access to state or local economic development assistance. The coordinated response may include the development of an application for a National Dislocated Worker grant as provided in 20 CFR part 687;
- The provision of emergency assistance adapted to a particular layoff, disaster, or other emergency situation;
- As appropriate, developing systems and processes for identifying and gathering information for early warning of potential layoffs or opportunities for layoff aversion; analyzing, and acting upon, data and information on dislocations and other economic activity in the state, region, or local area; and tracking outcome and performance data and information related to the activities of the Rapid Response program;
- To ensure the ability to provide Rapid Response services as early as possible, developing and maintaining partnerships with other appropriate Federal, State and local agencies and officials, employer associations, technical councils, industry business councils, labor organizations, and other public and private organizations, as applicable.  These partnerships must conduct strategic planning activities for addressing dislocation events and ensuring timely access to a broad range of assistance.  They must also develop mechanisms for gathering and exchanging information and data relating to potential dislocations, available resources, and the customization of layoff aversion or Rapid Response activities;
- Delivery of services to worker groups for which a petition for TAA has been filed;
- The provision of additional assistance to local areas that experience disasters, mass layoffs, or other dislocation events that exceed the capacity of the local area to respond with existing resources; and
- The provision of guidance and financial assistance as appropriate, when establishing a labor-management committee if voluntarily agreed to by the employee's bargaining representative and management.  The committee may devise and oversee an implementation strategy that responds to the reemployment needs of the workers.  The assistance to such a committee may include training and technical assistance to members of the committee, and funding the operating costs of a committee to enable it to provide advice and assistance in carrying out Rapid Response activities and in the design and delivery of WIOA-authorized services to affected workers.

Other Allowable Activities

WIOA offers significant flexibility with regard to the use of Rapid Response funds.  States or designated Rapid Response providers may, in order to conduct layoff aversion activities or to prepare for and respond to dislocation events, devise additional strategies or conduct activities that are intended to minimize the negative impacts of dislocation on workers, businesses, and communities and to ensure that workers impacted by layoffs are able to be reemployed as quickly as possible.

Additionally, when circumstances allow, Rapid Response operators may provide guidance and/or financial assistance to establish community transition teams to assist the impacted community in organizing support for dislocated workers, and in meeting the basic needs of

28

their families. Such assistance can include, but is not limited to providing heat, shelter, food, clothing and other necessities and services that are beyond the resources and ability of the American Job Center network to provide.

<u>Additional Assistance</u>

WIOA allows states to reserve up to 25 percent of dislocated worker funds for Rapid Response activities. Once the state has reserved adequate funds for Rapid Response activities, any of the remaining funds reserved may be provided to local areas that experience increases of unemployment due to natural disasters, layoffs or other events, for provision of direct career services to participants if there are not adequate local funds available to assist the dislocated workers. We encourage states to establish the policies or procedures governing the provision of additional assistance.

<u>Program Reporting</u>

In certain instances, states must report certain information on recipients of Rapid Response services. When an individual record exists for a WIOA participant also served under the Rapid Response program, states must report information regarding the receipt of Rapid Response services for that individual.

<u>Rapid Response Funds at the End of the First Program Year</u>

Funds that are reserved for Rapid Response activities and remain unobligated after the first program year for which they were allotted may be used to carry out statewide activities under 20 CFR 682.200 and 682.210. Statewide activities for which these funds may be used include prioritizing the planning for and delivery of activities designed to prevent job loss, increasing the rate of reemployment, building relationships with businesses and other stakeholders, building and maintaining early warning networks and systems, and otherwise supporting efforts to assist long-term unemployed workers to return to work. When managing the use of Rapid Response funds and their availability for statewide purposes after the first program year, states must ensure 80 percent of their total Dislocated Worker funds are obligated by the end of the first program year, or they could trigger recapture of the next program year's Dislocated Worker funds under the realottment provision contains in WIOA 133(c).

Although the states have additional flexibility in using rapid response funds for statewide activities at the end of the first program year, the recapture process that takes place during the same time has not changed. States are expected to obligate 80 percent of its Dislocated Worker funds, including its rapid response funds, in order to avoid recapture (20 CFR 683.135).

19. **<u>Coordination with WIOA Core Programs</u>.** WIOA provides a significant opportunity for coordination across all of the core programs including planning, reporting, and service delivery. Below are some examples of how the WIOA title I Adult and Dislocated Worker

29

programs, along with the ES program, can partner with the other WIOA core programs:

<u>Youth Formula Program (WIOA title I)</u>

WIOA creates an opportunity for the Adult program to work closely with the Youth program to ensure young adults receive the services they need to succeed in education and the workforce.  Individuals aged 18-24 may be eligible for both the WIOA Youth and Adult programs and can be co-enrolled in the two programs.  ETA encourages the WIOA Adult and Dislocated Worker programs, along with the ES program, to coordinate closely with the WIOA Youth program to maximize flexibility and service delivery to eligible populations.  Some examples where enhanced coordination could take place are as follows:

- Referring 18-24 year old individuals to the title I Youth program if they need more intensive support around specific program elements described under WIOA sec. 129(c)(2).
- Utilizing WIOA Adult formula program funded ITAs as part of a career pathway strategy for Youth program participants co-enrolled as adults or dislocated workers;
- Utilizing work-based training opportunities for Youth program participants co-enrolled as adults or dislocated workers, as identified in their Individual Service Strategy (ISS) as part of a career pathway; and
- Career pathway planning.

*(Note: This is not an exhaustive list of ways to coordinate activities and service delivery, but is meant to illustrate some of WIOA's flexibilities and services to improve educational and employment opportunities for participants.)*

Local program operators may determine, for these individuals, the appropriate level and balance of services under the Youth and Adult programs. Such determinations regarding the appropriate program for the participant must be based on the service needs of the participant and if the participant is career-ready based on an assessment of his/her occupational skills, prior work experience, employability, and the participant's needs. An important difference to note here is that while receiving an assessment from the Adult, Dislocated Worker, or ES programs does trigger participation and inclusion in the performance accountability calculations for those programs, an objective assessment carried out under WIOA sec. 129(c)(1)(A) does not trigger participation in the Youth program.  Local program operators must identify and track the funding streams which pay the costs of services provided to individuals who are participating in Youth and Adult programs concurrently, and ensure no duplication of services.

<u>Adult Education and Family Literacy Act (WIOA title II)</u>

Title II of WIOA authorizes the Adult Education and Family Literacy Act (AEFLA). AEFLA, administered by the US Department of Education, is designed to create a partnership among the Federal government, States, and localities to provide, on a voluntary basis, adult education and literacy activities.  These activities are designed to:

- Assist adults to become literate and obtain the knowledge and skills necessary for

30

employment and economic self-sufficiency;
- Assist adults who are parents or family members to obtain the education and skills that are necessary to becoming full partners in the educational development of their children and lead to sustainable improvements in the economic opportunities for their family;
- Assist adults in attaining a secondary school diploma and in the transition to postsecondary education and training, including through career pathways;
- Assist immigrants and other individuals who are English language learners in:
  o Improving their reading, writing, speaking, and comprehension skills in English, as well as mathematical skills; and,
  o Acquiring an understanding of the American system of government, individual freedom, and the responsibilities of citizenship.

WIOA provides new opportunities for the title I Adult and Dislocated Worker programs, as well as the ES, to partner with title II providers.

WIOA sec. 134(c)(2) authorizes career services to be provided with title I adult and dislocated worker funds.  Some of these services are activities that are also allowable under AEFLA, including workforce preparation activities, English language acquisition programs, and integrated education and training programs. In order to ensure consistency across the services for the benefit of participants and service providers, ETA is aligning the definitions for these services with those used by the AEFLA program; see Attachment III for their definition.

This allows title I and title II programs to coordinate in the development of career pathways and to co-enroll participants so they receive the full spectrum of services for their education and employment needs. For example, an individual could receive adult education services while at the same time receiving services from the OJT program funded by title I. If individuals are unable to receive services from the AEFLA program, but are determined to be in need of those services by the career planner and eligible for the services, then title I may provide those services the program is authorized to provide, as long as they are provided concurrently or in combination with training services.

Vocational Rehabilitation (WIOA title IV)

Title IV of WIOA makes a number of significant changes to the Rehabilitation Act of 1973 (Rehab Act) in order to improve and align core programs towards the goal of empowering individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion in and integration into society. To achieve these goals, title IV amends regulations governing the State Vocational Rehabilitation Services program (VR) and State Supported Employment Services Program (Supported Employment Program) and implements limitations on the payment of subminimum wages to individuals with disabilities.  WIOA provides new opportunities for coordination and referrals for the title I Adult and Dislocated Worker programs, as well as the Employment Service, to partner and enhance service delivery to individuals with disabilities, including those served under title IV of WIOA.  Individuals with disabilities are identified as individuals with barriers to

31

DOL_PRWORA _000118

employment under WIOA, and should receive any and all American Job Center services that would normally be provided to any other job seeker.

WIOA makes the following key changes to title IV programs:
- Strengthen the alignment of the VR program with other core components of the workforce development system by aligning requirements governing unified state planning, performance accountability measures, and integration into the American Job Center network ;
- Place heightened emphasis on coordination and collaboration at the Federal, State, and local levels to ensure a streamlined and coordinated service delivery system for job-seekers, including those with disabilities, and employers;
- Include a new definition of "competitive integrated employment" that combines, clarifies, and enhances the two separate definitions of "competitive employment" and "integrated setting" for the purpose of employment under the VR program;
- Revise the definition of "employment outcome" in §361.5(c)(15) and now specifically identifies customized employment as an employment outcome under the VR program, and requires that all employment outcomes achieved through the VR program be in competitive integrated employment or supported employment;
- Amend the Supported Employment Program in order to maximize the potential of individuals with disabilities, especially those with the most significant disabilities, to achieve competitive integrated employment and to expand services for youth with the most significant disabilities;
- Requires that Supported Employment must be in competitive integrated employment or, if not, in an integrated setting in which the individual is working towards competitive integrated employment on a short-time basis;
- Extends time for which supported employment services may be provided is extended from 18 months to 24 months;
- Requires States to reserve and expend 50 percent of their allotments under the Supported Employment Program to provide supported employment services, including extended services, to youth with the most significant disabilities; and
- Limit on the Use of Subminimum Wage.
- Adds new section 511, Limitations on the Use of Subminimum Wage, which imposes requirements on employers who hold special wage certificates under the Fair Labor Standards Act (FLSA) that must be satisfied before employers may hire youth with disabilities at subminimum wages or continue to employ individuals with disabilities of an age at the subminimum wage level.

VR Counselors, who are employed by the state VR agency, are responsible for determining whether an individual is eligible to receive VR services.  In order to be eligible, an individual with a disability must meet the following criteria:
- Have a physical or mental impairment that poses functional limitations resulting in a substantial impediment to employment;
- Require VR services to obtain or maintain employment; and
- Must be able to benefit from VR services to obtain or maintain employment

DOL_PRWORA _000119

While an individual may be determined eligible to receive VR services, the state VR agency may not be able to provide services due to insufficient staff and/or fiscal resources.  In this instance, the state VR agency must implement an order of selection (OOS) that establishes the priority categories by which individuals can be served based on their functional limitations. As of 2016, approximately 50 percent of the VR agencies have implemented an OOS.  For those individuals not in a priority category being served in the OOS, the state VR agency must refer the individual to another program that may be able to meet their needs. Therefore, effective partnering with the Adult, Dislocated Worker, and ES programs is essential in order to ensure individuals with disabilities seeking employment and training services receive the services they need for employment.

In order to align the core programs and create additional flexibility for the purposes of achieving the goals under title IV, funds allocated to a local area for adult and dislocated worker activities may be used to improve coordination between employment and training programs carried out in the local area for individuals with disabilities through the American Job Center network .  ETA encourages local areas to utilize this flexibility to ensure a highly coordinated service delivery in coordination with title IV activities to ensure that individuals with disabilities receive the services they need for their career needs, whether the services are provided by title I, III, or IV or some combination thereof, including other community resources.  Additionally, ETA encourages local areas to coordinate with programs carried out by State agencies relating to intellectual and developmental disabilities, as well as local agencies and organizations serving individuals with significant disabilities, including the local network of centers for independent living in each State.

Client Assistance Program

The purpose of this program is to advise and inform clients, client applicants, and other individuals with disabilities of all the available services and benefits under the *Rehabilitation Act of 1973*, as amended by WIOA, and of the services and benefits available to them under title I of the *Americans with Disabilities Act* (ADA). In addition, CAP grantees may assist and advocate for clients and client applicants in relation to projects, programs, and services provided under the *Rehabilitation Act*. In providing assistance and advocacy under title I of the *Rehabilitation Act*, a CAP agency may provide assistance and advocacy with respect to services that are directly related to employment for the client or client applicant.

