transitional housing, and other assistance." *Id.* at ¶ 300. Plaintiffs further allege that in reliance on the awards, many of the New CoC Plaintiffs "already notified service providers of forthcoming funding and/or contracted with service providers for homelessness assistance services." *Id.* at ¶ 301.

In addition, Plaintiffs allege that Defendants also continue to impose the funding conditions on DOT grants awarded to Alameda County, Albuquerque, Baltimore, Bellevue, Bellingham, Bremerton, Cambridge, Dane County, Eugene, Healdsburg, Hennepin County, Kitsap County, Los Angeles, Milwaukee, Milwaukee County, Multnomah County, Oakland, Pacifica, Pasadena, Petaluma, PSRC, Ramsey County, Rochester, Rohnert Park, San Diego, San Mateo County, Santa Rosa, SCTA, and Watsonville—the New DOT Plaintiffs. According to Plaintiffs, each of the New DOT Plaintiffs "previously received, currently receive, or are otherwise eligible to receive DOT grants, directly and/or on a pass-through basis. *Id.* at ¶ 391. Plaintiffs further allege that each of the New DOT Plaintiffs rely on the DOT grants to undertake transportation-related projects for the benefit of their communities.

Plaintiffs claim that "[t]he grant conditions that Defendants seek to impose leave [the New CoC and DOT] Plaintiffs with the Hobson's choice of accepting illegal conditions that are without authority, contrary to the Constitution, and accompanied by the poison pill of heightened risk of FCA claims or forgoing the benefit of grant funds—paid for (at least partially) through local federal taxes—that are necessary for crucial local services." *Id.* at ¶ 623. Finally, Plaintiffs assert that loss of these grant funds would result in loss of billions of dollars in funding for critical services and projects for the New CoC and DOT Plaintiffs, destabilizing their

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 11

communities. *Id.* at ¶¶ 625-627. Plaintiffs request that this Court extend its injunction against Defendants to the New CoC and DOT Plaintiffs' grants.

### B. Non-CoC HUD Grants

Plaintiffs allege that in addition to CoC grants, many of them receive or are otherwise eligible to receive non-CoC HUD grants—the Non-CoC HUD Plaintiffs. These grants include congressionally appropriated funding for homelessness assistance, affordable housing, community development programs, and other services that benefit the Non-CoC HUD Plaintiffs' communities, including the Community Development Block Grant ("CDBG") program, 42 U.S.C. §§ 5303–06; the Emergency Solutions Grant ("ESG") program, which funds emergency shelters and homelessness services, *id.* §§ 11371–78; the Home Investment Partnerships ("HOME") program, which supports affordable housing, *id.* §§ 12741–56; and the Housing Opportunities for Persons with AIDS ("HOPWA") program, *id.* §§ 12901–12. Dkt. No. 184 at ¶¶ 302-358.

Plaintiffs allege, and Defendants do not dispute, that HUD seeks to impose on *all* HUD grants substantially similar funding conditions to those that this Court previously enjoined. As evidence of this, Plaintiffs point to the fact that in April 2025, HUD amended its General Administrative, National, and Departmental Policy Requirements and Terms (the "HUD Policy Terms") that sets forth the "various laws and policies that may apply to recipients of" HUD grant awards. Dkt. No. 184 at ¶ 516. The amended HUD Policy Terms list President Trump's executive orders among the "laws and policies that may apply" to HUD grants as well as language materially the same as the previously enjoined funding conditions. *Id.* at ¶ 520.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 12

In addition, Plaintiffs note that in May 2025, HUD amended its standard Applicant and Recipient Assurances and Certifications ("the HUD Certifications") to require applicants to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws." Dkt. No. 271, Amaral Decl., Ex. B; Dkt. No. 184 at ¶ 522. Local governments and agencies must submit the HUD Certifications with certain consolidated plans and/or action plans annually as a condition to receiving CDBG, ESG, HOME, and HOPWA formula funding.

