Restraining Order and Preliminary Injunction. Dkt. No. 72 ("Pls. Sec. Mot."). In this motion, Plaintiffs Columbus, Intercity, Minneapolis, NYC, Port of Seattle, and Tucson sought a TRO against DOT enjoining it from imposing the new funding conditions on their conditionally awarded grants. Pls. Sec. Mot, Ex. 1, n. 1. And Plaintiffs Cambridge and Pasadena sought a TRO against HUD enjoining it from imposing the new funding conditions on their conditionally awarded grants. *Id.* Defendants acknowledged that they "oppose the New Plaintiffs' TRO and preliminary injunction motion for the same reasons they opposed the first." Dkt. No. 151 ("Defs. Opp. to Pls. Sec. Mot.") at 4. After reviewing the second motion for a TRO and Defendants' opposition thereto, this Court determined that the motion raised questions of law and fact that are materially identical to those raised in the first motion for a TRO, and granted the second TRO on the same terms as the first TRO. *See* Dkt. No. 152 ("Sec. TRO Order") at 2–4.

Now before the Court are Plaintiffs' first and second motions for a preliminary injunction, in which collectively all Plaintiffs join.

### III.    FACTUAL BACKGROUND

#### A.    Overview of Federal Grants

As stated above, this lawsuit concerns the allocation of grants from two federal agencies: HUD and DOT, and several DOT operating administrations: FTA, FHWA, FAA, and FRA.[4] Plaintiffs allege that in January 2025, they were each awarded grants from these agencies for the fiscal year 2024, but beginning in March and April 2025, Defendants began to impose new funding conditions on the grants. Plaintiffs claim that these conditions exceed Congressional

---

[4] Congress and DOT refer to DOT divisions—including FTA, FHWA, FAA, and FRA—as "operating administrations." 49 U.S.C. § 102; 49 C.F.R. § 1.2.

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 5

HUD-PRWORA_000169

authorization and violate the United States Constitution and the Administrative Procedure Act. With this lawsuit, Plaintiffs seek a declaration that the new funding conditions are unlawful and an injunction enjoining Defendants from imposing the conditions, or substantially similar conditions, on the grants, and/or from withholding the grants based on those conditions. To that end, it is helpful to have a basic understanding of the federal grant process.

Each year, Congress exercises its constitutional authority to appropriate taxpayer resources to federal agencies through annual appropriation bills. These bills specify the amount of money allocated to each agency, and for what purposes, for that fiscal year.[5] While the process for awarding grant funds varies by program, generally the federal agencies issue notices of funding opportunity ("NOFO") that announce the availability of funding, outline the requirements for the grant programs, and reflect the specific goals and priorities of the funding programs.[6] State and local governments, nonprofits, and other entities apply to receive grant funds and the agencies review the applications to assess the eligibility both of the applicant and the proposed use of the funds to ensure the proposed project is in compliance with the program's statutory and regulatory requirements.[7] The agencies then issue notices of award to those applicants whose proposals are approved and conditionally funded.[8] Once the grant recipient successfully meets the requirements for the grant, a grant or cooperative agreement is issued, and the funds are released. The grant or

---

[5] *The Appropriations Committee: Authority, Process, and Impact*, Appropriations Chairman Tom Cole, https://appropriations.house.gov/about/appropriations-committee-authority-process-and-impact (last visited May 9, 2025).

[6] *The Grant Lifecycle*, Grants.gov, https://www.grants.gov/learn-grants/grants-101/the-grant-lifecycle (last visited May 9, 2025).

[7] Natalie Paris, *Understanding Federal Agency Grant Disbursement, Payment Processes, and "Freezes"*, Congressional Research Service (Feb. 21, 2025), https://www.congress.gov/crs-product/IF12924.

[8] *Award Phase*, Grants.gov, https://www.grants.gov/learn-grants/grants-101/award-phase.html#NOA (last visited May 9, 2025).

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 6

Case 1:25-cv-00345-MSM-PAS   Document 86-10   Filed 01/30/26   Page 3 of 29 PageID
#: 3331
Case 2:25-cv-00814-BJR   Document 169   Filed 06/03/25   Page 7 of 49

cooperative agreement sets forth the terms and conditions attached to the award, which generally include the amount of funding approved, a description and scope of the project, an approved budget, and financial and performance reporting requirements.[9] If the grant recipient signs the agreement or withdraws grant funds, it becomes legally obligated to carry out the terms and conditions of the agreement.[10]

### B.     The HUD Grants

Congress enacted the McKinney-Vento Homeless Assistance Act (the "Homeless Assistance Act") to "meet the critically urgent needs of the homeless of the Nation" by providing "funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b)(2)–(3). Through the Act, Congress provides federal funding for a number of programs, including the Continuum of Care Program ("CoC Program"). The CoC Program is designed "to assist individuals (including unaccompanied youth) and families experiencing homelessness" by providing services "to help such individuals move into transitional and permanent housing, with the goal of long-term stability."[11] It does this by providing funding to states, local governments, Indian Tribes, and nonprofit entities for a variety of programs, including shelters and supportive housing, rental assistance, childcare, job training, healthcare, mental health services, and life skills training. *Id.* §§ 11360(29), 11381, 11383.

---

[9] Paris, *supra* note 7.
[10] *Award Phase, supra* note 8.
[11] *Continuum of Care (CoC) Program Eligibility Requirements*, HUD Exchange, https://www.hudexchange.info/programs/coc/coc-program-eligibility-requirements/ (last visited May 9, 2025).

