Defendants do not and reasonably could not argue that any of the new funding conditions were explicitly authorized by the Homeless Assistance Act. That legislation does outline several conditions that grant recipients must agree to. These enumerated conditions require recipients, among other things, "to monitor and report to the Secretary the progress of the project"; "to ensure . . . that individuals and families experiencing homelessness are involved" in the project; and to "monitor and report" the receipt of any matching funds. 42 U.S.C. § 11386(b). But the Homeless Assistance Act does not make direct (or even indirect) reference to any of the new conditions Plaintiffs are challenging in this case.

While the Act includes a limited "catchall" provision, which allows HUD to impose "such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner," Defendants have not argued that this provision confers the authority to impose the conditions at issue here. Applying basic rules of statutory interpretation, the Court concludes in any event it does not. Under the canon *ejusdem generis*, or "of the same kind," "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001). Substantive conditions implicating controversial policy matters that are unrelated to the authorizing statute, such as prohibitions on DEI initiatives and "promot[ing] elective abortion," are simply not "of the same kind" as conditions that require recipients to monitor and report the progress of their program. Moreover, Defendants have not even attempted to explain to this Court how the proposed funding conditions might actually fall within this catchall provision—how they would, in other words, support the Secretary in carrying out the CoC program "in an effective and efficient manner."

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 34

Given the stated objectives of the Homeless Assistance Act, including to "meet the critically urgent needs of the homeless of the Nation," and "to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans," the Court is skeptical that Defendants would be convincingly able to do so. 42 U.S.C. § 11301(b). The Court concludes that Plaintiffs are likely to prevail in their claim that in attempting to impose the new funding conditions on recipients of the CoC funds, Defendants have run afoul of the Separation of Powers doctrine, and were acting in excess of statutory authority, and that under the APA, those conditions must be set aside.

### (iii)   The New DOT Funding Conditions

Defendants' attempts to identify statutory authority for imposing the contested conditions on the DOT grants administered through FTA, FHWA, FAA, and FRA suffer from similar deficiencies. As noted above with respect to the new funding conditions in the CoC Grant Agreements, agency regulations cannot create or confer statutory authority, and the DOT Defendants' attempt to rely on them also fails.

Nor have Defendants identified any statutory authority for imposing the new DOT funding conditions. Plaintiffs have identified the statutory sources of the various DOT grant funds at issue in this case, and while many of those statutes contain explicit conditional prescriptions, none of those prescriptions relate to the conditions challenged here. *See* Amend. Compl., ¶¶ 85–120. The statute authorizing FTA's Urban Area Formula Grants, for example, imposes a number of conditions on grant recipients, providing that they will not be eligible to receive funding for a program unless, among other things, they "have the legal, financial, and technical capacity to carry out the program," and "have satisfactory continuing control over the use of equipment and

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 35

HUD-PRWORA_000199

facilities." 49 U.S.C. § 5307(c)(1)(A)–(B). In another similar example, the statute authorizing the FHWA's Bridge Investment Program provides financial assistance for improving the condition of the nation's bridges. That statute directs DOT to consider, among other factors, "the average daily person and freight throughput supported by the eligible project," "the extent to which the eligible project demonstrates cost savings by bundling multiple bridge projects," and "geographic diversity among grant recipients, including the need for a balance between the needs of rural and urban communities." 23 U.S.C. § 124(c)(5)(A); *see also* § 124(g)(4)(B) (authorizing grants only for projects that generate "safety benefits, including the reduction of accidents and related costs," "national or regional economic benefits," and "environmental benefits, including wildlife connectivity"). Defendants have not claimed that any of the DOT grant-authorizing statutes explicitly, or even implicitly, relate even remotely to the newly imposed DOT funding conditions.

