(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19.** *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20.** *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21.** *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22.** *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

**8448**    Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

**ADDENDUM 1. POLICY REQUIREMENTS**

If applicable:

1.  The Recipient shall not use grant funds to promote "gender ideology," as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

2.  The Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

3.  The Recipient certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964;

4.  The Recipient shall not use any grant funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment; and that,

5.  Notwithstanding anything in the NOFO or Application, this Grant shall not be governed by Executive Orders revoked by E.O. 14154, including E.O. 14008, or NOFO requirements implementing Executive Orders that have been revoked.

6.  The Recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.

7.  No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or shields illegal aliens from deportation, including by maintaining policies or practices that materially impede enforcement of federal immigration statutes and regulations.

8.  The Recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

9.  Faith-based organizations may be subrecipients for funds on the same basis as any other organization.  Recipients may not, in the selection of subrecipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

HUD-PRWORA_000227

Message

| | |
|---|---|
| **From:** | Hobbs, Benjamin R [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3B352438FFF04F3B8CBD3F84E52CD7C7-HOBBS, BENJ] |
| **Sent:** | 7/15/2025 9:25:09 PM |
| **To:** | McKenney, Caitlyn J [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=103e76aa68a4426ba54f0559b335b0ce-a9b74ec4-0a] |

AG Order Limiting Exceptions to PRWORA, July 11, 2025

Ben Hobbs
Principal Deputy Assistant Secretary
Office of Public and Indian Housing
202-374-9827

HUD-PRWORA_000228

**From:**     McKenney, Caitlyn J [Caitlyn.J.McKenney@hud.gov]
**Sent:**     7/15/2025 9:28:46 PM
**To:**       Hobbs, Benjamin R [Benjamin.R.Hobbs@hud.gov]
**Subject:**  HHS, USDA, Ed PRWORA

Federal Register :: Clarification of Federal Public Benefits Under the Personal Responsibility and Work Opportunity Reconciliation Act (Ed)
prwora-notice.pdf (HHS)
HHS Bans Illegal Aliens from Accessing its Taxpayer-Funded Programs | HHS.gov
Federal Register :: Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit" (USDA)

---

**From:** Hobbs, Benjamin R <Benjamin.R.Hobbs@hud.gov>
**Sent:** Tuesday, July 15, 2025 5:25 PM
**To:** McKenney, Caitlyn J <Caitlyn.J.McKenney@hud.gov>
**Subject:**

AG Order Limiting Exceptions to PRWORA, July 11, 2025

Ben Hobbs
Principal Deputy Assistant Secretary
Office of Public and Indian Housing
202-374-9827

HUD-PRWORA_000229

| | |
|---|---|
| **From**: | Fernandez, Claudette [Claudette.Fernandez1@hud.gov] |
| **Sent**: | 7/7/2025 9:27:52 PM |
| **To**: | Horn, Bryan W [Bryan.W.Horn@hud.gov] |
| **CC**: | Parker, Tennille S [Tennille.S.Parker@hud.gov] |
| **Subject**: | FW: HUD Correspondence re: Executive Orders |
| **Attachments**: | 20205.05.31 1-25cv10442 City of Chelsea v. Turmp 010_Amended Complaint Ex L HUD Letter.pdf; 6-5-2025 HUD Response to COSCDA NCDA.pdf |

Hi Bryan,

What Tennille shared is the actual copy of Secretary Turner's letter addressed to all HUD grantees, now being challenged in court. For the actual public facing link of the letter from HUD, here's the link https://www.hud.gov/news/hud-no-25-051.

Claudette

---

**From:** Parker, Tennille S <Tennille.S.Parker@hud.gov>
**Sent:** Monday, July 7, 2025 2:19 PM
**To:** Horn, Bryan W <Bryan.W.Horn@hud.gov>
**Cc:** Fernandez, Claudette <Claudette.Fernandez1@hud.gov>
**Subject:** HUD Correspondence re: Executive Orders

Hi,

Following up on our conversation this morning, here are the two items that I am aware have been shared by HUD publicly regarding Executive Orders. The first is a letter signed by Secretary Turner that appears on the HUD website but was not sent directly to any grantees. The second is the letter CPD sent to the community development industry groups. If there is other correspondence of this nature, it has not been issues by CPD and I am not sure who from HUD would have sent it.

**Tennille Smith Parker**
**Acting Deputy Assistant Secretary for Field Operations**
**Office of Community Planning and Development**
**U.S. Department of Housing and Urban Development**
**Phone: 202.402.4649**
**Cell: 202.821.8464**

HUD-PRWORA_000230

| | |
|---|---|
| **From**: | Parker, Tennille S [Tennille.S.Parker@hud.gov] |
| **Sent**: | 7/7/2025 6:19:06 PM |
| **To**: | Horn, Bryan W [Bryan.W.Horn@hud.gov] |
| **CC**: | Fernandez, Claudette [Claudette.Fernandez1@hud.gov] |
| **Subject**: | HUD Correspondence re: Executive Orders |
| **Attachments**: | 20205.05.31 1-25cv10442 City of Chelsea v. Turmp 010_Amended Complaint Ex L HUD Letter.pdf; 6-5-2025 HUD Response to COSCDA NCDA.pdf |

Hi,

Following up on our conversation this morning, here are the two items that I am aware have been shared by HUD publicly regarding Executive Orders. The first is a letter signed by Secretary Turner that appears on the HUD website but was not sent directly to any grantees. The second is the letter CPD sent to the community development industry groups. If there is other correspondence of this nature, it has not been issues by CPD and I am not sure who from HUD would have sent it.

**Tennille Smith Parker**
**Acting Deputy Assistant Secretary for Field Operations**
**Office of Community Planning and Development**
**U.S. Department of Housing and Urban Development**
**Phone: 202.402.4649**
**Cell: 202.821.8464**

HUD-PRWORA_000231

Message

| | |
|---|---|
| **From:** | McKenney, Caitlyn J [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=103e76aa68a4426ba54f0559b335b0ce-a9b74ec4-0a] |
| **Sent:** | 7/15/2025 9:56:28 PM |
| **To:** | Fernandez, Claudette [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=433442c4e01e4c8aa80431f60146680b-Fernandez,]; Horn, Bryan W [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=80bf0b06ce6c43a589879aeb22f789ba-e98a51fe-bf] |
| **Subject:** | For your awareness PRWORA |

Bryan and Claudette,

For your awareness, this notice from the AG went out on the 11th: AG Order Limiting Exceptions to PRWORA.

# Deliberative Process/Executive Privilege

Caitlyn

caitlyn.j.mckenney@hud.gov
(202)-316-8384

Deliberative Process/Executive Privilege

HUD-PRWORA_000232

To:    All Agency Employees and Contractors
       U.S. Department of Housing and Urban Development

From:  Associate General Counsel for Litigation
       Office of the General Counsel
       U.S. Department of Housing and Urban Development

Date:  October 20, 2025

Re:    Notice of Temporary Restraining Order in the case of: *Housing Authority of the County of San Deigo, et al. v. Turner, et al.,* 4:25-cv-08859 (N.D. Cal.)

---

## NOTICE OF TEMPORARY RESTRAINING ORDER

On October 18, 2025, the United States District Court for the Northern District of California in *Housing Authority of the County of San Diego, et al. v. Turner, et al.,* 4:25-cv-08859 (N.D. Cal.) (ECF No. 19), entered a temporary restraining order ("TRO") (note the TRO's caption states *"Housing Authority of the City and County of San Francisco, et al."*). A copy is attached for reference.

The TRO directs that by close of business on October 21, 2025, HUD "shall serve and file a status report verifying under penalty of perjury that (1) Plaintiffs are not subject to the HUD Grant Conditions; and (2) Defendants have complied with this order, including providing a copy of this order to all HUD personnel. Defendants shall also detail any additional steps they have taken to comply with this order." ECF No. 19, ¶ 5. Accordingly, this Notice is provided.

The eight Plaintiffs protected by the TRO are: the Housing Authority of the County of San Diego, Home Forward, the Housing Authority of the City of Los Angeles, the Los Angeles County Development Authority, the Housing Authority of the City of Salem, the Housing Authority of the City and County of San Francisco, the Housing Authority of Baltimore City, and the San Diego Housing Commission.

The TRO affects the following grant programs as to the named Plaintiffs only: Capital Fund Grants, Operating Subsidy Grants, Multifamily Housing Services Coordinator Grants, and Family Self-Sufficiency Grants for Fiscal Years 2024, 2025, and 2026.

The relevant terms at issue (the "HUD Grant Conditions") are:

1. The recipient "shall not use grant funds to promote 'gender ideology,'" as defined in E.O. 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."
2. The recipient must certify "that it does not operate any programs that violate any applicable Federal antidiscrimination laws" (which precludes diversity, equity, and inclusion ("DEI") programs) and that such compliance is "material to the U.S. Government's payment decisions" for purposes of the False Claims Act, ]" as required by

HUD-PRWORA_000233

E.O. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," and E.O. 14218, "Ending Taxpayer Subsidization of Open Borders."

3. Recipients must certify that grants are not used "in a manner that . . . facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation" as required by E.O. 14218, "Ending Taxpayer Subsidization of Open Borders" and E.O. 14287, "Protecting American Communities From Criminal Aliens."

4. Recipients must certify they administer the grants "in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 . . . (U.S.C. §§ 1601-1646) (PRWORA)" as required by E.O. 14218.

5. The recipient "does not use any Grant Funds to fund or promote elective abortions," as required by Executive Order No. 14182, "Enforcing the Hyde Amendment."

The TRO prohibits HUD—including its officers, agents, servants, employees, and attorneys, and "any person in active concert or participation" with HUD—from requiring Plaintiffs to agree to the HUD Grant Conditions or substantially similar conditions as a requirement for receiving funding related to Capital Fund Grants, Operating Subsidy Grants, Multifamily Housing Services Coordinator Grants, and Family Self-Sufficiency Program. More specifically:

1. HUD shall not impose or enforce the HUD Grant Conditions on Plaintiffs at any stage of the grant process, including new notices of funding availability or opportunity, grant applications, selection and funding allocation, grant agreements, or post-award submissions.

2. HUD shall not require Plaintiffs to make any certification or other representation related to compliance with such terms or conditions to apply for or receive HUD funds.

3. HUD shall not refuse to issue, process, or sign grant agreements based on Plaintiffs' participation in this lawsuit.

4. HUD shall immediately rescind and treat as null and void any actions taken to implement or enforce the HUD Grant Conditions, including requiring any certification or other representation related to compliance with the HUD Grant Conditions.

5. HUD may not retroactively apply the HUD Conditions to already awarded HUD funds during the effective period of this temporary restraining order.

6. HUD shall immediately take every step necessary to effectuate this Order, including clearing any administrative, operational, or technical hurdles to implementation.

The TRO remains in effect until November 14, 2025; unless, otherwise ordered by the Court. Please review the TRO.

If you have any questions about the scope or effect of the TRO, please contact HUD's Office of General Counsel. Thank you for your attention to this matter.

HUD-PRWORA_000234

To:     Agency Employees and Contractors
        U.S. Department of Housing and Urban Development

From:   Brian C. Kipnis, Rebecca S. Cohen, Sarah L. Bishop
        U.S. Attorney's Office for the Western District of Washington

Date:   August 14, 2025

Re:     Notice of Court Order, *King County v. Turner*, 2:25-cv-814-BJR (W.D. Wash.)

---

## NOTICE OF COURT ORDER

At the direction of the United States District Court for the Western District of Washington, you are hereby advised that a new preliminary injunction order has been entered in the case of *King County v. Turner*, 2:25-cv-814-BJR (W.D. Wash.), ECF No. 338 (Aug. 12, 2025). The Court has directed that notice of the order be provided to "all Defendants and their employees by the end of the second day after [its] issuance." A copy of the Court's order is enclosed for reference. You should review the injunction issued by the Court for its full terms. But to assist in your compliance, we provide a summary in this notice.

As relevant to you, this case challenges certain terms incorporated into U.S. Department of Housing and Urban Development ("HUD") grant agreements for Fiscal Years 2024 and 2025 awarded to the relevant plaintiffs (the "HUD Plaintiffs"). Lists of the relevant grant terms (the "Enjoined Terms") and HUD Plaintiffs can be found at the end of this notice.

Under the Court's order:

1.  HUD is enjoined from:

    a)  imposing or enforcing the Enjoined Terms at any stage of the grantmaking process, with respect to any HUD funds awarded to the HUD Plaintiffs;

    b)  as to the HUD Plaintiffs, rescinding, withholding, cancelling, or otherwise not processing any grant agreements, or pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning grant funds, based on the Enjoined Terms, including without limitation failing or refusing to process and otherwise implement grants signed with changes or other objections to the Enjoined Terms;

    c)  requiring the HUD Plaintiffs to make any "certification" or other representation related to compliance with the Enjoined Terms;

    d)  retroactively applying the Enjoined Terms to HUD Plaintiffs' grant agreements during the effective period of the Court's injunctions or TROs in this lawsuit— *i.e.*, from May 7, 2025, onwards; or

1

    e)  refusing to issue, process, or sign grant agreements based on HUD Plaintiffs' participation in this lawsuit.

2.  Further, HUD shall treat as null, void, and rescinded:

    a)  any actions already taken to implement or enforce the Enjoined Terms as to the HUD Plaintiffs, including any delays or withholding of funds based on the Enjoined Terms;

    b)  any of the Enjoined Terms included in any grant agreement executed by any HUD Plaintiff during the effective period of the Court's injunctions or TROs in this lawsuit, *i.e.*, from May 7, 2025, onwards.

3.  Lastly, HUD shall immediately take every step necessary to effectuate this order, including clearing any administrative, operational, or technical hurdles to implementation.

As the Court's order reflects, the injunction is temporary, as litigation in the case is ongoing. But the Court's order is in effect and must be complied with until further notice.

If you have any questions about the scope or effect of the Court's order, please contact HUD's Office of General Counsel. Thank you for your attention to this matter.

2

I.    **TERMS AND PLAINTIFFS RELATED TO CONTINUUM OF CARE ("COC") GRANTS**

A. **Relevant Plaintiffs:**

**Important:** the relevant plaintiffs include both the entities listed below *and* their continuum members or subrecipients.

Arizona:
Pima County
Tucson

California:
Alameda County
Oakland
Pasadena
Petaluma
San Francisco (City and County)
San Jose
San Mateo County
Santa Clara County
Santa Monica Housing Authority
Sonoma County

Maryland:
Baltimore

Massachusetts:
Boston
Cambridge

Minnesota:
Hennepin County
Ramsey County

New Mexico:
Albuquerque

New York:
New York City

Ohio:
Columbus

Oregon:
Multnomah County

Tennessee:
Nashville & Davidson County (Metropolitan Government of)

Washington:
King County & King County Regional Homelessness Authority
Pierce County
Snohomish County

Wisconsin:
Dane County
Milwaukee

3

HUD-PRWORA_000237

B. **Relevant Enjoined Terms:**

**Important:** the enjoined terms include both the terms listed below *and* any materially similar terms or conditions.

- The recipient or applicant shall not use grant funds to promote "gender ideology," as defined in Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

- The recipient or applicant agrees that its compliance in all respects with all applicable Federal antidiscrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

- The recipient or applicant certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964;

- The recipient or applicant shall not use any Grant Funds to fund or promote elective abortions, as required by Executive Order 14182, Enforcing the Hyde Amendment;

- The recipient or applicant must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) ("PRWORA") and any applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services [sic] may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws;

- No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation;

- Subject to the exceptions provided by PRWORA, the recipient or applicant must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States;

- The recipient or applicant agrees that use of Grant Funds and its operation of projects assisted with Grant Funds are governed by all Executive Orders.

4

## II.    TERMS AND PLAINTIFFS RELATED TO OTHER HUD GRANTS

### A.  Relevant Plaintiffs:

**Important:** the relevant plaintiffs include both the entities listed below *and* their continuum members or subrecipients.

Arizona:
Pima County
Tucson

California:
Alameda County
Culver City & Housing Authority
Los Angeles
Oakland
Pasadena
Petaluma
San Diego
San Francisco
San Jose
San Mateo County
Santa Clara
Santa Monica & Housing Authority
Santa Rosa
Sonoma County & Community Development
Commission
Watsonville

Illinois:
Chicago

Maryland:
Baltimore

Massachusetts:
Boston
Cambridge

Minnesota:
Hennepin County
Minneapolis
Ramsey County

New Mexico:
Albuquerque

New York:
New York City
Rochester

Ohio:
Columbus

Oregon:
Bend
Eugene
Multnomah County
Portland

Pennsylvania:
Pittsburgh

Tennessee:
Nashville

Washington:
Bellevue
Bellingham
Bremerton
King County & Regional Homelessness
Authority
Kitsap County
Pierce County
Snohomish County

Wisconsin:
Dane County
Milwaukee

5

HUD-PRWORA_000239

**B.  Relevant Enjoined Terms:**

**Important:** the enjoined terms include both the terms listed below *and* any materially similar terms or conditions.

- The recipient or applicant will not use Federal funding to promote diversity, equity, and inclusion ("DEI") mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws;
- – The recipient or applicant shall not use grant funds to promote "gender ideology," as defined in Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

- The recipient or applicant agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

- The recipient or applicant certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;

- The recipient or applicant shall not use any grant funds to fund or promote elective abortions, as required by Executive Order 14182, Enforcing the Hyde Amendment;

- The recipient or applicant must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) ("PRWORA") and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws;

- If applicable, no state or unit of general local government that receives or applies for funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation;

- Unless excepted by PRWORA, the recipient or applicant must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

- The recipient or applicant must comply with applicable existing and future Executive Orders, as advised by the Department, including but not limited to E.O. 14182, Enforcing the Hyde Amendment; Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity; Executive Order 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; and Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing.

6

HUD-PRWORA_000240

Search



(/)

## U.S. Department of Housing and Urban Development

News (/news)
/ HUD Secretary Scott Turner Doubles Down on Ensuring HUD Resources Do Not Benefit Illegal Aliens

# HUD Secretary Scott Turner Doubles Down on Ensuring HUD Resources Do Not Benefit Illegal Aliens

*Directive halts misuse of taxpayer funds meant for Americans*

**WASHINGTON** – U.S. Department of Housing and Urban Development (HUD) Secretary Scott Turner today issued a letter

**Website Feedback**

HUD-PRWORA_000241

to grantees and stakeholders underscoring that federal housing assistance will no longer be granted to illegal aliens or sanctuary cities. The directive reinforces HUD programs are strictly reserved for the American people, eliminating any ambiguity in policy. This action aligns directly with President Trump's Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders."

Read the full letter **here (/sites/dfiles/PA/documents/2025-04-04-HUD-Grantee-and-Stakeholder-Letter.pdf)** or below:

April 4, 2025

Dear HUD Grantees and Stakeholders,

President Trump issued Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders," on February 19, 2025, to promote the rule of law and prevent American taxpayer dollars from being spent on federal assistance for illegal aliens. As Secretary of the Department of Housing and Urban Development (HUD), it is my responsibility to effectively implement the President's executive order at the agency.

HUD's contributions to housing and community development across the country serve some of America's most vulnerable citizens on a path towards self-sufficiency. To that end, the President's Executive Order emphasizes that the federal resources distributed by HUD shall be primarily focused on benefiting American citizens and other qualified recipients, not illegal aliens.

**Website Feedback**

President Trump's Executive Order reinforces the 1996 Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA, P.L. 104-193), which unequivocally prohibits illegal aliens from receiving certain federal public benefits, including many forms of assistance provided under HUD programs. Further, Section 214 of the Housing and Community Development Act of 1980 (P.L. 96-399) prohibits HUD from making financial assistance available to persons other than United States citizens or certain categories of eligible noncitizens in the Section 8 Housing Assistance programs, Public Housing programs, Housing Development Grant programs, Section 202 direct loan program, Section 235 program, Section 236 Program, and Rent Supplement Program. This letter serves as a reminder to all HUD grantees of their legal obligations to comply with these laws and the President's Executive Order.

Recently, I directed HUD senior leadership to review our programs and institute mechanisms that can ensure that HUD programs are compliant with President Trump's Executive Order. For example, going forward, grant agreements will include language that will require compliance with Executive Order 14218, and the Department will take steps to ensure that Federal resources are not used to support "sanctuary" policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens.

I am excited to work with our grantees and **Website Feedback**er stakeholders to implement this Executive Order and enforce the law so that

HUD-PRWORA_000243

HUD programs are used for the benefit of the American people. Thank you for your cooperation, and I encourage you to contact our team at HUD with any ideas that may be able to help improve our implementation of President Trump's Executive Order.

Sincerely,
Scott Turner

*Follow @SecretaryTurner on **X** (**https://x.com/SecretaryTurner**), **FB** (**https://www.facebook.com/secretaryturner**), and **Instagram** (**https://www.instagram.com/secretaryturner**).*

***HUD.gov*** **(https://www.hud.gov/)**

---

Helping Americans (/helping-americans)

HUD Partners (/hud-partners)

Researchers (/researchers)

News (/news)

About (/aboutus)

Contact (/contactus)

**U.S. Department of Housing and Urban Development**

451 7th Street, S.W., Washington, DC 20410

T: (202) 402-3815

Find a HUD office near you (/contactus/local)



**Website Feedback**

HUD-PRWORA_000244



Office of Inspector General (https://www.hudoig.gov/)  |  No Fear Act (/no-fear-act)  |  FOIA (/foia)  |  Privacy (/aboutus/privacy-policy)  |  Accessibility (/accessibility)  |  Web Policies (/contactus/webmanagement)  |  Sitemap (/siteindex)

**Website Feedback**

HUD-PRWORA_000245

| Agency | Name Of Benefit Program |
|---|---|
| HUD | Emergency Solutions Grants (ESG) (including ESG-Rapid Unsheltered Survivor Housing ESG-RUSH) |
| HUD | Housing Opportunities for Persons with AIDS (HOPWA) |

HUD-PRWORA_000246

HUD                Community Development Block Grants (CDBG)

HUD                CDBG Disaster Recovery Assistance

HUD                Economic Development Initiative - Community
                   Project Funding (CPF)

HUD-PRWORA_000247

| HUD | CDBG Pathways to Removing Obstacles to Housing (PRO Housing) |
| HUD | Section 108 Loan Guarantee Program |
| HUD | Continuum of Care Program (CoC) (including CoC for Rural Areas) |
| HUD | Recovery Housing Program (RHP) |
| HUD | Youth Homelessness Demonstration Program |

HUD-PRWORA_000248

HUD                    HOME American Rescue Plan (HOME-ARP)

HUD

| Preservation and Reinvestment Initiative for Community Enhancement (PRICE) Manufactured Housing Community Grants and Manufacture Housing Tribal Community Grants |
| --- |
| Indian Community Development Block Grant (ICDBG) program |

With "HUD" label before the second row.

HUD-PRWORA_000249

| Brief Description of Program | Type of Specified Service |
|---|---|
| Provides grants by formula to States, metropolitan cities, urban counties, and U.S. territories for eligible activities, which generally include essential services related to emergency shelter and street outreach; rehabilitation and conversion of buildings to be used as emergency shelters; operation of emergency shelters; short-term and medium-term rental assistance for individuals and families who are homeless or at risk of homelessness; housing relocation and stabilization services for individuals and families who are homeless or at risk of homelessness; and Homeless Management Information System (HMIS) participation costs. | (g) Catch-all for "necessary" programs, services, or assistance |
| The HOPWA program provides funding to support long-term comprehensive strategies for meeting the housing needs of low-income persons living with HIV/AIDS and their families. Grants may be used to assist various forms of housing, including permanent, emergency, and transitional housing, shared housing arrangements, community residences, and single room occupancy dwellings (SROs). Appropriate supportive services must be provided in conjunction with any HOPWA-assisted housing. | (g) Catch-all for "necessary" programs, services, or assistance |

HUD-PRWORA_000250

Provides annual grants on a formula basis to entitlement communities to carry out a wide range of community development activities directed toward neighborhood revitalization, economic development, and improved community facilities and services. Entitlement communities, in consultation with local residents, develop their own programs and funding priorities. All CDBG activities must meet at least one of the following national objectives: benefit low- and moderate-income persons; aid in the prevention or elimination of slums and blight; or meet certain urgent community development needs. Eligible activities include: (1) acquisition of real property; (2) rehabilitation of residential and nonresidential properties; (3) provision of public facilities and improvements, such as water and sewer, streets, and neighborhood centers; (4) public services; (5) activities relating to energy conservation and renewable energy; (6) clearance; (7) homeownership assistance; and (8) assistance to nonprofits and for-profit businesses for special economic development activities.

(g) Catch-all for "necessary" programs, services, or assistance

Flexible grants to help the most impacted and distressed areas recover long-term after Presidentially declared disasters. This funding is not permanently authorized. In response to Presidentially declared disasters, Congress may appropriate funding for CDBG-DR grants that can be used in long-term recovery efforts to rebuild the affected areas and provide crucial seed money to stimulate recovery.

(g) Catch-all for "necessary" programs, services, or assistance

 Economic Development Initiative (EDI) Community Project Funding (CPF) grants are congressionally-directed spending grants that provide grantees wtih funds for a wide variety of projects such as housing, homelessness prevention, workforce training, public facilities, parks, resilience planning and other critical infrastructure and services.

(g) Catch-all for "necessary" programs, services, or assistance

HUD-PRWORA_000251

PRO Housing grants are provided on a competitive grants to State and local governments, metropolitan planning organizations, and multijurisdictional entities for the identification and removal of barriers to affordable housing production and preservation through activities intended to further develop, evaluate, and implement housing policy plans, improve housing strategies, and facilitate affordable housing production and preservation.

(g) Catch-all for "necessary" programs, services, or assistance

The Section 108 program is the loan guarantee component of the CDBG program. Under this program, HUD offers communities a source of financing for certain community development activities, such as housing rehabilitation, economic development, and large-scale physical development projects. Eligible activities include, but are not limited to: real property acquisition; rehabilitation of property/housing and other related activities, including relocation assistance, demolition, site preparation, and clearance.

(g) Catch-all for "necessary" programs, services, or assistance

Promotes community-wide commitment to the goal of ending homelessness; provides funding for efforts to quickly re-house homeless individuals and families while minimizing trauma and dislocation; promotes access to and effective utilization of mainstream programs; and optimizes self-sufficiency among individuals and families experiencing homelessness.

(g) Catch-all for "necessary" programs, services, or assistance

The Recovery Housing Program (RHP) provides funding for states and the District of Columbia using the CDBG model to provide stable, transitional housing for individuals in recovery from a substance use disorder. The funding covers a period of not more than two years or until the individual secures permanent housing, whichever is earlier.

(g) Catch-all for "necessary" programs, services, or assistance

The Youth Homelessness Demonstration program provides grants to States, counties, cities, townships, and nonprofits on a competitive basis to secure funds to serve youth, age 24 and under (including unaccompanied and pregnant or parenting youth), experiencing homelessness by developing and implementing a community plan to prevent and end youth homelessness.

(g) Catch-all for "necessary" programs, services, or assistance

HUD-PRWORA_000252

HOME-ARP provided funding under HUD's HOME Investment Partnerships Program, for tenant-based rental assistance, development and support of affordable housing, supportive services, and the acquisition and development of non-congregate shelter units. Eligible recipients include qualifying individuals or families who are: (1) homeless; (2) at risk of homelessness; (3) fleeing, or attempting to flee, domestic violence and other dangerous situations; (4) in other populations where providing assistance would prevent homelessness or would serve those with the greatest risk of housing instability; or (5) veterans and families that include a veteran that meets one of the qualifying criteria.

(g) Catch-all for "necessary" programs, services, or assistance

PRICE grants provide funding to to States, units of general local government, resident-owned manufactured housing communities, cooperatives, nonprofit entities including consortia of nonprofit entities, community development financial institutions, Indian tribes, or other entities approved by the Secretary to "preserve and revitalize manufactured housing and eligible manufactured housing communities."

(g) Catch-all for "necessary" programs, services, or assistance

Grants to help American Indians and Alaska Natives (AIAN) develop viable communities. The program provides funding for the following:

Housing: Housing rehabilitation, land acquisition to support new housing construction, and, under limited circumstances, new housing construction. Community Facilities: Infrastructure construction, e.g., roads, water and sewer facilities; and single or multipurpose community buildings. Economic Development: Wide variety of commercial, industrial, and agricultural projects. Imminent Threat grants are awarded on a first-come, first-served basis for qualifying disasters and other emergencies.

(g) Catch-all for "necessary" programs, services, or assistance

HUD-PRWORA_000253

Additional Notes
PRWORA may apply to a limited extent depending on the specific
activity that is funded and purusant to how DOJ interprets " federal public
benefit" and "means-tested." Examples of benefits that may be provided
with program funding in accordance with PRWORA's exemption of
certain benefits are street outreach,  emergency shelter and non-cash
services that are necessary to protect life or safety that are not tied to
income or resources.

PRWORA may apply to a limited extent depending on the specific
activity that is funded and purusant to how DOJ interprets " federal public
benefit" and "means-tested." Examples of benefits that may be provided
with program funding in accordance with PRWORA's exemption of
certain benefits are non-cash services that are necessary to protect life
or safety that are not tied to income or resources.

HUD-PRWORA_000254

PRWORA may apply to a limited extent depending on the specific activity that is funded and purusant to how DOJ interprets " federal public benefit" and "means-tested." Examples of benefits that may be provided with program funding in accordance with PRWORA's exemption of certain benefits are emergency shelter and non-cash services that are necessary to protect life or safety that are not tied to income or resources. Grantees exercise significant control over use of funding for local priorities.

PRWORA may apply to a limited extent depending on the specific activity that is funded and purusant to how DOJ interprets " federal public benefit" and "means-tested." Examples of benefits that may be provided with program funding in accordance with PRWORA's exemption of certain benefits are emergency shelter and non-cash services that are necessary to protect life or safety that are not tied to income or resources. Grantees exercise significant control over use of funding for local priorities.

These are congressionally-directed grants which provide funds for a wide array of activities. PRWORA may apply to a limited extent depending on the specific activity that is funded and purusant to how DOJ interprets " federal public benefit" and "means-tested."

