### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK; STATE OF WASHINGTON; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-345 |
|        Plaintiffs, | |
|        v. | **PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT** |
| U.S. DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as ATTORNEY GENERAL OF THE UNITED STATES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF EDUCATION; LINDA McMAHON, in her official capacity as SECRETARY OF THE U.S. DEPARTMENT OF EDUCATION; U.S. DEPARTMENT OF LABOR; LORI CHAVEZ-DeREMER, in her official capacity as SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; ERIC SCOTT TURNER, in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | |
|        Defendants. | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................. 4

   I.    PRWORA ............................................................................................................. 4

   II.   Longstanding Interpretations of PRWORA ........................................................ 6

   III.  Defendants' July 2025 PRWORA Notices ......................................................... 9

   IV.  HUD's November 2025 PRWORA Notice ........................................................ 11

   V.   Procedural History ............................................................................................. 12

   VI.  Plaintiff States Face Harm Because Their Critical Programs Are Threatened by the Notices ............................................................................................................... 13

   VII. Specifics as to the HUD Programs Listed in the HUD PRWORA Notice ...................... 16

      A.   Community Development Block Grant (CDBG and CDBG-DR) ............................... 16

      B.   Emergency Solutions Grants (ESG) and Continuum of Care (CoC) ........................... 19

      C.   Housing Opportunities for Persons with AIDS (HOPWA) ........................................... 21

      D.   HOME Investment Partnerships (HOME), HOME-American Rescue Plan (HOME-ARP), and National Housing Trust Fund (NHTF) ....................................................... 22

      E.   Additional Programs (PRO Housing, PRICE, and SHOP) ........................................... 24

ARGUMENT .................................................................................................................... 25

   I.    The PRWORA Notices Are Final Agency Actions ........................................... 25

   II.   The HHS, ED, DOL, and HUD PRWORA Notices Violated the APA's Procedural Requirements (Count I) ........................................................................................ 27

      A.   Statutory Text ..................................................................................................... 28

      B.   Agency Explanation ........................................................................................... 29

      C.   Inconsistency With Prior Rules ......................................................................... 30

      D.   Fit Within Statutory Scheme ............................................................................. 32

      E.   Practical Effect ................................................................................................... 33

   III.  The HHS, ED, DOL, and HUD PRWORA Notices Are Arbitrary and Capricious (Count II) ............................................................................................................... 34

      A.   HHS Notice ........................................................................................................ 35

      B.   ED Notice .......................................................................................................... 39

      C.   DOL Notice ........................................................................................................ 40

      D.   HUD Notice ....................................................................................................... 42

IV. The HHS, ED, DOL, and HUD PRWORA Notices Are Contrary to Law (Count III)..... 44

    A. The HHS PRWORA Notice Is Contrary to Law.......................................................... 45

        1. The HHS PRWORA Notice unlawfully applies PRWORA to benefits that are generally available to the public ..................................................................... 45

        2. The HHS PRWORA Notice unlawfully extends PRWORA to non-postsecondary educational benefits, including Head Start ..................... 50

        3. The HHS PRWORA Notice unlawfully includes all benefits funded by grants to State or local governments............................................................................. 54

        4. The HHS PRWORA Notice includes several programs that Congress exempted from PRWORA in subsequent statutes ............................................................ 55

    B. The ED PRWORA Notice Is Contrary to Law ......................................................... 58

    C. The DOL PRWORA Notice Is Contrary to Law....................................................... 61

        1. The DOL PRWORA Notice unlawfully applies to services that are generally available to the public ..................................................................................... 62

        2. The DOL PRWORA Notice is unlawful because it applies to non-postsecondary educational benefits ................................................................. 63

        3. Any remaining "participant-level services" also do not constitute Federal public benefits ................................................................................................. 65

    D. The HUD PRWORA Notice is Contrary to Law ..................................................... 67

    E. The DOJ PRWORA Notice Is Contrary to Law ...................................................... 70

V. The PRWORA Notices Violate the Spending Clause ..................................................... 75

    A. The PRWORA Notices Impose Impermissibly Retroactive Conditions...................... 76

    B. The PRWORA Notices Are Impermissibly Coercive ................................................. 78

VI. The Court Should Issue a Declaratory Judgment on the Verification Regulations (Count VI)..................................................................................................................................... 80

VII. The Court Should Vacate the PRWORA Notices, Issue a Limited Injunction, and Issue a Declaratory Judgment ....................................................................................................... 83

**CONCLUSION** ..................................................................................................................... **85**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amerijet Int'l, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) ................................................................34

*Appalachian Power Co. v. E.P.A.*,
  208 F.3d 1015 (D.C. Cir. 2000) ...............................................................26

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) .............................................2, 45, 50, 53, 60, 74, 78

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................25-26

*Bissonnette v. LePage Bakeries Park St., LLC*,
  601 U.S. 246 (2024) ................................................................................66

*Bond v. United States*,
  572 U.S. 844 (2014) ................................................................................50

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
  838 F.3d 42 (1st Cir. 2016) .....................................................................25

*California Communities Against Toxics v. E.P.A.*,
  934 F.3d 627 (D.C. Cir. 2019) ............................................................26-27

*California v. U.S. Dep't of Transportation*,
  No. 25-CV-208-JJM-PAS, 2025 WL 3072541 (D.R.I. Nov. 4, 2025) ...........83-84

*Cent. Maine Power Co. v. FERC*,
  252 F.3d 34 (1st Cir. 2001) .....................................................................84

*Chisom v. Roemer*,
  501 U.S. 380 (1991) ................................................................................73

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ...........................................................................26, 30

*Cir. City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001) ................................................................................52

*City & Cnty. of San Francisco v. E.P.A.*,
    604 U.S. 334 (2025) ............................................................................................. 69

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) ............................................................ 38

*City of Fresno v. Turner*,
    No. 25-CV-07070-RS, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025) ................... 82

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    591 U.S. 1 (2020) ................................................................... 34-36, 39, 70

*Doe v. Noem*,
    152 F.4th 272 (1st Cir. 2025) ......................................................... 43-44

*Dorsey v. United States*,
    567 U.S. 260 (2012) ..................................................................... 55-57

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ......................................................................... 39

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
    45 F.3d 530 (1st Cir. 1995) .............................................................. 84

*Esteras v. United States*,
    606 U.S. 185 (2025) ......................................................................... 51

*Facebook, Inc. v. Duguid*,
    592 U.S. 395 (2021) ..................................................................... 47-48

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ................................................................... 34, 40

*Florida v. Becerra*,
    544 F. Supp. 3d 1241 (M.D. Fla. 2021) ........................................... 33

*Gundy v. United States*,
    588 U.S. 128 (2019) ..................................................................... 71-73

*Harrington v. Chao*,
    280 F.3d 50 (1st Cir. 2002) .............................................................. 83

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024) ......................................................................... 66

*Heartland Reg'l Med. Ctr. v. Sebelius*,
   566 F.3d 193 (D.C. Cir. 2009) ................................................................84

*I.N.S. v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ...............................................................................52

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ...............................................................................77

*Kholi v. Wall*,
   582 F.3d 147 (1st Cir. 2009) ..................................................................48

*Kloeckner v. Solis*,
   568 U.S. 41 (2012) .................................................................................60

*Kucana v. Holder*,
   558 U.S. 233 (2010) ...............................................................................71

*La Casa Del Convaleciente v. Sullivan*,
   965 F.2d 1175 (1st Cir. 1992) ..........................................................27, 29

*Levesque v. Block*
   723 F.2d 175 (1st Cir. 1983) ..................................................................29

*Littlefield v. U.S. Dep't of the Interior*,
   85 F.4th 635 (1st Cir. 2023) ...................................................................25

*Lockhart v. United States*,
   546 U.S. 142 (2005) ...............................................................................56

*Lockhart v. United States*,
   577 U.S. 347 (2016) ..........................................................................47-48

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024) ...............................................31, 36, 45, 49, 73

*Maracich v. Spears*,
   570 U.S. 48 (2013) .................................................................................69

*Marcello v. Bonds*,
   349 U.S. 302 (1955) ...............................................................................56

*Martin Luther King, Jr. Cnty. v. Turner*,
   798 F. Supp. 3d 1224 (W.D. Wash. Aug. 12, 2025) ..............................82

v

*Massachusetts v. Nat'l Institutes of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025) ........................................................................31, 41, 83

*Michigan v. E.P.A.*
576 U.S. 743 (2015) ..........................................................................................................39, 41

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................................. 34, 38, 42-43

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
763 F. Supp. 3d 36 (D.D.C. Feb. 3, 2025) ............................................................................37

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
779 F. Supp. 3d 149 (D.N.H. Apr. 24, 2025) .......................................................................31

*Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*,
567 U.S. 519 (2012) .............................................................................................75-76, 78-80

*New Hampshire Hosp. Ass'n v. Azar*,
887 F.3d 62 (1st Cir. 2018) ................................................................28-29, 31-32, 34

*New Hampshire Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021) ..........................................................................................48, 83

*New York v. Trump*,
769 F. Supp (D.R.I. 2025) ..................................................................................................40

*New York v. U.S. Dep't of Energy*,
No. 6:25-CV-01458-MTK, 2025 WL 3140578 (D. Or. Nov. 10, 2025) ................................84

*New York v. U.S. Dep't of Health & Human Servs.*,
414 F. Supp. 3d 475 (S.D.N.Y. 2019) ........................................................................ 76, 78-79

*Noerand v DeVos*,
474 F. Supp. 3d 394 (D. Mass. 2020) ................................................................................ 56-57

*Oakley v. DeVos*,
No. 20-cv-03215-YG, 2020 WL 3268661 (N.D. Cal. June 17, 2020) ....................................56

*Pennhurst State Sch. and Hosp. v. Halderman*,
451 U.S. 1 (1981) ............................................................................................... 3, 74, 76-78

*Perez v. Mortgage Bankers Association*,
575 U.S. 92 (2015) ..............................................................................................................28

vi

*Plyler v. Doe*
   (457 U.S. 202) (1982) ........................................................................5, 51

*Ponta-Garca v. Ashcroft*,
   386 F.3d 341 (1st Cir. 2004) ...................................................................81

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ...............................................................................56

*Rhode Island v. Narragansett Indian Tribe*,
   19 F.3d 685 (1st Cir. 1994) .....................................................................83

*Rhode Island v. Trump*,
   781 F. Supp. 3d 25 (D.R.I. 2025) ............................................................43

*Riley v. Bondi*,
   606 U.S. 259 (2025) ...............................................................................81

*Shalala v. Guernsey Mem'l Hosp.*,
   514 U.S. 87 (1995) ............................................................................31, 33

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ...............................................................................75

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997) ..................................................................33

*Texas v. Becerra*,
   577 F. Supp. 3d 527 (N.D. Tex. 2021) .....................................................33

*U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*,
   578 U.S. 590 (2016) ...............................................................................27

*United States v. Morrison*,
   529 U.S. 598 (2000) ...............................................................................80

*Warder v. Shalala*,
   149 F.3d 73 (1st Cir. 1998) .................................................................28, 31

*Wash. State Ass'n of Head Start v. Kennedy*,
   No. 2:25-cv-00781-RSM, ECF No. 120 (W.D. Wash. Sept. 11, 2025)..............13, 36, 53, 57

*Washington v. U.S. Dep't of Housing & Urban Dev.*,
   No. 1:25-cv-00626-MSM, 2025 WL 3721053 (D.R.I. Nov. 25, 2025)...................................20

*Water Quality Ins. Syndicate v. United States*,
   225 F. Supp. 3d 41 (D.D.C. 2016) ..............................................................................38

**Constitutions**

U.S. Const.
   art. I, § 8, cl. 1 ..........................................................................................................75

**Federal Statutes**

5 U.S.C.
   § 553 ..........................................................................................................................27
   § 706 ..................................................................................................................34, 83
   § 804 ..........................................................................................................................33

8 U.S.C.
   § 1252 ........................................................................................................................81
   § 1601 ................................................................................................................48, 66-67
   § 1611 ..................................................................................................................*passim*
   § 1615 ..............................................................................................................53, 72
   § 1642 ..................................................................................6, 48-49, 80-82
   § 1643 ..............................................................................................5, 51, 59

20 U.S.C.
   § 1070e ......................................................................................................................56
   § 2301 ........................................................................................................................60
   § 2302 ........................................................................................................................60
   § 2342 ........................................................................................................................60

29 U.S.C.
   § 3151 ........................................................................................................................63
   § 3164 ..................................................................................................................63-64
   § 3171 ........................................................................................................................63
   § 3174 ................................................................................................................63, 66
   § 3226 ..................................................................................................................64-65
   § 3271 ........................................................................................................................60

42 U.S.C.
   § 254b ................................................................................................................46, 57
   § 673 ..........................................................................................................................50
   § 677 ..........................................................................................................................50
   § 3056i ......................................................................................................................63
   § 3056p ......................................................................................................................66
   § 5301 ........................................................................................................................68
   § 9840 ..................................................................................................................57-58

§ 9901 ......................................................................................................................55

§ 11374 ..................................................................................................................68

American Rescue Plan Act of 2021, Pub. L. No. 117-2 (2021) ....................................68

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (2022) ..........................68

Health Centers Consolidation Act of 1996, Pub. L. No. 104-299 (1996).....................57

Improving Head Start for School Readiness Act of 2007, Pub. L. No. 110-134 (2007) ..............58

Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193 (1996)......................................................................................................4, 52

Social Security Act Amendments of 1994, Pub. L. No. 103-432 (1994) ......................53

**Federal Regulations**

20 C.F.R.

§ 652.206 ................................................................................................................62

§ 652.207 ..........................................................................................................62, 65

§ 678.305 ................................................................................................................63

**Federal Register Notices**

61 Fed. Reg. 45,985 (Aug. 30, 1996)...............................................5-7, 45-46, 73, 76-77

62 Fed. Reg. 61,344 (Nov, 17, 1997)..........................................................................49, 54

63 Fed. Reg. 41,658 (Aug. 4, 1998)...........................................................7, 54, 76, 81, 83

66 Fed. Reg. 3,613 (Jan. 16, 2001) ..................................................7-8, 30, 44, 46, 73-74

81 Fed. Reg. 55,792 (Aug. 19, 2016).............................................................................62

86 Fed. Reg. 26,608 (May 14, 2021) .............................................................................56

90 Fed. Reg. 10,581 (Feb. 19, 2025) ..............................................................................9

90 Fed. Reg. 32,023 (Jul. 16, 2025).......................................9, 19, 35, 46, 70, 75, 80

90 Fed. Reg. 31,232 (Jul. 14, 2025).................... 9, 26, 30-31, 33, 37-39, 45-49, 52-55, 77

90 Fed. Reg. 30,896 (July 11, 2025)..........................................26, 40, 56, 58-60, 76-77

90 Fed. Reg. 54,363 (Nov. 26, 2025)..........................................22, 24, 29-30, 32, 42-44, 57, 67-68

**Rules**

Fed. R. Civ. P 65 .........................................................................................................16

**Miscellaneous Authorities**

141 Cong. Rec. H15431 (Dec. 21, 1995).......................................................................73

141 Cong. Rec. S12986 (Sept. 8, 1995).........................................................................51

141 Cong. Rec. S13568 (Sept. 14, 1995).......................................................................51

H.R. Conf. Rep. No. 104-725 (July 30, 1996) ...............................................................49

H.R. Rep. No. 104-725 (July 30, 1996) .........................................................................73

## PRELIMINARY STATEMENT

For nearly three decades, and across five Presidential Administrations, the federal government followed a clear and consistent understanding of what the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) required. Individuals needed to confirm their immigration status before accessing certain federally funded programs—Medicaid and Temporary Assistance for Needy Families, for example. But federal agencies consistently informed States[1] that PRWORA did not require individuals to produce their papers in order to access other vital community programs, many of which have always been open to all. The hungry have never needed to produce government identification to enter a soup kitchen or food bank; parents have never needed to produce their children's citizenship or immigration records before enrolling them in Head Start; those suffering from substance abuse disorders have never needed to bring their passports to a rehabilitation clinic; people facing homelessness or domestic violence have never needed proof of immigration status to walk into a shelter. These rules—set forth in clear, authoritative agency pronouncements unchanged for decades—shaped the way social services programs in every State operated. And they set the terms of the bargain under which States have accepted billions of dollars of federal funding each year.

Beginning in July, the Administration upended this stable equilibrium. In swift succession, four agencies explicitly repudiated the understanding of PRWORA that had governed since its inception. The Department of Justice (DOJ) revoked exemptions that had been in place since the very day after PRWORA was enacted, suddenly demanding that States screen individuals for lawful status before allowing them to access domestic violence shelters, senior nutrition programs, crisis counseling centers, soup kitchens, and myriad other services. The Department of Health and

---

[1] The term States includes the Plaintiffs and their subdivisions and their instrumentalities.

Human Services (HHS) overturned views that had been settled since 1998 and identified thirteen new programs, from Title X to Head Start to the Health Center Program, that it newly deemed subject to PRWORA's requirements. And the Department of Education (ED) and the Department of Labor (DOL) reversed their prior understandings of PRWORA to place a bevy of education and workforce training programs within the statute's ambit. Several months later, the Department of Housing and Urban Development (HUD) followed suit, relying on the same flawed legal interpretations as the other agencies to newly extend PRWORA's requirements to programs for community development, emergency shelter, and street outreach.

If allowed to go into effect, these changes would wreak havoc on the States' social safety nets. Defendants' new rules would put States to the impossible choice of shutting the doors of crucial programs or risking an immediate cutoff in federal funding. Many programs cannot realistically conduct verification at the door, such as 24/7 crisis hotlines, emergency services for individuals suffering an overdose, and homeless shelters. Even if some programs could implement such verification with time and resources, vulnerable people often lack government identification when accessing these services for myriad reasons, even where they are lawfully present in the country or have citizenship. For the first time, millions of U.S. citizens and lawful residents would face a new demand before they can access the Nation's most vital programs: "Show me your papers." Mem. and Order Granting Prelim. Inj. (PI Op.), ECF No. 64 at 2.

This Court correctly blocked these radical changes from going into effect when it granted Plaintiff States' Motion for a Preliminary Injunction, and it should grant Plaintiff States' Motion for Summary Judgment for the same reasons. Congress enacted PRWORA pursuant to the Constitution's Spending Clause. To impose conditions using that power, Congress must speak "unambiguously" and place officials on "fair notice" of what the law requires. *Arlington Cent. Sch.*

*Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296, 304 (2006) (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). As this Court explained, it is profoundly implausible to suggest that, for twenty-nine years, PRWORA has unambiguously meant the opposite of what every federal agency has said it does. PI Op. at 3. And, on issue after issue, Defendants' new interpretation of the statute is indefensible. PRWORA extends to "postsecondary education" benefits; Defendants now say it covers early childhood and secondary education benefits, too. PRWORA applies to programs with "eligibility units"; Defendants now say it extends to programs with no eligibility requirements at all. PRWORA gives States twenty-four months after promulgating regulations to implement new verification requirements; Defendants intended for their new requirements to take effect immediately without any regulations. These new interpretations are not "unambiguously" correct; as the Court explained when considering many of these arguments in its preliminary injunction opinion, they are quite simply wrong. *Id*. at 32-46.

The Constitution itself also forbids Defendants' effort to reimagine PRWORA. *Id*. at 46-48. Plaintiff States accepted federal funding for dozens of programs against the backdrop of Defendants' settled interpretation of this statute. The Spending Clause does not permit Defendants to dramatically change that bargain and "surpris[e]" the States with "postacceptance," "retroactive" conditions in the middle of their grant terms. *Pennhurst*, 451 U.S. at 25. Nor may Defendants coerce states to transform their social safety nets—including in areas of traditional state power—or else face the loss of billions of dollars in vital federal funding.

Defendants' notices implementing the new verification requirements are also inconsistent with the requirements of the Administrative Procedure Act. HHS, ED, DOL, and HUD failed to follow the requisite notice-and-comment procedures before announcing major, substantive changes to the way they implement PRWORA. PI Op. at 14-26. And their explanations lack the

3

basic elements of reasoned decisionmaking: Defendants did not consider the massive reliance that had built up around their settled interpretations, nor even explain why they deemed many programs newly within PRWORA's scope. *Id.* at 26-32. Furthermore, DOJ's notice is contrary to law because rather than "specif[ying] . . . which" programs are necessary to protect life or safety and otherwise meet the criteria for exclusion from PRWORA—the sole authority Congress granted the Attorney General, *see* 8 U.S.C. § 1611(b)(1)(D)—it declines to exempt programs regardless of whether they meet the criteria Congress listed.

