# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, et al.,

            *Plaintiffs,*

     v.

U.S. DEPARTMENT OF JUSTICE, et al.,

            *Defendants.*

Case No. 1:25-cv-00345-MSM-PAS
Judge Mary Susan McElroy

## MEMORANDUM OF *AMICI CURIAE* PUBLIC HEALTH ORGANIZATIONS AND SCHOLARS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1

## INTEREST OF *AMICI CURIAE*

*Amici curiae* public health organizations are the American Public Health Association, the Robert Wood Johnson Foundation, the National Center for Medical-Legal Partnership, and the Jacobs Institute of Women's Health. Collectively, these organizations include tens of thousands of public health professionals and researchers across the country. The organizational *Amici* advance public health law and policy to improve health equity in the United States.

The individual *Amici* (identified in the appendix) are 65 distinguished deans, professors, and scholars of public health, law, and policy with extensive expertise in the issues before the Court. They are authorities in programs that promote population health and alleviate barriers to healthcare services for immigrant communities. Individual *Amici* are acting in their individual capacity and not as representatives of their respective institutions. With decades of collective experience, *Amici* are well positioned to explain the consequences of the action at issue in this case.

*Amici* file this brief to explain the repercussions of barring certain immigrants from participating in health programs newly characterized as "Federal public benefits" under the Personal Responsibility and Work Opportunity Act of 1996 ("PRWORA"). This brief illustrates the vital services that these programs provide for patients across the country and describes the individual health, public health, and economic harms that will result from restricting immigrant access to these programs.

1

## SUMMARY OF ARGUMENT

In July 2025, the U.S. Department of Health and Human Services ("HHS") issued a notice expanding the scope of "Federal public benefits" from which certain immigrants are excluded (the "Notice"). As a result, millions of immigrants— including those with Temporary Protected Status, asylum applicants, recipients of Deferred Action for Childhood Arrivals (DACA), and holders of work and student visas—are barred from accessing essential federal programs, including the Health Center Program, Head Start, Title X family planning program, and several behavioral health grant programs. HHS did so even though Congress designed these programs to provide care on a community-wide basis, without regard to immigration status.

There is robust empirical evidence that the Notice will have disastrous short- and long-term effects on the country's public health because millions of immigrant adults, children, and pregnant people will no longer be able to get the healthcare they need—evidence the Notice ignores. The Notice will also deter U.S. citizens and other immigrants from accessing programs for which they are eligible and upon which they have relied for decades, compromising the health of the communities these programs are intended to serve. The Notice abruptly reverses long-standing policy, without considering how the Notice will affect the health of immigrants and U.S. citizens, strain safety net healthcare providers, harm the economy, and lead to public health crises.

## ARGUMENT

The Court should vacate and enjoin the Notice because the agency's action was arbitrary and capricious. 5 U.S.C. § 706(2)(A). With respect to all three types of harm detailed below, HHS "entirely failed to consider . . . important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and ignored decades of reliance interests before changing its policy. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016).

I.  **The Notice Restricts Immigrants' Access to Longstanding Public Health Programs, Harming Vulnerable Adults, Children, and Pregnant People.**

The Notice upends decades of established law by declaring that PRWORA prohibits certain immigrants from accessing a broad swath of federally funded healthcare programs.[1] Many of these programs provide essential healthcare services to millions across the country, including immigrants who often face compounded obstacles to care due to financial, language, and cultural barriers. Barring immigrants from the Health Center, Head Start, Title X, and HHS-funded behavioral health grant-funded programs (the "Programs") is a devastating blow to the nation's health. When the doors of safety net healthcare providers suddenly close on immigrant patients who cannot access other sources of care, those patients are more likely to get sick and experience worse outcomes.[2] Further, because these Programs

---

[1] U.S. Dep't of Health & Hum. Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit", 90 Fed. Reg. 31232 (July 14, 2025).

[2] *See* Joel S. Weissman et al., *Delayed Access to Health Care: Risk Factors, Reasons, and Consequences*, 114 ANNALS INTERNAL MED. 325 (1991).

support underserved populations, the Notice will disproportionately hurt pregnant immigrants, immigrant children, and immigrants with behavioral health needs.

The Notice does not consider any of the harmful effects of barring certain immigrants from broad-based population health programs, standing at odds with the robust public health evidence that documents how the Programs keep communities across the country healthy. Nor does the Notice account for the longstanding reliance on the Programs or acknowledge the inevitable consequences of the Notice on individual and population health.

