# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF
WASHINGTON; STATE OF RHODE ISLAND;
STATE OF ARIZONA; STATE OF CALIFORNIA;
STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE;
DISTRICT OF COLUMBIA; STATE OF
HAWAI'I; STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA; STATE OF
NEW JERSEY; STATE OF NEW MEXICO;
STATE OF OREGON; STATE OF VERMONT;
STATE OF WISCONSIN,

        Plaintiffs,

          v.

U.S. DEPARTMENT OF JUSTICE; PAMELA
BONDI, in her official capacity as ATTORNEY
GENERAL OF THE UNITED STATES; U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; ROBERT F. KENNEDY, JR., in his
official capacity as SECRETARY OF THE U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; U.S. DEPARTMENT OF
EDUCATION; LINDA McMAHON, in her official
capacity as SECRETARY OF THE U.S.
DEPARTMENT OF EDUCATION; U.S.
DEPARTMENT OF LABOR; LORI CHAVEZ-
DeREMER, in her official capacity as
SECRETARY OF THE U.S. DEPARTMENT OF
LABOR; U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT; ERIC SCOTT
TURNER, in his official capacity as SECRETARY
OF THE U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,

        Defendants.

Case No. 1:25-cv-345

**PLAINTIFF STATES' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................ 1

**ARGUMENT** ................................................................................................... 1

    I.    Plaintiffs' Claims Against DOL Are Not Moot .................................................... 1

    II.   The HHS, ED, DOL, and HUD PRWORA Notices Violated the APA's Procedural Requirements ..................................................................................... 4

    III.  The HHS, ED, DOL, and HUD PRWORA Notices Are Arbitrary and Capricious ............ 5

    IV.  The PRWORA Notices Are Contrary to Law ..................................................... 10

        A.    HHS PRWORA Notice .................................................................... 10

        B.    ED PRWORA Notice ...................................................................... 14

        C.    DOL PRWORA Notice .................................................................... 15

        D.    HUD PRWORA Notice .................................................................... 15

        E.    DOJ PRWORA Notice ..................................................................... 16

    V.   The PRWORA Notices Violate the Spending Clause .......................................... 22

        A.    The Spending Clause applies to executive agencies as well as Congress ............ 22

        B.    The PRWORA Notices impose unforeseeable post-acceptance conditions .......... 23

        C.    The PRWORA Notices are impermissibly coercive .................................... 25

    VI.  The Court Should Issue a Declaratory Judgment on the Verification Regulations........... 27

    VII. The Court Should Grant Plaintiffs' Requested Remedies ..................................... 31

**CONCLUSION** ............................................................................................... 33

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Bowater Inc.,*
313 F.3d 611 (1st Cir. 2002) ................................................................................................ 3

*Adams v. Fed. Bureau of Prisons,*
716 F. Supp. 2d 107 (D. Mass. 2010) .................................................................................. 3

*Almendarez-Torres v. United States,*
523 U.S. 224 (1998) ............................................................................................................ 28

*Ass'n of Am. Universities v. Dep't of Def.,*
806 F. Supp. 3d 79 (D. Mass. 2025) .................................................................................. 31

*Boston Bit Labs, Inc. v. Baker,*
11 F.4th 3 (1st Cir. 2021) ..................................................................................................... 2

*California v. U.S. Dep't of Educ.,*
132 F.4th 92 (1st Cir. 2025) .............................................................................................. 10

*California v. U.S. Dep't of Transp.,*
808 F. Supp. 3d 291 (D.R.I. 2025) ............................................................................... 23, 26

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) ............................................................................................................. 4

*Clay v. United States,*
537 U.S. 522 (2003) ........................................................................................................... 20

*Connectu LLC v. Zuckerberg,*
522 F.3d 82 (1st Cir. 2008) .................................................................................................. 2

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
603 U.S. 799 (2024) ........................................................................................................... 32

*Dep't of Homeland Security v. Regents of the Univ. of California,*
591 U.S. 1 (2020) .................................................................................................. 7, 8, 10, 11

*Dorsey v. United States,*
567 U.S. 260 (2012) ........................................................................................................... 14

*Fed. Bureau of Investigation v. Fikre,*
601 U.S. 234 (2024) ............................................................................................................. 3

*Fed. Trade Comm'n v. Bunte Bros.,*
  312 U.S. 349 (1941) ................................................................................................. 21

*Gailius v. I.N.S.,*
  147 F.3d 34 (1st Cir. 1998) ..................................................................................... 31

*Gundy v. United States,*
  588 U.S. 128 (2019) ........................................................................................... 17, 20

*Harrington v. Chao,*
  280 F.3d 50 (1st Cir. 2002) ..................................................................................... 31

*Harris Cnty., Texas v. Kennedy,*
  786 F. Supp. 3d 194 (D.D.C. 2025) ........................................................................ 22

*Illinois v. Fed. Emergency Mgmt. Agency,*
  801 F. Supp. 3d 75 (D.R.I. 2025)lott ........................................................................ 4

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ....................................................................................... 17, 21, 22

*Marcello v. Bonds,*
  349 U.S. 302 (1955) ................................................................................................. 14

*Massachusetts v. Nat'l Institutes of Health,*
  770 F. Supp. 3d 277 (D. Mass. 2025), *judgment entered,* No. 1:25-CV-10338, 2025 WL
  1063760 (D. Mass. Apr. 4, 2025), *and aff'd*, 164 F.4th 1 (1st Cir. 2026) ................................ 31

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,*
  763 F. Supp. 3d 36 (D.D.C. 2025) ............................................................................ 9

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ....................................................................................... 23, 25, 26

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n,*
  145 S. Ct. 2658 (2025) .............................................................................................. 32

*New Hampshire Hosp. Ass'n v. Azar,*
  887 F.3d 62 (1st Cir. 2018) ....................................................................................... 4

*New Hampshire Lottery Comm'n v. Rosen,*
  986 F.3d 38 (1st Cir. 2021) ........................................................................... 27, 28, 30

*New York v. U.S. Dep't of Health & Hum. Servs.,*
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...................................................................... 23

*Noerand v. Devos,*
  474 F. Supp. 3d 394 (D. Mass. 2020) ...................................................................... 14

*Oakley v. Devos,*
    No. 20-CV-03215-YGR, 2020 WL 3268661 (N.D. Cal. June 17, 2020) .................................. 14

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ....................................................................................................................... 24

*Rhode Island v. Trump,*
    781 F. Supp. 3d 25 (D.R.I. 2025) ....................................................................................... 10, 31

*Ry. Lab. Executives' Ass'n v. Nat'l Mediation Bd.,*
    29 F.3d 655 (D.C. Cir.)*, amended,* 38 F.3d 1224 (D.C. Cir. 1994) ......................................... 29

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ................................................................................................................... 25

*State of R.I. v. Narragansett Indian Tribe,*
    19 F.3d 685 (1st Cir. 1994) ....................................................................................................... 28

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) ..................................................................................................................... 2

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ................................................................................................................... 32

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................................................................................... 32

*Warder v. Shalala,*
    149 F.3d 73 (1st Cir. 1998) ......................................................................................................... 4

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
    586 U.S. at 9 (2018) .................................................................................................................. 18

**Federal Statutes**

5 U.S.C. § 703 ................................................................................................................................. 28

5 U.S.C. § 706 ........................................................................................................................... 31, 32

7 U.S.C. § 2015 ............................................................................................................................... 30

8 U.S.C. § 1611 ........................................................................................................... 15, 16, 19, 21, 29

8 U.S.C. § 1615 ............................................................................................................................... 21

8 U.S.C. § 1642 ......................................................................................................................... 27, 28

8 U.S.C. § 647 ................................................................................................................................. 19

20 U.S.C. § 1091 ............................................................................................................ 30

20 U.S.C. § 2301 ............................................................................................................ 15

20 U.S.C. § 2302 ............................................................................................................ 15

29 U.S.C. § 3271 ............................................................................................................ 15

42 U.S.C. § 601 .............................................................................................................. 13

42 U.S.C. §1436 ............................................................................................................. 30

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
    Pub. L. No. 104–193, § 423(c) (1996) ...................................................................... 19

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
    Pub. L. No. 104–208, § 403(a)(3)(A) ....................................................................... 19

**Federal Regulations**

45 C.F.R. § 260.31 ......................................................................................................... 13

**Federal Register Notices**

86 Fed. Reg. 26608, 26618–20 (May 14, 2021) ............................................................. 14

90 Fed. Reg. 30896 (Jul. 11, 2025) ................................................................................ 29

90 Fed. Reg. 31233–34 (Jul. 14, 2025) .......................................................................... 12

90 Fed. Reg. at 54,365 (Nov. 26, 2025) ......................................................................... 29

90 Fed. Reg. at 54364 (Nov. 26, 2025) ...................................................................... 15, 16

**Miscellaneous Authorities**

*Interpretation of "Federal Means-Tested Public Benefit" in the Pers. Resp. & Work Opportunity
    Reconciliation Act of 1996,*
    2025 WL 4055306 (O.L.C. Dec. 16, 2025) .............................................................. 21

**PRELIMINARY STATEMENT**

Defendants' opposition to Plaintiffs' Summary Judgment Motion largely rehashes arguments the Court has already rejected. Defendants still maintain that they were entitled to implement sweeping and immensely harmful changes to Plaintiff States' social safety nets with the stroke of a pen, without advance notice or input from anyone, without consideration of the havoc they would wreak, and in contravention of the text of PRWORA itself as well as the Constitution. Defendants do not meaningfully engage with the Court's prior reasoning in its comprehensive preliminary injunction opinion, instead asserting their same, tired defenses.

