# EXHIBIT 112

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * * * * * * * * * * *25-CV-345-MSM
                                          *
STATE OF NEW YORK; STATE OF               *
WASHINGTON; STATE OF RHODE ISLAND;        *
STATE OF ARIZONA; STATE OF CALIFORNIA;    *
STATE OF COLORADO; STATE OF               *
CONNECTICUT; DISTRICT OF COLUMBIA;        *
STATE OF HAWAI'I; STATE OF ILLINOIS;      *
STATE OF MAINE; STATE OF MARYLAND;        *
COMMONWEALTH OF MASSACHUSETTS;            *
STATE OF MICHIGAN; STATE OF MINNESOTA;    *
STATE OF NEVADA; STATE OF NEW JERSEY;     *
STATE OF NEW MEXICO; STATE OF OREGON;     *
STATE OF VERMONT; STATE OF WISCONSIN,     *
                      Plaintiffs,         *
                                          *
                                          *
              VS.                         *AUGUST 20, 2025
                                          *
U.S. DEPARTMENT OF JUSTICE; PAMELA        *
BONDI, in her official capacity as        *
ATTORNEY GENERAL OF THE UNITED STATES;    *
U.S. DEPARTMENT OF HEALTH AND HUMAN       *
SERVICES; ROBERT F. KENNEDY, JR., in his  *
official capacity as SECRETARY OF THE     *
U.S. DEPARTMENT OF HEALTH AND HUMAN       *
SERVICES; U.S. DEPARTMENT OF EDUCATION;   *
LINDA McMAHON, in her official capacity   *
as SECRETARY OF THE U.S. DEPARTMENT OF    *
EDUCATION; U.S. DEPARTMENT OF LABOR;      *
LORI CHAVEZ-DeREMER, in her official      *
capacity as SECRETARY OF THE U.S.         *
DEPARTMENT OF LABOR,                      *
                                          *Courtroom 2
                      Defendants.         *PROVIDENCE, RI
* * * * * * * * * * * * * * * * * * * * * *


BEFORE THE HONORABLE MARY S. McELROY
DISTRICT JUDGE

(Plaintiff States' Motion for Preliminary Injunction)

**APPEARANCES:**

FOR THE PLAINTIFFS:        JESSICA RANUCCI
                           NYS Office of
                           The Attorney General
                           28 Liberty Street
                           New York, NY   10005

                           MITCHELL REICH
                           400 SIXTH STREET, NW
                           2ND Floor
                           Washington, DC   20001


FOR THE DEFENDANTS:        SEAN SKEDZIELEWSKI
                           DOJ-Civ
                           950 Pennsylvania Avenue NW
                           Ste Ofc 3631
                           Washington, DC   20530


Court Reporter:            Denise P. Veitch, RPR
                           One Exchange Terrace
                           Providence, RI   02903

20 AUGUST 2025 -- 2:00 P.M.

THE COURT:  Good afternoon.  We are on the record in civil action 25-345, which we've designated the State of New York, et al v. The U.S. Department of Justice, et al.  Can I ask counsel to identify themselves for the record; and for each party, identify the people who are at your table and who will be speaking, please.

MS. RANUCCI:  Good afternoon, your Honor.  My name is Jessica Ranucci from New York State.  I'm joined by my colleague, Mitchell Reich from Washington, D.C.; Rabia Muqaddam also from New York; and Stephen Provazza from here in Rhode Island.

THE COURT:  Okay.

MS. RANUCCI:  Mr. Reich and I will plan to split the argument, if that works for the Court.

THE COURT:  I'm sorry, say that again.

MS. RANUCCI:  Sorry.  Mr. Reich and I will plan to submit the argument, if that works for the Court.

THE COURT:  Okay.  That's great.  Thank you.

MR. SKEDZIELEWSKI:  Good afternoon, your Honor.  Sean Skedzielewski from the Department of Justice in Washington, D.C.  I'm here by myself, so I'll be handing the argument for the government.

THE COURT:  Okay.  And I'm going to try not to

butcher your name.  Is it Mr. Skedzielewski?

MR. SKEDZIELEWSKI:  You got it, your Honor.

THE COURT:  Really.

MR. SKEDZIELEWSKI:  Yes.

THE COURT:  Are you just saying that?

MR. SKEDZIELEWSKI:  No.

THE COURT:  All right.  Thank you.

So first things before we get to argument. We're going to have one hour for each side.  However you want to divide it up or not divide it is fine with me.  Carrie will give you a signal when it's 10 minutes left, if that works for everyone, and then we'll allow the Plaintiffs a 15-minute rebuttal.  We'll probably take a break after the first case just to give the stenographer's fingers a little break.

And before we even get started, there's a motion to file an amicus brief, and that was filed by the Federation of American Immigration Reform.  And my understanding is that that is unopposed.  Is that correct?

MS. RANUCCI:  That's correct, your Honor.

MR. SKEDZIELEWSKI:  That's correct, your Honor.

THE COURT:  Okay.  So we'll grant that motion and accept that briefing.

So whenever you are ready, Ms. -- is it Ranucci?

MS. RANUCCI:  Ranucci.

THE COURT:  Okay.

MS. RANUCCI:  Do you prefer us up here at the podium?

THE COURT:  Yes.  Whenever you're ready.

MS. RANUCCI:  Good afternoon, your Honor.  As I said, I'm Jessica Ranucci from the State of New York for Plaintiffs.  Our plan is for me to first address the harm and the equities, finality and the procedural claim, and then turn it over to my colleague, Mr. Reich, to address the substantive claim.

Plaintiffs challenge Defendants' sweeping PRWORA notices that upend an unbroken 29-year history of the statute.  An injunction is warranted because the notices are unlawful many times over, and the harms stemming from the notices are immediate, and they are severe.

If the notices go into effect, millions of people will be excluded from key programs providing lifesaving services in Plaintiff States.  This includes not only undocumented immigrants, but also many immigrants who are lawfully present but do not meet the statutory definition of qualified alien, and all sorts of people, including U.S. citizens who are homeless, have experienced domestic violence, who have survived

natural disasters, and who don't have adequate paperwork. The chilling effect of these notices will deter the participation of many more.

But it's worse than that. The notices apply so broadly that they extend to programs for which verification is fundamentally incompatible with the services that they offer. The 988 suicide hotline with 24/7 mental health care for people in crisis, homeless shelters, domestic violence services, soup kitchens; all of these will have to check and verify immigration status immediately before providing services.

In short, the stakes are high, which is why Plaintiffs moved quickly to file this motion and the dozens of supporting Declarations just days after the notices were issued.

THE COURT: Can I ask that you pull the microphone a little closer.

MS. RANUCCI: Sure. Is that better?

THE COURT: Yes. Thank you.

MS. RANUCCI: Before I get into the details, I'd like to make three key points, none of which are actually disputed by the Defendants. These compel a finding in Plaintiffs' favor all of the issues that I'm going to speak about today; that is, harm, the equities, finality, and procedure.

First, the notices affect eligibility for States programs.  On the day the notices become effective millions of people will lose eligibility for dozens of programs.  That's the whole point of the notices.

The HHS, Department of Education, or "ED", and Department of Labor, or "DOL", notices each interpret the term "Federal public benefit," but then each one takes a second step.  They designate specific programs as Federal public benefits.  PRWORA excludes unqualified aliens from those programs, so as soon as the notices go into effect, unqualified aliens will be excluded from the programs the notices designate.

To take one example, 115,000 preschoolers -- who are eligible for Head Start on the day before the HHS notice went into effect -- will no longer be eligible for Head Start on the day the notice goes into effect.

The DOJ notice has a different method where it removes exemptions, but the same effect of determining eligibility of the programs in Plaintiff States.

Defendants do not dispute that the notices will restrict eligibility for the programs they affect.

Second, the notices impose obligations to verify.  As soon as the notices become effective, grantees will be obligated to verify immigration status in the designated programs.  The ED notice says this

clearly.  It says for programs that provide Federal public benefits, providers are required to verify eligibility in order to comply with PRWORA.

THE COURT:  So are you getting to the -- is this the balance of the equities that you're talking about now, or are you just sort of laying the groundwork of the harms?

MS. RANUCCI:  Your Honor, I think these key points really go to the arguments that Defendants make in response to really all four of the things:  Harm, equities, finality, and procedure.  I think these issues come up again and again.  But I'm happy to turn to one of them --

THE COURT:  No; just keep going.  I just want to make sure I'm thinking about it in the right way.

MS. RANUCCI:  Thank you.

The Department of Labor has said something similar, that grantees must verify.  Again, Defendants do not dispute this.  They've never stated that verification is not required or there's any future grace period when compliance is not required.  And Defendants have never adopted the position that States are exempt from verification.  Instead, Defendants state that the notices do not specify how to verify, which is true in some cases; but, of course, doesn't

mean the verification is not required.

And my third final high-level point is that as soon as the notices become effective, States face legal consequences in the threat of enforcement. The ED notice is crystal clear here. It says that the notice may be referenced when enforcing grantee compliance with PRWORA. And it also said that it would in general hold off enforcing until August 9th, but, of course, that date has already passed.

THE COURT: Wasn't this part of an agreement that the government agreed that these notices would not become effective; they asked for additional time for briefing and with that agreed upon September 11th, but I could have that date wrong, is the agreed-upon delay in the implementation of the order. So they haven't gone into effect yet; correct?

MS. RANUCCI: That's correct, your Honor. And just to clarify two different things. The ED notice itself did not state anything about when there could be enforcement, but the press release that was issued even back in July indicated that there would not be enforcement until August 9th; and then separately the parties in this case have negotiated a stay of enforcement through September 10th, notwithstanding what was in the notices.

Defendants have submitted Declarations here that show some of the legal mechanisms they can use to enforce against States and that they can terminate grant awards, and the President has directed them to enforce. Again, Defendants do not dispute this. They simply say that the notices themselves do not announce enforcement and the notices themselves do not state penalties. But, of course, just because the notices don't announce enforcement or state penalties does not foreclose enforcement later. And your Honor's correct, that this becomes an issue after September 10th when the agreed-upon stay expires. Having laid that high-level foundation, I appreciate you indulging me.

I'm now going to turn to the specific issues here. First, irreparable harm, Plaintiffs' harm is detailed in over 60 Declarations from senior state officials, and those Declarations, which are unrebutted, show that the notices will cause four types of irreparable harm to Plaintiff States. The first is the threat of enforcement. Of course I just laid that out, but just a few additional points: (1) The affected programs fund billions of dollars to Plaintiff States, so the magnitude of potential harm here is very large. And because some of these programs are operated on a reimbursement basis, as soon as the notices go

into effect, the funds are at risk.

A principle that has been reiterated over and over by courts is that a plaintiff does not have to sit and wait for enforcement to challenge illegal activity. That's true here.

The second way in which Plaintiffs will experience irreparable harm is the cost of compliance. Plaintiffs' record, again unrebutted, shows that it would be a massive undertaking to reform so many programs to verify citizenship status.  And to be clear, it's a much more complicated inquiry than are you undocumented.  There are people with student visas, for example, who are not qualified aliens under the status; asylum applicants may have work authorizations but not be qualified aliens.

The notices are clear themselves that there will be compliance expected.  HHS's notice estimated the cost of compliance to be over a hundred million dollars just for its own notice.  The Department of Labor directed grantees, too, stating that they must review and revise their policies and procedures.

The Declarations Plaintiffs have submitted show that compliance would take many steps, months, maybe years, and would cost not only the cost of reforming their systems, but also the opportunity cost of

diverting resources from the actual programs that are funded, into compliance.  And some programs, I think notably some Head Start centers, are likely to close because they just can't cover the administrative burden.  And yet, Defendants require compliance overnight.  They don't explain how they expect the States to scramble to comply immediately; and any effort to do so would be costly.

The third category of harm is the cost to the State when their key social services programs can no longer function as intended due to the notices.  Because people will leave the programs, it will lead to other effects on States.  For example, a number of the programs affected are preventative care, Title X clinics, federal health centers, and a number of mental health-related clinics.  When those can no longer serve all patients, more will end up in the emergency room, which will increase cost to States.  This also was acknowledged by HHS in the regulatory impact analysis where it said that the notices will have economic consequences for health care programs, including providers of charity care.

Finally, the notices reach so far they get to the heart of state sovereignty, directing States how to operate educational, shelter, and public health

programs that are at the core of State functions.

Turning to the balance of the equities, the magnitude of the harm here puts the equities in Plaintiffs' favor.  Just a couple of other points.

An injunction here would preserve the status quo that's been in place for the past 29 years, and Defendants would be free to effectuate the coerced statute, as they always have.  And courts routinely reject Defendants' arguments that injunction would disable them from implementing the President's priorities when they find that those priorities would likely be unlawful.

THE COURT:  Well, you're not arguing that the President's general priority of reducing illegal immigration is unlawful; correct?

MS. RANUCCI:  Correct, your Honor.  I think I maybe used the wrong antecedent in that sentence.  Just to be clear, that when undertaking the analysis required for balance of the equities, a court of course can consider the President's interest in effectuating his own priorities, but when those priorities are done through means that courts find are likely to be unlawful, those do not weigh in favor of the government.  I think a number of cases state that.

THE COURT:  Thank you.

MS. RANUCCI:  I'm now going to turn to the final agent action procedural claims pieces of this. Defendants make essentially the same argument with respect to both legal issues; but the legal framework for the two of them is different, so I'm going to take them one at a time.  These notices -- sorry.  One more thing, which is that, just to be clear, Plaintiffs only assert an APA claim against HHS, ED, and DOL.  So when I'm talking about the notices here, this is not with respect to DOJ.

These three notices that Plaintiffs challenge under the APA meet the familiar test for whether an agency action is final.  Defendants do not dispute that they're the consummation of their own decisionmaking. And the notices do determine rights or obligations from which legal consequences will flow.

The rights and obligations and the legal consequences are three-fold, which are just the same three points that I started with.  First, for millions of people their legal rights are affected because on the day the notices go into effect they are no longer eligible for programs that they were eligible for on the day before; second, the notices impose obligations on States to begin verifying; and third, for States, the threat of enforcement arises immediately, a clear

legal consequence.

That satisfies finality under the traditional pragmatic test of finality.  It also comports with the general principle that the Supreme Court has said in a number of contexts that a regulated party does not have to wait to expose itself to liability before bringing suit.

