# EXHIBIT A

2026 WL 2489361
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

COUNTY OF KING; County of Pierce; County of Snohomish; City and County of San Francisco; County of Santa Clara; City of Boston; City of Columbus; City of New York; City of Tucson; City of Pasadena; County of Pima; City of Santa Monica; City of Nashville; County of Davidson; Port of Seattle; Intercity Transit; City of Pittsburgh; City of Cambridge; County of Sonoma; City of Minneapolis; City and County of Denver; Treasure Island Mobility Management Agency; City of Portland; City of Wilsonville; Santa Monica Housing Authority; San Francisco County Transportation Authority; Central Puget Sound Regional Transit Authority; King County Regional Homelessness Authority; City of Chicago; City of Bend; City of San Jose; City of Culver City, Plaintiffs - Appellees,
v.
Scott TURNER, Secretary, United States Department of Housing and Urban Development; United States Department of Housing and Urban Development; Sean Duffy, Secretary, United States Department of Transportation; United States Department of Transportation; Federal Transit Administration; Tariq Bokhari, in his official capacity as Acting Administrator of the Federal Transit Administration; Gloria M Shepherd, in her official capacity as Acting Director of the Federal Highway Administration; United States Federal Highway Administration; Chris Rocheleau, in his official capacity as Acting Administrator of the Federal Aviation Administration; Federal Aviation Administration; Drew Feeley, in his official capacity as Acting Administrator of the Federal Railroad Administration; Federal Railroad Administration, Defendants - Appellants.

No. 25-3664
|
Argued and Submitted February 9, 2026 Seattle, Washington
|
Filed August 25, 2026

Appeal from the United States District Court for the Western District of Washington, Barbara Jacobs Rothstein, District Judge, Presiding, D.C. No. 2:25-cv-00814-BJR

**Attorneys and Law Firms**

Paul J. Lawrence (argued), Meha Goyal, Jamie Lisagor, Luther Reed-Caulkins, and Sarah S. Washburn, Pacifica Law Group LLP, Seattle, Washington; Erin L. Overbey, Chief Legal Advisor; Donna F. Bond and David J. Hackett, Senior Deputy Prosecuting Attorneys; King County Office of the Prosecuting Attorney, Seattle, Washington; Rebecca E. Wendling, Attorney; Bridget E. Casey and Rebecca J. Guadamud, Deputy Prosecuting Attorneys; Snohomish County Office of the Prosecuting Attorney, Everett, Washington; Mollie M. Lee and Sara J. Eisenberg, Attorneys; Ronald Lee and Alexander J. Holtzman, Deputy City Attorneys; Yvonne Mere, Chief Deputy City Attorney; San Francisco Office of the City Attorney, San Francisco, California; Stefanie Wilson, Deputy County Counsel; Meredith Johnson, Lead Deputy County Counsel; Kavita Narayan, Chief Assistant County Counsel; Tony LoPresti, County Counsel; Santa Clara Office of the County Counsel, San Jose, California; Naomi Tsu, Toby Merrill, and Sharanya Mohan, Public Rights Project, Oakland, California; Bobby Yu, Attorney; Samuel Emiliano Brown, Legal Counsel; Pima County Attorney's Office, Tucson, Arizona; David S. Mackey, Melissa C. Allison, and Christina S. Marshall, Anderson & Kreiger LLP, Boston, Massachusetts; Jeffrey S. Myers, Law Lyman Daniel Kamerrer & Bogdanovich PS, Olympia, Washington; Jakub L. Kocztorz, Law Lyman Daniel Kamerrer & Bogdanovich PS, Tumwater, Washington; Joshua A. Myers, Counsel, Sonoma County Counsel's Office, Santa Rosa, California; Andres Munoz, Columbia Legal Services, Seattle, Washington; for Plaintiffs-Appellees.

Yaakov M. Roth, Acting Assistant Attorney General; Daniel Tenny and Sarah N. Smith, Attorneys, Appellate Staff; Civil Division; Brett A. Shumate, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Sarah L. Bishop and Brian Kipnis, Assistant United States Attorneys, Office of the United States Attorney, United States Department of Justice, Seattle, Washington; for Defendants-Appellants.

Before: M. Margaret McKeown, Richard A. Paez, and Patrick J. Bumatay, Circuit Judges.

Opinion by Judge McKeown;

Partial Concurrence and Partial Dissent by Judge Bumatay

**OPINION**

McKEOWN, Circuit Judge:

This appeal highlights the tension that arises when sweeping executive orders collide with statutory text. Here, pursuant to several executive orders, the Department of Housing and Urban Development ("HUD") and the Department of Transportation ("DOT") have imposed after-the-fact conditions on earlier-awarded, statutorily authorized grants. The conditions would require the grant recipients—thirty-one cities, counties, and local agencies ("Local Governments")—to sign on to new conditions or lose billions of dollars in federal grants that fund critical services, including services for the homeless and health care. The conditions would specifically require the Local Governments to certify compliance with federal antidiscrimination law; acknowledge that those certifications are material for purposes of the False Claims Act; decline to use grant funds to fund or promote "gender ideology," "elective abortions," or "illegal immigration"; and verify the immigration status of individual grant recipients.

These conditions cannot be sustained as merely ensuring compliance with existing law, as the government argues. The majority of the conditions far exceed the limited authority set out by Congress and superimpose onerous requirements well after the government already awarded grant funds. Although the agencies' position is fairly reduceable to the excuse "the President made us do this," we are ultimately not in the business of second-guessing agency policy. Our resolution rests on a careful review of the authority that Congress has conferred upon the agencies, which review sits in the heartland of the judicial power.

***3** The district court concluded that the conditions do much more than impose existing legal obligations and preliminarily enjoined the grant conditions in full. Because we broadly agree, we affirm the injunction except as to the conditions that require compliance with federal antidiscrimination law. On that single issue, we remand to the district court with instructions to narrow the injunction in accord with this opinion.

**BACKGROUND**

This litigation stems from grants awarded under two statutory regimes: the McKinney-Vento Homeless Assistance Act ("Homeless Assistance Act"), administered by HUD, and a tapestry of statutes administered by DOT related to transportation infrastructure and operation.

The HUD grants are designed "to meet the critically urgent needs of the homeless of the Nation" and "to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b). Among the programs that Homeless Assistance Act establishes is the Continuum of Care ("CoC") program, which funds efforts to rehouse homeless individuals and families. *Id.* § 11381. The Act directs HUD to award CoC grants on a competitive basis using statutorily prescribed selection criteria. *Id.* § 11382(a). And the statute channels grant funds to approved

supportive services which may include, among others, childcare, job training, outpatient health services, food, and mental health services. *Id.* §§ 11360(29), 11385.

CoC grants follow an established process. The Secretary first publishes a notice of funding opportunity (“NOFO”). 42 U.S.C. § 11382(b). Grants are then “conditionally awarded” to local-coalition applicants, known as “Continuums,” based on conditions set out in the Homeless Assistance Act, implementing regulations, and the NOFOs themselves. *Id.* §§ 11382(b), (c)(2)(A); 24 C.F.R. § 578.23(c). By way of example, the Act requires recipients to agree to monitor and report to HUD on the project's progress and the provision of matching funds. 42 U.S.C. § 11386(b)(2), (6). The recipient also must agree “to comply with such other terms and conditions as the Secretary may establish to carry out [the CoC program] in an effective and efficient manner.” *Id.* § 11386(b)(8). Those conditions are incorporated in a grant or cooperative agreement presented to each grant recipient and become enforceable once the parties sign the agreement or the recipient begins to draw down funds.

The DOT grants fund programs for public transit projects, airport planning and development, rail infrastructure and safety, among many others. Like CoC grants, each of these grant programs is subject to conditions set forth in the authorizing statutes. *See* 49 U.S.C. § 5307, *et seq.*; *id.* § 47101 *et seq.*; *id.* § 22907; Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 840–845.

Before the actions that gave rise to this case, the Local Governments either received or were conditionally awarded grants under one or both regimes. The Local Governments allege that they rely on grant funds to sustain numerous programs and services. Some have already expended millions of dollars in reliance on their conditional awards.

In early 2025, HUD and DOT imposed a number of new conditions (the “challenged conditions”) on these preexisting grants. HUD, for its part, required CoC grant recipients to agree to the following commitments:

- The recipient “shall not use grant funds to promote ‘gender ideology,’ as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government”[1];

***4** • The recipient “agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)]”;

- The recipient “certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964”;

- The recipient “shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment”;

- “No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation”; and

- “Subject to the exceptions provided by [the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (“PRWORA”)], the recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.”