20. **Coordination with Trade Adjustment Assistance (TAA).**  The Dislocated Worker program is a critical partner with TAA in identifying and serving trade-impacted workers.  Co-enrollment, of workers covered under certified petitions (TAA-certified workers) in partnership with the WIOA Dislocated Worker or Adult program, allows for the timely provision of individualized career services and improves the overall effectiveness of the TAA Program. Additionally, sec. 221(a)(2)(A) of the Trade Act requires that the Governor ensure that Rapid Response and appropriate career services are delivered to all workers who are covered by a certified TAA petition.  In addition to the Rapid Response services, American Job Centers can also provide supportive services relating to child care, transportation, dependent care, housing assistance, and needs-related payments, and may also provide career

DOL_PRWORA _000120

services described in Section 4 of this TEGL.  TAA generally provides case management and employment services, training, income support, job search allowances, relocation allowances, wage supplements for older workers, and a health coverage tax credit for TAA-certified workers.  Strict deadlines must be met if individuals are to take full advantage of the TAA benefits available to TAA-certified workers.  Barriers to service delivery to this population should be eliminated in order to maximize all the resources available in the one-stop delivery system.

Of equal importance is serving workers who need assistance in filing a petition, or workers for which a petition for TAA eligibility is pending (under investigation), so that the duration of unemployment is minimized.  Since most workers who appear to be threatened with layoff or to be separated from employment due to increased imports or a shift in production of articles by their employer or employer's customers are likely to meet dislocated worker eligibility criteria, these individuals should enter the American Job Center network immediately following the announcement of a layoff.  They must be assisted in filing a petition with the Department (and the Governor) requesting certification as workers adversely affected by foreign trade.  Immediately beginning the process of needs and skills assessment improves TAA participation rates and allows individuals more time to consider all of the options available to them, even before these workers may become eligible for TAA.  Section 221(a)(2)(A) of the Trade Act of 1974, as amended, requires the provision of "appropriate career services" to workers covered by a Petition for Trade Adjustment Assistance. These services, in addition to Rapid Response, must be provided when the petition is filed, regardless of whether the petition is certified.  Note that adversely affected workers, certified under a Petition for Trade Adjustment Assistance under the Trade Act of 1974, as amended, are, by definition, Dislocated Workers under WIOA.

WIOA and TAA Program funds must be managed in a coordinated manner to best meet the needs of the workers while abiding by all applicable statutes, regulations and federal policies. The Trade Act, as amended, contains provisions allowing the costs of a training program approved under the Act to be paid by TAA funds or from other sources, but does not allow duplication of payment of training costs. Those authorities and restrictions are detailed in 20 CFR 617.25(b). Under certain circumstances, the costs of training may be shared, but such an arrangement must not authorize reimbursement from TAA funds of any training costs that were incurred before a participant was certified and determined individually eligible for TAA and that training was TAA-approved. Additionally, the TAA Governor-Secretary Agreement, Section E, requires that the TAA Program will be the primary source of assistance to adversely affected workers covered by a certification and that to the extent adversely affected workers covered by a certification enrolled in the TAA Program require assistance or services not authorized under the TAA Program, or for which TAA Program funds are unavailable or insufficient (including for required employment and case management services), such assistance will be made available through the American Job Center network.

TAA-certified workers may receive WIOA-funded training otherwise provided under TAA under limited circumstances. The most common circumstance is when a TAA petition has been filed by or on behalf of a group of workers but a determination of group eligibility has

DOL_PRWORA_000121

not been made.  In this case WIOA funding should be used for training in the short-term, until an affirmative decision is rendered after a completed TAA investigation and the state agency operating the TAA Program as an agent of the United States determines the worker's individual eligibility and approves the training.  In the event a negative decision is rendered and the petition is denied, the worker can continue as a WIOA participant.  Systems must be in place to seamlessly accommodate a change in the funding of training, as appropriate, after TAA program approval is obtained.  Training may be modified by the TAA Program to allow a worker additional training under the TAA Program in order to meet retraining needs as indicated in individual reemployment plans. Such a participant may remain enrolled in WIOA and the TAA Program as the individual may need continued career and supportive services through WIOA.  To effectuate this seamless service, the states should ensure that the six criteria for the approval of training under Trade, found at 20 CFR 617.22 are used for determining the appropriateness of training.  Also note, under co-enrollment, training  is a benefit available to TAA-certified adversely affected incumbent workers. See Section D.2. of TEGL No. *5-15, Change 1* for additional information regarding the training benefit for adversely affected incumbent workers.

WIOA allows up to 75 percent reimbursement to employers for OJT (see Section 14 of this TEGL), while the TAA Program allows reimbursement up to 50 percent of the wage rate, the cost of providing the training, and additional supervision related to the training.  For OJT approved training for a co-enrolled TAA participant, the TAA Program may reimburse employers up to 50 percent, and WIOA may reimburse employers up to an additional 25 percent, to bring the total reimbursement to employers up to 75 percent to align TAA program benefits with WIOA flexibilities provided that the State and Local policies provide for a 75 percent reimbursement rate.

21. **Inquiries**.  Questions regarding this guidance should be directed to the appropriate ETA regional office.

22. **Attachments**.
   - Attachment I:  References
   - Attachment II:  Participation Level Services Chart for Adult, Dislocated Worker, and Wagner-Peyser Act Employment Service
   - Attachment III:  Key Terms and Definitions

35

DOL_PRWORA _000122

**Attachment I:        References**

**WIOA Operating Guidance TEGL References**

- The Workforce Innovation and Opportunity Act (WIOA) of 2014 (Public Law (Pub. L. 113-128)) Title I and III, enacted July 22, 2014;

- WIOA Regulations at 20 CFR parts 651, 652, 680, and 682;

- Title 38 United States Code (38 U.S.C. 4213);

- TEGL No. 16-16, *"One-Stop Operations Guidance for the American Job Center Network,"* dated January 18, 2017;

- TEGL No. 10-16, "*Performance Accountability Guidance for Workforce Innovation and Opportunity Act (WIOA) Title I, Title II, Title III and Title IV Core Programs* ," dated December 19, 2016;

- TEGL No. 08-16, "*Supporting Unemployment Insurance Beneficiaries Seeking Postsecondary Education or Training*," dated September 23, 2016;

- TEGL No. 41-14, Change 1, *"Workforce Innovation and Opportunity Act (WIOA or Opportunity Act) Title I Training Provider Eligibility Transition,"* dated November 24, 2015;

- TEGL No. 41-14, "*Workforce Innovation and Opportunity Act (WIOA or Opportunity Act) Title I Training Provider Eligibility Transition,*" dated June 26, 2015;

- TEGL No. 19-14, "*Vision for the Workforce System and Initial Implementation of the Workforce Innovation and Opportunity Act,*" dated February 19, 2015;

- TEGL No. 15-12, *"Delivery of Benefits and Services to Trade Adjustment Assistance (TAA) Program Recipients through the American Job Center Network Delivery System,"* dated March 7, 2013;

- TEGL No. 10-09, *"Implementing Priority of Service for Veterans and Eligible Spouses in all Qualified Job Training Programs Funded in whole or in part by the U.S. Department of Labor (DOL),"* dated November 10, 2009;

- TEN No. 18-16, *"Pathways to Reemployment Tools and Resources,"* dated November 21, 2016;

- Unemployment Insurance Program Letter (UIPL) 12-01, Change 1, *"Outsourcing of Unemployment Compensation Administrative Functions – Claims Taking,"* dated November 26, 2007;

- UIPL 12-01, *"Outsourcing of Unemployment Compensation Administrative Functions,"* dated December 28, 2000;

**Attachment II**
**Participation Level Services Chart**
**WIOA Title I Adult, Title I Dislocated Worker, and**
**Title III Employment Service Programs[1]**

| Attachment II | | | |
|---|---|---|---|
| **Adult/DW/ES Service Type (WIOA Sec. 134 (c))** | **Does this service trigger inclusion in participation?** | **Category of Service (i.e. Basic, Individualized, Training)** | **Applicable PIRL Data Element Number(s)** |
| Eligibility Determination | No | Basic Career Service | N/A |
| Outreach, Intake, Orientation | No | Basic Career Service | N/A |
| Initial assessment of skill levels & supportive service needs | Yes | Basic Career Service | 1003, 1004, 1102 |
| Job search assistance (Self-directed) | No | Basic Career Service | N/A |
| Job search assistance (Staff-assisted) | Yes | Basic Career Service | 1003, 1004, 1104 |
| Placement assistance (includes "Referred to Employment") (Staff-assisted) | Yes | Basic Career Service | 1003, 1004, 1105, 1106, 1107, 1108, 1109, 1110, 1111 |
| Career Counseling (includes "Staff-assisted career guidance") | Yes | Basic Career Service | 1003, 1004, 1102 |
| Providing info on in-demand sectors, occupations, or nontraditional employment | No | Basic Career Service | 1100, 1101 |
| Provision of referrals and associated coordination of activities with other programs and services | No | Basic Career Service | 1100, 1101, 1113, 1115 |
| Provision of workforce and labor market employment statistics information | No | Basic Career Service | 1100, 1101, 1103 |

---

[1] Note this this chart does not include all available services that may be provided, but rather those services specifically authorized under WIOA sec. 134(c)(2). Additionally, these services do not indicate whether or not an individual is a participant, but rather which services trigger an individual to become a participant.

DOL_PRWORA _000124

| Attachment II | | | |
|---|---|---|---|
| Adult/DW/ES Service Type (WIOA Sec. 134 (c)) | Does this service trigger inclusion in participation? | Category of Service (i.e. Basic, Individualized, Training) | Applicable PIRL Data Element Number(s) |
| Provision of info on job vacancies | No | Basic Career Service | 1100, 1101, 1103 |
| Provision of info on job skills necessary to fill vacancies | No | Basic Career Service | 1100, 1101, 1103 |
| Provision of info on local demand occupations, with earnings, skill requirements, and opportunities for advancement for those jobs | No | Basic Career Service | 1100, 1101, 1103 |
| Provision of performance and program cost info for providers of education and training | No | Basic Career Service | 1100, 1101 |
| Provision of info on local performance | No | Basic Career Service | 1100, 1101 |
| Provision of info on availability of supportive services or assistance | No | Basic Career Service | 1100, 1101 |
| Referral to supportive services | No | Basic Career Service | 1113 |
| Provision of information and meaningful assistance filing for UI | Yes | Basic Career Service | 1003,1004, 1112 |
| Assistance establishing eligibility for financial aid | Yes | Basic Career Service | 1003,1004, 1116 |
| Comprehensive and specialized assessments | Yes | Individualized Career Service | 1004, 1200, 1201 |
| Development of IEP | Yes | Individualized Career Service | 1004, 1200, 1201, 1202 |
| Group Counseling | Yes | Individualized Career Service | 1004, 1200, 1201 |
| Individual Counseling | Yes | Individualized Career Service | 1004, 1200, 1201 |
| Career Planning | Yes | Individualized Career Service | 1004, 1200, 1201 |

2

DOL_PRWORA _000125

| Attachment II | | | |
|---|---|---|---|
| Adult/DW/ES Service Type (WIOA Sec. 134 (c)) | Does this service trigger inclusion in participation? | Category of Service (i.e. Basic, Individualized, Training) | Applicable PIRL Data Element Number(s) |
| Short-term prevocational services | Yes | Individualized Career Service | 1004, 1200, 1201, 1210 |
| Internships and work experiences (including transitional jobs) | Yes | Individualized Career Service | 1004, 1200, 1201, 1203, 1205, 1211 |
| Workforce preparation activities | Yes | Individualized Career Service | 1004, 1200, 1201 |
| Financial literacy services | Yes | Individualized Career Service | 1004, 1200, 1201, 1206 |
| Out-of-area job search assistance and relocation assistance | Yes | Individualized Career Service | 1004, 1200, 1201 |
| English-language acquisition and integrated education and training programs | Yes | Individualized Career Service | 1004, 1200, 1201, 1207 |
| Follow up services | n/a (must be a participant first to receive) | Follow up Service | 1503 |
| Training services under Sec. 134(c)(3)(D) with exception of Sec. 134(c)(3)(D)(iii) (incumbent worker training) | Yes | Training | 1300, 1301, 1302, 1303, 1304, 1305, 1306, 1307, 1308, 1309, 1310, 1311, 1312, 1313, 1314, 1315, 1316, 1317, 1318, 1319 |
| Incumbent Worker Training | No[2] | Training | 907 |

*Note: Receipt of any of the three types of services (Basic, Individualized, or Training) makes an individual a "Reportable Individual" while it only takes the receipt of one service that triggers participation to be considered a participant.

---

[2] While Incumbent Worker Training is not a self-service or information-only service, individuals are not required to meet eligibility requirements for the Adult or Dislocated Worker programs to receive Incumbent Worker Training.

3

DOL_PRWORA _000126

**Attachment III – Key Terms and Definitions**

This attachment is designed to be a key resource when implementing this TEGL for some of the key terms and definitions utilized by WIOA and the Final Rules. This is not intended to be an exhaustive list of all program definitions, see WIOA sec. 3 and 20 CFR 675.300 for a full list of definitions.

**ACTIVE DUTY** (38 USC 101(21))**-** means full-time duty in the active military service of the United States. Such term includes full-time training duty, annual training duty, and attendance, while in the active military service, at a school designated as a service school by law or by the Secretary of the military department concerned. Such term does not include full-time National Guard duty.