Lastly, on June 5, 2025, HUD's Office of Community Planning and Development ("CPD"), which administers the CoC, CDBG, ESG, HOME, and HOPWA programs, issued a letter announcing HUD's decision to impose on all CPD formula grants funding conditions substantially similar to the previously enjoined funding conditions. Dkt. No. 184 at ¶¶ 524-525. These funding conditions include requiring recipients to certify that they: (1) "shall not use grant funds to promote 'gender ideology,'" (2) will not "use any grant funds to fund or promote elective abortions," (3) will "use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States," and (4) agree that they will not use funding to "subsidiz[e] or promot[e] … illegal immigration or [to] seek to shield illegal aliens from deportation." *Id.* at ¶¶ 527-533.

Plaintiffs claim that HUD has already notified at least three Non-CoC HUD Plaintiffs that their consolidated/action plans violate the newly imposed funding conditions. For instance, HUD threatened to disapprove Petaluma's 2025 Consolidated Action Plan for CDBG funds because it allegedly violated the DEI, gender ideology, and immigration funding conditions by including

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 13

references to "equity," "environmental justice," "transgender or gender non-conforming," and "undocumented individuals." Dkt. No. 244, Cochran Decl., Ex. B. Bellevue and King County received similar notices. Dkt. No. 195, Esparza Decl., Ex. A; Dkt. No. 222, Third Supp. Marshall Decl., Ex. B. HUD gave Petaluma, Bellevue, and King County less than 48 hours to remedy the purported violations by scrubbing their plans of the offending language. *Id.*; Cochran Decl. at ¶ 12. King County's plan was subsequently disapproved. Dkt. No. 223, Holcomb Decl., Ex. A.

Plaintiffs further allege that the Non-CoC HUD Plaintiffs face immediate and irreparable harm from imposition of the funding conditions. Several Non-CoC HUD Plaintiffs face a deadline of Saturday, August 16, 2025 to submit consolidated/action plans to HUD or forfeit the formula grant funding. Dkt. No. 186 at 1; Dkt. No. 184 at ¶ 623. Plaintiffs assert that loss of this funding would disrupt the lives of the Non-CoC HUD Plaintiffs' most vulnerable residents, likely leading to evictions and increased homelessness and further straining local resources. According to Plaintiffs, even a temporary loss of funding would set back efforts to create and preserve affordable housing, ameliorate homelessness, and house low-income individuals living with HIV/AIDS. Dkt. No. 184 at ¶ 625. Plaintiffs request that this Court enjoin Defendants from imposing the new funding conditions on the Non-CoC HUD Plaintiffs' grants.

## C.    HHS Grants

HHS administers both competitive grant programs and formula and block grant programs that provide funds to local governments to enhance the health and well-being of their communities. In administering grant programs, HHS often acts through its operating divisions and agencies. For instance, ACF administers discretionary and formula grants to support programs that serve children and families. HRSA awards a variety of competitive and formula

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 14

grants including Primary Care/Health Centers, Health Workforce Training, HIV/AIDS, Organ Donation, Maternal and Child Health, Rural Health, the Health Center Program, and the Ryan White HIV/AIDS program. SAMHSA administers both competitive, discretionary grant programs and noncompetitive formula grant programs to fund substance use and mental health services to advance the behavioral health and improve the lives of those living with mental and substance use disorders. The CDC provides funding to support public health systems and activities by local and state governments. It supports programs such as HIV/AIDS, Viral Hepatitis, STI, and TB Prevention; Chronic Disease Prevention and Health Promotion; Public Health Preparedness and Response; and Injury Prevention and Control.

Congress annually appropriates funding for these HHS grant programs, setting forth priorities and directives to the Secretary of HHS with respect to the funding. Examples of such appropriation legislation are: Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1523– 28, 1567–98; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 397– 402, 441–74; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4808–13, 4854–87; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 272–77, 397–419.