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 7

HUD-PRWORA_000171

HUD is the federal agency responsible for administering the CoC Program. Most recently, Congress appropriated funds for the CoC Program in the 2024 Consolidated Appropriations Act ("the Appropriations Act") and in January 2024, HUD posted a NOFO announcing CoC funding for fiscal years 2024 and 2025.[12] Plaintiffs King County, Pierce County, Snohomish County, San Francisco, Santa Clara, Boston, Columbus, NYC, Nashville, Pima County, Cambridge, Pasadena, San Jose, Tucson, King County RHA, and Santa Monica HA (collectively, "the CoC Plaintiffs") each timely submitted applications in response to the NOFO and on January 17, 2025, HUD conditionally awarded the CoC Plaintiffs hundreds of millions of dollars in CoC grants for fiscal year 2024. Relying on these awards, CoC Plaintiffs have already committed, and in some cases expended, millions of dollars for homeless assistance services.

### C.    The DOT Grants

Congress established DOT in 1966 "to assure the coordinated, effective administration of the transportation programs of the Federal Government" and has established by statute a wide variety of grant programs that provide federal funds to state and local governments for public transit services. Department of Transportation Act, Pub. L. No. 89-670, 80 Stat. 931 (1966). In administering these grant programs, DOT often acts through its operating administrations, including the FTA, FHWA, FAA, and FRA.

---

[12] *FY 2024 and FY 2025 Continuum of Care Competition and renewal or Replacement of Youth Homeless Demonstration Program Grants FR-6800N-2025*, U.S. Department of Housing and Urban Development (August 29, 2025), FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants.

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 8

HUD-PRWORA_000172

## 1.   The FTA Grant Programs

FTA provides financial and technical assistance to local public transit systems nationwide.[13] Since at least 2021, Congress has annually appropriated funding for grants administered by FTA, including grants for: (1) the operation of public transit facilities and equipment in urban areas, (2) public transit systems that operate on fixed rights-of-way such as rail or passenger ferries, (3) replacement of rail rolling stock, and (4) the purchase and maintenance of buses and bus facilities. 49 U.S.C. §§5302(8), 5307(a)(1), 5337(b), 5339(a)(2), (b), (c). Plaintiffs King County, San Francisco, Boston, NYC, Pima County, Denver, Chicago, Culver City, Portland, Santa Monica, Tucson, Wilsonville, Intercity Transit, and Sound Transit operate public transit or are otherwise eligible for FTA grants and "currently rely on billions of dollars in appropriated federal funds from FTA grant programs for transit services and improvements provided or undertaken for the benefit of their residents." Amend. Compl. ¶ 91.

## 2.   FHWA Grant Programs

FHWA supports state and local governments in the design, construction, and maintenance of the nation's highway system through financial and technical assistance.[14] To that end, FHWA administers programs such as Safe Streets and Roads for All, the Federal Highway-Aid Program, the Bridge Investment Program, and the National Culvert Removal, Replacement, and Restoration Grant Program. Congress annually appropriates funds to the foregoing programs, including through the Infrastructure Investment and Jobs Act of 2021 ("the Infrastructure and Jobs Act").

---

[13] *About FTA*, Federal Transit Administration, https://www.transit.dot.gov/about-fta (last visited May 9, 2025).
[14] *About FHWA*, U.S. Department of Transportation Federal Highway Administration, https://highways.dot.gov/about/about-fhwa#:~:text=Who%20We%20Are,technologically%20sound%20in%20the%20world (last visited May 29, 2025).

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 9

Plaintiffs King County, Pierce County, San Francisco, Santa Clara, Snohomish County, Boston, Columbus, NYC, Denver, Nashville, Pima County, Chicago, Minneapolis, Portland, Pittsburgh, San Jose, Santa Monica, Sound Transit, Tucson, SFCTA, and TIMMA receive and rely on FHWA grants worth hundreds of millions of dollars in appropriated funds.

### 3.    FAA Grant Programs

The FAA's primary purpose is to regulate civil aviation and to maintain and operate air traffic control and navigation systems.[15] Congress has established by statute a variety of grant programs administered by DOT, acting through the FAA, that provide federal funds to public agencies for planning and development of airports. These programs include the Airport Improvement Program and the Airport Infrastructure Grants Program, which are funded by Congress through statutes such as the Infrastructure and Jobs Act, the FAA Reauthorization Acts of 2018 and 2024, and most recently, the Consolidated Appropriations Act of 2024. Plaintiffs King County, Pierce County, Snohomish County, San Francisco, Denver, Pima County, Sonoma County, Bend, Chicago, San Jose, and Port of Seattle currently have hundreds of millions of dollars in appropriated federal funds from FAA grant programs for airport development and infrastructure projects.

### 4.    FRA Grant Programs

The mission of FRA is to enable the safe, reliable, and efficient movement of people and goods via railways across the United States.[16] FRA provides federal funds to public agencies for

---

[15] *Federal Aviation Administration*, Federal Register, https://www.federalregister.gov/agencies/federal-aviation-administration#:~:text=The%20mission%20of%20the%20FAA,and%20the%20National%20Airspace%20System (last visited May 29, 2025).

[16] *FRA 101: Getting to Know FRA*, U.S. Department of Transportation Federal Railroad Administration (Aug. 2021), https://railroads.dot.gov/sites/fra.dot.gov/files/2021-12/20210824-FRA101.pdf.