The only statute Defendants cite in support of DOT's claimed statutory authority is 49 U.S.C. § 5334. That section authorizes the Secretary of Transportation to "prescribe terms for a project that receives Federal financial assistance under this chapter," and "include in an agreement or instrument under this chapter a covenant or term the Secretary of Transportation considers necessary to carry out this chapter." 49 U.S.C. § 5334(a)(1),(9). These provisions do not carry the weight Defendants suggest they do. First, they are contained in a section titled "Administrative provisions," clearly signaling a limit on what kind of authority is being delegated: to wit, authority to administer the programs, not to inject substantive policies into them. This is particularly true in this case given that the challenged conditions not only are unrelated to the subject matter of the statutes at issue, but also reflect divisive and hotly debated policy choices. Furthermore, as with the proposed CoC funding conditions, these seemingly broad delegations of

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 36

authority must be interpreted under the *ejusdem generis* canon of construction. The specifically enumerated authority outlined in Section 5334 includes such "administrative provisions" as granting the Secretary authority to "sue and be sued," to "foreclose on property," and to "collect fees to cover the costs of training." *Id.* § 5334 (a)(2),(3),(10). The seemingly broad authority that follows—to "prescribe terms for a project"—on which Defendants rely in imposing their conditions must be read in the limiting context of these specific grants of authority that precede it. Properly read, the statute does not confer the unbounded discretion that Defendants claim and indeed, require. And again, Defendants have not even attempted to explain how the conditions challenged here might be "necessary" to carry out the DOT grant programs—for example, how requiring grant recipients to certify that they do not "operate any programs promoting diversity, equity, and inclusion (DEI) initiatives," might be necessary to carry out the "development and revitalization" of the nation's "public transportation systems." 49 U.S.C. § 5301.

Accordingly, the Court concludes that Plaintiffs are likely to prevail on their claim that in attempting to impose on Plaintiffs the conditions in the Master Agreement, Defendants have acted in a manner that violates the Separation of Powers doctrine and exceeds statutory authority, and that under the APA those conditions must be set aside.

> **b.** **Defendants' Actions Were "Arbitrary and Capricious," 5 U.S.C. § 706(2)(A) (Count 5)**

Plaintiffs have also asserted that the funding conditions must be set aside as "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A); Amend. Compl., ¶¶ 276–90. The APA requires agencies to engage in "reasoned decisionmaking," and their actions must be "reasonable and reasonably explained." *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). An agency must offer "a satisfactory explanation for its action," and cannot rely on

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 37

HUD-PRWORA_000201

Case 1:25-cv-00345-MSM-PAS   Document 86-11   Filed 01/30/26   Page 5 of 27 PageID
#: 3362
Case 2:25-cv-00814-BJR   Document 189   Filed 06/03/25   Page 38 of 49

"factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs maintain that Defendants have not followed these prescriptions, and have failed to provide reasonable explanations for any of the new funding conditions.

The Court concludes that Defendants have failed to demonstrate that the new funding conditions were the result of "reasoned decisionmaking," let alone have been "reasonably explained." In fact, they have not been explained at all. The CoC Program Grant Agreements and the new DOT agreements proffer no explanation for adoption of the new conditions. Several of the conditions make reference to certain Executive Orders. *See, e.g.*, Abortion Condition, Marshall Decl., Ex. B (providing grant recipient "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182"). But rote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute "reasoned decisionmaking." For this reason, the Court concludes that Plaintiffs are likely to succeed on the merits of their claim that Defendants' insistence on the new funding conditions was arbitrary and capricious, which is independent grounds for setting aside those conditions.[19]

---

[19] Plaintiffs have asserted several other claims both under the APA and under the Constitution. *See* Compl., ¶¶ 116–95. The Court does not reach all claims at this stage, in part because "[t]he Court need only find that Plaintiffs are likely to succeed on one of [their] claims for [the likelihood-of-success] factor to weigh in favor of a preliminary injunction," and a ruling on Plaintiffs' additional claims would not affect the relief afforded. *Aids Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *7 (D.D.C. Mar. 10, 2025). Furthermore, the Court adheres to the "fundamental and longstanding principle of judicial restraint" that requires courts to "avoid reaching constitutional questions in advance of the necessity of deciding them." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, No. 22-55988, 2024 WL 5692756, at *14 (9th Cir. May 14, 2025) (vacating district court's "entry of judgment for Plaintiffs on the constitutional due process claim" where judgment was granted in Plaintiffs' favor on APA claim) (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988));

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 38

### 3.  Irreparable Injury

A plaintiff seeking a preliminary injunction must establish that it is likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. Such harm "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991)).