HUD-PRWORA_000255

PRWORA may apply to a limited extent depending on the specific activity that is funded and purusant to how DOJ interprets " federal public benefit" and "means-tested."

Section 108 loans are provided by an external lender, the fee paid by the Borrower goes to ensure that the HUD subsidy for the loan is zero, and the appropiation only provides a loan guarantee authority as an exception to the Section 108 statute. While there may be some activities that may serve illegal aliens, such activities are not Federal public benefits  under the definition, these include using community centers that are open to members residing in the community, living in housing that is not restricted as a public benefit such as LIHTC units, or benefiting from parks and public infrastructure.

PRWORA may apply to a limited extent depending on the specific activity that is funded and purusant to how DOJ interprets " federal public benefit" and "means-tested." Examples of benefits that may be provided with program funding in accordance with PRWORA's exemption of certain benefits are street outreach,  emergency shelter and non-cash services that are necessary to protect life or safety that are not tied to income or resources.

PRWORA may apply to a limited extent depending on the specific activity that is funded and purusant to how DOJ interprets " federal public benefit" and "means-tested."

PRWORA may apply to a limited extent depending on the specific activity that is funded and purusant to how DOJ interprets " federal public benefit" and "means-tested." Examples of benefits that may be provided with program funding in accordance with PRWORA's exemption of certain benefits are street outreach,  emergency shelter and non-cash services that are necessary to protect life or safety that are not tied to income or resources.

HUD-PRWORA_000256

PRWORA may apply to a limited extent depending on the specific
activity that is funded and purusant to how DOJ interprets " federal public
benefit" and "means-tested."

PRWORA may apply to a limited extent depending on the specific
activity that is funded and purusant to how DOJ interprets " federal public
benefit" and "means-tested."

PRWORA may apply to a limited extent depending on the specific
activity that is funded and purusant to how DOJ interprets " federal public
benefit" and "means-tested."

HUD-PRWORA_000257

Specification Section 4

(a) Crisis counseling and intervention programs

(b) Short-term shelter or housing

(c) Adverse weather assistance

(d) Soup kitchens

(e) Medical and public health services

(f) Activities designed to protect life or safety

(g) Catch-all for "necessary" programs, services, or assistance

Agencies
HUD
Educ
USDA
HHS
Labor
Treasury
Commerce
Defense
Homeland Security
Interior
Labor
State
Transporation
Veterans Affairs
Energy
Other

HUD-PRWORA_000258

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOUSING AUTHORITY OF THE CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>SCOTT TURNER, et al.,<br><br>     Defendants. | Case No. 25-cv-08859-JST<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION**<br><br>Re: ECF No. 19 |

Shortly after taking office this January, President Trump began issuing Executive Orders ("EOs") in furtherance of his policy agenda, many of which purport to expressly undo or radically reverse the policy choices of the prior administration. Pursuant to another EO directing them to do so, federal agencies began requiring grant recipients to "comply" with these EOs as a condition of receiving funding. Federal agencies also imposed other conditions that do not reference the EOs specifically but address similar themes, including "diversity, equity, and inclusion (DEI)," "gender ideology," "illegal immigration," and "elective abortion." Beyond referencing the executive orders themselves, these new grant conditions were unaccompanied by justification or reasoning.

HUD is one such agency. Plaintiffs, city and county public housing agencies ("PHAs") from around the country, challenge HUD's imposition of certain new grant conditions on four categories of HUD grants. They argue that the challenged conditions violate constitutional Separation of Powers, the Due Process Clause, and the Spending Clause. They also argue that the conditions exceed statutory authority and are arbitrary and capricious under the APA. Concluding that Plaintiffs are likely to succeed on the merits and have satisfied the other conditions for emergency relief, the Court joins many of its peer district courts and grants a preliminary

HUD-PRWORA_000259

injunction against the challenged grant conditions.

I.    BACKGROUND

A.    Executive Orders Targeting Federal Grants

Soon after his second inauguration, President Trump issued a series of EOs directing executive agencies to impose new conditions on federal grants. These include Executive Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("Ending Radical and Wasteful Government DEI Programs and Preferencing"); Executive Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"); Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Defending Women from Gender Ideology Extremism"); Executive Order No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025) ("Enforcing the Hyde Amendment"); Executive Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025) ("Ending Taxpayer Subsidization of Open Borders"); Executive Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) ("Protecting American Communities From Criminal Aliens"); and Executive Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) ("Improving Oversight of Federal Grantmaking"). The EOs contain clauses requiring them to be "implemented consistent with applicable law." *See* EO No. 14151 § 4(b); EO No. 14173 § 8(b); EO No. 14168 § 8(b); EO No. 14182 § 4(b); EO No. 14218 § 3(b); EO No. 14287 § 6(b); EO No. 14332 § 7(b).

Executive Order No. 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," calls for agencies to "terminate, to the maximum extent allowed by law, all DEI, [diversity, equity, inclusion and accessibility, or 'DEIA'], and 'environmental justice' offices and positions . . . ; all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees." EO No. 14151 § 2, 90 Fed. Reg. 8339 ("DEI Executive Order"). EO No. 14151 also requires OPM, OMB, and DOJ to "coordinate the termination of all discriminatory programs, including illegal DEI and [DEIA] mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." *Id.*

In a similar vein, Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," "order[s] all executive departments and agencies . . . to

2

terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." EO No. 14173 § 2, 90 Fed. Reg. 8633 ("Discrimination Executive Order"). It further orders "all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.*

The DOJ has issued departmental memos relevant to understanding these EOs. In a memo dated February 5, 2025, Attorney General Pam Bondi stated that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities, characterizing such programs as discriminatory if they "divide individuals based on race or sex." ECF No. 9-11 at 124, 124 n.1.[1] A second memo from Attorney General Bondi to grant recipients, dated July 29, 2025, purports to clarify the application of federal antidiscrimination laws to entities receiving federal funds. ECF No. 9-11 at 127. It suggests that DEI training programs that include discussions of inherent bias, white privilege, or toxic masculinity violate federal law. *Id.* at 134. It also states that targeting "underserved geographic areas," for instance, "risks violating federal law." *Id.* The letter instructs recipients to "[m]onitor third parties that receive federal funds to ensure ongoing compliance, including reviewing program materials." *Id.* at 135.

Executive Order No. 14168, "Defending Women from Gender Ideology Extremism," calls on agencies to "remove" and "cease issuing" "all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology." EO No. 14168 § 3(e), 90 Fed. Reg. 8615 ("Gender Ideology Executive Order"). "Agency forms that require an individual's sex shall list male or female, and shall not request gender identity." *Id.* "Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* Agencies must also "enforce laws governing sex-based

---

[1] Plaintiffs' request for judicial notice, ECF No. 9-11, is granted. The Court finds that the noticed documents are "not subject to reasonable dispute," Fed. R. Evid. 201(b), and are properly subject to judicial notice because they are "matters of public record" and official acts of the executive branch. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010); *Cross Culture Christian Ctr. v. Newsom*, 445 F. Supp. 3d 758, 765 (E.D. Cal. 2020); *Pratap v. Wells Fargo Bank, N.A.*, 63 F. Supp. 3d 1101, 1104 n.1 (N.D. Cal. 2014); *Nat. Res. Def. Council v. McCarthy*, No. 16-CV-02184-JST, 2016 WL 6520170, at *2 (N.D. Cal. Nov. 3, 2016).

HUD-PRWORA_000261

United States District Court
Northern District of California

rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id*. § 3(b). The EO further requires each federal agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id*. § 3(g).

Executive Order No. 14182, "Enforcing the Hyde Amendment," states that "[i]t is the policy of the United States, consistent with the Hyde Amendment, to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." EO No. 14182 § 1, 90 Fed. Reg. 8751 ("Elective Abortion Executive Order").

Executive Order No. 14218, "Ending Taxpayer Subsidization of Open Borders," requires each agency to ensure "that no taxpayer-funded benefits go to unqualified aliens" and to "align" federally funded programs with applicable federal law including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). EO No. 14218 § 2, 90 Fed. Reg. 10581 ("Immigration Status Executive Order").

Executive Order No. 14287, "Protecting American Communities From Criminal Aliens," tasks agencies with "restor[ing] the enforcement of United States [immigration] law" and suspending or terminating federal funds used by "sanctuary" jurisdictions. 90 Fed. Reg. 18761 ("Sanctuary Jurisdictions Executive Order").

Executive Order No. 14332, "Improving Oversight of Federal Grantmaking," provides that discretionary federal funding awards "must, where applicable, demonstrably advance the President's policy priorities" and must not "fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation"; "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic"; "illegal immigration"; or "any other initiatives that compromise public safety or promote anti-American values." EO No. 14332 § 4, 90 Fed. Reg. 38929. Additionally, "[e]ach agency head shall, to the maximum extent permitted by law and consistent with relevant Executive Orders or other Presidential directives, take steps to revise the terms and conditions of existing discretionary grants to permit immediate termination

United States District Court
Northern District of California

4

Case 1:25-cv-04544-MSN-PAT     Document 36-12     Filed 11/04/25     Page 5 of 33
Case 4:25-cv-04859-PAT     Document 86-1     Filed 10/25/26     Page 5 of 124
PageID #: 3423

for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest." *Id*. § 6.

### B.     Challenged Grant Conditions

Pursuant to the EOs described above, HUD incorporated new conditions into its grant programs' terms and conditions. HUD imposed the first of these conditions in April 2025. It revised its General Administrative, National, and Departmental Policy Requirements and Terms for its Financial Assistance Programs ("HUD Policy Terms") to require recipients of HUD grants to comply with all existing and future EOs ("HUD EO Condition"). ECF No. 9-11 at 8, 16–17. The HUD Policy Terms also prohibited state and local government units receiving HUD funding from "us[ing] that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation" ("HUD Immigration Enforcement Condition"). *Id*. at 9. In addition to the changes to the HUD Policy Terms, Defendants imposed specific grant conditions on four categories of HUD grants. All four categories of grants are awarded according to a noncompetitive process that takes into account eligibility criteria and available Congressional appropriations. Moreover, three out of the four categories of grants are awarded according to formulas—mandated by Congress and specified by HUD—determining the grant amount to which each eligible PHA is entitled.

### 1.     Operating Subsidy Grant Conditions

The first category of grants subject to conditions challenged by Plaintiffs are Operating Fund grants, also known as Operating Subsidy grants, which fund public housing maintenance, support services for residents, and work programs. ECF No. 9-1 at 14; ECF No. 9-5 at 16; ECF No. 1 at 10; 42 U.S.C. § 1437g(e)(1). The Housing Act directs the HUD Secretary to establish a formula to determine grant amounts for each fiscal year from the Operating Fund. *Id*. § 1437g(e)(2). A PHA is eligible to receive Operating Fund grants in an amount equal to the difference between its "formula expense" (an estimate of a PHA's operating expense) and its "formula income" (an estimate of the PHA's non-operating subsidy revenue), subject to congressional appropriations. 24 C.F.R. § 990.110(a)(2)–(3), (b)(3).

On July 17, 2025, HUD issued Notice PIH 2025-22 entitled "Public Housing Operating

5

Subsidy Grant Eligibility Calculations and Processing for Calendar Year 2026." ECF No. 9-5 at 15. The notice requires public housing agencies to make several certifications in completing Form SF–424, the standard application form for federal assistance. *Id*. at 21–24.

First, each recipient must "certif[y] that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964" and that it "[i]s in compliance, in all respects, with all applicable Federal anti-discrimination laws is [sic] material to the U.S. Government's payment decisions for purposes of [the False Claims Act]" ("Operating Subsidy Discrimination Conditions"). ECF No. 9-5 at 56. Although these terms and conditions do not explicitly address DEI programs, the DEI-related EOs and the Bondi memos described above strongly suggest that these new "discrimination" conditions are intended to discourage recipients from adopting any policies or programs that the current Administration might label as "DEI."

Second, Plaintiffs must certify that they will not use grant funding "in a manner that . . . facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation" ("Operating Subsidy Immigration Enforcement Condition"). ECF No. 9-5 at 56.

Third, Plaintiffs must certify they will "administer [their] grant[s] in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under [T]itle IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996" ("PRWORA"). ECF No. 9-5 at 56. Further, the Plaintiffs must certify that they will comply with any future restrictions or requirements "that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws." *Id*. Additionally, Plaintiffs must certify that they will "use SAVE [the Systematic Alien Verification for Entitlements Program], or an equivalent verification system approved by the Federal Government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present." *Id*. Plaintiffs refer to these conditions together as the "Operating Subsidy Immigration Status Conditions." ECF

6

HUD-PRWORA_000264

Case 1:25-cv-03451-MSN-PAT    Document 86-12    Filed 11/25/26    Page 7 of 38
Case 4:25-cv-04509-MSN-PAT    Document 86-12    Filed 11/25/26    Page 41 of 124
PageID #: 3425

No. 9-1 at 15.

Fourth, recipients are required to agree not to "use grant funds to promote 'gender ideology,' as defined in [EO No.] 14168" (the "Operating Subsidy Gender Ideology Condition"). ECF No. 9-5 at 56.

Fifth, recipients must agree that they will "not use any grant funds to fund or promote elective abortions, as required by" EO No. 14182 (the "Operating Subsidy Abortion Condition"). *Id.*

Notice PIH 2025-22 warns that any Plaintiff "who knowingly submits a false claim or makes a false statement is subject to criminal and/or civil penalties, including confinement for up to 5 years, fines, and civil administrative penalties" under the False Claims Act ("FCA") and similar statutes, 18 U.S.C. §§ 287, 1001, 1010, 1012, 1014; 31 U.S.C. §§ 3729 & 3802. ECF No. 9-11 at 35.

### 2.    Capital Fund Grant Conditions

Plaintiffs also challenge conditions attached to Capital Fund Program ("CFP") grants, which fund "development, financing, and modernization of public housing facilities, services supporting the safety and security of residents, as well as services promoting the economic self-sufficiency of residents." ECF No. 1 at 9. The Housing Act directs the HUD Secretary to establish a formula to determine Capital Fund grant amounts for each fiscal year and enumerates nonexhaustive factors that may be taken into account. 42 U.S.C. § 1437g(d)(2). A PHA is eligible to receive a CFP grant in accordance with the Capital Fund formula, which measures the existing modernization needs and accrual needs of PHAs, subject to congressional appropriations. 24 C.F.R. § 905.400(a), (b).

On May 23, 2025, HUD published "Capital Fund Processing Guidance for FY 2025 Grant Awards," which requires public housing agencies to sign an Annual Contributions Contract ("ACC") Amendment to accept their Capital Fund award and receive the funding. ECF No. 9-11 at 65. The amendment states that FY 2025 Capital Fund Grant Awards are "subject to Executive Order 14218, Ending Taxpayer Subsidization of Open Borders and applicable law" and that "HUD will take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State

HUD-PRWORA_000265

and local jurisdictions that actively prevent federal authorities from deporting illegal aliens" ("CFP Immigration Enforcement Condition"). *Id*. at 68.

### 3. Multifamily Housing Service Coordinator Program Grant Conditions

Multifamily Housing Program ("MFSC") grants fund social service staff for elderly and disabled individuals. The authorizing statute provides for HUD to determine the form and manner of applications for MFSC grants. 42 U.S.C. § 13632(b). However, the Act specifies the activities eligible for funding under the MFSC program and the eligibility requirements participants must meet to receive funds. *Id*. § 13682(a). In early 2025, HUD published Annual Renewal Guidance, ECF No. 9-11 at 74, and Terms and Conditions, ECF No. 9-11 at 96, for Service Coordinator in MFSC grants for calendar year 2025. These documents, which describe the criteria for the noncompetitive grant awards, include several conditions challenged by Plaintiffs.

First is the requirement that grantees "carry out grant activities in compliance with" "any applicable" EOs, including those outlined by the Court above.[2] ECF No. 9-11 at 97; *see also* ECF No. 9-11 at 107 (requiring the grantee to "certif[y] that it shall comply" with the same EOs, among other EOs and statutes) (MFSC EO Condition). It also requires grantees to ensure "compliance [with the EOs] by any other entity(ies) to which it makes grant funds available." ECF No. 9-11 at 97. The Guidance warns that "[f]ailure to comply will be a basis for denial of any additional grant funds." *Id*.

Second, the Annual Renewal Guidance requires grantees to certify that they do not "operate any programs promoting Diversity, Equity, and Inclusion (DEI) that violate any applicable Federal anti-discrimination laws" and to agree that "compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions" ("MFSC Discrimination Conditions"). ECF No. 9-11 at 97.

Third, the Annual Renewal Guidance states that "grantees have an obligation to ensure that grant monies and benefits do not go to unqualified aliens" (the "MFSC Immigration Status

---

[2] All of the EOs described by the Court above are enumerated explicitly here with the exceptions of EO No. 14287 ("Protecting American Communities From Criminal Aliens") and EO No. 14332 ("Improving Oversight of Federal Grantmaking"). ECF No. 9-11 at 97.

8

HUD-PRWORA_000266

Condition"). *Id*.

### 4. Family Self-Sufficiency Program Conditions

The Family Self-Sufficiency Program ("FSSP") funds services to enable low-income families to achieve economic independence. 42 U.S.C. § 1437u. The Housing Act provides for the HUD Secretary to establish a formula to determine FSSP funding amounts and sets forth eligibility criteria that HUD must consider to determine awards. *Id*. § 1437u(i)(1)–(2). The statute prioritizes renewals over new funding recipients. *Id*. § 1437u(i)(3)(A). On September 26, 2025, HUD issued Notice PIH 2025-24, concerning the FY 2025 FSSP annual funding notification and application process. ECF No. 9-11 at 111. The Notice states that grantees must ensure grant-funded activities "comply with applicable existing and future executive orders and other Presidential Actions," listing the same EOs discussed above (the "FSSP EO Condition"). *Id*. at 121.

### C. False Claims Act

On May 19, 2025, Deputy Attorney General Todd Blanche issued a memo indicating that the DOJ will invoke the False Claims Act ("FCA") to pursue funding recipients engaged in what it characterizes as "civil rights fraud"—including DEI initiatives and "allow[ing] men to intrude into women's bathrooms." ECF No. 9-11 at 137–38. The memo announces a DOJ initiative to "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds," and also states that DOJ "strongly encourages" private FCA lawsuits against funding recipients. *Id*. at 138.

### D. Plaintiffs' Receipt of Federal Grants

Plaintiffs are public housing agencies ("PHAs") and recipients of the grant programs listed above. ECF No. 1 at 4–7. They assert that the grant conditions identified above require them to "either risk legal liability for accepting the vague and unlawful requirements or forfeit" millions of dollars in "crucial funds which sustain affordable and dignified housing for low-income families, individuals with disabilities, and the elderly." ECF No. 9-1 at 17. They argue that losing the funds would cause "immediate, irreparable, and far-reaching" harm to their ability to provide housing but that agreeing to the unclear conditions "would leave them exposed to arbitrary

9

Case 1:25-cv-03048-SM-JSA   Document 336-1   Filed 11/01/25   Page 10 of 43
PageID #: 3428
Case 4:25-cv-08084-JST   Document 336-1   Filed 10/30/25   Page 10 of 124

enforcement, unpredictable penalties, and legal liability." *Id*. Plaintiffs' uses of grant funds include the following.

Plaintiffs use Operating Subsidy funds for essential repairs and maintenance of housing units and to pay case management, maintenance, and administrative staff. ECF No. 9-1 at 18. Plaintiffs Housing Authority of the County of San Diego ("HACSD"), Housing Authority of Baltimore City ("HABC"), Housing Authority of the City and County of San Francisco ("SFHA"), Home Forward, formerly the Housing Authority of Portland, and Los Angeles County Development Authority ("LACDA") receive annual operating funds ranging from hundreds of thousands of dollars to almost one hundred million dollars. *Id*. Had the Court not issued the TRO in this case, these Plaintiffs would have been required to certify to the challenged Operating Funds conditions on October 21, 2025 to apply for 2026 Operating Fund grants. ECF No. 9-1 at 18.

Plaintiffs HACSD, SFHA, Home Forward, HABC, Housing Authority of the City of Los Angeles ("HACLA"), LACDA were awarded substantial Capital Funds grants for 2025 and were required to certify to a challenged condition to access those funds. Plaintiffs use Capital Funds to rehabilitate and modernize their public housing units, including upgrading elevators, appliances, flooring, plumbing, and roofing. ECF No. 9-1 at 18. They use Capital Fund Emergency Safety and Security funds for projects such as upgrading and replacing fire alarms at public housing units. *Id*. Absent an injunction, Plaintiffs will be unable to access Capital Funds without first submitting the ACC Amendment containing the challenged Capital Fund condition. *Id*.

Plaintiffs Home Forward, Housing Authority of the City of Salem, and HACLA all receive Multifamily Housing Services Coordinators grants. *Id*. On September 19, 2025, Home Forward received a Notice of Award for FY2025, authorizing the remaining $448,831 (out of an original award of $2,814,587) for services rendered in 2025, but only if it certified the new unlawful terms and conditions within 14 days. *Id*. at 19. As of October 2025, Home Forward has expended most of this amount but has yet to be reimbursed. *Id*.

Plaintiffs use FSSP funds to provide case management, training, and referrals to supportive social services to help families achieve self-sufficiency. Home Forward, LACDA, HABC, HACLA, and SFHA each received hundreds of thousands of dollars of FSSP funding in 2025. *Id*.

10

The application deadline for FY2025 funding passed on October 29, 2025. *Id.* As with the Operating Subsidy funds deadline, Defendants were temporarily restrained from imposing the challenged conditions at that time.

As the discussion above illustrates, the circumstances of each grant award vary. In some cases, Plaintiffs have already been awarded the funds and must certify to challenged conditions to receive them (or a balance thereof). In other cases, Plaintiffs challenge the application of conditions to 2026 grants, which have not yet been awarded but which Plaintiffs expect to receive based on past allocations and the noncompetitive statutory and regulatory framework governing future allocations.

### E. Procedural History

Plaintiff PHAs bring this case against the U.S. Department of Housing and Urban Development ("HUD") and HUD Secretary Scott Turner challenging the grant conditions outlined above. ECF No. 1 at 7, 13. Plaintiffs filed their complaint on October 15, 2025. ECF No. 1. They filed a motion for a temporary restraining order on October 16, 2025, requesting relief by 5:00 p.m. Eastern Daylight Time on October 21, 2025—the first deadline by which HUD required them to certify to challenged grant conditions. ECF No. 9 at 12. The case was assigned to the undersigned on the morning of Friday, October 17, 2025. ECF No. 12. The Court held a hearing on the afternoon of October 17, 2025 to discuss the parties' positions and establish a briefing and hearing timeline. At that hearing, the government stated that it opposed the motion for the same reasons it opposed relief in the recent case of *City of Fresno et al. v. Turner et al.* ("*Fresno*"), No. 3:25-cv-07070-RS, 2025 WL 2721390 (N.D. Cal. 2025). The government also stated that rather than file an opposition to Plaintiffs' motion, it would request the Court consider the government's arguments in opposition to the motion for a preliminary injunction in *Fresno* as having also been made in the present case, and rule on that basis. The Plaintiffs' motion for TRO demonstrated that they would suffer irreparable harm unless the Court issued a TRO, and the government was unable to identify any prejudice from an order maintaining the status quo while the Court fully considered the parties' arguments. The Court therefore granted Plaintiffs' application for a TRO.

The TRO enjoined HUD from imposing the challenged conditions on Plaintiffs at any

HUD-PRWORA_000269

stage of the grantmaking process. ECF NO. 19 at 4. The Court also ordered Defendants to "show cause why a preliminary injunction should not issue enjoining Defendants during the pendency of this action from imposing or enforcing the HUD Grant Conditions or any materially similar terms or conditions on any federal funds received by or awarded, directly or indirectly, to Plaintiffs." *Id.* at 4–5. After holding a further hearing on November 12, 2025, the Court now grants a preliminary injunction extending the terms of the Temporary Restraining Order during the pendency of these proceedings.

## II. JURISDICTION

### A. Standing

To establish standing, a plaintiff must show it has suffered or will suffer an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). Courts have repeatedly recognized that the imposition of unlawful conditions on federal grants satisfies Article III standing. *See City & Cnty. of San Francisco v. Trump* ("*San Francisco*"), 897 F.3d 1225, 1235–36 (9th Cir. 2018) (finding that plaintiff counties had standing to challenge imposition of grant conditions which conflicted with their immigration "sanctuary" policies); *Arizona v. Yellen*, 34 F.4th 841, 849–51 (9th Cir. 2022) (finding that the plaintiff state had standing to challenge the imposition of conditions on federal COVID recovery funds, even though those conditions had not yet been enforced against the state).

Here, Plaintiffs have been or expect to be awarded millions of dollars in federal grant funding to provide public housing and related services. Plaintiffs must now either accept the allegedly unlawful and ambiguous conditions and the legal liability attached to them or suffer the loss of funding that, in many cases, has been budgeted for or already spent. This imminent harm is redressable by injunctive relief prohibiting Defendants from enforcing the challenged grant conditions against Plaintiffs. Plaintiffs have established Article III standing.

### B. Statutory Jurisdiction and the Tucker Act

Plaintiffs' claims "aris[e] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, are subject to the APA's waiver of sovereign immunity, 5 U.S.C. § 702, and

HUD-PRWORA_000270

United States District Court
Northern District of California

therefore are within this Court's jurisdiction.

Defendants argue that this Court lacks jurisdiction because Plaintiffs' claims fall within the Tucker Act. The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). In other words, claims seeking money damages under a "contract or contract-like agreement with the federal government can be heard only in the Court of Federal Claims." *Fresno*, 2025 WL 2721390, at *5. Defendants characterize Plaintiffs as "seek[ing] funding that [they] believe[] the federal government is obligated to pay under" the contracts with HUD setting the grant terms. *Fresno*, ECF No. 40 at 19.

That mischaracterizes Plaintiffs' complaint. Plaintiffs seek injunctive relief, not money damages. To determine whether an APA action for injunctive relief is actually a "'disguised' breach-of-contract claim" and thus subject to the Tucker Act, courts consider "(1) 'the source of the rights upon which the plaintiff bases its claims' and (2) 'the type of relief sought (or appropriate).'" *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). "If rights and remedies are statutorily or constitutionally based, then districts courts have jurisdiction; if rights and remedies are contractually based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id*. "[A] district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Dep't of Ed. v. California*, 604 U.S. 650, 651 (2025) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)); *see also Kidwell v. Dep't of Army, Bd. for Correction of Military Records*, 56 F.3d 279, 284 (D.C. Cir. 1995).

Here, Plaintiffs allege not that the government has breached any grant contracts, but that the conditions the government seeks to impose on Plaintiffs through those grant contracts violate the Constitution and the APA. Plaintiffs do not seek damages for the breach of contractual rights, but rather "seek to vindicate their rights to participate in congressionally authorized grant

13

HUD-PRWORA_000271

programs pursuant to the eligibility criteria Congress authorized, free from unlawful conditions that violate the separation of powers, the Fifth Amendment, the Spending Clause, and the APA." ECF No. 9-1 at 21. They challenge HUD's "policies and guidance" imposing the grant conditions "on statutory, namely APA, and constitutional grounds, and they seek injunctive relief barring Defendants' imposition of the conditions and setting aside related internal agency directives." *Fresno*, 2025 WL 2721390, at *6.

Defendants make much of the fact that Plaintiffs seek to block them from "pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning" grant funds because of the challenged conditions. *Fresno*, ECF No. 40 at 21. Critically, however, the relief Plaintiffs seek is limited to those challenged conditions. Plaintiffs do not seek to require the agency to pay funds under the terms of the grant agreement, but only ask the Court to enjoin the agency from applying the challenged conditions. ECF No. 9-1 at 36. The Court can do so, and therefore prevent Defendants from refusing to pay funds on the basis of the conditions, without having any other effect on the HUD's funding decisions and without adjudicating any rights under the grant contracts. The "source of the rights" is the statutory and constitutional prohibitions on the challenged conditions, and the "type of relief sought" is an injunction against the application of those challenged conditions. *United Aeronautical Corp*, 80 F.4th at 1026.

In the cases that Defendants marshal to argue that the Tucker Act governs Plaintiffs' claims, the plaintiffs alleged that the government had violated the terms of the grant contract and sought performance of that contract. *See California*, 604 U.S. at 651 (challenging termination of education grants as arbitrary); *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1362–63 (Fed. Cir. 2021) (challenging HUD's reduction of operating subsidy grants as violating the terms of the Annual Contributions Contracts governing the grants).

On the record presented here, involving constitutional and APA claims seeking an injunction against the imposition of allegedly unlawful grant conditions, courts have found with near or total uniformity that the district courts have jurisdiction over claims such as these. *See, e.g., San Francisco Unified Sch. Dist. v. AmeriCorps* ("*SFUSD I*"), 784 F. Supp. 3d 1280, 1291–97 (N.D. Cal. 2025); *Martin Luther King, Jr. Cnty. v. Turner* ("*King Cnty.*"), 785 F. Supp. 3d 863,

14

HUD-PRWORA_000272

877–82 (W.D. Wash. 2025); *Fresno*, 2025 WL 2721390, at \*5–6; *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1201 n.12 (N.D. Cal. 2025); *Illinois v. Federal Emergency Mgmt. Agency*, --- F. Supp. 3d ----, 2025 WL 2716277, at \*9 (D.R.I. Sept. 24, 2025); *President and Fellows of Harvard College v. U.S. Dep't of Health & Human Servs.*, --- F. Supp. 3d ----, 2025 WL 2528380, at \*10–14 (D. Mass. Sept. 3, 2025); *see also Thakur v. Trump*, 148 F.4th 1096, 1103–04 (9th Cir. 2025).