Although "reasonable policymakers can debate the merits of restricting access to programs to lawful citizens," the federal government's obligations to adhere to the Constitution, the language of PRWORA, and the reasoned decisionmaking requirements of the APA are beyond dispute. PI Op. at 3. Defendants failed to comply with those obligations here—and rather than attempting to fix their errors following this Court's reasoned preliminary injunction decision, they simply repeated them in the HUD PRWORA Notice. The Court should vacate the PRWORA Notices, declare them unlawful, and enter a permanent injunction barring their enforcement.

## **BACKGROUND**

### I.    **PRWORA**

Congress enacted PRWORA in 1996 as part of an overhaul of the federal welfare system. *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193 (Aug. 22, 1996). As relevant here, PRWORA provides that "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit," subject to certain exceptions. 8 U.S.C. § 1611(a)-(b); *see also id.* § 1621 (similar for State and local public benefits). A "qualified alien" is defined to include noncitizens with certain forms of lawful status, such as permanent residents and those granted asylum. *Id.* § 1641(b). Many noncitizens who are lawfully present in

the United States do not fall within the definition of "qualified alien," including foreign students, temporary agricultural workers, and exchange visitors. *See id.*

The definition of "Federal public benefit" is critical to the scope of this statute. Section 1611(c)(1) defines this term as two categories of benefits. First, under Section 1611(c)(1)(A), the term includes "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States . . . ." Second, under Section 1611(c)(1)(B), "Federal public benefit[s]" includes "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States."

Not every form of payment or assistance the federal government provides constitutes a "Federal public benefit." Under Section 1611(c)(1)(B), this term reaches only the enumerated benefits and those "similar" to them. And since the very day after the statute's enactment, DOJ has consistently concluded that PRWORA does not reach "regular, widely available services," such as "police, fire, ambulance, transportation (including paratransit), [and] sanitation[.]" 61 Fed. Reg. 45,985, 45,985 (Aug. 30, 1996). The statute also includes a rule of construction: "Nothing in this chapter may be construed as addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under *Plyler v. Doe* (457 U.S. 202) (1982)." 8 U.S.C. § 1643(a)(2).

PRWORA also includes provisions exempting certain "Federal public benefits" from its scope. *Id.* § 1611(b)(1). These exemptions include specific items, such as emergency medical care and short-term, in-kind emergency disaster relief. *Id.* § 1611(b)(1)(A)-(B). And there is also an

5

exemption for:

> Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety.

*Id.* § 1611(b)(1)(D) (the "Life/Safety Exemption").

PRWORA required the Attorney General to "promulgate regulations requiring verification that a person applying for a Federal public benefit . . . is a qualified alien and is eligible to receive such benefit," *id.* § 1642(a)(1), as well as regulations that "set forth the procedures by which a State or local government" performs verification, *id.* § 1642(a)(3). PRWORA further states that, "[n]ot later than 24 months after the date the regulations described in [Section 1642(a)] are adopted, a State that administers a program that provides a Federal public benefit shall have in effect a verification system that complies with the regulations." *Id.* § 1642(b). And any "nonprofit charitable organization, in providing any Federal public benefit . . . is *not* required . . . to determine, verify, or otherwise require proof of eligibility of any applicant for such benefits." *Id.* § 1642(d) (emphasis added).

## II.    Longstanding Interpretations of PRWORA

Federal agencies have issued notices interpreting PRWORA since almost immediately after its enactment. DOJ was the first agency to do so. As noted, it issued a regulation just one day after the statute's enactment that construed the statute not to apply to "widely available services[.]" 61 Fed. Reg. at 45,985. In addition, this notice explained that all non-means-tested community programs necessary to protect life and safety are exempt from the scope of PRWORA under the Life/Safety Exemption, 8 U.S.C. §§ 1611(b)(1)(D), 1621(b)(4), and specified that those exempt

programs included services for domestic violence or crime victims, short-term homeless shelters, soup kitchens, medical and public health services, and activities designed to protect the life and safety of children and youths. 61 Fed. Reg. at 45,985. This specification of exempt programs remained unchanged for the following twenty-nine years, including after a 2001 order reaffirmed the same specification. 66 Fed. Reg. 3,613 (Jan. 16, 2001).

ED and HHS issued notices interpreting PRWORA in 1997 and 1998, respectively. In 1997, ED issued a Dear Colleague Letter interpreting the statute not to cover "assistance provided under federally funded preschool, elementary and secondary education programs" because the statutory definition of Federal public benefits is limited to "postsecondary education" benefits. Ex. 6 at 4-5.[2] In 1998, HHS issued a notice that, among other things, explained that the statute does not cover non-postsecondary education programs; does not cover programs that lack eligibility criteria, noting that the definition requires an "eligibility unit"; and does not automatically cover block grants to States because they do not provide benefits to individuals. 63 Fed. Reg. 41,658, 41,659-60 (Aug. 4, 1998). It also listed thirty-one programs that HHS concluded provide Federal public benefits. *Id.*

The Department of Labor (DOL) issued its last interpretation of PRWORA in February 2024, explaining that "[m]any, but not all, services authorized" by workforce training programs fell outside PRWORA. *See* Ex. 7. In particular, DOL explained that services that provide non-postsecondary education, information and referrals, or assistance in completing paperwork do

---

[2] All exhibits are attached to Declarations of Jessica Ranucci, dated July 21, 2025, and filed at ECF No. 4 (Exhibits 1-76); dated August 18, 2025, and filed at ECF No. 55 (Exhibits 77-80); and dated February 27, 2026, and filed contemporaneously with this motion (Exhibits 81-111). A chart showing all exhibits with title and ECF numbers is included in the Ranucci Declaration filed today. The Parties have stipulated that all declarations and exhibits filed in connection with Plaintiffs' preliminary injunction motion may be part of the summary judgment record. ECF No. 89.

not fall within PRWORA. *Id.* at 5-7.

The Department of Housing and Urban Development (HUD) historically interpreted PRWORA's term "Federal public benefit" only as to a few specific programs. In 2001, HUD concluded that HUD's Lead Hazard Control Program was not a "Federal public benefit" because the term "grant" in the statute "refers to financial awards to individuals; it does not include so-called 'block grants' which are provided to states or localities." Ex. 82 (quotation omitted). The same day, DOJ explained that "many" HUD programs, including "programs funded under the . . . Housing Opportunities for People Living with AIDS (HOPWA) and the McKinney[-Vento] Homeless Assistance Act . . . may not be 'federal public benefits . . . .'" 66 Fed. Reg. at 3,615; *see also* Ex. 86 (2017 HUD Office of Inspector General noting lack of clarity).

HUD has issued guidance documents regarding the application of the Life/Safety Exemption to HUD programs. First, on January 19, 2001, HUD explained that "[b]oth emergency shelter and transitional housing programs" fall within the Life/Safety Exemption such that "HUD-funded programs that provide emergency shelter and transitional housing for up to two (2) years are to make these services equally available to all needy persons, including aliens who [are] not 'qualified aliens.'" Ex. 83. On August 5, 2016, HHS, HUD and DOJ issued a joint letter that "restate[d]" HUD's policy that "immigration status is not a bar to providing certain services necessary to protect life or safety, such as emergency shelter, short-term housing assistance including transitional housing, crisis counseling, and intervention programs." Ex. 84. The following week, HUD issued guidance applying the Life/Safety Exemption to two HUD programs, Emergency Solutions Grants (ESG) and Continuum of Care (CoC), determining that certain assistance under those programs was subject to the Life/Safety Exemption, including street outreach services, emergency shelter, rapid re-housing, and traditional housing. Ex. 85.

### III.     Defendants' July 2025 PRWORA Notices

In July 2025, the landscape governing PRWORA changed dramatically. Between July 10 and 16, DOJ, HHS, ED, and DOL issued notices setting forth brand new positions on the scope of PRWORA (together, with the HUD PRWORA Notice, the "PRWORA Notices"). These Notices purported to implement Executive Order 14218, which directed agencies to "align" their programs with the purpose and requirements of PRWORA. 90 Fed. Reg. 10,581 (Feb. 19, 2025). The Notices were released without warning or an opportunity for public comment. And they announced a sea change in the way PRWORA would operate.

The Department of Justice's PRWORA Notice (DOJ PRWORA Notice) revokes every one of the Life/Safety Exemptions that DOJ has had in place since PRWORA was enacted twenty-nine years ago. Ex. 1, 90 Fed. Reg. 32,023, 32,025 (Jul. 16, 2025). The DOJ PRWORA Notice claims that agencies misunderstood the scope of some exemptions, and that other exemptions were not "necessary" to protect "aliens' immediate welfare[.]" *Id*. The DOJ PRWORA Notice further reasons that, even if noncitizens did rely on previously exempt programs, their reliance was outweighed by DOJ's interest in "reduc[ing] the incentive for aliens to illegally migrate to the United States." *Id.* DOJ's Notice had an effective date of August 15, 2025. *Id.* at 32,023.

The Department of Health and Human Services' PRWORA Notice (HHS PRWORA Notice) overturns all of the interpretations HHS adopted in 1998 and announces several new conclusions about the scope of PRWORA. Ex. 2, 90 Fed. Reg. 31,232, 31,238 (Jul. 14, 2025). Contrary to its long-held interpretation, HHS announces that PRWORA applies to programs with no eligibility criteria; programs that provide non-postsecondary education benefits, including Head Start—notwithstanding that Section 1611(c)(1)(B) enumerates only "*postsecondary* education . . . benefit[s]"—because all education benefits are "similar" to "welfare"; and also to block grants

awarded to States because they are "grants." *Id.* at 31,233-37 (emphasis added). HHS further identifies thirteen specific programs that it deemed newly subject to PRWORA. Save for at most two programs, HHS offers no explanation as to why these programs are designated as Federal public benefits and expressly refuses to consider whether its novel interpretation of PRWORA would upset any reliance interests in its previously settled construction or have a negative impact on public health. *Id.* at 31,238.

The Department of Education's PRWORA Notice (ED PRWORA Notice) reverses its interpretation set forth in the Department's 1997 Dear Colleague Letter. Ex. 3, 90 Fed. Reg. 30,896 (July 11, 2025). Contrary to its prior policies, ED now reads the statute to cover: (1) all education benefits provided to adults and (2) all education benefits provided to children except "basic public education benefits." *Id.* at 30,899. Relying on this new interpretation, the ED PRWORA Notice announces that two programs that expressly include secondary education benefits are now Federal public benefits subject to PRWORA: Title II of the Workforce Innovation and Opportunity Act of 2014 (WIOA II) and career and technical education programs authorized under the Carl D. Perkins Career and Technical Education Act of 2006 (Perkins V). *Id.* at 30,899-900.

The Department of Labor's PRWORA Notice (DOL PRWORA Notice) reverses its interpretation set forth in the 2024 DOL Notice and identifies seven sets of programs as now subject to PRWORA. Ex. 4. Rather than distinguishing which services are covered based on the nature of the benefits provided, the DOL PRWORA Notice asserts without elaboration that "all participant-level services are considered 'federal public benefits' under PRWORA" because their "overall goal is to move participants into gainful employment." *Id.* at 2-3.

### IV.     HUD's November 2025 PRWORA Notice

On November 26, 2025, HUD published a PRWORA Notice. Ex. 81, 90 Fed. Reg. 54,363 (Nov. 26, 2025) (HUD PRWORA Notice). Like the others, the HUD PRWORA Notice was issued without notice or a comment period, despite the fact that it drastically expands the extent to which HUD programs are subject to PRWORA in at least three significant ways. First, like the HHS PRWORA Notice, the HUD PRWORA Notice interprets "grant" to "include[] any 'subgrant' derivative of a grant," as well as "grants to individuals *and* grants provided to states or localities." *Id.* at 54,364 (quotations omitted, emphasis added). Second, the HUD PRWORA Notice adopts the same expansive view of Section 1611(c)(1)(B) as the other Notices, reasoning that it applies to programs regardless of whether they impose eligibility criteria. *Id*. (interpreting 8 U.S.C. § 1611(c)(1)(B) and reading "eligibility unit" as modifying only the word "family"). And third, the HUD Notice interprets "any other similar benefit" in 8 U.S.C. § 1611(C)(1)(B) to "include 'assistance' similar to the 'deliver[y] [of] in-kind services at the community level, including through public or private nonprofit agencies' where such benefits have not been specifically excluded by 8 U.S.C. § 1611(b)(1)." *Id.*

Having set forth its new interpretation of PRWORA, HUD concludes that PRWORA applies "to all HUD programs related to public or assisted housing," unless "a more specific federal statute applies." *Id.* The HUD PRWORA Notice specifically identifies twelve programs that it newly understands to be "covered grant programs" subject to PRWORA. *See infra* pp. 16-25 (detailing programs). The HUD PRWORA Notice does not provide a specific explanation for HUD's decision to identify these programs. Nor does HUD address whether any of these programs are covered by the Life/Safety Exemption.

## V.    Procedural History

Plaintiffs filed this action on July 21, 2025, challenging the four PRWORA Notices issued in July (the DOJ, HHS, ED, and DOL PRWORA Notices) and filed a motion for a preliminary injunction the same day. Defendants agreed to temporarily stay enforcement of the Notices. ECF No. 46.

On September 10, 2025, the Court granted Plaintiff States' Motion for a Preliminary Injunction and enjoined implementation of the DOJ, HHS, ED, and DOL PRWORA Notices in their entirety. PI Op. at 59. The Court first found that the Notices were final agency actions because they were final decisions with legal consequences. *Id.* at 11-14. Then, it found that Plaintiffs were likely to succeed on their claim that the HHS, ED, and DOL Notices were legislative rules that should have gone through notice and comment rulemaking. *Id.* at 14-26. Next, the Court found these Notices were likely arbitrary and capricious, in violation of the APA, because, at a minimum, the agencies failed to consider reliance interests. *Id.* at 26-32. As to the HHS PRWORA Notice, the Court found that it was likely contrary to law in four independent ways: it unlawfully applies PRWORA to benefits that are generally available to the public; it unlawfully extends PRWORA to non-postsecondary educational benefits, including Head Start; it incorrectly includes all benefits funded by block grants to States; and it includes the Health Center Program, which Congress exempted from PRWORA in a subsequent statute. *Id.* at 32-42. The Court also found that the ED PRWORA Notice was likely contrary to law because it, too, unlawfully extends to non-postsecondary educational benefits. *Id.* at 42-44. And it held that the DOL PRWORA Notice was likely contrary to law because it includes programs specifically exempted by the statute. *Id.* at 44-46. The Court then proceeded to find that the States were likely to succeed on their Spending Clause claims because the Notices were impermissibly retroactive and coercive.

*Id.* at 46-48. Finally, the Court determined that Plaintiffs would face irreparable harm in the absence of an injunction and that the balance of the equities tipped in their favor. *Id.* at 48-56.[3]

On September 23, 2025, Plaintiffs filed the Second Amended Complaint adding two new counts (Count V and Count VI). ECF No. 68.

On November 26, 2025, HUD published the HUD PRWORA Notice. On December 4, 2025, Plaintiffs filed the Third Amended Complaint adding HUD and its Secretary as Defendants. ECF No. 76. On December 8, 2025, the Parties filed a stipulation in which Defendants agreed not to enforce the HUD PRWORA Notice through the resolution of this action in the District Court. ECF No. 80. Pursuant to a schedule agreed upon by the Parties and ordered by the Court, the Parties are now proceeding to cross-motions for summary judgment. *See* ECF No. 85.

## VI.   Plaintiff States Face Harm Because Their Critical Programs Are Threatened by the Notices

The PRWORA Notices deem dozens of critically important State-operated programs newly subject to PRWORA. The programs listed in the HHS PRWORA Notice fund a wide range of services vital to protecting health and safety—they support health clinics, aid substance abuse prevention and treatment, educate and protect at-risk children, and help alleviate the causes and conditions of poverty. *See* Pls.' Mot. for Preliminary Injunction (PI Mot.), ECF No. 2 at 14-30. The programs in the ED PRWORA Notice fund education and literacy, including at the secondary level. *Id.* at 30-34. The DOL PRWORA Notice newly designates a range of workforce-training programs subject to PRWORA. *Id.* at 34-36. The DOJ PRWORA Notice affects a sweeping set of

---

[3] Although Defendants filed a Notice of Appeal of the Preliminary Injunction Order, ECF No. 71, they later voluntarily dismissed the appeal, *see* ECF No. 82. Separately, the United States District Court for the Western District of Washington issued a preliminary injunction staying and enjoining enforcement of the HHS PRWORA Notice. *See* Ex. 111, *Wash. State Ass'n of Head Start v. Kennedy*, No. 2:25-cv-00781-RSM, ECF No. 120 (W.D. Wash. Sept. 11, 2025). Defendants likewise voluntarily dismissed their appeal of that preliminary injunction. *See Wash. State Ass'n of Head Start*, No: 2-25-cv-00781, ECF Nos. 130, 131, 138.

programs long considered exempt from PRWORA's requirements, including emergency homeless shelters and services for victims of domestic violence. *Id.* at 36-38. And as explained in more detail below, the HUD PRWORA Notice affects not only homeless shelters and services for individuals living with HIV, but also programs that provide infrastructure and other community benefits. *Infra* pp. 16-25.

As the Court has recognized, the PRWORA Notices will harm Plaintiff States because the Notices are "not fundamentally compatible with the emergency services offered by" Plaintiff States, meaning many of these programs will need to cease performing their functions or close entirely. PI Op. at 49; *see, e.g.*, PI Mot. at 24-25, 27-28 (the 988 hotline and Certified Community Behavioral Health Clinics will no longer be able to provide immediate, 24/7 life-saving support to individuals experiencing mental health crises); PI Mot. at 28-29 (key components of States' responses to the opioid epidemic will no longer function as many people seeking help with addiction will be unable to access them).

The PROWRA Notices place "new obstacles" between States' programs and their residents, a "well-established" harm. PI Op. at 50. Many of the programs affected by the Notices serve Plaintiff States' most vulnerable residents, who rely on those programs to meet their basic daily needs. The Notices will affect many needy U.S. citizens who lack government identification and will no longer be able to access any programs requiring verification. They will also have a significant chilling effect, causing fear among immigrant communities resulting in fewer people seeking Plaintiff States' programs. *See, e.g.*, PI Mot. at 15, 17. Those "obstacles" will undermine the mission and efficacy of Plaintiff States' programs, and thereby cause negative impacts that will not only harm Plaintiff States' residents but also force the States to pick up the bill as the federally funded safety net collapses. *See* Ex. 54 ¶ 48; Ex. 51 ¶ 24; Ex. 5 at 11 n.19.

Put simply, "human lives that the States have deemed worthy of protection are at stake." PI Op. at 51. "The State's interest here is important," because "[i]n life-or-death scenarios—times of crisis, when someone faces domestic violence, homelessness, or a mental health crisis—it practically goes without saying that there can be no do over and no redress if services are unlawfully denied and someone suffers for it." *Id.* The Notices thus impair the States' sovereign prerogative of shielding the public health and community safety. Plaintiffs have made the policy judgment that they are best served by keeping vulnerable residents healthy, learning, working, and housed. Programs like Title X and Head Start and community services like food banks work precisely because they are so accessible. *See* PI Mot. at 14-19. The Notices threaten the success of these programs, which each Plaintiff State has made, in its reasoned judgment, available to all, regardless of citizenship.

Further, as the Court has found, Plaintiff States face not only "confusion and chaos," but also out-of-pocket "compliance costs" due to the PRWORA Notices. PI Op. at 51-52. Many affected programs have no eligibility restrictions at all. And those that require income verification are not comparable because verifying income is far simpler than verifying immigration status, which requires specialized knowledge. The determination of who is a "qualified alien" under PRWORA is far from straightforward: it excludes many categories of noncitizens who are lawfully present in the United States and permitted to work or study here. Some programs are unlikely to be able to implement verification programs at all because the time and expense is too great for their overburdened services to bear, such that they may close entirely. *See* PI Mot. at 16-18. As the Court has recognized, it will take time and training (up to a year or more, in some programs' estimate) to prepare Plaintiff States' program staff to perform verification of immigration status. *See* PI Op. at 51-52.

Finally, as the Court has recognized, Plaintiffs face "the threat of enforcement and the uncertainty that stems from that threat," because "[t]he Notices take effect immediately, and the Government has explained that it maintains the authority to enforce them against the States." PI Op. 53. Indeed, even since the Court's Preliminary Injunction Order, Defendants have conditioned States' receipt of funding on their compliance with PRWORA and "and any applicable requirements" that Defendants may "establish . . . to comply with PRWORA." *See, e.g.*, Ex. 102 ¶ 23; Ex. 105 ¶ 10. Enforcement, in this context, jeopardizes the billions of dollars in federal funding that Plaintiff States receive.

**VII.    Specifics as to the HUD Programs Listed in the HUD PRWORA Notice**

Plaintiffs' motion for a Preliminary Injunction described in detail the specific programs affected by the HHS, ED, DOL, and DOJ PRWORA Notices and the impact that those Notices would have on Plaintiff States with respect to those programs. *See* PI Mot. at 14-38. Rather than repeat the lengthy summary of those programs, Plaintiffs incorporate that summary and all evidence submitted with respect to that motion by reference here. *See supra* n. 2; *see also* Fed. R. Civ. P 65(a)(2).