### a. The Notice Restricts Access to Care for Immigrant Adults.

The Notice restricts adult immigrants' access to essential physical and behavioral healthcare services. Health centers are required to deliver primary care and preventive health services to everyone in their community regardless of ability to pay or immigration status—a congressional directive the Notice ignores. 42 U.S.C. § 254b(a)(1) (requiring community health centers to serve "*all* residents of the area served by the center") (emphasis added). In 2023, health centers counted 132.5 million patient visits[3] and screened millions of patients for HIV and cancer.[4] Health centers also screen and manage patients' chronic conditions like diabetes and

---

[3] Kristine Namhee Kwon et al., *Community Health Centers Grew Through 2023, But Serious Hazards Are on the Horizon*, Policy Issue Brief #72, GEIGER GIBSON PROGRAM IN CMTY. HEALTH (Sept. 2024), https://geigergibson.publichealth.gwu.edu/72- community-health-centers-grew-through-2023-serious-hazards-are-horizon.

[4] *Impact of the Health Center Program*, HRSA HEALTH CTR. PROGRAM (updated Aug. 2025), https://bphc.hrsa.gov/about-health-center-program/impact-health-center-program.

hypertension.[5] Low-income and uninsured patients rely on health centers for routine care: 90% of health center patients have incomes below 200% of the federal poverty level (FPL), 67% are below the FPL, and 18% are uninsured.[6] Health center services can avert health problems and lessen demand for emergency services, demonstrating the long-term benefits of access to preventive and primary care services.[7]

Three in ten immigrant adults use a health center as their usual source of care.[8] Moreover, health centers often provide patients with transportation, interpretation, and translation services, which are critical to ensuring access to care for immigrants.[9] Excluding some immigrants from health centers will eliminate a trusted source of healthcare, leaving patients with nowhere else to go.

---

[5] *See, e.g.*, Leighton Ku et al., *The Value Proposition: Evidence of the Health and Economic Contributions of Community Health Centers*, Policy Issue Brief #68, GEIGER GIBSON/RCHN CMTY. HEALTH FOUND. RSCH. COLLABORATIVE, (Aug. 2022), https://geigergibson.publichealth.gwu.edu/68-value-proposition-evidence-health-and-economic-contributions-community-health-centers.

[6] *National Health Center Program Uniform Data System (UDS) Awardee Data – 2024*, HEALTH RES. & SERVS. ADMIN., https://data.hrsa.gov/topics/healthcenters/uds/overview/national (last accessed Nov. 14, 2025).

[7] Ku et al., *supra* note 5.

[8] Drishti Pillai & Samantha Artiga, *New Policy Bars Many Lawfully Present and Undocumented Immigrants from a Broad Range of Federal Health and Social Supports*, KFF (July 21, 2025), https://www.kff.org/racial-equity-and-health-policy/new-policy-bars-many-lawfully-present-and-undocumented-immigrants-from-a-broad-range-of-federal-health-and-social-supports/.

[9] *Enabling Services*, NAT'L ALL. OF CMTY. HEALTH CTRS. (July 2023), https://www.nachc.org/wp-content/uploads/2023/07/Health-Center-Enabling-Services_NACHC_July2023_2021UDS.pdf.

The Notice also restricts access to HHS-funded behavioral health programs that offer critical services, exacerbating the nation's behavioral health crisis.[10] For example, the Notice bars access to mobile crisis teams, crisis stabilization programs, 988 lines, peer supports, and supported housing programs funded by Community Mental Health Services Block Grants.[11] Untreated and undertreated mental illness and substance use disorder are each associated with poorer overall health, greater utilization of health services to treat exacerbated health conditions, and devastating long-term consequences, such as productivity losses and involvement with the criminal justice system.[12] Without access to these programs, immigrants may be left with untreated behavioral health conditions that could result in a crisis and need for immediate intervention from a first responder or in an emergency department.[13]

---

[10] Certified Community Behavioral Health Clinics provide a wide range of behavioral health services to adult community members regardless of their ability to pay, insurance status, or place of residence.

[11] *See Community Mental Health Services Block Grant*, SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN. (Apr. 24, 2023), https://www.samhsa.gov/grants/block-grants/mhbg. These grants require adults with severe mental illness to be a target population. *Id.*

[12] Heather L. Taylor et al., *Economic Burden Associated with Untreated Mental Illness in Indiana*, 4 JAMA HEALTH FORUM e233535 (2023); Erminia Fardone et al., *Economic Benefits of Substance Use Disorder Treatment: A Systematic Literature Review of Economic Evaluation Studies from 2003 to 2021*, 152 J. SUBSTANCE USE & ADDICTION TREATMENT 209084 (2023).