Defendants do now make a few welcome concessions: they no longer contest that the PRWORA Notices are final agency action reviewable under the APA; they recognize that they were required to consider reliance interests; they concede that "a 'Federal public benefit' is, logically, a program for which the recipient(s) meet some sort of eligibility criteria"; and they have abandoned any defense of their assertion that all grants to state and local government are covered by PRWORA. These concessions are reason enough to grant the Plaintiffs' motion because they alone demonstrate that the Notices are arbitrary and capricious and contrary to law, in violation of the APA. But as detailed below, Defendants' remaining arguments are also flawed, providing several additional independent grounds for the Court to grant Plaintiffs' motion. The Court should grant Plaintiffs' motion; deny Defendants' cross-motion; and issue Plaintiffs' requested relief.

**ARGUMENT**

I.      **Plaintiffs' Claims Against DOL Are Not Moot**

As Defendants note, on March 18, just a few days before filing their summary judgment response, DOL issued Training and Employment Guidance Letter No. 10–23, Change 3, which "rescind[ed]" the DOL PRWORA Notice. Defs.' Opp'n and Cross-Mot. (Opp'n) at 7 n.1; *see also*

1

Ex. 114. DOL further stated that in order "to facilitate further consideration and implementation of PRWORA requirements, and to obtain input from interested stakeholders," DOL "will engage in notice-and-comment rulemaking via publication in the *Federal Register*." Ex. 114.

Contrary to Defendants' claims, this voluntary withdrawal does not defeat this Court's jurisdiction by rendering Plaintiffs' claims moot as to DOL. *Contra* Opp'n at 7 n.1. As this Court recently held in another case, federal agency defendants' withdrawal of a challenged agency action in response to a lawsuit that could hold the agency action unlawful presents "a classic voluntary cessation scenario" that does not deprive the Court of jurisdiction to rule on the lawfulness of the action. *See* Ex. 112, Dec. 19 Hr'g Tr., *Washington v. Dep't of Hous. & Urb. Dev.*, No. 25-CV-00626-MSM (D.R.I.) at 68:16–17. As it did there, the Court should reject Defendants' mootness arguments because Defendants have not shown that the challenged aspects of the DOL PRWORA Notice will not later be restored.

"The burden of establishing mootness rests with the party urging dismissal . . . . This burden is a heavy one." *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 88 (1st Cir. 2008) (internal citations omitted). "[T]he voluntary-cessation doctrine exists to stop a scheming defendant from trying to immunize itself from suit indefinitely by unilaterally changing its behavior long enough to secure a dismissal and then backsliding when the judge is out of the picture[.]" *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021) (citation modified). "[V]oluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)); *see also Fed. Bureau of*

2

*Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (describing the voluntary cessation doctrine as a "formidable burden" for defendants).

Defendants have not met their formidable burden. As detailed in Plaintiffs' Motion, the DOL PRWORA Notice was unlawful because Defendants failed to undertake notice-and-comment rulemaking, because it was arbitrary and capricious, and because it was contrary to law and the Spending Clause of the Constitution. By withdrawing the Notice and pledging to go through notice-and-comment rulemaking, DOL has solved one of these problems—but only one. Defendants have reserved the right to issue a new DOL PRWORA notice "implement[ing] . . . PRWORA['s] requirements," which requirements they continue to misconstrue. Ex. 114; *see* Pls.' Summ. J. Mot. (SJ Mot.) 61-67. Indeed, they refused to stipulate that they would not implement the policy contained within the now-rescinded DOL Notice. *See* Third Suppl. Decl. of Jessica Ranucci ¶ 7; *see also Adams v. Bowater Inc.*, 313 F.3d 611, 615 (1st Cir. 2002) ("[W]here a defendant is unwilling to give any assurance that the conduct will not be repeated, a natural suspicion is provoked that recurrence may well be a realistic possibility."); *Adams v. Fed. Bureau of Prisons*, 716 F. Supp. 2d 107, 112 (D. Mass. 2010) (holding defendants could not carry their burden of voluntary cessation where they "have not disavowed the policy"). Meanwhile, Defendants' prior PRWORA rule—Training and Employment Guidance Letter No. 10-23, which identified certain DOL programs as "not included in the definition of 'federal public benefits'" under PRWORA, Ex. 7—apparently remains rescinded. Ex. 114. Thus, as things stand now, DOL's prior, correct interpretation of PRWORA remains withdrawn, and Defendants have "preserved [their] discretion to reapply" their new, incorrect interpretation of PRWORA in imminent rulemaking. *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 87

3

(D.R.I. 2025) (internal quotation marks omitted), *appeal docketed*, No. 25-2131 (1st Cir. Dec. 1, 2025). Plaintiffs' challenge to the DOL PRWORA Notice is thus not moot.

**II.      The HHS, ED, DOL, and HUD PRWORA Notices Violated the APA's Procedural Requirements**

As they did in opposing a preliminary injunction, Defendants insist that the Notices were immune from notice-and-comment rulemaking because they are purportedly interpretive, not substantive. But they do not meaningfully engage with the relevant factors outlined by the First Circuit in *Azar*, nor with this Court's prior analysis applying those factors. *See New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018). Instead, they offer the same arguments this Court already found wanting.

Defendants contend the Notices "do not modify or add to any legal norms," but merely reflect "pre-existing legal norm[s]." Opp'n at 17–18. But Defendants substantively reversed the eligibility requirements applicable to a host of foundational federal programs, which will strip millions of people of eligibility for programs like Head Start, Title X, and career assistance, and they do so in direct contravention of how the federal government has consistently administered these programs since PRWORA was enacted decades ago. *See* Prelim. Inj. Opp'n at 21–23; s*ee also id.* at 25. This is substantive; it literally changes the rules for millions of people. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) ("[A] substantive rule" is "one 'affecting individual rights and obligations'" such that it "may be 'binding' or have the 'force of law.'"); *cf. Warder v. Shalala*, 149 F.3d 73, 80 (1st Cir. 1998) ("[A] rule is exempt from notice and comment as an interpretative rule if it does not 'effect a substantive change in the regulations.'" (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)).

Despite the manifest substantive effects of Defendants' new rules—to the millions of people who will be stripped of eligibility and the Plaintiff States who Defendants will require to

4

restrict access or face the consequences—Defendants insist the rules are not substantive because they supposedly "do not have any independent legal effect separate and apart from the PRWORA statute." Opp'n at 20. But as this Court already found, "the Notices significantly expand the reach of the statute." Prelim. Inj. Op. at 23. For decades, HHS, ED, and HUD have administered the newly restricted programs in a manner that permitted individuals to receive benefits regardless of their immigration status. The PRWORA Notices change all that. The Notices add restrictions to federal programs that go beyond what PRWORA requires and what Defendants have required since PRWORA was first signed into law. The statute has not changed—only the agencies' policy preferences have. And these new policy preferences have massive practical effects that would affect the U.S. economy to the tune of hundreds of millions of dollars at least. SJ Mot. at 33. The fact that Defendants purport to tether these substantial changes to statutory text—wrongly, as it happens—does not immunize them from notice-and-comment requirements.

**III.      The HHS, ED, DOL, and HUD PRWORA Notices Are Arbitrary and Capricious**

In their opening brief, Plaintiffs explained that the HHS, ED, DOL, and HUD PRWORA Notices are arbitrary and capricious because they each fail to consider reliance interests, fail to consider costs, including the cost to U.S. citizens, and fail to adequately explain why the specific newly restricted programs have been redesignated as "Federal public benefits." *See* SJ Mot. at 35. In response, Defendants do not specifically address their failure to consider the cost of the PRWORA Notices, even those that will be borne by U.S. citizens. As to Plaintiffs' other arguments, Defendants respond with three broad points, none of which is persuasive.

First, Defendants contend that the PRWORA Notices cannot impose any costs or upset any reliance interests because they merely "indicate how each agency interprets the statute" and neither "require adoption of specific verification methods," nor "identify any consequences that would

5

follow failure to verify." Opp'n at 34. But it is incorrect to suggest that Defendants were not required to consider whether their new understanding of PRWORA, which dramatically expands the number of programs deemed "Federal public benefits," would impose costs and upset settled reliance interests simply because the Notices do not directly address those verification details. *See id.* That assertion cannot be squared with the Notices themselves, which acknowledge that "verification requirements are related to a practical effectuation of the prohibition set forth in § 1611(a)." *See, e.g.*, HHS PRWORA Notice at 31,237; *id.* at 31,238 (acknowledging, but underestimating, the "incremental costs of verification" it will impose).[1] Nor can it be reconciled with Defendants' opposition to Count VI, where they argue that "PRWORA's plain text" imposes verification obligations as a means of implementing its eligibility requirements. *See* Opp'n at 46. In short, unless Defendants are willing to concede that verification is never required—and that there are no penalties for offering Federal public benefits without regard to immigration status— they were required to acknowledge and meaningfully consider the impact of their decision to adopt a far broader interpretation of "Federal public benefit" on entities required to verify. And, in any event, Defendants were undoubtedly required to consider the reliance interests of the millions of individuals whose eligibility may have been affected by the Notices, which they failed to do.