Defendants' sole defense to finality is that their rules are interpretive.  But the Supreme Court has clarified that interpretive rules can be final; so that although all substantive rules are final, not all final rules are substantive.  And the Supreme Court explained that the reason for this is that otherwise an agency could characterize its rules as interpretive and be shielded even from arbitrary and capricious review.  What this means is -- in contrary to what the government suggests -- the question of final agency action does not rise and fall with whether these rules are interpretive; and all the cases they cite saying that have been superseded.

THE COURT:  But don't I need to decide whether they're interpretive or legislative anyway?

MS. RANUCCI:  That's correct, your Honor.  But if you were to find them interpretive, you could also find them to be final and thus subject to the APA

claims, the other APA -- the substantive APA claims.

THE COURT:  And what effect, if any, what's the implications of bringing the APA claims against the three agencies but not the Department of Justice.  Like what is the practical impact or effect of that?

MS. RANUCCI:  I think the practical impact of that, your Honor, is that an order to obtain an injunction against the Department of Justice -- for today's hearing, the practical effect is that in order to obtain a preliminary injunction against the Department of Justice, the Court would have to find that Plaintiffs have a likelihood of success on the merits of their Spending Clause claim against the Department of Justice, since that's the only claim we assert against that Defendant.

THE COURT:  So you're saying we do need to decide whether or not there is a likelihood of success on the merits with respect to each claim in order to determine -- in order to issue an injunction.  Is that what you're saying?

MS. RANUCCI:  I think that it would be as to least one claim against each Defendant.  So I do not believe that your Honor would need to reach the Spending Clause claim as to the other three Defendants if the Court found the APA claims were likely to

succeed and vice versa.  But I do think that as to DOJ you would have to have finding a likelihood on the spending claim since there's only one claim asserted.

As to procedural claim, as your Honor noted Defendants' notices -- excuse me -- Defendants argue here again that the rules are interpretive.  But here, as the Court recognized and as we agree with Defendants that the question of the interpretive rule really does -- the question of whether Plaintiffs have a viable APA procedural claim really does rise and fall with the question of whether these are interpretive rules.

But Defendants' notices are not interpretive rules.  They start by interpreting PRWORA, but they don't end there.  Each of them takes a second step, applying that interpretation to definitively announce the application of PRWORA, the specific programs.  The HHS notice, for example, first sets forth an interpretation of PRWORA, and then it says, (Reading) Based on the interpretation of PRWORA set forth above, HHS identifies the following additional programs as providing Federal public benefits.

The ED notice does the same thing.  Section II of the notice explains its interpretation, and then Section III asserts its applicability of PRWORA to

specific department programs.

The rule that takes that second step can never be interpretive because interpretive rules have no legal force.  The rule that does have legal force, meaning it affects individual rights and obligations, is a substantive rule.

The notices have the hallmarks of a substantive rule, and I think you probably know what I'm going to say.  First, they affect individual rights, millions of people are no longer eligible for benefits; second, they create legal obligations in the form of verification.  They give States marching orders and suggest -- and tell States to comply; and third, they create the risk of enforcement.  That's what the D.C. Circuit has called the clearest case of a substantive rule; one where on the day before the rule there would be no legal basis for enforcement, and the rule created that enforcement authority.

THE COURT:  What do you make of the fact that the original rules from 30 years ago were not subject to notice-and-comment.  They're similar in form; correct?

MS. RANUCCI:  That's correct.  I don't think that that is determinative here.  I think that there are a couple of reasons.  One is that sort of in a meta

way the law has evolved 30 years ago; so what may or may not have been permitted by courts is different than what is permitted, permissible today.

But more fundamentally, these notices change 30 years of practice in a way that directly affects individual rights.  That may or may not have been the case for each of these programs at the time, depending on what the prior practice was in each of these programs.  I can't speak to that, but here --

THE COURT:  But maybe I misunderstood the point you were making.  I understand you to be saying that taking that second step of naming specific programs is what made this legislative because they named programs, but the original notices didn't do that -- I mean the original notices did that as well, so.

MS. RANUCCI:  Apologies.  My point was just that the thing that they announced at the time might have been consistent with the pre-existing preface; I am just not familiar enough with the pre-existing practice.

THE COURT:  So you're saying regardless of how they did it 30 years ago, whether it was interpretive or legislative doesn't matter because we're looking at what's here now and what the practice has been.  Is that correct?

MS. RANUCCI:  Yes.  And I would say that the case law on this is frankly all over the place, and I think that recently some aspects of it have been clarified.  But I do think that one thing that has become clear over the years is that courts should really look at what the effect of the notice is rather than the characterization by the agency; whereas I think past courts have indicated in decades ago that held more weight than it does not now.

THE COURT:  But that's not the only thing. There's the five factors that the First Circuit laid out in the *Azar* case; correct?

MS. RANUCCI:  Yes.

THE COURT:  And so I want to talk about those. The factors are, as I understand it, the text, explanation, the fit with past regulation, the place in the statutory scheme, and the pragmatic considerations.

The text and explanation favors the government insofar as they suggest that the notices are interpretive; so if they are interpretive, that favors the government.  But the last three factors all favor the States in that they suggest that the notices are legislative.

So the First Circuit hasn't explained how to

weigh the different factors; so what is your position on that, and particularly given some of the factors cut each way.  For example, you know, pragmatic considerations cut both ways, as does the explanation in the text.

MS. RANUCCI:  I would say, your Honor, that I think that -- I'm not sure if by "text" you just mean the agency's own characterization.  But I'm not sure that I would agree that the text of the rules itself cuts towards the government because to be sure they do interpret the term "Federal public benefit", but they do not resemble rules that only interpret the terms of the statute.  I think looking at the text of the rules does show the practical impact that would weigh in favor of States here; and that those, the practical concerns, that they affect the rights of parties, that they impose obligations, that they lead to enforcement authority would all favor the States.

THE COURT:  Favor the States in what way?  When the Court is looking at what?

So the text isn't decisive, I guess is what I'm saying.  So I'm trying to figure out of those five factors that the First Circuit set forth, how do I weigh them.  What's the most important, what does the State argue is -- what do the States argue is the sort

of biggest impact factor?  How do I look at which factors go which way?

MS. RANUCCI:  Thank you.  Just give me a minute.

(Pause)

THE COURT:  And maybe I can sort of give you sort of a better sense of what I'm asking you.  So Congress notes that the definition of Federal benefit is that the, is defined in subsection (c) of the statute, okay, and that seems to downsize the agency's roles in the deliberative process.  But then subsection (c) provides a robust but not clear necessarily definition of "Federal public benefit".  And so the agency notices serve a somewhat narrow function to decide whether specific programs they administer provide a Federal public benefit.

So that's why I'm saying I think the text sort of favors the government in that case.  I'm not saying that's the only factor.

So like in *Azar*, there was textual silence and that gave the agency a lot of room to operate.  We don't have that here.  Correct?

MS. RANUCCI:  That's correct, your Honor.  I think I understand what you were saying now; and you're correct, these notices do interpret and make a determination about specific statutory text.  I agree

with you.  Thank you.

I'm happy to answer any more questions, but I'm mindful that I want to give my colleague enough chance to speak.

THE COURT:  All right.  I want to go back to irreparable harm.  So there's a line of cases that talks about irreparable harm in cases where there can be no do-over and no redress without an injunction; and it seems like the emergency services are precisely that.  If the services are unlawfully denied and someone suffers for that, is that what you see as the irreparable harm?

MS. RANUCCI:  I think a number of pieces of the harm here are irreparable, and that's certainly one of them.  But I think in every program, whether emergency or not, compliance with these notices will come at a cost that is at the expense of the other services provided where staff, for example, who would be delivering services now will be spending their time verifying.  Those services, whether emergency or not can't just be -- a kid can't just be taught later who is not taught at Head Start, to be overly-simplistic.

So I do think that not just emergency services, but all of the services here once taken away are really not able to be offered later of the nature of these

programs.

THE COURT:  Okay.

MS. RANUCCI:  Thank you.

MR. REICH:  Good afternoon, your Honor. Mitchell Reich from the District of Columbia.

As Ms. Ranucci said, I'll be addressing the merits.  And as she also said, these PRWORA notices upend the interpretations of PRWORA that Defendants themselves have adhered to since PRWORA's enactment, and extend the statute, extend the statutes' programs always understood as open to all.  And to defend that interpretation, Defendants need to swim against the current of two settled legal principles.

First, PRWORA was enacted pursuant to the Spending Clause.  And as Defendants themselves concede, that means that any requirements in the statute need to be imposed unambiguously, and the federal government can't impose any new conditions on the State post-enactment that the States could not have fairly anticipated.

Second, as the Supreme Court reaffirmed recently in *Loper Bright*, longstanding, consistent constructions of a statute that were contemporaneous with this enactment are entitled to very great weight.  And as many of the courts' recent arbitrary and capricious

precedents make clear, when the federal government wishes to depart from the settled understanding of the statute, it needs to provide reasons, and those reasons need to include consideration of the reliance that has built up around this old policy and consideration of the costs of changing its policy.

THE COURT: I know that's sort of your preface; but you referenced *Loper Bright*, and that only applies where statute is ambiguous; correct?

MR. REICH: Correct. I think that *Loper Bright* I take it to have rejected to some degree this distinction, the Chevron framework that turns on ambiguity. But I think it was saying in trying to reach the best understanding of the statute, courts should take into account longstanding constructions.

THE COURT: Thank you.

MR. REICH: Yes. But agreed, your Honor, to the extent the import of your question is that they need to show an unambiguous interpretation. To win they need to show that their interpretation is unambiguously correct; that's exactly right.

THE COURT: Okay.

MR. REICH: And I think that their new interpretations of the statute cannot meet that incredibly high threshold. And we make any statutory

arguments here, but I want to focus on the two most critical that underlie the bulk of the HHS and ED and DOL notices here.  And those are, first, Defendants' position that PRWORA now extends to statutes that are generally available, meaning statutes that don't -- programs that don't themselves impose eligibility requirements or require an application; things like homeless shelters, soup kitchens, emergency services, public health clinics.  And, second, Defendants' new interpretation that PRWORA extends to non-postsecondary education benefits.  Both those interpretations are indisputably contrary to what the agencies have thought since shortly after PRWORA's enactment, and both fly in the face of text.

Starting with the generally available benefits question:  Two clear textual indications in PRWORA make clear that PRWORA does not extend to programs that don't have eligibility requirements.  One is the definition of --

THE COURT:  Slow down a smidge --

MR. REICH:  Sorry, your Honor.

THE COURT:  -- because I'm  having a little trouble following, --

MR. REICH:  Yup.

THE COURT:  -- and I'm betting that my

stenographer does as well.

MR. REICH:  Apologies.

First, in Section 1611(c)(1)(B) the definition of Federal public benefits, Congress defined Federal public benefits to be limited to programs provided to, quote, an individual, household, or family eligibility unit.  And the words "eligibility unit" by their plain text refer to the unit used to determine eligibility.  Programs that don't set eligibility requirements don't have eligibility units; and so this definition by its terms does not apply to programs that lack eligibility requirements.

Then trying turning to Section 1642, the statute's verification provision.  Laced throughout that provision are terms limiting verification requirements to people who, quote, apply for benefits or to applicants for benefits.  The verification provisions don't make any sense as applied to programs that don't have applications.

THE COURT:  Okay.  Let's back up a little bit and talk about the interpretation of 1631 where they talk about family eligibility units.  And in arguing that the words "family eligibility unit" means just that, the government points to 1631(f)(2) where the statute makes reference to the same household or family

eligibility unit.

Doesn't that cut against the States' reading that eligibility unit modifies individual, household, or family?  So I'm just, that's the -- does it run afoul of the last antecedent rule in statutory interpretation?

MR. REICH:  I don't think so, your Honor.  So a couple things.  First, 1631(f) refers to, quote, a household or family eligibility unit.  It uses that phrase as a bundle.  It doesn't refer to just family eligibility units.  And throughout that provision it also refers to families and household.  This is about victims of domestic violence and talking about who's in their family, who's in their household, et cetera.

So in the context of that provision and that particular, what is relevant there are only household and family eligibility units matter, just not -- there would have been no reason in that particular provision to refer to an individual eligibility unit.

THE COURT:  You're saying 16(f) just kind of doubles-down on the ambiguity; it doesn't clarify it.

MR. REICH:  I certainly don't think it clarifies it.  And, in fact, what the government doesn't have is a phrase in the statute that just refers to family eligibility unit on its own.  Even there, it's a

package of household or family eligibility unit.

And more broadly as to the interpretive canon your Honor referenced, I think the relevant one here, not to get too technical on interpretive canons, is what's know as the series-modifier canon.

THE COURT:  Say that again slowly.

MR. REICH:  I said the canon that's most relevant here, not to get too technical on canons, is what's known as the series-modifier canon, which is where there is a compact integrative list of nouns or verbs, when there's a modifier at the end of it, the presumption is that applies to everything in the list. And the Supreme Court said this most clearly in the *Facebook v. Duguid* case.

The last antecedent rule applies where those criteria aren't met, where there's disparate words or clauses throughout the sentence and then there's a modifier at the end that only applies to the last one.

It doesn't apply where you have, here, individual, household, or family eligibility unit. It's easy to apply the terms to every item in the list.

And I'd also note it doesn't really make any sense to limit eligibility units to just family.  After all, in determining what "household" is relevant, that's not a self-defining term so it would make sense

to look to the underlying statute to understand what "household" counts.

And also the government's reading I think by its own admission in the HHS notice has the result that "eligibility unit" has no work to do in the statute at all.  In fact, it says the bottom line of its interpretation is that Federal public benefits applies to any benefits provided to an individual, household or family.  Full stop.  And can't be right that Congress included the words "eligibility unit" superfluously in the statute whose entire purpose is to redefine eligibility terms.

And then, of course, there's the history.  Since day one DOJ has understood the statute not to extend to generally available benefits, things like ambulance services, paratransit services, that are provided to individuals but that don't check eligibility.  And it would seem that the logical result of the government's interpretation is that ambulances can't pick up anybody unless they screen them for their immigration status first.  And that's both never been the understanding of the statute and, of course, is an absurd result Congress couldn't possibly have intended.

THE COURT:  So is that not sort of a problem that has sort of run through a few of the cases where

there are different mechanisms that the government could undertake to change the programs, but sort of painting with a broad brush is the problem because obviously if somebody is calling the suicide prevention hotline we're not going to ask for, you know, it's impossible, it's a virtual impossibility to ask for papers before that.