DOT similarly updated its grant agreements to require the following:

- The recipient “[a]grees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)]”;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

- The recipient "certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws"; and
- "[T]he Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

On May 2, 2025, eight Local Governments (San Francisco, Boston, Columbus, New York, Santa Clara County, King County, Pierce County, and Snohomish County) sued HUD, DOT, the Federal Transit Administration ("FTA"), an agency within DOT, and their respective administrators, and challenged their imposition of new funding conditions on grants conditionally awarded for fiscal year 2024. They were joined by several other Local Governments.

On June 3, 2025, the district court granted the Local Governments' preliminary injunction motions and enjoined the federal agencies from (1) enforcing the challenged conditions; (2) withholding grant funding from the Local Governments based on the challenged conditions; (3) requiring the Local Governments to certify compliance with the challenged conditions; (4) or refusing to process the Local Governments' grant agreements due to their participation in this litigation. On appeal, the government contests the injunction as to all challenged conditions, except the condition related to cooperation with federal immigration officials.

## ANALYSIS

***5** In seeking a preliminary injunction, the Local Governments must establish a likelihood of success on the merits, a likelihood of irreparable harm, that the balance of equities tips in their favor, and that the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Where, as here, the federal government is a party, "the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). Reviewing for abuse of discretion, we affirm in large part and remand with instructions to narrow the preliminary injunction with respect to the antidiscrimination conditions. *Id.*

### A. Likelihood of Success on the Merits

We begin with the likelihood of success on the merits, which we have deemed the "most important" factor. *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). The Local Governments assert a number of claims for relief under the Constitution and the APA. But the parties devote most of their attention to the claim that the challenged conditions violate the APA because they are unlawful, *see* 5 U.S.C. § 706(2)(C), so we start there. [2]

The APA directs reviewing courts to set aside agency actions that are "in excess of statutory jurisdiction [or] authority." *Id.* That inquiry controls here because the challenged conditions can only be creatures of statute. As we have previously explained, the power to "attach conditions on the receipt of federal funds" is "incident to the spending power," which is exclusively committed to Congress. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (citation modified) (quoting *South Dakota v. Dole*, 483 U.S. 203, 206–07, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)). HUD and DOT thus cannot impose the challenged conditions "[a]bsent congressional authorization." *Id.* at 1235.

Our task, then, is to evaluate the government's statutory justification for each condition. Although the conditions are myriad and wide-ranging, they fall into four broad categories: (1) the HUD and DOT conditions certifying compliance with anti-discrimination laws (the "antidiscrimination conditions"); (2) the HUD and DOT conditions certifying that compliance with antidiscrimination laws is "material" for purposes of the FCA (the "FCA conditions"); (3) the HUD conditions restricting recipients' use of funds (the "funding conditions"); and (4) the HUD condition requiring verification of individual grant recipients' immigration status (the "verification condition").

The government attempts to ground the challenged conditions in two authorities: Title VI of the Civil Rights Act and the Homeless Assistance Act. The government argues that the antidiscrimination and FCA conditions are permissible means of enforcing Title VI's mandate against discrimination in financial assistance programs, 42 U.S.C. § 2000d, while the funding and verification conditions are necessary to carry out Housing Assistance Act programs in an "effective and efficient manner," 42 U.S.C. § 11386(b)(8). Reviewing de novo those legal contentions, *Norbert v. City & County. of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021), we conclude that the federal agencies exceeded the bounds of their statutory remit.

### 1. The Antidiscrimination Conditions

We begin with the antidiscrimination conditions. The conditions imposed by HUD require a grant recipient to certify "that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964." DOT similarly requires recipients to certify that they do not operate "any programs promoting diversity, equity, and inclusion (DEI) initiatives" that violate such laws. These conditions' broad terms cover *any* program administered by a local government, not just programs receiving grant funding.

***6** The government submits that Congress authorized these measures as a means of enforcing Title VI's antidiscrimination mandate. 42 U.S.C. § 2000d-1. We agree with the government to a point. As relevant, Title VI prohibits discrimination "on the ground of race, color, or national origin" in the administration of "any program or activity receiving Federal financial assistance." *Id.* § 2000d. Congress directed agencies like HUD and DOT to "effectuate" Title VI's mandate via "rules [and] regulations" setting out antidiscrimination requirements. *Id.* § 2000d-1. And Congress authorized agencies to "refus[e]" or "terminat[e]" a grant for failure to comply with those rules. *Id.* Together, those statements contemplate the power to "place conditions on the grant of federal funds." *Barnes v. Gorman*, 536 U.S. 181, 185–86, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). In the government's view, the conditions at issue here fall within Congress's intended scope.

But importantly, Congress limited that authority in key respects: Agencies empowered to grant financial assistance to a "program" may only effectuate Title VI's mandate "with respect to such program" and in a manner "consistent with achievement of the objectives of the statute authorizing the financial assistance." 42 U.S.C. § 2000d-1. That limitation tracks the text of the mandate itself, which covers discrimination "under any program or activity receiving Federal financial assistance." *Id.* § 2000d. And both agencies and courts have taken that limitation to heart. Indeed, while HUD and DOT have implemented regulations under Title VI that require antidiscrimination assurances, each regulation is limited to the program or activity receiving funding. 24 C.F.R. § 1.5 (HUD); 49 C.F.R. § 21.7 (DOT). Courts, too, recognize that Title VI covers "federally funded programs and activities." *E.g., Barnes*, 536 U.S. at 185, 122 S.Ct. 2097.

The government relies on a dissent from Justice Marshall to buttress its claims that conditions are permissible, but that dissent similarly contemplates that "*the program*" receiving assistance will "comply with Title VI." *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (Marshall, J., dissenting) (emphasis added). Nothing in the text of Title VI reaches *other* activities that grant recipients undertake.

The antidiscrimination conditions exceed the limits imposed by Congress because they apply not just to the programs receiving grant funding from HUD and DOT, but to "any programs" operated by the Local Governments. In addition, the conditions appear to permit the agencies to terminate grants in a manner unrelated to the "objectives" of the underlying grant statute. *Contra* 42 U.S.C. § 2000d-1. This concern is not merely speculative. A letter from the Secretary of Transportation, for example, asserts the power to terminate grants not just based on discrimination "in the programs or activities [the agencies] fund[ ] or financially assist[ ]" but also in recipients' "own policies, programs, [ ] activities," and "employment practices." Ltr. from Sec. Sean Duffy to Recipients of U.S. Dep't of Transp. Funding (Apr. 24, 2025).[3] Title VI does not permit the imposition of that condition and the government points to no other authority to support the blanket restriction.

***7** The government contends that any such conclusion is premature because it has not attempted to eliminate all DEI policies and would only enforce the antidiscrimination conditions as to activities that violate Title VI. But we rejected a similar defense in *City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018). In *San Francisco*, the government argued that an executive order directing agencies to condition grants on compliance with an immigration statute should not be read to impose unlawful conditions because it was simply a use of the "bully pulpit." *Id.* at 1238. We rejected that argument because it was in tension with the executive order's "dispositive" text. *Id.*; *cf. Harris v. Bessent*, 160 F.4th 1235, 1251 (D.C. Cir. 2025) ("[C]ourts consider the 'authority' that an agency 'possesses,' not the rigor with which the power is exercised."). So too here. The plain text of the challenged conditions means what it says, and the government cannot use its litigating position to "avoid legal consequences." *See San Francisco*, 897 F.3d at 1238–39.

Accordingly, we conclude that the Local Governments are likely to succeed in establishing that the conditions are unlawful to the extent they cover programs or activities that do *not* receive federal financial assistance. Although the district court enjoined the antidiscrimination conditions in their entirety, we see nothing wrong with conditioning grant funds on an assurance that recipients, consistent with Title VI, will implement programs that *do* receive such assistance in a non-discriminatory manner. The Local Governments are thus likely to succeed only as to the portion of the antidiscrimination conditions that exceed Title VI's lawful parameters, meaning that efforts to extend to "all programs" goes well beyond the mandate of Title VI.

### 2. The False Claims Act Conditions

We next turn to the FCA conditions. Both HUD and DOT require a grant recipient to:

> agree[ ] that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)].

Some legal context helps frame the impermissibility of this proviso. The FCA heavily penalizes fraudulent claims against the government, including in applications for grant funding. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 769, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (citing 31 U.S.C. § 3729, which provides treble damages for such claims). Claimants are liable under the FCA if they certify compliance with a condition of payment yet knowingly fail to disclose a "violation of a material statutory [or] regulatory ... requirement." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 180, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016).

Materiality is a central and often hotly contested issue. Requiring grant recipients to agree in advance and in the abstract that a statutory violation *is* material would sidestep this requirement and bolster the case for FCA liability. As claimants for grant funds, the Local Governments legitimately fear that by agreeing to the condition in this one context, they will have handed the government a liability-based cudgel to wield whenever violations are alleged. That concern is not unfounded given the breadth of the condition.