**ADULT** (WIOA sec. 3(2)) – means an individual who is age 18 or older.

**ADULT EDUCATION AND LITERACY ACTIVITIES** (§ 463.30) – means programs, activities, and services that include:

  (A)  Adult education,
  (B)  Literacy,
  (C)  Workplace adult education and literacy activities,
  (D)  Family literacy activities,
  (E)  English language acquisition activities,
  (F)  Integrated English literacy and civics education,
  (G)  Workforce preparation activities, or
  (H)  Integrated education and training

**BASIC SKILLS DEFICIENT** (WIOA sec. 3(5)) – means, with respect to an individual—

(A) who is a youth, that the individual has English reading, writing, or computing skills at or below the 8th grade level on a generally accepted standardized test; or

(B) who is a youth or adult, that the individual is unable to compute or solve problems, or read, write, or speak English, at a level necessary to function on the job, in the individual's family, or in society.

**CAREER PATHWAY** (WIOA sec. 3(7)) – means a combination of rigorous and high-quality education, training, and other services that—

(A) aligns with the skill needs of industries in the economy of the State or regional economy involved;

(B) prepares an individual to be successful in any of a full range of secondary or postsecondary education options, including apprenticeships registered under the Act of August 16, 1937 (commonly known as the ''National Apprenticeship Act''; 50 Stat. 664, chapter 663; 29 U.S.C. 50 et seq.) (referred to individually in this Act as an ''apprenticeship'', except in section 171);

(C) includes counseling to support an individual in achieving the individual's education and career goals;

(D) includes, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster;

(E) organizes education, training, and other services to meet the particular needs of an individual in a manner that accelerates the educational and career advancement of the individual to the extent practicable;

(F) enables an individual to attain a secondary school diploma or its recognized equivalent, and at least 1 recognized postsecondary credential; and

(G) helps an individual enter or advance within a specific occupation or occupational cluster.

**CAREER PLANNING** (WIOA sec. 3(8)) – means the provision of a client-centered approach in the delivery of services, designed-

(A) To prepare and coordinate comprehensive employment plans, such as service strategies, for participants to ensure access to necessary workforce investment activities and supportive services, using, where feasible, computer-based technologies; and

(B) To provide job, education, and career counseling, as appropriate during program participation and after job placement.

**DEPLOYMENT** (10 USC 991(b)) – means

(A) A member of the Armed Forces is considered to be deployed or in a deployment on any day on which, pursuant to orders, the member is performing service in a training exercise or operation at a location or under circumstances that make it impossible or infeasible for the member to spend off-duty time in the housing in which the member resides when on garrison duty at the member's permanent duty station or homeport, as the case may be.

(B) In the case of a member of a reserve component who is performing active service pursuant to orders that do not establish a permanent change of station, the housing referred to in paragraph (1) is any housing (which may include the member's residence) that the member usually occupies for use during off-duty time when on garrison duty at the member's permanent duty station or homeport, as the case may be.

(C) A member is not deployed or in a deployment when the member is—

   (i)   Performing service as a student or trainee at a school (including any Government school);

2

DOL_PRWORA _000128

    (ii)      Performing administrative, guard, or detail duties in garrison at the member's permanent duty station; or

    (iii)     Unavailable solely because of--

        (1) a hospitalization of the member at the member's permanent duty station or homeport or in the immediate vicinity of the member's permanent residence; or

        (2) a disciplinary action taken against the member.


**DISLOCATED WORKER** (WIOA sec. 3(15)) – means an individual who—

(A) (i) has been terminated or laid off, or who has received a notice of termination or layoff, from employment, including separation notice from active military service (under other than dishonorable conditions);

    (ii) (I) is eligible for or has exhausted entitlement to unemployment compensation; or

    (II) has been employed for a duration sufficient to demonstrate, to the appropriate entity at a one-stop center referred to in section 121(e), attachment to the workforce, but is not eligible for unemployment compensation due to insufficient earnings or having performed services for an employer that were not covered under a State unemployment compensation law; and

    (iii) is unlikely to return to a previous industry or occupation;

(B) (i) has been terminated or laid off, or has received a notice of termination or layoff, from employment as a result of any permanent closure of, or any substantial layoff at, a plant, facility, military installation or enterprise;

    (ii) is employed at a facility at which the employer has made a general announcement that such facility will close within 180 days; or

    (iii) for purposes of eligibility to receive services other than training services described in section 134(c)(3), career services described in section 134(c)(2)(A)(xii), or supportive services, is employed at a facility at which the employer has made a general announcement that such facility or military installation will close;

(C) was self-employed (including employment as a farmer, a rancher, or a fisherman) but is unemployed as a result of general economic conditions in the community in which the individual resides or because of natural disasters;

(D) is a displaced homemaker; or

(E) (i) is the spouse of a member of the Armed Forces on active duty (as defined in section 101(d)(1) of title 10, United States Code), and who has experienced a loss of

3

DOL_PRWORA _000129

employment as a direct result of relocation to accommodate a permanent change in duty station of such member; or

(ii) is the spouse of a member of the Armed Forces on active duty and who meets the criteria described in paragraph (16)(B).

**DISPLACED HOMEMAKER** (WIOA sec. 3(16)) – means an individual who has been providing unpaid services to family members in the home and who –

(A) (i) has been depending on the income of another family member but is no longer supported by that income; or

(ii) is the dependent spouse of a member of the Armed Forced on active duty (as defined in section 101(d)(1) of title 10, United States Code) and whose family income is significantly reduced because of a deployment (as defined in section 991(b) of title 10, United States Code, or pursuant to paragraph (4) of such section), a call or order to active duty pursuant to a provision of law referred to in section 101(a)(13)(B) of title 10, United States Code, a permanent change of station or the service-connected (as defined in section 101(16) of title 38, United States Code) death or disability of the member; and

(B) Is unemployed or underemployed and is experiencing difficulty in obtaining or upgrading employment

**ELIGIBLE SPOUSE** – means an individual whose military active duty or veteran spouse was—

a. Any veteran who died of a service-connected disability;

b. Any member of the Armed Forces serving on active duty who, at the time of application for the priority, is listed in one or more of the following categories and has been so listed for a total of more than 90 days:

    i. Missing in action;

    ii. Captured in the line of duty by a hostile force; or

    iii. Forcibly detained or interned in the line of duty by a foreign government or power;

c. Any veteran who has a total disability resulting from a service-connected disability, as evaluated by the Department of Veterans Affairs; or

d. Any veteran who died while a disability was in existence. A spouse whose eligibility is derived from a living veteran or service member (i.e., categories b. or c. above) would lose his or her eligibility if the veteran or service member were to lose the status that is the basis for the eligibility (e.g. if a veteran with a total service-connected disability were

4

to receive a revised disability rating at a lower level). Similarly, for a spouse whose eligibility is derived from a living veteran or service member, that eligibility would be lost upon divorce from the veteran or service member.

**ENGLISH LANGUAGE ACQUISITION PROGRAM** (34 CFR 463.31) – is a program of instruction—

(A) That is designed to help eligible individuals who are English language learners achieve competence in reading, writing, speaking, and comprehension of the English language; and;
(B) That leads to—

(1)(a) Attainment of a secondary school diploma or its recognized equivalent; and

(b) Transition to postsecondary education and training; or

(2) Employment

**EXIT** (see 20 CFR 677.150 for full definition) – as defined for the purpose of performance calculations for the WIOA Adult, Dislocated Worker, and Employment Service programs, exit is the point after which a participant who has received services through any program meets the following criteria:

(1) For the adult, dislocated worker, and youth programs authorized under WIOA title I, the AEFLA program authorized under WIOA title II, and the Employment Service program authorized under the Wagner-Peyser Act, as amended by WIOA title III, exit date is the last date of service.

a. The last day of service cannot be determined until at least 90 days have elapsed since the participant last received services; services do not include self-service, information-only services or activities, or follow-up services.  This also requires that there are no plans to provide the participant with future services.

**FAMILY** (20 CFR 675.300) **-** means two or more persons related by blood, marriage, or decree of court, who are living in a single residence, and are included in one or more of the following categories:

(A) A married couple and dependent children;
(B)  A parent or guardian and dependent children; or
(C)  A married couple.

**HOMELESS INDIVIDUAL OR HOMELESS CHILDREN AND YOUTHS** (WIOA sec. 3(24)(G)) **–** is an individual who meets any of the following criteria:

(A) Lacks a fixed regular, and adequate nighttime residence; this includes a participant who:

5

DOL_PRWORA _000131

    a.  Is sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason;

    b.  Is living in a motel, hotel, trailer park, or campground due to a lack of alternative adequate accommodations;

    c.  Is living in an emergency or transitional shelter;

    d.  Is abandoned in a hospital; or

    e.  Is awaiting foster care placement;

(B) Has a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, such as a car, park, abandoned building, bus or train station, airport, or camping ground;

(C) Is a migratory child who in the preceding 36 months was required to move from one school district to another due to changes in the parent's or parent's spouse's seasonal employment in agriculture, dairy, or fishing work; or

(D) Is under 18 years of age and absents himself or herself from home or place of legal residence without the permission of his or her family (i.e. runaway youth)

(*Note- A participant imprisoned or detained under an Act of Congress or State law does not meet the definition. Additionally, a participant who may be sleeping in a temporary accommodation while away from home should not, as a result of that alone, be recorded as homeless.*)

**INDIVIDUAL EMPLOYMENT PLAN** (20 CFR 680.170) **–** is an individualized career service, under WIOA sec. 134(c)(2)(a)(xii)(II), that is developed jointly by the participant and career planner when determined appropriate by the one-stop operator or one-stop partner. This plan is an ongoing strategy to identify employment goals, achievement objectives, and an appropriate combination of services for the participant to achieve the employment goals.

**INDUSTRY OR SECTOR PARTNERSHIP** (WIOA sec. 3(26)) – ' means a workforce collaborative, convened by or acting in partnership with a State board or local board, that—

(A) organizes key stakeholders in an industry cluster into a working group that focuses on the shared goals and human resources needs of the industry cluster and that includes, at the appropriate stage of development of the partnership—

    (i) representatives of multiple businesses or other employers in the industry cluster, including small and medium-sized employers when practicable;

    (ii) 1 or more representatives of a recognized State labor organization or central labor council, or another labor representative, as appropriate; and

DOL_PRWORA _000132

(iii) 1 or more representatives of an institution of higher education with, or another provider of, education or training programs that support the industry cluster; and

(B) may include representatives of—

(i) State or local government;

(ii) State or local economic development agencies;

(iii) State boards or local boards, as appropriate;

(iv) a State workforce agency or other entity providing employment services;

(v) other State or local agencies;

(vi) business or trade associations;

(vii) economic development organizations;

(viii) nonprofit organizations, community-based organizations, or intermediaries;

(ix) philanthropic organizations;

(x) industry associations; and

(xi) other organizations, as determined to be necessary by the members comprising the industry or sector partnership.

**INTEGRATED EDUCATION AND TRAINING** (34 CFR 463.35) – refers to a service approach that provides adult education and literacy activities concurrently and contextually with workforce preparation activities and workforce training for a specific occupation or occupational cluster for the purpose of educational and career advancement.

**LOW-INCOME INDIVIDUAL** (WIOA sec. 3(36))– means an individual who—

(A) IN GENERAL—

(i) receives, or in the past 6 months has received, or is a member of a family that is receiving or in the past 6 months has received, assistance through the supplemental nutrition assistance program established under the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.), the program of block grants to States for temporary assistance for needy families program under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.), or the supplemental security income program established under title XVI of the Social Security Act (42 U.S.C. 1381 et seq.), or State or local income-based public assistance;

(ii) is in a family with total family income that does not exceed the higher of—

7

DOL_PRWORA _000133

(I) the poverty line; or

(II) 70 percent of the lower living standard income level;

(iii) is a homeless individual (as defined in section 41403(6) of the Violence Against Women Act of 1994 (42 U.S.C. 14043e–2(6))), or a homeless child or youth (as defined under section 725(2) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11434a(2)));

(iv) receives or is eligible to receive a free or reduced price lunch under the Richard B. Russell National School Lunch Act (42 U.S.C. 1751 et seq.);

(v) is a foster child on behalf of whom State or local government payments are made; or

(vi) is an individual with a disability whose own income meets the income requirement of clause (ii), but who is a member of a family whose income does not meet this requirement.

**LONG TERM UNEMPLOYED INDIVIDUAL** (see Bureau of Labor Statistics definition) – is a person who has been unemployed for 27 or more consecutive weeks.

**NONTRADITIONAL EMPLOYMENT** (WIOA sec. 3(37)) – refers to occupations or fields of work, for which individuals from the gender involved comprise less than 25 percent of the individuals employed in each such occupation or field of work.

**PARTICIPANT** (20 CFR 677.150) – is a reportable individual who has received services other than the services described in paragraph (a)(3) of this section, after satisfying all applicable programmatic requirements for the provision of services, such as eligibility determination.

(1) For the Vocational Rehabilitation (VR) program, a participant is a reportable individual who has an approved and signed Individualized Plan for Employment (IPE) and has begun to receive services.