Plaintiffs allege that the HHS Plaintiffs have received, currently receive, or are otherwise eligible to receive federal grants administered by ACF, HRSA, SAMHSA, and CDC, among others. Collectively, HHS Plaintiffs rely on over $2 billion in appropriated federal funds from HHS grant programs which support essential health programs and services in the HHS Plaintiffs' communities, such as child welfare assistance, adoption and foster care services, and healthcare for low-income individuals and those living with HIV/AIDS. Dkt. No. 184 at ¶¶ 475.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 15

Plaintiffs claim that like HUD and DOT, HHS has begun attaching unlawful funding conditions to HHS grants that are substantially similar to those that this Court previously enjoined, including by updating HHS's Grants Policy Statement in April 2025 ("the 2025 HHS GPS") to provide:

> [R]ecipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).
>
> (1) Definitions. As used in this clause –
> (a) DEI means "diversity, equity, and inclusion."
> (b) DEIA means "diversity, equity, inclusion, and accessibility."
>
> (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.
> . . . . .
>
> By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws.

Dkt. No. 184 at ¶ 606.[7]

Plaintiffs further alleged that in addition to these agency-wide changes, several HHS operating divisions and agencies have issued their own general terms and conditions incorporating the 2025 HHS GPS. For instance, ACF updated its Standard Terms and Conditions that apply to both discretionary and non-discretionary awards, to add a certification that states:

---

[7] On July 24, 2025, after Plaintiffs filed the instant motion, HHS updated the 2025 HHS GPS, removing express references to DEI but stating: "By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams." 2025 HHS GPS at 18, https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-july-2025.pdf. Thus, the foregoing certification is required even to just "apply[]" for federal funds from HHS. The 2025 HHS GPS also states that "[r]ecipients are responsible for ensuring subrecipients, contractors, and partners also comply." *Id.*

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 16

*For new awards made on or after May 8, 2025*, the following is effective immediately:

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the FCA].

(1) Definitions. As used in this clause –

(a) DEI means "diversity, equity, and inclusion."

(b) DEIA means "diversity, equity, inclusion, and accessibility."

(c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

(e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

(2) Grant award certification.

(a) By accepting the grant award, recipients are certifying that:

(i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote the following in violation of Federal anti-discrimination laws: DEI, DEIA, or discriminatory equity ideology.

*Id.* at ¶ 609.[8]

Likewise, HRSA issued updated general terms and conditions applicable to all active awards. The revised HRSA terms and conditions incorporate the 2025 HHS GPS and also contain the following new provision:

---

[8] On July 29, 2025, ACF updated its Standard Terms and Conditions again to remove express references to DEI.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 17

Case 1:25-cv-00345-MSM-PAS    Document 86-8    Filed 01/30/26    Page 8 of 22 PageID
Case 2:25-cv-00814-BJR    Document 335-2    Filed 08/12/25    Page 18 of 50
\# 3392

By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients, whose programs, are covered by Title IX certify as follows:

- Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.

- The above requirements are conditions of payment that go to the essence of the Agreement and are therefore material terms of the Agreement.

- Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.

- Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.

- Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

Dkt. No. 184 at ¶ 611. Plaintiffs allege that SAMHSA and the CDC have also updated their terms to contain funding conditions that require recipients not to promote gender ideology. *Id.* at ¶¶ 607-08.

Plaintiffs argue that foregoing funding conditions are unconstitutional, violate the APA, exceed statutory authority, and are President Trump's attempt to coerce grant recipients that rely on federal funds into implementing his political agenda. According to Plaintiffs, withholding "HHS grants from the HHS Plaintiffs would threaten or eliminate critical individual and public health services for millions of residents. Loss of funding could decimate public health budgets

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 18

and cause residents, including those most vulnerable, to lose access to meals, medical care, housing and lifesaving social safety net services. Loss of funding could also devastate local public health and child welfare agencies, who may be forced to conduct significant layoffs and operational reductions." *Id.* at ¶ 628. Therefore, Plaintiffs request that this Court enjoin HHS and/or its operating agencies from imposing the new funding conditions on the HHS Plaintiffs' grants.