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 10

rail infrastructure projects such as the Railroad Crossing Elimination Grant Program that provides funds to improve the safety and mobility of people and goods at railway crossings. Funding for the program was provided through the Infrastructure and Jobs Act. Plaintiffs allege that Bend, Minneapolis, Portland, Sound Transit, and San Jose currently have millions of dollars in appropriated federal funds from FRA grant programs for rail infrastructure projects.

### 5.    The DOT SMART Grant Program

The Strengthening Mobility and Revolutionizing Transportation ("SMART") grant program was established by Congress through the Infrastructure and Jobs Act to provide grants "to eligible public sector agencies for projects focused on advanced smart community technologies and systems in order to improve transportation efficiency and safety." *Id.* ¶ 116. It is administered by DOT.  Plaintiffs allege that Boston, Chicago, Minneapolis, Nashville, and Intercity Transit are slated to receive millions of dollars in appropriated funds for the SMART grant program.

### D.    New Funding Conditions in the HUD and DOT Grant Agreements

Plaintiffs claim that HUD and DOT are imposing unlawful funding conditions on the CoC and DOT grants—conditions that were not included in the relevant NOFOs or authorized by statute or regulation. Rather, Plaintiffs argue, the new funding conditions seek "to coerce grant recipients that rely on federal funds into implementing President Trump's policy agenda, and direct them to adopt his legal positions, contrary to settled law. Amend. Compl. ¶ 4. Plaintiffs challenge Defendants' imposition of new funding conditions on the grants, arguing that the conditions are unconstitutional, violate the Administrative Procedure Act, and exceed statutory

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 11

HUD-PRWORA_000175

authority. It is understood that without acceptance of these conditions, the grants will not be funded.

### 1.  The New HUD Funding Conditions

Plaintiffs allege that beginning in March and April 2025, HUD presented the CoC Plaintiffs with grant agreements (collectively, "the CoC Grant Agreements") that contained new funding conditions that were not included in the relevant NOFO, and not authorized by the Homeless Assistance Act, the Appropriations Act, or HUD regulations. Specifically, Plaintiffs object to the following six conditions in the CoC Grant Agreements:

A.  The recipient "shall not use grant funds to promote 'gender ideology,' as defined in E.O. 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government";

B.  The recipient "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)]";

C.  The recipient "certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964";

D.  The recipient "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment";

E.  "No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation"; and

F.  "Subject to the exceptions provided by [the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA")], the recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States."

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 12

HUD-PRWORA_000176

Dkt. No. 11 ("McSpadden Decl."), Ex. A at 3. In addition, the CoC Grant Agreements also state that the Agreements, the recipients' use of funds provided under the Agreements, and the recipients' operation of projects with grant funds are "governed by" "all current Executive Orders." *Id.* at 1, ¶ 5.

### 2.    The New DOT Funding Conditions

Plaintiffs claim that DOT and its operating administrations have also attached unlawful funding conditions to the DOT grants by amending the grants' general terms and agreements, master grant agreements, and/or assurance requirements. For instance, Plaintiffs allege that DOT inserted the following funding conditions in the FTA Master Agreement that governs all FTA grants:

A.    "Pursuant to section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)]";

B.    "Pursuant to section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this Agreement, Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws"; and

C.    "[T]he Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

Amend. Compl. ¶¶ 164, 172. In addition, the April 25, 2025 FTA Master Agreement requires that the recipient comply with all applicable federal laws, regulations, and requirements and defines "federal requirements" to include "executive order." *Id.* ¶¶ 168, 170. Plaintiffs allege that the

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 13

foregoing new funding conditions are included in materially identical form in the FHWA, FAA, and FRA grant requirements, as well as the DOT SMART grant program. They charge that the new funding conditions were not included in the relevant NOFOs, were not authorized by the relevant statutes, and are inconsistent with the relevant regulations.

### E.    Plaintiffs Allege Irreparable Harm

Plaintiffs allege that "[t]he grant conditions that Defendants seek to impose leave [them] with the Hobson's choice of accepting illegal conditions that are without authority [and] contrary to the Constitution . . . or forgoing the benefit of grant funds . . . that are necessary for crucial local services." *Id.* ¶ 235. Plaintiffs claim that loss of the CoC Program grants would result in a loss of hundreds of millions of dollars in funding for housing and other services meant to meet the basic needs of the CoC Plaintiffs' homeless residents, including access to housing, healthcare, and counseling, which would have a devasting impact on their residents and communities. Likewise, Plaintiffs allege that the DOT grants represent billions of dollars in funding for critical services and projects for the DOT Plaintiffs' residents, including transit improvement and safety initiatives, critical railway and airport infrastructure, transportation modernization, and improved air quality. Plaintiffs assert that the loss of these projects would irreparably harm DOT Plaintiffs' residents and communities.

### IV.    DISCUSSION

### A.    The APA Sovereign Immunity Waiver Applies to Plaintiffs' Claims and this Court Has Jurisdiction pursuant to 28 U.S.C. § 1331

"[A plaintiff] may sue the United States only if Congress has waived sovereign immunity for the lawsuit, and may bring its claim in federal district court only if Congress has provided for jurisdiction there." *North Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (en

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 14

banc) (per curiam). Thus, as a threshold matter, this Court must determine whether Congress has waived sovereign immunity for Plaintiffs' claims and whether this Court has subject-matter jurisdiction to address them. For the reasons set forth below, this Court concludes that the answer to both questions is yes.