Plaintiffs here have alleged several forms of irreparable harm that are either presently occurring, or are likely to occur, in the absence of injunctive relief. They are facing a choice between two untenable options; as this Court has already determined, "Defendants have put Plaintiffs in the position of having to choose between accepting conditions that they believe are unconstitutional, and risking the loss of hundreds of millions of dollars in federal grant funding, including funding that they have already budgeted and are committed to spending." TRO Order at 3; *see San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-CV-02425-EMC, 2025 WL 974298, at *4 (N.D. Cal. Mar. 31, 2025) ("[H]aving to decide between two losing options constitutes irreparable injury because "very real penalty attaches to [Plaintiffs] regardless of how they proceed."). On the one hand, being forced to accept conditions that are contrary either to statute or to the Constitution (or both) is a constitutional injury, and constitutional injuries are

---

*see also Washington v. Trump*, 441 F. Supp. 3d 1101, 1125 (W.D. Wash. 2020) ("[A] court should not reach a constitutional question if there is some other ground upon which to dispose of the case. Given that this Court has already determined that Defendants' [action] violates the APA and, therefore, can dispose of the case on that basis, the Court exercises restraint and declines to reach the constitutional claims raised by Washington.") (cleaned up, citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009); *Harmon v. Brucker*, 355 U.S. 579, 581 (1958)). Because Plaintiffs are likely to prevail on Counts 5, 6 and 7 of their Amended Complaint—that the challenged actions were arbitrary and capricious, contrary to the constitutional Separation of Powers doctrine, and in excess of Defendants' statutory authority, and must therefore be set aside under the APA—the Court's inquiry into the likelihood-of-success factor is at an end.

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 39

"unquestionably" irreparable. *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury."); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537–38 (N.D. Cal. 2017) ("[B]eing forced to comply with an unconstitutional law or else face financial injury" constitutes a constitutional injury) (citing *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058–59 (9th Cir. 2009) (plaintiffs were injured where they were faced with the choice of signing unconstitutional agreements or facing a loss of customer goodwill and significant business.)). Defendants argue that Plaintiffs have failed to demonstrate that the new funding conditions would in fact deprive Plaintiffs of their constitutional rights, arguing that at least some of the conditions are not on their face illegal. Defs.' Opp. at 29. This contention ignores the Court's conclusion that, as outlined at some length above, Plaintiffs are likely to succeed in demonstrating that the new funding conditions were imposed in violation of the APA, and are contrary to the Constitution's Separation of Powers doctrine. *See supra*, § IV.B.2.; *Santa Clara*, 250 F. Supp. 3d at 538 ("[E]ven where the constitutional injury is structural," *e.g.* a violation of the Separation of Powers doctrine, "the constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm.") (quoting *Am. Trucking*, 559 F.3d at 1058–59).

On the other hand, avoiding the constitutional offense by refusing to agree to the new funding conditions may very well result in the loss of access to promised grant funds. And indeed, Defendants have not denied that Plaintiffs would be assuming this risk by not signing the agreements. They merely complain that Plaintiffs have not provided details as to when exactly that loss will occur. But this argument misses the point. It is this looming risk itself that is the injury, and one that Plaintiffs are already suffering. Courts evaluating similar circumstances have

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 40

recognized that this injury of acute budgetary uncertainty is irreparable; "[w]ithout clarification regarding the Order's scope or legality, the Counties will be obligated to take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services. These mitigating steps will cause the Counties irreparable harm." *Santa Clara*, 250 F. Supp. 3d at 537 ("The threat of the Order and the uncertainty it is causing impermissibly interferes with the Counties' ability to operate, to provide key services, to plan for the future, and to budget. The Counties have established that, absent an injunction, they are likely to suffer irreparable harm.") (citing *United States v. North Carolina*, 192 F.Supp.3d 620, 629 (M.D.N.C. 2016)). While a preliminary injunction will not eliminate these risks entirely, Plaintiffs have demonstrated it will at least mitigate them pending resolution of this case on its merits.