The Supreme Court's recent order in *National Institutes of Health v. American Public Health Association*, cited by both sets of parties, warrants discussion. In that case, the district court had vacated NIH's decision to terminate certain research-related grants. The Supreme Court partially stayed the district court's vacatur on the grounds that the district court lacked jurisdiction "to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." 145 S. Ct. 2658 (2025). Writing separately, Justice Barrett concurred in the Court's conclusion that the district court lacked jurisdiction to hear challenges to the grant *terminations*. *Id*. at 2661 (Barrett, J., concurring in partial grant of application for stay). However, she also explained that the district court retained jurisdiction over the claims challenging—and seeking to vacate—the guidance documents that imposed the funding conditions. *Id*. In Justice Barrett's view, "[t]hat the agency guidance discusses internal policies *related to* grants does not transform a challenge to that guidance into a claim *'founded . . . upon'* contract that only the [Court of Federal Claims] can hear." *Id*. (quoting 28 U.S.C. § 1491(a)(1)) (emphasis added). Contrary to Defendants' assertion, *Fresno*, ECF No. 40 at 22, the "vacatur of internal agency guidance" is exactly what Plaintiffs seek. *Id*. The majority opinion therefore does not contradict the Court's conclusion here, and Justice Barrett's concurrence supports it.

The Tucker Act does not bar this Court from hearing Plaintiffs' claims.

## III.  LEGAL STANDARD

"To obtain a preliminary injunction, a plaintiff must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest." *Geo*

HUD-PRWORA_000273

*Group, Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where "the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023).

## IV.   DISCUSSION

### A.   Likelihood of Success on the Merits

#### 1.   Separation of Powers

The Court agrees with Plaintiffs that HUD likely violated Separation of Powers doctrine by imposing grant conditions that exceed the authority delegated by Congress. *See* ECF No. 9-1 at 23–24, 30–31.

"Congress's power to spend is directly linked to its power to legislate" and the spending power contemplates the imposition of conditions to further Congressional policy objectives. *San Francisco*, 897 F.3d at 1231. That power is exclusive to Congress. Our constitutional system does not authorize the President to enact legislation, cancel Congressional appropriations, refuse to spend appropriated funds, or otherwise "decline to follow a statutory mandate or prohibition simply because of policy objections." *Id*. at 1232. "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990)).

More generally, "[t]he President's authority to act 'must stem either from an act of Congress or from the Constitution itself.'" *San Francisco*, 897 F.3d at 1233 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). "[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *Id*. (quoting *Youngstown*, 343 U.S. at 637).

Analyzing these principles, courts invalidate grant conditions that exceed Congress's delegation of authority to the executive branch. *See San Francisco*, 897 F.3d at 1234–35

United States District Court
Northern District of California

16

HUD-PRWORA_000274

(invalidating an executive order tying funding to 8 U.S.C. § 1373, which prohibits government entities from themselves prohibiting the sharing of noncitizens' immigration status information, because Congress appropriated the funds without tying them to Section 1373); *City of Los Angeles v. Barr*, 941 F.3d 931, 935, 945 (9th Cir. 2019) (invalidating as "ultra vires" conditions imposed on a grant program for which Congress specified eligibility criteria and allocation methodology).

Defendants argue that the Supreme Court's decision in *Dalton v. Specter* forecloses Plaintiffs' separation of power claims by "reject[ing] the notion that 'every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the constitution.'" *Fresno*, ECF No. 40 at 26 (quoting 511 U.S. 462, 472 (1994)). But as *San Francisco* and *City of Los Angeles* demonstrate, the Ninth Circuit interprets *Dalton* to hold only that "'an action taken by the President in excess of his statutory authority [does not] *necessarily* violate[ ] the Constitution.'" *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1111 (2024) (quoting *Dalton*, 511 U.S. at 473) (emphasis added). "[S]pecific allegations regarding separation of powers may suffice." *Id.*; *see also Sierra Club v. Trump*, 963 F.3d 874, 889–90 (9th Cir. 2020), *vacated and remanded on other grounds sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (holding that claims alleging the President violated the Constitution by exceeding statutory authority are justiciable constitutional claims). Indeed, "[c]ontemporary Ninth Circuit jurisprudence weighs in favor of justiciability by taking an expansive view of the constitutional category of claims highlighted in *Dalton*." *Murphy Co.*, 65 F.4th at 1130.

Congress has enumerated various certifications and requirements that public housing agencies must adhere to as a condition of receiving funds, and has clearly laid out the permissible uses and purposes of each program. *See* 42 U.S.C. § 1437g(e) (establishing the Operating Fund for "operation and management of public housing" including "anticrime and antidrug activities," "systems to ensure efficient management and operation of public housing units," insurance costs, and energy costs); *id*. § 1437g(d) (establishing the Capital Fund for "capital and management activities" including redesign, construction, and reconfiguration of sites and buildings); *id*. § 8011(d)(4) (providing funding under the Multifamily Services Coordinator program for personnel to "assess the service needs of eligible residents," "mobiliz[e] public and private

HUD-PRWORA_000275

United States District Court
Northern District of California

Case 1:25-cv-01644-SM-JS Document 36-12 Filed 11/04/25 Page 18 of 53
Case 4:25-cv-04078-SM-JST Document 36-12 Filed 11/04/25 Page 18 of 124
PageID #: 3436

resources" to fund services, and "monitor[] and evaluat[e] the impact and effectiveness" of services); *id*. § 1437u (g), (h) (establishing the FSS program to "enable eligible families to achieve economic independence and self-sufficiency"). None of these statutes authorizes HUD to condition PIH grant funding on eliminating of all forms of DEI, facilitating enforcement of federal immigration laws, verifying of immigration status, or prohibiting "promot[ion]" of "gender ideology" or "elective abortion."

The HUD, MFSC, and FSSP EO Conditions and the Operating Subsidy and the MFSC Discrimination Conditions attempt to prohibit the use of funds for "DEI" or "equity" even though Congress has never enacted legislation barring grantees from supporting such initiatives. In fact, in some cases Congress *requires* consideration of diversity when allocating HUD funds. For instance, one of the purposes of the MFSC program is to fund employment of service coordinators in insured and assisted multifamily housing designed for the elderly and persons with disabilities. 42 U.S.C. § 8011(a). Further, HUD requires PHAs to certify they "will affirmatively further fair housing." 42 U.S.C. § 1437c-1(d)(16). The distribution of services to members of protected classes—residents with disabilities with disabilities and the elderly—as well as "affirmative[ly]" furthering "fair" housing are both potentially prohibited by the Administration's DEI orders, conditions, and guidance.

Similarly, the HUD, Operating Subsidy, and CFP Immigration Enforcement Conditions purport to require cooperation with federal immigration enforcement activities and prohibit policies that "facilitate" or "promote" "illegal immigration," even though Congress has repeatedly declined to enact legislation cutting off federal funds for so-called "sanctuary jurisdictions." *See San Francisco*, 897 F.3d at 1231 (holding that Executive Branch may not withhold federal grants from sanctuary cities without congressional authorization).

Additionally, the Operating Subsidy Immigration Status Conditions, the MFSC Immigration Status Condition, and the EO Conditions conflict with section 214 of the Housing and Community Development Act of 1980—which specifically provides public housing eligibility for mixed-status households, *see* 42 U.S.C. § 1436a(b)(2). These conditions also exceed the authority created by PRWORA in requiring use of the SAVE verification system, 42 U.S.C. § 1320b-7, because PRWORA explicitly does not require states to have an immigration status

HUD-PRWORA_000276

verification system until twenty-four months after the Attorney General promulgates final regulations and the AG has not yet promulgated regulations requiring the use of SAVE. 8 U.S.C. § 1642(b). Instead, interim guidance from 1997 remains in place. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998).

The Gender Ideology Condition attempts to bind recipients to the policy dictates of EO 14168, yet Congress has never authorized the Executive to use Title IX or Title VI as vehicles for prohibiting "gender ideology." In fact, courts have recognized that transgender individuals are a protected category under provisions of the Civil Rights Act. *See, e.g., Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 683 (2020); *Roe v. Critchfield*, 137 F.4th 912, 928 (9th Cir. 2025); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023). The Gender Ideology Condition likely facially discriminates based on transgender status, violating the Separation of Powers by contravening federal antidiscrimination law. *See San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1232 (N.D. Cal. 2025).

The same is true of the Abortion Condition, which purports to "enforce" the Hyde Amendment. The Abortion Condition prohibits grantees from using federal grants to "fund or promote elective abortions" in all contexts, extending the restriction far beyond the prohibitions of the Hyde Amendment, which says nothing about the "promotion" of abortion and includes exceptions in cases of rape, incest, or where the life of the mother is at risk. *See* 42 U.S.C. § 300a–6 (and related appropriations provisions); Pub. L. No. 117-103, 136 Stat. 49. These conditions impose broader restrictions on recipients than those required or authorized by existing law. *See Martin Luther King, Jr. Cnty. v. Turner*, --- F. Supp. 3d ----, 2025 WL 2322763 at *13 n.9 (W.D. Wash. Aug. 12, 2025).

Defendants attempt to characterize the grant conditions as permissible exercises of the power delegated by Congress. *Fresno*, ECF No. 40 at 32. But Defendants must identify specific legislation authorizing the challenged conditions or conferring on the executive branch the power to impose them, which they have failed to do. Defendants point to two statutory provisions

HUD-PRWORA_000277

United States District Court
Northern District of California

United States District Court
Northern District of California

governing HUD grants. *Id.* The first provides that "[a]ny Community Development Block [("CDBG")] grant . . . shall be made only if the grantee certifies to the satisfaction of the Secretary that . . . the grantee will comply with the other provisions of this chapter and with other applicable laws." 42 U.S.C. § 5304(b)(6). CBDG grants are not at issue here. Moreover, while this provision requires the Secretary to satisfy himself that the grantee complies with applicable laws, it says nothing about the Secretary's authority to impose additional conditions. *Id.* The second provision identified by Defendants prohibits HUD from providing Continuum of Care ("CoC") program grants unless the applicant agrees "to comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner." 42 U.S.C. § 11386(b)(8). CoC grants are also not at issue here. And regardless, this language too appears to be cabined to the enumerated goals and methods of the statute, suggesting that the Secretary may establish conditions to "carry out" the statute "in an effective and efficient manner." *Id.*

Finally, Defendants repeatedly argue that the challenged conditions are generally permissible because they only prohibit activities that violate preexisting federal laws.[3] *Fresno*, ECF No. 40 at 34. The Court is not persuaded by this argument. All federal grant recipients were already prohibited from violating applicable federal laws by operation of those laws themselves. Moreover, the executive orders repeatedly cast themselves as departing drastically from the practices of prior administrations. *See, e.g.*, 90 Fed. Reg. 8339 ("The Biden Administration forced illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government," causing "immense public waste and shameful discrimination. That ends today."); 90 Fed. Reg. 8615 ("The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women."); 90 Fed Reg. 10581 ("Over the last 4 years, in particular, the prior

---

[3] Defendants also suggest that the Grant Conditions are permissible because they implement preexisting regulations, executive orders, or Presidential directives. *Fresno*, ECF No. 40 at 32. This argument is circular. A grant condition cannot be within statutory authority because it complies with executive edicts; one must then determine whether those executive edicts are themselves within the scope of the statutory grant of power.

20

HUD-PRWORA_000278

administration repeatedly undercut the goals of [PRWORA], resulting in the improper expenditure of significant taxpayer resources."). Given these self-professedly radical departures from a longstanding status quo, the Court cannot credit Defendants' position that the executive orders and other challenged grant conditions do no more than reiterate the importance of complying with the law.

Defendants insist that the challenged EO Conditions are saved by provisions requiring them to be implemented "consistent with applicable law." *Fresno*, ECF No. 40 at 34. But "savings clauses such as . . . 'to the maximum extent permitted by law' do not magically ensure that the conditions incorporating that language only operate in so far as they are within Congress's grant of authority." *Fresno*, 2025 WL 2721390, at *10. Rather, "[s]avings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the [lawfulness] of a measure, would override clear and specific language." *San Francisco*, 897 F.3d at 1239. For the reasons stated above, the Court concludes that the executive orders exceed statutory authority and conflict with preexisting statutory obligations, notwithstanding their savings clauses.

The challenged conditions far exceed the authority delegated to HUD by Congress and contradict a variety of federal laws in meaningful and consequential ways. Plaintiffs are likely to succeed on the merits of their claim that the challenged grant conditions violate the Separation of Powers.

### 2. Due Process Clause Vagueness

Plaintiffs next argue that the challenged grant conditions are unconstitutionally vague. A requirement imposed by the government violates the Due Process Clause for impermissible vagueness if it fails to either (1) give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" or (2) "provide explicit standards for those who apply" the requirement, thereby encouraging "arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972). "[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

The Court agrees that the challenged grant conditions are unconstitutionally vague in

21

HUD-PRWORA_000279

numerous respects. With respect to the EO Conditions, a central issue is the mismatch between the identity of Plaintiffs and the nature of the executive orders. Plaintiffs are local government agencies that provide public housing to vulnerable individuals, while the executive orders regulate the conduct of federal agencies and require those agencies to advance ill-defined policy objectives. Yet every HUD grant recipient must "comply" with any applicable EOs. *See* ECF No. 9-11 at 16–17 (all HUD grants); ECF No. 9-11 at 97, 107 (MHSC grants); ECF No. 9-11 at 111 (FSSP grants); *see also* ECF No. 9-11 at 65 (making Capital Fund grants "subject to" EO No. 14218). Worse, recipients of the MFSC funds must ensure that "any other entity to which it makes grant funds available" complies with the EOs. ECF No. 9-11 at 97. These EOs set requirements and policy priorities for federal agencies and do not provide a clear action-guiding directive for grant recipients. As Plaintiffs argue, "[a] recipient is left to guess whether, and how, a particular EO applies to its conduct and risks loss of critical federal funding and FCA liability if it guesses incorrectly." ECF No. 9-1 at 25. While the HUD Policy Terms use the word "comply" many times, the other instances pertain to rules clearly governing the conduct of PHAs. *See* ECF No. 9-11 at 8 ("Recipients must comply with all applicable fair housing and civil rights requirements . . . ."); *id.* at 12 ("Recipients must comply with the drug-free workplace laws . . . ."); *id.* ("All recipients must comply with the award terms . . . .").

Moreover, many of the challenged grant conditions and underlying EOs prohibit grantees from "promoting" "DEI," "illegal immigration," "gender ideology," or "elective abortions," or some combination of the above. *See* ECF No. 9-11 at 9 (HUD Policy Terms, prohibiting use of HUD funding to "promot[e] illegal immigration"); ECF No. 9-5 at 56 (operating subsidy grants, prohibiting promotion of illegal immigration, gender ideology, or elective abortions); ECF No. 9-11 at 97 (MFSC grants, prohibiting promotion of DEI). Others require "support" or "furtherance" of certain agendas. It is not clear what meaning these words might carry in the context of public housing services. Would referring undocumented noncitizens to other public services, for example, violate the Immigration Status Executive Order and Conditions? Would housing someone who has an "elective abortion" while living in the housing violate the Elective Abortion Executive Order? Would referring to a housing applicant or tenant by their chosen pronouns,

22

HUD-PRWORA_000280

asking them for their gender identities, or providing housing to them violate the Gender Ideology Executive Order?

The Court notes that its prior decision in *San Francisco A.I.D.S. Foundation* concluded that the Gender Ideology EO grant condition was not likely to be unconstitutionally vague. 786 F. Supp. 3d at 1227. In doing so, it relied heavily on the EO's clear definition of "gender ideology." *Id*. at 1226–27. Here, Plaintiffs do not contend that the meaning of "gender ideology" is a source of impermissible vagueness. In *San Francisco A.I.D.S. Foundation*, the Court also determined that Plaintiffs were able to understand the meaning of "promoting" gender ideology. *Id*. at 1227. This was so, however, because of the distinct nature of the Plaintiffs in that case, who were "nonprofit organizations that provide healthcare, social services, and advocacy for LGBTQ communities—many specifically serving transgender individuals." *Id*. at 1200. The meaning of "promoting" gender ideology is clear in the context of the provision of services targeting the distinct needs of transgender persons. It becomes incoherent in the context of housing services, which may have no particular nexus to "gender ideology," other than perhaps the identity of residents who use those services.

The challenged conditions are also problematic in requiring compliance with all future executive orders. The HUD, MFSC, and FSSP EO Conditions ambiguously incorporate a non-exhaustive list of "applicable existing and future Executive Orders" and require recipients to "comply" with them. "A condition that directs compliance with 'applicable existing and future Executive Orders' provides no meaningful guidance as to what conduct is expected, tolerated, or prohibited." ECF No. 9-1 at 25. "Executive orders vary in scope and subject matter, are subject to change at any time, and are addressed exclusively to executive branch actors." *Id*.

The Court also agrees with Plaintiffs that the EOs introduce ambiguity by purporting to reverse existing law. ECF No. 9-1 at 25–26. For instance, the Gender Ideology Executive Order instructs that Title VII as interpreted in *Bostock* does not protect the rights of transgender persons. 90 Fed. Reg. 8615. But many courts, including this one, have concluded the opposite. *See San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1231. At the same time, the Discrimination Executive Order directs Plaintiffs to comply with antidiscrimination law. 90 Fed. Reg. 8633.

23

HUD-PRWORA_000281

Case 1:25-cv-04452-JSR Document 336-12 Filed 11/01/25 Page 58 of 124
Case 4:25-cv-04450-JSW Document 136-1 Filed 11/01/25 Page 24 of 53
PageID #: 3442

Similarly, the Trump Administration's guidance concerning DEI, captured in the Bondi Memos described above, is inconsistent with Supreme Court precedent that has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria— even where the decision-maker was "well aware" the race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (cleaned up) (citing *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015)). Plaintiffs, caught between the statutes promulgated by Congress and interpreted by the Courts, and the Administration's attempts to overwrite those interpretations by fiat, are left in an impossible position.

Finally, the Court agrees that the Abortion Conditions are impermissibly vague because the Elective Abortion Executive Order suggests that the Hyde Amendment prohibits elective abortion in all cases when in fact its prohibition expressly excludes cases of rape, incest, and where the life of the mother is at risk. *See* EO No. 14182, 90 Fed. Reg. 8751. The Order leaves open questions about whether an abortion following rape is "elective" and the degree of harm that an individual must face from carrying a pregnancy in order for the abortion not to be "elective." ECF No. 9-1 at 27.

Rather than engaging with Plaintiffs' arguments about vagueness, Defendants respond that due process simply does not apply. First, they assert that due process does not apply because plaintiffs challenge conditions applied to federal funding conditions rather than statutory prohibitions on certain conduct. *Fresno*, ECF No. 40 at 23 (citing *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018)). The argument has no basis in law and relies on a gross misreading of *Dimaya*. *Dimaya* does state that "[t]he void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have 'fair notice' of the conduct a *statute* proscribes." *Id.* (emphasis added). But *Dimaya* used the word "statute" not because it was limiting the right to due process only to statutes—as the government argues—but because a statute was at issue in that case. In fact, "[t]he Supreme Court has long recognized that the 'liberty' or 'property' interests protected by the Due Process Clause contemplate a variety of protected interests, and '[t]he procedural guarantees of the Fourteenth Amendment apply *whenever* the State seeks to remove or

24

Case 1:25-cv-04488-JSR Document 36-12 Filed 11/04/25 Page 25 of 58
Case 4:25-cv-04737 Document 36-1 Filed 11/30/26 Page 59 of 124
PageID #: 3443

significantly alter that protected status.'" *Moody v. Cnty. of Santa Clara*, No. 5:15-CV-04378-EJD, 2017 WL 2903159, at *3 (N.D. Cal. July 7, 2017) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976) (emphasis added)); *Hall v. Childers*, No. 2:16-CV-00106-REB, 2017 WL 8944051, at *3 (D. Idaho Feb. 6, 2017) (noting that "the procedural due process protections of the Fifth and Fourteenth Amendments apply whenever a constitutionally protected liberty or property interest is at stake"), *report and recommendation adopted*, No. 2:16-CV-00106-EJL(REB), 2017 WL 878231 (D. Idaho Mar. 6, 2017). And several courts—including this one—have applied the Due Process Clause's vagueness doctrine to federal grant funding. *See, e.g., Fresno*, 2025 WL 2721390, at *12–18; *San Francisco Unified Sch. Dist. v. AmeriCorps* ("*SFUSD II*"), 789 F. Supp. 3d 716, 745–50 & n.12 (N.D. Cal. 2025); *San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1224–26; *Gay Men's Health Crisis v. Sullivan*, 792 F. Supp. 278, 292–304 (S.D.N.Y. 1992).

Defendants next argue that Plaintiffs cannot show a protected liberty interest because due process protects only "entitlement-like benefits" and not "ordinary" or "routine" government contracts like those at issue here. *Fresno*, ECF No. 40 at 24. This argument, too, is contrary to the law and the facts. Plaintiffs challenge conditions applied to "formula and non-competitive federal funding designed to support housing for the most vulnerable populations nationwide." ECF No. 30 at 13. They have a legitimate property interest in funds that they have already been awarded or are entitled to receive under statutory or regulatory award formulas. *Cf. Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (holding that individuals with a property interest in a benefit must have "a legitimate claim of entitlement to it"). The statutes which create the noncompetitive grants direct HUD to award them according to certain criteria and HUD has promulgated regulations and guidance implementing those directives. "Where such law or mutually explicit rule gives people 'a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement.'" *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774 (7th Cir. 2021) (quoting *Kvapil v. Chippewa Cty., Wis.*, 752 F.3d 708, 713 (7th Cir. 2014)). The grants at issue in this case are therefore far more like public benefits than the regular procurement or construction contracts to which Defendants analogize them. *See Perry v.*

United States District Court
Northern District of California

25

*Sindermann*, 408 U.S. 593 (1972) (property interest in a teaching position that was "de facto" tenured); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (property interest in welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases). *Eloyan v. United States*, cited by Defendants, does not hold otherwise. That court dismissed plaintiffs' due process claim, not because it involved government contracts, but because plaintiffs had no "legitimate claim of entitlement" to the procurement contracts in question, which they had never been awarded and which were entirely within government officials' discretion. No. 2:19-CV-09565-CBM(MRW), 2020 WL 7382316, at *5 (C.D. Cal. Oct. 21, 2020).

Moreover, the challenged Discrimination Conditions state that Plaintiffs are subject to the False Claims Act ("FCA"). Each violation of the FCA is punishable by mandatory treble damages plus civil penalties. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a). Moreover, DOJ has formed a nationwide task force to target grantees that sign these certifications and employ potential FCA liability as a "weapon," and has "strongly encourag[ed]" private parties to bring civil suits against grant recipients. ECF No. 9-11 at 137–38. The threat of civil and criminal liability under the FCA resulting from potential misinterpretation of Defendants' vague grant conditions further threatens Plaintiffs' property and liberty interests and exacerbates the due process problems with these conditions.

Finally, at the hearing on the Order to Show Cause, the government repeatedly argued that the challenged conditions pose no Due Process problem because Plaintiffs can resolve any ambiguity by asking their local HUD office for advice when a question arises. This solution, which does not appear in the government's brief, does not address either of the concerns raised in *Grayned*. First, case-by-case clarification from the government does nothing to give Plaintiffs a "reasonable opportunity to know what is prohibited" at the point in time when they must decide whether to subject themselves to the challenged conditions. 408 U.S. at 108–109. Second, such clarification does nothing to "provide explicit standards for those who apply" the challenged conditions and therefore encourages "arbitrary and discriminatory application"—the exact harm that vagueness doctrine seeks to avoid. *Id.*

Plaintiffs have established that the challenged grant conditions are likely to violate the Due

HUD-PRWORA_000284

Process Clause of the Fifth Amendment of the U.S. Constitution because they are impermissibly vague.

### 3. Spending Clause

Plaintiffs assert that the challenged conditions violate the Spending Clause of the U.S. Constitution. ECF No. 9-1 at 27–28. The Spending Clause authorizes Congress to legislate via expenditures of funds—here, to authorize agencies to impose conditions on grant monies—but sets limits on that power. *See S. Dakota v. Dole*, 483 U.S. 203, 207 (1987). Most saliently, if Congress places conditions on the receipt of federal funds, "it must do so unambiguously" before a recipient enters into a grant agreement. *Id.* at 206–07. This way, the grant recipient can "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207. The recipient's knowing and voluntary acceptance of the conditions is what legitimates Congress' power to legislate. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "By insisting that Congress speak with a clear voice, [courts] enable the [recipients] to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* Because the challenged conditions are unconstitutionally vague, they also likely violate the Spending Power. To the extent that the Grant Conditions do not provide Defendants fair notice from a Due Process perspective, they also fail to enable Plaintiffs to "knowingly accept" them under the Spending Power. *Id.*

### 4. APA

The Administrative Procedure Act permits judicial review of a "final agency action" that is not "committed to agency discretion by law." 5 U.S.C. §§ 701(a)(2), 704. The APA authorizes courts to "hold unlawful and set aside agency action . . . found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2). The Court concludes that the challenged grant conditions are "final agency actions" that are not "committed to agency discretion by law" and are therefore reviewable under the APA. The Court further agrees with Plaintiffs that the challenged grant conditions are arbitrary and capricious as well as unlawful for the reasons the Court has explained

HUD-PRWORA_000285

Case 1:25-cv-04549-JSR   Document 336-12   Filed 11/04/25   Page 28 of 124
Case 4:25-cv-04737-JST   Document 336-12   Filed 11/04/25   Page 28 of 124
PageID #: 3446

above.

### a. Final Agency Action

The challenged grant conditions are "final agency actions" subject to review under the APA. *See* 5 U.S.C. § 704. Final agency actions "mark the consummation of the agency's decisionmaking process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Final agency action must be a "discrete" act that causes the plaintiff harm rather than a "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). "[C]ertain factors provide an indici[um] of finality, such as 'whether the [action] amounts to a definitive statement of the agency's position, whether the [action] has a direct and immediate effect on the day-to-day operations of the party seeking review, and whether immediate compliance [with the terms] is expected.'" *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (quoting *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003)). Courts "focus on the practical and legal effects of the agency action." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).

Defendants argue that the challenged conditions do not constitute final agency action because "Plaintiffs here seek to enjoin the imposition of a vast swath of grant conditions, loosely defined as any that 'embrac[e] the series of Executive Orders and agency policies issued between January and August 2025, directing executive agencies to impose new conditions on federal grants.'" ECF No. 40 at 30. They further contend that "[t]he APA forbids this kind of broad programmatic attack against agency grant conditions writ large."[4] But the quoted language is from a proposed order in *Fresno*, not this case. And rather than a "vast swath" of "agency grant conditions writ large," Plaintiffs here identify specific grants they expect to receive subject to specified challenged conditions. These grant conditions have been enacted via the April 2025 amendments to the HUD Policy Terms; the July 17, 2025, Notice PIH 2025-22; the May 23, 2025, FY2025 Capital Fund Processing Guidance for PHAs; the CY 2025 Annual Renewal Guidance

---

[4] Because the government relies here on its opposition in *Fresno*, it is possible that the government does not actually dispute—or has no means to dispute—that the conditions challenged in this case constitute final agency action. The Court can only consider the arguments placed before it.

HUD-PRWORA_000286

United States District Court
Northern District of California

and the applicable CY 2025 Terms and Conditions for Multifamily Housing Service Coordinators Program grants; and the September 26, 2025, Notice PIH 2025-24. They are implemented in the SF-424 and ACC forms that Plaintiffs must sign to apply for or receive funding. In no sense is Plaintiffs' challenge overly broad, unspecified, or programmatic.

Rather, the grant conditions easily satisfy each of the three indicia of finality described in *Indus. Customers*. They represent a definite statement of the agency's position, placing certain requirements on organizations that receive HUD grants. *See Fresno*, 2025 WL 2721390, at *7 (finding that grant conditions nearly identical to those at issue here constituted "final agency action" because they "take [the] 'definitive' legal position" that the Executive Orders and Grant Conditions are authorized and enforceable against Plaintiffs" (quoting *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412, 414 (D.C. Cir. 2011))). Courts have found much broader challenges to similar grant conditions to still constitute final agency action. *See Fresno*, 2025 WL 2721390, at *7.

The grant conditions also pose an "immediate and significant practical burden" to Plaintiffs by barring them from receiving funds or governing their conduct if they do. *Id.*; *see Rhode Island Coal. Against Domestic Violence v. Bondi*, No. 25-cv-279-WES, 2025 WL 2271867, at *6 (D.R.I. Aug. 8, 2025) ("Without agreeing to the challenged conditions, the Coalitions are effectively barred from applying for and receiving funds which they are legally entitled to seek.").

Lastly, HUD expects immediate compliance because it plans to deny grants unless the plaintiffs certify their compliance with the challenged conditions. "[T]he challenged conditions will potentially change the lawful scope of activities permitted with grant funds, lead to the termination of grant awards, and require the Coalitions to 'subject themselves to potential criminal and civil liability under the False Claims Act.'" *Id.*

This Court joins many others in declining to find that binding conditions imposed on federal grant recipients, which meaningfully restrain recipients' conduct and impose penalties under the FCA, are not "final agency action." *King Cnty.*, 785 F. Supp. 3d at 884 n.18; *Rhode Island Coal. Against Domestic Violence*, 2025 WL 2271867, at *6; *SFUSD II*, 789 F. Supp. 3d at 749–42; *Fresno*, 2025 WL 2721390, at *5–6.

HUD-PRWORA_000287

**b.     Not Committed to Agency Discretion**

An action is "committed to agency discretion by law" only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).  "Even where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which [a] court may review its exercise of discretion." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021) (quoting *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015)).

Defendants argue that "an agency's determination of how to allocate and condition appropriated funds among competing priorities is classic discretionary action" under *Lincoln* and therefore not subject to judicial review.  *Fresno*, ECF No. 40 at 31.  Agencies do sometimes have absolute control over the allocation of funds and the prioritization of projects.  But here, the operative prioritization is performed by statutory and regulatory frameworks governing the allocation of noncompetitive and formula grants.  This is not, as in *Lincoln*, a case involving "an agency's allocation of funds from a lump-sum appropriation" with no conditions attached.  508 U.S. at 193; *see also King Cnty.*, 785 F. Supp. 3d at 884 (contrasting the statute at issue in *Lincoln* with enabling statutes like those at issue here which "provide[] substantial guidance as to how the agencies' discretion should be exercised in implementing these programs, and for the Court to evaluate whether that discretion is being exercised in a reasonable manner").  And even if HUD were allocating funds based on competing priorities, it may not do so based on unlawful criteria.  For instance, an agency may not "prioritize" between grant recipients on the basis of race.  *See, e.g., Bolling v. Sharpe*, 347 U.S. 497 (1954).  Thus, adjudicating the Plaintiffs' claims does not require the Court to wade into the "complicated balancing of a number of factors which are peculiarly within [agency] expertise." *Lincoln*, 508 U.S. at 193.