However, because the HUD PRWORA Notice was promulgated after the preliminary injunction, those papers do not describe the affected HUD programs. As detailed below, the programs affected by the HUD PRWORA Notice fund programs and services that are designed to benefit the community at large, such as housing development, infrastructure, and homelessness services.

**A.  Community Development Block Grant (CDBG and CDBG-DR)**

The Community Development Block Grant (CDBG) program funds infrastructure improvements, housing rehabilitation to ensure safe and sanitary living conditions, support for small businesses, and community facilities and services that meet urgent needs. Ex. 103 ¶ 5;

Ex. 97 ¶ 5. While the CDBG program as a whole is intended to benefit low- and moderate-income communities, CDBG has no individualized eligibility check or verification. Ex. 103 ¶ 11.

CDBG funds are used by Plaintiff States to fund a wide variety of projects, many of which are inherently open to the public and for which verification of immigration status would be impracticable or completely impossible. In New Jersey and Colorado, for example, CDBG funds were recently used to make a municipal senior center ADA-compliant; to improve public water infrastructure; and to install an elevator at a local courthouse. Ex. 99 ¶ 11; Ex. 88 ¶ 10; *see also* Ex. 108 ¶ 10 (describing similar improvements). In Oregon, most CDBG funds are used for water, wastewater, and stormwater system improvements. and it would be "difficult if not impossible to" verify immigration status because these improvements benefit everyone. Ex. 103 ¶ 9; *see also* Ex. 88 ¶ 11 ("challenging or impossible"). Oregon also uses CDBG for the acquisition, rehabilitation, and construction of public facilities like libraries, community centers, food banks, mental health facilities, homeless shelters, senior centers, and fire stations which likewise are open to all. Ex. 103 ¶ 9. The same for New Mexico: CDBG funds mainly support infrastructure like streets, drainage, water, wastewater; public facilities like community centers, parks, elevators, sidewalks; and ADA improvements like ramps, elevators, and accessible restrooms. Ex. 100 ¶¶ 8-10; *see also* Ex. 97 ¶ 7 (similar); Ex. 87 ¶ 12 (similar); Ex. 94 ¶ 18 (similar). In New York City, CDBG funds code enforcement for reported building hazards to protect the public from dangers such as fatal fires. Ex. 109 ¶ 8.

Community Development Block Grant Disaster Recovery (CDBG-DR) funds emergency projects to repair or mitigate damage arising from a State- or federally-declared state of emergency. Ex. 103 ¶ 9; Ex. 87 ¶ 13. Like traditional CDBG, these funds typically serve the community at large, and verification here too would be difficult, if not impossible. Ex. 103 ¶ 9; Ex. 87 ¶ 14.

In California, for example, CDBG-DR can be used to fund construction, reconstruction and repair of roads, bridges, utilities, and public safety and emergency buildings. Ex. 87 ¶ 14; *see also* Ex. 94 ¶¶ 42-43 (similar in Massachusetts).

Truly imposing verification requirements for these public programs would require States to take absurd (and unlawful) steps, such as verifying the immigration status of entire neighborhoods or towns and setting up checkpoints to exclude ineligible individuals. *See* Ex. 100 ¶ 14; Ex. 97 ¶ 8; Ex. 108 ¶ 24. Even if Plaintiff States could comply without violating their residents' rights, they would have to expend significant time and resources to implement the HUD PRWORA Notice for CDBG and CDBG-DR, involving administrative oversight, training, new data tracking systems, audits, and review. Ex. 103 ¶ 12; Ex. 100 ¶¶ 12-13; Ex. 97 ¶ 8; Ex. 88 ¶ 13; Ex. 108 ¶¶ 25-26; Ex. 99 ¶ 22. Verification for CDBG and CDBG-DR could undermine those programs' accessibility and would exclude eligible individuals who lack documentation, such as homeless individuals, survivors of domestic violence, the elderly, people with disabilities, and those recently released from incarceration. Ex. 103 ¶ 13; Ex. 99 ¶¶ 21, 24; Ex. 94 ¶ 35.

Further, some States' programs may have to close, at least temporarily, because implementing the verification requirements immediately would be impossible. Ex. 103 ¶ 14; Ex. 97 ¶ 9; Ex. 99 ¶ 23. That would have significant effects on Plaintiff States, as families could be forced to live in unsafe conditions, homelessness could increase, essential infrastructure projects could be delayed, and small businesses might close permanently. Ex. 88 ¶ 12; Ex. 94 ¶ 33; Ex. 103 ¶ 14. In turn, demand for state-funded emergency assistance may increase. Ex. 103 ¶ 15 ("[S]uspending CDBG funding, even temporarily, turns relatively small, preventive investments into large, long-term expenses for the State."). The increased costs of compliance may even deter applicants from seeking CDBG funds in the first place, leading to less effective projects. Ex. 100

¶ 13; Ex. 108 ¶ 29.

### B. Emergency Solutions Grants (ESG) and Continuum of Care (CoC)

The Emergency Solutions Grant Program (ESG) and the Continuum of Care (CoC) Program provide rapid rehousing, transitional housing, and homeless outreach. For decades, HUD and DOJ have maintained that emergency and transitional shelter provided by ESG and CoC fall within PRWORA's Life/Safety Exemption. *See supra* pp. 8-9. Nonetheless, the HUD PRWORA Notice includes these programs without addressing whether the Life/Safety Exemption continues to apply to these programs—as it must under the Court's preliminary injunction order.[4]

Specifically, ESG provides funds to States to engage in homeless prevention; help homeless individuals and families living on the street; improve the number and quality of emergency shelters and help operate those shelters; provide essential services to shelter residents; and rapidly rehouse homeless individuals and families. Ex. 89 ¶ 5; Ex. 96 ¶ 7; Ex. 108 ¶ 9; Ex. 99 ¶ 13; Ex. 105 ¶ 5; Ex. 87 ¶ 17; Ex. 95 ¶ 5; Ex. 42 ¶ 6. Many of these services are short-term and crisis-oriented and designed specifically to be able to be accessed with minimal barriers. Ex. 89 ¶¶ 10, 25; Ex. 108 ¶ 28. In Illinois, for example, ESG funds temporary shelter for over 13,000 individuals and families each year. Ex. 89 ¶ 11. In Maine, ESG-funded programs providing shelter must be open to homeless individuals 365 days per year. Ex. 96 ¶ 7. Some ESG-funded services are *not* housing, including for example, street outreach, which involves conducting safety assessments, referrals, and benefits assistance, and case management, which involves needs assessments, coordination of health care, and public benefits assistance. Ex. 89 ¶¶ 13-15; Ex. 96 ¶ 7; Ex. 102 ¶ 15; Ex. 95 ¶ 5. ESG also funds the costs of running homeless shelters, like fuel,

---

[4] The DOJ PRWORA Notice also indicated that the Life/Safety Exemption covers CDBG, meaning that the Court's injunction of that Notice should likewise apply to CDBG. *See* Ex. 1, 90 Fed. Reg. at 32,025. This is also unaddressed in the HUD PRWORA Notice.

19

furniture, and utilities. Ex. 96 ¶ 7; Ex. 99 ¶ 15; Ex. 102 ¶ 15. Verification is "fundamentally incompatible" with the purpose of the ESG program, which is to respond to crises. Ex. 89 ¶ 26; Ex. 42 ¶ 7 (Because ESG funds "services provided in emergency situations, where speediness of service delivery can be the difference between life and death, it is not realistic to implement a time-consuming screening process such as requiring the collection of citizenship documentation."); Ex. 92 ¶ 29.

CoC provides transitional housing, rapid re-housing, permanent supportive housing, and coordinated entry system supportive services to individuals experiencing homelessness. Ex. 95 ¶ 5.[5] In Maryland, for example, these services reach more than 4,000 individuals experiencing homelessness per year. *Id*. CoC operates on a "Housing First" approach, which prioritizes rapid placement and stability in permanent housing in which admission does not have preconditions (such as sobriety or a minimum income threshold) and in which housing assistance is not conditioned upon participation in services, and so most CoC funding goes to permanent supportive housing. *See generally* Ex. 99 ¶¶ 17-19; Ex. 108 ¶ 15; Ex. 102 ¶¶ 10, 12.

Imposing verification on ESG and CoC programs would burden Plaintiff States with significant administrative and compliance costs. Ex. 96; Ex. 105 ¶¶ 12-13; Ex. 99 Decl. ¶ 22; Ex. 102 ¶ 21; Ex. 42 ¶ 8. In Illinois, for example, annual compliance costs just for ESG would be about 8,000-12,000 additional staff hours, which equals more than $500,000. Ex. 89 ¶ 18; *see also* Ex. 105 ¶ 12 (four to five months for guidance updates). This would reduce the efficacy of Plaintiff States' programs, by increasing intake times and delaying access to critical services. Ex. 89 ¶ 23; Ex. 96 ¶ 11. Verification is likely to result in reduction or closure of ESG or CoC programs, which

---

[5] The CoC program is the subject of a separate lawsuit before the Court involving many of the same parties. *See Washington v. U.S. Dep't of Housing & Urban Dev.*, No. 1:25-cv-00626-MSM, 2025 WL 3721053 (D.R.I. Nov. 25, 2025).

in turn would lead to more of Plaintiff States' residents facing homelessness and placing a burden on other State resources, including healthcare, education, and public safety systems. Ex. 89 ¶¶ 19-21; Ex. 96 ¶ 11; Ex. 105 ¶ 13; Ex. 99 ¶ 23; Ex. 102 ¶ 20. It would also likely cause providers to leave the programs rather than deal with increased administrative burdens and compliance risks, which would undermine the efficacy of Plaintiff States' programs. Ex. 89 ¶ 26; Ex. 96 ¶ 11; Ex. 108 ¶ 29; Ex. 105 ¶ 18; Ex. 42 ¶ 8; Ex. 31 ¶ 11; Ex. 91 ¶ 35.

The ESG and CoC programs are particularly targeted at individuals who are least likely to have access to documentation, including those who have experienced domestic violence, homeless veterans, senior citizens, and individuals with disabilities, and thus are likely to be excluded from critical services, even if eligible. Ex. 89 ¶¶ 19-21; Ex. 105 ¶ 19; Ex. 95 ¶ 8; Ex. 96 ¶ 11; Ex. 108 ¶ 28 ("Individuals in crisis—for example, someone experiencing a mental health episode or fleeing from a domestic abuser—will not, in many cases, have documentation that would allow them to prove their citizenship or immigration status."); Ex. 42 ¶ 7; Ex. 102 ¶ 20; Ex. 91 ¶ 34 (requiring documentation would "effectively exclude a wide swath of otherwise qualified individuals from receiving supportive services"). Any verification requirement would undermine the trust built up between these particularly vulnerable populations and States' programs. Ex. 89 ¶ 27; Ex. 96 ¶ 11; Ex. 31 ¶ 12. And imposition of a verification requirement would appear to require immediate eviction of homeless individuals who are currently living in shelter funded by these programs and cannot provide the requisite documentation, requiring States to literally put their residents, including children, out on the streets. Ex. 95 ¶ 8.

### C. Housing Opportunities for Persons with AIDS (HOPWA)

HOPWA provides stable housing for persons living with HIV/AIDS, which increases access to comprehensive healthcare and adherence to HIV treatment. Ex. 90 ¶ 5; Ex. 102 ¶ 14. HOPWA funds short-term rental, mortgage, and utility assistance, as well as permanent housing

stabilization. Ex. 90 ¶ 5; Ex. 102 ¶ 15. In Minnesota, for example, HOPWA funds only short-term housing and utilities payments. Ex. 98 ¶ 9. HOPWA can also fund non-housing services such as case management, healthcare, crisis intervention, drug and alcohol use counseling, and childcare. Ex. 90 ¶ 5; Ex. 102 ¶ 15. HOPWA participants must have an HIV diagnosis and, with some exceptions, must meet certain income requirements. Ex. 90 ¶ 5; Ex. 102 ¶ 16.

Like the other programs, verification of immigration status for HOPWA would require significant staff time, data system enhancement, training, outreach, and other administrative costs. Ex. 90 ¶ 6; Ex. 98 ¶ 14; Ex. 102 ¶ 21. The data privacy concerns are paramount in the HOPWA program, given that all individuals served have an HIV diagnosis; for the same reason, individuals participating in HOPWA may be particularly deterred by the need to provide documentation. Ex. 90 ¶ 6; Ex. 98 ¶ 14; Ex. 102 ¶¶ 21-22. Moreover, the effects of excluding HIV-positive individuals—including those with lawful status who lack documentation—are particularly harmful, as the loss of housing contributes not only to potential homelessness, but also to an increase in the risk of HIV transmission to others and higher healthcare costs overall. Ex. 90 ¶ 7; Ex. 98 ¶ 14; Ex. 102 ¶ 20.

### D. HOME Investment Partnerships (HOME), HOME-American Rescue Plan (HOME-ARP), and National Housing Trust Fund (NHTF)

The HOME Investment Partnerships (HOME) Program[6] provides funding for States to create and preserve affordable housing via home construction or rehabilitation, and also rental assistance. Ex. 98 ¶ 6; Ex. 98 ¶ 8; Ex. 87 ¶ 15. In Minnesota, for example, HOME (and HOME-ARP) solely fund construction, preservation, and rehabilitation of multifamily rental housing. Ex. 98 ¶ 6. In Maine, HOME funds similar services, and also funds short-term rental

---

[6] The HUD PRWORA Notice separately lists "HOME" and "HOME Investment Partnerships," but Plaintiffs' understanding is that these refer to the same program. *See* Ex. 81, 90 Fed. Reg. at 54,364.

assistance for individuals who are living in homeless shelters. Ex. 96 ¶ 8; *see also* Ex. 108 ¶¶ 11-12 (similar for Washington); Ex. 104 ¶ 5; Ex. 105 ¶ 8 (similar for Oregon). Here in Rhode Island, HOME and NHTF funds will be used to produce or preserve nearly 2,000 units of affordable housing over the next five years. Ex. 107 ¶ 13.

The HOME-American Rescue Plan (HOME-ARP) provided a one-time award to States already receiving traditional HOME funds to provide homelessness assistance and support. Ex. 98 ¶ 7. HOME-ARP funds can be used for tenant rental assistance; development and support of affordable housing; supportive services; and development of non-congregate shelter units. *Id*. HOME-ARP funds must be targeted to populations with significant housing instability, including those who are homeless or at risk of homelessness and those fleeing or seeking to flee domestic violence, sexual assault, stalking, or human trafficking. Ex. 96 ¶ 9. For example, HOME-ARP funds are being used in Maine to provide housing for homeless veterans. *Id*.

NHTF is an entitlement program that provides funds to States to produce and preserve affordable housing, including new construction; rehabilitation; adaptive reuse; acquisition; rental assistance; and housing preservation. Ex. 98 ¶ 8; Ex. 104 ¶ 7; Ex. 107 ¶ 16. In Minnesota, for example, NHTF funds are used solely for the capital costs of home construction. Ex. 98 ¶ 8. Similarly, in Maine, NHTF funds go to developers building affordable housing. Ex. 96 ¶ 8(c); *see also* Ex. 104 ¶ 7 (similar in Oregon); Ex. 107 ¶ 21.

As with the other HUD programs, verification in HOME, HOME-ARP, and NHTF would impose significant administrative burdens on Plaintiff States. Ex. 96 ¶ 11, 13; Ex. 105 ¶¶ 12-13; Ex. 107 ¶¶ 24-25. And, like the other programs, imposing a verification requirement is likely to exclude many individuals with lawful status who lack documentation. Ex. 96 ¶¶ 11; Ex. 98 ¶¶ 10-11; Ex. 104 ¶ 16. But verification within the HOME and NHTF programs presents

an additional challenge, because those funds are typically used to fund developers building housing, *not* benefits to individuals. *See, e.g.*, Ex. 104 ¶ 7. Requiring verification would place an additional burden on developers and property managers who would have to set up a system to collect, track, and verify immigration status, seemingly in perpetuity. Ex. 96 ¶ 11; Ex. 108 ¶ 29. This burden, a "real added cost[]" to affordable housing, would be likely to reduce developer participation in the programs, frustrating States' affordable housing goals. Ex. 104 ¶ 14; *see also* Ex. 96 ¶ 11; Ex. 98 ¶ 12; Ex. 107 ¶ 23. It would also delay projects, resulting in increased construction costs. Ex. 107 ¶ 22 (affordable projects in Rhode Island would be "less desirable or infeasible"); Ex. 93 ¶ 21 (PRWORA requirements could "delay or destabilize entire projects, discourage private investment, and create negative spillover effects on the production of market rate units and community spaces"). Further, if private developments become insolvent due to the increased administrative burden, States may be left holding the bag. Ex. 104 ¶ 15.

### E.  Additional Programs (PRO Housing, PRICE, and SHOP)

The HUD PRWORA Notice lists three additional small programs. The Pathways to Removing Obstacles to Housing (PRO Housing) funds planning for land use reforms, and it is not clear whose immigration status would be required to be verified or how any verification would work. Ex. 95 ¶¶ 11-13. The Preservation and Reinvestment Initiative for Community Enhancement (PRICE) program provides for the maintenance, protection, and stabilization of manufactured homes, which are often a key source of unsubsidized affordable housing. Ex. 106 ¶ 4. In Oregon, for example, PRICE is used to provide funding to turn rental-based manufactured home communities into co-ops to keep rents permanently affordable. *Id.* Finally, unlike the other programs in the HUD Notice, the Self-Help Homeownership Opportunity Program (SHOP) is provided only to non-profit organizations, not to States, *see* Ex. 81, 90 Fed. Reg. at 54,364. Although States benefit from the "sweat equity" programs funded by SHOP, through which

prospective homeowners complete months of manual labor on their future homes, often in furtherance of affordable housing goals in the same rural communities to which Plaintiff States' HOME and CDBG funds are directed.[7] Extending PRWORA to these programs would have the same types of negative effects on Plaintiff States as described above. *See* Ex. 106; Ex. 95.

## ARGUMENT

In a case under the Administrative Procedure Act (APA), a motion for summary judgment "is simply a vehicle to tee up a case for judicial review." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). At summary judgment, the Court must "conduct a searching examination to ensure that the agency's decision is" lawful, including that it is "reasonably supported by the administrative record." *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023). Defendants' PRWORA Notices are procedurally improper, arbitrary and capricious, and contrary to law. Accordingly, the Court should grant Plaintiffs' motion for summary judgment.

### I.      The PRWORA Notices Are Final Agency Actions

As this Court already found, the PRWORA Notices are final agency actions. PI Op. at 13. They plainly "mark the consummation" of agency decision-making and determine "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified); *see also* PI Op. at 13 ("[B]oth facets of the final agency action test are satisfied."). By their terms, the Notices reversed nearly three decades of Defendants' own precedent to dramatically constrict eligibility requirements for critical federal programs. As the Court already detailed, there is no dispute that "'legal consequences will flow' and both rights and

---

[7] *See, e.g.*, Community Frameworks, https://communityframeworks.org/ (last visited Feb. 25, 2026) (Washington-based affordable housing provider and SHOP grant recipient developing affordable housing in Washington).

obligations 'have been determined'" by the Notices, regardless of whether they are interpretive or substantive. PI Op. at 14 (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024)). The Notices have the "immediate effect" of rendering millions of people ineligible for government programs, *id*. at 13, and set forth positions that Plaintiffs must "heed" or else suffer "the risk of significant . . . penalties"—namely, the loss of billions of dollars in federal funding, *California Communities Against Toxics v. E.P.A.*, 934 F.3d 627, 637 (D.C. Cir. 2019) (citation modified) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016)). *See also* Ex. 2, 90 Fed. Reg. at 31,238 (HHS Notice "effective immediately."); Ex. 3, 90 Fed. Reg. at 30,900 (ED's Notice "may be referenced when enforcing . . . compliance"). By any measure, these Notices are final agency actions and thus subject to review under the APA. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (finding action final where agency had "given the States their 'marching orders' and . . . expect[ed] the States to fall in line").

Defendants cannot dispute that the PRWORA Notices reflect the completion of their decisionmaking process. Instead, in opposing Plaintiffs' Preliminary Injunction motion, they argued that the non-DOJ Notices were merely "interpretive rules" that set out the agencies' thinking. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 48 at 13-17.[8] But this is doubly wrong. First, as this Court already found, the PRWORA Notices are not merely interpretive. PI Op. at 14-26. Defendants did not *merely* change their interpretation of a statute—they also reversed decades-old policies to strip millions of vulnerable people of eligibility for a host of specific government-funded programs as soon as the Notices take effect. *See Chrysler Corp. v. Brown*, 441

---

[8] Plaintiffs do not understand there to be any dispute that the DOJ Notice is final agency action. Because the DOJ Notice plainly "mark[s] the consummation" of DOJ's decisionmaking and determines substantive "rights or obligations . . . from which legal consequences will flow" by cutting off eligibility for the programs subject to that Notice, there is no basis for any dispute on this point. *Bennett*, 520 U.S. at 177-78 (citation modified).