[13] *See* 2025 NATIONAL GUIDELINES FOR A BEHAVIORAL HEALTH COORDINATED SYSTEM OF CRISIS CARE, SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN. 47 (2025), https://988crisissystemshelp.samhsa.gov/sites/default/files/2025-04/national-guidelines-crisis-care-pep24-01-037.pdf.

b. **The Notice Denies Immigrant Children Access to Critical Preventive Care and Early Childhood Development Programs.**

The Programs are also critical to children's physical and mental wellbeing and healthy development, especially low-income immigrant children who are at greater risk of poor health outcomes. Health centers care for children in many of the nation's most underserved urban and rural communities,[14] providing preventive care like well-child check-ups, immunizations, and vision and dental screenings. In 2023, more than four million children received preventive care at a health center during 6.42 million visits.[15] Health centers are critical for screening, early childhood interventions, and supporting age-appropriate child development.[16] For example, children who receive primary care from health centers have higher rates of well-child visits, fewer preventable hospitalizations, and lower rates of emergency department use compared to children who are not health center patients.[17] Restricting immigrant

---

[14] *Impact of the Health Center Program*, HRSA HEALTH CTR. PROGRAM (Aug. 2025), https://bphc.hrsa.gov/about-health-center-program/impact-health-center-program.

[15] *2025 Uniform Data System Chartbook: Analysis of the 2023 UDS Data*, NAT'L ASS'N OF CMTY. HEALTH CTRS. (May 19, 2025), https://www.nachc.org/resource/2025-uniform-data-system-chartbook-analysis-of-the-2023-uds-data/.

[16] Sara Rosenbaum et al., *Strengthening Community Health Centers' Role in Early Childhood Development: The New Biden Administration Initiative*, Policy Issue Brief #70, GEIGER GIBSON PROGRAM IN CMTY. HEALTH (Feb. 2023), https://geigergibson.publichealth.gwu.edu/70-strengthening-community-health-centers-role-early-childhood-development-new-biden-administration.

[17] Testimony of Robert Sayoc Nocon, MHS, PhD, *Community Health Centers: Saving Lives, Saving Money*, U.S. SENATE COMM. ON HEALTH, EDUC., LAB. & PENSIONS (Mar. 2, 2024), https://www.help.senate.gov/imo/media/doc/Testimony-Nocon-CHCs%202023-0228_Final.pdf.

children's access to health centers will eliminate a key, and often the only, source of routine health services for these patients.

The Head Start Program serves as a key link to health centers and other healthcare services for children. Head Start regulations require that all children served—approximately 800,000 low-income children ages zero to five each year[18]—have a continuous source of care within 30 days of enrollment; receive vision, hearing, and developmental screenings within 45 days of enrollment; and have nutritional needs identified. *See* 45 C.F.R. § 1302.45. Compared to their non-Head Start counterparts, children in Head Start are more likely to experience better outcomes on a variety of metrics, such as high school and college completion.[19] Head Start programs must reserve ten percent of program slots for children with disabilities, ensuring they receive the special education, early intervention, or other services they need.[20] Excluding immigrant children from Head Start will deny these children access to health and developmental services that are essential to their well-being and long-term growth and development.

---

[18] *National Services Snapshot (2023-2024)*, OFF. OF HEAD START, https://headstart.gov/sites/default/files/pdf/service-snapshot-all-2023-2024.pdf (last accessed Oct. 30, 2025).
[19] Martha J. Bailey et al., *Prep School for Poor Kids: The Long-Run Impacts of Head Start on Human Capital and Economic Self-Sufficiency*, 111 AM. ECON. REV. 3963 (2021).
[20] *FAQs About the 10% Enrollment Requirement*, HEADSTART.GOV (May 29, 2025), https://headstart.gov/publication/faqs-about-10-enrollment-requirement.

    **c.  The Notice Strips Immigrants of Critical Access to Maternal and Reproductive Healthcare.**

Barring immigrants from the Health Center, Head Start, and Title X Programs will strip them of critical maternal and related health services that are foundational for healthy communities. Health centers serve one in three low-income women of reproductive age.[21] *See* 42 U.S.C. § 254b (requiring health centers to offer family planning services). Title X is the only federal program dedicated to providing people with low incomes access to affordable family planning care. *See* 42 U.S.C. § 300 *et seq.* Title X clinics provide cancer screenings, sexually transmitted infection (STI) prevention services, HIV services, and contraceptive and prenatal care. In many areas, Title X clinics are the only source of essential care,[22] such as detection or prevention of cervical cancer.[23]

---

[21] Michelle Long et al., *Women's Health Care Utilization and Costs: Findings from the 2020 KFF Women's Health Survey*, KFF (Apr. 21, 2021), https://www.kff.org/womens-health-policy/womens-health-care-utilization-and-costs-findings-from-the-2020-kff-womens-health-survey/.

[22] Managi Lord-Biggers & Amy Friedrich-Karnik, *Factsheet: Features and Benefits of the Title X Program*, GUTTMACHER INST. (Feb. 2025), https://www.guttmacher.org/fact-sheet/features-and-benefits-title-x-program.