Second, Defendants now concede that, under applicable Supreme Court precedent, they were required to consider reliance interests. *See* Opp'n at 35 (*Dep't of Homeland Security v. Regents of the Univ. of California,* 591 U.S. 1 (2020), "requires that agencies undertake *some* consideration of reliance interest"); *see also id.* at 34 ("[T]he agencies were . . . required to

---

[1] HHS further suggested that "all entities that are part of HHS's administration of public benefits should pay heed to the clear expressions of national policy described" in various Executive Orders emphasizing President Trump's desire to deprive noncitizens of access to public benefit programs.

evaluate how the change in interpretation could generally affect the administration of applicable programs."). Defendants nonetheless argue that, if the PRWORA Notices did impose costs and upset reliance interests, they met their obligation, "[i]n accordance with *Regents*," to "undertake *some* consideration" of those concerns, through their immediate dismissal of them as irrelevant when the text of the statute purportedly supports Defendants. *See* Opp'n at 34–35. However, nothing in *Regents* relieves Defendants from their foundational obligation under the APA to actually take reliance interests "'into account,'" regardless of the statutory text. *Dep't of Homeland Security v. Regents of the Univ. of California,* 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 212 (2016)).

Moreover, there is nothing in the record to indicate that Defendants actually considered costs and reliance interests before deciding those interests should receive "little to no weight," and Defendants do not even attempt to identify record evidence showing that ED, DOL, or HUD considered the impact of their respective notices. *See* Opp'n at 35–37. All Defendants can muster in support of their assertion that HHS considered costs and reliance interests is HHS's brief speculation—two sentences, in total—that "'[s]ome may argue that'" the HHS PRWORA Notice will upset reliance interests or "'negatively impact public health.'" *See* Opp'n at 35 (quoting HHS PRWORA Notice at 31,238). In the next breath, however, HHS dismissed these concerns as legally irrelevant, no matter their seriousness, based on its view that the newly covered programs should have always been covered by the statute. *See* HHS PRWORA Notice at 31,238. This illustrates that HHS "punt[ed] on reliance interests," Prelim. Inj. Op. at 30, not that it took these concerns "'into account.'" *Regents*, 591 U.S. at 30 (quoting *Encino Motorcars*, 579 U.S. at 212). Defendants' assertion that HHS' out-of-hand dismissal of costs and reliance interests somehow "accord[s] with *Regents*," Opp'n at 35, requires a reading of *Regents* that conflates an *outcome* the

Supreme Court acknowledged might be acceptable with the *process* it nevertheless required. *See Regents*, 591 U.S. at 32.

In support of Defendants' conclusion that they sufficiently addressed reliance interests, Defendants principally rely not on the *Regents* majority, but on Justice Thomas's *dissent* in that case, which concluded that "'reliance interests are irrelevant when assessing whether to rescind an action that the agency lacked statutory authority to take.'" *See* Opp'n at 34 (quoting *Regents*, 591 U.S. at 60 (Thomas, J., concurring in the judgment in part and dissenting in part)).[2] But dissents are not the law and, as the Court has already found, this particular dissent—and Defendants' application of it—"is unconvincing." *See* Prelim. Inj. Op. at 30.

Accepting Defendants' approach, and the PRWORA Notices they seek to justify, reduces the APA's reasoned decision-making requirement to an empty exercise.[3] The Court must avoid that outcome because, as the *Regents* majority opinion illustrates, requiring agencies to consider reliance interests before they eliminate even unlawfully issued benefits serves a substantive function. Among other things, it might cause the agency to wind down a program in a manner that will minimize harm to those who have come to rely on it. *See Regents*, 591 U.S. at 32 (observing

---

[2] On the specific point at issue here, Justice Thomas, who was joined by Justices Alito and Gorsuch, wrote in dissent. *See Regents*, 591 U.S. at 31–33 (characterizing opinion as the "lead dissent"); *id.* at 60 (Thomas, J., concurring in the judgment in part and dissenting in part) (disagreeing with "the majority").

[3] Defendants spend several paragraphs arguing that the DOJ PRWORA Notice "identified reliance interests, assessed their significance, and explained why competing considerations outweighed them." *See* Opp'n at 35. Plaintiffs have not moved for summary judgment on the basis that the DOJ PRWORA Notice is arbitrary and capricious, however, only that it is contrary to law. *See* Mot. at 70–75. The DOJ PRWORA Notice is not wholly irrelevant to Plaintiffs' arbitrary and capricious claim, however. By comparison to DOJ's minimal treatment of reliance interests, the deficient consideration of reliance interests in the HHS, ED, DOL, and HUD PRWORA Notices becomes all the more apparent. *Compare* DOJ PRWORA Notice at 32025-26, *with* Prelim. Inj. Op. at 27–32 (discussing inadequate consideration of reliance interests in HHS, ED, DOL PRWORA Notices).

that an agency's failure to consider reliance interests before terminating a program it judged to be unlawful meant that the agency failed to consider less harmful options for winding down the program). Defendants might have done that here by, for instance, delaying the effective date of the PRWORA Notices until they could issue further guidance and affected parties could attempt to prepare for the changes. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) ("Rather than taking a measured approach . . . Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision."). Their failure to do so ensured that the PRWORA Notices, published with immediate effect, have sown significant chaos and raised considerable doubts about how longstanding programs must change. *See* Prelim. Inj. Op. at 30 (rejecting Defendants' construction of *Regents* and observing that Plaintiffs' "concerns about reliance interests here are likely weightier than in *Regents*, given that some of the programs here have operated for nearly 30 years, while DACA had operated for only eight at the time of the *Regents* decision").

Third, Defendants contend that the PRWORA Notices are adequately explained because they not only "set forth each agency's interpretation of PRWORA and . . . the basis for those interpretations," but also explain "how those interpretations broadly apply to the programs each agency administers." Opp'n at 36. To the contrary, even if the PRWORA Notices' explanation of Defendants' construction of the term "Federal public benefit" were sufficient, Defendants made no effort to *apply* their interpretation to the programs they identified as newly covered by PRWORA. For instance, HHS simply stated that certain programs were now deemed "Federal public benefits" "[b]ased on the [new] interpretation of PRWORA" and "intervening developments since the promulgation of the 1998 Notice," which HHS did not identify. *See* HHS PRWORA

Notice at 31,237. Neither HHS' reliance on "conclusory statements" nor elliptical references to unidentified factors suffice to "'reasonably' explain agency action[.]" *See Rhode Island v. Trump*, 781 F. Supp. 3d 25, 46 (D.R.I. 2025), *appeal dismissed,* No. 25-1477, 2025 WL 3459538 (1st Cir. Nov. 25, 2025) (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)); *see also California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (requiring "that the agency's reasons 'must be set forth with such clarity as to be understandable'" (quoting *Sec. & Exch. Comm'n v. Chenery Corp*, 332 U.S. 194, 196 (1947)). This problem is laid bare now that Defendants have conceded that some of their primary interpretive arguments were incorrect, *see infra*, as the public (and the Court) have no way to assess which programs' designations were based on those interpretations. *See Regents*, 591 U.S. at 16 (agencies must explain their reasoning not only to be "accountable to the public," but also so that their actions are "subject to review by the courts"). The other Defendants' PRWORA Notices fare no better. *See* Mot. at 40–44.

Because Defendants cannot demonstrate that the PRWORA Notices were the subject of reasoned agency decision making, the Court should find that they are arbitrary and capricious and grant summary judgment to Plaintiffs on Count II.

## IV.      The PRWORA Notices Are Contrary to Law

### A.  HHS PRWORA Notice

1. *Generally available benefits*. Defendants now concede that PRWORA does not extend to programs that lack eligibility criteria. Contradicting their preliminary injunction briefing, as well as the HHS PRWORA Notice itself, they admit that "a 'Federal public benefit' is, logically, a program for which the recipient(s) meet some sort of eligibility criteria." Opp'n at 21. They also acknowledge that the term "eligibility unit" modifies "each of the terms individual, household, and family." *Id.* at 30. Their only remaining argument on this score is that all of the programs listed in

10

the HHS notice *do* "require the submission of an application or some other sort of qualification criteria to be met." *Id.* at 21.