But contrasting that maybe with some of the Department of Labor programs, there might be a way to get that eligibility determination done.  Does that --

MR. REICH:  Well, I think you have to take it program by program.  I don't think the inquiry would be is it workable, is it good policy to apply to that program or not.  I think they would have to fit it in the text, and to the extent the basis for its textual interpretation is it doesn't matter whether there's an eligibility requirement to the underlying statute; that's wrong for every program.

But some programs do have eligibility requirements, and as to those we don't argue that this is a reason for finding the government's interpretation unlawful; there's other problems with them.  But this applies to that is subset of programs.

The second major interpretive move the government makes in both the HHS and the ED notices is

to extend the statute to non-postsecondary education benefits, things like Head Start education benefits for preschool, and the secondary education benefits in WIOA II and Perkins V.  And as to that, the statutory text and history could not be clearer. Section 1611(c)(1)(B) is expressly defined to include, quote, postsecondary education benefits.  And if the text wasn't clear enough, the legislative history confirms that that was a deliberate choice to exclude primary and secondary education benefits.

When PRWORA was first proposed, the statute referred to all education benefits, and on the floor of the Senate members objected that that would sweep in primary and secondary education; and the Senate amended the bill specifically to add the word "postsecondary" to solve the education issue.  And Defendants' interpretation would negate that clear legislative choice reflected in the text of the statute itself.

THE COURT:  I want to walk through a few things here with you.  You're arguing that the notice, the HHS notice, I think the States argue at most three of the newly-covered programs impose limits on the eligibility of individuals, households, or families to receive their benefits.

MR. REICH:  Correct.

THE COURT:  How are we to structure an order in a case that paints -- and I guess that's sort of what I was trying to get at inartfully before, is these programs span a wide --

MR. REICH:  Yes.

THE COURT:  -- swarth of types, swarths of ability.  You know, if somebody is overdosing you can't, I don't think you have the time to ask them for their papers before you put them in an ambulance or administer Narcan.  So I guess I'm trying to figure out how the court would look at and structure any kind of an order if I were to find that those, that these notices are contrary to the law.

MR. REICH:  So our arguments, the full breadth of our arguments, arbitrary and capricious statutes, Constitution, cover all of the programs included in the notices; and if you agreed with us, they would justify enjoining the notices in their entirety.

I think the narrowest way to get to that result, the grounds that would easily sweep in the entirety of the notices is first finding the notices arbitrary and capricious, for reasons I can discuss in a moment; and, second, finding the DOJ notice contrary to the Spending Clause because the States do not have clear notice that DOJ was going to do a 180 on its longstanding position.

Those would cover everything.  There's other reasons that components of these are unlawful that in the aggregate cover everything, too, but I think that would be the narrowest ground to rule for us on enjoining the notices in their entirety.

On the arbitrary and capricious problem that pervades all three of the HHS, ED, and DOL notices, is the failure to consider reliance interests or the costs of changing the departments' interpretation and adopting a new policy.  The Supreme Court said in *Regents* that the fact that an agency has determined a program is unlawful does not absolve it of the responsibility to consider reliance interests associated with changing its position.

And here, Department of Health and Human Services explicitly refused to consider reliance interests or weigh them in its analysis, and both ED and DOL are silent on them.

(Extraneous background noise)

(Judge confers with the Clerk)

THE COURT:  Sorry; hopefully that was it.  If not, we're going to ask them to stop.

MR. REICH:  Of course.  Would you like me to wait, your Honor?

THE COURT:  Yes, just give it a minute.

(Pause)

MR. REICH:  Thanks, your Honor.

On the arbitrary and capricious issue, agency is obligated to consider reliance interests in changing its policy.  The government seems to think that because it concluded these are unlawful it had no discretion to consider reliance, but that's clearly wrong.  The government states --

(Court Reporter requests clarification)

MR. REICH:  The government states in these notices that it's going to comply its new interpretations immediately and take them into account and enforce them.  But the government, of course, has discretion not to apply its new interpretations immediately:  It could not apply them to existing funding streams where funding has already been awarded; it could have a delay in implementation; it could not apply them to programs where changing the approach is going to be highly disruptive.

But the government doesn't consider any of those alternatives or the reliance interest they'd upend. And it also doesn't consider the harms that this new interpretation will inflict on the people these notices are purportedly designed to protect.  As Ms. Ranucci said, these notices aren't only going to exclude

undocumented immigrants.  They're also going to harm people who are eligible for these programs who won't be able or willing to produce documentation to show citizenship and lawful status.

Finally, on the constitutional questions, your Honor, all four notices are unlawful because the States did not have any notice of the agency's new position when they accepted money under these programs and agreed to participate in them.

Supreme Court's case law crystal clear that, as the court said in *Pennhurst*, the federal government can't spring post-enactment conditions -- post-acceptance conditions on States that are receiving federal funding.

Here, every State had been assured for three decades that the programs now covered by these notices were excluded from PRWORA, and for three decades DOJ has told them that it was, that the Attorney General was exercising the full extent of her authority under Section 1611 to exempt programs.

Now the agencies have changed their views.  But it defies belief that any States could have anticipated those new views or structured its programs in advance to comply with PRWORA.

THE COURT:  So does that mean that the

government can't impose new conditions or new interpretations forever, or just for the term of the current grants?

MR. REICH:  I think at minimum the term of the current grants, and I think that is sufficient to grant preliminary injunctive relief in this case.

The conditions are -- the government's new interpretations are also coercive.  Its understanding of PRWORA would require the agencies to restructure their own programs dramatically as a cost of receiving federal money.

Most of the money at issue here goes to State programs, State health clinics, State education programs; and when States accepted that money, they understood and believed they could continue operating them as open to all without performing eligibility -- screening for immigration status.

Now the cost of accepting federal money is in many cases shuttering the programs entirely, programs like the ones Ms. Ranucci mentioned that just can't operate screening for immigrant eligibility; and in other cases restructuring them dramatically in a way to demand papers at the door.  That is a coercive condition that requires the transformation of a separate independent program as a cost of receiving

federal money and not only -- and in addition, programs that are at the heart of States' sovereign authority under our federal system.  And the amount of money at stake here is so high no State could realistically turn down all of the money at issue under PRWORA in order to, in order to comply with this new interpretation.

THE COURT:  Can you walk me through the States' argument that block grants are not necessarily covered.

MR. REICH:  So I took Defendants' brief to concede this point.  But our understanding is programs are only covered under PRWORA if they provide benefits to individuals, households, or family eligibility units.

Block grants don't themselves provide any benefits to individuals.  The money that goes to States under block grants may in turn be used to fund such benefits, and if those benefits fall within the scope of PRWORA they are subject to PRWORA's restrictions. But the mere fact that a block grant goes to a State doesn't and can't mean that every dollar that comes out of that block grant is automatically subject to PRWORA.

I took the Defendants' opposition brief to agree with this point, and they say you've misunderstood our notice and actually we're going to do program-specific guidance that carves programs out of the things we've

listed in the HHS notice.  But I think that itself is an admission that the notice is both arbitrary and capricious and unlawfully broad.  HHS listed these programs en mass.  It said the programs themselves were Federal public benefits, and it gave the States no clarity, suggesting that some benefits of the programs were carved out.  And that's particularly telling, given that the original HHS notice specifically identified the benefits within the programs that were subject to PRWORA and clarified that some benefits within those programs were not subject to PRWORA.

So the States, as a Spending Clause matter, have no clear notice as to what's covered and what isn't under this notice, and the plain terms of the notice are unlawful because they suggest the programs are covered in their entirety.

THE COURT:  So I just want to, before you leave the podium I have a few questions.  So are the States arguing that only the non-postsecondary Perkins V programs are exempt and, if so, how do we divide them out?

MR. REICH:  We think Perkins V is exempt in its entirety.  Different parts of it are exempt for different reasons.  The non-postsecondary Perkins V benefits are not subject to PRWORA because PRWORA is

limited to postsecondary education benefits.  The postsecondary benefits are not subject to PRWORA because they have no eligibility requirements.  And I think the government concedes that second point as a factual matter.  It itself says in the ED notice that Perkins doesn't have eligibility, that Perkins V deals with postsecondary level, doesn't have eligibility requirements.

And of course, your Honor, if you agree with us on the arbitrary and capricious or Spending Clause grounds, that would be an independent reason why the extension of PRWORA to Perkins V is unlawful in its entirety.

THE COURT:  Okay.

MR. REICH:  I wanted to --

THE COURT:  Hang on.  But right after the list HHS explains that the list itself does not mean that all benefits or services provided by these programs are Federal public benefits and require verification.  So it then carved out an example exception for the benefits funds under LIHEAP and even though that was not qualified in the list above, but it did not beyond that explain that all benefits in each program are covered.  So can you help me out with that analysis.

MR. REICH:  So this is the original 1998 HHS

notice.

THE COURT:  Yes.

MR. REICH:  HSS had a list of benefits, and if you look at the list itself there's parentheses after many of the items that say this is limited to these benefits provided under that program.

So first, HHS made clear it's only subsets of those programs.  And then at the end of the list it said there may be further benefits within these programs that are not subject to PRWORA -- because PRWORA applies on a benefit-by-benefit basis.  Some of these are huge programs that do lots of things.  Some of those things might fall within the scope of PRWORA because they're health benefits provided to individuals; some might not because, like the LIHEAP benefit you were just describing, that's provided at the building or house level and just doesn't flow to individuals at all.

So I think HHS was saying -- and DOJ says this in their 1996 and 1998 -- 7 notices as well -- the analysis in PRWORA has to be benefit-by-benefit.  The language in the statute is "benefits", not program.  And that's what HHS failed to do in its new notice.  It does not break these programs down by benefit at all.  It includes them en mass.  And some of these programs

are enormous.  Some of them are, the block grants in particular, the SUBG Program, the mental health block grant program, these fund a vast array of services, many of which no one could plausibly argue are subject to PRWORA.  They might apply, fund public services that aren't applied --

(Court Reporter requests clarification)

THE COURT:  Please slow down.

MR. REICH:  I apologize.

They fund public services that are not applied on an individualized basis at all, and so I think it's clear applying them to the entirety of the program is unlawful.

THE COURT:  I want to -- I asked your co-counsel that, but some questions, but I have a few for you as well.  What are the, what is the foundation in the statute, what is -- the foundation is for listing the coverage benefit-by-benefit.  The other ones clearly textual arguments.

MR. REICH:  So Section 1611(c)(1)(B) defines, says "Federal public benefit" means, and then it includes a list, any retirement, welfare, et cetera, benefit or any other similar benefit for which payments or assistance are provided.

So the language of the statute is benefits and

it refers, and it refers to the type of benefit provided. So, for example, if a statute provided both health benefits and another type of benefit entirely, one benefit would fall within the scope of the statute and another wouldn't. And similarly, because it's limited to benefits provided to individual, household and family eligibility units, if some benefits covered by the statute go to individuals and some are delivered at the community level, for example, they fund police writ large, some would fall in the statutory definition and some would not.

THE COURT: So you're arguing that the program list is overbroad.

MR. REICH: Exactly. Listing the programs in their entirety is overbroad.

THE COURT: So with respect to the Department of Labor notices, can you provide additional information as to why the programs identified in ECF 48-6 paragraph 5 are not postsecondary.

MR. REICH: So our main argument with respect to the DOL notice is not that it covers non-postsecondary education benefits. Actually, perhaps I'm understanding your question. I don't think those are post-secondary education benefits. Those are forms of training or information that -- I think postsecondary

education benefits are funds for college, a form of continuing education after someone has finished high school.  These are individualized, maybe brief provisions of information that nobody in ordinary parlance would describe as postsecondary education. Someone who's been given a job counseling session wouldn't say they've received a postsecondary education.

And indeed, DOL itself admits that several very similar forms of assistance don't fall within PRWORA at all.  It says, for example, that light touch services, light touch job counseling services don't fall within the statute.  And I don't think one could plausibly claim that the light touch services are non-postsecondary and the other forms of job training and assistance are postsecondary.

Their argument I understand to be that these are, quote, similar benefits because they are -- help an individual obtain gainful employment.

Do you want me to really explain either in its notice or in its briefing why that's a relevant statutory criterion and we struggled to find a reason. That's not a -- the fact that a benefit helps someone obtain gainful employment doesn't seem to be a unifying characteristic of the elements in the list in the

statutes.  It's not really characteristic of any of those items.  And the idea that the goal of the benefit is what's relevant itself seems questionable.  And extending the PRWORA to the mere provision of information or light touch training would just extend the statute to a type of benefit that --

THE COURT:  But they're saying it's not extended to light touch; right?

MR. REICH:  I think that all of these things are just provision of information; so I'm not sure where the distinction between light touch and not light touch comes from.

THE COURT:  I guess what I'm struggle with and what we've struggled with is why are the DOL programs the same in-kind as others.  So career counseling or job training is clearly very different from Head Start; right?  And different in-kind, different in effect, different in who it impacts down the line, sort of downstream effect.  So how do I think about DOL programs?

MR. REICH:  What I think you would think about is -- the way I could conduct the analysis is first does it fall within any of the items listed in 1611(c)(1)(b).  Is it retirement, welfare, health, disability, et cetera.

THE COURT:  Or similar.

MR. REICH:  Right.  That was my second step, your Honor.

THE COURT:  Okay.

MR. REICH:  So first, is it one of the listed items.  DOL itself does not argue that it is, and I think they should be judged on the explanation they give.  That's basic administrative law.  Then the second step is, is similar to one of the listed benefits, and their theory as to why it's similar is that it is -- it helps a person obtain gainful employment.  And I think judged on that reason, which is I think the reason your Honor should judge it on, that does not seem like a characteristic that makes benefits similar to one of the listed benefits.

For one thing that rationale if taken to its extreme covers any form of education.  And as I mentioned, it's clear from the statute or the text in history that Congress did not intend to cover all educational, primary, secondary education.

THE COURT:  So I guess that's where I'm having some trouble, okay?  How do I conduct this analysis.  I understand what you're saying, the framework of look at it, is it listed, and if it's not then does it fall into the catchall of a similar kind.

But I'm not sure how those DOL programs differ substantially from postsecondary education, right, because we can all agree postsecondary education doesn't have to be college; right?  It can be a trade school, it can be those, you know, kind of an apprenticeship program.