The government's claim that the FCA conditions flow naturally from certifying compliance with Title VI lacks a statutory basis. Nothing in the text of Title VI's enforcement provision expressly contemplates the assurances that the government seeks to impose. And context suggests that such assurances cannot be fairly implied as a means of "effectuat[ing]" Title VI's mandate. *See* 42 U.S.C. § 2000d-1. As explained, agencies are authorized to effectuate *Title VI's* mandate with respect to programs that receive federal funds. *Id.* The FCA conditions, however, relate to a different statutory mandate and, crucially, cover compliance with antidiscrimination law "in all respects," not with respect to the program receiving financial assistance. The government's efforts to play mix and match with the two separate enforcement mechanisms is problematic. To endorse the government's

position is to sanction a "judicially implied system of enforcement" broader than the one Congress expressly set out—something we are loath to permit. *See* *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 289, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (emphasis omitted).

***8** Beyond Title VI, the conditions are in tension with the FCA itself. The conditions define what is "material" for purposes of FCA liability. But this is not a situation where Congress has delegated "to an agency the authority to give meaning to a particular statutory term." *See* *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024). Rather, the FCA defines "material" to require an objective inquiry into what has a "tendency to influence" the government, not what the government "deem[s]" important. *Universal Health Servs., Inc.*, 579 U.S. at 193–94, 136 S.Ct. 1989 (quoting 31 U.S.C. § 3729(b)(4)). Hence, it is for Congress, not the Executive, to amend that statutory definition. *See* *Clinton v. City of New York*, 524 U.S. 417, 438, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998). And it is for the courts to interpret that provision and to apply the definition to the facts of a particular case. By purporting to impose its own definition of what is "material," the government attempts an end run around that scheme "into an area in which it has no jurisdiction." *See* *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990) (quoting *Fed. Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 745, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973)). The government points to nothing in the FCA to support that exercise of authority.

The government and the dissent also attempt to downplay the conditions' terms. In the government's view, the required agreement that Title VI compliance "is material to the U.S. Government's payment decisions" is really just a form of notice to prospective recipients of federal funds. While the statement may serve as evidence in future litigation, the argument goes, it would not "lower the standard required under the False Claims Act." But whether you call it notice or mere evidence changes nothing. You don't have to be Nostradamus to "predict[ ] ... what will happen" in future litigation. Dissent at ——. All else equal, if the government enters litigation with such a forceful precertification in hand, it would need to do less to establish materiality than it would without one. That sure sounds like a "big deal." Dissent at ——. In any event, the government's characterization does not solve the more fundamental problem that neither Title VI nor the FCA appears to authorize the condition in the first instance. Neither agency can "confer [that] power upon itself" unilaterally. *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). Ultimately, imposition of this condition is not hypothetical—it is real and a question of agency power.

### 3. The Funding Conditions

The third set of conditions involves the use of grant funds that Local Governments receive. These conditions, imposed by HUD, state:

> The recipient "shall not use grant funds to promote 'gender ideology,' as defined in E.O. 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government";
>
> The recipient "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment"; [and]
>
> "No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation."[4]

***9** The conditions relate solely to Local Governments who received CoC grants related to homeless assistance.

While the subject matter differs, all funding conditions share a core feature: Each one restricts not only the immediate destination of the funds—*i.e.*, the approved project—but also the *effect* of the projects toward which those funds are directed. That feature undergirds the Local Governments' primary argument against the funding conditions: that the government is using those conditions to impose its policy preferences in unrelated areas.

These conditions are contrary to the plain terms of the CoC statute. While the CoC statute sets out several "terms and conditions" to which grant recipients must agree, none addresses the target or effects of program funds. 42 U.S.C. § 11386(b)(1)–(8). Indeed, the statute is elsewhere specific about how grant recipients are to use program funds: for example they "shall distribute the funds to project sponsors" who are in turn responsible for carrying out "eligible activities." 42 U.S.C. §§ 11382(d)(3), 11360(22); *see also* 42 U.S.C. § 11383(a) (eligible activities include "[c]onstruction of new housing units," "[s]upportive services" for families experiencing homelessness, and the like). Congress authorized funds for these activities subject to only a few "[u]se restrictions," none of which relates to the promotion of immigration, abortion, or gender ideology. *Id.* § 11383(c)(1)–(3) (requiring certain projects to last "for not less than 15 years"; requiring other projects to run "for the duration of the grant period"; and providing for the conversion of certain housing projects). We customarily assume that "when Congress expresses meaning through a list," then "what is not listed is excluded." *Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014).

With that context, it is unsurprising that the government makes no attempt to identify an express statutory authority for the funding conditions. Instead, the government claims implied authority under a residual clause authorizing HUD to impose terms necessary to carry out the CoC program in "an effective and efficient manner." 42 U.S.C. § 11386(b)(8). That clause is part of a provision that requires recipients who fund eligible projects to:

(1) "ensure the operation of the project in accordance with the provisions of" the CoC statute;

(2) "monitor and report to the Secretary the progress of the project";

(3) "ensure, to the maximum extent practicable, that individuals and families experiencing homelessness are involved, through employment, provision of volunteer services, or otherwise, in constructing, rehabilitating, maintaining, and operating facilities for the project and in providing supportive services for the project";

(4) "require certifications from all project sponsors that" they will protect "the confidentiality" of individuals in "family violence prevention" programs, will not restrict "provision of educational and related services," and ensure that children placed in housing services "are enrolled in school";

(5) "establish [certain] fiscal control and fund accounting procedures";

***10** (6) "monitor and report to the Secretary the provision of matching funds";

(7) "take the educational needs of children into account" when placing families in "emergency or transitional shelter[s]"; and

(8) "*comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner.*"

*Id.* § 11386(b)(1)–(8) (emphasis added). The government argues that subsection 11386(b)(8) authorizes "a range of conditions" both "ministerial" and "substantive," "so long as they are designed to enhance the program's efficiency and effectiveness."

Notably, the government did not rely on subsection 11386(b)(8) in the district court, and for good reason: Even by its plain terms, the subsection does not authorize conditions based solely on disagreement with the program's perceived policy orientation. Subsection 11386(b)(8) authorizes terms related to carrying out "this part"—i.e. the CoC program, 42 U.S.C. § 11381, *et seq.*—efficiently and effectively. "[E]fficient" commonly means "effective" or "adequately operative," and "effective," in turn, means "product[ive]" of or "attended with result[s]." *Efficient, Effective*, Oxford English Dictionary (2d. ed 1989).[5] Together, this language contemplates conditions designed to facilitate the operation of the CoC program, to ensure the program produces results set out by Congress, 42 U.S.C. § 11381(1) (noting the "goal of ending homelessness"), and the like. Nothing in it contemplates conditions based solely on a perception that the programs are inconsistent with the President's views on "hot-button issues." *See* Dissent at ——.

That language, to be sure, supports the government's position to a point. The funding conditions may certainly prevent applicants from using grant funds in ways prohibited by law. It is a commonsense conclusion, for instance, that authority designed to achieve results desired by Congress would encompass conditions aimed at uses Congress has elsewhere put off limits, like helping ineligible individuals receive federal public benefits. 42 U.S.C. § 11386(b)(8); 8 U.S.C. § 1611(a) (subject to certain exceptions, "an alien who is not a qualified alien ... is not eligible for any Federal public benefit"). [6] Precisely because such restrictions are already required, the government argues there is little issue with "making [them] explicit." If HUD's conditions only required the Local Governments to comply with conduct already prohibited by law, there would be little to see here.

***11** But these funding conditions go much further than compliance with the law. They cover the *effects* of funded activities and the ideas that they *promote*—even where Congress has either expressly authorized or declined to prohibit the activity at issue. Consider the following example involving the "gender ideology" condition: A local government allocates grant funds for a "structure" that provides mental health services to "homeless individuals." 42 U.S.C. § 11383(a)(2) (funding for such a "structure" offering "supportive services" is an "eligible activity"); *id.* § 11360(29)(F) ("supportive services" includes "mental health services"). During a visit by a transgender individual, a case manager uses the visitor's chosen name, helps secure safe shelter placement, and coordinates access to counseling. This course of action would be permissible because the Homeless Assistance Act does not prohibit delivery of "supportive services" in a manner that accounts for a recipient's gender identity. But it might constitute "*promoting* gender ideology" and thus serve as grounds for terminating a grant, even if the CoC statute permits it. The same problem persists across all funding conditions. Apart from the specific prohibitions in Title VI and PRWORA, the government points to no law against promoting "gender ideology" or facilitating the promotion of illegal immigration in the abstract. [7] Yet the government claims the power to condition funding on those perceived disagreements, even in areas where Congress has not prohibited the activity at issue. The meaning of "effective and efficient" does not stretch so broadly.