(2) For the WIOA title I youth program, a participant is a reportable individual who has satisfied all applicable program requirements for the provision of services, including eligibility determination, an objective assessment, and development of an individual service strategy, and received 1 of the 14 WIOA youth program elements in sec. 129(c)(2) of WIOA.

(3) The following individuals are not participants:

a. Individuals in an Adult Education and Family Literacy Act (AEFLA) program who have not completed at least 12 contact hours;

b. Individuals who only use the self-service system;.

DOL_PRWORA _000134

    i.   Subject to paragraph (a)(3)(ii)(B) of this section, self-service occurs when individuals independently access any workforce development system program's information and activities in either a physical location, such as a one-stop center resource room or partner agency, or remotely via the use of electronic technologies.

    ii.   Self-service does not uniformly apply to all virtually accessed services. For example, virtually accessed services that provide a level of support beyond independent job or information seeking on the part of an individual would not qualify as self-service.

    c.   Individuals who receive information-only services or activities, which provide readily available information that does not require an assessment by a staff member of the individual's skills, education, or career objectives.

(4) Programs must include participants in their performance calculations.

**REPORTABLE INDIVIDUAL** (20 CFR 677.150) – is an individual who has taken action that demonstrates an intent to use program services and who meets specific reporting criteria of the program, including:

    (1) Individuals who provide identifying information;

    (2) Individuals who only use the self-service system; or

    (3) Individuals who only receive information-only services or activities.

**SERVICE CONNECTED** (38 USC 101(16)) – means, with respect to disability or death, that such disability was incurred or aggravated, or that the death resulted from a disability incurred or aggravated, in line of duty in the active military, naval, or air service.

**TRANSITIONAL JOB** (20 CFR 680.190) – is a time limited work experience that is wage-paid and subsidized, and is in the public, private or non-profit sectors for those individuals with barriers to employment who are chronically unemployed or have inconsistent work history, as determined by the Local Workforce Development Board.  These jobs are designed to enable an individual to establish a work history, demonstrate work success in an employee-employer relationship, and develop the skills that lead to unsubsidized employment.

**WORK EXPERIENCE (OR INTERNSHIP)** (20 CFR 680.180) – is a planned, structured learning experience that takes place in a workplace for a limited period of time.  Internships and other work experiences may be paid or unpaid, as appropriate and consistent with other laws, such as the Fair Labor Standards Act.  An internship or other work experience may be arranged within the private for profit sector, the non-profit sector, or the public sector.  Labor standards apply in any work experience setting where an employee/employer relationship, as defined by the Fair Labor Standards Act, exists.  Transitional Jobs are a type of work experience.

DOL_PRWORA _000135

**WORKFORCE PREPARATION ACTIVITIES** (34 CFR 463.34) – include activities, programs, or services designed to help an individual acquire a combination of basic academic skills, critical thinking skills, digital literacy skills, and self-management skills, including competencies in:

(A) Utilizing resources;

(B) Using information;

(C) Working with others;

(D) Understanding systems;

(E) Skills necessary for successful transition into and completion of postsecondary education or training, or employment; and

(F) Other employability skills that increase an individual's preparation for the workforce.

10

DOL_PRWORA _000136

**Attachment II**
**Participation Level Services Chart**
**WIOA Title I Adult, Title I Dislocated Worker, and**
**Title III Employment Service Programs[1]**

| Attachment II | | | |
|---|---|---|---|
| **Adult/DW/ES Service Type (WIOA Sec. 134 (c))** | **Does this service trigger inclusion in participation?** | **Category of Service (i.e. Basic, Individualized, Training)** | **Applicable PIRL Data Element Number(s)** |
| Eligibility Determination | No | Basic Career Service | N/A |
| Outreach, Intake, Orientation | No | Basic Career Service | N/A |
| Initial assessment of skill levels & supportive service needs | Yes | Basic Career Service | 1003, 1004, 1102 |
| Job search assistance (Self-directed) | No | Basic Career Service | N/A |
| Job search assistance (Staff-assisted) | Yes | Basic Career Service | 1003, 1004, 1104 |
| Placement assistance (includes "Referred to Employment") (Staff-assisted) | Yes | Basic Career Service | 1003, 1004, 1105, 1106, 1107, 1108, 1109, 1110, 1111 |
| Career Counseling (includes "Staff-assisted career guidance") | Yes | Basic Career Service | 1003, 1004, 1102 |
| Providing info on in-demand sectors, occupations, or nontraditional employment | No | Basic Career Service | 1100, 1101 |
| Provision of referrals and associated coordination of activities with other programs and services | No | Basic Career Service | 1100, 1101, 1113, 1115 |
| Provision of workforce and labor market employment statistics information | No | Basic Career Service | 1100, 1101, 1103 |

---

[1] Note this this chart does not include all available services that may be provided, but rather those services specifically authorized under WIOA sec. 134(c)(2). Additionally, these services do not indicate whether or not an individual is a participant, but rather which services trigger an individual to become a participant.

DOL_PRWORA _000137

| Attachment II | | | |
|---|---|---|---|
| Adult/DW/ES Service Type (WIOA Sec. 134 (c)) | Does this service trigger inclusion in participation? | Category of Service (i.e. Basic, Individualized, Training) | Applicable PIRL Data Element Number(s) |
| Provision of info on job vacancies | No | Basic Career Service | 1100, 1101, 1103 |
| Provision of info on job skills necessary to fill vacancies | No | Basic Career Service | 1100, 1101, 1103 |
| Provision of info on local demand occupations, with earnings, skill requirements, and opportunities for advancement for those jobs | No | Basic Career Service | 1100, 1101, 1103 |
| Provision of performance and program cost info for providers of education and training | No | Basic Career Service | 1100, 1101 |
| Provision of info on local performance | No | Basic Career Service | 1100, 1101 |
| Provision of info on availability of supportive services or assistance | No | Basic Career Service | 1100, 1101 |
| Referral to supportive services | No | Basic Career Service | 1113 |
| Provision of information and meaningful assistance filing for UI | Yes | Basic Career Service | 1003,1004, 1112 |
| Assistance establishing eligibility for financial aid | Yes | Basic Career Service | 1003,1004, 1116 |
| Comprehensive and specialized assessments | Yes | Individualized Career Service | 1004, 1200, 1201 |
| Development of IEP | Yes | Individualized Career Service | 1004, 1200, 1201, 1202 |
| Group Counseling | Yes | Individualized Career Service | 1004, 1200, 1201 |
| Individual Counseling | Yes | Individualized Career Service | 1004, 1200, 1201 |
| Career Planning | Yes | Individualized Career Service | 1004, 1200, 1201 |

2

DOL_PRWORA _000138

| Attachment II | | | |
|---|---|---|---|
| Adult/DW/ES Service Type (WIOA Sec. 134 (c)) | Does this service trigger inclusion in participation? | Category of Service (i.e. Basic, Individualized, Training) | Applicable PIRL Data Element Number(s) |
| Short-term prevocational services | Yes | Individualized Career Service | 1004, 1200, 1201, 1210 |
| Internships and work experiences (including transitional jobs) | Yes | Individualized Career Service | 1004, 1200, 1201, 1203, 1205, 1211 |
| Workforce preparation activities | Yes | Individualized Career Service | 1004, 1200, 1201 |
| Financial literacy services | Yes | Individualized Career Service | 1004, 1200, 1201, 1206 |
| Out-of-area job search assistance and relocation assistance | Yes | Individualized Career Service | 1004, 1200, 1201 |
| English-language acquisition and integrated education and training programs | Yes | Individualized Career Service | 1004, 1200, 1201, 1207 |
| Follow up services | n/a (must be a participant first to receive) | Follow up Service | 1503 |
| Training services under Sec. 134(c)(3)(D) with exception of Sec. 134(c)(3)(D)(iii) (incumbent worker training) | Yes | Training | 1300, 1301, 1302, 1303, 1304, 1305, 1306, 1307, 1308, 1309, 1310, 1311, 1312, 1313, 1314, 1315, 1316, 1317, 1318, 1319 |
| Incumbent Worker Training | No[2] | Training | 907 |

*Note: Receipt of any of the three types of services (Basic, Individualized, or Training) makes an individual a "Reportable Individual" while it only takes the receipt of one service that triggers participation to be considered a participant.

---

[2] While Incumbent Worker Training is not a self-service or information-only service, individuals are not required to meet eligibility requirements for the Adult or Dislocated Worker programs to receive Incumbent Worker Training.

DOL_PRWORA _000139

| EMPLOYMENT AND TRAINING ADMINISTRATION ADVISORY SYSTEM U.S. DEPARTMENT OF LABOR Washington, D.C. 20210 | CLASSIFICATION WIOA |
|---|---|
| | CORRESPONDENCE SYMBOL OWI |
| | DATE February 21, 2024 |

**ADVISORY:**    **TRAINING AND EMPLOYMENT GUIDANCE LETTER NO. 10-23**

**TO:**    STATE WORKFORCE AGENCIES
STATE WORKFORCE ADMINISTRATORS
STATE WORKFORCE LIAISONS
STATE AND LOCAL WORKFORCE BOARD CHAIRS AND DIRECTORS
AMERICAN JOB CENTER DIRECTORS
STATE LABOR COMMISSIONERS
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 166
INDIAN AND NATIVE AMERICAN GRANTEES
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 167
MIGRANT AND SEASONAL FARMWORKER JOBS PROGRAM
GRANTEES
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 169
REENTRY EMPLOYMENT OPPORTUNITIES GRANTEES AND OTHER
DEMONSTRATION PROGRAMS
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 171
YOUTHBUILD GRANTEES
SENIOR COMMUNITY SERVICE EMPLOYMENT PROGRAM
GRANTEES

**FROM:**    BRENT PARTON
Principal Deputy Assistant Secretary

**SUBJECT:**    Reducing Administrative Barriers to Improve Customer Experience in Grant
Programs Administered by the Employment and Training Administration

1. **Purpose.** The purpose of this guidance is to provide grant recipients direction in developing policies, procedures, and practices that reduce unnecessary administrative barriers to serving customers seeking employment and training services.

2. **Action Requested.** Entities receiving grants under the following programs must review eligibility policies, documentation requirements, data validation procedures, and other customer-facing processes to reduce administrative barriers and improve timely access to service delivery under the following programs: Workforce Innovation and Opportunity Act (WIOA) Title I Adult, Dislocated Worker, Youth, National Dislocated Worker Grants (DWG), Wagner-Peyser Act (W-P) Employment Service, Section 166 Indian and Native American Program (INAP), Reentry Employment Opportunities (REO) and other programs authorized under Section 169 of WIOA, YouthBuild, Section 167 National Farmworker Jobs Program (NFJP), and the Senior Community Service Employment Program (SCSEP).

| RESCISSIONS None | EXPIRATION DATE Continuing |
|---|---|

3.  **Summary and Background.**

    a.  Summary – This Training and Employment Guidance Letter (TEGL) directs the public workforce development system to streamline intake and eligibility processes to ensure individuals have full and equitable access to career services and training. The TEGL provides methods to consider when developing these policies, procedures, and practices to ensure career services and training are widely available to those meeting program eligibility requirements.

    b.  Background – As stated in WIOA, a primary purpose of public workforce programs is "to increase, for individuals in the United States, particularly those individuals with barriers to employment, access to and opportunities for the employment, education, training, and support services they need to succeed in the labor market." The grants that the Employment and Training Administration (ETA) administers serve a wide range of job seekers with various needs, some with intersecting barriers that complicate eligibility determination and timely service delivery. When viewed from a customer experience perspective, navigating and accessing these services comes with varying requirements that can result in significant wait times before participants can enroll or begin services. Such delays may cause individuals in need to miss out on getting critical supports that can help to secure employment and establish or re-establish accompanying financial stability. Whether individuals are engaged in finding a first or new job, transitioning to a better job, recovering from job loss, or dealing with a natural disaster, these life adjustments often require time, supports, and training or education to gain new skills. Such life transitions can be difficult for people to manage along with additional challenges such as childcare, unreliable transportation, unstable housing, and language or cultural barriers, among others.

    In line with the December 2021 *Executive Order on Transforming Federal Customer Experience and Service Delivery to Rebuild Trust in Government,* federally funded human service programs, including workforce development programs, should design intake and eligibility processes to meet urgent participant needs as quickly and seamlessly as possible, emphasizing a customer experience that gets people what they need for relief rather than focusing on what may be a time-consuming process of securing documentation as a prerequisite for obtaining any program services. With customer experience in mind, government-wide efforts are underway to establish a model of the federal delivery system working together—within programs, across programs, across levels of government — that creates solutions based on listening to people's needs and is driven by "human-centered design" research.[1]  To further that work, this guidance identifies several opportunities to improve customer experiences by clarifying administrative and documentation requirements for ETA administered grants.

4.  **Mechanisms to Reduce Administrative Burden .** Each of the grant programs identified above (WIOA Title I Adult, Dislocated Worker, Youth, DWGs, W-P Employment Service, INAP, REO and other WIOA Section 169 programs, YouthBuild, NFJP, and SCSEP) have their own unique eligibility, documentation, and reporting requirements. It is both useful and

---

[1] Building trust through improved service delivery and experience | Performance.gov.