## IV.   DISCUSSION

### A.   Legal Standard

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking preliminary injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. Alternatively, an injunction may issue where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor," provided that the plaintiff can also demonstrate the other two *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (citation and internal quotation marks omitted). Under either standard, Plaintiffs bear the burden of making a clear showing that they are entitled to this extraordinary remedy. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). The most important *Winter* factor is likelihood of success on the merits. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 19

HUD-PRWORA_000133

## B.     Plaintiffs' Claims Are Reviewable under the APA

As they did when they opposed Plaintiffs' first two motions for a preliminary injunction, Defendants argue that Plaintiffs' claims are not reviewable by this Court because the actions at issue are committed to the agencies' discretion. While "the APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action, that presumption can be rebutted by a showing that . . . the agency action is committed to agency discretion by law." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (cleaned up); 5 U.S.C. § 701(a)(2). Where that is the case, courts have no authority to review or set aside the agency's action.

However, as this Court previously concluded, this exception to the "basic presumption of judicial review" does not apply in this case. Agency action is committed to agency discretion only in those "rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply, thereby leaving the court with no meaningful standard against which to judge the agency's exercise of discretion." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015); *Texas v. United States*, 809 F.3d 134, 168 (5th Cir. 2015), as revised (Nov. 25, 2015). Once again, Defendants have failed to demonstrate that the contested conditions fall within "[t]his limited category of unreviewable actions." *Regents*, 140 S. Ct. at 1905 (citing *Weyerhaeuser Co. v. United States Fish and Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). As before, Defendants rely on *Lincoln v. Vigil*, 508 U.S. 182 (1993) for the principle that an agency's decision to cancel a program is unreviewable because how to allocate funds "'from a lump-sum appropriation' is an 'administrative decision traditionally regarded as committed to agency discretion.'" Dkt. No. 334 at 11 (citing 508 U.S. at 192). This Court previously concluded that the agency action in *Lincoln*

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 20

differed materially from the actions at issue in this case, namely that the funds at issue in this case are not appropriate in undifferentiated "lump sums" as they were in *Lincoln*. Dkt. No. 169 at 28. Rather, the grants at issue here "abound with specific directives" that provide substantial guidance as to how the agencies' discretion should be exercised in implementing these programs. *Id.* at 28-29. Defendants ignore entirely this Court's previous conclusion, and the Court once again concludes that Plaintiffs' claims do not involve the "narrow category" of agency actions that are unreviewable under the APA.

### C.    Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims

The Court has already determined that Defendants' attempt to impose the challenged funding conditions on the CoC and DOT grants violated the APA. *See generally* Dkt. No. 169. Defendants present no argument as to why this conclusion should not apply equally to the New CoC and DOT Plaintiffs; thus, the Court concludes that the New CoC and DOT Plaintiffs are also likely to succeed on the merits of their APA claim and focuses the remainder of its analysis on the Defendants' actions with respect to the non-CoC HUD and HHS grants.

The APA broadly "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Regents*, 140 S. Ct. at 1905 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). Under the APA, agencies must "engage in reasoned decisionmaking," and courts are empowered to "hold unlawful and set aside agency action . . . found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). As stated above, Plaintiffs challenge Defendants' actions as "contrary to constitutional right" and "in excess

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 21

of statutory authority," and as arbitrary and capricious. *See* Dkt. No. 184, Counts 5, 6, and 7, ¶¶ 670-703.

### 1. Defendants' Actions Violate the APA as Contrary to the Constitution and in Excess of Statutory Authority (Counts 6 & 7)

#### (a) *Separation of Powers Doctrine*

Under the APA, a court may set aside an agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C). Plaintiffs challenge Defendants' conditions as both contrary to the Constitution's Separation of Powers doctrine and in excess of any authority conferred by Congress. Dkt. No. 184 at ¶¶ 690-703. As with this Court's prior order enjoining Defendants' actions, because the Separation of Powers doctrine and the APA's "in excess of statutory authority" standard both turn on the same essential question— whether the agency acted within the bounds of its authority, either as conferred by the Constitution or delegated by Congress—the Court addresses the claims in a single analysis.

The Separation of Powers doctrine recognizes that the "United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.")). "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28, 2473 (1990)).