### 1.    The Sovereign Immunity Waiver under the APA

It is a bedrock principal of our legal system that the federal government—including its federal agencies—has sovereign immunity and may not be sued absent a clear and express waiver by statute. *See United Aeronautical Corporation v. United States Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that existence of such consent is a prerequisite for jurisdiction."). The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, is one example of such waiver—the statute expressly waives federal sovereign immunity so that a plaintiff "adversely affected" by a "final agency action" may obtain "judicial review thereof." *Id.* § 702; *see also Cmty Legal Servs. in E. Palo Alto v. U.S. Dep't of Heath & Hum. Servs.*, No. 25-2802, 2025 WL 1393876, at *2 (9th Cir. May 14, 2025) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140–41 (1967) (The APA "embodies [a] basic presumption of judicial review to one 'suffering legal wrong because of agency action.'")).

However, the APA's sovereign immunity waiver is not without limits. Relevant to this motion are two such limitations. First, the waiver does not apply if the relief sought by the plaintiff is expressly or impliedly forbidden by another statute. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998); *see also Cmty Legal Servs. in E. Palo Alto*, 2025 WL 1393876, at *2 ("The APA generally waives sovereign immunity and permits a

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 15

HUD-PRWORA_000179

challenge to agency action unless 'any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'") (quoting 5 U.S.C. § 702). Second, the waiver does not apply if an agency action is "committed to agency discretion by law." *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1014 (9th Cir. 2024) (quoting 5 U.S.C. § 701(a)(2)).

In addition, the APA is not a jurisdiction-conferring statute in that it does not directly grant subject matter jurisdiction to the federal courts. *See Califano v. Sanders*, 430 U.S. 99, 105 (1977). Instead, federal courts exercise jurisdiction over APA claims pursuant to 28 U.S.C. § 1331, which grants courts jurisdiction to hear cases arising under federal law. *See South Delta Water Agency v. United States*, 767 F.2d 531, 539 (9th Cir. 1985) ("[T]he Supreme Court has interpreted section 1331 as conferring jurisdiction on federal courts to review agency action 'subject only to preclusion-of-review statutes created or retained by Congress. . . .'") (quoting *Califano*, 430 U.S. at 105)).

### 2.    The Parties' Jurisdictional Arguments

According to Plaintiffs, their claims fall squarely within the APA's sovereign immunity waiver because they seek injunctive and declaratory relief against HUD and DOT actions that have adversely affected them, and that this Court has jurisdiction under 28 U.S.C. § 1331. Defendants counter that Plaintiffs' claims fall outside the APA's waiver and this Court's jurisdiction for two reasons. First, they argue that the relief Plaintiffs request is impliedly forbidden by the Tucker Act, 28 U.S.C. § 1491, which grants the Court of Federal Claims exclusive jurisdiction over contract claims against the federal government. § 1491(a). Second, Defendants contend that HUD's and DOT's decision to impose the new funding conditions on

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 16

the grants is not subject to this Court's review because the action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

### 3. The Tucker Act Does Not Impliedly Forbid the Relief Sought by Plaintiffs

Defendants argue that Plaintiffs' claims, while pled under the APA, are actually breach-of-contract claims against the United States and, therefore, must be brought in the Court of Federal Claims. In other words, Defendants' jurisdictional argument hinges on their successfully recharacterizing Plaintiffs' allegations as contract claims rather than APA challenges to agency action. *See Cmty Legal Servs. in E. Palo Alto*, 2025 WL 1393876, at *2 ("[T]he Tucker Act . . . 'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim.") (quoting *United Aeronautical Corp.*, 80 F.4th at 1026).

#### a. Plaintiffs' APA Claims Are Not "Disguised" Breach-of-Contract Claims

To resolve whether Plaintiffs' APA claims are "disguised" breach-of-contract claims that must be brought in the Court of Federal Claims, this Court must determine: (1) "the source of the rights" upon which Plaintiffs base their claims, and (2) "the type of relief" Plaintiffs seek. *United Aeronautical Corp.*, 80 F.4th at 1026 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) ("The classification of a particular action as one which is or is not 'at its essence' a contract action depends on both the source of the rights upon which plaintiff bases its claims, and upon the type of relief sought (or appropriate).")). "If the rights and remedies are *statutorily* or *constitutionally* based," this Court has jurisdiction; "if the rights and remedies are *contractually* based," the Court of Federal Claims has jurisdiction. *Id.* (emphasis in original).

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 17

HUD-PRWORA_000181

### (i)    The Source of Rights on which Plaintiffs' Base Their Claims

In examining the source of the rights upon which a plaintiff bases its claims, courts consider, among other things: (1) whether the "asserted rights and the government's purported authority arise from statute," (2) whether the "rights exist . . . apart from rights created under [a] contract," and (3) whether the plaintiff seeks to enforce a duty on the government that was created by a contract "to which the government is a party. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). Courts have explicitly rejected the notion "that any case requiring some reference to . . . a contract is necessarily on the contract and therefore directly within the Tucker Act" because to do so would "deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Id.* (quoting *Megapulse*, 672 F.2d at 967–68) (recognizing that "[c]ontract issues may arise in various types of cases where the action itself is not founded on a contract"). "[T]he mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse*, 672 F.2d at 968; *see also Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *rev'd on other grounds*, *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ("The answer . . . depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution.").