Furthermore, Plaintiffs have submitted substantive and detailed evidence illustrating the ways in which a loss of grant funds would be devastating and irreparable, if these risks in fact materialize. With respect to the HUD Plaintiffs, the resulting irreparable injuries would be both to Plaintiffs and their operations, and to the vulnerable populations they serve. *See, e.g.*, Marshall Decl., ¶¶ 17–21 (King County) ([T]he loss of [CoC] funding would negatively impact King County because King County has already begun the contracting process with service providers in reliance on receiving the CoC funds. . . . It is important to remember that the key focus in this work is keeping people in housing. In order to do that, it is imperative that housing providers, with whom King County contracts, receive the funds necessary to support the housing. 2144 households in King County will be impacted by the loss of CoC funds."); Dillon Decl., ¶¶ 12–14 (Boston) ("Without CoC funds, the approximately 2,000 households served would lose assistance that is integral to their ability to maintain stable housing, most likely leading to evictions and

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 41

homelessness."); Semonoff Decl., ¶ 31 (Cambridge) ("Without grant funding to support the CoC projects, over 200 individuals currently enrolled in CoC . . . projects would potentially lose their housing and access to critical supportive services. The loss of supportive housing capacity would further strain the City's emergency shelter system, resulting in longer durations of homelessness and reduced exits to stable housing."); McSpadden Decl., ¶¶ 16–19 (San Francisco) ("Without CoC funding, close to 2,000 program participants will lose their housing subsidies and services and will be at risk of imminent evictions. These individuals and families may slip back into homelessness, which would be profoundly detrimental. Rehousing these individuals and families will come with enormous challenges and costs, adding to the homelessness crisis in San Francisco."). The administration's attempt to compel Plaintiffs' compliance with unrelated policy objectives by leveraging the needs of our most vulnerable fellow human beings is breathtaking in its callousness. Defendants' argument that these harms are not irreparable is simply wrong.

The harms threatening the DOT Plaintiffs are also demonstrably irreparable. While perhaps emotionally less compelling than injury to the homeless and the local agencies who serve them, injury to the continued operation of the nation's transportation projects can hardly be considered less important. One need not conjure the most extreme cases of bridges collapsing and train derailments to understand instinctively that maintaining the health of the systems by which this nation—its goods and its people—get from one place to another safely, efficiently, and predictably, is critical. Plaintiffs have submitted evidence supporting their contention that "loss of DOT funding would force Plaintiffs to substantially curtail existing and planned transportation safety and other improvements and operations." Pls. Sec. Mot. at 13 (citing, *inter alia*, Franklin-Hodge Decl. (Boston) ("The unpredictability injected into these complex road-safety projects

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 42

HUD-PRWORA_000206

through new grant terms hinders the City of Boston's ability to complete such projects. Specifically, the City is unable to provide stability to its partners in this work, including vendors and other governmental entities."); Davis Decl., ¶ 22 (Chicago) ("The loss of the pending and expected DOT grant funds will cause severe hardship for [the Chicago Department of Transportation] and its ability to maintain Chicago's roadways and transportation systems safely. CDOT relies on DOT for a large portion of its budget and Chicago uses the funds to repair and expand bridges and roadways to prevent accidents, to make pedestrian walkways safer and more accessible, and to update outdated transit stations. These funds are critical to Chicago's ability to implement and maintain safe and effective means of transportation for millions of Chicagoans and its annual visitors.")); *see also* Morrison Decl., ¶ 12 (King County) ("Given the amount of money at stake, it is almost impossible to overstate how important these FTA grant programs are to Metro's ongoing transit operations. . . . Given the range and depth of Metro transit operations that are funded by these four FTA grant programs, it is plain that those FTA grant funds are absolutely mission-critical to Metro's existing and planned transit operations. To be clear, the scope and scale of Metro's existing and near-future planned transit operations would almost certainly have to be substantially curtailed, and some elements likely entirely abandoned, if any substantial portion of this FTA grant funding were to be withheld or eliminated. As of the date of this declaration, I know of no other existing or proposed funding source that could replace FTA's grant funds. . . . To put it plainly, without FTA grant funds, Metro's service network would likely have to be cut back in ways that could significantly reduce mobility options for a large portion of King County's population while potentially increasing traffic congestion and slowing the movement of freight and goods across our region.").