Nor may HUD may evade review of any unlawful grant conditions by recasting them as an exercise in prioritization.  To review the challenged conditions, the Court need only apply the laws identified by Plaintiffs—the Separation of Powers doctrine, the Fifth Amendment vagueness doctrine, and the Spending Clause.  The statutes authorizing and governing the grantmaking,

30

HUD-PRWORA_000288

Case 1:25-cv-04860-JPS Document 36-1 Filed 11/04/25 Page 31 of 65
Case 4:25-cv-04860-JST Document 336-1 Filed 10/24/25 Page 65 of 124
PageID #: 3449

which Plaintiffs argue that Defendants have exceeded, also provide law to apply. *See, e.g.*, 42 U.S.C. § 1437u (governing the Family Self-Sufficiency program); 42 U.S.C. § 8011(b) (governing the Multifamily Services Coordinator program).

Plaintiffs' challenge does not concern agency action solely committed to HUD's discretion by law.

### c. Contrary to the Constitution and In Excess of Statutory Authority

As just explained, the challenged grant conditions are likely unconstitutional because they are impermissibly vague and ambiguous in violation of the Due Process Clause and the Spending Clause.

They are also likely unconstitutional because they exceed the Congressional delegation of spending authority and thus violate the separation of powers. These constitutional violations provide a standalone basis for enjoining the challenged conditions. *See San Francisco*, 897 F.3d at 1235 (holding that "the district court properly entered summary judgment" in favor of the plaintiffs because the challenged EO violated "the constitutional principle of the Separation of Powers").

For the same reason, the challenged conditions are also in excess of statutory authority under APA Section 706(2)(C). *See King Cnty.*, 785 F. Supp. 3d at 885 ("[T]he Separation of Powers doctrine and the APA's 'in excess of statutory authority' standard both turn on the same essential question—whether the agency acted within the bounds of its authority, either as conferred by the Constitution or delegated by Congress.").

The Court concludes that the challenged grant conditions likely violate both APA Section 706(2)(B) because they are unconstitutional and Section 706(2)(C) because they exceed statutory authority.

### d. Arbitrary and Capricious

Plaintiffs argue that the imposition of the Grant Conditions was arbitrary and capricious under Section 706(2)(A) of the APA. ECF No. 9-1 at 33. Agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ohio v. Environmental Protection*

HUD-PRWORA_000289

United States District Court
Northern District of California

*Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  Courts look to see whether the agency has offered "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  An action may be arbitrary and capricious when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Id*.  The court may not "infer an agency's reasoning from mere silence." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (cleaned up).

Furthermore, the standard is more exacting when an agency changes positions or is "not writing on a blank slate." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020) (citation omitted).  When changing its position, an agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id*.  "It would be arbitrary and capricious to ignore such matters." *Id*.

Plaintiffs do not argue that the agency's reasoning was irrational or omitted relevant considerations.  Rather, they argue that the agency erred by providing no reasoning at all to support the imposition of the challenged grant conditions.  In a letter to grantees and stakeholders, HUD Secretary Turner explained that the challenged conditions were imposed to "effectively implement" and "ensure . . . complian[ce]" with the President's executive orders.  *See* HUD, Ltr. to Grantees and Stakeholders (Apr. 4, 2025).[5]  But this is no explanation at all.  Executive orders are not "law," but "presidential directives to agency officials to consider certain policies when making regulatory decisions" that "do not create freestanding private rights to enforce such policies." *California v. Env't Prot. Agency*, 72 F.4th 308, 318 (D.C. Cir. 2023).  An agency cannot change position solely based on compliance with an EO without further explanation.  *See*

_____

[5] https://www.hud.gov/sites/default/files/PA/documents/2025-04-04-HUD-Grantee-and-Stakeholder-Letter.pdf.

HUD-PRWORA_000290

United States District Court
Northern District of California

*California by & through Becerra v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1169–70 (N.D. Cal. 2019) ("conclusory assertions" regarding compliance with Executive Order were inadequate "given that [the agency] failed to provide any data or analysis to support them"). Otherwise, any decision made pursuant to an EO would be exempt from judicial review under the APA. *See California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020) ("While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration.").

Finally, as a sort of catch-all, Defendants argue that "given the agencies' significant discretion to impose appropriate terms and conditions on the receipt of federal funds, and general grantmaking requirements that the recipients of such funds follow federal law, the adoption of grant conditions that require recipients to certify their compliance with executive orders, federal anti-discrimination laws, and other restrictions on the use of federal funds, such as the Hyde Amendment, can hardly be considered arbitrary or capricious." *Fresno*, ECF No. 40 at 35. Other than citations to cases about the deferential standard of review under the APA, the government cites no authority. Nor could it, since the argument asks the Court to ignore the many problems with the challenged conditions discussed at length above. The Court has identified numerous conflicts between the challenged EOs and preexisting federal law, including the laws governing the grants themselves. The Court has also concluded that the challenged conditions are impermissibly vague, and in that sense they also diverge from existing laws.

The government's implication is that an agency acts lawfully any time it orders its grantees to certify compliance with Executive Orders. As the discussion above makes clear, that isn't true. And even if imposing grant conditions to certify compliance with Executive Orders were an unremarkable aspect of agency practice—which is not the Court's conclusion—those agencies would still be required to explain themselves. "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of*

HUD-PRWORA_000291

*Com. v. New York*, 588 U.S. 752, 785 (2019). Defendants have failed in that task.[6]

The challenged grant conditions are arbitrary and capricious.

### B.   Irreparable Harm

Plaintiffs seeking the extraordinary remedy of a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.

The Court finds that Plaintiffs face immediate and irreparable harm because HUD requires them to either certify compliance with unconstitutional grant conditions—by deadlines which have now passed—or lose hundreds of millions of dollars in funding. Plaintiffs have been coerced into accepting conditions that are contrary to law. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 536–37 (holding that the challenged executive order, which conditioned federal funds on compliance with 8 U.S.C. § 1373, caused irreparable harm because it "improperly seeks to coerce [the plaintiffs] into changing their policies in violation of the Tenth Amendment"). And if they accept the challenged conditions and become subject to policies that violate the law or the Constitution, they experience a constitutional injury. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

On the other hand, if Plaintiffs reject the conditions, they experience a loss of funding and the budgetary clarity "which is essential to their ability to preserve and increase the availability of affordable housing to meet critical needs." ECF No. 30 at 20. This, too, is constitutes irreparable injury. *Cnty. of Santa Clara*, 250 F. Supp. 3d at 536–37 ("The Order's uncertainty interferes with the Counties' ability to budget, plan for the future, and properly serve their residents. Without clarification regarding the Order's scope or legality, the Counties will be obligated to take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services."); *see also King Cnty.*, 785 F. Supp. at 890–91 (explaining

---

[6] While some of the EOs contain preambles explaining their purpose and reasoning, the agencies still need to justify the application of those general principles and policy objectives to specific grants. HUD has not purported to incorporate the EO preambles by reference or in any other manner explained its decision to require grant recipients to comply with EOs setting broad policy priorities and agendas for federal agencies.

34

United States District Court
Northern District of California

that the risk of lost funding because of unconstitutional grant conditions, with its attendant mitigation costs and budgetary uncertainty, is a distinct source of irreparable injury). While the restoration of funding at the conclusion of litigation may remediate Plaintiff's direct economic loss, it will not compensate Plaintiffs for the additional costs of accommodating and mitigating that potential loss of funds. It will also not compensate for the constitutional injury of, again, being subjected to and harmed by unconstitutional grant conditions.

Defendants assert that Plaintiff's economic harm is fundamentally reparable because the funds can be restored at a later date. *Fresno*, ECF No. 40 at 326. But Plaintiffs have presented ample evidence of budgetary harms that restoration of funding would not undo. For instance, their declarants attest that delays in facility repairs and maintenance will snowball into more expensive repairs. ECF No. 9-1 at 34. They also attest that lost funds would hinder their ability to provide childcare, transportation assistance, vocational training, and other critical services—potentially driving families who rely on those services further into poverty. *Id.* at 35.

Defendants also suggest that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Fresno*, ECF No. 40 at 37 (quoting *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)). But Defendants cite *Agency for International Development* selectively. The Court in that case immediately distinguished the general case as described by Defendants, from the situation where the government "den[ies] a benefit to a person on a basis that infringes his constitutionally protected [interests], even if he has no entitlement to that benefit," which is impermissible. 570 U.S. at 214.

The Court finds that Plaintiffs have established the requisite risk of immediate and irreparable harm.

### C. Balance of Equities and Public Interest

The third and fourth factors for a preliminary injunction—the balance of equities and the public interest—merge when the government is a party. *Wolford v. Lopez,* 116 F.4th 959, 976 (9th Cir. 2024); *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the government's interest in imposing the challenged grant conditions sooner rather than later is minimal. If this Court revisits the merits determination on summary judgment or is

35

HUD-PRWORA_000293

overturned on appeal, Plaintiffs will then be subject to the challenged grant conditions. Defendants have identified no harm that would result from the attendant delay in enforcing the grant conditions.

Defendants assert that they will be harmed by granting funds to Plaintiffs that they will be unable to recover. As a colleague court said, however, "these concerns cut both ways since Plaintiffs may be forced to divert and spend unplanned sources of public money to keep afloat projects that the Grant Conditions jeopardize. In fact, since Plaintiffs have shown a likelihood of success on the merits, this concern cuts in their favor." *Fresno*, 2025 WL 2721390, at \*19.

Courts have repeatedly held that injunctions are in the public interest because they prevent the government from taking potentially unconstitutional actions. *See Melendres*, 695 F.3d at 1002; *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). The Court concludes that the balance of the equities and the public interest support a preliminary injunction.

**D.     Bond**

Federal Rule of Civil Procedure 65(c) provides that a district court "may issue a . . . preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (cleaned up). "[T]he court may waive the bond requirement if 'there is a high probability of success that equity compels waiving the bond, the balance of the equities overwhelmingly favors the movant . . . or the requirement of a bond would negatively impact the movant's constitutional rights.'" *SFUSD II*, 789 F. Supp. 3d at 755 (quoting *Gilmore v. Wells Fargo Bank, N.A.*, No. C 14-2389 CW, 2014 WL 3749984, at \*6 (N.D. Cal. July 29, 2014)).

Because Defendants have not made a particular showing as to Plaintiffs' risk of non-repayment and Plaintiffs are likely to succeed on the merits of their claims, a preliminary injunction is not likely to pose any harm to Defendants. *See King Cnty.*, 785 F. Supp. 3d at 893 (reaching the same conclusion concerning a challenge to similar grant conditions); *SFUSD II*, 789

HUD-PRWORA_000294

Case 4:25-cv-08489-JSW   Document 36-12   Filed 11/14/25   Page 37 of 38
Case 4:25-cv-08489-JSW   Document 36-1   Filed 11/04/25   Page 71 of 124
PageID #: 3455

F. Supp. 3d at 755 (same)

Further, a bond in a substantial amount would deprive Plaintiffs and the public they serve of the very funds the preliminary injunction seeks to protect. Accordingly, Plaintiffs shall be required to pay only a nominal bond of $100.

### E.     Stay

Finally, Defendants request that any relief ordered by the Court "be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to consider whether to seek an emergency, expedited stay from the Court of Appeals." *Fresno*, ECF No. 40 at 39. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [judicial] discretion." *Nken*, 556 U.S. at 433–34.  The four relevant factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  "It is generally logically inconsistent for a court to issue a TRO or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites." *Maryland v. Dep't of Agriculture*, JKB-25-0748, 770 F. Supp. 3d 779, 820, (D. Md. Mar. 13, 2025).

A stay is not appropriate here because Plaintiffs are likely to succeed on the merits of their claims and, as the Court has explained, any harm resulting from the payment or nonpayment of grant funds favors the Plaintiffs.  Accordingly, Defendants' request for a stay is denied.

## V.     CONCLUSION

The Court grants a preliminary injunction extending the terms of the temporary restraining order granted on October 18, 2025.  ECF No. 19.

Defendants argue that the Court should tailor relief to the reach only those grant conditions and plaintiffs for which all of the emergency relief requirements are satisfied.  *Fresno*, ECF No. 40 at 38.  However, the Court has concluded that each of the challenged grant conditions is unlawful.  HUD provided no rationale in support of any of the grant conditions, which are

37

therefore arbitrary and capricious. And all of the challenged grant conditions are both unconstitutionally vague and in excess of the authority delegated to HUD, violating the separation of powers. All Plaintiffs face immediate and irreparable constitutional harm. No further tailoring of the preliminary injunction is warranted.

Defendants also suggest that the Court should enjoin the challenged conditions only to the extent they create requirements beyond those imposed by existing federal law. This would compound, not cure, the vagueness defects in the challenged conditions. Moreover, Plaintiffs are already required to comply with federal law. The Court will not restrict its order in such a way.

**IT IS SO ORDERED.**

Dated: November 14, 2025



JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

HUD-PRWORA_000296

Case 1:25-cv-01350-WHO Document 225-12 Filed 08/22/26 Page 73 of 124
Case 3:25-cv-01350-WHO Document 225 Filed 08/22/26 Page 1 of 15
PageID #: 3457

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

             Plaintiffs,

     v.

DONALD J. TRUMP, et al.,

             Defendants.

Case No. 25-cv-01350-WHO

**ORDER GRANTING SECOND MOTION FOR PRELIMINARY INJUNCTION AND RULING ON PROPRIETY OF HUD CONTINUUM OF CARE AND FORMULA GRANT CONDITIONS**

Re: Dkt. No. 177

On April 24, 2025, I granted a Preliminary Injunction to plaintiffs San Francisco, Santa Clara, and fourteen other cities and counties[1] that maintain policies placing them within the definition of "sanctuary jurisdictions," because I determined that the Cities and Counties are likely to succeed on the merits of their claims that defendants' actions with respect to the enjoined executive orders and related agency directives were unconstitutional violations of the separation of powers and spending clause doctrines and violated the Fifth Amendment, Tenth Amendment and Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* Dkt. No. 111 (the "Preliminary Injunction").[2] This Order extends the Preliminary Injunction to include the new plaintiffs recently added in the Second Amended Complaint ("SAC").[3] The defendants offered no

---

[1] The original plaintiffs, which I have referred to as "the Cities and Counties" and that are covered by the First Preliminary Injunction, are: City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"), City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of Saint Paul ("Saint Paul"), and City of Santa Fe ("Santa Fe").

[2] I issued a further order explaining my reasoning on May 3, 2025. Dkt. No. 126 (Further Order).

[3] On August 5, 2025, I granted the Plaintiffs' Motion for Leave to File the SAC, adding new plaintiffs County of Alameda ("Alameda County"), City of Albany ("Albany"), City of

opposition to this extension other than that the Order granting the Preliminary Injunction was wrong in the first place. That issue is on appeal.

This Order also addresses the parties' dispute over whether conditions imposed by the Department of Housing and Urban Development ("HUD") on Continuum of Care ("CoC") grants violate the Preliminary Injunction because they implement the enjoined sections of EO 14,218 to impose immigration-related conditions wholesale on grants unrelated to immigration enforcement. Dkt. No. 143 (Joint Letter Brief). I had delayed ruling on that to give defendants time to brief whether the CoC grants shared a nexus with immigration enforcement. Dkt. No. 147 (Order Regarding Disputes Over Propriety of Standard Conditions on Federal Grants). Further briefing did not reveal any nexus. The Preliminary Injunction reaches the HUD CoC grants. Finally, the Preliminary Injunction also reaches the HUD Community Development Block Grant ("CDBG") programs—non-competitive grants that support some plaintiffs' services to address homelessness and boost economic development—because there too, HUD has imposed conditions that implement the enjoined language of Executive Order 14,218 upon grants that lack a nexus with immigration enforcement.

---

Albuquerque ("Albuquerque"), County of Allegheny ("Allegheny County"), City of Baltimore ("Baltimore"), City of Bend ("Bend"), City of Benicia ("Benicia"), City of Berkeley ("Berkeley"), City of Boston ("Boston"), City of Cambridge ("Cambridge"), City of Cathedral City ("Cathedral City"), City of Chicago ("Chicago"), City of Columbus ("Columbus"), City of Culver City ("Culver City"), County of Dane ("Dane County"), City and County of Denver ("Denver"), City of Healdsburg ("Healdsburg"), County of Hennepin ("Hennepin County"), City of Los Angeles ("Los Angeles"), County of Marin ("Marin County"), City of Menlo Park ("Menlo Park"), Multnomah County, City of Pacifica ("Pacifica"), City of Palo Alto ("Palo Alto"), City of Petaluma ("Petaluma"), Pierce County, City of Richmond ("Richmond"), City of Rochester ("Rochester"), City of Rohnert Park ("Rohnert Park"), County of San Mateo ("San Mateo County"), City of Santa Rosa ("Santa Rosa"), County of Sonoma ("Sonoma County"), City of Watsonville ("Watsonville"), and City of Wilsonville ("Wilsonville"). Dkt. No. 186 (Order on Motion to Amend and Motion to Expedite).

The SAC also added two new defendants: the United States Office of Management and Budget; and Russell Vought in his capacity as Director of the Office of Management and Budget. They join original defendants Donald J. Trump, President of the United States; the United States; the United States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the United States; Kristi Noem in her official capacity as Secretary of the Department of Homeland Security; Emil Bove in his capacity as Acting Deputy Attorney General of the United States; and the United States Department of Homeland Security ("DHS").

HUD-PRWORA_000298

United States District Court
Northern District of California

**ORDER GRANTING SECOND PRELIMINARY INJUNCTION**

The Preliminary Injunction blocks the first sentence of Section 17 of Executive Order 14,159 ("Protecting the American People Against Invasion") (hereafter, "EO 14,159"), Section 2(a)(ii) of Executive Order 14,218 ("Ending Taxpayer Subsidization of Open Borders") (hereafter, "EO 14,218") (together the "2025 Executive Orders") and the Preamble and Section 1 of the February 5, 2025, Memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives," (the "Bondi Directive").  On May 9, 2025, I made clear that Executive Orders and related executive actions issued and undertaken in the wake of the Preliminary Injunction (e.g. Section 3 of Executive Order 14,287 and the agency directives that flowed from it) could not be used as end runs around it.  Dkt. No. 136 (Clarifying Order).

The plaintiffs now move for a second preliminary injunction that precisely mirrors the first to protect the new plaintiffs too.  *See* Motion for a Second Preliminary Injunction ("Second PI Motion") [Dkt. No. 177].  The new plaintiffs have each alleged similar reliance on federal funding as the Cities and Counties and filed declarations showing similar harms to community health, welfare and social services and to their budgetary processes that depend on the regularly authorized grants of federal funding for a variety of critical needs.  *See* SAC ¶¶ 82-321; *see e.g.* Declaration of Y. Sanchez [Dkt. No. 177-5] ¶ 14; Declaration of H. Medina [Dkt. No. 177-7] ¶ 10; Declaration of F. Leach [Dkt. No. 177-10] ¶¶ 24-26; Declaration of E. King [Dkt. No. 177-12] ¶ 15; Declaration of A. Groffenberger [Dkt. No. 177-15] ¶ 12; Declaration of T. Maulawin [Dkt. No. 177-19] ¶¶ 13-31.  Defendants offer no opposition to entry of the expanded Preliminary Injunction except to say that the Order granting the Preliminary Injunction and Further Order were wrongly decided in the first place and *no* plaintiff is entitled to the relief sought.  Both in the defendants' response to the Second PI Motion and at the hearing, counsel for the defendants accepted that the Second PI Motion is subject to the same analysis as the plaintiffs' first preliminary injunction request was.

Consequently, I will grant the plaintiffs' request for the expanded Preliminary Injunction for the same reasons that I issued the Preliminary Injunction originally.  The challenged sections of Executive Orders 14,159 and 14,218, and the executive actions that have parroted them threaten

3

to withhold all federal funding from the plaintiffs as sanctuary jurisdictions if they do not adapt their policies and practices to conform with the Trump administration's preferences. That coercive threat (and any actions agencies take to realize that threat, or additional Executive Orders the President issues to the same end) is unconstitutional, so I enjoined its effect. I do so again today for the protection of the new parties in this case.

For the foregoing reasons, the plaintiffs' Second Motion for Preliminary Injunction is **GRANTED**. Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are enjoined from directly or indirectly taking any action to withhold, freeze, or condition federal funds based on (1) the first sentence of Section 17 of Executive Order 14,159 ("EO 14,159"); (2) Section 2(a)(ii) of Executive Order 14,218 ("EO 14,218"); (3) the February 5, 2025 memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives" (the "Bondi Directive"); or (4) any other Executive Order or Government action that poses the same coercive threat to eliminate or suspend federal funding based on the Government's assertion that a jurisdiction is a "sanctuary jurisdiction," on the basis that the jurisdiction has policies that limit (i) the honoring of civil immigration detainer requests; (ii) cooperation with administrative warrants for purposes of immigration enforcement; (iii) the sharing of information with federal immigration authorities other than immigration or citizenship status; (iv) the use of local law enforcement to arrest or detain individuals solely for civil immigration violations; or (v) the use of local resources to assist with civil immigration enforcement activities.[4]

**ORDER REGARDING PROPRIETY OF HUD CONTINUUM OF CARE GRANTS**

The parties dispute whether the Preliminary Injunction reaches the challenged HUD Continuum of Care grant agreement conditions. It does.

---

[4] For the avoidance of doubt, this expanded Preliminary Injunction is identical to the Preliminary Injunction issued on April 24, 2025, except that it now covers all of the plaintiffs named in the SAC, and requires compliance by all defendants, new and old. Because the substance is identical, I do not differentiate between the original and expanded Preliminary Injunction in this Order; they are one in the same.

HUD-PRWORA_000300

United States District Court
Northern District of California

## A.     FY2024 HUD CoC grant agreements

Congress enacted the McKinney-Vento Homeless Assistance Act (the "Assistance Act") to "meet the critically urgent needs of the homeless of the Nation" by providing "funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b)(2)-(3). Congress, through the Assistance Act, provides federal funding to several programs, including the Continuum of Care ("CoC") program, which is designed to "assist individuals (including unaccompanied youth) and families experiencing homelessness" by providing services "to help such individuals move into transitional and permanent housing, with the goal of long-term stability."[5] HUD is responsible for administering the CoC program.

The FY2024 HUD CoC grant agreement containing the condition that the plaintiffs challenge states that "[n]o state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." Dkt. No. 143, Attachment M. In the June 23, 2025, Order Regarding Disputes Over Propriety of Standard Conditions on Federal Grants, I acknowledged the distinction between the conditions on HUD CoC grants (which conditioned the use of funds already received upon compliance with federal immigration law) and the DHS and DOT standard conditions (which conditioned the receipt of funds upon the same). I pointed out that the defendants had "not yet attempted" to show the required nexus between the HUD CoC grant programs upon which the defendants sought to impose the challenged condition and immigration enforcement. I gave the defendants additional time and briefing space to show, if they could, the required nexus. None emerged.

## B.     The Preliminary Injunction reaches the challenged provision of the FY2024 HUD CoC grant agreement

The substantive question of whether HUD is properly withholding HUD CoC grants is

---

[5] Continuum of Care (CoC) Program Eligibility Requirements, HUD Exchange, https://www.hudexchange.info/programs/coc/coc-program-eligibility-requirements/, last accessed June 19, 2025.

5

pending before the Hon. Barbara Rothstein in the District of Washington in *King County v. Turner*, where Judge Rothstein has enjoined HUD and its officers, agents, servants, employees and attorneys, and any other persons who are in active concert or participation with them, from imposing the challenged HUD CoC grant conditions.[6] – F. Supp. 3d. –, 2025 WL 1582368 (W.D. Wash. June 3, 2025) (First Preliminary Injunction in *King County*), *appeal docketed*, No. 25-3664 (9th Cir., June 10, 2025); 2025 WL 2322763 (W.D. Wash. Aug. 12, 2025) (Third Preliminary Injunction in *King County*). Twenty nine (29) of the plaintiffs in this case are covered by those injunctions, seventeen (17) are not. Suffice it to say, I agree in full with Judge Rothstein's opinion. That goes a long way to resolve the dispute here. But what I must still address is whether the Preliminary Injunction in this case, which specifically enjoins actions based on "(1) the first sentence of Section 17 of Executive Order 14,159 ("EO 14,159"); (2) Section 2(a)(ii) of Executive Order 14,218 ("EO 14,218"); (3) the February 5, 2025 memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives" (the "Bondi Directive"); or (4) any other Executive Order or Government action that poses the same coercive threat to eliminate or suspend federal funding based on the Government's assertion that a jurisdiction is a 'sanctuary jurisdiction,'" has been violated.

In plaintiffs' letter brief regarding the propriety of conditions imposed on the subject HUD CoC grants, they challenge a condition in the FY2024 HUD CoC grant agreement that mirrors the enjoined language of EO 14,218. The condition provides: "No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design

---

[6] Specifically, Judge Rothstein enjoined the HUD Defendants from "(1) imposing or enforcing the CoC Grant Conditions … or any materially similar terms or conditions with respect to any CoC funds awarded to the HUD Plaintiffs or members of their Continuums; (2) as to the HUD Plaintiffs, rescinding, withholding, cancelling, or otherwise not processing any CoC Agreements, or pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning CoC funds, based on such terms or conditions, including without limitation failing or refusing to process and otherwise implement grants signed with changes or other objection to conditions enjoined by this preliminary injunction; (3) requiring the HUD Plaintiffs to make any "certification" or other representation related to compliance with such terms or conditions; or (4) refusing to issue, process, or sign CoC Agreements based on HUD Plaintiffs' participation in this lawsuit." – F. Supp. 3d. –, 2025 WL 1582368 (W.D. Wash. June 3, 2025). Judge Rothstein then issued a Third Preliminary Injunction in *King County* to protect newly added plaintiffs in that case. 2025 WL 2322763 (W.D. Wash. Aug 12, 2025). The government has appealed.

HUD-PRWORA_000302

or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." Dkt. No. 143 (Attachment M) (the "challenged condition"). They assert that the challenged condition violates the Preliminary Injunction because it imposes immigration-related conditions on funding for a program that lacks a nexus with immigration enforcement. *See* Dkt. No. 143 (Joint Letter Brief) 4.

If there were any uncertainty as to the origin of the challenged condition, the letter from HUD Secretary Scott Turner on April 4, 2025, to "HUD Grantees and Stakeholders" confirms that the quoted language in the grant agreement arises from EO 14,218. Dkt. No. 95-1 at 90 (April 4, 2025, the "Turner letter"). In that letter, Turner states that he "directed HUD senior leadership to review our programs and institute mechanisms that can ensure that HUD programs are compliant with … Executive Order [14,218]. For example, going forward, grant agreements will include language that will require compliance with Executive Order 14,218, and the Department will take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens." *Id.* The timing of that letter, hard on the heels of the subject Executive Orders, and its direction that grant agreements incorporate the language of the enjoined section of that Executive Order 14,218, leaves little doubt that Secretary Turner intended to implement the Executive Order.

In my Order Regarding Disputes Over Propriety of Standard Conditions on Federal Grants, I directed the parties to provide more briefing on whether the HUD CoC grants shared a nexus with immigration enforcement such that the utilization of the language from EO 14,218 to impose conditions upon those grants might not be obviously unlawful. Defendants offered several responses, none of which address the nexus question I posed. *See* Defendants' Response to Court's Order ("Gov't Response") [Dkt. No. 166]. I take this omission as a concession that there is no nexus. But I will address the defendants' alternative arguments for why the Preliminary Injunction should not apply to the challenged condition, none of which has merit.

First, they (briefly) argue that the challenged condition should not be enjoined because it is a condition on the use of awarded funds, not a condition on the receipt of funds. *See* Gov't Response 2. At oral argument, counsel for defendants expanded on this argument, contending that

HUD-PRWORA_000303

the language of the Preliminary Injunction (enjoining the defendants from taking action to withhold, freeze, or condition Federal funds from the plaintiffs) implies that the injunction only reaches conditions placed on receipt of those funds, and does not reach conditions placed on their use. That obtusely narrow interpretation is wrong. *See* Dkt. No. 136 (Clarifying Order) 4 ("[t]he Government cannot avoid liability down the line by 'hewing to the narrow letter of the injunction' while 'simultaneously ignoring its spirit.'") (quoting *Inst. of Cetacean Research v. Sea Shepard Conserv. Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014)). I issued the Preliminary Injunction to prevent the defendants from taking actions with respect to federal funding for so-called sanctuary jurisdictions that fall outside of the bounds of the Constitution, particularly because of their overly coercive effect. It bars the defendants (and their officers, agents, servants, employees, and attorneys, and any other persons in active concert or participation with them) from, in relevant part, taking any action to withhold, freeze, or condition federal funds from the Cities and Counties based on Section 2(a)(ii) of Executive Order 14,218. The challenged HUD CoC grant agreement condition, of course, would require adherence to Section 2(a)(ii) of EO 14,218 to receive federal funds. *Compare* 90 Fed. Reg. 10581 with Dkt. 68, at Ex. 1, p. 3; Dkt. 143, Attachment M, at p. 2; *see also* Further Order at 56-57 (finding Section 2(a)(ii) to be unconstitutionally ambiguous for purposes of the Fifth Amendment). Secretary Turner's letter shows that HUD's express purpose in inserting the challenged condition into the FY2024 HUD CoC and other grant agreements was to implement the enjoined section of EO 14,218. *See* Further Order 8; *see* discussion *supra.* Whether that condition applies to the receipt of the grant funds or to their use is immaterial: the effect is to coerce jurisdictions into changing their local policies to adhere to federal ones. When it comes to applying the Preliminary Injunction, it is a distinction without a difference.