U.S. 281, 302 (1979) ("[A] substantive rule" is "one affecting individual rights and obligations[]" such that it "may be binding or have the force of law." (internal quotation marks and citations omitted)).

Second, even if the Notices were merely interpretive, "interpretive rules can be final," *California Communities Against Toxics*, 934 F.3d at 635 (citing *Perez v. Mortgage Bankers Association*, 575 U.S. 92 (2015)), so "the test for finality" must be "independent of the analysis for whether an agency action is a legislative rule rather than an interpretive rule[,]" which "is better suited for the Court's consideration" of Plaintiffs' notice-and-comment claim. *Id.*; *see also Hawkes*, 578 U.S. at 599-600; PI Op. at 14.

## II.    The HHS, ED, DOL, and HUD PRWORA Notices Violated the APA's Procedural Requirements (Count I)

The HHS, ED, DOL, and HUD PRWORA Notices are procedurally invalid because Defendants failed to undertake notice-and-comment rulemaking. Defendants have argued that notice-and-comment rulemaking was not required for the HHS, ED, and DOL PRWORA Notices because they are merely interpretive rules under 5 U.S.C. § 553(b)(A). But as this Court already found, this is wrong. PI Op. at 14-26. By their terms, the HHS, ED, and DOL Notices reverse the agencies' longstanding positions regarding eligibility for foundational federal programs and modify applicability for these programs going forward—as does the more recent HUD Notice. They are thus substantive rules for which notice-and-comment rulemaking was required.

Under the APA, before a federal agency can adopt or repeal a "legislative" or "substantive" rule—i.e., one that "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself"—it must generally go through the notice-and-comment process. *See La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992); 5 U.S.C. § 553. By contrast, "[i]nterpretive rules," which "'do not have the force and effect of law

and are not accorded that weight in the adjudicatory process[,]'" need not undergo the notice-and-comment process. *Perez*, 575 U.S. at 97 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). "Put more succinctly, a rule is exempt from notice and comment as an interpretative rule if it does not 'effect a substantive change in the regulations.'" *Warder v. Shalala*, 149 F.3d 73, 80 (1st Cir. 1998) (quoting *Guernsey Mem'l Hosp.,* 514 U.S. at 100). The distinction is important because, where notice and comment are required, the agency's "[f]ailure to abide by these requirements renders a rule procedurally invalid." *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

The First Circuit has outlined "'five considerations'" to help distinguish interpretive from substantive rules, namely: "statutory text; the explanation (or lack thereof) given by an agency in adopting a policy; whether the rule is 'inconsistent with another rule having the force of law' or otherwise 'alters or enlarges obligations imposed by a preexisting regulation'; the 'manner in which the Secretary's actions fit within the statutory and regulatory scheme'; and, finally, 'pragmatic considerations.'" PI Op. at 16 (quoting *Azar*, 887 F.3d at 73, and outlining the relevant considerations). Here, these factors tip decisively toward finding that the Notices are substantive.

### A. Statutory Text

In *Azar*, the Court started by examining the extent to which "the statute leaves 'unaddressed'" the subject matter of the new rules, and thus the extent to which an agency's rule was filling a gap. *Azar*, 887 F.3d at 71. As detailed below, PRWORA is quite clear in what it does and does not cover. Thus, this factor arguably favors Defendants. *See* PI Op. at 18. The catch, however, is that Defendants here are trying to add terms and restrictions to the statute that cannot be squared with its history, text, and structure. They are, in other words, treating the clear, limited language of PRWORA as an open-ended delegation of power from Congress to "mak[e] a

discretionary policy judgment" about what programs ought and ought not be open to non-qualified aliens. *Azar*, 887 F.3d at 71.

### B.  Agency Explanation

HHS, ED, and HUD characterize their respective notices as "interpretive," though DOL does not. *See* PI Op. at 18-20; *see also* Ex. 81, 90 Fed. Reg. at 54,363 (purporting to engage in an "interpretation" of PRWORA's text). The First Circuit recognizes that "the probative value of" an agency's "own characterization of a pronouncement as interpretive is limited," however, and cautions against "plac[ing] on it more weight than its merits can bear." *Azar*, 887 F.3d at 72; *see also La Casa Del Convaleciente*, 965 F.2d at 1178. The probative value of Defendants' own characterizations is particularly limited here for at least two reasons.

First, HHS, ED, and HUD's own characterizations are not entitled to deference because the Notices have a "substantial impact" on the Plaintiff States and the people served by the covered programs. *Levesque v. Block*, 723 F.2d 175, 182 (1st Cir. 1983). Each Notice purports to cut off eligibility for foundational safety net programs. The probative value of HHS's characterization is particularly limited insofar as HHS concedes that it has taken an action that meets the definition of a "major rule," which would ordinarily trigger the notice-and-comment rulemaking requirement. *Azar*, 887 F.3d at 72. Because "[t]he substance of the claim, rather than just the classification, matters most," PI Op. at 20, there is no reason to credit Defendants' self-serving characterizations.

Second, Defendants' analyses are minimal and entirely fail to consider the very different statutory and regulatory regimes governing the various programs. The HUD PRWORA Notice, for example, merely lumps together "all HUD programs related to public or assisted housing" and, using the same flawed analysis this Court already rejected, asserts that they are "Federal public benefits." Ex. 81, 90 Fed. Reg. at 54,364. There is no consideration of how differences between

the programs affect the statutory analysis under PRWORA—for example, whether any of the covered programs are generally available to the public or funded under block grants. *See* PI Op. at 33-38, 40-41. This is particularly problematic here because DOJ has long cautioned that "many of [the] programs" subject to the HUD PRWORA Notice "may not be 'federal public benefits . . . .'" 66 Fed. Reg. at 3,615. Making matters even more confusing, the HUD PRWORA Notice does not even acknowledge the existing injunction against the DOJ Notice, which has clear relevance to some of the programs HUD identifies. Accordingly, it is unclear whether, in HUD's view, PRWORA restricts access to emergency and transitional housing programs, including those funded under the Continuum of Care and Emergency Solutions Grant Programs, Ex. 81, 90 Fed. Reg. at 54,364, despite the fact that those programs are (and have always been) subject to DOJ's Life/Safety Exemption, which remains in effect pursuant to an order of this Court. PI Op. at 59-60. Substantive legal analysis would grapple with all of these considerations. HUD's failure to engage in that analysis confirms that its characterization of its Notice should not mean much.

### C. Inconsistency With Prior Rules

By contrast, Defendants' "'[i]nconsistency with past regulations' heavily favors the States." PI Op. at 21 (quoting *Azar*, 887 F.3d at 73). Here, the HHS, ED, DOL, and HUD PRWORA Notices substantially change eligibility for several foundational programs, exactly the sort of thing for which notice and comment is required.

Take HHS. For at least twenty-seven years—essentially the entirety of PRWORA's lifespan—HHS has maintained that all thirteen of the newly restricted programs are available to all, regardless of immigration status. *Supra* pp. 7, 12-16. The HHS PRWORA Notice abruptly changes that. And HHS readily admits that the Notice is meant to "affect[] individual rights and obligations[,]" *Chrysler Corp.*, 441 U.S. at 302, by blocking millions of Americans who were previously eligible for certain programs from accessing those services. *See* Ex. 2, 90 Fed. Reg. at

31,238 ("The Department anticipates that numerous unqualified aliens will no longer receive benefits under Federally funded programs due to this notice."). Changing programs to deny people benefits is plainly substantive. *See Azar*, 887 F.3d at 73-74; *Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 315 (D. Mass. 2025) (finding a notice was substantive where it "is both inconsistent with an existing rule and alters existing obligations"); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 199 (D.N.H. Apr. 24, 2025); *compare Guernsey Mem'l Hosp.*, 514 U.S. at 99-100 (holding a policy was "a prototypical example of an interpretive rule" because it merely applied existing law and was not "inconsistent with any of the Secretary's existing regulations"); *Warder*, 149 F.3d at 81.[9]

The same goes for ED, which has applied a consistent interpretation of PRWORA since 1997. But now, ED drastically alters that interpretation, and its Notice specifically concludes that WIOA II and Perkins V career and technical education programs are no longer available for millions of Americans.

DOL, too. Less than eighteen months ago, DOL maintained that PRWORA did not restrict eligibility for individualized services that did not provide a financial benefit, such as labor exchange services, informational services, referrals to community resources for transportation or childcare, career planning services, and assistance in completing paperwork to finalize work authorization. Ex. 7. But the DOL PRWORA Notice now restricts these services and imposes a new requirement that grantees verify work authorization for all participants. Ex. 4.

---

[9] Nothing in *Loper Bright* changes the analysis here. *Contra* Ex. 2, 90 Fed. Reg. at 31,238. Quite the opposite: the *Loper Bright* Court emphasized that prior agency interpretations of a statute are entitled to "very great respect," "especially . . . when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385-86 (2024) (citation omitted).

The same goes for HUD. To start, the HUD PRWORA Notice is a direct reversal of HUD's stance on whether grants to States are a "Federal public benefit." HUD previously explained that the term "grant" in 8 U.S.C. § 1611(C)(1)(A) "does *not* include so-called 'block grants' which are provided to states or localities." Ex. 82 (citation omitted, emphasis added). But the new HUD PRWORA Notice interprets the very same term to include "grants to individuals *and grants provided to states or localities*"—a 180-degree change in position. Ex. 81, 90 Fed. Reg. at 54,364 (emphasis added). Further, were all of the programs identified in the HUD Notice to become Federal public benefits subject to verification under PRWORA, regardless of prior policy and DOJ's Life/Safety Exemption, this would be a sea change. Since 2001, "HUD-funded programs that provide emergency shelter and transitional housing for up to two (2) years" have been "equally available to all needy persons, including aliens who were not 'qualified aliens,'" because those programs fall in the Life/Safety Exemption. Ex. 83; *see also* Ex. 84; Ex. 85. And the HUD Notice extends PRWORA's bar to a host of programs that HUD has never before found are "Federal public benefits." This includes, for example, CDBG, HOPWA, CoC, and ESG which provide a range of services, from homeless outreach, to rental assistance, to funding for housing developers. Since PRWORA was enacted, HUD has consistently declined to conclude that these programs, as a blanket matter, fall within (or without) PRWORA's definition of a "federal public benefit." *See* Ex. 81, 90 Fed. Reg. 54,364; Ex. 86. But now, with the stroke of a pen, HUD would undo nearly three decades of nuanced consideration, categorically cutting off services for non-citizens without any public input.

### D.  Fit Within Statutory Scheme

Likewise, and for many of the same reasons, the Notices' "fit within the" applicable "statutory and regulatory scheme[s]," *Azar*, 887 F.3d at 73, weighs in favor of a finding that the Notices are substantive rules. PI Op. at 23-24. Here, Defendants' PRWORA Notices set new

eligibility requirements for programs that the Defendants themselves administer. They "significantly expand the reach of the statute" in a manner that has "expansive practical effects" that are "inconsistent[] with past interpretations." *Id.* at 23. Furthermore, as discussed below, the Notices rest on multiple interpretations of PRWORA that this Court has already found inconsistent with the statute's plain text. And the PRWORA Notices' shortcomings do not affect some peripheral issue in a minor way, but rather strike at the heart of the statute and radically change eligibility requirements for foundational federal programs. That renders them substantive. *See Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (finding a rule substantive where the FDA's interpretation of the Food, Drug, and Cosmetic Act meant that drugs that previously "clearly fell within the scope" of a statutory category were suddenly "thought no longer to fall within that scope"); *Guernsey Mem'l Hosp.*, 514 U.S. at 100 ("We can agree that APA rulemaking would still be required if PRM § 233 adopted a new position inconsistent with any of the Secretary's existing regulations.").

### E.  Practical Effect

Finally, practical considerations weigh in favor of finding that the Notices are substantive. Simply put, the real-world effect of Defendants' new understanding of PRWORA is massive. Indeed, HHS admits that the Notice is a "major rule" within the meaning of the APA because it "may result in an annual effect on the economy of *$100 million or more*." Ex. 2, 90 Fed. Reg. at 31,238 (emphasis added); *see also* 5 U.S.C. § 804(2). For Head Start *alone*, HHS has "estimated expenditure effects between $184 million and $1,881 million . . . ." ECF No. 74-3 (HHS Admin. Record) at 20. Agency actions with such massive effects are exactly the sort for which notice-and-comment rulemaking are most critical. *See Texas v. Becerra*, 577 F. Supp. 3d 527, 545-46, 547-50 (N.D. Tex. 2021) (holding that HHS could not impose funding condition affecting grants to Head Start without going through notice-and-comment); *Florida v. Becerra*,

544 F. Supp. 3d 1241, 1269, 1288-90, 1298 (M.D. Fla. 2021) (considering economically significant agency action to be a rule requiring notice-and-comment). The predictable result of this change is that vulnerable individuals in the Plaintiff States will lose access to critical services when they need them most. "In short, the [PRWORA Notices] announced a new policy on a matter of some considerable import." *Azar*, 887 F.3d at 74. "That is true economically, politically, and socially." PI Op. at 24-25.

Just as this Court already found with respect to the HHS, ED, and DOL PRWORA Notices, Defendants' failure to go through the notice-and-comment process in promulgating the PRWORA Notices renders them unlawful.

### III.    The HHS, ED, DOL, and HUD PRWORA Notices Are Arbitrary and Capricious (Count II)

Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n*, *Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Fundamentally, this requires that the agency "set forth its reasons for decision[,]" *Amerijet Int'l*, *Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014), so that its decision is "reasonable and reasonably explained," *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requirement ensures that agencies are "accountable to the public" and that their actions are "subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). "A decision is not reasonably explained if, among other things, 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" PI Op. at 27 (quoting *Melone v. Coit*, 100 F.4th 21, 29

(1st Cir. 2024)). At a minimum, the agency's explanation must demonstrate that it took into account the reliance interests affected by its decision and also the costs of its decision. *Regents*, 591 U.S. at 30.

The HHS, ED, DOL, and HUD PRWORA Notices are arbitrary and capricious because they fail to consider reliance interests, fail to consider costs, including the cost to U.S. citizens, and fail to adequately explain why the specific newly restricted programs have been redesignated as "Federal public benefits." Any one of these deficiencies would support the conclusion that the Notices are the product of unreasoned agency decisionmaking. Indeed, the Court previously found that the HHS, ED, and DOL PRWORA Notices were arbitrary and capricious because Defendants not only failed to consider reliance interests, but "even seemed to spurn the thought of it." PI Op. at 29 (HHS PRWORA Notice); *see also id.* at 31 (finding that neither ED nor DOL "grapple[d] with reliance interests at all."). Nothing in the administrative record or the more recently issued HUD PRWORA Notice changes the analysis. This Court should reaffirm its finding with respect to the HHS, ED, and DOL Notices, and extend its conclusion to the HUD Notice as well.

### A. HHS Notice

As this Court explained, "[b]ecause HHS was 'not writing on a blank slate,' it 'was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.'" PI Op. 29 (quoting *Regents*, 591 U.S. at 33). HHS all but explicitly declined to comply with that binding requirement. The HHS PRWORA Notice states that "[s]ome may argue that there are reliance interests that are affected by the Department's change in position" and conceded that its "new position [may] negatively impact public health," but HHS nevertheless declined to consider these concerns, no matter their strength because, it "has no power to override Congress's will, expressed in the clear statutory text of PRWORA." Ex. 1, 90 Fed. Reg. at 31,238 (citing *Loper Bright*, 603 U.S. at 400).

However, *Loper Bright* concerns the *courts'* ability to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]" 603 U.S. 369 at 412. It does not empower agencies to ignore the cost of their action, simply because they firmly believe it was required by statute. In *Regents,* the Supreme Court held that the U.S. Department of Homeland Security' rescission of the DACA program was arbitrary and capricious, based on DHS' failure to consider reliance interests, *even though* DHS rescinded the program because the Attorney General concluded that it was illegal and should be rescinded. *Regents*, 591 U.S. at 33. Nothing in *Loper Bright sub silentio* overturns this rule; rather, *Loper Bright* repeatedly reaffirms that agencies must comply with the APA. *See also* Ex. 111 (*Wash. State Ass'n of Head Start* PI Order) at 14 (finding HHS PRWORA Notice arbitrary and capricious because "the Supreme Court clearly set out in *Regents* that failing to consider reliance interests when rescinding a program based on illegality is arbitrary and capricious").

The reliance interests that the HHS PRWORA Notice refuses to take into account are extensive. For nearly thirty years, the newly restricted HHS Programs like Title X and Head Start have served people regardless of immigration status. *See supra* pp. 7, 12-16. States have relied on HHS's longstanding view of the law in developing networks of providers, tailoring programs to hard-to-reach client populations. Not to mention the millions of people who have relied on these services for early childhood education, substance abuse treatment, and other necessities, many of whom will now be unable to access them due to burdensome documentation requirements. *Supra* pp. 12-16.

Unsurprisingly, given HHS' explicit position that reliance interests are immaterial, nothing in the administrative record helps the agency's cause. HHS' regulatory analysis—which focuses solely on the Head Start program—estimates "that approximately 115,000 Head Start children and

families could be impacted" by the new eligibility rule. ECF No. 74-3 at 24. But HHS breathes not a word about what might happen to these children and families, nor to the programs that have relied on HHS' prior guidance. The rest of the administrative record is even less helpful, consisting of the rule itself, some printouts from merriam-webster.com, and a House Republican committee report focused on the alleged "crisis" at the border caused by the prior presidential administration. *See generally* ECF No. 74-3 (HHS Admin. Record). In short, HHS was telling the truth when it said in its Notice that it was disregarding reliance interests.

There are likewise significant costs (including, as referenced in the Notice itself, negative impacts to public health), that HHS refused or failed to consider. For one thing, the Notice does not grapple at all with the fact that it would take significant time and resources for States to implement new processes to verify immigration status for services that have always been considered to *not* provide Federal public benefits, if such changes are possible at all. *See* Ex. 2, 90 Fed. Reg. at 31,232. Indeed, the Notice completely ignores that it would have been impossible for programs to immediately implement the requisite verification systems. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. Feb. 3, 2025) ("Rather than taking a measured approach . . . Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision.").

Nor did the HHS PRWORA Notice (or the administrative record) consider other critical disadvantages. For instance, to the extent that programs are able to implement immigration status verification at some point, the result will be to exclude not only undocumented people but also any other vulnerable *still-eligible* people—including citizens and qualified noncitizens under PRWORA—who rely on safety net benefits but lack ready proof of citizenship or immigration status or are deterred by the requirement to provide it. *See supra* pp. 12-16 (discussing the expected

difficulty that program participants, including citizen participants, will have proving their status); *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1108 (N.D. Cal. 2019) (concluding that agency likely acted arbitrarily when it failed to consider that its action would cause people who "erroneously believe[d] themselves to be affected" to "disenroll" from public benefit programs). This predictable effect undermines a fundamental purpose of the Notice, "to protect benefits for American citizens in need, including individuals with disabilities and veterans." Ex. 2, 90 Fed. Reg. at 31,237. But the Notice, as confirmed by the administrative record, shows that HHS either failed to consider this effect entirely or, if it did, failed to draw a "rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43.

Likewise, the Notice and administrative record fail to consider the potential for covered programs to close because they do not have the resources to implement a complex system for immigration status verification, which fatally undermines the Notice's own purported purpose of protecting benefits for needy citizens and qualified noncitizens. Ignoring all of this, the HHS PRWORA Notice asserts, without explanation, that there will be an increase in benefits to U.S. citizens and qualified noncitizens from the "corresponding" decrease to unqualified noncitizens. Ex 2, 90 Fed. Reg. at 31,238; *see also* ECF 74-3. But failure to justify such an assertion, while ignoring important and predictable reasons this bold claim is unlikely to be true, is a quintessential "'unsupported assumption[]' on which an agency is not entitled to rely." *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 70 (D.D.C. 2016) (citation modified).