[23] Jennifer J. Frost et al., *Publicly Supported Family Planning Services in the United States: Likely Need, Availability and Impact, 2016*, GUTTMACHER INST., 9-10 (Oct. 2019), https://www.guttmacher.org/sites/default/files/report_pdf/publicly-supported-fp-services-us-2016.pdf.

Effective family planning[24]—whether through health centers or Title X programs—is the most effective way to reduce unintended pregnancies[25] and support birth spacing, which reduces the risk of low birthweight and preterm births.[26] Family planning also reduces the risks from untreated STIs, such as infant mortality, pelvic inflammatory disease, infertility, ectopic pregnancy, and chronic pelvic pain.[27] Without access to these services, individuals are more likely to have poor health outcomes.[28]

These Programs also enable healthy pregnancies. About three-quarters of pregnant health center patients begin their care during the first trimester, which is important for ensuring healthy outcomes for both mother and child.[29] Health center

---

[24] Agustin Conde-Agudelo et al., Birth Spacing and Risk of Adverse Perinatal Outcomes: A Meta-Analysis, 295 JAMA 1809 (2006); see also Healthy People 2023 Objective FP-02: Reduce the Proportion of Pregnancies Conceived Within 18 Months of a Previous Birth, OFF. OF DISEASE PREVENTION & HEALTH PROMOTION, https://odphp.health.gov/healthypeople/objectives-and-data/browse-objectives/family-planning/reduce-proportion-pregnancies-conceived-within-18-months-previous-birth-fp-02 (last accessed Oct. 30, 2025).

[25] Am. Coll. of Obstetricians & Gynecologists, Committee Opinion No. 642: Increasing Access to Contraceptive Implants and Intrauterine Devices to Reduce Unintended Pregnancy, OBSTETRICS & GYNECOLOGY (Oct. 2015).

[26] Conde-Agudelo et al., supra note 24, at 1809; see also Preterm Birth, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 8, 2024), https://www.cdc.gov/maternal-infant-health/preterm-birth/index.html; Low Birthweight, MARCH OF DIMES (June 2021), https://www.marchofdimes.org/find-support/topics/birth/low-birthweight.

[27] Clayton Bishop, The Dangers of Undiagnosed Sexually Transmitted Infections, AM. SOC'Y OF MICROBIOLOGY (Aug. 28, 2025), https://asm.org/articles/2022/december/the-dangers-of-undiagnosed-sexually-transmitted-in; Frost et al., supra note 23, at 18.

[28] See supra note 26.

[29] Community Health Centers: Providers, Partners and Employers of Choice, 2024 Chartbook, NAT'L ASS'N OF CMTY. HEALTH CTRS. (Mar. 2023), https://www.nachc.org/wp-content/uploads/2024/07/2024-2022-UDS-DATA-Community-Health-Center-Chartbook.pdf.

patients have fewer low- or very low-weight births compared to national averages.[30] One study found that the majority of women who participated in Early Head Start while pregnant received prenatal education on fetal development (86%) and information on the benefits of breastfeeding (86%) and infant care and safe sleep practices (79%).[31] Denying pregnant immigrants access to these services will harm them and their children.

## II.    The HHS Notice Will Have a Chilling Effect on Eligible Immigrants and Citizens.

Restricting access to healthcare based on immigration status also deters eligible immigrants and U.S. citizen family members from using essential healthcare programs. There are more than four million households in the U.S. where an immigrant with legal status lives with someone with differing status.[32] Fear about the role of immigration status in accessing programs can cause patients in mixed-status families to forgo services even though they are eligible.[33] For instance, children with immigrant parents are twice as likely to be uninsured compared to those with U.S. citizen parents, even though most children in immigrant families are themselves

---

[30] *Id.*

[31] *Early Head Start Home Visiting and Support for Pregnant Women*, NAT'L HEAD START ASS'N (2022), https://nhsa.org/wp-content/uploads/2022/08/EarlyHeadStart-Home-Visiting-1.pdf.

[32] Matthew Lisiecki & Gerard Apruzzese, *Proposed 2024 Mass Deportation Program Would Socially and Economically Devastate American Families*, CTR. FOR MIGRATION STUDIES OF N.Y. (2024), https://cmsny.org/wp-content/uploads/2024/10/CMS-REPORT-Proposed-2024-Mass-Deportation-Program-Would-Socially-and-Economically-Devastate-American-Families.pdf.

[33] *See* Elizabeth Aranda & Liz Ventura Molina, *The Impacts of Florida's SB 1718 on Immigrants' Well-Being*, UNIV. OF S. FLA. IM/MIGRANT WELL-BEING RSCH. CTR. (2024), https://www.usf.edu/arts-sciences/centers/iwrc/documents/report-sb-1718-final-nov2024.pdf.