That new argument is both forfeited and incorrect. It is a "foundational principle of administrative law" that an agency's decision can be upheld, if at all, only on "the grounds that the agency invoked when it took the action." *Regents*, 591 U.S. at 20 (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). The HHS PRWORA Notice did not claim that the listed programs have eligibility criteria; it argued, at some length, that no such criteria are required. *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit," 90 Fed. Reg. 31234–35 (Jul. 14, 2025) (spending thirteen full paragraphs arguing that the term "'eligibility unit' does not modify all items of the list'" and that "the word 'eligibility' [does not] suppl[y] any significant constraint in this context"); *see also* Prelim. Inj. Opp'n at 22 (arguing that "PRWORA reaches 'generally available' benefits"). Defendants therefore cannot attempt to resuscitate the Notice based on a novel justification that the agency itself never offered.

In any event, as Plaintiffs have shown, "'at most three'" of the programs listed in the HHS notice "impose limits on eligibility." Prelim. Inj. Op. at 38 (quoting ECF No. 2 at 66).[4] Indeed, Defendants themselves have already effectively conceded that some of the listed programs lack eligibility criteria. *See* Ex. 112 (Tr. of PI Hearing) at 88:23-89:6 (Defendants' counsel: "[A]ll the programs at issue here . . . have either eligibility requirements or prioritized services to specific types of individuals." The Court: "Those are two different things, right?" Defendants' counsel:

---

[4] *See, e.g.*, Ex. 27 ¶ 5 (Title X open "to all persons desiring such services"); Ex. 54 ¶ 5 (Health Centers provide care to "all residents"); Ex. 71 ¶¶ 7 ("CCBHCs are required to serve anyone who requests care for mental health or substance use."), 15 ("The MHBG is designed to meet needs anytime, anyplace, and for anyone.").

"That's right."). That admission is simply irreconcilable with Defendants' claim that all of the programs have eligibility requirements, Opp'n at 21, and Defendants offer nothing but bare assertion to respond to Plaintiffs' showing to the contrary.

2. *Grants to state or local governments*. Defendants have likewise abandoned any defense of HHS's claim that all grants to state and local government are covered by PRWORA. They now claim only that "an *alien* who is not a qualified alien is not entitled to receive HHS grants." Opp'n at 21 (emphasis added). That is a stark departure from the position HHS took in its Notice, which argued at some length that the statute "does not distinguish between grants 'to individuals' and grants 'provided to states or localities.'" 90 Fed. Reg. at 31233–34. But it is a welcome concession nonetheless, and one that this Court has already concluded is compelled by the statutory text. *See* Prelim. Inj. Op. at 40 (concluding that "block grants to the states are not covered" by PRWORA). It follows that HHS's attempt to sweep numerous block grants into PRWORA is, by the agency's own admission, unlawful.

3. *Non-postsecondary educational benefits*. Defendants also fail to refute Plaintiffs' showing that non-postsecondary educational benefits, including Head Start, do not fall within the scope of PRWORA. They merely repeat, without material change, their preliminary injunction-stage argument that Head Start is subject to the statute because it is "'similar' to 'welfare benefits.'" Opp'n at 22 (quoting 90 Fed. Reg. at 31236). This Court has already rejected that argument, Prelim. Inj. Op. at 38–39, and it remains without merit. As Plaintiffs have explained, Congress made the deliberate choice to exclude non-postsecondary educational benefits such as Head Start from the statute. Mot. at 50–52. Defendants' contention that the term "welfare" is broad enough to include any "services that help children," Opp'n at 22, would negate that clear choice.

12

It would also "render another item in the list, 'postsecondary education,' meaningless," Prelim. Inj. Op. at 39. Under basic principles of statutory construction, "[t]hat cannot be." *Id.*

Further, even taken on its own terms, Defendants' understanding of "welfare" is untenably broad. PRWORA elsewhere uses the term "welfare" to refer exclusively to cash benefits. *See* Mot. at 52 (listing examples). The sole statutory provision Defendants cite to support their alternative construction (Opp'n at 23) does not use the word "welfare" at all. *See* 42 U.S.C. § 601; *see also* 45 C.F.R. § 260.31 (similarly not using this term). And a website issued by one HHS sub-component, decades after PRWORA's enactment, that uses the distinct phrase "child welfare," *see* Opp'n at 22 (citing Administration for Children & Families, *Child Welfare*, https://acf.gov/acf_issues/child_welfare), has no bearing on how Congress used the term "welfare" in PRWORA.

4. *Programs excluded by subsequent statutes.* Defendants make only a fleeting attempt to dispute that Congress exempted the Health Center Program and Head Start from PRWORA. As Defendants admit, after the enactment of PRWORA, Congress enacted statutes requiring that the Health Center Program be open to "*all* residents within" a given area, and that individuals "*shall* be eligible for participation" in Head Start if they are homeless or have low incomes. Opp'n at 24 (quoting 42 U.S.C. §§ 254(a)(1)-(2), 9840(a)(1)(B)(i)-(ii)). Those mandatory directives are irreconcilable with a requirement that individuals be excluded from those programs unless they are "qualified aliens." Mot. at 57–58. As the "later-in-time" and more "specific" enactments, those statutes thus take precedence over PRWORA. Prelim. Inj. Op. at 42 (reaching this conclusion as to the Health Center Program and reserving decision on Head Start).

Defendants argue that these statutes are not specific enough because they do not "include language specifically requiring aliens to receive benefits." Opp'n at 24. But Congress need not use

13

"magical passwords" to exempt a later statute from the scope of an earlier one. *Marcello v. Bonds*, 349 U.S. 302, 310 (1955); *see Dorsey v. United States*, 567 U.S. 260, 274–75 (2012). And both courts and the government itself have already concluded that a statute may override PRWORA without mentioning noncitizens at all. *See Noerand v. Devos*, 474 F. Supp. 3d 394, 398, 403 (D. Mass. 2020) (concluding that the CARES Act took precedence over PRWORA because it made benefits available to "all students"); *Oakley v. Devos*, No. 20-CV-03215-YGR, 2020 WL 3268661, at *15–16 (N.D. Cal. June 17, 2020) (same); Eligibility To Receive Emergency Financial Aid Grants to Students Under the Higher Education Emergency Relief Programs, 86 Fed. Reg. 26608, 26618–20 (May 14, 2021) (agreeing with this position).[5] It is enough that the "fair implication" of the later statutes is that Congress wished their eligibility criteria to supersede PRWORA's, *Dorsey*, 567 U.S. at 275, and that is the case for both the Health Center and Head Start statutes.

### B. ED PRWORA Notice

As to the ED PRWORA Notice, Defendants offer no meaningful response to either this Court's Preliminary Injunction opinion or Plaintiffs' Motion. Instead, they repeat—almost verbatim—the arguments they made at the Preliminary Injunction stage. *Compare* Opp'n at 25-28, *with* Prelim. Inj. Opp'n at 16–19. The Court has already rejected those arguments, *see* Prelim. Inj. Op. at 42–44, and Defendants grapple with none of the flaws both this Court and Plaintiffs have identified. Among other things, they do not explain how extending PRWORA to non-postsecondary education benefits is consistent with Congress's deliberate decision to exclude

---

[5] Defendants misunderstand Plaintiffs' summary judgment motion in claiming that Plaintiffs believe the HHS Notice extended PRWORA to CARES Act benefits; there is no dispute that it did not. *Compare* Mot. at 56 *with* Opp'n at 24 n.4.

such benefits from the statute. *See* Prelim. Inj. Opp'n at 38–39, 43; Mot. at 58–60. They do not explain how Workforce Innovation and Opportunity Act, Title II (WIOA II) and Strengthening Career and Technical Education for the 21st Century Act (Perkins V)—statutes designed, respectively, to provide training "below the postsecondary level," 29 U.S.C. § 3271(3), or at the "secondary" level, 20 U.S.C. §§ 2301, 2302(5)—could fall within a statute that is limited to "postsecondary education . . . benefits." 8 U.S.C. § 1611(c)(1)(B); *see* Prelim. Inj. Op. at 43-44; Mot. at 60. Nor do they address this Court's conclusion that Perkins V is likely exempt from PRWORA because it lacks eligibility criteria, which Defendants now concede is a statutory prerequisite for PRWORA to be applicable. Prelim. Inj. Op. at 44; Mot. at 60; *see supra* pp. 10–12; *see also* Ex. 30 ¶ 22 (Perkins V is "open to all students who wish to enroll"). Defendants thus give no reason for this Court to depart from its preliminary determination that the ED PRWORA Notice is unlawful.

### C. DOL PRWORA Notice

For the reasons explained in Plaintiffs' opening brief, the DOL Notice is contrary to law. Mot. at 61–77. Defendants do not respond to any of these arguments, instead relying on their incorrect assertion that Plaintiffs' claims against DOL are moot. Opp'n at 7 n.1.

### D. HUD PRWORA Notice

The HUD PRWORA Notice is unlawful for many of the same reasons as the HHS and ED PRWORA Notices. The HUD Notice claims that *all* grants are covered by PRWORA, even if they are provided to states or localities rather than individuals. Personal Responsibility and Work Opportunity Reconciliation Act, 90 Fed. Reg. at 54364 (Nov, 26, 2025). And, like the HHS and ED Notices, it applies PRWORA to programs that lack eligibility criteria. *See* Mot. at 68 (listing examples). As noted above, Defendants now concede that both of those interpretations are incorrect: they admit that grants are only covered by PRWORA if they are provided to "an *alien*

who is not a qualified alien," Opp'n at 21 (emphasis added), and that PRWORA is limited to programs "for which the recipient(s) meet some sort of eligibility criteria," *id.*; *see* Prelim. Inj. Opp'n at 30 (similar). It follows that HUD acted unlawfully by including in its list numerous block grants to states and programs that are generally available to the public. *See* Mot. at 68.