So are you saying that I have to look at whether or not each program, I have to look at each program, or are you saying that DOL needed to look at each program before they put forth the notice.

MR. REICH:  A few points, your Honor.  One is the DOL notice itself didn't justify inclusion of these programs on the basis that they were similar to postsecondary.  So I think if they wanted to make that argument, that was their burden to make it.  Under *Chenery* their notice has to be judged on the explanation it gives.  And so I don't think they make that argument in the notice itself.

Second, I think the way to figure out if a program is similar is not looking at each individual item in the list and saying is it similar to this one, is it similar to that one.  It's -- one has to look at the list in its entirety and identify a common characteristic and see if this type of service shares that characteristic.  That's the normal interpretive

principle when used to look at residual clauses is, is it similar to something that binds the wholeness together.  And I think what binds this list together is not postsecondary education specifically; if any one, that's kind of the odd man out here.

I think the common characteristic of this list is their forms of monetary or in-kind assistance, something tangible that is seen as providing someone who has some long-term barrier to employment.  This doesn't really have any -- either of those characteristics.  If this is a information, this is sort of -- to use a casual term this is just talking; it's not anything like providing someone student loans, which is the postsecondary assistance that's covered here, or health benefits, or food.  And it's also for people who are trying to work; and the whole purpose of the PRWORA is to cover people who in Congress' view were not self-sufficient, so this aiding people in obtaining self-sufficiency.

So from a textual or a purpose of standpoint, it just doesn't seem likely that Congress would have wanted to extend the statute this far.

THE COURT:  So I want to ask -- I want you to address the Attorney General's unreviewable discretion.

MR. REICH:  So first, Congress can't make an

agency decision unreviewable under the Constitution, and I don't take my friends to argue that they can.  So I think it's clear that the Attorney General's authority is reviewable under the Spending Clause. That's the only argument we raise at this point.

Congress itself doesn't have the authority to impose coercive or retroactive conditions, and it can't delegate to an agency the authority to review such conditions; and it would raise grave constitutional concerns if it tried to give that authority and then prevented courts from reviewing it.

So I think it is clear that as to the only argument we're making as to DOJ here, the Attorney General's actions are reviewable.

THE COURT:  But the other agencies' actions are based upon the unreviewable discretion of the Attorney General; correct?

MR. REICH:  I don't think that's correct, your Honor.  The Attorney General's authority is limited to exemptions under 1611(b)(1)(D).  All of the other notices are framed as interpretations of the term "Federal public benefit" in (c)(1)(B).  So these are two distinct sources of authority.  The agencies are interpreting a provision over which the Attorney General has no discretion; the Attorney General's

purporting to exercise authority that allows her to further exempt programs from PRWORA.

THE COURT:  I see.  So you're saying that the authority that the agencies are asserting, whether correctly or incorrectly, is not derivative of the Attorney General's authority.

MR. REICH:  Absolutely.  And the Attorney General -- this DOJ notice itself as well as all prior DOJ notices makes clear that it is not interpreting the term "Federal public benefits".  It's an exercise of discretion separate from that.

THE COURT:  Okay.

MR. REICH:  If I can return to one question your Honor asked me earlier about how to craft the scope of relief in this case.  As I said, I think our arguments would entitle us to injunctions against the orders in their entirety.  But if your Honor would find it helpful, we're, of course, happy to provide a proposed order that could provide with greater specificity how to craft relief in this case either as to orders in their entirety or as to some subset of them.

THE COURT:  I'm going to ask you to do that just in case, depending on how we rule.

MR. REICH:  Happy to.

THE COURT:  So just so I understand, that your

first argument is, you know, notice-and-comment wasn't abided by.  Why isn't HHS's 30-day notice-and-comment period sufficient?

MR. REICH:  At Section 553 of the APA, the requirements of notice-and-comment means that before the agency puts the rule into effect it needs to give notice, receive comments, consider comments.  The Supreme Court talks about this the *Harris v. Mortgage Bankers Association*.  That's the process.  They have to do it in order, and they can't give a rule effect if they haven't gone through all those steps.

THE COURT:  Does the delay in implementation affect that at all?

MR. REICH:  I don't think so, your Honor, because as your Honor noted earlier, the delay in implementation only runs through the end of September 10th.  They will not have considered comments and issued a new notice by that point.  If they do so somehow, then we would at that point of course have a separate claim that they may not have considered the comments fully.  We'd have to, of course, see what they say.  But unless they have received, considered, and responded to comments by September 11th, it's unlawful to put the rule into effect on that date.

THE COURT:  All right.  Is there anything else

you want to add?

MR. REICH:  No, your Honor.

THE COURT:  Okay.  We're going to take a brief 10-minute recess and then we'll be back for the government's argument.  And you're going to have to pronounce your name again for me; I'm sorry.

MR. SKEDZIELEWSKI:  Sure.  Skedzielewski.

THE COURT:  Skedzielewski.

MR. SKEDZIELEWSKI:  That's right, your Honor.

(Recess)

THE COURT:  Are we all ready to proceed?

MR. SKEDZIELEWSKI:  Yes, your Honor.

(Court confers with Clerk)

THE COURT:  She'll let you know when only 10 minutes are left, if that's okay with you.

MR. SKEDZIELEWSKI:  That's great.

THE COURT:  Okay.  Whenever you're ready.

MR. SKEDZIELEWSKI:  Thank you.  Good afternoon, your Honor.  And may it please the Court, Sean Skedzielewski on behalf of the Defendants.

So for decades the Personal Responsibility and Work Opportunity Reconciliation Act, or difficult to pronounce PRWORA, has stated that only United States citizens are qualified and qualified aliens are entitled to Federal public benefits.

The challenged notices here simply restore compliance with federal law and ensure that taxpayer-funded programs intended for the American people and qualified aliens are not diverted to unqualified aliens.

Plaintiffs' fears about the extending from the notices are premature.  They face no irreparable harm because the notices are merely interpretive statements.  Once the stipulation staying enforcement ends in September, these notices don't suddenly cause something to happen.

THE COURT:  But is it the government's argument that for 30 years everybody else has been wrong about the statute from the very beginning?

MR. SKEDZIELEWSKI:  Yes, your Honor, it is true that interpretations that are contemporaneously or near contemporaneously published with the statute are entitled to some weight in judicial determinations, but that weight is not absolute.  And as the *Loper Bright* decision has indicated, it's for the courts to decide ultimately what the statutes mean.  But the *Loper Bright* decision didn't overturn sort of old Skidmore deference; and so the agencies that have issued these notices are still entitled to some degree of respect in the interpretations that they've given of PRWORA,

though that respect is not a compulsion on the Court.

THE COURT:  But so we're -- how are we expected to understand a shift after 30 years when every administration, including the first iteration of this administration, have interpreted this differently?

MR. SKEDZIELEWSKI:  I think the way to understand it, your Honor, is through the notices themselves that lay out the specific statutory arguments, statutory interpretation arguments, rather, as to why PRWORA is correctly understood in the way that the notices indicate now.  So I'm happy to dive into the statutory interpretation piece, if you like.

THE COURT:  Do it in whatever order makes sense for you.

MR. SKEDZIELEWSKI:  Okay.

THE COURT:  I didn't mean to throw you off.

MR. SKEDZIELEWSKI:  I will certainly get to that, your Honor, and I'll address it.  But I would like to start, if it's all right with you, with whether or not these notices amount to final agency action, the sort of threshold issue here.

So as you know, final agency action has two characteristics.  To be final, the action has to be the consummation of the agency's decisionmaking process. And here, the government doesn't want to press that

first prong, though like we could quibble with the idea that there was a decision; but leaving that aside.

And then the second prong, whether the action is one by which rights or obligations have been determined. And that's where we think that the notices simply don't rise to a level of final action agency.

Interpretive rules generally don't qualify as final agency action because they're not finally determinative of the issues or rights to which they are addressed. And here, the notices are the consummation of the agency's interpretation of PRWORA, but any legal consequences flowing from them flow from the statute itself.

THE COURT: But doesn't the fact that the government in this case in agreeing to stay the enforcement of these notices until briefing, additional time for briefing was allowed, doesn't that fact sort of concede that some real consequences flow from these notices?

MR. SKEDZIELEWSKI: I don't think so, your Honor, and I don't think the government conceded that point by filing the stipulation. I think that was meant to give the Plaintiffs comfort. But all the government sort of promised in the stipulation is that it wouldn't move on to the next step that could lead to

final agency action --

THE COURT:  Which is what?

MR. SKEDZIELEWSKI:  Enforcement, enforcement of PRWORA with respect to the programs that have been designated as Federal public benefits in the notices. So it's once you get to that step that you would have or could begin to start to think about final agency action.

THE COURT:  Can I -- I'm sorry, I'm going belabor this point.  But if the rule is settled, why do they need to wait for enforcement to complain?  Why isn't it -- isn't there case law that says that there's no need to wait for the sword of Damocles to drop, so, you know, they can come in now and say we're impacted by this.  Why do they need to wait for enforcement?

MR. SKEDZIELEWSKI:  Because, your Honor, enforcement in this case historically and by regulation is a lengthy process.  I'll just give you a specific example because I think it might be helpful to illustrate.  So if we just pick one of the many programs at issue today, the Employment and Training Administration monitors grants and when it finds that noncompliance occurs, it can make determinations about the noncompliance.

But ETA follows a process with extensive back

and forth between the grantee and the Department of Labor.  So first they would try for informal resolution with Plaintiff States.

THE COURT:  But we're talking about programs that don't have eligibility criteria set up with them initially; correct?  So everybody -- the new obligations have already been determined because they need to now comply with the way this Administration is interpreting the statute in new context, and so that's the reason that it's final agency action.  Correct?

MR. SKEDZIELEWSKI:  I want to understand the question, your Honor.  I thought that you said that -- if you could maybe sort of repeat the first part of your question.  I apologize.

THE COURT:  So the States have new obligations under the current Administration's notices; correct?

MR. SKEDZIELEWSKI:  The States under the current notices -- let me rephrase that.  The States have the obligations that they have under PRWORA, and the new notices clarify what those obligations are.

THE COURT:  So you're saying that everybody else's interpretation for 30 years was wrong and now all of a sudden you have this clarity with respect to what Congress meant 30 years ago and what the agencies meant?

MR. SKEDZIELEWSKI:  Yeah, so it's within the competency of the agencies to apply -- to interpret PRWORA with respect to all the various programs that they administer.

THE COURT:  So it extends it to other programs.

MR. SKEDZIELEWSKI:  Well, by vis-a-vis the previous notices, sure.  But the position of the agency is that that's no deviation from the statute.

But if I could, to sort of put a fine point on this, the reason that this is not final agency action is the next step that, say, ETA takes with respect to one of the programs that it monitors is to issue a monitor report, which would be in the normal course.  A report like that would make findings and propose resolutions to the Plaintiff States or the entities to which grants might flow.  That could then become what they call in, you know, their parlance an initial determination.  And even that, it still leads to additional process between ETA and --

THE COURT:  But it's between the agency and the program, not the actual finality of the notice of the obligations under the notice, because otherwise why would the States be worried about this?  Because among their concerns are compliance costs.  Are those not justified?

MR. SKEDZIELEWSKI:  Happy to talk about compliance costs.  I think one thing to note, I don't recall that Plaintiffs mention this in their briefing, but it's there in the notices and I've confirmed this with the agencies.  For the Department of Labor, HHS, and ED notices, the grantees may use grant funds to cover administrative costs of verifying identity pursuant to the PRWORA so --

THE COURT:  Okay.  So let's just take this from the pragmatic and not the in-the-weeds statutory.  So practically speaking, I get what you're saying.  You chose DOL, those programs are a little easier to say we're going to have this interface whether we get to this or not.

But what about their arguments about these funds that are for emergency medical or emergency mental health, homeless shelters, soup kitchens.  How are States supposed to say oh, everybody who comes in because they're hungry has to show their papers.

MR. SKEDZIELEWSKI:  So a couple of points on that, your Honor.  First, the Department of Justice notice from the Attorney General says, a brief quote: I do not construe the Act to preclude aliens from receiving police, fire, ambulance, transportation, sanitary, and other similar services.

THE COURT:  But that's not housing, and that's not food, and that's not Head Start; right?

MR. SKEDZIELEWSKI:  Indeed, your Honor.  And so a couple additional points.  PRWORA explicitly does not intend for those benefits to go to unqualified aliens.  That's what's right there in the statute and so as for --

THE COURT:  So it's the government's position that back in 1995 or '6 when this law was passed, Congress intended for undocumented immigrants not to be allowed to go to homeless shelters or soup kitchens.

MR. SKEDZIELEWSKI:  Well, on the soup kitchen's point in particular, soup kitchens is referenced -- I believe it's 1611(b), I think -- as an exception that the Attorney General can make.  And so clearly since an exception needed to be made, you know, the Congress understood that the definition of Federal public benefits was broad enough to sweep in something like soup kitchens and then it left it to the Attorney General in her discretion to either exempt or not exempt any programs not necessary for life and safety, as she determines.  And as I said, the Attorney General, consistent with all the prior DOJ notices, you know, does not construe the Act to preclude aliens of any sort whether, you know,

qualified or unqualified from receiving emergency services.

THE COURT:  I want to go back because taking your point, fair point about the soup kitchens.  So I look at it as there are three claims, or there's the notice-and-comment.  Okay.  The remedy, if I find a violation of notice-and-comment, is to send it back for a notice-and-comment, proper notice-and-comment period.

There's arbitrary and capricious, and the remedy here in that case if I were to find that these were arbitrary and capricious and include -- is a remand for reconsideration; correct?

MR. SKEDZIELEWSKI:  That's my understanding, your Honor, in the sort of seminal over to the *Park* case, that was the result of the court there.  They found that there wasn't a sufficient record to justify the decision that the agency had taken and so they sent it back for further development of the record.

THE COURT:  Okay.  So contrary to law is the one that for the three agencies -- not for the Department of Justice -- that's the one that they need to meet that burden in order to prove, in order to sustain their burden initially at least for an injunction; correct?

MR. SKEDZIELEWSKI:  Yes, your Honor, although

it's Plaintiffs' burden to show the other prongs as far as irreparable harm and so forth to warrant --

THE COURT:  Right.  I'm talking about the other two problems that they put forth.  The notice and the arbitrary and capriciousness don't get them injunction; correct?