Additional principles applied to residual clauses reinforce our conclusion. We often interpret a residual clause by discerning how it "is linked to its 'surrounding words.' " *Fischer v. United States*, 603 U.S. 480, 486, 144 S.Ct. 2176, 219 L.Ed.2d 911 (2024) (quoting *Yates v. United States*, 574 U.S. 528, 536, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (plurality opinion)). In so doing, we "give effect, if possible, to every clause and word" of the statute, considering both "the specific context" of the provision and "the broader context of the statue as a whole." *Id.* (first quoting *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), then quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)) (citation modified). To achieve that goal, we rely on the canon of *ejusdem generis*, which counsels that when a residual clause, or "a catchall phrase," follows "an enumeration of specifics, as in dogs, cats, horses, cattle, and other animals," A. Scalia & B. Garner, *Reading Law* § 32, 199 (2012), we are to read that clause to "embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 115, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001).

The list that precedes subsection 11386(b)(8) also suggests that residual conditions must be tied to the statute's underlying goals of "ending homelessness" and "minimizing the trauma" to individuals who participate in authorized programs. 42 U.S.C. §§ 11381(1)–(2). Every other substantive provision shares that common denominator. For example, subsection 11386(b)(3)'s involvement provision furthers self-sufficiency, and subsection 11386(b)(7)'s education provision seeks to minimize the adverse impact of relocation. If subsection 11386(b)(8) were not limited to other, comparable matters, it would make a hash of that provision. Had Congress intended "efficient and effective" to confer the free-flowing authority the government claims, it would not have bothered to define seven narrow programmatic requirements in the preceding subsections.

The dissent's rejoinder about why the *ejusdem generis* canon does not apply is both incorrect and misses the point. Dissent at –––– – ––––. On the first score, that subsection 11386(b)(8) embraces both "procedural" and "substantive" "program requirements" does not render it incapable of cohesive understanding. The specificity of the "paragraphs preceding the catchall" at least enables an inference that the Secretary's powers "are not limitless," and, at a bare minimum, an inference that Congress did not create a "roving commission" to enforce orthogonal policy objectives. *See* *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 220, 144 S.Ct. 2071, 219 L.Ed.2d 721 (2024). And the Supreme Court routinely applies the canon to provisions that do not contain only "a broad, generic phrase." *Contra* Dissent at ––––. *See* *Harrington*, 603 U.S. at 218, 144 S.Ct. 2071 (applying cannon to subparagraph with independent "qualifi[er]"); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512, 138 S.Ct. 1612, 200

L.Ed.2d 889 (2018) (similar). In any event, the applicability of a canon is no excuse to ignore the "context of [the] statute as a whole"—which contemplates *nothing* akin to the government's assertion of authority in this case. *See Fischer*, 603 U.S. at 486, 144 S.Ct. 2176. Indeed, the government's theory is affirmatively inconsistent with aspects of Congress's reticulated scheme, including its express list of permissible "use restrictions." *Supra* ––––.

***12** The dissent's criticism that we are second-guessing the administration's policy choices fares no better. Dissent at ––––. The meaning of statutory terms and "the boundaries of delegated authority" are questions of law, not policy, that are left for courts to decide. *Loper Bright*, 603 U.S. at 395, 144 S.Ct. 2244 (citation modified). This is not a situation, for example, where Congress has "explicitly left a gap for the agency to fill." *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1177 (9th Cir. 2019). The dissent's suggestion that HUD's policy choices are lawful *because* they are reasonable, Dissent at –––– – ––––, channels the bygone era of *Chevron* deference and has no bearing on our legal analysis. For all those reasons, we express no view as to the merits of HUD's policy positions.

While the dissent pays lip service to our duty to set the bound of statutory authority, it is notable that the dissent does not appear to articulate any. And therein lies the deeper problem. If conditions tied to supra-legal policy objectives fall within "efficient and effective," it is difficult to imagine what does not. On the dissent's theory, facially valid policy reasoning would be enough to authorize all manner of ambiguously-worded terms "unrelated to the federal interest" in the program, even though we have long understood such conditions to violate the Spending Clause. *See Dole*, 483 U.S. at 208, 107 S.Ct. 2793.[8] That cannot be right. And, "[a]s a matter of basic communication," we highly doubt Congress would have introduced such authority "in the way the government [and dissent] assert[ ]." *See Rodriguez Vazquez v. Bostock*, ––– F.4th ––––, ––––, 2026 WL 2196424, at *18 (9th Cir. July 30, 2026).

With all that in mind, it is simply not the case that the conditions "largely track existing restrictions on CoC funds," as the government argues. Nor do we countenance the argument that any unlawful application of the conditions has not been "explained" or tested. Dissent at ––––. Whether an agency's power has been explained or tested has no bearing on the "the scope of an agency's own power," which is a question of statutory interpretation. *See Loper Bright*, 603 U.S. at 401, 144 S.Ct. 2244; *cf. Harris*, 160 F.4th at 1251. If HUD claims authority that it lacks, it cannot "cure" the problem "by declining to exercise some of that power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001).

As to the abortion-related condition specifically, we also note that Congress has not attached a Hyde Amendment-like restriction to the HUD appropriations at issue here. *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. C, tit. II, §§ 202–204, 138 Stat. 25, 153 ("None of the funds appropriated ... [for the Department of Justice] shall be available to pay for an abortion."); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. V, §§ 506–507, 138 Stat. 460, 703 (no funds appropriated for the Departments of Labor, Health and Human Services, and Education "shall be expended for any abortion"). After oral argument, the government filed a letter with this court agreeing that the provision to which the parties had referred in the briefing does not apply to HUD. Dkt. No. 53. The President's authority to instruct HUD to impose the funding conditions must flow from either the Constitution or a congressional enactment. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Whatever effect the "Enforcing the Hyde Amendment" executive order may have on other agencies subject to the Hyde Amendment or similar restrictions, it cannot direct HUD to impose conditions that bar the "use [of] any Grant Funds to fund or promote elective abortions" in the absence of statutory authorization.

***13** The funding conditions are thus without statutory authorization to the extent that they impose obligations that are not already prohibited by law, such as obligations that target the effects of the funded activities and the ideas that they promote. The district court did not abuse its discretion in enjoining these conditions.

#### 4. The Verification Condition

The verification condition requires grant recipients to "use SAVE, or an equivalent verification system approved by the federal government" to "prevent any Federal public benefit from being provided to an ineligible alien," subject to PRWORA's exceptions. This condition, too, exceeds the authority delegated by Congress to require verification.

PRWORA broadly provides that individuals who lack immigration status are not "eligible for any Federal public benefit," including "any grant ... provided by an agency." 8 U.S.C. §§ 1611(a), (c). The law contains several exceptions, including for certain "[m]edical assistance" under the Social Security Act and emergency disaster relief. *Id.* § 1611(b)(1)(A)–(B).

Congress clearly contemplated that agencies are to verify eligibility for federal public benefits, but there is no governing requirement to use SAVE or an equivalent system. *See* 8 U.S.C. § 1642. The statute directs the Attorney General to make "regulations requiring verification" and directs states that administer public benefit programs to develop a compliant program within two years. *Id.* § 1642(a), (b). As the Local Governments explain, however, no Attorney General has ever finalized a verification rule. What governs instead is guidance that permits program administrators to review an applicant's documentation or accept a sworn declaration of the applicant's status. 62 Fed. Reg. 61344, 61345 (Nov. 17, 1997); 8 U.S.C. § 1642(a)(1) (authorizing the Attorney General to issue interim verification guidance).

The verification condition offers recipients two options. One is to use SAVE—a form of verification that is neither expressly authorized by PRWORA nor set out by regulation as PRWORA requires. *See* 8 U.S.C. § 1642(a). That disconnect proves fatal. HUD cannot compel the Local Governments to comply with requirements that Congress never authorized it to impose. Congress tasked the Attorney General with creating an immigration status verification requirement and gave grant recipients 24 months to comply with it. *Id.* § 1642(b). So it makes no sense that Congress would permit HUD—and not the Attorney General—to establish new verification procedures under the guise of making a program more effective where it elsewhere required that such procedures be set out in regulation. We generally do not allow agencies to bind third parties "without ever paying the procedural cost." *See* *Kisor v. Wilkie*, 588 U.S. 558, 583, 139 S.Ct. 2400, 204 L.Ed.2d 841 (2019). Bypassing the statutory requirements, no matter the policy objective, does not pass muster. [9]

The recipients' other option is worse yet: utilize an "equivalent" to SAVE. That term lacks not only statutory and regulatory authorization, but also an operative definition. As the government acknowledged at oral argument, whether a hypothetical non-SAVE verification system satisfies this condition would likely depend on future federal approval. A Local Government thus cannot "voluntarily and knowingly" accept a verification condition where the "potential obligations" to which it agrees "are largely indeterminate." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 24, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *see also* *Los Angeles*, 929 F.3d at 1176 (explaining that an agency may not "impose ... ambiguous conditions on recipients of [federal] funds"). Because the "equivalent" option has no basis in PRWORA and leaves the Local Governments in an interpretive limbo, it cannot support a valid grant condition.