DOL_PRWORA _000141

necessary to properly establish eligibility and capture key information and characteristics of individuals to understand their needs and the potential programs or benefits for which they may be eligible, as well as for program and performance management purposes. However, processes for gathering such information must be done as efficiently as possible to administer important services timely. In many instances, the documentation may be gathered at later dates or be substituted with equivalently acceptable documentation. At times, grantees can presume eligibility for a participant based on a single, known characteristic like homeless status in the WIOA Youth program. There also may be times when certain documentation is not necessary or the grantees can play a crucial role in helping people obtain the required documents. Grantees should distinguish in policies and procedures what information is needed initially for establishing eligibility and initiating service delivery and the information needed for future service delivery and grant administration. The information shared below clarifies administrative requirements to assist grantees in refining their intake and service delivery processes.

a. **Social Security Numbers**. For the programs covered by this guidance, none require individuals or their family members to disclose their Social Security Number (SSN) for eligibility determination. While grantees must request an individual's SSN for performance reporting purposes, grantees cannot deny services if an individual chooses not to share it. Furthermore, state and local policies cannot require individuals to disclose their SSN to receive services. While SSNs are needed for purposes of wage record matching to support performance accountability data collection efforts, eligibility and service provision do not and should not be conditioned upon an individual providing their SSN or their SSN card. As discussed in more detail in TEGL 14-18, *Aligning Performance Accountability Reporting, Definitions, and Policies Across Workforce Employment and Training Programs Administered by the U.S. Department of Labor (DOL)*, when requesting an SSN, grantees must explain, in writing, the authority to request it, the purpose, how the information will be used for understanding outcomes, and the right to decline disclosure. Grantees should also discuss privacy measures they use to protect personally identifiable information. Note that grantees may request a participant's SSN *during* their period of service, once an individual may feel a greater level of trust. Grantees may also explain to participants that employers will require disclosure of SSNs for tax purposes, so they can be prepared for that eventuality. However, it remains the participants' choice whether to share their SSN with the grantee. Grantees must always identify participants by an alternate unique identifier.

Regardless of the availability of a participant's SSN, grantees must count those individuals served by workforce programs in performance metrics, unless explicitly and specifically exempted. Grantees should use supplemental data to collect outcome data wherever possible in cases where they lack an SSN for a participant and using an Unemployment Insurance wage match is not possible. More information on supplemental data for performance can be found in TEGL 26-16, *Guidance on the use of Supplemental Wage Information to implement the Performance Accountability Requirements under the Workforce Innovation and Opportunity Act.*

b. **Data Validation and Performance Reporting**. Documentation and data validation are important for promoting accountability of federally funded workforce development

3

programs. Several programs require grantees to prioritize services to certain individuals (such as veterans for all DOL-funded workforce programs and adults considered basic-skills deficient and/or low-income for the WIOA Adult Program), and grantees must strike a reasonable balance between collecting documentation and providing much-needed, timely services. During intake, grant recipients should limit collection of documentation only to those items required for eligibility rather than trying to collect all the documentation necessary for data validation purposes. Procedures should include opportunities to request documentation after intake and initial service provision. In many situations, self-attestation is sufficient for both eligibility determination and data validation purposes. While ETA does not promote overuse or exclusive use of self-attestation, it does encourage grantees to consider it as a viable alternative, particularly among certain populations whose life circumstances may preclude immediate access to certain documents (such as youth experiencing homelessness or adults experiencing homelessness, people who have moved for a new job, recently incarcerated individuals, youth leaving foster care, survivors of natural disasters, refugees, and others). Grantees should review TEGL 23-19, Change 2, *Guidance for Validating Required Performance Data Submitted by Grant Recipients of U.S. Department of Labor (DOL) Workforce Programs,* for details on data validation and documentation requirements, including where self-attestation may be used.

Nearly all grantees covered by this guidance are required partners in the American Job Center (AJC) network and should leverage such partnerships to reduce the quantity and duplicative collection of information from customers. For example, in the context of income eligibility, if individuals seeking services indicate that they receive benefits from Temporary Assistance for Needy Families (TANF), but they cannot quickly or easily provide documentation, grantee procedures should identify how the grantee can obtain necessary information for both eligibility and data validation from the TANF partner. Aligned case management systems are ideal to streamline collection of administrative data across programs. AJC partners can also establish data sharing agreements and other procedures to ease the customer burden. In this specific example, self-attestation suffices for establishment of income status for purposes of eligibility, and grantees can work with partners outside of the eligibility determination process to validate that status.

Negotiated performance accountability targets for the WIOA title I programs may sometimes influence the choices grantees make when enrolling participants. ETA urges grantees to keep the customer and their needs as the primary focus of activities. Understanding that labor markets change, ETA uses a statistical adjustment model (SAM) to adjust state performance targets for WIOA core programs each year to account for the characteristics of participants served (which include but are not limited to poor work history, lack of work experience, educational or occupational skills, dislocation from high-wage and high-benefit employment, low levels of literacy or English proficiency, disability, homelessness, welfare dependency, etc.), economic conditions (such as unemployment rates and job losses or gains in particular industries) and other factors in the state during the corresponding period (see TEGL 11-19*,* Change 1, *Negotiations and Sanctions Guidance for Workforce Innovation and Opportunity Act (WIOA) Core Programs*). Adjusting performance targets based on the characteristics of

4

the actual participants served is a primary requirement of the WIOA SAM (WIOA Section 116 (b)(3)(v)(II)(bb)). The WIOA SAM is an objective regression model, developed pursuant to Section 116(b)(3)(A)(3)(viii) of WIOA, used to estimate levels of performance and derive the adjusted levels of performance based on participant characteristics and economic conditions. The SAM also considers other factors that, through empirical support, are determined to affect state outcomes. An individual's work authorization can be fluid and is not explicitly collected and accounted for in the SAM, and individuals with and awaiting work authorization all have varying skills that prepare them for a range of work and earnings. Once eligibility is established, as grantees provide services to customers, they are encouraged to thoroughly collect and report all barriers to employment a participant may face so levels of performance can be adjusted using the SAM.

c.  **Work Authorization**. For the grant programs covered by this guidance, grantees may deliver many services without proof of the participant's work authorization. This can be helpful in many situations, including where workers are awaiting work authorization, already have work authorization but do not have the documents to demonstrate it due to surviving a disaster, recently returning from incarceration, experiencing homelessness, leaving foster care, moving to a new location, or otherwise lack full access to many of their vital documents, or any number of circumstances. Grantees do not need to verify that one of these scenarios occurred; grantees can deliver certain services (described below) without checking work authorization to ensure the efficient delivery of services to workers in need.

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) restricts the eligibility of non-U.S. citizens and non-U.S. nationals to receive what the law defines as "federal public benefits," 8 U.S.C. § 1611, limiting eligibility for such benefits to certain "qualified" individuals, 8 U.S.C. § 1641. Many, but not all, services authorized by the programs covered by this guidance can be provided to program-eligible individuals with or without work authorization verification because the services are not included in the definition of "federal public benefits," as explained further in the next paragraph.[2]

The services limited to qualified individuals include certain supportive services that represent a direct financial benefit (such as a voucher or reimbursement for transportation and childcare, relocation expenses, or needs-related payments), post-secondary education and training, and work-based learning such as on-the-job training and incumbent worker training. Therefore, WIOA and W-P funds may *not* be used to provide these services until a participant can show that they have been granted asylum, been granted refugee status, or are otherwise included in the PRWORA definition of "qualified" individual described above. Also, in addition to all "qualified" non-U.S. citizens and non-U.S. nationals being broadly eligible for WIOA and W-P services, WIOA Section 188 makes all WIOA and

---

[2] At 8 U.S.C. 1611(a), PRWORA states, "an alien who is not a qualified alien (as defined in section 1641 of this title) is not eligible for any Federal public benefit." The law then defines "qualified aliens" to include, among others, lawful permanent residents and individuals who have been granted asylum or refugee status. This TEGL refers to "qualified aliens" as "qualified" individuals or "qualified" non-U.S. citizens or non-U.S. nationals.

5

W-P services available to all parolees and other immigrants authorized to work in the U.S., which includes individuals such as those who hold both Temporary Protected Status (TPS) and work authorization, and those who have received employment authorization while their application for asylee, parolee, or other status (such as TPS) are pending.[3]

Note that programs such as YouthBuild, REO Youth, and NFJP youth services generally assist young people in obtaining their high school equivalency while gaining career exposure through occupational skills-building, and thus those program services can be provided to individuals with or without verification of work authorization. As part of program eligibility determinations, INAP grantees validate whether a participant is Native American, Alaska Native, or Native Hawaiian, and Tribes determine tribal membership. Therefore, INAP grantees do not need to incorporate work authorization into their eligibility determinations or check for work authorization before any service at any time.

The guidance below identifies which services grantees may provide to eligible individuals with and without verifying work authorization. WIOA Title I Adult, Dislocated Worker, Youth, DWGs, W-P Employment Service, REO and other WIOA Section 169 programs that serve adults, NFJP programs that serve adults, and SCSEP can deliver some basic, individualized, and follow-up services without verifying work authorization, including:

- Labor exchange services such as labor market information, career exploration, career guidance, resume writing assistance, and job search assistance.
- Information on worker rights and where to find legal assistance.
- Referrals to community resources such as transportation, childcare support, food assistance, housing assistance, medical assistance, and other similar resources.
- Individualized services such as career assessments, development of an individual employment plan, group counseling, one-on-one case management, career planning, information on foreign credential evaluation services and on obtaining credit for prior learning.
- Basic skills education, including English language instruction, and high school equivalency.
- Assistance in completing paperwork to finalize work authorization.
- Assistance in applying for an occupational license including the cost of such applications.

---

[3] Section 188(a)(5) of WIOA states, "Participation in programs and activities or receiving funds under [Title I of WIOA] shall be available to citizens and nationals of the United States, lawfully admitted permanent resident aliens, refugees, asylees, and parolees, and other immigrants authorized by the Attorney General to work in the United States." This means that if individuals can show they are legal permanent residents, refugees, asylees, or parolees, all WIOA services shall be available to them without needing to separately check their work authorization documentation. Other immigrants outside of those categories must be able to show they have work authorization in order to receive WIOA services limited to "qualified" individuals. Please note that non-immigrant visa holders, such as H-2A agricultural workers or CNMI-only Transitional Worker visa holders in the Commonwealth of Northern Mariana Islands, are not included in Section 188's category of "other immigrants authorized to work in the United States." For questions on non-immigrant visas and which services can be provided to individuals who have them, grantees should contact their Federal Project Officers for additional guidance.

DOL_PRWORA _000145

- Outreach to workers regarding the Employment-Related Law Complaint System and processing of such complaints.

For WIOA Title I Adult, Dislocated Worker, Youth, DWGs, W-P Employment Service, REO and other WIOA Section 169 programs the serve adults, NFJP programs that serve adults, and SCSEP, services such as those listed below require verification of work authorization documentation:[4]

- Job placement.
- Occupational post-secondary training.
- Work experience, including community service employment assignments in SCSEP.
- Supportive services that represent a direct financial benefit such as a voucher or reimbursement, relocation expenses, or needs-related payments.

Grantees can postpone verifying work authorization documentation until the participant is moving into services that require such authorization. Reviewing documentation at the time it is needed instead of extensive, time-consuming document reviews when a customer first seeks services can benefit many jobseekers who do not have easy access to documents, such as youth in foster care, homeless youth or adults, individuals returning to the community from incarceration, and those recovering from a disaster.

When serving participants whose work authorization has not been verified, ETA encourages grantees to develop service plans that consider the menu and order of services that best prepare the individual to successfully reside in the community and to eventually secure employment with a livable wage. For example, programs funded through the Adult Education and Family Literacy Act (AEFLA), authorized by WIOA title II, provide basic skills instruction below the high school level; high school level instruction; integrated English literacy and civics education; and English language acquisition instruction. Additionally, some programs serving youth may deliver workforce services alongside education services, many of which have different eligibility requirements. Partnerships with community-based organizations, particularly those focused on assisting immigrants and non-native English speakers, can enable public workforce system grantees to better understand the cultural background and immediate service needs of immigrants, refugees, asylees, parolees, and other non-citizens and help identify how the public workforce development system can best serve individuals who do not yet have

---

[4] ETA does not expect staff in AJCs to have extensive expertise in validating immigration status or work authorization. Work authorization can be evidenced by several types of documents. These include: Form I-9 acceptable documents, including documents presented by green card holders; and Employment Authorization Documents (EADs) held by individuals including refugees, asylees, parolees, and other immigrants with work authorization, including individuals with deferred action, Deferred Action for Childhood Arrivals (DACA) protection, and individuals who have work authorization while their applications for asylee, parolee, or other status (such as TPS or other) are pending. Some grantees use the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) system to verify individuals' work authorization; however grantees are not required to do so. Grantees can consider an individual's verification in the SAVE system or presentation any of the documents described above as documentation of work authorization for the purpose of enrolling someone in an ETA-funded program.