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 22

HUD-PRWORA_000136

In contrast, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *San Francisco*, 897 F.3d at 1231. Quite the contrary, it is well-established that an executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see California v. Trump*, 379 F. Supp. 3d 928, 941 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020). When an agency is charged with administering a statute, "both [its] power to act and how [it is] to act [are] authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *San Francisco*, 897 F.3d at 1235.

Plaintiffs argue that in attempting to condition disbursement of funds in part on grounds not authorized by Congress, but rather on Executive Branch policy, Defendants are acting in violation of the Separation of Powers principle and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C). Plaintiffs argue that the statutes authorizing the grants at issue do not confer on Defendants the kind of authority they are attempting to assert. For the reasons explained below, and in its June 3, 2025 order, the Court agrees.

### (b) The Non-CoC HUD Funding Conditions

Plaintiffs contend that the contested conditions must be set aside because the statute's underlying the non-CoC HUD grants do not give HUD the authority to impose "conditions that

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 23

HUD-PRWORA_000137

prohibit DEI or promotion of 'gender ideology' or 'elective abortion' or require participation in federal immigration enforcement, immigration status verification, or adherence to EOs unrelated to the grant's purpose." Dkt. No. 186 at 9. Defendants counter that they do have the authority to impose the challenged conditions, citing to HUD regulations that require "federal agencies [to] incorporate 'statutory, executive order, other Presidential directive, or regulatory requirements' into the terms and conditions" of HUD grants. Dkt. No. 334 at 8 citing 2 C.F.R. § 200.211(c)(1)(ii). However, as this Court noted in rejecting this argument the first time Defendants raised it, "an agency *regulation* cannot create *statutory* authority; only Congress can do that." Dkt. No. 169 at 33 (emphasis in original). Defendants must point to a *statutory* source that confers the authority. Without such a source, the agency action violates the separation of powers principle.

Next Defendants argue that the challenged conditions "merely require grant recipients to agree to comply with existing federal laws, like federal antidiscrimination laws" and "Congress has expressly authorized HUD to require that grantees comply with federal laws." Dkt. No. 334 at 8 (citing 42 U.S.C. § 5304(b)(6) ("Any [CDBG] grant ... shall be made only if the grantee certifies to the satisfaction of the Secretary that ... the grantee will comply with the other provisions of this chapter and with other applicable laws.")). The problem with Defendants' argument is that they fail to acknowledge the evidence in the record that demonstrates that Defendants interpret federal antidiscrimination laws in a manner that is inconsistent with well-established legal precedent. For example, on April 4, 2025, DOT Secretary Duffy issued a letter "To All Recipients of U.S. Department of Transportation Funding" in which he stated that "*any* policy, program, or activity" that is "designed to achieve so called "diversity, equity, and

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 24

inclusion,' or 'DEI[]' goals[] presumptively violates Federal law" even if the policy, program, or activity is "described in neutral terms." Dkt. No. 6 at 346 (emphasis added). Secretary Duffy's statement can easily be interpreted to mean that a federal grant recipient that has a "policy" to accommodate individuals with disabilities so that those individuals can participate in an "activity" has "presumptively violate[d] Federal law." This, of course, is inconsistent with well-established federal precedent that requires entities that receive federal funds to provide reasonable accommodations for qualified individuals with disabilities so that they can participate in their programs. *See e.g., U.S. Dept. of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 604 (1986) ("Section 504 prohibits discrimination against any qualified handicapped individual under 'any program or activity receiving Federal financial assistance.'"); *Muir v. United States Dept. of Homeland Security*, 2025 WL 2088450, *6 (D.C. Cir. July 25, 2025) ("Section 504 of the Rehabilitation Act prohibits discrimination against disabled persons by recipients of federal funds."); *Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014) (It is a basic tenet of the Rehabilitation Act of 1973 "that the government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result").