Defendants argue that the purpose of Plaintiffs' lawsuit is to force the government to release the CoC and DOT grant funds to them, and the sources of Plaintiffs' rights to those funds

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 18

are the CoC and DOT Grant Agreements. According to Defendants, "[t]hat means the source of Plaintiffs' rights are [*sic*] contractual, and this Court lacks subject-matter jurisdiction." Dkt. No. 55 ("Defs.' Opp.") at 15. Defendants misconstrue the nature of Plaintiffs' lawsuit. Contrary to what Defendants argue, Plaintiffs are not seeking an order from this Court directing payment of the grant funds to them. Instead, the relief Plaintiffs seek is an order from this Court *declaring* that the *new funding conditions* are unlawful and *enjoining* Defendants from imposing them in the Grant Agreements. Specifically, Plaintiffs seek: (1) a declaration that the new funding conditions Defendants imposed in the Grant Agreements "are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful" and (2) an injunction "enjoining [Defendants] from "imposing or enforcing [the new funding conditions] or any materially similar terms or conditions to any [CoC or DOT] funds received by or awarded to, directly or indirectly, [Plaintiffs]." Amend Compl. at VI. A–D. Plaintiffs contend that the funding conditions are unlawful because they are not included in the relevant NOFOs, are unauthorized by the statutes that created the relevant programs, are inconsistent with the appropriations statutes that fund the programs, and do not comply with the regulations that HUD and DOT promulgated to implement the programs. *See generally* Amend. Compl. Resolution of Plaintiffs' claims will require this Court to conduct an in-depth analysis of the foregoing statutes and regulations to determine whether Defendants acted reasonably and in compliance with Plaintiffs' statutory and constitutional rights; resolution of Plaintiffs' claims will not require an analysis of the respective Grant Agreements. Thus, the source of Plaintiffs' rights resides in statutes and the Constitution, not in any contractual provisions in the Grant Agreements. *See Cmty Legal Servs. in E. Palo Alto*, 2025 WL 1393876, at *2 ("[P]laintiffs seek to enforce

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 19

compliance with statutes and regulations, not any government contract. . . . Seeking to ensure compliance with statutory and regulatory commands is a matter beyond the scope of the Tucker Act's exclusive jurisdiction."); *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *10 (D.C. Cir. May 3, 2025) (Pillard dissenting) ("What matters is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretation of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual."); *Crowley*, 38 F.4th at 1109–10 (claim was statutory, not contractual, when it "require[d] primarily an examination of statutes"); *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 842360, at *6 (D.D.C. March 18, 2025) ("Plaintiffs do not challenge a contract between the parties—they challenge an action . . . Plaintiffs' 'claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties.'") (quoting *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985)).

### (ii)   The Type of Relief Sought by Plaintiffs

Next, this Court must consider the nature of the relief sought by Plaintiffs in this lawsuit. *United Aeronautical Corp.*, 80 F.4th at 1026. If the relief sought is "akin to the traditional remedies available for breach of contract (damages or specific performance)", the Tucker Act applies, and Plaintiffs' claims belong in the Court of Federal Claims. *Id.*; *Crowley*, 398 F.4th at 1107 ("The crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages in the suit."). If, however, the relief sought is not for money damages, then Plaintiffs' claims do not belong in the Court of Federal Claims, which is a specialized forum to resolve "actions based on government contracts," *Megapulse*, 672 F.2d at 967, for "naked money

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 20

judgment[s] against the United States." *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988). As discussed above, Plaintiffs seek injunctive and declaratory relief only, they do not seek money damages based on a breach of contract claim. Indeed, the Amended Complaint expressly seeks no monetary relief. This, alone, is sufficient to render the Tucker Act inapplicable. *See Bowen*, 487 U.S. at 893 ("[I]nsofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages.").

Nevertheless, Defendants argue that if this Court grants the equitable relief Plaintiffs request, it will ultimately result in the federal government having to disburse the grant funds, so Plaintiffs' request is really one for money damages. Defendants' argument is foreclosed by *Bowen*, 487 U.S. at 893. In *Bowen v. Massachusetts*, the Supreme Court was asked to address the scope of the APA's sovereign immunity waiver where the Commonwealth of Massachusetts challenged a final order of the Secretary of Health and Human Services ("the Secretary") refusing to reimburse Massachusetts through the Medicaid program for services related to care for the mentally disabled. *Id.* at 882. Massachusetts filed a complaint in district court alleging jurisdiction pursuant to 28 U.S.C. § 1331 and waiver of sovereign immunity under the APA. *Id.* The Secretary argued that Massachusetts could not bring its claim under the APA because it was seeking "money damages"—*i.e.*, reimbursement for the Medicaid services—and, as such, the federal district court did not have jurisdiction.

The Supreme Court disagreed, concluding that the district court did have jurisdiction because the relief sought by Massachusetts did not constitute "money damages" within the meaning of the APA. *Id.* at 893. In reaching this decision, the Supreme Court noted that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 21

HUD-PRWORA_000185

reason to characterize the relief as 'money damages'". *Id.* In other words, the Supreme Court held that even though the relief Massachusetts requested—reversal of the Secretary's decision to deny reimbursement—would obligate the United States to pay Massachusetts, this did not mean that Massachusetts' claim was for "'money damages' as that term is used in the law." *Id.* at 883. The Supreme Court distinguished between compensatory damages, which "'are given to the plaintiff to *substitute* for a suffered loss'" and specific remedies, which "'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (quoting *Md. Dep't of Hum. Res.*, 763 F.2d at 1446 (quoting D. Dobbs, *Handbook on the Law of Remedies* 135 (1973)) (emphasis in original)). With this distinction in mind, the Supreme Court concluded that Massachusetts' action to enforce the requirement that the government "'shall pay' certain amounts for appropriate Medicaid services, is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statute mandate itself, which happens to be one for the payment of money." *Id.* at 900 (emphasis in original). Thus, the Supreme Court determined that Massachusetts' claim was one for specific relief, not money damages; as such, the district court had jurisdiction over the claim.[17]

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") faced a similar jurisdictional issue in *Katz v. Cisneros*, 16 F.3d 1204 (Fed Cir. 1994). The plaintiff in that case was a low-income housing developer who entered into a housing assistance payments

---

[17] The Supreme Court also noted that the legislative history of the 1976 amendment to the APA (the amendment that added the sovereign immunity waiver) made it clear that Congress intended to authorize APA review of federal grant-in-aid programs, and this is "surely strong affirmative evidence" that Congress "did not regard judicial review of an agency's disallowance decision as an action for damages." *Id.* at 898.