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 43

Plaintiffs have provided substantial evidence demonstrating that these likely harms are not, as Defendants suggest, merely monetary in nature. Adequate financial compensation for hundreds of shelter-unstable families losing access to housing does not exist; the same must be said of the incalculable effects of forcing unforeseen reductions in transportation spending. Homeless assistance and transit grants are essential tools in addressing these urgent community needs. Congress has consistently affirmed their importance by repeatedly authorizing these grants, underscoring the federal government's vital role in supporting local governments as they confront the challenges of homelessness and maintenance of critical transportation infrastructure. The Court concludes that the harms Plaintiffs have alleged are quintessentially irreparable in nature, and can be avoided only by entry of the requested injunction.

### 4. The Balance of Equities Weighs in Plaintiffs' Favor

In deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters*, 869 F.3d at 866 (quoting *Winter*, 555 U.S. at 24). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted). Where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Based on the Court's conclusions discussed above, the Court finds that the balance of equities tips sharply in Plaintiffs' favor. Defendants' argument to the contrary hinges on their position that "Plaintiffs could be compensated for any lost money after a ruling on the merits."

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 44

HUD-PRWORA_000208

Defs.' Opp. at 32. The Court has already squarely rejected this contention in discussing the irreparable harm Plaintiffs are likely to suffer in the absence of an injunction. *See supra*, § IV.B.3. Moreover, Defendants have not posited any anticipated (let alone likely) non-monetary harm they will experience if an injunction were to issue, stating only that the "federal government maintains an interest in ensuring that its funds are spent pursuant to the conditions it attaches to those federal dollars." Defs.' Opp. at 29. Of course, Defendants do not have a legitimate interest in ensuring that funds are spent pursuant to conditions that were likely imposed in violation of the APA and/or the Constitution. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (there is no legitimate government interest in violating federal law). For the reasons outlined above, the irreparable harms Plaintiffs face in the absence of an injunction tip the balance of equities sharply in their favor.

## C.   The Court Denies Defendants' Request for a Bond and Request to Stay

Defendants request that if this Court grants Plaintiffs' motions for a preliminary injunction, the Court require Plaintiffs to post a bond for the value of the specific grants subject to the injunction and stay the injunction pending "a determination by the Solicitor General whether to appeal and, if appeal is authorized, pending any appeal." Defs.' Opp. at 33. Federal Rule of Civil Procedure 65(c) states that courts "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citations and internal quotation marks omitted).

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 45

"In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (cleaned up). Defendants have not argued, let alone demonstrated, that they will suffer any material harm from the injunction the Court issues today. Nor have Defendants met the standard for a stay. *See, e.g., Maryland v. Dep't of Agriculture*, JKB-25-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("It is generally logically inconsistent for a court to issue a TRO or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites."). Therefore, the Court denies Defendants' requests for a bond and to stay the injunction.