Second, defendants insist that the conditions are lawful because they are consistent with provisions of the Homeless Assistance Act, 42 U.S.C. § 11386(b), which predates the Preliminary Injunction and requires a recipient of HUD funds to enter into an agreement with HUD, accepting specific conditions, before the HUD Secretary may disburse CoC grant funds. *See* Gov't Response 1. The defendants argue that "both this language and the immigration laws upon which the conditions are based preceded the challenged Executive Orders" and "such discretionary

8

language has routinely been used by HUD to require certification that recipients comply with federal anti-discrimination laws." *Id.* 1-2. This contention bears no weight. Set aside, for now, that HUD has posted to its website its current "Administrative Requirements" for grantees[7], and that list makes no mention of § 11386(b)(8)—it identifies the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") and EO 14,218, only. Even if § 11386(b)(8) *were* the source of the challenged condition, it does not help the defendants' argument.

The defendants say that "[s]ection 11386(b)(8) squarely encompasses the challenged funding condition, as it aims to ensure that grant funds are not used for unlawful purposes—such as providing services to individuals who are not eligible under federal law, including illegal aliens." Gov't Response 3. That subpart of the Assistance Act is one of several conditions in 42 U.S.C. § 11386(b) to which grant recipients must agree. Among them are conditions requiring recipients "to monitor and report to the Secretary the progress of the project"; "to ensure ... that individuals and families experiencing homelessness are involved" in the project; and to "monitor and report" the receipt of any matching funds. The subpart relied upon by defendants requires a HUD grant recipient "to comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner." 42 U.S.C. § 11386(b)(8).

None of the conditions in § 11386(b) are remotely akin to the condition the plaintiffs challenge here. Substantive conditions—like those that prohibit HUD CoC grant recipients from using their funds "in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation"—are not "of the same kind" as conditions requiring grant recipients to monitor and report on their program's progress, or involve individuals and families experiencing homelessness in those programs. The defendants in *King County* made a similar argument, which Judge Rothstein soundly rejected. *See King County*, -- F. Supp. 3d --, 2025 WL 1582368, at *15.

The defendants contend that were I to find that the Preliminary Injunction reached the

---

[7] Available at https://www.hud.gov/stat/cfo/policy-requirements (last visited August 19, 2025).

HUD-PRWORA_000305

United States District Court
Northern District of California

challenged provision of the FY2024 HUD CoC grant agreement, I would be encroaching into the agency's discretion to ensure its programs run properly. They invoke the canon *ejusdem generis*, or "of the same kind," to argue that this canon "confirms that the [HUD Secretary] has broad authority to impose a range of conditions on CoC recipients, from the ministerial to the substantive, so long as they are designed to enhance the program's efficiency and effectiveness, which necessarily include Congressional and case law mandate." Gov't Response 3. Instead of encroaching on the Secretary's discretion, I am simply requiring him to abide by his oath to support and defend the constitution and laws of the United States. The Preliminary Injunction intends to restrain the defendants from coercing the plaintiffs to change policies that the Tenth Amendment reserves for the plaintiffs to develop and enforce.

Third, contrary to the defendants' contention, PRWORA does not permit the challenged CoC grant condition. Defendants argue that since "under the [PRWORA] federal public benefits, including the housing and supportive services provided through the CoC program, are only available to U.S. citizens and aliens with a qualifying immigration status," the challenged CoC conditions "enforce PRWORA's purpose" by "[e]ssentially . . . ensur[ing] compliance with already-existing statutory restrictions," meaning that Secretary Turner is "acting within the authority granted to him by Congressional mandate and section 11386(b)(8)" when he enforces them. Gov't Response 4. As the plaintiffs rightfully point out in their Reply, "[w]hile PRWORA states that certain categories of non-citizens are not eligible for some 'Federal public benefits,' 8 U.S.C. § 1611(a), nowhere does the text suggest giving the federal Government the authority to condition the receipt of federal funds on the requirement that states and local jurisdictions actively assist in enforcing federal immigration laws." Reply Re: Gov't Response [Dkt. No. 174] 4, n.3.

The defendants also insist that Preliminary Injunction does not apply to the HUD CoC grant conditions because "HUD will only apply conditions that are based on statutory authority." Joint Letter 7. They compare this dispute to those over "discrete funding conditions" litigated in cases like *Cal. ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1023-24 (N.D. Cal. 2018), where plaintiffs challenged the termination of Byrne JAG funding, as opposed to disputes over Executive Orders, like *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 507 (N.D. Cal. 2017). Joint

United States District Court
Northern District of California

10

Letter 7, n.6. But that is a false comparison. Cases like *Cal. ex rel. Becerra*, (and its counterparts that proceeded in the Second, Third, and Seventh Circuit, *see* Further Order at 2-3) involved litigation over discrete funding conditions imposed on a particular grant. The challenged condition here exists because of agency-wide directives employing enjoined Executive Orders, not discrete conditions on a particular grant. HUD is incorporating language from the Executive Order that I have enjoined in all of its grant agreement conditions (at least according to Secretary Turner's letter), including the CoC grants I have just discussed, and the formula grants I am about to discuss. The plaintiffs do not ask me to opine on the legality of "discrete funding conditions" like those imposed upon the Byrne JAG grants—they ask me to enjoin the apparently agency-wide, coercive utilization of language from EO 14,218 with respect to all HUD grants, irrespective of their relation to immigration enforcement.

For all the foregoing reasons, I conclude that the Preliminary Injunction does reach the challenged condition in the FY2024 HUD CoC grant agreements and that it is enjoined.[8] HUD may not deny federal funding under the FY2024 HUD CoC grants based on the challenged condition.

**C.      The HUD formula grants**

Plaintiffs ask that if I extend the Preliminary Injunction to encompass the challenged CoC grant condition, I also find that it reaches HUD "formula grants"—particularly, the Community Development Block Grant ("CDBG") programs, which control non-competitive grants that

---

[8] The defendants also gesture toward *Trump v. CASA*, arguing that the Supreme Court's decision in that case dictates that "extending this Court's preliminary injunction to HUD as a non-party is improper." Gov't Response 1 (citing 606 U.S. __, 145 S. Ct. 2540, 2567 (U.S. June 27, 2025)). That case addressed jurisprudential concerns about extending relief to plaintiffs who are not party to a lawsuit. *See CASA*, 606 U.S. __, 145 S. Ct. at 2567 (Kavanaugh, J., concurring) ("The District Courts granted universal preliminary injunctions—that is, injunctions prohibiting enforcement of the Executive Order against anyone. Under the Court's holding today, district courts issuing injunctions under the authority afforded by the Judiciary Act of 1789 may award only plaintiff-specific relief."). Here, I limited my relief to the plaintiffs in this case, and to afford them complete relief, I enjoined "named defendants and any other agency or individual acting in concert with or as an agent of the President or other defendants to implement" the enjoined Executive Orders. Further Order 65, n.14. This was consistent with Federal Rule of Civil Procedure 65(d)(2), and with principle that while the President cannot be enjoined in the performance of his official duties, injunctive relief may run against executive officials. *See Franklin v. Massachusetts*, 505 U.S. 788, 802-803 (1992); *see* Further Order 65 n.14.

HUD-PRWORA_000307

United States District Court
Northern District of California

support services to address homelessness and boost economic development, and upon which many plaintiffs rely. Plaintiffs argue that HUD is imposing the same kind of impermissible conditions flowing from EO 14,218 upon CDBG grants as it is upon CoC grants. At the hearing on this matter, I said that I was hesitant to rule on this issue having not requested briefing that squarely addresses it. Counsel for the plaintiffs argued that the only evidence I needed was already in front of me, in the form of the plaintiffs' various declarations, the letter from Secretary Turner and a letter from HUD General Deputy Assistant Secretary Claudette Fernandez. Having reviewed them again, focusing on this issue, I agree.

The plaintiffs assert that it is apparent that HUD is implementing EO 14,218 through *all* of its grants, not just the CoC grants, as a result of the Turmer and Fernandez letters. I have already discussed the Turner letter. Fernandez, who is now the director of CPD (the subagency of HUD that administers funding that the plaintiffs receive from HUD for rental support, housing support, and supportive services to low income and homeless individuals, including CDBG grants), sent a letter on June 5, 2025, in her capacity as HUD General Deputy Assistant Secretary, regarding the HUD Office of Community Planning and Development's ("CPD") grantee consolidated plan and annual action plan submissions for Fiscal Year 2025 (the "Fernandez Letter").[9] Fernandez states in the letter that "grantees are … encouraged to review the White House Executive Orders as they develop their consolidated plan and annual action plans. After submission and HUD's review of these plans, the FY2025 grant agreement will also emphasize conformity with applicable Administration priorities and executive orders. Under the FY 2025 grant agreement, conformity means that []: … (7) If applicable, no state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." Fernandez Letter 2 (Condition 7). In short, the Fernandez letter tracks the Turner letter and the enjoined Executive Order 14,218.

As described in the plaintiffs' Motion to Expedite (Dkt. No. 178) and through declarations

---

[9] Ltr. of C. Fernandez to Council of State Community Dev. Agencies and Nat'l Community Dev. Assoc., June 5, 2025, at p. 3 ("Fernandez Letter."), available at https://perma.cc/4A3P-ZKHD.

12

HUD-PRWORA_000308

attached to the Second PI Motion, several plaintiffs faced a regulatory deadline of August 16, 2025, to submit consolidated action plans that are a pre-requisite for receiving several types of grants from HUD, including CoC grants and, pertinently, CDBG grants. *See* Dkt. No. 177-6 (Declaration of G. Grande, explaining that plaintiff the City of Albany, New York, "uses nearly $1 million in federal funds to support public transportation improvements and maintenance within the City … to access these HUD funds, Albany must, in part, submit an annual consolidated plan to HUD," and stating that the deadline for this year's plan was August 16, 2025); Dkt. No. 177-9 (Declaration of J. Fournier, explaining that plaintiff Allegheny County had an August 16, 2025, deadline to submit its HUD Consolidated Five Year Plan for four programs, including the CDBG program).

At least one plaintiff, the City of Petaluma, has already received a challenge to its proposed Consolidated Action Plan based on alleged inconsistency with EO 14,218. *See* Declaration of B. Cochran ("Cochran Decl.") [Dkt. No. 177-37] ¶¶ 12-15. After Petaluma transmitted its 2025 Consolidated Action Plan to HUD on May 15, 2025, HUD staff member Nicholas D. Nordahl on July 1, 2025, "sent an email to Petaluma Housing staff questioning the accuracy of Petaluma's certification that CDBG funds described in the City's 2025 Consolidated Action Plan would be administered in conformity with applicable laws, including Executive Orders." *Id.* ¶ 13.

Cochran, the Assistant City Manager of the City of Petaluma, states that the Nordahl email "indicated that Petaluma would have an opportunity to respond (i.e., to provide specified evidence demonstrating compliance with the certification)," but it "also indicated that Petaluma should reply by close of business Wednesday, July 2, 2025 – that is, just 24 hours after the Nordahl email was sent." *Id.* ¶ 13. More concerningly, "[t]he Nordahl email stated that failure to address HUD's concerns could result in HUD determining that the Petaluma certification is inaccurate or unsatisfactory, which would result in disapproval of the Action Plan," and it "specified that HUD identified language in the City's 2025 Action Plan that appears to HUD to violate specified Executive Orders, including Executive Order 14218." *Id.* It then "directed that the City's response should make specified edits to the City's Action Plan to remove references to specified terms the use of which HUD deemed to violate Executive Orders, including the term 'undocumented

13

Case 1:25-cv-01350-MPS Document 36-12 Filed 08/22/25 Page 14 of 15
Case 3:25-cv-03698-WHO Document 225-12 Filed 08/22/26 Page 86 of 124
PageID #: 3470

individuals,'" and instructed that the revised Action Plan should include the following statement:

> The city of Petaluma shall administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and certification requirement that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S. C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218 or other Executive Orders or immigration laws. The city will not use funding under this grant in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation. Unless excepted by PRWORA, the city must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

*See* Cochran Decl. ¶ 13; *see also id.*, Ex. A (the "Nordahl email"). Cochran declares that "[t]he Nordahl email … caused sudden uncertainty as to Petaluma's receipt of CDBG and other HUD funding that is critical to food and housing security for some of Petaluma's most vulnerable community members." Cochran Decl. ¶ 15.

The Nordahl email implements the Fernandez and Turner letters, which in turn implement the enjoined section of EO 14,218. The Fernandez letter, issued on June 2, 2025, states that "[a]fter submission and HUD's review of [consolidated action plans and annual action plans], the FY2025 grant agreement will also emphasize conformity with applicable Administration priorities and executive orders," and then, in Condition 7, quotes EO 14,218. The Nordahl email, sent on July 1, 2025, instructs Petaluma to fix its consolidated action plan to conform with EO 14,218, on implied pain of disapproval and loss of CDBG funds.

This agency action is enjoined, for the same reasons the challenged conditions upon CoC grants are. Through the Fernandez Letter and related agency actions, HUD is imposing immigration-related conditions upon grants that share no nexus with immigration enforcement, for the purpose of coercing sanctuary jurisdictions into modifying their policies to conform with federal ones. Pursuant to this Order, condition 7 is enjoined and HUD may not deny plaintiffs federal funding for CDBG grants based on the implementation of condition 7 in the Fernandez letter.

Defendants have not responded directly to the evidence linking condition 7 to the enjoined

14

Executive Order as just described.  They may seek reconsideration of this Order if the facts differ from what is in the record thus far.

**IT IS SO ORDERED.**

Dated: August 22, 2025



William H. Orrick
United States District Judge

United States District Court
Northern District of California

15

HUD-PRWORA_000311

 

July 11, 2025

Bryan Horn
Deputy Assistant Secretary
Office of Community Planning and Development
U.S. Department of Housing and Urban Development
451 7th Street SW
Washington, DC 20410

Dear Deputy Assistant Secretary Horn,

The National Community Development Association (NCDA), the Council of State Community Development Agencies (COSCDA), and the National Association of Housing and Redevelopment Officials (NAHRO) write to request immediate guidance on issues affecting grantees' ability to implement the FY2025 CPD grant process. We are also seeking information on HUD's next steps for streamlining the environmental review process.

First, paragraph 6 of HUD Form 424B requires grantees to certify "they will not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities…" As grantees are now developing their consolidated plans and annual action plans, they need immediate clarification from HUD on the meaning of DEI in this paragraph and other federal documents that may arise in the grant funding process, such as grant agreements. For example, CDBG grantees use funds for inclusion activities to provide accessibility improvements for people with disabilities. They also use CDBG funds to provide in-home meals to seniors. Would HUD flag these activities as efforts to promote DEI? Grantees are hesitant to sign HUD Form 424B without clear guidance on the definition of diversity, equity, and inclusion, so we urge swift guidance from you on this definition.

As cited in HUD's June 5 letter to NCDA and COSCDA[1], grantees must use SAVE or an equivalent system to verify legal immigrant status. We are uncertain as to how the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) of 1996 (and

---

[1] *Unless excepted by PRWORA, the Grantee must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.*

HUD-PRWORA_000312

subsequently the SAVE system) applies to HUD CPD programs and request guidance from HUD on the applicability of PRWORA (and the SAVE system) to these program areas. For example, many CDBG grantees subgrant program funds to nonprofit organizations. PRWORA exempts nonprofits from the requirement to verify the immigration status of applicants. Further, many CDBG programs are infrastructure projects that benefit a community as a whole rather than providing direct benefits to individuals. The SAVE system is designed to verify the immigration status of individuals and therefore would be extremely challenging for CDBG grantees to implement with infrastructure projects.

Finally, on May 29, 2025, the U.S. Supreme Court issued a ruling *in Seven County Infrastructure Coalition vs. Eagle County* that provides deference to federal agencies on the scope of program environmental analysis under the National Environmental Policy Act (NEPA). The Supreme Court's decision appears to provide an opportunity for HUD to streamline the environmental review process for CPD grantees. On July 3, the Economic Development Administration (EDA) of the U.S. Department of Commerce published a final rule in the Federal Register (90 FR 29417) that amends 13 CFR Part 302 in response to this Supreme Court ruling. The list of subjects in 13 CFR Part 302 includes community development and grant programs related to housing and community development. What are the next steps for HUD to implement environmental streamlining for grantees? Our undersigned organizations request additional guidance on how grantees should respond to the Supreme Court's decision and other new federal regulations related to environmental review.

We appreciate our partnership with HUD and look forward to receiving quick guidance on our inquiries so that we can help our member grantees proceed with program implementation.

Please feel free to reach out to Vicki Watson (vwatson@ncdaonline.org), Executive Director, NCDA, Tess Hembree (thembree@coscda.org), Executive Director, COSCDA and Mark Thiele, (mthiele@nahro.org), CEO, NAHRO.

Sincerely,

*Vicki Watson*

Vicki Watson
Executive Director
National Community Development Association

HUD-PRWORA_000313

Tess Hembree
Executive Director
Council of State Community Development Agencies

Mark Thiele
CEO
National Association of Housing and Redevelopment Officials

HUD-PRWORA_000314

# Exhibit J

## HUD Letter

HUD-PRWORA_000315



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
THE SECRETARY
WASHINGTON, DC  20410-0001

April 4, 2025

Dear HUD Grantees and Stakeholders,

President Trump issued Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders," on February 19, 2025, to promote the rule of law and prevent American taxpayer dollars from being spent on federal assistance for illegal aliens. As Secretary of the Department of Housing and Urban Development (HUD), it is my responsibility to effectively implement the President's executive order at the agency.

HUD's contributions to housing and community development across the country serve some of America's most vulnerable citizens on a path towards self-sufficiency. To that end, the President's Executive Order emphasizes that the federal resources distributed by HUD shall be primarily focused on benefiting American citizens and other qualified recipients, not illegal aliens.

President Trump's Executive Order reinforces the 1996 Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA, P.L. 104-193), which unequivocally prohibits illegal aliens from receiving certain federal public benefits, including many forms of assistance provided under HUD programs. Further, Section 214 of the Housing and Community Development Act of 1980 (P.L. 96-399) prohibits HUD from making financial assistance available to persons other than United States citizens or certain categories of eligible noncitizens in the Section 8 Housing Assistance programs, Public Housing programs, Housing Development Grant programs, Section 202 direct loan program, Section 235 program, Section 236 Program, and Rent Supplement Program. This letter serves as a reminder to all HUD grantees of their legal obligations to comply with these laws and the President's Executive Order.

Recently, I directed HUD senior leadership to review our programs and institute mechanisms that can ensure that HUD programs are compliant with President Trump's Executive Order. For example, going forward, grant agreements will include language that will require compliance with Executive Order 14218, and the Department will take steps to ensure that Federal resources are not used to support "sanctuary" policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens.

I am excited to work with our grantees and other stakeholders to implement this Executive Order and enforce the law so that HUD programs are used for the benefit of the American people. Thank you for your cooperation, and I encourage you to contact our team at HUD with any ideas that may be able to help improve our implementation of President Trump's Executive Order.

Sincerely,

Scott Turner
Secretary

www.hud.gov          espanol.hud.gov

HUD-PRWORA_000316



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-7000

OFFICE OF COMMUNITY PLANNING
AND DEVELOPMENT

June 5, 2025

Ms. Tess Hembree
Executive Director
Council of State Community Development Agencies
630 I Street, NW
Washington, DC 20001-3736

Ms. Vicki Watson
Executive Director
National Community Development Association (NCDA)
1775 Eye Street NW, Suite 1150
Washington, DC 20006

Dear Ms. Hembree & Ms. Watson:

On behalf of Secretary Scott Turner, thank you for your letter regarding the Department of Housing and Urban Development's (HUD) Office of Community Planning and Development's (CPD) grantee consolidated plan and annual action plan submissions for Fiscal Year (FY) 2025. Your letter states that Council of State Community Development Agencies (COSCDA) and National Community Development Association (NCDA) members are concerned that their submissions may be flagged for noncompliance with the Administration's executive orders. As a result, both agencies are requesting that HUD issue a memorandum like the guidance provided to Community Development Block Grant – Disaster Recovery (CDBG-DR) grantees under the Universal Notice.

CPD administers the CDBG-DR program through *Federal Register* Notice each time it receives a Congressional appropriation. This approach has been taken because the CDBG-DR program does not have its own authorization and corresponding regulations. As a result, CPD must describe the processes, procedures, timelines, waivers, and alternative requirements that HUD intends to implement with each allocation of CDBG-DR funding after a qualifying Presidential disaster declaration. Specifically, following the most recent appropriation of CDBG-DR funds for qualifying disasters, the Department published an Allocation Announcement Notice (AAN) in the *Federal Register* that incorporates, via cross-reference, the waivers and alternative requirements provided in the Universal Notice, as appropriate, along with any other new requirements imposed by the specific appropriation.

In contrast, the consolidated plan and annual action plan submission process for CPD formula grantees is governed by the regulations at 24 CFR Part 91. The January 14, 2025, notice entitled CPD-25-02, Guidance on Submitting Consolidated Plans and Annual Action Plans for FY 2025 remains in effect, including the requirements at 24 CFR 91.500(b) located on page 5. HUD has no plans at this time to update this notice as it continues to accurately document when HUD may disapprove a plan according to the regulations. 24 CFR 91.500(b) states that HUD may disapprove a plan or a portion of a plan if it is inconsistent with the purpose of the Cranston-Gonzalez National Affordable Housing Act (42 U.S.C. 12703), if it is substantially incomplete,

HUD-PRWORA_000317

or, in the case of a CDBG certification under §91.225(a) and (b) or §91.325(a) and (b), if it is not satisfactory to the Secretary in accordance with §570.304, §570.429(g), or §570.485(c).  The following are examples provided in §91.500(b) of substantially incomplete plans:

1. A plan that was developed without the required citizen participation or the required consultation;

2. A plan that fails to satisfy all the required elements in this part; and

3. A plan for which a certification is rejected by HUD as inaccurate, after HUD has inspected the evidence and provided due notice and opportunity to the jurisdiction for comment; and

4. A plan that does not include a description of the manner in which the unit of general local government or state will provide financial or other assistance to a public housing agency if the public housing agency is designated as "troubled" by HUD.

Grantees are also encouraged to review the White House Executive Orders as they develop their consolidated plan and annual action plans.  After submission and HUD's review of these plans, the FY2025 grant agreement will also emphasize conformity with applicable Administration priorities and executive orders.  Under the FY 2025 grant agreement, conformity means that a grantee:

1. shall not use grant funds to promote "gender ideology," as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

2. agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code;

3. certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964;

4. shall not use any grant funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment; and that

5. notwithstanding anything in the grant or application, this Grant shall not be governed by Executive Orders revoked by E.O. 14154, including E.O. 14008, or requirements implementing Executive Orders that have been revoked.

6. The Grantee must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable

requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.

7. If applicable, no state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation.

8. Unless excepted by PRWORA, the Grantee must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

9. Faith-based organizations may be subrecipients for funds on the same basis as any other organization. Grantees may not, in the selection of subrecipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

Grantees should be reminded that they must also continue to use their CPD funding in a manner that complies with applicable statutes, which include:

- Section 109 of the HCDA, 42 U.S.C. 5309;
- Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*;
- Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*;
- Title VIII of the Civil Rights Act of 1968 (The Fair Housing Act), 42 U.S.C. 3601 – 19;
- Section 504 and 508 of the Rehabilitation Act of 1973, 29 U.S.C. 794;
- The Americans with Disabilities Act of 1990, 42 U.S.C. 12131 *et seq.*; and
- Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104-193) (PRWORA).

Your letter also requests a 60-day extension to allow grantees time to comply with any Administration requested changes. Under 24 CFR 91.15, each jurisdiction should submit its consolidated plan to HUD at least 45 days before the start of its program year. The majority of CPD's grantees have a program year start date of July 1st, which means those grantees would submit their plan on or before May 15th. As you are aware, the Department is required to release its formula allocations within 60 days of appropriation. For FY 2025, HUD posted these allocations on May 13, 2025. Given the timing of most annual appropriations, it is not unusual for a grantee to be able to submit its plan as soon as allocations are announced and completes its citizen participation process. We are aware that many grantees begin their planning process well in advance of an allocation announcement and provide guidance on this in CPD Notice 25-02. Additionally, §91.15(a) provides HUD the ability to grant a jurisdiction an extension of the submission deadline for good cause, with the exception of the deadline of August 16. **The Department's failure to receive the plan by August 16, 2025, will automatically result in a loss of CDBG funds for the program year.**

HUD-PRWORA_000319

We value our partnership with NCDA and COSCDA and the broader CDBG Coalition's efforts to assist grantees across the nation perform and achieve program outcomes. Thank you for the collaboration in guiding grantees and reminding them of the value of aligning with applicable statutes, regulations, and executive orders in developing and preparing to submit their respective consolidated plan and/or annual action plan. CPD staff, as always, are available to provide technical assistance.

We look forward to continuing our partnership with you. If you should have any questions, please reach out to me via email at Claudette.Fernandez1@hud.gov.

Sincerely,

**Claudette Fernandez**
Digitally signed by
Claudette Fernandez
Date: 2025.06.05
12:13:50 -04'00'

Claudette Fernandez
General Deputy Assistant Secretary

HUD-PRWORA_000320

# Proposed Agency Interpretation of ''Federal Means-Tested Public Benefit[s]'' Under Personal Responsibility and Work Opportunity Reconciliation Act of 1996

The interpretation of the phrase ''federal means-tested public benefit[s]'' in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 proffered by the Departments of Health and Human Services and Housing and Urban Development — that it applies only to mandatory (and not discretionary) spending programs — constitutes a permissible and legally binding construction of the statute.

January 14, 1997

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF HEALTH AND HUMAN SERVICES

You have requested the views of the Office of Legal Counsel regarding a construction, proffered by the Departments of Health and Human Services (''HHS'') and Housing and Urban Development (''HUD''), of the scope of the phrase ''federal means-tested public benefit[s]'' contained in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (''PRA'' or ''Act'').[1] In particular, HHS and HUD have concluded that this phrase is best construed to apply only to mandatory (and not discretionary) spending programs.[2] Both departments have determined that this construction of the PRA ''best balances [their] other statutory obligations with Congressional goals embodied in the [PRA].''[3] We further understand that the Departments of Agriculture, Education, Labor and Veterans Affairs and the Social Security Administration all concur in, or defer to, the HHS and HUD proffered interpretation of the PRA.[4]

As explained more fully below, we believe that the proffered interpretation is a permissible construction of the statute. The PRA was enacted as a budget reconciliation bill, and, accordingly, must be construed against the backdrop of the Congressional Budget Act of 1974 (''CBA'').[5] Under the CBA, budget reconciliation legislation is subject to expedited procedures in both the Senate and the House. To counterbalance these expedited procedures, the CBA permits a member of the Senate to raise a point of order against any material included in the legislation that is extraneous to the budget reconciliation process. Here, through application of this procedure, a broad definition of the phrase ''federal means-tested

---

[1] Pub L No 104–193, 110 Stat 2105

[2] *See* Letter for Christopher H Schroeder, Acting Assistant Attorney General, Office of Legal Counsel, from Harriet S Rabb, General Counsel, Department of Health and Human Services (Dec. 13, 1996) (''Rabb Request'')

[3] *See, e g.*, Letter for Arthur Fried, General Counsel, Social Security Administration, from Harriet S Rabb, General Counsel, Department of Health and Human Services and Nelson A Diaz, General Counsel, Department of Housing and Urban Development (Nov 21, 1996) (''Rabb/Diaz Letter'')

[4] Rabb Request at 1 Since receiving your letter of December 13, 1996, we have received oral advice from your office that the Social Security Administration concurs in the proffered definition

[5] Pub L. No 93–344, 88 Stat 297 (1974) (codified as amended in scattered sections of 2 U.S.C ).

21

HUD-PRWORA_000321

public benefit'' was struck from early versions of the bill that ultimately became the PRA. Significantly, the broad definition was struck because it reached discretionary spending programs, which, in this context, lay beyond the proper scope of the reconciliation process.

In light of this history, and the absence of a sufficiently clear indication that Congress intended, notwithstanding the CBA, to reach discretionary spending programs, we conclude that the meaning of the phrase ''federal means-tested public benefit'' is, at the very least, ambiguous. We further conclude that the HHS/HUD proffered definition is a reasonable construction of the statute, that the agency interpretation is entitled to judicial deference, and that, accordingly, the proffered definition should govern.

## DISCUSSION

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 110 Stat. at 2260, imposes various restrictions on aliens' eligibility for public benefits in the United States. A number of provisions in title IV establish restrictions with respect to aliens' receipt of ''federal means-tested public benefit[s].'' These restrictions fall into three general categories: (1) provisions that deny ''federal means-tested public benefit[s]'' to qualified aliens for the first five years after their entry into the United States;[6] (2) provisions that require certain groups of aliens who seek federal and state public benefits to prove that they can be credited with 40 qualifying quarters of work under title II of the Social Security Act (''SSA'') and have not received any ''federal means-tested public benefit'' during any of those quarters;[7] and (3) provisions that establish and define sponsor-to-alien deeming rules to be applied to aliens seeking ''federal means-tested public benefit[s].''[8]

The PRA contains no statutory definition of the phrase ''federal means-tested public benefit.'' HHS and HUD, however, have concluded that the restrictions on federal means-tested public benefits contained in title IV should apply only to mandatory spending programs, i.e. programs for which funding is not subject to a definite appropriation.[9] Under this construction of the Act, for example, newly arrived qualified aliens would be ineligible for benefits under mandatory programs for the first five years after their arrival in this country, but they would remain eligible for benefits under discretionary spending programs. The rationale of HHS and HUD for this approach is that ''affected departments should hesitate to apply

---

[6] *See* § 403(a) & (c), 110 Stat. at 2265–66.

[7] *See* §§ 402(a)(2)(B)(ii)(II), 402(b)(2)(B)(ii)(II), 412(b)(2)(B)(ii), 435; 110 Stat. at 2262–63, 2264–65, 2269, 2275–76.

[8] *See* § 421(a), (b)(2)(B), (c), (d), 110 Stat. at 2270–71.

[9] While we have not been provided with a comprehensive list of which programs would be subject to these title IV restrictions under the HHS/HUD interpretation, we understand that Medicaid, food stamps, Supplemental Security Income (''SSI''), and Temporary Assistance for Needy Families (''TANF'') are included within the mandatory category.