The HHS PRWORA Notice is additionally flawed because it fails to explain why it classifies eleven of the thirteen newly restricted HHS programs as "Federal public benefits." HHS generally asserts that it based its re-designation of programs as "Federal public benefits" on the

interpretation of PRWORA set forth" in the Notice—and for eleven programs, says nothing more. Ex. 2, 90 Fed. Reg. at 31,237. It also elliptically says that it redesignated certain programs based on "intervening developments since" 1998, but it fails to identify those developments or explain their significance. *See id.* at 31,237. Certainly nothing in the administrative record sheds light on HHS' reasoning. HHS' failure to "provide even [a] minimal level of analysis" means that its PRWORA Notice "is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

This flaw is not academic. The HHS PRWORA Notice is meant to have "immediate" practical effect on regulated programs, Ex. 2, 90 Fed. Reg at 31,238, which are left guessing as to the reason for this seismic change. As an example, the Health Center Program, one of the eleven newly restricted programs, funds over 1,400 community health centers, which are located in all states and territories, and serves over thirty million people per year. The Notice provides no explanation as to why services at these centers are now designated as Federal public benefits, and providers and patients are left to wonder: is it due to a broader definition of "grant"? The change in "eligibility unit"? Some "other similar benefit"?

For all of these reasons, the HHS PRWORA Notice is arbitrary and capricious.

## B.  ED Notice

The ED PRWORA Notice suffers from the same flaws. The ED PRWROA Notice contains some statutory analysis, which is incorrect for the reasons identified. *Infra* pp. 58-60. But, even if that analysis were correct, ED was still required to consider reliance interests, *see Regents*, 591 U.S. at 33, as well as any disadvantages of its decision, *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015). Neither ED's PRWORA Notice, nor its administrative record contains any reference to reliance interests. *See generally* ECF No. 74-5 (ED Admin. Record Index); 74-6 (ED Admin Record). Unlike HHS, ED does not even attempt to excuse these shortcomings.

The newly restricted ED programs have operated for decades in reliance on ED's determination that they are not Federal public benefits. *See supra* pp. 7, 12-16. Requiring these programs to undertake immigration status verification and forcing them to immediately exclude thousands of participants in the middle of programs without any regard to the impact on them, their families, their employers, and their communities is arbitrary and capricious. *New York v. Trump*, 769 F. Supp, 3d. 119, 142 (D.R.I. 2025) (considering "the catastrophic consequences that flowed" as evidence that the agency failed to meaningfully consider the important aspects of the problem, in violation of the APA). The ED PRWORA Notice also fails to "reasonably explain[]" its scope, *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), because it suggests that it may apply to some unspecified programs beyond the two newly restricted ED programs. Ex. 3, 90 Fed. Reg. at 30,900 n.3. ("[J]ust because a program is not specifically mentioned herein does not mean the program does not have obligations under PRWORA."). The ED administrative record provides no additional clarity as to which programs may be subject to PRWORA. *See generally* ECF No. 74-5, 74-6.

### C. DOL Notice

The DOL PRWORA Notice also ignores reliance interests and fails to address the costs it will impose. Many of the programs offered by the States under these statutes do not verify immigration status and cannot immediately do so. *See supra* pp. 7-8, 12-16. The Notice gives no consideration whatsoever as to the effects on the people who will lose access to these services, their families, employers, and communities. And, while DOL's administrative record contains a table that appears to show the costs associated with using the Systematic Alien Verification for Entitlements (SAVE) system to verify status for benefit programs, those costs are presented without any comment, computations or analysis and are not even mentioned in the DOL PRWORA Notice. All of this provides further confirmation that DOL failed to consider even costs that were

right in front of it. *See* ECF No. 74-9 (DOL Admin. Record), Ex. C at 171; *cf. Michigan,* 576 U.S. at 753.

The DOL PRWORA Notice is also arbitrary and capricious because, like its co-Defendants, DOL failed to explain *why* it determined that the newly restricted DOL Programs are "Federal public benefits" under PRWORA. The DOL PRWORA Notice identifies these new programs as "Federal public benefits" by classifying them as "participant-level services." Ex. 4 at 2. This term is undefined in the Notice, and although the Notice asserts that the term is defined in another document, it is not. *Id.* (stating term is defined in TEGL 19-16 Attachment II); Ex. 8. The DOL Notice asserts that "participant-level services," however defined, are necessarily "Federal public benefits" under PRWORA because "their overall goal is to move participants into gainful employment." Ex. 4 at 3. But the agency gives no explanation of why this goal is a relevant criterion under PRWORA, or how "participant-level services" share this characteristic. The lack of definition and explanation violates the "'fundamental requirement of administrative law'" that "'an agency set forth its reasons for decision . . . .'" *Nat'l Insts. of Health*, 770 F. Supp. 3d at 304 (quoting *Amerijet Int'l, Inc.*, 753 F.3d at 1350).

Nor does the administrative record elucidate why DOL thinks "participant-level services" are necessarily "federal public benefits" requiring eligibility verification. *See generally* ECF No. 74-9. Rather, it incorporates recently-issued guidance that says just the opposite. *See id.* at 90 ("Basic career services are universally accessible and must be made available to all individuals seeking employment . . ."); *id.* at 145 (identifying "basic, individualized and follow-up services [that can be delivered] without verifying work authorization").

Because DOL failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made[,]'" the

Court must find that the DOL PRWORA Notice is arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

### D.  HUD Notice

The HUD PRWORA Notice should meet the same fate as the HHS, ED, and DOL PRWORA Notices, and for largely the same reasons. First, HUD completely failed to consider the "weight[y]" reliance interests that Plaintiff States have in their ability to continue using various HUD-funded programs without the need to implement an onerous immigration status verification system. *See* PI Op. at 30 (observing that "some of the programs" at issue "have operated for nearly 30 years"). Neither the HUD PRWORA Notice nor the administrative record indicate that HUD made any effort to "assess whether there were reliance interests" that would be upset, let alone consider whether those interests "were significant" or outweighed by "competing policy concerns," *id.* at 29 (quoting *Regents*, 591 U.S. at 33). *See* Ex. 81, 90 Fed. Reg. at 54,363; ECF No. 86-2 (HUD Admin. Record Index).

Second, HUD also failed to consider the substantial costs of the Notice, such as "compliance costs" on funding recipients like Plaintiffs, which will be required to expend significant time and resources to implement new processes to verify immigration status for services that have never before required that burdensome step. *Supra* pp. 15-25; *see* PI Op. at 52 (acknowledging that these "compliance costs are, indeed, costly"). For instance, HUD now considers programs like CDBG to be subject to PRWORA's verification requirements, despite the fact that CDBG funds are used by Plaintiffs to fund a wide variety of projects, such as infrastructure projects, that are inherently open to the public. *Supra* pp. 16-19. HUD was well aware when it issued the Notice that "verify[ing] the immigration status of individuals" for these kinds of projects "would be extremely challenging for CDBG grantees to implement." *See* ECF No. 86-12 at 88-89

(Ltr. from Nat'l Cmty. Dev. Ass'n to HUD Off. of Cmty. Plan. and Dev. (July 11, 2025)). And yet those concerns are neither acknowledged nor addressed in the Notice or its administrative record.

HUD instead offers only the conclusory assertion that its new interpretation of PRWORA will not have a "significant economic impact," and the empty promise that it "continues to analyze the economic impact of" its action. *See* Ex. 81, 90 Fed. Reg. at 54,365. The APA requires more. *See Rhode Island v. Trump*, 781 F. Supp. 3d 25, 46 (D.R.I. 2025) ("[C]onclusory statements do not 'reasonably' explain agency action." (quoting *Amerijet Int'l*, 753 F.3d at 1350)). Even if HUD had support for the claim that the HUD PRWORA Notice imposes no costs on its own, its claim becomes all the more dubious when viewed in the context of DOJ's decision—currently enjoined—to rescind the PRWORA Life/Safety Exemption on which HUD has long relied. *See* Ex. 84 at 1. HUD was apparently aware that DOJ had taken such drastic action, *see* ECF 86-12 at 118-21 (DOJ PRWORA Notice), which means that it either "failed to consider an important aspect of the problem"—i.e., the true cost of its action—or "offered an explanation for its decision that runs counter to the evidence before [it] . . . ." *See State Farm*, 463 U.S. at 43.

Third, to the extent HUD has offered an explanation for the HUD PRWORA Notice, it is not a reasonable one. Like its co-Defendants, HUD contends that its decision to adopt such an untenably broad interpretation of PRWORA was required by the statutory text. *See* Ex. 81, 90 Fed. Reg. at 54,363-64. But HUD's construction of PRWORA is erroneous, *see infra* pp. 67-70, and has already been rejected by the Court. *See* PI Op. 36, 40. The HUD PRWORA Notice is thus "premised on a 'legal error,'" which "runs afoul of" the APA's requirement for reasoned agency decision-making. *Doe v. Noem*, 152 F.4th 272, 287 (1st Cir. 2025).

Fourth, by taking the "position that any grants it administers that are not explicitly governed by another statute are federal public benefits related to housing assistance," HUD appears to sweep

within the definition of "Federal public benefit" HUD funding programs that have nothing to do with "public or assisted housing," including a program that HUD previously and expressly excluded from its definition of "Federal public benefit." *See* Ex. 81, 90 Fed. Reg. at 54,364. This definition would appear to include the Lead Hazard Control program, which enables local governments to help homeowners mitigate lead-based paint hazards. However, since at least 2001, HUD has deemed that program beyond the scope of PRWORA. *See* 66 Fed. Reg. at 3,615; *see also* Ex. 82. Although HUD asserts that the Notice "supersedes any prior interpretation in any notice or other document issued by any HUD program or office," *see* Ex. 81, 90 Fed. Reg. at 54,363, that hardly displays the requisite awareness that the APA requires when an agency does an about face. *See Doe,* 152 F.4th at 289 ("[A]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." (quoting *FDA v. Wages & White Lion Invs., LLC,* 604 U.S. 542, 568 (2025)). Even if HUD expressly acknowledged this change in position, however, it could offer nothing more than its erroneous construction of PRWORA's plain text as justification for the change, which would fail to "'show that there are good reasons for the new policy.'" *See id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

## IV. The HHS, ED, DOL, and HUD PRWORA Notices Are Contrary to Law (Count III)

The PRWORA Notices are also contrary to law. By their own admissions, these agencies have rejected the interpretations of PRWORA they adhered to for decades and have dramatically reinterpreted the statute to cover more than two dozen programs they long considered exempt from the statute's requirements. Critically, although the agencies do not acknowledge it, the HHS and HUD PRWORA Notices also reject a foundational understanding of the statute—that it excludes

programs "widely available" to the public—that the federal government has consistently adhered to since one day after PRWORA was enacted. 61 Fed. Reg. at 45,986.

It would be surprising, to say the least, if five Presidential Administrations, spanning both parties, had so fundamentally misread the statute since the day after its enactment. *See Loper Bright*, 603 U.S. at 386 (explaining that an Executive Branch interpretation that "was issued roughly contemporaneously with enactment of the statute and remained consistent over time" is "entitled to very great respect" (citation omitted)). And Defendants' burden in making this showing is a high one: because PRWORA was enacted pursuant to the Spending Clause as a condition on the States' acceptance of federal funds, any requirements must be set forth "unambiguously" in the statutory text. *Arlington*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17). As the parties proffering the more burdensome reading of the statute, Defendants must therefore show not simply that their interpretation is the "best" one, *cf.* Ex. 2, 90 Fed. Reg. at 31,238, but that their interpretation is "unambiguously" correct—and, correspondingly, that every State has been on "clear notice" for thirty years that the federal government was misreading the statute. *Arlington*, 548 U.S. at 296.

Defendants cannot meet that high burden. To the contrary, the PRWORA Notices are riddled with a series of legal errors, many of which this Court already identified in its preliminary injunction ruling. Together, these errors render the Notices unlawful several times over.

### A. The HHS PRWORA Notice Is Contrary to Law

#### 1. The HHS PRWORA Notice unlawfully applies PRWORA to benefits that are generally available to the public

The HHS PRWORA Notice unlawfully expands the scope of PRWORA by reading it to apply to programs that are generally available to members of the public. *See* PI Op. 33-38. PRWORA would have been a statute of breathtaking scope and severity if it barred noncitizens

from receiving services that members of the public can receive without applying or meeting eligibility requirements. Under that reading, PRWORA would have barred noncitizens from being picked up by ambulances, having their calls answered by emergency dispatchers, or receiving crime victim counseling whenever those services were supported—as most are—by federal funds. What is more, the statute would have required States and localities to require that every person furnish proof of citizenship or lawful presence before receiving any of those forms of assistance. That absurd reading has never been the law. Since one day after the statute's enactment, DOJ has interpreted the law not to apply to "regular, widely available services." 61 Fed. Reg. at 45,985; *see* 66 Fed. Reg. at 3,616 (same). And it has made clear that this interpretation holds even where those benefits are provided on an individualized basis, such as "ambulance" or "paratransit" services. 61 Fed. Reg. at 45,985; *see* Ex. 1, 90 Fed. Reg. at 32,026 (retaining this interpretation).

The HHS PRWORA Notice overthrows this settled understanding. It rejects the longstanding reading of the statute as limited to programs that require applications or impose some eligibility restriction on recipients. *See* Ex. 2, 90 Fed. Reg. at 31,234. Instead, it claims that PRWORA extends to *any* benefits that are "provided on either a per-individual, per-household, or per-'family eligibility unit' basis,'" regardless of whether those programs require applications or otherwise impose eligibility limits. *Id.* And the Notice follows this reading all the way down the slippery slope, including programs on its banned list that fund public health clinics, *see* 42 U.S.C. §§ 254b *et seq.* (Health Center Program); outreach to the homeless, *id.* §§ 290cc-35 *et seq.* (Projects for Assistance in Transition from Homelessness); and substance abuse counseling, *id.* §§ 300x-21 *et seq.* (Block Grants for Prevention and Treatment of Substance Abuse). The astonishing result, it seems, is that none of these federally funded programs can remain open to all comers, as they have been for decades. Going forward, by HHS's lights, States and localities may

46

not let anyone walk into a health clinic or a homeless shelter unless they first demand: "show us your papers."

Statutory text, history, and common sense all refute this interpretation. First, the text: at every turn, PRWORA makes clear that Congress did not intend its requirements to apply to programs that are generally available to the public. The statutory definition of "Federal public benefits" is limited to (A) "grant[s], contract[s], loan[s], professional license[s], or commercial license[s]," and (B) "benefit[s] for which payments or assistance are provided to an individual, household, or family *eligibility unit* . . . ." 8 U.S.C. § 1611(c)(1) (emphasis added). Subsection (A) necessarily excludes generally applicable benefits because grants, contracts, loans, and licenses "all require an application or a similar transaction in order to take effect." PI Op. at 33. And subsection (B) presupposes that a program already limits eligibility; otherwise, there would be no "eligibility unit" for PRWORA to apply to. By definition, a program that imposes no limits on eligibility is not provided to "eligibility units," and so cannot constitute a "Federal public benefit" under Section 1611(c)(1)(B).

HHS disputes this reading on the ground that the phrase "eligibility unit" only modifies the term "family." *See* Ex. 2, 90 Fed. Reg. at 31,234-35. But that interpretation strains the ordinary rules of grammar. Under the "series-modifier canon," where there is "'a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402-03 (2021) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012)). By contrast, the "rule of the last antecedent," invoked by Defendants, typically applies only where a list contains "unexpected internal modifiers or structure," and it takes "more than a little mental energy to process the individual entries in the list." *Lockhart v. United States*, 577 U.S. 347, 351-52 (2016).

47

Section 1611(c)(1)(B) falls into the former bucket, not the latter. The term "eligibility unit" appears after an "integrated list" of nouns that "hangs together as a unified whole." *Facebook*, 592 U.S. at 404. And it closely resembles the paradigm cases for application of the series-modifier canon, such as "the laws, the treaties, and the constitution of the United States." *Lockhart*, 577 U.S. at 352; *see id.* at 362 (Kagan, J., dissenting) (giving additional examples).

Several additional textual clues reinforce this reading. *See Facebook*, 592 U.S. at 404 ("The rule of the last antecedent is context dependent."). First, if the rule of the last antecedent applied, the words "eligibility unit" would be "meaningless." PI Op. at 36. Under HHS's interpretation, Section 1611(c)(1)(B) simply refers to benefits provided on a "per-individual, per-household, or per-family basis." Ex. 2, 90 Fed. Reg. at 31,235. But Congress could easily have conveyed that meaning by omitting the words "eligibility unit" and just drafting Section 1611(c)(1)(B) to refer to "benefits for which payments or assistance are provided to an individual, household, or family." HHS's interpretation thus runs headlong into the "rule against superfluities." *Kholi v. Wall*, 582 F.3d 147, 153 (1st Cir. 2009), *aff'd*, 562 U.S. 545 (2011). Yet it is particularly unlikely that Congress inserted a meaningless reference to "eligibility" in a statute whose principal purpose was to refine "[c]urrent eligibility rules" and "enact new rules for eligibility." 8 U.S.C. § 1601(4)-(5); *see New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 55 (1st Cir. 2021) (explaining that courts should not "apply the [last-antecedent] rule in a mechanical way where it would require accepting unlikely premises" (citation modified)).

Second, the statute's verification provisions presume that individuals must "apply" for federal public benefits. Section 1642(a) directs the Attorney General to promulgate regulations "requiring verification that a person *applying for* a Federal public benefit . . . is a qualified alien and is eligible to receive such benefit." 8 U.S.C. § 1642(a)(1) (emphasis added); *see id* § 1642(a)(2)

(similar). Section 1642(d) likewise excepts nonprofit charitable organizations from the requirement to "require proof of eligibility of any *applicant* for such benefits." *Id.* § 1642(d) (emphasis added). These provisions would make no sense if the definition of "Federal public benefits" included generally available programs that do not require applications in the first place.

The statutory history also undermines HHS's reading. The Conference Report for PRWORA explains that Title I-A, which funds public schools that are open to all children, "would not be affected by Section [1611] because the benefit is not provided to an individual, household, or family eligibility unit." H.R. Conf. Rep. No. 104-725, at 380 (July 30, 1996). This contemporaneous interpretation by the statute's drafters is consistent with the view that Section 1611(c)(1)(B) does not reach generally available benefits. By contrast, it is difficult to square with HHS's view, under which educational benefits that flow to individual children are covered by the statute regardless of whether they are subject to separate eligibility restrictions. *See* Ex. 2, 90 Fed. Reg. at 31,235-36.

It is also significant that DOJ first adopted its view that the statute excluded generally available benefits one day after the statute was enacted, *see* 62 Fed. Reg. at 61,361, and that it has not wavered from that interpretation over the intervening twenty-ninen years. The Supreme Court recently reaffirmed that "when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute [at issue] and remained consistent over time[,]" it is "entitled to very great respect." *Loper Bright*, 603 U.S. at 386; *see id.* at 394 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). It is difficult to imagine a case in which an agency's interpretation was more contemporaneous or consistent than this one.

Finally, the extreme results of HHS's interpretation give ample reason to reject it. Were HHS correct, then PRWORA would have silently superimposed an extraordinary new term on

every grant agreement with State or local governments: as a condition of receiving federal funds, each recipient would have needed to erect a new system for screening individuals before granting them access to federally funded services that were previously open to all. Congress, however, must speak "unambiguously" before imposing new spending conditions on the States. *Arlington*, 548 U.S. at 296 (quotation marks omitted). And that is especially true where the grant terms would intrude on areas of core state power, like the manner in which States conduct law enforcement, protect public health, or provide education. *See, e.g.*, *Bond v. United States*, 572 U.S. 844, 858 (2014) (legislation affecting the federal-state balance requires a "clear statement" of intent (internal quotation marks omitted)). The absence of any explicit indication that Congress intended the dramatic mandate HHS now imposes further confirms it is wrong.

HHS's error in this regard renders nearly its entire Notice unlawful. Of the programs that HHS added to the Notice, at most three of them impose limits on the eligibility of individuals, households, or families to receive their benefits. *See, e.g.*, 42 U.S.C. §§ 673(d)(3), 677(i)(1) (Title IV-E programs); *id.* § 9840(a)(1)(A) (Head Start). The rest do not. Although some of these programs are *targeted* at certain populations, such as low-income individuals or the homeless, they do not limit benefits to those populations, require that individuals meet any particular eligibility requirements, or demand that people submit an application to access these programs. *See, e.g.*, Ex. 55 ¶ 11 (Community Service Block Grant); Ex. 21 ¶ 8 (Behavioral Health Clinics). Under a proper construction of the statute, all of these programs should therefore be excluded from PRWORA's requirements.

## 2. The HHS PRWORA Notice unlawfully extends PRWORA to non-postsecondary educational benefits, including Head Start

The HHS PRWORA Notice is also contrary to law because it misreads PRWORA to extend to benefits for non-postsecondary education, including the Head Start program. PI Op. at 38-39.

The statute could hardly be clearer on this point: It provides that the term "Federal public benefits" includes "any retirement, welfare, health, disability, public or assisted housing, *postsecondary education*, food assistance, unemployment benefit, or any other similar benefit." 8 U.S.C. § 1611(c)(1)(B) (emphasis added). By expressly including "*postsecondary* education . . . benefit[s]" in the statute, Congress made clear it did not intend to include *non*-postsecondary education benefits, like Head Start. *See Esteras v. United States*, 606 U.S. 185, 186 (2025) ("expressing one item of an associated group or series excludes another left unmentioned" (citation and alteration omitted)).