U.S. citizens.[34] When individuals do not use the services to which they are entitled, they have higher uninsured rates,[35] which can delay access to timely medical care and prescriptions.

The widespread chilling effect that followed previous policy changes provides strong evidence of the chilling effects that the Notice will have today. Notably, during the first Trump Administration, anti-immigrant rhetoric and proposed changes impacting immigration status for individuals receiving certain benefits led to "chilling effects on [] participation in noncash public benefits" among more than one-quarter of adults in low-income households with at least one foreign-born member, even among those who were not affected directly by the changes.[36] From 2016 to 2019, participation in Medicaid, Children's Health Insurance Program, and SNAP fell twice as fast among U.S. citizen children with noncitizen household members compared to those in only U.S. citizen households, due to fear and uncertainty caused by changes

---

[34] Drishti Pillai et al., *Children of Immigrants: Key Facts on Health Coverage and Care*, KFF (Jan. 215, 2025), https://www.kff.org/racial-equity-and-health-policy/children-of-immigrants-key-facts-on-health-coverage-and-care/.
[35] The Center for Law and Social Policy (CLASP), Statement for the Record, *Impact of Illegal Immigration of Social Services: Hearing Before the H. Comm. on the Judiciary, Subcomm. on Immigr. Integrity, Sec., & Enf't*, CONGRESS.GOV. (Jan. 11, 2024), https://www.congress.gov/118/meeting/house/116727/documents/HHRG-118-JU01-20240111-SD021.pdf [hereinafter "CLASP Statement"].
[36] Hamutal Bernstein et al., *Amid Confusion over the Public Charge Rule, Immigrant Families Continued Avoiding Public Benefits in 2019*, URBAN INST. (May 18, 2020), https://www.urban.org/research/publication/amid-confusion-over-public-charge-rule-immigrant-families-continued-avoiding-public-benefits-2019; Benjamin D. Sommers et al., *Assessment of Perceptions of the Public Charge Rule Among Low-Income Adults in Texas*, 3 JAMA NETWORK OPEN e2010391 (2020).

in federal policy.[37] The decline in participation was nearly the same for U.S. citizen children in mixed-status households as it was for noncitizens, demonstrating the reach of chilling effects.[38] Despite eventual reversal of these policies, the previous attempts resulted in long-lasting harms in immigrant communities, including vaccine hesitancy, food insecurity, and increased child uninsurance.[39]

The Notice is yet another attempt to weaponize health policies against the underserved communities they were designed to serve, this time by establishing new eligibility requirements for programs that Congress intended to be accessible to everyone because of their vital importance in keeping communities healthy. Research shows that immigration-related fears broadly deter immigrants from accessing healthcare services like well-child visits, regardless of an individual's legal status.[40] In one study of a Florida immigration law that required Medicaid-participating hospitals to ask prospective patients about their immigration status, approximately

---

[37] Randy Capps et al., *Anticipated "Chilling Effects" of the Public-Charge Rule Are Real: Census Data Reflect Steep Decline in Benefits Use by Immigrant Families*, MIGRATION POL'Y INST. (Dec. 2020), https://www.migrationpolicy.org/news/anticipated-chilling-effects-public-charge-rule-are-real.

[38] *Id.*

[39] Protecting Immigrant Families Coalition, *Research Documents the Harm of Past Public Charge Policies* (updated May 2023), https://pifcoalition.org/resources/library/research-documents-the-harm-of-past-public-charge-policies/.

[40] *See, e.g.*, Arturo Vargas Bustamante et al., *Avoiding Medicaid Enrollment After the Reversal of the Changes in the Public Charge Rule among Latino and Asian Immigrants*, 57 HEALTH SERVS. RSCH. 195 (2022); Stephanie Ettinger de Cuba et al., *Reduced Health Care Utilization among Young Children of Immigrants after Donald Trump's Election and Proposed Public Charge Rule*, HEALTH AFFS. SCHOLAR, Aug. 2023.

one-third of immigrants with U.S. citizenship reported increased hesitation to seek healthcare services and concerns about their ability to get medical care if needed.[41] The Notice will only intensify these well-documented chilling effects, causing harm to families across the country.[42]

## III. The Notice Will Increase Uncompensated Care Costs, Harm the Immigrant Workforce, and Weaken the Broader Economy.

Denying immigrants access to preventive and primary care does not eliminate their need for services. Instead, the burden to provide this care will shift to hospital emergency departments and to states and taxpayers who bear the cost for patients with nowhere else to go. By ignoring immigrants' reliance on the Programs and disregarding the elimination of access to integral sources of healthcare, the Notice will increase healthcare spending and strain the economy by further destabilizing the nation's immigrant workforce and stagnating consumer spending.