What is more, HUD erred by including programs on its list merely because it believed they provided benefits "*related to* public or assisted housing." Personal Responsibility and Work Opportunity Reconciliation Act, 90 Fed. Reg. at 54364 (Nov, 26, 2025) (emphasis added). That phrase appears nowhere in PRWORA, which is limited to "public or assisted housing" itself, and which uses the phrase "related to" in other provisions but conspicuously omits it from Section 1611(c)(1)(B). 8 U.S.C. § 1611(c)(1)(B); *see* Mot. at 68–69. Defendants' brief only confirms that engrafting a "related to" standard onto PRWORA deprives the statute of any limiting principle. By their lights, "childcare, employment, substance abuse, and counseling services" are all "related to . . . housing benefits." Opp'n at 30. It is unclear what links these programs with housing other than Defendants' desire to give PRWORA as broad a scope as possible. And if this boundless reading were accepted, it is difficult to identify which benefits would *not* fall within the statute's scope. The Court should reject Defendants' novel interpretation and hold that the PRWORA Notice is unlawful because it is infected by this legal error, as well.

### E. DOJ PRWORA Notice

The DOJ PRWORA Notice is contrary to law because the Attorney General acted far outside the scope of the discretion Congress conferred on her by effectively excising the Life/Safety Exception from the statute. Congress authorized the Attorney General to "specif[y] . . . which" programs meet the three criteria listed in Section 1611(b)(1)(D). Instead, she refused to exempt programs from the statute *regardless* of whether they meet the listed criteria. As

16

Plaintiffs have explained, that extravagant claim of authority defies the plain meaning of the phrase "specif[y] . . . which." Mot. at 70–71. It is inconsistent with the Supreme Court's interpretation of a comparable statutory provision in *Gundy v. United States*, 588 U.S. 128 (2019). *See* Mot. at 71–73. And it would raise grave concerns under the Spending Clause, as it would subject States to massive and unforeseeable post-acceptance changes in the terms of their funding agreements whenever the Attorney General, at their whim, decided to switch off the Life/Safety Exception in its entirety. *See id.* at 74.

Defendants' principal response is not to engage with the merits, but to attempt to evade review by claiming that Defendants challenge a decision "committed to agency discretion by law." Opp'n at 14 (quoting 5 U.S.C. § 701(a)(2)). That gambit is meritless. The gravamen of Plaintiffs' claim is that the Attorney General *exceeded* the discretion conferred on her—that is, that the Attorney General was not "committed" with "discretion" to refuse to exempt programs from PRWORA regardless of whether they meet the statutory criteria. In other words, while the Attorney General had discretion *how* to apply the statute, she did not have discretion *whether* to apply the statute. Denying Plaintiffs an opportunity to raise that claim on the ground that the Attorney General's decision was "committed to agency discretion" would beg the answer to the very question that Plaintiffs pose. Unsurprisingly, the Supreme Court has repeatedly made clear that the APA does not preclude review for claims that executive officers exceeded the scope of their discretion set by statute. *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (when a statute "delegates discretionary authority to an agency, the role of the reviewing court under the APA" is to "fix the boundaries of the delegated authority" and ensure the agency has acted "within those boundaries" (citation modified)); *Weyerhaeuser Co. v. U.S. Fish & Wildlife*

17

*Serv.*, 586 U.S. at 9, 23–24 (2018) (APA does not preclude review for claims that "the agency did not properly justify its determination under [the] standard set forth in the statute").

When Defendants finally turn to the merits, they do not grapple with either the plain meaning of the terms "specif[y] . . . which" or the constitutional problems with their interpretation. Rather, they focus almost exclusively on the clause granting the Attorney General "discretion." Opp'n at 30–31. But as Plaintiffs have explained—and Defendants do not dispute—that phrase is a subordinate clause modifying the word "specified." Mot. at 74–75. Under ordinary rules of grammar, it therefore simply gives the Attorney General discretion to "name specifically" which programs meet the listed criteria. Webster's New Universal Unabridged Dictionary 1832 (2ed. 1996). Defendants cannot decouple this phrase from its grammatical mooring and assert that it gives the Attorney General discretion to exempt or refuse to exempt programs for whatever reason she wishes, regardless of whether they meet the listed criteria. By analogy, if the rules for entry into a student honor society stated that school administrators should "specify, in their sole and unreviewable discretion, which students (i) are individuals in good standing at the university, (ii) have no major disciplinary infractions, and (iii) have exhibited academic distinction," there would be no doubt that the administrators could not admit or decline to admit students for reasons other than the three criteria—much less decline to admit anyone regardless of those criteria. Just like here, their sole charge would be to identify, using their discretion, which students met the criteria that the rules specify.

This conclusion draws further support from related statutory provisions that use the phrase "specified by the Attorney General," all of which give the Attorney General a limited responsibility to apply a general set of instructions to specific circumstances. In Section 423 of PRWORA, for instance, Congress stated that a provision requiring affidavits of support for noncitizens "shall

18

apply to affidavits of support executed on or after a date specified by the Attorney General, which date shall be not earlier than 60 days (and not later than 90 days) after the date the Attorney General formulates the form for such affidavits under subsection (b) of such section." Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104–193, § 423(c) (1996) (codified at 8 U.S.C. § 1183a note). Similarly, in the Illegal Immigration Reform and Immigrant Responsibility Act—a statute closely related to PRWORA and enacted just over one month later—Congress left several minor and technical details of the statutory scheme to be "specified by the Attorney General." *See, e.g.*, PRWORA, Pub. L. No. 104–208, § 403(a)(3)(A) (requiring use of an employment verification system "by not later than the end of 3 working days (as specified by the Attorney General) after the date of hiring"); *id.* § 403(b)(4)(A) (referring to a person "that elects, in a manner specified by the Attorney General consistent with subparagraph (B), to participate in the pilot program under this paragraph"); *id.* § 647(d) (requiring an application to be submitted "in a form and manner specified by the Attorney General"). By contrast, Defendants have not identified any provision that uses the phrase "specified by" to confer authority to *decline* to specify programs regardless of whether they meet the criteria Congress set out.

Defendants contend that, had Congress intended to give the Attorney General a duty to exempt programs that meet the specified criteria, it would have introduced this phrase with the words "[t]he Attorney General shall." Opp'n at 31. But as these examples indicate, Congress often assigns responsibilities by stating that certain details will be "specified by" or "determined by" a given officer. *See also, e.g.*, 8 U.S.C. § 1611(b)(3)–(4) (exempting certain noncitizens who are "lawfully present in the United States as determined by the Attorney General"); *id.* § 1611(c)(2)(B) (exempting noncitizens "qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Attorney General,

19

after consultation with the Secretary of States"); *Clay v. United States*, 537 U.S. 522, 532 (2003) ("that the presence of a phrase in one provision and its absence in another reveals Congress' design . . . grows weaker with each difference in the formulation of the provisions under inspection" (quoting *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435–36 (2002))).

*Gundy* strongly reinforces Plaintiffs' interpretation. As Defendants do not dispute, that case considered a textually similar—if anything, more open-ended—use of the word "specify," and rejected an argument almost identical to the one Defendants press here. *Compare Gundy*, 588 U.S. at 144 (holding that the phrase "'specify the applicability' . . . does not mean 'specify *whether* to apply SORNA' to pre-Act offenders"), *with* Opp'n at 32 (arguing in favor of "reading 'specif[y]' . . . as 'specify *whether*' . . . to extend access to Federal public benefits to unqualified aliens") (italics in originals). Defendants claim that the Supreme Court rested this interpretation almost exclusively on the statute's statement of "purpose." Opp'n at 31–32. To the contrary, the Court applied ordinary principles of statutory interpretation and looked at the "statutory scheme" as a whole. *Gundy*, 588 U.S. at 141 (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)). That included not just the statute's "declaration of purpose," *Gundy*, 588 U.S. at 141–42, but also its structure, *id.* at 142–43, the "legislative history," *id.* at 143–44, the "rest of the section th[e] phrase [wa]s in," *id.* at 144, and the fact that "no Attorney General has used (or, apparently, thought to use) [the provision] in a more expansive way," *id.* at 144–45.

Defendants do not contest that most of these indicia of meaning weigh in favor of reading the statute as Plaintiffs propose. *See* Mot. at 72–73. They contend only that the statute's "purpose" of promoting "self-sufficiency" would be better served by giving the Attorney General *carte blanche* to deny noncitizens benefits that are "necessary for the protection of life or safety."