MR. SKEDZIELEWSKI:  Agreed, your Honor.

THE COURT:  Okay.

MR. SKEDZIELEWSKI:  Yeah, if -- exactly correct. If these notices did require note-and-comment, then the solution is to provide notice-and-comment.

THE COURT:  Okay.  But your argument is that the sort of reinterpretation stems from the Department of Justice, correct, and the Attorney General?

MR. SKEDZIELEWSKI:  At least in part, your Honor.  I think that the Attorney General's notice is -- sort of informs the rest of them, although of course as far as the nuances and the details of the other three agency notices they are (indecipherable).

THE COURT:  They're not challenging her action on any other challenge other than the Spending Clause. So if it's a violation of the Spending Clause, her -- if the Court, I'm not saying the Court has or will, but if the Court were to find that, does that negate all the others regardless of what they prove?

MR. SKEDZIELEWSKI:  I don't think so, your Honor, because the other three notices, while they can certainly take instruction from the Department of Justice which serves as their counsel -- that's why I'm here today -- they would have their own competence to make determinations within the sort of expert knowledge that the possess with respect to all these programs, to interpret the notice and then give, as they do in the notices, examples of which programs fall under it.

THE COURT:  So to sort of hopefully put an end to this point, the other three agencies can't take any refuge from the fact that the Attorney General's discretion is unreviewable; correct?

MR. SKEDZIELEWSKI:  That's correct, your Honor. We don't make the case that because the Department of Justice notice is unreviewable that therefore the other three are unreviewable.

THE COURT:  Okay.  So it's only that one notice that you're claiming is unreviewable.

MR. SKEDZIELEWSKI:  Correct.  Yes, as far as statutorily unreviewable.

We do think that the other three notices are not final agency action and not reviewable under the APA, but that's a separate argument.

THE COURT:  Right.  And you haven't conceded

that it's constitutionally reviewable, the Attorney General's notice?  You're not, certainly not suggesting that Congress can insulate the Administration from any kind of judicial review for unconstitutional actions; correct?

MR. SKEDZIELEWSKI:  Correct, your Honor.  The Constitution supersedes PRWORA.

THE COURT:  I'm just making sure our record is clear.

MR. SKEDZIELEWSKI:  Of course.  Yes.

THE COURT:  All right.  Go on.  I didn't mean to interrupt so much.

MR. SKEDZIELEWSKI:  Not at all.

I think considering time I'll move on to the notice-and-comment piece of this.  So the previous, as your Honor mentioned earlier, the previous notices for 25 years ago were also not issued through a notice-and-comment process, and to my knowledge they were never challenged on that basis.  That doesn't resolve the case here, but I do think it's persuasive that, you know, the agencies in this case are operating consistent with previous -- not the previous interpretation, but with previous practice.

THE COURT:  Did the APA provide for a notice-and-comment period 30 years ago?

MR. SKEDZIELEWSKI:  I don't want to speak out of turn, but I'm also certain, your Honor, that the notice-and-comment provisions were in the APA from the beginning.

THE COURT:  And so the failure to object to that is the reason that they went into effect and have been effective for 30 years.  Is that what you're arguing?

MR. SKEDZIELEWSKI:  Yes.  In other words if these original notices did require notice-and-comment, then certainly those two would have to be overturned. This is sort of a confusing posture to be in.  But they're not challenged in front of the Court today obviously.

THE COURT:  But we're looking at this sort of this legislative versus interpretive case law, and doesn't it focus heavily on changes to the way laws are interpreted?

MR. SKEDZIELEWSKI:  That's true, your Honor. But in the *Perez* case the agencies were not required to use notice-and-comment when issuing a new interpretation, even one that deviated significantly from a prior one.  And the court there overturned a string of cases from the D.C. Circuit, I believe, that had developed this rule that when you make a deviation from prior interpretation that raises the

interpretation to the level of requiring notice-and-comment. The court rejected that for the same reason that I think the Court should reject that here, because interpretative statements are really just providing notice to the interested public as to how the agency views the statute so they can best accommodate, you know, the statute and agency regulation.

THE COURT: Okay. I'm going to ask you questions similar to what I asked Ms. Ranucci. The Supreme Court in *Guernsey Memorial Hospital* said that APA rulemaking is required or would be required if an agency action adopted a new position inconsistent with the existing regulations.

And so the First Circuit has set out a five-part test in *Azar*. How do we analyze that with respect to, how do I -- there's the text, the explanation, the fit with past regulation, the place in the statutory scheme, and the pragmatic considerations; which I think are sort of the tail wagging the dog on some of this. But why don't you tell me how I analyze that.

MR. SKEDZIELEWSKI: Happily, your Honor. I think that the text when we're talking about statutory interpretation has to be primary, and so to the extent that your Honor needs to balance those factors, we think that putting emphasis on getting the correct

interpretation of PRWORA is paramount.

Many other cases in the APA domain emphasize that what the agency needs to do is explain what -- why it's done, whatever it may have done.  And I think the same is true here.  And the agencies don't need to give an interpretation the Court finds more persuasive than past interpretations; they just need to give a reasonable one.

So I think when you take those two factors in tandem and then you, I think as your Honor mentioned earlier, the pragmatic considerations, there are arguments on both sides.  But the very statute that we're interpreting I think it's -- I don't take Plaintiffs to be arguing that the notices are inconsistent with the purpose of PRWORA.  The reading of Federal public benefits that the notices take, namely, to apply Federal public benefits to an increased number of programs, only strengthens the purpose of PRWORA, which is a few things --

THE COURT:  But you're not asking me to go to congressional intent and look at that kind of, you know, sort of squishy.  You're talking about the text of the statute, and statutory interpretation is where we go.  I don't look at what Congress meant to do, but what they actually did; correct?

MR. SKEDZIELEWSKI:  I completely agree.  I'm not suggesting that your Honor should go sifting through the legislative history.

THE COURT:  But in this context, other cases, the case law seems to focus on changes in position; and so isn't that the crux of the argument or the issue here?

MR. SKEDZIELEWSKI:  Even if it is, your Honor, I think the way to resolve a change in position, there's a case, *Fox v. FCC* where the Supreme Court held that a change, when there is a change in interpretation or policy, the change doesn't have to be a better, you know, a change for the better in the court's view as long as they are, you know, good reasons given and there's a sound explanation.  Even if in the court's eyes the previous explanation was preferable, that agencies have met their burden to offer an explanation under those five factors that your Honor was mentioning.

THE COURT:  Then don't I have to get into the other things, like the pragmatic consideration and the reliance interest?

MR. SKEDZIELEWSKI:  I'm sorry, I might have missed the first part of the question.

THE COURT:  If we looked at the other case,

you're saying, you know, I don't have to like this interpretation; which I agree, that's not the standard. But I have to get into whether or not it is, it fit with past regulations, what its place is in the statutory scheme, and then also the pragmatic consideration; and if the government doesn't consider the reliance interest of the States, then isn't that automatically sort of arbitrary and capricious?

MR. SKEDZIELEWSKI:  No, your Honor.  Well, first I think the government does consider the reliance interests here.  The DOJ notice in particular sort of lays out a number of reliance interests.

And as far as the pragmatic considerations go, I was trying to mention this earlier.  I'm not asking your Honor to interpret the statute in light of the statutory purposes.  But the statutory purposes I think can illuminate some of the pragmatic concerns here, some of which according to the notices are to pursue the purposes of the statute such as removing the sort of magnet effect or the interest or I think the language -- let's call it the magnet that attracts illegal immigration to the U.S. and to preserve the federal fisc for those whom it is intended for under PRWORA.  So just to the extent that the statutory purposes could influence the pragmatic factor, that

that was what I was trying to get at there.

But when it comes to arbitrary and capricious, to sort of continue answering your Honor's question, an agency's decision is presumed valid, and then the courts review only whether the decision was based on the consideration of relevant factors and whether there's been a clear error of judgment.

So I think here, there's no doubt that the notices contain consideration of the relevant statutory factors.  They walk through at some length considering, you know, different rules of construction to make sense of the statute and to then apply it.

THE COURT:  All right.  But in arbitrary and capricious, this year the United States Supreme Court in an FDA case said that under the change-in-position doctrine, which I think is one of the issues that is here, that agencies are free to change their existing policies as long as they provide a reasoned explanation for the change and display awareness that they are changing position and consider serious reliance interest.  Why doesn't that settle this case, this issue in this case, particularly the failure to consider reliance interests?

MR. SKEDZIELEWSKI:  Just briefly that on the first two points I think it's clear the notices do.

They're very self-aware about making a change, and there's even some subheadings in the notices that say Change in Policy. And then they provide reasons for that change as to why the notices, as to why the agencies in the notices think that the --

THE COURT: Did the Department of Labor provide any reasoned explanation? That's the very short notice.

MR. SKEDZIELEWSKI: Right. Yes, your Honor, I believe they do. I have to review the notice to distinguish exactly what the, exactly what reasons the DOL gives.

So this addresses some of the Plaintiffs' points from earlier as well. So in the DOL notice -- just pull this up here -- they explain their statutory interpretation. It's admittedly not as extensive as HHS's. For example -- well, my pages might be different than yours, but at Section III subsection B they say this change aligns with PRWORA and WIOA. That's spelled W-I-O-A. And then they go on, This guidance uses the more commonly understood and better defined category of participant level services, which is defined in other regulations, and clearly states that, All participant-level services are Federal public benefits under PRWORA because -- and here's the

reason -- they're the same or similar as benefits listed in PRWORA.  And then there's a footnote that gives that list that we've been talking about all afternoon.

So they're offering reasons.  They think that the programs that they're covering in the notice fall under postsecondary education and unemployment benefits and it's --

THE COURT:  Is that really enough just to say it's one of those, you figure out which one, States.

MR. SKEDZIELEWSKI:  I think looking at PRWORA, your Honor, that's a reasonable amount of explanation, given how capacious the list that we find is in the statute.  It's sort of breathtaking, really, you know, any retirement, welfare, post -- I'm skipping a bit -- postsecondary education, unemployment benefits, or, any other similar benefit.  It's a sweeping grant, and DOL relies on that in its notice and applies it to the programs that it administers.

And again, so the question before the Court as far as the explanation is, you know, has the DOL considered relevant factors.  Well, since we're doing statutory interpretation, the relevant factors' in the statutory language and DOL has considered that.  So I think that they easily meet that prong.

The reliance interest piece is a sort of separate one that your Honor raised, which I'm happy to address; and the reliance interest I think I would point to the Department of Justice notice, which I think gives the most extensive outline of the reliance interests and the consideration that the Attorney General gave to them.

There's sort of four basic points. I'm happy to sort of tick through them for your Honor. So the Attorney General reasoned that the previous exceptions were beyond the agency's authority. That was point number one.

THE COURT: Previous, I'm sorry, say that again.

MR. SKEDZIELEWSKI: That the previous exceptions -- I should be more clear. Excuse me.

The exceptions that were laid out in the previous DOJ notice from 1998 or 2001 were issued beyond agency authority. There was ultra vires, that the agency didn't have the authority to issue those exceptions because they weren't permitted by stat -- by PRWORA. So that's the agency, you know, considering what it's able to do, found the previous guidance went beyond. And then where -- since a number of those prior exceptions the A.G. found were not necessary for life or safety, and the notice references, for example,

like a scientific leadership program, which may be a valuable and interesting program, but it doesn't sound like the kind of thing that's necessary for life or safety.

THE COURT:  But am I -- I don't think you can rely on the Department of Justice's notice.  I mean we have to look at the agency notices; right?  Isn't that sort of Administrative Procedures Act, administrative law sort of doctrine that I have to look at the notice and the reasons that the agencies themselves gave?

MR. SKEDZIELEWSKI:  That's true, your Honor, although I think that the Attorney General and the Department of Justice may have a little bit of an exception to that insofar as the task of the DOJ is to advise the other agencies what the law is.  So I think to the extent that the DOJ notice provides information -- consideration of reliance interests, the other agency notices are within, well within their remit to consider that, and I think it's evident that they did.

When the HHS notice, for example, does go into some considerable detail about the reliance interests in this case -- and there's some numbers here so I want to make sure I get the quote right.  So HHS says, the notice, excuse me, says that the notice will not have a

significant economic impact on a substantial number of small entities because verification costs stemming from PRWORA are about point-one percent of average annual expenditures per enrollee.  So that's a pretty small percentage.  And so that's a consideration of the States' reliance interest, the States will have to bear that burden, and then so taking that into account, HHS made its decision regardless.

They also considered the Head Start program in particular and the funding involved there.  HHS found Head Start receives over $12 billion in funding annually.  And the Plaintiffs mention the second number here, but not the first, which I think is important for context.  So the compliance cost for all program entities receiving federal HHS funds, HSS estimated to be between 115 and 175 million; but that's a fraction of the $12 billion that they get on a yearly basis.

THE COURT:  Right.  Okay.  Go ahead.

MR. SKEDZIELEWSKI:  So I just, I do think the reliance interests are considered, your Honor.

As well, I would also add I think this is maybe the most important point if -- with respect to reliance interest.  If the statute doesn't permit something or if it requires something, then the reliance interests really have very little weight because we have to

follow the statute that Congress promulgated.  So, you know, there could be all the reliance interests in the world for an unauthorized decision, but if it's unauthorized that's sort of the end of the analysis.  And despite that, the agencies did give consideration to the reliance interest.

THE COURT:  But -- okay.  So you're not arguing that DOJ taking into account reliance interests gives the other agencies a pass; correct?

MR. SKEDZIELEWSKI:  No, I don't think it gives them a pass.  But I also don't think the other agencies are required to ignore the notice that the Department of Justice issued.

THE COURT:  Okay.  Looking still at arbitrary and capricious, you and the States argue the *Regents* case and what it means for the arbitrary and capricious analysis; and why do you think that Justice Thomas' partial dissent is the best statement of the law as it applies here?

MR. SKEDZIELEWSKI:  We cite that, your Honor, in the brief, and I think he kind of makes the point that I just made, that if a statute grants X amount of authority, then the agency can't do X plus one, even if the plus one has a ton of reliance interest.

THE COURT:  And I guess this is a pragmatic and

maybe not really for you to answer, but why not just go back to Congress and ask them to clarify if it's unclear; right?  If it's ambiguous, then *Loper Bright* says the agencies don't interpret.  If it's unambiguous, it's been misinterpreted for 30 years, why not just go to Congress and tell them this is clearly being misinterpreted, you know, be more specific.