***14** The district court did not abuse its discretion in enjoining the verification condition.

* * *

In sum, we conclude that Local Governments are likely to succeed on their APA claim that the challenged conditions exceed HUD and DOT's statutory authority. We note, however, that our conclusion is narrower than the district court's in one respect. We conclude that Title VI permits agencies to condition grant funds on a commitment not to discriminate in administering federally funded programs, and so the Local Governments are likely to succeed only to the extent the antidiscrimination conditions exceed that directive.

Because the Local Governments are likely to succeed on their statutory authorization claim—and consistent with constitutional avoidance principles—we need not address their additional APA and constitutional claims, none of which would affect the scope of relief awarded below.

**B. Remaining Preliminary Injunction Factors**

The district court did not abuse its discretion in its assessment of the remaining *Winter* factors. To establish that they are likely to suffer irreparable harm, the Local Governments had to demonstrate that they would suffer "harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); 5 U.S.C. § 702 (providing for relief "other than monetary damages"). The Local Governments have made that preliminary showing.

The Local Governments have "established that they likely are bearing and will continue to bear heavy financial costs" that are not recoverable and arise from the challenged conditions. *City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 762 (9th Cir. 2020). In addition, the district court, in its factual findings, found that the HUD plaintiffs had "submitted substantive and detailed evidence illustrating the ways in which a loss of grant funds would be devastating and irreparable" to both the Local Governments and "the vulnerable populations they serve." The court found the same with respect to the DOT plaintiffs, and detailed the harm caused by the Local Governments' curtailing of existing and planned projects. It further concluded that "these likely harms are not ... merely monetary in nature," and noted the potential harm to "shelter-unstable families" and the "incalculable effects of forcing unforeseen reductions in transportation spending." We agree.

Whether they comply or refuse, the Local Governments face the "imminent harm" of a "very real penalty." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009). They confront a classic Hobson's choice: sustain unrecoverable losses to comply with the government's conditions, or refuse to submit, and risk losing the grant funds in their entirety. On the one hand, if they accede to the conditions, which are likely unlawful, the Local Governments "will be forced to incur large costs" that "will disrupt and change" their services due to delay and financial uncertainty arising from confusion about the conditions' scope and applicability. *Id.* Those costs flow from the mitigating steps that the Local Governments must take to come into compliance with conditions that are likely unlawful, and that cannot be recovered as damages. *Id.* at 1058–59.[10] On the other hand, the Local Governments can refuse to agree to the conditions and lose the entirety of the grant funds, including funds that they have already budgeted and are committed to spending. *Id.* at 1058. We and our sister circuits have routinely held that this double bind constitutes irreparable harm. *Id.* at 1057–59; *Fed. Trade Comm'n v. Qualcomm Inc.*, 935 F.3d 752, 756 (9th Cir. 2019) (finding irreparable harm in a stay posture because the "fundamental business changes" that district court's injunction imposed "[could] not be easily undone should Qualcomm prevail on appeal"); *see also Kentucky v. Biden*, 57 F.4th 545, 555–56 (6th Cir. 2023) (same result where plaintiffs had to choose between loss of funding if they refused the challenged condition and unrecoverable compliance costs if they accepted it); *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014) (similar). The harm here particularly impacts vulnerable populations, critical programs, and ongoing services.

***15** The dissent, for its part, takes the view that if you squint hard enough, irreparable harm starts to look like the merits. *See* Dissent at —— (arguing that the Local Governments "haven't quantified how much of their grants go to supporting illegal immigration, performing elective abortion, promoting gender ideology, or advancing illegal DEI programs"). But "we have held otherwise," for even if the likelihood of success on the merits factor can "raise[ ] the specter of irreparable harm," *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011), the equitable preliminary injunction factors "do not collapse into the merits question." *See Cuviello v. City of Vallejo*, 944 F.3d 816, 831 (9th Cir. 2019). The dissent's argument about irreparable harm ultimately depends on rewriting the conditions as the dissent thinks that they should read.

That argument is beside the point. The district court found as a matter of fact that irreparable harm is presently occurring or likely to occur absent injunctive relief. The harm can hardly be described as "speculative." Dissent at ——. We are bound to respect those findings, for our review of them "is limited and 'very deferential.' " *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1193 (9th Cir. 2024) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005)). Based on that standard, we conclude that court's "evaluation" of the harm alleged was not " 'illogical, implausible, or without support in the record.' " *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Doe v. Kelly*, 878 F.3d 710, 713 (9th Cir. 2017)). We therefore identify no abuse of discretion.

Nor was there abuse of discretion in the district court's determination that the balance of the equities and the public interest, which merge when the government is the opposing party, favor the Local Governments. *Id.*; *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). We agree with the district court that "the balance of equities tips sharply in [the Local Governments'] favor" given the findings of irreparable harm. *See also Am. Trucking Ass'ns*, 559 F.3d at 1059–60 (same). We add that agency action taken in excess of statutory authority runs counter to the public interest, which "is served by compliance with the APA." *E. Bay Sanctuary Covenant*, 993 F.3d at 678; *see also Env't Prot. Info. Ctr.*, 968 F.3d at 992 ("The public interest is served by requiring the Forest Service to comply with the law."). The district court's conclusion was supported by the record.

## CONCLUSION

We therefore affirm in large part. As to the FCA, funding, and verification conditions, we affirm the district court's preliminary injunction in full. As to the antidiscrimination conditions, we affirm with instructions. Because we conclude that Title VI authorizes antidiscrimination conditions related to programs that receive federal funding, the injunction should be revised to permit such conditions.

**AFFIRMED in part and REMANDED with instructions to narrow the injunction with respect to the antidiscrimination conditions. Costs are awarded to the Local Governments.**

BUMATAY, Circuit Judge, concurring in the judgment in part and dissenting in part.

Too often it's forgotten that the federal judiciary is the "weakest" branch. The Federalist No. 78, at 464 (Alexander Hamilton) (Clinton Rossiter ed. 1961). That's because the judiciary "has no influence over either the sword or the purse." *Id.* In other words, the federal "purse" belongs to the political branches—not the courts. Unfortunately, those principles are forgotten here.

Following several Executive Orders, the Department of Transportation ("DOT") and the Department of Housing and Urban Development ("HUD") imposed several conditions on grant programs to ensure that the millions of dollars doled out to States and local governments comply with the law and aren't spent on unrelated policy goals. The conditions ask fund recipients to certify compliance with existing anti-discrimination obligations and restrict the diversion of funds for certain unauthorized purposes.

***16** And Congress expressly allows DOT and HUD to do this. First, Congress mandates that no funding recipient may discriminate based on race in the use of federal funds. *See* 42 U.S.C. § 2000d. Enforcing this mandate, DOT and HUD require funding recipients to certify that no federal funds will be used for illegal DEI programs. Second, Congress grants the Executive Branch broad authority to condition funding to ensure program money is spent in "an effective and efficient manner." *See* 42 U.S.C. § 11386(b)(8). Here, HUD determined that spending federal dollars allocated for the homeless on hot-button political issues *unrelated* to homelessness is not "effective and efficient." After all, every dollar spent promoting extraneous political causes, like gender ideology, elective abortion, and illegal immigration, is a dollar not spent on housing the homeless.

The majority doesn't like these conditions—apparently because "the President made [them] do this." Maj. Op. at ——. But dislike for the President's policies is no substitute for following the law. Rather than deferring to the Executive's discretion to make these choices, we once again step into the political arena and decide what we think is best for the country. By enjoining these funding conditions, we overstep our bounds and intrude on the policymaking left to the elected branches.

Because the majority believes that courts—rather than the political branches—control the federal purse, I respectfully concur in part and dissent in part.

# I.

# ANALYSIS

The Supreme Court has repeatedly emphasized that "[a] preliminary injunction is an extraordinary remedy." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Benisek v. Lamone*, 585 U.S. 155, 158, 138 S.Ct. 1942, 201 L.Ed.2d 398 (2018) (per curiam); *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345, 144 S.Ct. 1570, 219 L.Ed.2d 99 (2024). We don't resort to this "drastic" remedy unless no other remedy is sufficient. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010). To meet this high standard against the government, those requesting an injunction must prove (1) a likelihood of success on the merits, (2) an irreparable harm, and (3) the balance of equities and the public interest favor an injunction. *Env'l Protection Info. Ctr. v. Carlson*, 968 F.3d 985, 989, 991 (9th Cir. 2020). These factors don't support an injunction here.