7

work authorization. For instance, employment norms and employer-worker expectations in the U.S. compared to the norms in other countries can differ. Regardless of work authorization, grantees can help any participant understand common workplace expectations as well as worker rights and protections. Another useful service includes financial literacy education which assists new entrants in the U.S. workforce in managing their income, understanding taxes and deductions, banking and savings, as well as including cautions about predatory lending and credit cards.

Some individuals may not wish to disclose whether or not they are authorized to work. Others may have a changing or under review status or may not know what their status is. In such situations, grantees should clearly explain what services they can and cannot provide to individuals who may not yet have work authorization documentation, as well as clearly explain that employers will need work authorization documentation.

Grantees must verify that an individual has been granted work authorization prior to delivering those services identified above as requiring verification of work authorization documentation. While a copy of such documentation is not required for a participant file, we encourage grantee case managers working with participants to see the participant's documents and note in the case file that the participant has an employment authorization document. Confirmation of work authorization documentation, for the services described above that require it, is necessary to ensure that services provided do not violate PRWORA as well as to better serve employer customers who will need to verify authorization to work.

As grantees conduct verification of work authorization, they must ensure they comply with the requirements of the non-discrimination regulations implementing Section 188 of WIOA at 29 C.F.R. part 38. Specifically, a grantee "must not directly or through contractual, licensing, or other arrangements, discriminate on the basis of citizenship status." 29 C.F.R. 38.11. Among other prohibited actions, discrimination includes "[treating] an individual differently from others in determining whether the individual satisfies any admission, enrollment, eligibility, membership, or other requirement or condition for any aid, benefit, service, or training provided under a WIOA Title I-financially assisted program or activity." 29 C.F.R. 38.6(b)(5).

d.  **Selective Service Registration**. Grantees must continue to follow requirements related to Selective Service registration and documentation of such as a prerequisite for eligibility for all programs covered by this guidance. For details on these requirements, see TEGL 11-11, Change 2, *Selective Service Registration Requirements for Employment and Training Administration Funded Programs*.

e.  **Role of Public Workforce Development System in Helping Customers Obtain Documents**. While certain documents, such as a driver's license or a social security card, may not be necessary for individuals to begin receiving services, these documents or other forms of identification are often necessary for individuals who intend to work. AJC network staff can improve the customer experience by reducing administrative burden for individuals, particularly those who have historically been underserved, by helping them

8

obtain necessary documents for employment, such as a driver's license or identification card, a social security card, and/or a birth certificate. AJC network staff are encouraged to refer individuals to partner organizations for legal assistance, as well as to partner organizations that provide support to populations with barriers to employment such as immigrants and refugees, homeless individuals, youth, and justice-involved individuals. In addition, many of the grant programs discussed in this guidance permit paying of fees to obtain such documents as an allowable supportive service, except for individuals not yet authorized to work.

f. **Human-Centered Design Approach to Enhance Customer Experience.** In addition to the above methods and mechanisms, ETA encourages grantees to use human-centered design methods to conduct customer research that can strengthen their understanding of the customer experience and journey. When implementing new or updated intake and service procedures, conduct user testing of the changed approach to assess its effectiveness. Grantees should collect feedback from customers to inform what is working well and potential areas of improvement. The "Human Centered Design Discovery Field Guide V.1" provides step-by-step guidance on how to conduct customer research using the human-centered design framework and then synthesize the research findings, towards the goal of helping organizations identify opportunities to improve service.

5. **Inquiries.** Please direct inquiries to the appropriate Regional Office or your ETA Federal Project Officer.

6. **References.**
   - Workforce Innovation and Opportunity Act (WIOA), Pub. L. 113-128, 29 U.S.C. 3101 et seq
   - Wagner-Peyser Act (W-P Act), 29 U.S.C. 49 et seq.
   - Older Americans Act, Title V, 42 U.S.C. 3056 et seq.
   - Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), Title IV, Pub. L. 104-193, 8 U.S.C. 1601 et seq.
   - The Nondiscrimination and Equal Opportunity Provisions (Section 188) of WIOA available at: https://www.ecfr.gov/current/title-29/subtitle-A/part-38
   - Training and Employment Guidance Letter 14-18, *Aligning Performance Accountability Reporting, Definitions, and Policies Across Workforce Employment and Training Programs Administered by the U.S. Department of Labor (DOL)* available at: https://www.dol.gov/agencies/eta/advisories/training-and-employment-guidance-letter-no-14-18
   - Training and Employment Guidance Letter No. 23-19, Change 2, *Revisions to Training and Employment Guidance Letter (TEGL) 23-19, Change 1, Guidance for Validating Required Performance Data Submitted by Grant Recipients of U.S. Department of Labor (DOL) Workforce Programs* available at: https://www.dol.gov/agencies/eta/advisories/tegl-23-19-change-2
   - Training and Employment Guidance Letter 11-19, Change 1, *Negotiations and Sanctions Guidance for Workforce Innovation and Opportunity Act (WIOA) Core*

9

*Programs* available at: https://www.dol.gov/agencies/eta/advisories/tegl-11-19-change-1

- Training and Employment Guidance Letter No. 11-11, Change 2, *Selective Service Registration Requirements for Employment and Training Administration Funded Programs* available at: https://www.dol.gov/agencies/eta/advisories/training-and-employment-guidance-letter-no-11-11-change-2
- Training and Employment Guidance Letter No. 26-16, *Guidance on the Use of Supplemental Wage information to implement the Performance Accountability Requirements under the Workforce Innovation and Opportunity Act* available at: https://www.dol.gov/agencies/eta/advisories/training-and-employment-guidance-letter-no-26-16
- Training and Employment Guidance Letter No. 02-14, *Eligibility of Deferred Action for Childhood Arrivals Participants for Workforce Investment Act and Wagner-Peyser Act Programs* available at: https://www.dol.gov/agencies/eta/advisories/training-and-employment-guidance-letter-no-02-14
- Customer Experience references:
  - Executive Order on Transforming Federal Customer Experience and Service Delivery to Rebuild Trust in Government
  - GSA's Human Centered Design Discovery Field Guide V.1
  - WorkforceGPS resource on Customer Centered Design https://ccd.workforcegps.org/home

7. **Attachment.** Not Applicable.

10

DOL_PRWORA_000149

| EMPLOYMENT AND TRAINING ADMINISTRATION ADVISORY SYSTEM U.S. DEPARTMENT OF LABOR Washington, D.C. 20210 | CLASSIFICATION WIOA |
|---|---|
| | CORRESPONDENCE SYMBOL OWI |
| | DATE March 27, 2025 |

**ADVISORY:**  **TRAINING AND EMPLOYMENT GUIDANCE LETTER NO. 10-23, Change 1**

**TO:**  STATE WORKFORCE AGENCIES
STATE WORKFORCE ADMINISTRATORS
STATE WORKFORCE LIAISONS
STATE AND LOCAL WORKFORCE BOARD CHAIRS AND DIRECTORS
AMERICAN JOB CENTER DIRECTORS
STATE LABOR COMMISSIONERS
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 166
INDIAN AND NATIVE AMERICAN GRANTEES
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 167
MIGRANT AND SEASONAL FARMWORKER JOBS PROGRAM
GRANTEES
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 169
REENTRY EMPLOYMENT OPPORTUNITIES GRANTEES AND OTHER
DEMONSTRATION PROGRAMS
WORKFORCE INNOVATION AND OPPORTUNITY ACT SECTION 171
YOUTHBUILD GRANTEES
SENIOR COMMUNITY SERVICE EMPLOYMENT PROGRAM
GRANTEES

**FROM:**  AMY SIMON
Acting Assistant Secretary

**SUBJECT:**  Rescission of Training and Employment Guidance Letter (TEGL) No. 10-23: *Reducing Administrative Barriers to Improve Customer Experience in Grant Programs Administered by the Employment and Training Administration (ETA)*

1. **Purpose.** To rescind Training and Employment Guidance Letter (TEGL) No. 10-23.

2. **Action Requested.** Please disseminate this information to appropriate staff.

3. **Summary.**

   - Summary – TEGL No. 10-23, Change 1, changes the status of TEGL No. 10-23 to rescinded.

4. **Rescission of TEGL No. 10-23.** TEGL No. 10-23 is hereby rescinded. ETA will issue further guidance.

| RESCISSIONS TEGL 10-23 | EXPIRATION DATE Continuing |
|---|---|

DOL_PRWORA _000150

5. **Inquiries.** Please direct inquiries to the appropriate Regional Office.

6. **References.** N/A.

7. **Attachment(s).** N/A.

2

DOL_PRWORA _000151

# Certificates of Non Citizen Nationality

The Department of State occasionally receives requests for certificates of non-citizen national status pursuant to Section 341(b)of the Immigration and Nationality Act (INA), 8 USC 1452(b).

As defined by the INA, all U.S. citizens are U.S. nationals but only a relatively small number of persons acquire U.S. nationality without becoming U.S. citizens. Section 101(a)(21) of the INA defines the term "national" as "a person owing permanent allegiance to a state." Section 101(a)(22) of the INA provides that the term "national of the United States" includes all U.S. citizens as well as persons who, though not citizens of the United States, owe permanent allegiance to the United States (non-citizen nationals).

Section 308 of the INA confers U.S. nationality but not U.S. citizenship, on persons born in "an outlying possession of the United States" or born of a parent or parents who are non-citizen nationals who meet certain physical presence or residence requirements. The term "outlying possessions of the United States" is defined in Section 101(a)(29) of the INA as American Samoa and Swains Island. No other statutes define any other territories or any of the states as outlying possessions.

In addition to Section 308 of the INA, Section 302 of Public Law 94 - 241 provides for certain inhabitants of the Commonwealth of the Northern Mariana Islands, who became United States citizens by virtue of Article III of the Covenant, to opt for non-citizen national status. (See requirements of Section 302).

As the Department has received few requests, there is no justification for the creation of a non-citizen national certificate. Designing a separate document that includes anti-fraud mechanisms was seen as an inefficient expenditure of resources. Therefore, the Department determined that those who would be eligible to apply for such a certificate may instead apply for a United States passport that would delineate and certify their status as a national but not a citizen of the United States.

If a person believes he or she is eligible under the law as a

non-citizen national of the United States and the person
complies with the provisions of section 341(b) of the INA, 8
USC 1452(b), he/she may apply for a passport at any
Passport Agency or acceptance facility in the United States.
When applying, applicants must execute a Form DS-11 and
show documentary proof of their non-citizen national status
as well as their identity.

**Pertinent Sections of Law on Non-Citizen Nationality**

**Section 341 of the Immigration and Nationality Act:**

(b) A person who claims to be a national, but not a citizen,
of the United States may apply to the Secretary of State for
a certificate of non-citizen national status. Upon - (1) proof
to the satisfaction of the Secretary of State that the
applicant is a national, but not a citizen, of the United
States; and, (2) in the case of a non-citizen national born
outside of the United States or its outlying possessions,
taking and subscribing, before an immigration officer within
the United States or its outlying possessions, to the oath of
allegiance required of an applicant for naturalization.

**Section 101(a)(21) of the Immigration and
Nationality Act:**

The term "national" means a person owing permanent
allegiance to a state.

**Section 101(a)(29) of the Immigration and
Nationality Act:**

The term "outlying possessions of the United States" means
American Samoa and Swains Island.

**Section 101(a)(36) of the Immigration and
Nationality Act:**

The term "State" includes the District of Columbia, Puerto
Rico, Guam, and the Virgin Islands of the United States.

**Section 308 of the Immigration and Nationality Act:**

Unless otherwise provided in section 301 of this title, the
following shall be nationals, but not citizens of the United
States at birth:

(1) A person born in an outlying possession of the United States on or after the date of formal acquisition of such possession;

(2) A person born outside the United States and is outlying possessions of parents both of whom are nationals, but not citizens, of the United States, and have had a residence in the United States, or one of its outlying possessions prior to the birth of such person;

(3) A person of unknown parentage found in an outlying possession of the United States while under the age of five years, until shown, prior to attaining the age of twenty-one years, not to have been born in such outlying possessions; and

(4) A person born outside the United States and its outlying possessions of parents one of whom is an alien, and the other a national, but not a citizen, of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than seven years in any continuous period of ten years -

(A) during which the national parent was not outside the United States or its outlying possessions for a continuous period of more than one year, and

(B) at least five years of which were after attaining the age of fourteen years.

The proviso of section (301(g)) shall apply to the national parent under this paragraph in the same manner as it applies to the citizen parent under that section.

## Section 302 of Public Law 94 - 241:

Any person who becomes a citizen of the United States solely by virtue of the provisions in Section 301 [applying to those born in or residing in the Northern Mariana Islands] may within six months after the effective date of that Section or within six months after reaching the age of 18 years, whichever date is later, become a national but not a citizen of the United States by making a declaration under oath before any court established by the Constitution or laws of the United States or any other court of record in the

DOL_PRWORA _000154

Commonwealth in the form as follows " I _____ being duly
sworn, hereby declare my intention to be a national but not
a citizen of the United States."