Likewise, on May 19, 2025, U.S. Deputy Attorney General Todd Blanche sent a memorandum to all United States Attorneys, among others, in which he stated that federal fund recipients may run afoul of the False Claims Act if they allow transgender individuals to use bathrooms consistent with their gender identities (*i.e.*, "allow[] men to intrude into women's bathrooms"). Dkt. No. 65 at 5. Deputy Attorney General Blanche's statement contradicts the decisions of multiple appellate courts that have held that federal law forbids discrimination based on transgender status. *See e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 25

Cir. 2020) (transgender student's exclusion from bathroom constituted Title IX discrimination); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) ("[D]iscrimination against transgender persons is sex discrimination for Title IX purposes . . . .").

And as recently as July 29, 2025, U.S. Attorney General Pam Bondi issued a memorandum titled "Guidance for Recipients of Federal Funds regarding Unlawful Discrimination" in which she purports to "clarif[y] the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ("DEI") programs." Dkt. No. 331, Ex. A at 1. Among other "clarifications", Attorney General Bondi states that the use of "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." *Id.* at 2. This "clarification," however, is inconsistent with Supreme Court precedent that has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria "out of a desire . . . to improve racial diversity and inclusion"—even where the decision-maker was "well aware" the race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (internal quotation marks and citation omitted) (citing, *inter alia*, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015). Nor does Supreme Court precedent prohibit the use of diversity statements for the purpose of advancing racial diversity goals; to the contrary, in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, the Court described these goals as "commendable" and "worthy" (though insufficient to justify race-based admissions). 600 U.S. 181, 214-15, 230

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 26

HUD-PRWORA_000140

(2023) ("[N]othing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise."); *United States v. Skrmetti*, 145 S. Ct. 1816, 1854 (2025) (Thomas, J., concurring) (suggesting strict scrutiny does not apply to "a university's decision to credit 'an applicant's discussion of how race affected his or her life'" simply because it is "inextricably bound up with" the applicant's race) (cleaned up).

The above demonstrates that Plaintiffs are at the mercy of Defendants' interpretation of federal antidiscrimination laws, regardless of how those laws are interpreted by the courts. Indeed, this has already played out in this case where HUD recently informed King County that it was rejecting King County's CDBG Consolidated Plan submission for Program Year 2025 because HUD "is questioning the accuracy of King County's ... certification that the [CDBG] funds described in [the plan] will be administered in conformity with applicable laws, including Executive Orders." Dkt. No. 223 at 5-6. Among other reasons HUD expressed concern was King County's use of words such as "equity," "migrant," and "immigrant" throughout the plan. *Id.* at 6-8. In order to assuage HUD's concerns, King County was instructed to replace "all 'equity' references" throughout the plan with "activities and actions that do not violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964" and to replace all references to "migrant" and "immigrant" with "legal/documented migrant/immigrant." *Id.* at 8. However, as Plaintiffs aptly point out, "[n]o case law ... suggests that using words like 'equity' or 'migrant' violates *any* law." dkt. no. 335 at 3, thus refuting Defendants' claim that the challenged funding requirements "merely require grant recipients to

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 27

HUD-PRWORA_000141

agree to comply with existing federal laws, like federal antidiscrimination laws," dkt. no. 334 at 8.[9]

Moreover, Defendants' ability to impose the challenged conditions on the non-CoC HUD grants is further constrained by 42 U.S.C. § 12711, which prohibits HUD from "denying funds made available under [HUD] programs . . . based on the adoption, continuation, or discontinuation" of any lawful local policies. Stated differently, "HUD may not … *condition* funding on changes to local policies." *Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.*, 802 F.3d 413, 433 (2d Cir. 2015) (emphasis in original). Yet that is exactly what Defendants attempt to do here; they are leveraging the Non-CoC HUD Plaintiffs' dependence on federal funding to coerce them into replacing their own local policies with the Trump Administration's political agenda.