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 22

contract as part of the Section 8 Moderate Rehabilitation Program of the United States Housing Act of 1937. The Section 8 Program is administered by HUD through Public Housing Agencies ("PHAs") with whom HUD contracts to carry out the program at the local level. The *Katz* plaintiff had entered into a contract with a local PHA to develop a low-income housing project for an agreed-upon amount of rent payable to the plaintiff. The agreed-upon rent was calculated in accordance with HUD regulations based on the plaintiff's cost of acquiring, owning, managing, and maintaining the project. However, after the plaintiff completed the project, HUD determined that the contract rent rate was too high, ordered that the rent be lowered, and further ordered that the plaintiff return all overpayments. The plaintiff filed suit in federal district court, alleging claims for declaratory and injunctive relief, as well as breach of contract, among other claims, and asserting that the district court had jurisdiction under 28 U.S.C. § 1331 and the APA sovereign immunity waiver. HUD challenged the district court's jurisdiction, arguing that the lawsuit was "contractual and that money damages [were] the appropriate relief." *Id.* at 1207. The district court agreed with HUD and transferred the case to the Court of Federal Claims.

The plaintiff appealed and the Federal Circuit reversed and remanded the case back to the district court. In reaching its decision, the Federal Circuit held that "*Bowen v. Massachusetts* . . . compels the conclusion that the relief sought by [the plaintiff] is not money damages, but a declaratory judgment and other equitable relief." *Id.* at 1208. The Federal Circuit saw no distinction between the kind of relief sought by Massachusetts in *Bowen* and that sought by the plaintiff in the case before it:

> Like Massachusetts, [plaintiff] seeks payments to which it alleges it is entitled pursuant to federal statute and regulations; it does not seek money as compensation for a loss suffered. It wants to compel HUD to perform the calculation of contract rents in accordance with [HUD regulations]. That a payment of money may flow

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 23

from a decision that HUD erroneously interpreted or applied its regulation does not change the nature of the case.

*Id.*

The Federal Circuit reached the same conclusion in *National Center for Mfg. Sciences v. United States*, 114 F.3d 196 (Fed. Cir. 1997) in which the National Center for Manufacturing Sciences ("NCMS") filed suit against the United States Air Force in federal district court seeking an order directing the Air Force to release funds appropriated by Congress pursuant to an agreement between NCMS and the Air Force. The district court had determined that NCMS's claim was a contract claim against the government and ordered that the case be transferred to the Court of Federal Claims. NCMS appealed the transfer and the Federal Circuit determined that the district court had jurisdiction, stating:

> [t]he distinction drawn by the Supreme Court in *Bowen v. Massachusetts* and by this court in *Katz v. Cisneros* between "money damages" (as that term is used in 5 U.S.C. § 702) and other forms of monetary relief makes it clear that NCMS's demand for the release of the remaining funds referred to in the Appropriations Act is not a demand for "money damages" within the meaning of the exception to the APA's waiver of sovereign immunity. Like the grant-in-aid applicants referred to in *Bowen v. Massachusetts*, NCMS is seeking funds to which it claims it is entitled under a statute; it is not seeking money in compensation for losses that it has suffered or will suffer as a result of the withholding of those funds. Thus, the message of *Bowen v. Massachusetts* and *Katz v. Cisneros*, as applied to this case, is that sovereign immunity does not bar the district court from conducting APA review of the Air Force's refusal to release funds appropriated under the Appropriations Act.

*Id.* at 200.

The message of *Bowen*, *Katz*, and *NCMS* is crystal clear—the term "money damages" for purposes of the APA's sovereign immunity waiver refers to "a sum of money used as compensatory relief" that is "given to the plaintiff to *substitute* for a suffered loss." *Bowen*, 487 U.S. at 895 (quoting *Md. Dep't of Hum. Res.*, 763 F.2d at 1446 (emphasis in original). This

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 24

contrasts with "specific remedies," which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he is entitled." *Id.* Applying this message to the instant case, it is beyond dispute that Plaintiffs are not seeking monetary damages to compensate them for losses they have suffered or will suffer because Defendants have inserted the challenged funding conditions in the Grant Agreements. Instead, they are seeking a specific remedy: the right to enter into the Grant Agreements without the challenged funding conditions. As the Supreme Court, the Federal Circuit Court, and numerous other courts have held, the fact that the relief requested may eventually result in disbursement of the money to Plaintiffs does not change the nature of the relief sought. *See, e.g., Tucson,* 136 F.3d at 645 ("An action for specific performance is not an action of 'money damages' under APA § 702, even if the remedy may actually require a payment of money by the government."); *Tootle v. Secretary of Navy,* 446 F.3d 167, 175–76 (D.C. Cir. 2006) (the fact that plaintiff may recover monetary benefits if he prevails does not render his lawsuit anything "more than a routine APA case—a challenge to the reasonableness of the governmental action on the grounds that it was arbitrary, capricious, inadequately explained, and in violation of agency regulations."); *Kidwell v. Dep't of Army, Bd. for Correction of Military Records,* 56 F.3d 279, 284 (D.C. Cir. 1995) ("A plaintiff does not 'in essence' seek monetary relief . . . merely because he or she hints at some interest in a monetary award from the federal government or because success on the merits may obligate the United States to pay the complainant."); *Pacito v. Trump,* No. 2:25-cv-255-JNW, 2025 WL 655075, at *17 (W.D. Wash. Feb. 28, 2025) ("[W]hen a party suing the federal government 'seek[s] funds to which a statute allegedly entitles it, rather than money in compensation for the losses,' such a claim is not excepted from Section 702's sovereign-immunity waiver.").