## V.    CONCLUSION

For the foregoing reasons:

1. Plaintiffs' Motion for Preliminary Injunction is GRANTED;

2. Plaintiffs' Second Motion for Preliminary Injunction is GRANTED;

3. HUD and its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (collectively "Enjoined HUD Parties"), are enjoined from (1) imposing or enforcing the CoC Grant Conditions, as defined in the Motions, or any materially similar terms or conditions with respect to any CoC funds awarded to the HUD Plaintiffs or members of their Continuums; (2) as to the HUD Plaintiffs, rescinding, withholding, cancelling, or otherwise not processing any CoC Agreements, or pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning CoC funds, based on such terms or conditions, including without limitation failing or refusing to process and otherwise implement grants signed with changes or other objection to conditions enjoined by this

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 46

preliminary injunction; (3) requiring the HUD Plaintiffs to make any "certification" or other representation related to compliance with such terms or conditions; or (4) refusing to issue, process, or sign CoC Agreements based on HUD Plaintiffs' participation in this lawsuit;

4. The Enjoined HUD Parties shall immediately treat any actions taken to implement or enforce the CoC Grant Conditions or any materially similar terms or conditions as to the HUD Plaintiffs or their Continuums, including any delays or withholding of funds based on such conditions, as null, void, and rescinded; shall treat as null and void any such conditions included in any grant agreement executed by any Plaintiff or member of a Plaintiff Continuum while this PI or the previous TROs are in effect; and may not retroactively apply such conditions to grant agreements during the effective period of this PI or the previous TROs. The Enjoined HUD Parties shall immediately take every step necessary to effectuate this order, including clearing any administrative, operational, or technical hurdles to implementation;

5. DOT, the DOT OAs, and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (collectively "Enjoined DOT Parties"), are enjoined from (1) imposing or enforcing the DOT Grant Conditions, as defined in the Motions, or any materially similar terms or conditions to any DOT funds awarded, directly or indirectly, to the DOT Plaintiffs or their subrecipients; (2) as to the DOT Plaintiffs or their subrecipients, rescinding, withholding, cancelling, or otherwise not processing the DOT grant awards, or pausing, freezing, impeding, blocking, canceling, terminating, delaying, withholding, or conditioning DOT funds, based on such terms or conditions, including without limitation failing or refusing to process and otherwise implement grants signed with changes or other objection to conditions enjoined by this preliminary injunction; (3) requiring the DOT

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 47

HUD-PRWORA_000211

Plaintiffs or their subrecipients to make any "certification" or other representation related to compliance with such terms or conditions; or (4) refusing to issue, process, or sign grant agreements based on DOT Plaintiffs' participation in this lawsuit;

6. The Enjoined DOT Parties shall immediately treat any actions taken to implement or enforce the DOT Grant Conditions or any materially similar terms or conditions as to DOT funds awarded, directly or indirectly, to the DOT Plaintiffs or their subrecipients, including any delays or withholding of funds based on such conditions, as null, void, and rescinded; shall treat as null and void any such conditions included in any grant agreement executed by any DOT Plaintiff or subrecipient while this PI or the previous TROs are in effect; and may not retroactively apply such conditions to grant agreements during the effective period of this PI or the previous TROs. The Enjoined DOT Parties shall immediately take every step necessary to effectuate this order, including clearing any administrative, operational, or technical hurdles to implementation;

7. Defendants' counsel shall provide written notice of this Order to all Defendants and their employees by the end of the second day after issuance of this Order;

8. By the end of the second day after issuance of this Order, the Defendants SHALL FILE on the Court's electronic docket and serve upon Plaintiffs a Status Report documenting the actions that they have taken to comply with this Order, including a copy of the notice and an explanation as to whom the notice was sent;

//

//

//

//

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 48

9. This order remains in effect pending further orders from this Court.

It is so ordered this 3rd day of June, 2025.

_Barbara J. Rothstein_

Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION

- 49

HUD-PRWORA_000213

The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARTIN LUTHER KING, JR. COUNTY, *et al.*,

Plaintiffs,

v.

SCOTT TURNER, *et al.*,

Defendants.

Case No. 2:25-cv-00814-BJR

**NOTICE OF APPEAL**

**PRELIMINARY INJUNCTION APPEAL**

Defendants Scott Turner, Secretary of Housing & Urban Development; Sean Duffy, Secretary of Transportation; Marcus J. Molinaro as Administrator of the Federal Transit Administration (FTA); Gloria M. Shepherd as Executive Director of the Federal Highway Administration (FHWA); Bryan Bedford as Administrator of the Federal Aviation Administration (FAA);[1] Drew Feeley as Acting Administrator of the Federal Railroad Administration (FRA); Robert F. Kennedy, Jr., Secretary of Health & Human Services; the U.S. Department of Housing & Urban Development; the U.S. Department of Transportation; the U.S. Department of Health &

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Marcus J. Molinaro is substituted as Administrator of FTA, and Bryan Bedford is substituted as Administrator of FAA.