22

*Proposed Agency Interpretation of "Federal Means-Tested Public Benefit[s]" Under Personal
Responsibility and Work Opportunity Reconciliation Act of 1996*

the term 'federal means-tested public benefit' broadly in a manner that would deny qualified aliens more benefits than Congress may have clearly intended.'' Rabb/Diaz Letter, attachment at 4. HHS and HUD assert that ''this reading of the term best balances our Departments' other statutory obligations with Congressional goals embodied in [the PRA],'' Rabb/Diaz Letter at 1, and that ''sound legal and policy considerations support a conclusion that the term is limited to means-tested mandatory spending programs.'' Rabb/Diaz Letter, attachment at 1.

In evaluating the construction proposed by HHS and HUD, we are guided by the Supreme Court's landmark opinion, *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which explains the proper approach for reviewing the construction of statutes by the agencies that administer them. The first step in the *Chevron* analysis is to determine ''whether Congress has directly spoken to the precise question at issue.'' 467 U.S. at 842. If congressional meaning, as discerned through ''traditional tools of statutory construction,'' *id.* at 843 n.9, is clear, then no further inquiry is necessary, for the ''unambiguously expressed intent of Congress'' must control. *Id.* at 843. *See also United States v. Alaska*, 503 U.S. 569, 575 (1992). If the statute is silent or ambiguous with respect to the issue posed, then, under the second step in the *Chevron* analysis, the questions become whether Congress has implicitly or explicitly delegated to the agency the authority to resolve the ambiguity and, if so, whether ''the agency's answer is based on a permissible construction of the statute.'' *Chevron*, 467 U.S. at 843. *See also Alaska*, 503 U.S. at 575.

I. *Chevron Step I*

The starting point in determining whether ''Congress had an intention on the precise question at issue,'' *Chevron*, 467 U.S. at 843 n.9, is, of course, the language of the statute itself. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). Ordinarily, if the terms of the statute are plain, they control and that is the end of the matter. *See Chevron*, 467 U.S. at 843; *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398 (1996).

At the same time, it is well-established that a provision in one act of Congress should be read in conjunction with other relevant statutory provisions and not in isolation. *See Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 712–13, 722–36 (1989); *id.* at 738–39 (Scalia, J., concurring in part and concurring in the judgment); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). Thus, courts regularly construe statutory language in light of both other provisions of the same law and relevant provisions from other laws. *See, e.g., Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 711–12 (1996); *Sullivan v. Everhart*, 494 U.S. 83, 92 (1990); *cf. Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring) (meaning of later enacted statute may affect interpretation of ''previously

23

enacted statute, since statutes *in pari materia* should be interpreted harmo-
niously''). The fact that different statutory provisions may employ similar terms
in varying contexts, for example, may give insight as to the meaning of the term
in the particular context that is under review. *See Medtronic, Inc. v. Lohr*, 518
U.S. 470, 487–89 (1996) (plurality opinion). Similarly, the possibility that the
adoption of a seemingly plain statutory meaning may cause a direct conflict with
a different statutory provision, even if in a different law, may trigger application
of the presumption against repeals by implication. *See Watt v. Alaska*, 451 U.S.
259, 266 (1981); *FAA v. Robertson*, 422 U.S. 255, 263 (1975); *Silver v. New
York Stock Exchange*, 373 U.S. 341, 357 (1963). Moreover, courts commonly rely
upon a general interpretive statute, the Dictionary Act, 1 U.S.C. § 1, in construing
specific statutory language that, but for the otherwise-codified definitional provi-
sion, might suggest a different meaning. *See Rowland v. California Men's Colony*,
506 U.S. 194, 199–200, 209–10 (1993); *id.* at 212–13, 222 (Thomas, J., dis-
senting); *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 666 (1979); *United States
v. A & P Trucking Co.*, 358 U.S. 121, 123 (1958).

The general rule that the meaning of particular statutory provisions should be
determined with reference to the broader legislative landscape provides significant
guidance here. As reconciliation legislation, the PRA must be interpreted in the
context of both the Congressional Budget Act of 1974, which establishes general
rules that govern the enactment of budget reconciliation measures, and congres-
sional actions taken pursuant to that statutory regime. Just as courts, when consid-
ering a term that has been defined in the Dictionary Act, read that term in light
of the Dictionary Act definition, so too, here, the rules set forth in the CBA pro-
vide important guidance in discerning the meaning of the relevant provisions of
the PRA.

## A.

The PRA was brought to the floor of the Senate as a reconciliation bill, and
as such was subject to the special rules that govern the reconciliation process
set forth in section 313 of the CBA. *See* 2 U.S.C. § 644 (1994); Robert Keith
& Edward Davis, *The Senate's "Byrd Rule" Against Extraneous Matter in Rec-
onciliation Measures* 1–2 (Congressional Research Service 1995). Section 313
serves to facilitate the expedited consideration of reconciliation legislation by pro-
viding a mechanism for restricting the content of such legislation to provisions
that are material to the reconciliation process. *See* Allen Schick, *The Federal
Budget: Politics, Policy, Process* 82–86 (1995). Over time, these subject matter
restrictions have become known as the "Byrd rule," after Senator Robert Byrd
of West Virginia, their principal proponent. The basic purpose of the Byrd rule
is twofold: to protect the effectiveness of the reconciliation process by excluding
extraneous material that has no significant budgetary effect, and to preserve the

24

deliberative character of the Senate by exempting from expedited consideration all legislative matters that should properly be debated under regular procedures.[10]

Section 313 establishes the general framework that governs the nation's budgeting process and shapes the content of the legislation that Congress enacts through the reconciliation process. Indeed, the Byrd rule has been deemed sufficiently important to the fashioning of the nation's budget that it is not merely an internal rule of Senate procedure but, as we have noted, a statute duly passed by both houses of Congress and signed by the President. The meaning of a particular provision of reconciliation legislation, therefore, such as the phrase "federal means-tested public benefit" in the PRA, must be construed in light of congressional actions taken pursuant to the CBA.

Specifically, the CBA provides:

> When the Senate is considering a reconciliation bill or a reconciliation resolution . . . upon a point of order being made by any Senator against material extraneous to the instructions to a committee which is contained in any title or provision of the bill or resolution or offered as an amendment to the bill or resolution, and the point of order is sustained by the Chair, any part of said title or provision that contains material extraneous to the instructions to said Committee as defined in subsection (b) of this section shall be deemed stricken from the bill and may not be offered as an amendment from the floor.

Pub. L. No. 93–344, tit. III, §313 (codified at 2 U.S.C. §644(a)). Section 313(b)(1) outlines six categories of "extraneous" provisions, the most significant of which, for purposes of this analysis, is (b)(1)(D), which states that a provision shall be considered extraneous "if it produces changes in outlays or revenues which are merely incidental to the non-budgetary components of the provision." 2 U.S.C. §644(b)(1)(D). The rule, as set forth in section 313, is enforced by a Senator raising a point of order against some provision or provisions of the bill, on the ground that that provision deals with subject matters extraneous to the legislation.

---

[10] The Byrd rule was adopted in 1986, following years of struggle on the Senate floor over the inclusion of extraneous provisions in budget reconciliation legislation. Originally enacted as section 20001 of the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub L. No. 99–272, §20001, 100 Stat 82, 390–91 (1986), it was, in 1990, incorporated as section 313 of the Congressional Budget Act of 1974 *See* Budget Enforcement Act of 1990, *enacted as* Title XIII of Omnibus Budget Reconciliation Act of 1990, Pub. L No. 101–508, §13214(b)(1), 104 Stat 1388, 1388–622. As Senator Byrd explained in introducing the amendment that ultimately bore his name:

> Mr President, the Senate is a deliberative body, and the reconciliation process is not a deliberative process . . Such an extraordinary process, if abused, could destroy the Senate's deliberative nature Senate committees are creatures of the Senate, and, as such, should not be in the position of dictating to the Senate as is being done here By including mater[i]al not in their jurisdiction or matter which they choose not to report as separate legislation to avail themselves of the nondeliberative reconciliation process, Senate committees violate the compact which created both them and the reconciliation process

131 Cong. Rec. 28,968 (1985)

25

The PRA's original definition of "federal means-tested public benefit," contained in both the Senate and House bills, encompassed an expansive range of benefit and assistance programs and did not distinguish between those that were mandatory and those that were discretionary. When the Senate bill reached the floor, Senator Exon invoked the Byrd rule to raise an omnibus point of order against a number of provisions of the legislation, including the definition of "federal means-tested public benefit." 142 Cong. Rec. 18,296–97 (1996). His objection to this provision was based upon section 313(b)(1)(C) of the CBA, i.e. the provision was not within the Finance Committee's jurisdiction. *Id*. at 18,297.

The Parliamentarian upheld Senator Exon's Byrd rule objection on the grounds that the provision was outside the Finance Committee's jurisdiction and that, to the extent the definition encompassed discretionary programs, its impact on the budget was "merely incidental." [11] Rules determining eligibility for discretionary program benefits within a reconciliation bill have no direct effect on the budget. Rather, reducing the size of a discretionary program is accomplished by Congress reducing the appropriation for the program, which the proposed definition of "federal means-tested public benefit" did not do. By contrast, so-called entitlement, or mandatory, programs, generally operate under indefinite appropriations; the size of the program is not determined based on a fixed appropriation, but rather on expenditures incurred for all eligible program participants. Thus expenditures under mandatory programs can be directly reduced by restricting eligibility and thereby reducing the number of people receiving benefits.

The ruling sustaining Senator Exon's objection was not appealed by any other Senator. As a result, the definition of "federal means-tested public benefit" was struck from the Senate bill. Moreover, the House acceded to the Senate deletion and agreed to remove its own expansive definition of the term "federal means-tested public benefit" in conference. The conference committee acknowledged the deletion of the definition under the Byrd rule. 142 Cong. Rec. 20,484 (1996).

This legislative record provides strong evidence that the phrase "federal means-tested public benefit[s]," as used in the PRA, should be construed to reach only mandatory (and not discretionary) spending programs. In keeping with section 313, a Byrd rule objection was made and sustained, a definition was dropped from the bill in response to the objection, and the House acceded to the Senate version of the bill in light of the Byrd rule objection. To ignore these events

---

[11] The Parliamentarian upheld the objection on the basis of both sections 313(b)(1)(C) (not within Finance Committee's jurisdiction) and 313(b)(1)(D) (prohibition against policy changes with "merely incidental" budgetary impact). *See* 142 Cong Rec 20,975 (1996) (statement of Senator Graham during consideration of conference report on H R. 3734), *see also id* at 20,979 (statement of Senator Chafee) Although Senator Exon's specific objection to the definition, as itemized in his list, was jurisdictional only, he raised that objection in an omnibus point of order based generally upon section 313(b)(1), which permitted the Parliamentarian to consider any basis under (b)(1) for upholding the objection In any event, in this case it ultimately makes no difference to the analysis whether Senator Exon's objection was sustained on jurisdictional grounds alone or on both grounds because any jurisdictional objection under section 313 is based upon the fact that the Senate committee considering a reconciliation bill would only have jurisdiction over mandatory programs. *See* Schick, *The Federal Budget* 83 (1995) (under current practice, "reconciliation instructions are given only to committees that have jurisdiction over revenues or direct (mandatory) spending programs"). Thus, the underlying reasoning for objections under (b)(1)(C) and (b)(1)(D) is the same.

26

in determining the meaning of the phrase "federal means-tested public benefit" would be to disregard the purpose and language of section 313 itself, which serves to facilitate the budgeting process by providing a mechanism by which the scope of reconciliation legislation may be contained.[12]

## B.

Several aspects of the text and legislative history of the PRA, when viewed in isolation, arguably support a broad interpretation of "federal means-tested public benefit" that would include discretionary programs. Ultimately, however, we find little evidence that Congress, in passing the final version of the bill, intended to reintroduce the very definition that had been struck through the operation of section 313 of the CBA. What evidence does exist is at best ambiguous, and thus, in our view, does not foreclose HHS and HUD, two of the agencies charged with administering the Act, from construing the PRA in the manner that they propose.

As previously noted, the PRA, as enacted, contains no definition of the phrase "federal means-tested public benefit." Had Congress intended for this phrase to include discretionary spending programs, over the sustained objection of a member of the Senate, it could have reinserted the deleted definition or similar language in the final version. Indeed, the conference committee did reintroduce a number of other provisions that also had been struck from the Senate bill through Senator Exon's omnibus Byrd rule objection, and Congress ultimately voted to retain these provisions in the final version of the PRA. *See* § 816, 110 Stat. at 2318 (caretaker exemption; originally § 1126 of S. 1956, 104th Cong. (1996)); § 838, *id.* at 2331 (expedited coupon service; originally § 1148 of S. 1956; § 850, *id.* at 2336–37 (waiver authority; originally § 1159 of S. 1956); § 729(d), *id.* at 2303 (WIC program/drug abuse; originally § 1259(d)(1) of S. 1956); § 912, *id.* at 2353–54 (abstinence education; originally § 2909 of S. 1956); *compare with* S. 1956 (July 16, 1996 and July 24, 1996 versions). The decision of the conference not to reintroduce the deleted definition of "federal means-tested public benefit" leaves

---

[12] Some language in one appellate decision might be read to suggest that courts should distinguish between procedural and substantive legislative motivations in inferring congressional intent. *See Elizabeth Blackwell Health Ctr. for Women v. Knoll,* 61 F 3d 170, 180 (3d Cir. 1995), *cert denied,* 516 U S 1093 (1996) The appellees in *Elizabeth Blackwell Health Center* argued that Congress, by using a rule of House parliamentary procedure to eliminate a provision in the 1994 Hyde Amendment requiring victims of rape or incest to report the crime to the police prior to seeking publicly funded abortions, intended to prohibit state statutes imposing such reporting requirements. The Third Circuit rejected that argument stating that, "[a]t most, the rejection [of the provision] is a sign that Congress did not wish to mandate reporting requirements on the states," and that Congress's rejection of mandatory reporting requirements "on procedural grounds provides no basis for any inference regarding Congress's views about the substantive provisions of the legislation " 61 F.3d at 180 Unlike here, the procedural objection made in *Elizabeth Blackwell Health Center* did not in any way suggest that Congress intended the specific interpretation offered in that case. The procedural objection raised to the reporting provision was based upon a House rule of parliamentary procedure that prohibited attempts to "legislate" on an appropriations bill. *Id* at 174 The basis for this objection bore no relationship to the substantive interpretation appellees urged. In contrast, here the definition proffered by HHS and HUD is based upon a budgetary distinction between mandatory and discretionary programs, precisely the same basis upon which Senator Exon's Byrd rule objection was made

27

HUD-PRWORA_000327

the PRA without the most obvious textual guidance that Congress might have provided had it wished to adopt the previously stricken definition.

The PRA does, however, define the related phrase "federal public benefit" broadly, and in a manner that appears to draw no distinction between mandatory and discretionary programs.[13] The phrase "means-tested," moreover, though not defined in the statute, is defined in the dictionary.[14] It could be argued that these two phrases combine to produce a phrase that is sufficiently plain to make clear that, in enacting the bill, Congress effectively overruled the prior Byrd rule deletions.

Although not entirely without force, we find this argument inconclusive. First, even assuming that the phrases "federal public benefit" and "means-tested" are free of ambiguity, the proposition that combining plain terms necessarily results in an equally plain phrase is not at all self-evident.[15] *See, e.g., Smiley v. Citibank,* 517 U.S. 735, 746–47 (1996). It is not clear, therefore, that, even ignoring the deletion of the broad definition pursuant to the CBA, the bill's final language is so free from ambiguity as to be deemed plain.

More important, as we have explained, the PRA was enacted as reconciliation legislation, and thus can be understood only in light of the special rules that Congress set forth in the CBA and the congressional action taken pursuant to those

---

[13] Section 401(c)(1) defines "federal public benefit" as

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States, and

> (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States

110 Stat at 2262

[14] The dictionary defines "means test" as "any examination of the financial state of a person as a condition precedent to receiving social insurance, public assistance benefits, or other payments from public funds," *Webster's Third New International Dictionary* 1399 (3d ed 1986) *See also Random House Dictionary of the English Language* 1192 (2d ed 1987) ("means test" is "an investigation into the financial position of a person applying for aid from public funds") Despite this definition, precisely what constitutes a "means test" in the context of federal programs that distribute benefits on the basis of need is not clear Some federal programs look to both an applicant's income *and* his or her resources to determine eligibility *See, e.g.,* Medicaid program, 42 U S C. §§ 1396–1396v (1994 & Supp II 1996), Supplemental Security Income program, 42 U S C. §§ 1381–1381a (1994), Food Stamp program, 7 U S.C §§ 2011–2032 (1994 & Supp II 1996) Others look *only* to income without any inquiry into resources. *See, e g,* National School Lunch program, 42 U S C §§ 1751–1769h (1994 & Supp II 1996); Women, Infants & Children program, 42 U S.C § 1786 (1994 & Supp II 1996) Still others presume need on the basis of area of residence, enrollment in another welfare program, or some other factor *See, e.g.,* Indian health services, 42 C F R. § 36 12 (eligibility based upon area of residence), Commodity Supplemental Food Program, 7 U S C. § 612c note (1994) (eligibility based upon enrollment in another government benefit program for low-income persons), Chapter 1 migrant education program, 20 U S.C. § 6398 (1994) (presumption of need for migrant children)

[15] An unrelated provision of the PRA itself hints at the ambiguity of the phrase "federal means-tested public benefit" Section 911 of the PRA ensures that individuals whose benefits have been reduced because of an act of fraud by the individual may not receive increased benefits under "any other means-tested welfare or public assistance program for which Federal funds are appropriated" as a result of such reduction. § 911(a), 110 Stat. at 2353. The provision then defines the phrase "means-tested welfare or public assistance program for which Federal funds are appropriated" to include "the food stamp program     , any program of public or assisted housing under title I of the United States Housing Act of 1937     ., and any State program funded under part A of title IV of the Social Security Act." § 911(b), 110 Stat at 2353 The provision does not state whether these programs are intended to be exhaustive or exemplary, but, in any event, the fact that Congress concluded that it was necessary to provide a definition of some sort suggests that Congress did not believe that the meaning of the defined phrase was plain.

28

PageID #: 3489

rules. Therefore, the critical question is not whether the phrase "federal means-tested public benefit" is plain when read in isolation, but rather whether the phrase reveals that Congress intended to incorporate the definition that the Senate had deleted, with the House's acquiescence, as a consequence of its compliance with the budgetary rules established by section 313. The PRA's definition of "federal public benefit" does not reveal such an intention. That same definition was already in the bill at the time Senator Exon raised his point of order objecting to the definition of "federal means-tested public benefit." Its inclusion in the final bill, therefore, cannot reasonably be viewed as a rejoinder to Senator Exon's objection.

Moreover, even apart from the operation of section 313, it is a well-settled canon of interpretation that "where the final version of a statute deletes language contained in an earlier draft, [it may be presumed] that the earlier draft is inconsistent with ultimate congressional intentions." *In re Town & Country Home Nursing Servs., Inc.*, 963 F.2d 1146, 1153 (9th Cir. 1991); *see also Russello v. United States*, 464 U.S. 16, 23–24 (1983); *Gulf. Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974) (Congress's deletion of provision "strongly militates against a judgment that Congress intended a result that it expressly declined to enact"); *cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) (" 'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.' ") (citations omitted). That canon surely applies with particular force in a context such as this, in which the deletion occurs by reason of an independent congressional statute that governs the nation's budgeting process.

A second textual argument that could be made in support of a broader definition arises from the list of exceptions to "federal means-tested public benefit" programs in section 403(c)(2) of the PRA. The inclusion of some discretionary programs in this list of exceptions would be unnecessary unless the term itself included such programs. As an initial matter, we note that the logic of this argument proves too much, particularly in light of other drafting flaws that appear in the Act. The same provision that excepts certain discretionary programs from the limitation on eligibility for "federal means-tested public benefit[s]," for example, also excepts certain programs specified by the Attorney General that are not conditioned on "the individual recipient's income or resources." § 403(c)(2)(G), 110 Stat. at 2266. The view that Congress would not have excepted a program that was not otherwise covered would erroneously suggest that "means-tested" must be a more expansive term than the phrase "condition[ed] . . . on the individual recipient's income or resources."

More to the point, the list of exceptions included in section 403(c)(2) is quite plausibly understood as an inconsistency resulting from the proper operation of the Byrd rule itself. The remedy provided in section 313 is a blunt instrument

29

offering a basis for striking extraneous material in a reconciliation bill, but no mechanism for re-drafting remaining legislative provisions to conform them to the legislation as revised by application of the Byrd rule. Indeed, there was no careful mark-up of the bill following the deletion of the definition of "federal means-tested public benefit," where inconsistent provisions might have been brought into conformity.[16]

Moreover, it is unlikely that members of Congress would have seen the list of exceptions as obviously inconsistent with the PRA as revised by application of the Byrd rule. The categorization of particular programs as mandatory or discretionary is not at all obvious, and it is likely that many, if not most, members did not know precisely which programs fell into which category.[17] In addition, the list of exceptions can be seen as Congress's attempt to safeguard certain programs from any definitional skirmishes and ensure their exception.[18]

We are also unpersuaded that the legislative history of the PRA supports the conclusion that Congress intended to enact extraneous material through the reconciliation process over the sustained objection of a member of the Senate. Although noting that the definition of "federal means-tested public benefit" was deleted from the bill through operation of section 313, the conferees' report on the PRA nonetheless asserts that "[i]t is the intent of the conferees that [the deleted] definition be presumed to be in place for purposes of this title." 142 Cong. Rec. 20,484 (1996). We believe that this statement in the conferees' report cannot be taken as controlling.

As noted above, " '[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.' " *Cardoza-Fonseca*, 480 U.S. at 442–43 (citations omitted). Here, this rule cannot plausibly give way to contrary legislative history. Both houses of Congress deleted the definition of "federal means-tested public benefit": the Senate did so on the basis

---

[16] Similar inconsistencies appear in other provisions of the PRA as a result of Byrd rule deletions For example, the family cap provision of S 1956, *see* § 103 of July 16 version of S 1956 (establishing new section 408(a)(2) of TANF program), was deleted through a Byrd rule objection The conference report notes this deletion and the provision does not appear in the final version of the PRA 142 Cong Rec 20,459 (1996) Nevertheless, a reference to the family cap provision remains, in § 103 of the PRA (establishing new § 402(a)(7) of title IV of the SSA), which permits states to waive program requirements in cases of domestic violence. 110 Stat. at 2112, 2115

[17] In fact, during Senate consideration of the conference version of the bill, Senator Graham confirmed, for himself and for any other members that might not have analyzed the list of excepted programs, that the post-conference version of the bill was consistent with the Senate's earlier Byrd rule objections, defining "federal means-tested public benefit" as applicable only to mandatory programs *See infra* note 20

[18] As a result, we do not believe it to be significant that the final version of the PRA also included exceptions for two discretionary programs that did not appear in the Senate version of the PRA from which the broad definition of "federal means-tested public benefit" had been deleted Specifically, the Head Start and Job Training programs were only included in the House's final list of exempted programs, and not the Senate's, even though they do appear in the final version of § 403(c)(2) 110 Stat. at 2266. The inclusion of these two additional exceptions does not change our conclusion because there is no reason to believe that the inclusion of exceptions for these particular discretionary programs, more than the exceptions for the other discretionary programs, was intended to do more than safeguard them from further definitional disagreements In any event, the inclusion in the final bill of two additional discretionary programs seems to us a most oblique means for Congress to reinsert a definition of "federal means-tested public benefit" that had previously been struck

HUD-PRWORA_000330

of the CBA, and the House acceded to the Senate. A conference committee cannot essentially overrule those decisions by including contrary language in its report. To permit this to occur not only would run counter to the canon against construing a statute to include terms that Congress had earlier discarded, *id.*, but, even more fundamentally, would undermine the rules that were established with such care in section 313, which permit a Senator to object to extraneous material that the conference might include in the legislation itself, but provide no mechanism for correcting the conference's explanatory statement.[19] Finally, subsequent Senate colloquy — admittedly an insubstantial grounding for legislative intent if standing alone — confirms the understanding that a definition that would have extended the term to encompass discretionary programs was deleted because it was outside the subject matter scope of the reconciliation process.[20]

We thus conclude that the legislative record provides strong support for the proffered construction of the PRA and that the inconsistencies noted above, while giving rise to some ambiguity, are insufficient to rebut the evidence that Congress intended to reach only mandatory spending programs. We, accordingly, turn to the second step of the *Chevron* inquiry.

---

[19] Section 313 permits a Byrd rule objection to be made at various points throughout the legislative process, including after the bill has been reported out of conference. 2 U.S.C. § 644(c). Thus, the statute allows for the possibility that Congress might attempt to reinsert a deleted provision into a bill during conference, and provides the Senate with the opportunity to renew its Byrd rule objection if it insists upon the deletion. However, because a Byrd rule objection can be raised only against legislative language, not against explanatory statements in the conference report, *see* § 644(a), allowing a conference report statement to act as the equivalent of legislative language effectively abolishes the statutory mechanism established to ensure the integrity of the Byrd rule process

[20] Specifically, in the debate over the conference report on the Senate floor, Senator Graham sought to confirm the exact scope of the term "federal means-tested public benefit." After reviewing the history of the Byrd rule objection and the Parliamentarian's ruling, Senator Graham engaged Senator Kennedy in the following colloquy.

> *Mr. Graham* . . . [W]ould the Senator agree that, when the Senate struck these sections as violating the Byrd rule, the Senate's intent was to prevent the denial of services in appropriated programs such as those that provide services to victims of domestic violence and child abuse, the maternal and child health block grant, social services block grant, community health centers and migrant health centers?
>
> *Mr. Kennedy* Yes. Under the Byrd rule, the budget reconciliation process cannot be used to change discretionary spending programs. Only mandatory spending is affected.

142 Cong. Rec. 20,975 (1996).

Senator Graham subsequently asked Senator Exon, who was one of the Senate conferees on the bill, whether "the version of the bill recommended in this conference report is consistent with this understanding." *Id* Senator Exon confirmed that it was. Later during the debate, Senator Graham raised this issue again with another conferee, Senator Chafee:

> *Mr. Graham* I wonder if my colleague could address one point on this bill. I notice that the term "Federal means-tested public benefit" was defined in previous versions of the bill However, in this conference report, no definition is provided.
>
> *Mr Chafee* . . [W]hen the bill was considered in conference, I understand that there was an intentional effort to ensure this provision complied with [the] Byrd rule by omitting the definition of that particular term.
>
> In other words, then, the term "Federal means-tested public benefit" — if it is to be in compliance with the Byrd rule — does not refer to discretionary programs.

*Id* at 20,979.

31

## II. *Chevron Step II*

Under the second step of the *Chevron* analysis, two questions arise. First, it is necessary to determine whether Congress intended for agencies or courts to resolve the ambiguity that Congress, either intentionally or inadvertently, failed to resolve. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990) ("[a] pre-condition to deference under Chevron is a congressional delegation of administrative authority"); *see also Johnson v. United States R.R. Retirement Bd.*, 969 F.2d 1082, 1088 (D.C. Cir. 1992) ("If agencies are simply interpreting a statute, but have not been granted the power to 'administer' it, the principle of deference applies with less force."), *cert. denied*, 507 U.S. 1029 (1993). Second, if Congress intended for agencies to resolve the ambiguity, then it is necessary to determine whether the proposed agency interpretation is "permissible." *Chevron*, 467 U.S. at 843.[21] If Congress intended for the agencies to resolve the interpretive ambiguity, and the agency resolution is permissible, then the agency construction is binding.[22] *See id.*

### A.

Congress need not expressly authorize agencies to construe ambiguous statutory terms in order for courts to be bound by agency constructions. In *Chevron* itself, for example, the Court deferred to an Environmental Protection Agency ("EPA") construction of the Clean Air Act, even though no statutory language expressly empowered that agency to impose a binding interpretation of the term "stationary source." The Court simply inferred that Congress must have intended for the EPA, as the agency entrusted with administering the Clean Air Act, to resolve the policy choices that inhere in the interpretation of ambiguous statutory language. *See Chevron*, 467 U.S. at 843. The Court explained that this inference was reasonable because agencies generally possess superior expertise and greater political accountability than courts. *See id.* at 865–66.

On the other hand, Congress may impliedly authorize courts to interpret a particular statutory provision, even though an agency has been generally charged with administering the statute as a whole. In *Adams Fruit Co.*, for example, the Court refused to defer to the Department of Labor's resolution of the question whether exclusivity provisions in state worker compensation laws trumped a federal private right of action under the Migrant and Seasonal Agricultural Worker Protection

---

[21] Although the Court stated in *Cardoza-Fonseca* that *Chevron*-deference does not apply to pure questions of law, such as the one at issue here, it has subsequently retreated from this position Our memorandum proceeds on the assumption that *Chevron* applies to such questions. *Cardoza-Fonseca*, 480 U.S at 454–55 (Scalia, J., concurring)

[22] Even if Congress has *not* entrusted the interpretative function to an agency, courts should still give careful consideration to agency constructions that are based on expertise and to which they have consistently adhered. *See, e g., Atchison, Topeka and Santa Fe Ry. v. Pena*, 44 F 3d 437, 445 (7th Cir. 1994) (Easterbrook, J, concurring), *aff'd sub nom, Brotherhood of Locomotive Engineers v Atchison, Topeka & Santa Fe Ry*, 515 U S 1141 (1995).

HUD-PRWORA_000332

Act, 29 U.S.C. §§ 1801–1872 (1994 & Supp. I 1995) ("Worker Protection Act").
Even though the Department was responsible for administering the Worker Protec-
tion Act generally, the Court concluded that Congress intended for the judiciary,
not the agency, to construe the contours of the private right of action that the
Worker Protection Act created. *See Adams Fruit Co.*, 494 U.S. at 649. The Court
based that conclusion primarily on the fact that the Department was not required
to interpret the private right of action provisions as an incident of its general
administration of the Worker Protection Act, as those provisions established a
parallel and independent enforcement mechanism. *See id.* at 649–50.