The statute's rule of construction underscores this straightforward reading. It instructs that "[n]othing in this chapter may be construed as addressing alien eligibility for a basic public education as determined by the Supreme Court of the United States under *Plyler v. Doe*." 8 U.S.C. § 1643(a)(2). Reading Section 1611(c) to encompass *all* education benefits would necessarily limit noncitizens' "eligibility for a basic public education." By contrast, reading the definition as limited to "postsecondary education . . . benefit[s]" would not affect eligibility for a "basic public education" as discussed in *Plyler*. *See Plyler v. Doe,* 457 U.S. 202, 223 (1982). The rule of construction thus requires agencies to adopt the latter interpretation.

Indeed, the statute's history makes clear that Congress included the word "postsecondary" in the statute specifically to ensure that it did not apply to all education benefits. An early version of the bill that became PRWORA would have defined "Federal benefit[s]" to include "education . . . benefits," without qualification. *See* 141 Cong. Rec. S12986 (Sept. 8, 1995) (Amendment No. 2525). But after Senators expressed concerns that this language would have terminated all "educational assistance to . . . children," including "elementary and secondary education," 141 Cong. Rec. S13568 (Sept. 14, 1995) (statement of Sen. Graham), the bill's sponsor

introduced an amended version that added the word "postsecondary." *id.* at S13567 (Amendment No. 2525, as modified). The Senate then adopted this amendment with the assurance that it "takes care of the education issue." *Id.* at S13569 (statement of Sen. Simpson).

The Court should be exceedingly reluctant to read the statute to bear the meaning contained in bill text that Congress specifically discarded in favor of narrower language. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987). And HHS's attempts to unwind this clear legislative choice are unpersuasive. First, HHS argues that benefits for non-postsecondary education fall within the catchall for "other similar benefit[s]" in Section 1611(c)(1)(B) because they are "similar" to welfare benefits. Ex. 2, 90 Fed. Reg. at 31,236. But it is hornbook law that courts should not read a "residual phrase" in a way that "fails to give independent effect to the statute's enumeration of the specific categories . . . which precedes it." *Cir. City Stores*, *Inc. v. Adams*, 532 U.S. 105, 114 (2001). If "other similar benefits" covered all education benefits because they are similar to "welfare," then the enumeration of "postsecondary education benefits" earlier in the same list would be superfluous. PI Op. at 39.

In any event, the premise of HHS's argument is wrong. Congress used the word "welfare" some six dozen times in PRWORA—a statute famously designed to reform the welfare system— and its consistent meaning throughout the statute is to refer to cash payments to low-income families. *See*, *e.g.*, PRWORA, Pub. L. No. 104-193, § 101(8)(F) (finding that "[c]hildren born out-of-wedlock are 3 times more likely to be on welfare when they grow up"); *id.* § 103(a) (qualifying states for block grants based on "the level of welfare spending per poor person"); *id.* § 302(a) (directing a study into program's success in "moving people off of welfare and keeping them off of welfare"). In-kind services to support a child's education are not "similar" to such payments. HHS attempts to support a broader definition of "welfare" by invoking two unrelated, cherry-

picked sources, but neither supports its interpretation. One source (a statute enacted two years before PRWORA) uses the term in much the same way as PRWORA: it directs the agency to consider three programs authorizing cash payments to low-income individuals in a report on "welfare receipt in the United States." *See* Social Security Act Amendments of 1994, Pub. L. No. 103-432, § 232 (1994). The other is a government website, posted by HHS decades after PRWORA's enactment, that defines the distinct term "child welfare." Ex. 2, 90 Fed. Reg. at 31,236 & n.4. Needless to say, this post-enactment website is considerably less probative in defining PRWORA's terms than the Act itself.

Second, HHS suggests that Head Start is not just an education program because it provides "health," "nutritional," "social and other services," and "child care." Ex. 2, 90 Fed. Reg. at 31,236 (quoting 42 U.S.C. § 9831(2)). But these features are expressly designated by the statute as means "through" which it achieves its educational goals of "promot[ing] the school readiness of low-income children" and "enhancing their cognitive, social, and emotional development." 42 U.S.C. § 9831. Further, these features of Head Start do not distinguish it from any other form of education for young children, which typically includes healthy meals, support for physical and mental health, social and emotional support, and full-day child care. *See* 8 U.S.C. § 1615 (explicitly carving school-lunch programs out of PRWORA).

In sum, the best reading of the statute is that it means what it says: it applies to "postsecondary education . . . benefit[s]," not early childhood benefits like Head Start. 8 U.S.C. § 1611(c)(1)(B). At minimum, "a state official" reading the Act would not "clearly understand" it to mean the opposite. *Arlington*, 548 U.S. at 296. Accordingly, HHS erred by including Head Start in its list of banned programs. Ex. 111 (*Wash. State Ass'n of Head Start* PI

Order) at 10-13 (finding likelihood of success on claim that Head Start does not fall within the scope of PRWORA).

### 3.  The HHS PRWORA Notice unlawfully includes all benefits funded by grants to State or local governments

The HHS PRWORA Notice incorrectly includes any benefits provided by grant programs within its definition of "Federal public benefits." PI Op. at 40-41. Section 1611 only restricts the eligibility of "an alien" for Federal public benefits. 8 U.S.C. § 1611(a). A grant issued to a State or local government therefore does not itself trigger any of the Act's prohibitions, because it is not provided to "an alien." Such a grant only triggers PRWORA if it is in turn used by the State or local government to fund payments or assistance to noncitizens that constitute "Federal public benefits" within the meaning of the statute—for instance, if they pay for "welfare" to an "individual, household, or family eligibility unit," but not if they fund police services or a library. 8 U.S.C. § 1611(c)(1)(B); *see* 62 Fed. Reg. at 61,361 (giving additional examples).

Again, this reading of the statute has long been uncontroversial. DOJ explained shortly after the statute's passage that the Act "does not prohibit governmental or private entities from receiving federal public benefits that they might then use to provide assistance to aliens, so long as the benefit ultimately provided to the non-qualified aliens does not itself constitute a 'federal public benefit.'" 62 Fed. Reg. at 61,361 (emphasis removed). HHS reached a similar conclusion in its 1998 notice. 63 Fed. Reg. at 41,659. This reading did not exclude grants to States or local governments (often called "block grant" programs) from the statute entirely. *Cf.* Ex. 2, 90 Fed. Reg. at 31,234. It simply meant that HHS deemed block grant programs included only where they provided qualifying Federal public benefits to noncitizens, such as certain benefits provided under the Social Services Block Grant program. 63 Fed. Reg. at 41,660.

The HHS PRWORA Notice departs from this straightforward understanding. It claims that block grants necessarily qualify as Federal public benefits because they are "grants" within the meaning of Section 1611(c)(1)(A). Ex. 2, 90 Fed. Reg. at 31,233-34 (quoting 63 Fed. Reg. at 41,659). Relying on this reasoning, HHS adds a large number of block grants to its list of "programs [that] provid[e] 'Federal public benefits,'" Ex. 2, 90 Fed. Reg. at 31,237, which it now claims noncitizens are "Ban[ned]" from "Accessing."[10] But one conclusion simply doesn't follow from the other: the fact that a State receives a grant does not mean that the State uses that program to "provid[e] 'Federal public benefit[s],'" let alone that noncitizens are barred from accessing those benefits. In fact, the block grant programs that HHS has listed fund a large number of services that do not qualify as "Federal public benefits." *See*, *e.g.*, 42 U.S.C. § 9901 (authorizing the use of Community Services Block Grants to strengthen "community capabilities" and increase the role of "business, labor, and professional groups" in combatting poverty); *id.* § 300x-1(b)(1)(A)(iii) (authorizing use of Community Mental Health Block Grants to "coordinate . . . law enforcement services" and the "services to be provided by local school systems"). The inclusion of these grants on the list of covered programs is unlawful.

### 4. The HHS PRWORA Notice includes several programs that Congress exempted from PRWORA in subsequent statutes

Finally, the HHS PRWORA Notice is unlawful because it includes several programs that Congress exempted from PRWORA in subsequent statutes. Because "statutes enacted by one Congress cannot bind a later Congress," *Dorsey v. United States*, 567 U.S. 260, 273 (2012),

---

[10] *U.S. Department of Health and Human Services*, HHS Bans Illegal Aliens from Accessing its Taxpayer-Funded Programs (July 10, 2025), https://www.hhs.gov/press-room/prwora-hhs-bans-illegal-aliens-accessing-taxpayer-funded-programs.html.

Congress always remains free to exempt programs from PRWORA's scope. It need not use "magical passwords" to do so. *Marcello v. Bonds*, 349 U.S. 302, 310 (1955). Even where the Supreme Court has encountered statutes that mark their terrain far more emphatically than PRWORA—providing, for instance, that a statute controls unless Congress "expressly provides" otherwise—the Court has held that later statutes are exempt from their requirements if the "plain import" or "fair implication" of the later statute is that it is not subject to the earlier. *Dorsey*, 567 U.S. at 274-75 (citing cases); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("the specific governs the general"); *Lockhart v. United States*, 546 U.S. 142, 149 (2005) (Scalia, J., concurring).

Applying this rule, both courts and Defendants themselves have found statutes exempt from PRWORA where they were enacted later-in-time than PRWORA and contain mandatory obligations inconsistent with its restrictions. In 2020, for instance, multiple courts held that a provision of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was exempt from PRWORA because Congress enacted it decades later and "unambiguously directed certain aid to a plainly defined group of people": "all students." *Noerand v DeVos*, 474 F. Supp. 3d 394, 398, 403 (D. Mass. 2020); *see Oakley v. DeVos*, No. 20-cv-03215-YG, 2020 WL 3268661, at *15-16 (N.D. Cal. June 17, 2020) (same). ED itself agreed with that interpretation in a final rule. *See* 86 Fed. Reg. 26,608, 26,618-20 (May 14, 2021). And the ED PRWORA Notice maintains a similar approach, stating that its interpretation does not apply to "specific later in time statutory exceptions." Ex. 3, 90 Fed. Reg. at 30,899. As an example, it gives 20 U.S.C. § 1070e, a statute stating that child-care grants "shall be used" for programs "primarily serving the needs of low-income students," including students on temporary visas. 20 U.S.C. § 1070e(b)(5), (7)(B)(ii);

*see also* Ex. 81, 90 Fed. Reg. at 54,364 (HUD acknowledging that a program is not subject to PRWORA if "a more specific federal statute applies").

At least two programs on the HHS list are similarly exempt from PRWORA. First, the statute governing the Health Center Program provides that health centers that receive funding under the program are subject to a "requirement . . . to provide services for *all* residents within a catchment area . . . ." 42 U.S.C. § 254b(a)(1)-(2) (emphasis added). This statute unambiguously directs aid to "all" residents, without regard to immigration status. *Cf. Noerand*, 474 F. Supp. 3d at 398 (finding exemption from PRWORA for statute that directed benefits to "all students"). It contains several carefully drawn exceptions, none of which includes PRWORA. *See* 42 U.S.C. § 254b(b), (g), (h), (i). And it is both more specific than PRWORA—as it applies to one program rather than many—and was enacted later in time. *See* Health Centers Consolidation Act of 1996, Pub. L. No. 104-299, § 2 (Oct. 11, 1996). Because it is impossible both to provide services to "all residents" of an area and to exclude a large class of noncitizens, the "plain import" of this provision is that it is not subject to PRWORA. *Dorsey*, 567 U.S. at 275; *see* PI Op. at 41-42.

Second, Head Start is similarly exempt from PRWORA by a later enactment. *See* Ex. 111 (*Wash. State Ass'n* PI Order) at 12-13. The statute governing the Head Start program provides that, "[e]xcept as provided in paragraph (2)"—a provision governing Head Start agencies in small communities—"children from low-income families *shall* be eligible for participation" if they meet the relevant income thresholds, 42 U.S.C. § 9840(a)(1)(B)(i) (emphasis added), and that "homeless children *shall* be deemed to be eligible for such participation . . . ." *Id.* § 9840(a)(1)(B)(ii) (emphasis added). As with the Health Center statute, these directives are specific, mandatory, and qualified by only a single exception. And the statute repeatedly reaffirms that Congress intended to enable universal coverage among these groups of children. It directs Head Start agencies to

"ensure" that they are "meeting the needs of children eligible under" these clauses before enrolling other children, *id.* § 9840(a)(1)(B)(iii)(II); it requires agencies to attempt to "be fully enrolled with children eligible under" these clauses, *id.* § 9840(a)(1)(B)(iv)(III); it instructs the Secretary to "remove barriers to the enrollment and participation of homeless children," including burdensome documentation requirements, *id.* § 9835(m); and it authorizes funding specifically to "address the challenges of children from immigrant, refugee, and asylee families," *id.* § 9835(a)(5)(B)(i). Congress enacted all of these provisions more than a decade after PRWORA, at a time when it was the settled understanding that PRWORA did not apply to Head Start. *See* Improving Head Start for School Readiness Act of 2007, Pub. L. No. 110-134 (Dec. 12, 2007). It is a "fair implication" of these provisions that Congress did not intend Head Start to be subject to PRWORA.[11]

### B.  The ED PRWORA Notice Is Contrary to Law

The ED PRWORA Notice, too, is contrary to law. PI Op. at 42-44. From 1997 onward, ED (like HHS) interpreted PRWORA to cover only those educational benefits provided at the "postsecondary" level. *See* Ex. 6 at 4-5. In its new PRWORA Notice, ED rejects this reading and adopts a jerry-rigged new test: it contends that the statute covers (1) all educational benefits provided to adults, "postsecondary education benefits or otherwise"; and (2) all educational benefits provided to children that are not "basic public education benefits." Ex. 3, 90 Fed. Reg. at 30,899. And it relies on this test to cover two programs that expressly provide secondary education benefits. *See id.* at 30,899-900.

---

[11] It is especially clear that PRWORA does not apply to children already enrolled in Head Start programs. Section 9840(a)(1)(B) provides that "a child who has been determined to meet the eligibility criteria described in this subparagraph and who is participating in a Head Start program in a program year shall be considered to continue to meet the eligibility criteria through the end of the succeeding program year." 42 U.S.C. § 9840(a)(1)(B)(v).

This test is flawed on its face. The statutory text expressly defines "Federal public benefit[s]" to include "postsecondary education . . . benefits." 8 U.S.C. § 1611(c)(1)(B). Congress would not have included the qualifier "postsecondary" in this phrase if it actually intended to cover "all" educational benefits except "basic public education." *Cf.* Ex. 3, 90 Fed. Reg. at 30,899. And the statute's rule of construction, its drafting history, and the contemporaneous and consistent construction of the federal agencies responsible for administering this statute confirm that it is limited, as it says, to postsecondary education benefits. *See supra* pp. 50-54.

Much like HHS, ED attempts to cram non-postsecondary education benefits into the catchall clause in Section 1611(b)(1)(C), on the theory that "the disparate nature" of the benefits listed in Section 1611(c)(1)(B) "suggest[s] that Congress intended to capture an expansive array of Federal benefits." Ex. 3, 90 Fed. Reg. at 30,897. But this reading ignores the principle that a catchall clause should not be used to contradict specific limits elsewhere in the statute. *See supra* p. 52. And it lacks any apparent limiting principle; if the only rule in interpreting Section 1611(c)(1)(B) is that Congress intended the covered benefits to be "expansive," then the word "similar" has no work to do, and the statute effectively means "any other benefit."

In an effort to avoid this untenable result, ED proposes to read the catchall clause in Section 1611(c)(1)(B) to contain an unstated exception for "basic public education benefits." Ex. 3, 90 Fed. Reg. at 30,899. But Section 1643(a)(2) is a rule of construction, not a statutory exception. If ED's interpretation of the catchall clause in Section 1611(c)(1)(B) leads to a result that contradicts the rule of construction, that is proof that it is wrong—not a license to graft an extratextual exception onto Section 1611(c)(1)(B).

In the end, ED's theory of how the statute works is simply too complicated to be plausible. If Congress had wished to cover all educational benefits except basic public education benefits, it

could easily have said so. It would not have achieved this result by (1) expressly listing "postsecondary education . . . benefit[s]," (2) implicitly including all other education benefits through the phrase "any other similar benefit," and (3) implicitly excluding "basic public education benefits" through a rule of construction placed at the other end of the statute. ED offers "no reason for Congress to have constructed such an obscure path to such a simple result." *Kloeckner v. Solis*, 568 U.S. 41, 52 (2012). And the very obscureness of ED's reading is a further reason, under the Spending Clause's clear-statement rule, that it cannot prevail. *See Arlington*, 548 U.S. at 296.

Because ED's interpretation is wrong, it follows that ED erred by relying on that interpretation to deem two new programs covered by PRWORA that both fund secondary education. *See* Ex. 3, 90 Fed. Reg. at 30,899-900. WIOA II authorizes grants to States to provide basic literacy training and education "below the postsecondary level" to adults who are "basic skills deficient," lack a secondary-level education, or are "English language learner[s]." *See* 29 U.S.C. § 3271(3); *cf.* Ex. 3, 90 Fed. Reg. at 30,899 (describing the program as an "alternative" to "secondary school"). Perkins V authorizes grants to states to fund "career and technical education" at both the "secondary" and "postsecondary" levels. *See* 20 U.S.C. §§ 2301, 2302(5); *see* Ex. 3, 90 Fed. Reg. at 30,900. ED suggests that the program's secondary-level benefits are only exempt from PRWORA if they are provided "in the secondary school setting," Ex. 3, 90 Fed. Reg. at 30,900, but it does not matter where secondary-level benefits are provided. They are not "postsecondary education . . . benefit[s]," and fall outside of PRWORA for that reason. In any event, all of Perkins V falls outside of PRWORA because, as ED acknowledges, it contains no "test for eligibility." *Id.*; *see also*, 20 U.S.C. § 2342(d). Accordingly, it cannot constitute a "Federal public benefit." *See* PI Op. at 44.

### C.  The DOL PRWORA Notice Is Contrary to Law

The DOL PRWORA Notice is also contrary to law. PI Op. at 44-46. That notice states that PRWORA applies to "all participant-level services" provided under employment and training programs established by three statutes: Title I of WIOA, the Wagner-Peyser Act, and the Older Americans Act. *See* Ex. 4 at 1-2, 5. Although the notice itself is unclear as to what the term "participant-level services" means, DOL has since said that this term refers to items marked "Yes" in the column entitled "Does this service trigger inclusion in participation?" in Attachment II of Training & Employment Guidance Letter 19-16. *Id.* at 2 n.2; *see* ECF No. 48-6 ¶ 6. Those items include "Basic Career Service[s]," such as "job search assistance" and "career counseling"; "Individualized Career Service[s]," such as "financial literacy services" and "English-language acquisition and integrated education and training programs"; and one type of "Training." Ex. 8 (capitalization omitted).

DOL's explanation for why these myriad services constitute "Federal public benefits" consists, in full, of two sentences:

> [A]ll participant-level services are "federal public benefits" under PRWORA, because they are the same or similar as benefits listed in PRWORA at 8 USC 1611(c). While [these] programs provide a range of services to jobseekers, the overall goal is to move participants into gainful employment.

Ex. 4 at 2-3. This interpretation is flawed in at least three respects. First, most of the services subject to the DOL PRWORA Notice are provided pursuant to a statute—the Wagner-Peyser Act—that lacks eligibility criteria and is therefore exempt from PRWORA. Second, many of the services are non-postsecondary educational benefits that do not constitute "Federal public benefits." And, third, any remaining services subject to the notice do not constitute the types of benefits listed in 8 U.S.C. § 1611 or its residual clause.

### 1. The DOL PRWORA Notice unlawfully applies to services that are generally available to the public

The DOL PRWORA Notice, like the HHS and ED notices, impermissibly sweeps in a statute—in this case, the Wagner-Peyser Act—that lacks eligibility criteria. As DOL has repeatedly explained, "employment services under the Wagner-Peyser Act are universal and available to all." 81 Fed. Reg. 55,792, 55,809 (2016); *see* 20 C.F.R. § 652.207(a) (discussing "the requirement for universal access" to Wagner-Peyser Act services); *id.* § 652.207(b)(1) ("Labor exchange services must be available to *all* employers and job seekers" (emphasis added)). Indeed, the DOL PRWORA Notice itself reiterates this point, explaining that the program "provides access to *all* job seekers." Ex. 4 at 5 (emphasis added). Accordingly, such services are not "Federal public benefits" subject to PRWORA. *See* PI Op. at 38.