When immigrant adults, children, and pregnant people cannot obtain routine care in their community, hospitals will be left to care for them when they get sick. Delays in preventive care and routine treatment worsen chronic conditions, such as

---

[41] *See* Aranda & Molina, *supra* note 33.

[42] *See* Michael Fix & Jeffrey S. Passel, *Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform: 1994-97*, OFF. OF THE ASSISTANT SEC'Y FOR PLAN. & EVALUATION (Feb. 28, 1999), https://aspe.hhs.gov/basic-report/trends-noncitizens-and-citizens-use-public-benefits-following-welfare-reform-1994-97 (finding that existing PRWORA restrictions already deter eligible immigrants and U.S. citizen family members from seeking essential programs); Scarlett Sijia Wang et al., *Changes in the Public Charge Rule and Health of Mothers and Infants Enrolled in New York State's Medicaid Program, 2014-2019*, 112 AM. J. PUB. HEALTH 1747 (2022) (finding that the initial leak of a new public charge rule in 2017 was associated with a significant delay in prenatal Medicaid enrollment and a significant decrease in birth weight among their newborn babies).

diabetes, that are manageable with early intervention but require far more complex and costly care when left unaddressed.[43] Then hospitals, especially in rural and underserved areas, will be required to provide more intensive and uncompensated care, threatening their financial viability.[44]

When immigrants cannot maintain good health, they may also become too sick to work. Immigrants are essential workers across the economy, and the Notice will impact industries where immigrants have a disproportionate role, including healthcare. The Notice will worsen the existing healthcare workforce shortages, further reducing healthcare access for everyone.[45] Immigrants also provide long-term care to older adults and people with disabilities. As newly disqualified immigrants are too sick to work, more people will need to provide direct care to their loved ones, adding to the $600 billion of lost annual income due to family caregiving.[46]

Finally, when immigrants cannot receive needed healthcare services, they shift their spending priorities. They lessen their discretionary spending, resulting in losses

---

[43] *See, e.g.*, Brenda Leese, *The Costs of Diabetes and Its Complication*, 35 SOC. SCI. & MED. 1303 (1992).

[44] *See* Teresa A. Coughlin et al., *An Estimated $84.9 Billion In Uncompensated Care Was Provided In 2013; ACA Payment Cuts Could Challenge Providers*, 33 HEALTH. AFFS. 1068 (2014).

[45] Drishti Pillai & Samantha Artiga, *Employment Among Immigrants and Implications for Health and Health Care*, KFF (June 12, 2023), https://www.kff.org/racial-equity-and-health-policy/employment-among-immigrants-and-implications-for-health-and-health-care/.

[46] Susan C. Reinhard, *Valuing the Invaluable: 2023 Update Strengthening Supports for Family Caregivers*, AARP PUB. POL'Y INST. (Mar. 2023), https://www.aarp.org/content/dam/aarp/ppi/2023/3/valuing-the-invaluable-2023-update.doi.10.26419-2Fppi.00082.006.pdf.

to local economies,[47] which can have a ripple effect on the larger economy. Following

the 2019 public charge rule change, there was an estimated $24 billion loss to U.S.

GDP and more than 164,000 jobs lost across the country.[48]

The Notice will impact the health of the nation's economy due to the extensive

ripple effects of its adverse population health outcomes.

## CONCLUSION

The Court should grant Plaintiffs' Motion for Summary Judgment and

permanently enjoin Defendants from implementing the Notice.

March 6, 2026                                    Respectfully submitted,

                                                /s/ Amy R. Romero
                                                Amy R. Romero (RI Bar #8262)
                                                DeLuca, Weizenbaum, Barry & Revens,
                                                Ltd.199 North Main Street
                                                Providence, RI 02903
                                                (401) 453-1500
                                                amy@dwbrlaw.com
                                                Cooperating Counsel, Lawyers' Committee
                                                for RI

                                                Of counsel:

                                                Eric Gold
                                                Ross Margulies
                                                Alex Somodevilla
                                                Shannon Gonick
                                                Manatt, Phelps & Phillips, LLP
                                                1050 Connecticut Ave, NW, Suite 600
                                                Washington, D.C. 20036
                                                Tel: 202-585-6500

                                                *Counsel for American Public Health
                                                Association, National Center for Medical-Legal*

---

[47] CLASP Statement, *supra* note 35.
[48] *Only Wealthy Immigrants Need Apply: The Chilling Effects of "Public Charge"*,
FISCAL POL'Y INST. (Nov. 25, 2019), https://fiscalpolicy.org/publiccharge2019.