20

Opp'n at 36; 8 U.S.C. § 1611(b)(1)(D). But it is facially implausible (and profoundly cruel) to suggest that Congress wanted noncitizens to either be "self-sufficient" or else risk death or personal injury. On the contrary, PRWORA is shot through with provisions making clear that Congress sought to ensure that even noncitizens who are not "qualified aliens" can receive life-saving services. *See, e.g.*, 8 U.S.C. §§ 1611(b)(1)(A), (B), (C), 1615(a). Indeed, as DOJ's Office of Legal Counsel recently acknowledged, the fact that the Life/Safety Exception itself is repeated five times throughout PRWORA "reflect[s] Congress's overriding concern that critical services 'necessary for the protection of life or safety' be clearly excepted from PRWORA's otherwise broad restrictions on benefits for aliens." *Interpretation of "Federal Means-Tested Public Benefit" in the Pers. Resp. & Work Opportunity Reconciliation Act of 1996*, 2025 WL 4055306, at *10 (O.L.C. Dec. 16, 2025). Reading the Life/Safety Exception to allow the Attorney General to withhold life-saving services from noncitizens would flout, not promote, that "overriding" congressional purpose.

Finally, *Loper Bright* only hurts Defendants' case. Defendants admit that "[n]o Attorney General before now" has claimed the authority DOJ now asserts. Opp'n at 32 (quoting Mot. at 73). Under *Loper Bright*, that longstanding, consistent, and contemporaneous construction of the statute is entitled to "very great respect," 603 U.S. at 386—particularly as it involves the Executive's refusal to adopt an interpretation that would have *expanded* executive authority. *See Fed. Trade Comm'n v. Bunte Bros*., 312 U.S. 349, 352 (1941) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred."). And although *Loper Bright* acknowledged that Congress may "delegate[] discretionary authority to an agency," the Court

21

emphasized that the court's first task when confronting such a delegation is to "fix the boundaries of the delegated authority" and ensure that the agency has acted "within those boundaries." 603 U.S. at 395 (citation modified). Here, the Attorney General has acted far outside the boundaries of the discretion Congress afforded her: to "specif[y] . . . which" services meet the criteria listed in Section 1611(b)(1)(D). The DOJ PRWORA Notice is therefore unlawful.

## V.     The PRWORA Notices Violate the Spending Clause

As this Court concluded in its preliminary injunction ruling, the PRWORA Notices also violate the Constitution's Spending Clause because the agencies introduced "post-acceptance change[s]" on the conditions of federal funding and "imposed conditions that function as coercive ultimatums." Prelim. Inj. Op. at 47–48. Defendants offer almost nothing new in response to this ruling; they largely just recycle the same arguments this Court considered and rejected months ago. *Compare* Opp'n at 37–44, *with* Prelim. Inj. Opp'n at 28–33. Those arguments remain incorrect, and the few new points that Defendants offer are uniformly without merit.

### A. The Spending Clause applies to executive agencies as well as Congress

Defendants start by offering the novel theory that the Spending Clause has no application to the Executive Branch at all. In their view, while *Congress* cannot impose retroactive funding conditions on states or coerce them into accepting federal funding conditions, *executive agencies* are free to violate those constitutional limits at will. *See* Opp'n at 38. Defendants offer neither reasoning nor precedent to support this conclusion. Their sole support, such as it is, is dicta from an out-of-circuit district court opining that this issue was "unclear" because the court was "not aware of any cases that have extended Spending Clause doctrines to the Executive Branch," but nonetheless declining to address the question because "the government did not dispute" that the Spending Clause applied to the Executive. *Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 212 (D.D.C. 2025).

In fact, as Plaintiffs have pointed out, multiple courts—including in this District—have held that the Spending Clause applies to the Executive Branch and have invalidated executive actions on that basis. *See, e.g.*, *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 311 (D.R.I. 2025) (holding that a grant condition imposed by the Department of Homeland Security "blatantly violates the Spending Clause"); *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019) (holding that an HHS rule violated the Spending Clause). And the basic logic of our Constitution dictates that these cases are correct. Outside of a few narrow areas of inherent executive authority, the Executive Branch may only act pursuant to a valid delegation of authority by Congress. If Congress cannot violate the Spending Clause, it assuredly cannot grant the Executive authority to do so, either. And that is particularly so given that the limits on the Spending Clause derive in substantial part from the Tenth Amendment, which the Executive no less than Congress is bound to respect. *See Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 577–78 (2012) (plurality opinion).

**B. The PRWORA Notices impose unforeseeable post-acceptance conditions**

Defendants do not dispute that they have dramatically reversed their prior positions on the scope of PRWORA, both by abrogating their long-settled understandings of the statute and by repealing their longstanding regulatory exemptions. Nor do Defendants dispute that, as a result of these changed positions, States will need to substantially alter their administration of dozens of previously accepted grants in order to continue receiving federal funds. It follows that Defendants have "surprise[d] participating States" with an impermissible "post-acceptance . . . condition[]": no state official accepting grant funding prior to the PRWORA Notices could reasonably have foreseen that Defendants would suddenly say the statute means the opposite of what they had said for decades, or that DOJ would retract exemptions in place since the day after the statute's

23

enactment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981); *see* Prelim. Inj. Op. at 47–48; Mot. at 76–78.

Defendants nonetheless contend that "the text of the statute itself" provided Plaintiffs with "fair notice" of the interpretations in the HHS, ED, DOL, and HUD PRWORA Notices. Opp'n at 40. As an initial matter, Defendants admit that this argument depends on the proposition that Defendants' statutory arguments are not just correct, but that they are "explicit[ly]" and "unambiguous[ly]" so, *id.*—a hurdle that Defendants cannot clear. *See supra* pp. 10–22. But even if Defendants somehow had the better of the statutory arguments, it does not follow that States had fair notice that the agencies would do a 180 on their consistent, settled, published interpretations of PRWORA. As the Supreme Court has noted in similar circumstances, "[it] strains credulity to argue that participating States should have known of their 'obligations' under [a statute] when . . . the governmental agency responsible for the administration of the Act . . . has never understood [it] to impose [the] conditions" it now claims. *Pennhurst*, 451 U.S. at 25. So too here, it blinks reality to imagine that the States "knew" the agencies were publicly misinterpreting PRWORA for nearly thirty years.

Defendants' "fair notice" argument makes even less sense as to DOJ. They claim that Plaintiffs were on clear notice that DOJ could revoke all of its exemptions at a moment's notice because PRWORA allegedly gave it the legal authority to do so. Opp'n at 40–41. But no prior Attorney General had ever claimed to possess that sweeping legal authority, and the statute does not grant it. *See supra* pp. 16–22. And even if it did, this argument proves far too much: If the existence of legal authority to change grant terms were sufficient to eliminate retroactivity objections under the Spending Clause, then the constitutional constraint would never come into play. Furthermore, the Supreme Court rejected a similar argument in *NFIB*. There, much like here,

24

the federal government argued that States were on notice of any changes to Medicaid because the statute includes a provision "expressly reserving '[t]he right to alter, amend, or repeal any provision' of that statute." *NFIB*, 567 U.S. at 583 (quoting 42 U.S.C. § 1304). The Court disagreed, explaining that "[a] State could hardly anticipate" that Congress would use this power to "dramatically" "transform" the Medicaid program. *Id.* at 584. The same holds here: no State could reasonably be charged with anticipating that the Attorney General would use never-before-claimed discretionary authority under PRWORA to revoke all exemptions, and to dramatically enlarge the States' obligations.

### C. The PRWORA Notices are impermissibly coercive

The PRWORA Notices are also unconstitutionally coercive. The financial threat attached to compliance with these Notices is overwhelming: States must conform their practices to the PRWORA Notices in order to continue receiving funding for dozens of programs, which together amount to billions of dollars in funding.[6] But Plaintiffs have introduced a mountain of unrebutted evidence showing that compliance with the Notice would compel States to dramatically restructure or shutter many of their social services programs—including by effectively compelling States and their subgrantees to stop operating programs that cannot feasibly implement a verification system, and by requiring many other programs to transform their operations in ways that would slash enrollment or render them inaccessible to large numbers of eligible individuals.

Defendants argue that this financial threat is too mild to cross the line from pressure to coercion, analogizing this case to *South Dakota v. Dole*, 483 U.S. 203 (1987). Opp'n at 42. But

---

[6] *See, e.g.*, Congressional Research Service, *Labor, Health and Human Services, and Education: FY2024 Appropriations* (Nov. 4, 2024), https://www.congress.gov/crs_external_prod ucts/R/PDF/R47936/R47936.7.pdf, at 36–38 ($12 billion for Head Start, $286 million for Title X, $1.9 billion for the Substance Use Prevention, Treatment, and Recovery Services Block Grant).

unlike in *Dole*, where the challenged condition was tied to receipt of only 5% of a state's funding under one federal program, a State that disregards PRWORA stands to lose "*all* of" the funding for *dozens* of federal programs. *NFIB*, 567 U.S. at 581. It is fantasy to suggest that the States could opt out of dozens of vital federal programs.