MR. SKEDZIELEWSKI:  I don't think, respectfully, your Honor, that the statute is ambiguous.  I just think it's capacious; but I think there's a meaningful difference there.  So the statutory language is very broad, and it seems that previous secretaries and administrations wished to interpret it narrowly for whatever reason.  But we think a fair reading of the --

THE COURT:  Including the prior iteration of this Administration; correct?

MR. SKEDZIELEWSKI:  Correct.  The previous President Trump Administration did not change the statutory interpretation with respect to PRWORA, that's correct.

THE COURT:  And you're suggesting that they were intentionally in contrary to the law that the Congress set forth, so it was at least a reasonable interpretation at that time; correct?

MR. SKEDZIELEWSKI:  Well, I don't want to make a

pronouncement as to whether it was reasonable or not. I wasn't in the Department of Justice during that first term.

But what I do think is that even if the previous notices were reasonable, as I've mentioned, you know, the case law in this is pretty clear. The new notices don't need to even necessarily be better in the Court's eyes so long as they give good reasons. And here, I think it's pretty clear that we give good reasons. And I think with the time maybe it's best if we talk about some of them, if that's all right with your Honor, some of the statutory interpretation elements.

THE COURT: Sure.

MR. SKEDZIELEWSKI: So to start with the ED notice, which says that all educational benefits provided to individuals, households, and family eligibility units regardless of age, including in-kind at the community level, are Federal public benefits and thus subject to verification requirements, excepting basic public education.

So PRWORA defines Federal public benefit, uses broad disparate group of benefits that I've been going on about. One way to think about it is you have in the same sentence benefits, you know, food benefits alongside with retirement benefits, so just totally

different in-kind and type, and so clearly Congress intended an expansive array of Federal public benefits.

Here, ED relies on postsecondary education. At some point I believe Plaintiffs suggested that that really should just mean payments, but the statute's clear that it's "payments" or "assistance". And so assistance, as we can see from other pieces in the statute where things like soup kitchens, as your Honor has mentioned, are accepted, clearly mean that by assistance is envisioned in-kind services, not just --

THE COURT: But how is that clear?

MR. SKEDZIELEWSKI: How is that clear?

THE COURT: Yes.

MR. SKEDZIELEWSKI: Well, I think it's clear, your Honor, when you look at the other pieces of the same 1611 that accept things like crisis counseling, as another example. You would need to accept crisis counseling in the definition of Federal public benefit if it wasn't swept up by the definition. So clearly crisis counseling is an individual service provided by a provider, you know, to a recipient in the form of, you know, counseling. There may be -- someone is getting their salary paid at the same time, but of course the real service there is the counseling.

And so assistance I think is clearly within the,

just looking within the four-corners of the statute easily encompasses in-kind services like the sort that ED gave notice of in its notice.  So the WIOA and the Perkins V each provide educational services to adults and children who lack basic skills.  They're Federal public benefits because they're similar to, if not just encompassed by, postsecondary education and the term "assistance".  So we put those three together, "similar to", "postsecondary education", and "assistance," I think ED easily gets, you know, shows why those programs would be included.

The HHS notice -- unless your Honor has questions about the ED notice?

THE COURT:  What about the Head Start program?

MR. SKEDZIELEWSKI:  Sure.  So let me talk about Head Start, which I just sort of think of as under HHS heading.

THE COURT:  It might be HHS.  I shouldn't be thinking of it as Education, so I apologize.

MR. SKEDZIELEWSKI:  It's okay.  So I think the relevant terms in our sort of this catchall list in 1611 for Head Start and -- well, for Head Start would be welfare, and so let me talk about why we think welfare applies here.

Welfare is defined as any means-tested

assistance to families and individuals.  And Head Start, while it does a lot, it's an antipoverty program that principally focuses on providing school readiness.  So it would be one thing if it provided school, but it provides school readiness, right, so it's principally a welfare program.

THE COURT:  How do you figure that?  Because isn't it the program that takes children who are not at the level that they need to be to enter kindergarten for whatever their reasons and provides for them basically pre-education.  It's a preschool essentially, isn't it?

MR. SKEDZIELEWSKI:  I think there's a lot more to it than preschool.  I'm no expert on Head Start, your Honor, but my understanding is it includes health services, nutritional services, and social services, not just for the child in pre-K, but for the family.  So it's much broader than, you know, just pre-K.

THE COURT:  But if we construed the residual clause to include -- the residual phrase, I mean, to include all education programs like Head Start because they were a similar benefit to welfare, then why would Congress have used the phrase "postsecondary education"?

MR. SKEDZIELEWSKI:  I think Congress made this

somewhat easier to understand by incorporating the *Plyler* case.  So by adding that into the statute they said, look, we have this capacious definition of Federal public benefits; it includes everything similar to postsecondary education.  But here's what it doesn't include:  It doesn't include basic public education as outlined in the *Plyler* decision.  And just to note, Head Start, that was passed 20 years before the *Plyler* decision, and it's not mentioned there, and then PRWORA was passed in '96.  So if Congress wanted to sweep Head Start into that notion of basic public education, it would have been able to do so.  It was clearly aware of that.

THE COURT:  But basic statutory construction and not congressional intent interpretation; your interpretation of the residual clause sort of eats the rest of the definition.  Right?

MR. SKEDZIELEWSKI:  When you say the residual clause, do you mean the "similar to"?

THE COURT:  Yes.

MR. SKEDZIELEWSKI:  No, your Honor.  Similar to is broader and -- rather, and less specific than identity.  It doesn't mean same.  But it does mean there have to be characteristics in common.  That's one definition of similar.  So anything that doesn't have

characteristics in common with postsecondary education wouldn't be swept in, but --

THE COURT:  But it makes postsecondary really lack any meaning, that word, "postsecondary".

MR. SKEDZIELEWSKI:  I think that postsecondary is sort of understood at least in laymen's terms in the context of primary, secondary, and postsecondary, right, and so in a certain way it's really not secondary.  It's not high school, it's something other than high school and --

THE COURT:  But is Head Start something other than high school?  Are you arguing that Head Start is a postsecondary education?  I guess what you're asking me to do is interpret what the congressional, whatever Congress meant 30 years ago and by the word "postsecondary", and by your sort of method of interpretation doesn't welfare cover education generally?

MR. SKEDZIELEWSKI:  First point, I think Head Start really falls under welfare more so than postsecondary.  And then whether -- and I'm sorry, your Honor, because I wanted to made that point I may have slipped on what the real crux of your question was.

THE COURT:  So if we're looking at -- doesn't welfare cover all education?  Isn't the word "welfare"

in that statute?  What we're saying -- if you read welfare so broadly as to include Head Start, right, postsecondary education probably lacks any meaning in that statute.  There's no need for it.

MR. SKEDZIELEWSKI:  I see.  So just to make sure I understand the question.  Because we're reading welfare broadly it seems like it's so broad in your Honor's view, or at least as far as the question goes, that it totally encapsulates postsecondary education so that's redundant, something like that?

THE COURT:  Right.  And we're not supposed to assume that Congress put words in there that they didn't intend.

MR. SKEDZIELEWSKI:  Correct.  I don't think welfare naturally would include the kind of programs encapsulated in the ED notice which were much -- excuse me -- I actually meant to refer to the DOL notice, which are much more like sort of employment or unemployment benefits, jobs training and job placement type of programs.  That would seem to be captured by unemployment, but it's not obvious that that would be captured by welfare, especially -- I think that one of the essence of welfare is means-tested, so it's only for individuals who meet certain requirements, like income below a certain level.  Whereas unemployment is

a different standard; it's are you employed or not. Maybe you made a million dollars last year but you lost your job so you might still want to go join -- you see my point.

THE COURT:  But I guess that's -- isn't that why Head Start probably isn't under welfare either?

MR. SKEDZIELEWSKI:  I don't think so, your Honor, because what Head Start incorporates, as I mentioned, is sort of health, nutritional and social services.  I think social services for low income families is sort of quintessential welfare, and that's at least the way Head Start is described.

THE COURT:  Okay.

MR. SKEDZIELEWSKI:  If I could, your Honor, because it was discussed earlier, this idea that the phrase "eligibility unit" --

THE COURT:  That's what I was going to ask that we move on to.

MR. SKEDZIELEWSKI:  Surely.  So I think just on its face without getting into canons of construction, "family" is a much broader term than "individual" and "household".  I don't have any trouble telling anybody what an individual is or what a household is, but a family could be a nuclear family, cousins, aunts and uncles, second cousins; it can keep going and sort of

the circle's growing ever larger.

So it makes sense that Congress would need to add a qualifier to family.  Namely, only a family unit that's eligible for benefits as defined by the various programs at issue here, and then they define differently.  But it's family that is an eligibility unit; and individual and household makes sense on their own.  Unless your household is -- you have a manor, an estate with a bunch of outlying buildings.  I think "household" is generally pretty easy to identify; it's whoever's in the house.  So those terms didn't require that modifier.

And your Honor mentioned this as well, but I'll just reiterate the point that Section 1631(f), you know, it creates an exception to eligibility requirements and it discusses family residing in the same household.  So there you see Congress using those two words sort of in parallel and not in this list, and so I think that gives credence to the plain meaning of the sentence.

THE COURT:  But if I were to say the laws, treaties, and Constitution of the United States, you would assume that "United States" applies to the laws and the treaties as well; correct?

MR. SKEDZIELEWSKI:  The laws, the treaties and

-- of the United States.  Your Honor, certainly there is, you know, there are scenarios where a list like that can be modified by the final sort of modifier.

But here, it doesn't make a whole lot of sense. No HHS program, for example, uses the phrase "individual eligibility unit."  I think that's a telling omission.  It's just not part of the regulatory or statutory scheme here.  I think it's a bit of a forced reading to try to sort of add that in.  So that's sort of our view on the eligibility language. Happy to talk about it more.

THE COURT:  So, but hasn't the Supreme Court in *Lockhart v. United States* said that the antecedent modifies the whole phrase when it is simple and parallel without unexpected internal modifiers or structure.  And that's what we seem to have here.

MR. SKEDZIELEWSKI:  Granted, your Honor. However, like I mentioned, I think that it doesn't -- it's not really clear on its face what "individual eligibility unit" would add to the statute, when an "individual" makes already clear, and elsewhere in the statutory scheme this individual eligibility unit phrase doesn't appear.

THE COURT:  Nor is it clear what "family eligibility unit" would add, except if it all imposes

an eligibility requirement.  So unless there's an eligibility requirement on individuals and on, I forget what the other --

MR. SKEDZIELEWSKI:  Households.

THE COURT:  -- households.  Then wouldn't family eligibility -- then why would we need eligibility unit modifier?

MR. SKEDZIELEWSKI:  I think you need it so that it refers whoever is interpreting the statute to the specific programs that are going to have those eligibility requirements for families, to the extent that some of them are provided to families.

In any case, I mean just to sort of argue in the alternative, even if eligibility unit modifies that list, it only modifies -- and just looking at the statute, it would only modify those three terms, namely, "individual, household or family eligibility unit."  Before that you get an "or," you know, or any similar benefit for individuals, household, et cetera. It wouldn't go back; any retirement eligibility unit, right, that doesn't make sense.

So it would just mean the unit by which eligibility is assessed.  And by the way, even if your Honor wishes to read it in Plaintiffs' preferred way, all the programs at issue here, contrary to Plaintiffs'

assertion earlier, have either eligibility requirements or prioritized services to specific types of individuals.

THE COURT:  Those are two different things; right?

MR. SKEDZIELEWSKI:  That's right.

So at a maximum there are specific, you know, income requirements and, you know, other things like that for eligibility, and at a minimum the services are provided to specific types of individuals; such as homeless individuals, for example; right?  You don't need housing assistance for people who are housed.

So at the most then, you know, sort of Federal public benefits, the definition here still covers all of the programs that are at issue in this case, and so any relief, you know, if your Honor were to construe the statute in Plaintiffs' favored way, would have to take that into account, namely, the specific eligibility requirements and priorities of all the programs that are in the --

THE COURT:  So by your interpretation, "individual, household, or family eligibility unit" only applies to any other similar benefit, but not to retirement, welfare, health, et cetera?

MR. SKEDZIELEWSKI:  If I understand the

question, I think that's right, your Honor, yes.

THE COURT:  Okay.  Thank you.

MR. SKEDZIELEWSKI:  You're welcome.  Great.

Well, I think in that since there's 10 minutes left, your Honor, I would like to spend some time while we can on irreparable harm, --

THE COURT:  Sure.

MR. SKEDZIELEWSKI:  -- which I actually think is, in a way I would have wanted to start with this because I think it's really favorable for the government here.  It sort of dovetails in a way with the final agency action argument, but here I'll discuss it in terms of irreparable harm.

So, first, no enforcement measures have been taken against any Plaintiff States.  There haven't been any noncompliance consequences ordered or commanded by the agencies.  In fact, no action has been taken other than publishing an interpretation.

So enforcement is governed by 2 CFR 200 for all these agencies.  That sets the parameters for how they can go about enforcing their grants, and it requires, among other things, notice of termination, so pre-termination notice.  It requires comments.  It requires the agencies to receive comments from the grantee.

So Plaintiffs have argued that, you know, the notices require notice-and-comment.  But what the regulations say is that it's when enforcement proceedings begin, well, then, yeah, the agencies do have to receive comments and consider them.  And that process historically can take months where the agencies, you know, are providing training and technical assistance to the grantees to help bring them into compliance.  After all, you know, these agencies are concerned with administering these grants, not with punishing grantees, and so they work with them.

And then if a resolution is not reached and if noncompliance is still, you know, the grantees are still noncompliant -- and again, this is all in the CFR 200 -- there's process for the grantee to object, to have a hearing, and then to take an intra-agency appeal.  So the whole process can eventually lead to what I would call final agency action when let's say a, you know, a disallowance is taken or a particular portion of a grant is withheld, or if its already been paid then the agency, you know, issues a debt that needs to be repaid by the grantee, that would be final agency action.  And that would be irreparable harm, or, even the intimation that anything like that is about to happen could get us closer to a showing of irreparable

harm.

But irreparable harm has to be imminent, and even if there wasn't a stipulation right now, you know, and let's say the stipulation ended today, there's still no enforcement imminent.  At least one of the Plaintiff States or one of the grantees would have to receive a notice that termination is contemplated; but that hasn't happened yet.  So irreparable harm to the States I think is really not present here.