## A.

## Likelihood of Success on the Merits

Start with likelihood of success on the merits—"the most important factor." *Id.* at 989. Because the State-and-local-government plaintiffs ("Local Governments") that challenge the conditions are unlikely to succeed on the merits, the district court's preliminary injunction should have been reversed.

### i.

### Anti-Discrimination Conditions

HUD and DOT instituted several grant conditions that require recipients of grant funding to certify their compliance with federal anti-discrimination law. The conditions require:

- A HUD recipient to "certif[y] that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964."

- A DOT recipient to "certif[y] that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws."

- A recipient to "agree[ ] that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)]."

The district court enjoined these conditions in their entirety, suggesting that the government can't prohibit grant recipients from engaging in discrimination in violation of Title VI. But that's wrong. The government may, of course, direct grant recipients to comply with anti-discrimination law. Under Title VI of the Civil Rights Act of 1964, no person shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. HUD and DOT already have rules requiring grant recipients to comply with federal anti-discrimination law "as a condition" of payment. *See* 24 C.F.R. §§ 1.4, 1.5(a)(1) (HUD); 49 C.F.R. §§ 21.5, 21.7(a)(1) (DOT). As Justice Thurgood Marshall observed, "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title

VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 629–30, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (Marshall, J., dissenting). So there's no issue with conditioning program grants on complying with anti-discrimination law.

***17** At oral argument, however, the government conceded that the first two conditions could be read more broadly to prohibit grant recipients from engaging in discrimination in any programs—even those not receiving federal financial assistance. The government agrees that this goal is beyond Title VI's scope and that we should limit the HUD and DOT conditions to pertain only to "program[s] or activit[ies] receiving Federal financial assistance." 42 U.S.C. § 2000d. I thus agree with the majority's decision to remand with instructions to narrow the injunction on these two conditions.

The conditions related to the False Claims Act, 31 U.S.C. §§ 3729–3733, are a different matter. Under the False Claims Act, steep penalties may be imposed against those who defraud the government, including those who falsely certify compliance with all conditions of payment in a funding case. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 180, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016). Generally, liability attaches only if a false certification is "material to the Government's payment decision"—a "demanding" element. *Id.* at 181, 194, 136 S.Ct. 1989. To HUD and DOT, these conditions reinforce Title VI's anti-discrimination requirement. According to them, the conditions provide notice to recipients of the seriousness of compliance with civil rights laws. I see no reason to enjoin these conditions.

To begin, the conditions seem like straightforward admissions to a true statement. HUD and DOT have clearly confirmed that compliance with Title VI is of the utmost importance. And with certification, the funding recipient merely acknowledges that following the law is important. Anyone who has ever signed a contract is familiar with these types of provisions. So, these conditions seem like no big deal.

The majority raises the concern that these conditions would force recipients to concede the "materiality" element of a False Claims Act charge. This, the majority asserts, alters the separate enforcement mechanisms enacted by Congress through Title VI and the False Claims Act. But nothing in either the False Claims Act or Title VI precludes the government from seeking truthful admissions from funding recipients. And the government must still prove each element of the False Claims Act to secure a win. Contrary to the majority's contention, the conditions don't alter the meaning of "materiality" under the False Claims Act. In the end, a jury—not the government—will determine whether a misrepresentation was sufficiently "material." So the majority's fear that these conditions supersede Congress's will is off the mark.

Even if these conditions were problematic, it would be premature to enjoin them now. That's because funding recipients could still contest materiality. The Supreme Court has said that "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Universal Health Servs.*, 579 U.S. at 194, 136 S.Ct. 1989. "[M]inor or insubstantial" violations *cannot* be material. *Id.* And the government's practice can also defeat materiality, such as if the government regularly pays a type of claim despite knowing of violations. *Id.* at 195, 136 S.Ct. 1989. Although the majority feels comfortable predicting what will happen in imaginary litigation, it's not clear what effect the conditions would have in a given case. It would be better to decide these weighty issues in an actual False Claims Act case when the stakes are not so hypothetical.

We don't enjoin the Executive simply because we think it might *potentially* lead to some outcomes we dislike.

**ii.**

**HUD Funding Conditions**

***18** Next, HUD established four funding conditions that restrict using federal funds on illegal immigration, elective abortion, and gender ideology. The HUD conditions require:

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

County of King v. Turner, --- F.4th ---- (2026)

- "No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation."
- "Subject to the exceptions provided by [the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA")], the recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States."
- The recipient "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."
- The recipient "shall not use grant funds to promote 'gender ideology,' as defined in E.O. 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

The conditions apply to "Continuum of Care" program funding, which Congress created through the Homeless Assistance Act to support the homeless. *See* 42 U.S.C. §§ 11381–11389. The grant funding must be "used to carry out projects that serve homeless individuals or families," such as through new housing construction, housing and shelter rehabilitation, and rehousing services. *Id.* § 11383. The funding conditions fall within HUD's authority to set conditions that advance the effectiveness and efficiency of the funding program.

**a.**

Our role isn't to judge the wisdom of HUD's positions on these hot-button issues. Instead, our only job is to determine whether these conditions comply with the law. And Congress delegated to HUD wide discretion to implement "other terms and conditions" to Continuum of Care funding. *Id.* § 11386(b)(8). Congress provided that "[t]he Secretary may not provide assistance for a proposed project under this part unless the collaborative applicant involved agrees ... to comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner." *See* 42 U.S.C. § 11386(b)(8).

Under this provision, HUD may set conditions to ensure that the "Continuum of Care" funds are used to accomplish the program's goals in the most effective and productive manner. *See* The American Heritage Dictionary of the English Language 587 (3d ed. 1996) (defining "effective" as "[h]aving an intended or expected effect" and "efficient" as "[a]cting or producing effectively with a minimum of waste, expense, or unnecessary effort"); Webster's Third New International Dictionary 724–25 (1993) (defining "effective" as "capable of bringing about an effect: productive of results" and "efficient" as "marked by ability to choose and use the most effective and least wasteful means of doing a task or accomplishing a purpose").

The central question then is: Who decides what's "effective" and what's "efficient"? The Executive branch or judges? Under the separation of powers, absent some constitutional violation, the answer must be the Executive. Sometimes the best reading of a statute shows that "the agency is authorized to exercise a degree of discretion," such as when a "term or phrase leaves agencies with flexibility." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394–95, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024) (simplified). When this is the case, our role is to "fix[ ] the boundaries" of the delegation and "ensur[e] the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* at 395, 144 S.Ct. 2244 (simplified). We don't second-guess that decisionmaking if the agency acted within the reasonable range of the boundaries of the delegation.

***19** Section 11386(b)(8) grants the agency broad flexibility. By inviting HUD to establish "such other terms and conditions" as would accomplish programmatic purposes "in an effective and efficient manner," 42 U.S.C. § 11386(b)(8), the statute grants the agency considerable use of its judgment and discretion. *See* *Loper Bright Enters.*, 603 U.S. at 395, 144 S.Ct. 2244 (noting

that statutory terms like "appropriate" and "reasonable" leave agencies flexibility). We shouldn't countermand those decisions unless they're clearly outside the bounds of what's "effective and efficient."

HUD's decision to prohibit the use of program funds to promote illegal immigration, elective abortion, or gender ideology falls within its "reasoned decisionmaking." *Id.* Directing funding recipients to avoid funding activities HUD reasonably considers peripheral to the goal of ending homelessness fits easily within the statute's grant of discretion. The Continuum of Care program seeks to "end[ ] homelessness," including by "provid[ing] funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[.]" *See* 42 U.S.C. § 11381(1)–(4). It's reasonable to prevent the dilution of those purposes by stopping the redirection of funds toward unrelated policy goals.

Begin with the prohibition on facilitating or promoting illegal immigration. Under PRWORA, with limited exceptions, it is unlawful for a grant recipient to provide federal public benefits to ineligible aliens, which includes illegal aliens. *See* 8 U.S.C. §§ 1611(a), 1641(b). HUD's condition overlaps with PRWORA's legal limitations and promotes the effective use of the funds. As the majority concedes, "[i]t is a commonsense conclusion ... [that a grant recipient] helping ineligible individuals receive federal public benefits" in violation of law would not be "effective." Maj. Op. at ——. Even if the HUD condition goes beyond PRWORA's restrictions by also prohibiting the "promotion of illegal immigration," HUD could reasonably conclude that banning the use of funds to encourage illegality would improve the efficiency and efficacy of the program.