DOL_PRWORA _000155



**U.S. Citizenship
and Immigration
Services**

MENU

Home > SAVE > Current User Agencies > News & Alerts > DHS, USCIS and DOGE Announce Comprehensive Optimization of SAVE Service

# DHS, USCIS and DOGE Announce Comprehensive Optimization of SAVE Service

*Overhaul Includes Elimination of SAVE Fees for Non-Federal Agencies*

Homeland Security Secretary Kristi Noem, alongside U.S. Citizenship and Immigration Services (USCIS) and the Department of Government Efficiency (DOGE), announced a comprehensive optimization of the Systematic Alien Verification for Entitlements (SAVE) database to ensure a single, reliable source for verifying non-citizen status nationwide.

As part of the optimization, effective April 1, 2025, SAVE has revised its transaction charges for all state, local, tribal, and territorial government agencies to eliminate those charges.

SAVE, a critical tool for lawful immigration status verification operated by USCIS, provides federal, state, and local agencies with the immigration status of aliens and naturalized or derived citizens applying for certain public benefits. It does not maintain U.S. born citizen data and is not used to verify U.S. born citizens.

Last Reviewed/Updated: 04/29/2025



Need Help?
Chat with Emma™

DOL_PRWORA _000156

# Employment Eligibility Verification
## Department of Homeland Security
### U.S. Citizenship and Immigration Services

**USCIS**
**Form I-9**
OMB No.1615-0047
Expires 05/31/2027

**START HERE:** Employers must ensure the form instructions are available to employees when completing this form. Employers are liable for failing to comply with the requirements for completing this form. See below and the **Instructions**.

**ANTI-DISCRIMINATION NOTICE:** All employees can choose which acceptable documentation to present for Form I-9. Employers cannot ask employees for documentation to verify information in **Section 1**, or specify which acceptable documentation employees must present for **Section 2** or Supplement B, Reverification and Rehire. Treating employees differently based on their citizenship, immigration status, or national origin may be illegal.

**Section 1. Employee Information and Attestation:** Employees must complete and sign Section 1 of Form I-9 no later than the **first day of employment**, but not before accepting a job offer.

| Last Name (Family Name) | First Name (Given Name) | Middle Initial (if any) | Other Last Names Used (if any) |
|---|---|---|---|

| Address (Street Number and Name) | Apt. Number (if any) | City or Town | State | ZIP Code |
|---|---|---|---|---|

| Date of Birth (mm/dd/yyyy) | U.S. Social Security Number | Employee's Email Address | Employee's Telephone Number |
|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements, or the use of false documents, in connection with the completion of this form. I attest, under penalty of perjury, that this information, including my selection of the box attesting to my citizenship or immigration status, is true and correct.

Check one of the following boxes to attest to your citizenship or immigration status (See page 2 and 3 of the instructions.):

☐ 1. A citizen of the United States
☐ 2. A noncitizen national of the United States (See Instructions.)
☐ 3. A lawful permanent resident (Enter USCIS or A-Number.)
☐ 4. An alien authorized to work until _____ (exp. date, if any)

If you check **Item Number 4.**, enter one of these:

| USCIS A-Number | OR | Form I-94 Admission Number | OR | Foreign Passport Number and Country of Issuance |
|---|---|---|---|---|

| Signature of Employee | Today's Date (mm/dd/yyyy) |
|---|---|

If a preparer and/or translator assisted you in completing Section 1, that person MUST complete the **Preparer and/or Translator Certification** on Page 3.

**Section 2. Employer Review and Verification:** Employers or their authorized representative must complete and sign **Section 2** within three business days after the employee's first day of employment, and must physically examine, or examine consistent with an alternative procedure authorized by the Secretary of DHS, documentation from List A OR a combination of documentation from List B and List C. Enter any additional documentation in the Additional Information box; see Instructions.

| | List A | OR | List B | AND | List C |
|---|---|---|---|---|---|
| Document Title 1 | | | | | |
| Issuing Authority | | | | | |
| Document Number (if any) | | | | | |
| Expiration Date (if any) | | | | | |
| Document Title 2 (if any) | | **Additional Information** | | | |
| Issuing Authority | | | | | |
| Document Number (if any) | | | | | |
| Expiration Date (if any) | | | | | |
| Document Title 3 (if any) | | | | | |
| Issuing Authority | | | | | |
| Document Number (if any) | | | | | |
| Expiration Date (if any) | | ☐ Check here if you used an alternative procedure authorized by DHS to examine documents. | | | |

**Certification:** I attest, under penalty of perjury, that (1) I have examined the documentation presented by the above-named employee, (2) the above-listed documentation appears to be genuine and to relate to the employee named, and (3) to the best of my knowledge, the employee is authorized to work in the United States.

First Day of Employment (mm/dd/yyyy):

| Last Name, First Name and Title of Employer or Authorized Representative | Signature of Employer or Authorized Representative | Today's Date (mm/dd/yyyy) |
|---|---|---|

| Employer's Business or Organization Name | Employer's Business or Organization Address, City or Town, State, ZIP Code |
|---|---|

For reverification or rehire, complete **Supplement B, Reverification and Rehire** on Page 4.

Form I-9   Edition   01/20/25

DOL_PRWORA _000157

Page 1 of 4

# LISTS OF ACCEPTABLE DOCUMENTS

All documents containing an expiration date must be unexpired.
* Documents extended by the issuing authority are considered unexpired.
Employees may present one selection from List A or a
combination of one selection from List B and one selection from List C.
**Examples of many of these documents appear in the Handbook for Employers (M-274).**

| **LIST A**<br>**Documents that Establish Both Identity and Employment Authorization** | OR | **LIST B**<br>**Documents that Establish Identity** AND | **LIST C**<br>**Documents that Establish Employment Authorization** |
|---|---|---|---|
| 1. U.S. Passport or U.S. Passport Card<br><br>2. Permanent Resident Card or Alien Registration Receipt Card (Form I-551)<br><br>3. Foreign passport that contains a temporary I-551 stamp or temporary I-551 printed notation on a machine-readable immigrant visa<br><br>4. Employment Authorization Document that contains a photograph (Form I-766)<br><br>5. For an individual temporarily authorized to work for a specific employer because of his or her status or parole:<br><br>  a. Foreign passport; and<br><br>  b. Form I-94 or Form I-94A that has the following:<br><br>    (1) The same name as the passport; and<br>    (2) An endorsement of the individual's status or parole as long as that period of endorsement has not yet expired and the proposed employment is not in conflict with any restrictions or limitations identified on the form.<br><br>6. Passport from the Federated States of Micronesia (FSM) or the Republic of the Marshall Islands (RMI) with Form I-94 or Form I-94A indicating nonimmigrant admission under the Compact of Free Association Between the United States and the FSM or RMI | OR | 1. Driver's license or ID card issued by a State or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address<br><br>2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address<br><br>3. School ID card with a photograph<br><br>4. Voter's registration card<br><br>5. U.S. Military card or draft record<br><br>6. Military dependent's ID card<br><br>7. U.S. Coast Guard Merchant Mariner Card<br><br>8. Native American tribal document<br><br>9. Driver's license issued by a Canadian government authority<br><br>**For persons under age 18 who are unable to present a document listed above:**<br><br>10. School record or report card<br><br>11. Clinic, doctor, or hospital record<br><br>12. Day-care or nursery school record | 1. A Social Security Account Number card, unless the card includes one of the following restrictions:<br><br>  (1) NOT VALID FOR EMPLOYMENT<br>  (2) VALID FOR WORK ONLY WITH INS AUTHORIZATION<br>  (3) VALID FOR WORK ONLY WITH DHS AUTHORIZATION<br><br>2. Certification of report of birth issued by the Department of State (Forms DS-1350, FS-545, FS-240)<br><br>3. Original or certified copy of birth certificate issued by a State, county, municipal authority, or territory of the United States bearing an official seal<br><br>4. Native American tribal document<br><br>5. U.S. Citizen ID Card (Form I-197)<br><br>6. Identification Card for Use of Resident Citizen in the United States (Form I-179)<br><br>7. Employment authorization document issued by the Department of Homeland Security<br><br>For examples, see **Section 7** and **Section 13** of the M-274 on **uscis.gov/i-9-central**.<br><br>The Form I-766, Employment Authorization Document, is a List A, **Item Number 4.** document, not a List C document. |

## Acceptable Receipts

May be presented in lieu of a document listed above for a temporary period.

For receipt validity dates, see the M-274.

| | OR | | |
|---|---|---|---|
| • Receipt for a replacement of a lost, stolen, or damaged List A document.<br><br>• Form I-94 issued to a lawful permanent resident that contains an I-551 stamp and a photograph of the individual.<br><br>• Form I-94 with "RE" notation or refugee stamp issued to a refugee. | OR | Receipt for a replacement of a lost, stolen, or damaged List B document. | Receipt for a replacement of a lost, stolen, or damaged List C document. |

*Refer to the Employment Authorization Extensions page on **I-9 Central** for more information.

# Preparer and/or Translator Certification for Section 1

**Department of Homeland Security**

U.S. Citizenship and Immigration Services

**USCIS
Form I-9
Supplement A**

OMB No. 1615-0047

Expires 05/31/2027

Supplement A,

| Last Name *(Family Name)* from **Section 1.** | First Name *(Given Name)* from **Section 1.** | Middle initial (if any) from **Section 1.** |
|---|---|---|
| | | |

**Instructions:** This supplement must be completed by any preparer and/or translator who assists an employee in completing Section 1 of Form I-9. The preparer and/or translator must enter the employee's name in the spaces provided above. Each preparer or translator must complete, sign, and date a separate certification area. Employers must retain completed supplement sheets with the employee's completed Form I-9.

**I attest, under penalty of perjury, that I have assisted in the completion of Section 1 of this form and that to the best of my knowledge the information is true and correct.**

| Signature of Preparer or Translator | | Date *(mm/dd/yyyy)* | |
|---|---|---|---|
| Last Name *(Family Name)* | First Name *(Given Name)* | | Middle Initial *(if any)* |
| Address *(Street Number and Name)* | City or Town | State | ZIP Code |

**I attest, under penalty of perjury, that I have assisted in the completion of Section 1 of this form and that to the best of my knowledge the information is true and correct.**

| Signature of Preparer or Translator | | Date *(mm/dd/yyyy)* | |
|---|---|---|---|
| Last Name *(Family Name)* | First Name *(Given Name)* | | Middle Initial *(if any)* |
| Address *(Street Number and Name)* | City or Town | State | ZIP Code |

**I attest, under penalty of perjury, that I have assisted in the completion of Section 1 of this form and that to the best of my knowledge the information is true and correct.**

| Signature of Preparer or Translator | | Date *(mm/dd/yyyy)* | |
|---|---|---|---|
| Last Name *(Family Name)* | First Name *(Given Name)* | | Middle Initial *(if any)* |
| Address *(Street Number and Name)* | City or Town | State | ZIP Code |

**I attest, under penalty of perjury, that I have assisted in the completion of Section 1 of this form and that to the best of my knowledge the information is true and correct.**

| Signature of Preparer or Translator | | Date *(mm/dd/yyyy)* | |
|---|---|---|---|
| Last Name *(Family Name)* | First Name *(Given Name)* | | Middle Initial *(if any)* |
| Address *(Street Number and Name)* | City or Town | State | ZIP Code |




**Supplement B,**

# Reverification and Rehire (formerly Section 3)

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-9**
**Supplement B**
OMB No. 1615-0047
Expires 05/31/2027

| Last Name (Family Name) from **Section 1.** | First Name (Given Name) from **Section 1.** | Middle initial (if any) from **Section 1.** |
|---|---|---|
| | | |

**Instructions:** This supplement replaces Section 3 on the previous version of Form I-9. Only use this page if your employee requires reverification, is rehired within three years of the date the original Form I-9 was completed, or provides proof of a legal name change. Enter the employee's name in the fields above. Use a new section for each reverification or rehire. Review the Form I-9 instructions before completing this page. Keep this page as part of the employee's Form I-9 record. Additional guidance can be found in the **Handbook for Employers: Guidance for Completing Form I-9 (M-274)**

| Date of Rehire (if applicable) | New Name (if applicable) | | |
|---|---|---|---|
| Date (mm/dd/yyyy) | Last Name (Family Name) | First Name (Given Name) | Middle Initial |
| | | | |

**Reverification:** If the employee requires reverification, your employee can choose to present any acceptable List A or List C documentation to show continued employment authorization. Enter the document information in the spaces below.

| Document Title | Document Number (if any) | Expiration Date (if any) (mm/dd/yyyy) |
|---|---|---|
| | | |

**I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented documentation, the documentation I examined appears to be genuine and to relate to the individual who presented it.**

| Name of Employer or Authorized Representative | Signature of Employer or Authorized Representative | Today's Date (mm/dd/yyyy) |
|---|---|---|
| | | |

| Additional Information (Initial and date each notation.) | ☐ Check here if you used an alternative procedure authorized by DHS to examine documents. |
|---|---|

| Date of Rehire (if applicable) | New Name (if applicable) | | |
|---|---|---|---|
| Date (mm/dd/yyyy) | Last Name (Family Name) | First Name (Given Name) | Middle Initial |
| | | | |