---

[9] Nor are the new funding conditions authorized by PRWORA or the Hyde Amendment as Defendants claim. The challenged funding conditions purport to require non-CoC HUD Plaintiffs to "use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States." Dkt. No. 184 at ¶¶ 492, 517. While PRWORA does provide that noncitizens without qualifying immigration status are ineligible for certain "Federal public benefit[s]," 8 U.S.C. § 1611(a), it does not require grant recipients to verify eligibility *until* the U.S. Attorney General has promulgated regulations implementing a verification requirement. *See id.* § 1642(a); § 1642(b) ("Not later than 24 months after the date the regulations described in subsection (a) are adopted, a State that administers a program that provides a Federal public benefit shall have in effect a verification system that complies with the regulations."). The Attorney General is yet to promulgate a final regulation implementing a verification requirement. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule). By requiring grant recipients to verify eligibility by using SAVE (or an equivalent system) without the benefit of implementing regulations and/or the two-year ramp-up period, Defendants are attempting to rewrite PRWORA, not implement it.

The Hyde Amendment also does not authorize the challenged funding condition that requires the Non-CoC HUD Plaintiffs to certify that no grant funds will be used "to promote elective abortions." Dkt. No. 1854 at ¶¶ 494, 520. The Hyde Amendment bars use of federal funds to pay for or to require a person to facilitate an abortion; it does not prohibit federally funded programs from promoting elective abortions, which could be read to include providing program participants with information about lawful abortions. Pub. L. 118-42, §§ 202–03, 138 Stat. 153.

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 28

Lastly, the challenged funding conditions conflict with statutory provisions authorizing the HUD grant programs. Far from barring diversity-related "inclusion," Congress *requires* consideration of diversity when allocating HUD funds. For instance, the HUD Secretary is required to set aside CDBG funds for "[s]pecial purpose grants," including grants to "historically Black colleges." 42 U.S.C. § 5307(b)(2); *see also id.* § 5307(c) (requiring CDBG funds be allocated to provide "assistance to economically disadvantaged and minority students"). And in authorizing the HOME and HOPWA programs, Congress acted to "improve housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis." 42 U.S.C. § 12702(3). Congress also requires HOME recipients "to establish and oversee a minority outreach program . . . to ensure the inclusion, to the maximum extent possible, of minorities and women, and entities owned by minorities and women . . . in all contracts[] entered into by the participating jurisdiction." 42 U.S.C. § 12831(a).

Based on the foregoing, the Court concludes that the Non-CoC HUD Plaintiffs are likely to prevail on their claim that in attempting to impose the challenged funding conditions on the recipients of non-CoC funds, Defendants have run afoul of the Separation of Powers doctrine, and are acting in excess of statutory authority, and that under the APA, those conditions must be set aside.

### (c) The HHS Grants Funding Conditions

Defendants' attempts to identify statutory authority for imposing the contested conditions on the HHS grants suffer from similar deficiencies. As an initial matter, Defendants once again rely on agency regulations for the authority to impose the conditions, but as noted above, agency regulations are not the equivalent of statutory authority, and HHS' attempt to rely on them also

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 29

HUD-PRWORA_000143

fails. Nor does Defendants' reliance on generic statutory provisions authorizing the HHS Secretary to prescribe the "form and manner" for grant applications and the "information" it must "contain" fair any better. Dkt. No. 335 at 6 (citing 42 U.S.C. §§ 254b(k)(1), 300ff-15(a), (b), 290ee-1(b)(1)(B)). These provisions only encompass prescriptions as to form, manner, and information, and Defendants' claim that such ministerial provision authorize wide-ranging substantive conditions on hotly debated policy choices runs afoul of the well-established principle that "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Defendants also invoke Title IX of the Education Amendments Act of 1972, which prohibits sex discrimination by federal education funding recipients, as authority for requiring HHS grant recipients to comply with Presidential Executive Order 14168 "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." This Executive Order mandates that "[f]ederal funds shall not be used to promote gender ideology" and requires grant recipients to "recognize two sexes, male and female" and that "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality." But nothing in Title IX mandates such understandings. To the contrary, as cited above courts have concluded that failure to recognize an individual's transgender status constituted discrimination under Title IX. *See e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020) (transgender student's exclusion from bathroom constituted Title IX discrimination); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) ("[D]iscrimination against transgender persons is sex discrimination for Title IX purposes

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 30

. . . ."). As such, far from enforcing Title IX, Defendants seek to graft new requirements into the statute.