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 25

The Supreme Court's recent stay order in *Department of Education v. California*, 145 S. Ct. 966 (2025) does not mandate a different outcome. In that case, a federal district court had issued a temporary restraining order enjoining the government from terminating education-related grants. In addition, the order required the government to pay past-due grant obligations and future obligations as they accrued. *Id.* at 968. Given the payment requirements, the Supreme Court construed the order as effectively an order "to enforce a contractual obligation to pay money" and stayed the temporary restraining order, finding, in part, that the government was likely to succeed on its claim that the federal district court did not have jurisdiction to order the payment of money under the APA. *Id.* The Supreme Court noted that while a district court's jurisdiction is not barred simply because "an order setting aside an agency's action may result in the disbursement of funds," the APA's immunity waiver "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). In the instant case, while it is true that a preliminary injunction may ultimately result in payment by the government to Plaintiffs, the injunction, itself, will not direct such payment. Thus, *Department of Education* has no application where, as here, the claims sound in statute and the Constitution, not a contract. *See Cmty. Legal Servs. in E. Palo*, 2025 WL 1393876, at *3 (9th Cir. May 14, 2025) (holding that *Department of Education* is inapplicable to claims that sound in statute rather than contract).

> **4.    The Imposition of the New Funding Conditions on the Grants Is Not Committed to Agency Discretion by Law**

Next, Defendants argue that even if this Court determines that Plaintiffs' claims are not foreclosed under the Tucker Act, the claims are not reviewable because the actions at issue are

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 26

committed to the agencies' discretion by law. While "the APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action, that presumption can be rebutted by a showing that . . . the agency action is committed to agency discretion by law." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (cleaned up); 5 U.S.C. § 701(a)(2). Where that is the case, courts have no authority to review or set aside the agency's action.

The Court concludes this exception to the "strong" and "basic presumption of judicial review" does not apply in this case. Agency action is committed to agency discretion only in those "rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply, thereby leaving the court with no meaningful standard against which to judge the agency's exercise of discretion." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015); *Texas v. United States*, 809 F.3d 134, 168 (5th Cir. 2015), as revised (Nov. 25, 2015) (Even where "a statute grants broad discretion to an agency," courts are empowered to review the agency's actions under the APA "unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised."). As courts have often (and recently) repeated, to "honor the [APA's] presumption of review, we have read the exception in § 701(a)(2) quite narrowly," confining it to a "rare" and "limited category" of "administrative decision[s] traditionally left to agency discretion." *Regents*, 140 S. Ct. at 1905 (citing *Weyerhaeuser Co. v. United States Fish and Wildlife Serv.*, 139 S. Ct. 361, 370 (2018); *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

Defendants have failed to demonstrate that the contested conditions fall within "[t]his limited category of unreviewable actions." *Id.* They broadly assert that an "agency's

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 27

HUD-PRWORA_000191

determination of how best to condition appropriated funds to fulfill its legal mandates is classic discretionary agency action," and cite a single case, *Lincoln v. Vigil,* for the principle that an agency's decision to cancel a program is unreviewable, because how to allocate funds "'from a lump-sum appropriation' is an 'administrative decision traditionally regarded as committed to agency discretion.'" Defs.' Opp. at 29 (citing 508 U.S. at 193). But the agency action at issue in *Lincoln* differs materially from the actions at issue in this case.

In *Lincoln*, the Indian Health Service ("IHS") administered the "Indian Children's Program," funded through a "lump-sum appropriation" from Congress with instruction to "expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians" for the "relief of distress and conservation of health." *Lincoln,* 508 U.S. at 185 (citing 25 U.S.C. § 13). After IHS discontinued the program, plaintiffs filed suit under, *inter alia,* the APA. The *Lincoln* court determined that the lack of congressional attention to any details regarding the spending of the appropriated funds indicated that the agency receiving funds was empowered to exercise discretion in how to spend them. *Id.* at 193 ("[A]s the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, [the APA] gives the courts no leave to intrude."). In fact, as Plaintiffs point out, Congress's "lump sum" appropriation did not even mention the program. *See id.* at 190 (noting lower courts could identify "no statute or regulation even mentioning the Program"); *id.* at 187 ("Congress never authorized or appropriated moneys expressly for the Program.").