NOTICE OF APPEAL
[Case No. 2:25-cv-00814-BJR] - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

HUD-PRWORA_000214

Human Services; FTA; FHWA; FAA; and FRA appeal to the United States Court of Appeals for the Ninth Circuit from the preliminary injunction entered in this action on August 12, 2025, Dkt. No. 338.

Dated October 10, 2025.

Respectfully submitted,

CHARLES NEIL FLOYD
United States Attorney

s/ Brian C. Kipnis
BRIAN C. KIPNIS

s/ Annalisa L. Cravens
ANNALISA L. CRAVENS

s/ Sarah L. Bishop
SARAH L. BISHOP
Assistant United States Attorneys
United States Attorney's Office
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Phone: 206-553-7970
Fax:    206-553-4067
Email: brian.kipnis@usdoj.gov
        annalisa.cravens@usdoj.gov
        sarah.bishop@usdoj.gov

*Counsel for Defendants*

NOTICE OF APPEAL
[Case No. 2:25-cv-00814-BJR] - 2

HUD-PRWORA_000215

Federal Register / Vol. 90, No. 36 / Tuesday, February 25, 2025 / Presidential Documents        **10581**

# Presidential Documents

Executive Order 14218 of February 19, 2025

## Ending Taxpayer Subsidization of Open Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* The plain text of Federal law, including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) (PRWORA), generally prohibits illegal aliens from obtaining most taxpayer-funded benefits. Title IV of the PRWORA states that it is national policy that "aliens within the Nation's borders not depend on public resources to meet their needs," and that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." But in the decades since the passage of the PRWORA, numerous administrations have acted to undermine the principles and limitations directed by the Congress through that law. Over the last 4 years, in particular, the prior administration repeatedly undercut the goals of that law, resulting in the improper expenditure of significant taxpayer resources. My Administration will uphold the rule of law, defend against the waste of hard-earned taxpayer resources, and protect benefits for American citizens in need, including individuals with disabilities and veterans.

**Sec. 2.** *Preserving Federal Public Benefits.* (a) To prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens, the head of each executive department or agency (agency) shall:

(i) identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including the PRWORA;

(ii) ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called "sanctuary" policies that seek to shield illegal aliens from deportation; and

(iii) enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(b) Within 30 days of the date of this order, the Director of the Office of Management and Budget and the Administrator of the United States DOGE Service, in coordination with the Assistant to the President for Domestic Policy, shall further:

(i) identify all other sources of Federal funding for illegal aliens; and

(ii) recommend additional agency actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems.

(c) Agencies shall refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action.

**10582**    **Federal Register** / Vol. 90, No. 36 / Tuesday, February 25, 2025 / Presidential Documents

**Sec. 3.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 19, 2025.*

[FR Doc. 2025-03137
Filed 2-24-25; 8:45 am]
Billing code 3395-F4-P

HUD-PRWORA_000217

## Presidential Documents

Executive Order 14287 of April 28, 2025

## Protecting American Communities From Criminal Aliens

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose and Policy.* Federal supremacy with respect to immigration, national security, and foreign policy is axiomatic. The Constitution provides the Federal Government with plenary authority regarding immigration to protect the sovereignty of our Nation and to conduct relations with other nations, who must be able to deal with one national Government on such matters. This power is sometimes contained in specific constitutional provisions: Article II of the Constitution vests the power to protect national security and conduct foreign policy in the President of the United States, and Article IV, Section 4, requires the Federal Government to "protect each of [the States] against Invasion." This Federal power over immigration is also an inherent element of national sovereignty.