In our view, the delegation question presented here is more analogous to
*Chevron* than to *Adams Fruit Co*. Although the PRA does not expressly delegate
general administrative authority to HHS, HUD, or, for that matter, to any other
particular agency, the PRA effectively amends the statutes that establish the assist-
ance programs over which HHS, HUD and other federal agencies have already
been delegated administrative authority. Because those agencies possess general
administrative authority to interpret eligibility criteria set forth in statutes enacted
prior to the PRA, we believe it to be a fair inference that Congress intended
for the changes effected by the PRA to be administered in the same manner.

In an analogous context, the Third Circuit deferred to HHS' construction of
the Hyde Amendment, even though, as the dissent in that case pointed out, the
Hyde Amendment does not expressly delegate administrative authority to any
agency. *Compare Elizabeth Blackwell Health Ctr. for Women*, 61 F.3d at 182,
*with id.* at 196 (Nygaard, J., dissenting). The court concluded that HHS' authority
to administer the Medicaid statute necessarily included the authority to construe
legislation that amended the Medicaid statute's eligibility requirements. *Id.* at 182;
*see also Fort Wayne Community Schools v. Fort Wayne Educ. Ass'n*, 977 F.2d
358, 365 (7th Cir. 1992) (deferring to Postal Service's construction of a criminal
statute on the ground that it was "intimately connected" to the purposes of the
statute that Postal Service was charged with administering), *cert. denied*, 510 U.S.
826 (1993); *Associated Third Class Mail Users v. United States Postal Serv.*, 600
F.2d 824, 826 n.5 (D.C. Cir.), *cert. denied*, 444 U.S. 837 (1979) (same).

The case for deference is even stronger here, moreover, because the PRA not
only amends the eligibility requirements for the programs that these agencies
administer, but also expressly assigns these agencies the responsibility of
informing the public of the changes in those eligibility requirements that the PRA
effects. Section 404(a) of the PRA requires federal agencies that administer assist-
ance programs to provide the public with information about how the PRA changes
the eligibility requirements for those programs.[23] This assignment, we believe,
impliedly delegates to these agencies the authority to resolve the meaning of the

---

[23] "Each Federal agency that administers a program to which section 401, 402, or 403 applies shall, directly
or through the States, post information and provide general notification to the public and to program recipients
of the changes regarding eligibility for any such program pursuant to this subtitle " 110 Stat. at 2267

phrase "federal means-tested public benefit": agencies must first interpret the meaning of the term "federal means-tested public benefit" in order to comply with section 404(a)'s mandate to inform the public of the PRA's impact on eligibility requirements. Only by determining whether that term applies to both mandatory and discretionary assistance programs (among other questions of application) will agencies be able to determine who is eligible for the programs that they already administer pursuant to separate statutory delegations. Section 404(a)'s notification requirement serves a useful function, moreover, only to the extent that the agencies are able to provide *accurate* information about the eligibility changes that the PRA mandates. If courts are free to reject reasonable agency interpretations of that term, then agencies will be forced to risk providing inaccurate eligibility information or to refrain from providing complete eligibility information altogether. Because neither result seems consistent with the purpose behind section 404(a), it is proper to infer that Congress intended for the agencies to provide the authoritative construction of the term "federal means-tested public benefit" when it assigned them the notification task set forth in section 404(a).

In light of the agencies' statutorily assigned responsibilities, the agencies cannot fairly be viewed as "trying to 'bootstrap' [themselves] into an area in which [they have] no jurisdiction" in seeking deference for their construction of the term "federal means-tested public benefit." *Wagner Seed Co. v. Bush*, 946 F.2d 918, 923 (D.C. Cir. 1991), *cert. denied*, 503 U.S. 970 (1992) (citation omitted). Rather, they are offering an interpretation that results from the "intimate connection" between the purposes of the statutes that the agencies already administer and those of the PRA generally, *Fort Wayne Community Schools*, 977 F.2d at 365, and that arises in connection with the "special duty" that section 404(a) of the PRA assigns them. *See FLRA v. Department of Treasury*, 884 F.2d 1446, 1451 (D.C. Cir. 1989), *cert. denied*, 493 U.S. 1055 (1990).

We are aware of those cases that assert that courts should not defer to statutes that are "general" in nature or that are subject to interpretation by more than one agency. *See, e.g., Johnson v. United States R.R. Retirement Bd.*, 969 F.2d at 1088 (citing cases). We do not believe that this rule of construction should apply here. The rule has been invoked primarily in cases in which agencies seek *Chevron* deference for their construction of statutes that have been expressly entrusted to other agencies for administration, *see id.; Cheney R.R. Co. v. Railroad Retirement Bd.*, 50 F.3d 1071, 1073–74 (D.C. Cir. 1995), that are designed to ensure that agencies remain publicly accountable or proceed in a fair manner, *see, e.g., Professional Reactor Operator Soc'y v. United States Nuclear Regulatory Comm'n*, 939 F.2d 1047, 1051 (D.C. Cir. 1991); *see Air North Am. v. Department of Transp.*, 937 F.2d 1427, 1436 (9th Cir. 1991), or that are not intimately connected to the mission of the agency that seeks deference. *See, e.g., Professional*

HUD-PRWORA_000334

*Airways Sys. Specialists v. FLRA*, 809 F.2d 855, 857 n.6 (D.C. Cir. 1987). The
results in these cases are, therefore, best explained as particular applications of
the justifiable presumption that Congress does not intend for courts to be bound
by agency constructions that are beyond agency expertise, *see, e.g., Colorado
Nurses Ass'n v. FLRA*, 851 F.2d 1486, 1488 (D.C. Cir. 1988), or that concern
provisions that are designed to ensure agencies proceed in a fair and accountable
manner, *see Air North Am. v. Department of Transp.*, 937 F.2d at 1436. These
cases do not establish, in our view, a general presumption in favor of judicial
resolution of all statutory ambiguities that confront more than a single agency.

Indeed, *Chevron*'s emphasis on the greater political accountability of agencies
counsels against a rule of construction that would afford judges the last word
on the meaning of any statute that does not authorize a single agency to administer
it. *See Chevron*, 467 U.S. at 865–66. Where, as here, a statute assigns a group
of agencies a particular task that is related to the duties that the agencies already
have been assigned by their governing statutes, Congress may be presumed to
have intended for these agencies to resolve any ambiguities that may arise. That
the PRA does not assign any particular agency primary interpretive responsibility
does not change the analysis. Congress may have intended for the courts to resolve
the meaning of the term "federal means-tested public benefit" in the event of
unresolved interpretive conflicts among the agencies identified by section 404.
There is no reason to suppose, however, that Congress intended for unelected
judges to countermand a *unanimous* resolution of the policy question by the agen-
cies closest to it. *Cf. American Fed'n of Gov't Employees v. FLRA*, 2 F.3d 6,
10 (2d Cir. 1993) ("[W]hen two agencies, each examining statutes they are
charged with administering, agree as to the interplay of the statutes, there is no
more reason to mistrust their congruent resolutions than there is to mistrust action
taken by a single agency."); *see also Salleh v. Christopher*, 85 F.3d 689 (D.C.
Cir. 1996) (suggesting that joint agency interpretations may deserve deference);
*cf. Lieberman v. FTC*, 771 F.2d 32, 37 (2d Cir. 1985) (declining to defer to joint
agency construction but noting that Congress may delegate "dual lawmaking
authority"). So long as the agencies identified by section 404(a) concur in their
interpretation of the term "federal means-tested public benefit," therefore, we
believe that courts would be bound to accord that interpretation *Chevron* def-
erence.

Finally, we do not believe that the deference that the agencies receive under
*Chevron* should turn on whether their construction of the term "federal means-
tested public benefit" would be deemed an "interpretative" or "legislative" rule
under the Administrative Procedure Act. We agree with those courts that have
concluded that *Chevron* deference turns solely on whether the agency's interpreta-
tion may fairly be understood to be one for which Congress intended judicial
deference to apply, *see, e.g., Elizabeth Blackwell Health Ctr. for Women*, 61 F.3d
at 182; *id.* at 190–96 (Nygaard J., dissenting) (reviewing conflicting caselaw);

HUD-PRWORA_000335

*Kelley v. EPA*, 15 F.3d 1100, 1108 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1110 (1995); *see generally* Robert A. Anthony, *Which Agency Interpretations Should Bind Citizens and the Courts?*, 7 Yale J. on Reg. 1 (1990), and not on whether the proposed construction is "interpretative" or "legislative" in nature.[24] The latter determination, in our view, relates only to the procedural question whether the agency's rule may be promulgated outside the process of notice and comment rulemaking. That determination should have no bearing on the entirely separate question whether Congress intends for courts or agencies to resolve the interpretive ambiguity at issue.[25]

### B.

Given that Congress impliedly delegated to the agencies the responsibility for resolving the interpretive question raised by the PRA's use of the phrase "federal means-tested public benefit," the only remaining issue under step two of the *Chevron* analysis is whether the answer provided by the agencies "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. If it is, that construction is binding. *Id.*

A definition of the term "federal means-tested public benefit" that includes only mandatory assistance programs is manifestly "permissible." The second step of the *Chevron* analysis arises only if Congress failed to resolve whether the term "federal means-tested public benefit" applies to discretionary assistance programs. The conclusion that Congress left that question open is possible only if the phrase admits of the proffered construction. The same reasons that led us to conclude that there is strong evidence to support the HHS and HUD proffered definition of "federal means-tested public benefit," *see infra* pp. 22–31, therefore, also show that the proffered definition is a "permissible" one. Moreover, HHS and HUD assert that their reading "best balances our Departments' other statutory obligations with Congressional goals embodied in the [PRA]." Rabb/Diaz Letter at 1. Under *Chevron*, agency constructions based on reasonable assessments of statutory purposes are entitled to deference. *See Chevron*, 467 U.S. at 858.

---

[24] The Supreme Court has stated in post-*Chevron* dicta that interpretive rules are entitled to less weight than "norms that derive from the exercise of the Secretary's delegated lawmaking powers." *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U S 144, 157 (1991) More recently, however, the Court has intimated that interpretive rules may be entitled to *Chevron*-style deference *See Reno v Koray*, 515 U S 50, 60–61 (1995).

[25] Of course, there are clearly some instances in which informal agency interpretations may be presumed to be undeserving of full *Chevron* deference There are sound reasons, for example, to presume that Congress does not intend for courts to defer to agency litigating positions *See Bowen v. Georgetown Univ Hosp.*, 488 U S. 204, 212–13 (1988) Here, however, the agencies proffer their construction outside the litigation context. Moreover, we note that the very existence of the *Bowen* rule, which precludes the application of *Chevron* deference to agency litigating positions, would be unnecessary if all "interpretative" rules — including those fashioned outside the litigation process — were already precluded from receiving such deference

HUD-PRWORA_000336

*Proposed Agency Interpretation of "Federal Means-Tested Public Benefit[s]" Under Personal
Responsibility and Work Opportunity Reconciliation Act of 1996*

## CONCLUSION

We accordingly conclude that the HHS/HUD proffered definition constitutes a permissible and legally binding construction of the PRA.

DAWN E. JOHNSEN
*Acting Assistant Attorney General*

RANDOLPH D. MOSS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

37

HUD-PRWORA_000337

No. 731–TA–652 (Review), may be closed to the public to prevent the disclosure of BPI.

By order of the Commission.

Issued: January 8, 2001.

**Donna R. Koehnke,**
*Secretary.*

[FR Doc. 01–1221 Filed 1–12–01; 8:45 am]

**BILLING CODE 7020–02–P**

## INTERNATIONAL TRADE COMMISSION

**[Inv. No. 337–TA–444]**

### In the Matter of Certain Semiconductor Light Emitting Devices, Components Thereof, and Products Containing Same; Notice of Investigation

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Institution of investigation pursuant to 19 U.S.C. 1337.

**SUMMARY:** Notice is hereby given that a complaint was filed with the U.S. International Trade Commission on December 15, 2000, under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, on behalf of Rohm, Inc., of Japan. A supplement to the Complaint was filed on January 4, 2001. The complaint, as supplemented, alleges violations of section 337 in the importation into the United States, the sale for importation, and the sale within the United States after importation of certain semiconductor light emitting devices, components thereof, and products containing same by reason of infringement of claims 1, 2, 4 and 6–45 of U.S. Letters Patent 6,084,899 and claims 1–5 and 9–23 of U.S. Letters Patent 6,115,399. The complaint further alleges that an industry in the United States exists and/or is in the process of being established as required by subsection (a)(2) of section 337.

The complainant requests that the Commission institute an investigation and, after the investigation, issue a permanent exclusion order and a permanent cease and desist order.

**ADDRESSES:** The complaint and supplement, except for any confidential information contained therein, are available for inspection during official business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary, U.S. International Trade Commission, 500 E Street, SW., Room 112, Washington, DC 20436, telephone 202–205–2000. Hearing impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on 202–205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000. General information concerning the Commission may be obtained by accessing its Internet server (*http://www.usitc.gov*).

**FOR FURTHER INFORMATION CONTACT:** Anne M. Goalwin, Esq., Office of Unfair Import Investigations, U.S. International Trade Commission, telephone 202–205–2574.

**Authority:** The authority for institution of this investigation is contained in section 337 of the Tariff Act of 1930, as amended, and in section 210.10 of the Commission's Rules of Practice and Procedure, 19 CFR § 210.10 (2000).

*Scope of Investigation:* Having considered the complaint, the U.S. International Trade Commission, on January 9, 2001, *Ordered That—*

(1) Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain semiconductor light emitting devices, components thereof, or products containing same by reason of infringement of claims 1, 2, 4, 6–44 or 45 of U.S. Letters Patent 6,084,899 or claims 1–5, 9–22 or 23 of U.S. Letters Patent 6,115,399, and whether an industry in the United States exists and/or is in the process of being established as required by subsection (a)(2) of section 337.

(2) For the purpose of the investigation so instituted, the following are hereby named as parties upon which this notice of investigation shall be served:

(a) The complainant is—

Rohm Co., Ltd., 21, Saiin Mizosaki-cho, Ukyo-ku, Kyoto, 615–8585, Japan

(b) The respondents are the following companies alleged to be in violation of section 337, and are the parties upon which the complaint is to be served:

Nichia Corporation, 491 Oka, Kaminaka-Cho, Anan, Tokushima, 774–8601, Japan

Nichia America Corporation, 3775 Hempland Road, Mountville, PA 17554

(c) Anne M. Goalwin, Esq., Office of Unfair Import Investigations, U.S. International Trade Commission, 500 E Street, S.W., Room 401–P, Washington, DC 20436, who shall be the Commission investigative attorney, party to this investigation; and

(3) For the investigation so instituted, the Honorable Sidney Harris is designated as the presiding administrative law judge.

Responses to the complaint and the notice of investigation must be submitted by the named respondents in accordance with section 210.13 of the Commission's Rules of Practice and Procedure, 19 CFR § 210.13. Pursuant to 19 CFR §§ 201.16(d) and 210.13(a), such responses will be considered by the Commission if received no later than 20 days after the date of service by the Commission of the complaint and the notice of investigation. Extensions of time for submitting responses to the complaint will not be granted unless good cause therefor is shown.

Failure of a respondent to file a timely response to each allegation in the complaint and in this notice may be deemed to constitute a waiver of the right to appear and contest the allegations of the complaint and to authorize the administrative law judge and the Commission, without further notice to that respondent, to find the facts to be as alleged in the complaint and this notice and to enter both an initial determination and a final determination containing such findings, and may result in the issuance of a limited exclusion order or a cease and desist order or both directed against that respondent.

Issued: January 10, 2001.

By order of the Commission.

**Donna R. Koehnke,**
*Secretary.*

[FR Doc. 01–1222 Filed 1–12–01; 8:45 am]

**BILLING CODE 7020–02–P**

## DEPARTMENT OF JUSTICE

**[A.G. Order No. 2353–2001]**

### Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation

**AGENCY:** Department of Justice.

**ACTION:** Notice of final order.

**SUMMARY:** This publication contains the final version of the Attorney General's Order that is issued pursuant to sections 401 and 411 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. The Order specifies the types of community programs, services, or assistance for which all aliens remain eligible. This publication also responds to comments submitted regarding the Order.

**DATES:** This Notice is effective January 16, 2001.

**FOR FURTHER INFORMATION CONTACT:** Jessica Rosenbaum, Office of Policy

HUD-PRWORA_000338

Development, Department of Justice, 950 Pennsylvania Avenue, NW., Washington, DC 20530, telephone (202) 514–3737 for general information. For information regarding particular programs, contact the federal agency that administers the program.

**SUPPLEMENTARY INFORMATION:** On August 22, 1996, the President signed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("Welfare Reform Act" or "the Act"). The Act, among other things, vests in the Attorney General the authority to specify certain types of community programs, services, or assistance for which all aliens remain eligible. Pursuant to the Act, the Attorney General issued an Order (AG Order No. 2049–96) ("the Order") implementing that authority, and making a "provisional specification" of such programs. The Order was published on August 30, 1996, at 61 FR 45985.

Under §§ 401 and 411 of the Act, aliens who are not "qualified aliens" (as defined in § 431 of the Act) are generally ineligible for federal, state, and local public benefits. However, there are a number of specified exceptions to those restrictions. Included in the list of statutory exceptions is a provision authorizing the Attorney General to identify programs, services, and assistance to which the Act's limitations on alien eligibility do not apply. Pursuant to §§ 401(b)(1)(D) and 411(b)(4), the Attorney General may specify only those types of programs, services, and assistance that meet all of the following three criteria: (1) Deliver in-kind services at the community level, including through public or private non-profit agencies; (2) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (3) are necessary for the protection of life or safety. Any programs that are exempted under this provision of the Act must meet all three of the foregoing requirements. A program meeting only one or two of the criteria does not qualify for exemption under this section of the Act.

**Discussion of Comments**

On September 15, 1997, the Department published a notice requesting public comments on the Order (62 FR 48308). The comment period ended on November 14, 1997. The Department received 48 comments from a variety of sources including private, non-profit organizations, as well as city, state, and federal agencies. The Department also received four comments on the Order in response to the Attorney General's notice of proposed rule-making: "Verification of Eligibility for Public Benefits," which was published on August 4, 1998 (63 FR 41662). In developing this final Order, the Department of Justice also relied on the input of other appropriate federal agencies and departments. All comments have been considered in preparing this final Order. Any significant changes are discussed below.

Many commenters seemed to believe that unless the Attorney General exempted their program, they would be required to verify citizenship or immigration status of all applicants. While that is certainly true in some cases, a service provider should not assume that it must verify citizenship or immigration status simply because its program or service is not exempted by this Order. Service providers and other interested parties should refer to benefit-granting agencies' interpretations of the term "federal public benefit" as used in the Act in order to determine whether their program is a federal public benefit and therefore subject to the alienage restrictions of the Act. See, for example, the Department of Health and Human Services notice of interpretation of federal public benefit, 63 FR 41658 (Aug. 4, 1998) (identifying which of their programs provide "federal public benefits" subject to PRWORA's limitations on alien eligibility. HHS advises that HHS programs not listed in the notice, such as Community Health Centers, and HHS programs under the Ryan White CARE Act and the Older Americans Act, do not meet the statutory definition of "federal public benefit" and therefore do not have to verify the citizenship or immigration status of applicants or recipients under PRWORA.).

In the past, the Department of Justice has deferred to other benefit-granting agencies' interpretations of whether their programs fall within certain definitions under the Welfare Reform Act. See, e.g., Department of Justice, Verification of Eligibility for Public Benefits, 63 FR 41662, 41664 (1998) (to be codified at 8 CFR pt. 104) (proposed Aug. 4, 1998) (in establishing proposed regulatory definition of "federal public benefit," Immigration and Naturalization Service intends to give "all appropriate deference to benefit granting agencies' application of the definition to the programs they administer"); Department of Justice, Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 FR 61344, 61361 (1997) (directing interested parties with questions about the applicability of the Act to a benefit program to consult with the federal agency overseeing the program). Consistent with that practice, where commenters have raised questions about whether a particular program is a federal public benefit under the Act, the Department will grant all appropriate deference to the determination, if one has been made, by the benefit granting agency as to whether the program is a federal public benefit. Agencies and service providers should also note that section 432(d) of the Welfare Reform Act, which provides that nonprofit charitable organizations are not required to verify the immigration status of applicants for Federal, State, or local public benefits, may be applicable to their programs. For more information about this exemption, see Department of Justice, Verification of Eligibility for Public Benefits, 63 FR 41662, 41664 (1998) (to be codified at 8 CFR pt. 104) (proposed Aug. 4, 1998).

The majority of commenters emphasized the need for the Attorney General to exempt their particular services because they believed them to be necessary for the protection of life or safety. Many of those commenters, however, did not take account of the legal requirement that a program or service must satisfy all three prongs of the test set forth by Congress. Any service that is exempted by the Order not only must be necessary to protect life or safety and be delivered in-kind at the community level, but also must not condition the provision, amount, or cost of services on a client's income. With respect to the last requirement, in other words, if a state or community service provider charges fees that vary with the clients' income level, or determines the clients' eligibility for services based upon their income or ability to pay, the program at issue does not satisfy prong two of the test and therefore is not covered by the Order regardless of how necessary for life or safety the program, service, or assistance may be.

Twenty comments were received from community services providers, while the rest were from concerned citizens, members of Congress, and city, state, and federal agencies. Many comments addressed a variety of concerns, but more than twenty-eight concerned services provided to people with HIV/AIDS. The majority of those comments asked the Attorney General to exempt categorically all programs funded under the Ryan White CARE Act, Housing Opportunities for People Living with AIDS (HOPWA) and the McKinney

HUD-PRWORA_000339

Homeless Assistance Act due to the special nature of the AIDS epidemic. As already indicated, many of those programs may not be "federal public benefits" as determined by relevant benefit-granting agencies, and therefore an exemption under this Order is unnecessary. While the Act authorizes exemptions for "programs, services, or assistance" that meet the three-pronged test, the Attorney General has no authority to provide a blanket exemption for all programs authorized by a single statute. That is because one or more of those programs may fail to meet all of the requirements imposed by the statute. Agencies and service providers must assess each program individually to determine whether it meets the three-pronged test. While many, if not all, HIV/AIDS-related services are likely to meet the first and third prongs, any state or federally funded programs that are required as a condition of their funding to employ sliding scales, or that otherwise limit the access to services or the amount of such services according to a client's income or ability to pay would not qualify for exemption under the Attorney General's Order.

Thirteen comments were received concerning services for the elderly. The majority of those comments also sought categorical exemptions for services provided under a variety of statutes. Again, the Act does not give the Attorney General the authority to exempt groups of programs. For a program to be covered by the Order, it must meet all three prongs of the statutory test.

Twenty-three comments addressed the importance of shelter and safe housing. Those community programs cover a wide range of services from emergency shelter to lead paint abatement. While many shelter and housing programs are important to the protection of life or safety, each program must meet the requirements of the three-pronged test in order to be exempt under the Order. With respect to the specific issue of lead paint abatement programs, we note that HUD has determined that benefits under the Lead Hazard Control program are not federal public benefits within the meaning of section 401(c) of the Welfare Reform Act. In accordance with the Department's practice of deferring to the determinations of benefit granting agencies, we therefore note that there is no need to conduct any verification procedures with respect to the immigration status of individuals whose dwellings receive services under the Lead Hazard Control program. We therefore need not, at this time, consider whether such benefits should be exempted under section 401(b).

Nine comments emphasized the importance of access to health care in general. One commenter described health centers that have a sliding scale of costs for services. Such programs do not qualify for coverage under the Order as they fail to meet the prong of the Order related to means testing. However, another commenter explained that their health centers have a fundamental obligation to serve all patients regardless of their ability to pay. As stated above, where community-level health programs serve all eligible clients regardless of their ability to pay and do not administer any type of sliding scale fee schedule or other income or resource test, they are covered by the Attorney General's Order.

Some commenters argued that the administrative burden that would result from having to verify immigration status would outweigh any proposed savings that could be derived from denying benefits to unqualified aliens. It should be understood, however, that the decision to deny federal, state, and local public benefits to aliens not qualified to receive them was made by Congress. Title IV of the Act does provide several exceptions to this blanket denial, including the programs covered by this Order and an exception from verification for all non-profit charitable providers. See the Department of Justice, Proposed Rule, Verification of Eligibility for Public Benefits, 63 FR 41662, 41677 (Aug. 4, 1998). All programs and services covered by the Order are exempt from any requirement that verification be conducted, unless service providers are mandated to conduct such verification pursuant to federal, state, or local law other than the Welfare Reform Act.

A number of commenters sought clarification as to whether service providers were obligated to verify a benefit seeker's immigration status prior to providing services covered by the Order. The services exempted by the Order are one of several categories of services that were designated by Congress to remain available to all aliens regardless of their status as qualified or not qualified for welfare benefits. Accordingly, service providers are not obligated to verify immigration status before providing those services unless they are required to do so by a law other than the Welfare Reform Act.

The remaining comments addressed services to migrant farmers, the disabled, victims of domestic violence, child care, and mental health services. While all of those concerns are important to the protection of life or safety, each program must meet the requirements of the three-pronged test described above in order to be exempt under the Order.

Several providers of emergency shelter have expressed the concern that they may be barred from providing temporary housing to aliens not qualified for welfare benefits. The final Order, like the original Order, specifies that "short term shelter or housing assistance for the homeless, for victims of domestic violence, or for runaway, abused or abandoned children" are deemed to be necessary for the protection of life or safety. Accordingly, programs and services of that type that deliver in-kind services at the community level and do not condition the provision of assistance, or the amount or cost thereof, on the individual recipient's income or resources are exempt from any requirement that verification be conducted, unless service providers are mandated to conduct such verification pursuant to federal, state, or local law other than the Welfare Reform Act.

**Final Specification of Community Programs Necessary for the Protection of Life or Safety Under the Welfare Reform Act**

*Preamble*

(1) The types of programs, services, and assistance enumerated in this Order are ones that Congress authorized the Attorney General to except from limitations on the ban on the availability of federal, state, or local public benefits imposed by Title IV of the Act.

(2) The Attorney General has fully exercised the power delegated to her under §§ 401(b)(1)(D) and 411(b)(4) of the Welfare Reform Act (codified at 8 U.S.C. 1611(b)(1)(D) and 1621(b)(4)).

(3) Neither states nor other service providers may use the Act as a basis for prohibiting access of aliens to any programs, services, or assistance covered by this Order. Unless an alien fails to meet eligibility requirements provided by applicable law other than the Act, benefit providers may not restrict the access of any alien to the services covered by this Order, including, but not limited to, emergency shelters.

(4) Thus, unless required by some legal authority other than the Act, benefit providers who satisfy the requirements of this Order are not required to verify the citizenship, nationality, or immigration status of applicants seeking benefits.

HUD-PRWORA_000340

(5) If a benefit provider offers a number of services, only some of which are exempt from verification as a result of this Order, the benefit provider may conduct verification of the non-exempt programs or services as specified in the applicable portions of the "Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996," 62 FR 61,344 (1997) or may be required to conduct verification as specified by any subsequent or superseding regulations.

(6) To the extent that it can be accomplished without undue administrative hardship, benefit providers should make every effort to provide information to all prospective benefit seekers about which benefits they qualify for and which benefits involve citizenship or immigration verification requirements.

*Specification*

Therefore, by virtue of the authority vested in me as Attorney General by law, including Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, I hereby specify that:

1. I do not construe the Act to preclude aliens from receiving police, fire, ambulance, transportation (including paratransit), sanitation, and other regular, widely available services and, for that reason, I am not making specifications of such programs, services, or assistance. It is not the purpose of this Order, however, to define more specifically the scope of the public benefits that Congress intended to deny certain aliens either altogether or absent my specification, and nothing herein should be so construed.

2. The government-funded programs, services, or assistance specified in this Order are those that: deliver in-kind (non-cash) services at the community level, including through public or private non-profit agencies or organizations; do not condition the provision, amount, or cost of the assistance on the individual recipient's income or resources, as discussed in paragraph 3, below; and serve purposes of the type described in paragraph 4, below, for the protection of life or safety. Specified programs must satisfy all three prongs of this test.

3. The community-based programs, services, or assistance specified in paragraphs 2 and 4 of this Order are limited to those that provide in-kind (non-cash) benefits and are open to individuals needing or desiring to participate without regard to income or resources. Programs, services, or

assistance delivered at the community level, even if they serve purposes of the type described in paragraph 4 below, are not within this specification if they condition on the individual recipient's income or resources:

(a) the provision of assistance;

(b) the amount of assistance provided; or

(c) the cost of the assistance provided on the individual recipient's income or resources.

4. Included within the specified programs, services, or assistance determined to be necessary for the protection of life or safety are:

(a) Crisis counseling and intervention programs; services and assistance relating to child protection, adult protective services, violence and abuse prevention, victims of domestic violence or other criminal activity; or treatment of mental illness or substance abuse;

(b) Short-term shelter or housing assistance for the homeless, for victims of domestic violence, or for runaway, abused, or abandoned children;

(c) Programs, services, or assistance to help individuals during periods of heat, cold, or other adverse weather conditions;

(d) Soup kitchens, community food banks, senior nutrition programs such as meals on wheels, and other such community nutritional services for persons requiring special assistance;

(e) Medical and public health services (including treatment and prevention of diseases and injuries) and mental health, disability, or substance abuse assistance necessary to protect life or safety;

(f) Activities designed to protect the life or safety of workers, children and youths, or community residents; and

(g) Any other programs, services, or assistance necessary for the protection of life or safety.

Dated: January 5, 2001.

**Janet Reno,**
*Attorney General.*
[FR Doc. 01–1158 Filed 1–12–01; 8:45 am]
**BILLING CODE 4410–19–P**

---

# DEPARTMENT OF JUSTICE

## Immigration and Naturalization Service

**[INS No. 2093–00]**

### Establishing an Immigration and Naturalization Service Data Management Improvement Act Task Force

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Notice establishing a Task Force.

---

**SUMMARY:** In accordance with the provisions of the Federal Advisory Committee Act, and Public Law 106–215, the Attorney General is establishing an Immigration and Naturalization Service Data Management Improvement Act Task Force. This notice advises Federal, State, and local agencies, and private sector representatives that the Immigration and Naturalization Service (Service) is soliciting members from interested groups, associations, or individuals who may wish to serve on the Task Force.