Nearly all of the "participant-level services" subject to the DOL PRWORA Notice either must or may be provided pursuant to the Wagner-Peyser Act. DOL regulations provide that Wagner-Peyser Act funding "*must* be used to provide basic career services" and "*may* be used to provide individualized career services." 20 C.F.R. § 652.206 (emphasis added). The document that DOL uses to define participant-level services says the same thing: "*all* of the basic career services *must* be made available by ES staff"—that is, staff funded by the Wagner-Peyser Act Employment Service (ES) program—and "ES staff *may* also make available the individualized career services" discussed in the guidance." Ex. 8 at 4 (emphasis added). The sole "participant-level service" subject to the DOL PRWORA Notice that cannot be provided through the Wagner-Peyser Act is one type of "Training," which the notice says must be provided "under Sec. 134(c)(3)(D)" of WIOA. *See id.* at 3.

Accordingly, recipients of DOL employment and training grants must provide nearly all "participant-level services" to any individual who walks in the door. By statute, recipients of grants

under the Wagner-Peyser Act, WIOA Title I, and the Older Americans Act must administer all three statutes as part of a "one-stop delivery system." 29 U.S.C. § 3151(1)(B)(i), (ii), (v); *see also id.* § 49f(e); 42 U.S.C. § 3056i. Under that system, recipients must make all of the career services authorized by these statutes available at a single physical location, which DOL refers to as an "American Job Center." *See* 29 U.S.C. § 3151(b)(1)(A)(i), (e)(2); *see* 20 C.F.R. § 678.305; Ex. 110. Thus, contrary to the DOL PRWORA Notice, if an individual enters an American Job Center seeking any of the participant-level services provided under the Wagner-Peyser Act—which is nearly all of them—the grantee must provide those services without checking citizenship or immigration status.

### 2. The DOL PRWORA Notice is unlawful because it applies to non-postsecondary educational benefits

Several of the programs and services subject to the DOL PRWORA Notice fall outside of PRWORA for another independent reason: they constitute non-postsecondary educational benefits that are necessarily "preservative of the possibility of attaining any postsecondary education," and thus are not similar to post-secondary education. *See* PI Op. at 43. Specifically, the DOL PRWORA Notice interprets PRWORA to apply to services provided under "YouthBuild," "WIOA Title I . . . Youth programs," and multiple additional non-postsecondary services. Ex. 4 at 1 (citation modified).[12] By statute, however YouthBuild is limited to individuals between the ages of 16 and 24 who have "[not received] a secondary school diploma or its recognized equivalent," who are deficient in basic skills "despite attainment of a secondary school diploma," or who have been "referred by a local secondary school for participation in a YouthBuild program leading to the

---

[12] The DOL PRWORA Notice lists "Adult, Dislocated Worker, [and] Youth programs" as a single item, *see* Ex. 4 at 1, but it actually constitutes two distinct statutory programs: the Adult and Dislocated Worker Program under 29 U.S.C. §§ 3171-3174, and the Youth Formula Program under 29 U.S.C. § 3164.

attainment of a secondary school diploma." 29 U.S.C. § 3226(e)(1)(A)-(B) (limiting eligibility to "school dropout[s]" and the other listed groups); *id.* § 3102(54) (defining "school dropout"). It provides these "disadvantaged youth[s]" with "education and employment skills" necessary to prepare them for "postsecondary education and training opportunities, *id.* § 3226(a)(1), including a variety of "secondary education services and activities," *id.* § 3226(c)(2)(A)(iv)(III). Much like WIOA II, this program therefore provides "education for adults [and minors] who lack a secondary school education." PI Op. at 43. It is accordingly exempt from PRWORA.

The WIOA Title I Youth Program is similarly limited to individuals between the ages of 16 and 24 who lack a basic education—including because they are "school dropout[s]," "basic skills deficient," or are "within the age of compulsory school attendance," but "ha[ve] not attended school for at least the most recent complete school year calendar quarter." 29 U.S.C. § 3164(a)(1)(B)-(C). And, like YouthBuild, it funds a variety of education and training services to "support the attainment of a secondary school diploma or its recognized equivalent, entry into postsecondary education, and career readiness." *Id.* § 3164(c)(2); *see id.* § 3164(b)(2)(B), (c)(1)(C) (similar). This program thus provides secondary-level education services that are exempt from PRWORA.

Beyond these two programs, the DOL PRWORA Notice covers several additional buckets of "participant-level services" that are primary- and secondary-school benefits and therefore non-postsecondary educational benefits. DOL defines those services to include *inter alia* "[f]inancial literacy services," "English-language acquisition," and "integrated education and training programs." Ex. 8 at 3. These basic literacy and language skills are primary- or secondary-level educational benefits, not the type of "postsecondary education[al] . . . benefit" to which Congress restricted PRWORA. 8 U.S.C. § 1611(c)(1)(B). Indeed, some of these items are

specifically listed as services designed to "meet the educational needs" of secondary-level students in YouthBuild and the WIOA Title I Youth Program. 29 U.S.C. § 3226(c)(2)(A)(iv)(II); *see id.* § 3164(b)(2)(D).

With respect to all three types of services, DOL concedes that several of the services subject to its interpretation are "secondary-level education services," but suggests that PRWORA nonetheless applies to them because *other* "services provided to youth participants are federal public benefits." Ex. 4 at 2 n.1. That is legal error twice over. First, some statutory programs like YouthBuild and the WIOA Title I Youth Program *only* provide secondary-level educational benefits exempt from PRWORA. Second, as Defendants have since acknowledged, PRWORA applies on a "benefit-by-benefit" basis. ECF No. 48 at 22-23. If a statutory program contains both Federal public benefits and benefits not subject to PRWORA, a recipient cannot extend the reach of PRWORA by conditioning eligibility to the latter on compliance with PRWORA's restrictions.

### 3. Any remaining "participant-level services" also do not constitute Federal public benefits

Any remaining services covered by the DOL PRWORA Notice are also not "Federal public benefits" within the meaning of PRWORA. The various "career services" subject to this notice do not fall within any of the categories expressly listed in the definition of "Federal public benefits." 8 U.S.C. § 1611(c)(1)(B). They are not, for instance, forms of "retirement," "public or assisted housing," or "food assistance" benefits. 8 U.S.C. § 1611(c)(1)(B). Nor are they a form of "postsecondary education." *Id.* As its name suggests, the term "postsecondary education" means "education following secondary school." *Postsecondary*, Merriam-Webster Dictionary. None of the services covered by the DOL Notice requires a secondary-level education. On the contrary, all of them must be provided to job-seekers without regard to their level of educational attainment. *See* 20 C.F.R. § 652.207(b)(1) (services under the Wagner-Peyser Act "must be available to all

employers and job seekers"); 29 U.S.C. §§ 3174(c)(3) (requiring provision of WIOA I services to "adults" or "dislocated workers"); 42 U.S.C. § 3056p(a)(3)(A), (B)(ii)(V) (individuals eligible for workforce training programs under the Older Americans Act if they are 55 or older and have a low income, including if they have "limited English proficiency or low literacy skills"). Indeed, as noted above, many of those services are specifically designed for students who lack a secondary-level education.

The services listed within the DOL PRWORA Notice also do not fall within the residual clause for "other similar benefit[s]." 8 U.S.C. § 1611(c)(1)(B). In construing a catchall term of this kind, courts apply the "*ejusdem generis*" canon, which instructs that courts "interpret a general or collective term at the end of a list of specific items in light of any *common attributes* shared by the specific items." *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252 (2024) (citation modified; emphasis added). Thus, an agency should not determine whether a service is an "other similar benefit[]" by comparing it to one of the listed terms in isolation. Rather, it must identify the "common attribute" or "linkage" between *all* of the terms and determine if the service at issue shares that quality. *Id.* at 252-53; *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024) (defining scope of a catchall by identifying "what a statute's specific listed items share in common").

The text of PRWORA itself makes clear what "common attribute" links the benefits Congress decided to cover. The "statements of national policy" at the start of the statute explain that Congress's aim in enacting PRWORA was to promote "self-sufficiency," by ensuring that noncitizens "not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." 8 U.S.C. § 1601(1), (2)(A). Consistent with that purpose, all of the items listed in Section 1611(c)(1)(B) are

types of benefits that support the basic needs of noncitizens who cannot provide for themselves. *See id.* § 1611(c)(1)(B) ("retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment").

The services covered by the DOL Notice are the polar opposite. These DOL services are designed to assist individuals in obtaining work precisely so that they *can* provide for themselves. As DOL puts it, their "overall goal is to move participants into gainful employment." Ex. 4 at 3. These programs thus do not fulfill a person's "needs," like food, healthcare, housing, or education benefits. 8 U.S.C. § 1601(2)(A). They provide information, counseling, and training so that noncitizens can be "self-sufficien[t]" and fulfill those needs for themselves. *Id.* They are therefore not "similar" to the benefits listed in Section 1611(c)(1)(B) and fall outside the statute's scope.

### D.  The HUD PRWORA Notice is Contrary to Law

The HUD PRWORA Notice is unlawful for many of the same reasons as the HHS, ED, and DOL Notices. Indeed, its legal justification rests on two of same core flaws as those earlier notices. First, like the HHS notice, it asserts that "*any* grants [HUD] administers" are automatically subject to PRWORA, regardless of whether the benefits they provide fall within the definition of Federal public benefits in 8 U.S.C. § 1611(c)(1)(B). Ex. 81, 90 Fed. Reg. at 54,364 (stating that because the ESG and Continuum of Care programs "award 'grants' as defined in PRWORA," they are "therefore covered by the definition of 'Federal public benefit' under the statute"). Second, like each of the earlier notices, it interprets the phrase "eligibility unit" to modify only the term "family"—and thus makes clear that HUD applies the statute to programs without eligibility criteria. *See id.* (stating that an otherwise-qualifying benefit "is a 'Federal public benefit,' as long as the benefit is 'provided to' one of three types of recipients: (i) 'an individual,' (ii) a 'household,' or (iii) a 'family eligibility unit'"). The HUD PRWORA Notice then doubles down on that interpretive error by asserting that the residual clause in Section 1611(c)(1)(B) includes

"'assistance' similar to the 'delivery of in-kind services *at the community level*," *id.* (alterations omitted), making clear that HUD interprets the statute to apply to benefits provided "at the community level" rather than only to eligible individuals, households, or families.

As this Court has already concluded, both of those legal interpretations are incorrect. Block grants do not fall within PRWORA unless they are used to provide benefits that satisfy Section 1611(c)(1)(B). PI Op. at 40-41. And programs without eligibility criteria are not subject to PRWORA at all. PI Op. at 38.

It follows that HUD's reliance on those interpretations to add new programs to its list of PRWORA-subject programs is unlawful. Many of the programs that HUD lists in its notice do not include eligibility criteria. *See, e.g.*, 42 U.S.C. § 11374 (authorizing use of Emergency Solutions Grant for activities including "provision of essential services related to emergency shelter or street outreach"); American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 3205 (2021) (authorizing use of HOME-ARP funding to undertake activities that "primarily benefit" people who are homeless, at risk of homelessness, fleeing domestic violence, or belong to populations with the greatest risk of housing instability, among others). And many are block grants that do not provide benefits subject to Section 1611(c)(1)(B), lack eligibility criteria, or both. *See, e.g.*, 42 U.S.C. §§ 5301 *et seq.* (Community Development Block Grant); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. L., title II (2022) (appropriating $85 million for PRO Housing program).

In addition to repeating the errors of the prior notices, the HUD PRWORA Notice also introduces one of its own: it "interprets PRWORA to apply to all HUD programs *related to* public or assisted housing" on the theory that such programs "*are* 'public or assisted housing'" within the meaning of 8 U.S.C. § 1611(c)(1)(B) (emphases added). Ex. 81, 90 Fed. Reg. at 54,364. But the statute does not encompass any benefits "related to" public or assisted housing; it includes only

"public or assisted housing" itself. 8 U.S.C. § 1611(c)(1)(B). That distinction is significant. Other provisions of PRWORA explicitly include or exclude items "related to" certain benefits. *See id.* § 1611(b)(1)(A) (excluding medical benefits provided they are "not *related to* an organ transplant procedure"), (c)(2)(A) (excluding contracts or professional licenses for any nonimmigrants "whose visa for entry is *related to* such employment in the United States") (emphases added). And the Supreme Court has often emphasized the capacious breadth of terms like "related to." *See Maracich v. Spears*, 570 U.S. 48, 60 (2013) ("everything is related to everything else" (citation omitted)). When Congress chose to omit the term "related to" from Section 1611(c)(1)(B), its decision must therefore be presumed intentional. *See City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

This error, too, renders much of HUD's new list unlawful. The block grant programs listed in the notice support a wide array of community-development programs—from water treatment to library refurbishment—that cannot be understood as "public or assisted housing" under any plausible construction of the term. *See supra* pp. 16-25. And several of the programs, such as ESG and HOPWA, encompass services such as street outreach, safety assessments, and case management for unhoused individuals—all benefits that are distinct from public or assisted housing. *See supra* pp. 19-22. Indeed, HUD itself acknowledged as much: its own internal analysis concluded that PRWORA applies to these programs only "to a limited extent," and does not cover services such as "benefiting from parks and public infrastructure" or receiving "street outreach."

ECF No. 86-12 at 32. Yet, HUD now asserts that these programs in their entirety are "Federal public benefits."

Because the HUD PRWORA Notice is infected by these clear legal errors, it should be vacated in its entirety. It is a "foundational principle of administrative law" that an agency's action can be upheld, if at all, only on "the grounds that the agency invoked when it took the action." *Regents*, 591 U.S. at 20 (quoting *Michigan*, 576 U.S. at 758). Because the sole legal justifications the HUD PRWORA Notice provides are wrong—indeed, they are largely rehashes of interpretations this court has already found unlawful—the Notice cannot stand.

### E.  The DOJ PRWORA Notice Is Contrary to Law

Finally, the DOJ PRWORA Notice is contrary to the text of PRWORA. In this notice, the Attorney General purported to effectively excise the Life/Safety Exception from the statute: she revoked the orders in effect since one day after PRWORA's enactment specifying which benefits were exempt from PRWORA pursuant to the Life/Safety Exception; and she stated that, instead, she had decided "not to except *any* benefits from PRWORA pursuant" to this provision. Ex. 1, 90 Fed. Reg. at 32,026 (emphasis added).

Congress did not give the Attorney General authority to turn this statutory provision on and off at will. Section 1611(b)(1)(D) provides:

> Subsection (a) shall not apply to . . . [p]rograms, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) *specified by the Attorney General*, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety.

8 U.S.C. § 1611(c)(1)(D). This provision thus permits the Attorney General to "specif[y] . . . which" programs, services, or assistance meet the three criteria identified in the statute. *Id.* The

ordinary meaning of the term "specify" is to "name specifically." Webster's New Universal Unabridged Dictionary 1832 (1996); *accord Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010) ("'specify' means 'to name or state explicitly or in detail'"). Read naturally, this provision thus allows the Attorney General to "name specifically . . . which" programs meet the conditions Congress listed. That is, it assigns the Attorney General the duty to identify specifically *which* programs deliver in-kind services at the community level, are not conditioned on a person's income or resources, and are necessary for the protection of life and safety. It does not allow the Attorney General to decide *whether* programs that do meet those criteria should be excepted.

The Supreme Court adopted a nearly identical construction of the term "specify" in *Gundy v. United States*, 588 U.S. 128 (2019). There, the Court considered the meaning of a provision in the Sex Offender Registration and Notification Act (SORNA) that gives the Attorney General "the authority to *specify* the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this subchapter . . . ." 34 U.S. § 20913(d) (emphasis added). The petitioner argued that the phrase "specify the applicability" "empowers the Attorney General to do whatever he wants [with] pre-Act offenders," including to "exempt them from registration forever." *Gundy*, 588 U.S. at 140 (plurality opinion). But the Court disagreed: It explained that this provision is most naturally read to grant the Attorney General authority to "specify *how* to apply SORNA to pre-Act offenders," not to "specify *whether* to apply SORNA to pre-Act offenders at all. *Id.* at 144 (internal quotation marks omitted). And the Court found reinforcement for that view in the Act's structure, its legislative history, and in the fact that no Attorney General since the statute's enactment in 2006 had "used (or, apparently, thought to use)" the statute "in any more expansive way." *Id.* at 141-44.

Here, the same indicia of meaning support reading the term "specify" in a similarly limited way. Start with the statute's structure. Throughout PRWORA, Congress made clear that it did not intend the statute to prohibit noncitizens from obtaining critical, life-saving benefits. The three provisions that immediately precede the Life/Safety Exemption exclude emergency medical assistance, emergency disaster relief, and treatment for communicable diseases from the statute's scope. 8 U.S.C. § 1611(b)(1)(A)-(C). Section 1615 clarifies that the statute does not render noncitizens ineligible for various forms of emergency food aid. *Id.* § 1615(a), (b)(2)(A)-(D). And Section 1641 ensures that noncitizens who are "battered or subjected to extreme cruelty" by a spouse or a parent may receive any benefits that they "need" because they suffered "such battery or cruelty." *Id.* § 1641(c)(1)(A); *see id.* § 1641(c)(2)(A), (3)(A) (similar).

It would be anomalous in the extreme if, alongside these provisions, Congress gave the Attorney General unfettered discretion to deny noncitizens eligibility for benefits that are "necessary for the protection of life or safety." *Id.* § 1611(b)(1)(D). A Congress that took care to ensure that noncitizens could access emergency medical care, disaster relief, food aid, and support for battered spouses would not have left it entirely in the hands of executive discretion whether the statute covered "soup kitchens," "short-term shelter," and other essentials of life. *Id.* It is far more plausible that Congress intended Section 1611(b)(1)(D) as a catchall provision that would entrust the Attorney General with the responsibility to identify "which" programs, other than those it explicitly listed in the neighboring provisions of the statute, are "necessary for the protection of life or safety." *Id.*

The legislative history reinforces this reading. *See Gundy*, 588 U.S. at 143 (plurality opinion). Congress passed PRWORA twice before it became law (the first version was vetoed), and the conference report for both iterations of the bill described the Life/Safety Exemption in a

way consistent with the ordinary meaning of the phase "specify . . . which." In December 1995, the conference committee said that this provision ensured that "'non-qualified' aliens may continue to receive . . . programs *specified by the Attorney General as necessary to protect life and safety,* such as soup kitchens and crisis counseling." 141 Cong. Rec. H15431 (Dec. 21, 1995) (Conference Report printed in Congressional Record). And in July 1996, the conference report stated, without qualification, that this provision exempts "community programs necessary for the protection of life or safety." H.R. Rep. No. 104-725, at 379 (July 30, 1996) (Conf. Rep.). Nowhere in these documents did anyone suggest that the provision granted the Attorney General discretion to turn the exemption on or off at will—a startling power that surely would have drawn comment if it existed. *See Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) (likening "Congress' silence" during legislative debate to "the dog that did not bark").

Nor has any prior Attorney General "used (or, apparently, thought to use)" the Life/Safety Exemption in the "expansive way" DOJ now proposes. *Gundy*, 588 U.S. at 144 (plurality opinion). Since one day after the statute's enactment, the Attorney General has stated that all programs that meet the three criteria in Section 1611(b)(1)(D) are exempt from PRWORA, and has merely gone on to specify particular programs that are "[i]ncluded within" this exemption. 61 Fed. Reg. at 45,985; *see* 66 Fed. Reg. at 3613 (same). No Attorney General before now has claimed the authority to *decline* to exempt programs that meet the statutory criteria. That longstanding, consistent application of PRWORA is entitled to great weight. *See Loper Bright*, 603 U.S. at 386. And it is particularly probative where, as here, Attorneys General of five successive administrations adopted an interpretation that was less rather than more protective of executive authority.

To the extent there is any doubt, the Spending Clause clinches the question. The Spending Clause requires that states receive "clear notice" of the terms of any condition on federal spending, *Arlington*, 548 U.S. at 296, and prohibits the federal government from "surpris[ing] participating States with post acceptance or 'retroactive' conditions," *Pennhurst*, 451 U.S. at 25. Defendants' interpretation would make it impossible for any state to anticipate the scope of PRWORA at the time they accept federal funding. Under that interpretation, the Attorney General could massively expand the scope of the statute on a moment's notice and require states to demand papers before granting their residents access to the most basic life-saving services. Principles of constitutional avoidance counsel against reading Section 1611(b)(1)(D) in a way that would make the conditions of federal spending constantly subject to executive whim. *See Arlington*, 548 U.S. at 296 ("States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" (quoting *Pennhurst*, 451 U.S. at 17)). And they provide further reason to construe the Attorney General's authority to be limited—as the text says—to "specif[ying] . . . which" programs meet the listed criteria.