*Partnership, Robert Wood Johnson Foundation, the Jacobs Institute of Women's Health, and 65 Public Health Scholars*

## Appendix

Below are the names and titles of the 65 individual *amici* who are deans, professors, and scholars of public health, law, and policy. Individual *Amici* are acting in their individual capacity and not as representatives of their respective institutions.

### A. Public Health Deans

1. Catalanotti, Jillian, MD, MPH, FACP, Associate Dean for Clinical Public Health & Population Health Practice, Associate Professor of Medicine, Associate Professor of Health Policy and Management, Director, Internal Medicine Residency Programs, The George Washington University

2. Chandler, G. Thomas, MS, PhD, Distinguished Dean Emeritus, Arnold School of Public Health, University of South Carolina

3. El-Mohandes, Ayman, MBBCh, MD, MPH, Dean, CUNY Graduate School of Public Health & Health Policy

4. Goldman, Lynn R., MD, MPH, MS, Dean Emerita, Milken Institute School of Public Health, The George Washington University

5. Gusmano, Michael K., PhD, Iococca Chair, Professor of Health Policy, Associate Dean of Academic Affairs, College of Health, Lehigh University

6. Jeffries, Pamela R., PhD, RN, FAAN, ANEF, FSSH, Dean, Vanderbilt School of Nursing, Valere Potter Distinguished Professor of Nursing, RWJF Nurse Executive Fellow Alumna, Vanderbilt School of Nursing

7. Lu, Michael C., MD, MS, MPH, Dean, UC Berkeley School of Public Health

8. Lushniak, Boris, MD, MPH, Professor and Dean, University of Maryland School of Public Health

9. Rimer, Barbara K., DrPH, Professor Emerita, Department of Health Behavior, Dean Emerita, UNC Gillings School of Global Public Health

10. Sikkema, Kathleen J., PhD, Interim Dean, Barbara and Bruce P. Dohrenwend Professor of Sociomedical Sciences, Director of Public Mental Health, Columbia University Mailman School of Public Health

11. Thorpe, Jane, JD, Professor and Sr. Associate Dean for Academic, Student & Faculty Affairs, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

12. Vermund, Sten H., MD, PhD, Dean and Distinguished University Health Professor, College of Public Health, University of South Florida

## B.  Health Professions, Public Health, Health Law and Policy Scholars

13. Alker, Joan, MPhil, Research Professor, McCourt School of Public Policy, Georgetown University

14. Barkoff, Alison, JD, Harold and Jane Hirsh Associate Professor of Health Law and Policy, Director, Hirsh Health Law and Policy Program, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

15. Beckerman, Julia Zoe, JD, MPH, Teaching Professor & Vice Chair of Academics, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

16. Blewett, Lynn A., PhD, MA, Professor, Division of Health Policy and Management, University of Minnesota School of Public Health

17. Borden, William B., MD, FACC, FAHA, Chief Quality and Population Officer, Professor of Medicine and Health Policy, The George Washington University Medical Faculty Associates

18. Brindis, Claire D., DrPH, Distinguish Professor, Departments of Pediatrics and Obstetrics, Gynecology and Reproductive Sciences, University of California, San Francisco, Emerita Director, Philip R. Lee Institute for Health Policy Studies

19. Burroughs, Thomas E., PhD, MS, MA, Professor of Health Management & Policy, Biostatistics, and Epidemiology, College for Public Health and Social Justice, Saint Louis University

20. Byrnes, Maureen, MPA, Teaching Instructor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

21. Calhoon, Claudia, DPH, MPH, Assistant Professor of Community and Public Health, Department of Health and Human Performance, CUNY York College

22. Choi, S. Wilton, PhD, MPP, Assistant Professor, Global Health Management & Policy, San Diego State University School of Public Health

23. Cohen, Alan B., Sc.D., Research Professor (Retired), Markets, Public Policy and Law, Boston University Questrom School of Business, and Professor of Health Law, Policy and Management (Retired), Boston University School of Public Health

24. Crays, Allyson, JD, Public Health Law and Policy Analyst, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

25. Cuello, Leonardo, JD, Research Professor, Center for Children and Families, Georgetown University McCourt School of Public Policy

26. Dutta, Elizabeth Arend, DrPH, MPH, Professorial Lecturer, The George Washington University

27. Frankford, David M., JD, Professor of Law, Rutgers Law School

28. Glied, Sherry, PhD, MA, Professor, Robert F. Wagner Graduate School of Public Service, New York University

29. Goldstein, Melissa M., JD, Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

30. Heinrich, Janet, DrPH, RN, FAAN, Research Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

31. Herring, Jordan, PhD, Postdoctoral Scholar, Stanford University

32. Hoffman, Allison K., JD, William Maul Measey Professor of Law and Health Sciences, Professor of Medical Ethics & Health Policy, University of Pennsylvania Carey Law School