Defendants also suggest, in passing, that the massive changes required by the PRWORA Notices are not significant enough to satisfy the coercion test. Opp'n at 43–44. But their sole support for that claim is a vague assertion that the Notices "do not outline specific verification methods," and that some costless verification method may exist. *Id.* It is not clear on what basis Defendants believe that States could implement massive verification programs with no cost. Regardless, the transformations required by the PRWORA Notices come from the requirement to verify eligibility for the newly covered programs *at all*. Requiring beneficiaries of soup kitchens, suicide hotlines, homeless shelters, domestic violence services, and mental health crisis clinics to produce proof of immigration status will render those programs inoperable. The Notices therefore will not merely "narrow the scope of who may access the programs at issue," Opp'n at 43; they will pose an existential threat to the programs themselves.

Finally, there is no basis for Defendants' claim that the coercion analysis does not apply to funding conditions that "existed at the time the states accepted the funding." Opp'n at 42. This novel rule would collapse the retroactivity and coercion inquiries into a single test, given that the retroactivity inquiry already bars post-acceptance changes to federal funding conditions. And the sole case Defendants cite as authority actually refutes their claim: in *NFIB*, the Court struck down on coercion grounds a condition on what it conceived of as "a new program" that the States had not yet begun to administer. 567 U.S. at 582; *see California*, 808 F. Supp. 3d at 311 (McConnell, C.J.) (deeming condition on receipt of new funding "blatantly" unconstitutional

26

because the government "expressly inserted" the term "to coerce States into cooperating with federal civil immigration enforcement").

**VI.        The Court Should Issue a Declaratory Judgment on the Verification Regulations**

Defendants concede that, in 8 U.S.C. § 1642(a)(3), Congress "expressly" "impose[d]" on the Attorney General the "obligation[]" to promulgate verification regulations relating to States. Opp'n at 31. They also concede that "a regulation under § 1642(a) has never been promulgated." Opp'n at 5. And Defendants do not even contest the plain meaning of 8 U.S.C. § 1642(b). As Plaintiffs explained, that provision—which requires States to "have in effect a verification system that complies with the regulations . . . [n]ot later than 24 months after the date the regulations . . . are adopted"—imposes an obligation on the States to have a compliant verification system only after the not-yet-promulgated regulations are adopted and two additional years have passed. *See* Mot. at 81–83 (Plaintiffs' unrebutted explanation of plain meaning, consistent DOJ prior interpretation, interpretation by reviewing courts, and fit within the statutory scheme).

Defendants instead assert that Plaintiffs' request for a declaratory judgment is "procedurally . . . unfounded" because "the Declaratory Judgment Act does not constitute a valid, independent cause of action." Opp'n at 44–45, 46. But Plaintiffs' Count VI is brought under both the Declaratory Judgment Act and the APA, which provides a substantive cause of action. Third Am. Compl. ¶ 256 (bringing claim "[p]ursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201"). And the First Circuit has recognized that "actions under the Declaratory Judgment Act and the APA can be maintained together," and that it may be proper to grant "the remedy provided by the Declaratory Judgment Act" in the first instance rather than deciding whether an APA remedy is appropriate on a declaratory judgment claim. *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 62 (1st Cir. 2021). So too, here. A declaratory judgment is a proper remedy under

either the Declaratory Judgment Act or the APA, as the APA itself specifically contemplates declaratory relief. 5 U.S.C. § 703. The Court may thus issue a declaratory judgment pursuant to the Declaratory Judgment Act, or under the APA; either (or both) would permit Plaintiffs' requested relief.[7]

Next, Defendants implausibly claim that "PRWORA's plain text" stands on their side and against Plaintiffs' reading of the statute. Opp'n at 46. But missing from their argument is any text of PRWORA relating to States or verification at all. The only statutory text Defendants point to is a provision regarding an individual alien's eligibility for benefits, *id.* (quoting 8 U.S.C. § 1611(a)) ("an alien who is not a qualified alien . . . is not eligible for any Federal public benefit"), and a provision regarding PRWORA's general purpose, *id.* (citing 8 U.S.C. § 1601). However, PRWORA has a specific provision titled "Verification of eligibility for Federal public benefits," with a subsection titled "State compliance," setting forth the States' verification obligation. 8 U.S.C. § 1642(b). And that section imposes an obligation for States to verify immigration status only after verification regulations are adopted and two years have elapsed. Mot. at 81–83; *see also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (explaining that "the title of a statute

---

[7] With respect to the declaratory judgment's scope, *see* Opp'n at 44–45 n.5, Plaintiffs seek a declaratory judgment only as to programs affected by the PRWORA Notices—that is, programs newly identified in the Notices as Federal public benefits or those deemed no longer subject to an exception, *see* Third Am. Compl. ¶¶ 71, 96, 256. The Court should declare that Plaintiff States are not required to undertake verification for these programs because the Attorney General has not promulgated the regulations described in 8 U.S.C. § 1642(a). *See id.* This declaratory judgment is directly "relevant" to the PRWORA Notices, which are the final agency action challenged under the APA, *contra* Opp'n at 45; *see also N.H. Lottery Comm'n*, 986 F.3d at 62 (scope of declaratory judgment appropriate if it is "responsive to the pleadings and issues presented" (quotations omitted)). A declaratory judgment on this claim would serve one of the primary purposes of the declaratory judgment: to "clarify legal relationships so that plaintiffs (and possibly defendants) could make responsible decisions about the future." *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 693 (1st Cir. 1994).

28

and the heading of a section are tools available for" statutory interpretation (quotations omitted)). Again, that has not happened yet.

Defendants have it backwards when they claim that "absent an explicit statutory exemption, the States are required to verify eligibility." Opp'n at 47. Absent an explicit statutory obligation, States are not required to verify eligibility. *Ry. Lab. Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir.), *amended,* 38 F.3d 1224 (D.C. Cir. 1994) ("Were courts to *presume*" a statutory obligation "absent an express *withholding*" of such obligation, "agencies would enjoy virtually limitless hegemony").

Defendants' fixation on the idea that the Notices do not direct States to undertake "any particular verification methods," Opp'n at 45, is beside the point. Defendants do not dispute that their position, both within and without the Notices, is that PRWORA requires States to undertake verification for each of the programs they have designated as "Federal public benefits." *See, e.g.*, Opp'n at 39 (asserting that "any government entity administering a 'Federal public benefit' as defined in 8 U.S.C. §1611 must verify the recipient is of a qualifying immigration status"); Opp'n at 45 (asserting that States must "verify program applicant eligibility"); Clarification of Federal Public Benefits under the Personal Responsibility and Work Opportunity Reconciliation Act, 90 Fed. Reg. at 30,896 (Jul. 11, 2025) (("[P]roviders are required to verify eligibility in order to comply with PRWORA," with no exceptions for states); Personal Responsibility and Work Opportunity Reconciliation Act, 90 Fed. Reg. at 54,365 (Nov, 26, 2025) (indicating "States and government actors" are required to verify). As the Court has recognized, Defendants have also maintained their authority to take enforcement action against the States. *See* Prelim. Inj. Op. at 53 ("[T]he Government has explained that it maintains the authority to enforce [the Notices] against

29

the States.").[8] And Defendants have asserted authority to condition billions of dollars of funding to States on compliance with "verification requirements that apply under" PRWORA. *See, e.g.*, Ex. 102 ¶ 23; Ex. 105 ¶ 10. For this reason, Plaintiffs seek a classic pre-enforcement declaratory judgment on the meaning of a federal statute, which courts in this Circuit favor in APA cases involving questions of law. *See N.H. Lottery Comm'n*, 986 F.3d at 62.

Finally, Defendants assert that this declaratory judgment would "directly conflict[] with the State[s'] decades-long acceptance of the verification requirement for programs the agencies previously interpreted as administering Federal public benefits." Opp'n at 45. But States have never before had the same stake in contesting it because the federal government has never before sought to dramatically increase the scope of "Federal public benefits" with the stroke of a pen, let alone to expand its scope to include programs with no application, or required verification for life-saving programs open to all. Defendants not only took these unprecedented actions but did all at once, without advance warning. Further, many of the State-administered programs for which States have long since verified immigration status are subject to separate, program-specific limitations on non-citizen eligibility that blunted PRWORA's independent impact. *See, e.g.*, 7 U.S.C. § 2015(f) (non-citizen eligibility for SNAP); 20 U.S.C. § 1091(a)(5) (non-citizen eligibility for federal student loans); 42 U.S.C. §1436a (non-citizen eligibility for certain housing programs). Given the dramatic changes wrought by the PRWORA Notices, any claimed past

---

[8] *See also* Press Release, U.S. Department of Education, *U.S. Department of Education Ends Taxpayer Subsidization of Postsecondary Education for Illegal Aliens* (July 10, 2025), at 14, available at https://www.ed.gov/about/news/press-release/us-department-of-education-ends-taxpayer-subsidization-of-postsecondary-education-illegal-aliens ("In general, the Department does not have any plans to take enforcement actions against any grantee or subgrantee under PRWORA prior to August 9, 2025.").

acquiescence by Plaintiffs is irrelevant, and it certainly does not change the plain meaning of Section 1642(b).