As far as the administrative costs are concerned, as I mentioned earlier, the grantees can use funds from the federal grants to cover the administrative costs.  Now I understand the court, if the Plaintiffs were to say that reduces the overall amount they can use for the administration of the program, and that's true, but it does diminish some of the claims in Plaintiffs' briefing about, you know, having to make these huge outlays of expenditure to cover these verification costs.

THE COURT:  But there are some infrastructure things that you're asking them to put into place that won't necessarily bear out a reduction in the cost --
I'm sorry.  You're asking them to use this money for administrative costs, and you're saying but it will reduce the number of people eligible so, therefore,

you'll have a savings on the other side.

But there are some things you need to, you know, an ambulance, you need to pay the -- and I know that's not a good example.  But for example, you need to pay the ambulance driver; you need to pay the EMTs; you need to put gas in the ambulance; you need to put all the stuff on there.  And those costs are static.

So do you have any analysis, has the government done any analysis of a cost and a savings that they anticipate?

MR. SKEDZIELEWSKI:  I'm unaware of the costs benefit.  But they did consider the cost to the Plaintiffs, which I think Plaintiffs are most concerned about here.

And I will also just add into the mix just to sort of -- and this applies to all the notices -- that the SAVE system, that's S-A-V-E, I'm forgetting what the acronym stands for, but that's an online web-based portal that grantees can use to verify immigration status.  My understanding is that it's as simple as entering the person's name, date of birth, and if they have it -- and the more information you give, the more accurate it is.  But if you give the name, date of birth, Social Security number, or alien A-number, that will immediately return the immigration status.  And it

works in seconds; it's free.  There used to be a fee with it, but the notices indicated that that fee has been removed.  So while, yes, somebody has to type in the information, that is a cost; it's not exactly setting up -- they aren't, you know, setting up this whole new --

THE COURT:  Well, they have to set up a system to get the information.  I ran a state agency before I did this job, and we had a whole unit whose job it was to get information from people in order to determine their eligibility.  And so that's the infrastructure I'm talking about.

And I also, you know, am not sure how you look at those savings and say -- what about the other costs that come in.  So, for example, Head Start, if we were to say yes, you know, not eligible immigrant children are not going to be provided Head Start anymore, okay.  States are responsible for public K through 12 education; correct?

MR. SKEDZIELEWSKI:  Yes.

THE COURT:  Yes.  Okay.  So the resulting sort of unprepared kindergartners are going into the school system and become the responsibility of the State.  How is this not a giant like sort of unfunded federal mandate to the States?

MR. SKEDZIELEWSKI:  Well, your Honor, none of the programs at issue here remove access to basic public education, which the States are responsible for.

THE COURT:  But Head Start is something that is in place to prepare students who are not otherwise prepared to enter public education.

MR. SKEDZIELEWSKI:  Right.  Understood, your Honor, and I think that's where the answer is the statute.  So PRWORA, the purpose of PRWORA and its meaning is to reserve those benefits for Americans and qualified aliens.  So to the extent that PRWORA has, you know, knock-on effects, that's something that Congress in its authority, you know, decided; and all that the agency is doing here is doing its level best to be faithful to Congress and the statutory text.  So it's -- the consequences here don't flow from the notices; they flow from the congressional mandate.  And speaking of that -- I'm not sure how much time is left. One minute?

THE COURT:  I would like you to address the Spending Clause.

MR. SKEDZIELEWSKI:  Yes, that's what I wanted, to make sure we address the Spending Clause.  So the issue there is are these retroactive conditions, are they impermissibly coercive.  I think the answer is no

on both counts.

I mean I don't take Plaintiffs to be arguing, you know, DOL actually laid out four factors whether the condition on the spending was for the general welfare. Here, I mean PRWORA was created by Congress for the general welfare. I don't think there's an argument from Plaintiffs on that here.

And then whether it's ambiguous or not, I think the statute is very clear in the conditions. So the question isn't is every single aspect of the statute spelled out right there in the statutory text. The question for Spending Clause is, is the condition that's being placed on the States, is that unambiguous. And here, the condition is crystal clear; right? The States knew from the beginning when they anticipated these grants that there was a condition for a lot of these grants which included verification of status.

So the condition is clear. And the condition here, is it related to the federal interest, I think that is also easily met. The federal interest here being facilitating the purposes of PRWORA, you know, discouraging illegal immigration, and preserving federal funds for (indecipherable).

THE COURT: But what do you do with the Spending Clause argument that for you to impose new conditions,

which these are, these are conditions that have not been imposed before, that it has to be crystal clear and unambiguous.

Are you arguing that it's been unclear and ambiguous for 30 years, and everybody except you right now has interpreted it incorrectly?

MR. SKEDZIELEWSKI:  To be clear, not me, because they didn't ask me to help write the notices.

THE COURT:  I understand.  Your Department.

MR. SKEDZIELEWSKI:  But yes, your Honor, our first argument is we've got it right on the statute, and that is enough for the notice or for the clarity that is required under this case law.

But even if it's not, as your Honor sort of raised earlier, then at most what any injunction should include or just grants that have already gone out, going forward --

(Indecipherable crosstalk)

THE COURT:  -- the States have conceded that, that it's not for future money.  It's grants that -- not grants that have gone out, but that have been committed by the government, where they've signed, they've accepted the grant terms, the States have agreed, and that money is committed by the federal government; not that it's already gone out the door.

But I think that the States conceded that it's not for future grants.

MR. SKEDZIELEWSKI:  I think that they did, and I'm just -- like I said, I can (indecipherable), that they couldn't go past that.

So I think the key question in this, you know, ambiguity piece, is there fair notice in the text of the statute that PRWORA applies to these programs, and our answer is yes.  These notices closely and correctly track the text of the statute and Congress' intent.

And there's evidence of this from before this Administration, your Honor.  During the President Biden Administration the Department of Education gave waivers to California and Oregon so that they could enroll unqualified aliens in a specific program; it's called the Disconnected Youth Program.  You don't need a waiver unless you understand that the statute covers the individual, the program that's being waived.

THE COURT:  Which specific program are you talking about?

MR. SKEDZIELEWSKI:  That was the Disconnected Youth Program.

THE COURT:  And what did it do?

MR. SKEDZIELEWSKI:  My understanding is that it's, it's like a -- it would be equivalent to a

postsecondary ed.  Let me see if I have some additional --

THE COURT:  So postsecondary education is included by the statute though; correct?  It's pretty clear that postsecondary -- nobody is arguing that postsecondary education needs is not included in the PRWORA.

They're arguing that the programs that these notices sweep, sweep more broadly.

MR. SKEDZIELEWSKI:  I should have said similar to, your Honor.  I think the argument would be that it's similar to postsecondary ed.  And I'm happy to submit supplemental authorities, if your Honor likes, to give you more details about that program.  I don't have them on hand as far as all the details of what it does and so on.

THE COURT:  If you want to, you can do that.  I don't want you to submit pages and pages, so if you want to just submit the citation to that program.

MR. SKEDZIELEWSKI:  Sure, we can do that.

But in any case the point there, your Honor, was that a waiver was issued, which is just evidence that people understood that Federal public benefit is really broad, it covers all kinds of programs that maybe weren't previously listed in the notices.

And as far as impermissibly coercive -- just to be mindful of time here -- the inducement can't be so coercive that pressure turns into compulsion, is the rule.

And when we compare some of the cases that the Plaintiffs cite to the issue here, in *NFIB* the Supreme Court, you know, held that the ACA there was a, in the Chief's words, a gun to the head of the States because of the just enormous breathtaking amount of money that was at stake.

And key there, it wasn't that it was just that it was a breathtaking amount of money.  It was that the ACA was going to withhold not just the funds that were linked to the new programs that the ACA was asking the states to enter into, to start to provide, but it was going to withhold all the stuff that they previously received.  So it was coercive because -- in part because the funds that were conditioned weren't meaningfully connected to the grants that were at issue in that case.

So for the same thing to be true here it would have to be that, you know, HHS is going to withhold, you know, everything that the States get with respect to Head Start just because they're not verifying status as required by PRWORA rather than --

THE COURT: It was status; I'm sorry. Okay.

MR. SKEDZIELEWSKI: Immigration status, yeah.

THE COURT: Okay.

MR. SKEDZIELEWSKI: Rather than just -- you know, we don't know what, if anything, would be withheld here, again, because no final agency action yet. But once -- if we get to that point, then we would know is it really impermissibly coercive. And, you know, one way to know that would be if all kinds of funds were going to be withheld from the States that weren't even connected to the conduct that's required by PRWORA. So I don't think we have that here, your Honor, and so I don't think the notices here are impermissibly coercive.

And with that I would just, since I know I think we're over time, I would just end by if the Court does decide to issue any kind of relief that sort of as I think was discussed earlier, there are a number of Plaintiff States who haven't submitted Declarations showing irreparable harm. Some have submitted Declarations with respect to the HHS notice, but not to the ED notice; and so I just think as an evidentiary matter the Court should, you know, make sure that any injunction that issues is linked to the evidence in the record.

THE COURT:  So are you arguing that because Connecticut says that it has irreparable harm in this way, Rhode Island, or Massachusetts or, I'm sorry, I know there are other states -- New York -- doesn't have that irreparable harm?  I mean isn't that asking the Court to micro-manage these grants?

MR. SKEDZIELEWSKI:  No, your Honor.

THE COURT:  Which I don't have any interest in doing, just so we're all clear.

MR. SKEDZIELEWSKI:  Understood, your Honor.  I don't think that would be micro-managing the grants; it's just micro-managing Plaintiffs' relief, and it's only micro -- it's hardly micro really because these are all States and it's all very large relief.  But because there are so many Plaintiffs, they've all brought different levels of evidence and they all have to meet the threshold independently to qualify for relief.

And I would just close then by -- and we mentioned this in our brief, of course, but we would request if an injunction is issued, for a bond.

THE COURT:  Just with respect to the last thing; not the bond.

But can't we draw the inference that the harm, if we got to the point of injunction, that the harm

extends broadly.  We have the power to do that; right?  There is some fairly extensive evidence here, fairly exhaustive.

MR. SKEDZIELEWSKI:  I would say, your Honor, at least as to some of that evidence, a lot of it is mere assertion from individuals, who while may be competent in some areas, in some instances speak outside of their competence, as far as I can tell.  There's a lot of discussion about individuals who are served by some of these grants being impacted by the notices.

THE COURT:  Can you give me some of the examples of people speaking outside of their competence, please.

MR. SKEDZIELEWSKI:  I'd like to retract that, your Honor.  I don't mean to say that they're speaking outside of their competence.  I think there are some things that are assertions that are just not supported other than by the assertions of the declarants, to be clear.

THE COURT:  But they're under oath, those assertions; correct?

MR. SKEDZIELEWSKI:  Correct.  And all I wish to indicate is that to the extent that some of the declarants say things to the effect of individuals who lack things like an identification would be affected by these notices, that there's no evidence in the record

beside those assertions to support that.  And to the extent that that's true, those would be harms to non-plaintiffs in this case.

THE COURT:  The Plaintiffs are the States.

MR. SKEDZIELEWSKI:  Right.

THE COURT:  But the harms would be to the units. So I think that what they're arguing -- and I don't want to argue for them -- is that I think it's common sense that people who are unhoused, people who are suffering from severe mental illness, people who are under three years old and looking for Head Start don't necessarily have good control of their papers, their documents; people don't have a passport necessarily or a birth certificate copy even.

So I think what they're saying is their programs would be significantly impacted by people who -- and I don't think it's -- I think it's common sense that there will be a cohort of people who are eligible for the program but cannot prove it.

MR. SKEDZIELEWSKI:  I think, your Honor, one answer to that, the SAVE program that I mentioned for verifying eligibility just requires a couple of bits of information.  It doesn't require documentary evidence for that system to function.

THE COURT:  But didn't we just -- and maybe I'm

misrepresenting what I read in the news.  There was a police officer in Maine who was working and has either been deported or taken into immigration custody because he wasn't eligible to work and, whatever, the government verify, E-verify, whatever it is, the government, they put him through it; and according to the news reports he was found to be eligible to work by that program.  And when called on it, Immigration's response or whoever's response from whatever agency arrested him was you shouldn't -- you can't rely on these things.

So are you saying that that program, that SAVE program will be a hundred percent up to date at all times?

MR. SKEDZIELEWSKI:  No, your Honor, it's not going to be a hundred percent effective, though it is -- I can't give you a percentage, but my understanding is that it is in the vast majority of cases effective in the first instance, like in seconds. And then if there's -- if it can't return an accurate response immediately, there's a process that takes like six days or something.

THE COURT:  What do we do with somebody who is experiencing a mental health crisis and who maybe doesn't even know their own name?

MR. SKEDZIELEWSKI:  Your Honor, I think that's something within the competency of the agencies to work out with the States.  And that's why I sort of try to emphasize in discussing final agency action sort of this back-and-forth process that the agencies have historically gone through when they're enforcing compliance with PRWORA.  So it's not just that these agencies, you know, slap a fine without anything further; there's training, technological assistance.

THE COURT:  But these are effective immediately, so they don't have the time for that.  The agencies made these effective immediately.

Back in the day when this was first done, Congress gave the States two years to figure out how to implement these programs.  And HHS and the other agencies here had said immediately, and that has been delayed in order to allow the parties to respond to the briefing in this case.

MR. SKEDZIELEWSKI:  Yeah.  Well, I think that made sense the first time that the requirement was issued.  But now all the States are familiar with, at least for all the programs they administered that fell under PRWORA prior to these notices, with performing a verification process.

THE COURT:  In some programs.  So, for example,

they're going to perform a verification program, say, for food stamps or SNAP benefits; right?  I would imagine States perform an eligibility determination because those benefits are considered welfare benefits.

MR. SKEDZIELEWSKI:  I would imagine there's a means test, yeah.

THE COURT:  Okay.  And it's tested as to whether they're eligible as a citizen or  an eligible immigrant or an eligible documented person in the United States.

So -- or if you want to take it even further, retirement benefits.  Let's go with that, Social Security retirement benefits or government retirement benefits.  That agency that administers both benefits will have the ability to determine the eligibility of people.  But that does not mean that the local mental health center has those eligibility infrastructure. That's why they made it the two years.