Likewise, HUD could reasonably tell recipients to use the Systematic Alien Verification for Entitlements ("SAVE") service or its equivalent to verify that no illegal alien receives federal funding. Such a condition advances the purpose of complying with PRWORA's mandate. The majority complains that neither PRWORA nor its implementing regulations mandate the use of SAVE or an equivalent. That may be true. But that's not dispositive. Nothing in either PRWORA or its regulations preclude other laws or regulations from instituting its use. So when § 11386(b)(8) provided HUD the ability to establish other conditions for effective and efficient use of housing funds, Congress granted HUD discretion to mandate SAVE, especially given its recent upgrades and availability to local governments for free. *See* U.S. Citizenship & Immigr. Servs., *SAVE: Transaction Charges* (Apr. 29, 2025).[1] Indeed, PRWORA's interim guidance explicitly contemplates a changing verification landscape. It expressly directs funding recipients to "continue to comply with any existing or *future* legal requirements for verifying citizenship and nationality that are imposed on [the recipient's] program, as well as with any applicable existing or *future* guidance provided by the agency or department overseeing [the recipient's] program." *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344, 61347 (Nov. 17, 1997) (emphasis added). With no legal impediment to directing the use of SAVE or its equivalent, HUD may include verification conditions to improve the funding program's efficacy and efficiency.

***20** The same goes for the prohibition on funding elective abortion. Generally, the Hyde Amendment bars some federal funds from paying for elective abortion. *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, Div. C, § 202, 138 Stat. 25, 153. To be sure, this version of the Hyde Amendment doesn't apply to the Continuum of Care program. But HUD may still determine that redirecting funds for housing the homeless to pay for or promote elective abortion isn't an effective or efficient use of that money. After all, funding elective abortion isn't an authorized use of the housing funds. *See* 42 U.S.C. § 11383. Congress set a rather detailed list of social services to be provided to the homeless, such as childcare services, job training, outpatient health services, mental health services, legal services, and transportation services. *See id.* §§ 11360(29), 11383(a)(6). Paying for elective abortion is not one of those services; so it's reasonable to prohibit it from being paid for by Continuum of Care funds.

Finally, prohibiting funds from promoting "gender ideology" also reasonably serves the program's effectiveness and efficiency. Once again, the Homeless Assistance Act identifies many approved supportive services for the homeless, such as childcare, job training, food, and mental health services. *Id.* Nowhere does the Act expressly permit promoting "gender ideology" as defined in Executive Order 14168.[2] If an unrelated policy goal is not authorized by the Act, HUD can reasonably decide it's both effective and efficient to prohibit its funding. After all, money is a zero-sum game. Every dollar spent on "gender ideology" is a dollar not spent on childcare, job training, food, and mental health services.

The HUD conditions are thus authorized by statute and not arbitrary and capricious.

**b.**

The majority arrives at a different result. It reads § 11386(b)(8) to only allow conditions that "are tied to the statute's underlying goals of 'ending homelessness' and 'minimizing the trauma' to individuals who participate in authorized programs." Maj. Op. at ——. It then narrows HUD's discretionary authority under the provision and rules that any conditions that "impose obligations that are not already prohibited by law" are unlawful. *Id.* at ——. These artificial limits on the Executive's discretion are unsupported by the plain text of the Homeless Assistance Act.

First, although the majority purports to follow the law's plain meaning, it instead substitutes its policy judgments for the Executive's. The majority accepts that § 11386(b)(8) allows HUD to adopt conditions that makes the funding more "product[ive]." Maj. Op. at ——. But it doesn't explain how prohibiting spending money allocated for ending homelessness on extraneous political causes can't reasonably make the Continuum of Care funds more productive. When Congress enacted the Homeless Assistance Act, its purpose was to "end[ ] homelessness"—not to promote illegal immigration, gender ideology, and elective abortion. 42 U.S.C. § 11381(1). Indeed, Congress expressly granted the Executive the authority to stop this diversion of resources for unrelated purposes. The majority might disagree with the Executive on whether spending money on supporting illegal immigration, gender ideology, and elective abortion is worthwhile—but Congress let the Executive make this decision, not the Ninth Circuit. So none of these conditions violate Congress's grant of discretion and we have no business superseding Congress's and the Executive's will.

***21** Second, with plain meaning failing to justify the majority's reasoning, it next relies on the faulty use of the canon of *ejusdem generis.* Under the canon, "when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008). It is true that § 11386(b)(8) superficially follows this structure. Recall that, after listing seven affirmative obligations of funding recipients, § 11386(b)(8) provides that HUD "may establish" "such other terms and conditions" to carry out the program "in an effective and efficient manner." 42 U.S.C. § 11386(b)(8).

But the majority ignores that *ejusdem generis* has its limits. Indeed, "we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008). Instead, "judges should not use the canon to narrow catchall phrases artificially, without regard to common-sensical judgments about what the words in question were probably intended to mean." Caleb Nelson, Statutory Interpretation 121 (2d ed. 2024). Based on that common-sense reading, we are to decide whether Congress impliedly meant to insert "*similar* after the word *other.*" Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012). And that only makes sense when "the specific items in [the] list all fit into one cohesive category." Nelson, Statutory Interpretation at 121–122; *see also* Scalia & Garner, Reading Law 199 (applying canon only "[w]hen the initial terms all belong to an obvious and readily identifiable genus"). In contrast, when "the enumeration of the specific items is so heterogeneous as to disclose no common genus," the canon doesn't apply. Scalia & Garner, Reading Law 209 (simplified). And even when it applies, judges must be careful with "how broadly or narrowly [they] define the class delineated by the specific items listed." *Id.* at 207. Limiting the general term too narrowly alters—rather than illuminates—Congress's meaning.

*Ejusdem generis* simply doesn't apply to § 11386(b)(8). No "cohesive category" is easily found among the seven specific obligations listed before § 11386(b)(8)'s grant of authority. Instead, the statute offers a hodgepodge of program requirements —some procedural, some substantive. Take the requirements to "monitor and report ... progress," § 11386(b)(2), and "monitor and report ... matching funds," § 11386(b)(6). These are largely procedural requirements, directing that paperwork be sent to Washington, D.C. They have no direct effect on the services provided to the homeless. Other requirements are of a different kind, dealing directly with the treatment of the homeless. One requires recipients to involve the homeless "to the maximum

extent practicable" in the project's operations and services. *Id.* § 11386(b)(3). Another mandates that "families with children" be placed "as close as possible to their school of origin" "to the maximum extent practicable." *Id.* § 11386(b)(7). If anything, the only throughline of this list is that they all assist with the "effective[ness]" and "efficien[cy]" of the funding program, which is already apparent from § 11386(b)(8)'s text. So *ejusdem generis* does no work. The majority says that the seven preceding items in § 11386(b) all share the characteristic of advancing the statute's underlying goals of "ending homelessness" and "minimizing [its] trauma." Maj. Op. at ––––. That may be true. But again, that doesn't add much to the plain text's requirement that the conditions serve the effectiveness and efficiency of the funding programs.

***22** Section 11386(b)(8) is also different from other statutes to which *ejusdem generis* has been applied because its general catchall term already introduces independent limitations—effectiveness and efficiency. Ordinarily, the general catchall provision is "a broad, generic phrase." Scalia & Garner, Reading Law 200 (simplified). Consider the list of "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (simplified). The generic phrase "other class of workers" was interpreted as meaning other *similar* workers—only "transportation workers"—based on the canon. *Id.* But the catchall here is something different. Section 11386(b)(8) provides a broad delegation with express limitations—that those discretionary conditions advance "effective[ness]" and "efficien[cy]". This suggests that the catchall shouldn't be limited through *ejusdem generis* beyond what the plain text already demands.

Third, the majority takes a huge logical leap to say that *ejusdem generis* prevents HUD from establishing funding conditions that "impose obligations that are not already prohibited by law." Maj. Op. at ––––. But this restriction is arbitrary and atextual. It cannot be derived from *ejusdem generis* because § 11386(b)'s other conditions do not mirror preexisting legal prohibitions or obligations. For example, no other legal obligation requires grant recipients to employ the homeless through their programs. 42 U.S.C. § 11386(b)(3). Nor is there an independent legal obligation for families to be placed as close as possible to their children's original school. *Id.* § 11386(b)(7). If Congress wanted to limit HUD's discretion to conditions that "impose obligations ... already prohibited by law," *see* Maj. Op. at ––––, it could have said so. Indeed, it's hard to see what work § 11386(b)(8) does if the Executive is only limited to conditions that require funding recipients to comply with the law. Instead, the majority reads language into the statute that directly conflicts with its plain text, effectively substituting Congress's words with its own.