**Reverification:** If the employee requires reverification, your employee can choose to present any acceptable List A or List C documentation to show continued employment authorization. Enter the document information in the spaces below.

| Document Title | Document Number (if any) | Expiration Date (if any) (mm/dd/yyyy) |
|---|---|---|
| | | |

**I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented documentation, the documentation I examined appears to be genuine and to relate to the individual who presented it.**

| Name of Employer or Authorized Representative | Signature of Employer or Authorized Representative | Today's Date (mm/dd/yyyy) |
|---|---|---|
| | | |

| Additional Information (Initial and date each notation.) | ☐ Check here if you used an alternative procedure authorized by DHS to examine documents. |
|---|---|

| Date of Rehire (if applicable) | New Name (if applicable) | | |
|---|---|---|---|
| Date (mm/dd/yyyy) | Last Name (Family Name) | First Name (Given Name) | Middle Initial |
| | | | |

**Reverification:** If the employee requires reverification, your employee can choose to present any acceptable List A or List C documentation to show continued employment authorization. Enter the document information in the spaces below.

| Document Title | Document Number (if any) | Expiration Date (if any) (mm/dd/yyyy) |
|---|---|---|
| | | |

**I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented documentation, the documentation I examined appears to be genuine and to relate to the individual who presented it.**

| Name of Employer or Authorized Representative | Signature of Employer or Authorized Representative | Today's Date (mm/dd/yyyy) |
|---|---|---|
| | | |

| Additional Information (Initial and date each notation.) | ☐ Check here if you used an alternative procedure authorized by DHS to examine documents. |
|---|---|


**U.S. Citizenship
and Immigration
Services**

MENU

Home > Handbook for Employers M-274

# 7.3 Refugees and Asylees

Refugees and asylees are employment eligible incident to their status and are authorized to work indefinitely because their immigration status does not expire. They may present any List A document or a combination of List B and List C documents from the Form I-9 Lists of Acceptable Documents to demonstrate identity and employment authorization. Employees may also present an acceptable receipt instead of the List A, B or C document. For more information about receipts, including the receipts refugees and asylees may present, see the information below in this section or Section 4.4, Acceptable Receipts.

## Refugees

Upon admission to the United States, DHS provides refugees with a Form I-94, Arrival/Departure Record, which does not expire.

When completing Form I-9, refugees should check "An alien authorized to work" and enter "N/A" on the Expiration Date field in Section 1, even if they have an EAD with an expiration date.

The departure portion that contains an unexpired refugee admission stamp or an electronic Form I-94 with an admission class of "RE" is an acceptable receipt establishing both employment authorization and identity for 90 days. If the refugee presents this receipt, at the end of the 90-day receipt period, the refugee must present either an EAD or a document from List B, such as a state-issued driver's license, with a document from List C, such as an unrestricted Social Security card.

Refugees may also present an expired EAD with a Form I-797C, Notice of Action, if the notice lists the same employment authorization category as the expired EAD. This combination is considered an unexpired List A document and is valid for up to 540 days after the "Card Expires" date on the EAD. For more information, see Section 5.0, Automatic Extensions of Employment Authorization and/or Employment Authorization Documents (EADs) in Certain Circumstances.

**Table 4: Documentation Refugees May Present**

This table provides examples of documentation refugees may present to complete Form I-9 and whether the reverification of employment authorization is required.


Need Help?
Chat with Emma™

DOL_PRWORA _000161

| Document | Additional Guidance | Is Reverification Required? |
|---|---|---|
| Form I-766, Employment Authorization Document (EAD) (List A) | Yes, employee may present a List A or List C document or receipt for reverification. | |
| Form I-766, Employment Authorization Document (EAD) that appears expired on the face of the card with a Form I-797C issued for a Form I-765 renewal application (List A) | Section 5.0 Automatic Extensions of Employment Authorization and/or Employment Authorization Documents (EADs) in Certain Circumstances for eligibility requirements and extension period. | Yes, employee may present a List A or List C document or receipt for reverification. |
| Form I-94 with:<br><br>• An unexpired refugee admission stamp; or<br>• An admission class of "RE" (List A receipt)<br><br>Note: Form I-94 does not expire. | No passport is needed. While the I-94 does not expire, this document is an acceptable receipt that is valid for 90 days. At the end of the 90-day receipt period, the employee must present an unexpired Form I-766, Employment Authorization Document (EAD) or a valid List B document and an unrestricted Social Security card. | If the employee presents an EAD at the end of the receipt period, you must reverify the employee's employment authorization when that EAD expires.<br><br>If the employee presents an unrestricted Social Security card and List B document, you may not reverify this employee's employment authorization. |

DOL_PRWORA _000162

| Document | Additional Guidance | Is Reverification Required? |
|---|---|---|
| Receipt for a lost, stolen or damaged Form I-766, Employment Authorization Document (EAD) (List A) | Acceptable receipt for 90 days. At the end of the receipt period the employee should show the replacement document. Alternatively, you may accept other Form I-9 documentation from the Lists of Acceptable Documents. | If the employee presents an EAD at the end of the receipt period, you must reverify the employee's employment authorization when that EAD expires.<br><br>If the employee presents an unrestricted Social Security card and List B document, you may not reverify this employee's employment authorization. |
| Form I-571, Refugee Travel Document (List C) | Can be presented with any List B identity Document | Yes, employee may present a List A or List C document or a receipt for reverification. |

# Asylees

After being granted asylum in the United States, DHS issues a Form I-94, Arrival/Departure Record, to asylees. Form I-94 will contain a stamp or notation, such as "asylum granted indefinitely" or the appropriate provision of law (8 CFR 274a.12(a)(5) or INA 208) to show their employment authorization. The asylee does not need to present a foreign passport with this Form I-94. An asylee can also present an electronic Form I-94 with an admission class of "AY." Form I-94 is an acceptable List C document and does not expire or require reverification. Asylees who choose to present this document must also present a List B identity document, such as a state-issued driver's license or identification card.

When completing Form I-9, asylees should indicate "an alien authorized to work" and enter "N/A" on the expiration date line in Section 1, even if they have an EAD with an expiration date.

USCIS issues EADs to asylees. These are acceptable List A documents; however, decisions from immigration judges or the Board of Immigration Appeals granting asylum are not acceptable List C documents because they are not issued by DHS.

**Table 5: Documentation Asylees May Present**

This table provides examples of documentation asylees may present to complete Form I-9 and whether reverification of employment authorization is required.

DOL_PRWORA _000163

| Document | Additional Guidance | Is Reverification Required? |
|---|---|---|
| Unexpired Form I-766, Employment Authorization Document (EAD) (List A) | Yes, employee may present a List A or List C document or receipt for reverification. | |
| Form I-766, Employment Authorization Document (EAD) that appears expired on the face of the card with a Form I-797C issued for a Form I-765 renewal application (List A) | See Section 5.0 Automatic Extensions of Employment Authorization and/or Employment Authorization Documents (EADs) in Certain Circumstances<br><br>for eligibility requirements and extension period. | Yes, employee may present a List A or List C document or receipt for reverification. |
| Receipt for a lost, stolen or damaged Form I-766, Employment Authorization Document (EAD) (List A) | Acceptable receipt for 90 days. At the end of the receipt period, the employee should show the replacement document. Alternatively, you may accept other Form I-9 documentation from the Lists of Acceptable Documents. | If the employee presents an EAD at the end of the receipt period, you must reverify the employee's employment authorization when that EAD expires.<br><br>If the employee presents an unrestricted Social Security card and List B document, you may not reverify this employee's employment authorization. |
| Form I-94 (List C) that contains either:<br><br>• Admission class of "AY"; or<br>• Stamp or notation, such as "asylum granted indefinitely" or the appropriate provision of law (8 CFR 274a.12(a)(5) or INA 208) | No passport is needed.<br><br>Can be presented with any List B identity Document<br><br>Note: Form I-94 does not expire. | |

DOL_PRWORA _000164

DOL_PRWORA _000165



**U.S. Citizenship
and Immigration
Services**

MENU

Home > I-9 Central > Form I-9 Acceptable Documents > Who is Issued This Document?

# Who is Issued This Document?

For guidelines on which documents on Form I-9, Employment Eligibility Verification, are issued to which categories of individuals, see the chart below.



Need Help?
Chat with Emma™

DOL_PRWORA _000166

| | Document Type | A Citizen of the U.S. | A Noncitizen National of the U.S. | A Lawful Permanent Resident | An Alien Authorized to Work |
|---|---|---|---|---|---|
| **LIST A** | U.S. Passport or Passport Card | x | x | | |
| | Permanent Resident Card or Alien Registration Receipt Card (Form I-551) | | | x | |
| | Foreign passport with temporary I-551 (ADIT) stamp or printed notation on a MRIV | | | x | |
| | Employment Authorization Document (Form I-766) | | | | x |
| | Foreign passport with Arrival/Departure Record (Form I-94) | | | | x |
| | Passport from the Federated States of Micronesia (FSM) or the Republic of the Marshall Islands (RMI) with Form I-94 | | | | x |

DOL_PRWORA _000167

| | Document Type | A Citizen of the U.S. | A Noncitizen National of the U.S. | A Lawful Permanent Resident | An Alien Authorized to Work |
|---|---|---|---|---|---|
| **LIST B** | Driver's License or ID card issued by a U.S. state or outlying possession | x | x | x | x |
| | ID card issued by a U.S. federal, state, or local government agency | x | x | x | x |
| | School ID card | x | x | x | x |
| | Voter registration card | x | x | x | x |
| | U.S.military card or draft record | x | x | x | x |
| | Military dependent's ID card | x | x | x | x |
| | U.S.Coast Guard Merchant Mariner Card | x | x | x | x |
| | Native American tribal document | x | x | x | x |
| | Driver's license issued by a Canadian government authority | x | x | x | x |
| | School record or report card (under age 18) | x | x | x | x |
| | Clinic, doctor, or hospital record (under age 18) | x | x | x | x |
| | Daycare or nursery school record (under age 18) | x | x | x | x |

DOL_PRWORA _000168

|  | Document Type | A Citizen of the U.S. | A Noncitizen National of the U.S. | A Lawful Permanent Resident | An Alien Authorized to Work |
|---|---|---|---|---|---|
| **LIST C** | Social Security Card* | x | x | x | x |
|  | Certification of Birth Abroad (Form FS-545) | x | x |  |  |
|  | Certification of Report of Birth (Form DS-1350) | x | x |  |  |
|  | Consular Report of Birth Abroad (Form FS-240) | x | x |  |  |
|  | U.S. birth certificate (original or certified copy) | x | x |  |  |
|  | Native American tribal document | x | x | x | x |
|  | U.S. Citizen ID Card (Form I-197) | x |  |  |  |
|  | ID Card for Use of Resident Citizen in the United States (Form I-179) | x |  |  |  |
|  | Employment authorization document issued by the U.S. Department of Homeland Security | x | x | x | x |

*Unrestricted Social Security cards that are acceptable List C documents are only issued to:

- U.S. citizens
- Noncitizen nationals of the U.S.
- Lawful permanent residents
- Refugees

DOL_PRWORA _000169

- Asylees

- Citizens of the Republic of Marshall Islands, the Federated States of Micronesia, or the Republic of Palau admitted under a Compact of Free Association

## More Information

- [Handbook for Employers M-274](#)

- [Take a Free Webinar](#)

Last Reviewed/Updated: 03/28/2025

DOL_PRWORA _000170



**U.S. Citizenship and Immigration Services**

MENU

# Transaction Charges

> ℹ️ **ALERT:** Effective April 1, 2025, SAVE has revised its transaction charges for all state, local, tribal, and territorial government agencies using SAVE to eliminate those charges.

## Federal Agencies

On Oct. 1, 2024, USCIS implemented the second phase of a transaction charge increase for SAVE verification cases, which also streamlines billing to a single charge per verification case. SAVE also charges a minimum monthly service charge of $25.00 for each month in which a user agency submits at least one SAVE case. This increase is necessary as part of a phased approach through 2028 to more fully recover program costs as required by law and Federal agency guidance.

The federal agency charge is $2.25 per case in Fiscal Year (FY) 2025 (Oct. 1, 2024 – Sept. 30, 2025) and incrementally increases until reaching $3.10 per case in FY 2026.

| Fiscal Year | Federal Agency Charge **Per Verification Case** |
|---|---|
| FY 2024 | $1.50 |
| FY 2025 | $2.25 |
| FY 2026 | $3.10 |

## Non-federal Agencies:

Effective April 1, 2025, SAVE has revised its transaction charges for all state, local, tribal, and territorial government agencies using SAVE to eliminate those charges.



Need Help?
Chat with Emma™

| Fiscal Year | Non-Federal Agency Charge<br>**Per Verification Case** |
|---|---|
| FY 2024 | $1.00 |
| FY 2025 | $1.50 for cases run through March 31, 2025; no charge for cases run on or after April 1, 2025. |

Last Reviewed/Updated: 04/29/2025

DOL_PRWORA _000172