Accordingly, the Court concludes that the HHS Plaintiffs are likely to prevail on their claim that in attempting to impose the conditions in the 2025 HHS GPS and the various operating agencies and divisions' terms and conditions, Defendants have acted in a manner that violates the Separation of Powers doctrine and exceeds statutory authority, and that under the APA those conditions must be set aside.

### 2. Defendants' Actions Were "Arbitrary and Capricious," 5 U.S.C. § 702(2)(A) (Count 5)

Plaintiffs also assert that the challenged conditions must be set aside as "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A); Dkt. No. 184 at ¶¶ 671-688. The APA requires agencies to engage in "reasoned decisionmaking," and their actions must be "reasonable and reasonably explained." *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). An agency must offer "a satisfactory explanation for its action," and cannot rely on "factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs maintain that Defendants have not followed these prescriptions and have failed to provide reasonable explanations for any of the challenged funding conditions.

Defendants do not dispute that they have not offered contemporary, reasoned explanations for the imposition of the challenged funding conditions; rather, they argue that they are not required to do so because the conditions are not subject to notice-and-comment rulemaking. Defendants are mistaken. "The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,'" *Bennett v.*

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 31

HUD-PRWORA_000145

*Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. § 704), whether or not that action is subject to notice-and-comment rulemaking. *See Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 635–36 (D.C. Cir. 2019). Defendants do not contest that the challenged funding conditions are final agency actions. As such, each agency must have "reasonably considered the relevant issues and reasonably explained its decision" to impose the challenged conditions. *Barton v. Off. of Navajo*, 125 F.4th 978, 982 (9th Cir. 2025) (cleaned up).

At most, the Defendants rely on reference to the Trump Administration's executive orders to justify the imposition of the challenged funding conditions, but as this Court previously stated "rote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relations to the agency's underlying action—does not constitute 'reasoned decisionmaking.'" Dkt. No. 169 at 38. Thus, the Court concludes that Plaintiffs are likely to succeed on the merit of their claim that Defendants' imposition of the challenged funding conditions is arbitrary and capricious, which is an independent ground for setting aide those conditions.[10]

[10] Plaintiffs have asserted several other claims both under the APA and under the Constitution. See Dkt. No. 184 at ¶¶ 630-669, 704-724. The Court does not reach these claims at this stage, in part because "[t]he Court need only find that Plaintiffs are likely to succeed on one of [their] claims for [the likelihood-of-success] factor to weigh in favor of a preliminary injunction," and a ruling on Plaintiffs' additional claims would not affect the relief afforded. *Aids Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *7 (D.D.C. Mar. 10, 2025). Furthermore, the Court adheres to the "fundamental and longstanding principle of judicial restraint" that requires courts to "avoid reaching constitutional questions in advance of the necessity of deciding them." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, No. 22-55988, 2024 WL 5692756, at *14 (9th Cir. May 14, 2025) (vacating district court's "entry of judgment for Plaintiffs on the constitutional due process claim" where judgment was granted in Plaintiffs' favor on APA claim) (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)); *see also Washington v. Trump*, 441 F. Supp. 3d 1101, 1125 (W.D. Wash. 2020) ("[A] court should not reach a constitutional question if there is some other ground upon which to dispose of the case. Given that this Court has already determined that Defendants' [action] violates the APA and, therefore, can dispose of the case on that basis, the Court exercises restraint and declines to reach the constitutional claims raised by Washington.") (cleaned up, citing *Nw. Austin Mun. Util. Dist. One v. Holder*, 557 U.S. 193, 205 (2009); *Harmon v. Brucker*, 355 U.S. 579, 581 (1958)). Because Plaintiffs are likely to prevail on Counts 5, 6 and 7 of their Second Amended Complaint—that the challenged actions were arbitrary and capricious, contrary to the constitutional Separation of

ORDER GRANTING PLAINTIFFS' THIRD
MOTION FOR PRELIMINARY INJUNCTION

- 32