In contrast, the moneys at issue in this case were not appropriated in an undifferentiated "lump sum." To the contrary, the grants at issue here abound with specific directives. For instance, the Homeless Assistance Act specifically authorized the CoC Program to provide

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 28

services to those experiencing homelessness with the goal of achieving long-term stability, and expressly sets forth directives that specify the types of programs that are eligible for funding and the criteria for selecting grant recipients. *See, e.g.*, 42 U.S.C. § 11383(a) (eligible activities include construction of new housing units to provide transitional or permanent housing, acquisition or rehabilitation of existing structure to providing housing or supportive services, provision of rental assistance, and payment of operating costs); *id.* § 11386(a) (selection criteria include past performance of recipients, the extent that the recipients address the needs of subpopulations, sets quantifiable performance measures, maintains implementation strategies). Likewise, the FTA grants in question here expressly and specifically allotted funds for (1) the operation of public transit facilities and equipment in urban areas, (2) public transit systems that operate on fixed rights-of-way such as rail or passenger ferries, (3) replacement of rail rolling stock, and (4) the purchase and maintenance of buses and bus facilities. 49 U.S.C. §§ 5302(8), 5307(a)(1), 5337(b), 5339(a)(2), (b), (c). And the DOT SMART program establishes a set of selection criteria that requires, among other things, that the funded projects reduce congestion and delays for commerce and the traveling public, improve safety for pedestrians, bicyclists, and the traveling public, and connect access for underserved or disadvantaged populations. Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 25005,135 Stat. 840-41 (2021).

As discussed further below, each of these enabling statutes provides substantial guidance as to how the agencies' discretion should be exercised in implementing these programs, and for the Court to evaluate whether that discretion is being exercised in a reasonable manner. Plaintiffs' claims thus do not involve the "narrow category" of agency actions that are unreviewable under the APA.

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 29

HUD-PRWORA_000193

For the foregoing reasons, this Court concludes that the APA waives federal sovereign immunity for Plaintiffs' claims seeking declaratory and injunctive relief against Defendants' agency action and this Court has subject-matter jurisdiction under 28 U.S.C. § 1331 to resolve the merits of Plaintiffs' claims.

### B.  Injunctive Relief Is Warranted

#### 1.  Legal Standard

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking preliminary injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. Alternatively, an injunction may issue where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor," provided that the plaintiff can also demonstrate the other two *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (citation and internal quotation marks omitted). Under either standard, Plaintiffs bear the burden of making a clear showing that they are entitled to this extraordinary remedy. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). The most important *Winter* factor is likelihood of success on the merits. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

#### 2.  Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims

The APA broadly "sets forth the procedures by which federal agencies are accountable to

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 30

the public and their actions subject to review by the courts." *Regents*, 140 S. Ct. at 1905 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). Under the APA, agencies must "engage in reasoned decisionmaking," and the Court is empowered to "hold unlawful and set aside agency action[18]. . . found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Plaintiffs challenge Defendants' actions as "contrary to constitutional right" and "in excess of statutory authority," and as arbitrary and capricious. *See* Amend. Compl., Counts 5, 6, 7, ¶¶ 276–303.

a.    **Defendants' Actions Violate APA as Contrary to Constitution and in Excess of Statutory Authority (Counts 6 & 7)**

*(i)    Separation of Powers Doctrine*

Under the APA, a court may set aside an agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C). Plaintiffs challenge Defendants' conditions as both contrary to the Constitution's Separation of Powers doctrine and in excess of any authority conferred by Congress. Amend. Compl., ¶¶ 291–95; 296–303. Because the Separation of Powers doctrine and the APA's "in excess of statutory authority" standard both turn on the same essential question—whether the agency acted within the bounds of its authority, either as conferred by the Constitution or delegated by Congress—the Court addresses the claims

---

[18]   For agency action to be final and thus reviewable under the APA, that action must (1) "mark the consummation of the agency's decisionmaking process," meaning not "tentative or interlocutory" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted). Plaintiffs assert, Defendants do not dispute, and the Court finds that under this standard, the new funding conditions at issue here are "final agency actions" for purposes of APA review.

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 31

HUD-PRWORA_000195

in a single analysis.

The Separation of Powers doctrine recognizes that the "United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.")). "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28, 2473 (1990)).

In contrast, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *San Francisco*, 897 F.3d at 1231. It follows that an executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see California v. Trump*, 379 F. Supp. 3d 928, 941 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020). When an agency is charged with administering a statute, "both [its] power to act and how [it is] to act [are] authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *San Francisco*, 897 F.3d at 1235.

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 32

Against this backdrop, Plaintiffs argue that in attempting to condition disbursement of funds in part on grounds not authorized by Congress, but rather on Executive Branch policy, Defendants are acting in violation of the Separation of Powers principle and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C). Plaintiffs argue that neither the Homeless Assistance Act nor any other statute authorizing the grants at issue confers on Defendants the kind of authority they are attempting to assert. For the reasons explained below, the Court agrees.

### (ii)    *The New HUD Funding Conditions*

Plaintiffs contend that the contested conditions must be set aside because there is no legislation that "authorizes HUD to impose conditions on CoC grant funding related to prohibiting all forms of DEI policies and initiatives, promoting aggressive and lawless immigration enforcement, requiring exclusion of transgender people, or cutting off access to information about lawful abortions." Amend. Compl., ¶ 300. In response, Defendants do not dispute that such authorization is required, but fail to identify a statutory source conferring it. Instead, they refer to several agency regulations for the proposition that Defendants "may terminate their grants merely based on a change in policy priorities." Defs.' Opp. at 27 (citing 2 C.F.R. § 200.340(a)(4)). As Plaintiffs point out, however, an agency *regulation* cannot create *statutory* authority; only Congress can do that. Whatever actions HUD chooses to take based on a change in its policy priorities must still be rooted in a congressional delegation of authority, a limitation that the cited regulation itself makes clear. *See* 2 C.F.R. § 200.340(a)(4) (award may be terminated if it "no longer effectuates the program goals or agency priorities," but only "to the extent authorized by law.").

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 33