The prior administration allowed unchecked millions of aliens to illegally enter the United States. The resulting public safety and national security risks are exacerbated by the presence of, and control of territory by, international cartels and other transnational criminal organizations along the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. This invasion at the southern border requires the Federal Government to take measures to fulfill its obligation to the States.

Yet some State and local officials nevertheless continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws. This is a lawless insurrection against the supremacy of Federal law and the Federal Government's obligation to defend the territorial sovereignty of the United States. Beyond the intolerable national security risks, such nullification efforts often violate Federal criminal laws, including those prohibiting obstruction of justice (18 U.S.C. 1501 *et seq.*), unlawfully harboring or hiring illegal aliens (8 U.S.C. 1324), conspiracy against the United States (18 U.S.C. 371), and conspiracy to impede Federal law enforcement (18 U.S.C. 372). Assisting aliens in violating Federal immigration law could also violate the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. 1961 *et seq.*). Some measures to assist illegal aliens also necessarily violate Federal laws prohibiting discrimination against Americans in favor of illegal aliens and protecting Americans' civil rights.

It is imperative that the Federal Government restore the enforcement of United States law.

**Sec. 2.** *Designation of "Sanctuary" Jurisdictions.* (a) Within 30 days of the date of this order, the Attorney General, in coordination with the Secretary of Homeland Security, shall publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions). After this initial publication, the Attorney General and the Secretary of Homeland Security shall update this list as necessary.

(b) Immediately following each publication under subsection (a) of this section, the Attorney General and the Secretary of Homeland Security shall notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law.

**Sec. 3.** *Consequences for Sanctuary Jurisdiction Status.* (a) With respect to sanctuary jurisdictions that are designated under section 2(a) of this

HUD-PRWORA_000218

**18762**   **Federal Register** / Vol. 90, No. 84 / Friday, May 2, 2025 / Presidential Documents

order, the head of each executive department or agency (agency), in coordination with the Director of the Office of Management and Budget and as permitted by law, shall identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate.

(b) With respect to jurisdictions that remain sanctuary jurisdictions after State or local officials are provided notice of such status under section 2(b) of this order and yet remain in defiance of Federal law, the Attorney General and the Secretary of Homeland Security shall pursue all necessary legal remedies and enforcement measures to end these violations and bring such jurisdictions into compliance with the laws of the United States.

**Sec. 4.** *Preventing Federal Benefits for Aliens in Sanctuary Jurisdictions.* The Secretary of Homeland Security, in coordination with the Attorney General, shall develop guidance, rules, or other appropriate mechanisms to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits within the meaning of 8 U.S.C. 1611(c) from private entities in a sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental entity on its behalf.

**Sec. 5.** *Equal Treatment of Americans.* The Attorney General, in consultation with the Secretary of Homeland Security and appropriate agency heads, shall identify and take appropriate action to stop the enforcement of State and local laws, regulations, policies, and practices favoring aliens over any groups of American citizens that are unlawful, preempted by Federal law, or otherwise unenforceable, including State laws that provide in-State higher education tuition to aliens but not to out-of-State American citizens that may violate 8 U.S.C. 1623 or that favor aliens in criminal charges or sentencing.

**Sec. 6.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Federal Register / Vol. 90, No. 84 / Friday, May 2, 2025 / Presidential Documents    **18763**

(d) The Department of Justice shall provide funding for this order's publication in the *Federal Register*.

THE WHITE HOUSE,
*April 28, 2025.*

[FR Doc. 2025-07789
Filed 5-1-25; 8:45 am]
Billing code 4410-CW-P

HUD-PRWORA_000220

## Presidential Documents

Executive Order 14159 of January 20, 2025

### Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1.** *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2.** *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3.** *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

HUD-PRWORA_000221

8444   Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents

**Sec. 4.** *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5.** *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6.** *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7.** *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8.** *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9.** *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10.** *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11.** *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12.** *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13.** *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

HUD-PRWORA_000223

8446        Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

Sec. 14. *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

Sec. 15. *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

Sec. 16. *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

Sec. 17. *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

Sec. 18. *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and