**Purpose of Task Force**

The Task Force will evaluate and make recommendations on:

(1) How the Attorney General, in consultation with the Secretaries of State, Treasury, and Commerce can efficiently and effectively implement an integrated entry and exit data system;

(2) How the United States can improve the flow of traffic at airports, seaports, and land border ports-of-entry through—

(a) Enhancing systems for data collection and data sharing, including the integrated entry and exit data system, by better use of technology, resources, and personnel;

(b) Increasing cooperation between the public and private sectors;

(c) Increasing cooperation among Federal agencies and among Federal and State agencies; and

(d) Modifying information technology systems while taking into account the different data systems, infrastructure, and processing procedures at airports, seaports, and land border ports-of-entry; and

(3) The cost of implementing each of the Task Force's recommendations.

Further, no later than December 31, 2002 and no later than December 31 of each subsequent year the Task Force is in existence, the Attorney General shall submit a report to Congress containing the findings, conclusions, and recommendations of the Task Force.

**Composition of Task Force**

The Task Force shall be composed of 17 members, including the Attorney General, private sector representatives of affected industries and groups, and representatives from Federal, State, and local agencies, who have an interest in: immigration and naturalization; travel and tourism; transportation; trade; law enforcement; national security; or the environment. Participation on the Task Force will not be remunerated, however, travel and associated expenses may be reimbursed or borne by the Government.

HUD-PRWORA_000341

## Findings of Fact

The Agency finds that, in light of Registrant's default, the factual allegations in the OSC are deemed admitted. According to the OSC, Registrant's Colorado registered nursing license, advanced practice nurse license, and nurse practitioner prescriptive authority license were suspended by the Colorado State Board of Nursing on October 21, 2024. RFAAX 1, at 1–2; *see also* RFAAX 4. According to Colorado online records, of which the Agency takes official notice,[2] Registrant's Colorado licenses have a status of "Suspended." Colorado DORA License Search, *https:// apps2.colorado.gov/dora/licensing/ lookup/licenselookup.aspx* (last visited date of signature of this Order). Accordingly, the Agency finds that Registrant is not licensed as a practitioner in Colorado, the state in which she is registered with DEA.[3]

## Discussion

Pursuant to 21 U.S.C. 824(a)(3), the Attorney General may suspend or revoke a registration issued under 21 U.S.C. 823 "upon a finding that the registrant . . . has had his State license or registration suspended . . . [or] revoked . . . by competent State authority and is no longer authorized by State law to engage in the . . . dispensing of controlled substances." With respect to a practitioner, DEA has also long held that the possession of authority to dispense controlled substances under the laws of the state in which a practitioner engages in professional practice is a fundamental condition for obtaining and maintaining a practitioner's registration. *Gonzales* v. *Oregon,* 546 U.S. 243, 270 (2006) ("The Attorney General can register a physician to dispense controlled substances 'if the applicant is authorized to dispense . . . controlled substances under the laws of the State in which he practices.' . . . The very definition of a 'practitioner' eligible to prescribe includes physicians 'licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices' to dispense controlled substances. § 802(21)."). The Agency has applied these principles consistently. *See, e.g., James L. Hooper, M.D.,* 76 FR 71,371, 71,372 (2011), *pet. for rev. denied,* 481 F. App'x 826 (4th Cir. 2012); *Frederick Marsh Blanton, M.D.,* 43 FR 27,616, 27,617 (1978).[4]

According to Colorado statute, "dispense" means "to deliver a controlled substance to an ultimate user, patient, or research subject by or pursuant to the lawful order of a practitioner, including the prescribing, administering, packaging, labeling, or compounding necessary to prepare the substance for that delivery." Colo. Rev. Stat. § 18–18–102(9) (West 2025). Further, a "practitioner" means a "physician . . . or other person licensed, registered, or otherwise permitted, by this state, to distribute, dispense, conduct research with respect to, administer, or to use in teaching or chemical analysis, a controlled substance in the course of professional practice or research." *Id.* § 18–18–102(29).

Here, the undisputed evidence in the record is that Registrant is not a currently licensed practitioner in Colorado. As discussed above, a nurse must be a licensed practitioner to dispense a controlled substance in Colorado. Thus, because Registrant's nursing licenses are suspended in Colorado and, therefore, she is not currently authorized to handle controlled substances in Colorado, Registrant is not eligible to maintain a DEA registration in Colorado. Accordingly, the Agency will order that Registrant's DEA registration be revoked.

## Order

Pursuant to 28 CFR 0.100(b) and the authority vested in me by 21 U.S.C. 824(a), I hereby revoke DEA Certificate of Registration No. MC5780639 issued to Diana Clouthier, N.P. Further, pursuant to 28 CFR 0.100(b) and the authority vested in me by 21 U.S.C. 823(g)(1), I hereby deny any pending applications of Diana Clouthier, N.P., to renew or modify this registration, as well as any other pending application of Diana Clouthier, N.P., for additional registration in Colorado. This Order is effective August 15, 2025.

## Signing Authority

This document of the Drug Enforcement Administration was signed on July 10, 2025, by Acting Administrator Robert J. Murphy. That document with the original signature and date is maintained by DEA. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DEA Federal Register Liaison Officer has been authorized to sign and submit the document in electronic format for publication, as an official document of DEA. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

Heather Achbach,

*Federal Register Liaison Officer, Drug Enforcement Administration.*

[FR Doc. 2025–13354 Filed 7–15–25; 8:45 am]

**BILLING CODE 4410–09–P**

---

**DEPARTMENT OF JUSTICE**

**[A.G. Order No. 6335–2025]**

**Revised Specification Pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996**

**AGENCY:** Department of Justice.

**ACTION:** Order.

---

**SUMMARY:** This document contains an Order of the Attorney General issued pursuant to sections 401 and 411 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA" or the "Act"). This Order withdraws the Attorney General's January 5, 2001, order issued pursuant to PRWORA.

**DATES:** The effective date of this Order is August 15, 2025.

---

[2] Under the Administrative Procedure Act, an agency "may take official notice of facts at any stage in a proceeding—even in the final decision." United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act 80 (1947) (Wm. W. Gaunt & Sons, Inc., Reprint 1979).

[3] Pursuant to 5 U.S.C. 556(e), "[w]hen an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary." The material fact here is that Registrant, as of the date of this Order, is not licensed as a nurse in Colorado. Accordingly, Registrant may dispute the Agency's finding by filing a properly supported motion for reconsideration of findings of fact within fifteen calendar days of the date of this Order. Any such motion and response shall be filed and served by email to the other party and to the DEA Office of the Administrator, Drug Enforcement Administration, at *dea.addo.attorneys@dea.gov.*

[4] This rule derives from the text of two provisions of the Controlled Substances Act (CSA). First, Congress defined the term "practitioner" to mean "a physician . . . or other person licensed, registered, or otherwise permitted, by . . . the jurisdiction in which he practices . . . , to distribute, dispense, . . . [or] administer . . . a controlled substance in the course of professional practice." 21 U.S.C. 802(21). Second, in setting the requirements for obtaining a practitioner's registration, Congress directed that "[t]he Attorney General shall register practitioners . . . if the applicant is authorized to dispense . . . controlled substances under the laws of the State in which he practices." 21 U.S.C. 823(g)(1). Because Congress has clearly mandated that a practitioner possess state authority in order to be deemed a practitioner under the CSA, DEA has held repeatedly that revocation of a practitioner's registration is the appropriate sanction whenever he or she is no longer authorized to dispense controlled substances under the laws of the state in which he or she practices. *See, e.g., James L. Hooper, M.D.,* 76 FR at 71,371–72; *Sheran Arden Yeates, M.D.,* 71 FR 39,130, 39,131 (2006); *Dominick A. Ricci, M.D.,* 58 FR 51,104, 51,105 (1993); *Bobby Watts, M.D.,* 53 FR 11,919, 11,920 (1988); *Frederick Marsh Blanton, M.D.,* 43 FR at 27,617.

HUD-PRWORA_000342

**FOR FURTHER INFORMATION CONTACT:**
Christina Greer, Office of Legal Policy, Department of Justice, Room 4254, 950 Pennsylvania Avenue NW, Washington, DC 20530, telephone 202–514–5739, for general information. For information regarding particular programs, contact the Federal agency that administers the program.

**SUPPLEMENTARY INFORMATION**

## I. Background on PRWORA

On August 22, 1996, President Clinton signed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, currently codified in relevant part at 8 U.S.C. 1611 *et seq.,* as amended. With certain exceptions, PRWORA makes aliens who are not "qualified alien[s]" ineligible for any "Federal public benefit," as those terms are defined by PRWORA. 8 U.S.C. 1611(a); *see also id.* 1611(c) (defining "Federal public benefit"), 1641 (defining "qualified alien"). PRWORA also restricts, with certain exceptions, all aliens from receiving "Federal means-tested public benefit[s]" for a five-year period from their entry into the United States with a status within the meaning of the term "qualified alien." 8 U.S.C. 1613(a). Additionally, PRWORA imposes limits on the receipt of State and local benefits by aliens but permits States to authorize the receipt of State and local benefits by otherwise ineligible aliens through the enactment of a State law postdating PRWORA. *See* 8 U.S.C. 1621(a), (d); *see also id.* 1621(c) (defining "State or local public benefit"). Finally, PRWORA added section 213A to the Immigration and Nationality Act, which excepts from reimbursement certain benefits provided to a sponsored alien pursuant to an affidavit of support. *Id.* 1183a note.

PRWORA requires the creation of uniform verification requirements to ensure that only "qualified aliens" eligible for benefits under PRWORA receive them. 8 U.S.C. 1642. Section 1642(a) requires the Attorney General, who at the time of PRWORA's enactment oversaw the Immigration and Naturalization Service within the Department of Justice ("DOJ"), to promulgate regulations requiring verification that a person applying for a Federal public benefit is a qualified alien and is eligible to receive the benefit. Section 1642(a)(2) requires establishment of fair and nondiscriminatory procedures for a person to provide proof of citizenship. Section 1642(b) requires States to have in effect a verification system that

complies with the regulations promulgated under section 1642(a). The Attorney General issued interim guidance about the implementation of these verification requirements in 1997. Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 FR 61344 (Nov. 17, 1997).

## II. Authority To Specify Exceptions to PRWORA's Verification Requirements

Sections 401(b)(1)(D) and 411(b)(4) of PRWORA (codified at 8 U.S.C. 1611(b)(1)(D) and 1621(b)(4)), provide that the Attorney General may, in her "sole and unreviewable discretion after consultation with appropriate Federal agencies and departments," specify as excepted from PRWORA's prohibition on receipt of public benefits by unqualified aliens certain types of programs, services, and assistance that meet all of the following criteria: (1) deliver in-kind services at the community level, including through public or private non-profit agencies; (2) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (3) are necessary for the protection of life or safety.

Shortly after PRWORA was signed into law, the Attorney General issued an order implementing this authority by making a "provisional specification" of benefits excepted from PRWORA. Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation, 61 FR 45985 (Aug. 30, 1996) ("Provisional Order"). Approximately one year later, the Attorney General issued a notice to solicit input from "federal, state, and local agencies operating programs or providing services or assistance that may be covered by the final Order." Request for Comments on the Attorney General's Specification of Community Programs Necessary for the Protection of Life or Safety Under the Welfare Reform Act, 62 FR 48308, 48308 (Sept. 15, 1997). The Attorney General subsequently issued a final order specifying these programs in 2001. Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation, 66 FR 3613 (Jan. 16, 2001) ("Final Order"). In both the Provisional Order and the Final Order—the latter of which was, in substance, unchanged in response to the comments received by DOJ—the Attorney General exercised her

authority to except programs, services, or assistance to the fullest extent permitted by law by excepting from PRWORA "any . . . programs, services, or assistance" that satisfied all three statutory criteria. 61 FR at 45985 (Provisional Order); 66 FR at 3616 (Final Order); *see also id.* at 3615 ("[the] Attorney General has fully exercised the power delegated to her under §§ 401(b)(1)(D) and 411(b)(4) of [PRWORA]").

The Attorney General's exercise of discretion to determine whether to except benefits from PRWORA does not require notice-and-comment rulemaking. Because PRWORA commits a decision about exceptions to the Attorney General's "sole and unreviewable discretion" after consultation with Federal officials, PRWORA "renders the formal notice-and-comment rulemaking regime inapplicable" to this action. *See Make The Rd. New York* v. *Wolf,* 962 F.3d 612, 634 (D.C. Cir. 2020). Moreover, the action is exempt from notice-and-comment procedures because the designation of certain benefits as excepted is a "matter relating to . . . public property, loans, grants, benefits, or contracts." 5 U.S.C. 553(a)(2).

## III. Executive Order 14218

On February 19, 2025, the President signed Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders," 90 FR 10581. One purpose of the Executive Order is to confirm agencies are complying with PRWORA in administering Federal programs by ensuring, "to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens." *Id.* sec. 2(a). The Executive Order directs agencies to identify "all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purpose of the Executive Order and applicable law, including . . . PRWORA." *Id.* sec. 2(a)(i).

## IV. Re-Evaluation of the 2001 Specification

*A. Review of Reliance on the Final Order*

In the discharge of her responsibilities under Executive Order 14218 and PRWORA, the Attorney General has reviewed the Final Order issued in 2001. As required by PRWORA, she has engaged in consultation with appropriate Federal agencies and departments about the propriety of

HUD-PRWORA_000343

specifying exceptions to PRWORA, including the extent to which agencies rely on the Final Order to except programs, services, or assistance from PRWORA, in order to determine whether the Final Order should be withdrawn or modified.

Multiple agencies responded that they do not rely on the Final Order at all because they do not confer benefits subject to PRWORA; because they rely only on PRWORA's statutory exceptions; or because they do not except the benefits they provide from PRWORA's eligibility requirements. The fact that a particular program does not fall within the scope of PRWORA does not mean that eligibility requirements imposed by other Federal statutes do not apply to the benefit. Some Federal programs, such as Medicaid, unemployment compensation, educational assistance under Title IV of the Higher Education Act of 1965, and assisted housing programs administered by the Department of Housing and Urban Development ("HUD") already require, absent a waiver, verification of the immigration status of an alien to ensure the alien meets the eligibility requirements for the program. 62 FR at 61345. To verify recipient status and eligibility, agencies use the Systematic Alien Verification for Entitlements ("SAVE") system, operated by U.S. Citizenship and Immigration Services. *See id.* Except where specified in the statute, PRWORA does not alter preexisting legal requirements regarding the use of the SAVE system or relieve the administrators of statutorily mandated programs of their obligations to comply with the SAVE program. *Id.* The Attorney General defers to agencies as to the extent to which PRWORA applies to the programs they administer and as to whether authorities other than PRWORA require them to ascertain the immigration status of benefit recipients.

Some agencies purported to rely upon the Final Order to except from PRWORA programs that are likely subject to one of PRWORA's statutory exceptions. For example, the Federal Emergency Management Administration purported to rely on the Final Order as to certain emergency or disaster relief programs. But PRWORA already excepts short-term, in-kind, emergency disaster relief from its eligibility requirements, so the Attorney General's exception authority under PRWORA is not legally necessary to except such programs. *See* 8 U.S.C. 1611(b)(1)(B).

Agencies also purported to rely upon the Final Order to except programs that may fail to meet the requirements of PRWORA because eligibility is conditioned on the income or resources of the recipients. For instance, many of the benefits provided through the Community Development Block Grant ("CDBG") program, managed by HUD, must be conferred to low- or moderate-income persons by statute. *See* 42 U.S.C. 5301 *et seq.* PRWORA, however, grants the Attorney General authority to except only programs for which eligibility is not conditioned on the resources or income of the recipients. *See, e.g.,* 8 U.S.C. 1611(b)(1)(D)(ii).

Agencies also purported to rely upon the Final Order for programs that may go beyond PRWORA's limitation of benefits to programs that are "necessary for the protection of life or safety." 8 U.S.C. 1611(b)(1)(D)(iii). Neither PRWORA nor the Final Order attempts to define this phrase more precisely. This lack of guidance has led to the exception being used more broadly than Congress intended. PRWORA provides examples of the kinds of assistance that the Attorney General has authority to except from the statute's limitation on eligibility—*i.e.,* "soup kitchens, crisis counseling and intervention, and short-term shelter." But agencies have excepted from PRWORA forms of assistance that are quite unlike these examples. For instance, the Department of Homeland Security ("DHS") funds "scientific leadership," "citizenship education and training," and law enforcement officer training. Such programs—focused more on career building or personal development than human necessities—are not "necessary for the protection life or safety" in the sense the drafters of PRWORA used that phrase. Nor is it clear why unqualified aliens would need to receive benefits from such programs. Similarly, while grants, contracts, and loans are a public benefit under PRWORA, many projects funded by HUD through CDBG to address infrastructure improvements or combat urban blight are too far removed from the circumstances that would make them "necessary for the protection of life or safety" in the sense that Congress directed when it enacted PRWORA.

### B. Revision of the Final Order

Based on her consultations with the appropriate Federal agencies and departments, the Attorney General has determined that the Final Order has created confusion about what sorts of programs are subject to PRWORA's requirements and is being applied more broadly than the statute permits. As a result, unqualified aliens have been able to receive public benefits for which they are not lawfully eligible. To correct this, the Attorney General, in the exercise of her discretion, has chosen not to except any benefits from PRWORA beyond those excepted by the statute itself.

In making this change, the Attorney General is aware that some aliens may have been able to receive certain types of in-kind public benefits that would otherwise be subject to PRWORA's requirements because of the exceptions detailed in the Final Order. Such aliens will not be eligible for those benefits in the future due to this revised specification. To the extent that aliens may have relied on such benefits, the Attorney General concludes, based on her consultation with Federal agencies and departments and other considerations, that the changes described in this specification are nonetheless warranted. This is so for several reasons. First, as noted earlier, some agencies have been excepting from PRWORA certain benefits based on a misunderstanding of the Attorney General's exception authority and hence have been providing benefits to aliens who were not lawfully eligible to receive them. "No amount of reliance could ever justify continuing a program" that an "agency lacked statutory authority to" implement in the first place, *see Dep't of Homeland Sec. v. Regents of the Univ. of California,* 140 S. Ct. 1891, 1930 (2020) ("*Regents*") (Thomas, J., concurring in part and dissenting in part), so bringing the Federal Government into compliance with the law is a powerful reason to withdraw the Final Order regardless of any reliance interests. Second, as also noted above, some of the benefits previously provided under the Final Order were not, in fact, necessary for life or safety. The lack of any connection to aliens' immediate welfare necessarily reduces the extent of any reliance interests in these benefits. Third, even as to benefits that the Attorney General has the legal authority (but not the duty) to except from PRWORA, any reliance interests are significantly outweighed by the need to reduce the incentive for aliens to illegally migrate to the United States. *See* 8 U.S.C. 1601(2) ("It continues to be the immigration policy of the United States that . . . the availability of public benefits not constitute an incentive for immigration to the United States."). Finally, Congress has delegated to the Attorney General the authority to determine the appropriate scope of this specification in her "sole and unreviewable discretion." *E.g.,* 8 U.S.C. 1611(b)(1)(D). This delegation indicates Congress's intent that the scope of this specification not be subject to the sort of arbitrary-and-capricious review that would typically require consideration of

reliance interests. *See Regents,* 140 S. Ct. at 1907, 1913 (assessing an agency's consideration of reliance interests only after concluding that the agency's action was subject to judicial review).

Although the Attorney General has the authority to except certain benefits from PRWORA, the decision to do so is expressly committed to her sole and unreviewable discretion. *See, e.g.,* 8 U.S.C. 1611(b)(1)(D). The Attorney General has concluded, in the exercise of that discretion, that the benefits of creating additional exceptions to PRWORA, beyond those set forth in the statute itself, are outweighed by the risks of creating incentives for unlawful migration by allowing access to such programs to individuals who are not "qualified aliens" as defined by PRWORA.

This Order does not purport to define what benefit programs are, and are not, "public benefits" subject to PRWORA. This Order also has no effect on other statutory eligibility requirements, including those found in PRWORA itself. *See, e.g.,* 8 U.S.C. 1611(b), 1615, 1621(b)(4). The Attorney General has the right, in her sole and unreviewable discretion, to revisit and amend the specification in the future.

Order Specifying Community Programs Necessary for the Protection of Life or Safety Under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996

By virtue of the authority vested in me as Attorney General by law, including Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "Act"), I hereby specify that:

1. Effective August 15, 2025, the Final Order of the Attorney General dated January 16, 2001, and published at 66 FR 6313, is withdrawn and no longer in force.

2. After undertaking the necessary consultations with appropriate Federal agencies and departments, the Attorney General has concluded, in her sole and unreviewable discretion, not to except any benefits from PRWORA pursuant to her authority to make such exceptions under section 401 and section 411 of PRWORA.

3. I do not construe the Act to preclude aliens from receiving police, fire, ambulance, transportation (including paratransit), sanitation, and other similar services. *See* 8 U.S.C. 1611(c), 1621(c). As a result, I need not specify and am not specifying any such services as being excepted from the Act.

4. It is not the purpose of this Order to define more specifically the scope of the public benefits that Congress intended to include within the scope of the Act, and nothing herein should be construed to do so.

Date: July 11, 2025.

**Pamela Bondi,**
*Attorney General.*
[FR Doc. 2025–13318 Filed 7–15–25; 8:45 am]
**BILLING CODE 4410–BB–P**

---

## DEPARTMENT OF LABOR

### Employment and Training Administration

### Native American Employment and Training Council

**AGENCY:** Employment and Training Administration, Labor.
**ACTION:** Notice of Renewal of the Native American Employment and Training Council charter.

**SUMMARY:** The Secretary of Labor (Department) announces the renewal of the Native American Employment and Training Council (NAETC) charter.
**SUPPLEMENTARY INFORMATION:**

#### I. Background and Authority

Section 166(i)(4) of the Workforce Innovation and Opportunity Act (WIOA), 29 U.S.C. 3221(i)(4) requires the Secretary of Labor (Secretary) to establish and maintain the NAETC. The statute, as amended, requires the Secretary, to formally consult at least twice annually with the NAETC on the operation and administration of the WIOA Section 166 Indian and Native American Employment and Training programs. In addition, the NAETC advises the Secretary on matters that promote the employment and training needs of Indians and Native Americans, as well as to enhance the quality of life in accordance with the Indian Self-Determination and Education Assistance Act. The NAETC also provides guidance to the Secretary on how to make Department of Labor discretionary funding and other special initiatives more accessible to federally recognized tribes, Alaska Native entities, and Native Hawaiian organizations.

#### II. Structure

The Council will be composed of no less than 15 members, but no more than 20, appointed by the Secretary, who are representatives of Indian tribes, tribal organizations, Alaska Native entities, Indian-controlled organizations serving Indians, or Native Hawaiian organizations pursuant to WIOA Section 166(i)(4)(B). The membership of the Council will, to the extent practicable, represent all geographic areas of the United States with a substantial Indian, Alaska Native, or Native Hawaiian population, and will include representatives of tribal governments and of non-reservation Native American organizations that have expertise in the areas of workforce development, secondary and post-secondary education, health care, business and economic development, and other sectors with job growth.

Each NAETC member will be appointed for a two-year term. A vacancy occurring in the Council membership will be filled in the same manner as the original appointment. A member appointed to a vacancy on the Council will serve for the remainder of the term for which the predecessor of that member was appointed. Members of NAETC will serve on a voluntary and generally uncompensated basis, but will be reimbursed for travel expenses to attend NAETC meetings, including per diem in lieu of subsistence, as authorized by the Federal travel regulations. All NAETC members will serve at the pleasure of the Secretary. Members may be appointed, reappointed, or replaced, and their terms may be extended, changed, or terminated at the Secretary's discretion.

**FOR FURTHER INFORMATION CONTACT:** Kimberly Vitelli, Office of Workforce Investment; (202) 693–3980; *vitelli.kimberly@dol.gov.*

*Authority:* Pursuant to the Workforce Innovation and Opportunity Act, 29 U.S.C. 3221(i)(4); Federal Advisory Committee Act, as amended, 5 U.S.C. App.

**Susan Frazier,**
*Acting Assistant Secretary for Employment and Training Administration.*
[FR Doc. 2025–13305 Filed 7–15–25; 8:45 am]
**BILLING CODE 4510–FN–P**

---

## DEPARTMENT OF LABOR

### Agency Information Collection Activities; Submission for OMB Review; Comment Request; Unemployment Compensation for Ex-Servicemembers Handbook

**ACTION:** Notice of availability; request for comments.

**SUMMARY:** The Department of Labor (DOL) is submitting this Employment and Training Administration (ETA)-sponsored information collection request (ICR) to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995

HUD-PRWORA_000345



DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

WASHINGTON, D.C. 20410

September 17, 1998

OFFICE OF GENERAL COUNSEL                                    IN REPLY REFER TO:

MEMORANDUM FOR:    Deborah Vincent, General Deputy Assistant Secretary
                   for Public and Indian Housing, PD

                   Ira Peppercorn, General Deputy Assistant Secretary
                   for Housing, H

FROM:    Robert S. Kenison, Associate General Counsel
         Office of Assisted Housing and Community Development

SUBJECT:    Interrelationship between the Welfare Reform Act and
            Section 214

    Section 214 of the Housing and Community Development Act of
1980 currently bars public housing and Section 8 housing
assistance (as well as several other assisted housing programs) to
undocumented aliens.  Section 214 was implemented through HUD's
"noncitizens rule" published in March 1995. (24 CFR Part 5,
Subpart E)

    Title IV of the 1996 Welfare Reform Act (the Personal
Responsibility and Work Opportunity Reconciliation Act of 1996,
Pub. L. 104-193) imposed various new restrictions on the
eligibility of noncitizens (both legal and undocumented) to
receive assistance from Federal programs.

    This memorandum relates to the Department's need to provide
guidance to housing providers on the interrelationship between
section 214 and the Welfare Reform Act.  More specifically this
memorandum provides the legal response to the questions: "how does
the Welfare Reform Act impact on HUD's current noncitizens rule";
and "how are public and assisted housing programs affected by the
Welfare Reform Act"?

    It is the position of the Office of General Counsel (OGC)
that the Welfare Reform Act does not override the section 214
restrictions.  This position is based on the fact that section 214
was amended by both the Welfare Reform Act and the subsequently
enacted Immigration Reform Act.  OGC believes that the two
statutes must be read in harmony and where there is conflict the
more specific statute (e.g., section 214) applies.  In this
context we do not characterize section 214 as the "more specific
statute" based on a provision by provision comparison with the
Welfare Reform Act.  In context there may be provisions of the

2

Welfare Reform Act which are more specific (e.g, directed to particular individuals). Rather we consider section 214 the more specific statute because while both statutes concern restrictions on the eligibility of noncitizens for public benefits, its area of application is limited to restrictions on the eligibility of noncitizens in assisted housing programs.

It should be noted that this reading does not mean that the Welfare Reform Act does not apply to assisted housing programs. Rather, the Welfare Reform Act applies only to the extent that it cannot be reconciled with section 214.  Thus, where section 214 does not speak to an issue, the Welfare Reform Act may be applicable.  For example, the procedures for verifying eligible immigration status will continue to be those required by section 214 and implementing regulations.  However, if a housing authority chooses to "opt out" of those procedure pursuant to 24 CFR § 5.501(a), (42 U.S.C § 1436a(h)(2)), the housing authority essentially "opts in" to the verifying procedures of the Welfare Reform Act.  Otherwise, as a practical matter we do not expect that the passage of the Welfare Reform Act will have major impact on HUD's current noncitizens rule.

The stronger impact of the Welfare Reform Act will primarily be felt by the Office of Community Planning and Development (CPD). This memorandum is not intended to address the issues surrounding the impact of the Welfare Reform Act on CPD programs or other issues unrelated to the legal fit between on section 214 and HUD's current noncitizens rule.  The Office of Housing (Housing) should note, however, that the Section 221(d)(3) Below Market Interest Rate program is the only FHA program affected by Welfare Reform, as it is not a covered program under section 214.  Housing may want to explore the possibility of implementing Welfare Reform in a manner similar to the section 214 regulations.

HUD-PRWORA_000347



U.S. Department of Housing and Urban Development
Washington, D.C. 20410-0500

October 3, 1996

OFFICE OF GENERAL COUNSEL

MEMORANDUM FOR: Henry G. Cisneros, Secretary, S

FROM: Nelson A. Díaz, General Counsel, C

SUBJECT: Effect of Immigration Provisions of Welfare Reform
Legislation and the Immigration Act on HUD Programs

    This memorandum reflects OGC's efforts to coordinate with the Department of Justice and other executive agencies on the impact of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended by the Illegal Immigration Reform and Responsibility Act of 1996 on the programs of these agencies. The Office of General Counsel has reviewed the immigration provisions of the first Act, Pub.L. 104-193 ("welfare reform legislation"), enacted on August 22, 1996, and the provisions of the second Act ("immigration act"), which was included as Division C of the Omnibus Appropriations Act, enacted on September 30, 1996. The immigration act was the subject of a conference report, H. Rep. No. 863, 104th Cong., 1st Sess., 137 Cong. Rec. H11787 (daily ed., September 28, 1966).

    The Office of General Counsel has reached the following conclusions: The welfare reform legislation, as amended, affects not only the assisted housing programs that are currently subject to immigration status verification, in accordance with section 214 of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a, "Section 214"), but also probably the Section 221(d)(3) Below Market Interest Rate program and several CPD programs. Section 577 of the immigration act requires HUD's regulations implementing Section 214 (24 CFR part 5, subpart F) to be revised by November 29, 1996, to reflect changes in verification and eligibility requirements. That section also provides that HUD's current regulations will cease to be effective on November 30, 1996, if they have not been so revised.

    For reference to the actual provisions of the welfare reform legislation, a previous memorandum summarizing the Act (September 10, 1996) is attached. For reference to the actual provisions of the immigration act, a summary comparing the final version of the legislation to a prior draft is attached. The key provisions of that legislation for HUD are Sections 501, 504, 508, 553, and 571-577.

HUD-PRWORA_000348