The statute's reference to "discretion" does not alter this conclusion. The phrase granting the Attorney General discretion is a subordinate clause that modifies the term "specified." *See* 8 U.S.C. § 1611(b)(1)(D) (exempting programs "specified by the Attorney General*, in the Attorney General's sole and unreviewable discretion* . . . , which" meet the three listed criteria (emphasis added)). It thus makes clear that the specification of which programs meet the listed criteria is a matter solely and exclusively within the discretion of the Attorney General. Accordingly, a court cannot second-guess whether the Attorney General has decided correctly that "meals on wheels" or "mental health" programs are necessary for life or safety; Congress vested that decision in the Attorney General alone. 66 Fed. Reg. at 3616 (concluding that both fall within the exemption). By

74

the same token, however, Congress did not give the Attorney General discretion to do more than "specify . . . which" programs satisfy the statute. That is the only matter that falls "in [her] discretion." So invoking this provision to do something else—say, to specify not *which* programs meet the listed criteria, but *whether* programs that do meet those criteria should be exempt at all— is well beyond the Attorney General's limited ambit of authority.

It follows that the DOJ PRWORA Notice is unlawful. It does not purport to identify which programs are necessary to protect life or safety; rather, it asserts that the Attorney General "has chosen not to except *any* benefits from PRWORA" because doing so would "create[e] incentives for unlawful migration." Ex. 1, 90 Fed. Reg. at 32,025-26 (emphasis added). But the question of whether a program incentivizes unlawful migration is not a statutory criterion Congress permitted the Attorney General to rely on in exempting programs under Section 1611(b)(1)(D). Her sole charge is to "specify . . . which" programs meet the three listed criteria. Because her notice overtly does not do so, it is contrary to law.

## V.    The PRWORA Notices Violate the Spending Clause

The Spending Clause provides that "[t]he Congress shall have Power To . . . provide for the general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1. While Congress may "attach conditions on the receipt" of such funds, its spending power is "of course not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 206, 207 (1987). Rather, conditions attached to federal spending are "much in the nature of a contract," and States must be able to "voluntarily and knowingly accept[] the terms" without undue "coercion" from the federal government. *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 577 (2012) (plurality opinion) (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)).

75

The Spending Clause therefore imposes two limits relevant here. First, the federal government must provide States "clear notice" of the terms of their grants and may not "surprise[e] participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. Second, the "financial inducement" must not be "impermissibly coercive." *NFIB*, 567 U.S. at 580. These limits constrain both Congress when it enacts spending legislation, *id.*, and federal agencies when they adopt or enforce spending conditions, *see, e.g.*, *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019) (holding that an HHS rule violated the Spending Clause).

The PRWORA Notices violate both of these limits, as this Court previously held. When accepting federal funds, the States could not have foreseen that the agencies would make a dramatic about-face on the scope of PRWORA in the middle of their grant terms. And the States cannot be coerced into transforming or eliminating their social service programs under threat of losing billions of dollars in federal funding.

### A.  The PRWORA Notices Impose Impermissibly Retroactive Conditions

The PRWORA Notices impose conditions on the States that they could not possibly have foreseen when accepting federal funding. *See* PI Op. at 47-48. At the time the Plaintiff States accepted funding from HHS, DOL, ED, and HUD, each agency had publicly adopted an interpretation of PRWORA that excluded all of the newly covered programs from its scope. *See* 63 Fed. Reg. at 41658; Ex. 4, at 5-7; 90 Fed. Reg. at 30,896 (describing 1997 ED Dear Colleague Letter). What is more, DOJ had in place a binding, notice-and-comment regulation formally exempting a vast swathe of federal spending programs from PRWORA. 61 Fed. Reg. at 45,985-86. These interpretations and exemptions were not new, and they were not contested: the HHS, ED, and DOJ notices had been in place almost from the statute's inception and had remained

untouched across five Presidential Administrations. And the DOL and HUD notices merely implemented the well-settled understanding of the statute's scope.

The new PRWORA Notices changed all of that overnight. HHS, ED, DOL, and HUD have repudiated their longstanding positions on the statute's scope and adopted novel interpretations that dramatically expand the reach of PRWORA. Those interpretations are anything but obvious: putting aside the merits of Defendants' newfound views, it "strains credulity to argue that participating states should have known of" these interpretations when "the government agenc[ies] responsible for the administration of the Act . . . h[ad] never understood" the statute in this way. *Pennhurst*, 451 U.S. at 25; *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (state agency "could not have realistically supposed" that spending statute meant something different than regulations that "ha[d] been on the books for nearly thirty years"). Yet the agencies have informed the States that they must obey their new interpretations immediately—in the middle of their grant terms—or risk enforcement and a cutoff in federal funding. Ex. 2, 90 Fed. Reg. at 31,238; Ex. 3, 90 Fed. Reg. at 30,900; Ex. 4 at 1.

The DOJ notice effects an even more egregious bait-and-switch. For thirty years—since the day after PRWORA's enactment—DOJ has exempted a broad number of programs from PRWORA's scope, *See* 61 Fed. Reg. at 45,986, and Plaintiff States have accepted federal grants in reliance on that interpretation. Without warning, DOJ has revoked all of those exemptions, demanding that agencies begin applying PRWORA to all of these programs in a matter of 30 days. Ex. 1, 90 Fed. at 32,023-24. And, it has done so as a purported exercise of the Attorney General's discretionary authority—that is, it has now claimed (however dubiously) that PRWORA *always* applied to these programs. *See id.* at 32,024. In an exercise of raw will, the Attorney General has just decided she no longer wishes to exempt them. *See id.* at 32,025-26.

This is the epitome of unfair notice. The Spending Clause bars the federal government from "surpris[ing] participating States with post acceptance or 'retroactive' conditions" on Federal grants, *Pennhurst*, 451 U.S. at 25. It therefore bars Defendants from imposing these conditions on the States that they were wholly "unable to ascertain" at the time they accepted the relevant grants. *Arlington*, 548 U.S. at 296. Indeed, the federal government had clearly, consistently told them precisely the opposite of what it now says. The Spending Clause therefore bars Defendants from demanding compliance with these conditions.

### B.  The PRWORA Notices Are Impermissibly Coercive

The PRWORA Notices also unconstitutionally coerce the Plaintiff States. *See* PI Op. at 48. The Supreme Court has held that a federal condition "pass[es] the point at which 'pressure turns into compulsion,'" when it threatens a substantial portion of a state's federal funding unless the state accepts a program that is "[different] in kind, not merely degree" than the one the state previously agreed to join. *NFIB*, 567 U.S. at 580-83. In *NFIB*, for instance, the Court held that the Affordable Care Act's Medicaid expansion was unconstitutionally coercive because it threatened to withhold the entirety of each State's Medicaid funding—equaling over 10 percent of a State's budget—unless the State accepted a dramatic transformation of the Medicaid program. *Id.* And in *New York*, a court found that an HHS "conscience rule" was unconstitutionally coercive because it conditioned access to all of the States' federal health care funding on new terms for responding to conscience-based objections in the health care area. 414 F. Supp. 3d at 570-71.

The PRWORA Notices place a similar "gun to the head[s]" of the Plaintiff States. *NFIB*, 567 U.S. at 581. The financial pressure on the Plaintiff States to accept these conditions is enormous. As noted, Defendants have imposed new conditions on the receipt of funds for dozens of federal programs. These programs comprise the very core of the social safety net in many States: they include resources for early childhood education (Head Start), health centers (the Health

Center Program), workforce training (WIOA), and programs for domestic violence prevention, foster care, mental health, temporary shelter, child welfare, and much more. Collectively, these programs provide billions of dollars in funding annually and are often critical to the survival of state programs. The States could not realistically forgo all of this federal funding—especially in the middle of the grant terms, when States have devised their budgets and designed their programs in reliance on federal funding.

Yet Defendants have demanded that the States "transform" their own social services programs "dramatically" in order to continue receiving federal funding. *NFIB*, 567 U.S. at 584. The PRWORA Notices "change[] the 'who,' 'what,' 'when,' 'where,' 'why,' and 'how'" with respect to how States must restrict eligibility for these programs. *New York*, 414 F. Supp. 3d at 571. They substantially alter which individuals may access these state programs, throwing numerous citizens and non-citizens alike out of the states' social safety net. They will require the development of costly new systems for screening for eligibility. *See supra* pp. 15-25. And in so doing, they will dramatically transform the nature of many of these programs. Programs that were previously open to all comers will now need to bar individuals at the door unless they can produce their papers. And many programs that cannot realistically provide such screening will likely need to close entirely. *See id*.

Two additional features of this coercion make it especially problematic. First, Defendants have not simply identified or enlarged conditions in the threatened programs *themselves*. Rather, they have taken a freestanding statute, PRWORA, and leveraged it as a basis to "threat[en] to terminate other significant independent grants." *NFIB*, 567 U.S. at 580. Furthermore, they have done so in order to achieve policy objectives entirely distinct from those that animate those grant programs themselves—in the Attorney General's words, to "reduce the incentive for aliens to

illegally migrate to the United States." Ex. 1, 90 Fed. Reg. at 32,025. In this context, "the conditions are properly viewed as a means of pressuring the States to accept policy changes." *NFIB*, 567 U.S. at 580.

Second, these grants cut deep into areas of traditional state authority. Many of the affected federal programs supplement or support the states' *own* efforts to carry out activities at the core of state authority in our federal system, such as foster care, combating domestic violence, and healthcare. *See United States v. Morrison*, 529 U.S. 598, 615-16 (2000). Because federal funds are used pervasively in many of these programs, States will need to alter how they themselves carry out their responsibilities in order to accept the terms. But the central concern underlying the Spending Clause doctrine is that the federal government not be able to use its spending power to "require the States to govern according to Congress' instructions." *NFIB*, 567 U.S. at 577 (quoting *New York v. United States,* 505 U.S. 144, 162 (1992)). Those concerns are at their apex here.

In short, Defendants have given Plaintiffs an ultimatum—dramatically restructure your social safety net, immediately, or lose billions of dollars in federal funding. The Spending Clause does not give Congress, and still less five federal agencies, the authority to dictate such coercive terms. The PRWORA Notices are therefore unconstitutional.

## VI.    The Court Should Issue a Declaratory Judgment on the Verification Regulations (Count VI)

Plaintiffs are entitled to a judicial declaration that, to the extent that the PRWORA Notices require Plaintiff States to verify immigration status for participants in programs identified as federal public benefits, the Notices are contrary to law in violation of the APA because the Attorney General has not promulgated the regulations described in 8 U.S.C. § 1642(a).

After enacting PRWORA, Congress directed that the Attorney General "shall" promulgate two sets of regulations in late 1997 and early 1998: regulations generally "requiring verification

that a person applying for a Federal public benefit . . . is a qualified alien," 8 U.S.C. § 1642(a)(1), and regulations specifically "set[ting] forth the procedures by which a State or local government" would perform the verification, *id.* § 1642(a)(3). But after missing both deadlines, DOJ issued a proposed rule that would have combined the two required regulations. *See* 63 Fed. Reg. at 41,662. The proposed rule was never finalized. To this day, no regulations have been promulgated under either provision.

Because no regulations have been promulgated, Section 1642(b)—the provision requiring states to comply with PRWORA's verification requirement *after* the regulations have been promulgated—has not been triggered. That provision states: "Not later than 24 months after the date the regulations described in [Section 1642(a)] are adopted, a State that administers a program that provides a Federal public benefit shall have in effect a verification system that complies with the regulations." 8 U.S.C. § 1642(b). The plain meaning of "not later than" is to set a deadline for compliance. Congress regularly uses "not later than" in this way; Courts do too. *See, e.g.*, 8 U.S.C. § 1252(b)(1) ("The petition for review must be filed not later than 30 days after the date of the final order of removal."); *Ponta-Garca v. Ashcroft*, 386 F.3d 341, 342 (1st Cir. 2004) (describing that statute as a "deadline"); *Riley v. Bondi*, 606 U.S. 259, 272 (2025) (same). Section 1642(b) thus sets the deadline for states to have in place a PRWORA-compliant verification system as the date that is two years after the regulations are promulgated—a date that must be at least two years in the future, since the government has not yet started the clock.

That is exactly the reading of § 1642(b) adopted by DOJ itself back in 1998 in its proposed regulation. It explained that the PWORA statute has a "2-year time frame for compliance" that "specifically refers only to states." 63 Fed. Reg. at 41663 (describing the requirement as "statutory"). The never-finalized rule would have required states to "verify . . . beginning no later

81

than the date that is 24 months after the date of promulgation." *See id.* at 41678 (proposed 8 C.F.R. § 104.2).

It is also the reading adopted by two reviewing courts. *See City of Fresno v. Turner*, No. 25-CV-07070-RS, 2025 WL 2721390, at *11 (N.D. Cal. Sept. 23, 2025) ("PRWORA only requires state immigration status verification systems *twenty-four months after* the Attorney General promulgates certain final regulations, and so far only interim guidance and proposed rules have been issued."); *Martin Luther King, Jr. Cnty. v. Turner*, 798 F. Supp. 3d 1224, 1250 n.9 (W.D. Wash. Aug. 12, 2025) (PRWORA "does not require grant recipients to verify eligibility *until* the U.S. Attorney General has promulgated regulations implementing a verification requirement . . . . The Attorney General is yet to promulgate a final regulation implementing a verification requirement.").

This reading of § 1642(b) is also consistent with PRWORA's statutory scheme, which specifically contemplates that some entities that provide Federal public benefits may be exempt from verification. Section 1642(b) puts States—for now—in the same position as non-profits, which are subject to PRWORA but not required to verify. 8 U.S.C. § 1642(d).

Further, this reflects a reasoned policy judgment by Congress. As Plaintiffs' evidence shows, numerous practical problems would arise from a hastily designed and rolled out implementation of the PRWORA Notices, including the likely immediate exclusion of individuals from emergency, life-saving services and the exclusion of U.S. Citizens, such as individuals who have experienced homelessness or domestic violence, due to lack of documentation. *See, e.g.*, Ex. 43 ¶ 13 ("In emergency situations, such as in the case of domestic violence intervention or homelessness, it would likely be difficult, if not impossible, to administer such verification requirements."); Ex. 44 ¶ 20 (noting "lack of guidance on how to practically implement" the

PRWORA Notices). The never-completed regulations would have taken substantial steps to resolve those questions, providing much needed certainty as to how and when states verify. *See, e.g.*, 63 Fed. Reg. at 41,680 (proposed 8 C.F.R. § 104.23 stating what evidence could be accepted for U.S. nationals including a third-party declaration); *id.* at 41,683-84 (proposed 8 C.F.R. § 104.48 providing "specific and distinct verification procedures" for victims of domestic violence).

As this Court has already found, Defendants have "maintain[ed] the authority to enforce" the PRWORA Notices "against the States" and so there is no reason why "the States should be forced to sit like Damocles while the Government draws out any subsequent enforcement measures." PI Op. at 53 (quoting *Rosen*, 986 F.3d at 54). Accordingly, the Court should issue a declaratory judgment to settle the "merits of th[is] controversy," which "turn entirely on a question of statutory interpretation." *Rosen*, 986 F.3d at 54; *see also Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 694 (1st Cir. 1994).

## VII.    The Court Should Vacate the PRWORA Notices, Issue a Limited Injunction, and Issue a Declaratory Judgment

The Court should vacate the PRWORA Notices. The APA directs reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "'The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur' of an unlawful agency action." *California v. U.S. Dep't of Transportation*, No. 25-CV-208-JJM-PAS, 2025 WL 3072541, at *11 (D.R.I. Nov. 4, 2025) (quoting *Corner Post*, 603 U.S. at 826-27 (Kavanaugh, J., concurring)); *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002)). Thus, "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Nat'l Insts. of Health*, 770 F. Supp. 3d at 329. Vacatur is necessary where, as here, the errors in the agencies'

actions are "sever[e]" and cannot "be mended." *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001); *see also Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009).

Upon ordering vacatur, Plaintiff States request that the Court also permanently enjoin Defendants from implementing or enforcing the PRWORA Notices against them by any other means. An injunction is appropriate because Plaintiffs face irreparable harm if the Notices or the policies they contain are implemented, as the Court has already found. PI Op. at 48-58; *see supra* pp. 13-25 (detailing harms); *California*, 2025 WL 3072541, at *12 (permanent injunction standard "is essentially the same as that for issuing a preliminary injunction"). The scope of Plaintiffs' injunction is narrowly tailored: it would apply only to Plaintiff States, and only to actions that implement or enforce the vacated PRWORA Notices by other means. *See New York v. U.S. Dep't of Energy*, No. 6:25-CV-01458-MTK, 2025 WL 3140578, at *17 (D. Or. Nov. 10, 2025) (ordering injunction in addition to vacatur to prevent Defendants from "continu[ing] to implement" a vacated policy "without reference to" the policy itself). To be clear, Plaintiffs' proposed injunction would not prohibit Defendants from promulgating *new*, *different* rules to cure the many defects of the vacated PRWORA Notices.

Finally, the Court should issue a declaratory judgment that the PRWORA Notices are unlawful because they violate the Administrative Procedure Act and the Constitution, under Counts I-V. A declaratory judgment here would "serve[] a valuable purpose" by clarifying the "legal rights and obligations of the parties. *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995). And for the reasons described above, the Court should order a declaratory judgment on Count VI specific to the verification statute.

## CONCLUSION

For the foregoing reasons, Plaintiff States and their subdivisions and instrumentalities respectfully request that the PRWORA Notices be vacated; that Defendants be enjoined from enforcing the vacated Notices; and that the Court issue a declaratory judgment.

Dated: February 27, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Jessica Ranucci
*Special Counsel*
Zoe Levine
*Special Counsel for Immigrant Justice*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
zoe.levine@ag.ny.gov
jessica.ranucci@ag.ny.gov

*Attorneys for the State of New York*


**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Andrew Hughes*
Andrew Hughes
Benjamin Seel
Zane Muller
*Assistant Attorneys General*
Cristina Sepe
*Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Andrew.Hughes@atg.wa.gov
Benjamin.Seel@atg.wa.gov
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for the State of Washington*


**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Sarah W. Rice*
Sarah W. Rice (RI No. 10588)
*Unit Chief, Consumer & Economic Justice Unit*
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
SRice@riag.ri.gov

*Attorney for the State of Rhode Island*


**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Hayleigh S. Crawford*
Hayleigh S. Crawford
Mary M. Curtin
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
Mary.Curtin@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Heidi Lehrman*
Heidi Lehrman
Neli Palma
Michael L. Newman
*Senior Assistant Attorneys General*
Kathleen Boergers
William Downer
*Supervising Deputy Attorneys General*
Heidi Lehrman
Jeanelly Orozco Alcalá*
Natasha A. Reyes
*Deputy Attorneys General*
1300 I Street
Sacramento CA 95814
Heidi.Lehrman@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
William.Downer@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov
Natasha.Reyes@doj.ca.gov

*Attorneys for the State of California*

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Patricia McCooey*
Patricia McCooey
*Deputy Section Chief for Health and Education*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov

*Attorney for the State of Connecticut*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
Jennifer L. Sullivan
*Deputy Attorney General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
jen.sullivan@coag.gov

*Attorneys for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia
By: */s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorney for the District of Columbia*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Sarah J. North*
Sarah J. North
*Deputy Division Chief, Public Interest
Division*
Elena Meth
*Assistant Attorney General, Special
Litigation Bureau*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
Sarah.North@ilag.gov
Elena.Meth@ilag.gov

*Attorneys for the State of Illinois*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ David Ureña*
Katherine Dirks
*Chief State Trial Counsel*
Ethan W. Marks
David Ureña*
Brett M. Gannon
*Assistant Attorneys General*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for Plaintiff State of Hawaiʻi*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6584
VWilliamson@oag.state.md.us

*Attorney for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
Bryan Beach
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603

87

Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2675
david.urena@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

GiovanattiN@michigan.gov
BeachB@michigan.gov

*Attorneys for the State of Michigan*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Joseph R. Richie*
Joseph R. Richie
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Attorney for the State of Minnesota*

**AARON D. FORD**
Attorney General for the State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorney for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Meghan Musso*
Meghan Musso
Patrick Clancey
Kathleen Riley
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5289
meghan.musso@law.njoag.gov

*Attorneys for the State of New Jersey*

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Mark Noferi*
Mark Noferi
*Senior Litigation Counsel*
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov

*Attorney for the State of New Mexico*

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Coby Howell*
Coby Howell
*Senior Assistant Attorney General*
Tel (971) 673-1880
Fax (971) 673-5000

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane
*Deputy Solicitor General*
109 State Street

coby.howell@doj.oregon.gov                           Montpelier, VT 05609
                                                     (802) 828-2153
*Attorney for the State of Oregon*                   Ryan.kane@vermont.gov

                                                     *Attorney for the State of Vermont*


**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Faye B. Hipsman*
Faye B. Hipsman
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov

*Attorney for the State of Wisconsin*