33. Holtz, Timothy H., MD, MPH, FACP, FACPM, RDML (ret) US PHS, Redstone Chair & Director, Sumner M. Redstone Global Center for Prevention and Wellness, Professor, Department of Global Health & Department of Epidemiology, Milken Institute School of Public Health, The George Washington University

34. Horton, Katherine, RN, MPH, JD, Research Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

35. Huberfeld, Nicole, Edward R. Utley Professor of Health Law, Co-Director, BU Program on Reproductive Justice, Chair, BU Health Law Program, Boston University School of Law and School of Public Health

36. Jacobs, Feygele, DrPH, MS, MPH, Professor and Director, Geiger Gibson Program in Community Health, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

37. Jost, Timothy Stoltzfus, JD, Professor Emeritus, Washington and Lee University School of Law

38. Ku, Leighton, PhD, MPH, Professor, Department of Health Policy and Management, Director, Center for Health Policy Research, Milken Institute School of Public Health, The George Washington University

39. Lantz, Paula, PhD, Associate Director, International Policy Center, James B. Hudak Professor of Health Policy, BA Program Director, Gerald R. Ford School of Public Policy, Professor of Health Management and Policy, University Professor of Diversity and Social Transformation, School of Public Health, University of Michigan

40. Law, Sylvia A., JD, Elizabeth K. Dollard Professor Emerita of Law, Medicine and Psychiatry, NYU Law School

41. Levi, Jeffrey, PhD, Professor Emeritus, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

42. Mariner, Wendy K., JD, LLM, MPH, Professor of Health Law, Ethics and Human Rights Emerita, Boston University School of Public Health

43. Markus, Anne R., PhD, MHS, JD, Professor and Chair, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

44. Mason, Diana J., RN, PhD, FAAN, Senior Policy Service Professor, Center for Health Policy and Media Engagement, School of Nursing, The George Washington University

45. McDonnell, Karen A., PhD, Associate Professor, Department of Prevention and Community Health, Milken Institute School of Public Health, The George Washington University

46. Michaels, David, PhD, MPH, Professor, Department of Environmental and Occupational Health, Milken Institute School of Public Health, The George Washington University

47. Murphy, Caitlin, MPP, Research Scientist, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

48. Musumeci, MaryBeth, JD, Associate Teaching Professor, Milken Institute School of Public Health, The George Washington University

49. Oberlander, Jonathan, PhD, Professor, Department of Social Medicine, Professor, Department of Health Policy & Management, University of North Carolina at Chapel Hill

50. Perreira, Krista M., PhD, Department of Social Medicine, UNC School of Medicine

51. Peterson, Mark A., PhD, Professor of Public Policy, Political Science, Health Policy and Management, and Law, UCLA Meyer and Renee Luskin School of Public Affairs

52. Pollack, Harold, PhD, Helen Ross Distinguished Services Professor, Associated Faculty, Public Health Sciences, Crown Family School of Social Work, Policy, and Practice, Administration, University of Chicago

53. Rosenbaum, Sara, JD, Professor Emerita, Health Law and Policy, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

54. Schneider, Andy, JD, Research Professor of the Practice, McCourt School of Public Policy, Georgetown University

55. Seiler, Naomi, JD, Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

56. Silberman, Pam, JD, DrPH, Professor Emerita, Director, Executive Doctoral Program in Health Leadership, Department of Health Policy and Management, UNC Gillings School of Global Public Health

57. Siminoff, Laura A., PhD, Laura H. Carnell Professor of Public Health, Department of Social and Behavioral Sciences, Temple University

58. Skinner, Daniel, PhD, Professor of Health Policy, Department of Social Medicine, Heritage College of Osteopathic Medicine, Ohio University

59. Slifkin, Becky, PhD, Professor Emerita, Department of Health Policy and Management, UNC Gillings School of Global Health

60. Sommers, Benjamin D., MD, PhD, Huntley Quelch Professor of Health Care Economics, Harvard T.H. Chan School of Public Health, Professor of Medicine, Harvard Medical School

61. Swartz, Katherine, PhD, MS, Professor of Health Policy and Management, Emerita, Harvard T.H. Chan School of Public Health, Harvard University

62. Ulrich, Michael R., JD, MPH, Associate Professor of Health Law, Ethics, & Human Rights, Boston University School of Public Health, Boston University School of Law

63. Vyas, Amita N., PhD, MHS, Professor, Director, Maternal & Child Health Program, Department of Prevention and Community Health, Milken Institute School of Public Health, The George Washington University

64. Wasserman, Alan G., MD, MACP, Eugene Meyer Emeritus Professor of Medicine, Department of Medicine, The George Washington School of Medicine and Health Sciences

65. Westmoreland, Timothy M., JD, Professor from Practice, Emeritus, Georgetown University School of Law