**VII.       The Court Should Grant Plaintiffs' Requested Remedies**

Defendants' PRWORA Notices should be vacated. 5 U.S.C. § 706(2). Defendants' argument that vacatur is not "appropriate," Opp'n at 47–49, runs counter to First Circuit law and federal courts' "overwhelming consensus on this issue." *Ass'n of Am. Universities v. Dep't of Def.*, 806 F. Supp. 3d 79, 123 (D. Mass. 2025). As Defendants acknowledge, the First Circuit has recognized vacatur as an available APA remedy, Opp'n at 48 n.6 (citing *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 145 F.4th 39, 50 (1st Cir. 2025)), and it has approved that remedy repeatedly. *See Gailius v. I.N.S.*, 147 F.3d 34, 47 (1st Cir. 1998); *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) (collecting cases). Indeed, the "normal remedy" when an agency action violates the APA is "vacatur of the rule and its applicability to all who would have been subject to it." *Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 329 (D. Mass. 2025), *judgment entered,* No. 1:25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), and *aff'd,* 164 F.4th 1 (1st Cir. 2026) (collecting cases). Defendants' contrary view that vacatur is not generally available is "fairly radical and inconsistent with" federal courts' longstanding practice. *Dep't of Def.*, 806 F. Supp. at 123 (quoting Transcript of Oral Argument at 35, *United States v. Texas*, 599 U.S. 670 (2023) (No. 22-58) (Roberts, C.J.)).

Defendants' assertion that relief "should apply only to the named Plaintiffs in this case," Opp'n at 49, "fundamentally misunderstands vacatur as a remedy." *Dep't of Def.*, 806 F. Supp. 3d at 121; *see also Rhode Island v. Trump*, 810 F. Supp. 3d 283 (D.R.I. 2025). Unlike an injunction, which acts upon a party and governs that party's conduct, vacatur generally acts upon the agency action itself. *Dep't of Def.*, 806 F. Supp. 3d at 122.

31

Next, against the law of this Circuit and overwhelming weight of authority, Defendants erroneously suggest that the "set aside" language of APA section 706(2) does not authorize vacatur. Opp'n at 48. But the plain text of the APA authorizes a court to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). And courts' power to vacate an unlawful rule has always been understood to be firmly rooted in the text of the APA. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) ("The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules."); *see Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (noting "[p]laintiffs frequently seek vacatur of internal agency guidance"); *see also* Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L.J. 2304, 2313, 2323 (2024).

Defendants misplace their reliance on Justice Gorsuch's concurrence in *United States v. Texas*. Opp'n at 47–49. As Justice Gorsuch himself acknowledged, he was merely "raising questions" regarding vacatur of agency rules and drew distinctions between vacatur and nationwide injunctions. *United States v. Texas*, 599 U.S. 670, 701–02 (2023) (Gorsuch, J., concurring). Defendants' reliance on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), is likewise inapposite. Opp'n at 48. *CASA* explicitly declined to extend its reasoning concerning courts' historical equitable power to issue injunctions to the separate issue of courts' statutory power to order vacatur under the APA. *CASA*, 606 U.S. at 847 n. 10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.").

Defendants argue that the Court should not order Plaintiffs' narrowly tailored injunction, which would apply only to Plaintiff States, and would only prohibit Defendants from undertaking

actions that implement or enforce the vacated PRWORA Notices by other means. This injunction is appropriate because, even after the Court's Preliminary Injunction Order, Defendants sought to incorporate the PRWORA Notices as a condition of grants to Plaintiff States. *See, e.g.*, Ex. 102 ¶ 23; Ex. 105 ¶ 10. An injunction would make crystal clear that, once vacated, neither the Notices nor the policies within them can be prospectively implemented or enforced, including via grant conditions. And, contrary to Defendants' assertions, *see* Opp'n at 49, the harm to Plaintiff States from such implementation or enforcement is the same harm Plaintiffs have extensively documented, and the Court has already found. *See* Prelim. Inj. Op. at 48–58; Mot. at 13–25, 84.

Finally, Defendants do not contest that if the Court grants Plaintiffs' motion for summary judgment, it should declare the PRWORA Notices unlawful. *See* Mot. at 84; Opp'n at 49.

## CONCLUSION

For the foregoing reasons, Plaintiff States and their subdivisions and instrumentalities respectfully request that Plaintiffs' Motion for Summary Judgment be granted; that the PRWORA Notices be vacated; that Defendants be enjoined from enforcing the vacated Notices; that the Court issue Plaintiffs' requested declaratory judgments; and that Defendants' cross-motion be denied.

Dated: April 3, 2026.

Respectfully submitted,

| | |
|---|---|
| **LETITIA JAMES** | **NICHOLAS W. BROWN** |
| Attorney General for the State of New York | Attorney General of the State of Washington |
| | |
| By: */s/ Rabia Muqaddam* | By: */s/ Andrew Hughes* |
| Rabia Muqaddam* | Andrew Hughes* |
| *Chief Counsel for Federal Initiatives* | Benjamin Seel* |
| Jessica Ranucci* | Zane Muller* |
| *Special Counsel* | *Assistant Attorneys General* |
| Zoe Levine* | Cristina Sepe* |
| *Special Counsel for Immigrant Justice* | *Deputy Solicitor General* |
| 28 Liberty St. | 800 Fifth Avenue, Suite 2000 |
| | Seattle, WA 98104-3188 |

New York, NY 10005
(929) 638-0447
Rabia.Muqaddam@ag.ny.gov
Zoe.Levine@ag.ny.gov
Jessica.Ranucci@ag.ny.gov

*Attorneys for the State of New York*

**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

By: */s/ Sarah W. Rice*
Sarah W. Rice (RI No. 10588)
*Assistant Attorney General*
*Deputy Chief, Civil Division*
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
SRice@riag.ri.gov

*Attorney for the State of Rhode Island*

**ROB BONTA**
Attorney General for the State of California

By: */s/ Heidi Lehrman*
Heidi Lehrman*
Neli Palma*
Michael L. Newman
*Senior Assistant Attorneys General*
Kathleen Boergers*
William Downer *
*Supervising Deputy Attorneys General*
Heidi Lehrman*
Jeanelly Orozco Alcalá*
Natasha A. Reyes*
*Deputy Attorneys General*
1300 I Street
Sacramento CA 95814
Heidi.Lehrman@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
William.Downer@doj.ca.gov
Jeanelly.OrozcoAlcala@doj.ca.gov

(206) 464-7744
Andrew.Hughes@atg.wa.gov
Benjamin.Seel@atg.wa.gov
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for the State of Washington*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Hayleigh S. Crawford*
Hayleigh S. Crawford*
Mary M. Curtin*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
Mary.Curtin@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
Jennifer L. Sullivan*
*Deputy Attorney General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
David.Moskowitz@coag.gov
Jen.Sullivan@coag.gov

*Attorneys for the State of Colorado*

34

Natasha.Reyes@doj.ca.gov

*Attorneys for the State of California*

**WILLIAM TONG**
Attorney General for the State of
Connecticut

By: */s/ Patricia McCooey*
Patricia McCooey*
*Deputy Section Chief for Health and
Education*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov

*Attorney for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Vanessa.Kassab@delaware.gov

*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia
By: */s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
Mitchell.Reich@dc.gov

*Attorney for the District of Columbia*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
David.D.Day@hawaii.gov
Kaliko.D.Fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawaiʻi*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Sarah J. North*
Sarah J. North*
*Deputy Division Chief, Public Interest
Division*
Elena Meth*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor

35

*Assistant Attorney General, Special Litigation Bureau*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
Sarah.North@ilag.gov
Elena.Meth@ilag.gov

*Attorneys for the State of Illinois*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ David Ureña*
Katherine Dirks
*Chief State Trial Counsel*
Ethan W. Marks*
David Ureña*
Brett M. Gannon*
*Assistant Attorneys General*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2675
David.Urena@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Joseph R. Richie*
Joseph R. Richie*
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
Joseph.Richie@ag.state.mn.us

*Attorney for the State of Minnesota*

**JENNIFER L. DAVENPORT**
Attorney General of New Jersey

Baltimore, Maryland 21202
410-576-6584
VWilliamson@oag.state.md.us

*Attorney for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Bryan Beach*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
BeachB@michigan.gov

*Attorneys for the State of Michigan*

**AARON D. FORD**
Attorney General for the State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorney for the State of Nevada*

**RAÚL TORREZ**
Attorney General for the State of New Mexico

36

By: */s/ Meghan Musso*
Meghan Musso*
Patrick Clancey*
Kathleen Riley*
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5289
Meghan.Musso@law.njoag.gov

*Attorneys for the State of New Jersey*

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Coby Howell*
Coby Howell*
*Senior Assistant Attorney General*
Tel (971) 673-1880
Fax (971) 673-5000
Coby.Howell@doj.oregon.gov

*Attorney for the State of Oregon*


**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Faye B. Hipsman*
Faye B. Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov

*Attorney for the State of Wisconsin*

By: */s/ Mark Noferi*
Mark Noferi*
*Senior Litigation Counsel*
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov

*Attorney for the State of New Mexico*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.Kane@vermont.gov

*Attorney for the State of Vermont*

37