MR. SKEDZIELEWSKI:  Your point is well-taken, your Honor, although, like I say, I think there are web-based searches that solve this problem.  They're free, they're provided by the federal government.  And so while there may be some initial steps that have to be taken to implement those at cites that formerly didn't perform verification, as HHS's findings have it, those are not going to be onerous; point-one percent of

average annual expenditures per enrollee.  So there's a cost, yes, but the cost comes out of the grants that they already receive.

THE COURT:  It's not just cost.  It's ramp-up time; right?  So if they don't have the people in place; they don't have the computers to check stuff; they don't have the experience to understand, you know, what am immigration status means, then they have to put all of that infrastructure in place in all of the agencies that are going to be impacted by this change in notice; correct?

MR. SKEDZIELEWSKI:  I understand your point, your Honor, about time.  These notices at least as far as the DOL notice was published July 10th, there's a stipulation in place until September 10th.  So that's July, August; it's two months.

THE COURT:  Two months.

MR. SKEDZIELEWSKI:  Two months.

THE COURT:  Maybe it's not fair, but I ran a state agency, I know how long it takes for things, for infrastructure to be put in; for people to get help; to get what we used to call FTEs, Full Time Equivalent Positions funded in order to hire people, in order to train people.  It's not a 60-day kind of magic thing where we can just say, well, you do it in another

agency, let's do it here.

MR. SKEDZIELEWSKI:  Right.

THE COURT:  So I think that you're simplifying. I understand that that's your job, but I think that the agency notices are oversimplifying what is a much more complex issue for the States.  I'm not saying that carries the day; I'm just saying it's not as simple as they're trying to make it out to be.

MR. SKEDZIELEWSKI:  Your point is well-taken, your Honor.  I would just reiterate this point about enforcement, which I think is crucial here.  The so-called sword of Damocles in this case is really like sword of a ghost; it's not hanging.  As I said, there's a process that the agencies go through.  There will be a determination notice before anything actually happens.

THE COURT:  So is the government saying that until this infrastructure is in place, its reinterpretation of these statutes would not be enforced?

MR. SKEDZIELEWSKI:  I can't commit the agencies to that, your Honor.  But based on history and practice I think that -- I don't think there's any reason to expect immediate withholding the funds on September 10th.

THE COURT:  But hoping that the government doesn't fine you isn't the same as having permission to do what you're doing, or having the leeway to take the time to get up to speed in whatever this is that they have to do.

MR. SKEDZIELEWSKI:  Just the very final point, your Honor.  That's true, that may be true, but it's required by PRWORA, in the government's view.

THE COURT:  In the government's view; right. Yes.

Okay.  Is there anything else?

MR. SKEDZIELEWSKI:  There were a number of points that Plaintiffs made, but I think we touched -- oh, one quick point then, your Honor.  But Plaintiffs mentioned the second step in our interpretation in the notices.  So first we interpret the statute, and Plaintiffs say then we do a second step of applying it to specific programs.

And I would just say there's nothing about that that goes beyond interpretation.  It's sort of part and parcel of interpretation to give an example of what you mean, and that's all that the agencies were doing here. They're saying here's the interpretation and here are some examples of programs that fall under it; oh, and by the way, here's a footnote; there may be others.

We're not claiming to be exhaustive; we're just trying to give the public information about what we think PRWORA means.

So I think the second step I don't think carries a lot of weight. And with that, I thank you, your Honor, for your time.

THE COURT: Thank you. I gave you a little extra time, so I'm going to let the States respond. I'll try to keep it to 15 minutes.

MR. REICH: Your Honor, I'll respond to the government's points on the merits, and then Ms. Ranucci will respond to some of the government's points on the equities and the finality questions.

First, starting with the arbitrary and capricious. I heard my friend to say that the relevant standard set forth in *Fox v. FCC*, and we agree with that. What *Fox v. FCC* said about reliance is the following: An agency must provide an explanation, quote, when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary and capricious to ignore such matters.

My friend suggested a contrary view was supported by Justice Thomas' partial dissent in *Regents*, which he said had the same statements of law

that he was presenting here.  That, too, is correct. The majority in *Regents* expressly and directly rejected Justice Thomas' view of the law, and said that even where an agency believes its prior policy is illegal, it needs to consider reliance interests in changing.

In terms of the agencies' explanations here, my friend relied on the Department of Justice's consideration of reliance interest; but I heard him ultimately to concede that, of course, the Department of Justice's considerations of reliance has no bearing on whether the HHS, ED, or DOL considered them.  That's especially the case since the Department of Justice notice came out last.  It was not even out when the prior notices were issued.

He also suggested HHS had considered reliance interest.  But HHS was very clear that it did not think it was permitted to consider reliance interest because no matter how strong they were, it couldn't justify not adopting what it viewed to be the better view of the law.  And I didn't hear him to point to anything in the Department of Education notice or in the Department of Labor notice that considered reliance; and we've looked and found nothing.

As to the statutory arguments:  First, on the question of whether PRWORA extends to programs that

don't have eligibility requirements.  Plaintiffs have made two core textual arguments, one based on the words "eligibility unit" in 1611(c)(1)(B) and one based on the references to applications in 1642.

I didn't hear the government's counsel to make any response to the second point.  He didn't explain how their interpretation is consistent with the references to application in 1642.

As to eligibility units, the norm under the series-modifier canon is that the term "eligibility unit" modifies each of the terms in the list.  My friend suggested that that's not the case here because it doesn't make sense to apply the modifier "eligibility unit" to households or individual.  But that's clearly not the case.

Statutes define households differently.  It's not self-evident what counts as a household.  Are children who have gone off to college part of a household?  Are spouses who don't live together part of the same household?  Underlying statutes may inform what unit is relevant for eligibility purposes.

And even as to individual, it may not always be self-evident whether the person who applies for benefits or the person who receives the benefits is the person whose eligibility matters.  Think, for instance,

of a case where a parent is applying for benefits for their child.  Is it relevant that the parent needs to meet eligibility criteria, or the child?  This statute tells you to look at the eligibility unit in determining where PRWORA applies.

The government's counsel also suggested that our interpretation was rebutted by the fact that there's certain programs included in the list of exceptions in 1611(b) that he thinks would not be necessary for interpretation (indecipherable), such as soup kitchens.

Two points on that, your Honor.  One is that there are certain items included in that list that are clearly not Federal public benefits under any definition.  For example, subsection (b)(1)(E) includes programs for housing or community development assistance provided by HUD.  HUD provides programs for community development assistance such as the Community Development Block Grant Program that afford benefits at the state level, things like funding for infrastructure, for sewers, for housing redevelopment that nobody would consider Federal public benefits.  So some of these definitions just sweep more broadly and are there out of an abundance of caution.

Separately, the Office of Legal Counsel in the Department of Justice in a 1997 opinion, which is at

21 OP OLC 21 -- and I have copies if your Honor is interested, or we can submit them separately.

THE COURT:  You can submit them, please.

MR. REICH:  Yes.

-- said on page 29 of that opinion in construing Section 1613, that the list of exceptions in the statute, you can't draw exactly the inference that government's counsel is suggesting, that many exceptions listed there clearly wouldn't be covered by the definition in the first place and that -- and rejected the inference that government's counsel is drawing as to that related provision.

The government also suggested that even under our view many of the programs that HHS is now saying PRWORA applies to have "eligibility units" because they're targeted at certain populations.  But as I think your Honor's question suggested, there is a fundamental difference between targeting programs to the population and limiting their eligibility to that population.

Title X clinics may be targeted at low income individuals, but they still don't screen for eligibility at the door.  There's nothing in the statute that requires that.  Similarly, homeless shelters, of course they targeted homeless people, but

they don't ask you to prove anything to walk in, or at least nothing in the federal statute requires you to do so. They, therefore, don't have eligibility units; they therefore don't have applications; they therefore do not fall within PRWORA.

On the second statutory question of whether PRWORA extends to non-postsecondary benefits, my friend tried to cram non-postsecondary benefits into the words "similar to". But I heard no answer to your Honor's point, that understanding the word "similar to" eats the rest of the definition and it makes the inclusion of the word "postsecondary" entirely superfluous; something that contradicts ordinary canons of statutory interpretation, and it's particularly inappropriate here where the legislative record makes crystal clear Congress added the word "postsecondary" as a conscious legislative choice to exclude primary and secondary education.

Opposing counsel also suggested Head Start is not an educational benefit because it includes things like food and childcare for young children. But as the government's own declaration, the Gradison Declaration makes clear at paragraph 6, it does all of those things, quote, to promote school readiness. Those all are means of achieving the educational objective of

promoting school readiness.  And the notion that promoting school readiness is not an educational objective for preschool children just does not seem correct.

Finally, on the Constitution, just two brief points:  (1) The suggestion that the Spending Clause only requires that the existence of the condition be unambiguous and not that the scope of the condition be unambiguous is plainly contrary to what the Supreme Court held in *Arlington Central School District* where it used -- applied that canon in interpreting the scope of the term "costs".

And separately, my friend mentioned waivers which I don't -- the Biden Administration apparently issued, which I don't believe appeared in the briefing. But based on some quick research, it appears that those were waivers relating to postsecondary benefits.  They refer to postsecondary directly in the announcement. So I don't think those have any bearing on the correctness of the government's interpretation today.

And with that, with your permission, Ms. Ranucci will make a few points as well.

MS. RANUCCI:  Thank you, your Honor.  Very briefly.  First to address Defendants' argument about the narrowing of the injunction.  Defendants don't

offer any support for this proposition other than *Trump v. CASA*, which was about a totally different issue; who are the proper parties to an injunction. Plaintiffs seek relief only for Plaintiffs here.  CASA is not implicated.

THE COURT:  Right.  And *CASA*, just so we're clear, specifically excluded APA claim cases and claims.

MS. RANUCCI:  That's correct, your Honor.

THE COURT:  And it's a slip opinion from the, whatever they call that docket, the emergency docket, and so it's not binding precedent here, so we don't need to spend a lot of time on that.

MS. RANUCCI:  Thank you, your Honor.  And we just would underscore the point here that the record contains over 60 Declarations.  Those Declarations are from high-level state officials.  For example, the Deputy Commissioner of the New York Office of Mental Health, The Director of Victim Services, the Rhode Island Attorney General's Office, et cetera; and that the Court could draw reasonable inferences from the record based on the extensive evidence, although we would reserve the right if the Court suggests to submit, we would be able to submit additional evidence if necessary.

Second, going back to your Honor's questions about *Azar* at the beginning, we do think that the pragmatic concerns really drive the analysis here. Just to consider what this looks like in the real world, I think that there are a number of issues that have come up today that were not squarely addressed in the notices.  As a practical matter, how will it affect people who are unhoused and may not have documents; what the effect will be on American citizens; how this is supposed to work for the 988 hotline.

Were HHS to have received the half a million comments before it promulgated this notice, it could have taken those practical considerations into effect, and it would have had the benefit of people like our declarants here who have expertise in these subject matters.  And we think that the support is not only notice-and-comment, but also our arbitrary and capricious claim because, of course, to the extent issues were not considered in the notices themselves, that supports that.

Third, there are two points that Defendants make on harm that I think if -- would prove too much.  One is that this rule does not create harm because the injury flows from the statute, not the rule.  If that were the case, no rule could be enjoined if that were a

principle.  Second, that there's no harm before enforcement.  There's a lot of case law that indicates the threat of enforcement is itself harm, but it would prove too much as well, which is that no rule could be challenged.  That's obviously not the case.

Briefly, as to SAVE.  There's no evidence in the record about the SAVE system.  I think to the extent the Court would like to take notice of how SAVE describes itself, when I looked about 48 hours ago the SAVE website describes it as a program for verifying noncitizens.  And so I do think, again, there's not any evidence about this in the record either way, but that there are some real questions that the government has not engaged with or put in evidence about whether the SAVE system could work for U.S. citizens who were born in the U.S., rather than naturalized citizens.

And just finally, Plaintiffs believe that a preliminary injunction could be issued if the Court finds a likelihood of success on any of the claims. We've already discussed the Spending Clause, and I think your Honor previously indicated contrary to law. But Plaintiffs' position is that even if the ultimate eventual remedy on an APA notice-and-comment claim or an APA arbitrary and capricious claim were to be remanded to the agency, that does not foreclose a

preliminary injunction on those claims, or an APA 705 stay, which is also relief that we seek.

And there are a number of cases that issue preliminary injunctions based on arbitrary and capricious claims, and also some, I think not as many, that issue preliminary injunctions based on notice-and-comment. Two that I can point you to just off the top of my head: One is cited in our briefing, although for a different purpose, which is *Massachusetts v. National Institutes of Health*, a recent case challenging NIH cost policy. And then a second one is not cited, but we could submit it if it would be helpful, which is, I believe it's captioned *State of Maryland v. AmeriCorps*. It's a multistate action issuing a preliminary injunction against AmeriCorps where the court's finding was premised on notice-and-comment violations.

THE COURT: Thank you.

MS. RANUCCI: Thank you.

THE COURT: I do want to clarify something. My law clerk -- who's smarter than I am and way more on top of things, today is his last day so that's sad; but anyway -- points out, reminds me that *CASA* is actually a merits opinion, and I misstated and said it was on the emergency docket.

But the relief sought here is limited to the Plaintiff States and well within the more general principles undergirding *CASA*, so. And I think they said (indecipherable), quote, Traditionally courts issued junctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit.

So is there anything further?

MS. RANUCCI: Not from Plaintiffs -- I guess I should turn around.

Not from Plaintiffs, your Honor.

THE COURT: From the government?

MR. SKEDZIELEWSKI: No, your Honor. Thank you.

THE COURT: Okay. I am going to ask that you get together, that the States get together a preliminary order and that you give it to the government for comment. Depending on how this comes out, I want to get it out by the 10th, and I'm losing my law clerk, so if you could get together. I understand the government is not going to agree to the substance of the order, but for comment, I would appreciate that and maybe give that to me in a week.

Okay. If there's nothing further, we're in recess.

(Adjourned)

123

C E R T I F I C A T I O N


        I, Denise P. Veitch, RPR, do hereby certify

that the foregoing pages are a true and accurate

transcription of my stenographic notes in the

above-entitled case.




                        /s/ Denise P. Veitch_
                        Denise P. Veitch, RPR
                        Federal Official Court Reporter



                        August 25, 2025
                        Date