Fourth, contrary to the majority's view, § 11386(b)(8)'s plain text doesn't swallow the other exceptions—it supplements them. The enumerated program requirements are just that: requirements. HUD may not issue grants under the program without ensuring recipients pledge to comply with each enumerated provision. 42 U.S.C. § 11386(b). But he may *add* program requirements that improve program effectiveness and efficiency. *Id.* § 11386(b)(8).

Nor does § 11386(b)(8) grant HUD untrammeled power to transform the Continuum of Care program. Instead, it grants a broad power to limit the use of grant funds—and only grant funds—to ensure that they are spent effectively and efficiently to achieve the program's ends. In other words, § 11386(b)(8) is no mousehole, and it hides no elephants. *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). HUD's decision to prevent diverting grant funds meant for the homeless to instead promote gender ideology, elective abortion, and illegal immigration reasonably advances the program's effectiveness and efficiency.

Next, the majority believes that deferring to the discretionary decisions that Congress left in the hands of the Executive is the second-coming of *Chevron. See* Maj. Op. ––––. To begin, it's wonderful to hear that the majority now agrees that *Chevron* is a bygone judicial misadventure. I agree with the majority that attempting to revitalize that wayward doctrine should be resoundingly condemned. But the majority misunderstands what *Chevron* actually did. Under *Chevron*, we treated statutory ambiguity as a delegation of binding interpretive authority to the Executive. *Loper Bright Enters.*, 603 U.S. at 398, 144 S.Ct. 2244. Thus, courts were forced to accept the Executive's interpretations of law even when it wasn't the best reading of the text. This violates both the separation of powers and the Administrative Procedure Act. *See id.* But here, we are asked to do something very different: we must recognize that sometimes the best reading of a statute explicitly delegates discretionary

County of King v. Turner, --- F.4th ---- (2026)

authority to the Executive. And when that's the case, the post-*Chevron* era requires we defer to the Executive's judgment. *Id.* at 395, 144 S.Ct. 2244.

***23** Finally, the majority puts on a parade of horribles to defend its curtailing of HUD's power. Maj. Op. at ——– ——. It argues, for example, that funding might be cut off if a grant recipient's employee uses a transgender individual's chosen name. Set aside for a moment that the challenged grant terms limit only the use of grant funds and not a grant recipient's every activity. *See Rust v. Sullivan*, 500 U.S. 173, 196, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (distinguishing between limits to the use of funds and restrictions on a grantee generally). This preliminary posture is ill-suited for adjudicating farfetched hypotheticals. *See id.* at 183, 111 S.Ct. 1759 (In a facial challenge, "[t]he fact that the regulations might operate unconstitutionally under some conceivable set of circumstances is insufficient to render them wholly invalid." (simplified)); *cf. Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449–50, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (counseling caution when challenges raise only "hypothetical" or "imaginary" disputes). At this stage, we shouldn't strike down HUD's discretionary decisions by imagining potential extreme scenarios. If the majority's parade of horribles ever comes to light, courts could step in then.

We thus should have reversed the injunction as to the HUD conditions.

### B.

### Remaining *Winter* Factors

That the Local Governments are unlikely to succeed on the merits is enough to reverse the injunction. But I briefly note that the remaining *Winter* factors also support reversal.

The Local Governments have not refuted HUD and DOT's position that they are "unlikely to recover the grant funds once they are disbursed." *Dept. of Education v. California*, 604 U.S. 650, 651–52, 145 S.Ct. 966, 221 L.Ed.2d 515 (2025) (per curiam). The Local Governments have not promised to return funds if the government prevails and the district court denied the government's request for a bond. *See id.* at 652, 145 S.Ct. 966. By contrast, the Local Governments' purported injuries are speculative. They haven't quantified how much of their grants go to supporting illegal immigration, performing elective abortion, promoting gender ideology, or advancing illegal DEI programs. Nor have they meaningfully quantified the potential costs of compliance. So it's unknown what difference—if any—adhering to these conditions would make to their funding programs. If they are already complying with these conditions, for example, agreeing to the conditions would have zero fiscal impact on the Local Governments. So neither irreparable harm nor the balance of interests supports the preliminary injunction.

### II.

In the end, this is yet another instance of courts confronting a question of "who decides" and choosing wrong. Section 11386(b)(8) is clear, and the Executive Branch's exercise of its authority to condition the use of its grant funds was proper. For these reasons, I concur with remanding for purposes of narrowing the injunction on the two anti-discrimination conditions, and dissent from affirming the injunction on the other grant conditions.

**All Citations**

--- F.4th ----, 2026 WL 2489361

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

County of King v. Turner, --- F.4th ---- (2026)

## Footnotes

1 As relevant, E.O. 14168 defines gender ideology to encompass the "claim that males can identify as and thus become women and vice versa" as well as the "idea that there is a vast spectrum of genders ... disconnected from one's sex." Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* § 2(f), 90 Fed. Reg. 8615, 8615–16 (Jan. 20, 2025).

2 The government does not contest on appeal that the decisions by HUD and DOT to impose the challenged conditions are agency actions subject to APA review. *King County v. Turner*, 785 F. Supp. 3d 863, 882–83 (W.D. Wash. 2025).

3 A memorandum from then-Deputy Attorney General Todd Blanche evidences a similar understanding. The memorandum explains that federal-fund recipients may violate Title VI and other statutes if they "knowingly engag[e] in racist preferences" in their "policies, programs, and activities," without limitation to activities that receive federal funds. Mem. re Civil Rights Fraud Initiative at 1–2 (May 19, 2025). That advice memorandum explains that violations may give rise to liability under the False Claims Act—discussed *infra* Section I.B—and "strongly encourages" private parties to bring suit. *Id.*

4 The district court's injunction also covers a provision of the grant agreements which states that "the recipient's use of funds ... and the recipient's operation of projects with grant funds" are "governed by" "all current executive orders." The government argues that the Local Governments lack standing to challenge these provisions because they are "informational" and do not "place[ ] any direct requirements on grant recipients." That argument does not withstand scrutiny. As we have previously explained, the "possibility of non-enforcement" of an executive order related to grant funding cannot defeat standing where, as here, enforcement would cause "a loss of funds promised under federal law." *San Francisco*, 897 F.3d at 1236. The government did not address those provisions in its opening brief and argues in reply that we "need not consider [them] separately." It has accordingly forfeited any challenge to these conditions on the merits. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("We review only issues which are argued specifically and distinctly in a party's opening brief.") (citation modified).

5 The dissent, citing Webster's Third, defines efficient as "marked by the ability to choose" an effective "means of doing a task." Dissent at —— (quoting Webster's Third New International Dictionary 724–25 (1993)). While that does not change matters, we would be reluctant to infer an extra measure of discretion from that definition given Webster's Third's "notoriously permissive" language. Antonin Scalia & Bryan Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 422 (2013); *see also MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 n.3, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (noting Webster's Third is "widely criticized" for "its portrayal of common error as proper usage").

6 The dissent claims we would prevent the Secretary from "establishing funding conditions that impose obligations that are not already prohibited by law." Dissent at —— (citation modified). Not so. Conditions based on preexisting obligations are an *example* of what would be permissible, but we can envision several other conditions similar to the statutorily enumerated requirements—all of which are materially distinct from those imposed here.

7 Indeed, there appear to be aspects of the grant application process that conflict with these directives. For example, the Local Governments quote a portion of the NOFO requiring applicants to explain how they would "advance racial equity" and address "the needs of LGBTQ+ individuals" in the CoC process. U.S. Dep't of Hous. & Urban Dev., *FY 2024 and 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants*, No. FR-6800-N-25, at 85, 97 (Aug. 29, 2025), https://perma.cc/82JB-VU44.

8 The Local Governments separately claim that the conditions at issue already violate the Spending Clause. The district court did not reach that claim, and we need not either. But we note that the claim remains available to the Local Governments at the merits stage.

9 Nor do we see any merit to the dissent's position that the interim verification guidance "explicitly contemplates a changing verification landscape." Dissent at ——. The interim guidance already requires grant recipients to "continue to comply with any existing or future *legal* requirements for verif[ication]," which, as explained, the verification condition is not. 62 Fed. Reg. at 61347 (emphasis added).

10 For instance, many Local Governments lack access to the SAVE system. In the absence of any guarantee from the government that they would get SAVE, those Local Governments would likely have to bear the costs of developing an equivalent, which would then be subject to further federal approval.

1 https://perma.cc/9MM7-FQFV.

2 Executive Order 14168 provides that,

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

Exec. Order No. 14168, 90 FR 8615 (January 30, 2025).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.